IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission,   ) | |
|   ) | Case No. 20-3758 |
|     Plaintiff,   ) | |
|   ) | The Honorable Thomas M. Durkin |
| v.   ) | |
|   ) | |
| Long Leaf Trading Group, Inc., James A.   ) | |
| Donelson, Timothy M. Evans, Jeremy S. Ruth,   ) | |
| and Andrew D. Nelson,   ) | DEFENDANT DEMANDS |
|   ) | TRIAL BY JURY |
|     Defendants.   ) | |

## DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant, Jeremy S. Ruth ("Ruth"), by and through his undersigned counsel for his

answer to Plaintiff's Complaint, states as follows:

### I.     SUMMARY

1.      From at least June 2015 through December 2019 ("Relevant Period"), Long Leaf
Trading Group, Inc. ("Long Leaf"), by and though, and at the direction of, its principals,
Defendants Timothy M. Evans ("Evans") and James A. Donelson ("Donelson"), and by and
through its agents and employees, including Defendants Jeremy S. Ruth ("Ruth") and Andrew D.
Nelson ("Nelson") (together with Long Leaf, Evans, and Donelson, "LLT Defendants"), engaged
in a scheme to defraud customers in connection with options on futures contracts traded on
designated contract markets, in violation of the Commodity Exchange Act ("Act"), 7 U.S.C §§ 1-
26 (2018), and accompanying Commission Regulations ("Regulations"), 17 C.F.R. pts. 1-190
(2019).

**ANSWER:**    Ruth admits that he worked as an employee at Long Leaf from April 29,
2015 through August 28, 2017, that Evans was a principal, and that options on futures contracts
were traded. Ruth denies each and every remaining allegation contained in paragraph 1 of the
Complaint.

2.      The LLT Defendants knowingly made numerous false and misleading statements
of material fact to retail customers about the success of Long Leaf's "Time Means Money"
("TMM") options trading program. The LLT Defendants touted the success of the TMM program,
claiming that it resulted in profits for customers.

**ANSWER:**    Ruth denies the allegations contained in paragraph 2 of the Complaint as to
himself.  Currently, as to the other Defendants, Ruth lacks information or knowledge sufficient to
form a belief about the truth of the remaining allegations contained in paragraph 2 of the
Complaint.

3.     In reality, substantially all of Long Leaf's customers lost money trading pursuant to the program. The LLT Defendants were aware of this from customer account statements they received, as well as from customers complaining about losses in their accounts. The LLT Defendants nonetheless knowingly or recklessly failed to disclose to, or deliberately withheld from, customers and prospective customers the material fact that substantially all customers lost money trading under the program.

**ANSWER:**     Ruth admits that some of his clients lost money trading in the program and he was aware of some of those losses, but he otherwise denies the remaining allegations contained in paragraph 3 of the Complaint against him.  Currently, as to the other Defendants, Ruth lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations contained in paragraph 3 of the Complaint.

4.     The LLT Defendants also knowingly or recklessly misled customers as to the status of their accounts, claiming that customers made money when in fact they had lost money.

**ANSWER:**     To the extent that the allegations of paragraph 4 involve Ruth, he denies them.  As to the other Defendants, currently, Ruth lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations contained in paragraph 4 of the Complaint.

5.     During the Relevant Period, Long Leaf's more than four hundred customers lost approximately $6.1 million trading pursuant to Long Leaf's recommendations. These recommendations were designed primarily to generate commissions for Long Leaf.

**ANSWER:**     Ruth has insufficient information sufficient to form a belief as to the veracity of the allegations in the first sentence of paragraph 5 of the Complaint.  Ruth denies the second sentence of paragraph 5 of the Complaint.

6.     Long Leaf made more than $4.4 million in commissions from its trade recommendations. These commissions accounted for more than seventy percent of customer losses.

**ANSWER:**     Given the lack of temporal modifier and the failure to identify the subject of clients, Ruth lacks the information or knowledge to form a belief as to the veracity of the allegations contained in paragraph 6 of the Complaint.

7.     As set forth in greater detail below, the LLT Defendants' conduct violates numerous anti-fraud provisions in the Act and Regulations, including, for all Defendants, Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 33.10, 17 C.F.R. § 33.10 (2019) (fraud in connection with options on futures transactions); and Section 4*o* of the Act, 7 U.S.C. § 6*o* (2018) (fraud by a commodity trading advisor), and, for Long Leaf and its principals, Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2019) (fraudulent advertising by a commodity trading advisor).

**ANSWER:**     As to himself, Ruth denies the allegations contained in paragraph 7 of the Complaint. Currently, as to the other Defendants, Ruth lacks information or knowledge sufficient to form a belief about the veracity of the remaining allegations contained in paragraph 7 of the Complaint

1033174\306910391.v3

8.    Long Leaf failed to make required customer disclosures relating to client accounts guided pursuant to a "systematic program that recommends specific trades," in violation of Regulation 4.31(a) and (b), 17 C.F.R. § 4.31(a), (b) (2019). Long Leaf failed to file any such disclosures with the National Futures Association ("NFA"), in violation of Regulation 4.36(d)(1), 17 C.F.R. § 4.36(d)(1) (2019).

**ANSWER:**    As to himself, Ruth denies the allegations contained in paragraph 8 of the Complaint. As to the other Defendants, currently, Ruth lacks information or knowledge sufficient to form a belief about the veracity of the remaining allegations contained in paragraph 8 of the Complaint.

9.    Certain LLT Defendants are liable for registration violations, including failure to register as a commodity trading advisor ("CTA") under Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), and failure to register as associated persons ("APs") under Section 4k(1) of the Act, 7 U.S.C. § 6k(1) (2018), and Regulations 3.12(a) and 33.3(b)(1) and (2), 17 C.F.R. §§ 3.12(a), 33.3(b)(1), (2) (2019).

**ANSWER:**    As to himself, Ruth denies the allegations contained in paragraph 9 of the Complaint. Currently, as to the other Defendants, Ruth lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations contained in paragraph 9 of the Complaint.

10.    Long Leaf's former and current principals, Defendants Evans and Donelson, respectively, are liable for Long Leaf's violations as controlling persons, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018).

**ANSWER:**    Currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 10 of the Complaint.

11.    Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

**ANSWER:**    As to himself, Ruth denies the allegations contain in Paragraph 11 of the Complaint. Currently, as to the other Defendants, Ruth lacks information or knowledge sufficient to form a belief about the veracity of the remaining allegations contained in paragraph 11 of the Complaint.

12.    Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel compliance with the Act and Regulations. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre-and post-judgment interest, and such other relief as the Court may deem necessary and appropriate. The CFTC demands a trial by jury on all issues so triable.

**ANSWER:**    Plaintiff's allegations as to motivation and intent in the first sentence do not require an answer by Ruth, and if they do require an answer, Ruth denies them.  Ruth admits that

3

Plaintiff seeks the relief specified but denies that it is entitled to the same.  Ruth admits that Plaintiff demanded a jury trial.

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

**ANSWER:**     Ruth admits the allegations contained in paragraph 13 of the Complaint.

14.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants transacted business in this District, and certain of the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

**ANSWER:**     Ruth admits the allegations contained in paragraph 14 of the Complaint.

## III.     PARTIES

15.     Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") is an independent federal regulatory agency charged by Congress with administering and enforcing the Act and accompanying Regulations.

