UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 20-3758 |
| | ) |
| Long Leaf Trading Group, Inc., James A. Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) Hon. Thomas A. Durkin |
| | ) |
| Defendants. | ) |

**PLAINTIFF CFTC'S MOTION FOR PARTIAL SUMMARY JUDGEMENT AGAINST DEFENDANT JEREMY RUTH**

Plaintiff Commodity Futures Trading Commission ("CFTC") hereby moves for partial[1] summary judgment on its claims against Defendant Jeremy Ruth, which are for (1) options fraud and (2) aiding and abetting his former employer, Long Leaf Trading Group Inc. ("Long Leaf"), in its commodity trading advisor ("CTA") fraud.

From April 2015 through August 2017, Ruth worked for Long Leaf soliciting prospective customers for participation in an options trading program. Ruth made numerous false and misleading statements to prospective customers touting the benefits of Long Leaf's trading program, including that the program conferred a "statistical advantage," that Long Leaf

---

[1] The CFTC seeks summary judgment on all of its claims against Ruth; the motion is "partial" only in that, if the motion is granted, the CFTC will subsequently seek injunctive relief, e.g., a trading ban, and imposition of a civil monetary penalty, in a motion for supplemental order.

"wouldn't be trading for customers if they weren't making a profit," and that customers could expect annual returns of 6-12% or more.

There is no dispute that Ruth made these statements. The statements were set forth in scripts provided to Ruth by Long Leaf's management, which Ruth admits that he followed. Ruth's misstatements are also captured in numerous recorded calls, some of which the CFTC has appended to this motion.

During the period Ruth worked for Long Leaf, customers who participated in the program lost more than $3.1 million. Substantially all customers lost money participating in Long Leaf's trading program.

Ruth knew that Long Leaf's customers lost money participating in the trading program. Ruth admits that he received and reviewed daily account statements for his customers, including for his own grandfather's account. These statements reflected losses. Ruth admits as well that he received frequent complaints from customers about losses in their accounts. Moreover, Ruth tracked losses from recommended trades, and emailed his analyses to other Long Leaf personnel.

Ruth failed to disclose to customers or prospective customers that almost all Long Leaf customers lost money as a result of the trading program. Ruth's omission was a deliberate one, and consistent with Long Leaf's policy of never disclosing its dismal trading results. Ruth admits that he followed the policy. Ruth even counseled other Long Leaf employees on how to get around requests for a "track record" by prospective customers

In light of the CFTC's overwhelming, objective, and undisputed evidence, no rational trier of fact could fail to find that Ruth engaged in fraud, in violation of the Commodity Exchange Act and CFTC Regulations. Accordingly, the CFTC respectfully requests that the

Court enter summary judgment in its favor against Ruth on Counts I (options fraud) and II (aiding and abetting CTA fraud) of the complaint.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment is warranted if no reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA, Inc.*, 3 F.4th 927, 938 (7th Cir. 2021).

## II. ANALYSIS

**A.     The CFTC is Entitled to Summary Judgment on Its Options Fraud Claim (Count I).**

CFTC's Count I against Ruth is for options fraud, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10. (Doc. 1, Compl. ¶¶ 79-86.) Under 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10, it is unlawful for any person directly or indirectly: (a) to cheat or defraud, or attempt to cheat or defraud, any other person; (b) to make or cause to be made to another person any false statement; or (c) to deceive or attempt to deceive any other person by any means whatsoever, in or in

connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction, including any option on futures transaction.[2]

In order to prove a claim for options fraud, the CFTC must establish that a defendant, in connection with a commodity option transaction: (a) made a misrepresentation, misleading statement, or a deceptive omission; (b) acted with scienter; and (c) the misrepresentation or omission is material. *CFTC v. Caniff*, No. 19-CV-2935, 2020 WL 956302, at *7 (N.D. Ill. Feb. 27, 2020). The CFTC is not required to prove reliance. *Slusser v. CFTC*, 210 F.3d 783, 786 (7th Cir. 2000).[3]

