UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 20-3758 ) |
| Long Leaf Trading Group, Inc., James A. Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) Hon. Thomas A. Durkin ) ) ) |
| Defendants. | ) ) |

**STATEMENT OF UNDISPUTED FACTS PURSUANT TO L.R. 56.1 IN SUPPORT OF PLAINTIFF CFTC'S PARTIAL MOTION FOR SUMMARY JUDGEMENT AGAINST <u>DEFENDANT JEREMY S. RUTH</u>**

**I.     RELEVANT PARTIES**

1.     Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") is an independent federal regulatory agency charged by Congress with administering and enforcing the Commodity Exchange Act ("Act") and accompanying Regulations.  (Doc. 36, Ruth Answer ¶ 15.)

2.     At all times relevant to this motion, Defendant Long Leaf Trading Group, Inc., ("Long Leaf") was an introducing broker ("IB"), and registered as such with the Commission. (*Id.* ¶ 21.)

3.     Defendant Jeremy S. Ruth worked for Long Leaf from April 29, 2015, through August 28, 2017.  (*Id*. ¶ 19.)

## II. JURISDICTION

4. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).

5. In addition, 7 U.S.C. § 13a-1(a) provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

6. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because Ruth and the other defendants transacted business in this District, and certain of the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places. (Doc. 36, Ruth Answer ¶ 14.)

## III. LONG LEAF'S "TIME MEANS MONEY" TRADING PROGRAM

7. Starting in at least June 2015, Long Leaf began soliciting customers and prospective customers to participate in Long Leaf's so-called "Time Means Money" ("TMM") options trading program. (*Id.* ¶ 26; CFTC Ex. 533[1], Ruth Test. 34:14–34:19.)

8. Long Leaf provided customers that agreed to participate in the TMM program with trading recommendations, typically four recommendations every month. (Doc. 36., Ruth Answer ¶ 27.) Each recommendation was for a different spread trade, with each trade typically involving four out-of-the-money options on futures contracts traded on designated contract

---

[1] All exhibits cited are appended to this statement of facts unless otherwise noted.

2

markets, i.e., exchanges, such as the Chicago Mercantile Exchange and New York Mercantile Exchange. (*Id.*)

9. All customers who participated in the TMM program got substantially the same set of recommendations each month. (CFTC Ex. 533, Ruth Test. 102:1–102:6.)

10. Ruth and the other Long Leaf associated persons ("APs") provided TMM recommendations to customers by email or phone. (Doc. 36, Ruth Answer ¶ 30; Doc. 23, Long Leaf Answer ¶ 30.)

11. Ruth and the other APs instructed customers to respond "yes" in a text or email to accept the recommended trades. (Doc. 36, Ruth Answer ¶ 31.)

12. Long Leaf would forward the customer orders to a futures commission merchant ("FCM"). (*Id.* ¶ 32.) The FCM would then place the orders on the exchange to be executed. (*Id.*)

13. As an IB, Long Leaf earned revenue in the form of commissions when its recommended trades were executed. (*Id.* ¶¶ 24, 33.)

14. During Ruth's tenure at Long Leaf, the majority of his customers were TMM program participants. (CFTC Ex. 533, Ruth Test. 36:6–36:15.) For the rest of the firm, "pretty much everything was Time Means Money." (*Id.*)

IV. RUTH'S SOLICITATIONS

15. Ruth's primary responsibility at Long Leaf was to solicit customers for participation in the TMM program. (*Id.* at 28:10–28:22, 401:23–402:6.)

16. In so doing, Ruth utilized a script provided to him by Defendant Timothy Evans, Long Leaf's then- owner and CEO. (CFTC Ex. 134, Email from T. Evans to J. Ruth, Sept. 7,

3

2016, attaching "demo script"; CFTC Ex. 533, Ruth Test. 232:7-232:9; *see also* Doc. 36, Ruth Answer ¶ 2 (Evans was CEO).)

17. The script included statements touting the benefits of the TMM program, including that the TMM program uses short options strategies to "drive results;" by selling four options, the script explains, "[t]here is a strong statistical likelihood you are going to win 3 of those … giving you a much more predictable path to success …." (CFTC Ex. 134 at 5-6[2] (ellipses in original).)

18. The script also includes the following statement: "At Long Leaf, we measure our success by our client's [sic] success. As a company, we wouldn't have the ability to work with hundreds of client's [sic] month-after-month for 6 years and oversee millions of dollars if we weren't being profitable for them." (*Id.* at 8-9.)

19. In addition to the script, Ruth used a power point presentation—also provided by Evans—to solicit customers. (CFTC Ex. 141, Email from J. Ruth to T. Evans, Apr. 8, 2017, attaching "custom version 3"; CFTC Ex. 533, Ruth Test. 287:20–288:21.) The presentation features slides illustrating the TMM program and depicting an "annual return" of 12%. (CFTC Ex. 141 at 12, 14.)

