CFTC Ex. 534

# Long Leaf Trading Group

# *Ruth, Jeremy 2021-06-04*

### *6/4/2021 9:20 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Friday, October 29, 2021

Page 1

1    IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2        EASTERN DIVISION
3 COMMODITY FUTURES TRADING    )
  COMMISSION,        )
4              )
        Plaintiff,   )
5            )
      vs.    ) No. 20 C 3578
6            )
  LONG LEAF TRADING GROUP,   )
7 INC., et al.,     )
            )
8    Defendants.   )
9
10
11    The remote video deposition of
12 JEREMY STEVEN RUTH, called by the Plaintiff for
13 examination, pursuant to subpoena and pursuant to
14 the Federal Rules of Civil Procedure for the United
15 States District Courts pertaining to the taking of
16 depositions, taken before Mary Maslowski, Certified
17 Shorthand Reporter and Notary Public within and
18 for the County of Cook and State of Illinois with
19 the witness located in Elk Grove Village, Illinois,
20 commencing at the hour of 9:20 o'clock on
21 June 4, 2021.
22
23
24

Page 2

1 A P P E A R A N C E S:
2
    (Appearing via videoconference)
3    MR. ASHLEY J. BURDEN, Senior Trial Attorney
    MS. ELIZABETH M. STREIT, Trial Team Leader
4    MR. JOSEPH C. PLATT, Trial Attorney
    MR. JOSEPH J. PATRICK, Senior Investigator
5    U.S. COMMODITY FUTURES TRADING COMMISSION
    DIVISION OF ENFORCEMENT
6    525 West Monroe Street, Suite 1100
    Chicago, Illinois 60661
7    (312) 596-0700
    aburden@cftc.gov
8    estreit@cftc.gov
    jplatt@cftc.gov
9    jpatrick@cftc.gov
10
    On behalf of the U.S. Commodity
11    Futures Trading Commission;
12
13   (Appearing via videoconference)
    MR. JEREMY RUTH
14
15    Appearing Pro Se.
16
17
18
19
20
21
22
23 CSR License No. 084-003278.
24

Page 3

1       I N D E X
2 WITNESS     DX  CX _RDX  RCX
3 JEREMY STEVEN RUTH
4 By Mr. Burden    4, 137
5 By Mr. Ruth    130
6      E X H I B I T S
7 CFTC EXHIBIT    FIRST REFERENCE
8 No. 93     98
   No. 110    94
9 No. 122    71
   No. 124    67
10 No. 125    109
    No. 126    115
11 No. 128    113
    No. 129    116
12 No. 134    13
    No. 141    27
13 No. 142    82
    No. 143    58
14 No. 148    103
    No. 149    73
15 No. 153    32
    No. 154    96
16 No. 155    118
    No. 330    69
17 No. 331    36
    No. 346    47
18 No. 349    112
    No. 351    22
19 No. 352    23
20
21
22
23
24

Page 4

1      JEREMY STEVEN RUTH,
2 called as a witness herein, having been first duly
3 sworn, was examined and testified as follows:
4      DIRECT EXAMINATION
5 BY MR. BURDEN:
6   Q   All right. Mr. Ruth, would you identify
7 yourself for the record.
8   A   My name is Jeremy Steven Ruth.
9   Q   And are you represented by counsel here
10 today?
11   A   I'm representing pro se.
12   Q   All right. Mr. Ruth, I want to jump
13 right in here and try not to cover areas that we
14 covered in investigative testimony.
15    MR. BURDEN: I want to state for the
16    record that we are starting without Jim Falvey,
17    who's counsel for Mr. Donelson and Long Leaf
18    Trading. Mr. Falvey advised us that he would
19    be late for the deposition and that it would
20    be fine with him for us to start without him.
21   Q   So, Mr. Ruth, you know, we've been
22 through this before. You know, we have to try
23 not to talk over each other and, you know, I do
24 that as much as anybody so I'll be good. If you

Page 5

1 need to take a break, it's fine to take a break,
2 but the clock stops. Additionally, please try
3 to finish whatever line of questions -- answer
4 whatever line of questions that I'm asking before
5 we do take a break. You know, I don't want to ever
6 ask a question that confuses you. I always want
7 to be clear. So if I ask a question and you don't
8 understand it, do you promise that you will tell
9 me?
10    A    Yes, sir.
11    Q    All right. So let's jump in. Mr. Ruth,
12 you started at Long Leaf Trading in March of 2015,
13 is that right?
14    A    Yes.
15    Q    All right. So how did you find out about
16 the job at Long Leaf Trading?
17    A    I don't recall.
18    Q    Well, did you like respond to an ad?
19 Did you apply for it online? Was there a friend
20 that worked there?
21    A    No, I didn't -- I mean, I know I didn't
22 have a friend, but I don't exactly recall how I
23 linked up with Long Leaf Trading.
24    Q    All right. And did you have an

Page 6

1 interview before you started at Long Leaf Trading?
2    A    Yes.
3    Q    With whom did you interview, please.
4    A    Timothy Evans.
5    Q    All right. And who was it that hired you?
6    A    Timothy Evans.
7        THE REPORTER:  Mr. Ruth, could
8 you speak up, please. I'm sorry, Ashley.
9 Mr. Ruth, could you speak up a lot more?
10        THE WITNESS:  Yes.
11        THE REPORTER:  Better. Thank you.
12 Sorry, Ash.
13        MR. BURDEN:  Yeah. Oh, that's all right.
14    Q    And, you know, Mr. Ruth, if you
15 wanted to get closer to the computer or move
16 it closer to you, you might -- you know, that might
17 be helpful too.
18    A    I just adjusted the microphone and
19 hopefully that will be better.
20    Q    Very good. Thank you. What were your
21 job responsibilities at Long Leaf Trading when you
22 started, please.
23    A    Nothing. Essentially when I was
24 first hired, I was not a licensed commodity broker.

Page 7

1 So my responsibilities were just to sit there and
2 listen and, you know, learn the industry and get
3 ready for the Series 3 examination.
4    Q    All right. And at what point did
5 you start, you know, doing real work at Long Leaf
6 Trading? At what point did you move out of that
7 listening phase?
8    A    I think it was 60 -- probably 60 days
9 like, and then I guess, what was it, March, April --
10 in May or June maybe.
11    Q    Okay. So in May or June what did you
12 start doing for Long Leaf then?
13    A    I started kind of -- well, like opening
14 up the conversation by, you know, calling leads that
15 were provided to me.
16    Q    Yeah. And when you called these leads,
17 what were you talking to them about?
18    A    I would try to, you know, get
19 them -- I don't know if you want to say excited
20 or interested in having an in-depth conversation
21 about, you know, utilizing futures and futures
22 options as an investment vehicle.
23    Q    All right. And was this with a view
24 to get them to eventually sign up for Long Leaf

Page 8

1 Trading's Time Means Money program?
2    A    I'm sorry. Can you repeat that, please.
3    Q    Yeah. So the calls that you were
4 making, that you started making in May or June
5 of 2015 for these leads, was that for the purpose
6 of ultimately getting them to sign up for Long Leaf
7 Trading's Time Means Money trading program?
8    A    Not necessarily, you know.
9 In the beginning I just wanted somebody to open
10 up an account. So, you know, if they wanted to be
11 a self-directed trader, you know, utilizing one of
12 the platforms we offered as the introducing broker,
13 they were more than welcome to do that or whatever
14 way that we could, you know, be involved in
15 servicing their needs and providing assistance.
16    Q    How many of your customers, Mr. Ruth,
17 were self-directed traders at Long Leaf Trading?
18    A    All of them.
19    Q    So these directed traders followed
20 recommendations provided by Long Leaf, is that
21 correct?
22    A    No, not --
23    Q    All right. So what's -- all right.
24 Well -- sorry, go ahead.

Page 9

1    A    I mean, the answer to that is no,
2  I guess, you know.  Your statement's kind of
3  absolute so ...
4    Q    All right.  Well, I'll tell you what.
5  Let's come back to that.  I don't know if it's that
6  important at this juncture.  So I want to drill down
7  a little bit on some of the testimony we got before
8  about your compensation, and your testimony in the
9  investigative phase is that at least early on during
10 your time at Long Leaf you got a $1500 a month
11 salary in addition to commissions.  Have I got
12 that right?
13   A    I mean, I don't -- are you saying
14 that's what I told you during the investigative
15 phase?
16   Q    All right.  I'm not telling you anything.
17 Do you recall that testimony?
18   A    No.
19   Q    All right.  Well, in that case let's
20 just start from the beginning and I'll ask how was
21 your compensation structured when you first started
22 at Long Leaf Trading?
23   A    I want to say it was probably like
24 1500 or $2,000 per month.  It was like a stipend

Page 10

1  and then like 20 percent of the net commissions
2  I generated maybe.
3    Q    All right.  So I want to drill
4  down, if we could, please, on that 1,500 to $2,000
5  stipend.  Did that start in like March 2015 when
6  you first started working for Long Leaf?
7    A    Yes and no.
8    Q    Explain, please.
9    A    I believe I got -- if I remember --
10 so I -- the first time I took the Series 3
11 I didn't pass.  I didn't pass the test.  And so
12 I think the deal was that maybe until I passed the
13 test he wasn't going -- you know, Long Leaf wasn't
14 going to pay me.  So it was essentially I was on
15 my own until I could become a licensed broker.
16 And so --
17   Q    Got it.
18   A    -- it's a 30-day waiting period if
19 you fail the Series 3, and I believe I -- I mean,
20 I know I passed it the second time.  So I would
21 assume maybe there was at least a month there where
22 I was not compensated.
23   Q    Got it, okay.  So how many months --
24 excuse me.  How many months at Long Leaf Trading

Page 11

1  did you get this 1500 to $2,000 stipend?
2    A    I mean, that was a long time ago
3  and our compensation plan was constantly evolving
4  throughout my tenure there.  So to be honest with
5  you, I couldn't say with any certainty.
6    Q    Okay.  Do you think it lasted for a year
7  or less than a year?
8    A    I hate to say it, but I can't really tell
9  you.  I don't recall.
10   Q    All right.  So I want to switch gears
11 and talk a little bit about customers.  Did you have
12 sort of customers that were your customers that you
13 were responsible for?
14   A    Well, again, that's, I don't know,
15 a trick question.  I mean, the customers are
16 customers of Long Leaf Trading Group.  But, you
17 know, I essentially was the middleman between Long
18 Leaf Trading Group and certain people that I had
19 solicited and certain people I hadn't solicited
20 as well.
21   Q    All right.  So, yeah, and I want to
22 ask about both sets of those people.  So when did
23 you first successfully solicit somebody?  You know,
24 when did you get your first customer, if I can use

Page 12

1  the word customer?
2    A    Can you help me understand what you,
3  I guess, consider a customer?
4    Q    No, I don't do the testifying.
5  If you want, we can look at the Gain statements
6  and go through those, but I think I'm inclined to
7  do that later.
8    A    Yeah, sorry.  I guess the point
9  I'm trying to make here is, you know, if somebody
10 funds the account, opens up an account, you know
11 if that's, you know, where a customer starts, then
12 I don't know, maybe like June or July of 2015.  But
13 if it's once they conduct their first self-directed
14 trade, I don't know.  It could be later.
15   Q    Okay.  So the first person you
16 solicited that opened an account with Long Leaf
17 Trading, you think that was around June or July
18 of 2015?
19   A    I don't know exactly, but that would
20 be -- I guess I'm guessing.  So sometime in the
21 first six months of me being a licensed commodity
22 broker I had a customer.
23   Q    All right.  How would you describe your
24 relationship with your customers?

Page 13

1    A    I wouldn't say that I could utilize, you

2  know, one set of words or, you know, put it into I

3  guess one box of how I interacted with my customers,

4  considering, you know, this was my first time in the

5  world of finance and, you know, constantly learning

6  new things every day and, you know, trying to, you

7  know, make sure that every day I, you know, was

8  more knowledgeable, a better broker than I was the

9  day before.  So I don't know.  It was constantly

10  evolving, my relationships and, you know, certain --

11  you know, certain people you had different

12  relationships with.  I wouldn't say there was

13  one specific style.

14    Q    Got it, okay.  Well, I'll tell you

15  what.  Let's jump ahead a little bit and if you

16  would, please, can you go to CFTC Exhibit 134.  And

17  just, if you would, please, click on it and open it

18  and take a look and tell me, please, when you have

19  had a chance to peruse it.

20    A    Just to clarify, Exhibit 134.pdf?

21    Q    Yeah, very good.  Yep, that's right.

22    A    And it's an email from Tim Evans to

23  Jeremy Ruth?

24    Q    That's right.  So I want you to

Page 14

1  take a look at this, please.  There's an email

2  and there's an attachment to the email, and I'm

3  going to ask you if you recognize it and I'm going

4  to ask you some questions about it.  So take a look

5  at it for me, if you would, please.

6    A    All right.  I've reviewed the Exhibit 134.

7    Q    All right.  Mr. Ruth, do you recognize

8  Exhibit 134?

9    A    Are you referring to the attachment?

10    Q    Yeah.

11    A    Yes.

12    Q    Could you tell me what it is, please.

13    A    This would be -- I don't know what

14  you'd call it -- a guide or a script of how to

15  conduct the demonstration for the Time Means Money

16  program.

17    Q    All right.  And is this a script

18  that you followed, a script or this guide, on calls

19  with customers and prospective customers?

20    A    Yes.

21    Q    Did you stick to the script for

22  substantially every customer or prospective

23  customer that you talked to about Time Means

24  Money?

Page 15

1    A    Can we go back to the last question?

2  I misspoke.

3    Q    Sure.

4    A    Can you reread that question?

5      MR. BURDEN:  Mary, would you read it

6  back, please.

7          (Whereupon the portion of the

8          record was read as requested.)

9    A    Am I able to proceed?

10    Q    Please.

11    A    Yeah.  I mean, just to clarify, just to

12  prospective customers, not to customers.

13    Q    Okay.  So what's the -- why not --

14  why prospective customers and why not customers?

15  Is it because, you know, the customer's already

16  a customer and you're talking about other stuff?

17    A    No, because it's, you know, a specific

18  guide or script or whatever you want to call it is,

19  you know, geared towards a specific sales process

20  that we were to follow and that was the second

21  phase of that sales process, which is provided

22  in the demonstration.  So after you provided the

23  demonstration -- I'm not saying it's unnecessary

24  information or anything of that nature -- but

Page 16

1  you move on to the next part of the solicitation

2  process.

3    Q    Got it.  So, Mr. Ruth, the script

4  that we're seeing in Exhibit 134, is this the first

5  part of the solicitation process?

6    A    No, sir.

7    Q    Is it the second part of the solicitation

8  process?

9    A    Yeah.  I mean, in an ideal world if

10  everything, you know, goes according to plan, yes,

11  it is Step 2.

12    Q    All right.  So for the prospective

13  customers that you talked to in Step 2, you know, is

14  this the script that you followed for substantially

15  all of them?

16    A    No.

17    Q    How did it change over time?

18    A    Well, first of all, some of my

19  customers I never solicited at all.  I inherited

20  them as people left the firm or there was a conflict

21  of personality with their previous assigned broker.

22  I had customers that, you know, didn't necessarily

23  go through the traditional process, I guess you

24  could say, and yeah.  So, yeah, not all of my

Page 17

1 customers I could say, you know, went through
2 this process.
3    Q    Sorry.  You broke up at the end there.
4 What was that again, please.
5    A    I mean, your question was, you know,
6 not all of my customers went through this process
7 to a various degree.
8    Q    All right.  Is it fair to say that
9 most of the customers that you gave this second
10 stage solicitation to got to hear you reading this
11 script?
12    A    I wouldn't be able to tell you that.
13 I don't know the number of people who have and
14 have not.
15    Q    All right.  Now, this was the script
16 that you were supposed to follow for that second
17 part of the solicitation, correct?
18    A    Well, during the -- I mean, again,
19 you know, during the time of my, I don't know,
20 employment with Long Leaf Trading Group, policies,
21 procedures, you know, solicitation materials,
22 everything was constantly changing and evolving.
23 So there was multiple versions of guides and, you
24 know, quote/unquote scripts were utilized to solicit

Page 18

1 customers from, you know, the first day I started
2 on the phone until the last day I was there.
3    Q    All right.  Mr. Ruth, would you turn,
4 please, to page 3 of the attachment.  And I want
5 to look at Bullet 5 like A and B here, please.
6 Tell me when you're there, if you would.
7    A    I'm there.
8    Q    All right.  So you see where it says,
9 5B it says, "Ok.  The Time Means Money program
10 utilizes short option strategies as the investment
11 vehicle to drive results.  Now, the reason this
12 is so important is because it's a fact that on
13 average of 76.5 percent of all options held to
14 expiration at the Chicago Mercantile Exchange
15 expire worthless."  So is that something that
16 you said to customers that you solicited?
17    A    I mean, if I was soliciting a customer
18 utilizing the guide or script, you know, that would
19 be something I would have said.
20    Q    But did you do that?
21    A    Again, if I was utilizing the guide
22 or script during that process, then I would have
23 said what is, you know, in the guide or script as
24 was given to me by Tim Evans, our compliance manager

Page 19

1 for the firm, and I was told that it was the
2 only approved solicitation materials to utilize.
3 But, yeah, I mean, this also -- I don't know if
4 you're familiar with it.  It comes with a visual
5 and --
6    Q    We're going to look at that next.
7    A    Yeah, yeah.
8    Q    So my question to you is, Mr. Ruth,
9 did you utilize Exhibit 134 in soliciting persons?
10    A    Yes, just not always.
11    Q    Okay.  So my question to you is
12 we're looking at page 3 of Exhibit 134, right?
13 We see 5B.  It says, "Ok.  The Time Means Money
14 program utilizes short option strategies as the
15 investment vehicle to drive results.  Now, the
16 reason this is so important is because it's a fact
17 that on average of 76.5 percent of all options held
18 to expiration at the Chicago Mercantile Exchange
19 expire worthless."  Is that something that you
20 said when you were soliciting persons on behalf
21 of Long Leaf?
22    A    If I was utilizing the guide at the
23 time of solicitation, this specific version of it,
24 then I would have said it.

