UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 20-3758 |
| Long Leaf Trading Group, Inc., James A. Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) Hon. Thomas A. Durkin ) ) ) |
| Defendants. | ) |

**PLAINTIFF CFTC'S PARTIAL MOTION FOR SUMMARY JUDGEMENT AGAINST DEFENDANT JAMES A. DONELSON**

The CFTC hereby moves for partial[1] summary judgment against Defendant James A. Donelson on its claims, including options fraud (Count I), commodity trading advisor ("CTA") fraud (Count II), and fraudulent advertising by a CTA or principal thereof (Count III). In addition to its fraud claims, CFTC moves for summary judgment on Counts IV through VI, which seek to hold Donelson liable as controlling person for various non-scienter regulatory violations by Donelson's company, Defendant Long Leaf Trading Group, Inc. ("Long Leaf").

In most cases involving investment fraud, the defendant denies making the challenged statements or omissions, and denies the guilty knowledge which constitutes scienter. Not so here. Donelson admits to both the false and misleading statements and omissions that constitute the fraud, as well as his knowledge of their falsity.

---

[1] The CFTC seeks summary judgment on all of its claims against Donelson; the motion is "partial" only in that, if the motion is granted, the CFTC will subsequently seek injunctive relief, e.g., a trading ban, and imposition of a civil monetary penalty, in a motion for a supplemental order.

Donelson was the CEO of Long Leaf, which offered customers the ability to participate in an options trading program. The trading program involved providing the customers with four trading recommendations a month, which customers would (and typically did) accept in a text or email. Long Leaf would then execute the trades on the customers' behalf, for which it charged commissions.

The program allowed Long Leaf to earn more than $1.2 million in commissions during Donelson's tenure. While Long Leaf made money for itself, substantially all customers consistently lost money—a total of more than $2.3 million—during Donelson's two-year tenure at Long Leaf. Donelson was aware of the fact and magnitude of his customers' losses.

Despite the losses, Donelson allowed, and in fact required, Long Leaf salespersons, referred to as associated persons or "APs," to continue soliciting customers. Donelson admits that, shortly after starting as CEO of Long Leaf, he expressly instructed Long Leaf APs to withhold any information about Long Leaf's dismal trading results from customers or prospective customers. This continued until 2019, when Donelson started making false and misleading "track records" and "trade reports" showing *positive* returns, which he distributed to customers and prospective customers himself or through APs. Donelson did not advise customers that these track records constituted hypothetical or cherry-picked trading results.

Donelson also made misleading claims to customers and prospective customers about his qualifications, while failing to apprise customers that he had almost no trading experience, had never worked as a trader, and on the few occasions he had traded for his own account, had lost money. Donelson provided false and misleading solicitations for APs to use, suggesting that Long Leaf's trading program "targeted" annual returns of 6-12%. Donelson was also aware, and failed to prevent, the APs from making other misleading statements to customers, e.g., that

participants in the trading program enjoy a "statistical advantage," and that Long Leaf seeks to provide its customers with a "strong return."

Donelson's false and misleading statements and omissions in the face of almost universal customer loses throughout the period of Donelson's tenure, are fraudulent as a matter of law based on well-established precedent in highly analogous cases (unsurprisingly, this is not the first time a financial advisor has lied about his qualifications, misled prospects using rosy statements about expected or "targeted" results, and failed to disclose complete and accurate historical trading information). Accordingly, the CFTC respectfully requests that the Court enter summary judgment for the CFTC and against Donelson.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA, Inc.*, 3 F.4th 927, 938 (7th Cir. 2021).

