CFTC Ex. 529

# Long Leaf Trading Group

## *Donelson, James 2021-06-24*

### *6/24/2021 9:09 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Wednesday, November 3, 2021

Page 1

1      IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2         EASTERN DIVISION
3  COMMODITY FUTURES TRADING    )
   COMMISSION,          )
4                 )
       Plaintiff,  )
5                 )
      vs.      ) No. 20 C 3758
6                 )
   LONG LEAF TRADING GROUP,    )
7  INC., et al.,       )
                 )
8      Defendants.   )
9
10
11     The remote 30(b)(6) deposition
12 of JAMES A. DONELSON, called by the Plaintiff for
13 examination, pursuant to subpoena and pursuant to
14 the Federal Rules of Civil Procedure for the United
15 States District Courts pertaining to the taking of
16 depositions, taken before Mary Maslowski, Certified
17 Shorthand Reporter and Notary Public within and
18 for the County of Cook and State of Illinois with
19 the witness located in Aurora, Illinois, commencing
20 at the hour of 9:09 o'clock on June 24, 2021.
21
22
23
24

Page 2

1 A P P E A R A N C E S :
2
     (Appearing via videoconference)
3   MR. JOSEPH C. PLATT, Trial Attorney
    MS. ELIZABETH M. STREIT, Trial Team Leader
4   MR. JOSEPH J. PATRICK, Senior Investigator
    U.S. COMMODITY FUTURES TRADING COMMISSION
5   DIVISION OF ENFORCEMENT
    525 West Monroe Street, Suite 1100
6   Chicago, Illinois 60661
    (312) 596-0700
7   jplatt@cftc.gov
    estreit@cftc.gov
8   jpatrick@cftc.gov
9     On behalf of the U.S. Commodity
      Futures Trading Commission;
10
    (Appearing via videoconference)
11  FALVEY LAW OFFICE
    BY MR. JAMES M. FALVEY
12  200 Sou h Wacker Drive, Suite 3100
    Chicago, Illinois 60606
13  (312) 404-5839
    jimfalvey@yahoo.com
14
     On behalf of Long Leaf Trading Group,
15    Inc., and James A. Donelson;
16  (Appearing via videoconference)
    MR. JEREMY RUTH
17
     Appearing Pro Se.
18
19
20 A L S O   P R E S E N T :
21  MS. LAUREN STAPLETON, CFTC Intern (Remotely)
22
23 CSR License No. 084-003278.
24

Page 3

1           I N D E X
   WITNESS         DX  CX _RDX  RCX
2
   JAMES A. DONELSON
3
   By Mr. Platt      4
4
5        E X H I B I T S
   CFTC EXHIBIT       MARKED FOR ID
6
7  No. 490  Amended Notice     10
   No. 491  2/21/18 Email Chain   55
8  No. 492  New Opener Calendar Invite 57
   No. 493  Adams Termination Emails  65
9  No. 494  5/21/19 4g Request   72
   No. 495  8/21/20 CFTC RFP   76
10  No. 496  5/21/18 Tier 2 Demo Set  86
   No. 497  4/24/18 Trade Rems   118
11  No. 498  LL Response CFTC First Set 123
      of Requests for Admission
12  No. 499  6/25/19 Trade Rem   136
   No. 500  5/3/2018 Gecas Email   141
13  No. 501  10/21/19 Hatz Email   146
   No. 502  4/4/19 Detail for Trade  151
14  No. 503  1/31/18 Trade Recap   158
   No. 504  Andrew Nelson NFA BASIC  178
15  No. 505  1/25/18 NFA Response   179
   No. 506  2019 Excel Tracking Data  187
16
17
18
19
20
21
22
23
24

Page 4

1        JAMES A. DONELSON,
2 called as a witness herein, having been first duly
3 sworn, was examined and testified as follows:
4       DIRECT EXAMINATION
5 BY MR. PLATT:
6   Q  My name is Joseph Platt and I'm
7 a trial attorney at the CFTC.  I'm joined today by
8 Beth Streit, who's the chief trial attorney, Joseph
9 Patrick, who's a futures trading investigator, a
10 law student intern, Lauren Stapleton, from the CFTC.
11 I also see that Jeremy Ruth, who's a defendant in
12 this action, is present and Mr. Donelson, who's the
13 witness for Long Leaf Trading.  And, Mr. Donelson,
14 are you represented -- or is Long Leaf Trading
15 represented by counsel today?
16   A  Yes, it is.
17   Q  And that's Mr. Falvey, who's sitting
18 beside you?
19   A  Correct.
20   Q  This deposition's being conducted
21 pursuant to Federal Rules of Civil Procedure and
22 the local rules for the U.S. District Court for the
23 Northern District of Illinois and we're proceeding
24 by videoconference today.  Mr. Donelson, do you

Page 5

1 agree to proceed in this manner today based on the
2 Coronavirus travel restrictions?
3    A   I agree.
4    Q   You've given a couple depositions
5 in this action and testimony. We'll just go over
6 the rules of the road very briefly. Let's do our
7 best not to talk over one another. I'll do my best
8 to let you finish answering your questions before
9 I ask -- finish answering my questions before I ask
10 another one, and I'll just ask that you let me
11 answer my question before you -- ask my question
12 before you answer, is that okay?
13    A   Agreed.
14    Q   And two other items based on yesterday.
15 Please do your best to speak and answer audibly
16 and also, you know, project your voice so that the
17 court reporter is able to pick up your answers,
18 okay?
19    A   I will try, and please tell me if it's
20 not coming through clearly.
21    Q   Yeah, will do. Thank you. And
22 if any of my questions today are unclear or
23 unintelligible, please let me know and I'll do
24 my best to ask a question that makes more sense,

Page 6

1 okay?
2    A   Okay.
3    Q   Mr. Donelson, can you please describe
4 your work history going back ten years or so?
5    A   For -- obviously I worked at Long Leaf
6 Trading for two years. Before that I was doing
7 mostly consulting after I left Jump Trading. At
8 Jump Trading I was the global controller responsible
9 for the financials, doing some of the FinOP work for
10 the broker-dealers. Also they had a CV registered
11 firm. And before that I worked for KCG, which was
12 the merger of Getco and Knight Capital. I worked
13 Getco before the merger. I was involved with
14 the merger. Mostly did business development,
15 taxes, finance at Getco, opened up most of their
16 international operations.
17    Q   And you started at Long Leaf Trading
18 in approximately December of 2017. Does that sound
19 right?
20    A   That is correct.
21    Q   When did you stop working at Jump Trading
22 as their global controller?
23    A   I want to say June 2016.
24    Q   And when did you leave the KCG/Getco

Page 7

1 conglomerate?
2    A   I left that in June of 2014.
3    Q   Why did you leave Jump Trading?
4    A   When or --
5    Q   Why, why.
6    A   I had gone into short-term disability
7 and basically couldn't return. I had torn up a
8 shoulder and the commute was just too much for me.
9    Q   What was the nature of the consulting
10 business that you did between Jump Trading and
11 Long Leaf Trading?
12    A   One is the development of middle
13 office software that does trade reconciliation,
14 accounting. That's ongoing. Also did consulting
15 for a couple manufacturing firms developing cost
16 accounting models for them, things like that.
17    Q   What is the National Futures Association?
18    A   It is a self-regulated -- a self-regulation
19 organization overseeing the futures industry.
20    Q   Commonly abbreviated the NFA. What
21 is the NFA's role with respect to regulating the
22 futures industry? I think you just said it, but
23 if you could just expand on your answer.
24    A   They do -- I'm trying to get the

Page 8

1 words right. They are in charge of all their
2 member firms reviewing compliance, some finance,
3 trading, et cetera, but it's only for their member
4 firms.
5    Q   Do you have an understanding that the
6 NFA handles registration of entities and entities
7 that are required to be registered in the futures
8 industry?
9    A   Correct. Yeah, I do understand that.
10    Q   Do you know what NFA BASIC is?
11    A   Yes. It's an online system where
12 you can look up a person, a company, see any --
13 where they're registered, any regulatory issues
14 that they've had, so on and so forth.
15    Q   Did you know about NFA BASIC before you
16 owned Long Leaf Trading?
17    A   Yes.
18    Q   I understand that you became the
19 principal of Long Leaf Trading in approximately
20 December '17 via a stock purchase agreement. Does
21 that sound right?
22    A   That is correct.
23    Q   Who was the principal of Long Leaf
24 Trading Group before you bought the company?

Page 9

1     A   Timothy Evans.
2     Q   Did you know Mr. Evans before
3   you entered into the stock purchase agreement
4   with him?
5     A   No, I did not.
6     Q   What's your understanding of the date
7   on which Long Leaf began operations?
8     A   The company itself?  I don't -- I think
9   it was 2009 or 2010.
10    Q   Are you aware of any other entities
11  or individuals who have held an ownership stake
12  in Long Leaf Trading at any time other than you
13  or Mr. Evans?
14    A   No, I'm not aware of any.
15    Q   For purposes of this deposition,
16  Mr. Donelson, can we agree that the Evans era
17  means things that happened at Long Leaf Trading
18  before December 1, 2017 and the Donelson era means
19  things that happened at Long Leaf Trading after
20  December 1, 2017?  Does that sound reasonable?
21    A   I can agree to that.
22    Q   Yesterday Mr. Burden sent you documents
23  ahead of time so you could click through it -- click
24  through them.

Page 10

1     A   Yeah.
2     Q   I'm going to show you exhibits by sharing
3   my screen with you.
4     A   Okay.
5     Q   So I want to make sure that you can
6   read them legibly when I share them.  I'm going
7   to share with you a document that I'm going to mark
8   as CFTC Exhibit 490.
9         (Whereupon  CFTC Exhibit No. 490
10            was marked for identification.)
11    Q   Please let me know when you're able
12  to see this document.
13    A   We can see it now.
14    Q   Is it legible on your screen?  Can you
15  read the words?
16    A   It is legible.  It's small but it's
17  legible.
18        MR. FALVEY:  Do you need your glasses?
19        THE WITNESS:  I'm trying to see if it
20  helps or hurts.
21    A   I can read it.
22  BY MR. PLATT:
23    Q   Thank you.  Do you recognize this
24  document as the CFTC's deposition notice regarding

Page 11

1   Long Leaf Trading in this action?
2     A   Yes.
3     Q   Have you seen this document before?
4     A   Yes, I have.
5     Q   I'm going to scroll to pages 3 and 4
6   of Exhibit 490.  There's a heading Rider to Notice
7   of Deposition of Defendant Long Leaf Trading Group.
8   Do you see that?
9     A   Yes.
10    Q   And then there's a list of 21 topics.
11  I've scrolled through them quickly.  If as we
12  proceed today you'd like me to focus on particular
13  parts of documents, please don't hesitate to ask me
14  to move the document around or manipulate it so you
15  can see a particular portion.  But do you see there
16  are 21 topics listed on this rider to the Long Leaf
17  deposition notice?
18    A   Yes, I do.
19    Q   I should have asked you this at the
20  outset, Mr. Donelson.  I assume you consent to
21  testify on Long Leaf Trading's behalf today, is
22  that right?
23    A   I do.
24    Q   I've had a series of discussions

Page 12

1   with your attorney Mr. Falvey about the scope
2   of this deposition, and the notice -- I'll put
3   it back up on the screen -- do you see where it
4   says, "The relevant period of the CFTC's examination
5   of Long Leaf Trading is 2015 through the present"?
6     A   Yeah, I see it.
7     Q   So Mr. Falvey has represented
8   to me a couple times that you do not have
9   the ability to answer questions concerning the
10  majority of the topics listed in Exhibit 490 to
11  the extent they occurred during the Evans era.  Is
12  that consistent with your understanding generally?
13    A   Yes.
14    Q   Is it true that you're not able
15  to obtain information that's reasonably available
16  to Long Leaf Trading to answer questions about the
17  Evans era?
18    A   I can obtain the materials.  However,
19  I have no way to authenticate them one way or the
20  other, and I have provided all the information that
21  was available to me.  It's just if there's anything
22  specific about a situation, I wasn't there.  I
23  don't -- I would only have secondhand information
24  at best.

Page 13

1    Q    Just so I understand your testimony,
2  you have available to you the documents and
3  information that Long Leaf possessed at the time
4  you bought the firm but because you weren't present
5  at the firm during the Evans era, you may not be
6  able to answer questions about that time period.
7  Is that generally right?
8    A    That is correct.
9    Q    Mr. Donelson, are you able to testify
10  about Long Leaf Trading's discovery responses in
11  this action?
12    A    Yes, I am.
13    Q    Can you testify about the documents
14  that Long Leaf Trading has produced to the CFTC
15  both during the investigative phase and during the
16  litigation?
17    A    Yes.
18    Q    Are you able to testify about
19  Long Leaf Trading's ownership and organizational
20  structure?  Is this a topic where you can testify
21  about the Donelson era but you cannot testify about
22  the Evans era?
23    A    Yes.
24    Q    Item 4 is compensation paid to Long

Page 14

1  Leaf Trading employees and principals.  Are
2  you able to testify about information known or
3  reasonably available to Long Leaf Trading concerning
4  the Evans era?
5    A    Yes.
6    Q    So for compensation you are able to testify
7  about the Evans era?
8    A    I have the records of what the compensation
9  was and have provided them to the CFTC.
10    Q    Item 5, the operation of Long Leaf
11  Trading's trading program, are you able to testify
12  about information known or reasonably available to
13  Long Leaf Trading concerning the Evans era?
14    A    No, not during the Evans era.  I'm --
15  wait.  Can I ask a question here?  Can you please
16  define what operation of the trading program
17  entails?
18    Q    You understand that Long Leaf Trading
19  sold a trading program to its customers, right?
20    A    Yes.
21    Q    What kinds of business activities went
22  into the trading program?
23    A    I just don't know how to answer this
24  question.

Page 15

1    Q    Okay.  Let me ask you some questions
2  and see if we can drill down on how to --
3    A    Okay.
4    Q    -- how to scope this topic.  Long
5  Leaf Trading's trading program involves trading
6  recommendations, right?
7    A    Correct.
8    Q    Long Leaf Trading came up with those
9  trading recommendations?
10    A    I assume during the Evans era.  I don't
11  have actual proof that he created them.
12    Q    Someone designed trades?
13    A    Someone designed trades, yes.
14    Q    Those trading recommendations were
15  disseminated to customers, right?
16    A    Correct.
17    Q    Customers may or may not have executed
18  those trades, right?
19    A    Correct.
20    Q    The trades either made money or lost
21  money, right?
22    A    Correct.
23    Q    Long Leaf Trading interacted with
24  customers about the trading recommendations,

Page 16

1  right?
2    A    Correct.
3    Q    Long Leaf Trading, you know, solicited
4  customers to participate in the trading program,
5  is that right?
6    A    That is correct.
7    Q    I think those are the kinds of
8  topics that I think about when I use the term the
9  operation of Long Leaf Trading's trading program.
10  It's a broad term.
11    A    Okay.  I --
12    Q    So with that in mind, are you as Long
13  Leaf's witness able to testify about information
14  known or reasonably available to Long Leaf Trading
15  concerning the Evans era?
16    A    Yes.
17    Q    And is this -- for Topic 5, is this
18  consistent with your answer earlier where you said
19  that you had the documents available to you and you
20  could go read documents that existed but you didn't
21  have firsthand knowledge?
22    A    Correct.
23    Q    Okay.  Are you able to testify --
24  on Item 6 are you able to testify about the manner

Page 17

1  by which Long Leaf Trading developed trading
2  recommendations --
3      A    No.
4      Q    -- during the Evans era?
5      A    No, I do not have any documentation of
6  how he developed the trades.
7      Q    Item 7, are you able to testify about the
8  records that Long Leaf maintains regarding trading
9  recommendations during the Evans era?
10     A    Yes.
11     Q    Are you able to testify about the --
12 and continuing on Item 7, you're able to testify
13 about records Long Leaf Trading maintained during
14 the Evans era concerning the performance of the
15 trading recommendations?
16     A    Not really.  There was no records of those
17 performance by trading recommendation.
18     Q    Okay.  We'll come back to that topic
19 just to see what you're able to testify about and
20 what you aren't.
21     A    Okay.
22     Q    Are you able to testify about
23 the performance of accounts of customers that
24 participated in the Long Leaf Trading program during

Page 18

1  the Evans era?
2      A    Yes, I have those.  Those are the records.
3      Q    Are you able to testify about the
4  commissions and fees charged to customers during
5  the Evans era?
6      A    Yes, I have those records.
7      Q    Able to testify about Long Leaf Trading's
8  accounts that it received from Gain Capital during
9  the Evans era?
10     A    Yes, I have those records.
11     Q    Are you able to testify about customer
12 complaints received by Long Leaf Trading during the
13 Evans era?
14     A    I didn't have firsthand knowledge of
15 those complaints.  I have the complaint log, but
16 that's -- that is an ongoing record that we kept.
17     Q    Other than the complaint log, which
18 I think reflected three customer complaints, do
19 you have information concerning customer complaints
20 received by Long Leaf Trading during the Evans era?
21     A    No.
22     Q    Are you able to testify about
23 information known or reasonably available to
24 Long Leaf Trading concerning information provided

Page 19

1  by Long Leaf to customers about their account
2  statements, balances and performance of the trading
3  system during the Evans era?
4      A    To the extent that they're in the records,
5  yes.
6      Q    Are you able to testify about Long Leaf
7  Trading's supervision of its associated persons
8  during the Evans era?
9      A    No, I don't -- very little HR records
10 were kept.
11     Q    Are you able to testify on Topic 15 about
12 Long Leaf Trading's solicitations of prospective
13 customers during the Evans era?
14     A    Only to the extent of the records.
15     Q    Item 16 on Exhibit 490, are you
16 able to testify about information provided to
17 Long Leaf Trading's prospective customers regarding
18 the performance of the trading program during the
19 Evans era?
20     A    Only to the extent of the records.
21     Q    Mr. Donelson, on a couple of these
22 topics you've repeated your answer as you can
23 testify about Long Leaf's information during the
24 Evans era only to the extent of the records.

Page 20

1  Can you please clarify what that means?
2      A    I can verify that the document is --
3  when I say the document, I may know nothing about
4  the conversation or anything around it.  I can't
5  add much color around whatever that is.
6      Q    Is it correct to say that to the
7  extent there are documents or information that
8  you received -- strike that question.
9          Is it fair to say that the
10 extent of your ability to testify on Long Leaf
11 Trading's behalf concerning the Evans era when
12 you say only to the extent of the records, is to
13 provide information concerning that you received
14 the documents or information in connection with
15 the stock purchase agreement by which you bought
16 Long Leaf Trading?
17     A    Yes.
18     Q    That's helpful.  Thank you.  I'm
19 going to share what's been previously marked as
20 CFTC Exhibit 62.  Do you see the stock purchase
21 agreement by which you purchased Long Leaf Trading?
22 Are you able to read that on your screen?
23     A    Yes.
24     Q    So as of December 1, 2017 Donelson

Page 21

1   Enterprises controlled all the issued and
2   outstanding stock of Long Leaf Trading, is that
3   accurate?
4       A    That is correct.
5       Q    Has Long Leaf Trading ever made any
6   capital distributions to Donelson Enterprises?
7       A    No.
8       Q    Has Long Leaf Trading ever made any
9   capital distributions to any person or entity
10  since you've owned the company?
11      A    No.
12      Q    Has Long Leaf Trading ever transferred
13  any other thing of value to Donelson Enterprises
14  since you owned the company?
15      A    It paid a management fee from Long
16  Leaf Trading to Donelson Enterprises to pay for
17  the SBA loan.
18      Q    How much did Long Leaf Trading
19  pay to Donelson Enterprises as part of this --
20  in connection with the management fees you were
21  just describing?
22      A    In total over time or on a monthly basis?
23      Q    Both, please. How much in total and
24  then how frequently and how much on a recurring

Page 22

1   basis.
2       A    It would transfer $16,000 a month
3   for management fees. It did that through -- let
4   me write some quick math here.
5       Q    Sure.
6       A    I don't have this pulled up in front
7   of me.
8           MR. FALVEY: This is something kids
9       don't do anymore, Jody, actually write
10      arithmetic.
11      A    As a ballpark figure it would be about
12  $240,000 over about 15 months, and it transferred
13  money to Long -- from Long Leaf Trading to cover
14  the SBA loan and any insurances that I had at the
15  Donelson Enterprises level.
16  BY MR. PLATT:
17      Q    Those $16,000 monthly transfers,
18  is that -- are those the only transfers that
19  Long Leaf Trading ever made to either Donelson
20  Enterprises or you?
21      A    They would not make it to me because Long
22  Leaf Trading was only owned by Donelson Enterprises.
23  Any distributions to me would have been considered
24  wage.

