CFTC Ex. 530

# Long Leaf Trading Group

## *Donelson, James 2019-08-27*

### *8/27/2019 9:10 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Wednesday, November 3, 2021

Page 1

1        UNITED STATES OF AMERICA
          BEFORE THE
2      COMMODITY FUTURES TRADING COMMISSION

3

4  IN THE MATTER OF:        )
                            )
5  LONG LEAF TRADING GROUP, INC.   )

6

7

8

9

10

11        The examination under oath of JAMES

12  DONELSON, taken pursuant to subpoena and the rules

13  of the U.S. Commodity Futures Trading Commission,

14  reported by Mary Maslowski, a Certified Shorthand

15  Reporter and Notary Public within and for the County

16  of Cook and State of Illinois, at 525 West Monroe

17  Street, 11th Floor, Chicago, Illinois, commencing at

18  the hour of 9:10 o'clock on August 27, 2019.

19

20

21

22

23

24

Page 2

1  A P P E A R A N C E S :

2

      MR. ASHLEY J. BURDEN, Senior Trial Attorney
3     MS. ELIZABETH M. STREIT, Trial Team Leader
      MR. JOSEPH J. PATRICK, Investigator
4     U.S. COMMODITY FUTURES TRADING COMMISSION
      DIVISION OF ENFORCEMENT
5     525 West Monroe Street, Suite 1100
      Chicago, Illinois 60661
6     (312) 596-0700

7

      On behalf of the U.S. Commodity
8     Futures Trading Commission;

9

      MS. REBECCA J. WING
10    5401 Patton Drive, Suite 115
      Lisle, Illinois 60532-4532
11    (312) 286-3485
      rebeccajwing@outlook.com

12

13        On behalf of the Witness.

14

15

16

17

18  A L S O   P R E S E N T :

19

      MR. MATT EDELSTEIN, Economist.
20

21

22

23  CSR License No. 084-003278.

24

Page 3

1              I N D E X

2  WITNESS              EXAMINATION

3  JAMES DONELSON

4  By Mr. Burden          4, 20, 49, 54,
                          109, 130, 137,
5                         144, 156, 184,
                          188, 193

6

    By Mr. Patrick         19, 48, 50, 107,
7                         129, 134, 143,
                          155, 176, 187,
8                         189

9

10          E X H I B I T S

    CFTC EXHIBIT          MARKED FOR ID
11
    No. 1                4
12  No. 55               6
    No. 56               32
13  No. 57               33
    No. 58               62
14  No. 59               73
    No. 60               76
15  No. 61               85
    No. 62               86
16  No. 63               137
    No. 64               144
17  No. 65               172
    No. 66               196
18  No. 67               201
    No. 68               213
19  No. 69               215
    No. 70               218
20  No. 71               248
    No. 72

21

22

23

24

Page 4

1            JAMES DONELSON,

2  called as a witness herein, having been first duly

3  sworn, was examined and testified as follows:

4            EXAMINATION

5  BY MR. BURDEN:

6    Q    All right.  Mr. Donelson, I'm

7  Ashley Burden.  This is Joe Patrick.  This is

8  Elizabeth Streit.  We're officers of the Commission

9  for the purposes of this proceeding.  This is an

10  investigation by the United States Commodity Futures

11  Trading Commission in the matter of Long Leaf

12  Trading Group to determine whether there have been

13  violations of certain provisions of the Commodity

14  Exchange Act and regulations.  However, the facts

15  developed in this investigation might constitute

16  violations of other federal or state civil or

17  criminal laws.

18        (Whereupon  CFTC  Exhibit No. 1 was

19          marked for identification, MM.)

20    Q    So I want to hand you what I've marked as

21  CFTC Exhibit 1.

22        MR. BURDEN:  And, Counsel, of course

23  I have copies for you -- you know, I do have

24  a copy of this for you, if you'd like it.

Page 5

1      MS. WING: I like paper.
2  BY MR. BURDEN:
3      Q    Mr. Donelson, prior to the opening
4  of the record you were provided with a copy of
5  the Commission's Statement to Persons Providing
6  Information about Themselves to the CFTC. A copy
7  of that statement has now been marked as Exhibit 1.
8          Mr. Donelson, have you had an
9  opportunity to read the Statement to Persons?
10     A    Yes, I have.
11     Q    Do you have any questions about it?
12     A    No, I don't.
13     Q    Mr. Donelson, are you represented
14  by counsel today?
15     A    Yes, I am.
16     MR. BURDEN: Would counsel please identify
17  herself.
18     MS. WING: Rebecca J. Wing.
19     MR. BURDEN: Ms. Wing, are you representing
20  Mr. Donelson as his counsel here today?
21     MS. WING: I'm representing him along
22  with -- yes.
23     MR. BURDEN: I want to go off the record
24  for just a moment.

Page 6

1          (Discussion off the record.)
2          (Whereupon CFTC Exhibit No. 55 was
3           marked for identification, MM.)
4      Q    Mr. Donelson, I'm handing you what I've
5  marked as CFTC Exhibit 55. Is this the subpoena
6  pursuant to which you're appearing here today?
7      A    Um-hmm, yeah.
8      Q    All right. Mr. Donelson, have you ever
9  been interviewed for testimony before?
10     A    No.
11     Q    Well, in that case I'm going to go over
12  some rules of the road I'm sure your counsel has
13  already covered with you. The first is please try
14  to give verbal responses to my questions rather than
15  nod or shake your head.
16     A    Yes.
17     Q    Please try not to talk over me. I will
18  try not to talk over you. It happens all the time.
19  I'm sure we'll wind up doing it, but let's try not
20  to. So I don't ever want to ask you a question
21  that you don't understand or that confuses you.
22  So if I ask you a question and you're confused,
23  do you promise that you will tell me?
24     A    Yes.

Page 7

1      Q    All right. I want to take a few
2  minutes and talk about your personal background,
3  professional, educational. Can you tell me a bit
4  about what you've done in school?
5      A    I graduated from Illinois Wesleyan
6  with a degree in accounting and German language.
7  I'm not going to say the year. It was a long time
8  ago. And then I also have my master's in business
9  administration from the University of Chicago.
10  I also have on my transcripts I did a work study
11  in Hamburg, Germany for one semester. And that was
12  actually through the University of Cincinnati, even
13  though I've never been in Cincinnati in my life.
14     Q    All right. So you have a Bachelor of
15  Science in accounting, is that right?
16     A    Arts.
17     Q    Bachelor of Arts, is that what it is?
18  Bachelor of Arts in accounting, correct?
19     A    Yeah.
20     Q    And an MBA from University of Chicago,
21  is that correct?
22     A    Correct.
23     Q    Any other degrees?
24     A    No.

Page 8

1      Q    So let's talk about licenses and
2  professional certifications such as Series 3.
3  Can you tell me which of those you hold, please.
4      A    I hold the Series 3. At one time
5  I held a Series 27. I think it has since lapsed.
6  I'm not sure. And I had a CPA license. I let that
7  lapse also. I was doing that when I was doing
8  consulting.
9      Q    All right. So you have a Series 3,
10  is that correct?
11     A    Correct.
12     Q    And when did you obtain that Series 3,
13  please.
14     A    March of last year.
15     Q    So March of 20 --
16     A    I don't know the exact date but,
17  yeah, 2018.
18     Q    So you obtained your Series 3 in March
19  of 2018?
20     A    Um-hmm.
21     Q    Is that correct?
22     A    Correct.
23     Q    And when did you obtain your Series 27,
24  please.

Page 9

1    A    I'm thinking back.  It would have been
2 2014, October.
3    Q    And I think you testified that that
4 lapsed, is that right?
5    A    Right.  I don't work for a broker-dealer.
6 So, therefore -- the last job I had that I used
7 it was at Jump Trading, and it has since lapsed.
8 It's been two years since I've worked there.
9    Q    So is it fair to say that it lapsed in
10 2016?
11    A    It lapsed in 2018.
12    Q    Do you remember what month?
13    A    Probably May.
14    Q    All right.  So when did your CPA license
15 lapse, please.
16    A    Lapsed in October of 2018.
17    Q    All right.  Any other professional licenses
18 or certifications?
19    A    No.
20    Q    So let's talk about your employment,
21 and I think probably the thing that makes sense to
22 do is maybe work backwards from Long Leaf Trading.
23 Where did you work before Long Leaf Trading, please.
24    A    I was actually doing independent

Page 10

1 consulting for a period of time and starting
2 up a different business which is still ongoing.
3 It is a software development business.
4    Q    And what's that called, please.
5    A    Forefront Technologies.  It is a middle
6 office software for trading, basically back office
7 stuff.
8    Q    Got it.
9    A    And before that I worked for Jump Trading
10 as their controller.
11    Q    And for how long did you work at Jump
12 Trading, please.
13    A    Almost two years.  Right about two
14 years.  I started in July of -- dates are bad
15 with me.
16         MS. WING:  These are the toughest
17    questions.
18    A    So I left there in 2017.  So I started
19 in 2015.
20 BY MR. BURDEN:
21    Q    So you spent approximately two years
22 as Jump Trading's controller?
23    A    Right.
24    Q    Now, I'm not entirely sure what

Page 11

1 a controller does.  My understanding is that
2 they're sort of an accountant, is that right?
3    A    Accounting, in this case the
4 accounting.  We do some risk management.  We
5 do a lot of work with the trading firms in terms
6 of what are their haircuts and things like that,
7 mostly on the equity side.
8    Q    All right.  And before you worked
9 for Jump Trading what did you do before that,
10 please.
11    A    I worked for KCG, which was actually
12 Getco when I worked for them, and then they merged
13 with Knight Trading.  So it was all basically the
14 same firm.  I was the global controller for that
15 firm from 2007, August 2007 through June of 2015.
16    Q    All right.  And just for the record,
17 please, what did KCG and Getco and Knight Trading,
18 what did they do?
19    A    They are predominantly equity
20 marketmakers, but they are proprietary trading
21 firms that trade almost everything worldwide,
22 cash equities, futures.
23    Q    So when you worked for Jump Trading,
24 did you do any trading for them?

Page 12

1    A    No, but I did a lot of analysis of
2 the trades.
3    Q    When you say analysis of the trades,
4 what did that entail, please.
5    A    Profitability, strategy to make sure that
6 they met risk tolerances.
7    Q    Did you design trading strategies for
8 Jump Trading?
9    A    No.
10    Q    So when you say you worked on trade
11 strategies, what aspects of the strategy did you
12 work on?
13    A    The trader would come up with a strategy.
14 We would then run it through our risk tools to find
15 out how much risk, how much margin they needed and
16 then what their expected returns are to say is that
17 an adequate return on risk.
18    Q    And when you worked at Jump, did you do
19 any work on options trading strategies?
20    A    No.
21    Q    What kind of strategies did you work
22 on at Jump?
23    A    They were predominantly equity strategies.
24    Q    And that means stocks, right?

Page 13

1   A   Stocks.
2   Q   All right.  So I think you testified
3 that KCG and Getco and Knight Trading were all
4 kind of rolled into one firm by the end, is that
5 right?
6   A   So, yeah, Getco is a separate
7 company and Knight was a separate company.
8 Then Knight had kind of the blowup where they
9 lost 400 million, and Getco then merged into the
10 company KCG.
11   Q   Okay.  So can we just call them KCG
12 collectively?
13   A   Yeah.
14   Q   All right.  So at KCG, did you do any
15 trading at KCG?
16   A   No, other than -- the only trading we
17 did was hedging.
18   Q   Did you personally do hedging?
19   A   Yes.
20   Q   And what did you do to hedge KCG's trades?
21   A   We were hedging currencies.
22   Q   So how do you hedge currencies?
23   A   We were buying or selling futures depending
24 on where we were at.

Page 14

1   Q   And did you develop the strategies
2 for buying and selling those futures?
3   A   I was a part of a team that did, yes.
4   Q   And what was your role in that team?
5   A   Basically it was the accounting side,
6 the treasuries side, the trading side and then
7 the owners dividing how much risk they were willing
8 to take in any one currency.  So, for example, we
9 didn't want to have more than $10 million of Euros
10 unhedged, so we would move the hedges based on that.
11   Q   And who would decide what the appropriate
12 hedge was?
13   A   That was myself and the treasurer.
14   Q   So you would determine what, you know,
15 what -- if you're in futures, what's the right
16 contract, what's the right month?
17   A   Right.
18   Q   Did you do any work on options at KCG?
19   A   We did look at using options to
20 hedge.  However, the owners did not want that.
21 They wanted a perfect hedge.
22   Q   So you never used options at KCG?
23   A   Not in that context, no.
24   Q   In any other context?

Page 15

1   A   Not trading hedges, no.
2   Q   Well, did you have any other --
3   A   I worked with the option team, but
4 I didn't develop the trades.
5   Q   What did you do for the option team?
6   A   A lot of it had to do with
7 tax implications and the impact of those tax
8 implications on the actual trade.
9   Q   So what would you tell the options team
10 or what would they consult you for?
11   A   The tax treatment of dividend
12 versus profitability on an option trade.  One
13 is considered a 1256 contract, one is not.  They
14 were wondering why the trade -- why traders got away
15 from dividends, and this is basically the reason
16 why.  They saw this anomaly going on in the trade.
17   Q   So what did you -- it sounds like
18 you gave some pretty specific advice to the option
19 team at KCG.
20   A   Yeah.
21   Q   So what was that advice?
22   A   It was basically stay away from the
23 dividends.
24   Q   And dividends are --

Page 16

1   A   So a dividend, a dividend of the stock,
2 underlying stock.
3   Q   Oh, I see.  As opposed to profits or
4 option trades?
5   A   Right.  They're treated differently
6 from a tax perspective.  One's taxed much more
7 highly than the other.  Obviously dividends are
8 taxed higher.
9   Q   So at KCG you didn't do any options
10 trading, correct?
11   A   No, we weren't allowed to trade.
12   Q   But at KCG you provided tax advice to the
13 options trading team there, correct?
14   A   And similar information as what
15 we did with Jump Trading is review new strategies,
16 understand what the margins and the risks are.
17   Q   So at KCG you reviewed option
18 strategies and advised the traders there about
19 risk implications, is that fair to say?
20   A   Correct.
21   Q   All right.  So I'm not sure we need
22 to go much further back than that but I want to
23 ask you broadly, other than what we've previously
24 discussed with respect to Jump and KCG, what is

Page 17

1 your experience with respect to options? And
2 I want to kick it off by asking have you ever traded
3 options --
4    A    Yeah, I have.
5    Q    -- before going to --
6    A    Yeah, I have traded options.
7    Q    And when was that, please.
8    A    Probably from like 2014 on.
9    Q    So in 2014 you started trading options,
10 is that correct?
11    A    I think so, yeah.
12    Q    Did you do any options trading before that?
13    A    No.
14    Q    And for whom did you trade options
15 starting --
16    A    Personal.
17    Q    We're talking over each other.
18    A    Oh, sorry.
19    Q    We've got to be careful. That's all
20 right.
21    A    My personal trades.
22    Q    All right. Did you trade for any company
23 or other account?
24    A    No.

Page 18

1    Q    And did you trade continuously
2 for your personal account from 2014 through the
3 present?
4    A    No.
5    Q    When did you cease trading for your
6 personal account?
7    A    Probably 2017.
8    Q    And why did you stop trading options
9 in 2017?
10    A    Just too busy to do it.
11    Q    What clearing firm did you trade through,
12 please.
13    A    Thinkorswim is what I used or
14 Interactive Brokers.
15    Q    There we go. And whose name was the
16 account under, please.
17    A    Mine.
18    Q    How did you do?
19    A    Okay. Not fantastic, not great.
20    Q    Did you make money overall? Did you
21 lose money overall?
22    A    I lost money. But one of them was
23 actually a hedge on a warrant I had in KCG, which
24 was part of the deal.

Page 19

1    Q    All right. So what was the instrument
2 you used as a -- I should say what was the contract
3 you used as a hedge for this warrant at KCG?
4    A    It was a put option.
5    Q    But a put for what, please.
6    A    For the stock.
7    Q    Oh, okay. So it was an equity option?
8    A    Um-hmm.
9    Q    Yes?
10    A    Yes.
11    Q    Very good.
12    A    It was. I'm sorry.
13    Q    It's all right.
14            EXAMINATION
15 BY MR. PATRICK:
16    Q    Were all of the options trades that
17 you did at thinkorswim, were they equity options?
18    A    There were a couple futures options.
19    Q    Which markets did you trade options in?
20    A    Currencies.
21    Q    Currencies. Do you remember which
22 currencies?
23    A    Euro and I think the pound, pound
24 sterling. I'm sorry.

Page 20

1    Q    I'm sorry. Did you trade option
2 spreads?
3    A    On a couple occasions, yes. Most
4 of the time it was just a pure one-sided trade.
5    Q    Did you trade any option spreads on
6 currencies, currency futures?
7    A    Yes. When you say an option spread,
8 can you be specific as to what you mean by an
9 option spread? You're not talking about spreading
10 across currencies.
11    Q    Did you do any spreading across currencies?
12    A    No, I did not do any spreading across
13 currencies. It would only be like a vertical spread
14 in a currency.
15    Q    Calendar spread?
16    A    No, typically not.
17            FURTHER EXAMINATION
18 BY MR. BURDEN:
19    Q    So, Mr. Donelson, other than your
20 equity hedge on your KCG warrant, was your trading
21 in options profitable between 2014 through 2017?
22    A    No.
23    Q    How much did you lose?
24    A    Maybe $5,000.

Page 21

1    Q    How much would you say you traded
2 overall during that period?  I guess I should ask
3 what did you put into your trading accounts?
4    A    The trading account only had 30,000 in it.
5    Q    So in 2014 -- so during the life of your
6 trading from 2014 through 2017 you invested $30,000,
7 is that fair to say?
8    A    Um-hmm.
9    Q    Yes?
10   A    Yes, sorry.
11   Q    That's all right.  And by the end of 2017
12 you had $25,000 left, is that right?
13   A    Yeah, about -- I think it might have
14 been like 16 or 15, mostly because of the hedge.
15   Q    Got it, okay.  So you lost $5,000
16 to non-hedged trading between 2014 and 2017 in
17 options, correct?
18   A    Correct.
19   Q    And then how much on this hedge trade?
20   A    Technically I didn't lose anything but --
21   Q    No, I know.  That's right, yes.
22   A    It was I want to say 8,000, something
23 like that.
24   Q    Well, if you lose on your hedge, you won in

Page 22

1 business, didn't you?
2    A    Right.
3    Q    All right.  Any other options trading
4 other than this personal trading between 2014 and
5 2017 until you went to Long Leaf?
6    A    No, no.
7    Q    All right.  What other experience
8 before joining Long Leaf did you have with respect
9 to options?
10   A    We used them in risk analysis, things like
11 that, when I worked for R.R. Donnelley, not options
12 as you would think of the whole option theory of
13 what's the option of making this investment versus
14 some other investment.
15   Q    Well, I think when I ask about
16 your experiences with options, I'm referring
17 to options contracts as they're traded at the CME
18 Group or on ICE.
19   A    Nothing like that.
20   Q    All right.  Well, let's switch gears
21 and talk about Long Leaf Trading.  And first let's
22 talk about, if we could, please, your acquisition
23 of Long Leaf Trading.  So when did you purchase
24 Long Leaf Trading?

Page 23

1    A    December 1, 2017 is the acquisition date.
2    Q    All right.  So when was your first
3 contact with Long Leaf Trading -- or I should
4 ask when did you first become aware of Long Leaf
5 Trading?
6    A    I'd say August 2017.
7    Q    And how did you become aware of Long
8 Leaf Trading?
9    A    Well, I didn't know it was Long Leaf
10 Trading, but it was in BizBuySell.com.
11   Q    What's that?
12   A    It is a business broker site which
13 lists all the businesses that are out there for
14 sale.
15   Q    And what was it listed for?
16   A    1.5 million.
17   Q    And how much did you wind up paying
18 for it, please.
19   A    1.5 million.
20   Q    And were you represented in the
21 transaction?
22   A    By Mrs. Wing.
23   Q    Any other representatives or consultants?
24   A    I had talked to the accountant

Page 24

1 of the firm because I had a lot of questions
2 about obviously the loan, the underlying accounting
3 behind it, how we were going to get to a final
4 balance sheet, typical things you would do in
5 an acquisition.
6    Q    And that was Mr. Coglianese, correct?
7    A    Correct.
8    Q    All right.  So Mr. Coglianese, he was
9 Long Leaf Trading's accountant, correct?
10   A    Correct.
11   Q    So he wasn't your accountant, right?
12   A    Correct.
13   Q    Did you have your own accountant
14 or consultant, other than Ms. Wing, in connection
15 with the transaction?
16   A    No.  I have done many transactions before.
17   Q    So tell me about that.  Most
18 people will have some kind of investment banker
19 or consultant.  It looks like Mr. Evans certainly
20 did.  But you felt you didn't need one, correct?
21   A    I was comfortable with it.
22   Q    Okay.  So tell me about why that was.
23 It seems like a lot of money.  You said you have,
24 you know, a history of doing transactions.  Tell me

Page 25

1  about that history, if you would, briefly.
2    A    For 20 years I worked for R.R. Donnelley &
3  Sons, which is now just R.R. Donnelley.  During
4  that time I was involved with 20 to 25 acquisitions.
5  I was involved with one acquisition at Getco.
6  Obviously I was involved with the merger from
7  KCG to -- from Knight and Getco merging into KCG.
8  In some cases I took the lead, some cases I was
9  the financial head, sometimes I was the integration
10  person.  So I've had quite a bit of experience
11  moving -- combining firms in a business -- in
12  a large business.
13    Q    So you know what to ask for and what to
14  look at when you're combining firms or acquiring
15  firms, is that correct?
16    A    Yes.
17    Q    So what made you want to buy Long Leaf
18  Trading?
19    A    I like the financial services industry.
20  I've been in it since 2007, went through 2008,
21  which is an interesting period of time.  I was
22  looking for a business that I could grow and had
23  some ideas of how to make an introducing broker,
24  not just a churn and burn but how do you build

Page 26

1  a simple month-over-month profitable type business
2  for my customers.
3    Q    All right.  So what do you mean when
4  you say that you didn't want an IB to just be churn
5  and burn?  What does that mean, churn and burn, to
6  you?
7    A    My perception was that most IBs bring
8  people in.  They try to make the home run.  When
9  they make the home run, it's great.  If they don't,
10  they go out of -- you know, the customer loses money
11  and they leave.  That's my perception.  I don't know
12  a lot about introducing brokers.
13    Q    Have you ever worked for an introducing
14  broker before?
15    A    No.
16    Q    Have you ever used an introducing broker?
17    A    Well, Interactive Brokers is an introducing
18  broker, isn't it?
19    Q    I don't know.
20      MS. WING:  I can't answer questions.
21    A    I've been pitched by them.
22  BY MR. BURDEN:
23    Q    All right.  There we go.
24    A    Put it that way.  I definitely heard

Page 27

1  the pitches and a lot of it is -- what I have
2  heard is, you know, we can pick the bottoms and
3  tops and we can pick the winners.  My view is nobody
4  can pick the winners and losers.  You have to build
5  it correctly.
6    Q    So you say your view is that no one
7  can pick the winners and losers.  What do you mean
8  by that?
9    A    What I mean by that is that if you
10  told me today, you know, are, say, soybeans going
11  to go up or down, there's so many factors involved
12  with that it's hard to say that somebody could just
13  pick that and say I'm going to buy a future and
14  you're going to make money on it.  On the other
15  hand, if you build the structure correctly, you
16  can profit from it moving.  Can you tell it's going
17  to move or not, yes.  You know, is it going to be
18  volatile, is it going to do those type of things.
19    Q    So your testimony is that a trader
20  can tell if a commodity will move, is that right?
21    A    I'm not -- can you rephrase that?
22    Q    So I guess your testimony was something
23  to the effect that a trader can't tell if soybeans
24  are going to go up or down, right?  That's what

Page 28

1  you testified?
2    A    That's been my experience with the firms
3  I worked with.
4    Q    Yeah.  There's too many factors and
5  a person can't know even if they have a good idea,
6  correct?
7    A    Correct.
8    Q    So how can a person tell if a particular
9  market is going to be volatile or not?
10    A    Usually you can tell by the actual
11  option pricing.  You can see it in the pricing
12  of the option.
13    Q    So I want to come back to that, but
14  let's sort of stay on the acquisition of Long Leaf
15  Trading.  I think you testified before that you had
16  thought you could find a simple way to make money
17  month after month for customers, is that right?
18    A    Correct.
19    Q    And that was one of the reasons why
20  you wanted to purchase Long Leaf Trading, correct?
21    A    Right.
22    Q    So what was that idea?  How were
23  you going to make profit month after month for
24  customers?

Page 29

1    A    There's a couple trades that we do and
2  also one of the people on the staff, Scott Gecas,
3  had multiple years of options trading experience
4  and I had talked to him after the acquisition about
5  other ways to make trades.  But the idea of being
6  nondirectional, low risk, those type of trades,
7  that's how we structured our trades.  That's how
8  we structured trying to make money for our clients.
9    Q    So what other introducing brokers did you
10  look into purchasing?
11    A    No other ones.
12    Q    Did you sort of have the idea you
13  wanted to purchase an introducing broker and Long
14  Leaf Trading came up or how did this idea --
15    A    I was looking at quite a few different
16  businesses.
17    Q    What other businesses were you looking at?
18    A    Looking at some distribution
19  businesses, trying to fall back on what I -- my
20  days at Donnelley.
21    Q    What does Donnelley do, please.
22    A    Well, Donnelley was the world's largest
23  printer.  It may still be.  I don't know.  But it
24  did printing distribution, basically everything,

Page 30

1  large-scale printing like the old days of the
2  Sears catalogue, that type of stuff.  I did not
3  look at buying a print business because I knew
4  that was not going to be there, but the distribution
5  arm is a big part of it.  So I was looking at some
6  distribution businesses, basically wholesalers.
7    Q    What other businesses were you looking
8  at purchasing?
9    A    One was down in South Carolina.  They did
10  headsets, things like that, mostly for the aviation
11  industry.  Another one was a distribution business
12  down in North Carolina was one thing I was also
13  looking at because I really didn't want to live
14  in Chicago anymore.
15    Q    Did you look at purchasing any financial
16  services businesses?
17    A    No.  Most them were priced up in
18  the very high millions to get into a full-scale
19  financial services business.
20    Q    So Long Leaf Trading was really the
21  only viable financial service business that you
22  could really purchase?
23    A    Right, correct.
24    Q    So when did talks start for the purchase

Page 31

1  of Long Leaf Trading, please.
2    A    September.
3    Q    Of 2017?
4    A    2017, I'm sorry.
5    Q    And who was your point of contact for
6  that, please.
7    A    That's Dennis Hansmann.  He is the business
8  broker.
9    Q    All right.  And so when you were --
10  did you do due diligence in connection with your
11  purchase of Long Leaf Trading?
12    A    Yes, and he would provide all the documents
13  through Dropbox usually.
14    Q    What documents did you look at in
15  connection with the due diligence for the Long
16  Leaf Trading acquisition?
17    A    Financials, the complaint log,
18  their compliance, the whole series of documents,
19  making sure that they're in good standing from
20  a corporation standpoint, you know.  Basically
21  a long list of stuff that we asked them to provide
22  us.
23    Q    Got it.  What were the most important
24  considerations in terms of your purchase of Long

Page 32

1  Leaf Trading?  What was most important to you?
2    A    Most important part is they had a clean
3  compliance record, which they showed, that they had
4  Long Leaf clients, which they showed, and that they
5  were kind of on the same page in terms of not trying
6  to hit the home run, not trying to -- you know,
7  trying to be consistent, profitable for the clients.
8  That was what was represented to me.
9    Q    All right.  Now, of course, the firm's
10  profitability was important to you, correct?
11    A    Correct.
12        (Whereupon CFTC Exhibit No. 56 was
13         marked for identification, MM.)
14    Q    All right.  Mr. Donelson, I want
15  to hand you what I've marked as CFTC Exhibit 56.
16  If you'd take a look at this document for a moment,
17  please, and tell me if you recognize this.
18    A    I do.
19    Q    All right.  What do you recognize this
20  document to be?
21    A    This was provided to me as their
22  profitability for 2017 through the end of September.
23    Q    All right.  And what did this show?
24    A    It showed a very profitable firm.

Page 33

1    Q    And how much money did it make during
2 the first nine months of 2017?
3    A    $583,633.
4    Q    So did this turn out to be correct once
5 you got control of the firm?
6    A    Yes, these numbers were correct.
7            (Whereupon  CFTC Exhibit No. 57 was
8              marked for identification, MM.)
9    Q    All right.  Mr. Donelson, I want
10 to hand you what I've marked as CFTC Exhibit 57.
11 As you'll see, it's a group exhibit comprised of
12 a number of different documents.  Do you recognize
13 Exhibit 57, Mr. Donelson?
14    A    Yes, I do.
15    Q    Can you tell me what it is, please.
16    A    They are the monthly profit and
17 loss statements from Long Leaf Trading from 2016.
18    Q    And did you receive these documents in
19 connection with the due diligence?
20    A    Yes, I did.
21    Q    And from whom did you receive them?
22    A    From Mr. Hansmann.
23    Q    And as you will see, Exhibit 57,
24 the months are inexplicably out of order.  So

Page 34

1 what I'd like us to do, if we could, please,
2 is grab January --
3    A    They're in alphabetical order.
4    Q    They might be.
5    A    They are.
6    Q    Oh, very good, yeah.  This must have
7 been how they were produced, so I guess it's not
8 entirely my fault.  But let's take a moment, if we
9 could, please, to put them in order because I'm
10 going to walk you through each month, and I promise
11 it will be very, very, quick.  So in Exhibit 57 do
12 you see the profit and loss statement for January --
13        MS. WING:  Why don't you give him
14    a moment to put it in order.
15 BY MR. BURDEN:
16    Q    Okay.  I was going to --
17    A    I smashed my finger earlier this year,
18 so I don't have any feeling in it.  Okay, I've put
19 them in order.
20        MS. WING:  I think that's the first
21    time I've ever had it in alphabetical order
22    instead of chronological.
23 BY MR. BURDEN:
24    Q    Now, I will say it was produced that way.

Page 35

1    A    Well, it's because the files are --
2 you're doing it based on the file name.  The file
3 name's got to be in alphabetical --
4    Q    That's a good thought.  I think
5 that's correct.  So let's look at Exhibit 57,
6 please.  And if you see the January profit and loss,
7 what's that showing for profit for January?
8    A    60,287.
9    Q    Did you consider that that was good?
10    A    It was factual.  It's a good profit.
11    Q    All right.  So let's look at February,
12 please.  What profit do we have for --
13    A    46,192.35.
14    Q    And how about for March?
15    A    39,512.61.
16    Q    How about for April?
17    A    42,091.83.
18    Q    How about for May?
19    A    55,158.81.
20    Q    How about for June?
21    A    50,103.87.
22    Q    How about for July?
23    A    52,312.43.
24    Q    How about for August?

Page 36

1    A    64,261.12.
2    Q    How about for September?
3    A    77,465.29.
4    Q    In October it looks like it's increasing,
5 is that right?
6    A    Correct.
7    Q    So what's the profit for October?
8    A    80,764.31.
9    Q    November?
10    A    105,952.60.
11    Q    And December, what's it at there, please.
12    A    52,889.12.
13    Q    So I didn't see an omnibus 2016 P&L
14 statement in the production.  But just from looking
15 at it, do you recall what Long Leaf Trading's
16 profits were for 2016?
17    A    I don't know the exact number, but it
18 was -- there should be an audited set of financials
19 that would have that information.
20    Q    Did the profit numbers that we see
21 in Exhibit 57, were those accurate once you got
22 control of the firm?
23    A    Yeah, the audited financials were correct.
24    Q    Exhibit 57, were those numbers correct?

Page 37

1    MS. WING:  If you know.
2    A    Yeah, that's what the financial ledger
3 tells you.  I don't know if there should have been
4 some costs in one month or another, but in total it
5 was correct.
6 BY MR. BURDEN:
7    Q    In connection with the purchase
8 of Long Leaf Trading did you receive any revenue
9 projections?
10   A    No.
11   Q    Did you ask for any revenue projections?
12   A    Yes, but they would not provide them.
13   Q    Why not?
14   A    It's typical in an acquisition
15 that they don't do that.  They don't want you to
16 have a revenue projection, especially in this type
17 of business which depends on a lot of different
18 factors.  It's not a contract business per se.
19   Q    Did you perform your own revenue
20 projections?
21   A    Yes.
22   Q    What did you project?
23   A    Just I bolted for the SBA loan.
24 They needed a full business plan, but I kind

Page 38

1 of expected a small amount of growth.  I did not
2 put a big number in.  There's two revenue streams,
3 obviously the trading revenue and then they also
4 had an introducing broker revenue from a European
5 CFD dealer -- contract for difference dealer --
6 from one of their customers overseas.  And that
7 was in their -- in the parlance would be it's
8 almost pure profit.  They don't really do anything.
9 They just receive an introducing broker fee.
10   Q    So how many years of projections did you
11 do for this SBA loan?
12   A    Three.
13   Q    And what did you project for the first
14 year approximately?
15   A    It's been a long time since I did it.
16   Q    If you don't remember, that's okay.
17 But, I mean, if you could give me a ballpark --
18   A    It wasn't substantially higher than what
19 the number was in 2017.
20   Q    But a little bit higher?
21   A    Yeah.
22   Q    And was it higher still in the second
23 year of the projections?
24   A    (Nodding).

Page 39

1    Q    Yes?
2    A    Yes.
3    Q    How about the third year?
4    A    Yes.  It showed, you know, modest growth.
5 Nothing --
6    Q    All right.  In connection with the
7 acquisition of Long Leaf Trading, did you request
8 results of customer trading, i.e., how the customers
9 did?
10   A    I did, but they would not provide it.
11   Q    When did you request those results, please.
12   A    Sometime in October.
13   Q    Of 2017?
14   A    Of 2017, correct.
15   Q    All right.  And who did you request
16 them from?
17   A    I worked directly with Dennis.  I only
18 met with -- Dennis Hansmann.  So all the requests
19 went through him.
20   Q    So you asked Dennis Hansmann for customer
21 results, is that correct?
22   A    Um-hmm.
23   Q    Yes?
24   A    Yes.

Page 40

1    Q    So what did you ask him for exactly
2 in October of 2017?
3    A    I asked him for -- they made the
4 representation that they'd had clients there
5 from four to seven years.  I asked, okay, could
6 you tell me which client, you know, could you show
7 me that and also what their result is.
8    Q    And what did Mr. Hansmann tell you?
9    A    That he would talk to the owner.
10 Basically he was the go-between so -- and then
11 came back and said they would not provide that
12 information.
13   Q    Did he tell you why?
14   A    No.
15   Q    Did you ask him why?
16   A    I asked him why.  He said, well,
17 that's proprietary information.  That's what was
18 told me.
19   Q    Did you push back on that at all?
20   A    Yes.
21   Q    How did you do that?
22   A    I said, well, how do I know if
23 you're telling me the truth on issues related to,
24 you know, how long your clients have been there.

