UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 20-3758 ) |
| Long Leaf Trading Group, Inc., James A. Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) Hon. Thomas A. Durkin ) ) ) |
| Defendants. | ) ) |

**PLAINTIFF CFTC'S MOTION FOR PARTIAL SUMMARY JUDGEMENT AGAINST DEFENDANT LONG LEAF TRADING GROUP, INC.**

The CFTC hereby moves for partial[1] summary judgment against Defendant Long Leaf Trading Group, Inc. ("Long Leaf") on all claims set forth in the complaint, including options fraud (Count I), commodity trading advisor ("CTA") fraud (Count II), fraudulent advertising by a CTA or principal thereof (Count III), failure to register as a CTA (Count IV), failure to provide required disclosures for a trading program (Count V), and various failures by its associated persons ("APs") to register in that capacity (Count VI).

The factual record set forth in the concurrently-filed statement of undisputed material facts[2] ("SOF") confirms the allegations in the CFTC's complaint—Long Leaf was a boiler room

---

[1] The CFTC seeks summary judgment on all of its claims against Long Leaf; the motion is "partial" only in that, if the motion is granted, the CFTC will subsequently seek injunctive relief, e.g., a trading ban, and imposition of a civil monetary penalty, in a motion for a supplemental order.

[2] The CFTC has filed three motions for summary judgment against three different defendants along with three statements of undisputed facts. The statement of facts as to Defendant Ruth focuses on Ruth's own statements. The statement of facts as to Defendant Donelson focuses on Donelson's own statements. The statement of facts as to Long Leaf is broader than both those filings and applies generally to material concerning Long Leaf.

that skirted registration and regulatory requirements and cheated and defrauded substantially all of its clients over its approximately five-year existence.

The registration and regulatory violations in this case are all imposed on a strict liability basis and underscore the critical role those requirements play in the regulatory scheme set forth by Congress in the Commodity Exchange Act. *See Stotler & Co. v. CFTC*, 855 F.2d 1288, 1293 (7th Cir. 1988) ("Registration is the kingpin in this statutory machinery, giving the [CFTC] the information about participants in commodity trading which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the [CEA]."). Long Leaf satisfies the straightforward statutory definition of a CTA because its business model involved providing trading recommendations to customers in return for compensation, which in turn triggers the registration requirement and additional regulatory obligations including the provision of a detailed disclosure document. Long Leaf did not register as a CTA and it did not provide customers with the required disclosure document.

In addition to its registration and regulatory violations and as reflected in the CFTC's separate motions for summary judgment against Defendants Jeremy Ruth and James Donelson, Long Leaf defrauded its customers through a scheme that spanned the ownership of both Defendant Timothy Evans (2015–November 2017) and Donelson (December 2017–December 2019). The fraud generally took the form of misrepresentations about the company's performance, the qualifications of its management, and omissions of track record information—all of which are items that courts have long held are material as a matter of law in this context. Long Leaf's misrepresentations and omissions were memorialized in pitch scripts and other solicitation materials that were used by Long Leaf's broker staff as they sat each day cold-calling hundreds of potential customers.

The record in this case cannot be genuinely disputed—the evidence is chiefly recorded telephone calls, Long Leaf's scripts and presentations, business records reflecting the staggering losses suffered by customers that followed Long Leaf's trading recommendations, and the Defendants' admissions about what they said and their awareness of customer losses. Pursuant to 7 U.S.C. § 2(a)(1)(B), Long Leaf is liable for the acts of its agents. Accordingly, all the evidence in the record—the telephone recordings, the customer complaints, Donelson's cherry-picked performance documents, the knowledge of customer losses—is imputed to Long Leaf for purposes of this motion. Because there are no genuine disputes of fact and this case is squarely controlled by long-established precedent, the Court should grant the CFTC's motion for partial summary judgment on all claims against Long Leaf.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA, Inc.*, 3 F.4th 927, 938 (7th Cir. 2021).

