UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| Commodity Futures Trading Commission, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 20-3758 |
| Long Leaf Trading Group, Inc., James A. Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) ) ) ) ) | Hon. Thomas A. Durkin |
| Defendants. | ) | |

**STATEMENT OF UNDISPUTED FACTS PURSUANT TO L.R. 56.1 IN SUPPORT OF PLAINTIFF CFTC'S MOTION FOR PARTIAL SUMMARY JUDGEMENT AGAINST DEFENDANT LONG LEAF TRADING GROUP, INC.**

**I.    RELEVANT PARTIES**

1. Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") is an independent federal regulatory agency charged by Congress with administering and enforcing the Commodity Exchange Act and accompanying Regulations. (Doc. 23, Long Leaf Ans. ¶ 15.)

2. Defendant Long Leaf Trading Group, Inc. ("Long Leaf") is an Illinois corporation with its principal place of business in Chicago, Illinois. (*Id*. ¶ 16.)

3. Long Leaf was, throughout the period June 2015 through December 2019 ("Relevant Period"), and continues to be, registered with the Commission as an introducing broker ("IB"). (*Id*.)  Long Leaf has never been registered with the Commission as a commodity trading advisor ("CTA").  (*Id*. ¶ 105.)

4. Defendant Timothy M. Evans was the founder of Long Leaf, as well as its owner and CEO from at least 2009 through December 2017.  (*Id*. ¶ 17.)

5. Defendant James A. Donelson purchased Long Leaf from Evans in November 2017. (CFTC Ex. 530[1], Donelson Test. 22:20-23:1.) Donelson took over as CEO of Long Leaf in December 2017, which position he held through the end of the Relevant Period. (Doc. 23, Long Leaf Ans. ¶ 18.)

6. Donelson first registered as an associated person ("AP") of Long Leaf in June 2018, which registration continued through December 2019. (*Id.* ¶ 18.)

## II. JURISDICTION

7. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).

8. In addition, 7 U.S.C. § 13a-1(a) provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

9. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants transacted business in this District, and certain of the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places. (Doc. 23, Long Leaf Ans. ¶ 14.)

## III. LONG LEAF INTRODUCED ACCOUNTS AND GENERATED COMMISSIONS

10. Throughout the Relevant Period, Long Leaf was an IB, and was registered as such with the Commission. (*Id.* ¶ 21.)

11. An IB cannot place customer orders on a designated contract market. (*Id.* ¶ 22.) Rather, an IB introduces its customers to a futures commission merchant ("FCM"), where each customer must open an account for trading on a designated contract market. (*Id.*)

12. An IB earns revenue in the form of a commission when a customer places a trade (or when the IB places a trade on behalf of the customer) in an account with the FCM in accordance with the customer's agreement with the IB. (*Id.* ¶ 23.)

13. Commissions are typically assessed on a per-trade basis, on whatever terms are agreed to between the IB and the customer. (*Id.* ¶ 24.) Commissions are deducted from the customer's account by the FCM, with a portion retained by the FCM and the balance forwarded to the IB. (*Id.*)

14. During the Relevant Period, Long Leaf introduced customers to certain FCMs and received commissions for orders executed in those customer accounts. (*Id.*)

## IV. LONG LEAF'S TRADING PROGRAM

15. Starting in June 2015 and continuing throughout the Relevant Period, Long Leaf recommended trades to customers as part of a "trading program." (*Id.* ¶ 26; CFTC Ex. 528[1], Long Leaf's Ans. and Objs. to CFTC's First RFAs at 4.)

16. Long Leaf provided customers that agreed to participate in the trading program with trading recommendations, typically four recommendations every month. (Doc. 23, Long Leaf Ans. ¶ 27; *see also* CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 4; CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 120:23–121:4.)

---

[1] All exhibits cited herein are appended to this statement of facts unless otherwise noted. All page numbers for exhibits other than transcripts are to the PDF exhibit and not to any internal pagination the exhibit may have.

17. Each recommendation was for a different spread trade, with each trade typically involving four out-of-the-money options on futures contracts traded on designated contract markets, i.e., exchanges, such as the Chicago Mercantile Exchange and New York Mercantile Exchange. (Doc. 23, Long Leaf Ans. ¶ 27; *see also* CFTC Ex. 530, Donelson Test. 106:21–107:4; CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 109:23–110:7.)

