CFTC Ex. 531

# Long Leaf Trading Group

# *Donelson, James 2021-06-23*

### *6/23/2021 9:03 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Wednesday, November 3, 2021

Page 1

1       IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION
3   COMMODITY FUTURES TRADING        )
    COMMISSION,                      )
4                                    )
              Plaintiff,             )
5                                    )
         vs.          )  No. 20 C 3758
6                                    )
    LONG LEAF TRADING GROUP,         )
7   INC., et al.,                    )
                                     )
8             Defendants.            )
9
10
11      The remote video deposition of
12  JAMES A. DONELSON, called by the Plaintiff for
13  examination, pursuant to subpoena and pursuant to
14  the Federal Rules of Civil Procedure for the United
15  States District Courts pertaining to the taking of
16  depositions, taken before Mary Maslowski, Certified
17  Shorthand Reporter and Notary Public within and
18  for the County of Cook and State of Illinois with
19  the witness located in Aurora, Illinois, commencing
20  at the hour of 9:03 o'clock on June 23, 2021.
21
22
23
24

Page 2

1   A P P E A R A N C E S :
2
       (Appearing via videoconference)
3   MR. ASHLEY J. BURDEN, Senior Trial Attorney
    MR. JOSEPH C. PLATT, Trial Attorney
4   MS. ELIZABETH M. STREIT, Trial Team Leader
    MR. JOSEPH J. PATRICK, Senior Investigator
5   U.S. COMMODITY FUTURES TRADING COMMISSION
    DIVISION OF ENFORCEMENT
6   525 West Monroe Street, Suite 1100
    Chicago,  Ilinois 60661
7   (312) 596-0700
    aburden@cftc.gov
8   jplatt@cftc.gov
    estreit@cftc.gov
9   jpatrick@cftc.gov
10      On behalf of the U.S. Commodity
        Futures Trading Commission;
11
       (Appearing via videoconference)
12  FALVEY LAW OFFICE
    BY MR. JAMES M. FALVEY
13  200 South Wacker Drive, Suite 3100
    Chicago,  Ilinois 60606
14  (312) 404-5839
    jimfalvey@yahoo.com
15
       On behalf of Long Leaf Trading Group,
16     Inc., and James A. Donelson;
17  (Appearing via videoconference)
    MR. JEREMY RUTH
18
       Appearing Pro Se.
19
20  A L S O  P R E S E N T :
21  MR. CONNOR GUILFOYLE, CFTC Intern (Remotely)
22
23  CSR License No. 084-003278.
24

Page 3

1                I N D E X
2   WITNESS            DX  CX _RDX  RCX
3   JAMES A. DONELSON
4   By Mr. Burden          5
5
6   E X H I B I T S
    CFTC EXHIBIT          FIRST REFERENCE
7   No. 4                107
    No. 48               123
8   No. 52               68
    No. 200              175
9   No. 201              179
    No. 274              210
10  No. 290              140
    No. 300              170
11  No. 380              8
    No. 381              53
12  No. 382              5
    No. 383              7
13  No. 395              115
    No. 396              109
14  No. 397              102
    No. 401              214
15  No. 408              212
    No. 409              143
16  No. 410              153
    No. 411              149
17  No. 413              156
    No. 414              157
18  No. 416              174
    No. 419              30
19  No. 422              203
    No. 427              207
20  No. 428              139
    No. 438              167
21  No. 440              169
    No. 450              132
22
23
24

Page 4

1          E X H I B I T S  (Cont'd.)
2   CFTC EXHIBIT            FIRST REFERENCE
3   No. 451                130
    No. 452                132
4   No. 454                202
    No. 455                200
5   No. 470                160
    No. 475                86
6   No. 477                186
    No. 478                14
7   No. 479                209
    No. 480                150
8   No. 485                36
    No. 486                120
9   No. 487                119
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1       (Witness duly sworn.)
2       MR. BURDEN:  All right.  And would
3   counsel identify themselves for the record.
4       MR. FALVEY:  Yes.  This is Jim Falvey,
5   Falvey Law Office.  I'm representing Jim
6   Donelson.
7       MR. BURDEN:  On behalf of the CFTC we
8   have Ashley Burden, Jody Platt, Beth Streit
9   and our intern Connor Guilfoyle, who's here
10  with the gracious permission of Donelson's
11  counsel.
12      JAMES A. DONELSON,
13  called as a witness herein, having been first duly
14  sworn, was examined and testified as follows:
15      DIRECT EXAMINATION
16  BY MR. BURDEN:
17      Q   All right.  Mr. Donelson, do you
18  have our PDF portfolio of exhibits available and
19  in front of you?
20      A   Yes.
21      Q   All right.  Will you go to CFTC
22  Exhibit 382, please.
23      MR. FALVEY:  382?
24      MR. BURDEN:  382.

Page 6

1       MR. FALVEY:  Yeah.  Oh, I'm sorry.
2   There it is.
3       A   Okay.  I have it.
4   BY MR. BURDEN:
5       Q   All right.  Take a moment to look at
6   CFTC Exhibit 382 and tell me what you recognize it
7   to be, please.
8       A   It is the demo presentation when I --
9   right when I acquired the firm.
10      Q   All right.  When you say demo presentation,
11  what does that mean?
12      A   It is the presentation we would give on
13  the first call with a customer or with a prospective
14  customer.
15      Q   Got it.  And so this was a presentation
16  that was developed under Mr. Evans at Long Leaf
17  Trading.  And we're seeing in Exhibit 382 that he
18  is sending the presentation to you, is that correct?
19      A   Correct.
20      Q   All right.  And how long did APs at Long
21  Leaf Trading continue to use this presentation for?
22      A   Maybe four to five months before we made
23  changes to it.
24      Q   All right.  And when did you make

Page 7

1   changes to this presentation, please.
2       A   Well, we removed Tim Evans from it.
3       Q   Sorry.  Would you say that again, please.
4       A   We removed Tim Evans from it.
5       Q   Okay, sorry.  I want to go into that
6   in a minute.  But you said that you used this
7   presentation in 382, or the APs used it, for four
8   to five months.  So they used it until approximately
9   April or May of 2018, is that right?
10      A   That's correct.
11      Q   All right.  And until that time were
12  any changes made to this presentation that the
13  APs were using?
14      A   The only change was removing Tim Evans
15  from the presentation.
16      Q   Got it.  Would you look for me, please --
17  would you go to Exhibit 383, please.  It should be
18  the next one in the portfolio.
19      A   Okay.
20      Q   Take a look at 383 for me, if you
21  would, please, and tell me what you recognize
22  it to be.
23      A   It is a demo presentation.
24      Q   All right.  Give me one moment here.

Page 8

1   Sorry.
2       MR. FALVEY:  No problem.
3   BY MR. BURDEN:
4       Q   All right.  Sorry about that.  Can you
5   turn to CFTC Exhibit 380 for me, please.
6       A   Okay.
7       Q   All right.  Take a moment to look this
8   over and tell me what you recognize it to be, if
9   you would, please.
10      A   It is a training demo script for the demo.
11      Q   All right.  So this is the script the
12  APs were supposed to use in connection with the
13  presentation we saw in Exhibit 382, is that right?
14      A   This is the script they were trained
15  on to give them an ability to understand how to
16  go through the demo.
17      Q   All right.  And was this the script that
18  you -- that the APs were using when you started at
19  Long Leaf Trading?
20      A   I believe so.
21      Q   All right.  What's your basis for that
22  belief?  Why do you think that?
23      A   I don't know what happened before I was
24  there.  This -- this is what they were training on

Page 9

1    when I took over, from my understanding.
2        Q    Well, what's your basis for that
3    understanding?  I'm not disagreeing with you.
4    I just -- I want to know why you think that this
5    is the script that, as you put it, the APs were
6    training on when you started.
7        A    I was not made aware of this script
8    for almost four months after I acquired the firm.
9    This was not given to me as part of the acquisition
10   documents.
11       Q    All right.  Well, I want to explore
12   that in a moment.  But, you know, why do you think
13   that this is the script the APs were using when you
14   started at the firm?
15       A    I'm just looking at the changed date and
16   the revision date on the document.
17       Q    And what are those dates, please.
18       A    The revised date is June 7, 2017
19   and the strike-through date is December 15, 2015.
20       Q    Okay.  Well, this document, Exhibit 380,
21   is one that you produced to us.  You produced this
22   to us in September of 2019.  The file name is Demo-
23   Jr. Broker.docx.  Where did you get this document
24   from to send it to us?

Page 10

1        A    I believe one of the APs sent it to
2    me earlier, and then I forwarded it in all the --
3    with all the documents at the company.
4        Q    What AP sent this script in 380 to you?
5        A    I don't remember which one.
6        Q    When did this AP send Exhibit 380 to you?
7        A    March of 2018, as best as I can remember.
8        Q    What's your basis for that recollection?
9    Do you remember getting an email?  Did somebody talk
10   to you?  Why can you remember that and not the name
11   of the guy that sent it to you?
12       A    I don't remember, honestly.
13       Q    All right.  Well, let's stay on
14   Exhibit 380 for a moment, if we could, please.
15   So Exhibit 380, your testimony just now is that, you
16   know, you were at Long Leaf Trading for four months
17   before you even saw this script, is that correct?
18       A    Correct.
19       Q    All right.  So if you hadn't seen
20   this script for four months, you know, what did
21   you think that the APs were telling customers?
22       A    Could you repeat the question?
23       Q    Yeah.  So if you didn't see this script
24   for four months when you started, you know, what

Page 11

1    did you think the APs were telling customers?
2        A    I was relying on the bullet point --
3    or the bullet points that were approved by the NFA
4    that were given to me at the time of acquisition.
5        Q    All right.  When you say you were
6    referring to bullet points approved by the NFA,
7    what are you talking about?
8        A    There was a talking points document
9    that was submitted to the NFA and received a no
10   comment back from it.
11       Q    Okay.  Did you read these talking points?
12   Do you know what they said?
13       A    Yes.
14       Q    What did they say?
15       A    They basically had talking points for
16   each one of the slides that came through in terms
17   of what questions you were asking, what information
18   you were trying to elicit from the prospective
19   customer.
20       Q    All right.  Did you actually
21   have a copy of these talking points that you
22   said that you believed were approved by the NFA?
23       A    Yeah.
24       Q    Okay.  Where did you keep them?

Page 12

1        A    They were in the solicitation folder
2    on my computer.
3        Q    All right.  We're going to come back
4    to those.  So I want to stay on CFTC Exhibit 380.
5    There are a couple representations in this script,
6    you know, that form the basis for our fraud claim,
7    so they're familiar to you.  You know, these
8    approved bullet points -- well, let me phrase the
9    question another way.
10            Were you aware during your
11   first four months at Long Leaf Trading that APs
12   were telling customers that 76.5 percent of options
13   expired worthless and that increased the customer's
14   statistical likelihood of success?  I'm paraphrasing
15   but were you aware that that was something that APs
16   were saying to customers?
17       A    Yes.
18       Q    All right.  And another point in
19   CFTC Exhibit 380 is the representation by APs
20   that one of Long Leaf's principles was to provide
21   strong returns for clients and that they wouldn't be
22   managing millions of dollars for hundreds of clients
23   if they weren't making money for their clients.
24            During your first four months

Page 13

1    at Long Leaf Trading, were you aware that APs were
2    saying that to customers?
3        A    Could you repeat what you're saying
4    in terms of what the customer -- what they are
5    saying to a customer?
6        Q    Yeah, I'll tell you what.  Let's go
7    to Exhibit 380, if we could, please, and go down,
8    if you would, please, to the seventh page.  And
9    I want to direct your attention to Point 10, which
10   is Introduce the Three Principles.  So tell me when
11   you're there, please.
12       A    Yeah, I'm there.
13       Q    All right.  So do you see the script
14   in 380 says, "Since 2009 Long Leaf was founded on
15   three principles."  And I want you to look at No. 3
16   and it says, "We should provide our clients a strong
17   return on their investment."  Point B says, "Now,
18   these three principles are what we have built our
19   company upon and everything that we do since our
20   inception.  At Long Leaf we measure our success by
21   our clients' success.  As a company, we wouldn't
22   have the ability to work with hundreds of clients
23   month after month for nine years and oversee
24   millions of dollars if we weren't being profitable

Page 14

1    for them.  Does that make sense?"
2            My question to you is did you know
3    that APs were saying that to customers?
4        A    I don't remember hearing them say that
5    because I was working off the bullet points and
6    the bullet points don't say that.
7        Q    All right.  So this piece we see
8    on page 7 of Exhibit 380 about the ability to work
9    with hundreds of clients month after month, oversee
10   millions of dollars if we weren't being profitable,
11   strong return, your testimony is that that is not
12   in the approved bullet points that you --
13       A    Correct.
14       Q    -- had seen?  All right.  Is your
15   testimony that you never heard any of the APs at
16   Long Leaf say these things about a strong return for
17   clients or that they wouldn't be able to do business
18   if they weren't being profitable for clients?
19       A    As I said, I don't remember hearing it.
20       Q    All right.  Mr. Donelson, I want you
21   to turn your attention, if you would, please, to
22   CFTC Exhibit 478.
23       A    Okay.
24       Q    Do you recognize this document?

Page 15

1        A    Yes.
2        Q    Can you tell me what it is, please.
3        A    It's our -- my response to the third set
4    of requests for production.
5        Q    Okay.  Is it correct?  Is it accurate?
6        A    Yes.
7        Q    All right.  So I want to look at this
8    part about review of oral communications on page 3.
9    Are you with me?
10       A    Yes.
11       Q    All right.  So it says here
12   oral communications were managed by Brian
13   Adams during his tenure and Scott Gecas.  To the
14   extent conversations were recorded, Mr. Adams was
15   responsible for reviewing and working with APs to
16   ensure compliance with NFA and CFTC rules.  It says
17   the call system had the ability to listen to a live
18   conversation or even provide communications -- you
19   know what, I'm going to stop reading.  There's no
20   reason to read this.
21           Let me just ask you instead.
22   And I want to come back to this, Mr. Donelson.
23   You know, your testimony is that you believe that
24   the APs were following some bullet points that were

Page 16

1    approved by the NFA.  What did you do to make sure
2    that the APs were actually following those bullet
3    points and not, I don't know, saying something else
4    or making misrepresentations to customers or
5    anything like that?
6        A    Well, I had assigned Brian and
7    Scott the responsibility of making sure that
8    they were following the approved communications.
9        Q    All right.  And how long were Brian Adams
10   and Scott Gecas in charge of that?
11       A    Brian was until June and Scott was --
12       Q    Of what year, please.
13       A    June 2018, I'm sorry.  And Scott
14   Gecas would have been through December of 2018.
15       Q    All right.  And then after that
16   you took responsibility for monitoring calls,
17   correct?
18       A    Correct.
19       Q    Prior to December of 2018 did you monitor
20   AP calls with customers?
21       A    Typically, no.  I turned that
22   responsibility over to Brian and Scott.
23       Q    So like did you ever go out to like
24   the sales floor and, you know, listen to what

Page 17

1  the APs were saying to customers?
2      A   I was sitting on the sales floor.
3      Q   Sorry.  Say it again, please.
4      A   The layout of the office was I'm right
5  in the sales floor.
6      Q   Oh, so you didn't -- I should ask that.
7  So you didn't have your own office during those
8  first four months at Long Leaf?
9      A   No.
10     Q   So it was just one big room and you were
11 in the middle of it with the APs?
12     A   I was not in the middle of it, no.  I was
13 in the back of it, but it was one room.
14     Q   And how many other guys were in that room,
15 please.
16     A   Twelve people.
17     Q   And were they all APs?  Were they all
18 salespeople?
19     A   I will say yes.  However, there are
20 short periods of time where somebody wasn't an AP.
21 But for the most part, yes, they were all APs.
22     Q   Got it.  And so you're sitting in the same
23 room with all 12 of these APs, and your testimony is
24 that you didn't listen to their calls and you didn't

Page 18

1  monitor their calls?
2      A   I heard their calls.  I didn't monitor
3  their calls.
4      Q   All right.  And your testimony is
5  that you never heard any of these APs talk about
6  how Long Leaf earned profits for clients or provided
7  strong returns?  That's your testimony?
8      A   Correct.
9      Q   Because you know they say that on
10 substantially every single recorded call we have.
11 You know that, don't you?
12     A   No, I don't.
13     Q   Well, you'll get to hear some.
14 If not today, then at trial or summary judgment.
15 All right.  So I want to talk about your delegation
16 of this task to Brian Adams and Scott Gecas.  So
17 your testimony is that Brian and Scott's job were to
18 make sure that the customers weren't -- or that the
19 APs weren't making misrepresentations to customers
20 and that they were sticking to the approved bullet
21 points, is that correct?
22     A   Correct.
23     Q   All right.  So did Brian or Scott ever,
24 you know, report to you that they heard somebody,

Page 19

1  one of the APs say something they weren't supposed
2  to say?
3      A   I don't remember them reporting anything
4  to me.
5      Q   Do you remember them reporting anything
6  to anybody else?
7      A   I know they would have conversations
8  with APs, though I don't know the content of the
9  conversations.
10     Q   Do you know if -- well, strike that.  So
11 do you know if Scott Gecas or Brian Adams actually
12 had words with any of the APs about saying things
13 to clients that were misleading or not approved?
14     A   I don't remember any specific instance
15 of it.  However, I know they had conversations about
16 present -- about the solicitation with APs.
17     Q   All right.  When you say you know
18 they had conversations about solicitations with
19 APs, what are you talking about?  Did the APs --
20 did one of the APs do something wrong?  Did they
21 just explain it?  What conversations are you
22 referring to?
23     A   There was a small office outside
24 of our office, which was joint space, where

Page 20

1  they would go and talk with the APs specifically
2  about the solicitation and I was not part of those
3  meetings.
4      Q   Okay.  So do you know what happened
5  in those meetings?
6      A   The only thing I know was that they had
7  a meeting talking about solicitation.
8      Q   Okay.  When did that meeting happen?
9      A   It would happen off and on, you know,
10 over a period of time, and it would be different
11 APs with Brian or different APs with Scott.
12     Q   And you were not in any of those meetings?
13     A   No.
14     Q   Were there any disciplinary actions
15 taken against any of the APs by Gecas or Adams for
16 like, I don't know, straying from the bullet points
17 or saying things they weren't supposed to say?
18     A   No.
19     Q   Any reports placed in any of the APs'
20 personnel files, anything like that?
21     A   No.
22     Q   So did you ever ask Gecas or Adams
23 whether the solicitations were proceeding according
24 to the bullet points, if there were anybody breaking

Page 21

1  the rules?
2      A   Yes, I would have meetings with Scott
3  every other week both on trading and solicitations.
4      Q   All right.  Did he ever tell you
5  that any -- so during these biweekly meetings
6  your testimony is you would ask Mr. Gecas whether
7  any of the APs had strayed from the bullet points
8  or made potentially misleading statements.  That's
9  your testimony?
10     A   Yeah.
11     Q   What did he tell you -- I should ask
12 you this.  Did he ever tell you, yes, that some of
13 them had strayed from the bullet points or yes, some
14 of them had made misrepresentations or potentially
15 misleading statements to customers?  Did Gecas ever
16 say that to you?
17     A   Yes on the point of straying from the
18 bullet points.  And usually it was somebody who was
19 newer and still learning, you know, how to present
20 that.  No in terms of misleading.
21     Q   All right.  Did Mr. Gecas, like
22 when he reviewed solicitations, do you know if
23 he like listened to recorded calls or just stood
24 over people?  What was his method of making sure

Page 22

1  that nobody said anything that could be construed
2  as a misrepresentation, if you know?
3      A   Typically he would listen in to
4  the conversation.  As I said, the system had
5  the capability for somebody to listen in to the
6  actual call.
7      Q   Did Mr. Gecas do that?
8      A   Yes.
9      Q   And how did he, like, select the calls
10 to listen to?
11     A   Typically it was somebody who
12 was in a training mode.  He would listen to
13 their conversations, somebody who was either new
14 or new to the next step or something like that.
15     Q   So your testimony is the calls
16 that Mr. Gecas monitored were new people's calls,
17 is that right?
18     A   As I said, typically, yes.
19     Q   All right.  Did Mr. Gecas make any
20 written reports back to you about compliance with
21 the bullet points or anything really?
22     A   No.
23     Q   Did you ask him to?
24     A   We were a small office.  We tended to do

Page 23

1  everything verbally.
2      Q   Okay.  Did you ask Mr. Gecas to make any
3  written reports to you about compliance?
4      A   No.
5      Q   All right.  So, you know, in this
6  CFTC Exhibit 478, your discovery requests, you
7  know -- all right.  Let me just ask you.  So
8  Mr. Gecas' -- Mr. Gecas' responsibility, is it
9  fair to say, was to monitor AP calls for compliance?
10 Is that right?
11     A   Correct.
12     Q   All right.  So when you say compliance,
13 compliance with what?
14     A   In compliance with NFA rules,
15 CFTC rules and the approved documentation we have
16 on the solicitation.
17     Q   All right.  So, Mr. Gecas, is he -- was
18 he an attorney?
19     A   No.
20     Q   Had Mr. Gecas ever done compliance
21 work before he worked for Long Leaf Trading?
22     A   Not that I know of.
23     Q   All right.  So Mr. Gecas, where did he
24 go to college?

Page 24

1      A   He had one year of college.  I don't
2  remember the university.
3      Q   All right.  So what possible
4  qualifications could Mr. Gecas have to supervise
5  compliance for 12 APs at your introducing broker
6  firm?
7      A   He had a Series 3.
8      Q   When did he acquire that Series 3?
9      A   I don't know the exact date.
10     Q   All right.  What other qualifications
11 did Mr. Gecas have?
12     A   He had options trading experience.  He had
13 worked in sales.
14     Q   I meant to be a compliance guy.
15     A   He had the Series 3.
16     Q   Anything else?
17     A   Not that I know of.
18     Q   All right.  So for December of 2017
19 through December of 2018 when Mr. Gecas was by
20 your account charged with monitoring the APs' calls,
21 he was soliciting customers himself during this
22 period, isn't that correct?
23     A   Correct.
24     Q   Did you ever listen to any of Mr. Gecas'

Page 25

1  calls from this period?
2      A   After Mr. Adams left, yes.
3      Q   Sorry.  Say it one more time, please.
4      A   After Mr. Adams left, yes.
5      Q   All right.  So after -- your testimony
6  is that after June of 2018, you started listening
7  to Mr. Gecas' calls with customers?
8      A   Some of them, yes.
9      Q   How many did you listen to?
10     A   I don't know an exact number.
11     Q   Well, did you listen to them -- well,
12 let's drill down on that.  Do you think you listened
13 to 50 calls that Mr. Gecas made?
14     A   I doubt it was that high.
15     Q   Did you listen to maybe 25 calls that
16 Mr. Gecas made to customers?
17     A   That seems like a more reasonable range.
18     Q   How frequently would you listen to
19 Mr. Gecas' calls?
20     A   Typically he was right next to me in
21 the office and I would listen basically because
22 he was right there.  I didn't listen to the phone
23 call going on.
24     Q   Oh, okay.  So now you can hear

Page 26

1  what guys are saying around you.  So did you ever
2  between December 2017 and December 2018, did you
3  ever listen to recordings of Mr. Gecas' calls?
4      A   Yes.
5      Q   How many?
6      A   Five or so.
7      Q   Okay.
8      A   I don't know an exact number.
9      Q   All right.  And when did you do that?
10     A   In September-October time frame.
11     Q   Of 2018?
12     A   Of 2018, correct.
13     Q   All right.  And when you listened
14 to these calls of Mr. Gecas, were they demo calls?
15 Were they calls where he was -- where he was
16 soliciting customers sort of for the first time?
17     A   No.
18     Q   What kind of calls were they that you
19 listened to, these five calls?
20     A   There are two types of calls, one
21 where he would be the second -- he would be
22 the more senior person giving more information,
23 and then the other would be where another AP had
24 done the more senior role but they had more

Page 27

1  technical questions about trading.
2      Q   Okay.  So which one were you listening to?
3      A   Both.
4      Q   Okay.  In these five calls did you
5  hear Mr. Gecas tell customers that 76.5 percent
6  of options expire worthless and that that increases
7  the customer's statistical likelihood of success?
8  Did you hear him say that?
9      A   Yes.
10     Q   Did you hear Mr. Gecas on these
11 calls say that one of Long Leaf's principles is
12 to provide strong returns and that they wouldn't be
13 managing millions of dollars for hundreds of clients
14 if they weren't making money for them?  Did you hear
15 Mr. Gecas say that?
16     A   I did not.
17     Q   That's a surprise because he says
18 it on almost every single call and settled with
19 us on our fraud charges on the basis of those
20 representations.  So let me ask you this.  I just
21 don't know how you could have missed those calls.
22 What were the calls, these five calls you listened
23 to, what were the dates of them?  Can you tell me
24 so I can hear them?

Page 28

1      A   I don't have -- I don't remember what
2  calls I listened to.
3      Q   Yeah, I didn't think so.  Well,
4  I'll tell you what.  Let's turn our attention,
5  if we could, please, to Brian Adams.  So Brian Adams
6  was not there for a long time.  He was there -- oh,
7  sorry.  I've got one more -- you know what, never
8  mind.  Okay, back to Brian Adams.  So Mr. Adams,
9  you know, what qualifications did Mr. Adams have
10 to be a compliance person?
11     A   He had a Series 3.  He had been
12 the sales manager prior to my ownership for
13 eight months.
14     Q   All right.  Now, let me ask you
15 a strange question.  Did Mr. Adams know that he
16 was a compliance person?
17     A   He was --
18     Q   This ought to be easy.  Come on.
19     A   His role included compliance duties.
20 He was not the chief compliance officer.
21     Q   Who was the chief compliance officer
22 during the first four months at Long Leaf?
23         MR. FALVEY:  Of Jim's time at Long Leaf?
24         MR. BURDEN:  Yes, thank you.