**ANSWER:**     Ruth admits the allegations contained in paragraph 15 of the Complaint.

16.     Defendant Long Leaf Trading Group, Inc. is an Illinois corporation with its principal place of business in Chicago, Illinois, which is in turn owned by Donelson Enterprises, Inc., a non-party Illinois corporation. Long Leaf was throughout the Relevant Period, and continues to be, registered with the Commission as an introducing broker ("IB").

**ANSWER:**     Currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 16 of the Complaint.

17.     Defendant Timothy M. Evans is a natural person. Evans was the founder of Long Leaf, as well as its owner and CEO from at least 2009 through December 2017. During that period, Evans resided in Chicago, Illinois. Sometime after 2017, Evans relocated to Tulum, Mexico, where he currently resides. Evans was registered with the Commission as an AP of Long Leaf from 2010 through 2018. Evans has no current registration status with the Commission.

**ANSWER:**     Ruth admits the first, second and last sentence of paragraph 17 of the Complaint.  As to the third sentence of paragraph 17 of the Complaint, Ruth admits that Evans resides in Mexico but is not sure where exactly. As to the fourth sentence of paragraph 17,

4

currently, Ruth lacks information or knowledge sufficient to form a belief about the veracity of the remaining allegations.

18.     Defendant James A. Donelson is a natural person. Donelson has been the CEO of Long Leaf from December 2017 through the present. Donelson resides in Aurora, Illinois. Donelson controls Long Leaf and Donelson Enterprises, Inc. Donelson was registered with the Commission as an AP of Long Leaf from June 2018 through December 2019. Donelson has no current registration status with the Commission.

**ANSWER:**     Currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 18 of the Complaint.

19.     Defendant Jeremy S. Ruth is a natural person. Ruth was registered with the Commission as an AP of Long Leaf from April 2015 through August 2017. During the period he worked for Long Leaf, Ruth resided in Chicago, Illinois. Upon information and belief, Ruth currently splits his time between Chicago, Illinois and Austin, Texas. Ruth has no current registration status with the Commission.

**ANSWER:**     Ruth admits the first sentence of paragraph 19 of the Complaint.  Ruth admits that he was registered as an AP with Long Leaf from April 29, 2015 to August 28, 2017 and denies the remaining allegations of the second sentence of paragraph 19.  Ruth admits the third sentence of paragraph 19 of the Complaint.  Ruth admits that he is not currently registered with Plaintiff, admits he lives in Austin, Texas and denies the remaining allegations of paragraph 19 of the Complaint.

20.     Defendant Andrew D. Nelson is a natural person.  Nelson acted as an AP for Long Leaf from September 2017 through July 2018, by soliciting and accepting customer orders. From July 2018 through November 2018, Nelson worked for Long Leaf reviewing and developing solicitation materials. Nelson resided in Chicago, Illinois while working for Long Leaf.  Upon information and belief, Nelson currently resides Elmhurst, Illinois.  Nelson has never been registered with the Commission as an AP of Long Leaf or in any other capacity.

**ANSWER:**     Currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 20 of the Complaint.

## IV.     FACTUAL ALLEGATIONS

### A. Long Leaf Was an Introducing Broker, Introducing Accounts and Generating Commissions.

21.     Pursuant to relevant parts of Section 1a(31) of the Act, 7 U.S.C. § 1a(31) (2018), an IB is any person "engaged in soliciting or in accepting orders for the purchase or sale of," among other financial instruments, commodity futures, swaps, and commodity options, but who "does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." Throughout the Relevant Period, Long Leaf was an IB, and was registered as such with the Commission.

**ANSWER:**     Ruth admits the allegations contained in paragraph 21 of the Complaint.

5

22.     An IB cannot place customer orders on a designated contract market. Rather, an IB introduces its customers to a futures commission merchant ("FCM"), where each customer must open an account for trading on a designated contract market.

**ANSWER:**     Ruth admits the allegations contained in paragraph 22 of the Complaint.

23.     An IB earns revenue in the form of a commission when a customer places a trade (or when the IB places a trade on behalf of the customer) in an account with the FCM in accordance with the customer's agreement with the IB.

**ANSWER:**     Ruth admits the allegations contained in paragraph 23 of the Complaint.

24.     Commissions are typically assessed on a per-trade basis, on whatever terms are agreed to between the IB and the customer. Commissions are deducted from the customer's account by the FCM, with a portion retained by the FCM and the balance forwarded to the IB. As will be described in greater detail below, during the Relevant Period, Long Leaf introduced customers to certain FCMs and received commissions for orders executed in those customer accounts.

**ANSWER:**     Ruth admits the allegations contained in paragraph 24 of the Complaint.

25.     A person who works for an IB in any capacity that involves the solicitation or acceptance of customer orders, or the supervision of such persons, is referred to as an "associated person" or "AP". Pursuant to relevant provisions of Section 4k(1) of the Act, 7 U.S.C. § 6k(1) (2018), it is unlawful for a person to be associated as an AP of an IB without being registered as such.

**ANSWER:**     Ruth admits the allegations contained in paragraph 25 of the Complaint.

## B. Long Leaf Made Trading Recommendations to Customers as Part of the "Time Means Money Program."

26.     Starting in at least June 2015, Long Leaf began soliciting customers and prospective customers to participate in Long Leaf's so-called "Time Means Money" options trading program.

**ANSWER:**     Ruth admits the allegations contained in paragraph 26 of the Complaint except the program was a broker assisted trading program.

27.     Long Leaf provided customers that agreed to participate in the TMM program with trading recommendations, typically four recommendations every month. Each recommendation was for a different spread trade, with each trade typically involving four out-of- the-money options on futures contracts traded on designated contract markets, i.e., exchanges, such as the Chicago Mercantile Exchange ("CME") and New York Mercantile Exchange ("NYMEX").

**ANSWER:**     Defendant Ruth admits the allegations contained in paragraph 27 of the Complaint for the time that he was associated with Long Leaf.  As to the other periods, currently, Ruth lacks information or knowledge sufficient to form a belief to the veracity of the allegations contained in paragraph 27 of the Complaint.

1033174\306910391.v3

28.     A spread trade is a trade in which a trader simultaneously buys and sells contracts in the same (or related) commodity interests in order to "bracket" the market. An option on futures contract is the right, but not the obligation, to buy or sell a futures contract upon or before expiry of the option at a pre-determined "strike" price.  An option is out-of-the-money if it cannot be profitably exercised at the current market price.

**ANSWER:**     Ruth admits the allegations contained in paragraph 28 of the Complaint.

29.     Every customer participating in the TMM program received the same recommendations as every other customer. The only difference was in the number of contracts recommended per spread trade; customers with more equity, i.e., value, in their accounts would be advised to trade more contracts; customers with less equity would be advised to trade fewer contracts. Customers who desired higher returns would also be advised to trade more contracts; this component of the program was "customized" on an individual basis for participants.

**ANSWER:**     Ruth denies the allegations contained in paragraph 29 of the Complaint as to himself.  Currently, as to the other Defendants, Ruth lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations contained in paragraph 29 of the Complaint.

30.     Long Leaf's APs, including Defendants Ruth and Nelson (collectively, the "AP Defendants"), provided the recommendations to Long Leaf customers typically by email or over the phone.

**ANSWER:**     Ruth admits that he provided TMM recommendations to his customers by e-mail or phone and denies all remaining allegations as to himself. Currently, as to the other Defendants, Ruth lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations contained in paragraph 30 of the Complaint.