### 1. Ruth Made Materially False and Misleading Statements to Customers and Prospective Customers.

Whether a misrepresentation has been made depends on the "overall message" conveyed by the defendant, as well as the "common understanding of the information conveyed" by an "objectively reasonable receiver" of the information. *CFTC v. Kratville*, 796 F.3d 873, 892 (8th Cir. 2015) (affirming summary judgment for CFTC on options fraud claims were defendant

---

[2] 7 U.S.C. § 6c(b) prohibits entering into any commodity options transaction contrary to any regulation which the Commission may prescribe. 17 C.F.R. § 33.10, "fraud in connection with commodity options transactions," is one such regulation.

[3] *Caniff* and other cases cited herein feature Regulations prohibiting fraud in connection with options on commodities, i.e., 17 C.F.R. § 32.4 ("fraud in connection with commodity option transactions"), or its predecessor regulation, 17 C.F.R. § 32.9 (2012). The instant action features violations of 17 C.F.R. § 33.10, which prohibits fraud in connection with options on commodity futures contracts. The regulations prohibiting fraud in connection with options on commodities and the regulations prohibiting fraud in connection with options on commodity futures have substantially the same language. Cases, like *Caniff*, applying 17 C.F.R. § 32.4 and 17 C.F.R. § 32.9 (2012) are therefore instructive here.

misrepresented "track record") (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). A representation or omission is material if a reasonable investor would consider it important in deciding whether to make an investment. *Id*. at 895.

Throughout his tenure at Long Leaf, Ruth made numerous false and misleading statements to customers and prospective customers. (CFTC's Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment Against Defendant Ruth ("SOF") ¶¶ 16-25.) Following the script and presentation provided to him by Evans, Ruth told customers, *inter alia*:

- "[W]e measure our success by our clients' success; now, as a company we wouldn't have the ability to work with hundreds of clients month after month for six years and oversee millions of dollars if we weren't being profitable for them." (*Id.* ¶ 22.)

- "[I]f you sell four options, there is a strong statistical likelihood you will win three of them, giving you a much more predictable path to success." (*Id.*)

- "[tT]hese positions are scalable so it's very easy to duplicate that to accomplish 12% on an annual basis." (*Id.* ¶ 21.)

- "I work with a lot of clients and a majority of them make money, and the ones that make money are the ones that keep emotions out of the process. The only time I see people lose money is when they bring emotions into the process …. If you're willing to work with me on that I can ensure [sic] you that things will work out." (*Id.* ¶ 24.)

- "I'm sitting in a chair and I'm looking at a screen and I get to see all the results of my clients so it's very easy for me to be almost certain about our ability to get you to reach your financial goals." (*Id.* ¶ 25.)

The overall message conveyed by Ruth is that Long Leaf had traded profitably for its customers in the past, and that Long Leaf's "Time Means Money" trading program ("TMM")

confers a "statistical advantage" on participants. Because of this advantage, according to Ruth, TMM program participants could expect annual profits of at least 6-12%. This message is false.

In reality, substantially all customers lost money who traded pursuant to Long Leaf's recommendations. (*Id.* ¶¶ 26-27.) During Ruth's tenure at Long Leaf, customers participating in the TMM program lost more than $3.1 million. (*Id.* ¶ 26.)

Ruth's misstatements are material as a matter of law because they relate to profit potential and risk. *See Kratville*, 796 F.3d at 895 (statements of profit potential and risk "go to the heart of a customer's investment decision" and are therefore material as a matter of law) (quoting *R.J. Fitzgerald*, 310 F.3d at 1330).