20. Ruth made the statements featured in the script and presentation, and other similar statements, to customers and prospective customers throughout his tenure at Long Leaf. (*See* CFTC Ex. 533, Ruth Test. 240:20–241:11.)

21. For example, on a January 12, 2016, call with then-prospective customer Harish Patel, Ruth explains that, under the TMM program, "following that math over those four assets,

---

[2] Page numbers for exhibits other than transcripts refer to the page number of the PDF exhibit and not to any internal pagination the exhibit may have.

4

on the three, you can expect it to be right; in the long run it would generate 1500; and the one you're wrong losing 1,000; and that would leave you with a net of 500 bucks." (CFTC Ex. 153[3] at 00:35:15–00:35:49.) "Now we want to continue that process month after month," Ruth explains, "continue that income-generating process, you know you carry that out for a year, you're looking at 6,000 dollars, which is a 6% return." (*Id*.) "Obviously these positions are scalable so its very easy to duplicate that to accomplish 12% on an annual basis." (*Id*.)

      22.      On a February 19, 2016, call with then-prospective customer Janice Janowiak, Ruth claims that the TMM program is based on the idea that, "if you sell four options, there is a strong statistical likelihood you will win three of them, giving you a much more predictable path to success." (CFTC Ex. 352 at 00:09:50–00:12:25.) Ruth goes on to say that, "we measure our success by our clients' success; now, as a company we wouldn't have the ability to work with hundreds of clients month after month for six years and oversee millions of dollars if we weren't being profitable for them." (*Id*.)

      23.      On an August 17, 2017, call with then-prospective customer Dale Bennett, Ruth explained that because 76.5% of options expire worthless (according to Ruth), Long Leaf is able to create "a predicable path to arrive at a specially targeted return." (CFTC Ex. 155 at 00:15:50–00:17:00.) Mr. Bennet says, "you got to be good to achieve that." (*Id*.) "We are," Ruth replies. (*Id*.)

      24.      Ruth goes on to tell Mr. Bennett, "I work with a lot of clients and a majority of them make money, and the ones that make money are the ones that keep emotions out of the

---

[3] CFTC Exs. 152, 153, and 155 are audio files. The CFTC has submitted these files through the Court's digital media submission portal. They should be reflected on the docket shortly after the CFTC files its motion. The format for the pin-cite is hh:mm:ss.

process." (*Id*. at 00:57:55–00:58:30.) "The only time I see people lose money," Ruth told Mr. Bennett, "is when they bring emotions into the process." (*Id*.) "If you're willing to work with me on that I can ensure [sic] you that things will work out." (*Id*.)

25. Ruth tells Mr. Bennett, "I'm sitting in a chair and I'm looking at a screen and I get to see all the results of my clients and so it's very easy for me to be almost certain about our ability to get you to reach your financial goals." (*Id*. at 1:05:00–1:05:55.)

## V. RUTH'S AWARENESS OF LOSSES

26. During the period Ruth worked at Long Leaf—approximately June 2015 through the end of August 2017—customers who participated in the TMM program lost more than $3.1 million. (*See* CFTC Ex. 535, Patrick Decl., Ex. A (showing customer losses by month).)

27. Substantially all customers who participated in the TMM program lost money during that period. (*Id*. ¶ 17.)

### A. Daily Account Statements

28. Ruth knew that his customers lost money participating in Long Leaf's TMM program. (*See* Doc. 36, Ruth Answer ¶¶ 3, 38.)

29. Ruth knew this because he received account statements for his customers every day the markets were open. (*Id*. ¶ 41; *see, e.g*., CFTC Ex. 346 at 29-55, Email from Gain Capital to J. Ruth, March 22, 2016 (attaching customer statements reflecting negative "profit & loss" for all funded accounts).) Ruth reviewed these statements every day he received them. (CFTC Ex. 533, Ruth Test. 77:16–78:8.)

30. One of Ruth's accounts belonged to Ruth's own grandfather, Michael Bruno. (Ex. 534, Ruth Dep. 57:16–57:18, 59:21–60:7; CFTC Ex. 346 at 46-47.) The account was

assigned to Ruth, and Ruth received statements for Mr. Bruno's account. (Ex. 534, Ruth Dep. 57:16–57:18, 59:21–60:7; CFTC Ex. 346 at 46-47.)

31. Mr. Bruno funded the account with $5,000 in November 2015. (Ex. 534, Ruth Dep. 57:16–57:18, 59:21–60:7.) In the space of seven months, the account had lost substantially all of its value. (CFTC Ex. 532, M. Bruno account statement, June 8, 2016.) In June 2016, Mr. Bruno withdrew the $54 remaining in his account. (*Id*.)

### B. Customer Complaints

32. Ruth received calls and emails from customers complaining about account performance. (Doc. 36, Ruth Answer ¶¶ 41, 63; *see, e.g.*, CFTC Ex. 126, Email from J. Hermanson to J. Ruth, June 14, 2017; CFTC Ex. 128, Email from S. Allen to J. Ruth, May 17, 2017; CFTC Ex. 129, Email from D. Snyder to J. Ruth, June 17, 2017.) He received these complaints "frequently." (CFTC Ex. 533, Ruth Test. 155:18–156:1.)