Page 20

1    Q    Well, did you do that?  Did you ever
2 use this guide in soliciting customers?
3    A    I don't recall if I ever used this specific
4 version of the guide.
5    Q    Is this something that you said
6 to customers, this 76.5 percent, you know,
7 drives results?  This business we see on page 3
8 of Exhibit 134, is that something you said to
9 customers?
10    A    If I was soliciting a customer
11 utilizing the guide, and in this specific instance
12 it says that, then I would have said it.
13    Q    Well, did you say that?
14    A    I don't recall when I was using this
15 version of the guide or --
16    Q    I didn't ask you when you were using it.
17 I just said did you use Exhibit 134.
18    A    I mean, I don't recall.  I mean,
19 for all I know this could have been -- Exhibit 134
20 could have been the version for five hours before
21 it was changed.  That's how often things changed
22 at Long Leaf Trading.
23    Q    All right.  Well, did you -- that piece
24 I read from 5B, did you -- is that something that

Page 21

1  you said to customers?
2      A   Again, I feel like I've asked --
3  you know, you've asked and answered this multiple
4  times.  But my official answer is is that in the
5  event that I was using this specific guide to
6  solicit a customer, then I would have said it.
7  I don't know when I was using this guide.  I don't
8  know if I ever used this guide.  But if I did,
9  then I would have said it.
10     Q   All right.  Well, I'll tell you what.
11 Give me just a moment, if you would, please, and
12 we are going to listen to some calls.  I want to
13 take a moment, I do need a moment, because this
14 takes forever to load.
15         (Discussion off the record.)
16     Q   All right.  Mr. Ruth, who is Steven
17 Beranek?
18     A   I -- I have no clue.
19     Q   All right.  Is that a name you
20 recognize as being a person you solicited at
21 Long Leaf Trading?
22     A   Could you spell the last name for me?
23     Q   B-e-r-a-n-e-k.
24     A   Is it Beranek by possibility?

Page 22

1  Q   Maybe.
2  A   Was he a customer of Long Leaf Trading?
3  Q   Well, I don't answer questions.  I just
4  have to ask you --
5  A   All right.  Steve Beranek, I think --
6  I don't know.  I think there might have been a
7  Steve Beranek.  I don't know.  I'm not sure.
8         MR. BURDEN:  Okay.  All right.  Well,
9  I'll tell you what.  I would like to mark
10 for the record CFTC Exhibit 351, and it is a
11 December 11, 2015 call with Steven Beranek
12 produced by Long Leaf Trading.  It's 53 minutes
13 and 4 seconds in duration and the file name for
14 it is 12-11-2015_STEVENBERANEK_9712184053 and
15 I'm going to start this around just before the
16 21-minute mark.
17         (Whereupon CFTC Exhibit No. 351
18             was marked for identification.)
19 Q   So we're going to listen to the call,
20 if we could, and I'll stop it at some point and
21 I'm going to ask you some questions about it.
22 Are you ready?
23 A   You said 21-minute mark?
24 Q   Yes.

Page 23

1      A   And what was -- how do you spell the last
2  name again?
3      Q   I already spelled it.
4          MR. BURDEN:  All right.  We're going
5  to start Exhibit 351.
6          (Whereupon the audio recording was played.)
7          MR. BURDEN:  All right.  So I'm going to
8  stop it there at 2440.
9      Q   Mr. Ruth, is that your voice on the call?
10     A   It sounds like it, yeah.
11         MR. BURDEN:  All right.  I want to move
12 on, if I could, please, to CFTC Exhibit -- I'm
13 going to mark it as 352.  It's a February 19,
14 2016 call with Janice Janowiak.
15         (Whereupon CFTC Exhibit No. 352
16             was marked for identification.)
17     Q   Mr. Ruth, do you recognize that name,
18 Janice Janowiak?
19     A   I don't think you're pronouncing the
20 name correctly but --
21     Q   I'm probably not.  If you would be
22 kind enough to correct me, I think we'd appreciate
23 it.
24     A   Can you spell that again, the last name

Page 24

1  for me?
2  Q   Sure.  It's J-a-n-o-w-i-a-k.
3  A   Janice Janowiak.
4  Q   All right.  So who's -- sorry.
5  A   A customer of Long Leaf Trading.
6  Q   All right.  And was Ms. -- how do you
7  pronounce it again?
8  A   Janowiak.
9  Q   Thank you.  Was Ms. Janowiak a person
10 that you solicited?
11 A   I don't recall if I did the entire
12 solicitation process solely on my own.  I know
13 I was involved.  I don't know if I did it all on
14 my own, though.
15 Q   Got it, okay.
16         MR. BURDEN:  So Exhibit 352 is a file
17 produced by Long Leaf Trading.  The name of the
18 file is 02-19-216_JANICEJANOWIAK_6303639370.
19 The date on that is February 19, 2016 and it's
20 41 minutes and 9 seconds long, and I am going
21 to start it at 10 minutes and 1 second in.
22         (Whereupon the audio recording was played.)
23         MR. BURDEN:  All right.  So I'm going
24 to stop that at 1224.

Page 25

1    Q   Mr. Ruth, is that your voice on that call?
2    A   Yes.
3    Q   All right.  So, you know, we listened
4  to these two calls and I've played you pieces of
5  them and we're hearing kind of the same things over
6  and over.  Well, at least with respect to the two
7  calls.  So, you know, how did you know what to say
8  on these calls?
9    A   Could you rephrase that question?
10   Q   Yeah.  So how did you know what to tell
11 prospective customers?
12   A   We were, you know, given training and
13 solicitation materials by Timothy Evans.
14   Q   Yeah.  So what I'm getting at here,
15 Mr. Ruth, is the calls that we just listened to,
16 Exhibits 351 and 352, were you perhaps following
17 a script?
18   A   I mean, it's possible.  I couldn't tell
19 you.  I don't recall.
20   Q   All right.  Well, you said that you
21 were -- sorry.  Go ahead.
22   A   I don't recall what I was doing
23 on December 11, 2015 on that phone call or on
24 February 19, 2016.

Page 26

1    Q   All right.  Well, you referred
2  to solicitation materials that Mr. Evans provided
3  to you.  When you first started at Long Leaf, what
4  solicitation materials did you receive?
5    A   What solicitation materials.  I didn't
6  receive any solicitation materials when I first
7  started at Long Leaf.
8    Q   When did you first receive solicitation
9  materials from Mr. Evans?
10   A   I don't recall.
11   Q   So what you said on these calls that
12 we just heard, 351 and 352, were you improvising?
13   A   I don't -- I don't know exactly what
14 I was doing on these calls.  I mentioned before
15 that I don't know what tools or resources or how
16 this came about on December 11, 2015 or February 19,
17 20 -- you know, 2016.  Just it was a long time ago.
18 I don't recall.
19   Q   Yeah.  So I want to focus on a couple
20 of statements you made that are common to both
21 calls.  The first is the idea -- and you'll forgive
22 me for paraphrasing -- that 76.5 percent of options
23 expire worthless and this gives Long Leaf customers
24 a statistical advantage is a phrase you used in

Page 27

1  Exhibits 351 and 352 and that statistical advantage
2  gives prospective I guess customers a predictable
3  path to success, and we heard you say that in
4  Exhibits 351 and 352.  Am I characterizing that
5  correctly?
6    A   I don't think so.
7    Q   I knew you'd say that.  How would you
8  characterize it?
9    A   I mean, you just played me eight
10 minutes of tape, and I didn't mentally store a
11 synopsis of what was being said on that.  I mean,
12 if you want to replay them, maybe I could better
13 answer that question, but I don't -- I don't have
14 a characterization at this time.
15   Q   Well, the things that we heard
16 you say in Exhibits 351 and 352, the portions
17 that I played you've said to substantially every
18 prospective customer while you were working at Long
19 Leaf, correct?
20   A   Not that I know of.  I don't know.
21   Q   All right.  Well, I'll tell you
22 what.  We've got all those calls, so if we've
23 got to play them at trial, we can.  Let's go,
24 if we could, please, to CFTC Exhibit 141.  So

Page 28

1  back to the PDF, if you would, please.
2    A   Okay.
3    Q   All right.  So could you take
4  a look at it for me, please.  Let me know when
5  you've taken a look at it, and then I'm going to
6  ask you if you recognize it and then I have some
7  more questions.
8    A   Okay.
9    Q   All right.  Mr. Ruth, do you recognize
10 CFTC Exhibit 141?
11   A   Not in this format, no.
12   Q   Okay.  Well, the way you answered
13 that makes me think you recognize it in another
14 format.  What are you referring to when you say
15 not in this format?
16   A   Well, the file attachment says pptx,
17 which is a Power Point -- Microsoft Office Power
18 Point file extension and, I don't know, I guess
19 maybe this is screenshots of it.  I don't know.
20 It doesn't tell me.
21   Q   Yeah, I don't know either.  What I'd
22 like you to do, though, please, is take a look at
23 the attachment to the email in 141, and it's all
24 part of 141.  It's a Time Means Money presentation

Page 29

1 and I want to ask if you recognize this
2 presentation.
3    A   I don't see where it says Time Means
4 Money presentation.
5    Q   Are you on Exhibit 141?
6    A   Yep.
7    Q   All right.  So you're on the first page
8 and you see your email, right?
9    A   Correct.
10    Q   All right.  Scroll down for me, if you
11 would, please.  What's the next page say?
12    A   It's an image of Time Means Money,
13 Take Control of your Options.  It looks like there's
14 some office buildings and it's gold.
15    Q   There we go.  So look at the rest of this,
16 please, Exhibit 141, and tell me if you recognize
17 it, if you've ever used this presentation before.
18    A   Yeah, I don't -- I don't -- I mean,
19 in this format, I don't think this is -- I've
20 never seen it in this format before but -- and I
21 think these might be images from a Power Point
22 presentation or a Power Point that we had, but
23 I don't -- I don't recognize this in this format.
24    Q   All right.  Did you ever use or

Page 30

1 have provided to you a similar presentation?
2    A   I think you need to rephrase that because
3 I don't -- I don't think this is a presentation.
4 So I can't --
5    Q   What would you characterize it as,
6 Mr. Ruth?
7    A   As I mentioned earlier, I think this
8 might be images of a Power Point document.  I don't
9 remember exactly.
10    Q   All right.  So your testimony is you
11 don't recognize --
12    A   Now, I -- you know, I don't want to
13 speculate.  I don't know what this is.  It looks
14 like images.  That's it.  That's why I --
15    Q   All right.  Do you recognize any of the
16 images?
17    A   I recognize some of the imagery, but
18 I don't recognize the images.
19    Q   All right.  What images do you -- what
20 imagery do you recognize, Mr. Ruth?
21    A   Long -- the risk disclosure, which is --
22 the pages aren't marked so --
23    Q   All right.  Well, I'll tell you what.
24 Let's -- if your testimony is you don't recognize

Page 31

1 CFTC Exhibit 141, that's your testimony.  But just
2 to be clear, Mr. Ruth, your testimony is that you
3 don't recognize CFTC Exhibit 141?
4    A   No.  My testimony is is that I recognize
5 some elements that are in -- elements of imagery
6 that are in CFTC Exhibit 141.  I do not recognize
7 Exhibit CFTC -- CFTC Exhibit 141 in this format.
8    Q   All right.  Well, I'll tell you what.
9 Let's listen to some calls, if we could, please.
10 Give me just a moment, if you would.
11    A   After we do -- listen to the calls,
12 I'd like to take a break.
13    Q   All right.  Do you recognize the name
14 Harish Patel, Mr. Ruth?
15    A   Harish, yeah.  Harish Patel, yes.
16    Q   All right.  So who's Mr. Patel?  Who's
17 Harish Patel, please.
18    A   Harish Patel was a customer of Long Leaf
19 Trading Group at some point.
20    Q   All right.  And is Mr. Patel a person
21 that you solicited?
22    A   I don't know how to answer that question.
23 Let me explain.  Harish Patel had called in to Long
24 Leaf Trading Group.  The only reason I remember him

Page 32

1 is because he's the only person who ever -- you
2 know, remember, this is the events that occurred
3 while I worked as a Long Leaf trader.  But I think
4 he's the only guy that ever called in saying that
5 he wanted Tim Evans to help him, you know, navigate
6 the commodity markets.  And so he had called in
7 trying to open an account, and we were just trying
8 to figure out what was the right account for him.
9    Q   Got it.  All right.  So did you speak with
10 Mr. Patel?
11    A   Yes.  I mean, amongst me and Tim Evans did.
12    Q   Got it.  All right.  Well, I'll tell
13 you what.  Let me play for you, if I could, please,
14 what I've marked as CFTC Exhibit 153.  And it's
15 a file produced by Long Leaf Trading and the file
16 name is 01-12-2016_HARISHPATEL_6304792608, and it's
17 48 minutes and 33 seconds long.
18        MR. BURDEN:  So I'm going to start it at
19 34 minutes --
20    A   What was the date?
21    Q   January 12, 2016.
22        MR. BURDEN:  So I'm going to start
23 it at 34 minutes.
24        (Whereupon the audio recording was played.)

Page 33

1      MR. BURDEN:  All right.  So I'm going to
2    stop that there at 36 minutes and 9 seconds.
3    Q    So, Mr. Ruth, is that your voice on the
4    call?
5    A    It sounds like it, yes.
6    Q    All right.  So did you have any
7    customers -- or I should ask it another way.
8    Mr. Ruth, were you aware of any customers of
9    Long Leaf Trading that got a 12 percent return
10    on an annual basis?
11    A    I mean, I don't recall any results.
12    Q    All right.  Mr. Ruth, do you recall
13    any customers of Long Leaf Trading who made $6,000
14    a year in profits from trading?
15    A    Yeah.  I've got a -- want to pose
16    an objection here.  I know you started this phone
17    call at 34 minutes, but you're not providing context
18    on what is actually occurring during this part of
19    the solicitation process.  This is a hypothetical
20    example, and you're trying to make it look like
21    I was representing that they would receive a
22    12 percent return or $6,000, which this is an
23    example of how you build out a $100,000 portfolio,
24    to show him how the risk/reward parameters were.

Page 34

1    So it has nothing to do with that.  And because
2    of your selective editing of that phone call, you
3    know, the record is not reflective of what is
4    actually occurring here.
5    Q    All right.  So I hear what you're
6    saying.  But if you're going to object on the
7    record, and I know this is a challenge because
8    you're pro se, it's got to be an objection pursuant
9    to the Federal Rules of Civil Procedure or the
10    Federal Rules of Evidence and you've got to cite
11    the rule or if it's form, you've got to identify
12    what's wrong with the form and say form.
13          So what you did is what we call a
14    speaking objection, right?  So that's not allowed.
15    If you do that, that's going to be deducted from
16    our time.  We get it back later, you know.  So I'm
17    going to caution you not to do it again.  And if
18    there's evidence that you want to introduce before
19    the court, you could do that in, say, a declaration,
20    you know, in opposition or for (inaudible) summary
21    judgment or something.  Do you understand what I'm
22    saying?
23    A    Yeah.  I think it would be a perfect time
24    for a break.