## II.  ANALYSIS

**A.    The CFTC is Entitled to Summary Judgment on its Options Fraud Claim (Count I).**

CFTC's Count I against Donelson is for options fraud in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10. (Doc. 1, Compl. ¶¶ 79-86.) Under 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10, it is unlawful for any person directly or indirectly: (a) to cheat or defraud, or attempt to cheat or

3

defraud, any other person; (b) to make or cause to be made to another person any false statement; or (c) to deceive or attempt to deceive any other person by any means whatsoever, in or in connection with any commodity option transaction, including any option on futures transaction.[2]

In order to prove a claim for options fraud, the CFTC must establish that a defendant, in connection with a commodity option transaction: (a) made a misrepresentation, misleading statement, or a deceptive omission; (b) acted with scienter; and (c) the misrepresentation or omission is material. *CFTC v. Caniff*, No. 19-CV-2935, 2020 WL 956302, at *7 (N.D. Ill. Feb. 27, 2020). The CFTC is not required to prove reliance. *Slusser v. CFTC*, 210 F.3d 783, 786 (7th Cir. 2000).[3]

Whether a misrepresentation has been made depends on the "overall message" conveyed by the defendant, as well as the "common understanding of the information conveyed" by an "objectively reasonable receiver" of the information. *CFTC v. Kratville*, 796 F.3d 873, 892 (8th Cir. 2015) (affirming summary judgment for CFTC on options fraud claims were defendant misrepresented "track record") (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). A representation or omission is material if a reasonable investor would consider it important in deciding whether to make an investment. *Id*. at 895.

Scienter is established if the defendant intended to defraud, manipulate, or deceive, or if the defendant's conduct was "reckless," i.e., representing an extreme departure from the

---

[2] 7 U.S.C. § 6c(b) prohibits entering into any commodity options transaction contrary to any regulation which the Commission may prescribe. 17 C.F.R. § 33.10, "fraud in connection with commodity options transactions," is one such regulation.

[3] *Caniff* and other cases cited herein feature Regulations prohibiting fraud in connection with options on commodities, i.e., 17 C.F.R. § 32.4 ("fraud in connection with commodity option transactions"), or its predecessor regulation, 17 C.F.R. § 32.9 (2012). These regulations have substantially the same language as 17 C.F.R. § 33.10, the regulation which forms the basis for Count I, which prohibits fraud in connection with options on commodity futures contracts.

standards of ordinary care. *Kratville*, 796 F.3d at 893. Such a departure involves "highly unreasonable omissions or misrepresentations ... that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it." *Id*. (quoting *R.J. Fitzgerald*, 310 F.3d at 1328) (alterations in original).

        1.        **Donelson Fraudulently Omitted to Disclose that All Customers Lost Money.**

It is undisputed that substantially all Long Leaf customers lost money as a result of their participation in the trading program. (CFTC's Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment Against Donelson ("SOF") ¶¶ 26-31.) By the time Donelson took over Long Leaf in December 2017, customers had lost more than $3.39 million as a result of the trading program. (*Id*. ¶ 26.)

Donelson became aware of these losses almost immediately after taking over the firm. The first monthly statements Donelson received showed substantial losses in all customer accounts. (*Id*. ¶ 32.) When Donelson undertook an analysis of trading results in the five months preceding his arrival, Donelson saw that customers consistently lost money in the trading program. (*Id*. ¶ 33.) In his first few months at Long Leaf, Donelson received numerous emails and calls from customers complaining of losses from the trading program. (*Id*. ¶ 34.)

Results for Long Leaf's trading program did not improve over time. During Donelson's tenure as CEO, customers lost an additional $2.37 million. (*Id*. ¶ 31.) Long Leaf customers lost $1,511,837 in 2018, Donelson's first full year at Long Leaf. (*Id*. ¶28.) They lost another $915,564 in 2019. (*Id*. ¶ 29.) Donelson was well aware of these facts. Donelson monitored the recommended trades in real time, received daily account statements for Long Leaf customers, and continued to receive complaints. (*Id*. ¶¶ 32-36.)

Despite his awareness of trading losses, Donelson sought to conceal these facts from customers and prospective customers. In February 2018, Donelson held a sales meeting in which

he instructed the APs not to provide customers with any information in response to requests for "past performance." (*Id*. ¶ 48.) If customers asked about it, Donelson told the APs they should say that it is Long Leaf's policy not to provide information on past performance.[4] (*Id*. ¶ 49.)