Page 23

1       Q    And what wages did you earn when you
2   owned Long Leaf Trading?
3       A    I didn't get -- I didn't pay myself
4   for a very long period of time. So, I mean, it
5   would be in my tax return, but I think in 2018
6   it was maybe $100,000 and in 2019 I want to say
7   $50,000. I'd have to check the exact numbers,
8   but that's ballpark.
9       Q    And that was your total compensation
10  from Long Leaf Trading during those two years
11  approximately?
12      A    Approximately, yes.
13      Q    I just want to click back to Exhibit 62
14  briefly. I'm going to scroll through -- I know
15  you've seen this document before. I'm going to go
16  to page 11. Actually, I'm going to go to page 10.
17  There's Item 4 titled Consideration.
18      A    Yes.
19      Q    And on paragraph 4.1, little B, it says,
20  "At the time of Closing, Purchaser will pay Seller
21  an upfront purchase price of $1.475 million," and
22  that's in addition to the $25,000 earnest money
23  that's reflected in little A. Was that the extent
24  of the consideration that Donelson Enterprises

Page 24

1   paid Timothy Evans to control all the issued
2   and outstanding stock of Long Leaf Trading?
3       A    Yes, it was.
4       Q    How did Donelson Enterprises come up
5   with the $1.5 million?
6       A    It took out an SBA loan through
7   Huntington Bank and also put in money from my
8   401(k).
9       Q    What was roughly the breakdown between
10  the SBA loan and the money that you put in from
11  your own assets?
12      A    My own assets were -- once again, I've
13  got to do some math. My own assets were 325,000,
14  and the loan was 1.265 because there was working
15  capital included in that.
16      Q    On page 11 under Part V, which is titled
17  Operation of the Business, paragraph 5.4 is titled
18  Assets. Did those assets include all of Long Leaf
19  Trading's books and records?
20      A    Yes, it does. I'm not sure -- I'm not
21  sure it's covered in that document -- or that line,
22  though. There --
23      Q    Okay, that's helpful. Even if
24  it's not covered in paragraph 5.4 of the stock

Page 25

1 purchase agreement, your understanding is that
2 this document contemplates the transfer of all
3 of Long Leaf Trading's assets from Timothy Evans
4 to Donelson Enterprises?
5    A   Yes.
6    Q   That includes all their email records,
7 telephone recordings --
8    A   Yes.
9    Q   -- and other items?  When did Long Leaf
10 Trading cease operations?
11   A   December 2019.
12   Q   Does Long Leaf Trading currently
13 hold any assets?
14   A   The only assets it has is a very
15 small amount in a bank account and a receivable
16 from Tim Evans.
17   Q   Is the receivable from Tim Evans --
18 or I should just ask you what is the receivable
19 from Tim Evans that you're describing?
20   A   It relates to settlements, taxes
21 due that he owes the company to pay based on this
22 agreement.
23   Q   What is -- what is the amount of the
24 receivable that you believe Timothy Evans owes

Page 26

1 Long Leaf Trading?
2    A   Around $84,000.
3    Q   You said that Long Leaf Trading
4 ceased operations in December of 2019.  At that
5 time did Long Leaf Trading hold any assets other
6 than the small amount of cash you just described
7 and the $84,000 receivable from Timothy Evans?
8    A   It held computers, probably five of them,
9 but no other assets.
10   Q   Just the physical plant, physical working
11 stuff?
12   A   Yeah, and we have had to remove
13 all of the hard drives of those computers, so
14 they're pretty much useless and storing of books
15 and records.
16   Q   When you owned the company, Long
17 Leaf's primary business involved recommending
18 option trades to retail customers, is that right?
19   A   Yes.
20   Q   What about the Evans era, do you know
21 what Long Leaf's primary business was during the
22 Evans era?
23   A   Based on the records during the time
24 period you're talking about, the primary business

Page 27

1 was as you said.  They also had a lot of other --
2 and we had them too -- of self-traders, people who
3 would just trade on their own.
4    Q   During the Evans era do you know the
5 breakdown in revenue between commissions associated
6 with self-traders and commissions associated with
7 the Time Means Money program?
8    A   As I testified yesterday, I think
9 it's around 10 percent came from self-traders,
10 90 percent came from -- of the commissions that
11 came from Gain, 90 percent came out of the program,
12 and then you also had commissions from a CFD
13 dealer (inaudible) where he had introduced
14 a customer.
15   Q   And for the CFD dealer, what proportion
16 of Long Leaf Trading's revenue during the Evans era
17 did that account for, do you know?
18   A   I think it started -- it started
19 in 2016, and I would say in 2017 it was probably
20 a couple hundred thousand dollars in commissions.
21   Q   And what's the total pie?  I'd
22 like to compare the couple hundred thousand
23 dollars commissions to --
24   A   Well, if you took the total commissions

Page 28

1 of the year and deducted the 200,000, the rest of
2 that all comes from Gain.
3    Q   And do you know what that amount is?
4    A   If you don't mind, if I can open up --
5 I could look at the financial records because I have
6 them.
7    Q   Let's not do that for now because --
8    A   I don't know the exact number, but it
9 was a couple million dollars of revenue, I mean,
10 a ballpark number, a couple million dollars of
11 revenue; $200,000 of it was coming from the CFD
12 and the other 1.8 million was coming from Gain.
13 So 90 percent of that would be kind of the ballpark
14 number.
15   Q   Okay.  So sticking with the ballpark --
16 and I understand that you don't have the data stored
17 in your brain -- for the Evans era, including all
18 the revenue sources, what is your best estimate for
19 the revenue associated with the trading program,
20 like 85 percent?
21   A   Probably 85 percent in 2017, and then
22 2016 and 2015 would be -- almost 100 percent would
23 be -- I mean, about 90 percent in those two years.
24   Q   Thank you.  And moving forward in

Page 29

1 time to your ownership, Long Leaf Trading's revenue
2 was entirely based on commissions it received,
3 is that right?
4    A   I'm sorry.  I didn't catch the second
5 word.
6    Q   Let me ask it a different way.
7 Did Long Leaf -- when you owned the company, did
8 Long Leaf Trading have any sources of revenue other
9 than commissions associated with options trading?
10    A   Yes.  For a short period of time we --
11 the CFD dealer revenues came in, but they ended in
12 February of 2018.
13    Q   After February of 2018 did Long Leaf
14 Trading have any other sources of revenue other
15 than commissions associated with options trading?
16    A   Yes, it still had revenue associated
17 with self-traders who were trading futures options.
18 We weren't providing any information -- we weren't
19 providing any recommendations to them.
20    Q   How long did Long Leaf continue to
21 have self-trading customers when you owned the
22 company?
23    A   Until we were -- we became a guaranteed
24 introducing broker because we could not have two

Page 30

1 clearing firms.
2    Q   Remind me when you switched to Cunningham
3 approximately?
4    A   We switched to Cunningham in August
5 of 2018.  However, we did not become a guaranteed
6 introducing broker until March of 2019.
7    Q   So for the period December 2017
8 through February 2018 -- strike that.  Let me
9 back up.  Is it fair to say that the majority of
10 Long Leaf Trading's revenue when you owned the
11 company came from commissions associated with the
12 trading program?
13    A   That is true.
14    Q   From December 2017 through February
15 2018 what proportion of Long Leaf Trading's revenue
16 came from commissions associated with the trading
17 program?
18    A   90 percent.
19    Q   Between March of 2018 and the date
20 on which Long Leaf became a guaranteed introducing
21 broker, what proportion of Long Leaf Trading's
22 revenue was associated with commissions connected
23 to the trading program?
24    A   Still 90 percent.  We kept all of our

Page 31

1 self-traders at Gain.
2    Q   So the fact that the CFD dealer dropped
3 out didn't have a material impact on the revenue
4 breakdown?
5    A   It dropped out in early of 2018.  I think
6 the last month was February.
7    Q   Right.  So --
8    A   It didn't have a material impact past
9 that point.
10    Q   That's helpful.  I think I may have
11 misstated my question.  I meant to ask between
12 March of 2018 and the date on which Long Leaf
13 Trading became a guaranteed introducing broker,
14 what is the proportion of Long Leaf Trading's
15 revenue that was associated with commissions
16 from the trading program?
17    A   Like I said, 90 percent is an estimate,
18 yeah.
19    Q   Okay.  And then after Long Leaf Trading
20 became a guaranteed introducing broker, was all of
21 its revenue associated with the trading program?
22    A   Yes, it was.
23    Q   When you owned the company, Mr. Donelson,
24 there was a staff of brokers at Long Leaf Trading,

Page 32

1 correct?
2    A   Correct.
3    Q   How many brokers worked at Long Leaf?
4    A   Twelve.
5    Q   Did that change over time?
6    A   Yes.
7    Q   Describe how it changed over time.
8    A   We let people go through either
9 financial or people -- some people left.  We
10 brought on only two brokers during that time.
11 One left, and I can't even remember his name,
12 but he came on, he got qualified, and then his
13 wife worked for Morgan Stanley and didn't want him
14 working in the same industry so he had to leave.
15 But usually it was a question of money, how much
16 money we were making and whether we could continue
17 to pay people and were they performing.
18    Q   Is it fair to summarize the broker
19 staff at Long Leaf Trading as being up to 12 in
20 2018 and no more than 3 in 2019?
21    A   That is correct.
22    Q   What about the Evans era, how many
23 brokers worked at Long Leaf during the Evans era
24 or is that a topic that you can't really speak to?

Page 33

1    A   I would have to put together at any
2  one point in time how many people were there, but
3  they went through a lot of brokers.
4    Q   Okay.  So it's a topic that's listed
5  on the notice.  So we provided notice that we're
6  going to ask questions about the operation of the
7  trading program.  So, you know, if your answer is,
8  you know, I would have to go do more work to figure
9  it out, that's fair.  But it sounds like you're not
10 prepared to answer that question today, right?
11   A   On the operation, how it actually
12 worked, I can give you how it was described to
13 me but I can't -- the specifics about this trade or
14 that trade, I wouldn't have any firsthand knowledge
15 of it.
16   Q   I'm asking about the broker staff
17 and how many brokers worked at Long Leaf during
18 the Evans era and did that change over time.  Do you
19 have that --
20   A   It definitely changed over time.
21 I can't tell you what the maximum was or the
22 minimum was, but I have a record of all the brokers
23 that ever worked there and when they started and
24 when they ended.

Page 34

1    Q   What were the brokers' duties during the
2  time period you owned the company?
3    A   They were to solicit new customers,
4  manage their current customers, write trading
5  recommendations.  That was their primary duties.
6  And we would also have them do some research, market
7  research for us in terms of what is going on in this
8  market or what is going on in that market.
9    Q   Just so I understand then, Long Leaf
10 brokers during the time you owned the company
11 solicited customers to open new accounts, right?
12   A   Correct.
13   Q   And they disseminated trading
14 recommendations to solicit orders from existing
15 customers, right?
16   A   Correct.
17   Q   And that's probably like 98 percent
18 of their daily duties, is that fair?
19   A   Yeah, a very high proportion of their
20 duties.
21   Q   What about during the Evans era,
22 what did the brokers spend their days doing during
23 the Evans era?
24   A   From the phone records and everything

Page 35

1  else, it was very similar.
2    Q   During the Evans era which brokers were
3  responsible for disseminating trade recommendations
4  to customers?
5    A   Are you talking about specific names or
6  are you talking about as a general class of people?
7  I'm just clarifying.
8    Q   I'd like you to identify the Long
9  Leaf brokers during the Evans era who disseminated
10 trading recommendations to customers.  And if that's
11 information that you don't know, that's an
12 acceptable answer.
13   A   I don't know that I would know all of
14 them but James Leeney, Vince -- I can't remember
15 his last name, Jeremy Ruth.  I have the list based
16 on the trading data that I have who the account was
17 assigned to at that time.  So I can pull that up
18 of who would send those up --
19   Q   How would you know about -- how
20 would you know which brokers disseminated trading
21 recommendations during the Evans era?  What would
22 be your source of knowledge?
23   A   The Gain system has a broker code
24 assigned to each customer, so it would tell me

Page 36

1  which broker was in charge of that customer.
2    Q   Are you assuming that Long Leaf
3  Trading operated in the same way during the Evans
4  era as it did during the Donelson era in that each
5  broker disseminated all the trading recommendations
6  for their assigned customers?
7    A   I'm making that assumption, yes.
8    Q   Do you know if that's actually true?
9    A   100 percent, no, but I would say I'm fairly
10 certain that that's the way it worked.
11   Q   Do you think it worked that way for
12 the entire Evans Time Means Money period, so May
13 of 2015 through November of 2017?
14   A   Yes, I'm fairly certain that's the way
15 it worked.
16   Q   And other than the broker code
17 on the Gain records, what's the basis of your
18 understanding?  What are you basing your assumption
19 on?
20   A   There are email records, there are other
21 records of this person sending this recommendation
22 to this individual, which concurs with what the Gain
23 record says.
24   Q   So email records and you said other

Page 37

1  records.  What kinds of other records?
2    A    Phone records where somebody would
3  call them.  The only times -- and why I say I'm
4  fairly certain is should a broker leave and they
5  reassign the account, sometimes the timing between
6  what happens with the Gain code and who's doing that
7  may not be in sync.
8    Q    Did you review Long Leaf broker emails
9  from the Evans era to determine that the brokers
10  transmitted trading recommendations to customers?
11    A    I did.  The primary record, though,
12  is -- was sent through the CRM system, which did
13  not store it in the email system, but you could
14  bring up what was sent through that system.  That's
15  when I say the other records.
16    Q    Can you explain what information
17  in the CRM system leads you to believe that during
18  the Evans era the broker associated with the Gain
19  code disseminated the trading recommendations to
20  their respective customers?  This may sound like
21  a really dumb question, but I'm drilling down on
22  what's the information in the system.
23    A    The CRM system had an email system --
24  an email capability in it.  They would set up

Page 38

1  the recommendation in that system.  They would
2  assign, you know, this would send this email to this
3  customer about this recommendation, and it's stored
4  as an email -- it's not stored as an email record.
5  It's stored as a log record.  I know I'm getting a
6  little wonky here, but that's -- it's not a simple
7  I can total it up and here's what it says.  It's
8  this person sent it to this person at this point
9  in time.
10    Q    That's very helpful.  And the CRM log
11  information, does it include data or information
12  about what the content of the body of the email is?
13    A    It refers to the template that was
14  being used.  However, since he would use the same
15  template over and over, it wouldn't necessarily --
16  this is why I stopped using it.  It would bring
17  up the latest recommendation, even if it was sent
18  two years ago.
19    Q    And what is the template associated
20  with the trading recommendations that was in use
21  during the Evans era?
22    A    It's -- you'll see in emails that were
23  returned to the -- so if a customer agreed to the
24  trade via email, you would see the actual email that

Page 39

1  went out, the blasted email.  That's how I
2  triangulate the --
3    Q    That's helpful.
4    A    But if they got this -- if they got the
5  approval over the phone, I wouldn't see that for
6  that specific person.  Plus we had the trade sheets
7  that mark who -- that's also the stamped approvals.
8  I'm not using the right words, but for each trade
9  there would be a trade stamped copy that said this
10  person agreed to it and time stamped here.
11    Q    Got it.  So I just want to circle back to
12  the CRM record -- the CRM log you're referencing.
13  Did each broker have specific records that were
14  associated with emails that were disseminated from
15  their accounts?
16    A    Yes.
17    Q    Okay.  So --
18    A    They were assigned -- the lead name was
19  assigned to an individual.
20    Q    So, for example, you could look at James
21  Leeney's CRM information and see that he transmitted
22  an email to customers in the form of the template
23  that you recognize as the trading recommendation
24  during the Evans era?

Page 40

1    A    Correct.
2    Q    And do you remember seeing that information
3  for James Leeney?
4    A    Yes.
5    Q    What about Jeremy Ruth?
6    A    Yes.
7    Q    During the Evans era did Long Leaf Trading
8  disseminate results of trades to customers?
9    A    I don't have -- I don't have any
10  records of them in a broad sense sending out
11  results of trades.
12    Q    What about in specific or one-off
13  cases, are you aware of any of those instances?
14    A    I have -- yeah, I have seen records
15  where they talk about how a specific trade did or
16  another trade did but not any type of historical
17  record of here's how every trade did within a
18  certain customer's account, nor have I found any
19  record that they kept that.
20    Q    To clarify your last statement,
21  you're not aware of any records maintained by
22  Long Leaf tracking the performance of their trading
23  recommendations?
24    A    Correct.

Page 41

1   Q   When you bought the company -- strike
2   that.  I'll come back to it later.  I think I've
3   asked you this, Mr. Donelson, but I'm going to
4   ask it again.  I apologize.  You testified that
5   during your ownership, Long Leaf brokers' primary
6   duties, 90 percent of their day was spent soliciting
7   new customers or disseminating and dealing with
8   trading recommendations.  Was that breakdown similar
9   for the Evans era?
10  A   I can't really say.  I wasn't there
11  when all Evans records and phone records and --
12  Q   I understand.  When you owned the company,
13  describe the process by which Long Leaf solicited
14  prospective customers.
15  A   There was a -- you had openers who
16  would basically call and the target was 200 calls
17  a day, just realizing that 200 calls doesn't mean
18  you talked to 200 people.  The pickup rate was
19  really low, you know, probably under 5 percent or
20  lower.  Then they would set up a time for them to
21  do a demo.  So they would talk to them and say,
22  you know, don't take much time but would you like
23  to learn more.  Then they would -- then the opener
24  would perform the demo, which is an introduction

Page 42

1   to the program, and set a custom.  And that
2   would really get into more details about the
3   trading, more details about the program.  And
4   then a closer would then do the custom, which
5   may or may not include a Power Point presentation
6   depending on the actual individual that they're
7   talking with.  Then that would -- if they joined the
8   company, then they would set a time to go through
9   the application, which was a Gain application at
10  first, which was done all online, and then we'd set
11  up the funding and the funding would come to Gain
12  eventually.  That was kind of the solicitation
13  process.
14  Q   And was that process the same across
15  the approximately two years that you owned the
16  company?
17  A   We changed that to get from the
18  multiple phone calls with multiple people involved,
19  and we also set up that the funding would be done
20  through a central person and not done through each
21  and every broker.
22  Q   When did this change to get away from
23  multiple phone calls take place?
24  A   I would say late summer 2018.

Page 43

1   Q   And after --
2   A   Yeah.
3   Q   So after approximately summer of 2018,
4   how was the sales process different?
5   A   We were combining some of the what
6   we called the demo and the custom into more of
7   a broader conversation and also would try to see
8   if they wanted to stay on the line and talk to a
9   senior broker, Scott Gecas, regarding questions
10  about options and things like that which were more
11  technical in nature so that we could get into --
12  my concern was always the first presentation didn't
13  tell you much of anything.  It just -- it wasn't
14  robust enough.
15  Q   Was there still an opener who would
16  then sort of set that second call after that late
17  summer of 2018 time period?
18  A   There were a few because that would
19  usually be the role of somebody new to the company.
20  So we wouldn't throw them into the deep end right
21  away.
22  Q   How about like in 2019 when there
23  was just three brokers and yourself, how did the
24  solicitation process work in 2019?

Page 44

1   A   They would still do the calling obviously,
2   but we had changed to a new CRM which allowed us to
3   be more targeted about who we would call.  The lead
4   information did not have any demographic information
5   in it.  It was just merely a phone number, an email
6   address and a name.  However, the system could check
7   if that's a valid email address, if that's a valid
8   phone number, and so they would have a shorter list
9   of people to call on a daily basis.  But they would
10  do the opening of calling them, a very short
11  introduction and then setting up a time to go
12  through the presentation.  They would not do the
13  presentation on the first call.
14  Q   Understood.  And during these multistep --
15  during these multiple steps in the sales process
16  at Long Leaf Trading when you owned the company,
17  the brokers were instructed to follow scripts,
18  is that right?
19  A   They were not instructed to follow
20  scripts.  I didn't even know about the scripts
21  until April of 2018.
22  Q   So before April of 2018 how did the
23  brokers know what to say?
24  A   Well, they had a script that I did

Page 45

1  not have, but they were going through and using
2  that script.
3      Q    And sometime in April of 2018 you
4  became aware of the script that the brokers were
5  following, right?
6      A    Correct.
7      Q    Who wrote that script?
8      A    It was a script that was there in
9  place before I bought the firm.  I don't know
10  who -- I assume Tim Evans wrote it, but I don't
11  know who exactly wrote it.  I was told Jeremy Ruth
12  wrote it, but that's -- that's all I know.
13      Q    Who told you Jeremy Ruth wrote the scripts?
14      A    A couple of the existing brokers that
15  were there prior to.  I think James Hatzigiannis
16  might have told me that, but I do not have like who
17  actually authored it.
18      Q    And then in April 2018 you discovered
19  that these scripts existed and that's what the
20  brokers were following on their --
21      A    Yeah.
22      Q    -- on the multiple steps in the sales
23  process.  And I understand that there came a time
24  when the solicitation materials were revised

Page 46

1  at Long Leaf Trading.  Were there new scripts
2  or talking points that were used by the brokers
3  after April of 2018 at some point?
4      A    Yes, yes, there was.
5      Q    And who wrote any revised solicitation
6  materials?
7      A    On the talking points it would have
8  been me.
9      Q    Did anybody else play a role in any of
10  the revisions of Long Leaf Trading's solicitation
11  materials after --
12      A    I had Andrew Nelson helping me,
13  but I also had the brokers helping me with do
14  you say it this way, do you say it that way.  I'm
15  not a salesperson, so trying to make sure that it --
16  how that should work.
17      MR. FALVEY:  Let Jody finish his questions.
18      THE WITNESS:  Oh, I'm sorry.
19  BY MR. PLATT:
20      Q    So it sounds like it was a team effort
21  to revise the solicitation materials at some time
22  after April of 2018.  Mr. Nelson was involved, the
23  other brokers were involved and you were involved,
24  is that fair?

Page 47

1      A    Correct.
2      Q    During the Evans era did the brokers
3  also follow scripts for the multiple steps?  This
4  is another one, Mr. Donelson, if you don't know,
5  then that's your answer.
6      A    I wasn't there.  I don't know, other than
7  from phone records.
8      Q    Well, did you ever review phone
9  records and come to an understanding that the
10  Long Leaf brokers were following scripts from the
11  Evans era?
12      A    For the time period I listened to them,
13  yeah, and that was 2017.
14      Q    And in 2017 were the brokers following
15  the same script that they followed after you became
16  the owner of the company in 2018?
17      A    I really don't remember if it's the exact
18  same record or not.
19      Q    Is it similar?
20      A    I would say it is similar.
21      Q    And that's based on your review
22  of recorded phone calls and your awareness of what
23  the script was in April of 2018, right?
24      A    Right, yes.

Page 48

1      Q    Just to summarize that testimony,
2  your understanding is that before you bought the
3  company in 2017, Long Leaf brokers followed the
4  same scripts and solicitation materials that they
5  followed through at least April of 2018, is that
6  accurate?
7      A    I would say similar.  I don't know if
8  they're exactly the same.
9      Q    Materially the same?
10      A    I would say materially the same.
11      Q    Okay, thank you.
12      MR. FALVEY:  Hey, Jody, if you get
13  to a breaking point, you know, I -- sorry,
14  but I need to use the rest room.
15      MR. PLATT:  Yeah, let's take five.
16  And just in the interest of not going until --
17  let's go off the record.
18      (Discussion off the record.)
19      (Whereupon a recess was taken from
20      10:17 a.m., to 10:25 a.m., after
21      which the following proceedings
22      were had:)
23      Q    Mr. Donelson, when you owned the
24  company -- this may seem like an overly simple

Page 49

1 question -- Long Leaf Trading solicited members of
2 the general public to open accounts and participate
3 in Long Leaf's trading program, right?
4 A Yes.
5 Q Is the same true for the Evans era?
6 A Can you ask the question again so that
7 I'm clear? I'm sorry.
8 Q Sure. During the Evans era did Long
9 Leaf solicit members of the general public to open
10 accounts and participate in Long Leaf's trading
11 program?
12 A Yes.
13 Q During the time period that you
14 owned the company, Mr. Donelson, Long Leaf came
15 up with its own trading recommendations for the
16 trading program inhouse, right?
17 A Yes, except for one month.
18 Q What month was that?
19 A January of 20 -- no, December of 2017
20 where we employed a Series 3 broker to provide the
21 recommendations.
22 Q What was the name of that individual?
23 A Jim Barrett.
24 Q Can you spell the last name, please.