Page 41

1 That's one thing that would draw me to the business.
2    Q    And what did Mr. Hansmann say in response
3 to that?
4    A    So they did get back to me with people
5 who had been there the longest but did not show me
6 profitability.
7    Q    When you say they got back to you with
8 people that had been there the longest, how did that
9 go down? Did you get an email? Did they just tell
10 you?
11    A    They -- I'm trying to remember.
12 There was a document sent to me that had a number,
13 you know, their account number because they didn't
14 release the name of when they opened the account.
15    Q    Okay. So you got a document with an
16 account number on it?
17    A    I believe so, yes.
18    Q    How many account numbers?
19    A    Maybe ten.
20    Q    Did it have names?
21    A    No, it did not have names.
22    Q    What else did the document say?
23    A    It was just the date it was opened,
24 that it was still open.

Page 42

1    Q    Was this a document that Long Leaf
2 Trading had created or was it something from the,
3 you know, the FCM?
4    A    I don't know. It was not -- I got
5 it but I don't know who produced it or how it was
6 produced.
7    Q    Well, what did you do with that
8 information? How did you use that to confirm
9 this representation that Mr. Hansmann had made?
10    A    He had ten clients that had
11 been there quite a long time. And, you know,
12 it kind of confirms that, yes, he does have clients
13 that had been there a significant amount of time.
14 Now, after the fact some of those were self-traders.
15 They weren't part of a program. They just traded
16 on their own.
17    Q    Got it. So did you talk to any customers
18 of Long Leaf Trading --
19    A    No.
20    Q    -- before the purchase?
21    A    No, I didn't. I looked on Better
22 Business Bureau. I looked on all the other things
23 looking for any negative reviews, negative comments.
24    Q    Did you see any?

Page 43

1    A    There were a couple, which in any
2 business you're going to always have a couple, some
3 client who's not happy.
4    Q    All right. Let's come back to that,
5 but I want to keep going on this document. So
6 I think you testified that you received a document
7 with ten account numbers on it, correct?
8    A    I believe so, yes.
9    Q    And Mr. Hansmann had represented
10 to you that these were customers that had been
11 there for four to seven years, is that correct?
12    A    Correct.
13    Q    According to Mr. Hansmann, were those the
14 only customers that had been there for four to seven
15 years or just like ten of many?
16    A    He didn't make any representation of which,
17 was it all or some.
18    Q    Did you ask him?
19    A    I asked him and he said he didn't know.
20    Q    Did you ask him to find out?
21    A    Yes.
22    Q    Did he?
23    A    I don't remember if he ever answered the
24 question.

Page 44

1    Q    So I don't understand what you were
2 supposed to do with this document. It didn't have
3 any names on it. It doesn't sound like you knew who
4 created it. Did this give you comfort? Like did
5 you think this document answered the question of
6 do customers stay at Long Leaf Trading?
7    A    Yes and no. Yes, there are customers
8 that have been there a while and, no, it didn't
9 give me great comfort that everything was true.
10 But as I pushed, I never got much more information.
11    Q    But you went through with the purchase
12 anyway, correct?
13    A    Yes.
14    Q    All right. So I think you testified
15 before that Mr. Hansmann had -- you know, I'll just
16 ask you. Prior to the acquisition did Mr. Hansmann
17 tell you anything about the profitability of
18 customer trading, whether customers made money
19 or not?
20    A    No, he never did.
21    Q    Did Mr. Evans ever say anything to you
22 about that?
23    A    I only met with him twice before the
24 acquisition. They implied that they were profitable

Page 45

1 but never flat out said it.
2    Q    How did Mr. Evans imply that customer
3 trading was profitable for customers?
4    A    Basically saying, you know, they wouldn't
5 stay with us this long if they weren't happy with
6 our services, and that was repeated multiple times.
7    Q    And who said that to you?
8    A    Both Mr. Evans and Mr. Hansmann,
9 but I'm assuming he was saying what Tim had told
10 him to say.
11    Q    And did they say this to you verbally?
12    A    Yes.
13    Q    Is there anywhere I can find it in writing?
14    A    I don't know.
15    Q    So I know I asked you this, but
16 I apologize because we're going to come back to
17 it. Did you ever ask Mr. Hansmann if customers made
18 money trading at Long Leaf?
19    A    Yes, I did.
20    Q    When did you ask Mr. Hansmann that?
21    A    In October.
22    Q    Of 2017?
23    A    Of 2017.
24    Q    All right. And how did you ask him?

Page 46

1 Was it over email? Was it orally?
2    A    Almost everything was done via
3 voicemail. I mean, not voicemail but conversations
4 on the phone. I probably talked to him two to three
5 times a day.
6    Q    Oh, got it. So --
7    A    I mean, it's a little less formal than
8 a normal acquisition process.
9    Q    So it sounds like you probably
10 asked Mr. Hansmann more than once whether clients
11 made money trading with Long Leaf, is that right?
12    A    Right, correct.
13    Q    How many times did you ask Mr. Hansmann?
14    A    I don't know. More than five.
15    Q    And what did he say to you when you
16 asked the first time?
17    A    First time was that he would go back
18 and talk to the owner because he didn't actually
19 have knowledge of it one way or the other, and then
20 he came back to me and said that's considered
21 proprietary information.
22    Q    All right. And what did you say in
23 response to that?
24    A    I said, well, if I'm going to buy

Page 47

1 the firm, I'm going to find out -- I need to know
2 that information.
3    Q    That's what you said to Mr. Hansmann?
4    A    Um-hmm.
5    Q    Yes?
6    A    Yes, I'm sorry.
7    Q    That's all right. We'll get you
8 there eventually. By the end of the day you'll
9 be doing perfectly. Well, how did Mr. Hansmann
10 respond to that?
11    A    Once again, he is the liaison between
12 me, so he said he'll go back to talk to the owner.
13    Q    And did he return to you with more
14 information from Mr. Evans?
15    A    No.
16    Q    So did you ever get information prior to
17 the acquisition of Long Leaf Trading about whether
18 customers made money?
19    A    No.
20    Q    Why not? I mean, I think you just
21 testified that that was an important thing. Why did
22 you let that go?
23    A    Probably made a mistake. I should have
24 looked harder or pushed harder on it.

Page 48

1    Q    Did you ask Mr. Hansmann or Mr. Evans
2 for redacted customer statements?
3    A    We did get an equity run. I don't
4 think it was redacted, but that doesn't really
5 tell you profitability. It tells you how much is
6 in accounts.
7    Q    And did you get that equity run for all
8 of the Long Leaf Trading accounts or just for one
9 account?
10    A    All of them.
11    Q    But it doesn't tell you whether the
12 customers were profitable?
13    A    No. An equity run just confirms balances.
14         FURTHER EXAMINATION
15 BY MR. PATRICK:
16    Q    Was this an equity run for Gain Capital?
17    A    Yes, it was from Gain Capital.
18    Q    And it wasn't redacted?
19    A    No, no. This was at closing to make --
20 as part of the closing process to make sure that
21 the balances are what they say they are, so on and
22 so forth, the transfer of balances.
23    Q    Oh, so you did not get this equity run
24 as part of your due diligence?

Page 49

1    A    No.
2    Q    You received an equity run after
3  you had already agreed to purchase the company
4  and at closing you received an equity run --
5    A    Right.
6    Q    -- so that you can ensure that the
7  balances were correct --
8    A    Right.
9    Q    -- in the customers' accounts?
10    A    Correct.
11          FURTHER EXAMINATION
12  BY MR. BURDEN:
13    Q    Well, I want to push back a little bit.  I
14  still -- I mean, did you threaten to not go through
15  with the acquisition if you didn't receive some kind
16  of customer trading results?
17    A    No, I did not.
18    Q    Why?
19    A    It was a bad decision on my part.
20    Q    Wasn't this important to you to know --
21  let me rephrase that.  Was it important to you
22  to know if customers made money trading with Long
23  Leaf?
24    A    Yes, it is.  And I probably was too

Page 50

1  trusting.
2    Q    Well, why didn't you seek verification
3  from Mr. Hansmann or Mr. Evans?
4    A    Like I said, I made a mistake.  I wish
5  I had done that, but I did not.
6          FURTHER EXAMINATION
7  BY MR. PATRICK:
8    Q    You said you met with Evans two times
9  prior to the acquisition?
10    A    I think it was two times, yes.
11    Q    When were those meetings that you had
12  with Mr. Evans?
13    A    One was in late October and one I think
14  was in November.
15    Q    And what did you talk about at those
16  meetings?
17    A    I talked about -- I talked to him
18  about his compliance record and, you know, what
19  is not in those documents, for example, the fact
20  that they have a clean NFA record.  And I have
21  the complaint log, you know, how do they handle
22  complaints, how do they -- you know, what do they
23  consider a complaint, just to make sure I understood
24  what the complaint log was.  Talked to him about

Page 51

1  the systems and the processes that they were
2  using.  I was unfamiliar with their system and
3  just understanding kind of what -- how it works,
4  where they get their leads from, how they -- you
5  know, those are -- all information pieces that we're
6  trying to get out of that were not easy as just some
7  document coming across the board.
8    Q    So you mentioned systems and processes.
9  What did you mean by systems and processes?
10    A    They had a CRM system called InsideSales,
11  which has a power dialer on it.  I've learned a lot
12  about it obviously since, but I had no knowledge
13  of that system and how it worked.  And then their
14  processes of what is their sales process, how did
15  they use their staff, how did they get trades out
16  the door, how did they get approvals in, you know,
17  those type of basic processes because they had
18  12 people.  They had openers and closers.  So the
19  opener's job was just to dial, dial, dial, dial,
20  dial.  And then the closers were once they got
21  through a certain step, it was kind of their final
22  process.  And just understanding why somebody's in
23  that role versus this role versus some other role.
24    Q    Okay.  So you said quite a bit there.

Page 52

1  Did you talk at all with Mr. Evans about sort
2  of the business model, in other words, the trading
3  model that he was employing?
4    A    Yeah, yeah, the trading model, yes.
5    Q    And you talked about that with
6  Mr. Evans at these meetings in October and November
7  of 2017?
8    A    Correct.
9    Q    And what did he tell you about the trading
10  model at that time?
11    A    The trading model, it was basically
12  putting on four short condors, iron condors, and
13  they'd do this only once a month so that everybody
14  would have four positions.  They would not be
15  correlated in that type of trade, that there's
16  not a lot to do other than sit and wait because
17  it's a time decay trade.  Represented that, you
18  know, you only need to win three out of four to
19  make money in a month, that they're all equally
20  weighted, that this way you had more time to run
21  the sales model versus just to sit there and trade,
22  trade, trade and that basically everybody -- all
23  the customers in that program basically had the
24  same trades on.

Page 53

1 It wasn't that everybody had different trades.
2 Then there was also a group of people that were
3 self-traders, which were -- they did whatever
4 they felt like doing and we just had to make sure
5 they weren't blowing through margin, things like
6 that.
7    Q    So for the four recommended trades,
8 did you ask Mr. Evans for any information about
9 the trades that he had been putting on month after
10 month so that you could get an idea about whether
11 or not this was a viable strategy?
12    A    I saw a few that he showed me of trades
13 that were profitable, but I didn't see every single
14 trade they put on.
15    Q    And when you say you saw them, what do you
16 mean by that, you saw them?
17    A    He showed me the trade, you know, the
18 trade recommendation that went out, you know.  Like
19 here's what it is, here's the four legs, here's how
20 much you collect.
21    Q    So he'd show you the actual document that
22 went out to clients?
23    A    Yeah, it was a trade recommendation sheet,
24 yeah.

Page 54

1    Q    And did you keep that sheet and then
2 kind of go back --
3    A    I took it -- he said I couldn't have
4 it permanently prior to the acquisition.  He said
5 the trade strategy was proprietary.
6    Q    Okay.  So you had no way to analyze
7 the trade to determine whether or not what he was
8 telling you about the entry and exit points or the
9 strikes or anything about the trade was actually
10 accurate?
11    A    No, not really.
12        FURTHER EXAMINATION
13 BY MR. BURDEN:
14    Q    Sorry, let me ask that a different
15 way.  It sounds like Mr. Evans showed you a handful
16 of trade recommendations and told you that those are
17 profitable for his clients, is that right?
18    A    Um-hmm.  Yes, I'm sorry.
19    Q    That's all right.  What did you do
20 to confirm that the trade recommendations were
21 in fact profitable for clients?
22    A    Well, I could remember what the
23 strikes were and you can kind of play back where
24 it was.  And as long as it ended -- if the option

Page 55

1 ended in the strike, inside the strikes, it would
2 be a profitable trade.  So it wasn't hard to confirm
3 that those trades would have made money.
4    Q    But did you go and confirm that
5 the strike price fell within the boundaries of
6 the trade?
7    A    Um-hmm, yes.
8    Q    And how did you do that?
9    A    You can look up historical pricing on the
10 CME in multiple places.
11    Q    So how were you able to do that if
12 Mr. Evans hung on to those recommendations?
13    A    I just -- you have to just remember what
14 the two strikes were.
15    Q    So you remembered?
16    A    Right.
17    Q    And then you went back to the office and
18 you checked, right?
19    A    Um-hmm.
20    Q    Yes?
21    A    Yes.
22        MS. WING:  We'll break you.
23 BY MR. BURDEN:
24    Q    How many recommendations did Mr. Evans

Page 56

1 show you?
2    A    Three or four.  I can't remember the
3 exact number.
4    Q    Did Mr. Evans show you any recommendations
5 that were not profitable?
6    A    No.
7    Q    Did you ask Mr. Evans to show you some
8 not profitable recommendations?
9    A    Well, I didn't know whether they were
10 profitable or not when he showed them to me.  He
11 said they were profitable trades -- or he showed me
12 trades.  He didn't say whether they were profitable
13 or not.  He just said this is the trade structure.
14    Q    Got it.
15    A    I'm sorry if I ever said that he --
16 I don't think he ever made a representation that
17 they were profitable or not profitable trades.
18 It was more about these are the trade -- more
19 about the style and the structure of the trade
20 than it was, hey, this is a profitable trade,
21 that's not.
22    Q    This is what it looks like when it goes
23 out the door?
24    A    Yeah.  And he represented that, you

Page 57

1 know, they don't win every trade, as we do now.
2 Well, we can't -- I would never make that
3 representation.
4    Q    Did Mr. Evans tell you how many trades
5 they win or lose?
6    A    Not that I know of.
7    Q    Did you ever ask Mr. Donelson how
8 many trades win or lose that Long Leaf Trading
9 recommends?
10       MS. WING:  He's Mr. Donelson.
11       MR. BURDEN:  I meant Mr. Evans.  Let me
12   do that again.  Thank you.
13    A    I'm not sure I understand the question.
14    Q    Did you ever ask Mr. Evans, well, how
15 many of your trade recommendations win, how many
16 lose?
17    A    Not in so many words, I guess.  I'm
18 weighing what I ask and what you're asking me.
19    Q    What did you ask him, how about that?
20    A    Okay.  I asked him, well, what's your
21 percentage winners.
22    Q    And what did Mr. Evans say?
23    A    And he said, you know, we're right
24 at the statistics that would tell you that you

Page 58

1 should be about 75 percent.
2    Q    And what --
3    A    And they play out over a period of
4 time.  They aren't month over month.  Any month
5 you could win all four, any month you could lose
6 all four, which given the statistics that they were
7 working with, yes, makes sense.
8    Q    What did that mean to you?  What did
9 you interpret that statement by Mr. Evans to mean?
10    A    Is that in the long run it would make
11 profits, but it may not be consistent month over
12 month in terms of making profits.
13    Q    Yeah, but I think your testimony was
14 that you asked Mr. Evans how many of your trades
15 that you recommend are winners.  That's what you
16 asked him, right?
17    A    I think that's what I said, yeah.
18    Q    And what did Mr. Evans say?
19    A    He says we hit the -- right about
20 at this statistical level, and we had talked
21 about before the CME study and the 76 percent.
22 So he was implying that it was 76 percent.  Did he
23 ever say that specifically, no.
24    Q    So you understood Mr. Evans' response

Page 59

1 to mean that 76.5 percent of the recommended trades
2 were winners, is that correct?
3    A    Correct, I implied it.
4    Q    Did you ask for corroboration of that?
5    A    I had asked him again for profitability
6 of customers.  He did not want to provide it to me.
7    Q    I still don't understand why you didn't
8 sort of insist upon it.
9    A    I made a mistake.  I was too naive.
10    Q    But why trust Mr. Evans?  Did you know
11 Mr. Evans from anywhere?
12    A    No, I did not.
13    Q    Did you know Mr. Hansmann from anywhere?
14    A    No.
15    Q    All right.  So I want to go back.
16 You said you had done some due diligence and that
17 you had looked for customer reviews online, is that
18 right?
19    A    Yeah.
20    Q    Where did you look, please.
21    A    Better Business Bureau.  There's always
22 Google reviews.
23    Q    Where else, please.
24    A    That's the two main places you would

Page 60

1 see reviews.
2    Q    Are those the two places you looked?
3    A    Yeah.
4    Q    Did you look anywhere else?
5    A    No.
6    Q    What did you see in terms of reviews?
7    A    Kind of -- on the Better Business
8 Bureau I don't think I saw anything at all.
9 On the Google reviews there was like one one-star
10 one that had no document -- nothing behind it, and
11 I recognized the name from what he gave me on the
12 complaint log where he had paid back this person X
13 amount of dollars.  I don't know, very unhappy with
14 the service or something like that.  His last name
15 was Patel.  And then the others were kind of a
16 mixed -- talked about service and things like that
17 but nothing glaring.
18    Q    So it sounds like you looked at
19 Better Business Bureau before you purchased Long
20 Leaf Trading and there was really nothing on there,
21 is that right?
22    A    As I remember, yes.
23    Q    All right.  And you looked at Google
24 and there was one really bad review from this person

Page 61

1  named Patel, correct?
2     A   I think that was his name, yeah.
3     Q   And the rest of the reviews that you saw
4  were mixed, is that right?
5     A   Um-hmm, right.
6     Q   And so mixed, I mean, to me mixed
7  means some good, some bad.  Is that what it means
8  to you?
9     A   They were -- I don't know that I would
10  characterize it that way.
11    Q   Okay.  What does that mean, mixed?
12    A   They were -- I'm trying to think of
13  the right words.  There were some that were kind
14  of I'm not real happy with it and some that I'm
15  kind of happy with it, but it was not -- it wasn't
16  like clear down here and clear up here.  It was
17  more kind of in the middle.  They were like two
18  or three stars.  They were noncommittal is the
19  best way I would think about saying them.  They
20  didn't really say one way or the other.
21    Q   Were there any really favorable reviews
22  on Google that you saw for Long Leaf Trading?
23    A   I think there was one.
24    Q   But most of the rest of them were two

Page 62

1  to three stars, correct?
2     A   Like two to four.  I mean, they were --
3     Q   Out of how many stars?
4     A   Out of five.  I'm sorry, yeah.  And
5  there were only I want to say six or seven at the
6  time, so it's hard to draw any inference on anything
7  with six or seven.
8     Q   So you couldn't really draw an
9  inference about whether customers were making money
10  from these reviews that you saw online, correct?
11    A   Correct.
12        (Whereupon CFTC Exhibit No. 58 was
13          marked for identification, MM.)
14    Q   All right.  I want to hand you what
15  I've marked as CFTC Exhibit 58.  And I'm going
16  to ask you when you're ready if you recognize this
17  document, Mr. Donelson.
18    A   Yes.
19    Q   All right.  So have you seen this document
20  before?
21    A   Yes.
22    Q   Where did you see it, please.
23    A   I created it, along with --
24    Q   Sorry, keep going.

Page 63

1     A   -- with her insight.
2        MR. BURDEN:  Let the record reflect
3  that Mr. Donelson is pointing towards Ms. Wing.
4        THE WITNESS:  Oh, I'm sorry.
5        MS. WING:  And I want to caution my
6  client about talking about any conversations
7  we had because it's attorney-client privilege.
8        MR. BURDEN:  Yes, I'm sure you've briefed
9  Mr. Donelson on attorney-client privilege.
10    Q   I don't think I'm going to invade that.
11  But, Mr. Donelson, if I do, you're going to take
12  your breath and then Ms. Wing will object on the
13  basis of attorney-client privilege.  And if you
14  choose to accept your counsel's advice and not
15  waive the privilege, we'll just move on to the
16  next question.
17    A   Okay.
18    Q   All right.  So I want to direct
19  your attention, if I could, please, to the bottom
20  of Exhibit 58.  You'll see it says Customer
21  Information.  Do you see?
22    A   Um-hmm.
23        MS. WING:  Yes?
24    A   Yes.

Page 64

1  BY MR. BURDEN:
2     Q   So it says, "Schedule of company's
3  12 largest customers in terms of sales thereto
4  and a description of sales thereto over a period
5  of 2 years."  Did you write that?
6     A   Yes.
7     Q   And then if you look, it says date
8  requested October 31, 2017 and then it says, "would
9  like to know types of trading."  Did you write all
10  that stuff?
11    A   Yes.
12    Q   All right.  So what does that mean?
13  What's going on there, please.
14    A   That is more of a question of are
15  they part of the program or are they part of --
16  are they self-traders.  For example, there are
17  people that basically just used it as an entry
18  vehicle and they traded on their own.
19    Q   Got it.  So looking at this due
20  diligence list, I will represent to you that the
21  file name for this in your production is Final Due
22  Diligence Checklist.  I don't know if that helps you
23  at all.  But where on this due diligence checklist
24  can I find a request for customer trading records,

Page 65

1  i.e., to confirm whether customers made money?
2     A    That would be sales series breakdown
3  or similar report.
4     Q    All right.  And that's the sixth item
5  under Customer Information?
6     A    Yes.
7     Q    All right.  Now, it says date requested
8  November 6, 2017, right?
9     A    Um-hmm.
10    Q    Yes?
11    A    Yes.
12    Q    All right.  And then it says right next
13 to that uploaded, is that right?
14    A    Correct.
15    Q    What does that mean?
16    A    That they said that they put
17 a file in Dropbox and that I pulled it down.
18 It doesn't -- does not say that it's the correct
19 file or the -- that it answers the question.  It's
20 just basically I'm keeping track of did they send
21 me something or did they not send me something.
22    Q    Well, did they send you the thing
23 you requested, which is by your interpretation of
24 Exhibit 58 customer trading records?

Page 66

1     A    No.
2     Q    Let's go, if we could, please, to this
3  item Intellectual Property, and it's closer to the
4  top of Exhibit 58.  Do you see that?
5     A    Yes.
6     Q    So what's going on here?  What's this
7  little list?
8     A    It gets into when you're buying
9  the business, you're also buying the intellectual
10 property and making sure that we have -- that he has
11 clear ownership of that intellectual property.
12    Q    All right.  So I want to direct your
13 attention --
14    A    Websites, trademarks.
15    Q    So I want to direct your attention,
16 please, to the item under intellectual property that
17 says description of important technical know-how.
18 Did you write that?
19    A    Yes.
20    Q    What does that means?
21    A    It could mean a myriad of things.
22 In this -- it's kind of a catchall to say is there
23 something other than what we've listed on here that
24 we need to know.

Page 67

1     Q    All right.  So what I want to get at here
2  is --
3     A    Like the trading, you know, trading
4  philosophy.  Those things could be part of that.
5  It could be if there's something about the way they
6  do phone calls.  It's meant to really deal with is
7  there something I need to know about that, do they
8  have the rights.
9     Q    Got it.  So what I want to get
10 at here is, you know, Long Leaf Trading, part
11 of their business is offering recommendations to
12 customers, correct?
13    A    Correct.
14    Q    In fact, that's probably the biggest
15 part of their business, correct?
16    A    Correct.
17    Q    So if you're taking over that business,
18 you've got to know how to do that, right?
19    A    Correct.
20    Q    And Long Leaf Trading does that
21 a certain way.  I think you described that your
22 understanding from talking to Tim Evans is that
23 they make these four-legged spread trades, is that
24 right?

Page 68

1     A    Correct.
2     Q    So how is that knowledge and
3  information going to be passed on to you in this
4  acquisition?  How are you going to learn Long Leaf
5  Trading's secret sauce?
6     A    It will be -- that's part of what
7  the transition services agreement is, is that
8  after the fact he would -- you know, once you close
9  the deal he stays on for a period of time to make
10 me comfortable with how to develop the trade, how
11 do they set the trade up, those type of things.
12    Q    Got it.  So developing trades, setting
13 them up, where can I find that on the due diligence
14 list?  And maybe it's not here.
15    A    Well, that's technical know-how.
16    Q    Got it.
17    A    That's the type of thing you would
18 say, well, how do you -- two things.  One is what
19 know-how and that do I need to have to run the
20 business and, two, how do you protect it and, three,
21 where is it resident.
22    Q    So let's talk about that technical
23 know-how.  Where is it resident or where was it when
24 you acquired Long Leaf Trading?

Page 69

1    A    It was resident in the owner himself,
2  Tim Evans.
3    Q    So is there any document where this
4  technical know-how was written down for you?
5    A    No.  There is no written documentation
6  other than he had five books, ebooks that outline
7  option trading strategies and everything else, you
8  know, and does specifically talk about the iron
9  condor and that trade.  The know-how is knowing
10  where to place it, when to place it.  That's the
11  secret sauce, not -- anybody can develop an iron
12  condor.  It's you put these two legs on, you put
13  those two legs on and you've got an answer.  But
14  trading is always about putting it on at the right
15  time at the right place.
16    Q    So the ebooks that you described,
17  those were PDFs that Mr. Evans made available to
18  the public, correct?
19    A    Correct.
20    Q    So that's not the secret sauce, is it?
21    A    No, it's basic education.
22    Q    Got it.  So the secret sauce, the
23  knowing how and when to place the trade, that
24  was something that Mr. Evans was going to impart

Page 70

1  to you sort of person to person, is it fair to say?
2    A    Correct.
3    Q    And we'll get into that.  So one
4  more item on Exhibit 58.  Let's look, if we could,
5  please, at material contracts.  We see there's a
6  foreign IB agreement line item here.  What's that,
7  please.
8    A    That is with CMC Markets, where one
9  of their clients they introduce to CMC Markets,
10  which is a contract for difference dealer in London,
11  and there's a specific agreement.  They're not -- he
12  was not involved with the trading.  It was basically
13  this firm in Jordan opened an account with this firm
14  in London and he introduced the firm in Jordan to
15  them so, therefore, he's getting a residual
16  commission from it.
17    Q    Got it.
18    A    And there's a full agreement of it.
19    Q    And what's the name of that Jordanian
20  firm, please.
21    A    It had multiple names.  It's First
22  Investment Corp.  I'd have to check for sure what
23  the name of it was.
24    Q    All right.  Were there any other customers

Page 71

1  you're aware of that Mr. Evans or Long Leaf Trading
2  introduced to CMC Markets?
3    A    There were no other clients.
4    Q    So this First Investment Corp, are
5  they sort of prop traders or do they trade for or
6  on behalf of many other clients?
7    A    They trade -- my understanding,
8  because they left almost immediately after
9  I bought the firm, was that they were funds.
10  So they were actually trading on customers' behalf
11  but not directly for a customer or like a fund.
12  You own part of the fund.
13    Q    Got it.  And did you get any commissions
14  from this IB relationship between Long Leaf Trading
15  and CMC Markets?
16    A    Maybe two months' worth.
17    Q    I'm sure I just asked this, but
18  First Investment Corp, are they the only client
19  that was introduced to CMC Markets by Long Leaf
20  Trading?
21    A    Yes.
22    Q    I did ask you that.  All right.
23        MR. PATRICK:  Roughly how much did you
24    receive in commissions in those two months

Page 72

1    from CMC?
2        THE WITNESS:  I would say somewhere in
3    the neighborhood of 50,000.
4  BY MR. BURDEN:
5    Q    So where does that come in from?
6  If we wanted to look at it in bank statements,
7  where would it be?
8    A    It would be -- it's actually a wire
9  from CMC Markets.
10    Q    Got it.
11    A    When MiFID II came in, they severed the
12  relationship.
13    Q    Sorry.  What was that bit?
14    A    When MiFID II came in, they severed
15  the relationship.  Our customer told me they
16  didn't want to be part of that deal, so we got
17  cut out of it.
18    Q    What's MiFID II?
19    A    I don't know what MiFID stands --
20  it's the new rulings that came in in early 2018 in
21  Europe related to outlining commissions and things
22  like that.
23    Q    Got it.
24    A    I can't remember.  It's minister

Page 73

1 of something, financial instruments derivatives
2 I think.
3        (Whereupon CFTC Exhibit No. 59 was
4             marked for identification, MM.)
5    Q   All right.  Mr. Donelson, I want to hand
6 you what I've marked as CFTC Exhibit 59.  Do you
7 recognize this document?
8    A   Yes.
9    Q   Can you tell me what it is, please.
10   A   It's a list of customers.
11   Q   All right.  And is this a document that
12 you received in connection with the acquisition?
13   A   Yes.
14   Q   And who did you receive it from?
15   A   Dennis Hansmann.
16   Q   All right.  So what are we looking at
17 here?  It's a little spreadsheet.  We see Account,
18 Geography, Individual, IRA, LTD Commissions, Account
19 Type.  Walk me through this quickly, if you would,
20 please.
21   A   Well, the first one you see here is what
22 I was just describing to you.
23   Q   The CMC contract --
24   A   CMC Markets, right.

Page 74

1    Q    -- for difference?
2    A    And the others are just account
3 numbers and telling me whether they're, you know,
4 are they U.S. or international, kind of what the
5 life-to-date commissions are and kind of what type
6 of account are they, are they electronic.  When
7 they say electronic, what they're talking about
8 is somebody who's trading directly --
9    Q   Got it.
10   A    -- on their own.  Broker assisted would
11 be what we would term in our program.
12   Q   The Time Means Money program you mean?
13   A   Correct.
14   Q   So is this saying that Long Leaf
15 Trading, at least during Mr. Evans' tenure, received
16 $264,299.28 in commissions from CMC?
17   A   Correct.
18   Q    So what are these other accounts that
19 are listed in Exhibit 59?
20   A   Well, I know what the first one is,
21 is somebody who trades on their own.
22   Q   Well, like why did you receive this?
23 Like this isn't all of Long Leaf Trading's accounts,
24 is it?

Page 75

1    A   I think it relates to one of the 12 largest
2 customers.
3    Q   Okay.
4    A   The first question on the customer
5 information request.
6    Q   Got it.  So you're looking at Exhibit 58.
7 And in your due diligence list you requested sales
8 records for the 12 largest customers, correct?
9    A   Um-hmm, correct.
10   Q   All right.  So Exhibit 59 is you getting
11 that, correct?
12   A   Correct.
13   Q   And so Exhibit 59 shows the commissions
14 that Long Leaf Trading received from the 12 largest
15 customers?
16   A   Correct.
17   Q   All right.  And it looks like two
18 of those large customers, they trade on their
19 own.  They don't use the Time Means Money program,
20 correct?
21   A   Correct.
22   Q    But the ones that are broker assisted,
23 they do use the Time Means Money program, correct?
24   A   Correct.

Page 76

1    Q   So it looks like one of these guys paid
2 75 grand in commissions, is that right?
3    A   Um-hmm, yes.
4    Q   Another one 72 grand, is that right?
5    A   Yes.
6        (Whereupon CFTC Exhibit No. 60 was
7             marked for identification, MM.)
8    Q   All right.  Mr. Donelson, I want to
9 hand you what I've marked as CFTC Exhibit 60, and
10 I'll ask you if you've had a chance to -- or once
11 you've had a chance to review the document, if you
12 recognize it.
13   A   Yes.
14   Q   All right.  Can you tell me what this
15 document is, please.
16   A   This is a question I had of the -- what do
17 they charge, where do all the fees go, basically how
18 the revenues are being created.
19   Q   So what I want to ask about here is this
20 business with Kingsview.  Who is Kingsview?
21   A   Kingsview is the one that licensed
22 Time Means Money through, and Kingsview would then
23 provide dead leads as part of that.
24   Q   So I get dead leads.  I don't get

Page 77

1  licensed Time Means Money.  Could you expound on
2  that for me, please.
3     A   It predates me so I will tell you what
4  I know, but I don't --
5     Q   Got it.
6     A   I was not part of the conversation,
7  is that Kingsview basically came up with the concept
8  of Time Means Money, and Mr. Evans licensed it
9  from them.  And the way the licensing was paid
10  was through this dead lead process, that this was
11  how they paid for the licensing of the name, the
12  trademark.  I think it's in one of the documents
13  I provided you, was the actual original agreement
14  between Kingsview and Long Leaf Trading.
15     Q   Did you continue to pay Kingsview during
16  your tenure at Long Leaf Trading?
17     A   For a period of time until June of
18  2018 when I severed the relationship and bought
19  the trademark from them.
20     Q   So you severed the relationship by just
21  buying the trademark, right?
22     A   Correct.
23        MS. WING:  Would now be a good time
24  to take a break?

Page 78

1        MR. BURDEN:  Yeah, sure, we can take
2  a break.  So, Ms. Wing, we have an economist
3  contractor who would like to sit in to see
4  testimony.  His name is Matt Edelstein.  He's
5  not currently staff on this case.  He might
6  be in the future just because anybody might
7  be, but he's not on the formal order of
8  investigation.  He just wants to see testimony.
9  Do you object to him coming in and watching?
10  He won't be asking questions.
11        MS. WING:  As long as he won't be asking
12  questions.
13        MR. BURDEN:  He will not be asking
14  questions.
15        MS. WING:  We're not prepared for
16  an economist.
17        MR. BURDEN:  No, no, no.  So off the
18  record then, if we could, please.
19           (Whereupon a recess was taken from
20             10:40 a.m., to 11 a.m., after which
21             the following proceedings were had:)
22        MR. BURDEN:  All right.  We're back on
23  the record.  I want the record to reflect that
24  neither I, nor any of the other CFTC personnel

Page 79

1     present had any substantive conversations with
2  the witness or his counsel, isn't that right?
3        THE WITNESS:  Correct.
4        MS. WING:  Yes, so stipulated.
5  BY MR. BURDEN:
6     Q   All right.  I want to just go back to
7  one thing before we move on to our next exhibit.
8  Mr. Donelson, I think you talked about a complaint
9  log that you received or reviewed in connection
10  with the acquisition of Long Leaf Trading?
11     A   Yes.
12     Q   Would you tell me about that, please.
13     A   It basically laid out complaints by
14  specific customers, the date they complained, any
15  resolution of it.  It was standard what you would
16  do, what I continue to do.
17     Q   And who showed this to you?
18     A   That was provided by Mr. Hansmann, but
19  obviously it was Mr. Evans.
20     Q   Mr. Evans who did what?
21     A   It was his complaint log.
22     Q   Got it.  And when did you review the
23  complaint log?
24     A   Soon after I received it.  By mid November

Page 80

1  probably.
2     Q   Of 2017?
3     A   Um-hmm.
4     Q   Yes?
5     A   Yes, sorry.  I'll get that down by the
6  end of the day.
7     Q   You will.  And how many complaints were
8  on this complaint log?
9     A   I want to say seven or eight.
10     Q   And do you remember the names of any
11  of the customers?
12     A   One was Patel, Harish Patel.
13     Q   What did Mr. Patel complain about on this
14  log?
15     A   He was complaining about sales tactics
16  and -- from Mr. Jeremy Ruth.  I think he settled for
17  some amount of money.  I want to say around $5,000.
18  There was another one, Okey Oteh or something.
19  It was like O-t-e-h O-t-e-y.  I think he settled
20  for a small amount of funds, complained also about
21  Mr. Ruth.
22     Q   So the other complainants, do you remember
23  any of their names on this log?
24     A   Those were two of the most recent ones.