## II. ANALYSIS

**A.    The CFTC is Entitled to Summary Judgment on its Options Fraud Claim (Count I).**

CFTC's Count I against Long Leaf is for options fraud in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10. (Doc. 1, Compl. ¶¶ 79-86.) Under 7 U.S.C. § 6c(b) and 17 C.F.R. §

3

33.10, it is unlawful for any person directly or indirectly: (a) to cheat or defraud, or attempt to cheat or defraud, any other person; (b) to make or cause to be made to another person any false statement; or (c) to deceive or attempt to deceive any other person by any means whatsoever, in or in connection with any commodity option transaction, including any option on futures transaction.[3]

In order to prove a claim for options fraud, the CFTC must establish that a defendant, in connection with a commodity option transaction: (a) made a misrepresentation, misleading statement, or a deceptive omission; (b) acted with scienter; and (c) the misrepresentation or omission is material. *CFTC v. Caniff*, No. 19-CV-2935, 2020 WL 956302, at *7 (N.D. Ill. Feb. 27, 2020). The CFTC is not required to prove reliance. *Slusser v. CFTC*, 210 F.3d 783, 786 (7th Cir. 2000).[4]

Whether a misrepresentation has been made depends on the "overall message" conveyed by the defendant, as well as the "common understanding of the information conveyed" by an "objectively reasonable receiver" of the information. *CFTC v. Kratville*, 796 F.3d 873, 892 (8th Cir. 2015) (affirming summary judgment for CFTC on options fraud claims were defendant misrepresented "track record") (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). A representation or omission is material if a reasonable investor would consider it important in deciding whether to make an investment. *Id*. at 895.

---

[3] 7 U.S.C. § 6c(b) prohibits entering into any commodity options transaction contrary to any regulation which the Commission may prescribe. 17 C.F.R. § 33.10, "fraud in connection with commodity options transactions," is one such regulation.

[4] *Caniff* and other cases cited herein feature Regulations prohibiting fraud in connection with options on commodities, i.e., 17 C.F.R. § 32.4 ("fraud in connection with commodity option transactions"), or its predecessor regulation, 17 C.F.R. § 32.9 (2012). These regulations have substantially the same language as 17 C.F.R. § 33.10, the regulation which forms the basis for Count I, which prohibits fraud in connection with options on commodity futures contracts.

Scienter is established if the defendant intended to defraud, manipulate, or deceive, or if the defendant's conduct was "reckless," i.e., representing an extreme departure from the standards of ordinary care. *Kratville*, 796 F.3d at 893. Such a departure involves "highly unreasonable omissions or misrepresentations ... that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it." *Id.* (quoting *R.J. Fitzgerald*, 310 F.3d at 1328) (alterations in original).

1. **Long Leaf Fraudulently Omitted to Disclose that All Customers Lost Money.**

Substantially all Long Leaf customers that participated in the Long Leaf trading program (which at times was called the "Time Means Money" program but had the same structure from June 2015 through December 2019 ("Relevant Period")) lost money. (Statement of Facts in Support of CFTC's Motion for Partial Summary Judgment Against Defendant Long Leaf ("SOF") ¶¶ 32-33.) At no time, however, did Long Leaf disclose this fact to customers or prospects or even attempt to provide complete and accurate performance information. (*Id.* ¶¶ 41-47.)

When Defendant Evans owned Long Leaf, he instructed APs that they should not provide track record information to prospects and if asked, APs should tell prospects that they were simply not allowed to disclose that information. (*Id.* ¶ 42.) This policy continued once Donelson bought the company in December 2017. (*Id.* ¶ 44.) Donelson acknowledged that he was aware of the trading program's poor performance from the outset of his tenure with the company, yet in a February 2018 meeting he reiterated to his APs that they were not to disclose information about Long Leaf's trading performance. (*Id.* ¶ 45.) Long Leaf's brokers have testified that they followed the policy throughout the Relevant Period. (*Id.* ¶¶ 41-42, 44.)