18. Every customer participating in the trading program received the same recommendations as every other customer. (CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 150:6–150:20; *see also*, *e.g.*, CFTC Ex. 65, Email from J. Donelson to various associated persons ("APs"), March 27, 2018, attaching "trade recommendations"; CFTC Ex. 66, Email from J. Donelson to APs, attaching "trade recommendations" and "customer analysis," May 24, 2018; CFTC Ex. 67, Email from J. Donelson to APs attaching "trade recommendations," Jan. 24, 2019; CFTC Ex 530, Donelson Test. 172:23–175:12, 196:13–199:11, 202:8–202:12.)

19. The only difference was in the number of contracts recommended per spread trade; customers with more equity, i.e., value, in their accounts would be advised to trade more contracts; customers with less equity would be advised to trade fewer contracts. *Supra* citations to para. 18.

20. Long Leaf's APs provided the recommendations to Long Leaf customers typically by email or over the phone. (Doc. 23, Long Leaf Ans. ¶ 30.) Long Leaf's APs instructed customers to simply respond "yes" in a text or email to accept the recommended trades. (*Id*. ¶ 31; *see also* CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 5.)

21. Long Leaf would forward the customer orders to its FCM, either over the phone or via an electronic trading platform. (Doc. 23, Long Leaf Ans. ¶ 32; *see also* CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 4.) The FCM would then place the orders

on the exchange to be executed. (Doc. 23, Long Leaf Ans. ¶ 32; *see also* CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 5.)

22. Long Leaf provided these recommendations to customers for compensation on a per-trade basis if those recommendations were accepted and acted upon by customers. (Doc. 23, Long Leaf Ans. ¶ 88; *see also id*. ¶ 51.) Long Leaf recommended the trades because they believes the trades to be "valuable or advisable." (. CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 4.)

23. Within a few months of the program's inception, most of Long Leaf's customers were participating in the trading program. (CFTC Ex. 539, Gecas Test. 14:21–15:19; CFTC Ex. 533, Ruth Test. 36:6–36:15.)

24. By November 2017, when Donelson started at Long Leaf, approximately 80% of the firm's customers were participating in the trading program. (CFTC Ex. 530, Donelson Test. 97:16–97:23.) After July 2018, all new Long Leaf customers were participants in the trading program. (CFTC Ex. 531, Donelson Dep. 131:19–131:24; *see also* CFTC Ex. 530, Donelson Test. 97:16–98:2.)

25. The customers who participated in trading program accepted Long Leaf's trading recommendations 80% to 85% of the time. (CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 121:10–121:19; *see also* CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 6.)

26. If a customer did not accept a trading recommendation, it was because he or she failed to respond in time, elected not to trade at all, or, approximately 5% of the time, elected to trade fewer contracts than recommended. (CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 121:24–122:7.) No participant in the trading program ever sought to change the structure of the

recommended trade, i.e., by requesting an option on a different future, or different strikes on the option. (*Id*. at 122:8–123:7.)

## V. AP SOLICITATIONS

27. Long Leaf marketed its trading program to the general public through the firm's website. (CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 7-8.)

28. Long Leaf also employed a staff of APs whose duties included soliciting members of the general public to participate in the trading program through oral and written presentations. (*Id.* at 8.)

29. In these presentations, the APs told customers and prospective customers, among other similar statements, that:

　　a. Long Leaf uses options-selling strategies to "drive results"; the results are attributable to the "basic advantage the seller has," which is that "on average 76.5% of options expire worthless." "[I]f you sell 4 options, there is a strong statistical likelihood you are going to win 3 on those . . . giving you a much more predictable path to success."

　　b. Long Leaf was founded on the principal that "[w]e should provide our clients a strong return on their investment." Long Leaf measures its success by the success of its clients; "[a]s a company, we wouldn't have the ability to work with hundreds of clients month-after-month for 6 years and oversee millions of dollars if we weren't being profitable for them;"

　　c. It will be "easy" for Long Leaf's customers to achieve annual returns of 6-12%.