Page 29

1    A   Up until Tim Evans left, which was
2   February, he was the chief compliance officer for
3   the information --
4    Q   No, no, no, no, no. Mr. Donelson, I hate
5   to cut you off, but we've got a lot to cover and I
6   think maybe you misunderstood my question. During
7   your first four months at Long Leaf Trading, who was
8   the chief compliance officer?
9    A   That's what I was answering. Tim
10  Evans was effectively the chief compliance officer
11  until he left in February, and then I was the chief
12  compliance officer.
13   Q   After February of 2018?
14   A   Um-hmm.
15   Q   That's a yes?
16   A   Yes, yes. I'm sorry, yes.
17   Q   All right. I'm going to come back
18  to that one. Let's stay on Brian Adams. So was
19  Mr. Adams an attorney?
20   A   No.
21   Q   All right. Had Mr. Adams previously
22  served in any compliance role, to your knowledge,
23  before working at Long Leaf?
24   A   I don't know.

Page 30

1    Q   Did you ever ask him?
2    A   No.
3    Q   All right. So Mr. Adams, where did he
4   go to school? What did he study?
5    A   I don't know the university.
6   Either North Carolina or North Carolina State,
7   one of those (inaudible) schools, and he studied
8   economics, I believe.
9    Q   All right. Did he finish?
10   A   To my knowledge, yeah.
11   Q   All right. Let's take a look, if we could,
12  please, at CFTC Exhibit 419.
13   A   Okay.
14   Q   All right. Do you recognize this document?
15   A   Yes.
16   Q   What is it, please.
17   A   It's an email from Brian to myself.
18   Q   All right. I want to direct your
19  attention -- and it is dated May 22, 2018. I want
20  to direct your attention to the third paragraph.
21  Mr. Adams says, "In March or April of this year
22  you asked me to sign a document agreeing to be
23  in a compliance role for the company, which would
24  effectively make me a principal of Long Leaf.

Page 31

1   I do not have any written confirmation confirming
2   what additional responsibilities are associated
3   with this position or any official change in
4   job title." Is that true?
5    A   Yes.
6    Q   And then he goes on to say, "Given that
7   I do not have previous experience in a compliance
8   role, nor have I received formal training for it,
9   I do not currently have a full understanding of the
10  responsibilities and liabilities of this position."
11  Is Mr. Adams right about that?
12   A   He has previous experience in a compliance
13  role. He was the sales manager at Long Leaf prior
14  to my acquisition.
15   Q   Yeah. All right. Well, it sounds like
16  your testimony is he was the sales manager, not the
17  compliance manager, is that correct?
18   A   But that is a compliance role.
19   Q   What's your basis for saying that?
20   A   He had direct responsibility for APs.
21   Q   And that was before you started at Long
22  Leaf, wasn't it?
23   A   Correct.
24   Q   So why did he -- what reason do you

Page 32

1   have to think that he was ensuring APs' compliance
2   with NFA and CFTC rules and also not defrauding
3   customers?
4    A   Can you ask that question again?
5   I'm confused as to are you talking before I bought
6   the company or after I bought the company?
7    Q   I'm talking about before. So your
8   testimony, you seem to be under the apprehension
9   that because Mr. Adams was a sales supervisor before
10  you joined the company, that there were compliance
11  responsibilities attendant to that. Is what I said
12  correct?
13   A   Correct.
14   Q   All right. So why do you think that?
15  It sounds like Mr. Adams didn't think that, reading
16  Exhibit 419.
17   A   That is what Mr. Evans told me before
18  I acquired the firm.
19   Q   Oh, when did he tell you that?
20   A   During November of 2017.
21   Q   Oh, are we going to see something
22  in writing where Mr. Evans says don't worry about
23  compliance; Mr. Adams is the compliance guy?
24   A   No, this was a conversation.

Page 33

1    Q   All right.  And why would that be the
2  case if, according to your testimony, Mr. Evans was
3  the chief compliance officer?
4    A   There's still -- he said there's
5  still a compliance role that he had regarding
6  representations -- or not representations.  Strike
7  it.  Versus the APs' solicitation.
8    Q   All right.  That didn't make any sense,
9  but I'm going to leave it alone.  So looking at
10 Exhibit 419, it seems like Mr. Adams did not know
11 he was the compliance guy and did not want to be
12 a compliance guy.  Would you agree with that
13 statement?
14   A   I would agree that is his opinion.
15   Q   But you disagree with that opinion?
16   A   No.  I said I would agree that is his
17 opinion.
18   Q   Yeah.  But I'm asking you -- you say
19 that like maybe you have a different opinion, like
20 he doesn't think he works in compliance but you
21 think he does.
22   A   He works in compliance, but he is not the
23 chief compliance officer.
24   Q   All right.  And Mr. Evans, I think you

Page 34

1  testified, your testimony is that he was the
2  chief compliance officer until February of 2018?
3    A   On paper, yes, he was.  He was there
4  through --
5    Q   Okay.
6    A   He was there through January.
7    Q   Oh, okay.  And where was he in February?
8    A   He was not in the office.
9    Q   Where was he?  You know where he was.
10   A   He might have been in Mexico.  He was also
11 a couple other places, North Carolina.
12   Q   Okay.  Well, where was he in January?
13   A   He was in the office and then he
14 would be in Mexico for a little bit and he would
15 be in North Carolina for a little bit.
16   Q   All right.  That's what you want
17 from a compliance officer.  And your testimony
18 is that after February of 2018, you took over as
19 the compliance officer, is that right?
20   A   Correct.
21   Q   So I'm not saying that there's some
22 requirement to this effect but, you know, is there
23 any formal documentation of your role as the chief
24 compliance officer?

Page 35

1    A   The NFA filing system has me listed
2  as that.
3    Q   Okay.  So you filed with the NFA
4  and you said I'm the chief compliance officer?
5    A   Um-hmm.
6    Q   Yes?
7    A   Yes.
8        MR. FALVEY:  You have to say yes.
9  BY MR. BURDEN:
10   Q   All right.  So from February 2018
11 onwards you were in charge of compliance, correct?
12   A   Correct.
13       MR. BURDEN:  All right.  You guys,
14   we've been going for an hour.  I want to take
15   a quick break, but it's primarily to retrieve
16   a document which I may or may not want to show
17   you after the break.  So can we break for ten,
18   please.
19       MR. FALVEY:  Sure.
20       MR. BURDEN:  All right.  Off the record.
21   Thanks.
22       (Whereupon a recess was taken from
23         10 a.m., to 10:20 a.m., after which
24         the following proceedings were had:)

Page 36

1        MR. BURDEN:  So can we go back on
2    the record, please, Mary.  Yep, very good.
3    Thank you.
4    Q   All right.  I emailed you what we've
5  marked as CFTC Exhibit 485.  Mr. Donelson, are these
6  the bullet points that you were previously referring
7  to?
8    A   Yes.
9    Q   All right.  So CFTC Exhibit 485
10 you understood to be talking points that would
11 accompany the presentation we saw in 382, is that
12 correct?
13   A   Correct.
14   Q   And your understanding is that these
15 received a no comments letter from the NFA, is
16 that correct?
17   A   Correct.
18   Q   And your belief is that the APs were
19 using this demo outline in their solicitation of
20 customers, is that correct?
21   A   Correct.
22   Q   All right.  You guys really can put
23 that one away for now.  I just wanted to make sure
24 that I understood what you thought was this demo

Page 37

1 outline.
2     A    Okay.
3     Q    All right.  So I want to go back
4 to CFTC Exhibit 419, your discovery responses.
5 So, Mr. Donelson, when did you start monitoring
6 AP calls?
7     A    After Scott Gecas left.
8     Q    And that was December 2018?
9     A    Correct.
10    Q    All right.  So how did you monitor oral
11 communications or AP calls?
12    A    At that time there was only three APs
13 there and we had a smaller office.  Well, at that
14 time we were still in the same office but they were
15 all closer, and we also were working on a brand new
16 presentation.  So we really weren't doing a lot of
17 solicitation in late December or January.
18    Q    Yeah, but I'm talking about your
19 monitoring of calls from December of 2018 through
20 December 2019.  I want to ask about that whole year.
21 So you were monitoring oral communications with
22 customers during that period of December 2018
23 through December 2019, correct?
24    A    Correct.

Page 38

1     Q    All right.  And during that period you
2 only had three APs to monitor, right?
3     A    Correct.
4     Q    That's Cybulski, right?
5     A    Yes.
6     Q    Hatzigiannis?
7     A    Hatzigiannis, yes.
8     Q    And Stemper, correct?
9     A    Correct.
10    Q    And how did you monitor the three APs'
11 calls with customers?
12    A    Basically I overheard every one
13 of their calls.  We were in a small office, very
14 close to each other.
15    Q    And you were in the same room as the --
16 sorry.  Keep going.
17    A    Yeah, I was in the same room.
18    Q    You were in the same room as the three
19 APs?
20    A    Correct.
21    Q    Did you listen to recordings of those
22 APs' calls?
23    A    I don't remember specifically listening
24 to recordings.

Page 39

1     Q    Well, do you remember -- it always
2 drives me crazy when people say I don't remember
3 specifically because it makes me think they remember
4 something generally or something they can't put
5 a date on.  So let me ask you, Mr. Donelson, do
6 you remember generally listening to recordings of
7 Mr. Cybulski, Mr. Hatzigiannis or Mr. Stemper's
8 calls?
9     A    I remember listening to recordings, but
10 specific ones I couldn't tell you.
11    Q    How frequently would you listen
12 to recordings of Mr. Cybulski, Hatzigiannis or
13 Stemper's calls?
14    A    Every two weeks, a few of them I would
15 listen to.
16    Q    How would you determine which ones you
17 would listen to?
18    A    It would be prospective clients, not
19 actual clients.  No actual solicitation process.
20    Q    Got it.  So every couple of weeks
21 you would listen to a few calls from each of your
22 APs and you would focus on calls that they made
23 to prospective customers?
24    A    Correct.

Page 40

1     Q    All right.  In your monitoring of your
2 APs' oral communications, did you ever hear anything
3 that you considered to be noncompliant with NFA or
4 CFTC rules?
5     A    Can you restate the question?
6     Q    Did you ever hear any of your APs
7 say anything that you considered to violate NFA
8 or CFTC rules?
9     A    No.
10    Q    So you were the compliance officer
11 during the period December 2018 through December
12 2019, if not earlier as well.  Did you ever hear
13 any of the APs say anything that you considered
14 not to be compliant?
15    A    No.
16    Q    Did you ever hear any of the APs say
17 anything that you considered to be misleading to
18 potential or existing customers?
19    A    No.
20    Q    Did you ever hear any of the APs tell
21 customers or prospective customers that there was
22 a statistical likelihood that they would succeed in
23 trading with Long Leaf?
24    A    No.

Page 41

1    Q    Did you ever hear any of the APs
2  tell customers that one of Long Leaf's values was
3  to create strong returns for clients?
4    A    Can you clarify the time frame?
5  We were talking about 2019 and now are we back
6  to 2018 through '19?
7    Q    I should clarify the time frame.
8  The time frame is ever, but it seems to me like --
9  well, don't worry about what it seems like to me.
10  Did you ever hear any of the APs tell customers that
11  one of Long Leaf's values was to create a strong
12  return for customers?
13    A    Yes.
14    Q    All right. And what did you do about that
15  or did you consider that that was okay?
16    A    I considered it a statement of the
17  company's values as it was stated.
18    Q    Okay. So you heard APs say this and
19  you didn't consider that it was false or misleading
20  or violative, correct?
21    A    No.
22    Q    Did you say yeah?
23    A    I said no.
24    Q    Sorry. You know what, I asked the

Page 42

1  question badly. Let me ask it again. When APs --
2  when you overheard APs tell customers that it was
3  one of Long Leaf's values to provide a strong return
4  for customers, did you consider that this was
5  misleading?
6    A    No.
7    Q    Did you hear -- did you ever hear
8  APs tell customers that they wouldn't be managing
9  millions of dollars for hundreds of clients if they
10  weren't making a profit for those clients?
11    A    No, I don't remember hearing that.
12    Q    Did you ever hear any AP tell anybody
13  that Long Leaf's strategies target 6 to 12 percent
14  returns on an annual basis?
15    A    Yes, in 2019.
16    Q    All right. And did you consider that that
17  was misleading?
18    A    No, and it was a new strategy.
19    Q    Well, we'll get to that. You know,
20  I asked this question before, but I think it sort
21  of got messed up. Did you ever hear Long Leaf APs
22  tell customers that there was a strong statistical
23  likelihood of success with their trading at Long
24  Leaf?

Page 43

1    A    No.
2    Q    All right. Did you ever write any of
3  the APs up or otherwise discipline them for making
4  misstatements or, you know, being noncompliant?
5    A    No.
6    Q    Did you ever, you know, create any
7  written work product, like a log or memos relating
8  to your review of the APs' oral communications with
9  customers?
10    A    No.
11    Q    Did you ever create any work product,
12  like memos or logs, in connection with your role
13  at Long Leaf as the chief compliance officer?
14    A    The complaint log.
15    Q    And is that something that you generated
16  or is that something that was already in the file
17  that you inherited from Mr. Evans I should have
18  said?
19    A    It was a continuous document. So
20  there's documents from when he was the owner and
21  then I would add on to it, so I had one complaint
22  log history.
23    Q    Got it. So anything other than the
24  complaint log? Did you generate anything other

Page 44

1  than this complaint log in connection with your role
2  as the chief compliance officer?
3    A    No.
4    Q    Did Long Leaf Trading have any written
5  compliance policies?
6    A    Yeah.
7    Q    All right. And who created those?
8    A    They were part of the acquisition
9  documents, so I am assuming Tim Evans created them
10    Q    Did you either create or cause to
11  be created any policies or procedures for Long
12  Leaf Trading?
13    A    We amended those documents that were
14  created. They were (inaudible).
15    Q    I want to go back to CFTC Exhibit 478,
16  if we ever left it, in your discovery responses.
17  So it says here on the third page Review of Written
18  Communications. "At the end of each month," it
19  says, "Mr. Donelson would review all communications
20  with prospects and customers. If any of these
21  communications needed followup, Mr. Donelson would
22  have a conversation with the specific AP as to the
23  context of communications and any other pertinent
24  details related to the communications." Is that

Page 45

1  true?
2     A   Yes.
3     Q   So you reviewed all written
4  communications, all of the emails between your
5  APs and their customers, prospective customers?
6     A   All would not necessarily be true.  I
7  would not review when they sent out a recommendation
8  because it -- very little -- there were very little
9  emails between APs and prospective customers or
10 customers.
11    Q   Yeah.  So this is not correct then
12 when you say at the end of each month Mr. Donelson
13 reviewed -- would review all communications with
14 prospects and customers?  That's a false statement?
15    A   I would review all communications with
16 prospects.  However, on the recommendations, I would
17 not review those.
18    Q   All right.  Except that Exhibit 478
19 says at the end of each month Mr. Donelson would
20 review all communications with prospects and
21 customers.  So that statement is false?  Anytime
22 you're ready.
23    A   Yes, in the sense of I did not review
24 customer recommendation emails.

Page 46

1     Q   All right.  So did you review all
2  of the other emails with customers and prospective
3  customers?
4     A   Yes.
5     Q   All right.  How did you do that, please.
6     A   By pulling up the data in the email
7  archives and then filtering it for the sender,
8  the receiver.  There's multiple filters you have
9  to put on it to just get who sent what to who.
10 For example, every day we got a statement from
11 Cunningham.  Like it's not something we were
12 reviewing.
13    Q   Got it.  So how frequently, Mr. Donelson,
14 would you review your APs' communications with
15 customers and prospective customers?
16    A   Monthly, monthly.
17    Q   So every month you would sit there
18 in the office and look at all of the emails, except
19 recommendations, that your APs sent to all of the
20 customers and prospective customers, is that right?
21    A   Correct.
22    Q   How long did that take you?
23    A   Not very long since there wasn't a lot
24 of email communication, or they were things like

Page 47

1  if you set up an appointment, it would create an
2  email, so on and so forth.
3     Q   And did you review the APs' written
4  communications in this manner, you know, for your
5  entire tenure at Long Leaf?
6     A   Yes.
7     Q   All right.  So I want to switch gears
8  a little bit and talk about your role generally
9  as a chief compliance officer.  So, Mr. Donelson --
10 you know, I'll tell you what.  Let's do some of
11 that later.  But let me ask you instead so at the
12 time you were chief compliance officer there were
13 three APs in the office, is that right?
14    A   In 2019, correct.
15    Q   Yeah.  But you were chief compliance
16 officer in 2018 as well, right?  Listen, I've got
17 this information, but I don't have it in front of
18 me.  Maybe we can just figure it out quickly here.
19 You know, when you started at Long Leaf Trading,
20 there were 12 APs, right?
21    A   Correct.
22    Q   At some point you'd winnowed it down or
23 circumstances had winnowed it down to just three
24 APs, Cybulski, Stemper and Hatzigiannis, correct?

Page 48

1     A   Correct.
2     Q   So when were you sort of down to just
3  those three?
4     A   From December 2018 on.
5     Q   Got it, okay.  All right.  Mr. Donelson,
6  are you an attorney?
7     A   No.
8     Q   Before joining Long Leaf have you ever
9  held a compliance position?
10    A   Yes.
11    Q   What was that position?
12    A   I was the FinOP for multiple broker-dealers
13 at Getco.
14    Q   And what is FinOP, please.
15    A   It requires a Series 27.  Effectively
16 it is the filing of all the 1-FRs, the -- any type
17 of financial information under SEC rules.
18    Q   All right.  So, in fact, you do have
19 a pretty good background in compliance.  Would you
20 agree with that statement?
21    A   Pretty good is a relative statement.
22 I have some background in compliance.
23    Q   All right.  Well, would you agree
24 that you were qualified to be the chief compliance

Page 49

1  officer of Long Leaf Trading?
2      A    Yes.
3      Q    All right.  So when you started
4  as chief compliance officer at Long Leaf Trading,
5  you -- would it be fair to say that you had a
6  working knowledge of NFA and CFTC rules?
7      A    Some of them.  Some of them I did not.
8      Q    All right.  Which ones didn't you
9  have knowledge of that wound up becoming important
10  later?
11      A    The question of a CTA, being the
12  qualifications and registration.  I would just
13  say some of the more administrative rules around it.
14      Q    Give me an example, if you would, please.
15      A    The specific KYC rules, I had
16  experience with KYC but not in this context.  So
17  while I was familiar with KYC, I wasn't familiar
18  what the specific rules of the NFA were fairly
19  close.  Other than that, I can't think of specific
20  issues.  It was mostly --
21      Q    Sorry, I cut you off.  What was that last
22  little bit again, please.
23      A    You know, mostly the administrative
24  side, which is not where I ever really spent the

Page 50

1  kind of time in administration of compliance
2  rules.
3      Q    Had you ever before joining Long Leaf been
4  chief compliance officer of a company?
5      A    No.
6      Q    Is it fair to say that your compliance
7  duties before joining Long Leaf were related to
8  accounting and financial details of broker-dealers?
9      A    Predominantly, yes.
10      Q    Because you're an accountant?
11      A    I have an accounting degree, yeah.
12      Q    All right.  So I want to talk about
13  some of the people that worked at Long Leaf.  While
14  you were chief compliance officer you supervised the
15  compliance of everybody at the firm, correct?
16      A    Correct.
17      Q    Yeah, I hope so.
18      A    I did --
19      Q    What?
20      A    Nothing.
21      Q    All right.  And, sorry, if you're going
22  to say something, we've got a small lag and that's
23  why I keep jumping on you.  What was that, please.
24      A    No, nothing more.

Page 51

1      Q    All right.  And your wife worked
2  at Long Leaf Trading, Mrs. Donelson, isn't that
3  correct?
4      A    Correct.
5      Q    All right.  When did she start, please.
6      A    July 2018.
7      Q    All right.  And is it fair to say that
8  one of her jobs was account opening documentation?
9      A    It was assisting the clients to open
10  an account, yes.
11      Q    All right.  And one of your APs was named
12  Ben Cybulski.  Did Mr. Cybulski have a connection
13  to your family in some way?
14      A    He is my daughter's boyfriend.
15      Q    And was Mr. Cybulski your daughter's
16  boyfriend during the period January -- sorry,
17  December 2018 through December 2019?
18      A    Yes.
19      Q    And, in fact, you hired him because he's
20  your daughter's boyfriend, right?
21      A    Not because he was my daughter's boyfriend.
22      Q    Was he your daughter's boyfriend when you
23  hired him?
24      A    Yes.

Page 52

1      Q    I apologize if I already asked you
2  this.  Is he currently your daughter's boyfriend?
3      A    Yes.
4      Q    All right.  And I hate to twist the
5  knife, but you know that he's taking the Fifth,
6  right?
7      A    I don't know that --
8      Q    Your lawyer didn't tell you that,
9  that we took his deposition and he invoked the
10  Fifth Amendment with respect to every question?
11      A    I know he took the Fifth, but I don't know
12  why.  I don't know anything about it.  He doesn't
13  discuss it with me.
14      Q    Yeah, I bet he doesn't.  You know he
15  is going to testify against you, right?  I take
16  that back.  He is going to be called as a witness
17  against you.  I don't know if he will testify or
18  not.  You've got to understand that, right?
19      A    I understand it.
20      Q    Did you see him on our witness list?
21  Did you see our witness list?
22      A    Yeah.
23      Q    Did you see his name on there?  Did you
24  see Mr. Cybulski's name?

Page 53

1    A    Yeah.
2    Q    All right.  So you're supervising
3  your wife and your daughter's boyfriend.  I've got
4  to ask, I mean, does Stemper or Hatzigiannis have
5  any connection to your family?
6    A    No.
7    Q    Yeah, I didn't think so.  I just --
8  I had to ask.  All right.  Now, your daughter
9  Stephanie Donelson, did she work at Long Leaf
10  Trading?
11    A    No.
12    Q    But she did prepare solicitation materials
13  for Long Leaf Trading, correct?
14    A    She helped with the design, the colors,
15  the -- things like that, not the content.
16    Q    Good.  All right.  Now, I know we're
17  jumping around a bit but, you know, I have to
18  be flexible and sort of go where the conversation
19  takes us.  I want to take us back, if I could,
20  please.  Would you turn in the PDF portfolio,
21  please, to CFTC Exhibit 381.
22    A    Um-hmm.  I am there, sorry.
23    Q    All right.  Mr. Donelson, would you take
24  a moment to look at the document, please, and then

Page 54

1  tell me if you recognize it.
2    A    Yes, I recognize it.
3    Q    What is CFTC Exhibit 381, please.
4    A    This is -- I don't remember the word
5  we used for it.
6    Q    What?
7    A    I don't remember the word we used for it.
8    Q    So I'll tell you what.  If this will
9  help, so CFTC Exhibit 381 was produced by you on
10  September 7, 2018.  The filing is Rebuttals.docx.
11  The metadata says it was created on July 25, 2018
12  and saved by you, and it is Doc Revision No. 2.
13  The Bates number is Long Leaf Trading 378293.
14  Does that help?
15    A    It's a list of rebuttals, yes.
16    Q    All right.  So what's this document,
17  please.
18    A    It's a training document for APs in how
19  to manage a customer conversation.
20    Q    All right.  And how long did APs use this
21  training document for?
22    A    I honestly don't know.
23    Q    Who wrote it?
24    A    Honestly, I don't know.