31.     Long Leaf did not utilize powers of attorney or letters of direction in connection with the TMM program. Long Leaf's APs instructed customers to simply respond "yes" in a text or email to accept the recommended trades.

**ANSWER:**     Ruth admits the allegations contained in paragraph 31 of the Complaint.

32.     Long Leaf would forward the customer orders to its FCM, either over the phone or via an electronic trading platform. The FCM would then place the orders on the exchange to be executed.

**ANSWER:**     Ruth admits that Long Leaf would forward customer orders to its FCM, but lacks the knowledge to form a belief regarding the means by which Long Leaf transmitted customer orders to its FCM. Ruth admits the allegations contained in the second sentence of paragraph 32 of the Complaint.

33.     Long Leaf was not registered as a CTA even though it was acting as one. Pursuant to relevant parts of Section 1a(12) of the Act, 7 U.S.C § 1a(12), a CTA is a person or entity engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading commodity options in return for

1033174\306910391.v3

compensation. In this case, the compensation took the form of commissions assessed against recommended trades.

**ANSWER:**   Ruth admits that Long Leaf charged customers commissions, but currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the remaining allegations contained in paragraph 33 of the Complaint.

34.   Long Leaf failed to provide customers with certain disclosures required by the Regulations when a CTA guides customer accounts pursuant to a systematic trading program. These required disclosures include, *inter alia*, the CTA's (and the program's) track record, or lack thereof.

**ANSWER:**   Currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 34 of the Complaint.

**C.  Long Leaf APs Made False and Misleading Statements About the Success of the TMM Program.**

35.   Long Leaf, by and through its APs, including the AP Defendants, made false and misleading statements to customers and prospective customers to induce them to participate in the TMM program. Those statements were set forth in various scripts and presentations provided to the APs by management, i.e., Defendants Evans and, later, Donelson, and included the following:

    a.  Long Leaf uses options-selling strategies to "drive results"; the results are attributable to the "basic advantage the seller has," which is that "on average 76.5% of options expire worthless." "[I]f you sell 4 options, there is a strong statistical likelihood you are going to win 3 on those…giving you a much more predictable path to success."

    b.  Long Leaf was founded on the principal that "[w]e should provide our clients a strong return on their investment." Long Leaf measures its success by the success of its clients; "[a]s a company, we wouldn't have the ability to work with hundreds of clients month-after-month for 6 years and oversee millions of dollars if we weren't being profitable for them…."

    c.  Long Leaf combines industry expertise, technical analysis, and a "proprietary algorithm" to "form ideas that have been providing a strong return for our clients."

    d.  Trades recommended by Long Leaf are "more likely than not" to make money for customers.

**ANSWER:**   As to himself, Ruth denies the first sentence of paragraph 35 of the Complaint. As to the other defendants, Ruth lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in the first sentence of paragraph 35 of the Complaint. Ruth admits that he and other representatives were provided scripts and presentations by Evans and denies that he was provided scripts and presentations by Donelson for the period that he worked at Long Leaf. Ruth lacks the knowledge to form a belief regarding whether any scripts

and presentation provided to him by Evans contained false and misleading statements. As to the specific examples cited, Ruth admits that the statements, or something similar, were used in scripts or the presentations as shown in examples a and c but denies that the statements set forth in examples b and d were used in the scripts or presentations. Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the use of examples a, b, c, or d when he was not working for Long Leaf.

36.     Promotional materials utilized by Long Leaf also included a power point presentation showing an annual return of twelve percent on a $100,000 account with Long Leaf. Long Leaf APs, including the AP Defendants, showed this presentation to prospective customers (via the web) and told them it would be "easy" to achieve a twelve percent return with TMM.

**ANSWER:**     Ruth denies the allegations of paragraph 36 of the Complaint as to himself. Currently, Ruth has insufficient information and knowledge sufficient to form a belief as to the veracity of the allegations in paragraph 36 as to the other defendants, or times when he did not work for Long Leaf.

37.     Long Leaf APs, including the AP Defendants, made some or all of these false and misleading statements to substantially every customer and prospective customer throughout the Relevant Period.

**ANSWER:**     Ruth denies the allegations of paragraph 37 of the Complaint as to himself. As to the other defendants, Ruth lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations contained in paragraph 37 of the Complaint.

**D. Substantially All Customers Lost Money in the TMM Program.**

38.     In reality, substantially all Long Leaf customers lost money under the TMM program. Not only that, many customers lost all funds deposited in their accounts. In many cases, these were customers' retirement accounts.

**ANSWER:**     Ruth admits that some of his customers lost money under the TMM program but he is unable to admit nor deny the allegations contained because the terms "many" and "substantially" are imprecise. Therefore, currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the remaining allegations contained in paragraph 38 of the Complaint.

39.     During the Relevant Period, more than four hundred Long Leaf customers lost more than $6.1 million trading pursuant to Long Leaf's recommendations. The TMM program was a failure for Long Leaf's customers from the outset; in the first two months of the program, June and July of 2015, customers lost $348,000. In the first nineteen months of the program, i.e., through the end of December 2016, customers lost $1.53 million. Customers continued to lose money each year after that; $2.35 million in 2017, $1.5 million 2018, and $809,000 in 2019.

**ANSWER:**     Currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 39 of the Complaint.

**E. The LLT Defendants Were Aware of Customer Losses.**

40. Long Leaf's principals, Defendants Evans and, later, Donelson, were aware that customers lost money trading under the TMM program. Evans and Donelson knew customers were losing money because they monitored the recommended trades on a real-time basis. They also received daily account statements showing losses in substantially all customer accounts. Moreover, Evans and Donelson received calls and emails from customers complaining about losses in their accounts.

**ANSWER:** Currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 40 of the Complaint.

41. Long Leaf APs, including the AP Defendants, were aware of customer losses as well. Long Leaf APs received daily account statements for their customers. Long Leaf APs, including the AP Defendants, also received complaints from their customers about the poor performance of their accounts.

**ANSWER:** Ruth admits that he heard from various clients about performance of their accounts and admits that he received daily statements for his clients trades executed the prior day. Ruth denies the remaining allegations in paragraph 41 of the Complaint as to himself. As for the remaining Defendants, currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 41 of the Complaint.

42. Despite their knowledge of customer losses, Long Leaf, through its APs, including the AP Defendants, continued to misrepresent that trading under the TMM program was profitable for customers.

**ANSWER:** Ruth denies that he made misrepresentations about the TMM program and has insufficient information or knowledge to form a belief as to the veracity of the "customer losses" as the time period is not specified. As for the remaining defendants, currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 42 of the Complaint.

**F. The LLT Defendants Concealed Losses from Customers and Prospective Customers.**

43. The LLT Defendants actively concealed losses from customers and prospective customers. Long Leaf had a policy of refusing to provide customers or prospective customers with historical trading results, average returns, or any kind of track record. The policy was instituted by Evans, and continued under Donelson.

**ANSWER:** Ruth denies the allegations of paragraph 43 of the Complaint for the time that he worked for Long Leaf. Ruth has insufficient information or knowledge to form a belief as to the allegations' veracity for the period he was not working for Long Leaf or for the other defendants

44. When customers asked if Long Leaf's recommendations were profitable for customers, Long Leaf APs, including the AP Defendants, claimed falsely that it was illegal for Long Leaf to provide that information.

**ANSWER:** Ruth denies the allegations of paragraph 44 of the Complaint as to himself. As for the other Defendants, currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 44 of the Complaint.