### 2. Ruth Omitted to Disclose Material Information to Customers and Prospective Customers.

Ruth failed to disclose to customers or prospective customers truthful information about customer losses in the TMM program. (SOF ¶¶ 43-35.) This omission was consistent with a policy of non-disclosure at Long Leaf, and Ruth counseled other APs on how to "get around a request for a track record" by a prospective customer. (*Id.*)

Ruth's failure to disclose that substantially all TMM participants lost money is material as a matter law. This is a fact that a reasonable investor would want to know before committing money to Long Leaf. *See R.J. Fitzgerald*, 310 F.3d at 1332–33 (reversing judgment for defendant and entering judgment for CFTC where defendant failed to disclose that 95% of customers lost money).

### 3. Ruth Acted with Scienter.

Scienter is established if the defendant intended to defraud, manipulate, or deceive, or if the defendant's conduct was "reckless," i.e., representing an extreme departure from the standards of ordinary care. *Kratville*, 796 F.3d at 893. Such a departure involves "highly

6

unreasonable omissions or misrepresentations ... that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it." *Id*. (quoting *R.J. Fitzgerald*, 310 F.3d at 1328) (alterations in original). The undisputed facts establish that Ruth knew, or at the very least was recklessly indifferent to, the fact that substantially all customers who participated in the TMM program lost money. (SOF ¶¶ 28-42.)

Ruth received and reviewed account statements for his customers every day the market was open. (*Id.* ¶ 29.) The information contained in the account statements contravenes Ruth's representations to customers that, e.g., Long Leaf would not have hundreds of customers if it was not profitable for them, or that its customers could expect 6-12% annual returns. (*Id.*) Indeed, the account statements reflect that Ruth's own grandfather lost substantially all of the money he deposited with Long Leaf. (*Id.* ¶¶ 30-31.)

Ruth was apprised of widespread customer losses from the "frequent" complaints he received from customers. (*Id.* ¶¶ 32-33, 35.) One customer wrote, "My account is down 33% when I look at my cash balance …. Even if you met the targeted 20% return per year that we initially discussed, it will be 2+ years to recover." (*Id.* ¶ 33.)

Moreover, Ruth tabulated results from Long Leaf's trading recommendations starting in April 2017, which he shared in spreadsheet form with other Long Leaf employees. (*Id.* ¶¶ 37-40.) Ruth's spreadsheets reflected losses for every monthly set of trade recommendation from March through May 2017. (*Id.*) Ruth nonetheless continued to solicit clients, touting the benefits of the TMM program. (*Id.* ¶¶ 15-25.)

The juxtaposition of information available to Ruth reflecting trading program losses with Ruth's flagrant misrepresentations to customers conclusively demonstrates Ruth's scienter. For example, as set forth above, Ruth received an email from an customer on August 30, 2016

7

complaining of a 33% drawdown. (*Id.* ¶ 33) The next day, Ruth wrote an email to a prospective customer the very next day stating, "This strategy would be perfect for your situation. Selling options is an income generating strategy. This will give you the ability to supplement your part time employment with that additional income generation." (*Id.* ¶ 34.)

In another example, Ruth, on July 25, 2017, emailed LLT's then-CEO trading results for a Long Leaf customer who had lost a total of $16,400. (*Id.* ¶ 41.) Later the same day, Ruth sent an email to a prospective customer stating, "Normally with a 10k account my clients Target $500 to $1000 per month. Obviously there are going to be months where we don't win, but getting an average of win in that range is a realistic Target [sic]." (*Id* ¶ 42.) In light of these undisputed facts, no reasonable jury could failed to conclude that Ruth acted with scienter.