33. For example, on August 30, 2016, Long Leaf customer Rob Mixer complained to Ruth, "My account is down 33% when I look at my cash balance. At this point, I need a 50% return on current capital just to get back to where we started a year ago. Even if you met the targeted 20% return per year that we initially discussed, it will be 2+ years to recover." (CFTC Ex. 124.)

34. The next day, however, Ruth wrote an email to prospective customer, David Norris, claiming that, "This strategy would be perfect for your situation. Selling options is an income generating strategy. This will give you the ability to supplement your part time employment with that additional income generation." (CFTC Ex. 330.)

35. In another example of a customer complaint, customer Steve Beranek sent Ruth an email on January 26, 2017: "Your firms [sic] business model is very impressive. It looks like

7

the commissions and fees for the year will surpass my entire $20K in investments, and I have only lost about 20% of my investment. At this rate in ten years my account balance will be zero and your firm will have made $200K." (CFTC Ex. 125.)

36. Ruth forwards Mr. Beranek's email to Evans, LLT's then-CEO, commenting, "I just got a good laugh reading this again." (*Id.*)

**C. Keeping Track of Losses**

37. Ruth kept track of results from Long Leaf trading recommendations and emailed them to other Long Leaf personnel, as set forth in the paragraphs below.

38. On April 13, 2017, Ruth emailed follow Long Leaf APs James Leeney and Vince Prieto with a spreadsheet titled "March 2017 results." (CFTC Ex. 121.) The spreadsheet reflects net losses of at least $920 on the four trades recommended to customers in March. (*Id.*)

39. On May 9, 2017, Ruth emailed Leeney and another colleague with "April 2017 results," reflecting net losses of at least $1,105 on the four trades recommended in April. (CFTC Ex. 93.)

40. On June 9, 2017, Ruth sent another email to his colleagues titled "May Results," with a note, "For your info only." (CFTC Ex. 94.) The results showed net losses of at least $28.90 on the four trades recommended in May. (*Id.*)

41. On July 25, 2017, Ruth emailed LLT's then-CEO, Evans, trading results for Long Leaf customer Harish Patel. (CFTC Ex. 122.) In the email, Ruth noted that Mr. Patel started with $25,700, ended with $9,200, and lost a total of $16,400. (*Id.*)

42. Despite this knowledge, Ruth sent an email to prospective customer Chris Zolton later the same day stating, "Normally with a 10k account my clients Target [sic] $500 to $1000

8

per month. Obviously there are going to be months where we don't win, but getting an average of win in that range is a realistic Target [sic]." (CFTC Ex. 149.)

## VI. RUTH'S OMISSIONS

43. Ruth did not disclose any historical results from the TMM program, such as annual or average rates of return, to customers or prospective customers. (CFTC Ex. 533, Ruth Test. 299:10–299:15, 300:23–301:4, 312:4–312:8.)

44. This was pursuant to a policy at Long Leaf instituted by Evans. (*Id.* at 299:10–299:15; CFTC Ex. 142, Email from T. Evans to J, Ruth, June 1, 2015.)

45. Ruth abided by the policy, and advised other APs at Long Leaf on how to "get around a request for a track record" by a prospective customer. (CFTC Ex. 110, Email from J. Ruth to J. Leeney, Apr. 27, 2017.)

## VII. RUTH'S COMPENSATION

46. Ruth was paid a total of $301,541.39 for his work at Long Leaf Trading. (CFTC Ex. 525, J. Ruth Form 1099s.) Ruth's compensation at Long Leaf was based primarily on commissions charged to customers. (Doc. 36, Ruth Answer ¶¶ 51, 56.)

47. For the his first few months at Long Leaf Trading, Ruth was paid $1,500 per month salary, plus a percentage of the commissions that he helped to generate. (CFTC Ex. 533, Ruth Test. 31:2–31:20, 32:1–32:5, 32:12–32:20.) After those first months, Ruth's compensation consisted entirely of commissions. (*Id.* at 32:12–32:20.)

9

/s/ Ashley J. Burden

Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2021, I provided service to the persons listed below, and by the following means:

Via the Court's electronic CM/ECF system:

Jim Falvey
Falvey Law Office
200 S. Wacker Dr., Ste. 3100
Chicago, IL 60606-5877
jimfalvey@yahoo.com

Counsel to Long Leaf Trading Group, Inc.
and James A. Donelson

Jeremey S. Ruth
11220 Brista Way
Austin, TX 78726
jeremysruth@hotmail.com

*Pro se*

Via email, pursuant to D.E. 13, to:

Andrew D. Nelson
267 May St. E.
Elmhurst, IL 60126
adnelson0503@gmail.com

*Pro se*

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700
aburden@cftc.gov

11