Page 35

1    Q    Well, I'll tell you what.  Do one
2    more for me, if you would, please, and then we
3    can take our break.  So, Mr. Ruth, are you aware of
4    any customers of Long Leaf Trading that made $6,000
5    in profit on an annual basis?
6    A    I -- I just don't recall.  I can't
7    confirm or deny that.
8          MR. BURDEN:  Okay.  Well, I'll tell
9    you what.  If you want to take a break, let's
10    go off the record.  What kind of a break do you
11    want to take, Mr. Ruth?  I mean, like time.
12          THE WITNESS:  Try and shoot for like ten
13    minutes or less.
14          MR. BURDEN:  Okay.  All right.  Well,
15    I'll tell you what.  Let's -- I'll see everybody
16    back at 10:35.  We'll make it 15 so I can get
17    a coffee.  Mary, off the record, please.
18          THE WITNESS:  You're saying back at 10:35?
19          MR. BURDEN:  Yes, please.
20          THE WITNESS:  All right.
21          (Whereupon a recess was taken from
22          10:21 a.m., to 10:40 a.m., after
23          which the following proceedings
24          were had:)

Page 36

1          THE WITNESS:  Yeah, I'd like to go back
2    to my objection.
3          MR. BURDEN:  Well, let's just make
4    sure that we're -- hey, Mary, I can't see you
5    or hear you.  Are we back on the record?
6          THE REPORTER:  Yes.  Can you hear me,
7    Ash?  Yeah, I'm here.  Anytime you're ready.
8    BY MR. BURDEN:
9    Q    All right.  Mr. Ruth, where are you
10    testifying from, please.
11    A    I am in -- I think I'm in Elk Grove
12    Village, Illinois.
13    Q    Thank you.
14    A    Actually, I'd like to go back to my
15    objection.
16    Q    Well, you can't.  You've said it,
17    we've moved on and any objections not made
18    with respect to that question are waived.  What
19    we're going to do instead is move on to CFTC
20    Exhibit 331.  Mr. Ruth, would you --
21          THE WITNESS:  Mary, I'd like to have the
22    record reflect that I would like to revisit my
23    objection.
24          MR. BURDEN:  The court reporter is not

Page 37

1  a referee.  You are not in a position to
2  revisit your objection.
3      THE WITNESS:  I'm not asking her to be
4  a referee.  I want to the record to reflect
5  that I'm asking to revisit my objection.
6      MR. BURDEN:  Well, I'll tell you what,
7  Mr. Ruth.  At the very end of the testimony if
8  there's time left, you will be asked if there's
9  any parts of your testimony you would like to
10  clarify or amplify.  So that could be a good
11  opportunity for you to say what you'd like to
12  say.
13      THE WITNESS:  I think the opportunity
14  is now.  So I'd like the record to reflect
15  that my objection is is that it's misleading,
16  and the reason it's being misleading was -- is
17  the recording is taken out of context and that
18  I ask that you to play the entire recording.
19      MR. BURDEN:  Well, we're not going to do
20  that.
21      Q    Mr. Ruth, do you have -- do you
22  have counsel available to you?  Are you perhaps
23  consulting with counsel on your cell phone,
24  Mr. Ruth?

Page 38

1      A    I'm not going to answer that question.
2      Q    I'm afraid that you have to.  What basis
3  do you have to decline to answer that question?
4      A    It's not relevant.
5      Q    It certainly is relevant, Mr. Ruth,
6  for you to be represented by counsel who's failed
7  to enter an appearance in this case.
8      A    Well, you're aware I'm not represented
9  by counsel.  Are you stating --
10      Q    Well, I'm asking you if you have counsel
11  available to you.  If you've been consulting with
12  counsel through this deposition, that counsel needs
13  to appear for the record.  Failure to do so would
14  be bad for that counsel.  So it's important that he
15  or she state for the record, or that you state for
16  the record, that you are being advised by counsel.
17      A    I've already stated for the record my
18  status.
19      Q    I didn't ask for your status.  I asked
20  are you being advised by counsel in this deposition.
21      A    I've already answered that question.
22      Q    Well, give me the answer again, if you'd
23  be kind enough.
24      A    Objection, asked and answered.

Page 39

1      Q    No, it wasn't.  Mr. Ruth, who are
2  you talking to on your cell phone?  Who are you
3  communicating with?  Is it perhaps counsel who has
4  failed to enter an appearance?
5      A    I've already objected.  I've already
6  answered the question.  I've already testified as
7  to what my status is with counsel.
8      Q    Mr. Ruth, you don't get to pick
9  a position.  You just have to answer the question.
10  My question for you is are you being advised by
11  counsel in connection with this deposition and
12  currently during the deposition, and your testimony
13  was that you refused to answer that question.
14  Now, that leads me to believe that you are, which
15  makes me want to subpoena your phone records.  So
16  you can either tell us yes or maybe the answer is
17  no, maybe you're just playing with your phone, but
18  you really should tell the truth and answer the
19  question for the sake of your friend.
20      A    Again, I have already -- I object to
21  what you're saying.  You've already asked me my
22  status on counsel.  I've already answered that.
23      Q    All right.  Well, I want to request
24  on the record, Mr. Ruth, that since you are in

Page 40

1  fact pro se and unrepresented by counsel,
2  any discussions you're having on your phone
3  or text messages are not privileged.  So we'll be
4  subpoenaing them and we demand on the record here
5  that you preserve them, which is to say all emails,
6  text messages or other communications relating to
7  this deposition and certainly made during this
8  deposition.  Do you understand that request?
9      A    Not necessarily.
10      Q    All right.  Well, you don't have to
11  because it's on the record.  Well, I'll tell you
12  what.  Let's depart from the question of your shadow
13  counsel, if this person exists, and move on, if we
14  could, to CFTC Exhibit 331.  You know, I'll tell you
15  what.  Before we go to 331, let me ask, Mr. Ruth,
16  what was your role in developing solicitation
17  materials at Long Leaf?
18      A    I don't -- I don't recall.
19      Q    Did you participate, Mr. Ruth, in
20  developing solicitation materials at Long Leaf?
21      A    I -- I couldn't tell you.
22      Q    Why couldn't you tell me?
23      A    Because the compliance manager, Tim
24  Evans, was the one who gave us the solicitation

Page 41

1  materials.  And I don't know if -- or recall if
2  anything I had to say was a part of the solicitation
3  materials.
4      Q    All right.  So your testimony is
5  that you don't recall if you participated in the
6  development of solicitation materials at Long Leaf?
7      A    Correct.
8      Q    All right.  Let's take a look,
9  if we could, please, at CFTC Exhibit 331.  So
10 navigate there, if you would.  And if you could
11 tell me, please, when you get there, I'll ask you
12 some questions about it.
13     A    I'm sorry.  What exhibit?
14     Q    Sorry.  331, please.
15     A    Okay.
16     Q    All right.  Do you recognize CFTC
17 Exhibit 331?
18     A    I don't recall.
19     Q    All right.  So do you see at the top
20 it's a document that looks like an email.  It says
21 from Jeremy Ruth to Tim Evans.  Do you see that?
22     A    Yep.
23     Q    All right.  So do you see at the top
24 there of Exhibit 331 it says jruth@longleaftrading?

Page 42

1      A    Correct.
2      Q    Was that your email address while you
3  were at Long Leaf?
4      A    It was the email address assigned to
5  me, yes.
6      Q    All right.  So is this an email that you
7  sent?
8      A    I don't recall.
9      Q    All right.  So let's go down, if we
10 could, please, to the fourth page -- sorry, no,
11 the top of the third page of CFTC Exhibit 331.  So
12 you see that there's like text in black and there's
13 text in red?
14     A    Yes.
15     Q    All right.  So I want to focus in on one
16 particular sentence and it says, "The only thing
17 I would ask for you to do in the meantime is give
18 it some thought as to what return you are looking
19 for.  Is that 10 percent, 20 percent, 30 percent or
20 any number that is going to ultimately satisfy you.
21 That way he can show you how we target that return
22 specifically."  So is this something that you wrote
23 so that you added it as a recommendation?
24     A    I don't recall.

Page 43

1      Q    All right.  Did you -- are you aware
2  of any customers at Long Leaf that got a 10 percent
3  return on their investment?
4      A    I'm going to object to the question.
5  It is misleading and it's taken out of context.
6      Q    Okay.  So your objection is noted, but
7  you've still got to answer it.
8      A    Can you repeat the question?
9      Q    Sure.  Are you aware of any customers
10 of Long Leaf that got a 10 percent return on their
11 investment?
12     A    I don't know what you mean by that
13 question.
14     Q    Are you aware of any customers at Long
15 Leaf that got a 10 percent return on an annual basis
16 on their account at Long Leaf?
17     A    I'm going to object that it is misleading
18 and it's taken out of context.
19     Q    Answer the question, please.
20     A    What -- can you repeat the question?
21     Q    Are you aware of any customers who --
22 of Long Leaf Trading who achieved an annual return
23 of 10 percent on their account?
24     A    I don't -- I mean, I don't know

Page 44

1  if -- I don't recall any client's like length of
2  time at the firm or having an account.  So I just
3  can't answer that question.
4      Q    Okay.  So same question with respect
5  to 20 percent.  Same answer?
6      A    I mean, again, I'm going to object that
7  it is a misleading question.
8      Q    Okay.  But now you have to answer it.
9      A    Can you repeat the question?
10     Q    Are you aware of any customers
11 at Long Leaf who achieved a 20 percent annual return
12 on their account?
13     A    I don't recall the length of time
14 that any customer had an account at Long Leaf, so
15 I can't answer your question.
16     Q    All right.  Well, let me ask you are
17 you aware of any customers at Long Leaf who achieved
18 a 20 percent return on their account over any time
19 horizon?
20     A    Do I recall?
21     Q    Yeah.
22     A    I mean, I can't say an exact percentage.
23 I don't know why you're asking me the percentage.
24 But, I mean, there are clients that at any time

Page 45

1  during the time that had accounts, that they saw
2  positive returns.  Does that -- yeah.
3      Q    Were those positive returns close to
4  20 percent?
5      A    I'm going to object that it's misleading.
6      Q    Okay.  You've got to answer now, though.
7      A    I don't recall.
8      Q    All right.  And I think you had
9  just testified, Mr. Ruth, that you were aware of
10 customers of Long Leaf that did achieve positive
11 returns for one period or another.  Is that -- am
12 I fairly characterizing your testimony?
13     A    Yes.
14     Q    Do you recall the names of any such
15 clients?
16     A    I guess I don't understand your
17 question because I don't know what you mean by
18 positive returns.
19     Q    So you made money.
20     A    All of our customers at some point
21 made money off of their trades that they executed.
22     Q    Do you recall the names of any customers
23 that made money off of trades?
24     A    I would -- I mean, I don't have

Page 46

1  like a client list in front of me.  But there are
2  clients of ours that, you know, pretty much every
3  single one of them had a winning, if you want to
4  call it, positive return trade at some point during
5  their account.
6      Q    But do you recall the names of any such
7  persons?
8      A    I mean, you could use two people that --
9  (inaudible) from previous testimony, Steven Beranek,
10 Janice Janowiak, Harish Patel.  They all had at some
11 point trades that they executed that were profitable
12 for them.
13     Q    But ultimately those three persons
14 lost substantially everything in their accounts
15 at Long Leaf, correct?
16     A    I -- I don't have access to that
17 information.  I couldn't tell you.  I don't recall.
18     Q    All right.  Well, I'll tell you
19 what.  Let's switch gears a little bit, if we
20 could, Mr. Ruth, and I want to talk about customer
21 statements.  When did you start receiving customer
22 statements from Gain?
23     A    I -- I have no clue.  I don't recall.
24     Q    Was it like right away?  Was it maybe

Page 47

1  in May or June after you had successfully solicited
2  your first customer?
3      A    Again, I don't recall.
4      Q    All right.  Well, I'll tell you what.
5  Let's move, if we could, to CFTC Exhibit 346.  So
6  could you navigate to that, please, and then let me
7  know when you're there.
8      A    Exhibit 346, right?
9      Q    Yeah.  All right.  Do you recognize this
10 document, Mr. Ruth?
11     A    No.
12     Q    All right.  So do you see it says
13 from gfstatements@gaincapital?  Do you see that?
14     A    Correct.
15     Q    And it goes to the email address assigned
16 to you, which is jruth@longleaftrading.com, is that
17 right?
18     A    It goes to -- no, it's not correct.
19     Q    Well, tell me where I'm wrong, please.
20     A    Well, it says to
21 jruth@longleaftrading.com.com.
22     Q    You received these daily statements
23 for your customers every day when you were at
24 Long Leaf, isn't that right?

Page 48

1      A    No.
2      Q    When did you get them?
3      A    I, you know, I don't recall when I'd
4  get them.
5      Q    Have you ever -- take a look at 346.
6  Did you ever receive these statements from Gain?
7      A    I don't know if I received Exhibit 346
8  from Gain or not.  I don't recall.
9      Q    That's okay.  I want you to take
10 a look at the Gain Capital statements and tell
11 me if you received statements like this from Gain
12 Capital.
13     A    Yeah, at some point I received
14 statements like this.  I just don't know when in
15 my career at Long Leaf Trading Group that I received
16 and the frequency in which I received them.
17     Q    Well, it looked to me from my review
18 of your emails like you got them every single day
19 starting in at least March of 2016.  Does that sound
20 right to you?
21     A    No.
22     Q    What about that doesn't sound right?
23     A    Daily statements are only generated
24 on days in which the markets were open and I want

Page 49

1 to say the markets with a non-holiday schedule
2 as well. But every single day, no, there's --
3 I don't think there's a statement on Saturday.
4 I don't think there's a statement on Sunday.
5 I don't think there was a statement on market
6 holidays, things of that nature. So, no, I didn't
7 receive a statement every day.
8    Q    All right. Well, Mr. Ruth, did you
9 receive a statement similar -- sorry?
10    A    I don't control when I receive the
11 statement, so I can't testify that I received the
12 statement.
13    Q    Mr. Ruth, did you receive a customer
14 account statement from Gain substantially every
15 trading day while you were at Long Leaf?
16    A    I don't necessarily recall if that's true.
17    Q    How frequently while you were at Long Leaf
18 did you receive account statements for customers?
19    A    I couldn't tell you.
20    Q    Is it fair to say that it was on a regular
21 basis?
22    A    I couldn't tell you.
23    Q    Now, we're looking at CFTC Exhibit 346.
24 Do you know how to read this statement?

Page 50

1    A    What do you mean by that?
2    Q    Do you understand them? Can you tell
3 how customers are doing when you look at a statement
4 like this?
5    A    Can I tell how customers are doing.
6 It would depend on the type of account that they
7 have.
8    Q    How so?
9    A    I mean, you can have -- I mean, I'll
10 give you an example. If they have a self-directed
11 trading account in which they're trading futures
12 contracts and they don't have open positions and
13 their account is active, then it's very black and
14 white as to what is the balance of their account.
15 If they are in a short option spread position,
16 their account statement doesn't necessarily
17 reflect what is the value of their account or
18 various other reasons. So, yeah, that's my answer.
19    Q    All right. What was your sales code at
20 Long Leaf Trading, Mr. Ruth?
21    A    I know I had multiple sales codes
22 I think throughout my tenure at Long Leaf Trading
23 Group. The only one that I know, because of looking
24 at this statement, is LLT010.

Page 51

1    Q    Okay. Mr. Ruth, I think you testified
2 earlier, and I'm switching gears a little here, that
3 you inherited customers or got customers from other
4 brokers. Am I characterizing that correctly?
5    A    Probably not. I mean, customers are
6 customers of the firm. They're not my customers.
7 They're customers of the firm.
8    Q    All right. Well, did you get any
9 customers assigned to you or to manage or to your
10 sales code that, you know, somebody else had already
11 solicited or they'd been with the firm for a while?
12    A    Yes.
13    Q    All right. Do you remember the names
14 of any of those customers?
15    A    I mean, I don't like have a list of
16 them in my head, but if somebody were to present
17 me with a list of them, I could either affirm or
18 deny all that were --
19    Q    Got it. Well, Mr. Ruth, for the --
20 sorry, I interrupted.
21    A    Yeah. Then, I mean, I could confirm
22 or deny it, I mean, to the best of my ability
23 if I had the names, like a multiple choice type
24 question as opposed to, you know -- it's been a

Page 52

1 while since I've worked at Long Leaf Trading Group.
2    Q    Well, for the customers that, you know,
3 that you inherited or that you hadn't solicited,
4 when they came to you were their accounts up, were
5 they down? How were they doing?
6    A    Well, I mean, I don't recall.
7    Q    All right. For customers that you
8 did solicit, Mr. Ruth, how did you keep track of
9 like whether they were making money or not?
10    A    I didn't really keep track.
11 I mean, as a -- the role at Long Leaf is, you
12 know, I'm not -- I don't, you know -- they're not
13 my trades or anything of that nature. And, you
14 know, if I have a client who asked or based off
15 of the relationship or (inaudible) or management
16 of the relationship we have, you know, on an
17 individual basis using the individual trades that
18 they executed, I would do my best to tell them or
19 show them or, you know, what a P&L was on the
20 specific trade. But --
21    Q    But how did you do that? If a customer
22 asked you to tell or show them what the P&L was on
23 a specific trade, like how did you do that?
24    A    Well, you have to understand as a

Page 53

1 commodity broker I, you know, learned new stuff
2 and evolved over time. So at the end of my career
3 I was able to utilize the statements to be able to
4 figure out what it is, you know, the specific P&L
5 on a trade. And the equation is very simple, is you
6 take the amount of premium that was collected minus
7 the -- minus the -- or, you know, the commissions,
8 fees and all the cost association with execution.
9 And, you know, then when the trade closed out,
10 whether it be through expiration or through, you
11 know, management of the position, you know --
12 and what I mean by management is, you know, closing
13 out the position through an execution, you know,
14 take the end result and offset those two and factor
15 in all the commissions and fees and all that jazz
16 and it's either, you know, positive, negative.
17 I guess it could be breakeven as well. And when I
18 relay that information to them, I don't necessarily
19 know if the answer is regularly to everybody, but in
20 certain circumstances that's how we'd calculate it.
21    Q    All right. Well, it sounds like
22 however you calculated it, you -- at least
23 later in your career -- you looked at the customer
24 statements, is that right?