A reasonable investor would undoubtedly find the fact that substantially all customer lose money to be material in determining whether to entrust his or her money to Long Leaf. *See R.J. Fitzgerald*, 310 F.3d at 1332-33 (entering judgment for CFTC on options fraud claim where defendant failed to disclose that 95% of customers lost money). Donelson knowingly omitted to disclose this fact to customers and prospective customers, and directed the APs to do the same. (SOF ¶¶ 47-52.) Donelson's omission was fraudulent as a matter of law.

### 2. Donelson's "Track Records" Were False and Misleading.

Starting in February 2019 and continuing through at least October 2019, Donelson created and distributed to customers and prospective customers, directly or through the APs, various documents purporting to be "track records," "trading histories," or "performance updates" for Long Leaf. (*Id*. ¶¶ 58-66.) All of the documents reflected profitable trading results at the same time Donelson knew that Long Leaf was continuing to lose money for customers. (*Compare id*. ¶¶ 35-36, *with id*. ¶¶ 58-66.)

Some of the "track records" reflect hypothetical trading results that did not occur in any real customer's account. (*Id*. ¶¶ 60-61, 64-66.) It is fraudulent as a matter of law to pass off hypothetical trading results as real ones, as Donelson did here. *See CFTC v. Heffernan*, 245 F. Supp. 2d 1276, 1294–95 (S.D. Ga. 2003) (entering summary judgment for CFTC on fraud claim where defendant presented hypothetical trading results without disclosing them as such); *CFTC*

---

[4] Donelson's prohibition on providing past performance continued into 2019, when Donelson and the APs started providing customers with false and misleading track records, as set forth below. (SOF ¶ 51.)

*v. Hall*, 49 F. Supp. 3d 444, 452 (M.D.N.C. 2014) (same), aff'd, 632 F. App'x 111 (4th Cir. 2015).[5]

Other track records that Donelson provided to prospects reflect the results of real trading in actual customer accounts. (SOF ¶¶ 58-59, 62-63.) However, they omit losing trades in those same accounts and show only subsets of trades that generated a net profit. (*See id*.) This kind of "cherry-picking" successful trades or accounts while omitting the unsuccessful ones constitutes fraud as a latter of law. *Cf. Kratville*, 796 F.3d at 892 (affirming summary judgment for CFTC on fraud claim where defendant represented one pool's track record as that of another).

### 3. Donelson's Statements About, And Failure to Disclose, His Lack of Trading Experience Were Misleading.

In communications with customers, Donelson touted his ten years of experience working for large and well-known proprietary trading firms and assured customers that he would be redesigning trades to provide "improved returns." (SOF ¶ 53.) It is true that Donelson worked for large trading firms. What Donelson failed to disclose to customers, however, was that he worked for those firms as an accountant. (*Id*. ¶ 56.)

In reality, Donelson never traded on behalf of these firms or otherwise worked as a trader. (*Id*.) What little options or futures trading Donelson had done for his own account resulted in losses. (*Id*. ¶ 55.) As Donelson acknowledges, prospective customers would not have wanted to take his trading recommendations had they known the truth about his experience. (*Id.* ¶ 57.)

---

[5] *See also CFTC v. Trademasters*, USA, LLC, No. 216CV01938GMNNJK, 2018 WL 3603019, at *2 (D. Nev. June 22, 2018) (entering summary judgment for CFTC on fraud claim where defendant presented hypothetical trading results without disclosing them as such); *CFTC v. PMC Strategy, LLC*, No. 3:11CV73, 2013 WL 1349177, at *6 (W.D.N.C. Apr. 3, 2013) (same); *CFTC v. Highland Stone Cap. Mgmt., L.L.C.*, No. 11 CIV. 5209 KBF, 2013 WL 4647191, at *16 (S.D.N.Y. Aug. 29, 2013) (same).