Page 50

1 A B-a-r-r-e-t-t.
2 Q You said you employed Mr. Barrett.
3 Did you pay him a salary or a consulting fee for
4 that time period?
5 A I just paid him a fee. I did not --
6 he was not an employee. He was a consultant.
7 Q Like an independent contractor, is that
8 fair?
9 A Correct.
10 Q How did you come to hire or contract
11 with Mr. Barrett in December of 2017 to design the
12 trading recommendations?
13 A Mr. Evans knew him from previous
14 roles. He is a trader for another firm and had
15 multiple conversations with him to develop the
16 trades.
17 Q Did Jim Barrett develop trading
18 recommendations for Long Leaf Trading during
19 the Evans era?
20 A I don't know.
21 Q Why didn't Long Leaf Trading continue
22 to contract with Jim Barrett after December of 2017
23 to develop trading recommendations?
24 A We were moving to a different trade that

Page 51

1 he was not comfortable providing recommendations on.
2 Q Did Barrett design iron condors?
3 A I think so. It was the trades that
4 were placed in December of 2017. I think there
5 was an iron condor. There's an iron butterfly.
6 They were credit spreads.
7 Q And when you say that Long Leaf
8 wanted to move to strategies that Barrett was
9 not comfortable with, what are you describing?
10 What changed?
11 A Going from credit spreads to debit
12 spreads, broken wing butterflies, broken wing
13 condors, volatility swaps, those type of trades.
14 Q Was Jim Barrett providing trading
15 recommendations to any other companies during
16 December of 2017 that you know of?
17 A None that I know of.
18 Q What was he doing during that time
19 period? Was he just an independent contractor out
20 in the world?
21 A He was an independent contractor working
22 for another introducing broker.
23 Q Which introducing broker did he work for?
24 A I would have to look that up. I knew

Page 52

1 it at one time.
2 Q Did he design multi-legged options trades
3 during December 2017 for that other introducing
4 broker?
5 A I do not know. He did not tell me.
6 Q What is your understanding of the nature
7 of Jim Barrett's professional duties in or around
8 December 2017 other than designing trades, trades
9 for Long Leaf?
10 A He was working as an AP of a separate
11 firm -- I'm sorry. I can't remember the name of
12 it -- and providing trading recommendations or
13 trading for that firm.
14 Q But it sounds like you actually don't know
15 what he was doing at the other firm?
16 A Not specifically, no.
17 Q During the Evans era did Long
18 Leaf Trading design its trading recommendations
19 inhouse?
20 A I believe so. I don't -- can't be certain.
21 Q What's your belief based on?
22 A I don't see any payments in the records
23 to any third party that I didn't recognize.
24 Q You're not aware of any payments that Long

Page 53

1  Leaf made to any service providers to compensate
2  them for providing trading recommendations?
3     A   Correct.
4     Q   During the Evans era?
5     A   Correct.
6     Q   Do you know who at Long Leaf Trading
7  was responsible for designing the trades in the
8  trading program during the Evans era?
9     A   Timothy Evans.
10    Q   What's that belief based on?
11    A   That's what he told me.
12    Q   Anyone else besides Evans participate
13 in designing the recommended trades during the Evans
14 era that you're aware of?
15    A   Not that I'm aware of.
16    Q   When you owned the company, it was
17 the brokers' duties -- it was among the brokers'
18 duties to disseminate the trading recommendations
19 to customers, right?
20    A   Correct.
21    Q   And they did that by email, is that
22 correct?
23    A   Correct.
24    Q   Any other methods of disseminating

Page 54

1  the trading recommendations during your ownership
2  of the company besides email?
3     A   In the first month we used the
4  CRM system that I described earlier, and then
5  we ceased using it and went to sending PDFs via
6  email.
7     Q   And the CRMs that you're describing,
8  that also was an email functionality, is that --
9  am I remembering your testimony correctly?
10    A   Yes, it does have one but it -- yes.
11    Q   And for sending out the trading
12 recommendations through the CRM, those would have
13 been sent by email, right?
14    A   Yes, they're sent through email. Yeah,
15 they are an email.
16    Q   What about during the Evans era,
17 how did Long Leaf Trading communicate its trading
18 recommendations to customers?
19    A   I really can't be certain how they did it.
20    Q   Okay, that's fair. Mr. Donelson,
21 do you have an understanding of whether NFA rules
22 require APs of introducing brokers to be supervised
23 with respect to their solicitation of customers and
24 customer orders?

Page 55

1     A   Yes, I am.
2     Q   You're aware that APs are required to
3  be supervised?
4     A   Yes, I am.
5     MR. PLATT:  I'm going to show you
6  a document that I'm going to mark as CFTC
7  Exhibit 491.
8        (Whereupon CFTC Exhibit No. 491
9        was marked for identification.)
10    Q   Do you recognize this as an email
11 chain between you and Tim Evans on or around
12 February 21, 2018?  The subject line is Update to
13 NFA Registration.  Do you see that, Mr. Donelson?
14    A   Yes, I do.
15    Q   I'm going to scroll down to the first
16 few emails in the chain.  The email chain starts
17 at the bottom in chronological order.  You write,
18 "Tim, I want to update the NFA info this week.  Let
19 me know when you have time," and Tim responds, "I
20 think you may need the Series 3 to take on all those
21 positions.  Do you have an exam scheduled?"  And
22 then you write back, "I spoke with Becky yesterday
23 and have a pretty good idea of what I can and cannot
24 do until I have a Series 3."  Who is Becky?  Is that

Page 56

1  Ms. Wing?
2     A   That is Ms. Wing.
3     Q   And what is a Series 3?
4     A   Series 3 is a test that you have to pass
5  to become an AP.  It covers the futures trading,
6  compliance.
7     Q   And AP stands for associated person, right?
8     A   That is correct.
9     Q   What do you recall about what Ms. Wing
10 told you about what you can or -- what you could or
11 could not do without a Series 3 license?
12    A   I could not solicit clients.  That
13 was -- that's what I remember, nor could I manage
14 or supervise APs.
15    Q   Yesterday I think you testified
16 that from February 2018 onward you were the
17 chief compliance officer of Long Leaf Trading and
18 that Brian Adams and Scott Gecas each performed
19 compliance and supervisory tasks, is that right?
20    A   That is correct.
21    Q   Between December 2017 and June 2018,
22 right, so the first approximately six months you
23 owned the company, did you meet with newly hired
24 brokers to discuss your expectations for them and

Page 57

1  the goals and the company's sales processes?

2    A   I don't believe we hired anybody in that

3  time frame.

4    Q   So I'm asking a slightly different

5  question than whether Long Leaf Trading hired

6  anyone during that time frame.  I'm asking if there

7  was a newly hired employee around that time, so

8  maybe hired in November or October of 2017, did you

9  meet with them to discuss expectations, goals and

10  the company's sales processes?

11    A   I met with each one to talk about

12  my vision of where the company will go, but I and

13  them would develop the goals.

14    Q   Is that a no, you did not meet with newly

15  hired brokers to discuss expectations, goals and the

16  company's sales processes between December 2017 and

17  June 2018?

18    A   No.

19       MR. PLATT:  I'm going to show you what

20  I'm marking as CFTC Exhibit 492.

21       (Whereupon  CFTC Exhibit No. 492

22       was marked for identification.)

23    Q   Mr. Donelson, can you see

24  Exhibit 492?  It's a calendar invitation from

Page 58

1  you to four recipients, Ryan Dillman, Chris Janyk,

2  Alexander Stemper and Shawn Mooney dated January 5,

3  2018.  Do you see that?

4    A   Yes.

5    Q   The subject is New Opener Meeting, right?

6    A   Yeah, yes.

7    Q   And the comments in the calendar

8  invitation reads, "Discuss expectations and goals.

9  New Process for next two weeks."  Do you see that?

10    A   Yes.

11    Q   Did you attend this meeting?

12    A   Yes.

13    Q   Between December 2017 and June

14  of 2018 did you meet with the Long Leaf broker

15  staff to engage the brokers on sales targets, data

16  quality improvements and training?

17    A   Yes.

18    Q   What does it mean to engage the brokers

19  on training?

20    A   It was more of what training they felt

21  they needed in addition to what's being provided.

22    Q   Training with respect to what topics?

23    A   Pretty much anything to do with the

24  sales process.  In other words, if you're new,

Page 59

1  are you -- what things do you need to be trained on.

2    Q   Including how to run through the sales

3  process?

4    A   That would be part of it.

5    Q   I'm going to go back to 492 for

6  a second.  This is the invitation to Dillman,

7  Janyk, Stemper and Mooney for the new opener

8  meeting.  These attendees, Mr. Donelson, these

9  are newly hired Long Leaf brokers, right, as of

10  that date?

11    A   They were hired in October of last year --

12  of the year before.

13    Q   So would you disagree with categorizing

14  them as recent hires?

15    A   Yeah, I would -- are they recent hires,

16  yes.  Are they brand new hires, no.

17    Q   Okay.  And they're brokers, correct?

18    A   They're APs, yes.

19    Q   What expectations and goals did you

20  discuss with these four APs who were hired three

21  months before this meeting was scheduled to take

22  place?

23    A   I'm sorry.  Three months before what?

24    Q   These four APs were recipients of your

Page 60

1  meeting invitation.  I think you testified that

2  they were hired around October 2017?

3    A   Yes, I believe so.

4    Q   And one of the agenda items that you

5  wrote is discuss expectations and goals, correct?

6    A   Correct.

7    Q   What expectations and goals did you

8  discuss with these four brokers at the new opener

9  meeting that occurred on Friday, January 5, 2018?

10    A   Basically what my overall expectations

11  for all employees are and also to engage them in

12  understanding, given the goals that I inherited,

13  whether those are the right goals.  This was me

14  engaging all employees in these type of

15  conversations when I first got there.

16    Q   That's helpful.  And what goals did

17  you describe to your broker staff around January

18  of 2018?

19    A   The goals that were -- at that time

20  were X number of calls, X number of this, X number

21  of that.  And I was trying to understand what gets

22  in the way of achieving those goals, are those

23  realistic goals, are they -- do they lead to what

24  we're trying to get done.

Page 61

1    Q    And what were you trying to get done?

2    A    Well, obviously you want to bring

3    in more clients. However, there's multiple ways

4    to do that, and the method I saw was just grinding,

5    grinding, grinding through hundreds and hundreds

6    of names that didn't seem to be overly productive

7    as I'm trying to understand the processes of the

8    firm.

9    Q    And so what were the goals that

10   you communicated to your broker staff at this

11   new opener meeting? Was it more like rather than

12   grinding through calls, for each call you can maybe

13   take more care to describe the trading program?

14   Like what -- I don't understand what the shift was.

15   A    One of the things that came out

16   of that meeting is better data around the lead

17   list and I -- there was a lot of data cleanup that

18   needed to be in there. They would get redundant

19   names, they would get names for people outside

20   of the United States, and it just gets in the way

21   of the process.

22   Q    What about this next agenda item,

23   new process for next two weeks? Do you remember

24   what that was?

Page 62

1    A    We were introducing the shift from

2    the broker doing the funding and application calls

3    to an individual -- a separate individual doing

4    that.

5    Q    And at this new opener meeting you

6    described the new process and how it would work

7    to the new brokers, is that fair?

8    A    Correct.

9    Q    Between December 2017 and June of 2018

10   did you conduct individual performance reviews with

11   Long Leaf brokers?

12   A    I did with Scott Gecas. He's the sales

13   manager.

14   Q    Scott Gecas is -- I apologize. I cut

15   you off.

16   A    Sales manager is Scott Gecas. He and

17   I both did the performance reviews so I could hear

18   what was going on.

19   Q    So your testimony is that you and

20   Scott Gecas jointly performed -- jointly conducted

21   performance reviews of the brokers?

22   A    Correct.

23   Q    Between December 2017 and June of 2018,

24   right?

Page 63

1    A    We continued that through 2018. We would

2    always do a joint review.

3    Q    And just to be clear, that occurred

4    between December 2017 and December of 2018 -- and

5    June of 2018, right?

6    A    Yes.

7    Q    Is it fair to characterize your

8    role between December 2017 and June of 2018 at

9    Long Leaf Trading as encompassing oversight of the

10   sales organization at Long Leaf Trading?

11   A    I had oversight of Scott and -- who ran

12   the sales organization, yes.

13   Q    So you're at the top of the pyramid.

14   Even if Gecas is between the APs and you, you're

15   at the top in charge of the sales organization at

16   Long Leaf Trading for all relevant time periods that

17   you owned the company, right?

18   A    I'm the owner of the company, yes. I'm

19   on top of the pyramid.

20   Q    And in that role one of your

21   responsibilities was overseeing the sales

22   organization at Long Leaf at all relevant times,

23   right?

24   A    Overseeing the sales manager, yes.

Page 64

1    Q    What's the distinction you're drawing

2    between overseeing the sales manager and overseeing

3    the sales organization?

4    A    I wasn't directly in charge of the

5    sales force. I was directly in charge of Scott

6    Gecas.

7    Q    What's the difference between like

8    indirect and direct? I don't get it.

9    A    Scott could discipline people underneath

10   him. I was focused on Scott Gecas, making sure that

11   he was managing the sales force.

12   Q    Do you think you ever told anyone

13   that you oversaw the sales organization at Long Leaf

14   Trading between December 2017 and June of 2018?

15   A    I'm sorry. Did you say I or he or --

16   I'm sorry. I didn't --

17   Q    Do you think that you have ever

18   described your role at Long Leaf Trading between

19   December 2017 and June of 2018 as encompassing

20   oversight of the sales organization at Long Leaf

21   Trading?

22   A    Yes, it's possible I did say that.

23   Q    And if you said it, it was because you

24   believed it, right?

Page 65

1  A  Yes.
2    MR. PLATT:  I'm going to show you
3  what I'm going to mark as CFTC Exhibit 493.
4    (Whereupon  CFTC Exhibit No. 493
5    was marked for identification.)
6    Q  You can see this is an email that --
7  the top email is forwarded from btadams21 to a
8  guy named Mike Leonard.  His email address looks
9  like it's a lawyer's email address, but I'm
10  going to scroll down to show you that the bulk of
11  Exhibit 493 is an email exchange between you and
12  Brian Adams on June 12, 2018.  Do you agree with
13  that?
14  A  Yes, that's what it is.
15    Q  And Brian Adams yesterday you testified
16  was -- I think you testified generally that he was
17  the sales manager during the Evans era and he was
18  more of a compliance role during your ownership
19  of the company.  Is that accurate or --
20  A  That is correct.
21    Q  So here's your response to Adams.  You
22  sent it from your -- from jimdonelson1420@gmail.
23  That's your personal email address, correct?
24  A  Yes.

Page 66

1    Q  Why did Brian Adams send this email,
2  subject line Termination from Long Leaf, to your
3  personal email address and not your Long Leaf
4  Trading email address?
5  A  You'd have to ask him.  I don't know.
6    Q  You didn't tell him to send the email
7  to your Gmail address?
8  A  Once he engaged his lawyer I told him to
9  send it to my personal email address.
10    Q  Why did you tell him to do that?
11  A  Because it could have legal issues
12  involved with it.  Probably a bad choice on my
13  part but ...
14    Q  Is it fair to summarize your testimony
15  just now, Mr. Donelson, that you wanted to keep
16  the potential legal issues with Adams off of like
17  the Long Leaf server?  Is that like in summary what
18  you're saying?
19  A  Yes.
20    Q  Did you ever direct anyone else to
21  send emails to your Gmail address as opposed to
22  your Long Leaf Trading address?
23  A  Not that I remember.
24    Q  Did you ever use your Gmail address for

Page 67

1  any other Long Leaf Trading communications other
2  than this email exchange that we see with Mr. Adams?
3  A  I would sometimes send files from
4  myself to myself so I could work on them at home.
5    Q  Other than this Adams email in 493 and
6  emailing yourself files, did you ever conduct Long
7  Leaf Trading business communications through your
8  Gmail address?
9  A  No, I did not transact business through
10  my Gmail address.
11    Q  I think I'm asking a slightly different
12  question rather than -- and I apologize if I asked
13  it imprecisely.  I'm not asking if you conducted
14  business through your Gmail address.  I'm asking
15  if you used your Gmail email account for any
16  communications related to Long Leaf Trading at any
17  time other than this Brian Adams email exchange
18  or emailing yourself documents so you could work
19  on them at home.
20  A  I don't remember ever using it, but I could
21  have done it by accident.
22    Q  Okay.  Well, we may come back to
23  that shortly.  And so the subject line of this --
24  of CFTC Exhibit 493 is Termination from Long Leaf.

Page 68

1  Do you remember, was Adams terminated around the
2  time this email was sent, June of 2018?
3  A  Yes.
4    Q  Why did you fire Brian Adams?
5  A  We did not have the money to pay his
6  salary and he was not in a sales position, so I had
7  no -- I had to take on all those roles myself.
8    Q  Other than not having the money to
9  pay his salary, were there any other factors that
10  contributed to your decision to fire Brian Adams?
11  A  No.
12    Q  So down on Adams' email to you he
13  writes -- the third paragraph so you can follow
14  along -- Adams writes, "I don't appreciate the
15  uncomfortable position this has put me in regarding
16  unknown potential personal liability associated with
17  having my name tagged to high-level positions within
18  Long Leaf that frankly didn't exist," and I think
19  he's referring to principal and chief compliance
20  officer.  Did I read that correctly?
21  A  He is a principal.  I don't believe he
22  was ever tagged as the chief compliance officer.
23    Q  So whether or not he was, in fact, the
24  chief compliance officer, do you agree that he's

Page 69

1  telling you that he's uncomfortable being associated
2  with those two positions, principal and chief
3  compliance officer?
4      A   Yes, that's what it says.
5      Q   And then we're just going to
6  scroll up to your response here.  You write,
7  "Brian, I understand your concerns and agree with
8  your assessment.  My first instinct is to have an
9  outline of what duties you were responsible for and
10  what you were not.  My list of what compliance tasks
11  you had responsibility for are as follows:"  And
12  then you have an itemized list of five items for
13  Adams and then you describe things that you were
14  responsible for.  Do you see that?
15      A   Correct.
16      Q   So in your email to Adams in June
17  of 2018 you write that you're responsible for --
18  and I'm assuming this is a non-exhaustive list --
19  financial filings, overseeing the sales organization
20  and assuring that non-scripted information meets
21  NFA rules, trade activities, all other compliance
22  activities.  Did I -- is that the list that you
23  wrote to Adams about your responsibilities?
24      A   Yes, it is.

Page 70

1      Q   What do you think you meant by overseeing
2  the sales organization there?
3      A   This had to do with compliance,
4  not the actual sales organization itself.
5  The day-to-day responsibilities were Scott Gecas'.
6  However, there's still our compliance that we go
7  through to make sure that rules are being followed.
8      Q   And that oversight of the sales
9  organization, whether from a compliance perspective
10  or a business perspective, that was something you
11  were responsible for, right?
12      A   At that time, yes.
13      Q   And compliance, does that mean that
14  making sure that your APs did not disseminate
15  misleading communications to prospective customers?
16  Was that one of the compliance activities involved
17  with overseeing the sales organization?
18      A   Yes.
19      Q   What is non-scripted information?  What
20  do you mean by that?
21      A   If somebody is saying something outside
22  of any script or any talking points, that it meets
23  the rules or if they send out a document or they
24  send out something to a customer or a prospective

Page 71

1  customer, that they -- you know, for example, review
2  of emails is what I would consider non-scripted
3  information.
4      Q   Okay, that's helpful.  And what about
5  listening to recorded phone calls?
6      A   That was primarily roles of Scott and
7  Brian.
8      Q   Right, but you list it as a thing that
9  you are responsible for.
10      A   I don't see the document anymore.  I don't
11  see it as being listed on there.
12      Q   Sure, and let me break it down because
13  I skipped an inferential step there.  You write
14  among the four things that you're responsible for,
15  Item 2, overseeing sales organization and assuring
16  that non-scripted information meets NFA rules.
17  And I'm focused on that second half, assuring that
18  non-scripted information meets NFA rules.  I think
19  you said that that means that you were responsible
20  for ensuring that anything that wasn't on the
21  scripts met NFA rules, is that a fair summary?
22      A   That's a fair summary.
23      Q   And one way you said that you did that
24  was by reviewing emails because email communications

Page 72

1  were not scripted, right?
2      A   Correct.
3      Q   And brokers also communicated to customers
4  on phone calls, right?
5      A   Correct.
6      Q   So what steps did you take to
7  ensure that during telephonic solicitations
8  the non-scripted information used by brokers met
9  NFA rules?
10      A   That's where I used Brian and Scott
11  to do that review and bring up any information
12  that they heard.
13      Q   So you weren't reviewing recorded
14  telephone calls during this pre-June 2018 time
15  period?
16      A   No, I was not.
17      MR. PLATT:  And let's change gears a
18  little bit here.  I'm going to share a document
19  that I'm going to mark as CFTC Exhibit 494.
20      (Whereupon  CFTC Exhibit No. 494
21          was marked for identification.)
22      Q   Do you recognize CFTC Exhibit 494
23  as the May 21, 2019 4g request directed to Long
24  Leaf Trading?