Page 81

1  Q   Do you remember any of the other names?
2  A   No, I do not.
3  Q   What did the other people on the log
4 complain about?
5  A   I think it was very similar complaints
6 about sales tactics or entering trades.  I don't
7 remember any of them being -- having any settlement
8 filed with them.
9  Q   So you said these customers, the
10 log reflects the customers complaining about sales
11 tactics, is that correct?
12  A   Correct.
13  Q   So what does that mean, sales tactics?
14 Like what do you remember about the log?  What did
15 it reflect about these sales tactics?
16  A   It was kind of nondescript.  I don't
17 have any personal knowledge of what the sales
18 tactics were, so all I have is what the log said.
19  Q   What did the log say?
20  A   I couldn't repeat it verbatim.
21 It was generally that there were aggressive sales
22 tactics.  That was kind of as far as what was put
23 onto the document itself.
24  Q   Did the log accuse Long Leaf Trading

Page 82

1 sales personnel of misrepresentations?
2  A   I don't remember that it did, but
3 I would have to review the document.  You have
4 the document that was provided with the information
5 I requested.
6  Q   Were you allowed to keep this complaint
7 log?
8  A   Yes.
9  Q   Was it in the documents that were
10 produced to us?  I didn't see it and I looked pretty
11 carefully, but I've been known to miss things.
12  A   If it wasn't, it should have been and
13 I do have it.
14  Q   Okay.  Me and Ms. Wing can talk offline
15 about it.
16  A   I thought we provided it.
17  Q   Yeah, you very well could have.  Did you
18 talk to Mr. Evans about the complaint log?
19  A   Yes, I did.
20  Q   And what did you say to Mr. Evans about
21 that complaint log?
22  A   One thing I noticed was that Mr. Ruth
23 was on there multiple times, and he had told me
24 that he had just let him go.

Page 83

1  Q   All right.  And were all of the complaints
2 about Mr. Ruth?
3  A   I don't think they were.  Some of them
4 might have even predated him being there.
5  Q   All right.
6  A   It's a cumulative list of everything.
7  Q   What else did you say to Mr. Evans about
8 the complaint log?
9  A   Just how he handled those two that he
10 settled, you know, why did you settle, what is it --
11 you know, how do you go about doing those things.
12  Q   What did Mr. Evans tell you in response?
13  A   Well, he said that, you know, he was the
14 chief compliance officer so he would investigate all
15 the -- if a customer called him with a complaint,
16 he would investigate what went on and he would make
17 a determination of is there some fault there, is
18 there something.  But typically it's -- everything
19 would -- the way he represented it, by the letter
20 of the law, no, there's nothing there.  But the
21 fact is is there can be kind of a nuisance aspect
22 of this that says, look, it's easier to just settle
23 it sometimes than to draw it out forever.
24  Q   Did Mr. Evans tell you that there was

Page 84

1 a nuisance aspect to these complaints?
2  A   I don't think he used that word,
3 no.  I think that was me interjecting a word.
4 He basically explained, you know, at some point
5 if they're going to go, you know, what's the least-
6 cost action you can take because they could take
7 it to court, they could take it to the NFA and then
8 you start running up legal bills.  And at some point
9 what is it that you're settling for versus what
10 could it cost.  Just a simple business decision.
11  Q   The customers on the trading log,
12 did they complain about losses in their accounts?
13  A   On which trading log?
14  Q   The complaint log, sorry.  Let me
15 rephrase that.  Did the complaint log reflect
16 customer complaints about losses in their accounts?
17  A   The one for Mr. Patel did, but he
18 was confusing two different accounts.  I remember
19 that specifically.  He had a Gain account where he
20 was trading forex and he had a Long Leaf Trading
21 account and he was losing money in his forex
22 account, which they had nothing to do with.
23  Q   What about the other complaints on
24 the log, did they mention trading losses at all?

Page 85

1    A    They might have.  I don't really remember
2  exactly what they said.
3          (WhereuponCFTC Exhibit No. 61 was
4            marked for identification, MM.)
5    Q    All right.  So this might be easier.
6  Mr. Donelson, I want to hand you what I've marked
7  as CFTC Exhibit 61.
8       MS. WING:  So I don't think we need
9    a talk afterwards.
10      MR. BURDEN:  You know, this was not
11    produced -- this document, if you could see
12    from the date, was not produced in connection
13    with like the acquisition-related production,
14    but it might just be the same thing and that
15    would obviate the need to talk about it.
16    Q    So, Mr. Donelson, do you recognize CFTC
17  Exhibit 61?
18    A    Yes, I do.
19    Q    Can you tell me what it is, please.
20    A    It is the complaint log.
21    Q    And is this the same complaint log that
22  was provided to you by Mr. Evans in late 2017 in
23  connection with the Long Leaf Trading acquisition?
24    A    Yes.

Page 86

1          (WhereuponCFTC Exhibit No. 62 was
2            marked for identification, MM.)
3    Q    Mr. Donelson, you can put that one aside,
4  if you would, please, and I want to hand you what
5  I've marked as CFTC Exhibit 62.
6    A    Okay.
7    Q    Do you recognize this document?
8    A    Yes, I do.
9    Q    Can you tell me what it is, please.
10    A    It is the stock purchase agreement of the
11  firm.
12    Q    And this is the final and executed
13  agreements, is that correct?
14    A    Let me check.  Yes.
15    Q    All right.  So I want you to take
16  a look, if you would, please, at Article 3.10
17  titled Access and Investigation.  It's on page 10.
18  Are you with me?
19    A    Yes.
20    Q    All right.  So it says here,
21  "Purchaser acknowledges that it is relying on
22  its own independent investigation and analysis in
23  entering into the transaction contemplated hereby.
24  Purchaser is knowledgeable about the industries

Page 87

1  in which the Corporation operates and is capable of
2  evaluating the merits and risks of the transactions
3  contemplated by this Agreement and is able to bear
4  the substantial economic risk of such investment
5  for an indefinite period of time.  Purchaser has
6  been afforded full access to the books and records,
7  facilities and personnel of the Corporation for
8  purposes of conducting a due diligence investigation
9  and has conducted a full due diligence investigation
10  of the Corporation."  Did I read that correctly?
11    A    Yes.
12    Q    All right.  And so you signed
13  this agreement that we see in Exhibit 62, right?
14    A    Correct.
15    Q    So Article 3.10, is all that right?
16  Is all that true?
17       MS. WING:  I'm going to object because
18    I believe it calls for a legal conclusion.
19  BY MR. BURDEN:
20    Q    All right.  Answer the question, please,
21  Mr. Donelson.
22    A    I don't know what the question is.
23    Q    Well, did you do all of the things
24  in Article 3.10?  Are you knowledgeable about the

Page 88

1  industries in which Long Leaf Trading operates?
2    A    Yes.
3    Q    Were you afforded full access to the
4  books and records, facilities and personnel of Long
5  Leaf Trading?
6    A    For this purpose, yes.
7    Q    What do you mean, for this purpose?
8    A    I acknowledge that I did.
9    Q    Well, is that true?  Is the thing that
10  you acknowledged correct?
11    A    There are also representations about
12  what's being made in here that have impact on this
13  statement, so there's representations made by them.
14  There are also warranties and representations that
15  they make.
16    Q    Got it.  But what I'm asking --
17    A    For this purpose, this is basically
18  saying I can't go back to them and say you didn't
19  tell me about this or you didn't represent something
20  about this.  This is not saying that it's done.
21  I'm confused as to what the statement is.
22    Q    Well, paragraph 3.10 or Article 3.10
23  says -- it represents that the purchaser, which
24  is you, has been afforded full access to the books

Page 89

1 and records, facilities and personnel of Long Leaf
2 Trading for purposes of conducting a due diligence
3 investigation and has conducted a full due diligence
4 investigation of the corporation, which is Long Leaf
5 Trading. That's what 3.10 says, right?
6    A   Right.
7    Q   Is that correct? Did that happen?
8    A   In my estimate, yes. That's why
9 I signed it. So the remainder of that says
10 purchaser acknowledges and agrees that the seller's
11 only making the representation and warranties
12 contained in Article II of this agreement, and
13 they are expressly made. So if they made a
14 representation in this document, that plays into
15 this.
16    Q   It says here, "Purchaser
17 acknowledges and agrees that Seller is only
18 making the representations and warranties contained
19 in Article II of this Agreement," is that right?
20    A   Correct.
21    Q   And it goes further and says you are
22 not relying on any other representations. Is that
23 a fair summary of the rest of 3.10?
24    A   Correct.

Page 90

1    Q   Are there any representations in
2 Exhibit 62, in the stock purchase agreement by the
3 seller about the profitability of customer trading,
4 whether customers make or lose money?
5    A   They don't make that express
6 representation, no.
7    Q   Do they make any implicit representations
8 to that effect in your mind?
9    A   The first two would be implicit.
10    Q   Where is that?
11    A   2.7.1 and 2.7.2.
12    Q   And what does 2.7.1 say?
13    A   "Any material adverse change in the
14 business, financial condition, operations, or assets
15 or liabilities of the Corporation."
16    Q   And what about 2.7.2?
17    A   "Any damage, destruction, loss, or
18 claim or threatened claim or lien (whether covered
19 by insurance or not) materially adversely affecting
20 the properties or business of the Corporation or
21 any of Seller's licenses."
22    Q   And it's your testimony that you understood
23 2.7.1 and 2.7.2 to warrant that customer trading was
24 profitable at Long Leaf?

Page 91

1    A   No.
2    Q   So why did you tell me that? Why is that
3 important, 2.7.1 and 2.7.2?
4    A   It would have to do with if there were
5 claims after the fact.
6    Q   Got it. So 2.7.1 and 2.7.2 in your
7 mind warrant that there were no outstanding claims
8 by customers, is that correct?
9    A   Correct.
10    Q   Do they warrant to you that customer
11 trading at Long Leaf is profitable?
12    A   No.
13    Q   All right. I want to turn again, if we
14 could, please, to 3.10 where we were before. And in
15 the first sentence of 3.10, Access and Investigation
16 it says, "Purchaser acknowledges that it is relying
17 on its own independent investigation and analysis in
18 entering into the transaction contemplated hereby."
19       What independent investigation
20 and analysis did you conduct with respect to whether
21 Long Leaf Trading's clients made or lost money?
22    A   I think I've already testified to what
23 I looked at.
24    Q   Tell me again, if you would, please.

Page 92

1    A   We asked for the top clients. We
2 asked for -- I mean, I asked for how long they
3 had been with the firm. I had done some analysis
4 of any complaints, the complaint log and also the
5 external complaints.
6    Q   And by that you mean online reviews,
7 correct?
8    A   Right.
9    Q   What else?
10    A   I don't know what else.
11    Q   Was there anything else?
12    A   Not that I know of.
13    Q   Did you ever see any customer profit
14 or loss statements?
15    A   No, I did not.
16       MR. BURDEN: Have you got any questions
17 about the acquisition or shall we proceed?
18       MR. PATRICK: Proceed.
19 BY MR. BURDEN:
20    Q   All right. So, Mr. Donelson, I think
21 you testified before that you purchased Long Leaf
22 Trading in December of '17, is that right?
23    A   Correct.
24       MR. BURDEN: Let the record reflect

Page 93

1 that we're being joined by Mr. Edelstein here
2 with the very gracious permission of Ms. Wing
3 and Mr. Donelson. Mr. Edelstein is a contractor
4 for the CFTC.
5 Q So when did you take over at Long Leaf
6 Trading, Mr. Donelson?
7 A I fully took over at the end of
8 January. That's what the transition services
9 agreement -- Mr. Evans and I worked together to
10 transition the business for the first two months.
11 Obviously I bought the business on December 1st.
12 So, therefore, I was in charge of it but a lot of
13 things I still had to learn about the specifics of
14 what was going on.
15 Q All right. So December 1, 2019 you sort
16 of started --
17 A 2017.
18 Q Sorry. So --
19 MS. STREIT: 2018?
20 THE WITNESS: 2017.
21 BY MR. BURDEN:
22 Q So December of 2017 you started at
23 Long Leaf Trading in what capacity, Mr. Donelson?
24 A As the CEO.

Page 94

1 Q But Mr. Evans at that point was still
2 at Long Leaf, correct?
3 A Correct.
4 Q Sort of showing you the ropes, correct?
5 A Correct.
6 Q And he transitioned out by February
7 of 2018, is that right?
8 A Correct.
9 Q Leaving you sort of alone to manage
10 the company, correct?
11 A Correct.
12 Q All right.
13 A And I would talk to him off and on after
14 that, but it wasn't a day-to-day thing.
15 Q Got it. What percentage of Long Leaf
16 Trading's customers when you started were broker-
17 directed customers?
18 A It's a hard question because there's
19 a difference between -- there's a whole bunch of
20 inactive accounts that I'm not sure what they were
21 for, but I would say probably 70 to 80 percent were
22 broker assisted.
23 Q So the broker assisted -- just so we're
24 on the same page, all broker-assisted accounts are

Page 95

1 accounts that are being traded under this Time Means
2 Money program, correct?
3 A At the time, yes.
4 Q So if 70 to 80 percent of the active
5 accounts were Time Means Money accounts, then 30
6 to 20 percent of the accounts were self-directed,
7 correct?
8 A Self-directed, correct.
9 Q And those figures are active accounts
10 when you started, right?
11 A Yeah, I would --
12 Q So how did that --
13 A I don't know the exact number, but that's
14 a good guess.
15 Q Got it. So how did that change over
16 time? Did it change over time is what I really
17 should ask.
18 A We don't -- we never went after
19 self-directed traders. I don't know how Mr. Evans
20 got the ones that he had, but effectively that was
21 not something we actually tried to bring on. So
22 for the most part the number of active self-traders
23 stayed about the same. There were about five or six
24 people that traded actively, and there were a whole

Page 96

1 bunch of people that had accounts that told us they
2 were going to do something but never did anything.
3 And then the self-trading, you know, people we were
4 bringing on were in the broker-assisted program.
5 Q So it sounds like from December of
6 2017 really through the present, 70 to 80 percent of
7 Long Leaf's customers are in this Time Means Money
8 program, is that right?
9 A No. To the present we have no
10 self-directed traders. So we became a guaranteed
11 IB. We had relationships with both Gain and
12 Cunningham. We gave up the Gain relationship and
13 went to Cunningham.
14 MS. WING: And I don't think you
15 heard his question. He said -- repeat
16 about the Time Means Money. They're not --
17 currently are you trading Time Means Money?
18 THE WITNESS: No.
19 BY MR. BURDEN:
20 Q All right. What I want to get at is it
21 sounds like over time the broker-assisted traders
22 constituted sort of a larger portion of Long Leaf's
23 customer base, is that right?
24 A Correct.

Page 97

1   Q   To a point where it was really
2  100 percent because there were no more self-directed
3  traders after that move to Cunningham, is that
4  right?
5   A   No, after the move when we became
6  a guaranteed introducing broker.  We moved to
7  Cunningham -- we moved the broker-assisted program
8  to Cunningham in August of 2018 but kept all the
9  self-trading at Gain.  And when we became
10  guaranteed, then we just removed -- we walked away
11  from the business at Gain.
12   Q   And I should know this off the top of
13  my head, but I don't.  When did Long Leaf become
14  a guaranteed broker, please.
15   A   In March of 2019.
16   Q   So between December of 2017 when
17  you started and March of 2019 the percentage of
18  broker-assisted customers at Long Leaf increased,
19  is that correct?
20   A   Yes.
21   Q   From 70 to 80 percent when you started
22  to what percent in March of 2019?
23   A   Probably like 85 percent.
24   Q   And then after March of 2019 it was

Page 98

1  100 percent broker assisted, right?
2   A   Correct.
3   Q   All right.  And during the period
4  of December of 2017 through March of 2019, broker-
5  assisted customers were customers who traded in this
6  Time Means Money program, is that correct?
7   A   We effectively stopped using the
8  Time Means Money program in February, probably
9  February 1st of 2018.
10   Q   All right.  And what was it replaced with?
11   A   It was replaced with a program of option
12  trading but not -- not the short condors, not those
13  type of trades.  They were much more a variant of
14  trades to really reflect market conditions.  Scott
15  Gecas, who was my chief market strategist, has a
16  wealth of knowledge about option trading and things
17  like that.  So we developed newer, different trades
18  but they're very well known within the industry.
19  They're nothing completely esoteric.
20   Q   So was there a name for this new trading
21  program?  So no more Time Means Money.  What's the
22  new thing?
23   A   We really didn't give it a new name.
24  A lot of the concepts of the Time Means Money,

Page 99

1  time decay, making profits off time decay were
2  similar.  However, the trade itself was completely
3  different.
4   Q   Now, is it fair to say that the Time
5  Means Money logo and trademark continued to appear
6  in Long Leaf Trading promotional materials after
7  February of 2018?
8   A   It probably did, yeah.  We've removed
9  most of it from our website now.  We don't really
10  have it out there at all.
11   Q   Why?
12   A   It's not a good -- it doesn't have
13  any economic value from a business perspective.
14  If it was some trademark that made people say,
15  oh, yeah, that's something.  It doesn't really have
16  any business value in the way I think about it.
17   Q   Got it.  So during your tenure at
18  Long Leaf Trading -- which continues through this
19  day, correct?
20   A   Correct.
21   Q    -- who are your customers?  Are they
22  persons in retirement?  Are they young persons?  Is
23  it possible for you to generalize?
24   A   They tend to be people in retirement

Page 100

1  or very close to retirement.  We have changed
2  a lot of our acceptance criteria from where it
3  was prior to Mr. Evans -- you know, when Mr. Evans
4  owned it to mine.  We state we don't want your
5  entire investment portfolio.  We don't want it.
6  This is only appropriate for 10 to 20 percent at
7  best and that this is an alternate to what you're
8  trading.  So we are looking for really more high
9  net worth people that can really take on the
10  risk of this type of trade.  The issue we've had
11  with some of the complaints we've had after from
12  clients that were brought in, they gave them their
13  entire savings.  I think that's just completely
14  inappropriate.  This is not what that should be
15  used for.
16   Q   So when did you impose this restriction
17  that customers can only --
18   A   That was very earlier on.  That was
19  before we even got out of Time Means Money, is that
20  we were looking for clients that this is a portion
21  of their portfolio, not their entire portfolio.
22   Q   We've got to be careful not to talk over
23  each other.
24   A   I'm sorry.

Page 101

1    Q    Remember, if you would, please.
2 Thanks. All right. During your tenure at Long
3 Leaf Trading, what percentage of the firm's accounts
4 were people's IRAs, either the entire IRA or part
5 of an IRA?
6    A    Maybe 30 percent, 40 percent of
7 the clients. I am not a big believer of using
8 the IRA. Just you lose some of the tax advantages
9 of the trade.
10    Q    I think you testified that Long Leaf
11 Trading's customers were primarily people at or
12 close to retirement, is that fair?
13    A    Yes.
14    Q    Was this a group that Long Leaf Trading
15 sort of -- targeted sounds bad, but sold to more
16 than other groups?
17    A    I think it also has just something to do
18 with the lead set that we had. My understanding,
19 and this is before my time also, was that these were
20 people who had signed up for an options education
21 program. So it isn't -- we really don't have
22 demographics on the names of the people in our
23 firm or in our lead list. We have a phone number.
24 We have their email address. We do not have age or

Page 102

1 anything like that. So it's more self-fulfilling
2 in the sense of if that's the group of people that
3 had signed up on these websites, then guess what,
4 this is the group of people we're going to be
5 targeting. We are working on a different marketing
6 obviously than this lead set because it's an old
7 lead set.
8    Q    And did you use this lead set throughout
9 your tenure at Long Leaf?
10    A    Yes.
11    Q    And this lead set was primarily
12 comprised of people who were retired or near
13 retirement, is that right?
14    A    That's what it would appear to be,
15 given when we contact people, that tends to be the
16 demographic of the people we contact.
17    Q    And I think you testified that you have
18 tried to sort of pitch to high net worth customers,
19 is that right?
20    A    Um-hmm.
21    Q    Yes?
22    A    Yes.
23    Q    When did that start, please.
24    A    Pretty early on.

Page 103

1    Q    When was that?
2    A    Probably March-April we talked about
3 how we could look for those people that are high
4 net worth that have some knowledge of the markets.
5 You're looking for a knowledgeable investor.
6    Q    And that's March or April of '18, correct?
7    A    Of '18, yes.
8    Q    And how did you implement that?
9    A    It was really in kind of what they
10 were -- you know, one of the things we do in
11 our demo or in our -- is get some idea what their
12 portfolio is, you know, is this -- this is all they
13 have or is this, you know, a part of a whole bunch
14 of investments. So it helps us with that and then
15 basically work on those probably more diligently
16 than other leads.
17    Q    So you didn't do anything in particular
18 to sort of pitch to high net worth people. You just
19 maybe focused more on the high net worth individuals
20 that were in your existing lead set, correct?
21    A    Correct.
22    Q    And you continued -- Long Leaf Trading
23 continued to pitch to not high net worth individuals
24 as well, correct?

Page 104

1    A    We wouldn't know the difference until we
2 actually talked to them.
3    Q    But for the people that turned out not
4 to be high net worth individuals --
5    A    You would still pitch to them, yes.
6    Q    So what's high net worth to you?
7 I mean, can you generalize about the, you know,
8 the level of income or savings of your average
9 client?
10    A    Our largest client's worth 5 to $6 million.
11    Q    How about the average client, though?
12    A    The average client, probably half
13 a million.
14    Q    Is it fair to characterize Long Leaf
15 Trading's clients as retail clients?
16    A    Yes.
17    Q    Did most Long Leaf Trading customers
18 have -- or I should ask what percentage of Long Leaf
19 Trading's customers had prior investment experience?
20    A    Say close to 100 percent.
21    Q    What percentage of Long Leaf Trading's
22 clients had experience trading options?
23    A    Probably more in the realm of 60 to
24 70 percent. Most of them had some option trading

Page 105

1  experience.
2       MS. WING:  And just for the record,
3  I'll put on an objection for speculation
4  on the percentages.
5       MR. BURDEN:  Yeah.  I mean, we understand
6  that Mr. Donelson is estimating.
7    Q   So I want to switch gears and talk
8  about, if I could, please, Long Leaf Trading's
9  recommendations to customers while you were in
10 charge at Long Leaf.  I want to ask some general
11 questions, and then we'll look at some specific
12 recommendations and you can help us to understand
13 what they say.
14   A   Okay.
15   Q   So I think you testified that when you
16 took over at Long Leaf, Long Leaf was recommending
17 a certain kind of trade to customers, is that right?
18   A   Correct.
19   Q   What kind of trade is that?
20   A   It is a short iron condor.
21   Q   Is it fair to characterize that as
22 a credit spread?
23   A   Correct.
24   Q   All right.  Did you continue when

Page 106

1  you were head of Long Leaf Trading to recommend
2  credit spreads to customers?
3    A   We only did it once.
4    Q   And when was that, please.
5    A   In January.
6    Q   Of?
7    A   Of 2018.
8    Q   So really your first trade that
9  you recommended to customers at Long Leaf was
10 a credit spread and then after that no more credit
11 spreads, correct?
12   A   Correct.
13   Q   All right.  So what did you change to from
14 these credit spreads?
15   A   We would do a series of trades.
16 We would do broken wing butterflies.  We would
17 do volatility swaps.  Sometimes we would just do
18 a long condor, but the key was we went to a debit
19 versus a credit spread.  All of our trades going
20 forward were debits, not credits.
21   Q   And I feel like you just testified
22 to this, so forgive me for asking it again.  But
23 were all of the trades that you recommended at Long
24 Leaf Trading spread trades?

Page 107

1    A   Yes.
2    Q   And is it fair to characterize
3  all of these spreads as out-of-the-money spreads?
4    A   Yes.
5    Q   So why --
6    A   Well --
7    Q   I'm sorry.
8    A   No, there are some that are -- step
9  back here.  I'm confused as to what you mean by
10 out-of-the-money or in-the-money spreads because
11 there are a couple trades that we make that are
12 traded in the money.  They're traded in the money
13 on two options but two are out of the -- in other
14 words, if it has to move past -- I'm just confused
15 as to when you say in the money, out of the money.
16 It's not as simple as that I guess is what I'm
17 trying to say.
18       FURTHER EXAMINATION
19 BY MR. PATRICK:
20   Q   Do most of your spreads that you
21 put on as a position, as a trade recommendation,
22 do they involve at least one leg of an option that's
23 out of the money?
24   A   Yes.

Page 108

1    Q   How far out of the money typically are
2  you looking for strikes?
3    A   Usually a standard deviation
4  depending on how the trade is made.  If we're
5  selling an option, we look to be one standard
6  deviation.  Buying, we may be inside -- we'll
7  usually be inside of that.
8    Q   Okay.  Can you quantify that in terms
9  of number of strikes typically --
10   A   Tends to be four strikes.  Almost
11 all of our trades that would be four strikes,
12 they tend to be nondirectional in nature.  So
13 think of a strangle and then selling a strangle
14 or even if they're a broken wing butterfly,
15 there's a bias towards a direction but it's not
16 required to make money on the trade.
17   Q   Typically what is your directional
18 bias, at least during the period subsequent to
19 January of 2018 when you said that was pretty much
20 the last time that you had done a Time Means Money
21 or a credit spread?
22   A   The only time we would take on any
23 type of bias, a lot of times we would trade corn
24 and soybeans against each other going into a WASDE

Page 109

1 report or whatever the name of that thing is.
2 So they tend to move together either up or down.
3 So one's going to win, one's going to lose, but
4 you're going to win on one and you're going to
5 lose and one and you can make enough to cover
6 both spreads. So we tend never to put on a pure
7 directional spread.
8         There are a few trades that we
9 did which were -- we would always clarify to our
10 customers that they were kind of outside the normal
11 program. These are just opportunistic trades. If
12 you want to take them, great. If you don't, don't.
13 Things like a gold call spread.
14    Q   Is that how you refer to them,
15 opportunistic trades in the materials that you
16 sent to customers, the recommendation emails
17 that --
18    A   I think we would always refer to them
19 as an opportunistic trade.
20         FURTHER EXAMINATION
21 BY MR. BURDEN:
22    Q   So the opportunistic trades
23 are directionally biased, is that correct?
24    A   Yes.

Page 110

1    Q   And the rest of your trades are designed
2 to be nondirectional, correct?
3    A   Correct.
4    Q   And is it fair to say that most
5 of the trade recommendations that you made were
6 nondirectional?
7    A   Yes.
8    Q   So I want to return, if I could,
9 please, you testified that in the spread trades
10 options you sold were typically four strikes away
11 from the market, is that right?
12    A   No.
13    Q   Correct it for me, if you would, please.
14 And I know I got it wrong.
15    A   They tend to be one standard
16 deviation, which could be two strikes, it could
17 be five strikes depending on the volatility of the
18 actual option.
19    Q   Would you characterize your spread
20 trades you recommended as involving the sale of
21 deep out-of-the-money options or close to the money?
22 Can you generalize at all?
23    A   I wouldn't call them deep out-of-the-
24 money options. They weren't close to the money

Page 111

1 either. They're somewhere in between.
2    Q   What's a deep out-of-the-money option
3 to you?
4    A   If I sold something that was, say,
5 two or three standard deviations from the current
6 price, that's deep out of the money and you wouldn't
7 collect much for it either.
8    Q   Got it. So you testified before
9 that the spread trades you recommended were
10 primarily nondirectional and those were program
11 trades?
12    A   Correct.
13    Q   And then there's these opportunistic
14 trades which are directional but less frequent,
15 correct?
16    A   I think we did five of them all
17 through 2018.
18    Q   So not a whole lot of the opportunistic
19 trades?
20    A   Right.
21    Q   All right. So let's talk about
22 the programmatic trades. And I feel like I know the
23 answer to this now, but for the programmatic trades
24 how many legs did they typically have?

Page 112

1    A   They would typically have four legs.
2    Q   And how many of these four-legged
3 trades were recommended to customers on a monthly
4 basis?
5    A   Typically at a minimum four. Sometimes
6 more than that if one of the trades came off early
7 as profitable.
8    Q   So while you were at Long Leaf Trading
9 customers were for the most part getting -- doing
10 16 trades a month, is that right?
11    A   Four trades a month with four legs.
12    Q   But that's like 16 --
13    A   Options, yes.
14    Q   So, you know, let me ask you this.
15 Why spread trading? Why not just -- I understand
16 why you wouldn't want to sell an option, but why
17 not just buy an option for a customer? Why always
18 do these spreads?
19    A   Well, even a simple directional spread,
20 if you're buying the option, you're paying for a
21 lot of time and volatility you don't need to pay
22 for. So if you sell an option and create a simple
23 vertical spread, you're getting into the option
24 at a lower price. And as it moves -- what you're

Page 113

1 giving up is that home run, massive move that has
2 less than half a percent chance of ever happening.
3 So you're not really giving up anything, but
4 you're being able to make money on a simple vertical
5 spread.  A spread trade just reduces your cost
6 of entry really.
7    Q   Because you're collecting premiums and
8 then applying that to the cost of purchasing the
9 option?
10    A   Correct.
11    Q   But as you said before, you know,
12 you're giving up the home run.  My question is why
13 give up the home run?
14    A   How often does the home run happen?
15    Q   I should ask you that question.  How often
16 does the home run happen?
17    A   Very rarely.  There's a reason why it's
18 five to six sigmas away -- or standard deviations
19 away from the mean, is that the likelihood of it
20 happening is very low.  And you're paying for it --
21 you're paying quite a bit for it even though the
22 chances of it happening are pretty low.
23    Q   So it sounds like with your program
24 trades the fundamental philosophy is to purchase

Page 114

1 an option and then to subsidize that option with
2 premiums from the sale of an option, another option,
3 is that right?
4    A   Correct.
5    Q   So it sounds like what you're saying is
6 you're giving up your not particularly likely home
7 run, but you are getting into the trade at a lower
8 price because of the premiums you're collecting,
9 is that accurate?
10    A   Correct.
11    Q   So how can you tell if that tradeoff
12 is worth it?  Do you have any calculations, any
13 studies?  You know, you're giving up the home run.
14 You're getting into the trade at less money.
15 Sometimes the trades win, right?
16    A   Um-hmm.
17    Q   Yes?
18    A   Yes.
19    Q   And sometimes they lose, right?
20    A   Correct.
21    Q   So how do you -- how can you tell, how do
22 you ascertain in making these recommendations that
23 that tradeoff is justified?
24    A   We use a tool called QuikStrike.

Page 115

1 It's right off the CME website.  And we can run
2 simulation on option spreads, things like that.
3 They could look at what's the probability of these
4 things happening.  The other thing that we do
5 with some of the trades because we're trading --
6 I don't -- so we would trade -- we would buy, for
7 example, the end-of-month strangle but we would
8 sell a weekly strangle.
9         So there's a time period when we
10 collect the premium, and say that those two options
11 that we sold are out of the money.  Now we just
12 have a long strangle on, which basically is the
13 home run component of it also.  So there are time
14 periods when we're not -- we're not short anything.
15 We're long everything.  And the basis of that trade
16 is usually that there's volatility difference
17 between the weeks and the months.
18    Q   So that brings me to my next question,
19 you know, and I'm going to betray my ignorance on
20 options here.  But is it fair to characterize the
21 program trades as bets on volatility?
22    A   No.
23    Q   How would you characterize them?  What
24 are you speculating --

Page 116

1    A   All options are some bet on volatility.
2 So I won't -- the element that we're using is
3 volatility and time.  Time is the most predictable
4 of all of the elements of an option.  I know exactly
5 how it's going to work.  It's going to work the
6 same for every single option.  And to the extent
7 that we can structure the trade that time works in
8 our favor, we get an edge.  So when you sell a
9 weekly and buy a monthly, effectively you've got
10 time working on your behalf because I'm selling
11 something that takes 7 days, for example, to decay
12 versus something I'm buying that takes 30 days to
13 decay.
14    Q   So I understand, but my question to
15 you is -- well, I should start from the beginning.
16 So the spread trades that you recommend to clients,
17 those are speculative trades, correct?
18    A   Correct.
19    Q   What are they speculating on?
20    A   They're speculating on the time
21 element of what we're doing, which is not as
22 much speculation, and that the volatility stays
23 at or around where we place the back -- the long
24 position at.

Page 117

1    Q    I'm going to betray my ignorance
2  again and ask are all of the program trades bets
3  that the underlying commodity will be more volatile
4  or less volatile?  Like do you make money if it's
5  more volatile or do you make money if it's less
6  volatile?
7    A    You will always make more money
8  if it's more volatile, but that's not to say that
9  the trade is based on that.
10    Q    So if the trade is -- if the market
11  is less volatile for a particular trade or if it's
12  not volatile at all, will a customer make money
13  then?
14    A    Most likely not.
15    Q    So really the program trades are
16  speculation that over time the market will be more
17  volatile rather than less, is that fair to say?
18    A    No.
19    Q    How would you say it?
20    A    That it will not go down in volatility.
21    Q    So when you say that the program
22  trades are sort of bets that the commodity won't
23  go down in volatility, down from where?  Like what's
24  the benchmark?

Page 118

1    A    Well, the benchmark is when you
2  place the trade, right?  So when I place a trade,
3  there is a volatility on that option at that time.
4  We then compare, especially the long position, to
5  kind of what is the historical volatility.  So, for
6  example, if I'm buying gold and it's at 40 percent,
7  well, the historical's closer to 10.  I wouldn't
8  want to make that trade because when I buy it and
9  it goes back to 10, the price of that thing's going
10  to go like that (indicating), right?  It's going to
11  go straight down.  So that's what we're comparing
12  it to, is historic volatilities and QuikStrike has
13  all that historical data in it.
14    Q    So that the program trades are
15  essentially bets that the market will be more
16  volatile than it has historically been, is it fair
17  to say?
18    A    No.
19    Q    How would you say it?
20    A    That it will regress to the
21  historical volatility.  That's what our kind
22  of underlying bet is, that the back, no matter
23  what I buy -- whatever my long position is will
24  not go significantly below historic volatilities.

Page 119

1    Q    Okay.  I apologize if I asked you
2  this in the first 20 minutes, but before joining
3  Long Leaf did you ever trade option spreads?
4    A    Yes.
5    Q    Was that for your own account?
6    A    Yes.
7    Q    And was that trading profitable?
8    A    No.
9    Q    How much did you lose?
10    A    About 5,000.
11    Q    Okay.  So all that trading you did before
12  was option spreads, except your hedge?
13    A    Yeah, I think so.  I'd have to look back
14  at it.
15      MR. PATRICK:  But some of that trading
16    was on equity options, correct?
17      THE WITNESS:  Correct.
18  BY MR. BURDEN:
19    Q    All right.  Long Leaf Trading, did you
20  have an account at Long Leaf Trading?
21    A    No, I did not.
22    Q    Did you trade according to the
23  recommendations that Long Leaf Trading provided
24  to customers?