Long Leaf's policy to not disclose that substantially all program participants suffered trading losses to prospects persisted across the entire Relevant Period and was communicated to

the AP staff directly from the company's owners. There are few pieces of information that could be more material to an advisory client, and courts consistently hold that failing to disclose this kind of information is fraudulent as a matter of law. *See R.J. Fitzgerald*, 310 F.3d at 1332-33 (entering judgment for CFTC on options fraud claim where defendant failed to disclose that 95% of customers lost money). Long Leaf purposely omitted to disclose that substantially all trading program participants lost money to customers and prospective customers, and directed the APs to do the same. (SOF ¶¶ 41-46.) Long Leaf's omission was fraudulent as a matter of law.

### 2. Long Leaf's "Track Records" Were False and Misleading.

Not only did Donelson direct his APs to continue to follow Long Leaf's policy of failing to disclose that substantially all its customers lost money in the trading program, beginning in 2019 he created documents—that he called by various names including "track records" or "trade history"—that reflected *positive* trading returns and directed his APs to distribute those documents to prospects. (SOF ¶¶ 50-56.) Long Leaf's brokers have testified that in fact they did distribute Donelson's "track record" documents and the information contained in them to prospective customers. (*Id.* ¶¶ 50, 52, 54-55.) Donelson's "track record" documents do not include complete and accurate performance information and do not include information from which a prospect could deduce that substantially all Long Leaf customers lost money—just the opposite, that was the point. (*Id.* ¶¶ 50-56.) At times, according to Donelson the "track record" documents he created in 2019 reflected hypothetical results that did not occur in any particular account. (*Id.* ¶¶ 50-51, 54-56.) At other times, Donelson admits, the track record documents reflect cherry-picked trades or periods of time when trading was briefly or selectively profitable, at times when customers were continuing to lose money in the aggregate. (*Id.* ¶¶ 48-49, 52-53.)

Disclosing historical performance information for a subset of trades or a hypothetical set of trades that reflects positive trading returns, when in fact substantially all customers lost money

6

over substantially all time period is fraudulent as a matter of law. *See CFTC v. Heffernan*, 245 F. Supp. 2d 1276, 1294–95 (S.D. Ga. 2003) (entering summary judgment for CFTC on fraud claim where defendant presented hypothetical trading results without disclosing them as such); *CFTC v. Hall*, 49 F. Supp. 3d 444, 452 (M.D.N.C. 2014) (same), aff'd, 632 F. App'x 111 (4th Cir. 2015);[5] *cf. Kratville*, 796 F.3d at 892 (affirming summary judgment for CFTC on fraud claim where defendant represented one pool's track record as that of another).

### 3. Donelson's Statements About, And Failure to Disclose, His Trading Experience Were Misleading.

Starting from the outset of his tenure as Long Leaf's CEO, Donelson represented to customers that he had professional experience at well-known proprietary trading firms and he would bring that experience to bear on his "trade design" at Long Leaf. (SOF ¶ 57.) Donelson made this misleading statement in a letter to Long Leaf clients that he directed his APs to distribute to all customers and it was incorporated into many different solicitation materials used by Long Leaf APs. (*Id.*)

Donelson is no trading guru. Donelson spent his entire professional career before Long Leaf as an accountant and although it is true he has worked at trading firms, he worked at them as an accountant. (*Id.* ¶ 60.) Before he worked at Long Leaf, Donelson never conducted any trading in a professional capacity and to the extent he traded options or futures in his personal account, that trading resulted in losses. (*Id.* ¶ 59.)

Holding oneself out as an experienced and qualified advisory professional is fraudulent as a matter of law if the truth is the exact opposite. *See CFTC v. Next Fin. Servs. Unlimited*, No.