(CFTC Ex. 42, Call from S. Gecas to J. Johnson, Nov. 6, 2017, at 00:39:00–00:40:00, 00:43:25–00:44:54[2]; CFTC Ex. 41, Email from S. Gecas to R. Dillman, March 12, 2018, attaching PowerPoint, at 12, 14; CFTC Ex. 539, Gecas Test. 57:16–59:17, 173:19–176:19, 179:9–180:21; CFTC Ex. 185, Email from B. Adams to J. Hatzigiannis, March 15, 2018, attaching PowerPoint, at 12, 28-29; CFTC Ex. 540, Hatzigiannis Dep. 84:9–86:19, 87:10–89:5, 89:11–90:24, 105:5–110:10; CFTC Ex. 101, Call from J. Leeney to O. Ainsworth, July 6, 2017, at 00:13:30–00:13:53, 00:16:10–00:18:50; CFTC Ex. 107, Email from T. Evans to J. Leeney, Jan. 1, 2017, attaching script, at 6-7, 9; CFTC Ex. 541, Leeney Test. 156:1–164:7, 168:4–169:14, 185:1–185:22, 186:17–187:24; CFTC Ex. 153, Call from J. Ruth to H. Patel, January 12, 2016, at 00:35:15–00:35:49; CFTC Ex. 352, Call from J. Ruth to J. Janowiak, Feb. 19, 2016, at 00:09:50–00:12:25; CFTC Ex. 155, Call from J. Ruth to D. Bennett, Aug. 17, 2017, at 00:15:50–00:17:00, 00:57:55–00:58:30; 1:05:00–1:05:55; CFTC Ex. 134, Email from T. Evans to J. Ruth, Sept. 7, 2016, attaching "demo script," at 5-6, 8-9; CFTC Ex. 141, Email from J. Ruth to T. Evans, Apr. 8, 2017, attaching "custom version 3," at 12, 14; CFTC Ex. 533, Ruth Test. 231:10–232:9, 240:20–241:11, 287:20–288:21)

30. These statements were set forth in scripts and presentations provided to Long Leaf APs by Evans. *Supra* citations to para. 29, *sans* calls.

31. APs made these statements throughout the Relevant Period and continued to make them after Donelson took over, through at least December 2018. (CFTC Ex. 539, Gecas Test. 57:16–59: 17; CFTC Ex. 540, Hatzigiannis Test. 97:14–97:20; CFTC Ex. 542, Stemper Dep. 167:10–179:13; *see also* CFTC Ex. 183, Call from J. Hatzigiannis to P. Campbell, May 23, 2018,

---

[2] CFTC Exs. 42, 101, 153, 155, 183, 288, and 352 are audio files. The CFTC has submitted these files through the Court's digital media submission portal. They should be reflected on the docket shortly after the CFTC files its motion. The format for the pin-cite is hh mm:ss

7

at 00:07:45–00:08:08, 00:11:29–00:11:51; CFTC Ex. 288, Call from A. Stemper to K. Cardon, Jan. 12, 2018, at 00:07:50–00:10:50, 00:12:10–00:12:45;)

## VI. CUSTOMER LOSSES

32. During the Relevant Period, customers participating in Long Leaf's trading program lost a combined total of $5,767,145. (CFTC Ex. 535, Patrick Decl. ¶ 22.)

33. Substantially all Long Leaf customers who participated in the trading program lost money. (*Id.* ¶¶ 17, 21.)

34. During the Relevant Period, Long Leaf received a combined total of $4,010,994 in commissions for accounts participating in the trading program. (*Id.* ¶ 29.)

## VII. AWARENESS OF CUSOMER LOSSES

35. Evans was aware of customer losses from the trading program; he received statements showing losses in customer accounts, as well as complaints from customers about account performance. (*See*, *e.g.*, CFTC Ex. 96, Email from A. Boparti to T. Evans, Sept. 21, 2016; CFTC Ex 125, Email from S. Beranek to J. Ruth, Jan. 26, 2017 (forwarded to T. Evans).)

36. The same is true for the APs. (CFTC Ex. 37, group exhibit of customer complaints to S. Gecas; CFTC Ex. 539, Gecas Test. 130:9–130:15, 132:18–132:22, 148:1–149:19; CFTC Exs. 211, 213-14, customer complaints to J. Hatzigiannis); CFTC Ex. 540, Hatzigiannis Test. 63:14-63:21, 66:7-67:9, 71:6-71:10; CFTC Ex. 541, Leeney Test. 121:8-121:21, 140:3-141:7, 149:2-149:7; CFTC Ex. 542, Stemper Dep. 103:1–118:21; Doc. 36, Ruth Answer ¶¶ 3, 38, 41, 63; Ex. CFTC Ex. 346, Email from GAIN to Ruth attaching customer statements, March 22, 2016, at 29-55; CFTC Exs. 124-126, customer complaints to J. Ruth; CFTC Ex. 533, Ruth Test. 77:16–78:8, 155:18–156:1.)