Page 55

1    Q    All right.  Well, you saved it, right?
2    A    I scanned it and saved it, yes.
3    Q    When did you scan it, please.
4    A    Probably in June, the date that you're
5  looking at.
6    Q    So you think that you scanned this
7  in June of -- in June -- well, the metadata says
8  it was created on July 25, 2018.
9    A    That's probably when I scanned it.
10  It wasn't --
11    Q    Okay.  So you scanned this document.
12  That means you had a hardcopy of it, right?
13    A    Yeah, somebody -- Andrew produced it to
14  me, Andrew Nelson, and I scanned it.
15    Q    All right.  And what were the circumstances
16  under which he gave it to you?
17    A    We were putting -- pulling together all
18  of the training documentation.
19    Q    All right.  How long was CFTC Exhibit 381
20  in use at Long Leaf for?
21    A    I honestly don't know.  We stopped
22  using it in August or September of 2018.  But was it
23  in existence before I got there, I don't know.
24    Q    All right.  So your testimony is

Page 56

1  CFTC Exhibit 381, this rebuttals document,
2  Long Leaf Trading stopped using this in August or
3  September of 2018, is that correct?
4    A    Correct.
5    Q    All right.  But up until then this
6  was something that APs used for rebutting customer
7  objections, is that correct?
8    A    Correct.
9    Q    All right.  So there's two pieces
10  of this I want to focus on, and they ought to be
11  familiar to you by now.  The past performance
12  request section, which is on page -- oh, Lord --
13  it's on page 3.  Are you with me?
14    A    Um-hmm.
15    Q    All right.  So Past Performance
16  Request it says, "I can sit here and show you
17  trades and wow you or something like that, but I'm
18  not going to do that because now you're going to be
19  basing your decision on what I did in the past, and
20  the market conditions moving forward are not going
21  to be the same.  But what I can do for you is give
22  you the structure of the program that puts you in
23  a position to try this out in a way that will make
24  you feel comfortable and put you in a position to

Page 57

1  hit your targeted goal, and I can do that in a
2  way where you'll never turn around and say what
3  the heck happened.  You'll be comfortable with
4  it."  And then he goes on to say other stuff.
5          So is this something that
6  you've heard APs tell to customers or prospective
7  customers?
8     A   The first one I heard.
9     Q   Which one did you hear APs telling
10  prospective customers?
11    A   I heard the I can sit here and
12  show you trades and wow, the wow word.  I don't
13  necessarily -- I mean, these are like one off each
14  apart, so I don't remember hearing any of the other
15  four.
16    Q   Got it.  Well, let's go to the next
17  page, if we could, please, and it's the bit that
18  says Structure More Important than Performance.
19  It says here -- you know, I guess APs are supposed
20  to say, and I'm looking at the second paragraph,
21  "Where our program is unmatched and has been so
22  successful is the actual structure of it.  It's
23  four trades a month that happen in the same time
24  frame toward the end of the month and we're

Page 58

1  following an execution strategy that both me and
2  you designed in the beginning before even getting
3  started."
4          Did you hear APs saying that to
5  customers and prospective customers?
6     A   I remember hearing the last sentence.
7  I don't remember hearing the first sentence.
8     Q   So what's the last sentence?  What's
9  the sentence you heard APs tell customers and
10  prospective customers?
11    A   It's four trades a month that happen
12  in the same time frame in the month and following
13  an execution strategy that both you and me designed
14  in the beginning before even getting started.
15    Q   Oh, so you heard that part but you
16  never heard the first sentence where they say where
17  the structure of the program is unmatched and has
18  been so successful is the structure, but you never
19  heard that bit?
20    A   I don't remember hearing it, no.
21    Q   All right.  Sorry to hop around.
22  Can we go to -- can we go back to page 3, please,
23  and there's this bit where it says Closing Off
24  Accountability/Trustworthiness/Our Ideas.  I want

Page 59

1  to direct your attention to the fifth paragraph.
2  So it says, "We are very confident because we are
3  good at what we do, and you're never really going
4  to know that until you actually try it.  But we
5  are so confident in what we do and confident that
6  we can make those your results that we work on a
7  one-month contract.  We only make money when we
8  execute positions and you only execute positions
9  if you're winning and making money."
10    Q   Did you hear APs at any point
11  say that to a prospective customer or a customer?
12    A   I am not finding that on page 3.
13    Q   All right.  Do you see where it says
14  Closing Off Accountability/Trustworthiness/Our Ideas
15  at the top?
16    A   Yeah.
17    Q   Now count five paragraphs down.
18    A   Oh, I'm sorry.  I'm on the wrong page.
19  Okay.
20    Q   All right.  So what this Rebuttals
21  Document 381 says here, "We are very confident
22  because we are good at what we do, and you're never
23  really going to know that until you actually try it.
24  But we are so confident in what we do and confident

Page 60

1  that we can make those your results that we work
2  on a one-month contract."
3          Did you ever hear any APs say that
4  to a customer or prospective customer?
5     A   I heard it being said with respect to
6  customers.
7     Q   All right.  Who did you hear say that?
8     A   Scott Gecas.
9     Q   Anybody else?
10    A   Not that I can remember.
11    Q   Did you tell Scott Gecas, hey, don't
12  say that?
13    A   I told him to drop the first part
14  of the line and only talk about it is a one-month
15  contract.
16    Q   Did you?  Is that in writing anywhere?
17    A   No.
18    Q   Did you put anything in Mr. Gecas'
19  personnel file about how he'd said something
20  misleading?
21    A   No.
22    Q   What date did you have this conversation
23  with Mr. Gecas?
24    A   I don't remember the date.

Page 61

1    Q   Do you remember the month?
2    A   Honestly, I don't remember when it was.
3    Q   All right.  So when Mr. Gecas
4  testifies against you, do you think that he's
5  going to remember that conversation and back you
6  up on it?
7    A   Yes.
8    Q   Okay.  Is there any proof whatsoever that
9  that conversation happened?
10   A   No written proof.
11   Q   Yeah, I didn't think so.
12       MR. BURDEN:  All right.  You guys,
13  let's, if we could, please, go off the record
14  for maybe ten minutes.  Back in ten, please.
15       MR. FALVEY:  Okay.
16       MR. BURDEN:  Very good.  Off the record.
17  Thank you.
18       (Whereupon a recess was taken from
19       11:07 a.m., to 11:22 a.m., after
20       which the following proceedings
21       were had:)
22       MR. BURDEN:  All right.  Are we ready
23  to go?
24       MR. FALVEY:  Okay, yep.

Page 62

1  BY MR. BURDEN:
2    Q   All right.  Mr. Donelson, when you
3  started at Long Leaf Trading, you began receiving
4  complaints from customers right away, isn't that
5  correct?
6    A   Correct.
7    Q   All right.  So what were the --
8  you know, what were customer results under this
9  Time Means Money program when you started?
10   A   I looked -- after the complaints,
11  I looked back and the brokers had told me about
12  a really bad October.  So I went back kind of
13  through October, maybe the first five months before
14  I acquired it, and they were consistently losing
15  money.
16   Q   And when did you do this five-month
17  look-back?
18   A   January of 2018, late.
19   Q   You waited until January 2018 to see
20  what the results were for this Time Means Money
21  program?
22   A   Yes.
23   Q   That's the first time you looked
24  to see if your customers were making or losing

Page 63

1  money?
2    A   I knew what happened on the trade
3  that was just placed.  I was going back into the
4  history.
5    Q   So you didn't go back and see how
6  these Time Means Money recommendations played
7  out until you had been at Long Leaf Trading for
8  a year?
9    A   I'm sorry?
10       MR. FALVEY:  Yeah, I think you're --
11  it was two months.
12  BY MR. BURDEN:
13   Q   Oh, okay.  So in January 2018.  So you've
14  been there for two months?
15       MR. FALVEY:  Right, right.
16  BY MR. BURDEN:
17   Q   Mr. Donelson, is that right?
18   A   Yeah.
19   Q   All right.  That makes a lot more
20  sense.  We were just looking at CFTC Exhibit 381,
21  which is the rebuttals.  And, you know, a part of
22  that document trained APs on how to deal with
23  requests for past performance, right?
24   A   Yes.

Page 64

1    Q   All right.  So what did you instruct
2  the APs to tell customers when they -- somebody
3  made a request about past performance?
4    A   Not to provide any.
5    Q   And how did you relay this message to
6  the APs?
7    A   There was a meeting, a sales meeting
8  in I want to say early February.  We went through a
9  bunch of different issues, one being not to provide
10  that.  The other, walking them through how to read
11  a statement, as I found that many of them did not
12  know how to read the statements.
13   Q   All right.  So in early February
14  of 2018 you had a sales meeting with the APs,
15  right?
16   A   Correct.
17   Q   And at this meeting you instructed
18  the APs not to provide customers with anything in
19  response to requests for past performance, correct?
20   A   Correct.
21   Q   And, in fact, this had been the
22  policy at Long Leaf before this meeting, right?
23   A   Correct.
24   Q   All right.  And this policy of

Page 65

1  not providing anything in response to requests
2  for past performance, how long did that last for,
3  please.
4      A   Until 2019.
5      Q   What month?
6      A   June or July.
7      Q   All right.  We're going to come back
8  to that.
9      A   Can I just confirm that you guys are
10  hearing me fine?
11     Q   It's not great, but I can hear you.
12         MR. BURDEN:  Mary, you're the one that
13      counts.  Will you give us a thumbs up if you
14      can hear Mr. Donelson okay, please.
15         (Discussion off the record.)
16     Q   All right.  So, you know, inevitably
17  customers were going to ask, you know, APs about
18  past performance.  Did you advise the APs about what
19  they should do in that circumstance?
20     A   To tell them it's our policy not to
21  provide past performance.
22     Q   And, in fact, in February of 2019 --
23  sorry.  In fact, by February of 2018, as far as you
24  knew, the results of Long Leaf Trading's Time Means

Page 66

1  Money program were very bad.  Is that fair to say?
2      A   It's fair to say, yes.
3      Q   So why did you want to conceal this
4  from customers?
5      A   We changed our trading in February of 2018.
6      Q   Yeah.  But don't you think that
7  if customers knew that Long Leaf customers had
8  previously lost a lot of money on recommendations,
9  they wouldn't want to sign up with Long Leaf
10  Trading?
11     A   I'm processing your question.
12     Q   Yeah, and I'll tell you what.  The
13  question is withdrawn because it was disastrous
14  and I'm pretty sure a double negative.  So the
15  reason that you advised APs not to tell anybody
16  what past performance is was because you were going
17  to start doing a new type of trading in February
18  of 2018?
19     A   Correct.
20     Q   All right.  So this new type
21  of trading that you're describing, this is where
22  Long Leaf transitioned from credit spreads to debit
23  spreads, is that correct?
24     A   Correct.

Page 67

1      Q   All right.  So with respect to these
2  trade recommendations that started in February
3  of 2018, who designed the trade recommendations?
4  Who decided what was going to be said about them?
5      A   Scott Gecas.  And I would do the
6  mathematics behind the recommendation and describe
7  it.
8      Q   All right.  How long did Scott Gecas
9  devise the trade recommendations for customers?
10     A   Through December of 2018.
11     Q   So he started in February of '18
12  and he continued through 2018 -- or, sorry, December
13  of 2018 in devising these recommendations?
14     A   Correct.
15     Q   And, I'm sorry, what was your role in
16  devising the trade recommendations?
17     A   Mostly administrative in the sense
18  of creating the trade recommendation sheets that
19  you see, putting the math in there, all those
20  things.
21     Q   So it sounds like Scott Gecas came up with
22  the trades but you would put together the actual
23  communications with the -- with the recommendations.
24  Is that your testimony?

Page 68

1      A   Correct.
2      Q   All right.  So I want to show you what
3  we've marked as CFTC Exhibit 52.  So take a moment
4  to look at it, please, and tell me what you
5  recognize it to be.
6      A   It's my introduction to our clients.
7      Q   Got it.  So this is a communication you
8  wrote and you directed your APs to send it to all
9  the customers, right?
10     A   Correct.
11     Q   All right.  So let's take a look here.
12  It says Long Leaf Trading Update, please, on the
13  second page of the exhibit.
14     A   Yes.
15     Q   I'm sorry.  I'm looking for the
16  sentence I want to talk about.  There we go,
17  all right.  So second paragraph, maybe halfway
18  through it says -- it's talking about you and it
19  says that you are working closely with Scott Gecas
20  on redesigning the trading processes to provide
21  improved returns and improved transparency, and
22  you were also focused on reporting on the outcomes
23  of the trades monthly with a quarterly summary of
24  results.  So did you write that?

Page 69

1    A    Yes.
2    Q    All right.  So let's scoot down,
3 if we could, please, and the next paragraph talks
4 about Scott Gecas.  And then the third sentence
5 says, "Scott and Jim share in the development of
6 the monthly trades and management of the trades
7 after they are made."  So did you write that?
8    A    Yes.
9    Q    So is that right?  Did you and Scott
10 share -- Scott Gecas share in the development
11 of the trades and the management of the trades?
12    A    Yeah.
13    Q    All right.  So I want to talk about
14 Scott Gecas.  When did he start designing these
15 trading recommendations for Long Leaf?
16    A    I want to say January of 2018 was the
17 first trade designs.
18    Q    Okay.  So was this a job that Mr. Gecas
19 did before you arrived at Long Leaf?
20    A    He was not doing it at Long Leaf.
21    Q    All right.  We already talked a little bit
22 about Mr. Gecas' qualifications.  What experience
23 did Mr. Gecas have trading options on futures?
24    A    He traded in the SPX pit.  He traded

Page 70

1 for various proprietary trading firms.
2    Q    Did Mr. Gecas tell you what his results
3 were, if he was profitable at those trading firms?
4    A    I don't remember.
5    Q    Did you ask him?
6    A    I don't remember.
7    Q    Did Mr. Gecas tell you that as a trader
8 in the pits he, quote, struggled to break even?  Did
9 he tell you that?
10         MR. FALVEY:  You broke up, Ashley.
11 BY MR. BURDEN:
12    Q    Did Mr. Gecas tell you that when
13 he worked as a trader in the pits -- oh, actually,
14 so strike that.  Did Mr. Gecas tell you that when he
15 worked as a trader, he had struggled to break even?
16 Did he tell you that?
17    A    I don't remember.
18    Q    Did you do anything to see if Mr. Gecas
19 was actually a good trader?
20    A    I spoke to someone who was the -- who
21 worked with him in the past.
22    Q    Okay.  What was that person's name?
23    A    Fred Lovely.
24    Q    How do you spell that, please.

Page 71

1    A    L-o-v-e-l-y.
2    Q    All right.  And where did Mr. Lovely work
3 with Mr. Gecas?
4    A    I don't remember the name of the firm.
5    Q    What did Mr. Gecas tell you about --
6 sorry.  What did Mr. Lovely tell you about
7 Mr. Gecas' trading or profitability?
8    A    That he wasn't great but he was average.
9    Q    That's what he told you?
10    A    That's what I remember of the conversation,
11 yes.
12    Q    When did this conversation occur?
13    A    June of 2018.
14    Q    All right.  So by that time Mr. Gecas
15 had already been like working with you designing
16 these trades for four months, right?
17    A    Yes.
18    Q    All right.  And he kept working
19 for you designing trades until December of 2018,
20 right?
21    A    Yes.
22    Q    So did Mr. Lovely explain to you what he
23 meant by Gecas being an average trader
24    A    He was explaining a very different

Page 72

1 context of trading.  This is -- they were market
2 makers slash, you know, day trading.
3    Q    All right.  Well, in this very
4 different context of trading did Mr. Lovely tell
5 you that Mr. Gecas' trading was profitable?
6    A    Yes, he did say it was profitable.
7    Q    Did he say how profitable it was?
8    A    He said it was breakeven to risk,
9 which means something different than whether
10 it's breakeven.
11    Q    Do you know what it means?
12    A    Yeah.
13    Q    What does it mean?
14    A    It's not -- the fact is are your --
15 is your profit covering the risk you're taking,
16 the risk-reward calculation.
17    Q    For Mr. Gecas was it?
18    A    It was breakeven at the risk he was
19 taking, which is --
20    Q    When did -- sorry.
21    A    -- which is what that means.
22    Q    When did Mr. Lovely work with Mr. Gecas?
23    A    In the early 2000s.
24    Q    All right.  Did you talk to anybody

Page 73

1  more recently about Mr. Gecas?
2     A   No.
3     Q   All right.  What else did you do,
4  if anything, to make sure that Mr. Gecas was
5  actually a good trader?
6     A   He would walk me through the trades
7  to see -- point out why he would make a certain
8  trade.
9     Q   All right.  I guess what I'm getting
10  at is, you know, did you ask Mr. Gecas for any
11  substantiation that he had traded profitably before
12  Long Leaf?
13     A   No.
14     Q   So why not?
15     A   I had tried a different Series 3
16  broker to make the trade and he couldn't do it.
17     Q   Yeah.  But like why did Mr. Gecas get
18  the job?
19     A   He had experience trading.
20     Q   Do you know if that experience was
21  profitable?
22     A   All I have is the information that
23  I relayed to you about -- from Mr. Lovely,
24     Q   Yeah.  But what about Mr. Gecas,

Page 74

1  did Mr. Gecas tell you that his trading had been
2  profitable before he joined Long Leaf?
3     A   I'm sorry.  I lapsed here for a second.
4  Could you repeat the question?
5     Q   Did Mr. Gecas tell you that he had
6  been a profitable trader before joining Long Leaf?
7     A   No.
8     Q   Well, did you ask him?  Were you like,
9  hey, Mr. Gecas, were you a good trader before you
10  worked here?
11     A   I asked his experience, yes.
12     Q   But he didn't tell you if he was profitable
13  or not?
14     A   No.
15     Q   And you didn't ask?
16     A   Correct.
17     Q   And you let this guy trade people's
18  retirement accounts?
19     A   Yes.
20     Q   All right.  You're next.  So after
21  Mr. Gecas left in December of 2018, you took over
22  coming up with the trading recommendations, correct?
23     A   Correct.
24     Q   Did you get any help from anyone?

Page 75

1     A   In what sense?
2     Q   Did anybody else help you come
3  up with these trading recommendations that you
4  delivered to customers?
5     A   No.
6     Q   Just you, huh?
7     A   Mr. Hatzigiannis helped me do research
8  and things like that, but he would not develop the
9  actual trades.
10     Q   All right.  We will get to him in
11  a moment.  Before working at Long Leaf Trading,
12  had you ever worked as a trader?
13     A   No.
14     Q   And, in fact, you were an accountant by
15  training, is that correct?
16     A   I'm a finance person, yes.
17     Q   Are you a CPA?
18     A   Yes.
19     Q   Before joining Long Leaf, did you ever
20  trade -- did you ever trade options or futures for
21  your own account?
22     A   Yes.
23     Q   How much money did you lose?
24     A   Most of the option trades were hedges

Page 76

1  so ...
2     Q   How much money did you lose?
3     A   30,000 on options.
4     Q   All right.  So these options trades
5  you did where you lost 30 grand, and I understand
6  they're hedges, did you do any other options or
7  futures trading for your own account before joining
8  Long Leaf?
9     A   Yeah.
10     Q   And what was the result of that trading?
11     A   I honestly don't remember.
12     Q   Well, when did the trading occur?
13        MR. FALVEY:  Do you need a break?
14        THE WITNESS:  Yeah.
15  BY MR. BURDEN:
16     Q   Well, you can't have one.  Please finish
17  answering the question.
18        MR. FALVEY:  After the -- after he answers.
19     A   2016.
20  BY MR. BURDEN:
21     Q   All right.  Was that trading profitable?
22     A   No.
23     Q   All right.  So have we covered all your
24  options and futures trading for your own account?

Page 77

1    A    I believe so.
2         MR. BURDEN:  All right.  Do you guys want
3    to take a break then?
4         MR. FALVEY:  Yeah.
5         MR. BURDEN:  How long, please.
6         THE WITNESS:  Do you want to take
7    a lunch break and then we can come back after
8    lunch?
9         MR. FALVEY:  Sure, 45 minutes.
10        THE WITNESS:  45 minutes?
11        MR. BURDEN:  Yeah, 45 minutes is good.
12   I will see you guys in 45 minutes.  Off the
13   record, please.
14        (Whereupon a lunch recess was taken
15        from 11:51 a.m., to 12:45 p.m., after
16        which the following proceedings were
17        had:)
18        A F T E R N O O N   S E S S I O N
19             JAMES A. DONELSON,
20   called as a witness herein, having been previously
21   sworn and examined, testified further as follows:
22        DIRECT EXAMINATION (Cont'd.)
23   BY MR. BURDEN:
24   Q    All right.  Mr. Donelson, we were talking

Page 78

1    about you, Mr. Gecas and your trade recommendations
2    and I want to keep going with that for a little
3    while, if we could, please.  So when you started
4    at Long Leaf Trading, Mr. Gecas was working as an
5    AP.  He was soliciting customers, correct?
6    A    Correct.
7    Q    Do you know how long Mr. Gecas had been
8    working in that capacity?
9    A    I think five months, six months, something
10   like that, based on his AP record.
11   Q    All right.  And before that do you know
12   what Mr. Gecas was doing?
13   A    He was working for -- I can't think
14   of the name of the firm.  They were an option
15   education company.
16   Q    Do you know how long it had been since
17   Mr. Gecas had done actual trading?
18   A    It was about six years.
19   Q    All right.  And did you know that, you
20   know, in February of 2018?
21        MR. FALVEY:  He asked if you knew that
22   in February of 2018.
23   A    Oh, okay.  I didn't hear the first
24   part of it.  All I heard was February '18.  Yes.

Page 79

1    BY MR. BURDEN:
2    Q    All right.  So you knew in February
3    of '18 that Mr. Gecas hadn't done any trading for
4    six years?
5    A    He hadn't traded for a firm for six years,
6    correct.
7    Q    Do you know if Mr. Gecas had traded for
8    his own account?
9    A    Yes.
10   Q    All right.  And when was that trading?
11   A    My understanding was he was trading an
12   account.
13   Q    Whose account?
14   A    His own account.
15   Q    All right.  And what did he tell you the
16   results of that trading were?
17   A    I didn't ask him.
18   Q    Did he tell you?
19   A    No.
20   Q    All right.  So let's get back to you.
21   I'm still having a little trouble hearing you.
22   A    Okay.
23   Q    I don't know if we can do anything
24   about it but if we could, that would be great.

Page 80

1    All right.  I apologize if I asked you this.
2    Before you started at Long Leaf, had you ever
3    traded options on futures?
4    A    Yes, with hedging.
5    Q    All right.  And when was that?
6    A    2016.
7    Q    And was this the episode where you did the
8    hedge and you lost 30 grand on it?
9    A    Correct.
10   Q    Any other experience trading options on
11   futures?
12   A    No.
13   Q    All right.  So did you tell customers that
14   you really didn't have any profitable experience
15   trading options on futures?
16   A    No.
17   Q    And, in fact, you told customers that you
18   had over 30 years of business experience, including
19   10 years of financial and business development
20   experience, in two of the largest proprietary
21   trading companies.  That's what you told customers,
22   right?
23   A    Yes.
24   Q    Do you think that customers would

Page 81

1 have wanted you to make trade recommendations for
2 them if they knew that you really didn't have any
3 meaningful experience trading?
4     MR. FALVEY:  Objection to speculation,
5 but go ahead.
6     A   Now I got confused.  What's the question?
7 BY MR. BURDEN:
8     Q   Do you think customers would have wanted
9 to take Long Leaf's trading recommendations if they
10 knew that you had substantially no profitable
11 experience trading?
12     A   I don't understand the question.
13 I'm sorry.  Ashley, could you repeat it again?
14 I'm just trying to figure out what the right answer
15 is given the question you asked in terms of yes or
16 no.
17     Q   It's one of those questions
18 there's no right answer to, but let me ask it
19 again.  Mr. Donelson, do you think customers of
20 Long Leaf would have wanted to take your trading
21 recommendations if they knew that you had no
22 profitable trading experience?
23     A   No.
24     Q   All right.

Page 82

1     A   No.
2     Q   Yeah, okay.  That's the right answer.
3 So why were you qualified to trade for people's
4 retirement accounts?  Why did you think this would
5 be a good thing to do?
6     A   I have experience in these markets and
7 understand how they work and how the competitors
8 work in the markets.  I know what trades won't work
9 in a retail environment, having been around prop
10 trading firms for almost ten years.
11     Q   But you didn't do any trading for those
12 firms yourself, did you?
13     A   We weren't allowed to.
14     Q   And you didn't do any trading for
15 customers or for anybody else's account, did you?
16     A   No.
17     Q   And you thought it would be a good idea
18 to trade hundreds of customers' retirement accounts
19 at Long Leaf Trading?
20     A   There was a specific trade that I felt
21 that it would be profitable.
22     Q   Was it?
23     A   For a long time, yes.
24     Q   Are you sure it was profitable

Page 83

1 for a long time?  How many months was it really
2 profitable?
3     A   Four to five months.
4     Q   Yeah.  And what happened after that?
5     A   All the volatility fell out of the market.
6     Q   What happened after that?
7     MR. FALVEY:  Asked and answered, but
8 go ahead.
9     A   All the volatility fell out of the market
10 and the trades lost.
11 BY MR. BURDEN:
12     Q   Yeah.  In fact, they lost so much,
13 it wiped out all of your customers' gains, isn't
14 that right?
15     A   Yes.
16     Q   And, in fact, substantially all
17 of Long Leaf's customers while you were the CEO
18 of the company lost in their accounts, correct?
19     A   Correct.
20     Q   All right.  We're going to drill down
21 on all of that stuff later, but I want to stay
22 on your trade recommendations.  So how did you come
23 up with the trade recommendations that you provided
24 to customers?

Page 84

1     A   Can you assign a time period?
2     Q   You know what, you're right.  I guess it
3 probably did change over time and I don't want to
4 waste too much time on that.  Did Long Leaf Trading
5 utilize any proprietary algorithms in their trading
6 recommendations?
7     A   Can you define algorithm?  I'm trying
8 to be very clear.
9     Q   Yeah.  Did Long Leaf Trading have any
10 computer or software tools that it had developed
11 inhouse, something proprietary to come up with these
12 trade recommendations?
13     A   It did not have an inhouse system.
14     Q   All right.  In fact, what you guys used
15 was QuikStrike, right?
16     A   Correct.
17     Q   And QuikStrike is an off-the-shelf
18 software program that builds options based on margin
19 and volatility, is that fair to say?
20     A   It is an option tool.  It doesn't
21 build it based on margin or volatility.  It --
22     Q   Okay.
23     A   It used strike price.
24     Q   All right.  Well, let me ask it

Page 85

1  a different way. QuikStrike is an off-the-shelf
2  software program, correct? Anybody can buy it?
3      A   Correct.
4      Q   Anybody can use it?
5      A   Correct.
6      Q   All right. And, in fact, it's available
7  for free through the CME website, correct?
8      A   A version of it is, yes.
9      Q   Other than QuikStrike, were there
10 any software programs that you used to come up
11 with the trading recommendations that you provided
12 to customers?
13     A   The other system we used was UpTick.
14     Q   Was UpTick another off-the-shelf software
15 program?
16     A   Yeah.
17     Q   All right. And that's something that
18 anybody could buy or use?
19     A   Theoretically, yes.
20     Q   Any other software programs that you
21 used to come up with trading recommendations for
22 Long Leaf?
23     A   Excel. But that was more just a
24 recording mechanism, not a determination mechanism.