45. Long Leaf provided APs with a script for how to deal with requests for past performance. The script instructed APs to tell customers that they could "sit here and show you trades and WOW you or something like that," but the "success" of the TMM program is attributable to its "structure," i.e., recommending spread trades in options on uncorrelated commodity futures.

**ANSWER:** Ruth denies the allegations of paragraph 45 of the Complaint as to himself. Currently, Ruth has insufficient information and knowledge sufficient to form a belief as to the veracity of the allegations in paragraph 45 of the Complaint as to the other defendants or for the time that he did not work for Long Leaf.

46. Long Leaf APs, including the AP Defendants, used the script regularly throughout the Relevant Period.

**ANSWER:** Ruth denies the allegations of paragraph 46 for himself. Currently, Ruth has insufficient information and knowledge sufficient to form a belief as to the veracity of the allegations in paragraph 46 of the Complaint as to the other defendants or for the time that he did not work for Long Leaf.

**G. The LLT Defendants Took Advantage of Customer Confusion.**

47. Long Leaf's customers were retail customers. Many customers had difficulty understanding the account statements they received from the FCM. Long Leaf APs, including the AP Defendants, took advantage of their customers' confusion.

**ANSWER:** Ruth admits the first sentence of paragraph 47 and denies the third sentence of paragraph 47 as to himself. As for the second sentence, Ruth admits that some of his customers had trouble comprehending certain information on the account statements received from the FCM, and denies the remaining allegations in that sentence. As for the remaining Defendants, currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in second and third sentences of paragraph 47 of the Complaint.

48. Sometimes Long Leaf APs, including the AP Defendants, would tell a customer that he or she had made money when in fact the customer had lost money. Other times they would tell a customer that he or she had made money on one of the recommended trades while failing to mention the customer had lost money on the other three.

**ANSWER:** Ruth denies the allegations against him contained in paragraph 48 of the Complaint. As for the other Defendants currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 48 of the Complaint.

49. For customers who understood they were losing money, Long Leaf APs, including the AP Defendants, would sometimes claim (falsely) that account statements did not reflect "unrealized P&L." Other times, they would acknowledge the losses, but claim that Long Leaf

11

tended to "perform well coming out of [ ] periods where we take a loss" because of "volatility." This was untrue.

**ANSWER:** Ruth has insufficient information or knowledge to form a belief as to the veracity of the allegations while he did not work at Long Leaf or while he worked at Long Leaf, what other defendants did or said, etc. Ruth denies the allegations contained in paragraph 49 of the Complaint against him.

**H. Long Leaf Made Millions in Commissions from the TMM Program.**

50. From a sales perspective, the TMM program was a great success. Within a few months after the program was introduced, substantially all Long Leaf customers were participating in it.

**ANSWER:** Ruth lacks information and knowledge sufficient to form a belief as to the veracity of the allegation in paragraph 50 of the Complaint.

51. Long Leaf's revenues expanded dramatically as a result of the TMM program. Before the program, Long Leaf was dependent on commissions from self-directed customers, or from one-off trading recommendations. The TMM program allowed Long Leaf to systemically generate commissions on a large scale by selling customers on the "idea" of the program.

**ANSWER:** Ruth lacks information and knowledge sufficient to form a belief as to the veracity of the allegation in paragraph 51 of the Complaint. Ruth admits that his clients in the program were charged commissions, but he lacks information to form a belief as to the remaining allegations contained in paragraph 51 because of the word "dramatically" and because his role was not as a principal or officer.

52. While customers lost money, Long Leaf made money in the form of its share of commissions received from the FCM executing recommended trades and carrying the customer accounts. During the Relevant Period, the TMM program generated more than $4.4 million in commissions for Long Leaf. Long Leaf made $373,000 from the program in 2015; $1.25 million in 2016; $1.54 million in 2017; $869,000 in 2018; and $369,000 in 2019.

**ANSWER:** As to the first sentence of paragraph 52, Ruth is unable to admit or deny the allegations because there is no explanation as to how "losses" were calculated, nor is there a temporal modifier. Ruth admits that Long Leaf was paid commissions for executing trades but lacks knowledge to form a belief as to whether Long Leaf "made money." Ruth lacks sufficient information or knowledge to admit the veracity of the allegations contained in the second sentence of paragraph 52.

**I. Long Leaf's Trade Recommendations Were Designed to Maximize Commissions.**

53. Long Leaf's trading recommendations were designed primarily to generate commissions. The trades had little potential economic benefit for customers. Even if the trades won, it was not possible for them to win much.

**ANSWER:** Ruth lack information or knowledge to admit the allegations of paragraph 53 for times he was not registered with Long Leaf. As to the other periods, Ruth denies the allegations as to himself. Currently, Ruth has insufficient information or knowledge to form a belief as to the veracity of the allegations against the other Defendants.

54. On the occasions when one of Long Leaf's recommended trades did win, Long Leaf's commissions typically resulted in net losses for customers. Indeed, the $4.4 million in commissions received by Long Leaf accounted for more than seventy percent of the $6.1 million that customers lost.

**ANSWER:** For the time Ruth was registered with Long Leaf, he denies the first sentence of paragraph 54 as to himself. For the period he was not at Long Leaf, Ruth has insufficient information and knowledge to admit the veracity of the first sentence of paragraph 54. As for the second sentence of paragraph 54, Ruth lacks information and knowledge to form a belief as to the veracity of the allegations.

55. By recommending four trades a month, each consisting of four legs, i.e., four individual option trades, the TMM program allowed Long Leaf to generate at least sixteen commissions per customer every month. This had the effect of steadily depleting customer accounts over time.

**ANSWER:** Ruth denies the allegations contained in paragraph 55 of the Complaint.

56. Long Leaf APs, including the AP Defendants, shared in these commissions.

**ANSWER:** Ruth admits the allegations of paragraph 56 for the period that he was registered with Long Leaf. As for the remaining periods, currently, Ruth lacks information or knowledge sufficient to form a belief as to the veracity of the allegations contained in paragraph 56.

**J. Defendant Ruth Knowingly Made False and Misleading Statements and Omissions to Customers and Prospective Customers.**

57. As set forth above, Ruth worked as an AP of Long Leaf from at least April 2015 through August 2017. Ruth was one of Long Leaf's most prolific and highest-paid APs.

**ANSWER:** Ruth admits that he worked at Long Leaf from April 28, 2015 to August 28, 2017 and denies all other allegations in the first sentence of paragraph 57 of the Complaint. Ruth lacks information and knowledge sufficient to admit the veracity of the allegations contained in the second sentence of paragraph 57.

58. Ruth made numerous false and misleading statements to customers and prospective customers about profits and losses in the TMM program. In investigative testimony, Ruth admitted that he followed the script given to him by Evans. This included the representations set forth above in paragraph 35.

13

1033174\306910391.v3

**ANSWER:** Ruth denies the first and third sentences of paragraph 58. As for the second sentence of paragraph 58, Ruth admits discussing scripts in his investigative testimony but denies that he "followed the script given to him by Evans."

59. For example, in a May 3, 2017, call with Prospective Customer A (an eighty-one year old Vietnam veteran), Ruth represented:

      a. Because "76.5% of options expire worthless," Long Leaf customers have a "higher probability of winning;"

      b. It is "very easy to … accomplish 12% on an annual basis."