**B.     The CFTC is Entitled to Summary Judgment on Its CTA Fraud Claim (Count II).**

The CFTC's Count II against Ruth is for aiding and abetting Long Leaf's commodity trading advisor ("CTA") fraud in violation of 7 U.S.C. § 6*o*(1) and 7 U.S.C. § 13c(a). (Compl. ¶¶ 87-92, 95.) 7 U.S.C. § 6*o*(1) provides that it is unlawful for a CTA, by any means or instrumentality of interstate commerce, directly or indirectly, (a) to employ any device, scheme, or artifice to defraud any customer or prospective customer; or (b) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any customer or prospective customer.[4]

Section 6*o*(1)(a), incorporates the traditional elements of common law fraud, i.e., a false or misleading statement or omission of material fact, made with scienter.[5] *Commodity Trend*

---

[4] The prohibition against CTA fraud applies even if the CTA is exempt from registration, 17 C.F.R. § 4.15, as Long Leaf argues that it is.

[5] As with options fraud, the CFTC is not required to prove reliance. *Slusser*, 210 F.3d at 786.

*Serv., Inc. v. CFTC*, 233 F.3d 981, 993–94 (7th Cir. 2000). Section 6*o*(1)(b), by contrast does not require a showing of scienter. *Id*. It requires that the CTA engaged in a course of conduct which "operates as a fraud or deceit" on a customer or prospective customer. *Id*. ("This language focuses upon the effect a CTA's conduct has on its investing customers rather the CTA's culpability, and so does not require a showing of scienter.").

1. **Long Leaf is a CTA.**

CTA fraud requires that the fraud have been committed by a CTA. 7 U.S.C. § 6*o*(1). A CTA is as a person who, for compensation of profit, engages in the business of advising others as to the value of or the advisability of trading in commodity options, including options on futures contracts. 7 U.S.C. § 1a(12)(A)(i), (ii). Courts interpret the definition of a CTA liberally. *CFTC v. Equity Fin. Grp.*, LLC, No. CIV. 04-1512 (RBK), 2007 WL 1038754, at *3 (D.N.J. Mar. 30, 2007) (entering summary judgment for CFTC on claims that defendant violated prohibition against a CTA accepting and trading customer funds). This is what Long Leaf did.[6]

Long Leaf provided customers who participated in the TMM program with trading recommendations for options on futures contracts. (SOF ¶¶ 8, 10-11.) This was Long Leaf's main business during the relevant period; most if not all of Long Leaf's customers participated in the TMM program. (*Id.* ¶ 14.) Long Leaf provided its recommendations in exchange for compensation, which it received in form the of commissions when recommended trades were executed. (*Id.* ¶ 13.) Long Leaf was therefore in the business of advising customers as to the

---

[6] Whether Long Leaf was a CTA is a subject of the CFTC's concurrently-filed motion for summary judgment against Long Leaf. As reflected in that motion, Long Leaf's discovery responses (specifically, its admissions in response to RFAs propounded by the CFTC) confirm there are no disputed facts concerning whether Long Leaf was a CTA.

9

trading of options, for compensation. *Cf. CFTC v. Hall*, 49 F. Supp. 3d 444, 450 (M.D.N.C. 2014) (entering summary judgment for CFTC; holding that defendant was CTA where he advised subscribers over emails as to when they should open and close positions in specific futures contracts), aff'd, 632 F. App'x 111 (4th Cir. 2015); *CFTC v. British Am. Commodity Options*, 560 F.2d 135, 141 (2d Cir. 1977) (holding that defendant was acting as a CTA where it offered advisory services and received compensation in the form of a 55% mark-up on options purchase premiums when customers placed orders).

2. **Ruth Aided and Abetted LLTs CTA Fraud.**

Under 7 U.S.C. § 13c(a), any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of the Act or Regulations, or who acts in combination or concert with any other person in any such violation, may be held responsible for such violation as a principal. In order to be held liable for aiding and abetting, the defendant must knowingly associate himself or herself with an unlawful venture, participate in it to bring it about, and seek by his or her actions to make it succeed. *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1348 (S.D. Fla. 2014) (citing *Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir.1987)).