Page 54

1    A    Not always.
2    Q    It doesn't have to be always. Just
3 sometimes.
4    A    I mean, there's other ways to obtain that
5 information as well.
6    Q    I'll ask you about those later.
7 So sometimes when customers asked what their P&L
8 was on trades, you'd tell them and you'd tell them
9 because you figured it out from their statements,
10 is that right?
11    A    I mean, there's a lot more factors
12 that we'd need, information to be able to answer
13 that question, like is it an open position, is it
14 a closed position, things of that nature. But you
15 really only give a P&L on a closed position.
16    Q    All right. So let me ask, cut to
17 the chase, did any of the customers at Long Leaf
18 that you spoke to make money?
19    A    Again, I object. You've already asked
20 this and I've already answered it.
21    Q    What was your answer?
22    A    I don't know. Do you want to have Mary
23 go back and read the testimony? I think that would
24 be appropriate.

Page 55

1    Q    No. I think you can answer it again,
2 Mr. Ruth.
3    A    I'm not going to answer that on the
4 basis of my objection. I've already answered the
5 question.
6    Q    How many accounts are you aware of at
7 Long Leaf that were opened and closed during your
8 time there that had a positive net lifetime return
9 as of the date the account was closed?
10    A    I don't recall.
11    Q    Were there any?
12    A    I -- I don't recall.
13    Q    How many accounts were opened and
14 closed at Long Leaf during your tenure there that
15 had a positive return rate for the year 2017?
16    A    I don't know. I mean, I don't even
17 think I -- I don't even think I -- I wouldn't
18 know that. I wasn't working there the entire year
19 of 2017, I don't think.
20    Q    What about 2016?
21    A    I -- I don't know how to answer
22 that question because I don't know if people
23 even opened and closed an account within the year
24 of 2016. I don't know.

Page 56

1    Q    How many accounts were open when
2 you left Long Leaf Trading that had a positive
3 net lifetime return rate?
4    A    I wouldn't know and I don't recall.
5    Q    Did any of the customers whose accounts
6 were included in the statements you received have
7 a positive net lifetime return rate?
8    A    I don't recall and I don't know.
9 That's a very difficult question to answer because,
10 I don't know, an account could be open for, I don't
11 know, a month or two and they had a good first
12 month, and there's a possibility that's the case.
13 And I don't know what happened to the account after
14 I left --
15    Q    I'm just asking about when you left.
16    A    I don't think I'm the appropriate person
17 to answer that question.
18    Q    Well, it doesn't matter if you think
19 you're the appropriate person or not. My question
20 is are you aware of any accounts that had a positive
21 net lifetime return rate by the time you left Long
22 Leaf Trading?
23    A    I was trying to be helpful in
24 answering your questions, but I guess I'll have

Page 57

1 to object because I -- it would be speculation.
2    Q   So that means you don't recall, correct?
3    A   No, you're -- I'm objecting because
4 you're asking me to speculate, and I don't think
5 it's appropriate for me to do so.
6    Q   What customers of yours had a positive
7 net lifetime return rate on their accounts?
8    A   I feel like I've answered this.
9 I don't recall. But in addition to that, I --
10 I don't, you know -- I don't -- I think the way
11 that you're trying to calculate the account and the
12 way that the customer and me as their broker would
13 calculate the account is a focus on individual
14 trades. And, yeah, so I don't -- I don't know
15 that information.
16    Q   All right. Your grandpa's name is Mike
17 Bruno, right?
18    A   Yeah. My grandfather's deceased.
19    Q   So did he invest at Long Leaf?
20    A   I'm sorry. What was the question?
21    Q   Did Mr. Bruno invest with Long Leaf?
22    A   Invest with Long Leaf. Can you rephrase
23 that?
24    Q   No. Did Mr. Bruno invest with Long Leaf

Page 58

1 Trading?
2    A   I guess I'm confused. Are you asking
3 like is he an investor of Long Leaf Trading Group?
4    Q   All right. Let's look at CFTC Exhibit 143,
5 if you would, please.
6    A   Well, we're in the middle of a question
7 and I'm asking you to help me understand --
8    Q   Yeah, but I don't answer your questions,
9 right? I'm not a witness.
10    A   With all due respect, Mr. Burden,
11 you told me earlier that if I don't understand
12 a question, to simply ask you to help me understand
13 it and that's what I'm trying to do so ...
14    Q   Well, you may consider the question
15 withdrawn.
16    A   I'm sorry?
17    Q   Please -- you may consider the
18 question withdrawn. So please navigate to CFTC
19 Exhibit 143.
20    A   Okay.
21    Q   All right. Do you recognize this document?
22    A   I don't recall.
23    Q   All right. So jruth@longleaftrading.com,
24 that's the email address that was assigned to you

Page 59

1 at Long Leaf, correct?
2    A   Yes.
3    Q   All right. So we've got here
4 a document produced by Long Leaf. It looks like
5 some chats. The chats appear to reflect Jeremy
6 Ruth saying, "Any word on my grandpa's check? Also,
7 can I get a performance statement to go over with
8 Art Rieck," and then you and Mr. Evans continue
9 the conversation.
10       So the thing I want to focus
11 in on is, "Any word on my grandpa's check?" Did
12 your grandpa send a check to Long Leaf?
13    A   I don't recall.
14    Q   Really? You really don't remember if your
15 grandpa sent a check?
16    A   I -- no, I don't. I have no clue --
17    Q   All right.
18    A   -- if he funded it or not.
19    Q   Sorry. Say again, please.
20    A   I have no clue how he funded his account.
21    Q   All right. So did Mr. Bruno have an
22 account with Long Leaf Trading?
23    A   Yes.
24    Q   All right. And that account was assigned

Page 60

1 to you as Salesperson LLT010, correct?
2    A   The account was assigned to me. I don't
3 know if it was LLT010. I don't recall.
4    Q   All right. Well, how much did Mr. Bruno
5 fund his account with at Long Leaf Trading?
6    A   If I had to guess, like 5,000. I'm not
7 exactly sure.
8    Q   All right. Now, did you monitor
9 Mr. Bruno's account?
10    A   I don't know what you mean by that.
11    Q   Well, did you check and see how your
12 grandpa's account was doing, how his $5,000 was
13 performing?
14    A   I -- I can't really recall.
15    Q   Well, how did Mr. Bruno's account perform
16 at Long Leaf Trading?
17    A   I don't recall.
18    Q   You really don't remember? You invested --
19 your grandfather invested, you had the account and
20 you don't remember how it went?
21    A   Objection. You already asked me that and
22 I answered it.
23    Q   Yeah. You know what? You did. You
24 did. How much did Mr. Bruno get back when his

Page 61

1  account was closed?
2      A   I don't recall.
3      Q   Sorry.  What was that again, please.
4      A   I don't recall.
5      Q   Does $54 sound right?
6      A   I don't recall.
7      Q   All right.  So when did Mr. Bruno first
8  fund his account at Long Leaf?
9      A   I don't recall.
10     Q   Does November 2015 sound right?
11     A   I don't recall.
12     Q   All right.  And how long do you think
13 it took for Long Leaf to trade his account down
14 from $5,000 to $54?
15     A   I don't recall.
16     Q   Does four months sound right?
17     A   I, you know, I was still answering
18 the previous question.  But what I was trying to
19 say is I don't recall and I don't even know what
20 the end performance of his account was.  So I'm
21 not --
22     Q   I'll tell you what.  Sorry, I cut you off.
23     A   You know, I guess I object to you asking
24 me to speculate.  I don't think it's appropriate

Page 62

1  so ...
2      Q   All right.  You know, I know we looked
3  at this one before, but could you turn back to CFTC
4  Exhibit 346, please, and let me know when you're
5  there.
6      A   Okay.
7      Q   All right.  I -- sorry?
8      A   I'm here.
9      Q   All right.  I would like you to navigate
10 all the way down to page 46, please, and we're going
11 to look at page 46 and page 47.  And the part we're
12 going to look at is the account sequence status
13 report for Michael Bruno.
14     A   I don't have page numbers.
15     Q   All right.  So I'll tell you what.
16 Rather than count, you know what's a good thing
17 to do is if you hover your mouse over the bottom
18 of the PDF, you get like a little -- some arrows
19 and you can click down and it tells you the page
20 number.
21     A   What page do you want me to go to?
22     Q   46, please.
23     A   Okay.
24     Q   All right.  So do you see where

Page 63

1  it says Account Sequence Status Report and then
2  it says Account E53806, Michael Bruno?
3      A   Yep.
4      Q   All right.  So do you see at the
5  bottom where it says month to date, year to --
6  or I should say MTD amounts, YTD amounts and LTD
7  amounts?
8      A   Yep.
9      Q   What do those stand for?
10     A   Month-to-date amounts, year-to-date
11 amounts and I'm going to say lifetime-to-date
12 amounts.
13     Q   All right.  So let's go to where it says
14 profit and loss.  Do you see that?
15     A   What -- I got -- I hit the wrong button.
16 What page are we on again?
17     Q   46, please.
18     A   46.  What was your question?
19     Q   All right.  I would like you to go
20 to where it says profit and loss.  It's sort of
21 like one, two, three, like the fourth column over
22 at the bottom of page 46.  Do you see that?
23     A   Um-hmm.
24     Q   What does that DR indicate?

Page 64

1      A   I believe that represents debit.
2      Q   All right.  So what's the month-to-date
3  P&L for Mr. Bruno's account?
4      A   For 3/21/16?
5      Q   Yeah.
6      A   It looks like at the time this
7  statement was printed, I mean, there's open
8  short option positions.  His month-to-date amount
9  according to this statement is debit $2,225.
10     Q   All right.  So what are we looking
11 at for Mr. Bruno's year-to-date amount as of the
12 date of this statement?
13     A   I don't know.  I'm sorry.  I don't
14 think that -- I don't know how that's possible.
15 His net liquidating value on that day is 16.97.
16 I don't know if it was a margin call.  I don't know.
17 What was the question?
18     Q   All right.  It looks here like the
19 year-to-date profit and loss amount for Mr. Bruno's
20 account as of March 21, 2016 is a debit of $6,460.
21 Am I reading that correctly?
22     A   Yes and no.  But the reason why I say
23 that is that's what it says under the column, but
24 that doesn't necessarily mean that's exactly what's

Page 65

1  going on with the -- that number has potential
2  to be inaccurate.
3      Q    All right.  Do you have any reason to
4  believe this number here is inaccurate?
5      A    Yes.
6      Q    Why do you think that?
7      A    Well, I earlier testified that
8  I believe he opened the $5,000 account.  I'm
9  not quite sure.  But in answering your question,
10  I'm making the assumption that he did open a $5,000
11  account, and I don't understand how he could have
12  a net liquidating value of $16.97 and -- or it looks
13  like a debit, debit value of $16.97 and have lost
14  $6,460.
15      Q    Is that difficult for you -- do you
16  think that's inaccurate because it's more than
17  you remember him funding the account?
18      A    Say that again.
19      Q    Yeah.  So when you say that you think
20  this number looks wrong or is inaccurate, is that
21  just because you remember Mr. Bruno putting $5,000
22  in and it looks like maybe he lost more than that?
23      A    No.  The other reason -- I mean,
24  that's one thing that looks suspicious to me

Page 66

1  in terms of the accuracy of that number.  The
2  second would be that he has an open position,
3  and I don't know where the market is on the date --
4  it looks like 3/17/16 but the numbers reflected
5  on -- this looks like it's an iron condor.  So
6  with a significantly -- you know, gap between the
7  call side and the put side of the trade that, you
8  know, there's a possibility that one of these sides
9  were reporting on the last traded value what should
10  be -- and isn't necessarily where the market --
11  the values of those could be incorrect.  So this
12  position could be from statement-wise not actually
13  providing the true value of what that option
14  position was worth as a whole.
15      Q    All right.  Did you ever talk about
16  your grandfather's Long Leaf Trading account with
17  him?
18      A    Yeah.  I mean, me and my grandfather
19  talked regularly.
20      Q    All right.  Well, did you talk about
21  the fact that it had lost substantially all of its
22  value?
23      A    I don't recall and I would be
24  speculating if I even knew that to be true.

Page 67

1  I don't know.
2      Q    I mean, did he ever -- did you ever
3  say, you know -- did you ever have to tell him
4  that his account was substantially gone?  Did you
5  break that news to him?
6      A    I don't recall the performance
7  of my grandfather's account.  I can tell you that
8  my grandfather opened an account with me as support
9  for, you know, my career and he was, you know, happy
10  that his, you know, grandson was doing something,
11  you know.  My grandfather likes to talk about
12  finance and money and has all his life with me,
13  and I think he was excited that his grandson was
14  involved in a -- (inaudible).
15      Q    Well, did Mr. Bruno ever bring it up
16  to you that his account had lost substantially all
17  of its value?
18      A    Not that I recall.
19      Q    All right.  I'll tell you what.  Could you
20  turn, please, to CFTC Exhibit 124.
21      A    Okay.
22      Q    All right.  Who is Rob Mixer?
23      A    Looks like he's a customer of Long Leaf.
24      Q    Well, do you recognize his name?

Page 68

1      A    I mean, after looking at this document,
2  yeah.
3      Q    All right.  Who do you recognize -- what
4  do you recognize him to be?
5      A    I don't know.  Rob Mixer.
6      Q    All right.  So let's focus on
7  the second paragraph of Mr. Mixer's email to
8  you on August 30th of 2016.  He writes, "I need
9  to cut my losses.  My account is down 33 percent
10  when I look at my cash balance.  At this point I
11  need a 50 percent return on current capital just
12  to get back to where we started a year ago.  Even
13  if you met the targeted 20 percent return per year
14  that we initially discussed, it will be two plus
15  years to recover.  Also, I have not had a single
16  account review, and the initial agreement was at
17  least quarterly reviews."  And then you write back,
18  "Thanks for reaching out.  I want to address this
19  immediately.  What time are you available tomorrow
20  to take my call?"  So did you write this email?
21      A    It appears so.  I don't recall writing it.
22      Q    All right.  So is what Mr. Mixer
23  saying here correct at this point in time in
24  August of 2016?  Was his account down 33 percent?

Page 69

1    A    I would have no clue to know that.
2    Q    All right.  So let's turn, if we could,
3  to CFTC Exhibit 330.  And let me know when you're
4  there, if you would, please.
5    A    I mean, I'm here.
6    Q    All right.  Do you recognize this document?
7    A    No.
8    Q    All right.  So I want you to look
9  halfway down CFTC Exhibit 330, please.  So it
10 says Jeremy Ruth wrote, "David, thanks for reaching
11 out.  I know you are working part time right now.
12 This strategy would be perfect for your situation.
13 Selling options is an income-generating strategy.
14 This will give you the ability to supplement your
15 part-time employment with that additional income
16 generation.  I'd like to keep this appointment to
17 show you how we can do that.  Please let me know
18 how you wish to proceed."  Did you write that
19 email, Mr. Ruth?
20   A    I don't recall.  I'm aware it comes from
21 my email account, but I don't recall it.
22   Q    All right.  Are you aware of any
23 customers of Long Leaf for whom selling options
24 was something that generated income?

Page 70

1    A    I don't understand what you mean by that.
2    Q    Are you aware of any customers
3  of Long Leaf Trading that got money through the
4  Time Means Money program that were able to generate
5  income?
6    A    Again, I don't know what you mean by that.
7    Q    What part of my question is confusing
8  to you, Mr. Ruth?
9    A    I mean, are you asking am I aware
10 of any customers that generated a profit from
11 a trade?
12   Q    No, I'm not talking about a trade.
13 What you appear to be writing here is that selling
14 options is an income-generating strategy.  This will
15 give you the ability to supplement your part-time
16 employment with that additional income generation,
17 right?  Are you aware of any Time Means Money
18 customers who were able to achieve or enjoy what
19 you were describing here?
20   A    I'm going to object that your question
21 is misleading.
22   Q    Okay.  Well, your objection is noted.
23 You can answer the question anyway, if you would,
24 please.