Donelson's failure to disclose the truth about his lack of qualifications to act as a trading advisor renders his statement about having worked for trading firms materially misleading as a matter of law. Donelson's failure to disclose his total lack of profitable trading experience (and lack of trading experience generally) constitutes a fraudulent omission. *See CFTC v. Next Fin. Servs. Unlimited*, No. 04-80562-CIVRYS, 2006 WL 889421, at *2 (S.D. Fla. Mar. 30, 2006) (entering summary judgment for CFTC on fraud claim where defendant misrepresented profitable trading experience); *CFTC v. McLaurin*, No. 95 C 285, 1996 WL 385334, at *3 (N.D. Ill. July 3, 1996) (same).

4.  **Donelson Induced or Allowed APs to make False and Misleading Statements.**

Donelson was aware of the losses suffered by Long Leaf customers but nonetheless demanded that APs continue soliciting customers and prospective customers. (SOF ¶¶ 38-46.) To aid in these solicitations, Donelson provided the APs with a power point presentation showing returns of 6% to 12% on a hypothetical account with Long Leaf. (*Id*. ¶ 45.) Consistent with the presentation, APs told customers that Long Leaf's trading program "target[s] 6 to 12 percent return on an annual basis." (*Id*. ¶ 45.) In light of the fact that substantially all customers lost money, this was a materially false or misleading statement. *See Kratville*, 796 F.3d at 895 (statements of profit potential and risk "go to the heart of a customer's investment decision" and are therefore material as a matter of law) (quoting *R.J. Fitzgerald*, 310 F.3d at 1330).

The same is true of statements by the APs that "76.5 percent of options expired worthless," which "increased the customer's statistical likelihood of success." (SOF ¶ 43.) Or that "one of Long Leaf's values was to create a strong return for customers." (*Id*. ¶ 44.) Because the APs made these statements with Donelson's knowledge, and indeed, at his inducement, Donelson is liable for them. *CFTC v. Prestige Ventures Corp.*, No. CIV-09-1284-R, 2010 WL 8355003, at *5 (W.D. Okla. Oct. 27, 2010) (entering summary judgment for CFTC on fraud

claim where defendant "failed to rectify" fraudulent information disseminated by underling), aff'd sub nom. *CFTC v. Lee*, 445 F. App'x 126 (10th Cir. 2011).

**B.     The CFTC is Entitled to Summary Judgment on Its CTA Fraud Claim (Count II).**

The CFTC's Count II is for CTA fraud in violation of 7 U.S.C. § 6*o*(1). (Doc. 1, Compl. ¶¶ 87-94.) The fraud was perpetrated by Long Leaf, which is a CTA. Donelson is liable for that fraud under 7 U.S.C. § 13c(b) as the controlling person of Long Leaf.

Section 6*o*(1)(a), incorporates the traditional elements of common law fraud, i.e., a false or misleading statement or omission of material fact, made with scienter.[6] *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 993–94 (7th Cir. 2000). Section 6*o*(1)(b), by contrast does not require a showing of scienter. *Id*. It requires that the CTA engaged in a course of conduct which "operates as a fraud or deceit" on a customer or prospective customer.[7] *Id*.

**1.     Long Leaf was a CTA.**

CTA fraud requires that the fraud have been committed by a CTA. 7 U.S.C. § 6*o*(1). A CTA is as a person who, for compensation of profit, engages in the business of advising others as to the value of or the advisability of trading in commodity options, including options on futures contracts. 7 U.S.C. § 1a(12)(A)(i), (ii). Courts interpret the definition of a CTA liberally. *CFTC v. Equity Fin. Grp., LLC*, No. CIV. 04-1512 (RBK), 2007 WL 1038754, at *3 (D.N.J. Mar. 30, 2007).

It is undisputed that, during Donelson's tenure, Long Leaf provided approximately four trading recommendations each month to customers participating in its trading program. (SOF ¶¶ 14-16.) Substantially all of Long Leaf's customers participated in the trading program, and

---

[6] As with options fraud, the CFTC is not required to prove reliance. *Slusser*, 210 F.3d at 786.