Page 73

1    A    Yes.
2    Q    What did you do to respond to this 4g
3    request?
4    A    I pulled all the documents related
5    to each and every item from either, you know, AWS
6    storage or backups on our computers or physical
7    paper documents.
8    Q    And those included emails and chats, right?
9    A    Correct.
10   Q    Telephone recordings, right?
11   A    Correct.
12   Q    Trading records and other documents related
13   to the trading program, right?
14   A    Correct.
15   Q    Did you perform the collection of
16   information for purposes of responding to this 4g
17   request or did you delegate that to someone?
18   A    I did most -- I did the electronic,
19   pulled things that were electronically stored.
20   My wife helped me with all the paper collection
21   and making sure we had everything.
22   Q    What documents did Long Leaf store in
23   hardcopy?
24   A    All the trading, the stamped trading

Page 74

1    data was -- or the trade tickets.  That's the
2    word I was looking for.  A lot of the applications,
3    the older applications were still in paper format.
4    Those were the two biggest parts of it.  There
5    were other things that were stored in hardcopy,
6    but it wasn't like a whole group of things.
7    Q    Were any of Long Leaf's scripts stored
8    in hardcopy?
9    A    They were only -- I mean, yes, they were
10   stored in hardcopy.
11   Q    In responding to the CFTC's May 21,
12   2019 4g request did you search for, collect and
13   produce all responsive Long Leaf scripts that had
14   been stored in hardcopy?
15   A    Honestly, I don't know.  There was a lot
16   of documents.  We tried to do an exhaustive search
17   of everything.
18   Q    Sitting here today, do you remember
19   making a decision not to produce scripts that had
20   been stored in hardcopy to the CFTC in response to
21   the 4g request?
22   A    No, I never made any conscious decision
23   to exclude any information.
24   Q    Were hardcopy scripts excluded from

Page 75

1    the Long Leaf response to the CFTC's May 21, 2019
2    4g request?
3    A    They may have been.  I don't know.
4    Q    Who would know?
5    A    You guys would know if they weren't there
6    or not.  I --
7    Q    So your testimony is that Long Leaf
8    Trading may or may not have excluded or failed to
9    produce scripts of solicitation materials that were
10   stored in hardcopy when responding to the CFTC's
11   May 21, 2019 4g request.  Do I have that right?
12   A    Could you repeat the question, please.
13   Q    Mr. Donelson, is it your testimony
14   that you are not sure if Long Leaf Trading produced
15   hardcopy scripts and other hardcopy solicitation
16   materials in response to the May 21, 2019 CFTC 4g
17   request?
18   A    Yes.
19   Q    It seems like kind of an important
20   set of documents to me in this case.  Do you think
21   the scripts are important documents?
22   A    Yes.
23   Q    And you don't know if you produced them
24   or not?

Page 76

1    A    There were a ton of documents.  It
2    took us weeks to pull all that data together, and
3    we reserved the right when we filed it to supplement
4    because we were still searching boxes and things
5    like that of data.
6    Q    Where were the hardcopy scripts stored
7    at Long Leaf Trading?  Was there a filing cabinet?
8    Was there like a little binder?  Where were they
9    kept?
10   A    I honestly don't remember.
11   Q    But you know they existed, right, hardcopy
12   scripts of solicitation materials?
13   A    Yes, I knew they existed at the time.
14   I thought they were part of what we submitted.
15       MR. PLATT:  I'm going to mark as CFTC
16   Exhibit 495 the CFTC's August 21, 2020 first
17   set of requests for production to Long Leaf
18   Trading in connection with this litigation.
19       (Whereupon  CFTC Exhibit No. 495
20       was marked for identification.)
21   Q    You've seen this document before, right,
22   Mr. Donelson?
23   A    Correct.
24   Q    And what did you do to respond to this

Page 77

1   set of requests for production?
2       A   Could you scroll down to make sure I'm
3   clear?  This is the extension of the 4g request
4   to the end of the period, is that correct?
5       Q   Yeah.
6       A   Same types of information.  Electronic,
7   obviously most of this was now electronic.  The
8   trades tickets were still in paper format, but we
9   were scanning them and just making sure we had all
10  the documents and also making sure that they got
11  moved from the old location to the new location.
12      Q   So we'll come back to the request
13  for production in a minute.  Earlier you talked
14  about a CRM system.  What does CRM stand for?
15      A   Customer relationship management.
16      Q   How did Long Leaf use its CRMs?
17      A   It would store all of its leads,
18  customers, everything in the system.  It would
19  use that as the basis to make phone calls, as the
20  basis of, you know, storing customer -- what's the
21  word, not their demographic data but their phone
22  numbers, their email addresses, everything.  It
23  would actually allow you to say is this a customer,
24  is this a prospective customer.  It's basically

Page 78

1   a way to manage or to -- it's a database all of
2   the possible customers.
3       Q   The CRM is the mechanism by which
4   Long Leaf would record telephone calls, right?
5       A   Correct.
6       Q   Whose telephone calls did Long Leaf
7   Trading's CRM system record?
8       A   It would record anybody who was calling
9   through their call manager.
10      Q   So is it your testimony that everyone
11  at Long Leaf had their own line recorded?
12      A   No, it would only be if they were
13  calling through the CRM.  For example, I didn't
14  call through the CRM.  Brian Adams didn't call
15  through the CRM.  None of those called through
16  the CRM so the recording would not happen or if
17  somebody called you, that would also not get
18  recorded.
19      Q   Does the CRM, was it connected to every
20  broker's desk phone or was it a separate device?
21      A   No, it's connected to their phone.
22      Q   What was the purpose of recording telephone
23  calls at Long Leaf Trading?
24      A   So that you had an accurate record of what

Page 79

1   the conversation was.
2       Q   For what purpose?
3       A   For compliance purposes, for training
4   purposes.
5       Q   You testified that you listened to
6   recorded phone calls as part of your supervision
7   of Long Leaf brokers, right?
8       A   Correct.
9       Q   I think you testified you listened to
10  a lot of calls, right?
11      A   I wouldn't say a lot of calls.
12      Q   Can you put a number on it?  Like
13  how many calls did you listen to per week or
14  per month?
15      A   Probably five or six a month.
16      Q   Okay.  Based on your review of recorded
17  phone calls and the fact that I think yesterday
18  you testified that you sat in close quarters with
19  the Long Leaf brokers on the sales floor, do you
20  think you had a pretty good understanding of the
21  content of Long Leaf Trading's brokers' verbal
22  solicitations during the time period you owned
23  the company?
24      A   Yes.

Page 80

1       Q   Did Long Leaf brokers ever make business
2   calls from their personal cell phones?
3       A   Not that I know of.  They were not
4   supposed to.
5       Q   Did you direct them to only make
6   solicitation calls through the CRM?
7       A   Yes.
8       Q   Did Long Leaf brokers ever disable
9   the CRM's recording functionality or otherwise
10  seek to circumvent its recordation of their phone
11  calls?
12      A   They could not disable it on their
13  phone.  Did they try to circumvent it?  I have no
14  instance of that, but could they have, yes.
15      Q   What about during the Evans era,
16  do you know if brokers did that during the Evans
17  era?  Do you know if brokers tried to circumvent
18  the recordation of their telephone calls during
19  the Evans era?
20      A   I don't know.
21      Q   Do you know if brokers used their
22  cell phones to make solicitation calls or talk to
23  customers during the Evans era?
24      A   I don't know.

Page 81

1    Q    And there came a time when Long Leaf
2    switched CRM vendors, right?
3        A    Correct.
4        Q    Do you remember approximately when that
5    occurred?
6        A    January of 2019.  I think that's when we
7    started implementing that.
8        Q    And so for the new vendor, was
9    it a similar policy whereby only outgoing phone
10   calls from the -- through the CRM system would be
11   recorded?
12       A    It was supposed to record incoming also.
13       Q    Did it record incoming?
14       A    I think so but I don't -- I'm not sure
15   about that.
16       Q    Why didn't you hook your phone up through
17   the CRM?
18       A    I was not soliciting customers.
19       Q    You never solicited any customers
20   during the -- you never spoke to any prospective
21   customer before they opened an account?
22       A    I did speak to prospective customers
23   but usually very rarely.  I would speak to existing
24   customers.

Page 82

1        Q    When a Long Leaf broker spoke to an
2    existing customer, their line would be recorded as
3    they made that call through the CRM system, right?
4        A    Correct.
5        Q    So were you trying to avoid having your
6    line recorded, Mr. Donelson?
7        A    No.
8        Q    Did it cost more to have an additional
9    recorded line or an additional account with the CRM?
10       A    Yes.
11       Q    Is that why your line was not recorded?
12       A    One reason, yes.
13       Q    Any other reasons?
14       A    I had a lot of other phone calls
15   that had nothing to do with the customers that --
16   that was primarily calls I was making on a daily
17   basis.  The CRM is where all the solicitation came
18   from.
19       Q    So your phone calls with existing
20   customers, did those deal with the trading program?
21       A    Sometimes yes, sometimes no.
22       Q    Your phone calls with existing
23   customers, did they deal with the results of the
24   trading program?

Page 83

1        A    Yes.
2        Q    Your phone calls with the existing
3    customers, did they sometimes deal with the goals
4    of the trading strategy on a going-forward basis?
5        A    I don't remember.
6        Q    Did you ever talk to an existing
7    customer about your vision for the way the Long
8    Leaf Trading strategy would evolve?
9        A    I don't remember.
10       Q    Long Leaf used emails regularly in the
11   course of business, right?
12       A    Correct.
13       Q    Including to communicate with both
14   prospects and customers, right?
15       A    Correct.
16       Q    Long Leaf received information from
17   its clearing firms by email, right?
18       A    Correct.
19       Q    Long Leaf used emails to solicit
20   prospective customers, right?
21       A    Correct.
22       Q    What was Long Leaf's document
23   retention policy for emails and other electronic
24   communications?

Page 84

1        A    We -- all the emails were sorted and
2    archived through GoDaddy, and they would archive
3    all the documents in there from the point -- yeah.
4        Q    When did that archiving process begin?
5        A    I don't have an exact date, but in 2016
6    when they switched to GoDaddy.
7        Q    Got it.  Thank you.  Do you know if any
8    Long Leaf employees deleted emails that they used
9    for business purposes?
10       A    They possibly deleted them, but the archive
11   would still have them.
12       Q    Can you explain how that works?
13       A    I'm not a tech person but I know how --
14   so every email that goes into the -- the archive
15   is a -- let me take a step back.  I'll try to give
16   you the layman version of what I understand it to
17   do is that for every email that goes in or out it
18   adds it to the archives.  The fact that you delete
19   it from your local mailbox doesn't change the
20   archive.  The archive's a once -- write-once only.
21       Q    I understand.  That's helpful.  And
22   when Long Leaf produced documents in response
23   to the requests for production and 4g request, did
24   Long Leaf collect its emails from the archive or

Page 85

1  from the local --
2      A   They came from the archive.
3      Q   Understood.  Did Long Leaf have an internal
4  chat functionality?
5      A   Yes.
6      Q   What was the document retention policy
7  with regard to the internal chats?
8      A   The internal chats would actually go
9  to the email archive also.
10     Q   Okay.  Do you know if Long Leaf Trading
11  produced chats to the CFTC in response to the 4g
12  request and the requests for production?
13     A   No.  Can you say that again because I'm
14  not sure I answered it correctly.
15     Q   Did Long -- let me ask it slightly
16  differently.  Did Long Leaf Trading produce chats,
17  as opposed to emails, in response to the CFTC's
18  4g request and requests for production in the
19  litigation?
20     A   Yes, they would be in the email archives,
21  from my understanding.
22     Q   Did Long Leaf use like a shared drive
23  or a network drive in the course of its business?
24     A   We used OneDrive and you could then

Page 86

1  share it.  We didn't use -- during my period we
2  did not use it very much.  I just didn't find it
3  overly effective.  I was spending more time trying
4  to make sure everybody could get into it than
5  actually was worth it.
6      Q   What is OneDrive?
7      A   It is a Microsoft product that
8  stores -- backs up all your data, but you can
9  also share files across it.  You can work on it.
10  It stores on your computer, but then it also updates
11  the stored drive.
12     Q   So let me just show you an exhibit.
13  I'm going to mark this, Mr. Donelson, as CFTC
14  Exhibit 496.
15         (Whereupon  CFTC Exhibit No. 496
16          was marked for identification.)
17     Q   Do you see this?  This is an email from
18  Brian Adams to you on May 21, 2018.
19     A   Yeah.
20     Q   And he's sharing a document and
21  down at the bottom you can see it says Microsoft
22  OneDrive.  Is this an example --
23     A   Yes.
24     Q   -- of the way that Long Leaf would

Page 87

1  use the OneDrive to store and share documents?
2      A   Yes.
3      Q   I'm going to scroll down.  This is
4  actually a group exhibit, but there's one other
5  email.  This is from you to Adams on March 14, 2018.
6  This is still on Exhibit 496.  The subject is Jim
7  Donelson shared the folder "Compliance" with you.
8  And this is also -- do you see that it's Microsoft
9  OneDrive?
10     A   Yes.
11     Q   Is this another example of the way
12  Long Leaf used OneDrive to store and share like
13  folders of documents and information?
14     A   Yes.
15     Q   Other than OneDrive, did Long
16  Leaf have any other centralized repositories for
17  electronically stored information such as a local
18  network drive or a local shared drive?
19     A   We did not have either of those.  We didn't
20  have our own server.
21     Q   Did you have anything that functioned --
22  do you know like what a local drive is or what a
23  shared drive is generally?
24     A   Yes, yes, I do.

Page 88

1      Q   Did Long Leaf -- is it right that Long
2  Leaf did not use one of those other than to the
3  extent that you used Microsoft OneDrive?
4      A   Correct.
5      Q   Did you maintain electronically stored
6  information in a local folder on your computer at
7  Long Leaf?
8      A   There was local -- yeah, there was
9  information on my local computer, yes.
10     Q   What information did you store on your
11  computer at Long Leaf?
12     A   The only things I remember are payroll
13  information, company opening documents and things
14  like that related to actually administration of the
15  company.  Those are the only things I would not put
16  into a OneDrive.
17     Q   What about during the Evans era, what
18  was the setup for electronically stored information
19  during the Evans era?  Did they use a shared drive?
20     A   I really don't know.
21     Q   Okay.  And so for OneDrive I see this
22  compliance folder that I showed you on Exhibit 496.
23  We see, you know, Adams sent you what looked like
24  a script document.  What kinds of information did

Page 89

1  Long Leaf store on OneDrive?
2     A    Basically all of our information was
3  stored on OneDrive, which was --
4     Q    Information related to the trading
5  program -- I'm sorry. I think we spoke over each
6  other. Let me just ask the question. Did Long Leaf
7  Trading store information related to the trading
8  program on OneDrive?
9     A    Yes.
10     Q    Did Long Leaf Trading -- strike that.
11  In responding to the CFTC's 4g request and requests
12  for production, both of them, did Long Leaf Trading
13  collect documents from -- that had been stored in
14  OneDrive?
15     A    Yes.
16     Q    Were there any documents that had
17  been stored in OneDrive that were excluded from
18  Long Leaf Trading's search for responsive documents
19  concerning the 4g request or the requests for
20  production?
21     A    Only documents related to attorney-client
22  privilege.
23     Q    So just to sum it up, and this is
24  going to be in laymen's terms, to respond to the

Page 90

1  4g request and the RFPs Long Leaf Trading went
2  into the OneDrive and got pretty much everything
3  and produced it that was responsive?
4     A    Yes.
5     Q    Okay, thank you. That's helpful.
6  Was OneDrive in existence when Long Leaf Trading
7  changed ownership or is that something you
8  implemented?
9     A    No, it was in existence when I purchased
10  the firm.
11     Q    And you sort of maintained the existing
12  foldering structure or did you change the foldering
13  structure?
14     A    I changed the foldering structure.
15     Q    Did you ever look in the OneDrive
16  to determine if there was any information related
17  to the performance of the trading system from
18  the Evans era?
19     A    Yes.
20     Q    Did you find any information on the
21  OneDrive related to the trading performance of the
22  trading system under the Evans era?
23     A    The only thing I saw was maybe
24  an individual trade or -- but nothing overall

Page 91

1  performance.
2     Q    Yesterday you testified that pretty
3  early on in your ownership you learned that the
4  trading results from the Evans era in connection
5  with the Time Means Money program had been poor.
6  Do you remember that?
7     A    Yes.
8     Q    How did you learn that?
9     A    There were -- a few brokers told me,
10  hey, the performance in October was bad. It was
11  bad in November. So I downloaded all the data out
12  of Gain's clearing system. You can bring it down.
13  That was a database to analyze that, yeah, this is
14  like four or five months in a row that they lost
15  money and what they were losing money on, but that
16  was basically for a five- to six-month period.
17     Q    Which brokers told you that the trading
18  had been poor when you first owned the company?
19     A    Well, the ones that had been there.
20  Scott Gecas had told me, Andrew Nelson had told
21  me, I think James Hatzigiannis kind of confirmed it,
22  that like October was a really bad month.
23     Q    So I'd like to summarize the process
24  by which you searched for and collected information

Page 92

1  for Long Leaf's response to the CFTC's 4g request
2  and requests for production. You got -- you pulled
3  emails from the Long Leaf Trading email archive,
4  right?
5     A    Correct.
6     Q    Did you exclude any emails based
7  on responsiveness or did you sort of pull the
8  archive emails and transmit that electronically
9  stored information?
10     A    The only things were things related to
11  attorney-client privilege.
12     Q    I understand. And the same with chats?
13     A    Yes.
14     Q    How about phone recordings, were any
15  phone recordings excluded from the productions?
16     A    No.
17     Q    And you did not exclude any material from
18  the Microsoft OneDrive system when you responded
19  to the 4g request or the RFPs other than what may
20  have been protected by attorney-client privilege,
21  is that right?
22     A    Correct.
23     Q    Did Long Leaf Trading maintain its
24  access to the OneDrive system after it stopped

Page 93

1 business operations in December 2019?
2    A   Yes.
3    Q   So that there was no loss of data
4 information or information between the time when
5 Long Leaf stopped operating and when it responded
6 to the CFTC's requests for production in August
7 of 2020?
8    A   That is correct.
9    Q   Did you ever search your Gmails for
10 any responsive communications to respond to the
11 4g request or the CFTC's requests for production?
12   A   Yes.
13   Q   You did search your Gmails?
14   A   Just to make sure.
15   Q   Did you produce any Gmails to the CFTC?
16   A   I don't think so.
17   Q   Did you identify any responsive --
18 any responsive information in your Gmail account?
19   A   Mostly attorney-client privileged
20 information.
21   Q   What about nonattorney-client privileged
22 information?
23   A   I didn't see any.  However, I don't
24 have an archive on my Gmail system so I'm looking

Page 94

1 at what my actual email system has right now, or
2 at the time when you asked the question.
3    Q   And so do your Gmails roll off, like
4 stored?  Like what's -- is there data loss there?
5 Describe that to me.
6    A   I don't know what the archiving --
7 or the time frame I have set.  I think it's a year
8 or so.
9    Q   Okay.  So --
10   A   Or if I particularly save it.
11   Q   So it's possible based on your Gmail data
12 retention setting that --
13   A   I could have missed something, yes.
14   Q   -- responsive information may not have
15 been retained?
16   A   Correct.
17   Q   Okay, that's helpful too.  So that's
18 all, thankfully, for the 4g and the RFPs.
19      MR. PLATT:  Do you guys want to break
20      for a quick lunch now or do you want to keep
21      going and take lunch later?  I'm about halfway
22      done.
23      MR. FALVEY:  Let's do it now then.
24      THE WITNESS:  Let's just keep pushing

Page 95

1 forward.
2      MR. FALVEY:  Oh, I need to go pee.
3      THE WITNESS:  Okay.  So let's just break
4 for lunch then.
5      MR. FALVEY:  Or I can do it in three
6 minutes and then we can keep going for a
7 little bit, if you want.
8      THE WITNESS:  I'd rather just take
9 a 30-minute break.  Is that enough time for
10 lunch?
11      MR. PLATT:  Yes.  Let's come back at
12 like 12:20 because I've got to run out to --
13      MR. FALVEY:  Okay.
14      MR. PLATT:  Let's go off the record.
15      (Whereupon a lunch recess was taken
16        from 11:43 a.m., to 12:25 p.m., after
17        which the following proceedings were
18        had:)
19
20
21
22
23
24

Page 96

1      A F T E R N O O N   S E S S I O N
2      JAMES DONELSON,
3 called as a witness herein, having been previously
4 sworn and examined, testified further as follows:
5      DIRECT EXAMINATION (Cont'd.)
6 BY MR. PLATT:
7    Q   Mr. Donelson, earlier this morning
8 I asked you a series of questions concerning the
9 sources of Long Leaf Trading's revenue.  Do you
10 remember those questions?
11   A   Yes.
12   Q   I just want to return to that topic
13 briefly to make sure I understand the answers.
14 So for the period of time when you owned Long
15 Leaf and you continued -- and Long Leaf continued
16 to receive revenue associated with the CFD dealer,
17 so that was December 2017 through approximately
18 February 2018, is that right?
19   A   That is correct.
20   Q   Did the revenue associated with the CFD
21 dealer, did that come from Gain?
22   A   No, it came from CMC Markets in London.
23   Q   Perfect, that's helpful.  And
24 of the bucket of money that came to Long Leaf

Page 97

1   Trading from Gain between December 2017 and
2   February 2018, do I have it correct that your
3   testimony was approximately 90 percent of that
4   revenue was associated with trading program
5   participants?
6       A   A better way to look at it is Gain
7   through August of 2018, that was about 90 percent
8   from the trading -- the trading program and about
9   10 percent from self-traders.  Any payments past
10  that point from Gain are only self-traders and
11  any payment from Cunningham is for the program.
12      Q   And is the answer the same for the
13  Evans period, would the revenue associated with
14  the CFD dealer have come from CMC Markets and not
15  from Gain?
16      A   Correct.
17      Q   Thank you.  Now I'd like to please --
18  do you still have access to CFTC Exhibit 450?
19  It's an Excel file.
20      A   Yes.
21      Q   Let me pull that up on your side and
22  we'll look at it together, if possible, please.
23      A   Okay.
24      Q   This is a document, Mr. Donelson,

Page 98

1   that you created for the purpose of responding to
2   our request for production, right?
3       A   Correct.
4       Q   And do I understand this document
5   correctly that it's any account, any Long Leaf
6   account that was open for any portion of the
7   relevant period as it's described in the complaint?
8       A   Correct.
9       Q   And there are four tabs.  The tabs are
10  Full List, Sheet 1, TMM Customers and Opened After
11  Ownership?
12      A   Yes.
13      Q   What does the Full List represent?
14      A   That is a complete list of all
15  customers that had accounts open at any time
16  during the complaint.
17      Q   And where did you obtain the
18  information that's in the Full List tab of
19  Exhibit 450?
20      A   The actual list of customers comes
21  out of downloading the Gain statements for those
22  periods that would tell me who is open, who's not,
23  the client numbers.  The emails and that I think
24  come from another source, but it's pulling together

Page 99

1   multiple pieces.
2       Q   To identify the information that's
3   in Column A of the Full List tab, that's account
4   name.  Did you --
5       A   That's the account --
6       Q   You obtained those -- that information
7   from the statements that Long Leaf received from
8   either Gain or Cunningham over the years, is that
9   right?
10      A   Correct.
11      Q   And then Sheet 1, what's going on in
12  Sheet 1?
13      A   I'm doing some type of analysis.  It's
14  not pertinent.
15      Q   The TMM Customers tab of Exhibit 450 has
16  195 accounts listed.  What does this tab reflect?
17      A   It would be anyone who was in
18  a broker-assisted program during the relevant
19  time period.
20      Q   And by broker assisted do you
21  mean the program whereby Long Leaf Trading would
22  recommend options trades to customers and then the
23  customer would either opt in or decline to trade?
24      A   Correct.