Page 120

1    A    Before or -- I'm confused as to
2  what time period you're talking about.  We had no
3  proprietary account.
4    Q    Yeah.  So during the time where
5  you were CEO of Long Leaf Trading, did you trade
6  yourself according to the recommendations provided
7  to customers?
8    A    No.
9    Q    Did you have any family members with
10  accounts at Long Leaf Trading?
11    A    No, I did not.
12    Q    Did you give them Long Leaf Trading's
13  trade recommendations?
14    A    No.
15    Q    Same questions for friends.
16    A    No.
17    Q    How come?
18    A    Until I was sure that it could make money.
19    Q    When were you sure that it could make
20  money?
21    A    Right now I feel very comfortable with
22  my clients' money consistently.  We made clients
23  money in 2018 but not consistently.  We would lose
24  one month, make one month.

Page 121

1    Q    So overall in 2018 did clients -- and
2  we'll come back to this -- did clients make money
3  or did they lose money?
4    A    They lost money.
5    Q    So your testimony is that you didn't
6  trade according to Long Leaf's recommendations
7  personally because you weren't sure it could make
8  money, correct?
9    A    No.  I didn't trade it because I don't
10  think it's right for me to be trading the exact same
11  thing as my customers.  I don't want any perception
12  that I'm frontrunning or doing anything like that.
13  I don't let my traders do it.  I don't let myself
14  do it.
15    Q    But surely there are ways to prevent --
16  you wouldn't front-run your customers, would you?
17    A    No.
18    Q    So why would you not put your own
19  skin in the game?  Why would you not make the same
20  bet your customers are making?
21    A    It's just my philosophy.  I don't --
22    Q    It was because you weren't confident the
23  trading recommendations could make money, correct?
24      MS. WING:  I'm going to object.

Page 122

1    He answered the question.
2      MR. BURDEN:  You're not going to object,
3    Ms. Wing.
4      MS. WING:  I am going to object on the
5    record.
6      MR. BURDEN:  You're allowed to object
7    for Fifth Amendment and for attorney-client
8    privilege.  There are no evidentiary rules
9    here.  It will not be before a court except
10    for impeachment purposes.  Would you read my
11    question back, please, Mary.
12      (Whereupon the portion of the record
13        was read as requested.)
14    A    That's not why.  I think the trades
15  we're making right now are very profitable, but
16  I still don't make my own -- trade on my own account
17  that way.
18    Q    Yeah, but I'm asking about prior to today
19  for the entire I think --
20    A    I would put --
21    Q    -- three years.
22    A    -- money on every one of those trades.
23  Did they all work, no.
24    Q    Wait.  But I thought you testified

Page 123

1  you didn't put any money --
2    A    I didn't, though.  I did not take the
3  trades -- I did not trade the trades that we were
4  recommending to our customers.
5    Q    And your testimony is that's because you
6  didn't want to front-run your customers?
7    A    I don't want even the perception that
8  that's happening.
9    Q    But how would customers ever perceive
10  that?  Do you tell customers what you're trading?
11    A    Of course.  I don't tell them my personal
12  investment, no.
13    Q    So how are they going to think you're
14  frontrunning?  Why would that perception be there?
15    A    Well, it would be in the compliance
16  side of the world.  It's not whether my customers
17  would know it.  It's, you know, if somebody comes
18  in and looks at your -- I'd just prefer that that
19  whole process be purely separate.  I don't want --
20  if I'm going to have a proprietary account at my
21  firm, it's going to be doing tests.  It's not
22  going to be doing live trading.
23    Q    Did you have a proprietary account at
24  Long Leaf Trading?

Page 124

1    A    There was one that was open, but we
2  never funded it because we could simulate most
3  of what we saw in QuikStrike and didn't see any real
4  reason to use that to test trades.
5      MR. BURDEN:  All right.  You know,
6    it's noon and this is a good place for me
7    to stop.  Do you guys want to take a lunch
8    break?
9      MS. WING:  Yes.
10      MR. BURDEN:  Okay.  Let's go off the
11    record, please.
12      (Whereupon a lunch recess was taken
13        from 12 p.m., to 1:06 p.m., after
14        which the following proceedings were
15        had:)
16
17
18
19
20
21
22
23
24

Page 125

1    A F T E R N O O N   S E S S I O N
2    MR. BURDEN:  Let the record reflect that
3  neither myself nor any other representative
4  of the CFTC had any substantive discussions
5  with counsel or the witness during the break.
6  Isn't that right, Counsel and the witness?
7    MS. WING:  We so stipulate.
8        JAMES DONELSON,
9  called as a witness herein, having been previously
10  sworn and examined, testified further as follows:
11      FURTHER EXAMINATION (Cont'd.)
12  BY MR. BURDEN:
13    Q    All right.  Mr. Donelson, I want to follow
14  up on a couple of points from our last session
15  before I start showing you trade recommendations
16  and we walk through them, and that's what's coming
17  up next.
18    A    All right.
19    Q    All right.  So I think you testified
20  before that during your tenure at Long Leaf, you
21  limited or tried to limit customers' investments
22  in Long Leaf Trading's programs to 10 to 20 percent
23  of their portfolio, is that right?
24    A    Right.  That's -- we're working on that,

Page 126

1  but we're still working through that.
2    Q    All right.  So how did you ensure that
3  customers didn't invest more than 20 percent of
4  their portfolio?
5    A    Part of the process is that the broker
6  creates a KYC of how much is their investments,
7  what's their portfolio, those type of things, so
8  that we know from that kind of what is their overall
9  net worth and everything else.  And then I have --
10  my assistant basically runs them through an
11  application.  The brokers never use the application,
12  and it's actually done through DocuSign now.
13    Q    And when did that process start, please.
14    A    Well, that started when we went
15  to Cunningham.  Gain's was actually electronic on
16  their platform.
17    Q    Did you limit customers to 10 to
18  20 percent of their accounts or if they wanted to
19  invest more, would you let them?
20    A    We would let them if they wanted to,
21  but most don't push the envelope that much.
22    Q    So was that 10 to 20 percent limit
23  something that you instructed brokers to tell
24  clients?

Page 127

1    A    Yes.
2    Q    And when did that start?
3    A    That started I would say October or
4  November of 2018.
5    Q    Before October-November of 2018,
6  were there any limits like that?  I guess limit's
7  not the right word, but before --
8    A    They're more guidelines.
9    Q    So before October-November of 2018,
10  were clients at Long Leaf told by your brokers,
11  you know, don't invest more than 20 percent?
12    A    They were told not to invest everything.
13  That was what they were told, that this isn't a
14  you put everything into it type investment.  The
15  guidelines have just kind of worked as we've looked
16  at clients, the ones that really can be successful
17  and ones who can't.
18    Q    So that 10 to 20 percent limit that
19  brokers advised clients, that came around October-
20  November of 2018, right?
21    A    Right.
22    Q    We were talking before about Kingsview
23  and, you know, this is not -- you had suggested that
24  you stopped using the Time Means Money like signage,

Page 128

1  is that right?
2    A    Yeah.
3    Q    Pretty early on in your tenure, correct?
4    A    Correct.
5    Q    And I think you testified too that you
6  wound up paying Kingsview for that Time Means Money
7  trademark, right?
8    A    Basically just closing out the agreement
9  as a final purchase of the trademark and everything
10  involved with it, yes.
11    Q    I'm not doubting your representation
12  that the trademark was not particularly valuable,
13  but those two things kind of seem to be at odds.
14  Can you reconcile them for me?
15    A    The way the agreement was set up is
16  we would have continued to pay them and pay them
17  and pay them forever under any leads that were
18  received from them for this.  This was just kind of
19  a one-time payment to cut off any future payments
20  that we'd make to them.
21    Q    So it sounds like this payment
22  wasn't really for the Time Means Money license
23  or trademark.  It was just to stop making future
24  payments, right?

Page 129

1   A   Right.
2   Q   Because they were getting --
3   A   It was --
4   Q   -- futures residuals from these leads?
5   A   Yeah, and I -- that agreement predated
6  me and some of the conversation isn't really on
7  there. It's hard for me to explain how it works
8  because I'm not really sure exactly how it works.
9  But effectively it was kind of their licensing
10 payment to Kingsview for the Time Means Money,
11 but this is the way it was being calculated.
12         FURTHER EXAMINATION
13 BY MR. PATRICK:
14  Q   After you made that final payment to
15 Kingsview and sort of closed out that arrangement,
16 did you continue to receive leads from Kingsview?
17  A   No.
18  Q   Did you continue to use Kingsview's
19 old leads?
20  A   Yeah, we were allowed to use the
21 leads that had already been provided to us, yes.
22  Q   Okay. But then you were no longer
23 receiving the Kingsview leads --
24  A   I have not received any new leads

Page 130

1  since June of last year, 2018.
2         FURTHER EXAMINATION
3  BY MR. BURDEN:
4   Q   So I'm confused about a point here.
5  Was Long Leaf Trading paying Kingsview for the
6  license of the Time Means Money trademark or for
7  these leads?
8   A   I think it is for the trademark.
9   Q   Why do you think that?
10  A   That's the way the agreement read to
11 me when -- I think it's actually in one of the
12 documents that are in what I provided to you on
13 the acquisition because we got a copy of that,
14 that it's the way the licensing agreement was paid
15 for. That was my understanding.
16  Q   Got it. And so the basis for the
17 payments to Kingsview, when would they get paid?
18 Is it like when a customer invests? Is it every
19 time you use the -- and I understand you didn't
20 after a certain period -- but the Time Means
21 Money method? Like how are payments being sent
22 to Kingsview?
23  A   They were being -- actually, so if
24 the client lead turned into a customer, then we

Page 131

1  would actually put them in a -- there were two --
2  like a broker would have two different accounts.
3  I'm not sure that's the right word but like two
4  different broker codes. One would be clients that
5  weren't through the program, one that were through
6  the program that -- not were through the program
7  but were leads provided to us by Kingsview. Those
8  then would have based on the instructions that were
9  given to Gain, would have this amount taken out
10 for each trade and then that would be remitted
11 to Kingsview.
12  Q   Interesting. So the payments to Kingsview
13 were actually made by Gain?
14  A   Correct.
15  Q   Did you provide those instructions to Gain?
16  A   We -- most of the people had already
17 been set up by the time I got there. I don't think
18 I set up any -- I don't know if I ever set up a new
19 sales rep.
20  Q   When you got there at Long Leaf, this was
21 already happening, right?
22  A   Yeah, this was already -- this is -- we
23 just continued the way it was being done before.
24  Q   So presumably Tim Evans or somebody

Page 132

1  else who preceded you had given these instructions
2  to Gain?
3   A   Instructions, correct.
4   Q   All right. I want to talk a little
5  bit more about spread trades as well. So it
6  sounds like the idea behind your program trades
7  at Long Leaf is to sell options to sort of finance
8  the purchase of options that are closer to the
9  money, is that fair to say?
10  A   Correct.
11  Q   So did you ever research and see if
12 there was a cheaper way to do this to effect the
13 same trade?
14  A   I'm not sure what -- I'm not sure what
15 you mean.
16  Q   So what I'm getting at here is did
17 you ever offer customers the options to -- or do you
18 ever recommend that customers enter into VIX options
19 rather than do these four-legged spread trades?
20  A   VIX is options specifically to the stock
21 market, not --
22  Q   No. I mean, there were options --
23 or I should ask you. Are you aware of VIX option
24 products on the CME Group's exchanges?

Page 133

1    A    Yes.
2    Q    So what VIX options products are you
3  aware of that are on the CME exchanges?
4    A    Predominantly the only one that I'm aware
5  of is the one for the S&P 500.
6    Q    So were you aware that there are many,
7  many other VIX option products traded on the CME
8  Group exchanges?
9    A    No, I was not aware of multiples.
10   Q    Is that something that you looked
11  into at all, whether there were VIX options
12  available to speculate on volatility in commodity
13  futures?
14   A    But we're not speculating on volatility.
15   Q    Well, whatever you're doing.  Did you look
16  into recommending ---
17   A    No, we did not look into VIX options.
18   Q    Why not?
19   A    The trades that we're looking at
20  have adequate volume and volatility and are
21  the product that we're actually trading.  So you
22  can use the economics of the product also.
23   Q    Well, it sounds like you weren't
24  aware of VIX options that were available on the

Page 134

1  CME Group exchanges, is that fair to say?
2    A    Yes.
3    Q    And for a VIX option there would be only
4  one commission to a customer, is that correct?
5    A    If you only bought one.
6         FURTHER EXAMINATION
7  BY MR. PATRICK:
8    Q    So did you ever look at alternatives
9  to the types of options contracts that you were
10  offering to your customers that might provide them
11  exposure to the same sort of whether it's volatility
12  or something else in the market that would be
13  similar to the types of investments that you were
14  offering your customers just to see if there was
15  an option out there that might serve your customers
16  better or have a better overall --
17   A    We did look at multiple things
18  in terms of we tend to trade, say, the Canadian
19  dollar versus the actual oil contracts.  They're
20  highly correlated so we use correlations.  We have
21  looked at could you use a future and an option
22  to synthesize something that would be just as
23  efficient.  So we have looked at different trading
24  styles.  To say one's better than the other,

Page 135

1  I mean --
2    Q    So you said something there.  I think
3  you mentioned efficient?  Did you use that as one of
4  the terms that you described the types of investment
5  options that might be out there as --
6    A    Yeah.
7    Q    -- some being more efficient or
8  less efficient?  Can you tell us what you mean
9  by efficient?
10   A    Efficient usually in my parlance
11  would mean that it's highly tied to the underlying
12  product that -- it's going to be an efficient --
13  it comes from the word efficient hedge, right?
14  So if I'm hedging oil, I should buy an oil future.
15  I shouldn't buy a Canadian dollar future.  However,
16  if you're trading options, it may be simpler to
17  trade at a lower cost Canadian dollar versus that
18  because they're highly correlated.
19   Q    So were there alternatives that you
20  explored with your customers?  I know you mentioned
21  the Canadian dollar trade.  Were there other options
22  that you explored with your customers or trades that
23  you may have put on?
24   A    We have to look at a couple different

Page 136

1  aspects.  One is there enough volume in that
2  trade to be able to execute the trade.  Also, does
3  it have weeklies, does it have monthlies.  There's
4  a lot of different things that we have to look at
5  when we make trades.  That's why we tend to trade
6  things that have monthly and weekly options, not
7  just monthly, and we manage how much -- we really
8  focus on how much margin is it going to take to
9  get into that trade.  We have a calculator that
10  tells us, hey, this trade's going to take this
11  much margin, that much margin because we're looking
12  at what's the expected return to the margin that
13  you're really risking, not dollars but margin risk
14  to say is it really worth making $20 on something
15  that you're risking a thousand.
16   Q    Do you have certain guidelines that
17  you want to stay within, parameters with regard to
18  that particular --
19   A    I usually look at like 20 to 25 percent
20  is kind of a bare minimum of how much margin are
21  you putting versus what your expected return
22  would look like.  The expected return can be based
23  on a couple different things.  One is in some cases
24  when you do the trade, when the shorts come off

Page 137

1 if everything stayed exactly the same, you would
2 actually make money on the trade. Sometimes it's,
3 well, it's going to need a little movement up or
4 down to make it profitable.
5     Q    So just so I understand, one of
6 the considerations that you make when you are
7 considering a trade is that the return has to be
8 at least 20 percent of --
9     A    The expected --
10    Q    -- the margin?
11    A    Yeah. I mean, the expected return
12 has to be about 20 percent of margin is what we
13 look for.
14          (WhereuponCFTC Exhibit No. 63 was
15           marked for identification, MM.)
16          FURTHER EXAMINATION
17 BY MR. BURDEN:
18    Q    Mr. Donelson, I'm going to hand you
19 what I've marked as CFTC Exhibit 63. If you could
20 just take a moment to look it over, please, I will
21 ask if you recognize it.
22    A    Yes.
23    Q    All right. What do you recognize
24 Exhibit 63 to be, please.

Page 138

1     A    It is a trade recommendation.
2     Q    Who came up with this trade recommendation?
3     A    This one would have been Mr. Evans.
4     Q    All right. And you see it was sent --
5 it looks like Craig Pace sent it to you and then
6 you sent it to Mr. Evans. So what's going on here?
7 As you can see, this is early in your tenure,
8 December 26th of 2017.
9     A    I'm not sure why it's in that
10 chain other than to say it's his approval. So
11 Mr. Nations approved it, Greg sent it to me and
12 I sent it to Tim.
13    Q    So let's look at the second
14 page of Exhibit 63, if we could, please. And
15 I want to look at -- there's a Recommendation 1,
16 a Recommendation 2 and then some columns, and I
17 want to ask you about these. So it says, "We are
18 recommending a total of five contracts for each
19 recommended position below."
20          Do you know what the basis was
21 for recommending five contracts as opposed to some
22 other number?
23    A    That would be how much the individual
24 had in their account.

Page 139

1     Q    All right. So how does the amount that
2 the individual has in his or her account correlate
3 to how many contracts are recommended?
4     A    Usually it has to do with how much
5 margin you're putting on as a percentage of their
6 total balance.
7     Q    But what's the rule?
8     A    At this time, because they're using short
9 condors, it was something like 20 to 25 percent of
10 their balance in margin. So, in other words, you're
11 only trading really about a quarter of their total
12 amount.
13    Q    Got it. So if you look here, it says --
14 there's a column that's second from the right that
15 says Reward/Risk. What does that indicate, please.
16    A    That would be your maximum profit and
17 your maximum loss.
18    Q    And how is that determined?
19    A    That would be by -- so this is a short
20 iron condor. So what would happen is if all these
21 things closed out of the money, you're basically
22 collecting 434.92 to start with --
23    Q    Got it.
24    A    -- and you get to keep it all, right?

Page 140

1 On the other hand, if it went through and say
2 it went to 1260 in gold, then you would lose a
3 thousand dollars but you collected 434.92, plus
4 your fees and everything else. That's how that's
5 calculated.
6     Q    All right. So it looks like the most
7 you can win here is $434, right?
8     A    Right.
9     Q    And the most you could lose is $565, right?
10    A    Correct.
11    Q    And that's somewhat determinative, isn't
12 it? That's bracketed by the spread?
13    A    Bracketed by the spread, correct.
14    Q    Now, I notice here that there is --
15 it doesn't look like there's any -- I'll tell you
16 what, how I should ask it is this. Mr. Donelson,
17 how did Long Leaf Trading secure customer consent
18 to exit this trade?
19    A    They may not have to.
20    Q    I didn't say they did.
21    A    If they were meaning to buy something
22 back, they would send out a secondary recommendation
23 to exit the trade. But the way these are built, if
24 they're in the money, there is no exit. Everything

Page 141

1 just expires.
2    Q    Got it.  And that, in fact, is the plan
3 for the credit spreads, is that right?
4    A    That is always the plan of our credit
5 spread.
6    Q    Was there ever an occasion -- and did
7 you testify you guys only did one credit spread or
8 just a few during your tenure?
9    A    We did one group, which would have been
10 four credit spreads.
11    Q    So that's got to be Exhibit 63, right?
12 This has got to be the only credit spread.  If you
13 look at Exhibit 63 as a group exhibit --
14    A    Yes.
15    Q    -- these two emails, they each have two
16 recommendations in them or this is the --
17    A    Yeah.
18    Q    -- the set of credit spreads that happened
19 on your watch, right?
20    A    Correct.
21    Q    And did all of these expire worthless?
22    A    No.  They all -- yeah, they all expired
23 in the money, actually.
24    Q    Got it.  That's what I meant to say.

Page 142

1    MS. WING:  I just take exception
2 with on his watch because he wasn't a licensed
3 Series 3 at this time.  He was -- that was --
4    MR. BURDEN:  Do you have an objection?
5    MS. WING:  No.  I'm just trying to
6 clear -- I have an objection to your use of
7 the word on his watch.
8 BY MR. BURDEN:
9    Q    All right.  Let's stay on Exhibit 63.
10 Do you see there's an offer price and it says
11 580 OB?
12    A    Or better.
13    Q    So that's what OB stands for?
14    A    Yes.
15    Q    So let me ask you this.  How do you know
16 when this recommendation gets sent out?  And maybe
17 you don't.  Maybe it was Evans' recommendation.
18 But if you do know, how do you know that you can
19 get 580 or better?
20    A    Well, two ways.  One is we had
21 QuikStrike, which basically will calculate --
22 you put all those pieces in.  It's going to say
23 here's what it is.  Then also you have at the time
24 Gain's trading platform.  So we could easily look

Page 143

1 at here's all the options, here's what they're
2 priced at, and then usually you would always add
3 a little bit just from the standpoint of the time
4 element of if I send it out and it comes back,
5 is it really going to be there anymore or not.
6 With these they tend to stay about the same price
7 for a whole day.
8    Q    So you gave yourself some wiggle room and
9 you checked the market --
10    A    Right.
11    Q    -- for liquidity?
12    A    Right.  You check the market for liquidity
13 and price.
14    FURTHER EXAMINATION
15 BY MR. PATRICK:
16    Q    So in this particular example if you were
17 to add some wiggle room as it was described, is that
18 adding to your-order price or is it -- in this
19 case is it adding to that price or pulling back?
20    A    Reducing the price.
21    Q    It would be reducing?
22    A    Right.
23    Q    Okay.
24    A    Basically saying, well, I think

Page 144

1 I can really get in at 43, but I don't know if
2 the market's going to move against me.  So I'm going
3 to go with 40, but I'm still going to execute at
4 the best price in the market.  I'm not going to
5 go execute at 40 if I can get in at 42.
6    Q    And with a debit spread, that would be
7 the opposite, of course?
8    A    The opposite, right.
9    Q    Okay.
10    A    But there was always the issue of timing.
11    (Whereupon  CFTC Exhibit No. 64 was
12    marked for identification, MM.)
13    FURTHER EXAMINATION
14 BY MR. BURDEN:
15    Q    All right.  Mr. Donelson, I want
16 to hand you what I've marked as CFTC Exhibit 64.
17 Mr. Donelson, do you recognize this document?
18    A    Yes.
19    Q    Can you tell me what it is, please.
20    A    It is a trade recommendation for British
21 pound and for the U.S. Treasury bond.
22    Q    All right.  And this was a recommendation
23 that was sent out while you were CEO of Long Leaf
24 Trading, is that right?

Page 145

1   A   Correct.

2   Q   Who came up with this trade?

3   A   Actually, it was myself and Scott

4   Gecas.  Scott was our marketing and his experience

5   in trading options, he had been on the floor.  He

6   had done a lot of options trading.  This is the

7   first set that we moved away from the credit

8   spreads.

9   Q   Got it.  So this is your first debit

10   spread, is that right?

11   A   Correct.

12   Q   All right.  So what I really want

13   to know is how you came up with the trade, but

14   let's just run through this real quick.  So we've

15   got a recommendation for a U.S. T-bond volatility

16   swap, is that right?

17   A   Correct.

18   Q   And we've got buy, we've got sell, we've

19   got max gain and loss.  How is that, for the record,

20   how is that calculated, please.

21   A   That's actually mathematical also.

22   If you took what's the maximum you could get to,

23   which is in this case -- let me look at the trade.

24   Yeah, it would be effectively -- if the sells came

Page 146

1   off and you hit a certain level -- this is very

2   hard.  That's why we don't use this max gain

3   anymore.  The max gain is actually infinite on

4   a volatility swap.  You just can't -- because

5   if you come off of the trade, the sell, and they

6   both expire worthless and say the bond goes to

7   190, well, you get all of that.  But this is why

8   we don't use max gain or loss anymore on these type

9   of trades because it doesn't make sense.  The loss

10   is basically what you're getting into the trade at.

11   Q   Got it.

12   MR. PATRICK:  And that infinite gain

13   is only because the expiration on the buys

14   are --

15   THE WITNESS:  Different than the

16   expirations on the sells.

17   MR. PATRICK:  And later, right, than the --

18   THE WITNESS:  Right.  So, I mean --

19   MR. PATRICK:  -- than the expirations on

20   the sells?

21   THE WITNESS:  Yeah.

22   BY MR. BURDEN:

23   Q   So, Mr. Donelson, here we've got target

24   gain and target max loss.  What are these, please.

Page 147

1   A   Those are exit points that we're

2   looking to take the trade off at this price or that

3   price based on as you go through the trade and where

4   that trade's going to effectively decay to, that we

5   don't want to wait until the last -- I mean, this --

6   to take the max loss means I'm going to sit there

7   and do absolutely nothing and I can't do anything

8   about it.  The other is if we recognize it's a loss,

9   we're going to get out of it as a loss.

10   Q   So that makes sense to me.  Target gain, it

11   seems to me that -- why do you have a target gain?

12   Why isn't the target gain the max gain?

13   A   Depending on the trade, the max gain

14   if you calculated it, it would have to be the

15   perfect -- you know, you'd have to hit the perfect

16   second of the perfect day of the perfect time at the

17   perfect price.  That would be the max.  It's kind of

18   the theoretical how much you would possibly make on

19   the trade.

20   Q   Got it.

21   A   It's not realistic to say that's how

22   much you're going to make on the trade.

23   Q   All right.  So what then is the target

24   gain?

Page 148

1   A   The target gain is based on the expiration

2   of the sells and what this spread should be worth

3   with any type of movement.

4   Q   So how do you figure that out?

5   A   Given this was our first one, we looked

6   at where would we expect it to move to based on what

7   we're seeing in the volatility and everything else

8   and that this should be moving fairly close to one

9   of these wings by that time, how much would it then

10   be worth, and that's how we came up with that

11   number.

12   Q   But you don't know if the volatility's

13   going to move in that direction, right?

14   A   Well, it's going to move in some

15   direction.  We're not looking at specific direction.

16   We're looking at volatility will tell you it's going

17   to move at least this much.

18   Q   Right.

19   A   Or has a high probability of moving that

20   much.

21   Q   So I guess that leads to my next question.

22   How do you assess the probability of realizing the

23   target gain?

24   A   We're putting it out there more as

Page 149

1 a here's the first shot at this and then as we go
2 along, the updates we give them of here's where this
3 is looking to come out. The idea is to keep them
4 informed of what's going on in the trade because,
5 you know, the first shot at -- this is our first
6 try at this. This is very different than what
7 they've been seeing.
8    Q   Yeah. So I understand they've changed,
9 and we'll look at later iterations too. But right
10 now --
11    A   No. I'm just saying this is the first
12 trade that wasn't a short condor.
13    Q   I understand. So with respect to
14 Exhibit 64, I'm still confused on how target
15 gain is arrived at. It sounds like your testimony
16 is this max gain is a theoretical number, right?
17    A   Yeah.
18    Q   It could theoretically happen, right?
19    A   Yeah. Well, theoretically the max
20 gain on this type of trade is actually infinite.
21    Q   Yeah. But while the long and the short
22 positions are on, that max gain is the most you
23 could conceivably make, right?
24    A   Right.

Page 150

1    Q   But that would not typically happen,
2 correct?
3    A   No.
4    Q   It would have to be I think you said the
5 perfect second of the perfect hour of the perfect
6 day, right?
7    A   Yes, or it would have to go to some
8 astronomical number.
9    Q   The target gain so presumably is in
10 your view more realistic, is that fair to say?
11    A   It's an area of which when we see it,
12 we're going to take if off at that, that we don't
13 think that there's much upside beyond that point.
14    Q   Got it. So where in Exhibit 64 can
15 a customer see the likelihood of achieving, you
16 know, the target gain, let's say?
17    A   They really don't in this example.
18    Q   So where on Exhibit 64 can the customer
19 see the likelihood of achieving the target loss?
20    A   No place really.
21    Q   Do you have a view at the time that
22 Exhibit 64 was created, do you have a way to tell
23 the likelihood of achieving the target gain?
24    A   We do and this is -- like I said,

Page 151

1 this is the first time we did this. So we kind
2 of tried to improve it as we went along.
3    Q   We can get to that stuff.
4    A   The -- this would be a one-sigma move
5 is where -- or one standard deviation move in the
6 underlying -- in the buy side after the sell had
7 come off in a week is kind of how we built it up.
8    Q   All right. So if you would, please --
9    A   All other things being equal. That was
10 the other part.
11    Q   Yeah. Assuming that I have no
12 background in statistics, which I don't, how
13 likely was it that a customer would achieve this
14 target gain? It sounds like you had assessed that
15 likelihood, correct?
16    A   You know, the calculation would be in the
17 area of 35 to 50 percent.
18    Q   Is that just for this recommendation,
19 Exhibit 64, or is that like across the board?
20    A   It would be for this one. I would have
21 to look at the other ones to understand if that's
22 the exact same thing.
23    Q   Well, I asked what's the likelihood
24 of achieving a target gain, and your testimony

Page 152

1 was 35 to 50 percent, right?
2    A   Yeah, but that's not to say that there
3 isn't going to be a gain.
4    Q   No, no, I understand. But what I mean
5 is --
6    A   That's why we would update it during
7 the process.
8    Q   Is that 35 to 50 percent, is that a
9 figure that you have and you're building the trades
10 around that?
11    A   No.
12    Q   So where does that number come from?
13    A   That's the math behind it.
14    Q   That it's 35 to 50 percent likely to
15 achieve the target gain?
16    A   That it hit that target, yeah.
17    Q   So is that figure generated by QuikStrike?
18 Who comes up with that?
19    A   That was -- QuikStrike would be able to
20 tell you the math behind it, yeah.
21    Q   But that 35 to 50 percent likelihood
22 of achieving a target gain, where does that number
23 come from? Like who gives it to you?
24    A   So if you have a one-sigma likely move,

Page 153

1 that's about 35 percent. And we usually would
2 move a little past that, which gets you -- it's a
3 one-sided move of one standard deviation is about
4 39 percent with a one standard deviation.
5    Q   So what's giving you the one standard
6 deviation? Like where are you getting that from?
7    A   That's out of QuikStrike.
8    Q   Got it, okay.
9    A   They have it all laid out in the
10 option pricing and everything else, like what is
11 a one standard deviation move.
12    Q   So for all of the program trades you
13 recommended, all of the debit spreads, does that
14 35 to 50 percent likelihood of achieving the target
15 gain hold?
16    A   Actually, we started bringing it down
17 to -- bringing the target gain down, therefore,
18 increasing the likelihood of it.
19    Q   And when did you start bringing that
20 target gain number down?
21    A   I want to say in April.
22    Q   Of what year, please.
23    A   Of 2018.
24    Q   So after you started bringing the

Page 154

1 target gain down for your trade recommendations,
2 what percentage likelihood of achieving that target
3 gain were you looking at?
4    A   It was more in like the 60 to 70 percent
5 likelihood we were getting to the target.
6    Q   And was that the case sort of through
7 the present, that 60 to 70 percent likelihood?
8    A   Yeah, that's -- I would say that's
9 accurate.
10    Q   All right. And so if there's a 35 to
11 50 percent chance of achieving the target gain,
12 what's the likelihood of achieving let's say the
13 target loss?
14    A   It was probably more in the -- well,
15 if you really want to think of it a different way,
16 it would be -- there's a real high likelihood you
17 can get the target loss, you know. I could take
18 it off earlier. I could do a lot of things. But
19 to say -- the target loss is really about once we
20 see the trade moving south, we get out of the --
21 you know, we're going to get out of the trade
22 at that price.
23    Q   Got it.
24    A   And that's really more of a question

Page 155

1 of being able to discern that might have been the
2 right trade when you put it on but now it's not.
3 You need to get out.
4        FURTHER EXAMINATION
5 BY MR. PATRICK:
6    Q   Is the one-sigma move that you
7 had described earlier when you were talking about
8 the max gain, can you roughly apply that to all of
9 the trades that you put on, the recommended trades?
10 Was that one standard deviation move what you were
11 kind of working with in terms of what the max profit
12 would be?
13    A   Well, the max profit was always
14 mathematical and theoretical, and rarely would we
15 ever say we're ever going to hit the max because
16 it's --
17    Q   I'm sorry. I misspoke. Target gain.
18    A   The target gain was usually that
19 one-sigma move. And depending on whether it
20 was nondirectional or more directional in nature
21 it mattered, but for the most part that's what you
22 were looking at.
23    Q   And how would the -- if it was
24 a directional versus multidirectional, how would

Page 156

1 that make a difference in the standard deviation?
2    A   Well, nondirectional, it doesn't matter
3 which direction it goes. So I open up a bigger --
4 if I'm directional this way and, yeah, it moves one
5 sigma but it -- one standard deviation but moves the
6 wrong way, it's not good, right? And so some of the
7 trades, even though there's a bias to them, you have
8 to take that into account. The only time we would
9 do that -- Scott's background was more technical
10 trading. Mine's more economics, like here's a
11 supply and demand of a certain industry. He would
12 be the guy looking at, okay, here's -- it's hit
13 the bottom twice. It's going to bounce off of this,
14 the technical aspect. So that's when we would put
15 something on with a little more directional bias,
16 if he's seeing something like that. But Scott
17 was doing a lot of the trade design at this time.
18 It was all of the trade design, actually.
19        FURTHER EXAMINATION
20 BY MR. BURDEN:
21    Q   Sorry. Your testimony is that Mr. Gecas
22 did all of the trade design?
23    A   Almost all of the trade design.
24 I did most of the work on the back end of making

Page 157

1  sure the trade, yeah, it's going to cost this,
2  it's going to cost that. And then obviously he
3  and I would discuss what trade should we put on,
4  should we put this one on or that one.
5      Q   So let's get into that a bit. Let me
6  just stay, if we could, please, on Exhibit 64. So
7  where in Exhibit 64 does it account for the effect
8  of fees and commissions?
9      A   It's calculated in the gain and loss
10 numbers.
11     Q   Got it.
12     A   That includes all the fees, all the
13 commissions.
14     Q   So let me ask -- I think you
15 testified before that there was a 35 to 50 percent
16 chance of achieving the target gain at least until
17 April of 2018, is that right?
18     A   Yes.
19     Q   And following April 2018 -- well, I should
20 just ask. Was that 35 to 50 percent likelihood
21 disclosed to customers?
22     A   No.
23     Q   Why not?
24     A   This is a targeted gain. It's not the

Page 158

1  exit recommendation.
2      Q   Well, do you think that a customer
3  would want to know what the likelihood of being
4  able to achieve not even the maximum gain but sort
5  of a more realistic targeted gain, do you think that
6  would be important to a customer?
7      A   I think it would be. We talked through
8  this with a lot of our customers because they had
9  never seen these trades before.
10     Q   Did you explain to any customers that
11 there was a 35 to 50 percent likelihood of achieving
12 the target gain?
13     A   Yeah. The target gain was meant to be --
14 you know, once it got to that point we would take it
15 off. We aren't going to keep holding it and trying
16 to get there. We're going to come back if we don't
17 think it's going to get to that level, and that's
18 what the target gain meant. It wasn't -- it wasn't
19 the target that we would -- every trade would hit
20 that number.
21     Q   So the piece that I'm concerned about is
22 this 35 to 50 percent likelihood. Did you ever tell
23 a client, hey, there's a 35 to 50 percent likelihood
24 of achieving the target gain?