---

[5] *See also CFTC v. Trademasters*, USA, LLC, No. 216CV01938GMNNJK, 2018 WL 3603019, at *2 (D. Nev. June 22, 2018) (entering summary judgment for CFTC on fraud claim where defendant presented hypothetical trading results without disclosing them as such); *CFTC v. PMC Strategy, LLC*, No. 3:11CV73, 2013 WL 1349177, at *6 (W.D.N.C. Apr. 3, 2013) (same); *CFTC v. Highland Stone Cap. Mgmt., L.L.C.*, No. 11 CIV. 5209 KBF, 2013 WL 4647191, at *16 (S.D.N.Y. Aug. 29, 2013) (same).

04-80562-CIVRYS, 2006 WL 889421, at *2 (S.D. Fla. Mar. 30, 2006) (entering summary judgment for CFTC on fraud claim where defendant misrepresented profitable trading experience); *CFTC v. McLaurin*, No. 95 C 285, 1996 WL 385334, at *3 (N.D. Ill. July 3, 1996) (same). Any reasonable investor would want to know that the person to whom he is committing funds—and often at Long Leaf its customers trusted the company with their retirement accounts—is a rank amateur. Accordingly, Long Leaf is liable for Donelson's misleading statements about his qualifications to professionally manage clients' money.

    **4.    Long Leaf Induced or Allowed APs to make False and Misleading Statements.**

Throughout the entire Relevant Period—spanning both the Evans and Donelson ownership eras—Long Leaf's APs solicited customers by following a script that was provided to them by management. (SOF ¶¶ 29-31.) APs were directed to cold call members of the general public and deliver the Long Leaf pitch. (*Id.* ¶ 28.) That pitch included statements such as

- Long Leaf uses options-selling strategies to "drive results"; the results are attributable to the "basic advantage the seller has," which is that "on average 76.5% of options expire worthless." "[I]f you sell 4 options, there is a strong statistical likelihood you are going to win 3 on those . . . giving you a much more predictable path to success."

- Long Leaf was founded on the principal that "[w]e should provide our clients a strong return on their investment." Long Leaf measures its success by the success of its clients; "[a]s a company, we wouldn't have the ability to work with hundreds of clients month-after-month for 6 years and oversee millions of dollars if we weren't being profitable for them;"

- It will be "easy" for Long Leaf's customers to achieve annual returns of 6-12%.

(*Id.* ¶ 29.) Long Leaf's script included these kinds of statements notwithstanding Long Leaf's knowledge that its trading recommendations resulted in trading losses for substantially all its customers. (*Id.* ¶¶ 35-40.) Long Leaf's APs continued to use the same script with the same

misleading statements well into the Donelson ownership era—through at least December 2018. (*Id.* ¶ 31.)

As set forth in the motions for summary judgment against Defendants Ruth and Donelson, Long Leaf's sales pitch, which included statements that can only be interpreted to be a representation that Long Leaf was in fact profitable for its clients, were fraudulent as a matter of law because the exact opposite was true for substantially the entire Relevant Period. *See Kratville*, 796 F.3d at 895 (statements of profit potential and risk "go to the heart of a customer's investment decision" and are therefore material as a matter of law) (quoting *R.J. Fitzgerald*, 310 F.3d at 1330); *cf. CFTC v. Prestige Ventures Corp.*, No. CIV-09-1284-R, 2010 WL 8355003, at *5 (W.D. Okla. Oct. 27, 2010) (entering summary judgment for CFTC on fraud claim where defendant "failed to rectify" fraudulent information disseminated by underling), aff'd sub nom. *CFTC v. Lee*, 445 F. App'x 126 (10th Cir. 2011).

**B.     The CFTC is Entitled to Summary Judgment on Its CTA Fraud Claim (Count II).**

The CFTC's Count II is for CTA fraud in violation of 7 U.S.C. § 6*o*(1). (Doc. 1, Compl. ¶¶ 87-94.) Section 6*o*(1)(a), incorporates the traditional elements of common law fraud, i.e., a false or misleading statement or omission of material fact, made with scienter.[6] *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 993–94 (7th Cir. 2000). Section 6*o*(1)(b), by contrast does not require a showing of scienter. *Id*. It requires that the CTA engaged in a course of conduct which "operates as a fraud or deceit" on a customer or prospective customer.[7] *Id*.