37. Donelson started receiving customer account statements on a daily basis shortly after starting at Long Leaf. (CFTC Ex. 71 at 1-19, group exhibit of customer complaints to J. Donelson; CFTC Ex. 530, Donelson Test. 217:20–218:2 *see also* Doc. 30, Donelson Corrected Ans. ¶ 40.) When Donelson reviewed the statements, he saw that substantially all customers who participated in Long Leaf's trading program had been losing money. (CFTC Ex. 530, Donelson Test. 221:3–222:3; CFTC Ex. 531, Donelson Dep. 62:7–62:22.)

38. Donelson began receiving calls and emails from customers complaining about account performance almost as soon as he arrived at Long Leaf. (*Id*. at 62:2–62:6; *see also* Doc. 30, Donelson Corrected Ans. ¶ 40.)

39. As Long Leaf and its trading program continued under Donelson's leadership, Donelson continued to receive daily account statements showing losses in substantially all customer accounts. (Doc. 30, Donelson Corrected Ans. ¶ 40.) Donelson also monitored the performance of Long Leaf's recommended trades in real time. (*Id.*)

40. Donelson likewise continued to receive emails and phone calls from customers complaining of poor account performance. (*Id*.; *see also* Ex. 530, Donelson Test. 247:23–248:2; Donelson Corrected Ans. ¶ 40; CFTC Ex. 71 at 20-41.)

VIII.  **PAST PERFORMANCE OMISSION**

41. Although substantially all Long Leaf customers lost money in the trading program, customers and prospective customers were not told this. (CFTC Ex. 531, Donelson Dep. 97:17–97:21; CFTC Ex. 539, Gecas Test. 128:19–129:11; CFTC Ex. 540, Hatzigiannis Test. 129:1–130:4; CFTC Ex. 541, Leeney Test. 200:1–201:9; CFTC Ex. 533, Ruth Test. 299:10–299:15, 300:23–301:10, 312:4–312:8.)

42. Evans advised APs that they should not provide track records, and that if asked they should say they are not allowed to provide them. (CFTC Ex. 539, Gecas Test. 126:12–128:18; CFTC Ex. 540, Hatzigiannis Test. 135:11–135:19; CFTC Ex. 541, Leeney Test 196:17–196:24; CFTC Ex. 142, Email from T. Evans to J, Ruth, June 1, 2015.)

43. APs were also provided with a "rebuttals" script instructing them to deal with requests for past performance by claiming the "structure of the program" was "unmatched" and the reason it had been "so successful." (CFTC Ex. 5, Email from J. Donelson to A. Nelson, July 25, 2018, attaching rebuttals file, at 5-6; CFTC Ex. 539, Gecas Test. 205:6–207:7; CFTC Ex. 540, Hatzigiannis Dep. 222: 23–223:17; CFTC Ex. 541, Leeney Test. 198:16–199:9.)

44. The policy of refusing to provide track records continued under Donelson. (CFTC Ex. 540, Hatzigiannis 135:22–137:1, 138:1-138:10; *see also* CFTC Ex. 192, Email from J. Hatzigiannis to "Vivian," June 20, 2018; CFTC Ex. 542, Stemper Dep. 150:11–15:13.)

45. By February 2018, the results from Long Leaf's trading recommendations were "very bad." (CFTC Ex. 531, Donelson Dep. 65:22–66:2.) Early that month, Donelson held a "sales meeting" with Long Leaf's APs. (*Id.* at 63:19–65:6.) At that meeting Donelson instructed the APs not to provide customers with any information in response to requests for "past performance." (*Id.*)

46. If customers asked about it, Donelson told the APs they should say that it is Long Leaf's policy not to provide information on past performance. (*Id*. at 65:16–65:21.) Donelson also advised the APs to get good with the "rebuttals." (CFTC Ex. 422, Email from J. Donelson to S. Gecas, June 1, 2018.)

47. Long Leaf did not provide disclosures required by 17 C.F.R. § 4.31(a) to customers or prospective customers required by. (Doc. 30, Donelson Corrected Ans. ¶ 34.)