Page 86

1      Q   Okay. Well, any other software
2  products that you used to help come up with trading
3  recommendations?
4      A   No. Let me correct that.
5      Q   Okay.
6      A   We did use the trading system to
7  see the movements in the markets. In the case of
8  Cunningham, it was their proprietary trading system.
9  In the case of Gain, it was their proprietary
10 trading system.
11     Q   Now, did you use those platforms
12 to come up with the trading recommendations
13 or just to sort of monitor where the market was?
14     A   They were -- if you're talking
15 specifically about the trading systems, those
16 were to look at the trends and also to monitor
17 trades as they were -- after they were made.
18     Q   Got it. So you're using the tools
19 that are available to any customers of Gain or
20 Cunningham, correct?
21     A   I'm not sure about Cunningham. Gain, yes.
22     Q   All right. Why don't you take a
23 look, if you could, please, at CFTC Exhibit 475.
24     A   Um-hmm.

Page 87

1      Q   And let me know if you recognize this
2  document and, if so, what you recognize it to be.
3      A   It is a trade recommendation.
4      Q   And it is a trade recommendation
5  authored by you, correct?
6      A   I'm the one who put it together, yes.
7      Q   And you sent -- yeah. And you sent this
8  to your APs to distribute to customers, correct?
9      A   Correct.
10     Q   All right. So I want to scroll
11 down, if we could, please, to the second page of
12 Exhibit 475. So did you put this together, this
13 trading recommendation?
14     A   Yes, I put together the Excel to put
15 this in place, yes.
16     Q   Got it, okay. So I just want to
17 look at the first one here. It says Trading
18 Recommendation: Oil Call Spread. Do you see that?
19     A   Yes.
20     Q   Do you see where it says buy?
21     A   Yes.
22     Q   That's the buy recommendation, correct?
23     A   Correct.
24     Q   Do you see sell? That's the sell

Page 88

1  recommendation, right?
2      A   Correct.
3      Q   So it says Max Gain and Loss. Do you
4  see that?
5      A   Um-hmm. Yes, I do. I'm sorry.
6      Q   What does that indicate?
7      A   That would reflect what the maximum
8  gain you could make on the trade and the maximum
9  loss you could take on the trade.
10     Q   All right. So was this the format
11 that the trading recommendations that you sent
12 to customers followed? Did it have like this max
13 gain/loss piece?
14     A   Yes.
15     Q   And how did you figure out what the max
16 gain and loss were?
17     A   It is -- so the max loss on that
18 trade would be equal to the amount you paid for
19 to buy, less what you received as the sell, less
20 commissions, less fees. In this case you can't
21 lose -- it's a long position so you can't lose more
22 than what you put in. And the other is basically
23 if it hit the top of the -- of that spread, that's
24 the maximum you could gain on that.

Page 89

1    Q    Got it.  So how frequently during
2    your tenure at Long Leaf did customers achieve the
3    max gain on a trade?
4    A    I would say rarely.
5    Q    Did you ever advise customers of that
6    fact or direct your APs to do so?
7    A    Yes.
8    Q    Where?  Where can I find evidence of
9    that?
10   A    The max gain or loss is a theoretical
11   construct.  It's -- if everything -- you would have
12   to close out on the very last day at the very last
13   point to hit that number.
14   Q    Yeah.  But I want to know when you told
15   customers that and I want to know when you told
16   customers that the max gain was rarely achieved,
17   if ever.
18   A    This is the format I inherited from
19   Tim Evans that had been reviewed by the NFA.
20   Q    First of all, it is most certainly
21   not.  Second of all, that is not responsive to
22   my question.  What customer did you tell that the
23   max gain is rarely, if ever, achieved?  Tell me the
24   name of the customer that you warned about that.

Page 90

1    A    I don't know.
2    Q    Did you ever tell any of the APs,
3    hey, make sure customers know that the max gain
4    is rarely, if ever, achieved?  Did you ever say that
5    to the APs?
6    A    They knew it and we talked about it, yes.
7    Q    Yeah, but that's not what I'm asking
8    you.  I'm asking you did you ever direct the APs
9    to tell customers that the max gain was almost never
10   achieved?
11   A    The point was we focused on the target,
12   not the max.
13   Q    Yeah, I don't care what the point
14   is and we're going to get to target in a minute.
15   What is the name of an AP that you told to make
16   sure that customers knew max gain was rarely, if
17   ever, achieved?
18   A    Scott Gecas.
19   Q    Oh, yeah?  When did you tell Scott that
20   and what did you say?
21   A    He understood what that number meant.
22   Q    Yeah, I don't care if you think he
23   understood.  I'm asking you what did you say to
24   Scott Gecas and when did you say it?

Page 91

1    A    When we first put these out in
2    February that this is consistent with what we
3    were putting out before, that the max gain and loss
4    is prescribed that we need to tell people what it
5    is, but that's not what you're going to (inaudible).
6    Q    So that's what you told Scott Gecas in
7    February of 2018?
8    A    Yes.
9    Q    Are there any emails about this?
10   Is there any other evidence other than your bare
11   say-so?
12   A    No.
13   Q    Yeah, I didn't think so.  Are there
14   any other APs that you're going to try to tell me
15   you told to warn customers about max gain?
16   A    No.
17   Q    What did you do to make sure that
18   the APs were -- Scott Gecas or anybody else were
19   warning customers that the max gain was rarely ever
20   achieved?
21   A    I'm sorry.  Repeat the question.
22   Q    Yeah.  What did you do to make sure
23   that Scott Gecas was telling customers, hey, the
24   max gain is really never achieved?

Page 92

1    A    I honestly don't remember.
2    Q    You didn't do anything, did you?
3    A    This had been a format that's been
4    explained to people before I got there and this
5    is what was approved by the NFA, saying we had to
6    put max gain or loss on trade recommendations.
7    Q    Yeah, I want to push back on that.  So
8    where can I find evidence the NFA approved this
9    format?
10   A    We had a solicitation and trading
11   review started in August of 2017 and reviewed
12   this format.
13   Q    All right.  Did you get a letter from
14   the NFA approving or providing no comments on this
15   format?
16   A    Yes, it's in their exit --
17   Q    I lost that last bit.
18   A    It's in their exit report.
19   Q    Oh, okay.  Where's their exit report?
20   What's the date of that?
21   A    It's in February of 2018.
22   Q    See, I don't believe you.  So I want you
23   to tell me where exactly I can find this document
24   in the files that you produced.

Page 93

1   A   It would be in the NFA review documents.
2   Q   What date did you produce that, please.
3   A   It would have been the first 5g --
4   or 4g request, which would have been June of 2019.
5   Q   All right.  And what did this exit
6   report say about your trade recommendation format?
7   A   It had one comment on it that
8   we needed to include the number of contracts.
9   The previous version did not have the number of
10  contracts on it.  The other was -- it was related
11  to not putting checks in the accounting system when
12  they were issued.
13  Q   Did you advise the NFA that with respect
14  to these trading recommendations, the max gain was
15  never achieved or substantially never achieved?
16  A   During that review?
17  Q   Yeah.
18  A   I wasn't part of that review.
19  Q   You just saw the exit report?
20  A   I saw the exit report as -- yeah, I saw
21  it --
22  Q   And when did you --
23  A   -- because it was an issue within the
24  acquisition is that the NFA had -- was reviewing

Page 94

1   the terms.
2   Q   All right.  With respect to this
3   target gain, what is that supposed to indicate on
4   Exhibit 475?
5   A   That is calculating a -- where we
6   would want to take it off if it got to that point.
7   Q   How frequently during your tenure at
8   Long Leaf Trading was the target gain achieved?
9   A   Maybe 20 percent, 30 percent of the time.
10  Q   And did you advise customers of that?
11  A   Yes.
12  Q   What customer did you tell this to?
13  A   Martin Pegelow, Mark Hartmann.
14  Q   So what did you say to Mr. Pegelow?
15  A   We were describing -- I was
16  describing this as if there's a sharp movement
17  in the underlying -- or in the underlying, that
18  we'd take it off at this price, but any -- you know,
19  we would also send out updated exit components to
20  say we would exit at --
21  Q   Yeah.  Mr. Donelson, you've got to
22  answer these questions in a responsive way.  My
23  question to you is did you tell customers that the
24  target gain was only achieved 20 to 30 percent

Page 95

1   of the time?
2   A   I told some of the customers, yes.
3   Q   Which ones?
4   A   Martin Pegelow, Mark Hartmann, Jerry
5   Krantz.  Those are the ones I distinctly remember.
6   Q   When did you tell Martin Pegelow
7   that the target max loss was only -- or, sorry,
8   the target gain was only achieved 20 to 30 percent
9   of the time?
10  A   It would have been after June of 2018.
11  Q   I'm not asking you when it would have
12  been.  I'm asking you when it was.
13  A   July 2018.
14  Q   And how did he respond?
15  A   He understood what we were talking about.
16  He said I under --
17  Q   All right.  So Mark Hartmann, when did
18  you tell him that the target gain is only achieved
19  20 to 30 percent of the time?
20  A   July of 2018.
21  Q   Same for Mr. Krantz?
22  A   Yes.
23  Q   All right.  And did you have these
24  conversations with these three customers over

Page 96

1   the phone?
2   A   Yeah.
3   Q   And was that line recorded?
4   A   I don't believe so.
5   Q   Yeah, I didn't think so.  But everybody
6   else's line was recorded, wasn't it?
7   A   Yes --
8   Q   But not yours?
9   A   -- but only outgoing calls.  Incoming
10  calls would not be recorded.
11  Q   Yeah, I'm aware of that.  All right.
12  And with respect to this oil call spread trade,
13  what was the ultimate result of this trade, if you
14  can recall?
15  A   I don't remember.  I would have to look
16  it up.
17  Q   Well, I've got it.  We'll look at
18  it in a minute.  So I want to push back on this
19  representation of yours that you told some customers
20  that the target gain was only achieved 20 to
21  30 percent of the time.  How did they react to that?
22  A   They understood that, as I explained
23  what it was for, that that makes sense.  It's meant
24  to give us a point in the short run which should

Page 97

1  move very quickly that (inaudible).
2      Q   Did you explain to these customers
3  that substantially all of Long Leaf's recommended
4  trades resulted in losses for customers?
5      A   Are you talking about the long --
6  the debit spread or are you talking about the
7  credit spread?
8      Q   I'm talking about all of Long Leaf's
9  trading recommendations during your tenure there.
10     A   I'm sorry.  I forgot the question.
11         MR. BURDEN:  Ms. Maslowski, would you
12     read back the question, please.
13             (Whereupon the portion of the
14             record was read as requested.)
15     A   Not all of our recommendations were
16  losses.
17     Q   But substantially all of your customers
18  lost most of their money, isn't that right?
19     A   Yes.
20     Q   Did you tell that to customers?
21     A   No.
22     Q   So when you're telling these customers
23  by your account that the target gain is reached
24  20 to 30 percent of the time, are you also telling

Page 98

1  them that most of the rest of the time we lose
2  money and it wipes out those gains?  Did you tell
3  that to customers?
4      A   I disagree that most of the trades lost
5  money.
6      Q   What was the average net return for
7  Long Leaf Trading customers during your tenure at
8  Long Leaf?
9      A   I don't know.
10     Q   All right.  You know what, we're
11  going to do this now.  I'll tell you what.  We
12  won't do it now.  We'll do it later.  So staying on
13  Exhibit 475, where it says max loss, how frequently
14  was the max loss endured during your tenure at
15  Long Leaf?
16     A   I don't know.
17     Q   Is it fair to say that it was --
18  was it like half of the time?  What do you think
19  it was?
20     A   I would say on long positions it was
21  10 percent of the time.
22     Q   I don't care about long or short.
23  I want to know all your trade recommendations
24  while you were at Long Leaf, how frequently was

Page 99

1  the max loss suffered by customers?
2      A   Ten percent would be an estimate.
3      Q   All right.  So what about this target
4  max loss, how frequently was something between the
5  max and the target loss suffered by customers?
6      A   I'm sorry.  Between the target --
7      Q   Yeah.  How frequently did Long Leaf
8  customers suffer the target max loss or worse?
9      A   I don't know the percentages off the top
10  of my head.
11     Q   Do you think it's more than 50 percent,
12  less than 50 percent?
13     A   I think it's less than 50 percent.
14     Q   Do you think it's more than 40 percent
15  or less than 40 percent?
16     A   I would have to look at the actual trading
17  to figure it out.  I don't have that percentage in
18  my head.
19     Q   What percentage of the time did Long
20  Leaf -- did these recommendations to Long Leaf
21  customers result in losses?
22     A   I know 2019.  I don't know those numbers
23  for 2018.
24     Q   So you know that 20 to 30 percent of the

Page 100

1  time Long Leaf recommendations achieved the target
2  gain but you somehow don't know how frequently they
3  lose money, is that right?  Is that what you're
4  telling me?
5      A   Well, if you're asking for a specific
6  percentage, no, I don't have that number on my
7  head.
8      Q   Yeah, give me a general percentage.
9  I'll take whatever you've got.
10     A   In 2019?
11     Q   No, I don't want to know 2019.  I want
12  to know your entire tenure at Long Leaf.
13     A   I can answer with certainty on 2019.
14     Q   Yeah, I know you can but we're
15  going to get to that.  What I want to know
16  is what percentage of customers' trades resulted
17  in losses during the year that you were doing the
18  trading.  I guess it was more than a year.  During
19  your entire tenure at Long Leaf.
20     A   A rough estimate is 60 percent win,
21  40 percent lose.
22     Q   Your testimony is that 60 percent of
23  the trades won and 40 percent of the trades lost?
24     A   That is my estimate.  I would have to

Page 101

1  check my actual data.
2      Q   Is that something you told customers?
3      A   We told them that we weren't going to
4  win every trade.  We made it clear.
5      Q   Yeah, I don't care.  What I'm asking
6  you is did you tell customers that Long Leaf
7  Trading wins 60 percent and loses 40 percent?
8  Is that what you told customers?
9      A   No, we never told customers that exact
10  percentage.
11      Q   All right.  I want to switch gears
12  a little bit and go back to solicitation.  So,
13  Mr. Donelson, was there a time when you sought to
14  review and revise the solicitation materials that
15  APs had previously been using?
16      A   Yeah.
17      Q   When was that, please.
18      A   July of 2018 through October and
19  then December of 2019 through March of 20 --
20  December of 2018 to March of 2019 -- March of
21  2019.  I believe that's right.  So July and October
22  in 2018 and then from the end of 2018 December to
23  March when we got approval by the CFTC -- or the
24  NFA of our solicitation materials.

Page 102

1      Q   All right.  I want to drill down
2  on that July 2018 revision.  What prompted this
3  revision of solicitation materials?
4      A   We had been looking at the demo
5  and the custom as being not separate but one
6  thing, and that's what we had been looking at
7  for a while.  Also, the demo had a lot of very
8  long-winded, not pertinent things about books and
9  training and things like that that we crunched down
10  to one thing.
11      Q   All right.  So it sounds like what you
12  guys were -- so what you were doing in July of 2018
13  was sort of collapsing these two presentations into
14  just one presentation and removing some of the fat,
15  is that fair to say?
16      A   Correct.
17      Q   All right.  So I'll tell you what.
18  You know, what I want to try to get to here are the
19  solicitation materials that were, you know, drafted
20  and/or revised and/or approved by you starting in
21  July, you know, of 2018.  So I'm going to show you
22  some docs and we'll see if we can get to the bottom
23  of this.  Would you turn to CFTC Exhibit 397,
24  please.

Page 103

1      A   Okay.  I'm here.
2      Q   All right.  Thanks.  So do you recognize
3  this document?
4      A   Yes, it's the custom.
5      Q   Wow.  So what is this?  It says New
6  Custom, Revised Custom.  It's from Andrew Nelson.
7  You're copied on it.  It's dated August 16th.  What
8  is this, please.
9      A   This would be a second presentation that
10  the AP might provide to the prospective customer,
11  but not necessarily.
12      Q   Got it.  So this is something that --
13  like who came up with this presentation?
14      A   It was a presentation that I had
15  from Tim Evans.  I don't know who under Tim Evans
16  created it, whether it was Tim or somebody else.
17      Q   Well, is this the one -- I mean,
18  is this the new one?  Is this the one that APs
19  are supposed to use from this point forward?  It
20  says, "Use this Power Point from now on."
21      A   Yes, it would be the revised version,
22  but most did not use this at all.  We were getting
23  away from using the custom altogether.
24      Q   All right.  So was this a presentation

Page 104

1  that was distributed to APs with your approval?
2      A   Yes.
3      Q   All right.  And how long was it used for,
4  if you know?
5      A   A month.
6      Q   What happened after that -- sorry?
7          MR. FALVEY:  That wasn't us.
8      A   It wasn't us.
9  BY MR. BURDEN:
10      Q   All right.  So what happened after that
11  month?
12      A   We stopped using the custom.  Only in rare
13  cases would we use it.
14      Q   And that's because the custom,
15  you know, that was like the second presentation,
16  right?
17      A   Right.
18      Q   And you wanted it to sort of just be one
19  presentation, right?
20      A   One presentation, yeah.
21      Q   All right.  Was this replaced by
22  a different Power Point presentation in September
23  of 2018?
24      A   No.

Page 105

1    Q    Sorry.  What was that again, please.
2    A    No.
3    Q    Did you instruct the APs to stop showing
4    this presentation to customers in September of '18?
5    A    Yes, I did.
6    Q    And -- you did?  You said yes?
7    A    Yeah.
8    Q    All right.  And how did you relate that
9    to the APs?  Did you write?  Was it in a meeting?
10   A    It was a meeting, you know, on the floor.
11   Not a formal one.
12   Q    And in that meeting you told the APs
13   not to use this presentation anymore, correct?
14   A    Correct.
15   Q    All right.  So let's stay on 397,
16   and I want you to go down to page 11 where it
17   says Portfolio Management.
18   A    Um-hmm.
19   Q    All right.  So were there any customers
20   at Long Leaf Trading who enjoyed an annual return
21   of 12 percent?
22   A    No.
23   Q    Were there any customers at Long Leaf
24   that enjoyed a positive annual return during your

Page 106

1    tenure?
2    A    Yes.
3    Q    Who was that?
4    A    Michael Hervey and --
5    Q    How do you spell that, please.
6    A    H-e-r-v-e-y.
7    Q    Any other customers?
8    A    There -- I may be confusing first
9    name and last name, but I think Gaylord Hughes.
10   Q    All right.  And were those customers
11   trading pursuant to Long Leaf's recommendations?
12   A    Yes.
13   Q    How long did Mr. Hervey trade for?
14   A    Mr. Who?  I'm sorry.
15   Q    Who was the first guy?
16   A    Hervey.
17        MR. FALVEY:  Hervey.
18   A    About three months.
19   BY MR. BURDEN:
20   Q    Okay.  So he traded for three months and
21   he got in and he got out?
22   A    He lost his job and had to pull the money
23   out.
24   Q    All right.  And he achieved a positive

Page 107

1    return on three months, huh?
2    A    Correct.
3    Q    What about Gaylord, how long did he take
4    Long Leaf's recommendations for?
5    A    I don't know the exact length of time.
6    It was a half a year I think.
7    Q    Okay.  Any other customers during
8    your tenure at Long Leaf that enjoyed a positive
9    annual return?
10   A    I don't remember any other names, no.
11   Q    In fact, all of your other customers
12   during your time at Long Leaf had negative annual
13   returns, isn't that true?
14   A    True.
15   Q    All right.  Let's take a look here,
16   if we could, please, at CFTC Exhibit 4.  What is
17   this document, please.
18   A    It's a demo training script.
19   Q    All right.  So this looks new to me.
20   This has got new colors.  What's it say?  It says
21   revised July 17, 2018.  So this is a script that you
22   revised, correct?
23   A    That Andrew and I were sending back and
24   forth with revisions, yes.

Page 108

1    Q    All right.  So was this a script that was
2    provided to the APs to use?
3    A    It was a training script.
4    Q    Was this a script that was provided to
5    the APs?
6    A    No.  It's a work product --
7    Q    So what happens -- sorry?
8    A    It's a work product between Andrew and
9    myself.
10   Q    All right.  Was some version of this
11   script provided to the APs?
12   A    No, because that presentation was never
13   sent to get no comment from the NFA --
14   Q    Okay.  I don't care why.  I don't
15   want to hear that.  What I'm trying to figure out
16   is if you're passing this back and forth with Andrew
17   Nelson, is there a version of this that was sent to
18   the APs?
19   A    No.
20   Q    All right.  So this demo script
21   was exchanged between you and Mr. Nelson and no
22   version of it was ever provided to the APs during
23   your tenure?
24   A    Correct.

Page 109

1  Q  All right. I want to show you what
2  I have marked as CFTC Exhibit 396. So take a look
3  at this one and tell me what it is, please.
4  A  These are the talking points to the
5  presentation we are altering.
6  Q  Okay. So the Power Point presentation
7  that we saw in CFTC Exhibit 397, you're saying that
8  Exhibit 396 is like the talking points that go along
9  with that presentation?
10  A  No. This is for the demo outline, not
11  for the custom outline.
12  Q  All right. Was this document we're
13  looking at, Exhibit 396, was this provided to Long
14  Leaf Trading APs?
15  A  No, because the presentation was never
16  approved or went to the NFA.
17  Q  All right. And you keep talking
18  about this presentation that was approved by the
19  NFA. When did you have a presentation approved
20  by the NFA? Like when did this happen?
21  A  I misspeak. It's not approved. There's
22  a no comments letter on it.
23  Q  Okay. All right.
24  A  There was one in --

Page 110

1  Q  So when did you get the no comment
2  letter on the presentation that you, you know,
3  wanted the APs to do?
4  A  That was in March of 2019 and it's
5  a completely different one than this. We were
6  trying to get that approved.
7  Q  Yeah. So --
8  A  The one that had already been approved,
9  the new one.
10  Q  All right. So I just want to make
11  sure I've got your story straight here. So your
12  testimony is that you, you know, you believe that
13  between December of 2017 through March of 2019 the
14  Long Leaf Trading APs were presenting to customers
15  according to the talking points that we saw in
16  Exhibit 485, which is -- well, I can let you look
17  at it. So that's your story?
18  A  485.
19  Q  It's the one I emailed you guys.
20  MR. FALVEY: Oh, right.
21  A  Yes.
22  BY MR. BURDEN:
23  Q  Okay, good. So we're getting somewhere,
24  not somewhere that's good for you, but somewhere.

Page 111

1  So let me do this again cleanly now that we're
2  on the same page and you've got 485 in front of
3  you. So your version of things, your story is that
4  between December of 2017 and March of 2019, you
5  know, your understanding is that Long Leaf Trading
6  APs were presenting to customers and prospective
7  customers and what they were presenting were just
8  the talking points in Exhibit 485, is that correct?
9  A  One thing that I think there was
10  another presentation between December and -- I'd
11  have to check, but another one was sent to the NFA
12  and there was a no comment letter on it. I think
13  I remember that. I'm not sure on that.
14  Q  What was the date of that no comment
15  letter?
16  A  The last one I have is 2017, 12 --
17  December 6. That's the last no comment letter I
18  have on the registration -- or on the solicitation.
19  Q  All right. I'm going to do all
20  of this again. And, incidentally, I've noticed
21  how long you're taking to answer questions. That
22  is your prerogative. You should take the time you
23  feel that you need. But you should know that if
24  you think you're going to run down the clock,

Page 112

1  we're going to demand more time and if we don't
2  get it, we're going to move for more time and we're
3  going to play this video for the judge with you
4  staring into space and going back and forth. So
5  you can confer with your counsel about that in a
6  break, should you need to, because we are not where
7  we should be with this.
8  All right. This December 6, 2017
9  no comment letter from the NFA, the presentation
10  that was submitted that they are not commenting on,
11  that is the presentation in Exhibit 485, is that
12  correct?
13  A  Yeah.
14  Q  All right. So as far as you know,
15  between December of 2017 when you start and March
16  of 2019 when you get a new no comment letter, this
17  Exhibit 485 is the only -- the only sort of script
18  or set of talking points that APs are using?
19  A  Correct.
20  Q  So there's no other presentations
21  or talking points that you --
22  A  The custom --
23  Q  -- that you --
24  A  The custom was not submitted to the NFA.