**ANSWER:** Ruth is unable to answer the allegations contained in paragraph 59 of the Complaint because he lacks the information and knowledge regarding the phone call, including the identity of the Prospective Customer A, the topics of the call, and whether he made the statements alleged in paragraph 59.

60. Ruth made these or other similar statements to substantially every customer or prospective customer during his tenure at Long Leaf.

**ANSWER:** Ruth denies the allegations of paragraph 60 of the Complaint.

61. Ruth also made off-script misrepresentations to customers and prospective customers about the profitability of Long Leaf's trading recommendations. In an email dated July 25, 2017, for example, Ruth wrote to Customer B: "Normally with a 10k account my clients target $500 to $1000 per month. Obviously there are going to be months where we don't win, but getting an average of win in that range is a realistic target." Earlier the same day, Ruth had sent an email to Evans about $16,000 in losses in a different customer's account.

**ANSWER:** Ruth denies the allegations of the first sentence of paragraph 61. As to the remaining allegations, Ruth is unable to answer the allegations contained in paragraph 61 because he lacks the information and knowledge to form a belief as to the veracity of the allegations regarding whether he, in fact, sent the first email referred to, the contents of the purported email, the identity of the prospective customer to whom he allegedly sent the email or concerning whether he, in fact, sent the second purported email or the contents thereof.

62. Ruth knew that his statements to customers were false. Ruth received daily account statements for the customers that he serviced. Some of those customers Ruth originated; others he inherited from APs that had left the firm. Substantially all of the customers' accounts had lost money.

**ANSWER:** Ruth denies the first and second sentences of paragraph 62. As to the third sentence, Ruth admits it. As to the last sentence of paragraph 62 of the Complaint, Ruth has insufficient information or knowledge to form a belief as to the veracity of the allegations because the phrase "lost money," is unclear and the allegation has no temporal modifier. In the alternative, Ruth denies the last sentence of paragraph 62 of the Complaint.

14

63.     Ruth also fielded customer calls and emails complaining about losses in their accounts. For example, on August 30, 2016, Customer C sent Ruth an email complaining that: "My account is down 33% when I look at my cash balance. At this point, I need a 50% return on current capital just to get back to where we started a year ago. Even if you met the targeted 20% return per year that we initially discussed, it will be 2+ years to recover." Ruth received similar complaints throughout his tenure at Long Leaf.

**ANSWER:**     Ruth admits the first sentence of paragraph 63, but Ruth is unable to answer the remaining allegations of paragraph 63 of the Complaint, including whether or not he, in fact, received an email on the date specified, whether the email was from the customer referred to above and, containing the contents of the above described email in the rest of paragraph 63 because the email described was purportedly from 4 years ago and the customer is not sufficiently identified. Ruth denies the last sentence of paragraph 63 of the Complaint.

64.     Starting as early as April 2017, Ruth started personally tracking returns on each recommended trade. Substantially all of them were losses; in an April 13, 2017, email, for example, Ruth sent a chart to two other Long Leaf APs showing losses of $970 per customer for the previous month's recommendations. Ruth continued to track losses on a per-trade basis through the end of the Relevant Period. Ruth nonetheless continued to misrepresent to customers that trading with TMM would be profitable.

**ANSWER:**     Ruth denies the first sentence of paragraph 64 of the Complaint.  As to the second sentence, Ruth denies that substantially all of the trades were losses, and Ruth has insufficient information or knowledge to form a belief as to the veracity of the remaining allegations of the second sentence of paragraph 64 because no terms of the particular options on futures trades were specified  and the other APs names are withheld. Ruth denies the third and fourth sentence of paragraph 64 in the Complaint.

65.     Pursuant to Long Leaf's policy, Ruth did not tell any customer or prospective customer that almost all of Long Leaf's customers lost money. Ruth encouraged other Long Leaf APs to do the same. In an April 27, 2017, email to another AP, Ruth attached a recording from a recent sales call, advising the AP that "the value in this call is how to get around a request for a track record and how to show empathy so he feels you understand him."

**ANSWER:**     Ruth denies the first and second sentences of paragraph 65 of the Complaint. As for the third sentence, Ruth has insufficient information or knowledge to form a belief as to the veracity of allegations concerning whether Ruth, in fact sent the email, whether a recording was attached and whether the quoted language was contained in either the email or the recording as the purported events took place more than three (3) years ago and the other AP was not identified.

66.     Ruth misled customers as to the status of their accounts. For example, on June 22, 2017, Customer D wrote to Ruth complaining about account losses. Ruth wrote back: "[W]e are then re-initiating the portfolio, we are now capturing that existing volatility with higher premiums on our option sales. This is why we tend to perform well coming out of these periods where we take a loss."

**ANSWER:** Ruth denies the first sentence of the paragraph 66 of the Complaint. Ruth is unable to answer the remaining allegations contained in the rest of paragraph 66 of the Complaint including whether he received an email on the date specified, the subject of that email and his alleged response because the email is from three (3) years ago and the customer is not sufficiently identified.

67. During the Relevant Period, Ruth was paid approximately $300,000 by Long Leaf, primarily in the form of commissions.

**ANSWER:** Ruth has insufficient knowledge or information to form a belief as to the veracity of the allegations contained in paragraph 67 of the Complaint.

**K. Defendant Nelson Knowingly Made False and Misleading Statements and Omissions to Customers and Prospective Customers.**

68. As set forth above, Nelson acted in the capacity of an AP of Long Leaf from at least September 2017 through at least July 2018. Nelson was not, however, registered as an AP of Long Leaf as required by the Act and Regulations.

**ANSWER:** Currently, Ruth is unable to answer the allegations contained in paragraph 68 of the Complaint because he lacks the information and knowledge as to the veracity of the allegations.

69. Nelson made numerous false and misleading statements to customers and prospective customers about profits and losses in the TMM program. In investigative testimony, Nelson admitted that he followed the script given to him by Evans. This included the representations set forth above in paragraph 35.

**ANSWER:** Currently, Ruth is unable to answer the allegations contained in paragraph 69 because he lacks the information and knowledge as to the veracity of the allegations.

70. For example, in a January 4, 2018, call with Customer E, Nelson represented:

　　a. "As a company we would not have the ability to work with hundreds of clients month after month for nine years and oversee millions if we were not being profitable for our clients"

　　b. "Tim [Evans] uses a proprietary methodology to then blend all these ideas together that have been providing strong returns for our clients."

**ANSWER:** Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 70 of the Complaint.

71. Nelson made these or other similar statements to substantially every customer or prospective customer during his tenure at Long Leaf.

**ANSWER:** Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 71 of the Complaint.

16

1033174\306910391.v3

72.     Nelson made additional, off-script misrepresentations to customers and prospective customers about the profitability of Long Leaf's trading recommendations. For example, in a May 3, 2018, call with Customer F, Nelson represented: "For the last month what I've done for the more aggressive guys I have…they are up a little bit over fifty percent; my more conservative guys are more around the thirty-two, thirty-five percent mark."

**ANSWER:**     Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 72 of the Complaint.

73.     Nelson knew that his statements to customers were false. Nelson received daily account statements for the customers that he serviced. Some of those customers Nelson originated; others he inherited from APs that had left the firm. Substantially all of the customers' accounts had lost money.

**ANSWER:**     Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 73 of the Complaint.

74.     Nelson also fielded customer calls and emails complaining about losses in their accounts. For example, on January 29, 2018, Customer G sent an email to Nelson complaining that his account balance had decreased from $30,000 to $12,000. Nelson responded by falsely assuring Customer G that his account statements do not reflect "unrealized P&L." Nelson received similar complaints throughout his tenure at Long Leaf.