The undisputed facts reflect that Ruth aided and abetted Long Leaf's fraudulent scheme. Ruth's misleading statements about expected returns and historical profits were taken from scripts and presentations that Long Leaf's management gave him. (SOF ¶¶ 16-25.) As set forth above, Ruth knew or recklessly disregarded that the rosy statements in Long Leaf's scripts and presentations were untrue. (*Id*. ¶¶ 26-41.) Pursuant to Long Leaf's policy, Ruth omitted to disclose the truth about losses to customers and prospective customers, and encouraged other Long Leaf employees to do the same. (*Id*. ¶¶ 43-45.) Ruth thus participated in Long Leaf's

scheme and sought by his actions to make it succeed.[7] The same conduct which supports the CFTC's options claim against Ruth also establishes his aiding and abetting liability for Long Leaf's CTA fraud.

### C. The CFTC is Entitled to Summary Judgment on Restitution and Disgorgement.

7 U.S.C.A. § 13a-1(d)(3) provides the Commission may seek, and the court may impose, on any person found to have committed a violation of the Act or Regulations, equitable remedies including: (A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and (B) disgorgement of gains received in connection with such violation.

The undisputed facts reflect that Ruth was paid a total of $301,541.39 for his work at Long Leaf. (SOF ¶ 46.) Ruth's pay was comprised almost entirely of money that customers lost to commissions. (SOF ¶ 45-46.) As such, it should be repaid to customers in the form of restitution. *See CFTC v. Escobio*, 833 F. App'x 768, 772 (11th Cir. 2020) (affirming award of restitution and disgorgement in the amount of commissions charged to customers). Where, as here, there are material omissions in the context of a fraudulent scheme, the court can presume the reliance of defendant's customers. *CFTC v. Ross*, No. 09 C 5443, 2014 WL 6704572, at *2 (N.D. Ill. Nov. 26, 2014) (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 131 (1972)). The same is true where, as here, there was "pervasive or widespread

---

[7] As set forth above, Ruth's scienter is amply demonstrated by the undisputed facts, thus satisfying 7 U.S.C. § 6*o*(1)(a). 7 U.S.C. § 6*o*(1)(b) dispenses with the scienter requirement if the CFTC can show that a defendant's conduct "operated as a fraud or deceit" on a customer or prospective customer. Customer complaints echoing Ruth's misrepresentations ("[E]ven if you met the targeted 20% return per year that we initially discussed, it will be 2+ years to recover") demonstrate this for Ruth. (SOF ¶ 33.)

11

misrepresentation." *CFTC v. Driver*, 877 F. Supp. 2d 968, 980 (C.D. Cal. 2012) (entering summary judgment for CFTC), aff'd sub nom. *CFTC v. Driver*, 585 F. App'x 366 (9th Cir. 2014).

Ruth's pay may also be characterized as disgorgement, since Ruth's work consisted primarily of soliciting customers using fraudulent misstatements and omissions. (*Id.* ¶¶ 15-25.) As such, Ruth's pay constitutes ill-gotten gains which should be disgorged. *See Escobio*, 833 F. App'x at 772.

## IV. CONCLUSION

For the foregoing reasons, the CFTC respectfully requests that its motion for partial summary judgment against Ruth be granted, and that an order be issued finding him liable for Counts I and II of the CFTC's complaint and ordering Ruth to $301,541.39 in restitution or disgorgement.

/s/ Ashley J. Burden

Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2021, I provided service to the persons listed below, and by the following means:

Via the Court's electronic CM/ECF system:

Jim Falvey
Falvey Law Office
200 S. Wacker Dr., Ste. 3100
Chicago, IL 60606-5877
jimfalvey@yahoo.com

Counsel to Long Leaf Trading Group, Inc. and James A. Donelson

Jeremey S. Ruth
11220 Brista Way
Austin, TX 78726
jeremysruth@hotmail.com

*Pro se*

Via email, pursuant to D.E. 13, to:

Andrew D. Nelson
267 May St. E.
Elmhurst, IL 60126
adnelson0503@gmail.com

*Pro se*

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700
aburden@cftc.gov