Page 71

1    A    What's your question?
2    Q    Are you aware of any Long Leaf
3  Trading customers who were able to supplement
4  their employment with additional income generation
5  through trading?
6    A    I don't -- I don't know how to answer
7  that question.  There's too many like variables
8  I think and I've asked you to rephrase it like I
9  think two times, and this might be my third, and
10 I just -- I'm having a hard time understanding
11 what it is that you're specifically asking.
12   Q    Well, I'll tell you what, Mr. Ruth.
13 I like your response just fine.  Let's move on
14 to CFTC Exhibit 122, if we could, please.  Let me
15 know when you're there, if you would, please.
16   A    Okay.
17   Q    All right.  Do you recognize this email?
18   A    I mean, I see the email in front of me.
19 I don't know.
20   Q    Do you remember sending it?
21   A    I believe so.
22   Q    Okay.  Well, why did you send this, please.
23   A    Harish Patel had called in to Long Leaf
24 and wanted to talk to Tim Evans directly, and Tim

Page 72

1  Evans asked me to send him -- I don't know if you
2  want to call it the data or some facts or numbers
3  about his account so that he could have an educated
4  conversation with Harish.
5    Q    All right.  So specifically -- sorry.
6    A    To familiarize himself with Harish's
7  individual situation.
8    Q    Got it.  So it says here Subject:
9  Harish Patel.  Started with $25,707.32, ended with
10 $9,249.72.  It says total loss $16,457.60, total
11 commissions $29,820.  Am I reading that right?
12   A    Yeah.  I mean, the only thing I want
13 to clarify is that when I say ended with, I mean,
14 his account's not closed or anything of that nature,
15 but I think at that point he decided that he didn't
16 want to execute any more of his trades.
17   Q    All right.  So how did you figure these
18 numbers out, if you can recall?
19   A    I would -- and I'm making an assumption
20 here, but I would assume that from what I remember
21 for the situation, his account was flat.  There was
22 no positions.  So due to the amount that he started
23 with, by looking at his first statement, I knew the
24 amount of money that he had because his account

Page 73

1  was flat and I subtracted that amount from the
2  started-with amount.  And I probably went to, you
3  know, that sequence report and pulled the number for
4  total commissions, the LTD amount of his account.
5  That's my guess as to how that was calculated.
6      Q    So how did you get those account
7  statements that you needed to come up with a
8  number?
9      A    I don't recall.
10     Q    It was because they were emailed to you,
11  right?
12     A    I don't -- I don't know of that to be true
13  and I don't -- I don't recall.
14     Q    All right.  So I want you to take
15  note here.  What time did you send this email to
16  Mr. Evans?
17     A    It says 8:47 a.m. and 36 seconds.
18     Q    All right.  So let's turn, if we could,
19  please, to CFTC Exhibit 149.  Are you with me?
20     A    Yes.
21     Q    All right.  Who is Chris Zolton?
22     A    Chris Zolton, I don't know.  Who's Chris
23  Zolton?
24     Q    Well, was he a customer of Long Leaf?

Page 74

1      A    I -- I don't recall.
2      Q    All right.  So do you remember
3  sending this email to Mr. Zolton that we see in
4  CFTC Exhibit 149?
5      A    I don't recall.
6      Q    All right.  This jruth@longleaftrading.com,
7  that's the email account assigned to you at Long
8  Leaf Trading, right?
9      A    Yes.
10     Q    All right.  So if you look, Mr. Zolton
11  writes to you at 9:51 a.m., "Hi Jeremy, what kind
12  of return are we looking for?  Was it 12 percent
13  annually or monthly?"  And then Jeremy Ruth writes,
14  "You will get to design that.  Normally with a 10K
15  account my clients target $500 to $1000 per month.
16  Obviously there are going to be months where we
17  don't win, but getting an average of win in that
18  range is a realistic target."  Did you write that,
19  Mr. Ruth?
20     A    I don't recall but -- I mean, obviously
21  I see this is in front of me, but I don't recall.
22     Q    All right.  So what time was this email
23  sent?
24     A    10:57:53 a.m.

Page 75

1      Q    All right.  So that's two hours and
2  change after you just calculated this $16,000 loss
3  and 29 grand in commissions for Harish Patel we saw
4  in Exhibit 122.  So, you know, my question for you
5  is why would you -- why did you send this email?
6  You know, you just had this email about Mr. Patel
7  and his losses and you're telling this guy Chris
8  Zolton this is a realistic target to get 500 to a
9  thousand dollars in a month.  Why did you do that?
10     A    Well, I don't know what I was
11  thinking at the time of the origination of this
12  email, but I can say a couple things.  Harish Patel
13  has a $25,000 account and this is a $10,000 account.
14  So the comparison of where's my correlation between
15  those, he said what kind of return are we looking
16  for, was it 12 percent annually, and I specifically
17  said, well, you get to design what you're trying to
18  target.  So I'm not telling him that you get it for
19  that.  And the reason why 500 to a thousand dollars
20  per month is realistic is because -- what I'm trying
21  to articulate, and which I did, is that I know how
22  much premium we bring in and how much risk we have,
23  and the whole talk about solicitation is is that
24  we're putting you in a position to actually be

Page 76

1  able to achieve those results because the trades
2  bring in the amount of money that's required to
3  achieve that.  As opposed to traditional investing,
4  you know, you buy a stock in a buy-and-hold strategy
5  and the only way that you'd -- let's say he was
6  trying to target 12 percent.  The only way it's
7  going to get to 12 percent is if, you know, the
8  stock moves up and the end result is 12 percent.
9  But the concept of utilizing a short option strategy
10  there, the option is -- has a defined amount of risk
11  and defined amount of, you know, profit potential.
12  Factoring in the cost of the commissions and
13  utilizing spreads, it puts us in a position where
14  if we -- if a client wants to design their strategy
15  to get a 12 percent return, that it could physically
16  happen because of the fact that they, you know,
17  collected enough premium to actually make it happen.
18  So your question is a little out of context because
19  it's not all what we talked about during the
20  solicitation process.  We're talking about structure
21  of trades so that they can actually physically be
22  in a position to achieve the goals that they are
23  wishing to achieve.
24     Q    Mr. Ruth, are you aware of any customers

Page 77

1  of Long Leaf Trading that earned 500 to a thousand
2  dollars per month on a $10,000 account?
3      A   I object.  That is a misleading question.
4  It was taken out of context and it doesn't make
5  sense.
6      Q   You just have to answer the question.
7  Are you aware of any customers of Long Leaf Trading
8  that made 500 to a thousand dollars a month on a
9  $10,000 account?
10     A   I'm sure that it has happened multiple
11 times.
12     Q   Okay.  What are the names of customers
13 that got those returns?
14     A   So if you're talking about a $10,000
15 account where they received a profit on a month
16 of 500 to a thousand dollars, it probably happened
17 I would assume to multiple $10,000 accounts, any
18 one of them.
19     Q   Just give me one name.
20     A   I don't -- I mean, I don't recall
21 specifically who has $10,000 accounts, but I'm
22 pretty sure that the majority of our clients had
23 a winning month at some point during their account.
24     Q   Yeah, you know, that might be true.

Page 78

1  I don't know if they had a winning month at some
2  point during the life of their account.  But looking
3  at Exhibit 149, you write obviously there are going
4  to be months where we don't win, but getting an
5  average of win in that range is a realistic target.
6  So what I want to focus on, Mr. Ruth, is this word
7  average.
8          Are you aware of any customers
9  of Long Leaf Trading that got an average return
10 of 500 to a thousand dollars per month on a $10,000
11 account or a similar percentage of a larger or
12 smaller account?
13     A   I mean, I don't recall.  But, again,
14 I don't think I'm the appropriate person to answer
15 that because the dataset -- you're trying to create
16 a dataset that doesn't exist, and not all accounts
17 are (inaudible).
18     Q   Did Harish Patel earn 5 to 10 percent
19 a month on his account?
20     A   Did he earn 5 to 10 percent.  I don't know.
21     Q   On average.
22     A   I have no clue.
23     Q   No.  He lost $16,000 and 29,000 in
24 commissions.  You just wrote that.  We saw it in

Page 79

1  Exhibit 122.
2      A   You just asked two different -- you
3  asked me if he earned 5 to 10 percent on a monthly
4  basis or --
5      Q   No, no, no, no, no.  I asked you did
6  Mr. Patel earn an average of 5 to 10 percent on his
7  account on a monthly basis.  Did he?
8      A   You just cut me off.  I was in the
9  middle of answering your previous question and
10 you cut me off.
11     Q   Well, I'll tell what you.  You ought
12 to consider that question withdrawn.  Let's focus
13 on my new question.  So, Mr. Ruth, did Mr. Patel
14 enjoy returns of 5 to 10 percent per month on
15 average during his account's life?
16     A   Objection, misleading.  It doesn't say
17 anywhere (inaudible) 5 to 10 percent.  You're trying
18 to say --
19     Q   Sorry, you cut out there.  What was that
20 again, please.
21     A   Objection.  Your question is
22 misleading because it doesn't say anything about
23 5 to 10 percent.
24     Q   It doesn't matter what it says.

Page 80

1  I'm asking you did Mr. Patel enjoy returns of
2  5 to 10 percent on average per month during the
3  life of his account?
4      A   I'm going to object because you are
5  referring to Exhibit 149, that it says that I am
6  soliciting Chris Zolton based off of 5 to 10 percent
7  and then referring back to Harish Patel.
8      Q   First of all, that's not a valid
9  objection.  It's not a basis for an objection
10 under the Federal Rules of Civil Procedure or
11 Federal Rules of Evidence.  I hear what you're
12 saying, Mr. Ruth, but it doesn't have anything to
13 do with the question or your obligation to answer
14 the question.  So if it helps, I want you to put
15 Exhibit 149 out of your mind, and I'll ask you again
16 did Mr. Patel enjoy returns of 5 to 10 percent on
17 average per month during the life of his account?
18     A   I can't answer that question.  I don't
19 have -- I don't have any way to know that.
20     Q   But you can, Mr. Ruth.  We looked
21 at Exhibit 122 and you wrote to Mr. Evans that
22 Mr. Patel had lost $16,000, right?
23     A   He could have lost $16,000 on one trade
24 at the end of the last month.  So your question,

Page 81

1  like I said, doesn't make sense to me because
2  you're asking me did he average 5 to 10 percent
3  per month. He could have and then lost it all in
4  one trade.
5     Q   But wouldn't that mess up the average?
6  Isn't that impossible to average 5 to 10 percent
7  per month?
8     A   You're asking me to comment or
9  answer questions off a dataset that doesn't exist.
10  You're asking me to speculate.
11    Q   All right. Well, I'll tell you what.
12  I think we've had about as much fun with these
13  exhibits as we can have, so I'd like to move on.
14       MR. BURDEN: You know what, it's 12.
15  Why don't we take a break here and then resume
16  at 1. Is that acceptable to everybody?
17       THE WITNESS: That's fine with me.
18       MR. BURDEN: All right. I will see
19  everybody back here at 1. Off the record,
20  please.
21       (Whereupon a lunch recess was
22            taken from 12 p.m., to 1:07 p.m.,
23            after which the following proceedings
24            were had:)

Page 82

1     A F T E R N O O N   S E S S I O N
2           JEREMY RUTH,
3  called as a witness herein, having been previously
4  sworn and examined, testified further as follows:
5        DIRECT EXAMINATION (Cont'd.)
6  BY MR. BURDEN:
7     Q   All right. Mr. Ruth, I'd like you
8  to turn, if you would, please, to CFTC Exhibit 142
9  and let me know when you're there, please.
10    A   Okay.
11    Q   All right. Do you recognize this document?
12    A   No.
13    Q   All right. So this is an email
14  that Long Leaf Trading produced. It looks like it
15  memorializes a chat. It says Jeremy Ruth 1:13 p.m.:
16  "Harry Kaplan was the guy that wouldn't really let
17  you do a real demo and requested you send him info
18  after your conversation with him. Was looking
19  for a track record and you were trying to give
20  him live rec's instead. Did you send anything to
21  him?" And Mr. Evans replies in Exhibit 142, "No.
22  We don't do track records," and Jeremy Ruth writes,
23  "Understood. How are we going to approach him from
24  here on out," and Mr. Evans responds, "Same as

Page 83

1  all customers. We will have to present him new
2  trade rec's as they come out." Do you recall this
3  exchange, Mr. Ruth?
4     A   No. I mean, I don't recall but I'm reading
5  it now.
6     Q   Okay. So Mr. Evans writes here, "We don't
7  do track records." Was that a policy at Long Leaf
8  Trading, not to provide track records to customers
9  or prospective customers?
10    A   Well, it's difficult to answer that
11  question because we had various different types
12  of customers. So if there is a trading style in
13  which they're -- a customer that is appropriate
14  for a track record, then we would provide them with
15  one. But in the event there isn't, then we wouldn't
16  provide them with one. In this specific situation,
17  looking back at the date, June 1, 2015, I believe
18  that this wasn't being solicited for I guess
19  the topic at hand, which my understanding is
20  the Time Means Money program. But I think this
21  guy was being solicited for Tim's like trade
22  recommendation program that was kind of like
23  ending as I was starting, which I believe was
24  called like in-the-money trade alerts or something

Page 84

1  of that nature. So ...
2     Q   Mr. Ruth, did you provide any customers
3  or prospective customers with a track record?
4     A   It would be inappropriate for me
5  to do so according to CFTC rules and regulations
6  and the NFA as well because our clients aren't,
7  you know -- they're not in a program that meets
8  the standards for providing a track record.
9     Q   All right. Well, I want to get into that
10  in a moment. But my question is, Mr. Ruth, did you
11  ever provide customers or prospective customers of
12  Long Leaf Trading with a track record?
13    A   I don't recall. But I might have --
14  you know, if I was soliciting somebody for, you
15  know, a CTA or something of that nature, maybe
16  I did. I just don't -- I just don't recall.
17    Q   Do you recall the names of any Long
18  Leaf Trading customers or prospective customers
19  to whom you provided a track record?
20    A   I don't recall providing any track
21  records. I don't -- I don't recall any clients.
22    Q   All right. So I want to stay here
23  on Exhibit 142, if we could, please. Mr. Evans
24  writes, "We don't do track records." Did you

Page 85

1 ever ask Mr. Evans why he doesn't, quote, "do track
2 records"?
3    A    I don't know if I asked him or part
4 of my training or just studying for rules and
5 regulations for the Series 3 exam, but nothing
6 I was a part of met the standards to provide a
7 track record.
8    Q    Yeah, I'm not asking you about
9 your opinion on that. I'm not asking you about --
10       MR. BURDEN: Hey, somebody is
11 rustling here and it's not me or Mr. Ruth.
12 So put yourself on mute, please. There we
13 go. Thank you. No rustling. Beth, is that
14 you, Ken, Joe?
15       (Discussion off the record.)
16    Q    All right. Sorry about that,
17 Mr. Ruth. Yeah. So, Mr. Ruth, I don't want to
18 talk about your training. I can ask you about that
19 in a minute. I don't want to talk about your view
20 on whether track records are required. I just want
21 to know if you talked to Mr. Evans about track
22 records and, if so, what he told you.
23    A    I don't recall any specific conversations.
24    Q    Well, do you recall generally?

Page 86

1    A    I mean, I'll try to answer that to
2 the best of my ability and I guess relay at least
3 my opinion or part of my training. So, you know,
4 I don't know how to answer that.
5    Q    I'm just asking about conversations
6 with Mr. Evans. Did you talk to Mr. Evans about
7 track records?
8    A    Yeah, I -- in this Exhibit 142 I talked
9 to him about track records.
10    Q    Well, did Mr. Evans ever explain to you
11 why we don't do track records or did you ever ask
12 him why we don't do track records?
13    A    Apparently here it says we don't
14 do track records and I accepted that answer, and
15 then I asked him how do we go about it from here
16 on out.
17    Q    So you accepted the answer, but did
18 you follow up on it? Did you say, hey, why not?
19    A    I don't -- like I said, I don't
20 recall specifically. I know from what I know
21 about the rules on track records is that I --
22 I mean, primarily my solicitations probably had
23 to do with Time Means Money. And Time Means Money
24 is a self-directed, broker-assisted program where

Page 87

1 various clients are doing different trades and
2 they're moving in and out of, you know -- opening
3 accounts at various different parts of the year,
4 and they don't meet the standards for providing
5 such track records. That's why we don't do track
6 records because they're all doing different trades.
7    Q    Well, is that something that Mr. Evans
8 told you or is that your position now?
9    A    I mean, I'm sure at some point
10 Mr. Evans talked about it or something of that
11 nature. Again, I don't recall specifically. I
12 can't tell you like a day or time or place or the
13 words that he chose or anything of that nature, but
14 it's not my position now. It was my position at the
15 time because I'm well aware that we had clients in
16 the Time Means Money program doing different trades
17 and not everybody was doing the same trades, which
18 doesn't meet the standards for providing a track
19 record.
20    Q    Yeah. So, Mr. Ruth, you do understand
21 that the CFTC's position is that a track record
22 would be required, correct?
23    A    I don't -- no, I don't understand that.
24    Q    Okay. Well, that's in the complaint

Page 88

1 that was filed against you. So I think --
2    A    I mean, I'm not here to convince
3 you otherwise. But, I mean, you have -- I mean,
4 if you look at the trade log of the trades, I mean,
5 there's -- it's very obvious that the clients
6 weren't doing the same trades. So it doesn't meet
7 the standards of a -- to provide a track record.
8    Q    All right. So who told you that?
9    A    The CFTC.
10    Q    Who at the CFTC told you that?
11    A    The statute or rules of procedure.
12 I don't know.
13    Q    All right. What statutes, please.
14    A    I couldn't tell you a specific one
15 off the top of my head. But a summarization,
16 a track record was only applicable in a situation
17 where either it's a letter of direction account
18 or an -- I don't know if you want to call it power
19 of attorney and you're, you know, doing trades
20 and allocating to clients and they are all doing
21 the same thing and you're recording when funds are
22 going into, you know, into the program and when
23 funds are being taken out of the program, and
24 that's not what the Time Means Money program is

Page 89

1  at all.  It's a self-directed, broker-assisted
2  environment to which the trades are customized and
3  individual and not all customers do the same trades,
4  you know, which when I was there were mainly trades
5  designed by James Leeney.  My -- the majority of
6  my clients' trades were designed by Tim Evans and,
7  you know, I had some clients that only did two
8  positions a month, one position.  Some did four,
9  some did five, some did, you know, different
10  fills executed on different parts of the month
11  in different markets, so all different trades,
12  and it doesn't meet the standard for it.
13      Q    All right.  Well, what I'm trying to
14  get to, Mr. Ruth, is your view on this.  Is this
15  informed by something another person told you or
16  is it informed by your, I don't know, review of the
17  law?
18      A    I guess I have to object here.  I think
19  you have a narrative and you're trying to get, you
20  know, the actual facts --
21      Q    Mr. Ruth, I told you before about
22  these speaking objections, you know.  If you
23  want to object, you can object on the basis of
24  the Federal Rules of Evidence or Civil Procedure.