[7] The prohibition against CTA fraud applies even if the CTA is exempt from registration, 17 C.F.R. § 4.15, as Long Leaf argues that it is.

9

every customer got substantially the same recommendation as every customer. (*Id*. ¶¶ 17-18, 23.) Customers typically accepted Long Leaf's trading recommendations, which Long Leaf executed on each customer's behalf. (*Id*. ¶¶ 20, 24-25.) Long Leaf provided its recommendations in exchange for compensation, which it received in form the of commissions when recommended trades were executed. (*Id*. ¶ 21.) Long Leaf was therefore in the business of advising customers as to the trading of options, for compensation. *Cf. Hall*, 49 F. Supp. 3d at 450 (finding on summary judgment that defendant was CTA where he advised subscribers over emails as to when they should open and close positions in specific futures contracts); *CFTC v. British Am. Commodity Options*, 560 F.2d 135, 141 (2d Cir. 1977) (holding that defendant was acting as a CTA where it offered advisory services and received compensation in the form of a mark-up on the customer's option premium).

### 2. Donelson is Liable For Long Leaf's CTA Fraud as a Controlling Person.

7 U.S.C. § 13c(b) provides that any person who, directly or indirectly, controls any person who has violated the Act or Regulations may be held liable for such violation to the same extent as such controlled person, provided that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation. *See Kratville*, 796 F.3d at 894-95. A controlling person "knowingly induces" conduct if he or she had actual or constructive knowledge of the core activities that make up the violation and allowed them to continue. *Id.*

It is undisputed that Donelson, as CEO, was the controlling person of Long Leaf. (SOF ¶ 4.) As set forth above, Donelson had actual or constructive knowledge of the activities comprising Long Leaf's CTA fraud. This is because Donelson was either aware of false or misleading statements made by APs, or because Donelson expressly instructed the APs to make false or misleading statements or omissions. Donelson is therefore liable for Long Leaf's CTA

fraud as a controlling person.[8] *See CFTC v. Crombie*, No. C 11-4577 CW, 2013 WL 3957506, at *25 (N.D. Cal. July 26, 2013) (entering summary judgment for CFTC on fraud and controlling person claims where defendant "was actually in control of the trading program itself"), aff'd, 914 F.3d 1208 (9th Cir. 2019); *CFTC v. PMC Strategy*, LLC, No. 3:11CV73, 2013 WL 1349177, at *7 (W.D.N.C. Apr. 3, 2013) (same, where defendant knowingly issued false "performance updates" to customers).

C. **The CFTC is Entitled to Summary Judgment on Its False CTA Advertising Claims (Count III).**

The CFTC's Count III is for CTA advertising fraud in violation of 17 C.F.R. § 4.41. (Doc. 1, Compl. ¶¶ 96-100.) The fraud was perpetrated by Long Leaf. Donelson is liable for that fraud as Long Leaf's controlling person.

17 C.F.R. § 4.41(a) makes it unlawful for a CTA or any principal thereof to advertise in a manner which: (1) employs any device, scheme or artifice to defraud any customer or prospective customer; or (2) involves any transaction, practice or course of business which operates as a fraud or deceit upon any customer or prospective customer.[9] 17 C.F.R. § 4.41(b) in particular prohibits the presentation of the performance of any hypothetical commodity interest account unless such presentation is accompanied by a disclaimer advising, *inter alia*, that the results are hypothetical and do not represent actual trading. This regulation is applicable to any publication, distribution, or broadcast of any writing, advertisement or other literature or advice,

---

[8] As set forth above, Donelson's scienter is amply demonstrated by the undisputed facts, thus satisfying 7 U.S.C. § 6*o*(1)(a). 7 U.S.C. § 6*o*(1)(b) dispenses with the scienter requirement if the CFTC can show that a defendant's conduct "operated as a fraud or deceit" on a customer or prospective customer. Customer complaints echoing Long Leaf's misrepresentations ("I want to know where the 78% winning rate has been all this time") demonstrate this for Long Leaf. (SOF ¶ 37.)