Page 100

1       Q   Is there another kind of broker-assisted
2   trading program at Long Leaf?
3       A   No.
4       Q   Okay.  And how did you determine which
5   accounts to include on the TMM tab?  How did you
6   determine which accounts were in the broker-assisted
7   trading program at Long Leaf -- trading program at
8   Long Leaf?
9       A   Two things.  One would be who was
10  the broker who opened the account.  And in the
11  case of any accounts of Tim Evans, I would look at
12  what the actual trades were and are they consistent
13  with other people who are in -- that have been
14  determined to be in the program.
15      Q   Bear with me so I summarize
16  your testimony accurately.  Your first step in
17  determining which accounts to include on the TMM
18  Customers tab was to look at the broker associated
19  with the account.  Is it correct that any account
20  that was not associated with Tim Evans as the broker
21  was included?
22      A   That is not correct because of two
23  accounts that Craig Pace opened that were from
24  a previous -- they were self-trading.

1    Q    Got it.  So all non-Evans broker

2  accounts and not the two Craig Pace self-directed

3  accounts was your first step, right?

4    A    Correct.

5    Q    Then among the Evans accounts,

6  you went to the trading statements, the customer

7  statements and looked at the trading activity to

8  see if it was consistent with the Time Means Money

9  trade recommendations, right?

10    A    Correct.

11    Q    And then on the Opened After Ownership

12  tab, those are all the accounts that were opened

13  after you purchased the company in December 2017,

14  is that right?

15    A    Correct.

16    Q    Do I have it correct that all the

17  Long Leaf customers who opened accounts after

18  you bought the company participated in the trading

19  program?

20    A    Correct.

21    Q    If you look at the TMM Customers

22  tab, and there are 195 customer accounts listed

23  on that tab, if you wanted to identify the lifetime

24  PNL associated with any of the accounts, how would

1  you do that?

2    A    How did I do it or how would I do it?

3    Q    Did you do it, first of all?

4    A    Well, you take the initial funding

5  and then you would take the closing balance when

6  they either left or when they ceased to be customers

7  of Long Leaf.

8    Q    Did you ever undertake to -- undertake

9  that analysis for the Time Means Money customers?

10    A    I did.

11    Q    When did you do that?

12    A    I don't remember when I did it.

13    Q    Did you attempt to determine the

14  lifetime PNL for the Time Means Money customers

15  while Long Leaf Trading was in operations or after

16  it ceased to operate?

17    A    It was while it was in operations.

18    Q    Do you think it was in 2019 or 2018?

19    A    For customers that were in --

20  were live customers in 20 -- when I acquired

21  the firm, I created a database that I shared with

22  CFTC of getting to their lifetime where they're

23  making money, what trades are making money, so

24  we're tracking it in there.  When we went from

1  Gain to Cunningham, we created a different report

2  to track that so sometimes you have to put the two

3  together.  But going back to all the customers

4  before, I don't know -- remember when I did that.

5    Q    Did you ever --

6    A    I remember doing it but it wasn't --

7  I don't remember when.

8    Q    Did you ever generate a document

9  that reflected the results of your analysis of

10  customer lifetime net PNL?

11    A    Yes.

12    Q    Where is that document?

13    A    Specific customers' PNL, yes.

14    Q    And which ones?

15    A    There were quite a few that we would

16  do the report, put the whole report together for

17  upon their request or in some cases kind of on

18  a monthly basis.  But they're in the documents

19  sent to -- you know, some names I know, Drayer,

20  Reeves.  I don't know each and every -- I can't

21  remember each and every one that I produced one

22  for.

23    Q    The analyses you're referencing right

24  now, they would be created for customers to show

1  their accounts sort of on a realtime basis,

2  is that right?  I think I know what you're talking

3  about, but I'm asking a slightly different question.

4  I'm asking did you ever conduct a lookback analysis

5  of all the Time Means Money customers to determine

6  their lifetime net PNL?

7    A    Yes, I did, but I don't remember when.

8    Q    All right.  Did you retain -- did you

9  create any documents that reflected that analysis?

10    A    I don't remember, honestly.

11    Q    You don't remember why you did it?

12    A    No, I don't remember where --

13  it should have been retained on the OneDrive.

14  Where exactly, I -- I'm sorry?  We can't hear

15  you.

16        MR. FALVEY:  No, we can't hear.

17        MR. PLATT:  Let's go back on the record,

18    please.

19    Q    So, Mr. Donelson, before my audio

20  cut out, unfortunately, I was asking you about

21  reports or analyses you created reflecting Long

22  Leaf Trading trading program participants' lifetime

23  net PNL, and I asked you did you create any

24  documents that reflected that analysis.

Page 105

1    A    There was an Excel spreadsheet that
2   I created.  I don't remember the name of it and
3   I don't remember when I did it.
4    Q    Was that file produced to the CFTC at
5   any time?
6    A    I believe it was.
7    Q    Do you remember why you created
8   the document with the analysis of the customers'
9   lifetime net PNL?
10    A    To understand the history.
11    Q    Do you remember if you did it in 2018
12   or 2019?
13    A    Sometime in 2018.
14    Q    This document that you're referencing
15   was a single Excel file?
16    A    From what I remember, yes.
17    Q    Did you email it to anyone?
18    A    No.
19    Q    What did it show?
20    A    Losses on accounts, when they had pulled
21   out the money.  It was a high-level analysis of how
22   much money was lost, how much money, period.
23    Q    Do you remember what part of 2018
24   it was when you created this analysis?  Was it

Page 106

1   early on right after you bought the company?
2   Was it after the significant losses in November and
3   December of 2018?  Can you ballpark it?
4    A    I don't remember.
5    Q    And it would have included -- do
6   you remember if your analysis included all the
7   customers, including those who opened accounts
8   after you opened the company -- after you purchased
9   the company?
10    A    It included all the customers to date.
11    Q    Do you recall if it showed any customer
12   achieving lifetime net profitability?
13    A    I remember a couple, but I really don't
14   remember the file that well.
15    Q    A couple, like less than five out of
16   that total?
17    A    Correct.
18    Q    And the total would have been over
19   a hundred, right?
20    A    A total of what?
21    Q    Total number of accounts that you
22   included in your analysis of lifetime net PNL
23   to track Time Means Money customers that you're
24   discussing right now.

Page 107

1    A    Yeah, it was over a hundred.  I know that.
2    Q    I'd like to just go back to
3   Exhibit 450 quickly.  I just have one more
4   housekeeping question on it.  On the TMM Customers
5   tab, Mr. Donelson --
6    A    Um-hmm, yes.
7    Q    -- if you filter Column J, which is the
8   broker column --
9    A    Um-hmm, yes.
10    Q    -- only for Tim Evans, you only get
11   three accounts.  Does that strike you as low?
12   How did you determine which of the -- or, excuse me.
13   Does that strike you as a low number?
14    A    No.
15    Q    What's your understanding of whether
16   or not Mr. Evans was opening customer accounts when
17   he owned the company?
18    A    My understanding was he was opening only
19   self-trading accounts.
20    Q    What's the basis for that understanding?
21    A    That's what he told me and the data seems
22   to support that.
23    Q    Did he tell you that during the due
24   diligence process associated with the purchase

Page 108

1   transaction of the company or after you had bought
2   the company?
3    A    After.
4    Q    How did that conversation come up?
5    A    It was a conversation about the Gain
6   statements and the assignment of the sales code
7   because as I downloaded the data, you would notice
8   multiple sales codes for the same customer and
9   he had to walk me through that, that okay, this
10   person may have opened it.  They left the firm so
11   it got assigned to somebody else, so they moved it
12   to a new sales code.  And then there was another
13   sales code related to -- I don't remember what it
14   was related to.
15    Q    Do you remember how many accounts
16   were associated with Evans as the broker overall?
17    A    All of the self-trading accounts
18   were associated with him except for the two
19   I mentioned with Craig Pace, and there were two
20   accounts where he had discretion on, maybe three.
21    Q    So circle back to your earlier testimony.
22   If you wanted to identify the lifetime net PNL for
23   any particular account, you would compare the amount
24   that was deposited in the account by the customer

Page 109

1  for the total amount --
2     A   Correct.
3     Q   -- with the ending balance at the time
4  the account was closed, is that right?
5     A   Correct.
6     Q   And are those amounts both available on
7  FCM statements?
8     A   Yes.
9     Q   Let's return to our discussion of Long
10  Leaf's trading program.  I think you testified that
11  a characteristic of Long Leaf's trading program was
12  that customers received recommendations and either
13  accepted the recommendations and executed the trades
14  or declined to execute it.  Is that generally right?
15     A   That is correct.
16     Q   What products were a part of Long Leaf's
17  trading program?
18     A   Bonds, currencies, ags and oil.
19     Q   Those are the underliers, right?
20  And Long Leaf's trades were in options on those
21  underliers, is that right?
22     A   That is correct.
23     Q   Can you explain at a high level the
24  structure of Long Leaf's recommended trades?

Page 110

1     A   It would be usually four options.
2  It would be nondirectional, so you had calls
3  and puts and sells, and it would also be two short
4  positions, two long positions.
5     Q   And that was for the time period that
6  you owned the firm, right?
7     A   Correct.
8     Q   What about the Evans era, what did
9  the trading recommendations look like during the
10  Evans era?
11     A   Very similar.  However, they -- based
12  on what I can glean from the trading records, they
13  were predominantly credit spreads.
14     Q   You know what an iron condor is,
15  Mr. Donelson, right?
16     A   Yes.
17     Q   Is it fair to say that the majority of
18  Tim Evans' trade recommendations were iron condors?
19     A   The majority were either iron condors
20  or iron butterflies is more accurate.
21     Q   Okay, that's helpful.  Thank you.  And how
22  do you know that?
23     A   Based on the trading records from Gain
24  Capital.

Page 111

1     Q   So it sounds like there came a time
2  where you went back and you looked at the trading
3  records from Gain for the Evans era.  Why did you
4  do that?
5     A   One was to confirm that these were TMM
6  customers or not by comparing it.  The other was
7  some of our current customers had started before
8  I joined the firm.  So to get an accurate report
9  to them, I had to go back a period of time and
10  just consistently those are what I saw.  I didn't
11  look at each and every trade.
12     Q   Did your trading recommendations include
13  iron condors and iron butterflies?
14     A   Only for one month.
15     Q   What month was that, December 2017?
16     A   Correct.
17     Q   And then going forward those strategies
18  were out of the Long Leaf rotation?
19     A   Correct.
20     Q   How were the Long Leaf trade
21  recommendations disseminated to customers?
22     A   During my period or Mr. Evans' period?
23     Q   Let's start with your time period.
24     A   The first month we did use the

Page 112

1  CRM system to do it.  After that I would create
2  an Excel, create a PDF and send it to the brokers
3  to send to their customers.
4     Q   What about during the Evans era?
5     A   The only part I can talk about
6  is what I saw with the CRM, sending it through
7  the CRM.  Before that I don't know.
8     Q   How far back did the Evans era
9  use of the CRM system to disseminate the trading
10  recommendations go, do you remember?
11     A   The start of 2017.
12     Q   And before that you're not sure how they
13  were disseminated?
14     A   No.
15     Q   So you just described you created
16  a document that would be sent out to customers
17  during your ownership.  I remember you and
18  Mr. Burden discussed those documents to a great
19  level of detail yesterday, and unfortunately I'd
20  like to return to them briefly.
21        Do you recall your testimony
22  about the inclusion of data points, like max
23  gain or target gain or max loss on the trading
24  recommendations?

Page 113

1    A    Yes, I do.
2    Q    Do you agree generally that data
3 like that in connection with an options trading
4 strategy can be classified as a potential outcome?
5    A    I would deem it as a possible outcome,
6 not potential.
7    Q    What's the difference between potential
8 and possible?  What's the distinction in your mind?
9    A    It's based on probability.  So max gain,
10 the probability of a max gain is actually very low
11 based on just the probability analysis of the option
12 itself.
13    Q    Okay.  I don't disagree with you there.
14 And on that topic do you agree that there's a range
15 of probablistic outcomes for an options trade?
16    A    Yes, I do.
17    Q    And there's a likelihood for any
18 particular potential outcome or probable outcome
19 that could mathematically be associated with each
20 potential outcome or probable outcome?
21    A    Yes.
22    Q    Did you ever attempt to quantify
23 the likelihoods of the possible outcomes that you
24 had put in your trading recommendations?

Page 114

1    A    Yes, it's in the QuikStrike data.
2    Q    Did do you that as a matter of practice
3 for every trading recommendation?
4    A    Not for every trading recommendation.
5    Q    Did you do it for the majority of your
6 trading recommendations?
7    A    Yes.
8    Q    Why didn't you include the likelihood of
9 the possible outcomes that you listed on the trading
10 recommendations on the trading recommendations?
11    A    I don't know.
12    Q    Did Long Leaf Trading during the Evans
13 era include the likelihood of the possible outcomes
14 of each trade with their trading recommendations?
15    A    Not on the recommendations I saw.
16    Q    Are you aware of any trading
17 recommendations from the Evans era that included
18 probabilistic information concerning potential
19 outcomes?
20    A    No on the ones I saw only.  I can only
21 speak to those.
22    Q    And other than the ones that you saw,
23 you don't have any understanding of what Long Leaf's
24 practices were during the Evans era concerning

Page 115

1 disclosure of the likelihood of potential outcomes
2 for each recommended options trade, is that correct?
3    A    That is correct.
4    Q    Do you think it's important to
5 a customer in assessing whether or not to accept
6 a recommended trade to know what the likelihood is
7 of the potential outcomes that are listed on the
8 recommendation?
9    A    I don't know.
10    Q    Is it important to you if you were
11 going to execute an options trade for your own
12 personal account to understand the likelihood of
13 potential outcomes of an options trade?
14    A    Yes, it would be important to know the
15 probability of making money on the trade but not
16 (inaudible) a point estimate.
17    Q    Did the Long Leaf Trading trade
18 recommendations include any probabilistic
19 information that any particular trade would make
20 money?
21    A    Yes.
22    Q    Describe where on Long Leaf's trading
23 recommendations it disclosed to a customer the
24 likelihood that a trade would make money.

Page 116

1    A    In 2019 when we sent a recommendation
2 out, it shows what the expected point is -- what
3 the expected profit or loss is going to be when the
4 short option expires.  It's not a probability number
5 as you would say it, but it does show if we make
6 this trade long and this trade short, all other
7 things being equal, if the short expire worthless,
8 this is -- that would be the remaining profit.
9    Q    So I think this is a really important
10 followup question, Mr. Donelson.  The information
11 you just described in the answer you just gave does
12 not tell a customer the likelihood that a particular
13 trade would make money.  Do you agree or disagree
14 with that statement?
15    A    I agree.
16    Q    Were there any other -- was there any
17 other information in a Long Leaf Trading trading
18 recommendation that disclosed to a customer the
19 likelihood that a trade would make or lose money?
20    A    Not in 2018.
21    Q    What about in 2019?
22    A    2019 it shows the progression that
23 says if I sell this, buy that, this is what the
24 net's going to be at the end.

Page 117

1    Q    But you just testified that that's
2   not information that shows the likelihood that
3   a trade would make or lose money, right?
4    A    Correct.
5    Q    And for the Evans period, no information
6   in the trading recommendations that would reflect
7   whether or not a trade was likely to make or lose
8   money, correct?
9    A    Not as far as I know.
10    Q    When you owned the company, I think
11   you testified yesterday that in 2018 your employee
12   Scott Gecas was responsible for designing the trades
13   in 2018 and then in 2019 it was primarily your
14   responsibility to design the trades, is that right?
15    A    That is correct.
16    Q    In 2018 did you and Gecas like talk shop?
17   Did he talk about the trading recommendations?
18    A    Yes.
19    Q    That makes sense to me that he did
20   that. I've seen a term in the Long Leaf documents
21   that I've never been exposed to in my career in the
22   financial markets called a volatility swap. Did you
23   learn that term from Scott Gecas?
24    A    Yes, it's a trading term.

Page 118

1    Q    Did you learn it from Gecas?
2    A    Yes.
3    MR. PLATT:  I'd like to show you
4   what I'm going to mark as CFTC Exhibit 497.
5        (WhereuponCFTC Exhibit No. 497
6        was marked for identification.)
7    Q    And this is an email from you to what
8   looks like the group of brokers on April 24, 2018,
9   subject line Trade Recommendations with a bunch
10   of --
11    A    Correct.
12    Q    -- attachments. Do you see that,
13   Mr. Donelson?
14    A    Yes, that is what it is.
15    Q    And the first two -- the attachments
16   describe a trade, right? I'll scroll down.
17    A    Correct.
18    Q    And this is a PDF in the nature of a
19   Long Leaf Trading recommendation. The attachment
20   is a trade recommendation, right?
21    A    I'm sorry. I didn't catch the whole --
22    Q    Sorry. That was the worst question
23   I've ever asked. This is a Long Leaf trade
24   recommendation, correct?

Page 119

1    A    Yes.
2    Q    And the first -- there are two trades
3   listed on here. One is a Euro volatility swap and
4   the second one is an oil broken wing butterfly,
5   correct?
6    A    Correct.
7    Q    Can you -- excuse me. Does this
8   reflect sort of the sale of a short-dated option
9   spread and the purchase of a longer-dated option
10   spread?
11    A    Correct.
12    Q    April is J and May is K, right, for the
13   volatility --
14    A    Correct, correct.
15    Q    Okay. So Gecas probably came up with
16   this trade, right?
17    A    Correct.
18    Q    How often did Scott Gecas' trade
19   recommendations include a volatility swap? And
20   you can do so on any time period, like per month,
21   per week, just sort of anything that will give us
22   a frame of reference.
23    A    Maybe once every other month.
24    Q    You testified that Mr. Gecas's trade

Page 120

1   designs ultimately performed poorly, correct?
2    A    Yes.
3    Q    And they performed so poorly that that
4   was a factor in his termination, is that right?
5    A    Correct.
6    Q    Was that the sole factor in Scott Gecas'
7   termination?
8    A    No.
9    Q    What other factors played a role in
10   Mr. Gecas' termination?
11    A    His impact on the other APs. He was
12   very negative.
13    Q    How did that play out in the office?
14    A    People wouldn't talk to him or
15   wouldn't want to talk to him, and having somebody
16   running a sales force that nobody wants to talk
17   to is not effective.
18    Q    I agree. So do you recall the results
19   from November of 2018?
20    A    They weren't good. I know that.
21    Q    Okay, yeah.
22    A    I don't remember the specifics.
23    Q    Okay, okay. That's fair. In a typical
24   month -- how many recommendations did Long Leaf send

1    out in a typical month?

2        A    Four to five until 2019 where we

3    tried to keep four positions on at all times,

4    four (inaudible) positions.

5        Q    And the customer would say, yes,

6    please execute or I don't want this trade, right?

7        A    Or sometimes they would say I don't

8    want to take that many.  I want to take fewer

9    contracts.

10       Q    That's helpful.  Thank you for that

11   clarification.  And can you estimate approximately

12   how frequently Long Leaf customers did not accept

13   the trade that was recommended to them; they said,

14   no, I'm going to pass on that trade?

15       A    Just a ballpark would be maybe 15 to

16   20 percent of the time either they declined it

17   or did not respond.

18       Q    And that's for 2018 through 2019?

19       A    Yes.

20       Q    What about during the Evans era,

21   how often did customers decline or not respond

22   to trading recommendations?

23       A    I don't know.

24       Q    And you mentioned sometimes customers

1    would deviate from the recommendation by saying

2    I would like to do the trade, but I would like more

3    contracts or I would like fewer contracts.  Is that

4    an accurate summary of your testimony?

5        A    That is correct.

6        Q    How often would that happen?

7        A    Much lower.  Maybe 5 percent of the time.

8        Q    And there was never a request to deviate

9    from the -- what I will call the core structure of

10   the trade?  Do you understand what I mean by the

11   core structure of a recommended trade?

12       A    No.

13       Q    No, I'm sorry.  It was a poorly

14   formed question, so I'll ask it like this.  Do

15   you understand when I say the core structure of a

16   trade, I mean the options that comprise the trade?

17       A    Yes.

18       Q    And did any customers ever request

19   to deviate from that core structure as defined

20   in that way?

21       A    No.

22       Q    So there was never a request to

23   change the underlier of a trade recommendation?

24       A    You mean the underlying future?

1        Q    Yeah, the underlying instrument of the

2    option.

3        A    No.

4        Q    There was never a request that you

5    modify a strike price to a particular trading

6    recommendation?

7        A    No.

8        Q    Isn't it also true that no Long Leaf

9    Trading program participants executed options

10   trading strategies that they devised on their own?

11       A    Not to us.  I'm sorry.  It's thundering

12   outside.

13       Q    I caught that.  I'm sitting in a windowless

14   office, so I don't know.

15       A    It could be snowing outside and you

16   wouldn't know.

17       Q    Exactly.

18            (Whereupon  CFTC Exhibit No. 498

19            was marked for identification.)