Page 159

1      A   Yes.
2      Q   What clients did you tell?
3      A   I'm trying to think who I talked to.
4  I'd have to remember who. I talked to a lot of
5  clients at that time. I'm just trying to think
6  of --
7      Q   Just one.
8      A   I've talked to a lot of clients.
9  It's just whether it was at this time or later on.
10     Q   Well, I'll ask about the later period
11 later, you know, between December of 2017 and --
12     A   I think Dennis Nations was one of the
13 people I talked to.
14     Q   Your testimony is that you told Dennis
15 Nations that he had a 35 to 50 percent chance of
16 achieving the target gain?
17     A   I think so, yes.
18     Q   Any other customers?
19     A   Jerry Krantz, because I've talked to -- I
20 talk to Jerry all the time. I'm trying to remember
21 which clients were there and which ones weren't. I
22 know I talked with -- I talked with Martin Pegelow,
23 but I think that was well after we had changed this
24 anyway.

Page 160

1      Q   Yeah. So, once again, my question is
2  what customers did you tell, hey, you've got a 35
3  to 50 percent chance of achieving the target gain
4  and no more than that? And you said --
5      A   I didn't say no more than that. I would
6  say statistically it's 35 to 50 percent chance.
7      Q   All right. And you said that to Dennis
8  Nations, right?
9      A   Yeah.
10     Q   And you said that to Jerry Krantz, right?
11     A   Um-hmm.
12     Q   Yes?
13     A   I believe so, yes.
14     Q   And you said that to Martin Pegelow?
15     A   I'm not sure because I'm not sure when I --
16     Q   Got it.
17     A   If we had already made the switch
18 over to a much lower -- a lower targeted number,
19 which would effectively mean a higher probability.
20     Q   So what other customers did you disclose
21 this 35 to 50 percent likelihood to?
22     A   I told most of my brokers. I don't
23 know which ones talked to anybody about it, but
24 the idea that it's -- the statistics would tell

Page 161

1  you 35 to 50 percent and that the target is,
2  look, this is kind of -- we're not going to carry it
3  past this point.  That's what the target was meant
4  to mean.
5     Q   I understand.  So were there any other
6  customers other than Nations --
7     A   That I personally talked to?
8     Q   Yeah, yeah.
9     A   I talked to tons and tons of
10 customers.  I don't know that I ever talked to
11 them specifically about this.
12    Q   But that is my question.  Who did you tell
13 about this 35 to 50 percent likelihood?
14    A   Well, like I said, I told the brokers.
15    Q   What customers?
16    A   I told you three.  I'm trying to
17 think of which customers were there at that time
18 that I talked to.
19    Q   If you're going to tell me I told
20 everybody or I told most people -- did you tell
21 most people?  Is that something you shared or just
22 kind of those three?
23    A   I told my brokers and I told those
24 three people, and I'm trying to think if I talked

Page 162

1  to anybody else at that time.  It was over a year
2  ago.
3     Q   Did you tell any other customers about
4  this 35 to 50 percent number, any other customers
5  other than Nations, Krantz or maybe Pegelow?
6     A   I think Mark Hartman.
7     Q   Anyone else?
8     A   I'm trying to think who I talked to
9  versus who -- I know Scott was talking to people.
10    Q   Just you.  Let's just do you.
11    A   That's what I'm saying is I didn't
12 have a lot of direct contact with customers at
13 that time.  I just know these two I did talk to.
14 Jerry Krantz I talked to quite a few times, Dennis
15 Nations.
16    Q   All right.  Anyone else that you told
17 about this 35 to 50 percent likelihood?
18        MS. WING:  If you recall.
19    A   I can't recall any other name.
20 BY MR. BURDEN:
21    Q   Did you tell other customers about
22 this 35 to 50 percent likelihood of achieving
23 the target gain but maybe you don't remember their
24 names?

Page 163

1     A   It's possible.
2     Q   What I'm asking you is --
3     A   Because we changed it so soon
4  right after we started this, that we moved it
5  to a different strike, that it's hard for me to
6  go, well, did we talk to them at that time or kind
7  of here's where we're moving this to.  We were
8  trying to be very transparent with them as we were
9  really moving from what Time Means Money was to
10 something that we saw as being much more in line
11 with the markets, in line with what you can make
12 profits on, so on and so forth.
13        So, you know, this was after
14 watching the first month of trading and then
15 looking back at the trading going this strategy
16 of doing short condors is not fit to the market
17 that we're in.  We need to make some changes.  So
18 we were doing some changes on the fly, and were we
19 as perfect at it as we'd hoped to be?  No.  But, on
20 the other hand, we put on a lot of trades that had
21 a higher likelihood of profitability because they
22 were fit to the market better.
23    Q   So I want to return to this 35 to
24 50 percent number.  I think your testimony was that

Page 164

1  you instructed the brokers to make this disclosure
2  to clients, is that correct?
3     A   To explain what the targeted gain was.
4     Q   Yeah.  But the piece that I'm concerned
5  about, which you've got to know by now --
6     A   Right.
7     Q   -- is this 35 to 50 percent likelihood.
8  Did you tell your brokers, hey, make sure you tell
9  clients there's only a 35 to 50 percent likelihood
10 of achieving the target gain?  Did you say that to
11 your brokers or email it to them?
12    A   I talked to them.
13    Q   What did you say to them?
14    A   I said tell them that there's less
15 than a 50 percent chance of hitting the targeted
16 number.
17    Q   What brokers did you make that statement
18 to?
19    A   All the brokers that were there at that
20 time.
21    Q   Do you recall their names?
22    A   Scott Gecas, Andrew Nelson, Craig --
23 no, Craig Pace wasn't there I don't think.  Connor
24 Campo.  Those are the only ones that had accounts.

Page 165

1    Q    Do you know if the brokers in fact
2 told customers there was a less than 50 percent
3 likelihood of --
4    A    I cannot say that I know that they did.
5    Q    Did you supervise them or listen in on
6 their calls at all?
7    A    I listened in on some of their calls,
8 but we don't record all of our calls.  If you dial
9 direct from our system, we don't have a recording.
10   Q    That explains something I was going
11 to ask later.  So how did you make sure that your
12 brokers advised clients of the less than 50 percent
13 likelihood of achieving the target gain?
14   A    I mean, we walked through all these
15 trades with them before they sent them out.  This
16 is just the documentation of it because at this
17 time, this was the first time we'd ever rolled
18 these type of trades out.  All they'd ever seen
19 from Scott -- or not Scott, from Tim was some
20 type of short condor or something like that.
21        So we walked them through each
22 trade, told them exactly what they needed to say
23 when they sent out the trade so that they could
24 explain the trade to them.  That's where we laid

Page 166

1 out this -- this is what the target gain is for.
2 It's not, hey, you're going to hit this number.
3 It's, you know, there's a likelihood -- there's
4 a less than 50 percent chance we'll hit there.  But
5 it's really our stop of if it gets to that point,
6 we're going to get out of the trade at that price.
7    Q    Got it.  But how did you make sure that
8 your brokers said that to customers?
9    A    I listened to them calling their customers
10 with the trade recommendations.
11   Q    Okay.  And you heard your brokers
12 telling customers there was a less than 50 percent
13 chance of achieving the target gain?
14   A    I heard them saying -- was it perfect,
15 no.  They were stumbling through some of it because
16 it's new to them, but they were talking about what
17 the targeted gain meant and what the targeted loss
18 meant.
19   Q    You've got to know the only thing I care
20 about right now --
21   A    Yeah.
22   Q    -- is the less than 50 percent likelihood
23 stat.  Did you hear the brokers --
24   A    I did not.

Page 167

1    Q    -- say that to clients?
2    A    Not every time.
3    Q    Did you discipline any brokers for that?
4    A    No.
5    Q    Did you write any of them up?
6    A    No.
7    Q    Did you fire them for that?
8    A    No.
9    Q    All right.  Let's look at something
10 a little bit easier.  Second page of Exhibit 64,
11 if you would, please.  You'll see that under
12 Recommendation 1 it says Exit: 15 Or Better Good
13 until Cancel.  Did I read that right?
14   A    Um-hmm.
15   Q    So what's that?
16   A    That would -- no, that's not the
17 Recommendation 2.  That's Recommendation 1.
18   Q    So that exit 15 OB good until cancel
19 applies to Recommendation 1, correct?
20   A    Right.
21   Q    Let's do Recommendation 2 because it'll
22 be easier for the record and it's all on one page.
23   A    Okay.
24   Q    So do you see Recommendation 2 in

Page 168

1 Exhibit 64?
2    A    Um-hmm.
3    Q    Yes?
4    A    Yes.
5    Q    If you would, please.  Thank you.
6 Do you see it says Order: Negative 75 OB Good until
7 Cancel, right?
8    A    Yes.
9    Q    And then it says Exit: 25 OB Good until
10 Cancel, right?
11   A    Correct.
12   Q    What's that exit 25 OB good until cancel
13 mean?
14   A    That is actually the max loss.
15 We're working on the idea that if we could have
16 that order in place, should it crash really fast
17 we can get out of it.
18   Q    So the idea is that the client
19 would consent to this trade sort of writ large
20 and if things sort of went really sideways, you
21 would consider that you had adequate authority to
22 exit at this max loss -- the price that would get
23 you the max loss?
24   A    Yeah, right.  Like I said, this is

Page 169

1  kind of the first time we were trying to figure
2  out how to get approval at the time of the entrance
3  or should we do it -- you know, it was -- some
4  of this was brand new to us and how do we -- before,
5  as you could tell, all of them were credit spreads.
6  You didn't need an exit criteria.  Now you need an
7  exit criteria.  How do we do that most efficiently
8  so that we protect our clients of, oh, well, gee,
9  it crashed way, way down and all of a sudden I can't
10  get out because I don't have an exit.
11     Q    Got it.
12     A    And so we have been working on multiple
13  iterations on this for a long time of how do we get
14  exit approval, found that sending out updates on a
15  Friday saying, okay, here's where our exit approvals
16  need to be.  We need your consent on those exit
17  approvals because it's not like in futures, well,
18  where it hits that price, well, it's kind of easy
19  to understand whereas this we have to keep watching
20  the markets.  We have to understand, you know, is
21  volatility dropping and, therefore, all the prices
22  are dropping.  Even though the price is moving in
23  our direction, we had to get out of it, you know,
24  those type of things.

Page 170

1     Q    Got it.  So I want to return to
2  this likelihood of achieving the target gain
3  piece.  So your testimony is that in April
4  of 2018 you and Mr. Gecas worked together to sort
5  of make the target gain a little bit more modest and
6  also more likely to occur, is that --
7     A    Right.
8     Q    -- fair to say?
9     A    Yeah.
10     Q    All right.  And your testimony is
11  that after April of 2018, those target gains were
12  gains that were 60 to 70 percent likely to occur,
13  is that right?
14     A    Right.
15     Q    So is that something you told to clients?
16     A    I don't know that we ever said exactly
17  what the targeted gain was based on.  We just said
18  that it's more likely than not.
19     Q    And this is something that you said to
20  clients?
21     A    Yes, same people.
22     Q    Right.  And is this something that you
23  had brokers say to clients, that the targeted gains
24  were more likely than not?

Page 171

1     A    Yes.
2     Q    So, you know, let me ask you about
3  that.  From April of 2018 through the present,
4  you know, have customers made money during that time
5  period overall or have they lost money?
6     A    Overall I would say they lost money.
7     Q    So how is it -- and I know that you
8  know this and I just don't.  How can it be that
9  trades are 60 to 70 percent likely to achieve this
10  target gain, which is solidly in the black -- even
11  accounting for commissions and fees, right?
12     A    Um-hmm.
13     Q    Yes?
14     A    Yes.
15     Q    So how can it be 60 to 70 percent
16  likely to achieve the target gains and yet be
17  negative overall?
18     A    Depends on the size of your loss and
19  the size of your gains.  We had some very good
20  months, had some so-so months, had some very bad
21  months.  November-December of -- November of last
22  year was a very bad month.  You had some massive
23  movements in the markets which were well outside
24  of a one-sigma move or one standard deviation

Page 172

1  move that given the trades we were making, blew up
2  our positions.  It's more about you have -- there's
3  the probability of something happening and then
4  the actual happening.  If I knew the probability
5  and the actual would be the same, you know, I look
6  at it this way.  Every trade we put out there was
7  a good trade based on the fundamentals that we saw,
8  the markets that we saw and, you know, one example
9  would be a lean hog.  We said, you know, prices are
10  going to have to go down, you know.  The inventories
11  are the highest they've been since 1967, you know.
12  Economics would tell you that prices have to come
13  down.  Prices climbed, climbed, climbed and climbed.
14  Never came down.
15     Q    So when customers lose money in
16  recommended trades, do those losses ever exceed
17  the target max loss?  Are you able to get out at the
18  price you want to get out at all the time?
19     A    I would say predominantly, yes, we'd be
20  out at our target max.
21         (Whereupon CFTC Exhibit No. 65 was
22          marked for identification, MM.)
23     Q    All right.  Mr. Donelson, I want to hand
24  you what I've marked as CFTC Exhibit 65.  And as you

Page 173

1 will see, it's a group exhibit comprised of an email
2 and then trade recommendations for March 27, 2018.
3 And I've given it away a bit, but I was going to
4 ask you do you recognize this document and, if so,
5 can you tell me what it is, please.
6 A It is a trade recommendation.
7 Q And this was a trade recommendation
8 that you gave to your brokers to send to customers,
9 correct?
10 A Correct.
11 Q All right. So if you look at the
12 cover email here, it looks like you're sending
13 recommendations for one contract and then two
14 contracts and then three contracts and then five
15 contracts and then ten. Am I reading that right?
16 A Correct.
17 Q And it looks like there are attachments
18 to this email that have substantially identical PDFs
19 but that recommend different numbers of contracts,
20 is that right?
21 A Correct.
22 Q So what's going on there? Why 1, 2, 3,
23 5 and 10, please.
24 A Those are based on the amount in the

Page 174

1 clients' accounts and I mentioned earlier kind of
2 what is their risk. Before this they were running
3 it through a system that would pick up something
4 and put it in. This was we did 1, 2, 3, 5 and 10.
5 So the customer -- I would send this to the brokers
6 with a PDF for each number of contracts so that
7 when they send out the recommendation, it's not I'm
8 recommending to you one contract, I'm recommending
9 to you two contracts so that when they get the
10 approval back, the number of contracts matches
11 what their approval is.
12 Q Got it. So --
13 A But there's no difference in the underlying
14 contract itself.
15 Q So how do you determine who gets
16 the one contract, two contracts, three contracts?
17 A Like I said, it's based on how much
18 excess margin they have and how much margin it
19 takes to do this trade, and then we try to keep
20 them within like 20 percent of all the trades.
21 Q Is it fair to say that for every $10,000
22 in equity or in excess margin that a customer has
23 in their account, they get recommended one contract?
24 Is that accurate or no?

Page 175

1 A It's close.
2 Q So why is that the magic number?
3 A Because it would be the margin
4 calculation coming back. If you're going to put
5 on four different trades, then if the margin of each
6 one of these would be around 500, 10,000, 500. So
7 by putting all four you'd have $2,000 of margin on
8 and that would be 20 percent of the 10,000 that
9 you have.
10 Q Got it.
11 A That's kind of the math behind it. The
12 idea is not to trade the entire account obviously.
13 Q All right. And looking again very
14 quickly at Exhibit 65, I don't see --
15 I don't see like an exit price on Exhibit 65. Can
16 you tell me where that is, please, if it's here.
17 A Oh, I screwed up and it says order
18 twice, if you noticed. It says order, order.
19 Q Oh, so that second order is supposed to
20 be the exit?
21 A Yeah, yeah.
22 Q Got it.
23 A Do you mind if we take a small break?
24 Q Yeah, yeah, of course.

Page 176

1 MR. BURDEN: Off the record, please.
2 (Whereupon a recess was taken from
3 2:08 p.m., to 2:25 p.m., after which
4 the following proceedings were had:)
5 MR. BURDEN: Let the record reflect
6 that neither I, nor any of my colleagues had
7 any substantive discussions with the witness
8 or his counsel, correct?
9 MS. WING: So stipulated.
10 THE WITNESS: Correct.
11 MR. BURDEN: Joe, take it away, if you
12 would, please.
13 FURTHER EXAMINATION
14 BY MR. PATRICK:
15 Q Mr. Donelson, you spoke earlier
16 about this percentage chance of reaching the profit
17 target. Do you remember that?
18 A Yes.
19 Q And it was roughly 30 to 50 percent?
20 A Yeah, but it's also a very high profit
21 target for that trade. That's kind of the high end
22 of what you could possibly make on that trade.
23 Q And I think you testified that later on
24 you started to, along with Scott Gecas, develop some

Page 177

1  trades that might have had a slightly higher chance,
2  percentage chance of reaching that profit target,
3  is that right?
4      A    More likely we moved the way we calculated
5  the target down.
6      Q    Okay.
7      A    Not necessarily that we changed
8  the trade itself.  It's just we said, well,
9  let's move the target down to a range so the
10  target profitability gets close more likely than
11  not versus kind of the very high end.
12     Q    Okay.  And you said that this was
13  something that you were discussing with your
14  customers and your salespeople and that your
15  expectation was that they were going to communicate
16  that --
17     A    Right.
18     Q    -- to the customers?
19     A    And the sales manager was in charge
20  of managing those salespeople.
21     Q    Okay.  So it strikes me that you
22  have the ability to go back and take a look at the
23  trades that you've been doing to determine whether
24  or not, you know, these profit targets are being

Page 178

1  achieved at the percentage rates that --
2      A    You would expect.
3      Q    -- you've been discussing with your
4  customers and with your salespeople, correct?
5      A    Correct.
6      Q    Did you do that?
7      A    Yeah, we did look back.  Like I said,
8  these two -- this set of trades was the first time
9  we've come out with these.  It was an evolving
10  process to figure out, well, what is it that's
11  the best way to depict these trades.
12     Q    Okay.  But as you're sitting here
13  today you've got -- since say February of 2018,
14  you've got somewhere around 16 months, right, of
15  trading performance since that time?
16     A    Right.
17     Q    As you're sitting here today, have
18  you gone back and looked at the trading that your
19  customers have done to determine whether or not that
20  profit target percentage is bearing itself out in
21  the actual trades that you're placing?
22     A    I have looked at it.  I haven't done
23  the exact percentage, but I think it's a little --
24  these were a little high.  The target was a little

Page 179

1  too high.  But we also at the end of 2018 changed
2  our trading style again just because this trade
3  was not being consistent in its profitability to our
4  customers.  We would have -- like I said, we would
5  have good months.  We would have bad months.  And
6  it would not bear itself out in a way that said,
7  hey, I can consistently make money with this trade.
8  And that's what I've been focused on the whole time
9  I've owned the firm is consistent profitability by
10  the customer in a way that makes sense for me as
11  a business and for them as a customer.
12     Q    So it sounds like you said that you did
13  actually go back and do some --
14     A    Right.
15     Q    -- review of actual client trading and
16  you determined that this 35 to 50 percent number
17  was maybe a little bit high?
18     A    Maybe a little bit high.
19     Q    And how did you determine that?
20     A    Just looking at the profitability
21  of the trades themselves and what they bore out
22  to in those trades.
23     Q    Okay.  So did you find that less
24  than 35 to 50 percent of the trades that you were

Page 180

1  recommending for your customers were reaching that
2  profit target?  Could you ask that question again, please.
3      A    Could you ask that question again, please.
4      Q    Sure.  So were you finding that less
5  than 35 to 50 percent of the trades that you were
6  recommending for your customers were reaching that
7  profit target?
8      A    Yes.
9      Q    Do you remember how much, what the
10  percentage was or how many of the trades weren't
11  reaching that?
12     A    Well, I'm trying to think of the
13  best way to say this because what we were trying
14  to bound is what's the gain and loss potential of
15  a trade.  If it made a profit, it still could have
16  made a profit but didn't hit the target or it could
17  have lost money but not lost the target.  So what
18  we're trying to do with that information was really
19  bound kind of what your probable gain or loss --
20  you know, how much gain or loss could you possibly
21  make on it.  I would say sometimes it would be we
22  would exit the trade.  It might have gotten to that
23  point, but we would sit on that exit recommendation
24  and leave the trade earlier than that.  So I'm not

Page 181

1  sure how much of it is the probability versus
2  what actually happens in reality because you're
3  trading along the way here and you're sitting out
4  recommendations and telling them, look, we're at
5  40 percent profit.  It's a good time to take off
6  the trade.  Could it have gotten there, possibly.
7  But that was one of the reasons why we lowered that
8  targeted goal, was to get to it you would have to
9  hold the trade -- it's like you'd be profitable
10  by, say, 30 percent.  And then you're holding it,
11  holding it, holding it, holding it and our clients
12  were more in tune with, look, if I've got a profit,
13  let's put it in our pocket and go to the next trade.
14     Q    But your testimony was, though, that when
15  you did make that adjustment, that the probability
16  then increased, correct?
17     A    The probability that you could hit
18  that target, yes.  That's not the same thing as
19  saying that the target -- that every trade I made,
20  I can't tell you I'm going to hit 50 percent of the
21  time it's going to be profitable.
22     Q    No, I'm only referring to the
23  percentage chance of reaching the profit target.
24  So the percentage chance of reaching the profit

Page 182

1  target, right --
2     A    All other things being equal, right.
3     Q    -- it previously was 35 to 50 percent
4  and that's what you were reporting to -- or you were
5  communicating to your customers --
6     A    Yeah, it was a little under 50 percent.
7     Q    -- and to your salespeople.  And
8  then when you made the adjustment, that percentage
9  chance of reaching the profit target moved up,
10  correct?  Instead of being 35 to 50, it was
11  somewhere closer to 60?
12     A    Yeah, probably 50 to 60.
13     Q    Okay.  Did you look at the
14  trading during that time period too?  Did you
15  compare the actual trading that you were doing
16  to these projections that you were making about
17  profit target?
18     A    Well, like I said, it's the difference
19  of what's happening when you're making the trade.
20  This is all statistical at the front end, right,
21  that says if it falls within this parameter and
22  if it moves here, it's going to have this type of
23  profitability.  The second I put that trade on,
24  all other things don't remain equal.  And so we're

Page 183

1  going to go back and do what's best for the customer
2  and we may exit before we hit the target.  That's
3  not to say we couldn't have possibly hit the target.
4  They're two different questions.
5     Q    Well, I guess what I'm trying
6  to understand is did the analysis that you did
7  reviewing your customers' actual trading match what
8  you were reporting to your customers and through
9  your salespeople to their customers regarding these
10  profit targets that you were reporting to them in
11  the trade recommendations?
12     A    I just think of it as two different
13  things.  I guess I'm not sure how to -- when you
14  talk about what is a targeted gain or loss, I'm
15  trying to give you a band of which -- that says
16  here's kind of where the high and low are going to
17  be and we're going to be in this area.  And then as
18  you go through the trade and as things move around,
19  you know, we're going to exit or we're going to get
20  out of a trade possibly earlier, but it could have
21  possibly hit that target.  I haven't ever done that
22  analysis which says if we would have carried this
23  trade all the way out, would it have hit the target.
24  That's a different analysis.

Page 184

1              FURTHER EXAMINATION
2  BY MR. BURDEN:
3     Q    Mr. Donelson, so between December
4  of 2017 and April of 2018 what percentage of the
5  recommended trades achieved the targeted gain?
6     A    I want to say -- well, before December
7  '18?  I mean, what was the time frame?  I'm sorry.
8     Q    You were telling me that this 35 to
9  50 percent number was the one that was being used
10  between December of '17 when you joined, right?
11     A    No, before that.  The December and
12  January they were doing the first recommendations
13  you showed.  And the max gain and loss on that are
14  purely --
15     Q    That's right, okay.
16     A    -- they're purely accurate.  There's
17  no guessing.  They just gave you max gain and max
18  loss.
19     Q    So January '18 was when your debit spread
20  started, right?
21     A    February.
22     Q    February.  So between February '18 and
23  April of 2018 what percentage of the recommended
24  trades achieved the targeted gain?

Page 185

1   A   I want to say two out of eight.

2   Q   So that is --

3   A   25 percent.

4   Q   All right. So between April of 2018 and

5 the end of 2018 what percentage of the recommended

6 trades achieved the targeted gain?

7   A   I don't know that statistic off the top

8 of my head.

9   Q   Is it less than 60 percent?

10   A   Probably, yeah.

11   Q   Is it less than 50 percent?

12   A   Yes.

13   Q   Is it less than 40 percent?

14   A   I'd have to look at the data.

15   Q   All right. So throughout your tenure

16 at Long Leaf have you done any backtesting for your

17 strategies?

18   A   Some of the strategies we have

19 backtested using QuikStrike, which you can do.

20 A lot of the strategies gets into -- one of the

21 things I've done with our newer strategies is lower

22 our commission rate. The lift is too big and that

23 commission rate was at 35.

24   Q   Well, let me make it a little bit

Page 186

1 simpler and we can band it by time. So between

2 February of 2018 and April of 2018 did you backtest

3 any of those credit spread strategies that you were

4 recommending -- I'm sorry, debit spread strategies

5 you were recommending?

6   A   We backtested them. We tested them

7 on different markets. It got into the question

8 of did we hit the right point, did we -- one thing

9 that has changed also was the strategy was always

10 being traded almost at the same time every month

11 because it's kind of a monthly trade, and that

12 was an issue.

13   Q   So an issue for what? Like are you

14 saying --

15   A   You're entering the same market conditions

16 with four trades.

17   Q   So it sounds like your testimony

18 is that you tried to backtest but it wasn't an

19 effective simulation. Am I understanding that?

20   A   It really isn't until you can actually --

21 we don't have that type of computer capability. We

22 can backtest with what we have, which is QuikStrike,

23 but we don't have a full quant base to build off of.

24

Page 187

1          FURTHER EXAMINATION

2 BY MR. PATRICK:

3   Q   What about just a track record? Do you

4 keep track of a track record?

5   A   Yeah, we kept track of all of our trades.

6 We do now too.

7   Q   So roughly you said about four trades

8 per month, correct?

9   A   Um-hmm.

10   Q   And that's not counting these additional

11 trades that you might see that are more --

12   A   Opportunistic.

13   Q   Opportunistic, yes. Thank you.

14 So you maintained a track record for each of your

15 trade recommendations?

16   A   Yes.

17   Q   And how did you do that? Like physically

18 how did you do it? Did you create a spreadsheet?

19 How did you do it?

20   A   I downloaded all of the trade data

21 from Gain -- you can get that all electronically --

22 and then built a database of all the trades and

23 basically calculate out what the gain and loss on

24 the trades were.

Page 188

1          FURTHER EXAMINATION

2 BY MR. BURDEN:

3   Q   Did you calculate that out for -- what

4 period did you calculate that out for, please.

5   A   All the way through August of 2018,

6 and then we switched to Cunningham. So we've had

7 to rebuild and retool everything trying to do that,

8 and then I actually went back in the history just

9 to figure out what had gone on before.

10   Q   What was sort of the starting period

11 for this track record that you put together in

12 this database? It's what through August of '18?

13   A   Probably like January of '17.

14   Q   All right.

15   A   Sometimes I could not get it to

16 tie to the reports. That was always why I was

17 fearful of sending it out to too many people because

18 it was like I couldn't get the trades to tie out

19 to what happened on the report. So usually only

20 if somebody specifically asked me or something like

21 that would I try to put something together. It was

22 a lot of work.

23

24

Page 189

1 　　　　FURTHER EXAMINATION
2 BY MR. PATRICK:
3 　　Q　You said it was a database?
4 　　A　Um-hmm.
5 　　Q　What software did you use to --
6 　　A　Access.
7 　　Q　Access. So it's an Access database?
8 　　A　Um-hmm.
9 　　Q　And was that produced to us?
10 　　A　No. That's just a -- it's basically
11 just something that I download all the fills and
12 everything else. I use it to try to analyze things,
13 but it's got its perks. It works sometimes. It
14 doesn't work sometimes. Not something overly shared
15 with a lot of people because I just don't have a lot
16 of confidence in it yet.
17 　　Q　Outside of calculating trading
18 performance on the recommended trades, what else
19 do you use that database for?
20 　　A　Cash movements, tracking cash movements
21 just to make sure I see what it is for some of the
22 AML procedures, like if somebody takes out more than
23 10,000 or something like that. Even though the FCM
24 is technically in charge of that, I would still want

Page 190

1 to see did I know about it, why did they take it
2 out, those type of things.
3 　　MR. BURDEN: When did you put together
4 this database, Mr. Donelson?
5 　　THE WITNESS: Oh, I've been building
6 it off and on since I started. Probably didn't
7 really get most of it built until the fall
8 of 2018.
9 BY MR. PATRICK:
10 　　Q　Have you created any sort of scripts
11 or queries for that, like queries that you use
12 repeatedly or design programs to analyze certain
13 kinds of trades in the database?
14 　　A　Not really. It's more just here's
15 the trade and here's the profitability of that
16 trade. I have not tried to build -- I'm not really
17 sure what you mean by fancy scripts or anything like
18 that. It's basically a database that I then can put
19 in Excel and play around with.
20 　　Q　Can you use it to query an individual
21 customer --
22 　　A　Yeah.
23 　　Q　-- and that customer's trades and
24 profitability?

Page 191

1 　　A　Right.
2 　　Q　And is that what you use to create
3 those kinds of reports for customers?
4 　　A　Yeah. The only problem is is anything
5 to do with if something got exercised into a future,
6 that's not the way it works in that system. So you
7 have to play around with it. That's always been
8 the difficulty of it and it doesn't tie. That's
9 a different issue.
10 　　Q　And what does this database that you
11 created, what does it say about profits in the
12 customers' accounts or tracking the profitability
13 of individual trades?
14 　　A　Well, we have -- the way we -- I built
15 it so that I can take all those legs and call it
16 one trade so that I don't have to go, well, how much
17 did they make on this leg. Then we had I would say
18 looking from February through November -- or through
19 August we were making profits on trades. We were
20 losing money on trades. We weren't consistent
21 with what we were trying to do, which is we want
22 to have a consistent profitability. That means
23 you're taking lower risk but you're taking lower
24 reward, and that's kind of where we've moved

Page 192

1 our trading to.
2 　　Q　And how does this database get updated? Do
3 you have to manually update it with the new trades?
4 　　A　Yeah.
5 　　Q　So it doesn't automatically get fed those
6 new trades from Cunningham or Gain?
7 　　A　No, it does not. Cunningham doesn't
8 provide electronic files other than PDFs, so it's
9 not as easy. I don't go through the entire days
10 of trading and do it. It's -- we build it off the
11 worst entry and worst exit prices saying, okay,
12 this is the worst price I got in at and this is
13 the worst price I got out at, and in an individual
14 that did two of these trades it may or may not
15 exactly pull their statement. And we've been
16 starting to use that over the last month or so as
17 I've felt more comfortable with that data being
18 accurate, and it's always close to what their net
19 liq is. It's not perfect, but it's close. And I
20 know that it's not going to be because if one person
21 had a slightly better entry than that, it's going
22 to be a different number, but we track it trade by
23 trade.
24

Page 193

1        FURTHER EXAMINATION
2  BY MR. BURDEN:
3    Q   All right. I think you testified
4  as well that after December of 2018 you changed
5  your strategy again at Long Leaf, is that right?
6    A   Correct.
7    Q   What did you change it to?
8    A   We changed it to a -- there's two
9  main trades that we make. One is a volatility swap,
10  which is buying a back strangle and then selling a
11  front strangle but that the front strangle actually
12  has higher volatility than the back. So what that
13  does is I get to collect more on a short-dated
14  option and I, therefore, significantly reduce
15  the cost of the back strangle. And we've done
16  that in metals, currencies, oil. The only thing we
17  almost never -- well, I wouldn't say almost never.
18  I have never traded it is anything to do with the
19  equity indices and mostly because our customers
20  already have exposure to the equity indices. And
21  then the other trade is a similar trade but for
22  very low volatility assets, which is actually
23  a gut strangle.
24    Q   And did you assess a likelihood

Page 194

1  of obtaining target gains on these volatility
2  swaps and gut strangles?
3    A   We lay them out a different way to
4  kind of tell them what their exposure is, what their
5  margin is, what happens when the front expires,
6  here's how much you're going to have to cover to
7  make it profitable.
8    Q   Got it. Going back again to the
9  likelihood of profitability with respect to all of
10  the recommended trades, did you assess -- you know,
11  we've been talking about the likelihood of achieving
12  the target gain, right?
13    A   Right.
14    Q   So did you assess the likelihood of
15  achieving any profitability at all?
16    A   Yeah. Every -- I mean, when we look
17  at the trades and we build them up, there's some
18  assessment of what's going to have to happen to this
19  asset. And I would say, you know, like any person
20  trading, every trade you make makes sense. It looks
21  at what we're looking at in the marketplace and we
22  believe it'll be profitable. That's not the same
23  thing as saying did it end up that way.
24    Q   No, no, I understand. But what I'm

Page 195

1  asking is if you can get QuikStrike to tell you
2  that there's a 35 to 50 percent chance of obtaining
3  a target gain, can you say, hey, QuikStrike, tell
4  me what the likelihood is of achieving any
5  profitability, even a single cent?
6    A   Well, you look at what are the factors
7  that are going to affect it, not necessarily is it a
8  probability. It's the -- the primary one is usually
9  falling volatility is almost at any time one of the
10  killers of the trade, if it falls and you're in a
11  debit position and then kind of where would it
12  have to move to. QuikStrike could do those things.
13  It's not -- I mean, you have to play around with it.
14  You have to play around with a lot of different
15  aspects of it.
16    Q   Got it. So if you wanted the number
17  of a trade, you know, the percentage likelihood of
18  a trade that would break even, you'd have to monkey
19  around with the legs and create a trade that breaks
20  even, right, and it would tell you the likelihood
21  that that would happen?
22    A   It would tell you the probability
23  of it happening, not necessarily the likelihood.
24    Q   Got it.

Page 196

1    A   They're two different things.
2    Q   So did you ever do that exercise?
3  Did you ever say let's put together a trade that
4  makes, you know -- we've got a trade. We've got
5  different strike prices. Let's mess around with
6  the strike prices until we find a trade that makes
7  one cent. Did you ever do that? I'm not saying
8  you should do that or that it makes sense. I'm
9  just asking if you did.
10    A   No.
11       (WhereuponCFTC Exhibit No. 66 was
12      marked for identification, MM.)
13    Q   Okay. Mr. Donelson, I want to hand
14  you what I've marked as CFTC Exhibit 66. Do you
15  recognize this document? If so, can you tell me
16  what it is, please.
17    A   Yes.
18    Q   All right. What do you recognize
19  Exhibit 66 to be?
20    A   It's a trade recommendation I sent out
21  to our brokers.
22    Q   All right. So this first attachment,
23  it's titled -- it's a file called Customer Analysis.
24  It's on the second page of Exhibit 66. Do you see

Page 197

1 that?
2   A   Yes.
3   Q   So did you create this?
4   A   Yes.
5   Q   What is this thing, please.
6   A   It is the -- this is how we determine
7 if somebody has enough margin to make the trade.
8 So we start with excess margin in their account as
9 of whatever day this was, and then expected is --
10 expected is what each one of the brokers had forward
11 at the time in the system that said this is how
12 many contracts per trade they were going to do.
13 And then it's just determining to make sure that
14 we are putting somebody in margin deficit at the
15 time of the trade because the way it was traded
16 at that time through Gain, they couldn't make that
17 determination because they were doing it as a block
18 trade.  So we had to make sure that we did not put
19 somebody in margin deficit at the time of trade.
20   Q   Got it.  So this is just a workup
21 that you put together and it would -- the Expected
22 column is the number of contracts that are going
23 to be recommended to a client and that's based
24 on their available margin, is that correct?