---

[6] As with options fraud, the CFTC is not required to prove reliance. *Slusser*, 210 F.3d at 786.

[7] The prohibition against CTA fraud applies even if the CTA is exempt from registration, 17 C.F.R. § 4.15, as Long Leaf argues that it is.

1. **Long Leaf was a CTA.**

CTA fraud requires that the fraud have been committed by a CTA. 7 U.S.C. § 6*o*(1). A CTA is as a person who, for compensation of profit, engages in the business of advising others as to the value of or the advisability of trading in commodity options, including options on futures contracts. 7 U.S.C. § 1a(12)(A)(i), (ii). Courts interpret the definition of a CTA liberally. *CFTC v. Equity Fin. Grp., LLC*, No. CIV. 04-1512 (RBK), 2007 WL 1038754, at *3 (D.N.J. Mar. 30, 2007).

Long Leaf's business model centered around recommending options trades to customers. (SOF ¶¶ 15-17.) Long Leaf disseminated the trading recommendations to customers via email or text messages and if a customer accepted the recommendation, Long Leaf caused the trade to be executed in the customer's account. (*Id.* ¶¶ 20-21.) Customers that participated in the trading program did not deviate from the recommended trades, except to the extent that they may have executed greater or fewer contracts per trade than were recommended. (*Id.* ¶¶ 25-26.) Each customer also received the same recommendations as every other customer, except that one customer might be advised to trade more or less of the same spread depending on the equity in his or her account. (*Id.* ¶19.) Customers that participated in the Long Leaf trading program never altered the structure (i.e., the underlying futures contract and strike prices) of the recommended trades and never entered options trades other than the trades that were recommended to them pursuant to the trading program. (*Id.* ¶ 26.) Long Leaf's business model was the same across the entire Relevant Period. (*Id.* ¶ 15.) Long Leaf has stated that it provided those recommendations to customers because it believed them to be advisable and Long Leaf received compensation from customers in the form of commissions, which Long Leaf received when it executed the recommended trades for customers. (*Id.* ¶ 22.)

Long Leaf was therefore in the business of advising customers as to the trading of options, for compensation. *Cf. Hall*, 49 F. Supp. 3d at 450 (finding on summary judgment that defendant was CTA where he advised subscribers over emails as to when they should open and close positions in specific futures contracts); *CFTC v. British Am. Commodity Options*, 560 F.2d 135, 141 (2d Cir. 1977) (holding that defendant was acting as a CTA where it offered advisory services and received compensation in the form of a mark-up on the customer's option premium).

### 2. Long Leaf Defrauded Customers

As set forth above and in the motions for summary judgment against Defendants Ruth and Donelson, Long Leaf (though its APs and management) made numerous false and misleading statements to customers that are fraudulent as a matter of law. For example, Long Leaf told customers that its trading program offered a "predictable path to success" and that Long Leaf would not be in business year after year if it was not trading profitably for its clients. (SOF ¶¶ 29-31.) And beginning in 2019, Long Leaf disseminated cherry-picked "track record" information to prospective clients that reflected positive trading returns. (*Id.* ¶¶ 48-56.) Long Leaf did all these things at the same time it had actual knowledge that its trading recommendations resulted in across-the-board losses across substantially any time period. (*Id.* ¶¶ 35-40.) Moreover, as set forth above, Long Leaf misrepresented the qualifications of its principal to prospective customer. (*Id.* ¶¶ 57-61.)

These facts are undisputed. Long Leaf is therefore liable for CTA fraud as a matter of law. *See CFTC v. Crombie*, No. C 11-4577 CW, 2013 WL 3957506, at *25 (N.D. Cal. July 26, 2013) (entering summary judgment for CFTC on fraud and controlling person claims where defendant "was actually in control of the trading program itself"), aff'd, 914 F.3d 1208 (9th Cir.