10

**IX.    2019 HYPOTHETICAL AND CHERRY-PICKED TRACK RECORDS**

48. On February 18, 2019, Donelson sent prospective customer "eric" an email attaching a description of a "bond replacement strategy" used by Long Leaf. (CFTC Ex. 409.) In the description, Donelson claims that "[]the targeted return for this type of trade is 6-10% per year after fees and commissions." (*Id.*) Donelson tells "eric" that, "[t]he profitability is primarily driven by the time decay variable and therefore creates a higher probability of success." (*Id.*) The email includes a "trade history" which reflects seven trades from August 2018 through January 2019 with a net P&L of $701.99 and an average return of 1.68% over a seventh month period. (*Id.*)

49. The results reflected in the "trade history" represent a small number of the trades made by Long Leaf on behalf of customers. (CFTC Ex. 531, Donelson Dep. 144:17–145:24 (noting this is history of "gut strangle" trades made by three customers).) During the period August 2018 through February 2019—the period reflected in the "trade history"—customers lost $323,932. (CFTC Ex. 535, Patrick Decl., Exs. A, C.) By February 2019, Long Leaf customers had lost a total of more than $1.57 million since the start of Donelson's tenure, and over $4.9 million since the start of Long Leaf's trading program. (*Id.*) Donelson did not disclose these losses to "eric" or any other prospective customer. (*See* CFTC Ex. 531, Donelson Dep. 147:20–148:14.)

50. On May 20, 2019, Donelson sent an email to his APs titled "new track record," and attaching a file named "track record – core strategy – 5-20-2019." (CFTC Ex. 414.) The attached file reflects a series of trades from July 2018 through May 2019 reflecting a total P&L of $460.23. (*Id.*) Donelson sent this email to the APs so they could distribute the "new track record" to customers and prospective customers. (CFTC Ex. 531, Donelson Dep. 159:22–

11

160:14.) The APs did so. (*Id.*; *see also, e.g.*, CFTC Ex. 470, email from J. Hatzigiannis to "ejshafter," May 20, 2019; CFTC Ex. 296, Email from J. Donelson to APs, May 20, 2018, attaching "track record"; CFTC Ex. 542, Stemper Dep. 239:20–242:18.)

51. This new "track record" reflects hypothetical results from a subset of trades that Long Leaf recommended during the period July 2018 through May 2019. (CFTC Ex. 531, Donelson Dep. 157:15–158:21, 159:22–162:14, 169:20–170:11.) In reality, Long Leaf customers lost $538,618 during that period. (CFTC Ex. 535, Patrick Decl., Exs. A, C.) By May 2019, Long Leaf customers had lost $1.74 million during Donelson's tenure and $5.1 million since the start of the trading program. (*Id.*) These facts were not disclosed to customers or prospective customers. (CFTC Ex. 531, Donelson Dep. 162:11 – 163:21.)

52. On August 28, 2019, Long Leaf AP Alexander Stemper sent an email to prospective customer Jack Lattner. (CFTC Ex. 300.) Stemper's email included an "updated performance report for one of our larger accounts." (*Id.*) The "performance report" shows trades from April through August 2019, and reflects profits of $37,719.45. (*Id.*) The attached report was created by Donelson, and provided to Stemper to give to Mr. Lattner. (CFTC Ex. 531, Donelson Dep. 171:5–172:4; CFTC Ex. 542, Stemper Dep. 264:1–264:16.)

53. The so-called performance report was based on an account belonging to a single Long Leaf customer, whose account was temporarily up (though it was eventually wiped out). (CFTC Ex. 531, Donelson Dep. 172:8–173:23.) During the period April through August 2019— the period reflected in the "performance report"—Long Leaf customers lost $148,234. (CFTC Ex. 535, Patrick Decl., Exs. A, C.) By this point, Long Leaf customers had lost a total of $1.78 million under Donelson and $5.1 million since the start of Long Leaf's trading program. (*Id.*) Customers were not apprised of these facts. (*See* CFTC Ex 300.)

54. On September 10, 2019, Long Leaf AP Hatzigiannis sent an email to prospective customer "Wally." (CFTC Ex. 200.) Hatzigiannis writes "I wanted to provide you an update of what we have been doing. Attached is a track record of our recent performance." (*Id*.) Hatzigiannis goes on to say, "The reason we have seen so much success as of late is because of the current market conditions and the way we are able to manage this." (*Id*.)