Page 113

1    Q    Got it, okay.  We're getting
2  somewhere.  So Exhibit 397, the revised custom
3  Power Point, that's something that you distributed
4  or had distributed to the APs, correct?
5    A    Yes.
6    Q    All right.  During the period
7  December 2017 through March of 2019, any other
8  Power Point presentations that were distributed
9  to the APs either by you or by somebody else that
10 you were aware of?
11   A    The only one I know of is the one
12 that was approved in December of 2017 removing Tim
13 Evans from the presentation, and we did not resubmit
14 that for no comment letter or review.
15   Q    Okay.  Other than that, any other
16 Power Point presentations that were distributed
17 to Long Leaf Trading APs between December of 2017
18 and March of 2019?
19   A    There were presentations in early
20 2019 as we were all working on, that they were
21 work product.  They weren't solicitation products.
22   Q    Were they given to the APs?
23   A    We were all working on the presentation
24 at the same time, so they were all being --

Page 114

1    Q    Once again --
2    A    They were given to the APs but they were
3  not used.
4    Q    Got it, okay.  So we'll get to
5  those in a minute.  So between December of 2017
6  and March of 2019 were there any scripts or talking
7  points that were distributed to the APs, to your
8  knowledge, other than Exhibit 485?
9    A    I found out about the script, and I don't
10 know the one that you pointed to, in April of 2018
11 that there was this script.  It was not provided to
12 me at the time of acquisition.
13   Q    Yeah, got it.  So we talked about
14 this.  What I'm trying to get at, Mr. Donelson,
15 is were there any other scripts or talking points or
16 outlines that were sort of new during your tenure?
17 I want to make sure I get everything, and I usually
18 do, but I'm going to check with you.
19   A    I don't know of any other one.
20   Q    Got it.
21   A    I don't remember any others.
22 I think that would be safe to say.  Mr. Burden,
23 the email that you sent us is exhibit what number,
24 to be confirmed?  I want to confirm the number.

Page 115

1    Q    Yeah, so it's 485 and I included
2  it in the subject line.  All right.  Would you
3  turn for me, please, to CFTC Exhibit 395.
4    A    Okay.
5    Q    All right.  So this is an email from
6  you to Andrew Nelson on July 25, 2018.  So, you
7  know, what's going on here?
8    A    This was a hardcopy that he gave me
9  that I scanned and sent back to him as a document.
10   Q    All right.  So why were you guys sending
11 this back and forth?
12   A    We didn't have this in any document format,
13 only hardcopy.
14   Q    Well, why did you want it in a document
15 format?
16   A    With the possibility of editing it,
17 changing it, making it more standard.
18   Q    Did you ever edit it or change it or make
19 it more standard?
20   A    We started on that path.  However, I don't
21 think we finished.
22   Q    Was a version of these rebuttals
23 ever distributed during your tenure to APs at
24 Long Leaf?

Page 116

1    A    I don't remember.  This document
2  wasn't provided at acquisition, but it seemed like
3  it had been there a long time.
4    Q    All right.  So did you make any changes
5  to it and then, you know, have it distributed to the
6  APs again?
7    A    We made some changes, but I don't know
8  if we ever -- I don't remember if we ever sent it
9  out again.
10   Q    All right.  Did you ever tell the
11 APs, hey, don't use these rebuttals?  Let me
12 rephrase that.  Did you ever tell the APs not to
13 use the rebuttals in Exhibit 395?
14   A    I don't remember.
15   Q    Did you ever encourage the APs to continue
16 to use the rebuttals that we see memorialized in
17 Exhibit 395?
18   A    No.
19   Q    Did you ever discourage the APs from using
20 the rebuttals in Exhibit 395?
21   A    Specific ones, yes, but not as a global
22 statement.
23   Q    Which ones?
24   A    As I answered before, one related

Page 117

1    to a month.  Any ones that talk about Tim Evans
2    obviously we took out, we told them not to use.
3        Q    What do you mean the one related to
4    a month?
5        A    It was the one, two, three, fourth,
6    fifth on page -- I have to count the page.  It's
7    under the header Closing Off the Accountability/
8    Trustworthiness/Ideas.  It's the fifth one down.
9        Q    Oh, so the one with the misrepresentations.
10   So you told the APs not to say this.  You told them
11   not to say we are very confident because we are good
12   at what we do.  We are so confident in what we do we
13   can make those your results.  That's the part you
14   told APs not to say?
15       A    I told them not to use that rebuttal.
16       Q    Okay.  When did you tell them this?
17       A    July 2018.
18       Q    All right.  And who was there for that?
19       A    The staff at that time.  That would
20   have been -- I'm trying to remember who was there --
21   Scott, Brian, James, Alex.  I think those are the
22   only four APs that we had at the time.  There was
23   also one rebuttal talking about -- and I don't see
24   it -- about the CME study and the 76-1/2 percent

Page 118

1    that just wasn't pertinent anymore.
2        Q    And you told them at this July 2018
3    meeting not to use that one?
4        A    Yeah.
5        Q    All right.  Is there any written evidence
6    of that?  Did you send out any instructions?
7        A    No.
8        Q    What did you do to make sure that they
9    didn't just continue to say this?
10       A    I had Scott reviewing the presentation.
11       Q    What else did you do?
12       A    Nothing more on my part.
13       Q    All right.  So what was -- I see
14   with the last few exhibits we've looked at here,
15   you know, Andrew Nelson is sort of going back and
16   forth on you with drafts.  What was Mr. Nelson's
17   role in this exchange of drafts?
18       A    He was updating some of our marketing
19   materials.  He was also learning the trade desk.
20   He was doing non-AP activity.  He was not contacting
21   customers.
22       Q    Got it.  Now, you had him doing this, but
23   you knew that he had been charged with two separate
24   incidents of theft and pled guilty to one of them.

Page 119

1    You knew that, right?
2        A    Correct.
3        Q    And you knew that before you tasked him
4    with working on those solicitations and learning the
5    trade desk, right?
6        A    Correct.
7        Q    And you knew also that he had no fewer
8    than two DUIs to his name, right?
9        A    Correct.
10       Q    So why did you have this guy doing this
11   stuff?
12       A    He was under my supervision.
13       Q    Well, we've covered your supervision.
14   We won't do it again.
15           MR. BURDEN:  All right.  Sorry, could
16       we take a five-minute break?  Off the record,
17       please.
18           (Whereupon a recess was taken from
19           2:10 p.m., to 2:20 p.m., after which
20           the following proceedings were had:)
21       Q    All right.  Mr. Donelson, I want
22   you to take a look at the exhibit that I have
23   marked as CFTC Exhibit 487, and it's a Power Point
24   presentation.  So could you take a moment and look

Page 120

1    at it for me, please.
2        A    Um-hmm, yes.  I'm sorry.
3        Q    All right.  So do you understand this
4    Power Point presentation to be the presentation
5    that the NFA issued a no comment letter with respect
6    to?
7        A    Yes.
8        Q    All right.  Now, Exhibit 485,
9    do you understand that to be the talking points
10   or presentation that the NFA issued a no comment
11   letter on?
12       A    485?
13       Q    Yep.  It's the first one I emailed you.
14       A    Oh, it's the first one.  Yes.
15       Q    All right.  I want you to open up
16   Exhibit 486, which I emailed you.  Can you take
17   a look at that one, please.
18       A    Yes, I've got it.
19       Q    All right.  And this document is a letter
20   from NFA to Mr. Evans dated December 12, 2017.  Is
21   this the no comment letter that you believe provides
22   no comment on Exhibits 485 and 487?
23       A    Yes.
24       Q    All right.  So if you look at the

Page 121

1  bottom, it says here NFA has no comments.  It
2  may be used to solicit clients.  However, NFA did
3  not verify any of the statements contained within
4  the material.  This notice does not preclude NFA
5  or the CFTC from raising compliance issues with
6  the content of this material at some future time.
7  Do you see that statement?
8     A   Yes.
9     Q   All right.  Do you know if Mr. Evans had
10  advised the NFA that substantially all customers
11  lost money participating in the Time Means Money
12  program?
13    A   No.  They --
14    Q   Go ahead.
15    A   Can you read back the question?
16    Q   Yeah.  So what I want to get at here
17  is did the NFA know --
18    A   I don't believe he told the NFA, no.
19    Q   What didn't he tell the NFA?
20    A   That the customers had lost money.
21    Q   All right.  Did you tell the NFA
22  that substantially all customers participating
23  in the Time Means Money program had lost money?
24    A   No.

Page 122

1     Q   All right.  And so after you got to
2  Long Leaf Trading you learned of a script, and
3  that's Exhibit 380, that had been used or was being
4  used to train APs, right?
5     A   Correct.
6     Q   Had that script been approved by the
7  NFA?
8     A   No.
9     Q   And you learned as well of this
10  like rebuttal document we see in Exhibit 381 at
11  some point after you started at Long Leaf, correct?
12    A   Correct.
13    Q   Had that document been approved by the
14  NFA?
15    A   No.
16    Q   All right.  So you didn't go back
17  to the NFA at any point and say, hey, listen,
18  it turns out that all of these customers have
19  lost money.  Are these solicitation materials in
20  Exhibits 487 and 485, are they still okay to use?
21  Did you ever do that?
22    A   No.
23    Q   All right.  I want to switch gears
24  a little bit, if I could, and let's go to CFTC

Page 123

1  Exhibit 48, and this is just in the portfolio.
2  There's no email for this.  Do you recognize --
3     A   I'm there.
4     Q   Do you recognize this document?
5     A   Yes.
6     Q   All right.  What is it, please.
7     A   It is a letter from the NFA to
8  Long Leaf Trading ticking off a review I guess
9  for what -- there's a technical term for it but --
10    Q   Yeah, I didn't get any of that.
11        MR. BURDEN:  Mary, did you get that?
12        THE REPORTER:  Half of it.
13  BY MR. BURDEN:
14    Q   All right.  You've got to --
15    A   It is a document -- it is a document
16  from the NFA starting a review based on findings.
17    Q   Yeah, you could say that.  So
18  Exhibit 48 is a letter from NFA to you dated
19  May 17, 2018.  And without reading the whole
20  thing aloud, it accuses Nick Gunther and Scott
21  Gecas of making misrepresentations to undercover
22  NFA investigators.  Is that a fair summary of what
23  this letter is saying?
24    A   Yes.

Page 124

1     Q   All right.  And what the letter says
2  is that, you know, these two APs told customers --
3  or, well, they told the undercover NFA guys that
4  customers get 7 to 10 percent returns a year and
5  some get more than 20 percent.  The letter says
6  that, right?
7     A   Yes, it does.
8     Q   And the letter also accuses Mr. Gecas and
9  Mr. Gunther of telling customers that 25 percent is
10  a realistic return for the recommendations that Long
11  Leaf provides, is that right?
12    A   The letter says that.
13    Q   All right.  And the letter also says
14  that they told customers that in March of 2018
15  some customer made between 25 and 50 percent profit.
16  The letter says that too, right?
17    A   The letter says that.
18    Q   All right.  So did you go back
19  and listen to these calls that are cited by this
20  letter?  They give you the dates.
21    A   I did.
22    Q   All right.  And, in fact, did Mr. Gunther
23  and Mr. Gecas say the things in this letter?
24    A   Some of them, yes.  Some of them, no.

Page 125

1    Q    Which ones did he say?  Which ones did
2  Mr. Gecas say?
3    A    Let me correct that.  There was one
4  that he did not say related to monthly target
5  return.
6    Q    Let's break this down.  Let's break
7  this down.  I've made this harder than it has
8  to be.  So the letter in CFTC Exhibit 48 has a bunch
9  of misrepresentations that, you know, the NFA say
10  Gunther made to their investigators.  Your testimony
11  is you went back and listened to these calls, right?
12    A    Correct.
13    Q    All right.  Did Mr. Gunther say these
14  things?
15    A    Yes.
16    Q    All right.  Did you fire Mr. Gunther?
17    A    We kept him on to help with trading --
18  with helping Mr. Gecas prepare for his radio spot
19  doing trading and market analysis.
20    Q    So it's your testimony that Mr. Gunther
21  stopped soliciting clients after this letter?
22    A    He did not stop soliciting clients, but
23  Mr. Gecas managed him closer.
24    Q    Yeah, that sounds great, except Mr. Gecas

Page 126

1  is also accused of making misrepresentations here.
2  So I'm just going to ask my question again in a
3  different way.  How long did Mr. Gunther continue
4  to solicit clients after you received this letter?
5    A    June 2018.
6    Q    Early June, mid June, late June?
7    A    I think late June.
8    Q    All right.  Did you fire Mr. Gunther?
9  Did he quit?
10    A    I fired him.
11    Q    And when did you fire him?
12    A    August 2018.
13    Q    Are you sure?  Are you sure it wasn't
14  October?
15    A    I honestly don't remember the exact date.
16    Q    All right.  I'm pretty sure it was
17  October.  NFA records indicate that he was an
18  AP of Long Leaf's until October 16th of 2018.  Do
19  you have any reason to believe that that's wrong?
20    A    No.
21    Q    All right.  So let's stay on Exhibit 48.
22  I should ask.  So why did you fire Mr. Gunther?
23    A    This was not the job for him.
24    Q    Why do you say that?

Page 127

1    A    He would get nervous, embellish, and
2  we tried to work on that but it did not work.  He
3  just could not kind of stay within what he needed
4  to say.  He was a good kid.  Just not the right job
5  for him.
6    Q    All right.  I would follow up on that,
7  but there's more stuff to do here.  So I want to
8  stay on Exhibit 48.  "Scott Gecas represented the
9  following," and it lists a bunch of false claims
10  that NFA says Gecas made to their investigator.
11  You listened to the calls, right?
12    A    Yeah.
13    Q    Did Mr. Gecas say this stuff?
14    A    Not the point on 8 to 12 monthly
15  target return, nor did he say the doubt about 8 to
16  10 percent, if not monthly, then annually.
17    Q    All right.  So you didn't hear him say
18  those two points?
19    A    Correct.
20    Q    Did you hear Mr. Gecas say the rest
21  of these points?
22    A    Yes.
23    Q    All right.  So did you fire Mr. Gecas
24  for this?

Page 128

1    A    Those statements are true.  He did
2  trade a volatility swap in bonds.  He did -- we do
3  trade short options with defined risk.
4    Q    Well, this last point -- sorry, I may
5  have missed it.  Did he -- did you hear Mr. Gecas
6  say he had no doubt he could hit 8 to 10 percent
7  returns, if not monthly, then annually?
8    A    No, I did not hear him say that.
9    Q    Okay.  That's the one you didn't hear.
10  And did you -- and you didn't hear him say the 8
11  to 12 percent monthly target return is obtainable?
12    A    I did not hear him say that.
13    Q    And did you listen to all of the calls
14  cited by the NFA?  Were you able to find them in
15  the system?
16    A    Yes.
17    Q    All right.  And Mr. Gecas stayed at Long
18  Leaf until December, correct?
19    A    Correct.
20    Q    Yeah.  So when Mr. Gecas said in
21  those calls that in March of 2018 most Long Leaf
22  customers made about 25 percent profit and the top
23  end made 50 percent, you heard him say that?
24    A    Yes.

Page 129

1    Q    Did Mr. Gecas in your listen to
2  his calls explain that March was one of the only
3  profitable months that year and, in fact, that any
4  gains made in March were almost immediately wiped
5  out?  Did you hear him say that to customers?
6    A    No.
7    Q    So Mr. Gecas just left this 25 to
8  50 percent stats and didn't provide any context
9  for it, is that correct?
10   A    Correct.
11   Q    All right.  And Mr. Gecas stayed at
12 Long Leaf until December of 2018, is that correct?
13   A    Correct.
14   Q    Was he fired or did he quit?
15   A    He was fired.
16   Q    For what?
17   A    Performance.
18   Q    Well, when you say performance, what
19 are you referring to?
20   A    His trading performance, his training
21 of the sales force.
22   Q    What about his training of the sales
23 force was unsatisfactory?
24   A    They were not getting up to speed as

Page 130

1  fast as I wanted them to be.
2    Q    Was it because they were consistently
3  making misrepresentations or misleading statements
4  to customers?
5    A    No.
6    Q    All right.  So I -- all right.  We're
7  going to switch gears a little.  I want you to go
8  to CFTC Exhibit 451 in the portfolio, please.
9    A    Okay, I'm there.
10   Q    All right.  Do you recognize this document?
11   A    This is the list of self-traders.
12   Q    All right.  And this is a document
13 that you provided to the NFA, is that correct?
14   A    Correct.
15   Q    In connection with their audit of you
16 or of Long Leaf in 2018, correct?
17   A    Correct.
18   Q    And is this a true, accurate and
19 complete list of the self-traders as of 7/26/2018?
20   A    Yes.
21   Q    Were there any self-traders as of that
22 date who were not on this list?
23   A    It is possible that some of the
24 customers had been there for years and never

Page 131

1  traded or anything, so I really didn't know what
2  they were.  But these are the ones that had actively
3  traded on their own.
4    Q    Okay.  So when you say had actively
5  traded on their own, during what period of time,
6  please.
7    A    Back to 2015 where I could determine from
8  the trade records that they were trading something
9  different than what was in the TMM program.
10   Q    Got it, okay.  So in order to come
11 up with this list of self-traders, you went back
12 to Long Leaf's trading records and looked to see who
13 was, you know, had their accounts traded according
14 to the recommendations, is that correct?
15   A    Correct.
16   Q    And these are the customers who didn't
17 during that 2015 through July 2018 time period?
18   A    Correct.
19   Q    So after July 26, 2018 is it fair
20 to say that all new customers were participants
21 in the Time Means Money program or, you know, the
22 recommendations that Long Leaf Trading was
23 provided -- providing after that?
24   A    Correct.

Page 132

1    Q    All right.  So I sent you guys
2  a couple of spreadsheets, and I was -- and one's
3  marked 450, one's marked 452.
4    A    Yes.
5    Q    Could we take a look at those now,
6  please.  Can we start with --
7    A    I have 4 (inaudible).  Which one do you
8  want to --
9    Q    You know what, give me one second.
10 Sorry.  All right.  Could we start with 52, please,
11 with 452.
12   A    Let me get it first.
13   Q    All right.  Thanks.
14   A    I've got it open.
15   Q    All right.  Do you recognize this document?
16   A    It's a list of all Long Leaf Trading's
17 customers back to the start of when they cleared
18 with Gain.
19   Q    Oh, okay.  So that's -- like what's the
20 start date here, like 2012?
21   A    That's when the funding took place,
22 yes.  So it would have been any account open as
23 of 11/2012, not even that.  It's pretty much a
24 complete list of every customer that Long Leaf had.

Page 133

1    Q   Got it, got it, got it.
2    A   And you'll see places where there is no
3 account type because I couldn't really determine
4 what they were doing.
5    Q   Got it.  All right.  Let's turn next,
6 if we could, please, to CFTC Exhibit 450.
7    A   Okay.
8    Q   Hey, sorry, so one more about 452.  So
9 Exhibit 452, on top of going back all the way to
10 like 2012, it's also just Gain customers, right?
11   A   No, it has Gain customers and Cunningham
12 customers.
13   Q   Got it.  Okay, thanks.  All right.
14 So CFTC Exhibit 450, what is this document, please.
15   A   It's a list of all the Long Leaf Trading
16 customers.
17   Q   Yeah.  So how did you -- this 450, how
18 did you put this one together, please.
19   A   In -- by pulling down all the trade
20 data, I could put this together and then -- and
21 Gain provided me a file with emails and all those
22 type of things.
23   Q   So is 450 -- sorry, go ahead.
24   A   And who the opening broker was.

Page 134

1    Q   Got it.  So is 450 just Gain?
2    A   No, 450 is all the customers -- 452
3 was the response to the 4g request back in June.
4 This is the additional to bring it up to date with
5 the request for production on the one, and it brings
6 it only to the time period where these people were
7 customers given the time period of the complaint.
8    Q   Okay.  So this tab -- we've got three
9 tabs.  Well, there's four tabs.  There's Full List,
10 Sheet 1, TMM Customers and Opened After Ownership.
11 So the TMM customers, how did you -- what does this
12 represent?
13   A   These were all the customers that
14 traded within the broker-assisted program based
15 on the trade data that I could ascertain for people
16 I didn't know.  Customers before I got there, I used
17 the actual trade data from their accounts.
18   Q   Got it.  So one of the things that
19 we talked about in, you know, in your investigative
20 testimony is, you know, I was referring generally to
21 Long Leaf Trading's trading program as being Time
22 Means Money and, you know, you had sort of testified
23 that you stopped using that name at some point or
24 you were calling it something else or you weren't

Page 135

1 calling it anything.  You know, what I'm trying
2 to get at with Exhibit 450 is, you know, does this,
3 these TMM customers, does this mean all of the
4 broker-assisted customers or just the ones that
5 participated in the Time Means Money program,
6 as you understood it, which I think is -- and these
7 are horrible questions, but I'm hoping it will open
8 a dialogue so you can see where I'm going with it
9 and be helpful.
10   A   Yeah, it's the tab --
11   Q   Is this supposed to be just the
12 guys that participated in like, you know, what
13 you thought TMM was, like just the credit spreads,
14 or is this like everybody who did broker-assisted
15 stuff?
16   A   This is everybody that did broker-assisted
17 brokerage.
18   Q   All right, yeah.  So, you know,
19 one of the things that -- well, okay.  So let
20 me ask you this.  With respect to Gain, the Gain
21 commissions were paid monthly to Long Leaf Trading,
22 is that correct?
23   A   Correct.
24   Q   And they kind of come in like a lump

Page 136

1 at the end of the month, right?
2    A   Correct.
3    Q   So, you know, when you started, you
4 know, what percentage of those monthly commissions
5 are attributable to broker-assisted trades to the
6 recommendations?
7    A   From the Gain commissions or the total
8 on the income statement?
9    Q   Just the Gain commissions.  I'm just asking
10 about the commissions.
11   A   90 percent.
12   Q   And how can you tell that?  Like how do
13 you know that that's the breakdown?
14   A   The -- you have commission by account
15 and the account has a broker code, and Tim Evans was
16 the one who was in charge of all the non-broker --
17 or the non broker-assisted programs.  And it would
18 vary depending on what those people decided to do
19 on a daily basis.
20   Q   Got it.  So that's helpful.  I want to
21 sort of keep going with this, but I want to talk
22 about the Gain commissions from when you started
23 in December of 2017 through the time that you
24 transitioned to Cunningham.  Remind me when that

Page 137

1  was, please.
2     A   August, the exact date I think is
3  the 24th, around that period of time, in 2018.
4     Q   All right.  Thanks, yeah.  So this
5  period, you know, December '17 through August
6  of '18, what percentage of the commissions from
7  Gain were attributable to this Time Means Money
8  program?
9     A   I think it was fairly consistent with
10 what happened in the past.
11    Q   So that's 90 percent is attributable
12 to the Time Means Money program --
13    A   I would have to access --
14    Q   -- correct?
15    A   Yeah.  I would actually have to look
16 to verify, but that's my recollection.
17    Q   All right.  So then in the period
18 December '17 through August of 2018, like maybe
19 10 percent of the commissions from Cunningham were
20 from like self-traded accounts.  Is that fair to
21 say?
22    A   Yeah, that's fair to say.
23    Q   And 90 percent are from the broker-assisted
24 accounts?

Page 138

1     A   Correct.
2        MR. BURDEN:  All right.  Could we
3  go off the record, please, for maybe ten
4  minutes.
5        MR. FALVEY:  Sure.
6        MR. BURDEN:  Thank you.
7          (Whereupon a recess was taken from
8            3 p.m., to 3:15 p.m., after which
9            the following proceedings were had:)
10    Q   All right.  We were talking about CFTC
11 Exhibit 450, which is a spreadsheet.  So -- sorry.
12 So is 450 sort of a lesser included subset of
13 what's on 452 or is it something different?
14    A   It is a subset based on whose accounts
15 were actually open during the time frame of the
16 complaint.
17    Q   Sorry.  So is that -- so is 450 based
18 on accounts that were open during the time frame
19 of the complaint or accounts that were opened during
20 the time frame of the complaint?
21    A   That were open, no e-d.
22    Q   Got it, thanks.  All right.  So
23 if we wanted to figure out, you know, what the
24 trading results, you know, were for Long Leaf

Page 139

1  Trading customers that participated in the trading
2  program, you know, between June of 2015 and the
3  present, we would just take all of the customers
4  that had open accounts and we would subtract those
5  self-traders that were listed on Exhibit 451,
6  is that correct?
7     A   Correct.
8     Q   All right.  So let's go back to the
9  PDF portfolio, if we could, please.  And I want
10 to try to -- I want you to take a look at CFTC
11 Exhibit 428.
12    A   Okay.
13    Q   All right.  So this is an exhibit
14 we put together.  We didn't get this from you or
15 anybody else.  So you'll see it's like five pages --
16 no, it's four pages.  Yeah, it's four pages.  All
17 right.  So let's look at the second page where it
18 says Month End, Customer PNL, Cumulative Monthly
19 Customer PNL.  This is just for your time at Long
20 Leaf.  Take a moment to look at this.  Does this
21 look correct to you?
22    A   It looks correct.  I would have to
23 verify because I don't know what customers you
24 included.