**ANSWER:**     Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 74 of the Complaint.

75.     Pursuant to Long Leaf's policy, Nelson never provided any track record or accurate information about returns to any customer or prospective customer. Nelson did not tell any customer or prospective customer that almost all of Long Leaf's customers lost money. In investigative testimony, Nelson acknowledged that he failed to disclose losses to customers because "that's not going to get us any more client capital."

**ANSWER:**     Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 75 of the Complaint.

76.     Nelson also lied to customers about his ability to share information regarding historic returns. In a November 1, 2017, call, for example, Nelson explained to customer H that he was precluded from disclosing Long Leaf's track record because of "HIPAA." HIPAA is the Health Insurance Portability and Accountability Act and does not preclude the disclosure of trading returns.

**ANSWER:**     Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 76 of the Complaint.

77.     Nelson additionally misled customers as to the status of their accounts. For example, on February 5, 2018, Customer I wrote to Nelson asking how the most recent trade went; Nelson responded that "3/4 are hitting our profit target already…between 100 - 200%." In reality,

three out of the four recommended trades had lost money, for a net loss of $2,200 in Customer I's account.

**ANSWER:** Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 77 of the Complaint.

78. During the Relevant Period, Nelson was paid approximately $33,000, a combination of commissions and salary (for assisting in developing solicitation materials).

**ANSWER:** Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 78 of the Complaint.

## V. STATUTORY AND REGULATORY VIOLATIONS

### COUNT I
### Fraud in Connection with Options on Futures Contracts
### Violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and
### Regulation 33.10, 17 C.F.R. § 33.10 (2019)
### (Against all LLT Defendants)

79. The allegations set forth in paragraphs 1 through 78 above are re-alleged and incorporated as if fully set forth herein.

**ANSWER:** Ruth realleges its answers to paragraphs 1 – 78 as though fully set forth herein.

80. 7 U.S.C. § 6c(b) provides that no person shall offer to enter into, enter into, or confirm the execution of, any transaction involving a commodity which is of the character of, or is commonly known to the trade as, an "option," contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

**ANSWER:** Ruth admits the allegations contained in paragraph 80 of the Complaint.

81. 17 C.F.R. § 33.10 provides that it shall be unlawful for any person directly or indirectly to: (a) cheat or defraud or attempt to cheat or defraud any other person; (b) make or cause to be made to any other person any false report or statement thereof; or (c) deceive or attempt to deceive any other person by any means whatsoever, in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

**ANSWER:** Ruth admits the allegations contained in paragraph 81 of the Complaint.

82. As set forth above in paragraphs 1 through 78, the LLT Defendants engaged in a fraudulent scheme with respect to the TMM program, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10. The LLT Defendants did so by knowingly or recklessly making false and misleading statements to customers and prospective customers about the profitability of trading pursuant to recommendations provided by Long Leaf.

1033174\306910391.v3

**ANSWER:** Ruth lacks information or knowledge sufficient to form a belief about the veracity of the allegations occurring before or after he worked for Long Leaf. As to the remaining allegations of paragraph 82 the of the Complaint that are directed against Ruth, he denies them. Currently, Ruth has insufficient information or knowledge to form a belief as to the veracity of the allegations against the other defendants.

83. Moreover, the LLT Defendants knowingly or recklessly failed to disclose that substantially all customers lost money trading pursuant to Long Leaf's recommendations. This is a fact that a reasonable investor would find material in determining whether to invest, and without which other statements by the LLT Defendants were misleading.

**ANSWER:** Ruth lacks information or knowledge sufficient to form a belief about the veracity of the allegations occurring before or after he worked for Long Leaf. As to the remaining allegations of paragraph 83 the of the Complaint that are directed against Ruth, he denies them. Currently, Ruth has insufficient information or knowledge to form a belief as to the veracity of the allegations against the other defendants.

84. The false and misleading statements and omissions made by the officers, agents, or other persons acting by or on behalf of Long Leaf, including Long Leaf's APs, were made within the scope of each such person's agency or employment. As such, Long Leaf is liable for each such person's false or misleading statements or omissions pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019).

**ANSWER:** Ruth lacks information or knowledge sufficient to form a belief about the veracity of the allegations occurring before or after he worked for Long Leaf. As to the remaining allegations of paragraph 84 the of the Complaint that are directed against Ruth, he denies them. Currently, Ruth has insufficient information or knowledge to form a belief as to the veracity of the allegations against the other defendants.

85. Defendant Evans was the founder, CEO, and owner of Long Leaf from at least June 2015 through December 2017, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Evans controlled Long Leaf during that period. Evans did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Evans is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least June 2015 through December 2017, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018).

**ANSWER:** Ruth admits the first two sentences of paragraph 85 of the Complaint. Currently, Ruth has insufficient information and knowledge to form a belief as to the veracity of the remaining allegations contained in paragraph 85 of the Complaint.

86. Defendant Donelson was the CEO of Long Leaf from at least December 2017 through the present, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Donelson controlled Long Leaf during that period. Donelson did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's

violations of the Act and Regulations. Accordingly, Donelson is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least December 2017 through the present, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:** Currently Ruth lacks information sufficient to form a belief as to the veracity of the allegations contained in paragraph 86 of the Complaint.

**COUNT II**
**Fraud by a Commodity Trading Advisor**
**Violation of Section 4*o* of the Act, 7 U.S.C. § 6*o* (2018)**
**(Against all LLT Defendants)**

87.     The Act defines a commodity trading adviser ("CTA"), in relevant part, as a person who, for compensation of profit, engages in the business of advising others as to the value of or the advisability of trading in commodity options, including options on futures contracts. 7 U.S.C. § 1a(12)(A)(i), (ii) (2018).

**ANSWER:** Ruth admits the allegations contained in paragraph 87 of the Complaint.

88.     During the Relevant Period, and as set forth in paragraphs 1 through 78, Long Leaf provided customers with recommendations for trading options on futures contracts pursuant to the TMM program. Long Leaf did so for compensation or profit, which it received in the form of commissions paid to it by FCMs on a per-trade basis. As such, Long Leaf was acting in the capacity of a CTA within the meaning of the Act.

**ANSWER:** Ruth lacks knowledge sufficient to form a belief of the allegations for the period that he was not working for Long Leaf.  Ruth incorporates his prior responses to paragraphs 1-78 as to whether "During the Relevant Period. . . Long Leaf provided customers with recommendations for trading options on futures contracts pursuant to the TMM program." Ruth admits that customers of Long Leaf paid their FCM on a per trade basis, but denies that such commissions were for "compensation or profit" as alleged in second sentence of paragraph 88 of the Complaint. Ruth denies the last sentence of paragraph 88 of the Complaint.

89.     7 U.S.C. § 6*o* (a) provides that it shall be unlawful for a CTA or associated person thereof, directly or indirectly, to: (a) employ any device, scheme, or artifice to defraud a customer or prospective customer; or (b) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any customer or prospective customer.

**ANSWER:** Ruth admits the allegations contained in paragraph 89 of the Complaint.

90.     As set forth above in paragraphs 1 through 78, Long Leaf engaged in a fraudulent scheme with respect to the TMM program, in violation of 7 U.S.C. § 6o. Long Leaf did so by knowingly or recklessly making false and misleading statements to customers and prospective customers, through its employees and agents, about the profitability of trading pursuant to recommendations provided by Long Leaf.