Page 90

1  You can't sort of object on the basis of not liking
2  it or thinking I'm doing one thing or another.  What
3  I want to try to get to is this view you have about
4  whether a track record is required, if Mr. Evans
5  told you that or not -- sorry.  I guess your view
6  is that it's not required.
7          You know, did Mr. Evans tell
8  you that?  Did Mr. Leeney tell you that?  Did
9  a lawyer tell you that?  Did you, you know -- were
10  you reviewing our complaint and saw it and thought
11  I disagree with that?  You know, I'm trying to get
12  the basis for your belief.  And whatever the answer
13  is, that's your testimony and that's fine.  I'm not
14  going to argue with you about it.
15      A    I'm not trying to engage in
16  an argument here.  What I was trying to do is
17  answer your question and you cut me off there.  So
18  as I was saying, is is that your narrative doesn't
19  match what happened and what went down.  I've told
20  you that I acquired the information from various
21  different sources as I was studying for the
22  Series 3, while I was receiving on-the-job training
23  from Tim Evans, speaking with other brokers and
24  utilizing some of my senses of eyes and ears

Page 91

1  to draw the conclusion that it doesn't meet
2  the standard to have a track record because the
3  clients are doing various different trades in a
4  self-directed, broker-assisted environment.
5      Q    Now, Mr. Ruth, did I hear you
6  testify before that --
7          MR. BURDEN:  All right.  You guys,
8  we've got to go off the record.  I'm getting
9  a ton of noise on this.  Mr. Ruth, I apologize.
10  We'll be back on in just five minutes, all
11  right?
12          THE WITNESS:  Okay.
13          (Whereupon a recess was taken from
14          1:24 p.m., to 1:27 p.m., after which
15          the following proceedings were had:)
16          MR. BURDEN:  Back on the record, if we
17  could, please.
18      Q    All right.  Mr. Ruth, did I hear
19  you testify just now that you were under the
20  impression that it is in fact illegal to provide
21  track records to customers or prospective customers?
22      A    No, I didn't say that.
23      Q    Okay.  Good, good, good.
24      A    I think my understanding is that

Page 92

1  there has to be certain standards that are met
2  in order for a track record to be a track record
3  of what is going on, and it only applies in certain
4  situations.  And while I was an employee at Long
5  Leaf Trading Group it was not applicable based off
6  of the account style or account type for a track
7  record, both the account type and how it's conducted
8  from an execution standpoint as well as the trading
9  activity doesn't meet the standard.
10      Q    Did customers ever ask you what the
11  average rate of return was for Long Leaf Trading
12  or how their, you know, other customers' accounts
13  performed or anything like that?
14      A    I mean, I would assume that customers
15  would -- I mean, I can't give a specific, you know,
16  instance that I recall or a name or anything, but
17  I think all investors generally ask that question
18  because the majority of them are -- and, again,
19  this is -- I don't know if it's appropriate for
20  me to speculate, but the majority of them maybe
21  like think, you know, like in a mutual fund
22  situation, which they generally have more
23  familiarity with than, you know, futures and
24  futures options as an investment vehicle.  That

Page 93

1 type of question is appropriate when trying to
2 learn about an investment vehicle. But if they
3 were to engage in that type of conversation with
4 us, myself, we wouldn't participate in it or we
5 would educate them as to why, you know, it's not
6 appropriate for -- to talk about when soliciting
7 the Time Means Money program because, again, it's
8 a self-directed account in a broker-assisted
9 environment and the trades are customized to the
10 individual and change, you know, throughout the
11 life of their account. And they're doing different
12 trades and they're coming in at, you know, different
13 times and things of that nature. So it's not a --
14 because it doesn't meet the standard, we wouldn't
15 be able to engage in that conversation except for
16 to help them better understand why their -- that
17 information is not applicable. Furthermore, the
18 type of client that we were looking -- I don't want
19 to say looking for, but the type of clients that
20 would generally, you know, utilize our services
21 is somebody that understood or agreed with I guess
22 you could say the structure of what we do and not
23 necessarily the end result of why we do it. And,
24 again, remember back, we're doing it to help them

Page 94

1 achieve a financial goal that they want to target
2 by utilizing an investment vehicle that gives us
3 the ability to put them in that situation where
4 it's even physically possible for it to happen.
5    Q    All right. Mr. Ruth, I want to direct
6 you, if I could, please, to CFTC Exhibit 110. And
7 take a look and let me know when you're there.
8    A    Okay, I'm here.
9    Q    All right. Do you recognize CFTC
10 Exhibit 110?
11    A    I don't -- like I don't recall. I'm
12 looking at it, but I don't recall.
13    Q    Got it, okay. So this was an email --
14 this is an email that Long Leaf Trading produced.
15 And if you look at the second email in the chain,
16 or I guess I should say the first email because
17 it's the earliest one, it says from Jeremy Ruth,
18 sent April 27, 2017 to James Leeney and Vince
19 Prieto. Who's Vince Prieto, please.
20    A    Vince Prieto is an A -- was an AP of Long
21 Leaf Trading Group.
22    Q    So the subject is Calls to Review
23 and Jeremy Ruth writes, "Bros, here are some calls
24 I think are worth the listen." And I want to focus

Page 95

1 on the second one here and it says Jerry Krantz.
2 Who's Jerry Krantz, please.
3    A    It looks like a phone call that we --
4 you know, I'm speculating based off of reading this
5 email, but it looks like a phone call that we, you
6 know, solicited --
7    Q    Was Jerry -- sorry.
8    A    I'm sorry?
9    Q    Sorry, I cut you off there. Was there
10 more?
11    A    Looks like he's a gentleman that we
12 solicited. I don't know if it was me or someone
13 else but looks like maybe Pierre had spoken with
14 him and, I don't know, maybe myself. I don't know.
15    Q    All right. So it says, "Jerry Krantz:
16 Broker Premier - started from a Pierre fuck up,
17 but the value in this call is how to get around
18 a request for a track record and how to show
19 empathy so he feels you understand him. Let me
20 know if you have any questions. Sincerely, Jeremy
21 Ruth." Did you write that?
22    A    I don't recall but it appears that I did.
23    Q    All right. So do you recall what you
24 were talking about here when you referred to the

Page 96

1 value in the call being how to get around a request
2 for a track record?
3    A    Yeah. What that means is our --
4 the Time Means Money program, which is what I'm
5 assuming we were soliciting Jerry Krantz, doesn't
6 meet the standards for a track record. And a lot
7 of times when you're soliciting, they say I want to
8 see a track record or I don't want to continue, you
9 know, talking about this or I'm not going to sign up
10 unless there's a track -- I can see a track record.
11 And I would assume the value that I'm speaking of
12 is explaining to Jerry Krantz why we can't provide
13 a track record and the reason why we can't provide a
14 track record is because, again, the program doesn't
15 meet the standard for obliging a track record.
16    Q    All right. Well, I'll tell you what.
17 I would like, if we could, please, to listen to
18 CFTC Exhibit 154, which is an April 27, 2017 call
19 with Mr. Jerry Krantz.
20    A    This is the CFTC -- what was the number?
21    Q    154.
22    A    And it was on what date? What date was
23 the call?
24    Q    It'll be in the file title.

Page 97

1    MR. BURDEN: All right. So for the
2 record, CFTC Exhibit 154 is a file produced
3 by -- audio file produced by Long Leaf Trading.
4 File name on that is 04-27-2017_JERRYKRANTZ_
5 8325459881 and the call is 1 hour, 15 minutes
6 and 22 seconds long and I'm going to start
7 this at 18 minutes in. Give me just a moment.
8 There we go. All right. I'm starting this
9 at 18:03.
10    (Whereupon the audio recording was played.)
11    MR. BURDEN: All right. Sorry, guys.
12 I'm going to do that one again. There we go.
13 All right. Here we go. So CFTC Exhibit 154,
14 I'm starting in at 17 minutes and 48 seconds.
15    (Whereupon the audio recording was played.)
16    MR. BURDEN: So I'm going to stop it
17 there at 20 minutes and 5 seconds.
18    Q    So, Mr. Ruth, is that your voice on the
19 call?
20    A    It appears so.
21    Q    All right. So why did you tell
22 Mr. Krantz that it's illegal to provide a track
23 record?
24    A    Because the standards of the program --

Page 98

1 or the way the program's conducted don't meet
2 the standards to provide a track record.
3    Q    So why do you think it's illegal
4 to provide the track record, though? What statute
5 or what regulation says you can't provide a track
6 record?
7    A    Again, I don't know the specific
8 section, and I'm paraphrasing, but it gives you
9 the specific standards that need to be met in order
10 to provide a track record somewhere in either the
11 CFTC code or the NFA.
12    Q    Yeah, so you're going to have to tell
13 me where, though. Where does it say that you can't
14 provide a track record unless certain standards are
15 met? Because that would be news to me.
16    A    I mean, I can't speculate whether
17 it would be news to you or not. I don't have
18 those resources available right now so I couldn't
19 tell you.
20    Q    All right. Well, I'll tell you what.
21 You know, could we turn, please, to CFTC Exhibit 93.
22    A    Okay.
23    Q    And let me know -- okay, so you're there.
24 All right. Do you recognize CFTC Exhibit 93?

Page 99

1    A    I don't.
2    Q    All right. So CFTC Exhibit 93
3 is an email produced by Long Leaf Trading it
4 says From: Jruth@longleaftrading.com. It's sent
5 May 9, 2017 to Vince Prieto and James Leeney and
6 Pierre Halteh. Who is Pierre Halteh, please.
7    A    He was an AP with Long Leaf Trading Group.
8    Q    Got it. So if you look at the subject
9 and the attachments, they're the same. It says
10 April 2017 Results.xlsx. And if you scroll down,
11 we've attached that exhibit -- or, sorry, that
12 attachment to the exhibit. Do you recognize that
13 document?
14    A    I mean, I don't recall it but I'm
15 looking at it.
16    Q    Is this something that you put together,
17 Mr. Ruth?
18    A    Probably.
19    Q    Okay. Why do you say probably?
20    A    Just by looking at like the table style.
21 It's something that I'm capable of producing.
22    Q    All right. So if you look at the
23 top row here, it says March 17 and then it says,
24 you know, there are columns that are numbered 1

Page 100

1 through 13 and it says soymeal, soybeans, gold,
2 cattle and then a net P&L. And if you look, all
3 those net P&Ls are negative and this is -- let me
4 just ask you about this. Do you know, what does
5 this indicate? What's this supposed to summarize?
6    A    I don't -- I don't know if these are
7 closed positions or, you know, based off of where
8 the market was trading at the time of, you know,
9 the production of this. But I think it's to kind
10 of, you know, give myself an idea of how, you know,
11 know that are -- were traded on the APS block
12 where, you know, their results are P&L-wise on
13 the individual four trades and the total of those
14 together. And I think the numbers across the top
15 was probably based off the number of contracts
16 that they traded.
17    Q    All right. So thanks for that. So it
18 looks like the net P&L for these trades in March
19 and it looks like April of 2017 is a negative for
20 all of the net P&L row on the bottom. Am I reading
21 that right?
22    A    I'm sorry. Can you repeat that?
23    Q    No, it was a terrible question. So let
24 me ask you instead why did you send this document

Page 101

1 to Mr. Leeney and your fellow APs?
2     A     Once I -- you know, over time I've, you
3 know, learned how to -- although I don't think I
4 ever became perfect because I would have to revise
5 this thing multiple times. But over time of being,
6 you know, a broker I learned myself how to, you
7 know, calculate the P&L of a position utilizing
8 statements. And when I talked to clients and
9 they asked me, well, where am I at, I, you know,
10 personally believe in giving them a to-the-penny
11 answer. It was like my own personal philosophy,
12 you know. It gives them more confidence in you
13 and makes it seem like you, you know -- I don't
14 want to say know what's going on or you're aware
15 of what's going on as opposed to round numbers.
16 And so if I made it for myself for the purposes
17 of giving it as a resource for my colleagues to
18 use, you know, is probably why I sent it to them.
19 But I would definitely tell them that, you know,
20 these are my calculations and I could be wrong,
21 and I think some -- you know, this might even be
22 the time I did this because this is like in the
23 last I think three -- or two or three months that
24 I worked there. This is when I think I actually

Page 102

1 had the knowledge to be able to somewhat get
2 accurate. But, you know, I would probably have
3 to revise this three or four times. Just, you
4 know, it would be like, oh, I didn't take that into
5 consideration because unique things would happen,
6 you know. But it wasn't just a standardized like
7 a position opens and then they expire or something,
8 you know. There might have been positions that --
9 or maybe it was assigned a futures contract and
10 then, you know, the futures contract clearing
11 rate is different from the options clearing rate
12 or whatever it might be. So I don't know if this --
13 what version this is, if it's 1, if it's 2, if it's
14 3, if it's 4, but it's not an official statement.
15 It's more of just a resource so you know what's
16 going on -- or I would know what's going on when
17 I was talking to people.
18     Q     Got it.
19     MR. BURDEN: Well, I'll tell you
20 what. I actually need to take a very quick
21 five-minute break here. So can we go off the
22 record and come back at 2, please.
23     THE WITNESS: Sure.
24     MR. BURDEN: All right. Off the record.

Page 103

1     Thanks very much.
2     (Whereupon a recess was taken from
3     1:52 p.m., to 2:01 p.m., after which
4     the following proceedings were had:)
5     MR. BURDEN: All right. Can we go back
6 on the record, please. Thank you.
7     Q     Mr. Ruth, would you turn to CFTC
8 Exhibit 148 for me, please.
9     A     Okay.
10     Q     All right. Now, this is a group exhibit.
11 I've put it together. It's three separate emails.
12 The emails are complete. Could you take a look at
13 them, please, and tell me if you recognize them.
14     A     Again, this is four years ago. I don't
15 recognize them, but I'm looking at them right now
16 and it's helping me familiarize myself with them.
17     Q     Okay. Well, let me know when you've
18 finished looking at them and I'll ask you some
19 questions about them.
20     A     I'm ready.
21     Q     All right. Very good. So, Mr. Ruth,
22 all right, so I want to look at the second email
23 in Exhibit 148. It's from jruth@longleaftrading.com
24 to an email address that's a string of numbers

Page 104

1 and letters. It says, "Barry, I just got
2 word you called," and there's some writing here.
3 The sentence I want to focus on is at the -- is
4 in the second paragraph. So the email that says,
5 "When we are holding positions and a market turns
6 unexpectedly, obviously it's not a good thing. But
7 when we are then reinitiating the portfolio, we are
8 now capturing that existing volatility with higher
9 premiums on our option sales. This is why we tend
10 to perform well coming out of these periods where
11 we take a loss. I will provide you some additional
12 details on these positions tomorrow, as well as our
13 new positions, as this is when the option period
14 for the next month will begin tomorrow."
15     So the bit I want to ask you
16 about, Mr. Ruth -- well, I guess I should ask
17 you first. Mr. Ruth, did you write this email?
18     A     (Inaudible).
19     Q     Sorry. One more time, please.
20     A     I don't necessarily recall. I mean,
21 it appears I did. I don't know who has an email
22 address like that. I don't know if that actually
23 went to Barry, but let's ask away. Let's go.
24     Q     All right. Very good. So the email

Page 105

1 says, "This is why we tend to perform well
2 coming out of these periods where we take a loss."
3 This idea that Long Leaf performs well coming out
4 of periods where it takes a loss, is this something
5 that you told customers?
6    A   I don't necessarily recall, but
7 from what I can gather from this string of
8 emails is maybe James -- I don't really email
9 clients like this. But James Leeney, his style
10 was to communicate a lot through email, and I think
11 James Leeney sent me an email as an example of kind
12 of what to say when talking to a client that maybe
13 I couldn't get on the phone or something of that
14 nature. But I think what we're trying to take
15 here -- or what you're trying to take here, which
16 I think is kind of being taken out of context,
17 is the concept of the purpose of short option
18 strategy spreads, especially iron condors, is
19 when you initiate the position, you want to capture
20 an increase in volatility so you can increase
21 the amount of premium that you collect, which
22 in a spread position decreases the amount of risk,
23 and then throughout the option period you want the
24 volatility to decrease. And what we're saying is