[9] The prohibition against fraudulent advertising by a CTA applies regardless of whether the CTA is exempt from registration. 17 C.F.R. § 4.41(c)(2).

11

whether by electronic media or otherwise, including information provided via internet or e-mail, or the texts of standardized oral presentations. 17 C.F.R. § 4.41(c)(1).

As set forth above, Long Leaf is a CTA. It is undisputed that Donelson was a principal of Long Leaf. (SOF ¶ 4.) The facts which form the basis for the CFTC's options fraud and CTA fraud claims above also satisfy the requirements of 17 C.F.R. § 4.41 and the facts which form the basis for Donelson's control person liability on Count II similarly support summary judgment on Count III pursuant to 7 U.S.C. § 13c(b). *CFTC v. Arrington*, 998 F. Supp. 2d 847, 871 (D. Neb. 2014) (noting that 4.41 language is the same as 6*o*, entering summary judgment on both), aff'd sub nom., *Kratville*, 796 F.3d 873; *see also CFTC. v. Heffernan*, No. CA 404-23302-TLW-TER, 2006 WL 2434015, at *7 (D.S.C. Aug. 21, 2006) (same).

D.     **The CFTC is Entitled to Summary Judgment on its CTA Registration Claim (Count IV).**

The CFTC's Count IV is for Long Leaf's failure to register as a CTA, in violation of 7 U.S.C. § 6m(1). (Doc. 1, Compl. ¶¶ 101-107.) Donelson is liable for that failure as a controlling person.

Under 7 U.S.C. § 6m(1), a person acting as a CTA is required to register as such if the person makes use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CTA. A CTA's failure to register as such is a strict liability violation, i.e., there is no scienter requirement. *CFTC v. JBW Cap.*, 812 F.3d 98, 106 (1st Cir. 2016) (affirming summary judgment for CFTC on registration claim).

As set forth above, Long Leaf acted as a CTA. In so doing, Long Leaf utilized the telephone and emails—instrumentalities of interstate commerce—to solicit prospective

customers and recommend trades to existing ones. (SOF ¶ 19.) Long Leaf has never been registered as a CTA (*id.* ¶ 3), and was therefore in violation of 7 U.S.C. § 6m(1).[10]

Donelson is liable as a controlling person because Donelson knowingly induced Long Leaf's violative conduct. The CFTC does not need to prove that Donelson knew Long Leaf was violating the law; it must only show that Donelson was aware of the facts that constitute the elements of the various violations. *In re Spiegel*, CFTC No. 85-19, Comm. Fut. L. Rep. 24103, 1988 WL 232212, at *7 (Jan. 12, 1988) ("we reject the view that a controlling person must know that the acts at issue amount to a violation in order to be held to have 'knowingly' induced the acts constituting the violation"); *see also CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311, 1324 (S.D. Fla. 2014) ("knowing inducement" standard met based on controlling person's knowledge of acts that amounted to a strict liability regulatory violation, without requiring proof that the controlling person knew he was violating the law). And "good faith" is not a defense to control person liability when the CFTC relies on the "knowing inducement" element of the statute. *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1570 n.39 (11th Cir. 1995) ("a finding of good faith is not necessarily enough to exculpate a controlling person under the Act as § 13(b) requires the Commission to prove a lack of good faith or knowing inducement") (citing *In re Spiegel*); *see also CFTC v. Sterling Trading Grp., Inc.*, 605 F. Supp. 2d 1245, 1259 (S.D. Fla. 2009).

Donelson knew that Long Leaf was acting as a CTA; indeed, it was Donelson that designed and distributed trading recommendations for Long Leaf's trading program. (*See, e.g.*, SOF ¶ 53.) Donelson had no basis to believe that Long Leaf was registered as a CTA, and

---

[10] Additional legal arguments for why Long Leaf is required to register as a CTA are set forth in the CFTC's motion for summary judgment against Long Leaf. The CFTC hereby incorporates those arguments by reference.

nonetheless directed Long Leaf's CTA activities. Donelson is therefore liable as a controlling person for knowingly inducing Long Leaf's acting as a CTA without registration.