20       Q    Mr. Donelson, I'm going to show you

21   a document I've marked as CFTC Exhibit 498, and

22   this is Long Leaf Trading's response to the CFTC's

23   first set of requests for admission.  Do you see

24   Exhibit 498 on your screen?

1        A    Yes, I do.

2        Q    I'm going to scroll down to Item 13.

3    This is a question that we posed to Long Leaf

4    through this mechanism that's provided for under

5    procedural rules for litigation.  And we asked

6    Long Leaf Trading to admit that Long Leaf Trading

7    did not limit participation in the trading program

8    to existing customers, and Long Leaf interposed an

9    objection that the request was vague and then denied

10   it.  What is it about this request that Long Leaf

11   doesn't understand?

12       A    The question is can I add customers

13   and then they'll participate.  But if you're not an

14   existing customer, you're not going to participate.

15       Q    I understand.

16       A    And, you know, if you're not our

17   customer, you don't participate in our program.

18   You can become a customer and participate in our

19   program.

20       Q    I understand.  And let me put it a

21   different way, and with your explanation in mind

22   I understand the objection.  I think I've asked this

23   today, but I'll clarify it now.  It's true that Long

24   Leaf employed a team of brokers to solicit members

Page 125

1   of the public who did not have a preexisting
2   relationship with Long Leaf Trading to come open
3   accounts at Long Leaf Trading and participate in
4   the trading program, right?
5       A   Yes.
6       Q   So the next line on Item 20 here
7   on CFTC Exhibit 498, we ask Long Leaf to admit
8   that it had not disclosed to prospects any of the
9   information described in CFTC Rule 4.35(b), which
10  is generally information about a trading program's
11  performance, including but not limited to,
12  disclosing that neither Long Leaf Trading nor any of
13  its trading principals had ever previously directed
14  any accounts.  And there's an objection here because
15  the meaning of directed any accounts is vague.
16          As a person who's participated
17  in this industry, is it true that you don't know
18  what the term directed any accounts means?
19      A   Yes.
20      Q   Have you ever heard the term directed
21  account before?
22      A   I've heard managed account, but I've
23  never heard of a directed account.
24      Q   Okay.  So since you don't know what

Page 126

1   a directed account is, is it fair to say that
2   Long Leaf Trading has never disclosed to prospects
3   that neither Long Leaf Trading nor any of its
4   trading principals had ever directed accounts?
5       A   Could you repeat the question?
6       Q   Sure.  So your testimony --
7       A   My mind lapsed for a second.
8       Q   No, I understand.  And depositions
9   are long, so I get it.  Your testimony was that
10  you haven't heard -- you don't have an understanding
11  of what the term directed accounts means in the
12  concept of the futures industry.  So my question
13  is because you do not know what the term directed
14  accounts means, is it also true that you have --
15  that Long Leaf Trading never disclosed to
16  prospective customers that neither Long Leaf
17  Trading nor any of its trading principals had
18  ever previously directed any accounts?
19      A   I'm still confused by the question
20  on two points.  Long Leaf Trading or any of its
21  trading principals, that would include Tim Evans,
22  that would include anybody who worked for Long Leaf.
23  And when you say ever previously, are you talking
24  about at a different firm, are you talking about --

Page 127

1   that's what I don't -- I struggled with this,
2   along with our lawyer, of understanding when you
3   say it never -- had never previously directed.  So
4   if you had a broker that worked someplace else and
5   came and started working, well, that person had
6   directed accounts, if that's what directed accounts
7   means, or is it just their time at Long Leaf?
8       Q   Okay, that's helpful.  And thank you
9   for that clarification.  For time period let's
10  go with the time that you owned the company, the
11  Donelson period.  And for the second clarification
12  let's use this -- let's read this as broadly as
13  possible.  So I'll rephrase it.
14          During the Donelson period did
15  Long Leaf ever tell any prospective customers that
16  neither Long Leaf nor any of its trading principals
17  had ever directed any accounts?
18      A   No, we never told anybody that we -- that.
19      Q   And what about for the Evans period?
20      A   I don't know.
21      Q   Okay, thank you.
22          MR. PLATT:  Can we take five?  I'm
23  about to start a different topic that's going
24  to take like a half an hour.

Page 128

1           MR. FALVEY:  Sure.
2           THE WITNESS:  Sure.
3           MR. PLATT:  Let's go off the record,
4   please.
5           (Whereupon a recess was taken from
6               1:24 p.m., to 1:33 p.m., after which
7               the following proceedings were had:)
8       Q   Mr. Donelson, another topic that you
9   and Mr. Burden covered yesterday and I'd like to
10  return to is the tracking of Long Leaf's trading
11  strategies.  One strategy that you referenced
12  from the time you owned the company was the core
13  strategy, right?
14      A   Correct.
15      Q   I think you testified the core strategy
16  encompassed gut strangles in 2019, right?
17      A   Correct.
18      Q   For the record, what is a gut strangle?
19      A   You buy an in-the-money put
20  and an in-the-money call and then you sell the
21  weekly against the monthly or that's effectively
22  the strategy.  It's similar to a volatility swap,
23  but it doesn't require different volatilities.
24      Q   Is it fair to say that a gut strangle

Page 129

1   as you just described it is a four-legged options
2   trade that's nondirectional in nature?
3       A   Correct.
4       Q   Where did you learn about gut strangles?
5       A   I first saw them when I was the CFO
6   of the United Methodist Pension Plan as we were
7   looking at alternate investments.
8       Q   Can you describe the duties and
9   responsibilities that you had as the CFO of the
10  United Methodist Pension Plan?
11      A   The CIO, the chief investment officer,
12  reported to me, the actuarials I think reported
13  to me, and then obviously the accounting function
14  reported to me.  When I say reporting, it was to
15  assure that the plans were adequately funded.
16      Q   And who are the pensioners for the
17  United Methodist Church?  Like can you describe
18  the organization to me?
19      A   Yeah, it is -- they are the ministers
20  and laypeople of the United Methodist Church and
21  the -- well, no, they're still laypeople, people
22  who work in the boards.  They're called boards but
23  they're effectively -- like there's a board over
24  finance.  There's a board over pension.  There's

Page 130

1   a board over worship, you know.  There's boards
2   all over the place.
3       Q   I understand.  And when did you hold this
4   position of CFO of the United Methodist Church?
5       A   I'm trying to go backwards.  It was
6   like 2002 to 2004 or 2004 or 2006.  It was right
7   before I joined Getco.
8       Q   In what context did a gut strangle
9   come up there?  Was it the chief investment officer
10  thinking about ways to put money to work?
11      A   It was an actual investment advisor
12  pitching us on an investment opportunity.  We didn't
13  do any direct trading at the board.
14      Q   And so you heard this trade strategy
15  in a pitch.  Did the organization you were working
16  for implement those trades?
17      A   No, we could not.  We cannot trade
18  derivatives.
19      Q   I understand.
20      A   You can, but it takes three layers
21  of funds and it's not worth it.
22      Q   That makes sense.  Incidentally,
23  what was the -- at the time you worked there
24  do you remember what the size of the assets under

Page 131

1   management was?
2       A   15 million.
3       Q   So other than the core of 2019,
4   I think we also yesterday heard you testify about
5   the edge strategy of 2019.  And I think, and correct
6   me if this is wrong, the edge was volatility swaps,
7   is that right?
8       A   Some of them were -- the volatility
9   swaps were also core and they were also edge.
10  Edge had more to do with intraday response time and
11  if people wanted, you know, a little higher return
12  and would take a little more risk.  But they were
13  usually something we saw during the day, had to get
14  out, and they needed to respond within two hours or
15  less or we couldn't put the trade on so we would
16  have to abandon the trade.
17      Q   Let me make sure I understand your
18  testimony.  So out of the volatility swap category,
19  I understand there may have been many different
20  underlying instruments for the volatility swap,
21  right?
22      A   Correct.
23      Q   So among the volatility swaps, they
24  could have been slotted into the core or the edge

Page 132

1   strategy?
2       A   Both, yes.
3       Q   And so core could have comprised volatility
4   swaps and gut strangle, right?
5       A   Correct.
6       Q   With lower response times?
7       A   Yes.
8       Q   And edge was all volatility swaps?
9       A   I believe so.
10      Q   And it was -- the defining characteristic
11  of an edge trade was the quicker response time to
12  take advantage of a perceived market imbalance?
13      A   Yes.
14      Q   Got it, got it.  Helpful.  And core
15  and edge, I've seen in the documents, Mr. Donelson,
16  this concept of cash management strategy.  Is it
17  right -- do I read these documents correctly that
18  the cash management strategy was an umbrella term
19  to encompass core and edge?  Is that the way that
20  Long Leaf Trading used that term?
21      A   Yes.
22      Q   And then there was another broader
23  category of trade when you owned the firm called
24  an opportunistic trade, is that right?

Page 133

1    A    Correct.
2    Q    And under opportunistic it was like sort
3 of a market-driven like -- you know what, strike
4 that. What were the market-driven or opportunistic
5 trades?
6    A    They would usually be a two-legged
7 directional trade. So one trade, I remember Syria
8 released gas, you know, poison gas. We went out
9 with a call on gold because if something happened
10 over the weekend, everybody's going to rush to gold
11 as security. That's a typical -- that would be
12 typically what we say is a pure opportunistic trade
13 and it would be two-legged.
14    Q    Understood. Directional in nature?
15    A    Directional in nature, correct.
16    Q    And so, you know, you've got a bucket of
17 cash management trades and a bucket of opportunistic
18 trades in 2019. What's the breakdown between the
19 frequency with which's each one is recommended? Was
20 it like 50/50 cash management and opportunistic or
21 75/25?
22    A    It would be more like 90/10.
23    Q    90 cash management --
24    A    Yeah.

Page 134

1    Q    -- 10 opportunistic?
2    A    Opportunistic were not used heavily,
3 I mean, as the term would expect.
4    Q    And among cash management, core and
5 edge, what do you think the breakdown was in 2019?
6    A    More like 80/20 between core and edge.
7    Q    So it sounds to me like the core trades
8 are the most commonly recommended trades, is that --
9    A    Correct.
10    Q    -- right?
11    A    That's correct.
12    Q    And core comprises volatility swaps,
13 gut strangles. Were there any other strategies that
14 were used in the core strategy in 2019?
15    A    No. We got away from broken wing
16 butterflies and condors.
17    Q    And so in 2018 what were the strategies
18 that were employed by Mr. Gecas?
19    A    Broken wing butterfly, broken wing
20 condor, volatility swaps, calendar spreads. We
21 had one ratio spread.
22    Q    You're much more expert in options
23 trading than I am, Mr. Donelson. But it sounds
24 to me based on what you listed for Gecas' trades

Page 135

1 that those are mostly nondirectional in nature,
2 is that right?
3    A    Yeah, they are all nondirectional.
4    Q    Okay, thank you. And then are any of
5 these two-legged spreads or are they all four-legged
6 spreads? I think you just described volatility
7 swaps, broken wing condors, broken wing butterflies,
8 ratio spreads and calendar spreads.
9    A    The ratio spread is a three-legged spread.
10    Q    Okay.
11    A    All the others are four.
12    Q    For 2018 and 2019 are there any
13 categories of trading strategy that we haven't
14 discussed?
15    A    There were some opportunistic trades
16 there too, two-legged spreads, similar to what we
17 did in 2019.
18    Q    In 2018, you mean?
19    A    In 2018.
20    Q    Similar breakdown do you think between
21 four-legged and two-legged trades? Was it 90/10 for
22 2018?
23    A    Probably more 95/5.
24        MR. PLATT: Okay. I'm going to

Page 136

1 show you a document I'm going to mark as
2 CFTC Exhibit 499.
3        (Whereupon  CFTC Exhibit No. 499
4        was marked for identification.)
5    Q    Can you see Exhibit 499, Mr. Donelson?
6    A    Yes.
7    Q    This is an email from you to the
8 brokers Cybulski, Hatzigiannis and Stemper on
9 June 25, 2019, subject line Trade Recommendation
10 6-25. Then there's a bunch of attachments, right?
11    A    Yeah, that is correct.
12    Q    And you write, "This is a volatility
13 swap in soybeans." Do you think this was probably
14 slotted into --
15    A    Core.
16    Q    Slotted to the core?
17    A    Yes.
18    Q    Okay. And here's the actual
19 recommendation. I don't know. Does it reflect
20 on there whether it's core or edge? I don't think
21 it does.
22    A    No. That became -- nobody paid attention
23 to it one way or the other, so we finally -- the
24 edge people moved their edge trades but the core

Page 137

1  people didn't.  It was just a trade recommendation.
2      Q    And how did you determine -- you know,
3  you just mentioned sort of a group of edge people.
4  Were those people who you knew -- I'll just ask you.
5  How did you identify that subset of customer
6  accounts?
7      A    We would actually talk to the
8  customers about whether they wanted to do this
9  or not and whether they would be able to answer it.
10  So they -- we did put it in front of them, but they
11  were kind of required -- they had to agree to it.
12      Q    So it sounds like the defining
13  characteristics, you know, to be in the edge
14  accounts was able to respond quickly and desire
15  the sort of risk profile of the trade?
16      A    Correct.
17      Q    Put 499 to the side.  So yesterday
18  you and Mr. Burden also discussed sort of at
19  length what is marked as CFTC Exhibit 470, and
20  I'll show you just to jog your memory here.  And do
21  you remember the attachment to 470 is Track Record
22  Core Strategy May 20, 2019, right?
23      A    Correct.
24      Q    And there's this sort of -- there's

Page 138

1  a PDF with 13 trades reflecting their closed gain
2  and loss percentage, correct?
3      A    Correct.
4      Q    And yesterday I think you testified
5  that this was mostly gut strangles.  Now it seems
6  like, you know, there may have been some volatility
7  swaps sprinkled in.  It's not clear to me if that
8  had happened by this point and, frankly, it doesn't
9  matter.  But this was a document that you created
10  for the purpose of tracking a category of trades,
11  right, the core strategy, right?
12      A    Correct.
13      Q    And CFTC Exhibit 200 is a document
14  that you and Mr. Burden discussed also and I've
15  pulled it up.  It was attached to Hatzigiannis'
16  email to a client or prospective client here called
17  Edge Strategy Performance, and I'll scroll down.
18  This was another document that you created to track
19  the performance of a particular strategy, correct?
20      A    Correct.
21      Q    Do you remember why in Exhibit 200
22  this only starts in sort of June of 2019?  Is that
23  when the edge trading really went into effect?
24      A    Yes.

Page 139

1      Q    Okay.  Where are the documents that
2  track other Long Leaf Trading strategies besides
3  core and edge?
4      A    I'm confused by the question.
5      Q    So you described a set of core
6  trades, a set of edge trades.  I think we also
7  talked about opportunistic trades.  Like was there
8  a document like Exhibit 470 or Exhibit 200 that
9  tracked the performance of the opportunistic trades?
10      A    It's all in the same file.  It's just
11  filtering.  So we track all of the trades on one
12  file and then if you want to see this or you want
13  to see that, it's just a filter on the same file.
14      Q    Okay, that's helpful.  But at certain
15  points in time you created particular documents by
16  filtering your master file to reflect only the core
17  trades and only the edge trades, right?
18      A    Correct.
19      Q    And we saw those on Exhibit 470 and
20  Exhibit 200, right?
21      A    Correct.
22      Q    Was there ever a time when you
23  filtered your document and created a report,
24  filtered your master document and created a report

Page 140

1  for the opportunistic trades?
2      A    No, there were only a couple of them.
3  Never, never did a report on opportunistic trades.
4      Q    What about trades that may not have
5  slotted neatly into any category, was there like
6  a miscellaneous report that you created from your
7  master file?
8      A    No.
9      Q    On your core strategy document,
10  which we saw in Exhibit 470 that you circulated
11  in May of 2019, do you remember that document?
12      A    Yes.
13      Q    You testified that core was volatility
14  swaps and gut strangles?
15      A    Correct.
16      Q    And earlier today you testified that
17  you learned how to do volatility strangles from
18  Scott Gecas, and he in fact implemented volatility
19  swaps at Long Leaf Trading in 2018.  So my question,
20  Mr. Donelson, is why did you omit Gecas' volatility
21  swaps from 2018 from your core strategy track record
22  document which incorporated volatility swaps?
23      A    At that time when we showed the core,
24  the core was only gut strangles.  We weren't doing

Page 141

1  volatility swaps.
2      Q    But there came a time where core
3  encompassed volatility swaps, right?  That's your
4  testimony?
5      A    Yes.
6      Q    So once you sort of made that switch
7  to including volatility swaps in that category,
8  why didn't you go back and add in the complete set
9  of trades to your track record document?
10     A    I don't know.
11          MR. PLATT:  I'm going to mark
12     a document as CFTC Exhibit 450 -- or,
13     excuse me, as 500.
14          (WhereuponCFTC Exhibit No. 500
15               was marked for identification.)
16     Q    This is -- you may recognize this
17  as an email from Gecas to Gecas on May 3, 2018,
18  and he blind carbon copies a bunch of Long Leaf
19  Trading customers.  The subject is Long Leaf Trading
20  and the attachments are March Trade After Action
21  Report and April Trade Recap.  Do you see those?
22     A    Yes.
23     Q    I'm interested in the April trade
24  report, so I'm just going to skip right down to it.

Page 142

1  We're scrolling through a bunch of fancy-looking
2  images that Mr. Gecas included in his email.  This
3  is a document that Mr. Gecas circulated to Long Leaf
4  customers.  This attachment is titled April Trade
5  Recap, and recall this is from May 3, 2018.
6          In the first bullet point
7  here on the first page of the April trade recap
8  document this document reads, "We are striving to
9  have four positions that match our criteria and meet
10  the program goals in place consistently throughout
11  the month.  These are what we would define as Core
12  trades, which will most often be four-legged
13  spreads that are nondirectional."  So this would
14  encompass volatility swaps, broken wing butterflies,
15  gut strangles, ratio spreads, right -- or not ratio
16  spreads, excuse me, but the others?
17     A    Yes.
18     Q    And then the second bullet point
19  says, "We are also looking to add trades which
20  exploit short-term opportunities in the market.
21  These trades we will define as opportunistic."
22  You drafted this document, right, Mr. Donelson?
23     A    Correct.
24     Q    So in May of 2018 Gecas is designing

Page 143

1  the trades.  There's one set called core trades,
2  there's another set called opportunistic trades,
3  and then the trading goes poorly and you fire Gecas,
4  right?
5      A    Correct.
6      Q    And then in 2019, if I understand
7  your testimony correctly, you create a new category
8  called core, a new category called opportunistic
9  with largely overlapping characteristics, and then
10  you start with a blank slate and create a new track
11  record document, is that -- do you disagree with
12  that summary?
13     A    I disagree that they were overlapping.
14     Q    Okay.  What parts of the core strategies
15  in 2018 don't overlap with the core strategies in
16  2019?
17     A    Broken wing butterflies, broken wing
18  condors, ratio spreads.  Basically the only trade
19  we carried forward was that volatility swap.
20     Q    But the broad category of being a
21  four-legged option spread that's nondirectional
22  in nature, that's a common theme between the core
23  strategy in 2018 and the core strategy in 2019.
24  And, in fact, there's at least one strategy,

Page 144

1  the volatility swap, that's exactly the same.
2  Do you agree with that?
3      A    Not entirely, no.
4      Q    I want to make sure I understand
5  what parts don't overlap between the two years.
6  So explain your points of disagreement with that
7  statement, please.
8      A    In 2018 all the options, other than
9  volatility swaps, would have the same expiration.
10  Everything going in 2019, the short options would
11  have a shorter duration than the long option.
12     Q    And so with that caveat, that in
13  2019 the trades may have had legs with slightly
14  different expirations, there were still broadly
15  overlapping categories of trades between the 2018
16  core trades and the 2019 core trades?
17     A    Yes, there were overlapping categories
18  of trades.
19     Q    And, in fact, some of the trades were
20  exactly the same structure, the volatility swaps?
21     A    Correct.
22     Q    And notwithstanding the similarities
23  between these two categories of core trades, the
24  2018 category of core trades and then the 2019

Page 145

1 category of core trades, Long Leaf Trading marketed
2 the new strategy as sufficiently different from the
3 old 2018 strategy to warrant a fresh start on the
4 track record and to omit the 2018 trades, right?
5     A    Agreed.
6     Q    Do you think any customers were
7 confused by the use of the term core trade at
8 Long Leaf Trading to mean two slightly different
9 things?
10    A    I don't know.
11    Q    I'm going to go back to CFTC
12 Exhibit 477, which you looked at with Mr. Burden
13 yesterday as well.  Do you recognize CFTC
14 Exhibit 477, Mr. Donelson?  This is Hatzigiannis
15 to you on October 23, 2019, subject line Send Out
16 Email Permission?
17    A    Yes.
18    Q    And scrolling down, you know,
19 Mr. Hatzigiannis begins this email chain by
20 seeking your approval to send out a solicitation
21 email that says, and I quote, "We have closed
22 out 30 out of our past 35 trades for a profit,"
23 and he includes a link to a PDF.  And I think your
24 testimony yesterday was, you know, I can't comment

Page 146

1 on what this means because I can't see the PDF.
2 Do you remember that?
3     A    Correct.
4     Q    I'm going to show you what I'm
5 marking as CFTC Exhibit 501, which is an email
6 from James Hatzigiannis on October 21, 2019 to
7 compliance@longleaftrading.com, subject Long Leaf
8 Update.
9         (Whereupon  CFTC Exhibit No. 501
10            was marked for identification.)
11    Q    Did you monitor the inbox
12 compliance@longleaftrading.com?
13    A    It actually just came to my inbox.
14    Q    So it automatically would go to you?
15    A    Yes.
16    Q    So the attachment is Long Leaf
17 Update 10.18.19.pdf.  And in Mr. Hatzigiannis'
18 email to you on CFTC Exhibit 477 the attachment is
19 titled Long Leaf Update 10.18.19.pdf.  Do you have
20 any reason to think that these are not the same
21 document?
22    A    No.
23    Q    And scrolling down to the attachment
24 that Mr. Hatzigiannis sent to you, it reflects

Page 147

1 closed trades that were entered between June 18,
2 2019 and October 15th of 2019, correct?
3     A    Correct.
4     Q    So either three or four months' worth
5 of trading activity depending on how you calculate
6 it from the entry or the exit, right?
7     A    Correct.
8     Q    And this reflects a return of $6700.  It's
9 not clear the value of the account but certainly net
10 profits.  Do you agree with that?
11    A    Correct.
12    Q    And in fact it reflects, as
13 Mr. Hatzigiannis suggests, 30 out of 35 winners
14 for this time period, right?
15    A    Correct.
16    Q    Let's go back to 477 now that you've
17 been able to see Mr. Hatzigiannis' attachment, and
18 you write the issue I have is that it's selective.
19 And so there was a time, Mr. Donelson, when this
20 concept of disclosing only a subset of trading
21 results struck you the wrong way.
22        My question is sort of with
23 that in mind, do any of the other documents that
24 we looked at yesterday or today where Long Leaf

Page 148

1 only discloses a subset of its trading results,
2 do any of those documents give you concern in
3 hindsight?
4     A    No, because it bases it on what the
5 question the person is asking.  James is talking
6 about the entire program and he's only -- that's
7 actually an account that only started in June.
8     Q    I'm not sure I understand.  James
9 isn't asking a question.  James is sending you a
10 draft email that he hasn't sent out yet, he's not
11 responding to anyone, and he's asking you will this
12 be okay.  And then --
13    A    Correct.
14    Q    -- and then you say I have an issue with
15 it.  So what's the issue?
16    A    The issue is that it only starts in June.
17    Q    So it only includes a subset of Long Leaf's
18 trading activity, that's the problem?
19    A    Correct.
20    Q    Why is it a problem to send out
21 only a subset of Long Leaf's trading activity to
22 prospective customers?
23    A    It's not showing the complete history.
24    Q    Why is it important to show the complete

Page 149

1  history to prospective customers?
2      A   They should see.
3      Q   They should see it because it's
4  important to an investing decision to know how
5  the investment advisor performs, correct?
6      A   Correct.
7      Q   And it's not sufficient to show
8  the prospective investor just a subset of the
9  trading activity, correct, because it only provides
10  an incomplete picture, right?
11     A   Correct.
12         MR. FALVEY:  Jody, we've given
13     some leeway on going over turf and the same
14     questions that Ashley was getting at yesterday.
15     Are we -- can you get back to the 30(b)(6)
16     questions?
17         MR. PLATT:  Yeah, that's fair, Jim.
18     I think these are pretty well within the list
19     of topics, but I'll move on.
20         MR. FALVEY:  Thank you.
21         THE WITNESS:  Can I request a quick break?
22         MR. PLATT:  Sure.  Yes, of course.  Ten
23     minutes.
24         THE WITNESS:  Thank you.