Page 198

1   A   Correct.
2   Q   All right.
3   A   Actually, let me correct that.
4   Q   Go ahead, yeah.
5   A   The expected is how many they have
6 agreed to -- I know I created this spreadsheet
7 but this -- actually, it's a determination of two
8 different things.
9   Q   What are those things, please.
10   A   How many they said they would do and
11 then do they have adequate margin to do that many.
12 So if one was higher -- you know, if they agreed
13 to do 3 but they could do 15, they're going to do 3.
14 If they agreed to do 3 but can only do 1, then we're
15 going to send it only as 1.  That's what the whole
16 intent of that was.
17   Q   Got it.  So what does the expected
18 show?  Does it show what they want to do or what
19 they can do?
20   A   It would first start with what they
21 want to do.  But if they cannot enter that many,
22 then it would be in what they can do.
23   Q   Okay.  And where's the column for what
24 they want to do?

Page 199

1   A   I usually hid that when I printed it out.
2   Q   Got it.  So the Expected column is what
3 you're going to let them trade?
4   A   Right.
5   Q   Okay.  And if you look -- if you just
6 turn the page to the third, fourth, fifth page of
7 Exhibit 66, we've got the actual recommendation,
8 right?
9   A   Um-hmm.
10   Q   Yes?
11   A   Yes.
12   Q   And this one is -- it may seem silly
13 that we keep harping on it, but it just doesn't
14 show up on the transcript unless you say yes.  It
15 just says grunt or something.  So I want to direct
16 your attention to where it says Trade Approval and
17 it says Exit Order: Market.  What's going on there,
18 please.
19   A   This is still us trying to figure out
20 how to get that exit approval on the front.  This
21 wasn't -- this was an attempt at it until somebody
22 explained to me that market meant something
23 different than I would think it meant.
24   Q   What did you think it meant?

Page 200

1   A   Well, I would think that I could
2 exit at target loss if that was the market, and
3 that's not the way it would be interpreted.  We
4 were still trying to figure out how to -- this was
5 tricky, and it's still tricky to this day, is how
6 to get exit approval for an option trade or any
7 type of trade where you're trying to exit a trade
8 but there's four pieces of it.  So are you asking
9 for exit of each component or are you asking for
10 the whole thing.  So, for example, we may want
11 to buy back a specific leg that's getting close to
12 being in the money, but it may be cheaper for them
13 to buy it.  Is that part of the total exit approval?
14 Is that a specific exit?  It's something we've
15 actually talked to quite a few people about how's
16 the best way to get this exit approval done.
17   Q   And how did you ultimately get the exit
18 approval done?
19   A   On this one it would have been something
20 we sent out directly to them.
21   Q   Well, it seems like per Exhibit 66
22 you didn't go back to the clients.  You're like
23 we're going to -- the trade recommendation reflects
24 that you're going to try to get out of the trade

Page 201

1  at, you know --
2      A    Yeah, you can see our targeted gains
3  are significantly lower now.  That's where we --
4      Q    Are you all right over there?
5      A    Well, I don't usually wear glasses
6  and I can't -- I'm trying to go between looking
7  at you and reading at the same time.  So, yeah,
8  we interpreted market that if we could hit the
9  targeted gain, we'd get out at the targeted gain.
10  And that's -- like I said, we're still working on
11  how to get that approval in a timely manner in the
12  structure we have because a lot of trades are --
13         MS. WING:  There's no question pending.
14         (WhereuponCFTC Exhibit No. 67 was
15              marked for identification, MM.)
16  BY MR. BURDEN:
17      Q    All right.  Mr. Donelson, I want to
18  hand you what I've marked as CFTC Exhibit 67.
19  If you could take a look at it for me, please,
20  and tell me if you recognize it.
21         MS. WING:  Is this the only 67?
22         MR. BURDEN:  Yeah.  Do you have another
23  one?
24         MS. WING:  I thought I did.  Let me

Page 202

1  double check here.  Oh, that's 57.  I just
2  didn't want to duplicate.
3         MR. BURDEN:  No, that's fine.  That's
4  a pain when that happens.
5      Q    Do you recognize this document,
6  Mr. Donelson?
7      A    Yes.
8      Q    Can you tell me what Exhibit 67 is, please.
9      A    It is a trade recommendation.
10      Q    All right.  Is this a trade recommendation
11  that you gave to your brokers to send to clients?
12      A    Yes.
13      Q    All right.  So let's take a look
14  at this because the format is different than some
15  of the earlier recommendations, right?
16      A    Correct.
17      Q    All right.  So we've got our price.
18  We've got our value at expiration.  What's value
19  at expiration, please.
20      A    In this case this is a gut strangle
21  and the minimum value that the gut strangle would
22  be worth is the -- is $4,000 because you're buying
23  a 142 call.  You're selling a 146 put -- I mean
24  you're buying a 146 put.  Worst case, if it ends

Page 203

1  up anywhere between those two numbers, it's worth
2  $4,000.
3      Q    All right.  So is that the value that
4  customers achieved from this trade recommendation?
5      A    No, they received something higher than
6  that.
7      Q    All right.  So this was a good trade
8  recommendation?
9      A    Right.
10      Q    All right.  So it says Return on Trade
11  at the bottom there.  Where is return on trade?
12  Is that 2.22 percent?
13      A    Yes.
14      Q    Am I reading that right?
15      A    Um-hmm.
16      Q    All right.  So how is that return on
17  trade determined?
18      A    The 104.89 divided by 4723.24, I think.
19      Q    All right.  So rather than -- what
20  are the factors that go into that return on trade?
21  It sounds like in this case that that return was
22  realized, is that correct?
23      A    I don't know if it was at that exact
24  number, but it was close.

Page 204

1      Q    So how are we getting this return on
2  trade number?
3      A    Can I ask a question?  What do you
4  mean how are we getting?  How are we mathematically
5  calculating it?
6      Q    Yeah.  How is that assessed?  So you're
7  telling -- what are you telling customers here?
8      A    Well, we've told people in this type of
9  trade that the return is going to be fairly low.
10  You've got to think of it in dollar terms because
11  you're paying a lot of money for the trade that
12  has an ending value to it.  So while you're paying
13  $5,000 for something that's worth 4,000, it's always
14  worth 4,000.
15      Q    Got it.
16      A    So -- and then this basically just
17  shows you that we're going to be targeting 2 to
18  3 percent on that type of trade.
19      Q    And how do you determine that the
20  2.22 percent is the amount you hope to obtain
21  on it?
22      A    In this case it is using our QuikStrike,
23  we figure out the number in the middle here, which
24  is 4828.13, and that would be what is the value

Page 205

1 of the buy at the expiration of on 2/1/18 -- 19, 19.
2    Q    Got it.
3    A    And then that says, well, then you're
4 going to be -- the long position's going to lose
5 $317 and what you sold will make you 422, so you'll
6 be net ahead 108 and we asterisk with it. That
7 assumes that futures stays at the current price
8 with all the same volatilities.
9    Q    Got it. So this return on trade
10 percentage that we see in recommendations after
11 this date, that's a return on trade that assumes
12 that futures stay at the current price and the
13 current value, is that right?
14    A    Correct.
15    Q    So your testimony was that Mr. Gecas
16 primarily came up with these trading strategies,
17 right?
18    A    Correct.
19    Q    So at some point Mr. Gecas left the firm,
20 is that right?
21    A    Correct.
22    Q    And when was that, please.
23    A    December 14, 2018.
24    Q    All right. So after December of 2018

Page 206

1 who came up with these strategies for Long Leaf?
2    A    I did.
3    Q    Did you have any help with that?
4    A    Other than what I had learned from
5 Scott for the preceding 12 months and then another
6 trade that we had tried for a few clients that was
7 successful. So we kind of stuck to those trades
8 that we saw the success on.
9    Q    So you did these trades by yourself?
10 You came up with them by yourself after December
11 of 2018?
12    A    Correct.
13    Q    So with respect to Mr. Gecas, do you
14 know how he came up with the trades? I mean, you
15 see -- you guys make trading recommendations in like
16 corn, right?
17    A    Um-hmm.
18    Q    Yes?
19    A    Yes.
20    Q    And bonds, right?
21    A    Right.
22    Q    And hogs, right?
23    A    Right.
24    Q    And these commodities are not correlated

Page 207

1 at all. In fact, that's kind of the point, right?
2    A    Correct.
3    Q    So how did Mr. Gecas, if you know, if
4 he told you, how did he come up with these trades?
5 How did he know what to trade or what prices?
6    A    He would do the technical analysis
7 on those markets, bonds, soybeans, looking at,
8 you know, all the technical stuff that I'm not --
9 Bollinger Bands and whatnot. He would determine,
10 hey, this is a market that needs to get traded.
11 Then he and I would really work out, well, what
12 are the strikes, what are the prices we want to --
13 you know, what is that structure that we want to
14 put on that trade.
15    Q    So Mr. Gecas would determine what he
16 wanted to trade and how he wanted those trades to
17 be structured based on technical analysis, correct?
18    A    Correct.
19    Q    And then after he came up with what
20 he wanted to do, you would work with Mr. Gecas and
21 you'd come up with what the strike prices should be,
22 is that right?
23    A    Strike prices and we would review
24 the economics, kind of what is out there in the

Page 208

1 market about soybeans or hogs or whatever.
2    Q    And that's the technical analysis, right?
3    A    Technical is more just the charts and
4 lines. The other would be he actually spoke on
5 RFD-TV. So he would go through a lot of just what's
6 going on in those markets, supply and demand. That
7 to me is the economic analysis, not the technical
8 analysis.
9    Q    And would Mr. Gecas tell you about the
10 economic analysis?
11    A    I would read most of it too.
12    Q    Did this economic analysis, was it economic
13 analysis that you performed?
14    A    No. It would be from different data
15 sources, MarketWatch, Hightower Report, you know.
16 There are a lot of different sources of information
17 about what's going on in the grains.
18    Q    And did you source this information
19 or did Mr. Gecas source it and provide it to you
20 and you would read it?
21    A    We both could get it. We both had
22 The Hightower Report, so we would both look at it.
23 The MarketWatch we would both read.
24    Q    All right. So do you know what

Page 209

1 Mr. Gecas was looking for in terms of technical
2 analysis?
3    A    I learned from him what data he's looking
4 for.
5    Q    What did he tell you?
6    A    Looking at trends, looking at bottoms
7 or support levels, resistance levels.  If something
8 breaks through, it's going to break through at a
9 certain level.  He showed me kind of on his charting
10 of like here's how that works, here's how that
11 moves across.  I am not a big believer in technical
12 analysis but the market is, so you have to
13 understand because the market's going to behave
14 that way.
15    Q    Got it.  So did Long Leaf Trading
16 use any algorithms or computer programs other than
17 QuikStrike to come up with these trades?
18    A    No, we did not.
19    Q    So it sounds like your sources of
20 information for arriving at these trades, as far
21 as you knew from Mr. Gecas, were publicly available
22 sort of news reports, is that right?
23    A    Publicly available news reports, yes.
24    Q    And also historical information on options,

Page 210

1 is that right?
2    A    Correct.
3    Q    What else?
4    A    Well, obviously the actual market
5 information live streaming to us in our systems.
6    Q    Okay.  What else?
7    A    I think that was the bulk of where it
8 came from.
9    Q    All right.
10    A    There was always a rumor on the floor
11 that you heard.
12    Q    Were you on the floor?
13    A    No.  But he would -- when he did his
14 TV spots, he would walk over to the CME floor.  He
15 knew a lot of people there.
16    Q    How frequently would Mr. Gecas do TV spots?
17    A    Once a week, twice a week.
18    Q    Do you know how far back Mr. Gecas
19 would look when he was looking at market historical
20 information?
21    A    About six months.
22    Q    And was that something Mr. Gecas told you?
23    A    Yeah.
24    Q    Was it typically six months for all

Page 211

1 of his trades?
2    A    Sometimes it would be six months.
3 Sometimes it would be -- we would be trading
4 around some type of an event, for example, a big
5 crop report release, an FOMC meeting, something like
6 that, which is not as much of a technical trade.
7    Q    So was that the case most of the time,
8 that Long Leaf was recommending trades it had built
9 around an event?
10    A    No.
11    Q    Just some of the time?
12    A    Yeah.  Some events were more important
13 than other events.
14    Q    Was there ever a month where
15 Mr. Gecas couldn't come up with, you know, four
16 recommendations for customers to do?
17    A    No.
18    Q    Any month where you couldn't come
19 up with four recommendations for customers to do?
20    A    Oh, in the first few months I could
21 come up with one or two.  But as I've learned, yeah,
22 I could easily come up with four or more.
23    Q    When you took over trading, what
24 did you look at to decide what types of trades

Page 212

1 you wanted to recommend?
2    A    We were looking at low volatility
3 assets, which used to be -- bonds used to be
4 low volatility, not lately.  Currencies, that
5 was a specific trade you showed in No. 67.  And
6 then looking for volatility discrepancies across
7 all the other markets.
8    Q    Well, I guess what I'm asking is
9 specific sources.  Like what news programs did
10 you watch?  Did you utilize a computer program?
11 Things like that.
12    A    We still used QuikStrike quite a bit.
13 We have Bloomberg on all the time, mostly because
14 they have more about commodities.  We still read
15 MarketWatch.  We have one guy who actually writes
16 for MarketWatch.  And then The Hightower Reports
17 and kind of a streaming amount of news.  There's
18 Donald Trump's Twitter account.
19    Q    So when you were working on developing
20 trades to recommend, you were looking at Bloomberg,
21 MarketWatch, Hightower and sort of other public
22 news, is that right?
23    A    Right.
24    Q    What else are you looking at?

Page 213

1    A    We're actually looking more at the actual
2  options structures.
3    Q    What do you mean by that?
4    A    So is the volatility in the front
5  higher than the volatility in the back?  That's
6  an opportunity for a trade.  Kind of what is the
7  overall volatility of a certain asset versus its
8  historical level.  So we're looking more on the
9  actual options structure to see if the structure's
10  something that could be traded, then saying does
11  the news support that type of trade.
12         (WhereuponCFTC Exhibit No. 68 was
13           marked for identification, MM.)
14    Q    All right.  I want to hand you what
15  I've marked as CFTC Exhibit 68.  Let me know if
16  you recognize this document, please.
17    A    Yes, I do.
18    Q    Can you tell me what it is, please.
19    A    It is Tim Evans sending me an email.
20    Q    And you're responding to Mr. Evans
21  and you write, "We have four good positions on.
22  We almost made an ES volatility swap but it was
23  too expensive.  It would have made a fortune.  It
24  has been nice not having to worry about the drop

Page 214

1  in the ES."  Did you write that?
2    A    Yes.
3    Q    So what's going on here?
4    A    So he just -- he was actually in Mexico
5  at the time, hadn't been following the markets.
6  We had looked at doing an ES mini volatility swap.
7  And, you know, backtesting it after that, it would
8  have made a ton of money.  But it was very expensive
9  to get in, so we couldn't recommend it to our
10  clients.  It was just too expensive.
11    Q    So when you say too expensive, you know,
12  what I want to know, if you'll tell me, please, is
13  what role does the price of a trade have on whether
14  you're going to recommend it?
15    A    It's more about the margin than the price.
16    Q    Tell me why, if you would, please.
17    A    You know, the -- so the price of
18  the trade you saw in 67 is $5,000.  However,
19  the margin is significantly lower than that.  This
20  trade, I don't remember the exact margin, but it
21  was 3 to $4,000 of margin to make that trade because
22  of the ES mini being highly volatile.  Anytime it's
23  highly volatile the margins go significantly up.
24  It makes it very hard to make those trades.  Also,

Page 215

1  we don't trade the ES that often because it is
2  very efficient.  It's one of the most efficient
3  markets out there in terms of trading, that you
4  don't get much slack in being able to get in or
5  out of the trades.
6    Q    So when you're building a trade
7  to recommend at Long Leaf, you know, it sounds
8  like it's built around it not taking up more than
9  did you say 20 percent of the account for margin?
10    A    Right.  The idea is to not overextend
11  them into 100 percent of their account being in
12  margin because even when you enter a trade, the
13  margin's going to move all through the trade.  So we
14  usually take margin, multiply it times 150 percent
15  and say that's how much margin you need to have.
16         (Whereupon  CFTC Exhibit No. 69 was
17           marked for identification, MM.)
18    Q    All right.  Mr. Donelson, I want to
19  hand you what I've marked as CFTC Exhibit 69.  And
20  please look it over and tell me if you recognize
21  the document.
22    A    Okay.
23    Q    Do you recognize Exhibit 69?
24    A    Yes.

Page 216

1    Q    Can you tell me what it is, please.
2    A    An email chain.
3    Q    And this is an email chain that you were
4  on, right?
5    A    Correct.
6    Q    All right.  So I want to direct
7  your attention to the middle of the first page of
8  Exhibit 69.  And you write on February 12, 2018 --
9  well, it says James Donelson writes, "We may need
10  to adjust the hogs again to 4.  Below that number
11  the trade doesn't cover the fees."  Was that
12  something you wrote?
13    A    Correct.
14    Q    So what's going on there, please.
15    A    I'm not sure which hog trade this
16  is, but what we're saying is to go out with a
17  trade adjustment to 4 and -- meaning we would
18  sell at 4.  If you sell below that, it's actually
19  negative.  You're going to end up negative.
20    Q    And that's because there are going to
21  be fixed commissions, right?
22    A    Fees, not commissions, on the exit.
23  Just the fees on trading that trade, if you went
24  to 3 it would actually -- you would still -- it

Page 217

1  would cost you money to trade.
2    Q    Got it.
3    A    That's what we're talking about.  It
4  happens.
5        MR. BURDEN:  Can we take a quick
6    five-minute break, please.
7        MS. WING:  That would be great.
8        MR. BURDEN:  Off the record.  Thank you.
9          (Whereupon a recess was taken from
10           3:17 p.m., to 3:30 p.m., after which
11           the following proceedings were had:)
12        MR. BURDEN:  Let the record reflect
13    that neither I, nor any member of my team
14    had any substantive discussions with the
15    witness or his counsel.  Isn't that right,
16    witness' counsel?
17        MS. WING:  So stipulated.
18        THE WITNESS:  Correct.
19  BY MR. BURDEN:
20    Q    All right.  Mr. Donelson, when you
21  started at Long Leaf Trading in December of 2017,
22  did you receive statements from Gain?
23    A    Yes.
24    Q    And those statements came to you

Page 218

1  every day in your email inbox, correct?
2    A    Yes.
3    Q    All right.  And so did those statements
4  show customer profit and loss over the life of the
5  accounts?
6    A    No, they don't.
7          (Whereupon CFTC Exhibit No. 70 was
8           marked for identification, MM.)
9    Q    All right.  I want to hand you what I've
10  marked as CFTC 70.  Do you recognize this document?
11    A    This is the one -- yes.
12    Q    All right.  What's this document, please.
13    A    I think it's the introducing broker report.
14    Q    And how frequently did you receive this
15  at Long Leaf Trading?
16    A    I think I received it daily, the daily
17  balancing reports.
18    Q    All right.  So what does the daily
19  balancing report show?
20    A    Well, the daily balancing report was --
21  really what I focused on was the Moneyline and
22  making sure that the cash and everything tied out.
23    Q    All right.  So let's take a look, if
24  we could, please, at the next page of Exhibit 70.

Page 219

1  And if you look, Exhibit 70 has five attachments.
2  This is just one of the attachments and it's an
3  attachment titled -- I don't think the attachment
4  is titled, but it says Account Sequence Status
5  Report.  Do you know what the Account Sequence
6  Status Report is?
7    A    It's a lifetime report of P&L.
8    Q    A lifetime report of P&L?
9    A    I think.
10    Q    All right.  Was this a document that
11  you looked at while you were at Long Leaf Trading?
12    A    I would look at it monthly.  I wouldn't
13  look at it daily.
14    Q    Okay.  Did you get a special monthly
15  one or would you just look at the daily one once
16  a month?
17    A    Just the last one of the month.  It would
18  give you the same answer.
19    Q    If you could, please, could you point
20  me -- let's just look at this first page in the
21  account sequence status report.  Can you show me,
22  please, where the life-to-date P&L of the account
23  is, please.
24    A    It would be -- that profit and loss

Page 220

1  right there would be the middle column called LTD
2  Amounts -- the life-to-date profit and loss 4915 is
3  the profit and loss life to date.
4    Q    All right.  What's the DR stand for,
5  please.
6    A    Debit.
7    Q    So that LTD, what does LTD stand for,
8  please.
9    A    Life to date.
10    Q    All right.  So Exhibit 70 indicates
11  that this particular account, Account E53602, had a
12  life-to-date loss of $4,915, is that correct?
13    A    Correct.
14    Q    All right.  So you, in fact, did
15  receive -- and the account sequence statement would
16  show this every day for every Long Leaf Trading
17  account, the P&L --
18    A    Correct.
19    Q    -- for the life of the account, correct?
20    A    Correct.
21    Q    All right.  And you testified that
22  this was a document you looked at once a month,
23  right?
24    A    Um-hmm.

Page 221

1   Q   Yes?
2   A   Yes.
3   Q   All right.  So do you remember the
4   first time you saw the P&L for Long Leaf Trading
5   accounts?
6   A   For you mean this report?
7   Q   Sure.
8   A   I saw it the first month I was there.
9   Q   Okay.  And what did it reflect in
10  terms of the P&L for Long Leaf Trading accounts?
11  A   That most of them were a loss.  I had
12  to figure out which ones were self-traders, though.
13  Some of these are self-traders.  These are all the
14  accounts.
15  Q   Got it.  So how did you figure out
16  which traders were self-traders and which ones were
17  traders who traded on a broker-assisted basis?
18  A   It would be based on the broker code.
19  Q   Got it.  So when you first saw the
20  P&L for Long Leaf Trading accounts, I think your
21  testimony was that most of them were losers, is that
22  right?
23  A   Correct.
24  Q   All right.  What about the traders

Page 222

1   who did broker-assisted trading, were most of
2   them losers when you first started at Long Leaf?
3   A   Yes.
4   Q   How much were they in the hole, if you
5   can generalize?
6   A   I couldn't really generalize the total
7   number.
8   Q   It varied depending on the customer,
9   correct?
10  A   Varied on the customer.  Varied on when
11  they got there.
12  Q   But substantially all of them had lost
13  money, correct?
14  A   Correct.
15  Q   So was this a surprise to you?
16  A   It was not -- it was a shock in terms
17  of that every customer lost money.  I expected some
18  up, some down.
19  Q   So what did you do when you learned this?
20  A   I started looking at the trades
21  and figuring out what drove them to this number.
22  Q   What drove them to those losses?  Did you
23  ever figure it out?
24  A   There were certain months where they

Page 223

1   would lose on all four trades.  2017 overall
2   was not a good trading year for them.  They had
3   good months, they had bad months, but it wasn't
4   consistent.
5   Q   Is it fair to say that in 2017
6   substantially all customers lost money who followed
7   Long Leaf's recommendations?
8   A   I wasn't personally there.
9   Q   Yeah.  But you looked at the results,
10  didn't you?
11  A   I would say yes.
12  Q   All right.  What about 2016, did you
13  go back and look at 2016 customer P&L for Long
14  Leaf Trading?
15  A   I tried to.  I got some months, but some
16  months I couldn't get to the data.
17  Q   All right.  How come you could get
18  some and not others?  I feel like you should be
19  able to get them all.
20  A   The -- I might be mixing up years.
21  I think I couldn't get all of '15.  '16 I could
22  get all of.  But trying to bunch the trades together
23  was a little more complicated.
24  Q   Got it.  So for 2016 did customers

Page 224

1   make money overall or lose money overall who traded
2   at Long Leaf?
3   A   From what I saw, they were down but not
4   down as much as they were in 2017.
5   Q   Got it.  So what about 2015, was 2015
6   a good trading year for Long Leaf Trading customers?
7   A   Like I said, I didn't have all the data
8   for 2015.
9   Q   Where did you seek the data from?
10  A   From the Gain system I could download
11  all trading data.
12  Q   So did you have trouble downloading some
13  of that 2015 data?
14  A   They moved trading -- clearing firms
15  sometime in 2015-2014, so they only had partial data
16  in there.
17  Q   Okay.  What did you do to try to get the
18  missing data from 2015?
19  A   There was no way to get missing data from
20  2015.
21  Q   But what about --
22  A   You had to go through the reports and
23  pull it off --
24  Q   Well, did you talk to anybody from

Page 225

1  Gain and say can you help me get the missing data
2  from 2015?
3      A   No, I did not.
4      Q   Did you email anybody from Gain?
5      A   No.
6      Q   Who was Gain's previous clearing firm,
7  if you would, please, if you know.
8      A   Gain's --
9      Q   You said they changed clearing firms --
10  or did you mean Long Leaf Trading?
11     A   Long Leaf Trading.
12     Q   Who did Long Leaf Trading -- that
13  makes a lot more sense since Gain is, in fact,
14  a clearing firm.
15         MS. WING:  Right.
16     A   I was confused.
17  BY MR. BURDEN:
18     Q   It's not mine to question -- well,
19  it is mine to question, but it's not mine to supply
20  the answer.  So who did Long Leaf Trading use before
21  Gain, please.
22     A   Well, they started with Open E Cry,
23  which was then acquired by Gain.  So all that data
24  I think is in there.  Before that it was Vision.

Page 226

1      Q   So did you ask Open E Cry for the 2015
2  data?
3      A   Actually, once I saw the data going
4  into 2015, it did not appear that he was doing the
5  same trading at that point in time that he was doing
6  now.  I didn't start seeing the options spreads and
7  that coming in heavily until late in 2015.
8      Q   Got it.
9      A   So before he was doing a future
10  and maybe an option or a short, you know, something
11  like that.  It was definitely not the same type of
12  trading.
13     Q   Okay.  So when did the same type
14  of trading, this options spread trading, appear
15  in the 2015 data?
16     A   I would say November-December
17  was what I recollect, but it was very late in
18  the year.
19     Q   All right.  Well, setting that aside,
20  you know, what did you do to obtain 2015 data from
21  Open E Cry or from Vision?
22     A   Open E Cry was in the data.  I may
23  be confused as to which year I had all the data
24  and which one I didn't.  I think it's 2014 is I

Page 227

1  don't have all the data or I have the data but
2  I don't have the names of the accounts because they
3  have account names that I don't know.
4      Q   I mean, what I want to know --
5  you've got to know what I want to know, right?
6  How did you fill in the blanks?  What did you do?
7      A   Basically I looked all the way from
8  2015 on specifically looking at the trading style
9  that they were doing at that time.
10     Q   So setting aside --
11     A   Not what they did in the past.
12     Q   So setting aside the trading style,
13  what did you do to complete your collection of
14  records from 2015?
15     A   From 2015?
16         MS. WING:  I'm going to object.
17     It's assuming that their records weren't
18     complete as it relates to the requirements
19     but --
20         MR. BURDEN:  I don't know that it matters
21     what the requirements are.
22     Q   Mr. Donelson, what did you do to complete
23  the records from 2015?  Did you go and request it
24  from some other party?

Page 228

1      A   I'm not sure what records
2  you're talking about.  The trading records were
3  electronic.  I would have to physically look at how
4  far back those go.  I thought they ended sometime
5  in 2015.  It might have been 2014.  I would have
6  to check.  All of this, we went through all of the
7  customer applications and everything else.  We had
8  those.  We had looked at all the trade records at
9  the time of the acquisition -- or at the transfer
10  and made sure we had all those records.
11     Q   Right.  I'm not asking about
12  recordkeeping requirements.  And I think maybe
13  an easier way to get to this is for me to ask you
14  how did Long Leaf Trading customers do in 2015?
15     A   I didn't spend a lot of time looking at
16  it because they were doing a completely different
17  type of trade.
18     Q   I understand.  But how did they do?
19     A   I -- honestly, I didn't spend a ton of
20  time looking at it.
21     Q   Did they make money or did they lose money?
22     A   I didn't spend a lot of time looking at it.
23         MS. WING:  Do you know the answer?
24         THE WITNESS:  No, I don't know the answer.

Page 229

1 BY MR. BURDEN:
2    Q    And it sounds before like maybe
3 you only got some of the records for 2015, is that
4 right?  Did I understand you correctly?
5    A   It's one year and I can't remember if
6 it's 2014 or 2015.  I only have a -- and I would
7 have to look back at my records because all of a
8 sudden on one day there's a huge amount of money
9 that comes into the system.
10   Q    Got it.
11   A    And I want to say that was in 2014,
12 but I am not absolutely sure, though.
13   Q    Okay.  So you probably don't know
14 how customers at Long Leaf Trading did in 2014?
15   A   No.
16   Q    Okay.  So I asked you how you reacted
17 to learning that substantially all Long Leaf Trading
18 customers had lost money, and you testified that
19 you were shocked, right?
20   A    Right.
21   Q    So you went and you looked and you
22 tried to ascertain why they lost money, right?
23   A   Correct.
24   Q    What else did you do?

Page 230

1    A    I looked at the trades, you know.  That
2 was one part of the looking at the profitability
3 is what were the trades.  Yes, they were all short
4 condors.  Did a lot of research on my own looking
5 at the short condor and when does it make sense to
6 put it in the market and when doesn't it make sense
7 to put it in the market and kind of -- we did the
8 first batch, and I actually brought in a Series 3
9 broker to help me determine those trades because
10 I'm not used to those trades.
11   Q    What's that broker's name, please.
12   A    Jim Barrett.
13   Q    All right.  You testified that you
14 were shocked.  What I want to know is did you talk
15 to Tim Evans about this?  Did you say, hey, I can't
16 believe all your customers lost money?
17   A    Yeah, and Tim --
18   Q    Yeah, tell me about that.
19   A    Tim was -- they know the risks.  They know
20 what we're putting on.
21   Q    So when did you have this conversation
22 with Mr. Evans?  I want to know everything about
23 confronting Mr. Evans with this outrageous
24 revelation.

Page 231

1    A    This would have been after the acquisition.
2    Q    Approximately when, please.
3    A    Oh, probably the 15th, 16th of December.
4    Q    And where did you talk to Mr. Evans?
5    A    Well, in our offices.
6    Q    Got it.  What did you say to Mr. Evans?
7    A    I said I can't believe that you're
8 showing this type of loss.  I said why do we
9 keep trading the same way if we keep getting the
10 same results, and he was first a little irritated.
11 Second, he said, look, it plays out over a long time
12 period.  It doesn't work any one month.
13   Q    How did you respond to that?
14   A    I said, well, it should work over
15 a year or two, right?  It shouldn't -- I understand
16 that, yeah, every month might not be perfect, but
17 you should be able to turn profitability on that.
18 He had also significantly reduced option premiums --
19 the commissions sometime in the mid part of 2017
20 because they were at $50.  They were at 35 when
21 I bought the firm.
22   Q    So in this conversation with Mr. Evans
23 you said -- you pushed back against this claim that
24 it works over time, right?

Page 232

1    A    Right.
2    Q    You said, hey, you know, if it works
3 over time, it ought to work over the course of
4 a year or two years, right?
5    A    Right.
6    Q    So how did he respond to that?
7    A    You know, he was talking about market
8 conditions.  He was talking about all these other
9 things that to me didn't make sense.  I'm not a
10 confrontational person, so it's not like I was going
11 to go, okay, we're out of here.  We're going to have
12 a fistfight out in the street.  But I kept doing my
13 research, kept looking at it, tried it for one more
14 month and said, okay, this -- you know, this is not
15 going to work.  This is just not a trading strategy
16 that can be consistently profitable.  I had seen
17 months where they won all four.  I had seen months
18 where they lost all four.  It just didn't point to
19 something that was going to be what I wanted the
20 firm to do to make the customers money, which is you
21 need something that has some level of consistency.
22 At the end of the day you know you're going to lose
23 trades.  You just are.  But on the other hand,
24 you've got to have more winners than losers to

Page 233

1  make sure you cover it.
2      Q    So your view is that these credit spreads
3  were not ever going to result in consistent profits
4  for customers, correct?
5      A    In the proper market conditions they
6  would.  But to say that you can make the same trade
7  for five years straight, hard to believe.  Just my
8  experience with prop traders is six months they've
9  got to revamp their strategies, even if they were
10 working really well.
11     Q    And you said all this to Mr. Evans?
12     A    Yeah.
13     Q    So what happens next?
14     A    Well, we go through the first month
15 of trading.  All four of them lose money.  I said
16 okay.  We brought in another -- a friend of his who
17 worked at another brokerage firm who has a lot of
18 trading experience.
19     Q    Is this guy at Walsh Trading?
20     A    I don't know where he's at now.
21     Q    What was his --
22     A    Jim Barrett.
23     Q    Oh, Jim Barrett, okay.
24     A    Yeah, he wasn't at Walsh.  He was at --

Page 234

1  he worked at another firm.  I know that.
2      Q    Okay.
3      A    And he developed the four credit
4  spreads for that month, all four of those out of
5  the money.
6      Q    So what other conversations did you
7  have with Mr. Evans about these dismal customer
8  results?
9      A    I had a lot of discussions with him
10 about how do you ever expect to make the money back
11 for these clients.  He's like, look, they know the
12 risks that they're taking when they make the trades.
13 They're making the trades.  I said, well, you know,
14 that's not the way I work, you know.  I'm there to
15 be making money for my clients, not losing money
16 for my clients just because it pays me.
17     Q    How did he respond?
18     A    He was a little indignant about that.
19     Q    So were you guys --
20     A    Are we best friends?  No.
21     Q    So, you know, it seems like you
22 paid, what, a million and a half dollars for this
23 business, correct?
24     A    Um-hmm.

Page 235

1      Q    Yes?
2      A    Yes.
3      Q    And now you're the CEO of the business,
4  right?
5      A    Correct.
6      Q    And a part of this business I think
7  we discussed was the technical know-how, right?
8      A    Correct.
9      Q    And it was making these spread trades,
10 right?
11     A    Correct.
12     Q    And Mr. Evans was going to show you how
13 to do that, right?
14     A    Right.
15     Q    There's no computer program that does
16 it.  It's Mr. Evans who's going to show you how to
17 do it, right?
18     A    Correct.
19     Q    Did he show you how to do it?
20     A    Yes.
21     Q    But you didn't want to do it, did you?
22     A    I saw how it was done and I could see
23 places where it would work, but in the market sets
24 that we had at that time I didn't see how it would

Page 236

1  be possible that that would be consistent.
2      Q    So it just seems to me like Mr. Evans sold
3  you this company for a million and a half dollars to
4  do these special trades that were their intellectual
5  property and it seems like you learned within just a
6  few weeks of arriving that the intellectual property
7  is absolutely no good and customers sort of lose
8  money across the board, right?
9      A    Correct.
10     Q    So, I mean, did you try to get your money
11 back from him?
12     A    We are still looking into legal options.
13     Q    All right.  Have you filed suit against
14 Mr. Evans?
15     A    Not yet.
16     Q    Have you made a demand against Mr. Evans?
17     A    We have made demands against him
18 to -- on remuneration for certain things that were
19 guaranteed to us under that contract.
20     Q    Okay.  So --
21     A    And he is not responding at all.
22     Q    Did you send a demand letter to Mr. Evans?
23     A    To his attorney, yes.
24     Q    Got it.  And who's Mr. Evans' attorney?