2019); *CFTC v. PMC Strategy*, LLC, No. 3:11CV73, 2013 WL 1349177, at *7 (W.D.N.C. Apr. 3, 2013) (same, where defendant knowingly issued false "performance updates" to customers).

### C. The CFTC is Entitled to Summary Judgment on Its False CTA Advertising Claims (Count III).

The CFTC's Count III is for CTA advertising fraud in violation of 17 C.F.R. § 4.41. (Compl. ¶¶ 96-100.) 17 C.F.R. § 4.41(a) makes it unlawful for a CTA or any principal thereof to advertise in a manner which: (1) employs any device, scheme or artifice to defraud any customer or prospective customer; or (2) involves any transaction, practice or course of business which operates as a fraud or deceit upon any customer or prospective customer.[8] 17 C.F.R. § 4.41(b) in particular prohibits the presentation of the performance of any hypothetical commodity interest account unless such presentation is accompanied by a disclaimer advising, *inter alia*, that the results are hypothetical and do not represent actual trading. This regulation is applicable to any publication, distribution, or broadcast of any writing, advertisement or other literature or advice, whether by electronic media or otherwise, including information provided via internet or e-mail, or the texts of standardized oral presentations. 17 C.F.R. § 4.41(c)(1).

As set forth above, Long Leaf is a CTA. The facts which form the basis for the CFTC's options fraud and CTA fraud claims above also satisfy the requirements of 17 C.F.R. § 4.41. *CFTC v. Arrington*, 998 F. Supp. 2d 847, 871 (D. Neb. 2014) (noting that 4.41 language is the same as 6*o*, entering summary judgment on both), aff'd sub nom., *Kratville*, 796 F.3d 873; *see also CFTC. v. Heffernan*, No. CA 404-23302-TLW-TER, 2006 WL 2434015, at *7 (D.S.C. Aug. 21, 2006) (same). Accordingly, the CFTC is entitled to summary judgment on its fraud claim against

---

[8] The prohibition against fraudulent advertising by a CTA applies regardless of whether the CTA is exempt from registration. 17 C.F.R. § 4.41(c)(2).

12

**D.      The CFTC is Entitled to Summary Judgment on its CTA Registration Claim (Count IV).**

The CFTC's Count IV is for Long Leaf's failure to register as a CTA, in violation of 7 U.S.C. § 6m(1). (Doc. 1, Compl. ¶¶ 101-107.) Under 7 U.S.C. § 6m(1), a person acting as a CTA is required to register as such if the person makes use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CTA. A CTA's failure to register as such is a strict liability violation, i.e., there is no scienter requirement. *CFTC v. JBW Cap.*, 812 F.3d 98, 106 (1st Cir. 2016) (affirming summary judgment for CFTC on registration claim).

As set forth above, Long Leaf acted as a CTA. In so doing, Long Leaf utilized the telephone and emails—instrumentalities of interstate commerce—to solicit prospective customers and recommend trades to existing ones. (SOF ¶ 20.) Long Leaf has never been registered as a CTA (*id.* ¶ 3), and was therefore in violation of 7 U.S.C. § 6m(1).

Long Leaf may argue that it is not required to register as a CTA because it was registered through the Relevant Period as an IB. This is wrong. Registration in one capacity does not include registration in any other capacity. 17 C.F.R. § 3.4(a).

That said, a registered IB is not also required to register as a CTA if the advice it gives customers is provided "solely in connection with its business as an introducing broker." 17 C.F.R. § 4.14(a)(6). An IB is any person engaged in soliciting or in accepting orders for any legal commodity option, including an option on a futures contract, but who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure customer trades. 7 U.S.C. § 1a (31)(A)(i).