55. The attached track record shows trades from June through September 2019, and profits from those trades of $5,978.50. (*Id*.) The track record was created by Donelson, and provided to Hatzigiannis to distribute to prospective customers, which Hatzigiannis continued to do through October. (CFTC Ex. 531, Donelson Dep. 175:7–176:23, 179:9–180:13; *see also* CFTC Ex. 201, Email from Hatzigiannis to "Tim," Oct 7, 2019.)

56. The track record does not reflect actual trading results; rather, it reflects hypothetical results. (CFTC Ex. 531, Donelson Dep. at 178:12–178:17.) By September 2019, Long Leaf customers had lost $1.63 million during Donelson's tenure and $5.02 million since the start of the trading program. (*Id*.) These facts were not disclosed to customers or prospective customers. (*See* CFTC Exs. 200, 201.)

X. **QUALIFICATIONS OMISSION**

57. On February 22, 2018, Donelson drafted a letter to Long Leaf's customers, which he distributed via the APs. (CFTC Ex. 52, *see also* CFTC Ex. 531, Donelson Dep. 68:2–68:10.) In the letter, Donelson writes that he has "10 years of financial and business development experience at two of the largest proprietary trading companies." (CFTC Ex. 52.) The letter goes on to say that Donelson is "working closely with Scott Gecas," then a Long Leaf AP, "on redesigning the trading processes to provide improved returns …." (*Id*.) "Scott and Jim share in the development of the monthly trades and management of the trades after they are made." (*Id*.)

13

58. Consistent with the letter, Donelson and Gecas worked together on the trade recommendations through December 2018, when Gecas left Long Leaf. (CFTC Ex. 531, Donelson Dep. 69:9–69:12, 74:20–75:5.) After that, Donelson alone generated the trade recommendations that were provided to Long Leaf customers. (*Id*. at 74:20–75:5.)

59. Before joining Long Leaf, Donelson's only prior experience in options trading was limited to a single trade in 2016 in which he lost $30,000. (Id. at 75:10–77:1, 79:23–80:12.) To the extent Donelson had done any futures trading, that trading was not profitable. (Id. at 75:10–77:1.)

60. Donelson's association with "two of the largest proprietary trading companies" was in an accounting role. (CFTC Ex. 530, Donelson Test. 10:9–11:15.) Donelson had not done any trading for those companies, and in fact had never worked as a trader for any company. (CFTC Ex. 531, Donelson Dep. 75:10–77:1, 75:10–75:13.)

61. Donelson did not share any of this information with customers or prospective customers. (*Id*. at 80:13–80:16; CFTC Ex. 537, LLT's Answers and Objections to CFTC's 2d RFAs at 5.) Donelson acknowledged that Long Leaf customers would not have wanted to take his recommendations if they knew that he had no profitable experience trading. (CFTC Ex. 531, Donelson Dep. 81:19–81:23.)

**XI.    NELSON AP REGISTRATION**

62. Andrew Nelson worked at Long Leaf from September 2017 through November 2018, soliciting customers for participation in the trading program. (Doc. 23, Long Leaf Ans. ¶ 20.)

63. Nelson was not registered as an AP of Long Leaf. (*Id*.)

64. On July 18, 2018, NFA sent an email to Nelson, stating that, "based on NFA's discovery this week that you have been acting as an AP without being registered as such, staff will not be recommending to the Membership Committee that you be conditionally registered." (CFTC Ex. 538.) Nelson forwarded the email to Donelson the same day. (*Id.*)

65. Donelson nonetheless allowed Nelson to continue soliciting customers for another four months without registration. (Doc. 23, Long Leaf Ans. ¶ 20.)

/s/ Ashley J. Burden
_____
Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700

# CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2021, I provided service to the persons listed below, and by the following means:

Via the Court's electronic CM/ECF system:

Jim Falvey
Falvey Law Office
200 S. Wacker Dr., Ste. 3100
Chicago, IL 60606-5877
jimfalvey@yahoo.com

Counsel to Long Leaf Trading Group, Inc. and James A. Donelson

Jeremey S. Ruth
11220 Brista Way
Austin, TX 78726
jeremysruth@hotmail.com

*Pro se*

Via email, pursuant to D.E. 13, to:

Andrew D. Nelson
267 May St. E.
Elmhurst, IL 60126
adnelson0503@gmail.com

*Pro se*

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700
aburden@cftc.gov