Page 140

1     Q   Yeah.  I mean, we included all the
2  customers from June 2015 through the present that
3  had open accounts, and then we subtracted all of
4  the accounts for persons you listed in Exhibit 451.
5  You know, I just want to -- I just want to see
6  if this looks about right to you or if you're
7  looking at this and you're like, no, they -- you
8  know, they made money in June of 2019.
9     A   And you're using the end-of-month statement
10 to do the math?
11    Q   That's correct.
12    A   It looks correct.
13    Q   All right.  Can you go to CFTC Exhibit 280,
14 please.
15    A   Sorry?
16    Q   Sorry, 290.
17    A   Okay.  Yes, I'm there.
18    Q   All right.  Take a look at this
19 document, if you would, please, and then tell
20 me what it is.
21    A   It's a draft presentation for --
22    Q   All right.  Sorry, go ahead.
23    A   -- for the new program in trading.
24    Q   All right.  Was this presentation

Page 141

1    distributed to APs?
2        A    Yes.
3        Q    All right.  Is this something that APs
4    used with customers?
5        A    No.
6        Q    How do you know they didn't use it
7    with customers?
8        A    This is just a work product that
9    we hadn't approved.  We were still working on the
10   actual presentation.
11       Q    Got it.  So this new trading program you
12   described, is this your Edge strategy?
13       A    No -- yes and no.  Edge strategy
14   was more about the same trades we're doing in
15   our core strategy.  However, they were -- intraday
16   we would see an opportunity and there were very few
17   people that could respond in time.  So there were
18   only a very few people that received those trades,
19   but they were the same types of trades as the other
20   trades.
21       Q    Got it.  So what's this new strategy then?
22       A    This is using either volatility swaps
23   or a gut strangle, which is a lower risk trade.
24   But then the others, the fundamentals or

Page 142

1    opportunistic were very similar to what we talked
2    about in the prior where we would see an opportunity
3    to do a two-legged spread because the market was
4    going to move.
5        Q    All right.  Is this new trading
6    strategy something that you had like a name for?
7        A    I don't think we ever used an actual
8    name for it.
9        Q    All right.  Can we go to CFTC
10   Exhibit 409.  You know what, I'll tell you what.
11   Let's stay here for a second.  So we don't have to
12   look at pages here.  You know, one of the things
13   that CFTC Exhibit 290 says is target 12 percent
14   returns on an annual basis after commissions and
15   fees.  Is that something that the APs said to
16   customers?
17       A    It's not in the final presentation.
18   We never used this presentation.
19       Q    Yeah, but that's not what I'm asking
20   you.  Did APs tell customers that Long Leaf would
21   target 12 percent returns on an annual basis after
22   commissions and fees?
23       A    That's what our target was, yes.
24       Q    I didn't ask you about that.  I asked

Page 143

1    did APs tell customers and prospective customers
2    that Long Leaf targets 12 percent returns on an
3    annual basis after commissions and fees?
4        A    I don't know.
5        Q    All right.  Did Long Leaf APs
6    tell customers that the Edge strategy opens up
7    the possibilities for higher returns and allows
8    us to tailor risk, it takes into account technical
9    patterns and allows us to inject our expertise into
10   our core strategy?  So that's in Exhibit 290.
11   Is that something that APs said to prospective
12   customers?
13       A    No.
14       Q    How do you know?
15       A    That was not part of this -- the
16   presentation that we actually gave to customers.
17   This is a work product.  This isn't the final
18   product.
19       Q    Yeah, but what I'm asking you is
20   did you ever hear an AP say that to a customer?
21       A    No.
22       Q    All right.  Let's take a look, if we
23   could, please, at CFTC Exhibit 409.  Are you with
24   me?

Page 144

1        A    Yes.
2        Q    Who is eric232@gmail.com?
3        A    I'm not sure.
4        Q    Is it a customer?  Is it a prospective
5    customer?
6        A    Yes, it is a prospective customer.
7        Q    All right.  And you sent this bond
8    replacement strategy thing to him, didn't you?
9        A    Yes, I did.
10       Q    Did you send this to other prospective
11   customers?
12       A    No.
13       Q    Just this one guy, huh?
14       A    Yes.
15       Q    Do you remember his last name?
16       A    No, I don't.
17       Q    All right.  So I want to look down
18   at this -- at like the third page of Exhibit 409,
19   and it's got a trade history that appears to show
20   returns of 1.69 percent on a handful of trades that
21   are listed.  What is this trade history?
22       A    This is the trade history of the gut
23   strangle trades.
24       Q    All right.  And -- all right.  So is this

Page 145

1    your new trading strategy?
2      A    One of them, yes.
3      Q    All right.  And you're just showing this
4    guy, eric232, just this gut strangle strategy and
5    the results from that?
6      A    That's correct.
7      Q    So whose results are these?  Is this
8    from somebody's account?  Is this -- are these
9    hypothetical?
10     A    They're actual trades we made for
11   certain individuals, I think three for sure, and
12   they are only if you took one of each, which I think
13   in that case they all just were one trade.
14     Q    Got it.  And what were those
15   individuals that were lucky enough to get these
16   special gut strangle trades?
17     A    Martin Pegelow -- that might not be
18   right.  Mark Hartmann and I think Robert Mehr,
19   but that may not be correct.  I'd have to check
20   and see.
21     Q    All right.  Did any other Long Leaf
22   customers get those trades or just those three
23   guys?
24     A    I believe just those three.

Page 146

1      Q    Got it.
2      A    Let me correct that.  The ones in
3    January I think there were more people involved,
4    but the ones in August, October, July, September
5    were only a small handful, and I think those were
6    those three people.
7      Q    Got it.  So who were some additional
8    people that got those trades in January?
9      A    I know those three did.  I don't have
10   the exact names.  It would be in the trade records.
11     Q    But is it like most of the customers or
12   just a few, maybe the high rollers?
13     A    Just a few because of the amount of
14   the premium that has to be paid on those trades.
15     Q    Was Eric Reeves a guy that maybe got these
16   trades in January?
17     A    I don't think Eric was there in January.
18     Q    What about Campbell?
19     A    He wasn't there in January.
20     Q    And you don't remember the names
21   of any of the other people that got these gut
22   strangle trades?
23     A    I can look it up, but I don't know off
24   the top of my head.

Page 147

1      Q    Got it.  All right.  So trade
2    history, is this something that you shared with
3    other customers or that you told brokers to share
4    with other customers?  I mean, I know you said you
5    only emailed this document to this one guy, eric232.
6    But this trade history that just shows the gut
7    strangle, is this something that you otherwise
8    disseminated?
9      A    No, this is the only time we disseminated
10   that set of data.
11     Q    Do you know if this guy, eric232, opened
12   an account?
13     A    He did not.
14     Q    Yeah.  So when you sent this trade
15   history out, you know, did you explain to this guy
16   that, you know, this was not reflective of results
17   that people at Long Leaf Trading were getting?
18     A    No, we were (inaudible) by specific
19   trades.
20     Q    Got it.  And so you didn't bother
21   to mention in this email that as of February 2019
22   when you sent the email, Long Leaf customers had a
23   cumulative monthly PNL of more than $1.5 million.
24   You didn't bother to mention that, did you?

Page 148

1      A    No.
2      Q    All right.  And you didn't bother to
3    mention that in January of 2019 your customers
4    lost -- sorry, in February of 2019 your customers
5    lost more than 72 grand, did you?
6      A    No.
7      Q    You didn't bother to mention that
8    in January of 2019 your customers lost 40 grand,
9    did you?
10     A    No.
11     Q    And you didn't bother to mention in
12   December of 2018 your customers lost a whopping
13   $119,000.  That's not in the email either, is it?
14     A    No.
15     Q    But you're just showing this guy these
16   like six trades that made a return.  Have I got that
17   right?
18     A    This was all the (inaudible) trades.
19     Q    What?
20     A    These were the only types of trades we
21   were going to make.
22     Q    Yeah, that's not what I asked.
23     A    Is there a question?
24     Q    Yeah, you know, there was but I've

Page 149

1   got even better exhibits and I don't want to waste
2   more time on 409, which is only okay. Let's go to
3   CFTC Exhibit 411. Do you recognize this document?
4       A   Yes.
5       Q   What is it, please.
6       A   It is the trade history of the gut
7   strangle trades.
8       Q   Got it, okay. And it looks like you
9   are sending it to your APs, is that right, and also
10  your wife?
11      A   Correct.
12      Q   All right. And why did you send it
13  to these guys?
14      A   It was to show how the trade works,
15  if you look at the bond February component of that.
16      Q   You sent it to your APs so that they could
17  use it to solicit customers, right?
18      A   I sent it to them as a trade history
19  of what happened.
20      Q   And you expected them to share this with
21  prospective customers, isn't that right?
22      A   No, I did not expect them to share it
23  with prospective customers.
24      Q   Really. Did you tell them that they

Page 150

1   shouldn't share it with prospective customers?
2       A   I don't remember. I struggle with the
3   concept of why I sent this.
4       Q   Yeah, okay. Well, don't worry. So
5   let's look at CFTC Exhibit 479. Also, we're having
6   trouble hearing you.
7       A   Okay. I'll get closer.
8       Q   Thank you. Oh, sorry, sorry, sorry,
9   sorry, 411, 411. Oh, wait, no. Maybe it is 479.
10  All right. Give me a second here. Sorry, give me
11  just a moment. Okay, all right. Sorry, it's 480.
12      A   All right.
13      Q   So go to 480, if you would, please.
14      A   Yep.
15      Q   So this is a group exhibit. You'll see
16  it's two emails, one sent on March 7th, one sent on
17  March 15th of 2019 by Mr. Hatzigiannis. The first
18  is to jonblomgren@gmail.com. Do you know who that
19  person is?
20      A   I believe he is a customer.
21      Q   All right. So let's take a look at
22  what Mr. Hatzigiannis sent to him, and it's on the
23  next page. So what's that document?
24      A   The trade history that I sent.

Page 151

1       Q   Yeah. So he just turned around and sent
2   this out to customers, didn't he?
3       A   Yes.
4       Q   All right. So did he get in trouble for
5   that?
6       A   No.
7       Q   Did you know that he did that?
8       A   Not at the time he did it, no.
9       Q   Did you find out later?
10      A   I found out reviewing the email.
11      Q   When did you find that out?
12      A   At the end of March when I reviewed
13  the email.
14      Q   All right. So did Mr. Hatzigiannis
15  get in trouble for this?
16      A   I told him not to forward those internal
17  documents.
18      Q   All right. And when did you have this
19  conversation with Mr. Hatzigiannis?
20      A   After my review. So early April, late
21  March --
22      Q   Sorry. Did you memorialize that
23  conversation in any way?
24      A   No. I told him anytime he's going to

Page 152

1   send something to a customer, to get my approval.
2       Q   All right. Is that written down
3   anywhere? Do we have any evidence of that other
4   than your say-so?
5       A   No.
6       Q   Did you reach out to this customer,
7   Jon Blomgren and say, hey, that's not really our
8   trading record. Those aren't really our -- that's
9   not our real trade history. Did you go back and
10  tell him that?
11      A   No, because this is the trade history
12  of that trading strategy.
13      Q   Yeah. But did you go back and say,
14  hey, this is just the trading history of this
15  trading strategy? Generally speaking, our customers
16  by March of 2019 had lost --
17      A   No.
18      Q   -- $1.6 million? Did you call Jon
19  Blomgren up and set the record straight there?
20      A   No.
21      Q   All right. So what about this other
22  guy that Hatzigiannis emailed these trading results
23  to, this new trade history? Billmtg@gmail.com,
24  who's that?

Page 153

1   A   I don't recognize the email address.
2   Q   All right.  Did you reach out to
3  this guy and say, hey, you know, this is the trade
4  history for this one trade.  Our customers are down
5  $1.6 million.  Did you say that?
6   A   No, I did not.
7   Q   You just let it lie, huh?  That's a
8  question.
9   A   What was the question?
10  Q   You just let it lie?  You let it be?
11  A   Yes.
12  Q   All right.  Let's take a look, if we could,
13  please, at CFTC Exhibit 410.
14  A   Okay.
15  Q   All right.  So there's an email
16  dated February 25, 2019.  It's you sending something
17  here.  It says Redacted Statements for On-Boarding.
18  What is this, please.  What are we looking at here?
19  A   It shows what a Cunningham statement
20  would look like for somebody coming on board, and
21  there should be one that has -- points to what this
22  means, what that means and how to look at the --
23  how to read the statement.
24  Q   Got it.  So the idea is that you

Page 154

1  sent some redacted statements to your APs and you
2  instructed them to go over this with new customers
3  to show them how to read Cunningham statements?
4   A   Correct.
5   Q   Did the APs, in fact, do that?
6   A   I have found cases where they didn't
7  do it and I've found cases where they did do it.
8   Q   All right.  And whose statement is this
9  that you redacted?
10  A   I don't know.
11  Q   All right.  So let's take a look
12  at this statement.  Where on this statement do we
13  see how the account is doing?
14  A   Net liq.
15  Q   All right.  And where can I find that,
16  please.
17  A   It is after you get past cash balance,
18  long market, short market, and then you have net
19  liquidating is the word.
20  Q   So the answer is it's on page 2 and it's
21  $14,034.80, correct?
22  A   Yeah.
23  Q   All right.
24  A   Yes.

Page 155

1   Q   I've got a real question for you, and
2  that's where on this statement does it show where
3  the account started from?
4   A   It would only show if the current year
5  was (inaudible) funded, and that would be under USD
6  Cash 10001.
7   Q   Is that on this statement?
8   A   It is under Year to Date.
9   Q   Where is that?
10  A   It's the third line down.
11  Q   On what page, please.
12  A   On page 2.
13  Q   Got it.  All right.  How did I miss
14  this, year to date.  All right.  It says negative
15  $8,874 is the year-to-date balance.  What does that
16  indicate?
17  A   That's the beginning balance.
18  Q   At the beginning of the year?
19  A   Yeah.  I -- this may have been one
20  that was transferred from Gain and, therefore,
21  I'm not sure.  The idea was not to depict any one
22  specific one.  It shows you where stuff comes in
23  on the report.  We sent something similar to this
24  when we transitioned from Gain to Cunningham to

Page 156

1  show people how to read the Cunningham report.
2   Q   All right.  So Exhibit 410, these
3  redacted statements, they're actually from
4  two different dates, is that -- that's right,
5  February 1, 2019 and February 22, '19?
6   A   Correct.  February 22nd and February 1st.
7   Q   All right.
8   A   The 1st of February.
9   Q   All right.  You know what, I'm going
10  to come back to this thing because I need to confer
11  with my colleagues who understand these statements
12  better than I do.  All right.  Would you turn to
13  CFTC Exhibit 413.
14  A   I'm there.
15  Q   All right.  So there's an email from
16  you to Mr. Cybulski dated May 21, 2019.  What are
17  you sending him here?
18  A   These are the completed trade reports.
19  Q   What does that mean?
20  A   These are trades that have all of
21  the components taken off and they are complete.
22  Q   And it's just for one customer, though,
23  isn't it?
24  A   For that customer, yes.

Page 157

1    Q    Yeah.  It's for Eric Reeves, right?
2    A    Correct.
3    Q    All right.  And it looks like Mr. Reeves
4  as of May 21, 2019, his closed trades have resulted
5  in a positive PNL of about $1300, is that right?
6    A    That's correct.
7    Q    All right.  So why did you send this
8  to Mr. Cybulski?
9    A    Mr. Reeves asked for it.
10   Q    Say it again, please.
11   A    Mr. Reeves asked for it.
12   Q    Got it.  And was Mr. Reeves Cybulski's
13  customer?
14   A    Yes, he was.
15   Q    All right.  Let's look at CFTC Exhibit 414,
16  please.
17   A    Okay.
18   Q    All right.  This is an email from you
19  to your APs dated May 20, 2019.  The subject is New
20  Track Record, Track Record Core Strategy 5-20-19.
21  And, yeah, so what's this, please.
22   A    This is what we deemed to be our core
23  strategy, which is a gut strangle trade.
24   Q    All right.  So this gut strangle

Page 158

1  trade, I thought that was your new strategy,
2  is that right?
3    A    Yes.
4    Q    All right.  So the new strategy
5  is the same thing as the core strategy, is that
6  right?
7    A    Yeah.
8    Q    All right.  I just wanted to make sure
9  we're speaking the same language here.  And this
10  new track record, as you describe it, it appears
11  to show trades between July of '18 and May of '19.
12  Am I reading this right?
13   A    Correct.
14   Q    And it shows a gain for these trades
15  cumulatively of .63 percent, is that right?
16   A    Correct.
17   Q    All right.  So does this new track
18  record, does it show all of Long Leaf's trades
19  between July '18 and May '19 or just these gut
20  strangles?
21   A    It's the gut strangles, the core strategy.
22   Q    I see.  So taking into account the
23  other trades that you were making during this
24  same time period, would that gain or loss still

Page 159

1  be positive or would it be negative?
2    A    I believe it would be positive or close.
3    Q    What's your basis for saying that?
4    A    Looking at the trades for Mr. Reeves
5  that are considered other or non-core, those are
6  the trades that are closed within that period.
7    Q    Where are you looking at these trades
8  for Reeves?
9    A    On Exhibit 413 you have core closed trades
10  and you have other trades.
11   Q    Yeah, but it looks like these trades are
12  only from April and May of 2019.
13   A    We didn't do much trading in January
14  or February.
15   Q    All right.  So going back to 414, we've
16  got our core trades between July '18 and May '19.
17  You know, according to our records, by May of '19
18  Long Leaf Trading's customers were down to the tune
19  of $1.7 million.  So how can it be then that -- oh,
20  it still isn't right.  Let me check here.  Yeah,
21  no, you know, according to our records here -- all
22  right.  So 414, so CFTC Exhibit 414, this new track
23  record, did you send this to your APs so that they
24  could share this new track record with prospective

Page 160

1  customers?
2    A    Yes.
3    Q    All right.  And, in fact, they did share
4  this track record with prospective customers --
5    A    Yes.
6    Q    -- isn't that right?
7    A    Yeah.
8    Q    All right.  I want you to take a look
9  at CFTC Exhibit 470.  So this is one of many emails
10  that Mr. Hatzigiannis sent distributing this new
11  track record.  So you knew he sent this email that
12  we see in Exhibit 470.  This was okay to do by you,
13  right?
14   A    Yes.
15   Q    All right.  So this is showing profit and
16  loss between July '18 and May '19 of .63 percent.
17  Does this reflect Long Leaf Trading's customer
18  results up through that date?
19   A    For those who took that trade, yeah.
20   Q    Was there anybody that just had these
21  trades?
22   A    I don't believe any one person only
23  had these trades.
24   Q    Got it.  So were there any customers

Page 161

1  that had actually between July and May achieved
2  these -- the PNL reflected here, .68 percent
3  I think?
4      A    On these trades, I don't believe any
5  one person had every one of those trades.
6      Q    All right.  So why did you show just --
7  so these results we're seeing, this new track
8  record, does that reflect, you know, real trading
9  in any one customer's account?
10     A    No, since this is only based on one
11 trade.  So if somebody had two or somebody had
12 three, it would be a different number.
13     Q    Yeah, that's not what I'm asking
14 and you know it.  What we're looking at here is the
15 rate of return.  Is there anybody at Long Leaf who
16 made only these core trades during this period and
17 achieved a rate of return of, you know, .68 percent?
18     A    I -- I don't know.
19     Q    So this is just hypothetical, right?
20     A    No, these are actual trades.
21     Q    Yeah.  But they're not actual trades
22 that any one person had in their account, are they?
23     A    I would have to -- I would have to
24 review it, whether somebody had each one of these

Page 162

1  trades in their account.  The only three that could
2  would be the ones that got the first three accounts.
3      Q    Got it.  So the majority of your
4  customers, which is to say all of them but three,
5  definitely didn't have these trades or get that rate
6  of return, correct?
7      A    They didn't have these trades, correct.
8      Q    All right.  And they didn't get that rate
9  of return, did they?
10     A    Not if they didn't have the trades.
11     Q    All right.  And when in Exhibit 414
12 you sent this new track record to your APs to
13 distribute, you know, did you tell them, hey, make
14 sure customers know that since December of 2017
15 we've lost $1.7 million of their money?  Did you
16 tell the APs that?
17     A    No, I did not.
18     Q    All right.  And, in fact, when you
19 sent this to the APs in May, you know, that month --
20 or, sorry, I should say the month before, you guys
21 lost $45,000 of customer money, isn't that right?
22     A    Based on the way you calculated it, yes.
23     Q    Okay.  And isn't it true that in March you
24 lost $56,000 worth of customer funds?

Page 163

1      A    Based on the way you calculated it, yes.
2      Q    And isn't it true that in February you
3  lost $72,000 of customer funds?
4      A    Based on the way you calculated it, yes.
5      Q    And isn't it true that in January of 2019
6  you lost $40,000 of customer funds?
7      A    Based on the way you calculated it, yes.
8      Q    Isn't it true that in December of 2018
9  you lost $119,000 in customer funds?
10     A    Based on the way you calculated it, yes.
11     Q    Isn't it true that in November of 2018
12 you lost $305,000 in customer funds?
13     A    Based on the way you calculated it, yes.
14     Q    And isn't it true that by November --
15 by May, the end of May of 2019, since you started at
16 Long Leaf customers had lost more than $1.7 million
17 cumulatively?
18     A    Based on the way you calculated it, yes.
19     Q    Did you tell any of that to prospective
20 customers?
21     A    No.
22     Q    Don't you think it's a little bit
23 misleading to have your APs send out this new track
24 record showing positive returns of .63 percent given

Page 164

1  Long Leaf's -- given your -- epically bad trading
2  results that your customers suffered?
3      A    Could you repeat what the question was?
4      Q    Yeah.  Don't you think it's a little
5  bit misleading to have your APs send out this
6  new track record given Long Leaf Trading's amazing
7  losses they had accrued for their customers at that
8  point?
9      A    This is a new strategy.  It's completely
10 different than what we've done before with a
11 completely different person trading it.
12     Q    But it isn't a completely different person
13 trading it.  It's you, isn't it?
14     A    Mr. Gecas was in charge of trade
15 development until we let him go.
16     Q    When did you let him go?
17     A    I'm sorry?
18     Q    When did you let him go?
19     A    When?  In December of 2018.
20     Q    So how did you do by yourself in January?
21     A    We hardly traded anything.
22     Q    You lost $40,000.  How did you do in
23 February?  You lost $72,000, didn't you?
24     A    Based on the way you're calculating it,

Page 165

1    yes.
2        Q    You say that like you don't agree with
3    the way I'm calculating it.  Are you calculating
4    it a different way?  Do you have another set of
5    calculations where your customers made money and
6    don't lose all of their retirement accounts?
7        A    On a month-to-month basis there is
8    realized PNL and unrealized PNL.  These reports
9    are talking about realized PNL.  If the trade
10   is open, you don't know what the results of that
11   trade's going to be.  However, the report will show
12   gains and losses on the movement on unrealized PNL.
13       Q    Yeah, but that's not what we're talking
14   about.  Our calculations that are reflected in CFTC
15   Exhibit 428, which you agreed is the right way to
16   calculate things, reflect closed trades.  So why
17   are you talking to me about open trades?
18       A    Because there's PNL in the report on
19   open trades.
20       Q    Yeah, I've got to tell you I don't
21   know where you're going with that.  And even if
22   it is a -- even if it is a new kind of trade that
23   you're doing, don't you think it would be material
24   to customers to know how Long Leaf has performed

Page 166

1    for customers in the past?
2        A    If it is continuing the strategies that
3    produced those results, yes.
4        Q    You don't think a customer would
5    think it was important to his or her decision
6    to invest with Long Leaf knowing that Long Leaf
7    had lost millions of dollars for customers up to
8    that point?  You don't think they would have cared?
9    You think they would have been like, you know what,
10   it's a new kind of trade.  Is that what you think?
11       A    No.
12       Q    Yeah, I asked that question a terrible
13   way and so your answer didn't make a lot of sense.
14   Let me ask it in a better way.  Do you agree that
15   it would be material to a customer to know how Long
16   Leaf's other customers had fared in the past?
17       A    Yes, if we were doing the same strategies.
18       Q    So you think that if you told a customer
19   we're doing something new, it would be completely
20   immaterial to them what Long Leaf's past performance
21   had been?
22       A    I don't agree that it would be completely
23   immaterial.
24       Q    All right.  So I want you to take

Page 167

1    a look, if we could, please, at CFTC Exhibit 438.
2    And let me know when you're there, please.
3        A    Here.
4        Q    All right.  What's CFTC Exhibit 438,
5    please.
6        A    It is a closed trade report.
7        Q    All right.  And it's for a customer
8    of Long Leaf Trading named Wells, is that right?
9        A    Yes, but the account is MHoldings, LLC.
10       Q    I see.  And you're a little garbled,
11   Mr. Donelson.  Maybe you could --
12       A    The name of the client is Gary Wells.
13   However, the account is under MHoldings, LLC.
14       Q    Got it, got it, got it.  All right.
15   So let's take a look at CFTC Exhibit 438.  It looks
16   like there is an account summary of closed trades in
17   Mr. Wells' account that you generated here and you
18   sent to Mr. Hatzigiannis, is that right?
19       A    Correct.
20       Q    All right.  And what's the date of this
21   email?  It's May 14, 2019, right?
22       A    Correct.
23       Q    All right.  So Mr. Wells it looks
24   like did a whole bunch of your core closed trades.

Page 168

1    Do you see that?
2        A    Correct.
3        Q    So how did he do on your core closed
4    trades?
5        A    He lost $2,443.
6        Q    All right.  And that's as of May 2019,
7    right?
8        A    Correct.
9        Q    Did you share this with customers?
10   Did you say, hey, customers, here's our new track
11   record, except that one of these guys lost $2,400
12   doing our core trades?  Did you share this with any
13   other customers?
14       A    I -- I believe on the track records we
15   do show that.
16       Q    Yeah, you're telling -- that's not
17   what I asked you because we already looked at
18   the track record.  I'm asking you did you tell
19   customers that one of your other customers, to wit,
20   Mr. Wells, lost $2,400 doing these core trades?
21   Did you tell them that?
22       A    No.  We don't share other customers' --
23       Q    You're breaking up again.  You've got to
24   get close to the phone.