**ANSWER:** Ruth lacks knowledge sufficient to form a belief of the allegations for the period that he was not working for Long Leaf.  Ruth denies the remaining allegations of paragraph

20

90 of the Complaint against himself. As for the other defendants, currently, Ruth lacks knowledge sufficient to form a belief as to the veracity of the allegations contained in the remaining allegations in paragraph 90 of the Complaint.

91. Moreover, Long Leaf knowingly or recklessly failed to disclose, acting through its employees and agents, that substantially all customers lost money trading pursuant to Long Leaf's recommendations. This is a fact that a reasonable investor would find material in determining whether to invest, and without which other statements by the LLT Defendants were misleading.

**ANSWER:** Ruth lacks knowledge sufficient to form a belief of the allegations for the period that he was not working for Long Leaf. To the extent that any allegation in paragraph 91 is directed against Ruth, he denies same. To the extent an allegations in paragraph 91 is argumentative, Ruth denies such allegation. As for the other defendants, currently, Ruth lacks knowledge sufficient to form a belief as to the veracity of the allegations contained in the remaining allegations in paragraph 91 of the Complaint.

92. The false and misleading statements and omissions made by the officers, agents, or other persons acting by or on behalf of Long Leaf, including Long Leaf's APs, were made within the scope of each such person's agency or employment. As such, Long Leaf is liable for each such person's false or misleading statements or omissions pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

**ANSWER:** Ruth lacks knowledge sufficient to form a belief of the allegations for the period that he was not working for Long Leaf. To the extent that any allegation in paragraph 92 of the Complaint is directed at Ruth, he denies such allegations. As for the other defendants, currently, Ruth lacks knowledge sufficient to form a belief as to the veracity of the allegations contained in the remaining allegations in paragraph 92 of the Complaint.

93. Defendant Evans was the founder, CEO, and owner of Long Leaf from at least June 2015 through December 2017, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Evans controlled Long Leaf during that period. Evans did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Evans is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least June 2015 through December 2017, pursuant 7 U.S.C. § 13c(b).

**ANSWER:** Ruth admits the first and second sentence of paragraph 93 of the Complaint. As for the remaining allegations, Ruth lacks information and knowledge sufficient to form a belief as to the veracity of the allegations in paragraph 93 of the Complaint.

94. Defendant Donelson was the CEO of Long Leaf from at least December 2017 through the present, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Donelson controlled Long Leaf during that period. Donelson did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Donelson is liable for Long Leaf's violations

of the Act and Regulations committed during the period of at least December 2017 through the present, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:** Currently, Ruth lacks information and knowledge sufficient to form a belief as to the veracity of the allegations in paragraph 94 of the Complaint.

95. Defendants Ruth and Nelson are liable pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2018), for aiding and abetting Long Leaf's CTA fraud. As set forth above, the AP Defendants knowingly made misstatements and omissions of material fact in order to further Long Leaf's fraudulent business.

**ANSWER:** Ruth denies the allegations in paragraph 95 of the Complaint as to himself. As for Defendant Nelson, Ruth lacks information and knowledge sufficient to form a belief as to the veracity of the allegations in paragraph 95 of the Complaint.

## COUNT III
### Fraudulent Advertising by a Commodity Trading Advisor
### Violation of Regulation 4.41, 17 C.F.R. § 4.41(a) (2019)
### (Against Long Leaf, Evans, and Donelson)

96. 17 C.F.R. § 4.41(a) makes it unlawful for a CTA or any principal thereof to advertise in a manner which: (1) employs any device, scheme or artifice to defraud any customer or prospective customer; or (2) involves any transaction, practice or course of business which operates as a fraud or deceit upon any customer or prospective customer. This prohibition applies, *inter alia*, to the texts of standardized oral presentations. 17 C.F.R. § 4.41(c)(1).

**ANSWER:** Ruth makes no answer to the allegations in Count III insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, he denies them.

97. As set forth above in paragraphs 1 through 78, Long Leaf APs made fraudulent misrepresentations and omissions to customers and prospective customers about the profitability of trading pursuant to recommendations provided by Long Leaf. These misrepresentations and omissions were set forth in scripts, i.e., standardized oral presentations, which APs delivered to customers and prospective customers. The scripts were provided and approved by the principals of Long Leaf, Evans and Donelson.

**ANSWER:** Ruth makes no answer to the allegations in Count III insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, he denies them.

98. Defendants Long Leaf, Evans, and Donelson therefore engaged in fraudulent advertising in violation of 17 C.F.R. § 4.41(a).

**ANSWER:** Ruth makes no answer to the allegations in Count III insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, he denies them.

99. Defendant Evans was the founder, CEO, and owner of Long Leaf from at least June 2015 through December 2017, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf.

22

As such, Evans controlled Long Leaf during that period. Evans did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Evans is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least June 2015 through December 2017, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:**     Ruth makes no answer to the allegations in Count III insofar as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

100.     Defendant Donelson was the CEO of Long Leaf from at least December 2017 through the present, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Donelson controlled Long Leaf during that period. Donelson did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Donelson is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least December 2017 through the present, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:**     Ruth makes no answer to the allegations in Count III insofar as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

## COUNT IV
### Failure to Register as a Commodity Trading Advisor
### Violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018)
### (Against Long Leaf, Evans, and Donelson)

101.     7 U.S.C. § 6m(1) requires a person acting as a CTA to register as such with the CFTC if the person makes use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CTA.

**ANSWER:**     Ruth makes no answer to the allegations in Count IV insofar as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

102.     An IB that guides the majority of customer accounts pursuant to a "trading program" is generally required to register as a CTA. Long Leaf was not otherwise exempt from registration as a CTA.

**ANSWER:**     Ruth makes no answer to the allegations in Count IV insofar as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

103.     Long Leaf guided the majority of its customer accounts through recommendations pursuant to the TMM program in the manner set forth above in paragraphs 1 through 78.

**ANSWER:**     Ruth makes no answer to the allegations in Count IV insofar as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

104.     Long Leaf used the instrumentalities of interstate commerce in connection with its CTA business, including email, the internet, and the telephone.

1033174\306910391.v3

**ANSWER:** Ruth makes no answer to the allegations in Count IV insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, he denies them.

105. Despite these facts, Long Leaf has never been registered as a CTA. Long Leaf therefore violated 7 U.S.C. § 6m(1).

**ANSWER:** Ruth makes no answer to the allegations in Count IV insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, he denies them.

106. Defendant Evans was the founder, CEO, and owner of Long Leaf from at least June 2015 through December 2017, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Evans controlled Long Leaf during that period. Evans did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Evans is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least June 2015 through December 2017, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:** Ruth makes no answer to the allegations in Count IV insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, he denies them.

107. Defendant Donelson was the CEO of Long Leaf from at least December 2017 through the present, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Donelson controlled Long Leaf during that period. Donelson did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Donelson is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least December 2017 through the present, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:** Ruth makes no answer to the allegations in Count IV insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, he denies them.

**COUNT V**
**Failure to Provide Required Disclosures for Trading Program**
**Violation of Regulation 4.31(a) and (b), 17 C.F.R. § 4.31(a), (b) (2019), and**
**Regulation 4.36(d)(1), 17 C.F.R. § 4.36(d)(1) (2019)**
**(Against Long Leaf, Evans, and Donelson)**

108. 17 C.F.R. § 4.31(a) requires a CTA registered or required to be registered to provide each customer or prospective customer with a detailed disclosure statement if the CTA seeks to guide the customer's account pursuant to a systematic program that recommends specific transactions, i.e., a "trading program."