Page 106

1 is that instead of the volatility decreasing, the
2 volatility increased at the end of the option period
3 and because of that, you know, we're going to, you
4 know, take a loss in the previous position. But at
5 the same time it's actually beneficial in the sense
6 that because there is an increase in volatility and
7 we're going to be entering into -- or maybe we're
8 reestablishing a position in the next option month
9 or whatever it might be, we get to collect a higher
10 premium. It means that we have the ability to make
11 more money if that position becomes successful and
12 because we're collecting more premium, we decrease
13 the amount of risk, which are all things that are
14 beneficial. So --
15    Q   All right. So, Mr. Ruth, I hate
16 to interrupt this long soliloquy but, you know,
17 I can read the emails. I hear what you're saying.
18 My question is a much simpler one.
19        What I want to know is we see
20 in Exhibit 141 jruth@longleaftrading.com  writes
21 in an email, "This is why we tend to perform well
22 coming out of these periods where we take a loss."
23 Is that something that you told customers? We can
24 talk about why, but my question is did you say this

Page 107

1 to customers?
2    A   I don't recall. But, I mean, what
3 I can draw from this is that this happened on
4 June 22, 2017, which is probably the last 60 days
5 of my employment there, and over a 2-year period
6 I see one example of me saying that in emails that
7 I typically don't send. So the answer to your
8 question is, no, I don't typically say this based
9 off of those things that I'm gathering from right
10 here. If I do, I don't recall.
11    Q   All right. You don't if you don't and
12 if you do, you don't recall. You're my favorite
13 kind of witness, Mr. Ruth. Never change. I do want
14 to follow up a little bit, if I could, please, on we
15 tend to perform well coming out of these periods
16 where we take a loss. What periods did Long Leaf
17 perform well in after taking a loss, if you can
18 recall?
19    A   I can't recall specifically, but
20 a lot of times -- I mean, I'm sure if me and you
21 were to sit down and go over every single trade, I
22 can point out multiple times in which that happened.
23    Q   Yeah. But I'm asking you now if you can
24 recall any incidence where that happened, a month --

Page 108

1    A   I mean, I don't -- I don't
2 remember specific trades from four to six years
3 ago, so I wouldn't be able to answer that question
4 specifically. But -- and generally I believe that
5 that is a true statement, yes.
6    Q   But you don't have any data to back that
7 up, do you?
8    A   I'm not saying that I don't have any
9 data. I'm saying that I think a reasonable person
10 could understand that I don't remember specific
11 trades from four to six years ago and if it was
12 put in front of me, I believe that the data exists.
13    Q   Well, I mean, we filed this case almost
14 a year ago. You've had a great deal of time. So,
15 you know, I guess I want to know why you haven't --
16 why you haven't sought to educate yourself on this,
17 you know. I mean, it sounds like you think that
18 you could point to me -- point out for me some
19 times when Long Leaf did well following periods
20 of losses if you had the data, you know. And my
21 question is, you know, like why don't you have the
22 data? It seems to me like you're not going to be
23 able to do that.
24    A   I'm sure the data will come out during

Page 109

1 trial.
2    Q   Yeah.  I don't -- I don't know how
3 you're going to make that happen, but that's fine
4 with me.  All right.  So let's stay on the exhibits,
5 if we could, please.  I would like for you to turn
6 to CFTC Exhibit 125 and take a look at it for me,
7 if you would, please, and let me know when you've
8 finished looking at it.
9    A   This one again.  All right.  I'm ready.
10    Q   All right.  Do you recognize this email,
11 Mr. Ruth?
12    A   Yes.
13    Q   All right.  Can you tell me what it is,
14 please.
15    A   Steve Beranek is an RIA.  (Inaudible) that
16 term?
17    Q   I don't answer questions, Mr. Ruth.
18    A   All right.  And he's, you know, he
19 was like a drinker, golfer, fisher, fisherman the
20 majority of the time during the week.  And a lot of
21 times we would talk while he was, you know, either
22 golfing or fishing and, you know, he would always
23 make comments about how, you know, he wanted to,
24 I don't know, get involved with our firm from an

Page 110

1 ownership standpoint.
2    Q   Did he?
3    A   Did he get involved?
4    Q   Yes.
5    A   Is that what you're asking?  No, no,
6 but he -- I mean, I don't think it's true but it's,
7 you know -- the reason why this is funny to me is
8 because, I don't know, I think he's kind of like
9 passively-aggressively saying that he's not doing
10 well.  He doesn't really care but -- and I'm just
11 summarizing it based off of what I know about him
12 and, you know, he thinks -- yeah, I don't know.
13 He just -- it's just a funny email.
14    Q   All right.  So, Mr. Ruth, in CFTC
15 Exhibit 125 Mr. Beranek writes to you, "Thanks.
16 Your firm's business model is very impressive.
17 It looks like the commissions and fees for the
18 year will surpass my entire $20K in investments,
19 and I have only lost about 20 percent of my
20 investment.  At this rate in ten years my account
21 balance will be zero and your firm will have made
22 $200,000.  Steve."
23         All right.  So Mr. Beranek
24 writes it looks like the commissions and fees for

Page 111

1 this year will surpass my entire 20K in investments.
2 I have only lost about 20 percent of my investment.
3 Is that true?  By October 29, 2016 had Mr. Beranek
4 lost 20 percent of his investment?
5    A   I don't -- I don't think any of these
6 numbers are true.
7    Q   Why do you think that they aren't true?
8    A   Because I don't think that -- I mean,
9 it's possible.  But, I mean, it's actually -- he's
10 kind of giving us a compliment in the sense that,
11 you know, we would only be able to make $200,000
12 in commissions if they're winning trades.  You
13 have to win, yeah, in order for that to happen.
14 So I don't know.  I don't know the numbers at the
15 time he wrote this or, you know, whether he's lost
16 about 20.  I don't know if that's true.  I just
17 don't recall and I don't have his statements.
18    Q   And, in fact, Mr. Beranek lost
19 substantially all of his investment at Long Leaf
20 Trading, isn't that correct?
21    A   I have no clue.
22    Q   So you write to Mr. Evans, "I just got
23 a good laugh reading this again."  You did write
24 that, didn't you?

Page 112

1    A   Yeah.
2    Q   All right.  So let's go, if we could,
3 please -- oh, and the date on this -- well, it
4 doesn't matter.  I guess the exhibit says the date
5 on it.  So I want to go to CFTC Exhibit 349.  So if
6 you would navigate to that, please, and indicate for
7 me when you are there, that would be great.
8    A   Okay.
9    Q   All right.  Do you recognize CFTC
10 Exhibit 349?
11    A   Again, I don't recognize it.  I'm
12 looking at it now.  I'm familiarizing myself with
13 it.
14    Q   All right.  So Mr. Mixer writes
15 to you, "Jeremy, please don't open any positions
16 in my account that can't be closed in February.
17 My account hit 15,000 in January, so I think it
18 is reasonable to assume that it won't be back
19 at $30,000 by the end of February.  I want to
20 liquidate my holdings as we near February expiration
21 and then take my business elsewhere."  Do you recall
22 receiving this email?
23    A   I don't recall it, you know, this
24 is four and a half years ago.  But it appears that

Page 113

1  I received this email to my Long Leaf email address.
2      Q    All right.  So Mr. Mixer seems
3  to suggest in his email that he started with
4  $30,000 and his account as of February 1, 2017 is
5  at $15,000.  Are those numbers right?
6      A    I don't have any way to tell you if that
7  is the case.  I don't recall.
8      Q    Did you go and check at the time and see
9  if that was correct?
10     A    I don't recall.
11     Q    All right.  Let's go to CFTC Exhibit 128,
12 if we could, please, and let me know when you're
13 there, if you would.
14     A    128?
15     Q    Yes, please.
16     A    Okay.
17     Q    All right.  So do you recognize CFTC
18 Exhibit 128?
19     A    Yes.
20     Q    All right.  What do you recognize it to be?
21     A    It's an email from Shane Allen to me.
22     Q    And is Shane Allen, was he a customer of
23 Long Leaf Trading?
24     A    It appears so, yeah.

Page 114

1      Q    So Mr. Allen writes on May 17, 2017
2  to you, "This is a written notification to cancel
3  all future orders based on performance over the past
4  year and a half.  I requesting the termination of
5  my account and the remaining balance to be mailed to
6  me in check form at the following address.  Please
7  advise and confirm," and he gives his address.
8  Do you recall receiving this email?
9      A    I don't recall it but I'm familiarizing
10 myself with it right now.
11     Q    All right.  So Mr. Allen says --
12 you know, he's requesting the termination of his
13 account.  He wants to cancel all future orders based
14 on performance over the past year and a half.  What
15 was the performance of Mr. Allen's account over the
16 preceding year and a half?
17     A    I don't know.  I have no clue.  I don't
18 recall.  And if I'm not mistaken, that might have
19 been a client I inherited I think from Tony Klancic
20 after he left the firm.
21     Q    Did you do anything to check and see
22 what that performance was, like what Mr. Allen might
23 be talking about here?
24     A    I don't recall if I did.  I would

Page 115

1  assume -- I mean, I probably notified Tim Evans of
2  this communication, which is the procedure anytime,
3  you know, you get an adverse --
4      Q    Yeah, but I'm not asking about that.  I
5  want to know did you look and see what that account
6  performance was that Mr. Allen was complaining of?
7      A    I don't recall.
8      Q    All right.  Let's go to CFTC Exhibit 126,
9  if we could, please.
10     A    Okay.
11     Q    Do you recognize CFTC Exhibit 126?
12     A    I don't recognize it, but I'm looking at
13 it and I'm familiarizing myself with it.
14     Q    All right.  Well, thank you for
15 doing so.  Was Joe Hermanson a customer of Long
16 Leaf Trading?
17     A    It appears so.
18     Q    All right.  And Mr. Hermanson writes
19 on June 14th of 2017, "Jeremy," and then there's
20 some weird symbol, "The reality of all of this is
21 finally hitting me" -- oh, it's an S -- "as you've
22 managed to take 13K and turn it into 5K.  I could
23 have done that bad all by myself.  I also noted
24 that of the last four positions you placed me in,

Page 116

1  I was not consulted.  You just did it.  That said,
2  can you see that is what is left here is sent back
3  to Midland.  Thanks, Joe Hermanson."  Do you recall
4  receiving this email, Mr. Ruth?
5      A    I don't.
6      Q    Did you check and see if this was
7  correct?  I should just -- before I ask you if
8  you checked, I should ask is what Mr. Hermanson is
9  writing here correct?  Did Long Leaf take a 13K
10 account and turn it into a 5K account?
11     A    I'm going to object to the
12 question as misleading.  Like it's not a managed --
13 it's a self-directed account in a broker-assisted
14 environment.  So I guess Joe Hermanson turned his
15 13K account into a 5K account.
16     Q    All right.  Well, let me ask it
17 a different way.  Mr. Hermanson suggests here
18 that he had a 13K account at Long Leaf Trading
19 and as of the date of the email, June 14, 2017,
20 it was a 5K account.  Is he right about that?
21     A    I wouldn't -- I don't recall.  I don't know
22 the performance of his account.
23     Q    Let's look, if we could, please, at
24 CFTC Exhibit 129.  And take a look at that and tell

Page 117

1 me if you recognize it, please.
2    A   I don't recognize it.
3    Q   All right.  Dan Snyder, was he a customer
4 of Long Leaf Trading?
5    A   It appeared so, yeah.
6    Q   All right.  And so if you look down at
7 the June 14, 2017 email at the bottom of Exhibit 129
8 Mr. Snyder writes, "Based on the recent statements,
9 the balance has reduced from $25,099 to $19,131,
10 a 24 percent reduction in 3 months.  A loss of
11 almost 2,000 per month, a far cry from expectations
12 to meet the original annual expectations, you would
13 need to exceed previous average expectations for
14 every month for the rest of the year and that does
15 not seem likely.  When we have gains, they are not
16 maximum gains.  Yet every loss has been a maximum
17 loss.  I am afraid I don't see the value in your
18 selection process."  Do you recall receiving this
19 email?
20    A   I do not.
21    Q   All right.  Do you know if -- is
22 Mr. Snyder right about this?  As of June 2017 was
23 his account down 24 percent?
24    A   I don't recall.

Page 118

1    Q   All right.  Hey, real quick, when did
2 you depart Long Leaf Trading, please, Mr. Ruth?
3    A   Hold on one second.
4    Q   Hey, Mr. Ruth, if you don't -- I don't
5 want you to like consult -- if you don't recall,
6 you don't recall.
7    A   So I -- it looks like I withdrew
8 from Long Leaf on 8/28/2017.  I actually think
9 that -- oh, let me tell you.  This date's very
10 important.  I want to say it was August 24th or
11 25th of 2017.
12    Q   Why do you think that?
13    A   Because I remember it being either
14 a Thursday or a Friday.  I think it was Thursday
15 afternoon.
16    Q   Got it.  All right.  Do you recognize
17 the name Dale Bennett?
18    A   No.
19    Q   All right.  I'm going to play you CFTC
20 Exhibit 155 and it is a call placed by Long Leaf
21 Trading from August 17, 2017 with Dale Bennett, and
22 the file name on that is 08-17-2017_DALEBENNETT --
23 B-e-n-n-e-t-t -- _2178332491 and the call is
24 2 hours, 49 minutes and 4 seconds.

Page 119

1        MR. BURDEN:  So this is CFTC Exhibit 155.
2 I'm going to start it off at 1602.
3        (Whereupon the audio recording was played.)
4        MR. BURDEN:  All right.  So I'm stopping
5 it at 1702.
6    Q   Mr. Ruth, is that your voice on the line?
7    A   It sounds like it.
8    Q   All right.  So I'm going to jump
9 ahead a little, and this is going to play for
10 a while but I promise it'll be worth it.  I'm going
11 to start at --
12    A   Do you mind if we take a break?
13    Q   Sure, yeah.  I don't mind.  When do you
14 want to come back?
15    A   Hopefully ten minutes or less.
16        MR. BURDEN:  Okay.  Off the record, please.
17        (Whereupon a recess was taken from
18        2:32 p.m., to 2:47 p.m., after which
19        the following proceedings were had:)
20        MR. BURDEN:  Mary, could we go back on
21 the record, please.  All right.  So, Mr. Ruth,
22 we're going to listen to Exhibit 155, which is
23 this August 17, 2017 call with Dale Bennett, and
24 I'm starting it at 54 minutes and 6 seconds.

Page 120

1        (Whereupon the audio recording was played.)
2    Q   All right.  So I want to stop that
3 one there and ask, Mr. Ruth, is that your voice
4 on the call?
5    A   Sounds like it.
6    Q   All right.  So, you know, this call
7 is from August of 2017.  So this has got to be
8 about the end of your tenure at Long Leaf, is that
9 right?
10    A   Yeah, one week before I left it sounds
11 like to me.
12    Q   All right.  This guy, Dale Bennett, he
13 sounds old.  Do you know how old he is?
14    A   I have no clue.
15    Q   All right.  Do you know if he ultimately
16 opened an account at Long Leaf?
17    A   I don't recall.
18    Q   He did.  You know, we heard a lot
19 of the call, Mr. Ruth but, you know, one of the
20 things that we heard you say is that the majority
21 of your customers make money.  You know, that was
22 in Exhibit 155 we heard you say it.  That's not
23 true, is it?
24    A   I'm going to object to misleading.

Page 121

1 The basis for the misleading is it's a 2-hour,
2 49-minute and 4-second phone call. And I want to
3 say maybe we listened to 3 minutes of it and you
4 represented that we listened to a majority of call,
5 which is --
6    Q    I think you must have -- I think
7 you -- first of all, that's not a valid objection.
8 Second of all, Mr. Ruth, you must have misheard
9 me. I didn't say that we listened to the majority
10 of the call. I said we heard you say on the call
11 that a majority of your customers made money. We
12 just hear you say that in Exhibit 155, didn't we?
13    A    No.
14    Q    Is it true that a majority of your
15 customers at Long Leaf made money?
16    A    I'm going to object. It's a misleading
17 question.
18    Q    All right. Your objection is noted
19 for the record and it's preserved for appeal.
20 What's your answer to the question, please.
21    A    I don't understand the question.
22    Q    Is it true that a majority of your
23 customers at Long Leaf Trading made money?
24    A    I -- and, again, I don't -- the way

Page 122

1 that you're stating the question, I don't have
2 the ability to answer that.
3    Q    I know.
4         MR. BURDEN: All right. Let's pick up
5 Exhibit 155 at 1 hour, 4 minutes and 44 seconds.
6         (Whereupon the audio recording was played.)
7         MR. BURDEN: All right. So I'm going to
8 stop that at an hour, 5 minutes and 49 seconds.
9    Q    Is that your voice on the call, Mr. Ruth?
10    A    Sounds like it.
11    Q    So, you know, this is August.
12 We've, you know, gone through a litany of the
13 exhibits, 125, 349, 128, 126, 129, of aggrieved
14 customers. We've seen your own calculations from
15 March and April showing losses for Long Leaf Trading
16 recommended trades at every contract level. Why
17 are you telling this poor old guy that you can see
18 results and you have lots of confidence and you're
19 certain, almost certain about your ability to reach
20 the goals? Like why are you saying this to this
21 guy?
22    A    Well, let's go back to -- hold on one
23 second. I'm going back to Exhibit 93.
24    Q    All right.