E. **The CFTC is Entitled to Summary Judgment on its Claim for Failure to Make Required CTA Disclosures (Count V).**

The CFTC's Count V is for Long Leaf's failure to make certain disclosures in connection with the offering of a trading program, as required by 17 C.F.R. § 4.31(a), (b) and 17 C.F.R. § 4.36(d)(1). (Doc. 1, Compl. ¶¶ 108-114.) Donelson is liable for that failure as the controlling person.

Under 17 C.F.R. § 4.31(a) a CTA registered or required to be registered is required to provide to each customer or prospective customer, in advance of any trading, a disclosure statement if the CTA seeks to "guide" the customer's account pursuant to a "trading program," i.e., a "systematic program that recommends specific transaction."[11]

Before guiding any customer account pursuant to such a trading program, the CTA must obtain a signed and dated acknowledgement from the customer that the customer has received the disclosure statement. 17 C.F.R. § 4.31(b). Under 17 C.F.R. § 4.36(d)(1), the CTA must also provide a copy of the disclosure statement to the National Futures Association ("NFA") at least three weeks before it plans to offer the trading program to customers or prospective customers.

Long Leaf Trading did not provide the above-described required disclosures to prospective customers. Needless to say, Long Leaf could not have provided non-existent disclosures the NFA. (SOF ¶ 52.) Donelson is liable for Long Leaf's violations because he

---

[11] The disclosure statement must include certain specific information relating to the track record (or lack of a track record) for the program, including: (1) the annual and year-to-date rate of return for the program specified for the five most recent calendar years and year-to-date, computed on a compounded monthly basis, and with monthly rates of return; and (2) the number of accounts traded pursuant to the offered trading program that were opened and closed with a negative net lifetime rate of return as of the date the account was closed. 17 C.F.R. § 4.35(a)(1).

14

knowingly induced them. 7 U.S.C. § 13c(b). Donelson not only failed to provide the required discloses, he instructed Long Leaf's APs withhold Long Leaf's dismal trading history from customers and distribute his own phony track records. (SOF ¶¶ 47-52, 58-66.)

F. **The CFTC is Entitled to Summary Judgment on its AP Registration Claim (Count VI).**

Count VI seeks to hold Donelson liable his own failure to timely register as an AP, and for Long Leaf's liability for Defendant Andrew Nelson's failure to register as an AP, in violation of 7 U.S.C. § 6k(1). (Doc. 1, Compl. ¶¶ 115-124.)

7 U.S.C. § 6k(1) provides that it shall be unlawful for a person to be associated with an IB as a partner, officer, employee, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves: (a) the solicitation or acceptance of customers' orders; or (b) the supervision of any person or persons so engaged, unless such person is registered with the Commission as an AP of such IB. There is no scienter requirement for violations of 7 U.S.C. § 6k. *Arrington*, 998 F. Supp. 2d at 872 (granting summary judgment for CFTC on registration count).

It is undisputed that Donelson was not registered as an AP from December 2017 through May 2018. (SOF ¶ 5.) Yet during that time period, Donelson supervised the APs who were involved in the solicitation of customers. Donelson was the CEO, and had thus the power to hire and fire APs. (*Id.* ¶ 4.) In February 2018, Donelson held a sales meeting and directed the APs to withhold information about past performance. (*Id.* ¶ 48.) Donelson also reviewed written AP solicitations with prospective customers on a weekly basis. (*Id.* ¶ 41.) Donelson was therefore required to have been registered as an AP from December 2017 through May 2018. Because he was not registered as an AP during that time period, he violated 7 U.S.C. § 6k(1).