Page 150

1          MR. FALVEY:  Okay.
2          (Whereupon a recess was taken from
3          2:12 p.m., to 2:20 p.m., after which
4          the following proceedings were had:)
5  BY MR. PLATT:
6      Q   Mr. Donelson, earlier today we discussed
7  the trading recommendations that were sent out to
8  Long Leaf customers.
9      A   Yes.
10     Q   And in each recommendation do you
11  generally agree that there's information about
12  the trades and then information about the number
13  of contracts that the customers can receive?
14     A   Correct.
15     Q   And the trade itself, the trade
16  structure was the same for every customer who
17  received the recommendation, but there was variance
18  among the number of contracts that were recommended
19  to particular customers, right?
20     A   Correct.
21     Q   So I want to show you an example of
22  one to make sure that I understand it properly.
23         MR. PLATT:  I'm going to mark CFTC
24     Exhibit 502.

Page 151

1          (WhereuponCFTC Exhibit No. 502
2          was marked for identification.)
3      Q   Do you recognize this as an email
4  that you sent to the Long Leaf brokers on April 4,
5  2019, subject line Detail for Trade?
6      A   Yes.
7      Q   There's one attachment titled Trade
8  Bond Hedge for Jobs Report Detail, and your email
9  is one sentence.  It says, "Here it is customer by
10  customer," right?
11     A   Correct.
12     Q   I'm just going to scroll down to the
13  attachment, Mr. Donelson, and it looks like sort
14  of an excerpt of an Excel file that shows the broker
15  number in one column, the account number in the
16  next column, the account name in the third column
17  and then there's a title -- there's a column with
18  the title Total.  Does that reflect the number of
19  contracts that would be recommended to the customer
20  for this particular trade?
21     A   Yes.
22     Q   And there are a bunch of different
23  numbers in the total column.  There's a 1, there's
24  a 2, there's a 3, there's a 4, there's an 8, there's

Page 152

1  a 6.  So there's about four or five different
2  options in terms of the number of contracts, right?
3      A   Correct.
4      Q   Then the brokers would take this
5  information and relay the recommendation to the
6  customer, is that right?
7      A   Correct.
8      Q   What are the factors that went into
9  Long Leaf's determination concerning how many
10  contracts to recommend to a particular customer?
11     A   One would obviously be the size
12  of the account.  The other would be -- another
13  would be how new they are to the program and then
14  also any adjustments that had been given by the
15  client to that number in the past.
16     Q   So that last item that you described,
17  adjustments by the client in the past, could that
18  be like the client may have reflected or expressed
19  a higher or lower risk tolerance in the past and
20  you're adjusting -- you are tailoring your
21  recommendation on that basis?
22     A   Yes, also certain -- whether they
23  would trade the specific underlying contract
24  or not.  Some customers would not trade.  We

Page 153

1 had a customer who was Muslim and would not trade
2 hogs. We had a customer who was a trader of the
3 E-mini, so he didn't want anything to do with E-mini
4 trades. We had some people, as I said earlier, that
5 traded options outside of what we were doing, that
6 they wouldn't take things that they were already
7 trading.
8 Q And this outside trading, it didn't occur
9 at Long Leaf, right?
10 A No.
11 Q So it sounds -- to sum all that up,
12 it sounds like Long Leaf knew its customers pretty
13 well and was able to tailor its recommendations
14 based on its knowledge of the clients' trading
15 preferences, right?
16 A Correct.
17 MR. PLATT: I've got one more just to
18 make sure I fully understand it. I'm going
19 to mark this as CFTC Exhibit 503.
20 Q Mr. Donelson, do you recognize this
21 as an email from -- actually, I'm sorry. We already
22 looked at this document. I've marked this as --
23 A 500, I think.
24 Q Your memory's probably better than mine.

Page 154

1 A But only for a short period of time
2 and then --
3 Q I think it's 499 if I did it right.
4 MR. FALVEY: We can say 499-1/2 if you
5 want.
6 MR. PLATT: I'm going to say 499 for the
7 sake of the record.
8 MR. FALVEY: Sounds good.
9 BY MR. PLATT:
10 Q So there are five PDF attachments to
11 this document. There's the customer list, there's
12 seven contracts, three contracts, two contracts and
13 one contract. I'm going to just scroll through them
14 very briefly. And the customer list is -- contains
15 information of the kind we saw on Exhibit 502
16 with sort of the account number, the account name
17 and then on the right-hand total column, that's the
18 number of contracts that would be recommended,
19 right?
20 A That is correct.
21 Q And then the remaining PDFs are the
22 trade recommendation documents that are tailored
23 for however many contracts are being recommended.
24 So on this document you can see on the top right

Page 155

1 above the box, "We are recommending a total of
2 7 contracts for each recommended position below,"
3 right?
4 A Correct.
5 Q And then the next PDF attachment says,
6 "We are recommending a total of 3 contracts for each
7 recommended position below," right?
8 A Correct.
9 Q So you would send this email to the
10 brokers. They would look at the customer list
11 and then disseminate the corresponding PDF based
12 on the appropriate number of contracts?
13 A Correct.
14 Q Mr. Donelson, what was an adjustment
15 trade in the context of Long Leaf, the Long Leaf
16 Trading program?
17 A There were typically two types.
18 One is we sold the short option. It expired.
19 We have a lot of long -- we have a lot of times
20 at the end it's not profitable at the moment, so
21 we'll sell another set of short options. Then the
22 one you showed me, which is a hedge of -- they were
23 in a good position. However, you know, we had a big
24 jobs report coming up. So we put a hedge in place

Page 156

1 at no commission just to protect that.
2 Q And when you would recommend trade
3 adjustments, would you recommend particular numbers
4 of -- particular amounts of contracts for particular
5 customers?
6 A It would be equal to what the
7 initial entry was. So if you had five contracts,
8 you're going to get five contracts. If you had
9 one contract, you want one contract. You can
10 still -- obviously they can, and sometimes did,
11 say no, I don't want to take the contract. But
12 we didn't want them to have two short and one long
13 and create a problem.
14 Q I understand. So for adjustment trades
15 Long Leaf Trading would go look at the customer's
16 trading history, determine what their original
17 position was and tailor the adjustment trading
18 recommendation to that prior trading activity?
19 A Yeah. We would actually download
20 it from the trading system of what their current
21 position was.
22 Q Got it. Thank you. And so we've been
23 discussing -- and just to clarify the record about
24 trading recommendations and number of contracts,

Page 157

1  this has been for the time period that you owned
2  the firm, right?
3     A   Correct.
4     Q   Do you have an understanding of how
5  Long Leaf determined the number of contracts for
6  customers to execute during the Evans period?
7     A   I have what he told me.  I don't have how
8  did that actually play out.
9     Q   What did Evans tell you about how Long
10  Leaf Trading determined the number of contracts to
11  recommend for a particular trade when he owned --
12     A   It was very similar to what I just
13  explained, that they look at the balance of the
14  account, the news of the account and any particulars
15  about the individual.
16     Q   Thank you.  Mr. Donelson, did Long Leaf
17  provide recaps or summaries of how its trading
18  activity performed for, you know, a month-long
19  period or a week-long period?
20     A   We did.  More was for an individual
21  asking for a complete account breakdown.  The
22  trading history reports you've seen mostly because
23  it's very hard to track what we called this trade
24  into what it looks like in your statement.

Page 158

1     Q   Does it ring a bell that these were
2  called like postmortems or after action reports?
3     A   Yes.
4     Q   What information was Long Leaf
5  trying to convey to customers with reports that
6  were titled postmortems or after action reports?
7     A   It was we took this trade, you know,
8  you agreed to this trade.  Here's how that trade
9  played out.  Here's kind of an explanation of what
10  went on in the market.
11     Q   And was the goal sort of like we want to
12  make sure customers know what's going on?
13     A   Yes.
14     MR. PLATT:  I'm going to show you
15  what's -- what I'm going to mark as CFTC
16  Exhibit 503.
17        (Whereupon  CFTC Exhibit No. 503
18        was marked for identification.)
19     Q   So if I did it right, I think I'm
20  going to show you what was probably like the first
21  postmortem or after action report that you did on
22  January 31, 2018 and the subject is January Trade
23  Recap.
24     A   Yep.

Page 159

1     Q   And is this sort of the first one that
2  you did --
3     A   Yes.
4     Q   -- once you owned the firm?
5     A   Yes.
6     Q   And then you write -- in this email you
7  write to the brokers, "We will follow up each month
8  with a postmortem of the trading for that month.  So
9  I will update this with final results based on the
10  expected entry," is that right?
11     A   Yes.
12     Q   Scrolling down to the recap, the
13  attachment, it's sort of a narrative describing the
14  mechanics of the trade and the market conditions.
15  Is that a fair summary?
16     A   Correct.
17     Q   Did Long Leaf Trading in its
18  postmortems ever include information about the
19  profit and loss associated with a particular trade?
20     A   Can you scroll down on this?  I'm --
21     Q   (Scrolling).
22     A   Yeah.  This is the first month we put
23  on long positions, so this would not have been the
24  result of the trade.  This would be the entry of the

Page 160

1  trade.
2     Q   Okay, that's helpful.  So, Mr. Donelson,
3  my question is I've looked at quite a few of these
4  postmortems or after action reports and they
5  generally take the form of Exhibit 503, like a
6  narrative describing the structure of the trade
7  and the market conditions.  But I have never seen
8  one that says, you know, Trade XYZ, if you traded
9  one contract, you would have made 400 bucks.
10        Did you ever include profit
11  and loss information in your trade recaps or your
12  after action reports?
13     A   I don't remember.
14     Q   During the Evans period did Long Leaf
15  Trading circulate trading recaps or after action
16  reports summarizing trading activity?
17     A   I don't know.
18     Q   If the goal was to increase
19  transparency into the performance of Long Leaf's
20  trading program, why didn't Long Leaf Trading
21  circulate trading results on a monthly basis along
22  with these postmortems and after action reports?
23     A   I was working on a better report for
24  an individual that could go out and say here's

Page 161

1   the exact trades.
2       Q    Did that ever come to fruition,
3   the better report that was tailored to individual
4   accounts?
5       A    Yeah, I -- we would send them out to
6   clients, not on an ongoing basis but as requested.
7       Q    When did that start? I think the
8   first one of those -- I know the documents you're
9   talking about. I think the first ones that I've
10  seen pop up in the spring of 2019. Does that sound
11  right?
12      A    No, there were reports long before that,
13  I think as early as February 2018.
14      Q    So Long Leaf had the ability to
15  generate reports reflecting trade-by-trade profit
16  and loss, but it only did so if requested by a
17  client and it did not do so to circulate with
18  its after action reports. Is that your testimony?
19      A    I don't remember if it was in the after
20  action reports.
21      Q    Well, it's not in CFTC Exhibit 503,
22  right? 503 doesn't include closed PNL information,
23  right?
24      A    That was the one you just showed me?

Page 162

1       Q    Yes.
2       A    No, it's not in that report.
3       Q    I have not seen any postmortems,
4   summaries or after action reports that include
5   closed trade PNL. Sitting here today, can you
6   identify any after action reports or postmortems
7   that include closed trade PNL?
8       A    No.
9       Q    But you do remember responding to
10  customer requests for PNL summaries for their own
11  individualized accounts, right?
12      A    Correct.
13      Q    And you generated those in response to
14  those requests?
15      A    Correct.
16      Q    Mr. Donelson, have you looked at the
17  CFTC's complaint in this action?
18      A    Yes.
19      Q    What's your understanding of the
20  nature of the legal claims against Long Leaf
21  Trading?
22      A    There are charges of fraud. There
23  are charges of not being registered as a CTA, false
24  and misleading statements as a CTA, not filing the

Page 163

1   requisite documents for a CTA and registration
2   of APs.
3       Q    I agree with your summary. And
4   to bucket those out, do you agree that there
5   are fraud claims and there are registration claims,
6   two different buckets?
7       A    Correct.
8       Q    And, you know, you're not a lawyer.
9           MR. PLATT: So, Mr. Falvey, if you want
10  to jump in on any of these questions, feel free
11  to object.
12          MR. FALVEY: Okay.
13          MR. PLATT: But just trying to categorize,
14  you know, the content of the complaint.
15          MR. FALVEY: That's fine.
16  BY MR. PLATT:
17      Q    So you referenced this violation that
18  the CFTC has charged Long Leaf Trading with for
19  operating as a commodity trading advisor without
20  registration.
21      A    Correct.
22      Q    And that was in the complaint. And
23  my question to you, Mr. Donelson, as Long Leaf's
24  corporate designee is did Long Leaf or any of its

Page 164

1   agents ever ask a lawyer whether or not Long Leaf
2   was required to register as a commodity trading
3   advisor?
4       A    Yes.
5       Q    Which lawyer did you ask?
6       A    Ms. Rebecca Wing.
7       Q    When did you ask Ms. Wing whether
8   or not Long Leaf Trading was required to register
9   as a CTA?
10      A    It's one of the responses but before
11  the acquisition and even after the acquisition
12  whether we should be registered as a CTA given
13  the facts.
14      Q    I'm going to show you what I've
15  previously marked as Exhibit 355, and you just
16  referenced it. This is a document that Long Leaf --
17  I think you produced in discovery, and I'll show it
18  to you. Just take a look at it and refamiliarize
19  yourself with Exhibit 355, please.
20          MR. FALVEY: Can you blow it up a tad,
21  Jody.
22          MR. PLATT: Yeah, yep, sorry. This is
23  tiny print. Sorry about that.
24          MR. FALVEY: No worries.

Page 165

1    MR. PLATT:  Is that legible?
2    THE WITNESS:  Yes.
3    MR. FALVEY:  Yep, thanks.
4    A    Yes.
5    BY MR. PLATT:
6    Q    Do you recognize Exhibit 355, Mr. Donelson?
7    A    Yes, I do.
8    Q    Did you draft it?
9    A    Yes.
10   Q    And so there are four discrete
11   conversations listed on here.  I'm really only
12   interested in the first one.  Do you generally agree
13   that the second, third and fourth conversations
14   listed in order from top to bottom are about your
15   registration personally as an associated person?
16   A    Correct.
17   Q    And the first conversation up at the
18   top is about Long Leaf's registration status as
19   a commodity trading advisor?
20   A    Correct.
21   Q    And the dates here are -- it's sort
22   of a broad date range, and I just want to drill
23   down on this a little bit.  The dates are listed
24   as November 1, 2017 through February 28, 2018.

Page 166

1    Is this meant to capture like there was one
2    conversation during that time period, there was
3    a series of conversations?  How did it work?
4    A    There were a series of conversations
5    and the best way to separate it is pre-acquisition,
6    post-acquisition.  So pre-acquisition we were
7    looking at the information being provided by
8    Mr. Evans.  I was -- I asked her to review should
9    this be registered as a CTA.
10   Q    And I take it --
11   A    And after -- after acquisition is the
12   continuation of that conversation now that we have
13   more insight than what's just in the acquisition
14   documents.
15   Q    In Exhibit 355 there's a sentence
16   that says, "We reviewed the requirements, looked
17   at the ongoing review of the NFA and information
18   provided by Mr. Evans."  There's three discrete
19   concepts there, and I'd just like to ask you
20   about each of them.  What does it mean when you
21   say we reviewed the requirements?  What did you and
22   Mrs. Wing look at?  Or Ms. Wing, sorry.
23   A    She's obviously the lawyer in this,
24   so she reviewed all the requirements to be a CTA

Page 167

1    and what the exact rules are around that.
2    Q    Do you know whether or not Ms. Wing
3    conducted any legal research on this issue?
4    A    I do not.
5    Q    Did she bill you for this advice?
6    A    Yes.
7    Q    When Ms. Wing sent you bills for legal
8    services, were you billed by the hour or was it
9    sort of a flat fee arrangement?
10   A    For the acquisition it was a flat fee.
11   Q    Subsequent to that?
12   A    Hourly.
13   Q    Did Ms. Wing ever tell you that,
14   you know, she needed to take some time to review
15   regulatory authority on these issues or did she just
16   like give you the answer sort of in the course of
17   the conversation?
18   A    She didn't tell me in the conversation
19   when I asked.  She came back to me a couple weeks
20   later on it.
21   Q    Did she explain the basis for her legal
22   opinion?
23   A    Yes.
24   Q    What did she tell you?

Page 168

1    A    That we did not have control of the
2    accounts.
3    Q    That was the key factor for Ms. Wing
4    at that pre-acquisition conversation concerning
5    Long Leaf's registration status?
6    A    Correct.
7    Q    What about after the acquisition?  You
8    testified that based on -- you know, I don't know
9    if you learned new information about the company.
10   You had been operating it for some time, so you
11   clearly knew more about it than what Mr. Evans had
12   told you.  Did you provide -- excuse me.  Strike
13   that.  What additional information did you provide
14   to Ms. Wing during the post-acquisition conversation
15   concerning Long Leaf's registration status?
16   A    Updates on the NFA review.
17   Q    I have two questions.  I'm just
18   going to ask them and I can clarify it if you
19   need them clarified.  One, what review are you
20   talking about and, two, what about that review did
21   you tell Ms. Wing that was relevant to Long Leaf's
22   registration status?
23   A    The review that started in August of
24   2017 and concluded in February of 2018 is the answer

1  to the first question.  Second question, basically
2  an update on the status of it.
3      Q   What do you mean --
4      A   We knew it was in progress at the time
5  of the acquisition.  We did not have the conclusion
6  of it, which didn't happen until February.
7      Q   Was there any factual information
8  connected to the fall of 2017 NFA audit that you
9  provided to Ms. Wing in connection with the post-
10  acquisition legal advice concerning Long Leaf's
11  registration status?
12     A   I provided her the exit letter.
13     Q   What did the exit letter say?
14     A   Two things.  One is that we needed to
15  put the number of contracts on the recommendation,
16  and the second was he needed to record the checks
17  when they were written, not when they were cashed.
18     Q   Was this a letter that was addressed
19  to Long Leaf Trading?
20     A   I'm not sure if it's addressed to Tim
21  Evans or Long Leaf Trading but one of those two.
22  It's from the NFA.
23     Q   And was this post-acquisition conversation
24  concerning Long Leaf's registration status, do you

1  think that happened in like February of 2018 based
2  on the registration conversations document or do
3  you think it happened later?
4      A   I would say it happened near the end
5  of February once we had the final NFA document.
6      Q   So by then you had a three-month sample
7  to understand the way that Long Leaf's trading
8  program operated and the extent to which Long Leaf's
9  customers followed the trading recommendations, is
10  that right?
11     A   Correct.
12     Q   What did Ms. Wing say in her legal opinion
13  in the post-acquisition conversation concerning Long
14  Leaf's registration status about whether or not Long
15  Leaf Trading was properly registered only as an
16  introducing broker?
17     A   She reiterated that we did not have
18  control of the accounts and that we would -- did
19  not need to be registered as a CTA.
20     Q   Did Ms. Wing ever ask any questions for
21  facts other than whether or not Long Leaf Trading
22  had control over the accounts?
23     A   Yes.
24     Q   What kinds of questions did Ms. Wing

1  ask you?
2      A   How many accounts there were, the kind
3  of rate of people accepting or, you know, declining
4  the recommendations.
5      Q   Do you remember anything else she asked
6  about in connection with her advice concerning Long
7  Leaf Trading's registration status?
8      A   I don't remember anything else.
9      Q   Did Long Leaf Trading ever tell Ms. Wing
10  that approximately 90 percent of its revenues came
11  from the trading program?
12     A   I don't remember.
13     Q   Did Long Leaf Trading ever tell
14  Ms. Wing that no customers in the trading program
15  ever deviated from the structure of the trading
16  recommendation as it was recommended?
17     A   I don't remember.
18     Q   Did Long Leaf Trading attempt to describe
19  the frequency with which customers accepted its
20  trading recommendations?
21     A   I don't remember.
22     Q   Did Long Leaf Trading tell Ms. Wing that,
23  you know, to the extent any customer deviated from
24  the trading recommendation, the only deviation was

1  a minor detail of the number of contracts, and even
2  then it was at most 5 percent of the customers for
3  any particular trade?
4      A   Ask that question again, please.
5      Q   Concerning information provided to
6  Ms. Wing in connection with legal advice about
7  whether or not Long Leaf Trading was required to
8  register as a commodity trading advisor, did Long
9  Leaf Trading tell Ms. Wing or any of its agents or
10  employees tell Ms. Wing that the only deviations
11  from the recommended trades by trading program
12  customers related to the number of contracts that
13  would be executed and if there was deviation, it
14  only occurred in, as you testified, 5 percent of the
15  trading recommendations?
16     A   No.
17     Q   Did Long Leaf Trading in connection
18  with seeking legal advice from Ms. Wing on the
19  issue of whether or not it should register as a
20  commodity trading advisor, did Long Leaf Trading
21  ever tell Ms. Wing that among the trading program
22  participants, no customers executed trades other
23  than the recommended trades?
24     A   I don't remember.