Page 237

1    A    Can she answer that question because
2  I don't know his name.
3    Q    We can talk about it off the record.
4  I don't want to put counsel on the spot.
5    A    It's Anthony somebody.
6        MS. WING:  It's a big Italian name.
7    A    It's two lawyers talking to each other.
8  BY MR. BURDEN:
9    Q    Got it.  So you have made a -- you've
10 served a demand on Mr. Evans through his attorney,
11 correct?
12   A    Correct.  On, for example, any claim
13 or something that came up prior to when I was in
14 business.
15       MS. WING:  We'll stipulate that
16    we served a demand on the indemnification
17    provisions under the agreement, and we're
18    still looking at getting it resolved with him.
19 BY MR. BURDEN:
20   Q    So when did that demand go out?
21   A    January, December.
22   Q    Of?  Sorry.  So January of --
23   A    2018.
24   Q    So January of 2018?

Page 238

1    A    Right.
2        MS. STREIT:  2019?
3  BY MR. BURDEN:
4    Q    Are you sure 2018?
5    A    No, no, no, no.  December of 2018 or
6  January of 2019, I'm sorry.
7    Q    All right.  And what did you ask
8  for here?  Like I know you're saying, oh, it's
9  something to do with the indemnification provisions
10 in the, you know, share purchase agreement or
11 some other agreement.  Like are you asking for your
12 million and a half dollars back?
13   A    No.
14   Q    What are you asking for?
15   A    This is for a claim that was settled
16 by -- with a client that was -- never traded under
17 me and was a client prior to the acquisition.
18   Q    And how much are you asking for for this
19 client settlement?
20   A    Thirty some thousand.
21   Q    So is that all you're asking for from
22 Mr. Evans in this demand letter?
23   A    On that demand letter, yes.  We're
24 looking at the other avenues of how to go after

Page 239

1  him vis-a-vis the purchase of the firm.
2    Q    All right.  Have you made any other demands
3  on Mr. Evans?
4        MR. BURDEN:  I know you're dying to
5    answer, Ms. Wing.
6        MS. WING:  No.  I mean, I think
7    it's getting into some -- I want to caution
8    my client about attorney-client privilege and
9    conversations we may have about what we can do
10   to seek recovery from Mr. Evans.  But as I told
11   you, part of the problem is finding Mr. Evans,
12   who is no longer in the United States and has
13   gone dark.
14 BY MR. BURDEN:
15   Q    All right.  Well, you know, I'm not going
16 to ask you about any attorney-client communications.
17 And as your counsel advised you, you know, in case
18 you go wandering near that area or divulge them in
19 the course of answering a question, you know, don't
20 because that would be privileged.  But Ms. Wing
21 will jump in.
22       So it sounds like you have one
23 settlement demand out there currently to Mr. Evans
24 for like $30,000 for like a settlement with a

Page 240

1  disgruntled customer, is that right?
2    A    Correct.
3    Q    And no other demands made on Mr. Evans?
4    A    Not at this time.
5    Q    Have you made any informal demands
6  on Mr. Evans like, for example, saying, hey, you
7  sold me a lemon, give me my million and a half back
8  or I'm going to sue you?
9    A    I have not made that demand of him, no.
10   Q    So, you know, why not?  I mean,
11 you testified that you were shocked.  It seems
12 shocking.  Like why did you not sort of serve a
13 demand on him or otherwise ask for your money back
14 ever?
15   A    I don't know that I can answer that,
16 given our conversations.
17   Q    Yeah.  I mean, I don't want to hear
18 about attorney-client conversations.  That stuff
19 is privileged.  But I'm asking you, and I have
20 to believe that -- and if the answer is because
21 my attorney told me not to, you know, that's
22 privileged.  But why wouldn't you do that?
23   A    We are looking at when to do it, not if
24 to do it.

Page 241

1    Q    But you haven't done it?
2    A    We have not done it as of yet.
3    Q    Got it.
4         MR. PATRICK:  So have you concluded
5    after looking at the business, after taking
6    it over in December of '17 and then you learned
7    from the reports that you were reviewing that
8    the customers lost --
9         THE WITNESS:  Money.
10        MR. PATRICK:  -- just consistently
11   across the board lost money, did you conclude
12   that Mr. Evans misrepresented the value of the
13   firm and the profitability of the intellectual
14   property that he was offering to you?
15        THE WITNESS:  I do.
16   BY MR. BURDEN:
17   Q    So back to customer results.  So Long
18   Leaf Trading in January of 2018 changed the style of
19   trades that were being recommended, is that correct?
20   A    Correct.
21   Q    All right.  And the change was really
22   to debit spreads, correct?
23   A    Debit spreads.
24   Q    All right.  How have Long Leaf customers

Page 242

1    done from January of 2018 through January of 2019?
2    A    We had an unbelievably bad November.
3    We had probably two really bad months where none
4    of the spreads came in positively.  They have lost
5    money.  Our trading wasn't consistent.  That's why
6    we've gone to a different strategy.
7    Q    All right.  So between --
8    A    But we did have profitable months but not
9    consistency that I was looking for.
10   Q    All right.  So between January --
11   I'm sorry.  I know I asked you this, but when did
12   the strategy change?
13   A    Which --
14   Q    Your own strategy, yeah.
15   A    It changed again in January of 2019.
16   Q    All right.  So between January of 2018
17   and January of 2019 what months were profitable for
18   customers?
19   A    Let me think about this because
20   we talk about it differently.  It would have
21   been -- you would have seen it in May where they
22   were profitable.  The July and August would have
23   seen slight profitability, September would have
24   had slight profitability, October.  But then we

Page 243

1    had very big losses in, say, June and November-
2    December.
3    Q    All right.  What about January
4    through May of 2018, were those losing months or
5    winning months for Long Leaf clients?
6    A    January and February were the previous
7    strategies.  It's hard to get -- so when we talk
8    about a January trade, it's made at the end of
9    January so it shows up in February.  The first month
10   of this new trade I want to say we were breakeven
11   or very close to breakeven on it.  The next month
12   we were down a little bit, but by the third month
13   I think cumulative we were about breakeven or
14   slightly up from the new trading style.
15   Q    All right.  So between January of 2018 and
16   January of 2019 how much did customers lose overall?
17   A    I don't know the exact number.
18   Q    Can you ballpark it?
19   A    It's above a half million.  I don't know
20   the exact number.
21   Q    Were there any individual customers
22   who made money between January 2018 and January 2019
23   in total net net, not just like month to month?
24   A    I think one did.

Page 244

1    Q    Okay.
2    A    I don't know -- I think that person had
3    left by the time I started.
4    Q    Okay.  So all the customers lost money
5    while you were there between January of '18 and
6    January of '19, is that right?
7    A    Oh, I'm sorry.  I got the wrong periods.
8    I was thinking '17 and '18.  There was one that made
9    money that left.
10   Q    During what period, please.
11   A    This would have been -- God, my years are
12   all screwed up -- January '18 to '19.
13   Q    All right.  So from January '18 to January
14   '19 one person made money, right?
15   A    Right.
16   Q    And it's because they sort of got out
17   while the getting was good?
18   A    They left for -- I don't remember what
19   reason they left for, but they left.
20   Q    And all the other customers lost money,
21   right?
22   A    Um-hmm, yes.
23   Q    All right.  So you said January '19 you
24   changed up your trading style to recommend these

Page 245

1 volatility swaps and also these gut strangles,
2 is that right?
3    A    Correct.
4    Q    All right.  So January '19 through
5 the present, what are customer trading results
6 like for Long Leaf?
7    A    We have customers that are up.  I don't
8 know.  The ones in the latest probably couple months
9 that have come on are up in total.  We had a couple
10 bad trades in the first part of the new trading
11 strategy that's kind of drug it all down.  However,
12 I think we've won 17 out of the last 20 trades,
13 the idea being profits are a couple hundred dollars
14 here, losses are less than a hundred.  So the idea
15 is to keep it within a very kind of tight range.
16 We have one client that's up 17 percent.
17    Q    So between January of 2019 and the
18 present with these new trading strategies did the
19 trading recommendations overall make money or lose
20 money net net?  I understand customers get in or
21 out, but you track the performance of each
22 individual trade recommendation, correct?
23    A    Right.
24    Q    So January '19 through the present,

Page 246

1 how are we doing on these new trades?
2    A    We're down about 3500, and that
3 reflects -- there are two very specific trades
4 that lost big and then there were a couple others
5 that lost.  But for the most part, you know, we're
6 on the right track moving forward.  We're showing
7 good profitability right now.
8    Q    So you said during the period January
9 2019 through the present, you said the trades are
10 down 3500, is that right?
11    A    Yeah.
12    Q    So is that like based on a sample
13 account size?  Can you express that as a percentage
14 or is --
15    A    That's based on making each and
16 every trade, one trade of every single trade
17 recommendation.
18    Q    Got it.
19    A    With the worst entry and the worst exit.
20 That's how we look at it.
21    Q    All right.  So can you express that as
22 a percentage loss?  Do you have like a --
23    A    You know, if you think of our normal
24 account size of being about 25,000, it would be

Page 247

1 15 percent.
2    Q    All right.  So between January '19 and
3 the present, a customer who had a $25,000 account
4 would be down 15 percent if they were in on all the
5 trades, is that right?
6    A    A good generality, yeah.
7       MR. PATRICK:  Would a $25,000 account be
8 participating in a one-contract level typically
9 or would they usually be participating in a
10 two-contract level?
11       THE WITNESS:  They're probably
12 participating in a two-contract level.
13       MR. PATRICK:  So would that mean then
14 that rather than down 3500 --
15       THE WITNESS:  It would be 7, yeah.
16       MR. PATRICK:  -- they would have been
17 down 7,000?
18       THE WITNESS:  Right.
19       MR. PATRICK:  But the percentage stays
20 roughly the same?
21       THE WITNESS:  Yes.
22 BY MR. BURDEN:
23    Q    All right.  And is it fair to say
24 that you consistently received customer complaints

Page 248

1 throughout your tenure at Long Leaf Trading?
2    A    Yes.
3    Q    What did you do about those customer
4 complaints?
5    A    I would log them if I felt that
6 there was cause to consider a customer complaint.
7 There's -- a customer complaint and a customer
8 complaining, they're two different things.
9    Q    How are they different?
10    A    Customer complaint is asking for
11 a specific action for me to take, you know.  I want
12 you to review my account.  I want you to understand,
13 you know, what it is and make sure that everything
14 is aboveboard and that the trades were all made to
15 my approval.  One client if you talk to him, he
16 would complain about Jeremy Ruth endlessly.
17    Q    Is it fair to say that you received
18 regular complaints about clients losing money and
19 their dissatisfaction with losing money?
20    A    I wouldn't say regularly, no.
21       (Whereupon  CFTC Exhibit No. 71 was
22          marked for identification, MM.)
23    Q    So I want to hand you what I've marked as
24 CFTC Exhibit 71, and it's a nice, big group exhibit.

Page 249

1  I want you to take a moment and look this over,
2  if you would, please, and tell me if you recognize
3  the documents therein.  All right.  Do you recognize
4  the documents in Exhibit 71, Mr. Donelson?
5      A   Yes.
6      Q   What are they, please.
7      A   They're people concerned about losses
8  in their accounts.
9      Q   All right.  Would you characterize these
10 as customer complaints?
11     A   I would not classify them to put them
12 in a complaint log.
13     Q   Okay.  So tell me about the complaint
14 log.  Where do you keep that, please.
15     A   I keep it on the One Drive system.
16     Q   All right.  I have not seen the complaint
17 log.  Do you know if that has been produced to us?
18     A   Yes, it should be in the documents
19 produced.
20     Q   In the most recent production or in
21 an earlier production?
22     A   In an earlier production.
23     Q   Okay.  Help me find it.  What's the file
24 called?

Page 250

1      A   Complaint log.
2      Q   Would it have been attached to an email?
3      A   No, it would not have.  It would have been
4  a standalone document.
5          MR. PATRICK:  Was it a document or
6  a worksheet?
7          THE WITNESS:  It's a document file.
8          MR. BURDEN:  So, Ms. Wing, we can talk
9  about this later, but what I'll ask is --
10         MS. WING:  We produced it.  We'll produce
11 another copy for you.
12         MR. BURDEN:  No, no, you don't have to
13 produce another copy.  It just seems like you
14 gave us all the emails, which I'm usually real
15 happy with.  But sometimes when people do that,
16 they forget to look on like the C drive or
17 something.  And if you were to tell me that
18 you did, then I'll just go find it.
19         MS. WING:  It probably is easier
20 and will help the Commission if we give you
21 another copy of the complaint log separately.
22 If you'll recall, there was some problems in
23 the downloading of the documents through your
24 portal, which I'm not going to profess that

Page 251

1  I understand the technological problems,
2  but maybe it got caught up in that.  I don't
3  know.  But instead of wasting everybody's time,
4  we can reproduce a copy.
5          MR. BURDEN:  Whichever one of us finds
6  it first, tell the other one.
7          MS. WING:  Okay.
8  BY MR. BURDEN:
9      Q   All right.  So you'll see that
10 a lot of the emails in Exhibit 71 complaining
11 about customer losses were sent to brokers.  Is that
12 an accurate characterization?
13     A   Correct.
14     Q   And the brokers then forwarded those
15 complaints to you, is that right?
16     A   Correct.
17     Q   What did you do with those complaints?
18     A   I would go back to talk to the broker
19 about this specific client and what we were going
20 to do about it, but most of the time this would be
21 they would close the account and that -- they would
22 just make a request to close the account.  I would
23 close the account.
24     Q   Did you ever discipline any broker

Page 252

1  at Long Leaf Trading for their performance?
2      A   I let people go because they weren't
3  bringing in revenue.  But in terms of their
4  performance of their trade recommendations, no.
5      Q   Because, I mean, it's not really their
6  fault, right?
7      A   The only part I would discipline them
8  is if they didn't accurately do the trade tickets
9  and everything else.
10     Q   Did that ever happen?
11     A   Not to my knowledge.
12     Q   Mr. Donelson, I want to hand you what
13 we've marked as CFTC Exhibit 4.  Do you recognize
14 Exhibit 4, Mr. Donelson?
15     A   Yes.
16     Q   Can you tell me what it is, please.
17     A   It's a draft document that myself and
18 Andrew Nelson were rewriting.
19     Q   And were you rewriting it here in July
20 of 2018?
21     A   We started rewriting it and then
22 we effectively just scrapped it as a general rule
23 because Time Means Money didn't make any sense.
24     Q   Was this a script that brokers used

Page 253

1 when they talked to clients on the phone?
2    A    This was a training script.
3    Q    What do you mean by that?
4    A    So we would help them through this.
5 So somebody new would come in.  That's why it's
6 deemed a junior broker.  This is kind of to help
7 them understand, well, you know, to practice some
8 of the terms and that.  The only piece that we used
9 was really a bullet point piece that said here's the
10 things you want to make sure you highlight.
11    Q    Did you provide -- I should ask who wrote
12 this, the script in Exhibit 4?
13    A    I have no personal knowledge of who wrote
14 it.
15    Q    Did you write it?
16    A    I did not write it, no.  Most of this
17 was written prior -- this was part of what was in
18 the documents provided at acquisition.
19    Q    So you reviewed this script in connection
20 with your acquisition of Long Leaf Trading?
21    A    Correct.
22    Q    All right.  Was this a script that
23 brokers at Long Leaf Trading used while you were
24 there?

Page 254

1    A    They didn't use the exact script
2 that I know of.
3    Q    What did they use to be able to say --
4    A    To highlight the points, highlights,
5 they would get this drilled into them by sales --
6 in sales training before I got there.  We've only
7 added one new broker so --
8    Q    So is it your testimony that while
9 you were at Long Leaf no broker used this script?
10    A    I can't say that for sure, that they
11 never used the exact script.  I know they didn't
12 use this script because this one was revised.  We
13 didn't send it out.
14    Q    Did you provide any scripts to brokers
15 at Long Leaf Trading?
16    A    We did as part of their training materials,
17 yes.
18    Q    And did you produce that script to the
19 CFTC?
20    A    No.  It was not used for solicitation.
21 It was only used for training.
22    Q    All right.  And this training script would
23 advise brokers of what to say, correct?
24    A    The highlighted points, yes.

Page 255

1        MR. BURDEN:  All right.  So we're
2 going to ask that that script be produced.
3 I think it's pretty obviously responsive to
4 the subpoena.  I can't imagine why you would
5 have withheld it.
6        MS. WING:  Obviously there was a mis --
7 it wasn't intentionally withheld, and I object
8 to any reference to that.  If there was not
9 an understanding that it was covered by the
10 subpoena, we would be happy to rectify that.
11        MR. BURDEN:  Yeah, please do.
12        MS. WING:  Just please watch the
13 characterization.
14        MR. BURDEN:  I'm going to characterize
15 things however I want.
16    Q    All right.  Mr. Donelson, I want
17 to direct your attention to page 3 of Exhibit 4,
18 and it's actually the fourth page but it's marked
19 page 3.
20    A    Um-hmm.
21    Q    Or is it?  There we go.  If you direct your
22 attention, please, to page 4 of Exhibit 4.
23    A    Um-hmm.
24    Q    This heading, Introduce Time Decay,

Page 256

1 it says, "In addition to the seller's basic
2 advantage, time decay is another driving force
3 behind the fact that on average 76.5 percent of
4 all options expire worthless if held to expiration.
5 The Time Means Money program focuses on benefitting
6 from time decay in its trading strategies."
7        Is this something that you heard
8 brokers say to customers on the phone, that --
9    A    I've heard it, yeah.
10    Q    Okay.  And did you discipline brokers
11 for that?  Is that a thing they were allowed to
12 say?
13    A    It is allowed to say.  The 76.5 is based
14 on a CME study.
15    Q    Yeah.  So have you read that study?
16    A    Yes.
17    Q    During what time period does that study
18 relate to?
19    A    The late '90s.
20    Q    Yeah.  So have you reviewed any updated
21 studies with respect to options expiring worthless?
22    A    There haven't been any on the CME options.
23    Q    Have you done any studies like that?
24    A    No.

Page 257

1    Q    So I want to take a look at this
2 76.5 percent figure.  Does 76.5 percent of Long
3 Leaf Trading's recommendations result in profits
4 to customers?
5    A    That's not what this says.
6    Q    I know, but I'm asking you.
7    A    No, it doesn't.
8    Q    All right.  For Long Leaf Trading's
9 recommendations with respect to option sales,
10 does 76.5 percent of those recommendations expire
11 worthless?  Is that what happened?
12    A    I don't know the exact number, no.
13    Q    Do you think it's higher or lower
14 than 76.5 percent of the recommended option sales
15 expiring worthless?
16    A    It's probably in about that range,
17 76-1/2.  That's a guess on my part.  I never looked
18 at it that way.
19    Q    Did you look to see what percentage
20 of recommended option sales at Long Leaf Trading
21 expire worthless?
22    A    I did not look at the exact number, no.
23    Q    All right.  So let's take a look, if
24 we could, please, at pages 5 and 6 of Exhibit 4.

Page 258

1 I'm going to start at the bottom of 5 and then we're
2 going to move to 6.  So it says Introduce the Three
3 Principles.  It says, "In 2009 Long Leaf was founded
4 on three principles," and the third principle is --
5 and this is on page 6 -- "We should provide our
6 clients a strong return on their investment."
7            Is this something that you heard
8 brokers say to customers?
9    A    Yes.
10    Q    All right.  What clients of Long
11 Leaf Trading obtained a strong return on their
12 investment?
13    A    None.
14    Q    All right.  So did you discipline
15 brokers for saying that?  Did you tell them not
16 to say that?
17    A    We were -- we changed this whole
18 layout over the last year to try to get rid of
19 some of these issues.
20    Q    Yeah, but you testified that you
21 heard brokers say to clients we provide our clients
22 a strong return on their investment.  You heard
23 that, right?
24    A    Yeah, but that's based -- the principle.

Page 259

1    Q    No, I understand.  So did you ever
2 say to these brokers don't say that to clients?
3    A    Yeah, I have said that to brokers.
4    Q    Who did you say that to?
5    A    All of our new brokers that were
6 doing the -- this is what we call a demo, you
7 know, for opening up and saying, you know, focus
8 them on this is where we're headed.  This is the
9 things that we're doing.  And the push-back on any
10 one from a customer standpoint in terms of return
11 is like we're working on that.  We've got -- you
12 know, we've worked on these types of things.  We've
13 had good months.  We've got bad months.  We're
14 working towards profitability on a consistent basis.
15    Q    Wait.  So your testimony is you told
16 customers -- sorry.
17    A    No, I didn't tell customers.
18    Q    You told brokers to tell customers that
19 we don't make money every month?
20    A    No, that's not accurate of what I'm
21 trying to say.  One push-back, there's another
22 piece of this, which is any response like what do
23 you do when somebody asks you a question, right?
24 And that was, look -- you know, one question is,

Page 260

1 well, how have your returns been this year.
2 I said, you know, here's what we have to say.
3 We have to say we've had good months.  We're working on being
4 had some tough months.  We're working on being
5 consistent and we're starting to see some of that
6 consistency when we went through the summer where
7 we were making the types of returns we expected
8 to make.
9    Q    So your testimony is that if
10 a customer asked what were your returns for the
11 year, there was an answer the broker was supposed
12 to give them, right?
13    A    Correct.
14    Q    And that answer was something
15 to the effect of we've had good months and we've
16 had bad months, is that right?
17    A    Right.
18    Q    Did you instruct brokers to tell
19 customers that, in fact, substantially every
20 customer of Long Leaf Trading had lost money?
21    A    No, I did not.
22    Q    Why not?
23    A    I was working off of the trades
24 that we were doing at that time, not the previous

Page 261

1 trading strategies.
2    Q    But that's not true, is it?  If
3 somebody asks for trading results for the past
4 year and you tell them you're working on it, that
5 doesn't really answer their question, does it?
6    A    Well, if you're talking about
7 trading results on one strategy versus another,
8 I can tell you what was happening on the previous
9 strategy.  That's why we changed it.
10    Q    But it sounds like you didn't let
11 the brokers tell customers what was happening on
12 the previous trades.
13    A    The previous trades we weren't using
14 anymore.
15    Q    Yeah, but customers --
16    A    They were not relative anymore.
17    Q    We'll get to that in a minute.  So
18 let's look at the rest of page 6 here.  So this
19 training script says, "These three principles are
20 what we have built our company upon and everything
21 that we do since our inception.  At Long Leaf we
22 measure our success by our clients' success.  There
23 is no way we would have the ability to work with
24 hundreds of clients month after month for over

Page 262

1 nine years and oversee millions of dollars
2 if we weren't being profitable for them."  Did you
3 hear brokers say this to customers?
4    A    I don't remember hearing anybody say that.
5    Q    Really?
6    A    I really don't.
7    Q    So let's talk about Long Leaf's offices.
8 What do Long Leaf's offices look like?
9    A    They're a little bigger than this room.
10    Q    So how big is that?
11    A    About 800 square feet.
12    Q    All right.  And are there walls in
13 the office that separate you from the brokers?
14    A    No.
15    Q    How many chairs are in the office?
16    A    At one time there were about 15 to 20.
17    Q    Where are you in relation to the brokers?
18    A    I'm back against the wall this way.
19 They're all that way.
20    Q    All right.  So they're in front of you,
21 right?
22    A    Correct.
23    Q    Are the brokers facing you or are their
24 backs to you?

Page 263

1    A    It's both.
2    Q    So how many brokers do you have in the
3 office at a time when you're there?
4    A    Right now only three.
5    Q    What was the most you ever had in the
6 office, please.
7    A    Twelve.
8    Q    So did you ever listen to brokers'
9 telephone calls?
10    A    I listened to some, yes.
11    Q    Okay.  And you never heard them
12 say there's no way we would have been able to
13 work with hundreds of clients month after month
14 if we weren't being profitable for them?  You never
15 heard that?
16    A    I never heard those exact words, no.
17    Q    Did you ever hear something to that effect?
18    A    I don't remember hearing it.
19    Q    Did you ever hear any brokers say
20 to customers rent here at the Board of Trade
21 is expensive.  We wouldn't be able to pay it or
22 keep the lights on if we weren't making money for
23 customers.  Did you ever hear anything like that?
24    A    No.  They wouldn't know what the cost

Page 264

1 of the rent was.
2    Q    So did you ever go back and review
3 phone calls with brokers?  Did you ever listen to
4 recorded phone calls?
5    A    I listened to not every single one of them,
6 but I listened to them.
7    Q    How many phone calls with brokers
8 would you say you listened to recordings of?
9    A    Probably 20 or 30 a month.
10    Q    How did you decide which phone calls
11 to listen to?
12    A    Usually start with the younger
13 brokers in terms of making sure that they're not
14 stumbling over everything and saying some things
15 that really don't need to be said.  And then in
16 terms of the closers and that, I would listen to
17 a couple of theirs a month.
18    Q    All right.  Did you ever listen to any
19 of Mr. Nelson's calls?
20    A    Yes.
21    Q    Did you ever listen to any of Mr. Gecas'
22 calls?
23    A    Yes.
24    Q    How many of Mr. Nelson's calls would

Page 265

1  you say you listened to?
2     A    Twenty or thirty.  He was also very
3  close to where I was at, so I could hear him much
4  more prominently than anybody else.  Both him and
5  Mr. Gecas were like the closest people to me, so
6  I heard a lot of their conversations.
7     Q    So how many of Mr. Gecas' calls would
8  you say you listened to?
9     A    Probably the same amount, 20 or 30.
10    Q    And you said Mr. Gecas was very close to
11 you as well?
12    A    Yeah, he was probably from maybe here
13 to there.
14    Q    Would it surprise you to learn that
15 we have listened to recordings of Mr. Gecas' and
16 Mr. Nelson's calls.  And, in fact, they say this
17 dozens and dozens of times, that there's no way we'd
18 have the ability to work with hundreds of clients
19 if we weren't being profitable for them.  Would that
20 be a surprise to you?
21    A    Yes, it would.
22    Q    All right.  Let's keep looking, if we
23 could, please, at page 6 of Exhibit 4.  So there's
24 a piece on NFA company record here.  And it says,

Page 266

1  "We are extremely data oriented when it comes to
2  adhering to all rules and regulations set forth by
3  the National Futures Association in order to protect
4  you.  This is the reason over the last nine years
5  and hundreds of clients later we have maintained
6  and kept a 100 percent clean track record with our
7  regulatory body, the National Futures Association,
8  relating to servicing customer accounts.  The NFA
9  runs legal investigations on every single complaint
10 they receive, regardless of merit.  As you can see
11 here, we have never had a complaint filed against
12 our firm by any of our clients."
13        Is this something you heard brokers
14 say on the phone to customers?
15    A    Yes.
16    Q    All right.  Are you aware of any complaints
17 filed by customers with the NFA?
18    A    I only know of one.
19    Q    And when did you learn of that complaint?
20    A    That was July or August.
21    Q    Of what year, please.
22    A    2018.
23    Q    All right.
24        MS. WING:  I want to -- hold on, please.

Page 267

1        (Discussion off the record.)
2  BY MR. BURDEN:
3     Q    Do you have additional testimony to
4  clarify your previous testimony?
5     A    No.  It was a specific person,
6  Priscilla Lamar.  And the exact dates, I could
7  tell you it dragged on for a long period of time.
8     Q    So you're aware that Priscilla filed
9  a complaint with NFA, correct?
10    A    Correct.
11    Q    And when did you become aware of that,
12 please.
13    A    I would say sometime in June.
14    Q    Of what year, please.
15    A    2018.
16        (Discussion off the record.)
17        MR. BURDEN:  What are you guys up to
18 over there?  I don't normally allow this,
19 but I get a benign feeling on it.
20        MS. WING:  I don't know if it was
21 an NFA complaint.  There was a demand letter,
22 okay?
23        MR. BURDEN:  Got it.
24        MS. WING:  So I want his testimony to

Page 268

1  be accurate.  And, unfortunately, I don't recall
2  whether or not a complaint was actually filed or
3  the issue was resolved prior to any complaint
4  being filed.
5        MR. BURDEN:  Got it.
6        MS. WING:  And I believe it's prior to
7  any complaint being filed.
8  BY MR. BURDEN:
9     Q    Well, setting aside whatever Ms. Lamar
10 did, are you aware of any other complaints filed
11 with the NFA by customers of Long Leaf Trading?
12    A    This is what I -- the nomenclature,
13 I'm not sure.  There was another man, Mr. Fischer
14 complained to the NFA, but I don't know if he filed
15 a formal complaint.
16    Q    All right.  Anybody else?
17    A    Nobody else that I know of.
18    Q    So when did you learn of Mr. Fischer's
19 complaining to the NFA?
20    A    I think it was about the same time, in
21 June.
22    Q    June of '18?
23    A    Yeah.  He made one trade and that was it.
24    Q    All right.  Do you know if customers

Page 269

1 complain to the NFA, are those forwarded on to
2 the firm?  Like if a customer had made a complaint
3 to the NFA, would you know about it?
4     A    I would assume so, yes.
5     Q    Why would you assume that?
6     A    Because they would -- the NFA would need
7 to notify me.
8     Q    Why do you think that?  I'm not disagreeing
9 with you, but why do you think that?
10     A    So that we can resolve it.
11     Q    Did NFA notify you of the Chris Fischer
12 complaint?
13     A    Yes.
14     Q    Okay.  That's how you learned of it?
15     A    Yes.
16     Q    Did you ever ask NFA if there were
17 complaints pending against Long Leaf Trading?
18     A    Yes, because I asked when the Chris
19 Fischer thing came up.  I said is there -- this
20 is fairly new to me and I'm like if it gets -- the
21 NFA gets a complaint, is that something that's going
22 to come to me so I have knowledge of that complaint
23 or what.
24     Q    And who did you talk to at NFA about

Page 270

1 that?
2     A    This would have been Kyle Wood.
3     Q    And you asked Mr. Wood if there were
4 other complaints?
5     A    Yeah.
6     Q    And what did he tell you?
7     A    He said there were none, I think.
8     Q    You think?
9     A    I don't know if it was Kyle Wood.
10 That's why I question it.  This was part of a --
11 this was all during the same time that the NFA
12 were doing a review and a lot of things were going
13 on.  So I might be a little off on who I talked
14 to or -- but I specifically never heard that there
15 was another complaint.
16     Q    So you asked and somebody from the
17 NFA told you, no, no other complaints, is that your
18 testimony?
19     A    Yes.
20     Q    And you can't remember who told you that?
21     A    It could have been Shane O'Mara.
22 It could have been Kyle Wood.  It could have been
23 the people who called me with the actual complaint,
24 which is another division altogether.

Page 271

1     Q    What were their names?
2     A    I don't know.  I can't remember.
3     Q    All right.  Prior to June of 2018 did
4 you ever inquire of the NFA if there were pending
5 complaints against Long Leaf Trading?
6     A    No.
7     Q    After the Chris Fischer complaint,
8 after you learned of it anyway, did you advise
9 the brokers to stop telling customers that there
10 never has been a complaint filed?
11     A    No, I -- this is where some of my --
12 to me it was was it a customer complaint or is --
13 or are they notified.  I didn't understand the whole
14 process of the --
15         MS. WING:  I think it would be helpful
16     to tell them what Mr. Fischer's complaint was
17     about.
18         MR. BURDEN:  That's not my question
19     and I'm not interested in it.
20     Q    Mr. Donelson, after you learned
21 of the Mr. Fischer complaint, your testimony is
22 that in fact you did not advise the brokers to stop
23 telling clients there were no complaints with the
24 NFA.

Page 272

1     A    Correct.
2     Q    Why not, though?  You had learned that
3 there was one.
4     A    My understanding is he made a complaint.
5 There was nothing there.  It was over and it was
6 done.  So anybody can make a complaint to the NFA.
7 The question is did they find anything wrong
8 about what we were doing, and the answer was no.
9     Q    Was that the result of Mr. Fischer's
10 complaint?  Was it resolved in Long Leaf's favor?
11     A    It was -- he said that we wouldn't
12 give his money back, and we kept telling him there
13 was an open position that we couldn't get out of.
14 He complained to the NFA that we were withholding
15 his money.  By the time he had made the complaint we
16 had already sent his money back because the position
17 closed and paid for the wire fee, as we had told
18 him we would do.
19     Q    So did that sort of resolve the complaint
20 from the NFA --
21     A    Yes.
22     Q    -- perspective?  Did they like send
23 you something that said this complaint is withdrawn
24 or anything to that effect?

Page 273

1    A    No, not that I know of.

2    Q    Did you advise customers that you had
3 received complaints directly from customers about
4 losses in their account like we saw in Exhibit 71?

5    A    I did not, no.

6    Q    Did any of the brokers do that?

7    A    I don't think so.

8        MS. WING:  It could be considered
9 a violation to do so.

10 BY MR. BURDEN:

11   Q    All right.  Mr. Donelson, I want
12 to hand you what we've marked as CFTC Exhibit 5.
13 Do you recognize this document, please.

14   A    Yes.

15   Q    Can you tell me what it is, please.

16   A    It is a training tool to help people
17 get past customer objections.

18   Q    Got it.  And who wrote this, please.

19   A    I assume Tim Evans wrote it.

20   Q    And you sent it to Mr. Nelson, is that
21 correct?

22   A    We -- I sent it to him as one of those
23 should we be using this trading tool or not, but
24 I had to scan it because it was all PDF.

Page 274

1    Q    So this training tool, it's a file titled
2 Rebuttals, is that right?

3    A    Correct.

4    Q    So do you have an understanding
5 of what that means?  Why is rebuttals the title?

6    A    These were designed for -- as people
7 have objections, well, how do you answer certain
8 types of -- I can't look at you with those glasses
9 on -- how you would answer certain things.

10   Q    All right.  And was this --

11   A    It was part of the training around the
12 sales style.

13   Q    Got it.  And whose training was this?

14   A    This would be brokers' training, sales
15 managers' training.

16   Q    Got it.  So the brokers that were
17 working while you were CEO at Long Leaf Trading,
18 was this a training tool that they used?

19   A    Some used it, some didn't.  We kind
20 of scrapped most of it by mid 2018.

21   Q    And when you say "we" scrapped it by
22 mid 2018 --

23   A    Across the board.  Across the board.

24   Q    Across the board?

Page 275

1    A    Yeah.  Just basically saying -- there's
2 certain things in here that are useful in terms
3 of people asking questions.  Some of them I think
4 are too argumentative, so we kept -- the rebuttals
5 were there.  It was just up to the individual broker
6 focusing on the ones that were specifically around
7 the amount of time it would take somebody or
8 something like that.  Those are kind of -- one
9 of the normal objections that somebody has going
10 into any program.