A registered IB that "guides" trading in the majority of customer accounts by advising the customer of the particular contract to buy or sell, and the price and quantity of the contract to buy

13

or sell, does not provide advice "solely in connection" with its business as an IB. *Clarification of Issues Concerning Guided Accounts of Introducing Brokers and Futures Commission Merchants*, CFTC Letter No. 95-82, 1995 WL 707862 (Sept. 19, 1995). This is true even where the IB does not actually control the account, and the decision of whether to follow the guidance is left to the customer. *Id*. Such an IB would be acting primarily as a CTA, and must therefore register as such. *Id*.

Throughout the Relevant Period, LLT guided the majority of customer accounts by providing trading commendations. (SOF ¶¶ 15-20, 23-26.) The trading recommendations advised customers as to the specific options on futures contracts to purchase, the quantity of such contracts to purchase (typically based on the equity in a customer's account), and the price at which to buy and sell such contracts. (*Id*.) It cannot therefore be said that Long Leaf Trading provided recommendations that were solely in connection with its business as an IB. Rather, Long Leaf was acting primarily as a CTA and is required to have been registered as such.

### E. The CFTC is Entitled to Summary Judgment on its Claim for Failure to Make Required CTA Disclosures (Count V).

The CFTC's Count V is for Long Leaf's failure to make certain disclosures in connection with the offering of a trading program, as required by 17 C.F.R. § 4.31(a), (b) and 17 C.F.R. § 4.36(d)(1). (Doc. 1, Compl. ¶¶ 108-114.) Under 17 C.F.R. § 4.31(a) a CTA registered or required to be registered to provide to each customer or prospective customer, in advance of any trading, a disclosure statement if the CTA seeks to "guide" the customer's account pursuant to a "trading program," i.e., a "systematic program that recommends specific transaction."[9] This is what Long Leaf did. (SOF ¶¶ 15-26.)

---

[9] The disclosure statement must include certain specific information relating to the track record (or lack of a track record) for the program, including: (1) the annual and year-to-date rate of return for the program specified for the five most recent calendar years and year-to-date, computed on a compounded monthly

14

Before guiding any customer account pursuant to such a trading program, the CTA must obtain a signed and dated acknowledgement from the customer that the customer has received the disclosure statement. 17 C.F.R. § 4.31(b). Under 17 C.F.R. § 4.36(d)(1), the CTA must also provide a copy of the disclosure statement to NFA at least three weeks before it plans to offer the trading program to customers or prospective customers.

It is undisputed that Long Leaf filed to provide to customers, or file with the NFA, the required disclosures. (SOF ¶ 47.) To the contrary, Long Leaf deliberately withheld its historical trading results from customers, and provided them instead with hypothetical or cherry-picked results. (*Id*. ¶¶ 41-56.)

### F. The CFTC is Entitled to Summary Judgment on its AP Registration Claim (Count VI).

The CFTC's Count VI is based on Long Leaf's allowing Defendants Donelson and Andrew Nelson to act as APs without registration in violation of 7 U.S.C. § 6k(1). (Doc. 1, Compl. ¶¶ 115-124.)

Under 7 U.S.C. § 6k(1) it is unlawful for an IB (which Long Leaf was, in addition to being a CTA) to permit a person required to be registered as an AP to become or remain associated with the IB if the IB knew or should have known that such person was not so registered. *See also* 17 C.F.R. § 33.3(b)(2) (same re options on futures contracts). A person is required to register as an AP the person is associated with an IB as a partner, officer, employee, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves: (a) the solicitation or acceptance of customers' orders; or (b) the

---

basis, and with monthly rates of return; and (2) the number of accounts traded pursuant to the offered trading program that were opened and closed with a negative net lifetime rate of return as of the date the account was closed. 17 C.F.R. § 4.35(a)(1).

15

supervision of any person or persons so engaged, unless such person is registered with the Commission as an AP of such IB. 7 U.S.C. § 6k(1). There is no scienter requirement for violations of 7 U.S.C. § 6k. *Arrington*, 998 F. Supp. 2d at 872 (granting summary judgment for CFTC on registration count).