Page 169

1      A   I said we don't share other customers'
2   results with another customer.
3      Q   I can see why.  Let's look at CFTC
4   Exhibit 439 -- sorry, 440.  So this is an email
5   from you in May of 2014 -- or, sorry, May 14,
6   2019 to Ben Cybulski, and here you are sending
7   Mr. Cybulski a trading summary for another client,
8   Ben Anderson.  Have I got that right?
9      A   That is correct.
10     Q   So this guy did some core trades as
11  well, didn't he?
12     A   Correct.
13     Q   And how did he do on them?
14     A   He lost $795.
15     Q   All right.  So did you tell that to
16  any of the customers who got this new track record?
17  Were you like, hey, one of my customers lost $795
18  doing these?
19     A   No.
20     Q   All right.  So it's starting to
21  come together for me here.  So this new track
22  record you're having the APs send out, you know,
23  this is the set of core -- this is the set of these
24  gut strangle trades, and it's the results that would

Page 170

1   be in somebody's account if they had traded one
2   contract for each of these gut strangles but had
3   not done any other of your trade recommendations
4   during that same period.  Have I got that right?
5      A   Correct.
6      Q   All right.  I see now.  Was there
7   any customer at Long Leaf who in fact just did
8   those core trades between July '18 and May '19 and
9   traded one contract and did no other trades?  Was
10  there anybody like that?
11     A   I don't believe so.
12     Q   All right.  So let's, if we could,
13  please, let's go to CFTC Exhibit 300.  And let me
14  know when you're there, please.
15     A   Okay, I'm here.
16     Q   All right.  So this is an email from
17  Mr. Stemper to Jack Lattner dated August 28, 2019
18  and the subject is Performance Update.  So do you
19  know who Mr. Lattner is?
20     A   Yes, I do.
21     Q   Who's that?
22     A   I'm sorry?
23     Q   Who is Mr. Lattner, please.
24     A   He joined very late in 2019.  He's

Page 171

1   a customer.
2      Q   Oh, boy.  How did he do?
3      A   I'm not sure if he even traded or, if he
4   traded, it was very few contracts.
5      Q   All right.  So let's get back to
6   Exhibit 300 here.  So Exhibit 300 Mr. Stemper
7   writes, "Good morning, Jack.  Hope all is well.
8   If you have any questions on the application, let
9   me or Vicki know.  Since you will be trading with
10  $100,000, I attached an updated performance report
11  for one of our larger accounts.  This is the same
12  account that I should you before."  I think he meant
13  "showed" you.
14          All right.  And so if you look,
15  you'll see a $628,000 account with trades between
16  April of '19 and August of '19.
17     A   Yes.
18     Q   And it looks like there's profit there
19  of 37 grand.  Am I reading that right?
20     A   Yes.
21     Q   All right.  So this looks like
22  something that maybe you put together.  Did you
23  put this together?
24     A   Yes.

Page 172

1      Q   All right.  And did you give it
2   to Mr. Stemper so that he could distribute it
3   to prospective customers?
4      A   I gave it to him to give to this customer.
5      Q   All right.  Was this something that any
6   other customers were provided with?
7      A   No.
8      Q   All right.  So are these results
9   that Long Leaf Trading APs discussed on calls with
10  other prospective customers or existing customers?
11     A   They wouldn't discuss this specific
12  report, but they would discuss the specific trades
13  that we're making.
14     Q   When you say "specific trades" --
15  I mean, you know what I'm interested in here.
16  Did the APs on calls with prospective customers
17  ever talk about this account that generated, you
18  know, during these four months 37 grand in profits?
19  Was that something that was touted by APs, to your
20  knowledge?
21     A   No.
22     Q   Did you provide these results to any
23  of the other APs?
24     A   I would have provided it to Mr. Cybulski

Page 173

1   because it's his customer.
2       Q   Got it.  And that customer is Reeves?
3       A   Correct.
4       Q   All right.  Do you know if Mr. Cybulski
5   talked about these results with any customers or
6   prospective customers?
7       A   These specific ones?
8       Q   Yeah.
9       A   Not that I know of.
10      Q   Did Mr. Cybulski discuss the
11  profits in Mr. Reeves' account with customers
12  or prospective customers?  Without using his name,
13  of course.
14      A   Not that I know of.
15      Q   I mean, what I'm trying to get at
16  here, Mr. Donelson, is is this another one of your
17  new track records you're giving to APs to give to
18  other people?
19      A   No.
20      Q   All right.  What ultimately happened
21  to Mr. Reeves' account?  How did he do in the end?
22      A   I think he lost about a hundred thousand
23  dollars.
24      Q   Right.  And, in fact, the four

Page 174

1   months that are reflected on this performance
2   report, Exhibit 300, you know, this is the only
3   period, the only combination of months where trading
4   at Long Leaf could mathematically be profitable,
5   correct?
6       A   I don't know --
7       Q   All right.  I've got a good --
8       A   -- (inaudible) detail.
9       Q   All right.  I've got a good email
10  to demonstrate this.  Hang on.  Oh, I've got
11  it.  Oh, all right.  Okay, here we go.  So let's
12  look at CFTC Exhibit 416.  So is this you sending
13  Mr. Stemper -- it says Trading Update All Trades
14  dated September 5, 2019, and we've got an account
15  here showing trades for just two months, July and
16  August of 2019, and there's profits here of three
17  grand in this account.  So whose account is this?
18      A   I'm not sure.
19      Q   Why did you send this to Mr. Stemper?
20      A   It's showing one of his customers,
21  I'm assuming.
22      Q   Did you send this to Mr. Stemper so
23  that he could share it with prospective customers?
24      A   This was to share with a specific customer.

Page 175

1       Q   What customer was that?
2       A   I don't know.  I don't see it on the
3   report.
4       Q   All right.  So it sounds like you
5   don't remember, is that fair to say?
6       A   Correct.
7       Q   All right.  So let's look at CFTC
8   Exhibit 200.  So you'll see this is an email
9   from James Hatzigiannis to theelauto@gmail.com
10  and it says Edge Strategy Performance - 1 Contract.
11  It's dated September 10, 2019.  So who's theelauto?
12  It looks like it's addressed to Wally.  Who's that,
13  please.
14      A   I don't know who Wally is.
15      Q   All right.  Well, I just picked this
16  one as an example.  Mr. Hatzigiannis sends dozens
17  of these.  You knew that, didn't you?
18      A   Yes.
19      Q   All right.  And the subject is
20  Track Record Update See Attach - Long Leaf Edge
21  Strategy Performance.  And he says, "Greetings,
22  Wally.  How have you been?  It has been a while.
23  I hope business is well.  I wanted to provide you
24  an update of what we have been doing.  Attached is

Page 176

1   a track record of our recent performance.  And as
2   you can see, the results are there and we have had
3   a great summer."
4           And if you look at the
5   attachment, we've got a bunch of trades from
6   June through September of 2019 and it says profit
7   $5,978.  Am I reading that right?
8       A   Correct.
9       Q   And it says Core Closed Trades, is that
10  right?
11      A   Correct.
12      Q   All right.  So this looks like
13  something you put together.  Did you put this
14  together?
15      A   Yes.
16      Q   And did you have Mr. Hatzigiannis send
17  this to customers?
18      A   I allowed him to send it to customers.
19      Q   You knew he was doing it, right?
20      A   Yes.
21      Q   Did Cybulski share this with customers
22  as well?
23      A   I believe so.
24      Q   All right.  So whose account are we

Page 177

1  looking at in CFTC Exhibit 200?
2      A   I think this is only one -- basically if
3  somebody took one trade a week, one of the trades,
4  this is what the (inaudible).
5      Q   Got it.  So this is a hypothetical
6  track record if some person took all of your
7  recommendations for one contract between June and
8  September of 2019 on these gut strangles, right?
9      A   These are all gut strangles.
10     Q   Yeah, I know that.  So these are
11 hypothetical results.  There's no person whose
12 account reflects this at Long Leaf, correct?
13     A   I don't believe so.  I would have to
14 check.
15     Q   Sorry, I asked that question badly.
16 Let me do it again, please.  So we're looking
17 here at CFTC Exhibit 200.  Is there any person at
18 Long Leaf whose account reflects these results?
19     A   Possibly Eric Reeves' IRA account would
20 reflect those results.
21     Q   Yeah, but it just reflects core --
22 this just shows the core closed trades.  It doesn't
23 show any of the other trades that you guys had been
24 doing, correct?

Page 178

1      A   There aren't any other trades we were
2  doing.
3      Q   So from June 2019 to September 2019
4  you guys were just doing these gut strangles?
5      A   And volatility swaps.
6      Q   All right.  Does Exhibit 200 reflect
7  the volatility swaps as well?  Are those part of
8  your core trades?
9      A   Yeah, they are reflected in there.
10 They would be any trades related to silver, any
11 trades related to ag.
12     Q   All right.  So CFTC Exhibit 200
13 reflects hypothetical results for an account
14 if that account traded one contract for all of
15 the recommendations that Long Leaf provided between
16 June and September of 2019, is that right?
17     A   Correct.
18     Q   Is there any actual account where that
19 happened?
20     A   I would have to check, but I think Eric
21 Reeves' IRA account would reflect those trades.
22     Q   But did Mr. Reeves' IRA account begin
23 trading in June?  I can't recall.
24     A   He had two accounts, his regular

Page 179

1  account and then an IRA account, and his IRA account
2  traded one of every trade.
3      Q   So when did those -- when did that start?
4      A   I don't -- I would have to check when
5  that actually started.
6      Q   Was it before June?
7      A   No, it was around June.  I don't know
8  if all those trades were in (inaudible) trades.
9      Q   Got it.  So let's look at CFTC Exhibit 201,
10 if we could, please.  All right.  And this is an
11 email from Mr. Hatzigiannis to tkranch93@msn.com
12 from October 7th of 2019.  Who's -- it looks like
13 it's Tim is the customer, prospective customer's
14 name.  So what -- who is tkranch93?
15     A   I don't know.  I don't believe he
16 (inaudible) a customer.
17     Q   Got it.  All right.  So Mr. Hatzigiannis
18 writes, "I trust you're well.  Please see attachment
19 of an update of our trades.  We have closed 26 of
20 our past 30 trades for a profit.  This attachment
21 shows results for our most conservative client,
22 who would only take one contract per position.
23 It can be scaled up.  I have clients that take
24 as much as 15 contracts per position.  Ever since

Page 180

1  we've implemented our Edge strategy we have seen
2  amazing results."
3          Did you know that Mr. Hatzigiannis
4  sent this email?
5      A   Yes.
6      Q   All right.  And that was because you
7  told him to, didn't you?
8      A   I didn't tell him to.  I allowed him
9  to send this report.
10     Q   All right.  So this report that shows
11 profits of $6,000 and change from June through
12 September of 2019, that's something you generated?
13     A   Yes.
14     Q   All right.  So did Mr. Stemper or
15 Mr. Cybulski send these results to customers as
16 well?
17     A   I'm not sure.  I'm not sure.
18     Q   All right.  Well, let's go back, if we
19 could, please, to CFTC Exhibit 428.
20     A   Okay.
21     Q   So I want you to look at our monthly
22 customer PNL and cumulative monthly customer PNL.
23 So these new trading -- the new track records and
24 the updated trading reports that you had your APs

Page 181

1  send out, those just feature trades from June
2  through September, is that correct?
3      A   The trading report, the one I just
4  saw, was an actual account.  That is Mr. Reeves'
5  IRA account.
6      Q   Yeah, I'm trying to -- what I'm trying
7  to do, Mr. Donelson, is find a common denominator,
8  and I think we can get there because I think you
9  want to tell me your crazy story and I want to hear
10 it.  You know, it seems to me that what you're doing
11 when you're allowing -- providing APs with these
12 track records or updated trade results and then
13 having the APs share those trade results with
14 customers and prospective customers is you're
15 just taking those trades that were recommended
16 in June through September, is that right?  Is that
17 what you were doing?
18     MR. FALVEY:  Ashley, you broke up on
19 the months.  Otherwise we heard everything.
20     MR. BURDEN:  Got it.  Okay, sorry.  So
21 let me do it again because I'm sure I can do
22 it better.
23     Q   You know -- so, you know, you're sending,
24 you're sending -- you're providing APs with these

Page 182

1  new track records or updated trading results, you
2  know, in sort of mid 2019, and these APs with your
3  blessing are sharing these new track records and
4  updated trading results with some customers and
5  prospective customers, right?
6      A   Correct.
7      Q   All right.  So looking at these
8  exhibits, you know, Exhibit 414, Exhibit 470,
9  Exhibit 415, 416, 200, 201, you know, it looks
10 to me like in your mind this new track record and
11 these updated trading results, they just include
12 trades from June 2019 through September of 2019.
13 Is that fair to say?
14     A   I agree that's what they have, yes.
15     Q   Okay.  And that is what you wanted
16 these new track records or updated trading results
17 to reflect, right?
18     A   I wanted them to reflect the most recent
19 trading.
20     Q   And what was the time period for that
21 trading that you wanted these new track records or
22 updated results to reflect?
23     A   Three to four months.
24     Q   And in particular those three to

Page 183

1  four months are May 2019 through September 2019,
2  is that right?
3      A   Yeah.
4      Q   All right.  So that brings us back
5  to CFTC Exhibit 428.  So if you look at monthly
6  customer PNL for closed trades by the end of
7  May, June, July, August and September, you get
8  a positive number, isn't that right?
9      A   The monthly PNL wasn't closed trades.
10     Q   What is it then?
11     A   It is closed trades plus open trades.
12     Q   All right.  But that's not right.
13 We just looked at these exhibits and all of them,
14 all of your new track records, all of your trading
15 results, your updated trading results, they all
16 depict closed trades, right?
17     A   Correct.
18     Q   All right.  So why are you talking to
19 me about open trades?
20     A   The monthly customer PNL that you're
21 depicting --
22     Q   No.  I told you before, Mr. Donelson,
23 Exhibit 428 reflects closed trades at the end of
24 the month, all right?

Page 184

1      A   And open trades.
2      Q   It does not reflect that and that
3  is not how we calculated it.  This just reflects
4  closed trades.  So what I want to try to suggest,
5  and what I want to ask you about, is it seems to
6  me that by selecting closed trades from May 19
7  through September of 2019, you have magically
8  cherry-picked the only span of time in Long Leaf
9  Trading's history, with you or ever, where the
10 recommendations generated a profit for some
11 customers on paper.  Is that fair to say?
12     A   I did not cherry-pick the period.
13     Q   All right.  And you'll see that in
14 October, in November and in December, you lost
15 for these customers any gains that any of them may
16 have enjoyed, isn't that right?
17     A   Correct.
18     Q   All right.  So I want to show you
19 what we've marked as CFTC Exhibit -- all right.
20 Hang on a sec.  All right.  Let me do that again.
21 So for these new track records and updated trading
22 results that you generated for the APs to share,
23 the period that those track records and statements
24 reflect, that May through September of 2019, that

Page 185

1   is the only period during your tenure at Long
2   Leaf, the only combination of months where trading
3   recommendations could ever be construed as
4   positive. Is that fair to say?
5       A   Not according to your report because
6   May of 2018 through October of 2018 would also
7   have positive results.
8           THE REPORTER: I'm sorry. I'm sorry,
9       Ashley. I cannot hear you, Mr. Donelson.
10      You're going to have to repeat your answer
11      and please, please stay close to the phone.
12          THE WITNESS: I said from May of 2018
13      through October of 2018 it would also show
14      a positive result.
15          THE REPORTER: Thank you.
16  BY MR. BURDEN:
17      Q   You know what, I guess you're right.
18  Yeah, I guess that's true. But if you had gone
19  back from September of 2019 to, say, March of 2019,
20  it would be negative, wouldn't it?
21      A   September of 2019 to when? I'm sorry.
22      Q   March of 2019.
23      A   Yeah, it would be.
24      Q   What about April, April 20 -- and

Page 186

1   I'm just asking this because I get the sense
2   you're better at math than me. What about April
3   of '19 through September of '19, would that be
4   positive or negative monthly PNL for customers
5   that traded during those months?
6       A   Given your numbers, it would be I'd say
7   close to breakeven I think.
8       Q   All right. And breakeven is zero, isn't
9   it?
10      A   Yes.
11      Q   All right. Let's look at CFTC Exhibit 477,
12  if we could, please.
13      A   477?
14      Q   Yes, please.
15      A   Okay.
16      Q   All right. So this is a series of
17  emails between you and Mr. Hatzigiannis. It looks
18  like Mr. Hatzigiannis is sending you a draft email
19  in October of 2019 to send to prospective customers,
20  is that right?
21      A   Correct.
22      Q   All right. And so in his draft he's,
23  you know, he's saying, "We have closed out 30 of
24  our past 35 trades for a profit. The link below

Page 187

1   shows results for an individual client that just
2   takes on one contract per trade. We have clients
3   that take on as many as 16 contracts per position.
4   We have seen great results of late and that is due
5   to the combination of how we manage these positions
6   and all the uncertainty surrounding these markets."
7   And he says, "Hi Jim. Can I send this email out to
8   people that I have taken through the sales process?"
9   And you say -- correctly -- "The issue I have is
10  that it is a selective list of only the last few
11  months. The argument would that it could be viewed
12  as misleading if it is not indicative of the full
13  year or life of the strategy." Did you write that?
14      A   Yes.
15      Q   And Jim says -- or James Hatzigiannis says,
16  "Sounds good. I agree." So how is this different
17  than what you were already doing?
18      A   I don't select the PDF he was showing.
19      Q   But what does it matter? You wrote,
20  "The issue I have is that it is a selective list
21  of only the last few months. It could be viewed as
22  misleading if it is not indicative of the full year
23  or life of the strategy." Isn't that what you
24  wrote?

Page 188

1       A   Yes.
2       Q   Isn't that what we just saw you
3   do in Exhibits 200, 201, 416, 415 and 300? You
4   just had your APs send customers a selective list
5   of the past few months. Isn't that what we just
6   saw?
7       A   Yes.
8       Q   All right. So you said the argument
9   is this could be viewed as misleading if it is not
10  indicative of the full year life of the strategy,
11  but you didn't have the APs give customers the full
12  year life of any strategy. You had them -- you had
13  them give customers the three to four best months
14  in Long Leaf's history, isn't that right?
15      A   We were showing the report for the
16  last -- I'm sorry. We are showing reports from
17  the strategies in the last four to five months of
18  them.
19      Q   I know. But I just -- I'm losing it.
20          MR. BURDEN: Mary, would you read back
21      my last question, please, because I definitely
22      didn't get an answer.
23          (Whereupon the portion of the
24          record was read as requested.)

Page 189

1    A    We were producing the report from
2  a point in time to a point in time, a five- to
3  six-month window.
4    Q    No, it wasn't.  It was a three- to
5  four-month window and it wasn't the full year
6  life of the strategy, was it?  Listen, this
7  is fraud no matter how you cut it.  I'm just
8  trying to figure out how you sent this email to
9  Mr. Hatzigiannis in October 23rd of 2019 after
10  you've just had your APs sending out all these
11  phony track records.  I just -- it seems completely
12  contradictory to me and I earnestly want you to
13  explain it.  Did you like change your mind?
14  You can change your mind.
15    A    I don't know what report he was showing
16  me.
17    Q    Yeah, I don't think it matters, though.
18    A    Well, if he's only showing one month
19  or a month and a half, it does matter because we're
20  going back --
21    Q    No.  He says in his email here
22  we closed out of 30 of the past 35 trades for
23  a profit, so I guess it doesn't show you the time
24  period.  So you get a sense of how many trades that

Page 190

1  is, don't you?
2    A    I don't know.  I don't know how many
3  30 to 35 trades were, what time period that went
4  back to.
5    Q    All right.  Well, I'll tell you what.
6  Let me go get it on a break.
7    A    Are we taking a break?
8    Q    You know what, why don't we.  Can we come
9  back in ten, please.
10    A    Sure.
11    MR. BURDEN:  All right, thanks.  Off the
12  record, please.
13    (Whereupon a recess was taken from
14    5:03 p.m., to 5:23 p.m., after which
15    the following proceedings were had:)
16  BY MR. BURDEN:
17    Q    All right.  Mr. Donelson, did you
18  submit any of your new track records or updated
19  performance reports to the NFA for approval?
20    A    No.
21    Q    All right.  In your answer you
22  suggested -- sorry, your answer to our complaint
23  you suggested that an attorney had reviewed some
24  of your solicitations.  What's the name of that

Page 191

1  attorney, please.
2    A    It would be Rebecca Wing.
3    Q    Oh, boy.  So when did --
4    MR. FALVEY:  Sorry, Ash.  Do you mind
5  asking the question again?
6    MR. BURDEN:  Sure.
7    MR. FALVEY:  (Inaudible) objection, but
8  anyway.
9    MR. BURDEN:  That's all right.  Yeah,
10  I don't mind.  You can object to these or not
11  object, you know what I'm saying?  I just don't
12  want somebody to pop out of a box and say, oh,
13  this is a defense or, oh, it isn't.  We can't
14  hear you guys that well also.
15    MR. FALVEY:  I'll talk louder.
16    THE WITNESS:  You've got to talk louder.
17  BY MR. BURDEN:
18    Q    All right.  Mr. Donelson, you
19  responded to our complaint in your answer by
20  saying that an attorney had reviewed some of
21  Long Leaf's solicitation materials, right?  Do
22  I gotta show it to you?
23    MR. FALVEY:  I have it handy.  Was it the
24  affirmative defense?

Page 192

1    MR. BURDEN:  Give me just one moment,
2  though you really ought to know.
3    MR. FALVEY:  Yeah, okay.
4    MR. BURDEN:  So it is -- I don't know
5  why I'm telling you guys this -- paragraph 35.
6  You say, "Donelson admits that subsequent to
7  January 1, 2018 representatives of Long Leaf
8  used scripts approved by Long Leaf's attorney
9  in soliciting customers."  Do you guys see it?
10    MR. FALVEY:  Yeah.
11  BY MR. BURDEN:
12    Q    All right.  What's the name of that
13  attorney?
14    A    That was Rebecca Wing and it was the
15  original part of the acquisition going through the
16  scripts -- the presentation and the bullet points
17  that were presented to us at the acquisition.
18    Q    Got it.  So Rebecca Wing reviewed the
19  presentation -- you know, let me get the exhibit
20  numbers for those.
21    A    I think it was the one you emailed us.
22    Q    It was.
23    A    4 --
24    Q    All right.  So CFTC Exhibit 485,

Page 193

1   so your testimony is that Ms. Wing reviewed that?
2       A    Prior to the acquisition.
3       Q    All right.  I mean, it says in your
4   answer, though, that she reviewed it subsequent to
5   January 1st of 2018.  So is that wrong or what?
6       A    That's not --
7       Q    All right.  So we've got another
8   thing that's wrong in one of your discovery
9   responses.  I guess this is the answer, which
10  is even more serious.  So that's wrong?
11      A    Yeah, that's wrong, that it was
12  reviewed -- or approved by an attorney after or
13  subsequent.
14      Q    All right.  So CFTC Exhibit 485, that
15  was something that Rebecca Wing reviewed before
16  you acquired the company?
17      A    Correct.
18      Q    What did she say to you about it?
19      A    That she didn't see anything in it that
20  was misleading.
21      Q    That was what?
22      A    However -- she didn't see anything in it --
23          MR. FALVEY:  Okay.
24      A    She did not see any problem with it,

Page 194

1   given the information we've had.
2   BY MR. BURDEN:
3       Q    Got it.  So CFTC Exhibit 382, you there?
4       A    Yes.
5       Q    All right.  Was this the other document
6   that Ms. Wing reviewed prior to the acquisition?
7       A    Yes.
8       Q    All right.  What did she tell you about
9   it?
10      A    That there was nothing on it given
11  the information we had that would be a problem.
12      Q    All right.  And when you acquired
13  Long Leaf, when Ms. Wing was reviewing these
14  solicitations, did she know that substantially
15  all of Long Leaf's customers had lost money at
16  that point?
17      A    No, not at that point.
18      Q    Did you go back and tell her that at
19  some juncture?
20      A    Probably.  I don't remember a specific
21  date, time --
22      Q    Was it like right away?  Was it like, oh,
23  God, or was it like much later?
24      A    Early on, I would say, in the first two

Page 195

1   to three months.
2       Q    So in the first two to three
3   months you called your lawyer, Ms. Wing, and
4   you said, hey, all these customers are down.  These
5   recommendations have resulted in net losses for
6   customers or something to that effect.  Is that
7   what happened?
8       A    Yes.
9       Q    And you did that in the first two
10  to three months.  So I guess that would have been
11  like January or February of 2018?
12      A    Correct.
13      Q    All right.  What did Ms. Wing say in
14  response to that?
15      A    That don't -- she looked at the
16  presentation again and maybe -- we talked about
17  the talking points, the actual presentation itself
18  also.
19      Q    What did she tell you?
20      A    That the presentation -- I would say
21  I don't remember because we talked about a lot of
22  things.  But I don't know specific, whether it was
23  about the talking points or whether it was talking
24  about the actual presentation.

Page 196

1       Q    All right.  Let me make this easy
2   for you.  Did Mrs. Wing advise you that these
3   solicitation materials, the talking points and the
4   Power Point presentation were false or misleading
5   in light of the trading results you've discovered?
6   Did she tell you that?
7       A    I don't remember.
8       Q    Did she tell you to stop using the
9   trading -- the talking points and the Power Point
10  presentation?  Did she tell you that?  What are you
11  looking at him for?
12      A    I'm not looking at him.
13          MR. FALVEY:  He wasn't looking at me.
14      A    No.
15  BY MR. BURDEN:
16      Q    Did she tell you it was okay to
17  keep using the talking points and the Power Point
18  presentation that you got from Evans?  Did she tell
19  you that?
20      A    She told me to review all the talking
21  points, all the presentations to make sure none
22  of that is in it.
23      Q    None of what is in it?
24      A    The finding of the losses.