**ANSWER:** Ruth makes no answer as to the allegations contained in Count V insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, the denies them.

24

109.     The required disclosure statement must include certain specific information relating to the track record (or lack of a track record) for the program, including:

      a.  the annual and year-to-date rate of return for the program specified for the five most recent calendar years and year-to-date, computed on a compounded monthly basis, and with monthly rates of return; and

      b.  the number of accounts traded pursuant to the offered trading program that were opened and closed with a negative net lifetime rate of return as of the date the account was closed.

17 C.F.R. § 4.35(a)(1) (2019).

**ANSWER:**     Ruth makes no answer as to the allegations contained in Count V insofar as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, the denies them.

110.     Before guiding any customer account pursuant to such a trading program, the CTA must obtain a signed and dated acknowledgement from the customer that the customer has received the disclosure statement. 17 C.F.R. § 4.31(b). The CTA must also provide a copy of the disclosure statement to NFA at least three weeks before it plans to offer the trading program to customers or prospective customers. 17 C.F.R. § 4.36(d)(1).

**ANSWER:**     Ruth makes no answer as to the allegations contained in Count V insofar as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, the denies them.

111.     As set forth above in paragraphs 1 through 78, Long Leaf is required to be registered as a CTA. Long Leaf nonetheless failed to provide customers or prospective customers with the required disclosures or obtain the required acknowledgement. Long Leaf likewise failed to file the required disclosure statement with the NFA.

**ANSWER:**     Ruth makes no answer as to the allegations contained in Count V insofar as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, the denies them.

112.     Long Leaf therefore violated 17 C.F.R. § 4.31(a), (b) and 17 C.F.R. § 4.36(d)(1).

**ANSWER:**     Ruth makes no answer as to the allegations contained in Count V insofar as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, the denies them.

113.     Defendant Evans was the founder, CEO, and owner of Long Leaf from at least June 2015 through December 2017, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Evans controlled Long Leaf during that period. Evans did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Evans is liable for Long Leaf's

violations of the Act and Regulations committed during the period of at least June 2015 through December 2017, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:** Ruth makes no answer as to the allegations contained in Count V insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, the denies them.

114. Defendant Donelson was the CEO of Long Leaf from at least December 2017 through the present, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Donelson controlled Long Leaf during that period. Donelson did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Donelson is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least December 2017 through the present, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:** Ruth makes no answer as to the allegations contained in Count V insofar as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, the denies them.

### COUNT VI
### Failure to Register as Associated Persons
### Violation of Section 4k(1) of the Act, 7 U.S.C. § 6k(1) (2018), Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2019), and Regulation 33.3(b)(1) and (2), 17 C.F.R. § 33.3(b)(1), (2) (2019)
### (Against Long Leaf, Donelson, Evans, and Nelson, Variously)

115. 7 U.S.C. § 6k(1) provides that it shall be unlawful for a person to be associated with an IB as a partner, officer, employee, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves: (a) the solicitation or acceptance of customers' orders; or (b) the supervision of any person or persons so engaged, unless such person is registered with the Commission as an AP of such IB. Moreover, it shall be unlawful for an IB to permit such a person to become or remain associated with the IB in any such capacity if the IB knew or should have known that such person was not so registered.

**ANSWER:** Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, he denies them.

116. 17 C.F.R. § 3.12(a) provides that it shall be unlawful for any person to be associated with an IB as an AP unless that person shall have registered with the Commission as an AP of that IB.

**ANSWER:** Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him. To the extent any allegations or inferences are directed to Ruth, he denies them.

117. 17 C.F.R. § 33.3(b)(1) provides that it shall be unlawful for any person to solicit or accept orders from an option customer (other than in a clerical capacity) for any commodity option

26

transaction, or to supervise any person or persons so engaged, unless such person is registered as an AP of an IB.

**ANSWER:**   Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

118.   17 C.F.R. § 33.3(b)(2) provides that it shall be unlawful for any person registered or required to be registered as an IB to permit another person to become or remain associated with such person as a partner, officer, employee, agent or representative (or in any status or position involving similar functions) in any capacity involving the solicitation or acceptance of an order from an option customer (other than in a clerical capacity) for any commodity option transaction, or the supervision of any person or persons so engaged, if such person knows or should have known that such other person is or was not registered as an AP.

**ANSWER:**   Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

119.   Defendant Nelson worked as an AP for Long Leaf from September 2017 through at least July 2018. During that period, Nelson solicited customers for participation in the TMM program, advised clients of recommendations, and accepted customer orders for options on futures contracts. Nelson was not at that time, and has never been, registered with the Commission as an AP of Long Leaf, or in any other capacity. Nelson therefore acted in violation of 7 U.S.C. § 6k(1), 17 C.F.R. § 3.12(a), and 17 C.F.R. § 33.3(b)(1).

**ANSWER:**   Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

120.   From December 2017 through the present, Donelson supervised persons engaged, and was engaged himself, in the solicitation and acceptance of customer orders for options on futures contracts. Donelson did not register as an AP of Long Leaf until June 2018. Donelson therefore acted in violation of 7 U.S.C. § 6k(1), 17 C.F.R. § 3.12(a), and 17 C.F.R. § 33.3(b)(1).

**ANSWER:**   Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

121.   Long Leaf, through its principals Evans and Donelson, knew or should have known about Nelson's lack of registration status, which is available to the public online through the website of the NFA. Long Leaf nonetheless allowed Nelson to work as an AP, soliciting and accepting customer orders for options on futures contracts. Moreover, Long Leaf allowed Donelson to act as an AP, and to supervise APs, without registration.

**ANSWER:**   Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

1033174\306910391.v3

122.    Long Leaf therefore acted in violation of 7 U.S.C. § 6k(1) and 17 C.F.R. § 33.3(b)(2).

**ANSWER:**    Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

123.    Defendant Evans was the founder, CEO, and owner of Long Leaf from at least June 2015 through December 2017, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Evans controlled Long Leaf during that period. Evans did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Evans is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least June 2015 through December 2017, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:**    Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

124.    Defendant Donelson was the CEO of Long Leaf from at least December 2017 through the present, and during that period possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. As such, Donelson controlled Long Leaf during that period. Donelson did not act in good faith with respect to, and knowingly induced, directly or indirectly, the acts and omissions constituting Long Leaf's violations of the Act and Regulations. Accordingly, Donelson is liable for Long Leaf's violations of the Act and Regulations committed during the period of at least December 2017 through the present, pursuant to 7 U.S.C. § 13c(b).

**ANSWER:**    Ruth makes no answer as to the allegations contained in Count VI as they are not directed at him.  To the extent any allegations or inferences are directed to Ruth, he denies them.

WHEREFORE, Ruth prays that an Order be entered dismissing the Complaint with prejudice.

DEFENDANT DEMANDS TRIAL BY JURY.

Respectfully submitted,

HINSHAW & CULBERTSON LLP

By:  /s/ Andrew S. May
        Andrew S. May

Andrew S. May

28

1033174\306910391.v3

Hinshaw & Culbertson LLP
151 North Franklin Street, Suite 2500
Chicago, IL 60606
Telephone: 312-704-3000
Facsimile: 312-704-3001
amay@hinshawlaw.com

1033174\306910391.v3