Page 123

1    A    And let's just say you look at gold,
2 okay? So I don't know the exact premium collection
3 of that trade, but if those numbers are true I'm
4 going to -- knowing what I know, $630.16 in a net
5 P&L in a trade is very good.
6    Q    Where do you see -- Mr. Ruth, where do
7 you see that in Exhibit 93?
8    A    In the table under March 17 gold.
9    Q    Oh, I see, I see. Thank you. So what
10 is the net P&L that you calculated for those four
11 trades, though?
12    A    So you asked -- your question you
13 asked me was where do I get the confidence to
14 say that, you know, that clients do very well.
15 Well, I've got a gold trade right there where it
16 won $630.16. Let's just say this is on the 17th.
17 If I'm not mistaken, gold options generally expire
18 in the middle of the month. So two days beforehand
19 I may have had a gold trade in which we won $630.16,
20 and I was very confident about our ability to be
21 able to do well and that's why I said what I said.
22    Q    What customers of yours did well?
23 Who are you talking about here when you say that
24 the majority of your customers make money, that

Page 124

1 you're looking at results that give you confidence?
2 Name one single customer of yours at Long Leaf
3 Trading that made money, that made a profit,
4 that withdrew funds from their account.
5    A    That's not how those accounts are
6 conducted. That's not how it works. But every
7 single one of our clients that was trading on the
8 block, or whatever this trade represents, whatever
9 it was, you know, per contract they made $630.16
10 on a gold trade. And so that is a -- you know,
11 and especially if you take that in relation to
12 commissions on that trade, it's a very good end
13 result. And so that client made money on that
14 trade.
15    Q    Yeah, but that client lost 900 --
16 that client you're referring to, a client that
17 traded one contract in March of 2017, may have made
18 $630 in gold but that client lost $970 plus on the
19 four recommended trades that you're tracking here
20 in Exhibit 93. Am I reading that right?
21    A    Yeah, but --
22    A    Yeah, I know I am.
23    A    Please don't talk over me. That
24 information is not available at the time. This is

Page 125

1 done multiple days after the option periods of all
2 four trades have closed. So the only information
3 that I could go off of is if I'm excited about a
4 recent victory or I'm, you know, down about a recent
5 loss of a trade, it's based off of what is happening
6 in real time. We're not looking at this in real
7 time, and that's why there's a discrepancy between
8 my level of confidence in the trades and your
9 analysis of results.
10    Q    But do you think that that's what clients
11 care about, whether they made or lost money on one
12 particular trade in a year, in a year and a half, in
13 two years' worth of trades? Is that what you think
14 clients are interested in?
15    A    I think clients are interested in what
16 is happening in real time, and I'm giving them the
17 information that is happening in real time.
18    Q    It's true, isn't it, that substantially
19 all of the clients that you talked to of Long Leaf
20 Trading lost substantially their entire account,
21 isn't it?
22    A    I wouldn't know that.
23    Q    You wouldn't know that?
24    A    No. The only --

Page 126

1    Q    That's your testimony?
2    A    The only information that I have
3 available to me and that I recall is just from
4 looking at the Harish Patel exhibit that you showed
5 earlier, and he started off with 25,000 and some
6 change and he ended up with 9,000 and some change.
7 So the answer to your question, the only one example
8 I have is, no, he didn't lose the entirety of his
9 account.
10    Q    Yeah, I guess at that point he'd
11 only lost most of it. In the end, though, Mr. Patel
12 did lose substantially all of it, didn't he?
13    A    I have no clue.
14    Q    Why don't you know? These are your
15 customers. They appear -- you've got to let me
16 finish here. They appear on your daily trading
17 statements from Gain that you get every day the
18 market is open. Do you really expect me or anybody
19 else to believe that you don't know that every
20 single customer is losing substantially everything
21 in their account?
22    A    Well, one, that's not true. And, two,
23 Harish Patel, which is what you specifically asked
24 about, he was no longer my customer after that day.

Page 127

1 And so I don't have his account statements or follow
2 his account statements because he's not my -- under
3 my domain. He specifically refused to talk with
4 me and Tim Evans had to take over talking to him
5 from there on out, and I believe that it was --
6 and this is not any disrespect for you, but I don't
7 know if you misspoke, but there -- I'm pretty
8 sure that there's no way that Harish Patel lost
9 his whole account considering I -- I don't think
10 he ever traded after he, you know, got to the point
11 where he talked to Tim Evans. I think they had a
12 falling-out on the phone, if I'm not mistaken.
13    Q    Yeah, I think you're probably right
14 about Patel. If memory serves, I think he withdrew
15 after he lost most, but not all, of his account.
16 But you can't tell me the names of any customers
17 at Long Leaf Trading that made money over the life
18 of their account, can you?
19    A    I can.
20    Q    Yeah. Who's that?
21    A    I mean, on March -- in March 17 every
22 client that was involved in that gold trade, per
23 contract they made $630.16.
24    Q    Mr. Ruth, I have to interrupt because

Page 128

1 my question was over the life of their account,
2 not the one tiny gold trade that you can see in
3 Exhibit 93, which incidentally was subsumed by
4 losses in other trades recommended on the same
5 day. My question to you is can you tell me the
6 name of a single Long Leaf customer who made money
7 over the life of their account?
8    A    I don't -- I never have had access
9 to that information and I don't recall, but that
10 doesn't mean that I --
11    Q    That's not true.
12    A    That doesn't mean that I don't -- that
13 it doesn't exist.
14    Q    Substantially every customer of Long
15 Leaf Trading that you've ever dealt with lost money,
16 most of the money over the life of their account,
17 correct?
18    A    No.
19    Q    So who didn't? You're going to
20 tell me that somebody made money at Long Leaf,
21 that their account was net positive? Who's that
22 person?
23    A    I'll name one. Arvind Ahuja (phonetic).
24    Q    How do you spell that, please.

Page 129

1    A    I don't know.

2    Q    All right.  Now, can you name any other

3  customers of Long Leaf Trading?

4    A    I'm sure there are multiple.

5    Q    Okay.  Do you remember any of their names?

6    A    No.  But if you were to give me

7  a list of clients, I could probably pick a few

8  out for you.

9    Q    All right.  So, Mr. Ruth, give me just

10  a minute here.  Let me --

11       MR. BURDEN:  Let's go off the record.

12  We might be about done here.  Off the record,

13  please.

14       (Whereupon a recess was taken from

15       3:10 p.m., to 3:11 p.m., after which

16       the following proceedings were had:)

17       MR. BURDEN:  All right.  Mr. Ruth,

18  the CFTC has concluded its examination of you,

19  though we reserve any time not used under the

20  rules, which by my count is another two hours

21  if we need it.  So, you know, you don't have

22  counsel present or appearing, so I guess nobody

23  can ask you questions.  But, I don't know, do

24  you want to ask yourself questions?  Is there

Page 130

1    anything about your testimony that you

2    wish to clarify?

3       THE WITNESS:  Yeah.  Do you mind giving

4    me a few minutes so I can compile things?

5       MR. BURDEN:  Of course not.

6       (Whereupon a recess was taken from

7       3:13 p.m., to 3:19 p.m., after which

8       the following proceedings were had:)

9       MR. BURDEN:  Mary, back on the record,

10    if you would, please.

11       THE WITNESS:  So I've been given

12    the opportunity to provide clarification

13    to my testimony today.  The first topic of

14    clarification I would like to provide has to

15    do with the types of the clients at Long Leaf

16    Trading during my tenure and more specifically

17    about the trades that they were conducting.

18       So, first of all, Long Leaf

19    Trading Group is an introducing broker.

20    Long Leaf Trading Group had clients that

21    were self-directed that traded on their own

22    platforms.  Long Leaf Trading Group had clients

23    that were self-directed that would call a broker

24    and use the -- you know, call in an order to

Page 131

1    a broker and the broker would place the trade

2    for them, either through the platform or by

3    calling the Gain trading desk while I was there.

4       MR. BURDEN:  Mr. Ruth, so the purpose

5    of this redirect, and I understand that you're

6    at a disadvantage without counsel, is that

7    you get to clarify points on your testimony.

8    So if there's something that I asked you and

9    you answered and you want to amplify that or,

10    you know, clear up what you consider to be

11    a misapprehension, now's the time to do that,

12    you know.

13       What we're not going to do,

14    because I'll just close the record, is sit

15    and listen to your lengthy description of Long

16    Leaf Trading's business model.  And what I want

17    to say too is if you want to do that, if you

18    want that evidence to be before the court,

19    you know, you can put it before the court.

20    I would hate for you to think that I was trying

21    to, you know, silence you or handicap your case.

22    I mean, you can write a declaration.  You can

23    sign the declaration.  But, you know, for

24    purposes of this court reporter, Ms. Maslowski,

Page 132

1    and our deposition here today, the redirect

2    is, you know -- the proper purpose of it is,

3    you know, for you to correct anything that you

4    said that was wrong or, you know, if you want

5    to clarify anything that we talked about.

6       THE WITNESS:  That's exactly what I'm

7    doing.  So thanks for that --

8       MR. BURDEN:  Yeah, but you've got to

9    keep it short or I'm just going to terminate

10    the dep.

11       THE WITNESS:  I guess I'm confused.

12    Do I have the ability to clarify my testimony

13    or correct my testimony or not?

14       MR. BURDEN:  You do, but a lengthy

15    description of Long Leaf Trading's business

16    model is not clarification within the meaning

17    of the Rules of Evidence or Civil Procedure.

18    So, you know, if there's something you want

19    to talk about that you said, you know, you

20    want to revisit, you know, I want you to get

21    the opportunity to do that, but it's sort of

22    necessarily brief.  You know, this is not

23    driven so much by time as it is by the proper

24    purposes of -- the proper purposes of redirect.

Page 133

1    So I don't want to cut you off
2  here.  If you want to go, Mr. Ruth, you know,
3  by all means.  I'm not going to tell you how
4  to, you know, how to do it.  But, you know,
5  if it goes on too long or if in my judgment
6  it's not responsive to the points I made in my
7  examination, you know, I'm going to terminate
8  it.
9    THE WITNESS:  Well, you've already
10 terminated it and, furthermore, it is directly
11 related to my testimony.  And I guess my
12 position to you is is since you've incorrectly
13 made the assumption that I'm giving the Long
14 Leaf business model and not clarifying my
15 previous testimony, I guess my question to you
16 is are you terminating my ability to clarify
17 or correct my previous testimony?
18   MR. BURDEN:  I don't answer questions,
19 but I am not terminating the deposition at
20 this juncture.  It just felt to me like we
21 were going down kind of a soliloquy path,
22 and I wanted to advise you that I am going to
23 terminate the dep if we get to a certain point
24 and I feel like it's not a proper redirect.

Page 134

1    So I don't want to waste any more
2  time explaining my position on this, you know.
3  I think you get it.  So you can please go right
4  ahead and clarify your testimony and I'll jump
5  in if I feel like I need to.
6    THE WITNESS:  Yeah.  With all due respect,
7  I believe you've incorrectly summarized what
8  I was just saying as, I don't know, I guess
9  something that's irrelevant to clarifying my
10 previous testimony, which is not the case.
11   MR. BURDEN:  All right.  Well, keep going
12 with it.  Keep going with it then.  Maybe you'll
13 prove me wrong.  Keep going.
14   THE WITNESS:  I'm not here to prove
15 you wrong.  I'm here to make sure that the
16 record reflects what my testimony is and provide
17 clarification to my testimony and, you know,
18 I guess I'm still confused.  Are you giving
19 me that ability to do that or are you taking
20 that away?  Also --
21   MR. BURDEN:  Yeah.  Go on, go on.  You've
22 got it, go.
23   THE WITNESS:  Okay.  Is there a reason
24 why your video camera is not on?

Page 135

1    MR. BURDEN:  I don't answer your questions.
2  Go, clarify your testimony.
3    THE WITNESS:  Yeah.  Well, there's no
4  video cameras on, so I don't understand who
5  I'm clarifying my testimony to.
6    MR. BURDEN:  The record.
7    THE WITNESS:  I would like to make sure
8  that the record reflects that during my tenure
9  at Long Leaf Trading, which I believe is from
10 the early part -- early to mid part of 2015
11 through August 24th of 2017, that clients or
12 customers that were in the Time Means Money
13 program utilized self-directed accounts in a
14 broker-assisted environment.  They were read
15 multiple risk disclosures, one including that
16 past performance is not indicative of future
17 performance.  And a -- multiple reasons as
18 to why the track record is not utilized in
19 this position is, one, we didn't want clients
20 joining the program because of a track record,
21 regardless if it was favorable or unfavorable.
22 Within the situation of a favorable track
23 record, you know, we wanted people to open
24 up accounts because they believed in what

Page 136

1  we believed in, which is utilizing a short
2  option strategy in order to reach financial
3  goals.  We had clients that were all doing
4  different trades, which is reflected in the
5  account statements and I'm sure it will come
6  up at trial, but some of those trades were
7  designed by James Leeney, some by Tim Evans,
8  some by associates of Tim Evans, and the trading
9  was constantly evolving.  And on a monthly basis
10 I would say there was at least one or more
11 winning trades, and our clients made money
12 on obviously winning trades.  And it's very
13 difficult to answer a lot of these questions
14 because you base it off of end results that
15 I don't know or recall were even at Long Leaf
16 Trading Group.  When that happened, I would
17 never have access to that information.  But the
18 record, the statements, the trades, you clearly
19 can tell that there is winning trades along
20 the way that our clients directed under their
21 own free will and executed.  They understood
22 the risks and they indicated their level of
23 sophistication, their age, their income, their
24 financial situation and things of that nature.

Page 137

1 And these accounts were opened by Gain Capital
2 Group in accordance with regulations and
3 procedures set forth by the National Futures
4 Association and the CFTC. That's all I have
5 to say and I'm done.
6      MR. BURDEN: All right. Mr. Ruth,
7 a little recross from the CFTC.
8           REDIRECT EXAMINATION
9 BY MR. BURDEN:
10   Q   I asked you before to name a customer
11 who had a net lifetime positive return in their
12 account at Long Leaf, and I believe your testimony
13 was Arvin something. It's embarrassing but would
14 you tell me, please, Arvin's last name.
15   A   I think it's like Ahuja or something.
16   Q   All right. And was that a customer that
17 you dealt with?
18   A   I was kind of like a -- I mean, I don't
19 know if you want to call it like a secretary or like
20 a go-between and assistant to Tim and Tony Klancic
21 involved with that client so --
22   Q   Was Arvind Ahuja's -- was he a Time
23 Means Money participant?
24   A   No.

Page 138

1   Q   So he was entirely self-directed,
2 didn't get recommendations through the Time Means
3 Money program?
4   A   No, not that I'm aware of.
5      MR. BURDEN: All right. Okay. So we
6 don't have any further questions, so let's
7 go off the record, please.
8      THE WITNESS: And the reason why I didn't
9 (inaudible) is because you didn't ask about the
10 Time Means Money program. You asked about Long
11 Leaf Trading Group.
12      MR. BURDEN: That's why we went back.
13 That's all right. All right. Well, I guess
14 that concludes today's deposition.
15           (WITNESS EXCUSED)
16
17
18
19
20
21
22
23
24

Page 139

1 NORTHERN DISTRICT OF ILLINOIS)
   EASTERN DIVISION         )
2 STATE OF ILLINOIS         )
                         ) SS.
3 COUNTY OF COOK           )
4      I, Mary Maslowski, Certified Shorthand
5 Reporter and Notary Public in and for the County of
6 Cook, State of Illinois, do hereby certify that on
7 June 4, 2021, the deposition of the witness, JEREMY
8 STEVEN RUTH, called by the Plaintiff, was taken
9 before me, reported stenographically and was
10 thereafter transcribed by me.
11      The said witness, JEREMY STEVEN RUTH,
12 was first duly sworn to tell the truth, the whole
13 truth, and nothing but the truth, and was then
14 examined upon oral interrogatories.
15      I further certify that the foregoing is a
16 true, accurate and complete record of the questions
17 asked of and answers made by the said witness, at
18 the time and place hereinabove referred to.
19      The signature of the witness was waived by
20 agreement.
21      The deposition terminated at 3:35 p.m.
22      The undersigned is not interested in the
23 within case, nor of kin or counsel to any of the
24 parties.

Page 140

1      Witness my official signature and seal as
2 Notary Public, in and for Cook County, Illinois on
3 this 11th day of June, A.D., 2021.
4
5
6
7           Mary Maslowski, CSR, RPR
            Notary Public
8           79 West Monroe, Suite 1001
            Chicago, Illinois 60603
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24