15

Under 7 U.S.C. § 6k(1) it is unlawful for an IB (which Long Leaf was, in addition to being a CTA) to permit a person required to be registered as an AP to become or remain associated with the IB if the IB knew or should have known that such person was not so registered. *See also* 17 C.F.R. § 33.3(b)(2) (applying § 6k(1) in the context of options on futures contracts). It is undisputed that Nelson solicited customers for Long Leaf through November 2018, and that he was not registered as a CTA. (SOF ¶ 69.) Long Leaf knew that Nelson was unregistered as early as July 2018, when the NFA advised it of that fact in a letter. (*Id.* ¶ 71.) Donelson (and Long Leaf) nonetheless allowed Nelson to continue soliciting customers for another five months. (*Id.* ¶ 72.) Long Leaf allowed Nelson to act as an AP without registration, in violation of 7 U.S.C. § 6k(1), and Donelson is liable for Long Leaf's violation as its control person.

G.  **The CFTC is Entitled to Summary Judgment on Restitution and Disgorgement.**

7 U.S.C. § 13a-1(d)(3) provides the Commission may seek, and the court may impose, on any person found to have committed a violation of the Act or Regulations, equitable remedies including: (A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and (B) disgorgement of gains received in connection with such violation.

Customers who participated in the trading program sustained losses totaling $2,376,738 during the period Donelson was CEO. (SOF ¶ 30.) This amount should be repaid to customers as restitution. Where, as here, there are material omissions in the context of a fraudulent scheme, the court can presume the reliance by defendant's customers. *CFTC v. Ross*, No. 09 C 5443, 2014 WL 6704572, at *2 (N.D. Ill. Nov. 26, 2014) (entering supplemental order for restitution following consent order) (citing *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 131 (1972)). The same is true where, as here, there was "pervasive or widespread

16

misrepresentation." *CFTC v. Driver*, 877 F. Supp. 2d 968, 980 (C.D. Cal. 2012) (entering summary judgment for CTC), aff'd, 585 F. App'x 366 (9th Cir. 2014).

Of the $2,376,738 lost by customers during Donelson's tenure, $1,235,413 of that sum consisted of commissions charged by Long Leaf. (SOF ¶ 31.) These commissions constitute ill-gotten gains that must be disgorged by Long Leaf. *See CFTC v. Escobio*, 833 F. App'x 768, 772 (11th Cir. 2020) (affirming award of restitution and disgorgement in the amount of commissions charged to customers).

Because Donelson was the controlling person of Long Leaf, and because, as set forth above, he knowingly induced Long Leaf's violations, Donelson is personally liable to the customers for this amount on a joint and several basis.[12] 7 U.S.C. § 13c(b).

## IV. CONCLUSION

For the foregoing reasons, the CFTC respectfully requests that its motion for summary judgment against Donelson be granted, and that an order be issued finding him liable for Counts I through VI of the CFTC's complaint and ordering Donelson to pay $2,376,738 in restitution and $1,235,413 in disgorgement, with an offset against disgorgement for all sums paid towards restitution.

---

[12] Although not necessary for the imposition of liability, it is worth noting that Donelson benefitted personally from Long Leaf's fraud. *Escobio*, 833 F. App'x at 772. During the period Donelson was CEO, Long Leaf paid Donelson Enterprises $250,000 in management fees and Donelson $150,000 in wages. (SOF ¶ 68.)

/s/ Ashley J. Burden
_____
Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700

18

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2021, I provided service to the persons listed below, and by the following means:

| Via the Court's electronic CM/ECF system: | Via email, pursuant to D.E. 13, to: |
|---|---|
| Jim Falvey<br>Falvey Law Office<br>200 S. Wacker Dr., Ste. 3100<br>Chicago, IL 60606-5877<br>jimfalvey@yahoo.com<br><br>Counsel to Long Leaf Trading Group, Inc. and James A. Donelson<br><br>Jeremey S. Ruth<br>11220 Brista Way<br>Austin, TX 78726<br>jeremysruth@hotmail.com<br><br>*Pro se* | Andrew D. Nelson<br>267 May St. E.<br>Elmhurst, IL 60126<br>adnelson0503@gmail.com<br><br>*Pro se* |

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700
aburden@cftc.gov