Page 173

1    Q   Were there any documents or notes
2 reflecting these conversations?
3    A   They're mostly phone calls.
4    Q   Ms. Wing never like put in an email
5 here's my justification?
6    A   Not that I know of.
7    Q   Well, it would have gone to your Long
8 Leaf Trading email probably, right?
9    A   I would assume so, yes.
10    Q   I know you're not a lawyer,
11 Mr. Donelson, but did you ever conduct any
12 searches on the internet or otherwise about when
13 an introducing broker is required to dually register
14 as a commodity trading advisor?
15    A   I only looked at the NFA website, which --
16    Q   What information did you learn from
17 the NFA website on the issue of whether or not Long
18 Leaf Trading may be required to dually register as
19 an introducing broker and a commodity trading
20 advisor?
21    A   It listed five things, the first one
22 being you had to have discretion over the account.
23 The second one had to do with numbers of people
24 that you sent the recommendation to.  To be honest,

Page 174

1 I don't remember all the other three.
2    Q   Your recollection is that the
3 NFA website says that only introducing brokers
4 that have discretion over customers' accounts are
5 required to register as commodity trading advisors?
6    A   That's what it said, yes.
7    Q   Or do you think maybe it says having
8 discretion over a customer's account is sufficient
9 but not necessary to require dual registration as an
10 introducing broker and commodity trading advisor?
11    A   I turned the matter over to Ms. Wing,
12 who's a lawyer, and took her advice on whether we
13 should be registered or not.
14    Q   Mr. Donelson, I understand that you
15 asked Ms. Wing or you say that you asked Ms. Wing
16 for legal advice on this issue.  What I'm trying to
17 get at is did you ever do any independent research
18 as a very well-educated corporate professional
19 that would call into question her -- the advice
20 that she gave you?  Did you ever question her and
21 say, Ms. Wing, I looked at the NFA website and they
22 had a bunch of factors and we hit all of them?  Did
23 you ever say something like that?  Was there ever
24 a conversation of that nature?

Page 175

1    A   No.
2    Q   Upon reviewing the NFA website, as
3 you described, did you ever think to yourself that
4 Long Leaf met the criteria that were listed by the
5 NFA?
6    MR. FALVEY:  Objection.  As Jody has
7    pointed out before, Mr. Donelson is not an
8    attorney, but go ahead and answer.
9    A   Parts of it did, parts of it didn't.
10 I relied on her expertise in the field.
11 BY MR. PLATT:
12    Q   You testified earlier that Ms. Wing
13 told you that the reason that Long Leaf did not
14 have to register as a commodity trading advisor
15 was because it did not exercise discretion over
16 customer accounts.  Did it ever make you question
17 her expertise to know that her advice didn't line
18 up with the factors listed on the NFA website?
19    MR. FALVEY:  Objection as to the
20    characterization as to whether her advice
21    lined up with the NFA website, but go ahead.
22    THE WITNESS:  I forgot the question now.
23    MR. PLATT:  Sure, I'll ask it again.
24    And, Mr. Falvey, your objection can stand.

Page 176

1 I understand where you're coming from.
2    MR. FALVEY:  Sure.
3 BY MR. PLATT:
4    Q   I think -- let me break it down so
5 it's a better question.  You testified I think
6 that Ms. Wing told you that the key factor was that
7 Long Leaf Trading did not exercise discretion over
8 customer accounts, right?
9    A   Correct.
10    Q   Did she say any other factors that
11 were important to her legal opinion that Long Leaf
12 Trading did not need to register as a commodity
13 trading advisor?
14    A   No.
15    Q   Did it give you cause for concern
16 as a business owner and educated professional
17 to know that her legal advice did not consider
18 the factors that were listed on the NFA website,
19 all of the factors?
20    MR. FALVEY:  Same objection.  Sorry,
21    same objection as before.
22    A   No, I did not.
23 BY MR. PLATT:
24    Q   So earlier today you testified that

Page 177

1  you knew what an associated person was in the
2  context of the futures industry.  Can you just,
3  please -- I apologize if you already answered this.
4  Who is required functionally to register as an
5  associated person?
6      A   Anybody who solicits clients or manages
7  the solicitation of clients.
8      Q   What if you solicit orders, would that
9  qualify too?
10     A   I believe so.
11     Q   In connection with your due diligence in
12 acquiring Long Leaf Trading Group, did -- actually,
13 strike that.  When you became the principal of Long
14 Leaf Trading Group, did Long Leaf undertake any
15 analysis to determine whether or not all its brokers
16 were properly registered as associated persons?
17     A   Yes, we reviewed NFA BASIC.
18     Q   Do you remember what the results of that
19 review were?
20     A   I remember that every one of our
21 brokers was registered and Andrew Nelson had
22 a temporary license.
23     MR. PLATT:  I'm going to mark CFTC
24     Exhibit 504.

Page 178

1      (WhereuponCFTC Exhibit No. 504
2      was marked for identification.)
3      Q   I'll represent to you, Mr. Donelson,
4  that this is a printout of Andrew Nelson's NFA
5  BASIC registration information.  Do you recognize
6  this, the format of this information?
7      A   Yes.
8      Q   And I'll scroll through it.
9      A   Yes, I do recognize the format.
10     Q   I've just scrolled through the whole
11 document.  It's a two-page PDF.  And under Long Leaf
12 Trading Group, there are two dates for September 5,
13 2017 listed.  One is associated person pending.  The
14 other is NFA associate member pending.  Is that --
15 do you think that's the information that you saw
16 when you looked up Andrew Nelson's registration
17 status?
18     A   Yes, that's what I believe it is.
19     Q   Did there come a time when you learned
20 that the NFA was going to initiate a registration
21 disqualification proceeding against Mr. Nelson?
22     A   Yes, I did.
23     Q   When was that?
24     A   Sometime in February of 2018 I think,

Page 179

1  about a couple months in.  It was in February or
2  January.  I can't remember.
3      (Whereupon  CFTC Exhibit No. 505
4      was marked for identification.)
5      Q   So I'm just going to show you CFTC
6  Exhibit 505, which is not inconsistent with your
7  testimony.  This is a January 25, 2018 email from
8  you to Mr. Evans, the former principal of Long
9  Leaf.  You write, "Got a letter today on Andrew.
10 They are initiating a registration disqualification
11 proceeding where he request a hearing unless he
12 withdraws the application.  Is this standard
13 procedure?  Not familiar with this."
14     Do you recognize this as an email
15 that you wrote to Evans?
16     A   Yes.
17     Q   Does this refresh your recollection that
18 you probably learned about the disqualification
19 proceeding against Mr. Nelson in late January 2018?
20     A   Yes.
21     Q   After you received this information
22 that you described as something you weren't familiar
23 with, did you permit Mr. Nelson to continue acting
24 as an associated person?

Page 180

1      A   I did.
2      Q   Did you ever ask anyone -- or you
3  asked Mr. Evans is this standard procedure.  Do you
4  remember if Mr. Evans responded to you?
5      A   He did.  I don't remember, but he didn't
6  really understand the procedure either -- proceeding
7  either.
8      Q   Did you ask Ms. Wing about -- in late
9  January 2018 about whether or not --
10     A   Yeah, I did, I did.
11     Q   So let me just finish the question,
12 and we've been talking over each other --
13     A   Okay.
14     Q   -- a little bit today.  It's mostly my
15 fault and I apologize.  Did you ask Ms. Wing around
16 the time you received Exhibit 505 whether or not you
17 should continue to permit Mr. Nelson to interact
18 with customers and solicit prospective customers?
19     A   No.  I asked her what this was and what
20 I had to do.
21     Q   What did she say?
22     A   We were talking about the procedure
23 itself, that we would have to file something,
24 and we sent the filing over.  I don't know when.

Page 181

1    Q   So was the conversation more around
2  what to do with the hearing that you reference in
3  your email here to Mr. Evans?
4    A   Correct.
5    Q   It wasn't about whether or not Mr. Nelson
6  should continue to operate in a customer-facing role
7  while the hearing was pending, is that accurate?
8    A   That's accurate.
9    Q   And Ms. Wing never told you around this
10  time to take Mr. Nelson out of a customer-facing
11  role?
12    A   No.
13    Q   I have a couple questions about the
14  Evans era, Mr. Donelson, just because --
15    A   Okay.
16    Q   -- just because some of your
17  answers today have indicated some knowledge of
18  the documentation from the Evans era but less than
19  perfect information about what was going on in the
20  office under normal practices and procedures.
21  Is that fair?
22    A   That's fair.
23    Q   During the Evans era was Long
24  Leaf Trading aware that its trading recommendations

Page 182

1  resulted in consistent losses for customers?
2    A   I don't know how they wouldn't know
3  that, but how many people knew what was going on,
4  I don't know.
5    Q   It sounds like, you know, your
6  answer is you're sort of speculating based on
7  your reconstruction of or analysis of documentation
8  and not on, you know, everyone was talking about
9  losses in the office kind of thing?
10    A   Yeah, I don't know whether they were --
11  how widespread.  But if you were a broker working
12  for Tim Evans, it's hard not to see the losses if
13  you're getting a report every day.
14    Q   Do you know whether the brokers from the
15  Evans era received reports every day?
16    A   I believe they were emailed from Gain
17  every day based on the broker code.  That was the
18  procedure -- that was the process when I acquired
19  the firm, and I don't think Gain changed their
20  process.
21    Q   And you say anyone who looked at those
22  daily customer account statements should know that
23  customers are losing money over time.  What is it
24  about the customer account statements that would

Page 183

1  show that?
2    A   If you're showing a dwindling net liq --
3  net liquidating value.
4    Q   And all the Long Leaf brokers had the
5  relevant skills and training to understand those
6  concepts, is that right?
7    A   I can't speak for the Evans period.
8  The brokers that worked for me, yes.
9    Q   Do you know which scripts Long
10  Leaf followed during the Evans era?  Earlier you
11  testified that in 2017 the script matched the script
12  that existed in the early part of 2018.  But beyond
13  that do you have any understanding of what scripts
14  Long Leaf used during the Evans era?
15    A   Not really.
16    Q   Do you know whether Long Leaf during the
17  Evans era told customers that it would use option
18  selling strategies to drive results?
19    A   I don't know specifically.
20    Q   Do you know during the Evans era
21  if the brokers told prospective customers that if
22  you sell four options, there is a strong statistical
23  likelihood that you're going to win on three of
24  those, giving you a much more predictable path

Page 184

1  to success?  Did Long Leaf use that line with
2  prospects during the Evans era?
3    A   I don't know for sure.  I've heard it.
4  I don't know if they continued to be -- used it
5  all the time.
6    Q   In what context did you hear that line
7  during the Evans era?
8    A   They were talking in terms of the CME
9  study from 1999.
10    Q   And you heard this on recorded calls,
11  is that right?
12    A   Yeah.
13    Q   Did you ever listen to a recorded call
14  of Jeremy Ruth?
15    A   I don't remember.
16    Q   During the Evans era did Long Leaf
17  Trading tell customers and -- tell prospective
18  customers that as a company we wouldn't have the
19  ability to work with hundreds of clients month
20  after month for six years and oversee millions of
21  dollars if we weren't being profitable for them?
22    A   I don't know.
23    Q   During the Evans era did Long Leaf
24  disclose to prospective customers complete and

Page 185

1 accurate track record information concerning the
2 trade recommendations?
3    A   I have no records of it.
4    Q   Do you know one way if they did or they
5 didn't?
6    A   I'm just saying I have no record of them
7 ever doing it.
8    Q   And you have no independent knowledge
9 other than the lack of recordation?
10    A   Correct.
11    Q   Did anyone at Long Leaf ever talk about
12 Jeremy Ruth during the time period you owned the
13 firm?
14    A   Yes.
15    Q   What did they say about him?
16    A   He was a good salesman.  He was hard
17 to work with.  Those were the two main things.
18    Q   Who told you those two things about
19 Mr. Ruth?
20    A   I'm paraphrasing the conversation
21 with multiple, but that's -- the ones that had
22 been there.  I think Connor was there.  I think
23 James was there.  I think Andrew and Scott may have
24 been there, but a lot of the brokers had not been

Page 186

1 there when Jeremy was there.
2    Q   Based on the statements of brokers
3 whose time overlapped with Mr. Ruth's time and with
4 your time, you had an understanding that Mr. Ruth
5 was a good salesman?
6    A   He was good at sales and he was very,
7 very difficult to work with.
8    Q   And just so the record's clear, Mr. Ruth
9 did not work at Long Leaf during the time you worked
10 there, right?
11    A   Correct.
12    Q   Did Mr. Hatzigiannis or Mr. Campo
13 or any of the other brokers who overlapped with
14 Mr. Ruth and with you, did they describe what made
15 Mr. Ruth good at sales?
16    A   I don't remember any specific comments,
17 you know, but he was -- as they said, he was good
18 at talking to the client.  He was good at, you know,
19 getting them over their objections, so on and so
20 forth.
21    Q   Did any of the Long Leaf brokers whose
22 time overlapped with Jeremy Ruth ever tell you that
23 Mr. Ruth made misleading or untrue statements in
24 the context of soliciting customers to Long Leaf

Page 187

1 Trading?
2    A   I don't know.
3    Q   Why was Mr. Ruth fired at Long Leaf?
4    A   I do not know.  It was before I got there.
5       MR. PLATT:  Okay.  Can we take you,
6    know, a ten-minute break?  I'm close to done.
7    I just want to make sure that I've covered all
8    the topics that I want to.
9       MR. FALVEY:  Sure.
10       THE WITNESS:  Sure.
11       MR. PLATT:  Thanks.  Let's go off the
12    record.
13          (Whereupon a recess was taken from
14             3:24 p.m., to 3:40 p.m., after which
15             the following proceedings were had:)
16    Q   Mr. Donelson, earlier when we
17 were discussing your track record documents,
18 you referenced a master file.
19       MR. PLATT:  I'm going to mark an exhibit
20    as CFTC Exhibit 506.
21          (Whereupon CFTC Exhibit No. 506
22             was marked for identification.)
23    Q   This is a file titled Trading Performance
24 Tracking Data Long Leaf 2019.  This was produced to

Page 188

1 CFTC in discovery.  It's a multi-tab spreadsheet.
2 The first half of it is titled CoreData.  Is this
3 the master tracking file you were referencing?
4    A   Yes.
5    Q   And there's an Account tab --
6    A   Yeah.
7    Q   -- that I just clicked on.
8    A   Yes.
9    Q   Is this the tab that you would filter to
10 create your reports concerning strategy-by-strategy
11 analysis?
12    A   I think it would be either the Historical
13 or the Report tab.
14    Q   I just clicked on the Report tab.
15 This looks like the tab that you would use to
16 generate --
17    A   Yeah.
18    Q   -- individual reports?
19    A   That would be individual reports, and
20 then I think the Historical or the Summary would be,
21 you know.
22    Q   This is the Historical tab, but it
23 doesn't look to me like it's filtered.  So is
24 there a tab that contains all the data that would

Page 189

1  be filtered?
2      A    Look at the Summary tab.  No, it's
3  all the data that was created.  I just don't see
4  the tab --
5      Q    The Detail file looks like it is filtered,
6  the Detail tab.
7      A    Yeah.
8      Q    Is there a flag or a piece of data in
9  here that you would associate with the strategy?
10     A    I don't see where it has the strategy
11 in there.
12     Q    So can you walk me through how you
13 would create a report associated with a particular
14 strategy?
15     A    There should be a strategy next to
16 each one of the trades.  That's why I'm confused.
17 It had multiple versions of this.  So, I mean, like
18 it would not -- I'd never go back to a previous
19 version but I would go forward to a different
20 version, but all the data would stay the same.
21     Q    This is the one that was produced
22 in discovery.  So it sounds like either this file
23 or a file like it you were able to manipulate --
24     A    Yeah.

Page 190

1      Q    -- or filter to produce strategy-
2  by-strategy or customer-by-customer reports --
3      A    Yes.
4      Q    -- in 2019, is that generally correct?
5      A    That's generally correct, yes.
6      Q    I just want to turn back very briefly
7  to your discussions with Ms. Wing concerning Long
8  Leaf Trading's registration as an introducing broker
9  or commodity trading advisor.  You said that you
10 clicked around the NFA website and identified a
11 list of factors that were relevant to the analysis,
12 and I just want to understand what it was that you
13 learned independently of your legal advice about
14 what factors were relevant to this analysis.
15     A    Like I said, there were five factors
16 and the first one being that you had to have control
17 or discretion over the account, which we didn't
18 have.  And the rest of them were about -- I kind
19 of stopped looking there after it says you have to
20 have discretion, which is the advice that she gave
21 me, "she," the lawyer.
22     Q    And you don't remember what those other
23 factors were?
24     A    I have a general -- one had to do with

Page 191

1  how many would be sent out to -- or how -- if it
2  would be sent out to X number of people.  I don't
3  remember the other two or three.
4      Q    And this is potentially a minor detail,
5  but I want the record to be clear.  Earlier you
6  said that your independent research reflected that
7  the broker had to have control or discretion.  Was
8  there a difference to your mind between the concept
9  of control and the concept of discretion?
10     A    No.
11     Q    And what did those terms mean to you
12 before you received legal advice?
13     A    I didn't even look at the NFA website
14 before I received legal advice.  This was before
15 the acquisition.
16     Q    When do you think you looked at the NFA
17 website?
18     A    I'd say February 2018.  I think I
19 was looking at some other registration issues
20 or something but kind of driving around the NFA
21 website.
22         MR. PLATT:  I think that's all the
23 questions that I had.  Mr. Falvey, did you
24 have any clarifications you wanted to ask

Page 192

1  the witness?
2          MR. FALVEY:  I do not.  I'd like
3  to thank you for your professionalism and
4  civility, Mr. Platt.  I do appreciate it.
5  So thank you for that.
6          MR. PLATT:  It's my pleasure.  I thank
7  you, Mr. Donelson, for appearing on behalf
8  of Long Leaf for a second day of depositions.
9  I know it's a long day.  So with that, we can
10 go off the record.
11         MR. FALVEY:  Thank you.
12            (WITNESS EXCUSED)
13
14
15
16
17
18
19
20
21
22
23
24

Page 193

```
 1        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
 2             EASTERN DIVISION
 3   COMMODITY FUTURES TRADING     )
     COMMISSION,                   )
 4                                 )
              Plaintiff,           )
 5                                 )
          vs.           ) No. 20 C 3758
 6                                 )
     LONG LEAF TRADING GROUP,      )
 7   INC., et al.,                 )
                                   )
 8            Defendants.          )
 9
10
         I, JAMES A. DONELSON, do hereby certify
11   that I have read the foregoing transcript of my
     remote 30(b)(6) deposition given on June 24, 2021,
12   consisting of pages 1 to 195, inclusive, and I do
     again subscribe and make oath that the same is a
13   true, correct and complete transcript of my
     deposition so given as aforesaid, and includes
14   changes, if any, so made by me.
15
              Corrections have been submitted
16            No corrections have been
              submitted
17
18
         JAMES A. DONELSON, Deponent
19
     Subscribed and sworn to
20   before me this  day of
              , 20
21
     Notary Public
22
23
24
```

Page 194

```
 1   NORTHERN DISTRICT OF ILLINOIS  )
     EASTERN DIVISION               )
 2   STATE OF ILLINOIS              )
                                    )  SS.
 3   COUNTY OF COOK                 )
 4
 5       I, Mary Maslowski, Certified Shorthand
 6   Reporter and Notary Public in and for the County of
 7   Cook, State of Illinois, do hereby certify that on
 8   June 24, 2021, at 9:07 a.m., the remote deposition
 9   of the witness, JAMES A. DONELSON, called by the
10   Plaintiff, was taken before me, reported
11   stenographically and was thereafter transcribed
12   by me.
13       The said witness, JAMES A. DONELSON, was
14   first duly sworn to tell the truth, the whole truth,
15   and nothing but the truth, and was then examined
16   upon oral interrogatories.
17       I further certify that the foregoing
18   is a true, accurate and complete record of the
19   questions asked of and answers made by the said
20   witness, at the time and place hereinabove referred
21   to.
22       The signature of the witness was not waived
23   by agreement.
24       The deposition terminated at 3:50 p.m.
```

Page 195

```
 1       Pursuant to Rule 30(e) of the Federal
 2   Rules of Civil Procedure for the United States
 3   District Courts, if deponent fails to read and sign
 4   this deposition transcript within 30 days or make
 5   other arrangements for reading and signing thereof,
 6   this deposition transcript may be used as fully as
 7   though signed, and the instant certificate will then
 8   evidence such failure to read and sign this
 9   deposition transcript as the reason for signature
10   being waived.
11       The undersigned is not interested in the
12   within case, nor of kin or counsel to any of the
13   parties.
14       Witness my official signature and seal as
15   Notary Public, in and for Cook County, Illinois on
16   this 14th day of July, A.D., 2021.
17
18
19             Mary Maslowski, CSR, RPR
               Notary Public
20             79 West Monroe, Suite 1001
               Chicago, Illinois  60603
21
22
23
24
```