11   Q    All right.  Was this rebuttals document
12 in Exhibit 5, was this a document that the brokers
13 had?

14   A    Some of them would have it and some
15 wouldn't.  I think it was more for the senior
16 brokers than it was for the junior brokers.

17   Q    So same question with respect to
18 Exhibit 4.  With respect to Exhibit 4, was that
19 a document that brokers at Long Leaf Trading had
20 when you were there?

21   A    Yes.

22   Q    And was it something -- and this
23 is Exhibit 4 again -- was it something that those
24 brokers used?

Page 276

1    A    Some used it, some didn't.

2    Q    All right.  Same question with respect to
3 Exhibit 5.  Was this rebuttals document a document
4 that some brokers used?

5    A    Wasn't that just the question you asked me?

6    Q    But it was Exhibit 4.  This is Exhibit 5.

7        MS. WING:  Does that change your testimony?

8    A    Okay.  Could you repeat the question
9 before that then?

10 BY MR. BURDEN:

11   Q    Yeah, sure.  So Exhibit 4 was our demo
12 junior broker revised JD script, right?

13   A    Yeah, all the junior brokers would have
14 that.

15   Q    Got it.  So Exhibit 4, while you were
16 CEO all the junior brokers had this demo junior
17 broker revised --

18   A    Not this actual one because we
19 never released this one.  This was Andrew and
20 I editing it back and forth to the point where I
21 just said I don't like it at all.  Rewrite the whole
22 thing.  Start from scratch.

23   Q    So your testimony is that the
24 brokers didn't have this demo junior broker revised

Page 277

1  JD?
2     A   Not this revision, no.
3     Q   Got it.  Did they have an earlier version
4  of it?
5     A   Most likely, yes.
6     Q   Okay.  Did the earlier version
7  have these same representations in it about
8  the 76.5 percent of options expire worthless?
9  Did it say that?
10    A   Yeah, I think so.
11    Q   So the earlier version that the
12  brokers had, did it contain this bit about how
13  we should provide our clients a strong return on
14  their investment?  Did it have that?
15    A   Yes.
16    Q   So did the earlier version of
17  Exhibit 4 that you testified the brokers have,
18  did it say there's no way we, meaning Long Leaf,
19  would have the ability to work with hundreds of
20  clients month after month for over nine years and
21  oversee millions of dollars if it weren't being
22  profitable for them?  Did the earlier version of
23  this script have that statement in it?
24    A   I'm not sure about that.

Page 278

1     Q   All right.  So it sounds like you
2  looked.  You saw this earlier version of Exhibit 4,
3  this earlier script, is that right?
4     A   Yes.
5     Q   How did you come to see it?
6     A   I think when I saw it the first --
7  when I took over the firm and looked through
8  all the training materials.  They basically gave
9  me a data dump of all the training materials they
10  had.  Some of it was video.  Some of it was other
11  things.
12    Q   Well, did you sort of take umbrage
13  with that statement?  I mean, I think it's fair
14  to say that Long Leaf Trading was not profitable
15  for customers, right?
16    A   Correct.
17    Q   So your testimony is that these
18  brokers had this script and the script said that
19  Long Leaf Trading was profitable for customers,
20  right?
21    A   I thought we took it out of the
22  script.  I would have to check if that was in the
23  script or not.
24    Q   So where am I going to see a version

Page 279

1  of this script without that portion in it about
2  the profitability?
3     A   Like I said, we started revising it and
4  then we completely wiped it out, redid everything.
5  So it's not in the new script at all.
6     Q   So --
7     A   And there is no new script.  It's just
8  talking points that's all been run through the NFA,
9  brand new everything, brand new everything.
10    Q   And so your testimony is you never
11  heard brokers during your time at Long Leaf telling
12  customers that Long Leaf wouldn't have been able
13  to work with hundreds of clients month after month
14  if Long Leaf wasn't being profitable for them?
15  Your testimony is you never heard that?
16    A   I heard it and I had talked with people
17  about not using it, but I didn't consistently hear
18  it on every single phone call, no.
19    Q   Who did you talk to and tell them not
20  to make that representation about profitability?
21    A   There was one gentleman, Gunther.
22    Q   What did you tell Mr. Gunther?
23    A   I said do not use that statement at all.
24    Q   All right.  And what did he say?

Page 280

1     A   He said yes, okay.
2     Q   What did you do to make sure that
3  Mr. Gunther didn't continue to use that statement
4  about profitability?
5     A   Once again, he was one of those
6  people very close to my earshot, so I could do
7  that and then I would also review any phone calls
8  that he was making.  The other part would be given
9  that he was an opener, he may only talk to 10 or
10  12 people a day at most, and maybe not even for
11  that long.
12    Q   What other brokers did you tell not
13  to make this representation about profitability?
14    A   Alex Stemper, who still works for us.
15    Q   All right.  What other brokers?
16    A   It was mostly -- Sean Mooney, who no
17  longer works there.  Those were our main openers
18  because this is more of an opening script than it
19  is a -- or something to get the thing started, not
20  necessarily the closing side of it.
21    Q   All right.  Well, openers or closers
22  aside, what other brokers did you tell to not
23  represent to customers that Long Leaf was trading
24  profitably?

Page 281

1    A    I had talked to Scott and I had talked
2  to Andrew both about not -- you know, how we want
3  to describe what we do and how we've got to be --
4  our compliance to be -- this is not something we
5  should be saying.  Most of them had no idea long
6  term because most of them had just been there
7  since October.
8    Q    So your testimony is that you told
9  Mr. Nelson not to tell customers that --
10   A    You can easily say that -- I told him
11 that, yes, you can say that people have been with
12 us for a period of time, you know, but to represent
13 that we're making everybody money is not accurate.
14   Q    Did you tell Mr. Nelson not to make
15 this representation in the demo training script,
16 that there's no way we would have been able to
17 work with hundreds of clients if we weren't being
18 profitable for them?
19   A    Like I said --
20   Q    You've got to -- please, you've got to
21 wait for me to finish.  You're getting excited.
22   A    We were just going through and editing
23 this document and we came to the conclusion early
24 on, almost a day or so after I edited it.  And

Page 282

1  I said, you know what, this is just -- let's start
2  from scratch.  It was -- this was never released
3  to anyone because we were just working on how do
4  we want this to go and we said we can either try
5  to fix this, throw it all away and start the way
6  we want to do it.
7    Q    Yeah, but that's not my question.
8  Did you ever tell Mr. Nelson not to tell customers
9  this line we see in Exhibit 4, there's no way we
10 would have the ability to work with hundreds of
11 clients if we weren't being profitable for them?
12 Did you ever say, Mr. Nelson, don't say that?
13   A    Yes, I've said that to him.
14   Q    When?  The earliest really.
15   A    Well, when he was actually on sales
16 calls.  That would have been April, sometime around
17 there.
18   Q    And what did you do to make sure
19 Mr. Nelson didn't continue to say this to customers?
20   A    Well, one, he was in earshot.  The other
21 is I would check, you know, I would check randomly
22 phone calls that he made and I would not hear him
23 say those exact words.
24   Q    All right.  So same with respect to

Page 283

1  Mr. Gecas.  Did you tell Mr. Gecas, hey, Mr. Gecas,
2  don't -- you can't say this bit in the demo training
3  script about not being able to work with customers
4  if we weren't being profitable?  Did you ever say
5  that to Mr. Gecas?
6    A    I believe I did, yeah.
7    Q    And when did you say that, please.
8    A    Probably about the same time, in April.
9    Q    Of 2018?
10   A    2018, right.
11   Q    And what did you do to ensure that
12 Mr. Gecas didn't make that representation?
13   A    I would check random voicemails.
14 I mean, there's a lot of -- not voicemails, voice
15 recordings.
16   Q    But you could also hear Mr. Gecas, right?
17   A    Sometimes.  Sometimes yes, sometimes
18 no.  I mean, it would depend on -- you don't know
19 what the other side of that conversation is so --
20 but that would require me to be in the office
21 100 percent of the time too.
22   Q    So did you hear Mr. Gecas or Mr. Nelson
23 disobeying instructions and telling customers that
24 Long Leaf Trading was being profitable for them?

Page 284

1    A    I don't remember hearing them, no.
2    Q    So you think they did what you said,
3  as far as you know?
4    A    As far as I know.
5    Q    All right.  So let's go back, if we could,
6  please, to Exhibit 5, which is this rebuttals
7  document.  I want to direct your attention to
8  page 3 and it's the fourth page of the document.
9  It's page 3 of the -- sorry.  It's the -- I want
10 to direct your attention to the fourth page of
11 Exhibit 5, which is the third page of the rebuttals
12 document.
13        All right.  And do you see where it
14 says Closing off Accountability/Trustworthiness/Our
15 Ideas?  Do you see that heading?
16   A    Um-hmm.
17   Q    Yes?
18   A    Yes.
19   Q    All right.  So is this something that
20 brokers at Long Leaf used during your tenure?
21   A    They had this document.  I don't know
22 that I heard them use -- a couple of these things
23 they would use, but I don't think most of it.
24   Q    Was this a document you gave to brokers

Page 285

1 to answer customer objections?
2  A  It's something our sales manager gave
3 them, yes.
4  Q  Who's the sales manager?
5  A  That was Scott Gecas.
6  Q  All right.  And did he do that at your
7 instruction?
8  A  I said I was okay with them having this
9 information for training purposes.
10  Q  You mean the information in Exhibit 5,
11 correct?
12  A  Correct.
13  Q  And had you reviewed it before you had
14 okayed it?
15  A  I had read through it and understood
16 how it was being used.
17  Q  All right.  So let's take a look, if we
18 could, please, at this passage underneath Closing
19 off of Accountability/Trustworthiness/Our Ideas,
20 that heading.  So a couple paragraphs down it says,
21 "We are very confident because we are good at what
22 we do, and you're never really going to know that
23 until you actually try it.  But we are so confident
24 in what we do and confident that we can make those

Page 286

1 your results that we work on a one-month contract.
2 We only make money when we execute positions, and
3 you only execute positions if you're winning and
4 making money."  So was that something you heard
5 brokers say?
6  A  Yes.
7  Q  All right.  Was that okay with you or
8 did you discipline them for it?
9  A  The way I understand it is that we
10 are not on a long-term contract.  We're on a
11 month-to-month contract and we don't make --
12 we only get paid commissions when they execute
13 positions, and that requires them to make the
14 decision.  So I don't make money if they don't
15 trade.
16  Q  Right.  But, you know, I asked you
17 if you disciplined any -- or chided any brokers
18 for making these representations that I just rattled
19 off in Exhibit 5, you know.  Did you?  This was okay
20 for them to say?
21  A  Yeah, this was specifically talking to an
22 individual about how we were paid.
23  Q  So it says here we are very confident
24 because we are good at what we do.  What basis

Page 287

1 would a Long Leaf broker have to say that we are
2 good at what we do when customers so consistently
3 lose money trading with Long Leaf?  Why would they
4 say that?  Why would you let them say that?
5  A  I mean, point taken on that piece.  I'm
6 looking at the rest of what that --
7  Q  I don't care about the rest of it.  I care
8 about that bit.
9  MS. WING:  I object to the point
10 that just one or two sentences may be taken
11 out of context, but go ahead and answer.
12  A  Yeah, I --
13  MR. BURDEN:  What was the question
14 again, please.  Would you read it back for
15 Mr. Donelson?
16  THE WITNESS:  Yeah, I'm not even sure
17 what the question was anymore.
18  (Whereupon the portion of the record
19  was read as requested.)
20  A  We do have knowledge of trading
21 and we do understand that.  That's what we're good
22 at.  Now, transferring that into profitability for
23 a client, we have other things that we have to --
24 pure structure of the trade was one of the issues

Page 288

1 in terms of commission rates.  That's why I dropped
2 them significantly.
3 BY MR. BURDEN:
4  Q  Yeah, so let's talk about the structure.
5 If you will turn the page, please, I want to direct
6 your attention to this topic heading Structure More
7 Important than Performance.  And I want to direct
8 your attention, if I could, please, to that second
9 paragraph and it says, "Where our program is
10 unmatched and has been so successful is the actual
11 structure of it.  It's four trades a month that
12 happen in the same time frame toward the end of the
13 month, and we are following an execution strategy
14 that both me and you designed in the beginning
15 before even getting started."
16  Was this something that you approved
17 for brokers to say?
18  A  No, I think we took that out.
19  Q  I thought your testimony was that
20 you had approved Exhibit 5 and you had allowed
21 Mr. Gecas to distribute this to brokers.
22  A  Maybe I'm wrong.  This is -- I know --
23 I don't remember anybody ever saying this.  So these
24 are not -- it isn't one continuous conversation.

Page 289

1 These are possible answers to possible questions.
2    Q    Got it.
3    A    So it's not like you would read the whole
4 entire thing.
5    Q    I kind of figured that.  So this
6 representation about our program being unmatched
7 and so successful, was this part of the rebuttal
8 document that you approved for Mr. Gecas to
9 distribute?
10   A    Early on, yes.
11   Q    All right.  So, again, this representation
12 the program is unmatched and has been so successful,
13 what basis would a broker have at Long Leaf for
14 representing to a client that Long Leaf's program
15 was so successful?
16   A    That's the piece that I had them
17 take it out over time, was we didn't want to make
18 that representation.  But the other one is really
19 the structure of the trade.
20   Q    So, I mean, obviously this is the
21 important representation, as far as I'm concerned,
22 about being successful.  So your testimony is that
23 you had somebody take this out of the rebuttal
24 document, is that right?

Page 290

1    A    I think so, yes.
2    Q    And who did you have do that?
3    A    That would have been Andrew working
4 on this piece.
5    Q    Andrew Nelson?
6    A    Yeah.  We got away from using almost
7 any of these rebuttals because the sales style I was
8 also trying to change at the same time.
9    Q    All right.  So when did you advise
10 Mr. Nelson to remove this representation about the
11 success of Long Leaf's program from the rebuttal --
12   A    I think soon after getting this.
13 This is a scanning -- this is a document I just
14 scanned and sent to him because all we had was a
15 PDF -- or not even a PDF version.  We had a printed
16 copy of it.
17   Q    So your testimony is that, you
18 know, shortly after July 25, 2018, which is
19 when this document was sent, that was when you
20 told Mr. Nelson, hey, take this bit about, you know,
21 success out of the rebuttal document?
22   A    Actually, I think we pulled back
23 on even distributing this document in general.
24 It could be used incorrectly too easily.

Page 291

1    Q    Let's do it one bit at a time.  When did
2 you tell Mr. Nelson to remove this representation
3 about the trading program being --
4    A    It would have been in August.
5    Q    Of 2018?
6    A    Of 2018.
7    Q    And did he do that?
8    A    We've never reissued this whole
9 rebuttal sheet to any of our brokers.
10   Q    So the brokers were --
11   A    And we were down to only four or five
12 brokers or five or six brokers.
13   Q    So then were the brokers working with
14 an older version of the rebuttals?
15   A    They might have been, yes.
16   Q    Here we go.  So let's go back, if we
17 could, please, to page 4 of Exhibit 5, which is
18 actually page 3 of this rebuttals document, and
19 I want to direct your attention to the heading
20 that says Past Performance Request.  What's this
21 piece, please.
22   A    This is a -- like I said, it's not
23 to be read across the board.  It's really each
24 and every rebuttal.  We worked on a very specific

Page 292

1 kind of how do we talk about past performance.  And
2 that's where we were talking about the change in the
3 trading style that we did, that we've seen some good
4 results, but we tried to avoid talking about the
5 prior performance of the previous trading because
6 it's not the same.
7    Q    All right.  So it sounds like, without
8 me having to read it all, this past performance
9 request piece of the rebuttals document is if people
10 ask about past performance, you sort of don't tell
11 them, is that right?
12   A    You don't -- that's what those rebuttals
13 are, yes.
14   Q    All right.  And was this an approach that
15 you sanctioned?
16   A    No.  That's where we were talking
17 about our specific -- separating what was the
18 prior trading strategy to what our current trading
19 strategy is.
20   Q    So what did you tell brokers to say to
21 customers if they asked about past performance?
22   A    First, that we had made a change in our
23 trading style.
24   Q    Got it.

Page 293

1    A   While -- and we didn't change a lot
2  of the Power Points or anything like that, but to
3  say we're using a lot of the same concepts, however,
4  in a different way.  Time decay, but we're long
5  not short.  Not credit spreads, debit spreads.
6  And that we have seen some success going forward.
7  We are looking for more consistency and that we
8  have seen -- this was probably three to four months
9  in by the time we were looking at this, and we
10  had seen good month, bad month but then we've seen
11  kind of it leveling off to decent profitability.
12  Not what I was looking for, but at least it was
13  profitable or at least breakeven.
14    Q   Did you tell brokers that they needed
15  to disclose to customers what the past performance
16  was?
17    A   Well, I told them specifically to
18  talk about our current trading strategies, not the
19  previous trading strategies, because we were not
20  going back to those trading strategies.
21    Q   All right.  So you specifically
22  told brokers that if customers asked about past
23  performance, not to talk about it and instead to
24  talk about --

Page 294

1       MR. BURDEN:  You're not going to object.
2       MS. WING:  I am going to object.
3  BY MR. BURDEN:
4    Q   -- future performance, correct?
5       MS. WING:  Because I think he already
6    testified to the same question.
7       MR. BURDEN:  All right.  Ms. Wing, I'm
8    going to ask the questions I want to ask in
9    the order I want to ask them.  You can object
10    on the basis of Fifth Amendment or privilege.
11    It's not a deposition.  Evidentiary objections
12    are not preserved and that's not an evidentiary
13    objection anyway.  And especially to object
14    in the middle of a question on a topic this
15    important is in extraordinary bad faith.
16       MS. WING:  Look --
17       MR. BURDEN:  We're going to get back.
18    To my question, and we're done with your
19    objection.
20       MS. WING:  Sir, treat me with civility.
21       MR. BURDEN:  If you want civility, you can
22    object properly.
23       MS. WING:  And we can dispute the way --
24    but, look, you've asked several questions

Page 295

1  throughout this deposition, identical questions
2  and, I mean, the identical questions that you've
3  asked several times.
4       MR. BURDEN:  I do not believe that is
5    a question that is identical to any previous
6    question.  If you think you could find one in
7    the record, you'll need to do that.
8       MS. WING:  When we get the record,
9    I'd be happy to point it out.
10       MR. BURDEN:  Great.
11       MS. WING:  But it is late in the day.
12    It is late in the day.
13       MR. BURDEN:  And you've bought yourself
14    a ticket back by failing to turn over those
15    bullet points.
16       MS. WING:  You know, this is ridiculous
17    and this is uncivil.  And if you do it again,
18    you and I are going to go --
19       MR. BURDEN:  What are we going to do?
20       MS. WING:  We'll go over and talk to
21    the ARDC about whether or not this is civil.
22       MR. BURDEN:  Are you making a threat
23    to advise the ARDC?
24       MS. WING:  No, you are implying that

Page 296

1  it was intentional.  It was not intentional.
2  We have been -- we've turned over thousands
3  of pages of documents that we have -- if there
4  is a missing document that was inadvertently
5  not turned over, we said we would correct that.
6       MR. BURDEN:  All right.  Counsel,
7    I don't know if it was withheld intentionally
8    or not and I'm not implying that it was, but
9    you will be coming back to talk about it.
10       MS. WING:  Fine, I'm happy to.  If we're
11    going to be coming back, maybe it's a good time
12    to stop.
13       MS. STREIT:  Answer the question.
14       MR. BURDEN:  No, we're going to keep going.
15       MS. WING:  No, wait a second.  How
16    much longer are you going to continue to go?
17    It is after 5.  I want that on the record.
18    And we have been here since 9, and we have
19    taken breaks.  I'm not saying we haven't, but
20    how much longer do you want to go today?
21       MR. BURDEN:  You know, I have so much
22    more to do that I think that I could go as
23    long as you would let me go.
24       MS. WING:  Well, it is very long

Page 297

1 and there are some health reasons why somebody
2 shouldn't be going this long, okay?
3     MR. BURDEN:  Without going into
4 any particular detail, are you referring to
5 personal, specific reasons for you or your
6 client or just in general?
7     MS. WING:  Personal reasons.
8     MR. BURDEN:  All right.  In that case
9 what I would like to do is finish this line of
10 inquiry.  And if you would like, we can break,
11 with the understanding that you will return.
12     MS. WING:  We never said we wouldn't.
13 BY MR. BURDEN:
14     Q    All right.  So let's return to
15 this past performance request that we have been
16 laboring over in Exhibit 5.  So your testimony is
17 that clients were not advised by brokers that past
18 performance was losses across the board, is that
19 correct?
20     A    As it relates to the prior strategies.
21 We weren't using those strategies.  We started
22 fresh in February of 2018.  We talked about what
23 performance we had on those trades, but we would not
24 talk about the prior strategy.  It wasn't pertinent.

Page 298

1     Q    All right.  So as the prior strategy
2 matured, I think it's fair to say that customers
3 I think you testified lost money overall, is that
4 correct?
5     A    Which -- define which strategy you're
6 talking about.
7     Q    The strategy that you utilized between
8 January-February of 2018 and January of '19.  I
9 think you had described them as debit spreads?
10     A    Yes, they lost money on those trades.
11     Q    All right.  Did you instruct brokers
12 to tell customers that Long Leaf Trading had lost
13 money for clients on those strategies?
14     A    We were talking -- I instructed
15 them to talk plainly and simply about we haven't
16 found the consistency we want but that we have seen
17 profitability on trades.  However, in some cases,
18 you know, markets turn against you.  There's not
19 much you can do about it and that really the biggest
20 losses were one month in 2018 I think.  It would
21 have been our May trades, but it would be probably
22 hitting the June statement.
23     Q    All right.  So to boil it down, you
24 told brokers when you had the history from the

Page 299

1 debit trades to tell clients there were profitable
2 months and not profitable months, is that fair?
3     A    Right, that we're looking to be
4 consistent and that we had made profits in I want
5 to say six out of eight months.  It was just the one
6 month that blew up.  Then we had another probably
7 in November-December when the whole market went
8 haywire.  It just blew up our trades, and that's
9 why we went away from that strategy.  It was too --
10 it was too volatile.  It didn't do what I wanted
11 it to do.
12     Q    So in January of 2019 did brokers advise
13 clients, hey, we have this debit spread strategy and
14 customers lost money using it net net.  They all
15 lost money.  Did brokers say that to clients?
16     A    To our clients?
17     Q    Yes.
18     A    Yes.  I mean, we walked each one of
19 the clients that we had through the new strategy.
20     Q    So your testimony is that brokers
21 told customers that Long Leaf's trading strategy
22 with the debit spreads was a losing strategy?
23     A    The clients that were there already
24 knew that.

Page 300

1     Q    I guess that's true.  What about
2 prospective clients on sales calls?
3     A    A  Prospective clients, we specifically
4 walked them through the strategy we were rolling
5 out, told them where we are in that process, you
6 know, that we don't have much experience with it.
7 We changed the presentation.  I think we sent all
8 that solicitation material in to the NFA in -- I
9 think the first time we sent it was in February,
10 and I think we finally got it approved in March
11 sometime.
12     Q    So my question is when your openers
13 or your closers are talking to prospective clients
14 in January of 2019 or in December of 2018, are they
15 telling customers, hey, we had this credit spread
16 strategy and all the customers have lost money?
17 Did they disclose that to clients, prospective
18 clients?
19     MS. STREIT:  I think you mean debit.
20     MR. BURDEN:  Yeah, debit.  Let me do
21 that whole thing again.
22     Q    So when your brokers were talking
23 to prospective customers in December of 2018
24 or January of 2019, were they disclosing to those

Page 301

1 customers that substantially all the Long Leaf
2 trades -- or substantially all Long Leaf customers
3 had lost money with the debit spreads?
4    A   I don't know how many new customers we
5 brought in.  We were spending more time working
6 with the existing customers, getting them rolled
7 over to this new strategy and making them understand
8 it.  Any new clients came in, I usually talked to
9 them before they actually joined the firm.
10    Q   So your testimony is that --
11    A   We were in the process of trying
12 to get new marketing materials and everything else
13 because everything we had before, that really didn't
14 apply in the way I wanted it to.
15    Q   So did you advise clients, new
16 clients that customers of Long Leaf Trading
17 had net net substantially all lost money?  Is that
18 a thing you told any client?
19    A   I don't know that I told any client
20 coming in, but I don't remember a lot of clients
21 coming in either.
22    Q   But surely there were brokers that
23 were calling new leads in early 2019?
24    A   Actually, we were going through and

Page 302

1 working out a lot of things other than calling
2 new leads.  It was keeping the customers we already
3 had.
4    Q   Well, how many leads were being called
5 on a daily basis by Long Leaf customers?
6    A   I would have to look at the records,
7 but the number of people that were being contacted
8 probably were mostly people we had talked to before
9 or had gone through a process versus brand new
10 fresh leads that we went through.
11    Q   All right.  Mr. Donelson, at this
12 time we are adjourning our testimony to a date to
13 be determined in the future.  It could be tomorrow
14 if you guys want, but it doesn't have to be.
15    MS. WING:  It cannot be tomorrow.
16 BY MR. BURDEN:
17    Q   All right.  Mr. Donelson, although
18 testimony is adjourned, you remain under subpoena.
19 Mr. Donelson, is there anything you wish to clarify
20 for the record or to add to the statements you've
21 made today?
22    MS. WING:  Well, since we're continuing,
23    we'll reserve that until the next time if we
24    think of anything to clarify.

Page 303

1 BY MR. BURDEN:
2    Q   Can you think of anything to clarify,
3 Mr. Donelson?
4    A   I can't remember everything I said,
5 so it's hard to clarify but --
6    Q   Anything spring to mind?
7    A   There was one thing in my head.  Let me
8 think for one second.
9    Q   Sure.  Do you want to adjourn with your
10 counsel and return to advise us of it?
11    A   Yeah, because I knew what I was
12 going to say and then it just bounced off my head.
13    MR. BURDEN:  All right.  Well,
14    we'll go off the record and we'll come
15    right back on and then we'll go off again.
16    THE WITNESS:  Okay, thanks.
17       (Whereupon a recess was taken from
18       5:19 p.m., to 5:24 p.m., after which
19       the following proceedings were had:)
20    MR. BURDEN:  Back on the record, please,
21    Mary.
22    Q   All right.  Mr. Donelson, you wanted
23 to clarify or add something?
24    A   There was something to clarify on

Page 304

1 Exhibit 4 and 5.  Those should have been in the
2 solicitation materials that I provided in the first
3 4g request.  They would be all of the solicitation
4 materials.  If they're not there, let me know, but
5 that's where they're supposed to be, is in the
6 documents.
7    MS. WING:  And the highlighted --
8    A   The training materials were in the
9 solicitation materials.  That's where they should
10 have been.  If they aren't, let me know, but that's
11 where I thought they were.
12    MS. WING:  And we will provide you with
13    the highlighted training material, but my client
14    is under the assumption it was in the first
15    data drop to you.
16    THE WITNESS:  The first -- yeah, the
17    first one, not the second one.
18    MR. BURDEN:  I know exactly what you're
19    talking about.  I just don't know off the top
20    of my head if that was in there.
21    THE WITNESS:  If it wasn't --
22    MS. WING:  But if it wasn't, it was
23    inadvertent.
24    MR. BURDEN:  Got it.  Okay.

Page 305

1    THE WITNESS:  Because that's where
2  I store all my solicitation materials, in one
3  place.
4       MS. WING:  But I do want the record to
5  reflect there was some technical difficulty in
6  doing that data dump, and we worked extensively
7  with your tech team in hopefully resolving that.
8       MR. BURDEN:  Okay.
9    A    That was -- it took me time to remember
10  what it was, but that was it.
11  BY MR. BURDEN:
12   Q    All right.  So your testimony
13  is that Exhibits 4 and 5 should have been in
14  the solicitation materials and maybe weren't?
15   A    Yeah.
16   Q    And is it Exhibit 4 and 5 in the form
17  that we have reviewed them or is it some other draft
18  or version of Exhibit 4 or 5?
19   A    I would -- I think they would be in PDF
20  form versus a Word document form.
21   Q    Setting that aside, it's the content
22  I care about.
23   A    The content, I'm assuming it would be the
24  version before you see those edits.

Page 306

1    Q    But you don't know for sure?
2    A    I'm pretty sure it is because that
3  document is JD edits, meaning there was a document
4  before that.
5    Q    Got it.
6    A    That's the way I would classify things.
7    Q    So Exhibit 4 --
8    A    And I think that -- just from what
9  I'm seeing is I think the dark points on there are
10  what's actually changed, but I'm not sure.
11   Q    Got it.  So your testimony that
12  Exhibit 4 --
13   A    As I said, on Exhibit 4 we started
14  down the path of trying to edit through it and
15  everything and said we hate the presentation.
16  It doesn't make sense for what we're trying to do
17  now versus spending a whole bunch of time trying
18  to rewrite this, let's go down a different path and
19  create it from scratch.
20   Q    All right.  So Exhibit 4, there's this
21  email from you to Mr. Nelson and the attachment
22  is Demo Junior Broker Revised JD.docx.  So your
23  testimony is that revised JD indicates that you
24  made edits to this document, correct?

Page 307

1    A    I think so, yeah.
2    Q    All right.  And how would those edits
3  be reflected?  Like are they just in there?  Are
4  we looking at the edited version?
5    A    I don't know.  It doesn't look like
6  I redlined it.
7    Q    So presumably any edits you made to
8  the demo junior broker document in Exhibit 4 are
9  reflected in the text of Exhibit 4?
10   A    Like I said, soon after this was
11  sent Andrew and I had a conversation and said,
12  you know, let's -- trying to put lipstick on a
13  pig didn't make sense.  Let's rebuild the entire
14  presentation and everything else.  So this was never
15  released to anybody, this version of it.
16   Q    And this version has your edits in
17  Exhibit 4?
18   A    Some of my edits, yeah -- or my edits.
19  I'm sorry, not some.  My edits.
20   Q    Got it.
21   A    But like I said, after thinking through
22  it, a couple days later we just said start from
23  scratch.  Let's do it all over again.  We've gone
24  away from having any scripts at all.  We only use

Page 308

1  bullet points.
2    Q    All right.  Anything else you want to
3  add or clarify to your testimony?
4    A    Not at this time.  Not that I can remember.
5       MR. BURDEN:  Okay.  Well, I'll tell you
6  what, you know.  We could do more, and I'm sure
7  we want to see this document.  But rather than
8  say it's, you know, adjourned and you're still
9  under subpoena, I think it probably makes sense
10  to close the record and say that we have no
11  further questions at this time.  We reserve
12  the right, as always, to call you again in
13  this investigation and we will then provide
14  a subpoena to your counsel should that become
15  necessary.  We'll see what happens with these
16  bullet points and these documents if we have
17  them or need to talk more.
18   Q    In light of that, in light of the fact
19  that you will not be returning, at least right now,
20  do you have any additional questions -- or, sorry,
21  any additional clarifications to your testimony?
22   A    Not that I know of at this time.  I mean,
23  I would like to see a transcript of it so that
24  I can look and see, A, did I make any sense, was

Page 309

1  I -- did it capture what I was trying to say, that I
2  can provide some clarification of what I was trying
3  to say.
4      Q    I mean, is there anything that you want
5  to correct now?
6      MS. WING:  Well, I think there is a
7  clarification that Mr. Donelson was not the
8  sales manager while he was there, and I think
9  that got lost in all this.
10 BY MR. BURDEN:
11     Q    Is that correct, Mr. Donelson?
12     A    Correct.  I was -- when I first got
13 there Scott Gecas was -- I appointed him to sales
14 manager.  Brian Adams also served as -- he wasn't
15 really the sales manager, but he oversaw a lot of
16 the issues with compliance and things like that.
17     MS. WING:  He was the compliance manager.
18     THE WITNESS:  Right.
19 BY MR. BURDEN:
20     Q    Any other additions or corrections?
21     MS. WING:  I'm trying to -- there might
22 have been, now that you said we're not coming
23 back.
24     MR. BURDEN:  Yeah.

Page 310

1      MS. WING:  And I think one thing I would
2  like the record to reflect, that Exhibit 4 and
3  5, they were existing documents under Mr. Evans.
4      MR. BURDEN:  I mean, here's the thing.
5  Are you testifying right now?
6      MS. WING:  No, but I think there needs
7  to be a clarification because I think some
8  of your questions came out implying that --
9  it may have the record misconstrued that
10 Mr. Donelson created these documents, so
11 I'd like him to clarify.
12     Were these documents in existence
13 when you acquired the company?
14     A    All of the documents regarding sales
15 training and presentations and everything else were
16 the original documents that I received at the time
17 of the acquisition, and they had been in use before
18 that.
19 BY MR. BURDEN:
20     Q    Any other clarifications or additions?
21     MS. WING:  And they're no longer in use?
22     A    Correct, they are no longer in use.
23 We've replaced them with solicitation documents
24 that you've received relative to our new strategies

Page 311

1  relative to our new system.
2  BY MR. BURDEN:
3      Q    Any other additions or corrections?
4      MS. WING:  No, not at this time.  And
5  if you order it, we'll reserve signature.
6      MS. STREIT:  They do not get to order the
7  transcript.  This is investigative testimony.
8  If you want, I believe --
9      MS. WING:  Right.  We can request one.
10     MS. STREIT:  You can request it
11 by writing a letter I believe to our deputy
12 director requesting to look at it, but you
13 cannot actually take a copy of it at this time.
14     MS. WING:  But don't we look at it
15 at the court reporter's --
16     MR. BURDEN:  No.
17     MS. STREIT:  No.  I think you
18 look at our copy of it here, but you have
19 to request that formally.  I think there's
20 actually a provision in the rules about that.
21     MS. WING:  Right.
22     MR. BURDEN:  Yeah, that is right.
23 I knew there was something, and that's what
24 it is.

Page 312

1      MS. WING:  That's fine.
2      MR. BURDEN:  All right.  Anything else?
3      MS. WING:  No.
4      MR. BURDEN:  Mr. Donelson?
5      THE WITNESS:  Nothing I can think of.
6      MR. BURDEN:  All right.  Well, in
7  that case we have no further questions at this
8  time.  We'll call you if necessary.  We're off
9  the record.
10     WHICH WERE ALL THE PROCEEDINGS
11     HAD OR OFFERED AT SAID HEARING
12     OF THE ABOVE-ENTITLED CAUSE.
13
14
15
16
17
18
19
20
21
22
23
24

Page 313

```
 1  STATE OF ILLINOIS)
              )  SS.
 2  COUNTY OF C O O K)
 3
 4        I, MARY MASLOWSKI, CSR, do hereby
 5  certify that I reported in shorthand the proceedings
 6  had at the examination under oath aforesaid, and
 7  that the foregoing is a true, complete and accurate
 8  transcript of the proceedings at said examination
 9  under oath as appears from the stenographic notes so
10  taken and transcribed on the 11th day of September,
11  2019.
12
13
14
15                Certified Shorthand Reporter
16
17
18
19
20
21
22
23
24
```