It is undisputed that Nelson solicited customers for Long Leaf through November 2018, and that he was not registered as a CTA. (SOF ¶ 62.) Long Leaf, through Donelson, knew that Nelson was unregistered as early as July 2018, when the NFA advised it of that fact in a letter. (*Id.* ¶ 64.) Donelson (and Long Leaf) nonetheless allowed Nelson to continue soliciting customers for another five months. (*Id.* ¶ 65.) Long Leaf allowed Nelson to act as an AP without registration, in violation of 7 U.S.C. § 6k(1).

It is undisputed that Donelson was not registered as an AP from December 2017 through May 2018. (SOF ¶ 6.) Yet during that time period, Donelson supervised the APs who were involved in the solicitation of customers. Donelson was the CEO, and had thus the power to hire and fire APs. (*Id.* ¶ 5.) In February 2018, Donelson held a sales meeting and directed the APs to withhold information about past performance. (*Id.* ¶ 45.) Donelson was therefore required to have been registered as an AP from December 2017 through May 2018. Long Leaf allowed Donelson to supervise APs without registration, in violation of 7 U.S.C. § 6k(1).

**G.      The CFTC is Entitled to Summary Judgment on Restitution and Disgorgement.**

7 U.S.C. § 13a-1(d)(3) provides the Commission may seek, and the court may impose, on any person found to have committed a violation of the Act or Regulations, equitable remedies including: (A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and (B) disgorgement of gains received in connection with such violation.

Customers who participated in the trading program sustained losses totaling $5,767,145 during the Relevant Period. (SOF ¶ 32.) This amount should be repaid to customers as restitution. Where, as here, there are material omissions in the context of a fraudulent scheme, the court can presume the reliance by defendant's customers. *CFTC v. Ross*, No. 09 C 5443, 2014 WL 6704572, at *2 (N.D. Ill. Nov. 26, 2014) (entering supplemental order for restitution following consent order) (citing *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 131 (1972)). The same is true where, as here, there was "pervasive or widespread misrepresentation." *CFTC v. Driver*, 877 F. Supp. 2d 968, 980 (C.D. Cal. 2012) (entering summary judgment for CTC), aff'd, 585 F. App'x 366 (9th Cir. 2014).

Of the $5,767,145 lost by customers during the Relevant Period, $4,010,994 of that sum consisted of commissions charged by Long Leaf. (SOF ¶ 34.) These commissions constitute ill-gotten gains that must be disgorged by Long Leaf. *See CFTC v. Escobio*, 833 F. App'x 768, 772 (11th Cir. 2020) (affirming award of restitution and disgorgement in the amount of commissions charged to customers).

## IV. CONCLUSION

For the foregoing reasons, the CFTC respectfully requests that its motion for summary judgment against Long Leaf be granted, and that an order be issued finding Long Leaf liable for Counts I through VI of the CFTC's complaint and ordering it to pay $5,767,145 in restitution and $4,010,994 in disgorgement, with an offset against disgorgement for all sums paid towards restitution.

/s/ Ashley J. Burden

Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700

## CERTIFICATE OF SERVICE

      I hereby certify that on November 5, 2021, I provided service to the persons listed below, and by the following means:

| Via the Court's electronic CM/ECF system: | Via email, pursuant to D.E. 13, to: |
|---|---|
| Jim Falvey<br>Falvey Law Office<br>200 S. Wacker Dr., Ste. 3100<br>Chicago, IL 60606-5877<br>jimfalvey@yahoo.com<br><br>Counsel to Long Leaf Trading Group, Inc. and James A. Donelson<br><br>Jeremey S. Ruth<br>11220 Brista Way<br>Austin, TX 78726<br>jeremysruth@hotmail.com<br><br>*Pro se* | Andrew D. Nelson<br>267 May St. E.<br>Elmhurst, IL 60126<br>adnelson0503@gmail.com<br><br>*Pro se* |

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700
aburden@cftc.gov