Page 197

1    Q    What?  All right.  Let's try that
2  again.  Did Mrs. Wing tell you that it was okay
3  for APs to continue using the talking points and
4  Power Point presentations?
5    A    That the presentation was fine.
6  However, we need to pull -- we need to make
7  sure it doesn't have anything in there, and then
8  the talking points had -- we had to go through the
9  talking points to pull out anything it mentioned.
10    Q    Anything that mentioned what?  What are
11  you on about?
12    A    Anything that talks about results.
13    Q    What did you take out?
14    A    Well, it isn't in the bullet point.
15  It was in the script that I didn't know about.
16    Q    So how then could she have told you
17  to take stuff out relating to results if it's in
18  a script you didn't know about?
19    A    She was giving me the advice to go
20  through and pull it out, not to physically --
21  not her looking at it and -- not looking --
22    Q    I can't wait to get you on the
23  stand.  Did Mrs. Wing review any other solicitation
24  materials other than Exhibits 485 and 382?

Page 198

1    A    No.
2    Q    Did you run by Mrs. Wing your new
3  track record?  Did you show that one to her?
4    A    I don't remember.
5    Q    Did you ever show Mrs. Wing your
6  updated performance results with your core closed
7  trades in 2019?  Did you ever do that?
8    A    I did.  I showed that to her.  I also
9  showed it to I believe Rita Tandaric at Cunningham
10  to get their comment on it.
11    Q    What did Rita tell you -- sorry.  What
12  did Ms. Wing tell you about it?
13    A    Let me correct that.  It was about
14  the customers -- the updated closed trade report
15  going to a customer, not --
16    Q    You know what I'm talking about, don't
17  you, your new track record.  Did you ever show your
18  new track record you gave to the APs, did you ever
19  run that by Mrs. Wing?
20    A    No.
21    Q    What about your updated performance
22  report where people took trades from Mr. Reeves'
23  account and showed them to customers, did you ever
24  run that stuff by Mrs. Wing?

Page 199

1    A    No.
2    Q    Yeah, I didn't think so.  Did
3  Mrs. Wing ever advise you that would be a material
4  omission to fail to disclose Long Leaf Trading's
5  previous performance to customers?
6    A    No.
7    Q    Did you ever ask Mrs. Wing if that's
8  something that you should do, instead of something
9  that you had to do, just to tell customers how the
10  trading recommendations had performed?
11    A    I don't remember.
12    Q    All right.  So are you testifying,
13  are you trying to tell me that you ran your new
14  track record by Rita Tandaric?
15    A    No.  I -- we showed her a, quote, trade
16  report and this is reporting to a specific customer
17  and had any suggestions or anything about what we
18  should add.  That's where we added the disclaimer
19  at the bottom, so if somebody asked us --
20    Q    You know I don't -- you know I'm not
21  talking about that.  My question to you is did you
22  show Rita Tandaric your updated performance reports
23  that APs distributed to prospective customers
24  showing trades from June to September, like

Page 200

1  CFTC Exhibit 416?  Did you show those to Rita?
2    A    I did not show those to Rita.
3    Q    Yeah, I didn't think so.  All right.
4  Did you have a sales code, Mr. Donelson?
5    A    Clarify what you mean by -- you mean
6  at the FCM?
7    Q    Yeah, I mean at the FCM.
8    A    Yes, I had a sales code.
9    Q    What was it, please.
10    A    001 I think.
11    Q    Any -- yeah.  Any other codes?
12    A    I think 099, but that was our error
13  account.
14    Q    Okay, all right.  Well, error account
15  doesn't count.  Any codes other than that?
16    A    No.
17    Q    All right.  I'd like to show you --
18  could you turn, please, to CFTC Exhibit 455.
19    A    Okay, I'm here.
20    Q    All right.  So this is an email
21  from Mr. Cybulski to you dated October 16, 2019.
22  The subject is Demo People and the attachment is
23  a spreadsheet titled Copy of Jim's Demos.  What is
24  this, please.

Page 201

1    A   It is us trying to clean up the CRM system.
2    Q   Okay.  What does this spreadsheet reflect?
3    A   It reflects customer IDs that are
4  assigned to me in the system when we transferred
5  things from one system to the other.  This is data
6  cleanup.
7    Q   Got it.  So when it's got like a
8  person's name and it says Lead Owner Jim Donelson,
9  does that mean that you were supposed to call that
10  person?
11    A   No.  That just means that I have --
12  nobody else can call back this person in the system.
13  So we were trying to move them to somebody who would
14  make a call.
15    Q   All right.  Got it.  So it says
16  here copy of Jim's Demos.  Did you call these
17  customers?
18    A   No.
19    Q   All right.  How many customers did you
20  call a day to do -- you know, prospective customers
21  did you call a day to solicit for participation in
22  Long Leaf's trading program?
23    A   None.
24    Q   Sorry?

Page 202

1    A   Zero.
2    Q   So you always had -- you've always had
3  the APs do like the solicitations?
4    A   Correct.
5    Q   But that's not to say you didn't talk
6  to customers on a daily basis, right?
7    A   I would talk to customers, yes.
8    Q   How many customers do you think you
9  would talk to in a day?
10    A   Maybe one, maybe two at the most.
11    Q   All right.  Can I direct your attention
12  to 454, please.
13    A   I'm sorry.  We're here.
14    Q   All right.  So Exhibit 454, this is
15  like a spam email that you sent out like every
16  day, right?
17    A   Yeah, it's a -- it's autogenerated.
18  It's an email blast, yeah.
19    Q   Yeah, all right.  So how many of
20  these emails do you think you sent to people?
21    A   The way it worked, I would say maybe
22  200 in a day.
23    Q   For how many days?
24    A   At least -- I mean, it would depend

Page 203

1  on whether they were starting a new customer
2  setup within the CRM.  That's what would trigger
3  the email.
4    Q   Got it.  Now, you sent out thousands
5  of these emails, didn't you?
6    A   Yeah.
7    Q   All right.  So when it says,
8  "Greetings, Eric.  I just wanted to touch base
9  and see if you had any desire to learn about trading
10  options and how to protect your downside risk,"
11  what are you referring to there?  How is this
12  guy going to protect his downside risk?
13    A   Hedging.
14    Q   Hedging.  You don't hedge for any
15  customers, do you?
16    A   We offered the service.  Nobody took us
17  up on it.
18    Q   Yeah.  You lose money for customers,
19  don't you?  Don't you?
20    A   We did lose money for our customers,
21  that is correct.
22    Q   All right.  Would you turn to CFTC
23  Exhibit 422, please.
24    A   I'm there.

Page 204

1    Q   All right.  So this is an email from
2  you to Scott Gecas that you sent on June 1, 2018
3  and the subject is June Sales Action Plan.  So did
4  you draft these June sales action plans?
5    A   Actually, these are conversations
6  between Scott and I, and he put together the
7  targets and the action items.  I just scribed it.
8    Q   Okay.  So you wrote these?
9    A   I typed them in.
10    Q   Okay, all right.  So let's go
11  to the second page.  It says June Action Plan,
12  James Hatzigiannis, Targets, and then you do some
13  targets.  And you're saying he ought to -- it says
14  that Mr. Hatzigiannis ought to do 63 demo sets a
15  day.  Am I reading that right?  No, I'm not.  He
16  ought to do three demo sets a day, is that right?
17    A   Meaning it's -- yes.
18    Q   All right.  And so Key Action
19  Items, and I want to direct your attention to the
20  second-to-last one.  Well, you know what, they're
21  all good.  Key Action Items it says, "Challenge the
22  customer.  Don't be an order taker."  Did you write
23  that down?
24    A   Yes.

Page 205

1    Q    All right.  Then it says, "Nail down
2  the rebuttals.  Need to be fluid with the answers."
3  Did you write that down?
4    A    Yes.
5    Q    All right.  And that's referring
6  to those that we saw in CFTC Exhibit 381, the
7  requests for past performance, that stuff, right?
8    A    Correct.
9    Q    All right.  We're getting to the
10 end here, so I'm jumping around a little bit.
11 So during your tenure at Long Leaf, how were the
12 APs compensated?
13   A    On commission.
14   Q    All right.  And how did they earn
15 a commission?
16   A    If their customer took a trade.
17   Q    Got it.  And how much did an AP make when
18 a customer took a trade?
19   A    They would make 35 percent of the total
20 commission.
21   Q    You mean the total commission on that
22 trade paid by the FCM?
23   A    Collected from the customer, paid by the
24 FCM to us, yes.

Page 206

1    Q    All right.  And did any of the APs
2  earn like a salary or it was just -- or was it
3  just the commissions?
4    A    They all made a base of a couple thousand
5  dollars a month.
6    Q    Was that for the entire time period you
7  were working at Long Leaf?
8    A    Yeah.
9    Q    Was that base a draw or did they just
10 get to keep it?
11   A    No, it was not a draw.  It was a salary.
12   Q    Did any of the APs get a 401(k)?
13   A    They had the opportunity in 2018.  None
14 of them did.  After that they were 1099 employees --
15 or contractors, so you can't have a 401(k) for them.
16   Q    Got it.  So could you have changed
17 this compensation structure anytime you wanted?
18   A    Yes.
19   Q    All right.  Wouldn't you agree
20 that this compensation structure for the APs at
21 Long Leaf incentivizes those APs to get customers
22 to make trades?
23   A    Yes, that's what that compensation
24 structure would do.

Page 207

1    Q    Thanks.  Let's go to CFTC Exhibit 427.
2  It's an email from you to your APs dated October 7,
3  2019 copying your wife, Subject:  Simple Commission
4  Model.  And the email says, "Guys, this is a quick
5  commission model to help you understand the value
6  of an account.  By changing the highlighted areas,
7  you can estimate the amount of monthly commission
8  generated from a single account.  It details
9  out total commission and your share."  So what
10 is this?  What's going on here?
11   A    This was an explanation to -- let me
12 check the date.
13   Q    October 7, 2019.
14   A    Yeah.  This is -- we were explaining
15 how the compensation works and what that lifetime
16 value would be if all these things happen.
17   Q    So walk me through it.  I really like
18 this commission structure thing.  What's going on
19 here?  There's a commission per month, you know.
20 It looks like there's a row for 25,000, a row for
21 50,000, a row for 100,000 and then there's some
22 commissions.  What is this supposed to show your
23 APs, please.
24   A    Basically it's showing with the

Page 208

1  trades that would be made and the legs, what their
2  commission per -- you know, the total commissions
3  would be per month.  And then we're looking at a
4  different proposed commission rate and then kind
5  of how much that total commission would be and how
6  much it would be for the AP versus the company.
7    Q    Got it.  So at the top where it says
8  Trading 25,000, 50,000, 100,000, what are those
9  numbers supposed to represent, like the size of
10 an account?
11   A    The size of an account.
12   Q    All right.  So then it says Full,
13 Adjustment, Sets, Trades.  Like legs are the same
14 for all of them.  Like what's all that supposed to
15 show?  Like here's what I'm getting at.  It looks
16 here like, you know, for the $100,000 there's like
17 a bunch of numbers and then it says commission per
18 month $4,692.  So how do you get from the 100,000
19 to the $4,692?
20   A    I'm struggling with it too and
21 I built the spreadsheet.  It's taking the proposed
22 commission -- I'm struggling with what the math is
23 here.
24   Q    All right.  If you don't remember,

Page 209

1  that's okay.  All right.  I want to direct your
2  attention, please, to CFTC Exhibit 480.  No, sorry,
3  479.
4      A   Yes.
5      Q   Yeah.  So what is this, please.
6      A   It was an analysis tool that I was
7  working with the APs to understand, you know,
8  what does it -- you know, if you do this, if you
9  do that, what happens, you know, how much leverage
10  is going to be in there, so on and so forth.
11     Q   All right.  Is this something that was
12  shared with customers?
13     A   I don't believe so.  This was us trying
14  to figure out something, and that was a long time
15  ago.
16     Q   Yeah.  I mean, I'm looking at this
17  and there's a row towards the middle that says Net
18  Annual Return $486,000, Net Annual Return Percentage
19  24.31 percent.  Like what's that supposed to be?
20  I mean, certainly nobody got that.  Like what's
21  this supposed to be?
22     A   This is all driven off of different
23  expectations.  If you do this, what would it get
24  you, what would this do.  This is very hypothetical.

Page 210

1  It's not meant to be a here's what you're going to
2  make.  It's us trying to understand ramifications
3  of doing X, Y or Z.
4      Q   All right.  Let's turn to CFTC Exhibit 274,
5  if we could, please.  So --
6      A   I'm there.
7      Q   Yeah.  So this is an email from you
8  to your APs dated July 27, 2018, is that right?
9      A   Correct.
10     Q   All right.  And it says, "After
11  my discussion on Tuesday, these call volumes
12  are unacceptable.  200 per day is the number
13  and we better start hitting it."  So what are
14  you -- 200 per day of what, calls to customers?
15     A   Calls, outgoing calls.
16     Q   All right.  You're a tough boss,
17  Mr. Donelson.  How many calls were the APs doing
18  soliciting for Long Leaf Trading?
19     A   If I look at this report, it says
20  there was only 533 calls by five different -- so
21  they're doing barely a hundred.
22     Q   Is that a day?
23     A   Yeah.  Most of the calls actually
24  don't go through.  Very few are actually answered.

Page 211

1  did you get your leads from?
2  Q   Where do you get your leads from or where
3      A   They were getting leads from --
4  it sounds like -- the name of the company is --
5  I have to remember the name of the company, but
6  they were getting leads from another broker.
7      Q   Did you wind up being able to sell your
8  leads after Long Leaf Trading closed?
9      A   No.  Maybe one person bought some, but
10  that was about it.  They were too old.
11     Q   All right.  And you tried to change
12  Long Leaf's name in June of 2019, didn't you?
13     A   We were discussing changing the name, yes.
14     Q   To Forefront?
15     A   Yes.
16     Q   Did you ever wind up changing that name?
17     A   No.
18     Q   Did you ever solicit anybody under the
19  banner of Forefront?
20     A   No.
21     Q   Why did you want to change the name?
22     A   At the time we were also looking at
23  becoming a CTA and we would use a different name
24  for the CTA.

Page 212

1      Q   Got it.  Wait.  So in June of 2019 you
2  wanted to become a CTA?
3      A   We were exploring it.
4      Q   Why did you want to do that?
5      A   It's a better fit for this type
6  of trading where we would have to go out and
7  get approvals, timing, but it wasn't -- you know,
8  we couldn't get the structure in place right.
9      Q   Sorry.  What was that last bit?  You
10  broke up, please.
11     A   (Inaudible) becoming a CTA and decided
12  we couldn't do it.
13     Q   Why couldn't you do it?
14     A   Capital, staffing, a lot of issues and
15  the issues around the SBA loan.
16     Q   Got it.  All right.  I want to direct your
17  attention, if I could, please, to CFTC Exhibit 408.
18     A   Okay.
19     Q   Do you recognize this document?
20     A   Yes, it's the solicitation approved
21  in 2019.
22     Q   And, in fact, this is the only -- it
23  doesn't say that the solicitations are approved,
24  does it?

Page 213

1    A    No, it says that they have no comments
2  on it.
3    Q    All right.  And this is the only
4  no comment letter that you received from NFA,
5  correct?
6    A    With regards to solicitation, yes.
7    Q    Did you get any other kind of no
8  comment letters from NFA that I don't know about?
9    A    No, not that I know of.
10    Q    All right.  There we go.  Okay.  So
11  when you submitted these materials to NFA and they
12  provided their no comment letter you'll see it says,
13  "NFA did not verify any of the statements contained
14  within the material.  This notice does not preclude
15  NFA or the CFTC from raising compliance issues with
16  the content of the material at some future time."
17          So when you submitted these
18  materials, did you advise NFA that substantially
19  all of Long Leaf's customers had lost money trading
20  pursuant to its recommendations?
21    A    They already knew that through a review
22  that they did in --
23    Q    We'll get to that in a minute.  When
24  you submitted these materials, did you advise

Page 214

1  the reviewer that Long Leaf Trading had lost since
2  you started more than $1.6 million of customer
3  money?  Did you tell them that?
4    A    No, I did not.
5    Q    All right.  So let's look at CFTC
6  Exhibit 401, if we could, please.  So what is this
7  document, please.
8    A    This is an exit letter from the NFA
9  examination.
10    Q    Got it.  All right.  So, you know,
11  before we were looking at some trade recommendations
12  and I was asking about the format of them, in
13  particular like max gain, target gain.  Do you
14  remember that discussion?
15    A    Yes.
16    Q    And you had suggested to me that this
17  format was approved by the NFA.  Do you remember
18  that?
19    A    I don't know that I said approved.
20  They reviewed it in previous reviews.
21    Q    All right.  When did that review occur?
22    A    That was the review in August of 2017.
23    Q    Oh, so you weren't there for that
24  review where they looked at these recommendations?

Page 215

1    A    I was not at the time of the review,
2  no.  However, I was there when the final exit
3  letter came out.
4    Q    All right.  What was the date of that
5  exit letter?
6    A    Late February of 2018.  I want to say
7  the 26th, but I'm not sure.
8    Q    You've got a real good memory
9  for some things.  So let's turn back to CFTC
10  Exhibit 401.  So the NFA has completed its audit
11  here in December 6th of 2018, and what they say in
12  this letter is that Long Leaf Trading used deceptive
13  sales practices and they point to a number of false
14  statements made by APs.  Is that a -- that they
15  claim were made by APs.  Is that a fair summary
16  of the letter?
17    A    That is a fair summary.
18    Q    All right.  So how did this audit
19  ultimately end for you?
20    A    I'm not sure what you mean by end.
21    Q    All right.  So the NFA ultimately
22  brought a business conduct complaint against Long
23  Leaf Trading and you, correct?
24    A    Correct.

Page 216

1    Q    And you resolved that business
2  conduct complaint by agreeing never to register
3  as an NFA member again, correct?
4    A    Correct.
5    Q    And that effectively ended your career
6  as a guy who runs a brokerage firm, is that fair
7  to say?
8    A    That's fair to say, yes.
9    Q    And in that settlement, though you
10  neither admit nor deny NFA's findings, the NFA
11  makes findings that Long Leaf and you in fact
12  engaged in fraudulent solicitation practices,
13  is that fair to say?
14    A    I neither admitted nor denied the claim.
15        MR. BURDEN:  All right.  You know what,
16  can we go off the record.  This might be it
17  for us.
18        MR. FALVEY:  Sure.
19        MR. BURDEN:  Thanks.  All right.
20  I'm going to -- I'm not going to mute myself
21  or anything.
22        (Whereupon a recess was taken from
23        6:14 p.m., to 6:15 p.m., after which
24        the following proceedings were had:)

Page 217

1       MR. BURDEN:  All right.  Thank you.
2       Q   Mr. Donelson, what does Donelson
3   Enterprises do right now?
4       A   Nothing.
5       Q   All right.  What are you doing for work
6   right now?
7       A   I'm a consultant.
8       Q   For whom?
9       A   A cryptocurrency trading operation,
10  I'm not allowed to say, in helping them with their
11  books and records around accounting.
12      Q   Oh, you're going to say.  What is the
13  crypto operation that you are currently consulting
14  for?
15      A   I have a nondisclosure agreement.
16      Q   Yeah.  That stuff does not trump
17  subpoenas or deposition notices and you, sir,
18  are being deposed.
19      A   It is Fractal Wealth, and all I am doing
20  for them is helping them with their tax trading
21  profits.
22      Q   Did you say Fractal Wealth?
23      A   Yes.
24      Q   All right.  Any other work that

Page 218

1   Donelson Enterprises is -- oh, sorry.  End of a long
2   day.  Any other work that you're doing currently,
3   Mr. Donelson?
4       A   (Inaudible) Forefront Technology,
5   we're talking with a customer who may or may not
6   (inaudible) the middle office system.  I'm helping
7   a couple that have a juice bar.  He's an ex-Marine,
8   and I'm helping them with kind of setting up the
9   company and getting the books and records in place.
10      Q   All right.  Any other work that you're
11  doing currently?
12      A   I do a lot of consulting in the concept
13  if somebody calls me up and I answer questions, but
14  I'm not paid.
15      Q   Yeah, no.  Sorry.  I meant for pay.  So
16  since you've left Long Leaf, any other paid work
17  that you've had?
18      A   I have done a lot of work with
19  Ronin Capital to clean up their trading and
20  kind of accounting issues, done some consulting
21  on specific tax accounting issues related to trading
22  with omission capital, that -- I mean, those are
23  the types of things I do.
24      Q   All right.  Anybody else that's given

Page 219

1   you paying work since Long Leaf?  We've got Ronin
2   Capital.  We've got Fractal Wealth.  We've got your
3   Forefront endeavor and your juice bar -- or your
4   friends'.
5       A   Yeah.
6       Q   Anything else?
7       A   Another trading firm, but that was
8   really about structuring and that was I want to
9   say Performance Trust, but that doesn't sound right.
10  I'd have to check.
11      Q   Got it, okay.  Any other paying work
12  since -- other than Long Leaf?
13      A   I do bits and pieces a lot for people
14  who make 600, 700.  Nothing major.  I do file tax
15  returns for them or help them understand why their
16  tax returns don't work right and so on and so forth.
17  So I've been dealing with the IRS.
18      Q   Okay.  So you've been doing CPA work?
19      A   Yeah.
20      Q   All right.  So when you get paid
21  for all of the things you just mentioned, does
22  that money go to you or does it go to some like
23  entity that you -- you know, some other entity?
24  Does it go to another person?

Page 220

1       A   Most -- almost all of it comes to me,
2   except for one where I'm supporting.  He has the
3   relationship so the payment goes to him and then
4   he sends me my paycheck.
5       Q   Got it, okay.
6       A   But it still comes to me.
7       Q   No, no, no, okay.  So how much
8   have you been getting a month in income since,
9   you know, let's say December of 2019?
10      A   Last year was tough.  I'd say maybe
11  6,000 a month last year.  Closer to 10 this year.
12      Q   Per month?
13      A   Per month.
14      MR. BURDEN:  Okay, great.  Well, you
15  know, that concludes the CFTC's examination.
16  Mr. Falvey, do you have any redirect?
17      MR. FALVEY:  I do not.  Thank you.
18      MR. BURDEN:  All right.  Mary, off the
19  record, please.
20      (WITNESS EXCUSED)
21
22
23
24

Page 221

1       IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION
3 COMMODITY FUTURES TRADING    )
  COMMISSION,                )
4                      )
       Plaintiff,     )
5                      )
      vs.        ) No. 20 C 3758
6                      )
  LONG LEAF TRADING GROUP,    )
7   INC., et al.,           )
                     )
8       Defendants.   )
9
10
      I, JAMES A. DONELSON, do hereby certify
11 that I have read the foregoing transcript of my
   deposition given on June 23, 2021, consisting of
12 pages 1 to 223, inclusive, and I do again subscribe
   and make oath that the same is a true, correct and
13 complete transcript of my deposition so given as
   aforesaid, and includes changes, if any, so made by
14 me.
15
          Corrections have been submitted
16           No corrections have been
          submitted
17
18
          JAMES A. DONELSON, Deponent
19
  Subscribed and sworn to
20 before me this   day of
        , 20
21
  Notary Public
22
23
24

Page 222

1 NORTHERN DISTRICT OF ILLINOIS  )
  EASTERN DIVISION         )
2 STATE OF ILLINOIS        )
              ) SS.
3 COUNTY OF COOK         )
4
5      I, Mary Maslowski, Certified Shorthand
6 Reporter and Notary Public in and for the County
7 of Cook, State of Illinois, do hereby certify that
8 on June 23, 2021, at 9:03 a.m., the remote video
9 deposition of the witness, JAMES A. DONELSON, called
10 by the Plaintiff, was taken before me, reported
11 stenographically and was thereafter transcribed by
12 me.
13      The said witness, JAMES A. DONELSON, was
14 first duly sworn to tell the truth, the whole truth,
15 and nothing but the truth, and was then examined
16 upon oral interrogatories.
17      I further certify that the foregoing is a
18 true, accurate and complete record of the questions
19 asked of and answers made by the said witness, at
20 the time and place hereinabove referred to.
21      The signature of the witness was not waived
22 by agreement.
23      The deposition terminated at 6:23 p.m.
24      Pursuant to Rule 30(e) of the Federal

Page 223

1 Rules of Civil Procedure for the United States
2 District Courts, if deponent fails to read and sign
3 this deposition transcript within 30 days or make
4 other arrangements for reading and signing thereof,
5 this deposition transcript may be used as fully as
6 though signed, and the instant certificate will
7 then evidence such failure to read and sign this
8 deposition transcript as the reason for signature
9 being waived.
10      The undersigned is not interested in the
11 within case, nor of kin or counsel to any of the
12 parties.
13      Witness my official signature and seal as
14 Notary Public, in and for Cook County, Illinois on
15 this 8th day of July, A.D., 2021.
16
17
18          Mary Maslowski, CSR, RPR
         Notary Public
19          79 West Monroe, Suite 1001
         Chicago, Illinois  60603
20
21
22
23
24