CFTC Ex. 533

# Long Leaf Trading Group

## *Ruth, Jeremy 2019-09-26*

*9/26/2019 9:50 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Friday, October 29, 2021

Page 1

1          UNITED STATES OF AMERICA
                   BEFORE THE
2      COMMODITY FUTURES TRADING COMMISSION
3
4  IN THE MATTER OF:          )
                              )
5  LONG LEAF TRADING GROUP, INC.   )
6
7
8
9
10
11        The examination under oath of JEREMY
12  RUTH, taken pursuant to subpoena and the rules
13  of the U.S. Commodity Futures Trading Commission,
14  reported by Mary Maslowski, a Certified Shorthand
15  Reporter and Notary Public within and for the County
16  of Cook and State of Illinois, at 525 West Monroe
17  Street, 9th Floor, Chicago, Illinois, commencing at
18  the hour of 9:50 o'clock on September 26, 2019.
19
20
21
22
23
24

Page 2

1  A P P E A R A N C E S :
2
       MR. ASHLEY J. BURDEN, Senior Trial Attorney
3      MS. ELIZABETH M. STREIT, Trial Team Leader
       MR. JOSEPH J. PATRICK, Investigator
4      U.S. COMMODITY FUTURES TRADING COMMISSION
       DIVISION OF ENFORCEMENT
5      525 West Monroe Street, Suite 1100
       Chicago, Illinois 60661
6      (312) 596-0700
7
       On behalf of the U.S. Commodity
8      Futures Trading Commission;
9
       CHUHAK & TECSON, P.C.
10     BY MR. ANDREW S. MAY
       30 South Wacker Drive, Suite 2600
11     Chicago, Illinois 60606
       (312) 855-6105 (direct)
12     amay@chuhak.com
13
       On behalf of the Witness.
14
15
16
17
18
19
20
21
22
23  CSR License No. 084-003278.
24

Page 3

1              I N D E X
2  WITNESS              EXAMINATION
3  JEREMY RUTH
4  By Mr. Burden          4, 99, 211
5  By Mr. Patrick         93, 209
6
            E X H I B I T S
7  CFTC EXHIBIT          MARKED FOR ID
8  No. 1                      5
   No. 116                    6
9  No. 117                    8
   No. 118                   60
10 No. 119                   66
   No. 120                   83
11 No. 121                  104
   No. 122                  124
12 No. 123                  127
   No. 124                  156
13 No. 125                  162
   No. 126                  167
14 No. 127                  171
   No. 128                  173
15 No. 129                  174
   No. 130                  177
16 No. 131                  180
   No. 132                  184
17 ** No. 133               193
   No. 134                  227
18
19
20
     ** NOTE:  Exh bit No. 133 is an audio file
21             which was not tendered for inclusion
               in the transcript.
22
23
24

Page 4

1              JEREMY RUTH,
2  called as a witness herein, having been first duly
3  sworn, was examined and testified as follows:
4              EXAMINATION
5  BY MR. BURDEN:
6      Q    All right.  Mr. Ruth, I'm Ashley
7  Burden.  This is Joe Patrick and Beth Streit.  We
8  are officers of the Commission for the purposes of
9  this proceeding.  This is an investigation by the
10  United States Commodity Futures Trading Commission
11  in the matter of Long Leaf Trading Group to
12  determine whether there have been violations of
13  certain provisions of the Commodity Exchange Act
14  and regulations.  However, the facts developed in
15  this investigation might constitute violations of
16  other federal or state, civil or criminal laws.
17         Prior to the opening of the
18  record you were provided with a copy of the
19  formal order of investigation in this matter.  It
20  will be available for your examination during the
21  course of this proceeding.  Mr. Ruth, have you had
22  an opportunity to review the formal order?
23      A    Is that what I just reviewed?
24      Q    Yes.

Page 5

1      MR. MAY: The document that he just
2  handed us, yes.
3          (Whereupon CFTC Exhibit No. 1 was
4          marked for identification, MM.)
5  BY MR. BURDEN:
6    Q   All right. I want to hand you what I've
7  marked as CFTC Exhibit 1.
8      MR. MAY: Are we sharing or do you have
9  copies for counsel?
10     MR. BURDEN: I have copies for counsel,
11 of course.
12     MR. MAY: Okay.
13 BY MR. BURDEN:
14   Q   Mr. Ruth, prior to the opening
15 of the record you were provided with a copy of
16 the Commission's Statement to Persons Providing
17 Information about Themselves to the CFTC. A copy
18 of that statement has been marked as Exhibit No. 1.
19         Mr. Ruth, have you had the opportunity
20 to read Exhibit No. 1?
21   A   Yes.
22   Q   All right. Do you have any questions
23 about the exhibit?
24   A   No.

Page 6

1    Q   Mr. Ruth, are you represented by counsel?
2    A   Yes.
3      MR. BURDEN: All right. Mr. May, would
4  you please identify yourself for the record.
5      MR. MAY: Sure. Andrew May, Chuhak &
6  Tecson, 30 South Wacker, Suite 26, Chicago,
7  Illinois, 60606. The number is (312) 855-6105.
8          (Whereupon CFTC Exhibit No. 116 was
9          marked for identification, MM.)
10 BY MR. BURDEN:
11   Q   All right. Mr. Ruth, I want to hand
12 you what I've marked as CFTC Exhibit 116. Mr. Ruth,
13 is this a copy of the subpoena that you're appearing
14 pursuant to here today?
15   A   Yes.
16   Q   Mr. Ruth, the subpoena calls for a
17 production of certain documents, and you'll see a
18 list of them appended to the subpoena on Exhibit A.
19 Have you tendered to the Staff all documents called
20 for by the subpoena, which currently is none?
21   A   I gave them to my attorney for review.
22     MR. BURDEN: All right. Mr. May, will
23 we be receiving a production from --
24     MR. MAY: Yes.

Page 7

1      MR. BURDEN: All right. Are you
2  holding in your hand the production for
3  Mr. Ruth?
4      MR. MAY: I am. Maybe I'll just describe
5  it. It's been Bates stamped Ruth 001 through
6  Ruth 056.
7      MR. BURDEN: All right. Do you know
8  what would be good I think? Do you have an
9  electronic version of those?
10     MR. MAY: That is the problem I had,
11 getting it on the memory stick.
12     MR. BURDEN: It is no problem at all.
13 Is that everything?
14     MR. MAY: It is.
15     MR. BURDEN: Well, I'll tell you what.
16 How about I take that off of you. I'll mark
17 it as an exhibit, and then we'll just scan --
18     MR. MAY: Do you want to use -- do you
19 want to use it as a number or a letter?
20     MR. BURDEN: I'm sorry?
21     MR. MAY: You're going to be using it --
22 Okay. So --
23     MR. BURDEN: I don't know if we'll have
24 an opportunity to use these during testimony,

Page 8

1  there's that many. So we'll try to look into
2  it over lunch.
3      MR. MAY: Sure.
4      MR. BURDEN: The production date was
5  earlier --
6      MR. MAY: Yeah, that did not get diaried
7  by our office.
8      MR. BURDEN: Sorry?
9      MR. MAY: That did not get diaried by
10 our office, the production date.
11     MR. BURDEN: That's okay. I'm not
12 going to bust your chops about it, but it may
13 require Mr. Ruth to return, though hopefully
14 not.
15         (Whereupon CFTC Exhibit No. 117 was
16         marked for identification, MM.)
17   Q   All right. Mr. Ruth, I'm going to
18 hand you what I've marked as CFTC Exhibit 117.
19 Do you recognize Exhibit 117?
20     MR. MAY: Can I ask you, you don't
21 mind me marking on these?
22     MR. BURDEN: No, you go right ahead.
23 Now, we can't let you take them with you,
24 but whatever you need to do on them. We'll

Page 9

1    just throw them out when you're done.
2         MR. MAY:  Okay.
3    A   Yes, I recognize it.
4  BY MR. BURDEN:
5    Q   Can you tell me what Exhibit 117 is,
6  please.
7    A   The documents that I'm providing in
8  response to the subpoena.
9    Q   All right.  And is this, the documents
10 we see in Exhibit 117, is that the sum total of the
11 responsive documents to the CFTC's subpoena?
12        MR. MAY:  Are you having -- do you have
13 a question for me?
14        THE WITNESS:  Yes.
15        MR. MAY:  Okay.  Do you mind if I ask
16 him some questions?
17        MR. BURDEN:  We don't usually allow it,
18 but it seems like --
19        MR. MAY:  No.
20        MR. BURDEN:  -- it might be appropriate.
21        MR. MAY:  Yeah.
22        MR. BURDEN:  So go right ahead, Mr. May.
23        MR. MAY:  So, Mr. Ruth, did you tender
24 a number of documents to me to assist you in

Page 10

1    complying with the subpoena?
2         THE WITNESS:  Yes.
3         MR. MAY:  And did I review the subpoena
4    and decide on your behalf what documents were
5    responsive and which ones weren't?
6         THE WITNESS:  Yes.
7         MR. MAY:  Okay.  And the documents that
8    we're tendering to the CFTC is essentially the
9    documents that I've come to the conclusion are
10   responsive?
11        THE WITNESS:  Yes.
12        MR. MAY:  Okay.
13        MR. BURDEN:  All right.  So thank you,
14   Mr. May.
15   Q   So the subpoena essentially calls
16 for all documents in your possession relating to
17 Long Leaf Trading.
18   A   Um-hmm.
19   Q   Yes?
20   A   That is my understanding, yes.
21   Q   All right.  So are all of those documents
22 in CFTC Exhibit 117?
23   A   The documents that I gave to Mr. May,
24 the ones that he determined were responsive to the

Page 11

1  subpoena are here.
2    Q   Got it.  So there's no more documents
3  you expect to produce?
4    A   Not to my understanding.
5    Q   Okay.  Mr. Ruth, have you withheld any
6  documents called for by the subpoena based on any
7  claim of privilege?
8    A   What do you mean by privilege?
9    Q   I'm sure you will have talked
10 about this with your counsel but attorney-client
11 privilege, the Fifth Amendment privilege against
12 self-incrimination?
13   A   No.
14   Q   All right.  So if you would, please,
15 please describe the search that was conducted for
16 the subpoenaed records.
17   A   What do you mean by that?
18   Q   Well, the documents we see in
19 Exhibit 117, those are documents that you found
20 and you gave them to your lawyer and your lawyer
21 produced them to us, right?
22   A   Correct.
23   Q   So where did you get those documents
24 from in 117?  Were they maybe in a file drawer?

Page 12

1  Were they on your computer?  Where did you find
2  them?
3    A   I mean, they were predominantly emails
4  between me and principals and former principals and
5  attorneys of Long Leaf Trading Group.
6    Q   Okay.  So you looked in your email account,
7  correct?
8    A   Yeah, correct.
9    Q   And what's the address for that email
10 account?
11   A   Jeremysruth@hotmail.com.
12   Q   And do you have any other email accounts?
13 Why is that funny?
14   A   I don't know.  Hotmail's really old.
15   Q   It is.  I always laugh when I see a
16 Hotmail or a Yahoo.
17   A   Yeah.
18   Q   All right.  So you looked in your Hotmail
19 account, right?
20   A   Yeah.
21   Q   Where else did you look for responsive
22 documents?
23   A   Well, the only other documents that
24 I would have had would be with a Long Leaf email

Page 13

1  account, which I don't have access to because I'm
2  not, I guess, affiliated with them.
3      Q   Got it.
4          MR. MAY:  So you didn't produce those?
5          THE WITNESS:  No.
6  BY MR. BURDEN:
7      Q   And you can't produce them because you
8  don't have access --
9      A   Right.
10     Q   -- to that email address, right?
11     A   Right.  I just have -- these are
12 the only emails that I have in my personal stuff
13 or any documents that I have.
14     Q   Got it.  So do you have any physical
15 files in your home or office?
16     A   No.
17     Q   Any paper copies of documents?
18     A   No.  That was -- as you'll see from these
19 documents, it's prevented from that happening.
20     Q   Why is that?
21     A   It's a violation of their, I don't know,
22 protocols I guess.
23     Q   So did you have any documents that
24 you used at Long Leaf that you maybe took home

Page 14

1  in a bag or that you put in a file?
2      A   No, no, no.
3      Q   Do you know of any documents responsive
4  to the subpoena but not provided that were in your
5  possession at some other time but have since been
6  lost or destroyed or disposed of?  Maybe you threw
7  them away or you moved, anything like that?
8      A   I mean, there's obviously documents
9  when I was -- I don't know if you want to call
10 it an employee or independent contractor of Long
11 Leaf Trading Group, but I don't have any of those
12 documents.
13     Q   Well, did you take any of those documents
14 home?
15     A   No.
16     Q   At any point?
17     A   No.  I mean, I don't know if no
18 is right.  I don't have any, but I don't recall.
19 I mean, maybe one day I brought a document home
20 but ...
21     Q   And maybe you threw it away but you
22 don't remember either way, correct?
23     A   Correct.  Yeah, I don't.
24     Q   All right.  Have you ever given sworn

Page 15

1  testimony before, Mr. Ruth?
2      A   No.
3      Q   All right.  So I'm sure your counsel
4  went over these with you, but for the record I want
5  to do some quick rules of the road.
6      A   Okay.
7      Q   So the first is be sure to answer
8  my questions verbally, please.  There's a natural
9  tendency to nod or shake your head or in my case,
10 you know, make an affirmative noise.  So say yes or
11 no.  Give your answer.  Do you understand?
12     A   Yes.
13     Q   All right.  You and I should try not
14 to talk over each other.  I'm the guy that does
15 this the most, so I'll be extra mindful of it.  But
16 I'm sure our court reporter, Mary Maslowski, will
17 remind us if we start doing that.
18     A   Okay.
19     Q   And you know what a good rule of thumb
20 is, and I'm sure your lawyer already told you, is
21 if I ask you a question, take a breath, then answer
22 it, you know.  I don't want to ask you any questions
23 in testimony that confuse you or that you don't
24 understand.  So do you promise that if something

Page 16

1  confuses you, you'll tell me?
2      A   Yes.
3      Q   All right.  So what I want to do first
4  is talk a little about your personal background,
5  your education, your professional credentials and
6  then we're going to move on to Long Leaf Trading,
7  all right?
8      A   All right.
9      Q   All right.  So, Mr. Ruth, what is the
10 highest level of education you received, please.
11     A   High school diploma.
12     Q   Any college in there?
13     A   Yeah.
14     Q   How much, please.
15     A   98 percent completion.
16     Q   All right.  So three or four years then?
17     A   Yes.
18     Q   And where did you attend college?
19     A   College of DuPage and the University
20 of Houston.
21     Q   And what did you study there, please.
22     A   Hotel and restaurant management.
23     Q   What professional licenses or
24 certifications do you hold?

Page 17

1    A    Currently nothing I guess you could say.
2    Q    I ought to know this, but do you currently
3 hold a Series 3 or did you let that lapse?
4    A    It's an interesting situation.  I don't
5 know if it ever lapsed, but I'm not currently
6 registered with the NFA.
7    Q    Got it, okay.  But do you have a Series 3
8 license currently?
9    A    I mean --
10        MR. MAY:  Can I ask a question?
11    A    -- I've passed the Series 3 test, yes.
12        MR. MAY:  Okay.  That's where I was going
13 to go.  Okay.
14    A    But I don't think they like give you
15 a license so ...
16 BY MR. BURDEN:
17    Q    All right.  Any other operational
18 licenses or certifications that you've previously
19 held?
20    A    I was certified in sanitation in the
21 state of Illinois.
22    Q    What else, please.
23    A    I think that's it.
24    Q    All right.  So let's talk a bit,

Page 18

1 if we could, please, about your professional
2 background.  During what period of time did you
3 work for Long Leaf Trading?
4    A    March 13, 2015 to a day in late August
5 of 2017.
6    Q    All right.  So what did you do before you
7 joined Long Leaf Trading, please.
8    A    I worked in like the internet marketing
9 industry.
10    Q    Okay.  Can you be a little more specific,
11 please.  Like what company, how about that?
12    A    I worked for a company called Yodle.
13    Q    What did Yodle do, please.
14    A    Internet marketing for small to medium-
15 sized businesses.
16    Q    Was there anything in particular they
17 focused on?
18    A    Google AdWords.
19    Q    Okay.  So it's not like finance stuff.
20 It's just sort of general internet marketing, is
21 that fair to say?
22    A    Yes.
23    Q    All right.  And how long did you work
24 for Yodle, please.

Page 19

1    A    One year.
2    Q    All right.  What did you do before Yodle?
3    A    I worked in real estate, which going
4 back means I had a professional license in the state
5 of Texas to be a real estate agent.
6    Q    All right.  And before real estate?
7    A    I worked in the restaurant industry.
8    Q    Okay.  So was Long Leaf Trading your
9 first experience working for a financial firm?
10    A    Yes.
11    Q    All right.  What did you do after you
12 left Long Leaf Trading?
13    A    I went to Postrock Brokerage.
14    Q    And how long did you work at Postrock
15 Brokerage for?
16    A    So I think it would be like the first
17 week of September of 2017 until May 2nd of 2019.
18    Q    All right.  So what have you done
19 since -- what have you been doing since May of
20 2019, please.
21    A    I've been trying to open up my own GIB.
22    Q    And who would be the guarantor of that GIB?
23    A    Multiple people that I'm trying
24 to guarantee my IB, multiple different FCMs.

Page 20

1    Q    Got it.  So have you settled on one yet
2 or is that still in the works?
3        THE WITNESS:  How do I answer that
4        question?
5        MR. MAY:  To the best of your ability.
6    A    Yeah.  I mean, I'm trying to.  I'm having
7 some issues getting registered.
8 BY MR. BURDEN:
9    Q    Why is that?
10    A    I don't know.  I was hoping maybe you
11 guys could fill me in on that.
12    Q    I mean, we can't answer any questions
13 but --
14    A    Yeah.  I'm in the dark on --
15    Q    I don't know.
16    A    -- a lot of things that are going on.
17    Q    So you're not currently registered,
18 correct?
19    A    No.
20    Q    All right.  So let's talk about
21 your experience trading options sort of generally.
22 So it sounds like when you started working at Long
23 Leaf Trading, that was your first experience with
24 options, is that right?

Page 21

1   A   Correct.
2   Q   Have you traded personally in any
3   futures or options products for your own account?
4   A   With real money, no.
5   Q   What about for the accounts of others?
6   A   Have I traded personally for the accounts
7   of others?  No, I don't think so.
8   Q   All right.
9   A   Like are you asking if I had like
10  discretionary --
11  Q   Yeah, sure.  You know, what I'm trying
12  to ascertain is your knowledge and experience with
13  respect to options trading.  I understand that you
14  worked for Long Leaf Trading as a senior broker,
15  is that correct?
16  A   Yeah.  I mean, that might be like a
17  self-designated title, but yeah.
18  Q   And we'll get into that, right?  That's
19  why you're here.
20  A   Yeah.
21  Q   But, otherwise, I want to know have
22  you done any options trading for yourself?  And it
23  sounds like the answer's no, correct?
24  A   No, no.

Page 22

1   Q   Have you done any trading for other
2   people, perhaps clients or family or friends or
3   anything like that?
4   A   Yeah.  I mean, I think that's where
5   I need clarification.  Like I -- the accounts
6   I opened are self-directed accounts in a broker-
7   assisted environment so -- but I didn't -- the trade
8   ideas and all that kind of stuff came from another
9   person.
10  Q   Got it.  I understand.  Thank you.
11  The work you did for Postrock, can you describe
12  that, please.
13  A   I was an associated person.
14  Q   And did you do the same type of work at
15  Postrock that you did at Long Leaf Trading, i.e.,
16  sales?
17  A   I guess what do you mean by the same?
18  What did I do at Long Leaf?
19  Q   Yeah, yeah.  What was your -- we want
20  to get into Long Leaf, but I want to quickly touch
21  on Postrock.  What was your job title at Postrock?
22  A   Just associated person.
23  Q   All right.  And what were your
24  responsibilities, please.

Page 23

1   A   Well, I mean, it's not like the
2   firm gave me responsibilities.  So it's whatever
3   you want to -- you know, my goal is to acquire
4   clients and have them generate, you know, revenues
5   for the firm and myself.
6   Q   All right.
7   A   Yeah.
8   Q   So your customers at Postrock -- did you
9   have customers at Postrock?
10  A   Yes.
11  Q   All right.  So did they trade in options?
12  A   Yes.
13  Q   All right.  Did they trade out-of-the-money
14  option spreads?
15  A   Out-of-the-money option spreads.
16     MR. MAY:  And we're talking about
17  at Postrock.
18  A   At Postrock?
19  BY MR. BURDEN:
20  Q   Yeah.
21  A   I mean, I'm not 100 percent positive
22  if I could use the word out of the money, but they
23  traded option spreads.
24  Q   Got it.

Page 24

1   A   Probably some were in the money and out
2   of the money, yeah.
3   Q   So at Postrock were your clients also
4   broker-assisted clients?
5   A   Yes.
6   Q   Got it.  All right.  So let's talk about
7   Long Leaf Trading, if we could, please.  So I think
8   you testified that you worked at Long Leaf Trading
9   from March 13th of 2015 through sometime into late
10  August of 2017, is that right?
11  A   Yeah.  I mean, I became an associated
12  person I don't think until like April 24th or
13  26th of 2015.  So, I mean, before that I was just
14  studying for the Series 3 and sitting there and
15  watching what was going on.  I don't know if I was
16  technically employed.
17  Q   All right.  So what was your job title
18  when you started at Long Leaf Trading?
19  A   I don't know.  Associated person,
20  commodities associate, something like that.
21  Q   All right.  And did that title change
22  when you were registered as an associated person?
23  A   I mean, we didn't really do titles.
24  We just -- kind of just some day like, you know,

Page 25

1  we were commodity associates and then some day
2  we woke up and said, well, we're senior commodity
3  associates.
4     Q   Yeah, I was going to ask about that.
5  So is that a meaningful distinction, senior --
6     A   No, I don't think so.  I don't know.
7     Q   Was that a title you gave yourself?
8     A   Probably, yeah.
9     Q   All right.  So when you started in
10 March of 2015, what were your responsibilities?
11 What did you do at Long Leaf Trading?
12    A   I was studying for the Series 3.
13    Q   What else did you do?
14    A   Got people coffee.
15    Q   What else?
16    A   That was pretty much it.
17    Q   All right.  And were you paid for that?
18    A   Interesting question.  I think the
19 deal that I had was if I passed the Series 3,
20 I would be compensated.  But I ended up failing the
21 Series 3 the first time I took it, so I don't think
22 I was compensated.  And then I passed the Series 3
23 the second time I took it.
24    Q   All right.  And after you passed

Page 26

1  the Series 3, was that when you were registered
2  as an associated person?
3     A   I would -- yeah, I would assume so, yeah.
4     Q   That's right?
5     A   That I was an associated person after
6  I passed the Series 3?
7     Q   Correct.
8     A   Yeah.  I mean, that was the whole
9  purpose of getting the Series 3, was to be an
10 associated person, yeah.
11    Q   So when did you pass that Series 3 then,
12 please.
13    A   I can't remember the exact date, but
14 I would assume my NFA record reflects it.  But I
15 think it's April 24th, if I'm not mistaken, 2015.
16 I wouldn't hold me to that but it's --
17    Q   I'm sorry.  I thought you testified
18 that you were registered as an AP in April of 2016.
19 Was it 2015?
20    A   2015.
21    Q   There we go.  That makes a lot more
22 sense.  So for a month you were kind of hanging out,
23 getting coffee, studying for your Series 3 and not
24 being compensated, correct?

Page 27

1     A   I was supposed to be compensated
2  in the event that I passed my Series 3 on the first
3  try, but I didn't.
4     Q   Oh, so you were getting retroactive comp
5  if you passed, correct?
6     A   Yeah, I think something of that nature.
7     Q   All right.  And you didn't the first
8  time --
9     A   No.
10    Q   -- but you passed eventually, correct?
11    A   Yes.
12    Q   All right.  So when did you
13 begin -- or I should ask instead when you
14 started as an associated person, what were your
15 job responsibilities then?
16    A   To bring in customers.
17    Q   Did you have any other responsibilities?
18    A   I mean, it's -- I think at the time
19 there was like three or four associated persons
20 and then, you know, the owner, principal, the
21 compliance officer.  So, I mean, I don't know.  Just
22 like general office stuff.  I think they designated
23 me maybe as like the IT guy.
24    Q   All right.  So one of your tasks

Page 28

1  was to bring in customers, right?
2     A   Yeah.
3     Q   And you sort of had an informal role
4  as an IT person, is that correct?
5     A   Yeah, like fixing computers and making
6  sure that they can print and stuff like that, yeah.
7     Q   What else did you do?
8     A   Just learned, studied, talked to people.
9  That's about it.
10    Q   All right.  Was your primary responsibility
11 to bring in customers?
12    A   Yeah, that's what I was hired to do, yes.
13    Q   All right.  And was that your primary
14 responsibility through April of 2015 until you left
15 the firm?
16    A   I think you have those dates -- I left
17 the firm in August of 2017.
18    Q   I understand.  I mean, was bringing
19 in customers your primary job duty from the time
20 that you were registered as an AP in April of '15?
21    A   Yeah, yeah, I could -- I mean, you could
22 say that, yeah.
23    Q   All right.  At Long Leaf Trading who
24 supervised you, please.

Page 29

1    A   Tim Evans and towards the end of my
2  tenure Brian Adams as well.
3    Q   Any other supervisors during your tenure
4  at Long Leaf?
5    A   No, no.
6    Q   And did you supervise anybody at Long Leaf?
7    A   I mean, I had the same job title
8  as a lot of people but, I mean, my personality
9  might -- I don't know, could be perceived as.
10  But, I mean, I was never given like an official
11  supervisor designation.
12    Q   Let me ask you this.  Who, stepping
13  back to supervising again, who hired you at Long
14  Leaf Trading?
15    A   Tim Evans.
16    Q   Did you ultimately quit or were you fired?
17    A   I don't know how to answer that question.
18  It's one of those, you know --
19    Q   I'll ask you what happened later, how
20  about that?
21    A   Yeah, it's -- I don't know.  He --
22  I don't know.  I guess if you were to reflect the
23  record, maybe I'm fired but ...
24    Q   Who fired you?

Page 30

1    A   Tim Evans.
2    Q   There we go.  All right.  Getting
3  back to the question of people that you supervised,
4  were there any employees at Long Leaf Trading or
5  contractors or people who worked there that reported
6  to you?
7    A   Well, I'm not saying that I supervised
8  anybody.
9    Q   Well, that's not what I'm asking,
10  right?  Is there anybody that reported to you?
11    A   No.  I mean, like not -- like if you're
12  talking like standard like corporate structure,
13  like pyramids or something, am I above anybody,
14  no, that's not how it worked.
15    Q   All right.
16    A   Like did I collaborate with other people,
17  yes, but it's not like they reported to me.
18    Q   Was there anybody at Long Leaf Trading
19  who did work for you?
20    A   Again, we -- it's a team-based environment,
21  so I don't know.
22    Q   All right.  Let's talk about your comp
23  at Long Leaf Trading, if we could, please.  What was
24  the basis for your compensation?

Page 31

1    A   What do you mean by that?
2    Q   Well, did you get salary?  Did you
3  get commissions?  Did you get a mix of salary and
4  commission?
5    A   The thing changed every five minutes,
6  so let's see.  I think originally my deal was I got
7  like $1500 a month and then 20 percent of revenues
8  generated I guess by my efforts or in coordination
9  with my efforts.  At one point I got 40 percent of
10  all commissions generated, but then I think I had
11  to pay like salaries of other people.  Then I had
12  like a sliding scale compensation structure where
13  it depended on like the amount of new accounts I
14  opened.  And then in going back to the team-based
15  environment, like who was involved in the opening
16  of the account process.
17    Q   Got it.  So it sounds like originally
18  you had sort of a $1500-a-month salary but then you
19  would get commissions in some amount, is that right?
20    A   Yeah.
21    Q   So that $1500, was that a draw?
22    A   No.
23    Q   So you just got that?
24    A   Yep.

Page 32

1    Q   All right.  So when did that arrangement
2  stop and when did it move to a commission-based
3  model?
4    A   Well, it's always been a commission-
5  based model.  It was the salary plus commissions.
6    Q   When did the salary go away is what I'm
7  asking.
8    A   I don't recall.
9    Q   How many months approximately of $1500
10  payments did you get, do you think?
11    A   I don't recall.
12    Q   So after this $1500-a-month arrangement
13  ceased, were there any other salary payments after
14  that or was it just some commission-based metric?
15    A   I think, yeah.  I mean, as I started
16  opening more accounts, which I can't tell you when
17  this date flipped, I moved to -- I didn't get the
18  guaranteed $1500.  I just got commissions.  But
19  like the commission percentage changed so often,
20  and I couldn't tell you the exact dates.
21    Q   Okay.  No, I understand.  What I'm
22  trying to ask is -- and I think probably not doing
23  a good job -- is after you stopped getting that 1500
24  a month, was there any more sort of salary after

Page 33

1 that or was everything commission based? And
2 I understand that the basis for the commission
3 changed and the percentage changed. I'm just
4 trying to focus on a salary component.
5 A  Right. I mean, I don't -- the reason
6 why I'm like hesitant in answering that is -- not
7 hesitant in like providing an answer. I'm just
8 unsure of the answer because like I think I had
9 some deal worked out where like he paid for like
10 my parking spot. And so I don't know if you
11 consider that salary, but I had like a parking
12 spot paid for. I had -- at one point I think
13 I had like a summer intern and that was paid
14 for, but it was like given to me. I don't know.
15 Somehow it was like salary. So I don't know.
16   Q  Got it. So you understand --
17   A  I had a weird situation.
18   Q  It sounds like it. So you understand
19 what a 1099 is, right?
20   A  Yes.
21   Q  All right. So what percentage --
22 like, you know, you're getting that 1099 every
23 year. Like what portion of that is going to be
24 salary versus commissions after that sort of $1500

Page 34

1 stops?
2   A  I don't know. I don't know off the top
3 of my head.
4   Q  All right. So are you familiar with the
5 phrase Time Means Money?
6   A  Yes.
7   Q  All right. What's the basis for your
8 familiarity? Why is that familiar to you?
9   A  At Long Leaf Trading Group that was
10 the name of the -- I don't know if you want to
11 call it program we would solicit.
12   Q  And when did that program start, please.
13   A  Pretty much when I started.
14   Q  Got it. So by the time you started
15 work as an AP in April of 2015, the Time Means
16 Money program was in full swing, is that fair to
17 say?
18   A  I guess, yeah. I mean, I wouldn't
19 actually say full swing but it was -- it existed.
20   Q  Got it. And is it fair to describe Time
21 Means Money as a broker-assisted trading program for
22 customers of Long Leaf Trading?
23   A  Broker-assisted trading program.
24 I mean, that's a very limited view of it, but yeah.

Page 35

1   Q  All right. Well, why don't you describe
2 it for me, if you would, please.
3   A  It's an option -- they use it as
4 an option selling strategies with defined risk and,
5 yeah, it's done in a broker-assisted environment.
6   Q  So what does that mean, please,
7 broker-assisted environment.
8   A  It means that the broker assists
9 the clients in, you know, executing trades.
10   Q  Got it. So does the broker recommend
11 the trades to the client?
12   A  In the situation -- I mean, not
13 under the -- I mean, not under the -- I mean,
14 I don't know. I can speak specifically about this
15 situation.
16   Q  That's all I'm asking about.
17   A  All right.
18   Q  So we're only talking about Time Means
19 Money.
20   A  The chief market strategist, which
21 was Tim Evans, would design a trade. It was given
22 to me to then present it to the client and obtain
23 their permission for execution. So I'm just kind
24 of like a lemming in this situation, if you want

Page 36

1 to call it. I don't -- it's not like my trade
2 ideas or I didn't have a choice. It wasn't like
3 I gave -- I didn't provide any feedback, but also
4 it wasn't -- it wouldn't have been accepted if
5 I did anyway so...
6   Q  So what percentage of your customers
7 when you were at Long Leaf Trading were Time Means
8 Money customers?
9   A  I would say a majority of them,
10 you know. I was -- there was -- I managed --
11 I mean, I had some people that were like given to
12 me that are either self-directed or I think, yeah,
13 that I would like communicate with or be like their
14 point of contact for the firm. But pretty much
15 everything was Time Means Money.
16   Q  Do you have any knowledge or understanding
17 of what Long Leaf Trading did before you showed up
18 in terms of broker recommendations? It's a terrible
19 question but, you know --
20      MR. MAY:  Because it calls for speculation.
21      MR. BURDEN:  It may or may not. I think
22   it's just inartfully worded.
23   Q  But, you know, did Time Means Money
24 take the place of something? Were they recommending

Page 37

1 other trades or just doing self-directed, if you
2 know?
3    A   Yeah.  I mean, from my understanding --
4 and this was just told to me.  I didn't see it
5 or anything -- was they had like some trade alert
6 service called In The Money maybe or some other
7 play on those words.  And, you know, there was also
8 just, you know, general brokerage accounts and
9 things of that nature.
10          And so I was getting there
11 when there was this move from -- again, I'm not
12 100 percent positive on the title, but I think it
13 was called In The Money trade alerts to Time Means
14 Money.  So I'm like that, I don't know, I guess
15 there's that before me.  Then I come and they had
16 already made the decision to switch and they had
17 already switched, but I was there I guess in the
18 beginning of it.
19    Q   Got it.
20    A   I don't know what -- I mean, I guess
21 they send out alerts and they I guess execute
22 maybe -- maybe they're discretionary accounts.
23 But, I mean, I guess I would be speculating.
24 I don't know exactly what they're doing.

Page 38

1    Q   Got it.  So, Mr. Ruth, did Mr. Evans
2 ever talk to you about or explain why Long Leaf
3 was transitioning from whatever they were doing
4 before to Time Means Money?
5    A   I mean, I think like a better trade
6 strategy.  Like so better client performance I think
7 was the goal.
8    Q   All right.  Is that what Mr. Evans said
9 to you?
10    A   I don't recall specifically.  But
11 if you were to like kind of sum it up, I think that
12 was the idea behind it.
13    Q   And that's something that Mr. Evans
14 communicated to you?
15    A   Yeah.
16    Q   Okay.  And how did he communicate that
17 to you?
18    A   Verbally.
19    Q   Got it.  And do you remember when he
20 said that to you?
21    A   I mean, this would all be happening
22 probably between the dates of March 13th and
23 April 24th.
24    Q   All right.  So Mr. Evans communicated

Page 39

1 to you that the transition to the Time Means Money
2 program was for better performance for clients,
3 is that right?
4    A   I think -- well, I mean, I guess
5 I could speak on behalf of all brokers.  I think
6 all brokers generally want to always improve account
7 performance, and so they're constantly evolving what
8 it is that they're doing in order to -- you know,
9 as results are coming in.  So, yeah, I would assume
10 that's what we're -- that's what he's going for.
11    Q   All right.  Did Mr. Evans say anything
12 else to you about the reasons for the transition
13 to Time Means Money?
14    A   Nothing that I recall.
15    Q   All right.  Do you have an understanding
16 of how Long Leaf's profits were affected by the
17 transition from Time Means Money?  Like did Long
18 Leaf make more money or less money, if you know?
19    A   I mean, I would assume -- I mean,
20 I really, you know --
21    Q   Well, rather than have you assume,
22 let me --
23    A   Like do I know for a fact like what the
24 dollar amount change is or --

Page 40

1    Q   Did anybody at Long Leaf Trading
2 talk to you about that?  Did Mr. Evans ever talk
3 about the firm's revenues sort of pre Time Means
4 Money and post Time Means Money?
5    A   I mean, yeah, he indicated that they were
6 making more money.
7    Q   And how did he indicate that to you?
8    A   Verbally.
9    Q   All right.  And when?
10    A   I mean, throughout my tenure there, yeah.
11    Q   So did he say why?  Like why was Time
12 Means Money more profitable than what Long Leaf was
13 doing before?  Did he tell you?
14    A   Well, I mean, we brought in more clients
15 so ...
16    Q   Did Mr. Evans ever talk to you about
17 why more clients came in?
18    A   Well, we -- I mean, we had more people
19 working there.
20    Q   Was there anything about the Time
21 Means Money program that Mr. Evans intimated to
22 you was a better draw for clients?
23    A   I think that's -- I don't know.  I think
24 I would be speculating on behalf of the client as to

Page 41

1 why they're attracted to the program so ...
2    Q   Yeah.  What I'm asking you is did
3 Mr. Evans say anything to you?  Did Mr. Evans say
4 anything like, oh, clients like this program better
5 because or this is more appealing to clients because
6 or I think this is working well because?
7    A   No, I don't think we would talk like that.
8    Q   Do you have any knowledge or understanding
9 as to where the idea for Time Means Money came from?
10    A   Yeah, what's this guy's name.  I don't
11 know.  He's some goofball who worked at LaSalle
12 Futures I think.  Matt, Matt -- do you know this
13 guy I'm talking about?  You probably already know
14 this answer.
15    Q   If I did, I couldn't say.
16    A   Matt -- I don't know.  I could tell you
17 everything about him but his name.
18    Q   Yeah.  So how did you find out about this
19 guy, how about that?
20    A   He -- I think he pitched -- so there's
21 another AP at the firm named James Leeney.  He used
22 to work at maybe LaSalle Futures or some subsidiary
23 of it or something.  Matt Zeman, that's his name,
24 Matt Zeman.

Page 42

1    Q   And how do you spell Zeman, please.
2    A   I couldn't tell you.  That's not
3 close, I'll tell you that.  Matt Zeman I guess
4 introduced -- or I guess Jamie, or James Leeney
5 introduced Matt Zeman to Tim Evans about this
6 program that I think was in some sort of form,
7 like maybe just -- it's called Time Means Money
8 and you do the short options, and I think he
9 actually had a book too as well.
10    Q   So how do you know those things?
11    A   How do I know those things?
12    Q   Yeah.
13    A   Just sitting in the office listening
14 to that.
15    Q   So you heard somebody talking about it,
16 right?
17    A   Yeah.
18    Q   Who was talking about it?
19    A   Tim Evans.
20    Q   Got it.  And was Tim Evans talking to
21 you or did you overhear him talking to somebody
22 else?
23    A   He would talk to us in a group setting,
24 yeah.

Page 43

1    Q   So Mr. Evans explained to you that
2 he got the idea for Time Means Money from Matt
3 Zeman, is that right?
4    A   Yeah, that's my understanding.
5    Q   Did Mr. Evans ever tell you what
6 appealed to him about this Time Means Money idea?
7    A   I think the most appealing thing is it
8 kind of like dictates time, like -- I'm sure you
9 know there's like four trades a month.  And so
10 it gives you, you know, from a broker standpoint
11 it gives you the ability to like, you know --
12 like traditional brokerage, like your phone rings
13 incoming and you don't know what's going to happen.
14 And then you get on the phone and the next thing
15 you know, like the whole day's gone by and you
16 might have talked to one person for seven hours.
17 So I think the idea behind it is from a like a
18 workflow management perspective, to kind of change
19 that around where we get to control when things are
20 happening in your workday so that you can maximize
21 your efforts.  And then also, on the other hand, so
22 the client had, you know, would know what exactly
23 was going to happen that month.
24          I think that's kind of the premise

Page 44

1 behind it is is that people, you know, somebody
2 might say I want a 10 percent return on my money.
3 Well, you're not going to get a 10 percent return
4 unless you put yourself in a position for a
5 10 percent return.  And so if you know how many
6 trades you're going to do and you know how much
7 money you're bringing in on the trade and then
8 you hope, you know, how much money is going out,
9 then you can, you know, make a -- create an
10 actual path where the possibility of getting that
11 10 percent can actually happen, whereas if you just
12 do things randomly you might not even put yourself
13 in that position for it to happen.
14    Q   Did Mr. Evans ever talk to you
15 about the commission-generating benefits of doing
16 four trades a month as part of the Time Means Money
17 program?
18    A   Well, what do you mean by that?
19    Q   Well, let's sort of make it simpler.
20 Did Mr. Evans ever talk to you about commission-
21 related benefits from this Time Means Money program,
22 about how it could potentially generate more
23 revenues for Long Leaf than other models?
24    A   No.  But, I mean, that wouldn't

Page 45

1  be applicable to me because I never -- I never
2  was in like a traditional brokerage era, so I don't
3  have anything to compare it to.
4      Q    I'm just asking you what Mr. Evans told
5  you.
6      A    Right.  And, no, I mean, the only thing
7  is is like he would preach is is that, you know,
8  you know how much money you're going to make this
9  month because you know how much clients you have
10  and you know how many trades we're doing.
11     Q    So Mr. Evans would tell you that with
12  Time Means Money you would know how much money you
13  were going to make this month because you knew how
14  many clients you had and what they were trading?
15     A    Well, you knew that they were going to
16  do four trades.
17     Q    Got it.
18     A    So you have a better idea of knowing
19  than just if you're a traditional broker.  It
20  depends I guess on volume and market conditions, you
21  know, the suitability of -- the financial situation
22  of your clients and things of that nature.  So it's
23  kind of an unknown where you don't know how much
24  money you would make until the month's over.

Page 46

1      Q    So why does Time Means Money sort
2  of provide more stable income for brokers?  Like
3  why is that so?
4      A    Because you're doing the same amount
5  of trades every month and you know how many clients
6  that you have and so -- and you know how much you
7  charge for a commission.  So you know -- you have
8  a better idea of knowing that.
9      Q    And with traditional brokerages,
10  you know, did Mr. Evans ever talk to you about what
11  the model is there?
12     A    I mean, yeah.  I mean --
13     Q    What's the model?
14     A    You call people and -- there's no
15  rhyme or reason.  You try to develop relationships
16  with them and just stay in front of them.  And, you
17  know, sometimes you get guys with a couple dollars.
18  Sometimes you get guys with a lot of money and you
19  just -- you're kind of at whatever happens happens,
20  you know.  You don't get to control your destiny.
21     Q    And so Time Means Money allowed sort
22  of the brokers to control their destiny a little
23  bit better?
24     A    I mean, you don't necessarily get to

Page 47

1  control your destiny because at the end of the
2  day they have to, you know, approve the trades and
3  things of that nature.  But you could -- you know,
4  if you had to tell your wife next month like, hey,
5  we're going to have probably about $3,000 to work
6  with, then you could probably say that, yeah.
7      Q    Got it.  And with traditional
8  brokerages your understanding is that it's a bit
9  more catch-as-catch-can, is that fair to say?
10     A    I'm not familiar with that term but,
11  I mean --
12     Q    Well, then I'll ask a different question,
13  all right?
14     A    All right.
15     Q    So for traditional brokerages it's more
16  random.  Customers would be more idiosyncratic in
17  their trading?
18     A    Yeah, that's my understanding, is it's
19  an unknown variable.
20     Q    Right.  And you got that understanding
21  from Mr. Evans, correct?
22     A    Yes.
23     Q    All right.  So we've been talking about
24  recommendations in the Long Leaf Trading Time Means

Page 48

1  Money program, but we haven't really gotten into
2  any kind of detail.  So under the Time Means Money
3  program, Mr. Evans would come up with trade
4  recommendations, right?
5      A    Yes.
6      Q    And you would pass those along to clients,
7  correct?
8      A    Yes.
9      Q    And there would be four recommendations
10  every month, correct?
11     A    Yes.
12     Q    And is it fair to describe these
13  recommendations as recommending out-of-the-money
14  option spreads during your tenure at Long Leaf?
15     A    Again, I couldn't tell you if they're
16  out of the money or in the money, but I can tell
17  you that they're all option spreads, except -- I
18  mean, unless you don't consider like a put ratio
19  front spread as a spread, but I would assume you
20  do.  So, yeah, they're all spreads.
21     Q    All right.  So how did you provide these
22  recommendations to your clients?
23     A    Verbally over the phone.
24     Q    All right.  Is there any sort of written

Page 49

1 record generated of the recommendations that you
2 provided?
3     A   I didn't provide any recommendations.
4     Q    Well, that you communicated, how about
5 that?
6     A   Oh, like as the passer guy?
7     Q    Yeah.  Like did you ever write
8 it down anywhere or did you like send emails to
9 people sometimes?
10     A   There's client trading statements.
11     Q    Any other written records of the
12 recommendations that you communicated to clients?
13     A   I don't know.  Some clients, like we'd
14 make like a chart type thing so they could better
15 understand it with like, you know, an image that's
16 very elementary in nature, but that's -- I don't
17 have those items or anything.
18     Q    We'll look at them in a little bit.
19 So when you called up clients and communicated
20 Mr. Evans' recommendation to them, how would you
21 do that?
22     A    To be honest with you, I don't really --
23 I don't recall specifically how we did it at Long
24 Leaf Trading Group.

Page 50

1     Q    Well, how many customers do you think
2 that you serviced at Long Leaf Trading?
3     A   Over a hundred.
4     Q    All right.  So every month how many
5 times do you call each customer?  Do you just
6 call them once at the beginning of the month or
7 a few times?  What did you do?
8     A   It really depended on how the person
9 wanted to be serviced.  But, I mean, I would assume
10 I talked to people once or twice a month, yeah.
11     Q    All right.  So if you're talking to
12 people once or twice a month and you have a hundred
13 clients, you're doing --
14     A   I had a hundred clients like --
15     Q    Total?
16     A   -- not at once, yeah.
17     Q    I get it, okay.
18     A   Yeah.
19     MR. MAY:  During your tenure?
20     THE WITNESS:  Yeah, I think.
21     MR. MAY:  Is a hundred an estimate?
22     THE WITNESS:  Yeah, that's not like
23 a -- yeah, I would --
24

Page 51

1 BY MR. BURDEN:
2     Q    So would --
3     A   I think at my high point, at one point
4 I was managing 63 clients at one time.
5     Q    All right.  So I guess what I'm getting
6 at here is it seems like you had a lot of calls with
7 a fair number of clients, and surely you must be
8 able to generalize as to how you delivered this
9 recommendation.
10     A   No.
11     Q    So it was different for everybody?
12     A   I mean, this is years ago.  No, it's
13 not that.  It's just that how I operate now and
14 how I operated before are -- not separate but it's
15 different and, you know, I've learned things over
16 the years and I've evolved as a broker and things
17 of that nature.  So I don't recall.  I actually
18 probably don't want to recall how I, you know,
19 how I sounded when I was, you know, fresh in the
20 industry.  So I don't -- but the idea, I mean,
21 like to give the general premise is the idea is
22 you tell them, you know, what the trade is.  So
23 I would assume you're saying like the strikes and
24 calendar months and the specific commodity and,

Page 52

1 you know, what premium generation and risk and
2 things of that nature but ...
3     Q    Got it.  So --
4     A   I think the most important part is
5 probably getting them to say yes so ...
6     Q    So that sort of leads me to my next
7 question.  It sounds like when I asked you how
8 you delivered these recommendations, it sounds like
9 the answer is you would call up a client and you
10 would give them the strike prices, right?
11     A   Yeah, I would assume so.  I mean,
12 I don't necessarily recall, but I would assume
13 that's what we would do, yeah.
14     Q    You would tell clients the details of the
15 proposed trade, right?
16     A   Yes.
17     Q    And those details were communicated to
18 you by Mr. Evans, correct?
19     A   Yes.
20     Q    And how did he communicate those details
21 of the recommendations to you?
22     A   He'd write them on a piece of yellow paper.
23     Q    And would he then hand that to you?
24     A   Yes.

Page 53

1   Q   Did he do this for all of the brokers?
2   A   There's only a few brokers that actually
3   communicated to the clients.
4   Q   Got it. You, Mr. Leeney, who else?
5   A   There was a Vince Prieto at one point.
6   There was a -- what's his name, Tony Klancic. And
7   then the only other person who would have talked to
8   a client would have been, what's his name, Chris
9   something. I don't remember his last name.
10   Q   All right. So I think you testified
11   earlier that the important thing in talking to
12   clients in describing the trades was getting them
13   to say yes, let's do the trade. Is that fair to
14   say?
15   A   Yeah. I mean, in a broker-assisted
16   environment you want to get people to approve the
17   trade, yeah, I would assume.
18   Q   Got it. And would clients approve
19   the trade on the phone or would you have them write
20   you an email? How did you obtain the approval?
21   A   Almost all the time the way I conducted
22   myself was over the phone. I mean, there might be
23   like some email approvals, but over the phone, yeah.
24   Q   Got it. And was there any written record

Page 54

1   that you created of this approval?
2   A   Well, I mean, we had like order tickets
3   and things of that nature so ...
4   Q   Okay. So other than the order tickets?
5   A   Well, if it was in an email, then there
6   would be an email.
7   Q   Okay. So other than the order tickets
8   and other than an email they sent, any other written
9   record?
10   A   Not that I recall.
11   Q   All right. So switching gears to talk
12   about the recommendations, did Mr. Evans ever tell
13   you what the basis of the recommendations were?
14   A   I mean, sometimes, yeah.
15   Q   Do you recall anything he said about it?
16   A   I couldn't tell you.
17   Q   What role did the equity in a customer's
18   account play in the trades that are recommended,
19   if any, if you know?
20   A   I'm not part of that decisionmaking
21   process so ...
22   Q   All right. Did you ever ask Mr. Evans
23   what the basis for his recommendations were?
24   A   Like I would assume -- I can't give

Page 55

1   you a specific time that I did. I mean, I don't
2   recall.
3   Q   Do you know if it's a thing that you ever
4   did or do you just sort of take the recommendations
5   and go with them?
6   A   I mean, yeah. I mean, I didn't have
7   a choice. So it was either -- I mean, it was either
8   do that or leave your job so ...
9   Q   Well, did you ever ask Mr. Evans
10   we're doing a crude oil spread this month, why
11   crude oil, why this spread? Did you ever ask Mr. --
12   A   I would have -- I can't tell you
13   specifically, but I would assume that I'm a person
14   who's curious about the world. So, yeah, I would --
15   you know, if I wanted to know why we did something,
16   yes, there is a justification for it.
17   Q   All right. And would Mr. Evans provide
18   that justification to you?
19   A   Probably most of the time, yeah.
20   Q   And how did he do that?
21   A   Everything's verbally.
22   Q   All right. I think you testified
23   before that under the Time Means Money program
24   customers received four recommendations a month,

Page 56

1   correct?
2   A   Um-hmm.
3   Q   Yes?
4   A   Yes.
5   Q   There we go. Why is the number four?
6   Why not two, why not eight, if you know?
7   A   You've got to ask Tim Evans but ...
8   Q   Did you ever ask Mr. Evans?
9   A   Yeah. I mean, the answer I got is
10   basically -- I don't know the way to describe
11   it. It's like the point of saturation. Like
12   if you have one trade, you have 100 percent risk.
13   If you have two trades, you have 50 percent, you
14   know, risk. If you have three trades, you have 33.
15   Four, you have 25 percent. When you go to five,
16   the amount of money it costs to finance the fifth
17   trade doesn't -- it overweighs the amount of
18   money -- the amount of percentage that you're
19   decreasing the risk, I guess spreading out risk.
20   So that's his philosophy on that.
21   Q   Do you know if that's right?
22   A   I don't know. I just do what I'm told.
23   Q   So let's talk more about the
24   recommendations, if we could, please. So for

Page 57

1 the options strategies that were recommended
2 by Long Leaf while you were there, did all of the
3 options expire? Were they all left to expire or
4 were some of them offset?
5    A    I mean, I don't recall. But, yeah,
6 I would assume that positions were managed within
7 the option period, but I don't recall specifically.
8    Q    Yeah. And if you don't recall
9 specifically, that's okay. But do you recall
10 generally were options sort of exited out of on
11 occasions rather than being left to expire?
12    A    Yeah. I mean, yeah, I would assume
13 that -- like we managed positions, if you want to
14 call it that, yeah.
15    Q    And I sort of -- I want to get to a clear
16 answer on that, if you have the recollection. Did
17 that in fact happen? Were client positions exited
18 out of rather than left to expire on occasion?
19    A    Yes.
20    Q    All right. Do you recall any specific
21 occasions where that happened?
22    A    No.
23    Q    Was permission obtained from clients
24 to exit out of those positions once permission --

Page 58

1 well, let me just ask that. Was permission obtained
2 from clients to exit out of those positions?
3    A    Anytime that there is a trade being done
4 there's permission from a client.
5    Q    Got it. So when it turned out that
6 you had to -- you know, that Long Leaf was going
7 to recommend exiting a trade rather than letting it
8 expire, how did you find that out?
9    A    From Tim Evans.
10    Q    All right. And how would he communicate
11 that to you?
12    A    Verbally.
13    Q    And what would you do once you had that
14 information?
15    A    Then it's my job to -- if he says we're
16 going to get out of crude oil, like a hypothetical
17 situation, okay, are we booking this for a profit
18 or a loss. He would tell me whatever the answer
19 is and then I would, you know, go tell the client --
20 you know, obviously it depends on the fill price --
21 but I think that we need to obtain your permission
22 to do this. This is what would happen within,
23 you know, a certain dollar amount depending what
24 the market's trading at.

Page 59

1    Q    Got it. And was there any written
2 record of the permission that you received from
3 clients to exit positions?
4    A    I mean, again, most of it was done
5 verbally. In the event that, you know, I had
6 to reach somebody by email, then yes, there could
7 be a written record. But there's nothing besides
8 a phone call or an email.
9    Q    Any other types of written records,
10 maybe records you kept for yourself?
11    A    No, I don't recall.
12    Q    All right. You mentioned order tickets
13 before. When clients gave you their permission to
14 exit positions, would you fill out order tickets for
15 them?
16    A    Yeah, I believe so, yeah.
17    Q    All right. And what would you do with
18 those order tickets?
19    A    Give them to Tim Evans.
20    Q    And so even when clients were exiting
21 positions rather than entering into them, you had
22 to contact those clients and you would fill out
23 order tickets for them, is that correct?
24    A    My understanding, yeah. I mean --

Page 60

1    Q    Is that what you did?
2    A    That's -- I believe that's what
3 we did. I don't know specifically. Like that's
4 how I would do it.
5    Q    But is that how you did do it?
6    A    I have -- I guess I don't recall then.
7        MR. BURDEN: All right. I'll tell you
8    what, guys. Could we go off the record for
9    five minutes here and then we're going to get
10    into some documents.
11        MR. MAY: Sure. Do you want to take
12    a break?
13        MR. BURDEN: Yes, please.
14        MR. MAY: Okay. Can you make it ten?
15        MR. BURDEN: Absolutely.
16        (Whereupon a recess was taken from
17        10:54 a.m., to 11:20 a.m., after
18        which the following proceedings
19        were had:)
20        MR. BURDEN: Back on the record, please.
21        (Whereupon CFTC Exhibit No. 118 was
22        marked for identification, MM.)
23    Q    All right. Mr. Ruth, I want to
24 hand you what I've marked as CFTC Exhibit 118.

Page 61

1  Do you recognize CFTC Exhibit 118, Mr. Ruth?
2       MR. MAY:  Can we have a little bit longer?
3       MR. BURDEN:  Of course.
4    Q   Mr. Ruth, do you recognize CFTC
5  Exhibit 118?
6    A   What do you mean by recognize?
7    Q   Well, have you seen it before?
8    A   Yeah.
9    Q   All right.  What is it, please.
10   A   These are these, in my previous
11 testimony, the elementary images that I make
12 so that I can understand the trades that Tim Evans
13 designs.
14   Q   So CFTC Exhibit 118 is a document
15 that was produced by Long Leaf Trading, and it's
16 an email with some attachments.  And it says from
17 jruth@longleaftrading.com and that was your email
18 address at Long Leaf, right?
19   A   Yep.
20   Q   And you'll see the date on it is
21 September 1st of 2016, is that right?
22   A   Correct.
23   Q   And there's an address or a To line
24 and it says Broker Team.  Who's the broker team,

Page 62

1  please.
2    A   I don't recall exactly.
3    Q   It's the brokers at Long Leaf, right?
4    A   I would assume so.
5    Q   All right.  So if you look and
6  you'll see the second page of Exhibit 118, we've
7  got a chart here.  And who generated this chart?
8    A   Me.
9    Q   How do you generate it?
10   A   I utilized Gain Trader I guess or
11 Long Leaf Trading Xpress, which is the white label
12 of Gain Capital's trading platform, and Microsoft
13 Word.
14   Q   All right.  So these charts you made
15 using this Gain electronic platform, is that right?
16   A   Correct.
17   Q   And you generated the charts and you
18 dropped them in a Word document, right?
19   A   Yes.
20   Q   And then you sent those documents,
21 these charts to the other brokers at Long Leaf,
22 correct?
23   A   Yeah, not because I was required
24 to or responsible to.  I just, hey, man, I made

Page 63

1  these.  Take a look at them.
2    Q   All right.  So did these trades
3  summarize the recommendations provided by Mr. Evans?
4    A   I couldn't tell you that information.
5    Q   All right.  So let's look, if we could,
6  at the first page of Exhibit 118.
7    A   Yep.
8    Q   The subject is Forward:  Long Leaf
9  Trading Group, September Trade Images.  So what does
10 that mean, September trade images?
11   A   Oh, we're looking here?
12   Q   Yeah.
13       MR. MAY:  The subject line.
14   A   So in -- executed in August of 2016 were
15 four trades, and these are the images that I made
16 of those trades that expire probably in September.
17 BY MR. BURDEN:
18   Q   Got it.  So does that help refresh your
19 recollection?
20   A   No, because you're asking me
21 is this like a derivative exactly of Tim Evans'
22 trade recommendation, and I don't have Tim Evans'
23 trade recommendation so ...
24   Q   Got it.  You know, I'm not trying

Page 64

1  to pin you down as to whether it's an accurate
2  representation.  I guess I should just ask the
3  question in a more leading way.  So, Mr. Ruth,
4  the charts that you've sent to this broker team
5  in Exhibit 118, these are your attempts to make
6  charts that represent the recommendations for that
7  month --
8    A   It's a draft --
9    Q   -- is that right?
10   A   Yeah, but this is a draft.  Like this
11 isn't like -- this is, hey, guys, did I make any
12 mistakes typing this.
13   Q   Got it.  So let's look at 118.  And if we
14 go to the second page, we've got these charts that
15 you put together, right?
16   A   Um-hmm.
17   Q   Correct?
18   A   Yes.
19   Q   All right.  So if you look on the
20 right-hand side, it says October/November Calendar
21 Swap.  Do you see that?
22   A   Yep.
23   Q   And then it says, "Idea:  Crude oil
24 trades at $44 or above through September 15th.

Page 65

1 After September 15th crude trades at $44
2 or blow" -- I think that's supposed to be, "or
3 below or above through October 17th with $43 or
4 below at expiration, giving the position max net
5 gain." Did you write that?
6    A   That I cannot recall.
7    Q   It says out of the money here. Where does
8 that data come from?
9    A   From the chart.
10    Q   All right. It says in the money. That
11 data comes from the chart as well?
12    A   Yep.
13    Q   So max net gain, where does that come
14 from?
15    A   That would be a calculation of
16 premium collection -- difference in strike prices
17 minus premium collection and fees, commissions,
18 all that stuff.
19    Q   Is that a calculation that you performed?
20    A   Attempted, yes.
21    Q   All right. So total risk $1412.16,
22 what's that, please.
23    A   I mean, I don't know the specific
24 numbers here. But I think the idea behind that

Page 66

1 would be in the event that you lost the trade, that
2 would be the amount of money that you would lose
3 on that specific trade per contract.
4    Q   All right. And how is that calculated?
5    A   By the total. It would be the spread,
6 plus commissions, fees and all that jazz.
7    Q   And is that a calculation that you
8 performed?
9    A   Attempted, yeah. Again, this is a --
10 these are all drafts.
11    Q   Got it. And so Exhibit 118, did you
12 send charts of this nature to your fellow brokers
13 substantially every month during your entire tenure
14 at Long Leaf?
15    A   I mean, I don't recall if I did it
16 regularly but, you know, I would take it upon
17 myself to make these for my own personal knowledge
18 so when I'm communicating with clients, I can talk
19 more educated about what is the trade that they
20 have in their account and so I knew like specific
21 expiration dates and stuff of that nature. But
22 I don't know if I was regular about it or not.
23 I don't recall.
24    Q   And you sent these charts when you

Page 67

1 made them to the other brokers to help them, right?
2    A   Yeah. I mean, more of like, hey,
3 I spent time doing this. Why should you spend
4 time doing it.
5    Q   And the charts that we see in Exhibit 118,
6 did you send those to clients?
7    A   I think sometimes I did but not like
8 regularly and not to everybody but ...
9    Q   So, yeah. So I was going to show you
10 one but maybe -- you know what, I won't. You know
11 what, sorry. Let's stay on 118.
12    A   Like the purpose of me sending it to a
13 client is like it's really the red light, green
14 light, yellow light system like.
15    Q   What does that mean?
16    A   Like in the green, this is where you
17 want the price action to be in order for -- you
18 know, if it were to expire worthless, then you would
19 get the full amount of premium that you collected.
20 The yellow, you know, it can go either way. There's
21 a breakeven point and it's a prorated amount
22 of either the total risk or the total net premium
23 collection. And the red is obviously, you know,
24 it's a total loss. So the purpose of it is to --

Page 68

1 it's an elementary image to --
2    Q   To what?
3    A   To just -- so, you know, a client
4 could have a -- I don't know if you guys have --
5 well, I'm sure you have. But if you look at
6 an account statement, it's very difficult to
7 understand, and I think this helps illustrate
8 physically what is going on with your position.
9        (Whereupon CFTC Exhibit No. 119 was
10        marked for identification, MM.)
11    Q   Mr. Ruth, I want to hand you what I've
12 marked as CFTC Exhibit 119, and I'm going to ask
13 you if you recognize this document and if you can
14 tell me what it is. But why don't you take a look,
15 if you would, please, and then indicate to me when
16 you have looked to your satisfaction.
17    A   Yeah, I'm ready to proceed.
18    Q   All right. Do you recognize Exhibit 119?
19    A   No.
20    Q   All right. So if you look at the top,
21 it says jruth@longleaftrading. Is that your email
22 address?
23    A   That is my email address.
24    Q   Or it was when you were at Long Leaf

Page 69

1 anyway?
2    A    Yep.
3    Q    All right.  You'll see it's dated 8/2/17.
4 In the To line --
5    A    No clue what that email address is.
6    Q    There we go.
7        MR. MAY:  Wait until he asks a question.
8        THE WITNESS:  All right.
9        MR. MAY:  You can't answer it until he
10 asks.
11 BY MR. BURDEN:
12    Q    All right.  So the subject is
13 Long Leaf Trading Group Strategy Explanations
14 of August Positions.
15    A    I would never write that.
16    Q    So do you think that somebody else wrote
17 this email?
18    A    I have no clue but ...
19    Q    All right.  Well, let's put it
20 aside then and let me follow up on your testimony.
21 I think you testified that you sent charts similar
22 to the ones in Exhibit 118 to customers, is that
23 correct?
24    A    Yeah.  I mean, after -- I mean,

Page 70

1 I don't send anything to customers unless I have
2 the permission of the compliance officer, which
3 is Tim Evans.  So I'd send it like, you know, hey,
4 look at this, is this okay, yeah.  And then if it's
5 okay, then I would send it to -- again, I don't
6 think I sent it to everybody, or maybe I did for
7 like a month or two.  I don't know.  But there's
8 some, yes, that I sent it to so they could, you
9 know, their visual ...
10    Q    Yeah, so that's my question.  Why did
11 you sometimes send these charts you generated to
12 customers?
13    A    I mean, in a broker-assisted environment
14 you've got people who like they want to talk to you
15 a lot, and then there's some people who don't want
16 to talk to you at all or, you know, just the bare
17 minimum requirements.  And some of the guys that
18 want to talk to me a lot, this helps like them
19 understand what's going on and stuff but ...
20    Q    Got it.  So the charts that you
21 generate you send to some customers if you think
22 it will be useful for them to see or if they would
23 like it, is that right?
24    A    Yeah.

Page 71

1    Q    All right.  And --
2    A    If they ask me for it or -- yeah.
3    Q    But you didn't send those charts to
4 customers as a general practice?
5    A    I don't recall specifically but
6 I might have like when I first started, I thought
7 maybe this is a good idea or I don't know.  So I
8 don't think I -- I don't think like if you were to
9 take my entire client list that I had and looked at
10 every single month, did I send it to every single
11 customer religiously, I would say that that's
12 probably not the case.
13    Q    Got it.  So let's switch gears a
14 little bit.  I want to talk about how customers
15 did at Long Leaf Trading and specifically with Time
16 Means Money.  How did customers do with Time Means
17 Money?
18    A    I don't recall.
19    Q    You don't recall.  Did your customers
20 make money?
21    A    I don't know.  I mean, it depends
22 on like --
23        MR. MAY:  I guess is the question
24    really net of their trading experience or

Page 72

1    on a month-to-month basis, on a daily basis?
2        MR. BURDEN:  What do you mean net of
3    their --
4        MR. MAY:  The amount of money that
5    they put into the account versus the amount
6    of money that they left in the account.
7        MR. BURDEN:  Yeah, I'll tell you what.
8    We'll see what we can do here and what Mr. Ruth
9    recalls and understands.
10    Q    So, Mr. Ruth, how many of your customers
11 made money trading?
12    A    I don't recall.
13    Q    Can you think of anyone who did?
14    A    I don't recall.
15    Q    Is it fair to say that substantially all
16 of your customers lost money trading?
17    A    I don't recall.
18    Q    All right.  Is it fair to say that that's
19 true for all of Long Leaf Trading's customers?
20    A    I don't recall.
21    Q    Did you ever talk to anybody about
22 Long Leaf Trading, any of the other brokers, about
23 customer profits or losses?
24        MR. MAY:  I'm sorry.  Could you repeat --

Page 73

1    could you read back the question?
2           (Whereupon the portion of the record
3           was read as requested.)
4    A   I don't recall specifically.
5    But, I mean, if you have clients calling in
6    and -- I don't know if I'm allowed to say the
7    word bitching, but bitching at you or whatever --
8    BY MR. BURDEN:
9    Q   You can say whatever you want to.
10   A   I would assume that like -- that I'm
11   like, hey, Jamie, can you believe this, this guy
12   said da, da, da, da, da, da, da, da.  My life's so
13   hard, you know, like that kind of talk?  Yeah,
14   I guess that falls under your conversation.
15   Q   All right.  So --
16   A   Do I recall anything specifically, no.
17   Q   Yeah, and I want to be clear.  I'm not
18   asking necessarily about specifics here, and I don't
19   mean to revisit questions I've already asked.  But
20   as a general matter, did your customers make or lose
21   money at Long Leaf Trading?
22   A   Well, I mean, this is like always
23   a tough question to ask because if you're asking
24   like -- you've got to understand like the way

Page 74

1    that Time Means Money is set up is you live month
2    to month.  So you judge what happened this month
3    and then, you know, that's what you're going with.
4    And so that's how the clients look at it.  That's
5    how you look at it.  So you can have good months
6    and you can have bad months.  You can have great
7    months.  You can have terrible months.  And when
8    you -- you know, the results are the results.  So
9    you tell them the results and if it's a good month,
10   well, yeah, technically you're making money.
11          Now, overall like what happens
12   at the end, I mean, I would assume, just like all
13   commodity accounts, they lose money.  But you don't
14   know that.  Like it's not like, you know, you're
15   sitting there and saying like, oh, we know the end
16   result is going to be they lose money and we make
17   money.  Like that's not how it is.  It's you're
18   judging on a month-to-month basis.  So they could
19   go make money one month and lose money another
20   month and you're just constantly evolving to try
21   to do whatever you can to make account performance
22   positive.
23   Q   Got it.  So during your tenure at
24   Long Leaf, is it fair to say that substantially

Page 75

1    all of your customers had less money in their
2    accounts at the end of their trading than when
3    they started?
4    A   I mean, I don't recall the specific
5    like equity balances of my clients from, I don't
6    know, what is this, two, three years ago?  But I
7    don't know.  I'm sure you probably know the answer
8    so ...
9    Q   What's your answer?
10   A   I don't have one really.  I don't recall
11   the specific ...
12   Q   Do you recall the names of any of your
13   customers who made money?
14   A   Again --
15          MR. MAY:  Could we define make money again?
16   A   Yeah, this is like -- you guys look
17   at making money and the way I look at making money
18   different.
19   BY MR. BURDEN:
20   Q   Yeah.  Who had more trade equity
21   in their accounts by the end of their trading or
22   by the end of your tenure than they did when they
23   started?
24   A   I mean, the last month I was there

Page 76

1    I signed up five people.  I don't know how their
2    results were so I can't -- I mean, there could
3    be a situation there.
4    Q   What do you mean by that?
5    A   Well, they could have made
6    money.  And so by the end of my tenure they
7    could certainly have more money than what they
8    started with, I guess.
9    Q   Was that the case for any customer whose
10   name you can recall?
11   A   No, I can't.
12   Q   All right.  I think your testimony
13   before was, you know, essentially that you can't
14   really say if a customer is making or losing money
15   because trades are recommended monthly and monthly
16   they may make money or they may lose money.  Is that
17   sort of a fair summary of your testimony?
18   A   No.
19   Q   All right.  Do it better for me, if you
20   would, please.
21   A   I think you're -- where you're taking
22   a snapshot of the end result of like the account
23   value.
24   Q   Got it.

Page 77

1    A    And I'm saying along the way they
2 could have been making money at some point or that
3 specific month the result, net result of those four
4 trades is they had a positive impact in their
5 account from a net liquidating standpoint.
6    Q    So --
7    A    So in my opinion, I would say that at
8 points they made money.
9    Q    Got it. What months were Long Leaf's
10 trading recommendations profitable for customers?
11    A    I couldn't tell you. I don't recall.
12    Q    Do you recall whether there were more
13 profitable or unprofitable months for customers
14 during your tenure at Long Leaf?
15    A    Don't recall.
16    Q    All right. You received statements
17 from Gain Capital, correct?
18    A    Yes.
19    Q    And you received those statements every
20 day, correct?
21    A    No.
22    Q    Well, every weekday?
23    A    No.
24    Q    How frequently did you receive statements

Page 78

1 from --
2    A    Anytime that the market is open.
3    Q    -- Gain Capital? All right. Did you
4 review these statements?
5    A    Yes.
6    Q    All right. How frequently did you review
7 them, please.
8    A    Every day the market was open.
9    Q    All right. So every time you got
10 a statement from Gain you reviewed it, correct?
11    A    It was my responsibility to review
12 it, yes, check for accuracy of the official record
13 of the account.
14    Q    Got it. Were they in fact accurate?
15    A    There is times when they're not.
16    Q    When were they not accurate? Can you
17 recall --
18    A    No.
19    Q    -- any specific instances?
20    A    No.
21    Q    What did you do when you found the
22 statements were inaccurate?
23    A    I immediately notify the compliance --
24    Q    And that's Mr. Evans, correct?

Page 79

1    A    Yes.
2    Q    How many occasions did that happen on?
3    A    I don't know. Numerous times.
4    Q    Do you think more than five?
5    A    I don't recall specifically, but I would --
6 I don't know. Yeah, sure.
7    Q    Okay. Well, you know, if you don't know,
8 that's okay.
9    A    I don't know the specifics but, yeah,
10 it's --
11        MR. MAY: Are you estimating or are you
12    guessing? Are you speculating?
13    A    Yes, yes, I am estimating, guessing
14 and speculating. I don't know for sure, but it
15 happened more than once.
16 BY MR. BURDEN:
17    Q    And when you felt like the statements
18 were inaccurate, you advised Mr. Evans of this,
19 correct?
20    A    Yes.
21    Q    And how did you advise Mr. Evans of this?
22    A    I would either call him, text him or
23 email him.
24        MR. PATRICK: What were the nature

Page 80

1    of the inaccuracies that you can recall about
2    the Gain statements when you received them?
3    A    Most of it had to do with like
4 allocations, you know. I don't think block order
5 is the correct way to describe the way that we --
6 that Tim Evans actually executed the trades. I
7 think that means something different. But, you
8 know, it's -- if one of my clients was supposed
9 to get like three of the specific, you know, trades
10 in the account, maybe there was one or four or five
11 or something like that. The other thing is he did
12 like this commission credit system on I think if
13 there was a four-legged strategy, maybe they got
14 some sort of commission discount. And that, I mean,
15 those were not entered properly sometimes. So --
16 and then I think in like the allocation, like let's
17 say I had a client who had told me, hey, I'm done
18 trading or something of that nature and I would
19 tell him, you know, I never turned in permission
20 for it to be traded. Well, sometimes there would
21 be a situation where like that account was traded
22 and those trades were entered in. So I'd have to
23 tell him about it then. I think those would be
24 like moved to like errors or omissions or something

Page 81

1 of that nature, but --
2 BY MR. BURDEN:
3    Q   Sorry, keep going.
4    A   It's never -- I don't think it's ever
5 like the wrong strike price or anything like that.
6 I think it's more of just the allocation system
7 breakdown.
8    Q   All right.  So did you feel that you
9 understood the statements you received from Gain?
10    A   Over time, yeah.  I mean, I wouldn't
11 say like, you know, when I had my first client
12 I understood it.  But, I mean, I could tell you
13 right now that I could -- I'm very well versed in
14 a statement right now, yeah.
15    Q   All right.  So --
16    A   But I've also -- you know, in my
17 time at Long Leaf I was -- you know, I'd only
18 been in the industry for, I don't know, a couple
19 years so ...
20    Q   So when at Long Leaf do you think you
21 first began to understand the Gain statements?
22    A   I couldn't tell you like a date.
23    Q   Was it early on or did it take some time?
24    A   Probably took some time, yeah.

Page 82

1    Q   All right.  Did you ever ask for help
2 in understanding the Gain statements?
3    A   Yeah.
4    Q   Who did you ask for help from?
5    A   Tim Evans.
6    Q   All right.  Did he give it to you?
7    A   I don't recall specifically, but I would
8 assume so.
9    Q   Well, do you remember if he did or not?
10    A   Yeah, I mean, he would help me out, yeah.
11    Q   Would Mr. Evans explain the statements
12 to you?
13    A   Yeah, he would try, yes.
14    Q   All right.  And was that effective?
15 Did you understand the statements when Mr. Evans
16 explained them?
17    A   I mean, not in its entirety but that
18 specific issue at the time, yes.
19    Q   All right.  Did you ask anybody
20 else for help understanding the Gain statements?
21    A   There would be times where I would
22 call like maybe the Gain trade desk and ask them
23 questions about it as well.
24

Page 83

1         (Whereupon CFTC Exhibit No. 120 was
2         marked for identification, MM.)
3    Q   Mr. Ruth, I want to hand you what
4 I've marked as CFTC Exhibit 120, and I'm going
5 to ask you if you recognize this document and if
6 you can tell me what it is.  And please indicate me
7 when you've reviewed it to your satisfaction.
8         MR. MAY:  I'm still looking at it.
9         THE WITNESS:  It's going to take you
10 a year.
11         MR. MAY:  This document isn't sequentially
12 Bates stamped.
13         MR. BURDEN:  Yeah, that's correct.
14         MR. MAY:  Okay.  So I really can't
15 say for the record how many pages it is, but
16 it looks to be at least like a hundred.
17         MR. BURDEN:  Do you consider that that's
18 required?
19         MR. MAY:  Do I consider it to be required?
20         MR. BURDEN:  Yeah.
21         MR. MAY:  It would be customary.
22         MR. BURDEN:  All right.  Well, we're not
23 going to do that today.
24    Q   All right.  Mr. Ruth --

Page 84

1         MR. MAY:  I'm not done.
2         MR. BURDEN:  Oh, by all means.  Have at it.
3         MR. MAY:  All right.
4         MR. BURDEN:  Mr. May?
5         MR. MAY:  Go ahead.
6 BY MR. BURDEN:
7    Q   All right.  Mr. Ruth, do you recognize
8 CFTC Exhibit 120?
9    A   I believe it appears to be my equity run
10 for 8/31/2016.
11    Q   So you'll see the subject of this
12 email is Daily Client Statement.  Do you see that?
13    A   Correct.
14    Q   All right.  So what's a daily client
15 statement for the record, please.
16    A   Daily client statement is -- over LLT010
17 it encompasses the account statements for everybody
18 under that sales code.
19    Q   And whose sales code is that, please.
20    A   That's one of my sales codes.  And
21 then it also encompasses -- I don't know what they
22 call this but -- I don't have a page number either.
23 But starting here, this is like a different -- it's
24 not a daily client statement.

Page 85

1    Q    So let me stop you there because
2  that's exactly the part I'd like to talk about.
3    A    Okay.
4    Q    And as your counsel pointed out,
5  Exhibit 120 is not sequentially number, nor are
6  any of the documents produced by Long Leaf Trading.
7  If you flip to where the pages of Exhibit 120 orient
8  horizontally --
9    A    Yeah.
10    Q    -- i.e., in a landscape format,
11  the title at the top is Account Sequence Status
12  Report.  Do you see that?
13    A    Um-hmm.
14    Q    Yes?
15    A    Yep.
16    Q    All right.  So what does this account
17  sequence status report show, please.
18    A    Well, there's a lot of things that you
19  can get from it.
20    Q    All right.  Does the account sequence
21  status report show the profit and loss of each
22  customer account?
23    A    I would say not clearly.
24    Q    All right.  Why do you say that?

Page 86

1    A    Like I wouldn't look under the
2  subject and say profit and loss and be like you
3  lost $20,000.
4    Q    Yeah, so we're looking at the same thing
5  here.  So let's take a look at --
6    A    That's not -- yeah, that's not accurate.
7    Q    -- the first page of the account
8  sequence status report for CFTC Exhibit 120, and
9  you'll see there is a part that says profit and
10  loss.  Do you see that?
11    A    Um-hmm.
12    Q    Yes?
13    A    Correct.
14    Q    All right.  And you'll see on the
15  left-hand side it says MTD amounts, YTD amounts and
16  LTD amounts.  Do you know what those words mean?
17    A    Yes.
18    Q    What does that mean, please.
19    A    Month to date, year to date, lifetime
20  to date.
21    Q    All right.  So for profit and loss,
22  is that showing us the month-to-date, year-to-date
23  and life-to-date profit or loss of the account?
24    A    No.

Page 87

1    Q    Why not?
2    A    Because I don't -- I don't know
3  who -- how that's calculated.  I didn't produce
4  that report.
5    Q    All right.
6    A    I don't know if that encompasses
7  commissions.  I don't know how that's calculated.
8  So, no, I'm going to say no.
9    Q    Okay.  But is your answer no or is it
10  that you don't know?
11    A    Well, I don't know and my answer is no.
12    Q    All right.  Why do you -- I mean,
13  it says profit and loss.  It says month to date,
14  year to date and life to date.  And you received
15  this statement every day that the market was open,
16  correct?
17    A    Right, but that client has an open
18  position.  So month to date how come there's no
19  profit and loss?
20    Q    Yeah, I don't know.  But my question
21  to you is why does this not reflect month-to-date,
22  year-to-date and life-to-date profits or losses for
23  this account?
24    A    These are short option strategies.

Page 88

1  So I would assume that that -- those numbers are
2  not correct.
3    Q    But why do you think that?
4    A    Because your statement that you guys
5  require doesn't reflect a short option strategy
6  properly.
7    Q    So what component of let's just
8  say profitability or value do you believe is not
9  reflected in this profit and loss calculation we see
10  in Exhibit 120?
11    A    Can you repeat the question?
12    Q    Yeah.  So your testimony is that
13  we're looking at a -- it says profit and loss life
14  to date 20,169.53.  Do you see that?
15    A    Correct.
16    Q    And do you see a DR next to it?
17    A    Correct.
18    Q    Do you know what DR means?
19    A    Debit.
20    Q    All right.  So why does this not
21  reflect a $20,000 loss for the life of this
22  account?
23    A    I think the better question is why does it.
24    Q    Well, I'm not testifying.  You're

Page 89

1 testifying.
2    A    Well, how do you -- well, I mean, you're
3 representing that it is.
4    Q    No, no, no, I'm not representing that it
5 is. I'm asking you if that is what it represents
6 and you're --
7    A    All right. Well, if you find out
8 if it is, then I'll testify whether or not it is
9 or isn't.
10    Q    All right. It sounds like your
11 testimony, though, is that this $20,000 does not
12 reflect life-to-date losses for this account,
13 correct?
14    A    You don't even know if it does. So when
15 you figure it out, I'll testify.
16    Q    Is there some component of this, some
17 component of value --
18    A    To who?
19    Q    -- to this account that is not reflected
20 in this 20,000 --
21    A    Value to who? A person needs value.
22 A value to me? A value to the client? The client
23 doesn't get this. This is to me.
24    Q    What I'm asking you is why do you think

Page 90

1 this does not represent --
2    A    Because most statements that are
3 produced do not reflect the actual value of the
4 account.
5    Q    Okay. So what would go into the actual
6 value of the account?
7    A    How would I calculate profit and loss?
8    Q    Yes.
9    A    I would -- in this situation I would
10 probably use an equation of closed positions, the
11 P&L of closed positions, and I would do that on a
12 net basis, including fees, brokerage commissions.
13    Q    Got it.
14    A    And, yeah. I guess, I don't know,
15 platform fees, something like that. I don't know
16 how that's calculated, so I can't tell you whether
17 or not it's an accurate representation of the profit
18 and loss of the account.
19    Q    Got it. So this profit and --
20    A    I have reason to believe it's not,
21 considering that it's zero in MTD and there's open
22 positions in Shane Allen's account at the time.
23    Q    All right. So where could we look
24 in these daily statements that you received to show

Page 91

1 us the P&L of an account over its life?
2       MR. MAY: I'm sorry. Could you repeat the
3    question, please.
4          (Whereupon the portion of the record
5          was read as requested.)
6    A    I don't want to like sound combative
7 here, but aren't you the CFTC? Shouldn't you --
8 like you're the one who designs this whole system.
9 So --
10    Q    Well, I don't -- sorry, go ahead.
11    A    Wouldn't you guys understand -- like
12 wouldn't you know where that is?
13    Q    But I can't testify, right? So
14 I have to ask you during this proceeding what you
15 know and understand. So if I know it --
16    A    All right. Well, I refer --
17    Q    -- I couldn't say.
18    A    I refer to the Commission to figure
19 out where they put the performance of the account.
20    Q    Do you know where we can find it here?
21    A    I mean, I think that if you were to
22 take, you know, a document and look at it and
23 there's a subtitle heading that says profit and
24 loss, I think one would assume that that might

Page 92

1 be the answer. However, you don't know what is
2 used in that calculation. So I wouldn't be able
3 to say with any certainty that that is the actual
4 profit and loss of the account.
5    Q    So when you received these daily
6 statements, would you look and see what the P&L
7 of an account was, you know, see how your clients
8 are doing?
9    A    No.
10    Q    Why not?
11    A    Because that's not part of my review.
12 My review stops before I get to this (indicating).
13 That's not part of my responsibilities. My
14 responsibilities is check for the accuracy of the
15 statement.
16    Q    Got it. But that does not include the
17 accuracy of P&L for the account?
18    A    I can't -- you can't compute it.
19 I can't compute it. The statement can't compute
20 it. So no one would make that a responsibility of
21 anybody.
22    Q    All right. So your testimony is that
23 you received these daily statements from Gain?
24    A    Um-hmm.

Page 93

1    Q    And you did review them, correct?

2    A    The purpose of my review is to check for

3 the accuracy of like the positions in the account.

4    Q    Got it. So you didn't -- did you keep

5 track of your clients' profit and losses over the

6 course of their trading?

7    A    Not that I -- no, not that I recall.

8    Q    Okay. You can put 120 aside, if you want.

9    A    (Witness complies).

10        EXAMINATION

11 BY MR. PATRICK:

12    Q    Before we do that, I think you

13 testified earlier that you became over time

14 pretty adept at reading the Gain statements, is

15 that right?

16    A    Correct.

17    Q    And since leaving Long Leaf Trading you've

18 worked at other brokerages?

19    A    Correct.

20    Q    And was it your responsibility

21 in your role at those other brokers to review the

22 statements, similar to how you reviewed them at Long

23 Leaf Trading, to identify whether the positions were

24 accurate, that sort of thing?

Page 94

1    A    I think it was the responsibility of

2 all brokers, yes.

3    Q    Okay. Do you understand the profit

4 and loss in a brokerage account statement to

5 include --

6    A    It's not an account statement, though.

7    Q    Okay. Do you understand the profit and

8 loss --

9    A    Sorry for cutting you off, yeah.

10    Q    Okay. When you review a Gain customer

11 statement, at the end of the customer statement is

12 there a recap section that includes customer profit

13 and loss?

14    A    No.

15    Q    So --

16    A    On the Gain statement there's

17 an account summary section. There's a net

18 liquidating value would be the closest thing, but

19 that is not a reflection of profit and loss of the

20 account.

21    Q    Okay. So if we look at the second

22 page -- make it the third page of Exhibit 120,

23 do you see that? And this would be --

24        MR. MAY: Are we talking --

Page 95

1    A    Shane Allen?

2 BY MR. PATRICK:

3    Q    Shane Allen, correct.

4    A    Consolidated financial statement?

5    Q    Correct.

6    A    Yes. There's no P&L line item on there.

7    Q    Okay. So at the very end of the

8 statement where you see the account summary as

9 of 30 August 2016, do you see that?

10    A    Yep.

11    Q    Okay. And in that recap section

12 there's -- I think it's the third row down --

13 there's a section called realized profit and loss.

14 Do you see that?

15    A    Yes.

16    Q    Okay. Do you understand what that means,

17 realized profit and loss?

18    A    Yes.

19    Q    What does it mean?

20    A    It means on that specific day a trade

21 was closed, and it has a specific debit or credit

22 value to that actual trade.

23    Q    Okay. And do you know if --

24    A    It has to be a closed trade from that

Page 96

1 specific day in that situation.

2    Q    I understand. So would Gain include

3 the gain or loss on an open position in that section

4 called realized profit and loss?

5    A    No, because it wouldn't meet the definition

6 of realized profit or loss.

7    Q    Okay. So is your understanding

8 of the term profit and loss, does that also include

9 unrealized profit and loss or does that only include

10 positions that have been offset and are now closed?

11    A    It's not a black or white situation.

12 It would be depending on what information you're

13 trying to obtain from me. So if you're a customer

14 and you say where is my account now, well, what

15 are you looking for? Are you looking for --

16 you know, I would have to clarify.

17    Q    I understand.

18    A    So it's not --

19    Q    I'm only asking in the context of

20 what you understand the Gain Capital statements to

21 say. So is it your understanding that Gain Capital

22 when it reports profit and losses on its account

23 statements, that it includes profit and losses

24 on open positions and closed positions?

Page 97

1    A    Well, net liquidating value by
2 definition is if we were to liquidate all the
3 positions in your account at the time that this
4 statement was printed at the prices reported to,
5 you know, the settle price on this statement, that
6 would be the value of your account.  That is not the
7 profit and loss of your account.
8    Q    Understood.  And I'm not asking about --
9    A    So nowhere, nowhere on this statement
10 does it give the profit and loss of the account.
11    Q    I'm only asking what you understand
12 Gain includes in that line called profit and loss.
13        MR. MAY:  You mean the one that says
14    realized profit and loss?
15        MR. PATRICK:  Correct.
16        MR. MAY:  Okay.
17    A    I think we've already answered that,
18 though.  I've said the realized profit and loss
19 can only happen on the day that there's a realized
20 profit and loss.
21 BY MR. PATRICK:
22    Q    So that does not include trades
23 that are open as of the date of the statement?
24    A    Correct.  I mean, I would assume that

Page 98

1 because of the fact that it says 0.00.
2    Q    Okay.
3    A    Yeah.  So there's -- in summation,
4 there's no way for me to look at this statement
5 and say here's the profit and loss of your account
6 on a specific day.
7    Q    Okay.  So do you think that the
8 Gain statements are not including premium that's
9 captured in a credit spread strategy as part of
10 the profit and loss in the profit and loss statement
11 and that's the reason why you can't calculate where
12 a customer's account is at?
13        MR. MAY:  That was a really long
14    statement.  Could you read it back to the
15    witness?
16        (Whereupon the portion of the record
17            was read as requested.)
18    A    I can't calculate where a customer's
19 account is at because the statement doesn't provide
20 that information on a daily basis.
21 BY MR. PATRICK:
22    Q    And I'm just trying to get at what
23 it is --
24    A    Here, I'll give you an example.

Page 99

1 I bet you if I were to take one of these spreads
2 and I were to actually do the math, I would say
3 that one of these spreads is probably going to
4 tell me that I'm losing -- I'm just going to throw
5 an arguable number out here -- let's say $3,000 on
6 this statement.  But if you go back to the actual
7 strategy and you look at the risk of the strategy,
8 you can't physically lose $3,000 on that strategy.
9 And so if you were to go to the net liquidating
10 value, it's going to have a negative draw of $3,000
11 but the strategy can only lose let's just say like
12 1200 bucks.  So there's 28 -- or $1800 there of
13 money that it's saying that you don't have at your
14 net liquidating value that you really do have.
15 And so, yes, the statement that you guys have
16 designed, I think it doesn't give an accurate
17 reflection of the profit or loss of the account
18 at any given point.  It's not black and white.
19        FURTHER EXAMINATION
20 BY MR. BURDEN:
21    Q    So forgive me for asking this question
22 I think possibly again, but how did you track your
23 customers' progress over time?
24    A    It's their responsibility.

Page 100

1    Q    And I don't want to dispute that
2 or be seen to argue with you, but did you track
3 it yourself?
4    A    I mean, it depends.  Like some people
5 I would do it for or try to get close or something
6 of that nature, but I don't like recall specifically
7 who or what or how long I did it for or anything of
8 that -- there's no like regular procedure.  But,
9 yeah, if there's -- I mean, yeah.  That's all I got.
10    Q    Well, I want to push back on that
11 a little bit.  It seems surprising to me that you
12 wouldn't have had any idea how your customers were
13 doing profitwise.  Was that the case?
14    A    I think you don't understand.  I'm
15 a lemming in this whole entire process, right?
16 I show up to work.  I do what I'm told.  I'm new
17 in the industry.  My mentor is Tim Evans, you know.
18 I've only heard from one person at this point in
19 my career as to what is right and what is wrong,
20 and I'm just trying to absorb as much information
21 as possible and be successful in life from a
22 professional standpoint and that's it.
23        Now, if you were to talk to
24 Jeremy in 2019 and how he conducts himself, yeah,

Page 101

1   like I agree.  I think it's ridiculous too that
2   I didn't know.  But I, you know, have learned
3   many things over the years and I've gotten, you
4   know, mentors with different perspectives and I'm
5   constantly trying to absorb new information to
6   be a better broker and understand my industry and
7   finance in general and compliance and regulations.
8   And, you know, I would volunteer to help you guys
9   design a statement that actually makes sense for
10  clients.  But, yeah, it's -- I mean, I went from
11  being, you know, internet marketing to a broker
12  in a short period of time and you're asking me
13  about, you know, then.  And I didn't have much
14  knowledge and I only had one person teaching me
15  the ropes.
16      Q   So you worked at Long Leaf Trading for
17  two years and change, is that right?
18      A   I believe so, yeah.
19      Q   So is it your testimony that during
20  that period you didn't know whether your customers
21  were making or losing money from month to month?
22      A   I don't recall what happened two years
23  ago with customers, you know, when I'm with specific
24  customers.

Page 102

1       Q   Well, I'm not asking about
2   specific customers.  I mean, for the Time Means
3   Money program, right, substantially all of those
4   customers get the same four trade recommendations
5   every month, is that right?
6       A   Essentially, yeah.
7       Q   Yeah.  So did you keep track of how
8   those recommendations were doing, whether they were
9   making money or losing money on a month-to-month
10  basis?
11      A   It's all right here.
12      Q   And you're indicating that it's all in
13  Exhibit 120, correct?
14      A   No.  I'm indicating that the record
15  of what happened to these people's accounts comes
16  through the account statements.  If you're asking
17  me like did I keep track of something outside of it,
18  not that I recall.
19      Q   Okay.
20      A   The official record of the account is
21  their account statement.  That's what happened.
22  You guys have access to them.  I see you have a
23  whole box of them, so I'm sure you guys know what's
24  going on.

Page 103

1       Q   Well, it just sounds like your
2   testimony is that you worked at Long Leaf Trading
3   for two years and you had no idea whether your
4   customers were making or losing money.  That's
5   what it sounds like your testimony is to me.  Is
6   that what you mean to say?  Is that right?
7       MR. MAY:  I think --
8       A   No.
9       MR. MAY:  -- we're asking the same
10  question kind of over and over again until
11  we get an answer that we like the best, which
12  is really not permissible.
13      MR. BURDEN:  Mr. May, I think what
14  we're trying to do is get an actual answer.
15      MR. MAY:  I think you have an actual
16  answer.  It just doesn't suit your purpose.
17      MR. BURDEN:  You don't know what my
18  purpose is, do you?
19      MR. MAY:  I have an idea.
20      MR. BURDEN:  Would you read the question
21  back, please.
22          (Whereupon the portion of the record
23           was read as requested.)
24      A   I mean, I don't think I testified to

Page 104

1   that.  That doesn't accurately reflect what I've
2   said.  All I'm saying is that you have a record
3   of what happened.  You have a box of it over there.
4   Like I don't understand my opinion of it.  I don't
5   know what -- how that matters.  I mean, these
6   things don't lie.  These are the results, right?
7       Q   Well, Mr. Ruth, the entire purpose
8   of you being here is to give us your opinions
9   and to tell us what you remember, what you said
10  or what people said to you.
11      A   Well, I mean, I don't know.  I can't
12  say this enough but in a different way.  I don't
13  remember the specific results of any of the accounts
14  that I had to deal with.
15          (Whereupon  CFTC  Exhibit No. 121 was
16           marked for identification, MM.)
17      Q   All right.  Mr. Ruth, I want to
18  hand you what I've marked as CFTC Exhibit 121.
19  And take a look at it, if you would for me, please,
20  and indicate to me when you've reviewed it to your
21  satisfaction.
22      MR. MAY:  Actually, these ones and
23  all the ones except CFTC Exhibit No. 120 are
24  sequentially numbered.

Page 105

1    MR. BURDEN: You know, why don't you
2  and me talk about this off the record because
3  your curiosity is understandable, but it doesn't
4  matter tremendously for the purposes of our
5  testimony.
6    MR. MAY: Okay, yeah. It's just --
7    MR. BURDEN: I'll tell you what,
8  since Mr. Ruth is reviewing, I'll indulge
9  your question on the record. So those were
10 produced by Long Leaf Trading. We Bates number
11 them internally.
12   MR. MAY: Okay.
13   MR. BURDEN: So they're really
14 more control numbers and it's actually not
15 sequential, but the reason you think it is
16 is because there's an email as an attachment.
17 So if the attachment was more than one page,
18 you would see 89750, 89751, 89751, 89751.
19 Does that make sense?
20   MR. MAY: It does.
21 A   What are you guys trying to investigate?
22 Like what's --
23 BY MR. BURDEN:
24 Q   I can't answer questions here.

Page 106

1 A   I mean, maybe you can fill --
2    MR. MAY: It's perfectly --
3 A   -- me in.
4    MR. MAY: It's perfectly understandable
5    but, yeah, they cannot answer questions.
6 BY MR. BURDEN:
7 Q   Yeah, your counsel can fill you in. He
8 knows what he's doing. All right.
9    MR. MAY: This is 121?
10   MR. BURDEN: That's right.
11 Q   All right. So do you recognize CFTC
12 Exhibit 121?
13 A   When you say recognize, what do you mean
14 by that?
15 Q   Do you know what it is? Have you seen it
16 before? Does it look familiar?
17   MR. MAY: That's a whole bunch of different
18   questions, though.
19   MR. BURDEN: But it illustrates my question
20   to Mr. Ruth.
21 Q   Does it look familiar? It doesn't.
22 Q   All right. So let's look at the From
23 line here, jruth@longleaftrading. That's your email
24 address, right?

Page 107

1 A   Yep.
2 Q   And it was sent on April 13th of 2017.
3 You worked at Long Leaf Trading during that time,
4 correct?
5 A   Correct.
6 Q   All right. So it's to James Leeney and
7 Vince Prieto, right?
8 A   Yes.
9 Q   All right. So who are they?
10 A   They are brokers at Long Leaf Trading
11 Group.
12 Q   All right. And you'll see the subject
13 is what?
14 A   March 2017 Results.xlsx.
15 Q   All right. So Exhibit 121 reflects
16 that this email has an attachment, is that right?
17 A   Yes.
18 Q   Yeah. And the attachment is called
19 March 2017 Results.xlsx as well, right?
20 A   Yep.
21 Q   All right. Is this an email that you sent?
22 A   It's what it indicates from the first page.
23 Q   All right. So let's turn the page,
24 if we could, please, and this is the attachment

Page 108

1 to the email. Do you know what this is?
2 A   It looks like a table.
3 Q   All right. Is this a table that you put
4 together?
5 A   Possibly.
6 Q   Is this type of table something that
7 you would put together regularly while you were at
8 Long Leaf Trading?
9 A   I wouldn't use the word regularly.
10 Q   Occasionally?
11 A   I wouldn't use the word occasionally.
12 Q   How frequently would you put together
13 tables like this?
14 A   Infrequently.
15 Q   All right. So do you recall what
16 this table was meant to represent? What were you
17 telling people with this email, if indeed you sent
18 it?
19 A   I think those would be the four trades
20 from, I don't know, either February or March and
21 those were the P&L on the three -- four trades or,
22 again, this is probably in draft form. So I don't
23 know if that's 100 percent accurate, but that would
24 be the net P&L on the four trades. And then through

Page 109

1  Excel I use the table to show based on the number
2  of contracts what that meant for the client.
3     Q   All right.  So --
4     A   But it was sent in April.
5     Q   I see that.
6     A   So I don't know.  I don't know what the
7  purpose of it was for or anything of that nature.
8     Q   So how did you put together this table,
9  please.
10    A   I don't recall specifically but, I mean --
11       MR. MAY:  Well, he's asking you about
12   this table.
13       THE WITNESS:  How did I put it together?
14    MR. MAY:  Not about tables in general.
15    A   I couldn't tell you.
16 BY MR. BURDEN:
17    Q   All right.  So it looks like the net P&L
18 for one I guess transaction, all the recommended
19 trades, is negative $920.21.  Did I read that right?
20    A   Can you state that again?
21    Q   Yeah, okay.  Well, I'll ask you.  So do you
22 see where it says net P&L at the bottom?
23    A   Yep.
24    Q   So do you see where it says $920.21

Page 110

1  in parentheses?
2     A   Correct.
3     Q   What does that indicate, please.
4     A   It may -- I'm speculating here because
5  I don't know specifically -- but it may reflect
6  the net P&L of the four positions for March 2017.
7     Q   All right.  So forgive me if you feel
8  that I've asked this question before, but how did
9  you ascertain that, if you recall?
10    A   I don't recall but ...
11    Q   So why did you send this to Mr. Leeney
12 and Mr. Prieto?
13    A   No clue.
14    Q   All right.  Let's put that aside, if we
15 could, please.
16    A   (Witness complies).
17    Q   All right.  So, Mr. Ruth, I want to
18 hand you what I've marked as CFTC 94, and it's
19 a group exhibit that consists of two emails with
20 their attachments.  And indicate for me, if you
21 would, please, when you've reviewed it to your
22 satisfaction.
23       MR. MAY:  Okay.
24

Page 111

1  BY MR. BURDEN:
2     Q   All right.  So, Mr. Ruth, do you recognize
3  Exhibit 94?
4     A   Nope.
5     Q   All right.  Do you see at the top where
6  it says jruth@longleaftrading.com?
7     A   Yep.
8     Q   Was that your email address?
9     A   Yes.
10    Q   All right.  It says June 9, 2017.
11 Did you work at Long Leaf Trading during that time?
12    A   Yes.
13    Q   Who were Pierre Halteh, Vince Prieto
14 and James Leeney?
15    A   Associated persons of Long Leaf Trading
16 Group.
17    Q   All right.  So the subject says TMM May
18 Results.  Do you see that?
19    A   Correct.
20    Q   And it looks like there's an attachment
21 to this email.  Do you see that?
22    A   Yep.
23    Q   All right.  Is this an email that you
24 sent to Mr. Halteh and Mr. Prieto and Mr. Leeney?

Page 112

1     A   It appears so.
2     Q   All right.  And it says, "For your info
3  only."  Did you write that?
4     A   I don't recall.
5     Q   All right.  So turn the page for me, if
6  you would, please, and this is the attachment and
7  the filing of the attachment is TMM May Results.
8  Is this a spreadsheet that you put together?
9     A   I don't recall.
10    Q   Do you have any understanding as to
11 what this shows?
12    A   It looks like it gives you a lot
13 of information about the potential profit and loss
14 of the specific trades.
15    Q   And when you say the specific trades,
16 you mean the trades that were recommended by Long
17 Leaf Trading to customers, is that right?
18    A   I would assume so, yeah.
19    Q   All right.  And if you look at the
20 right-hand corner of the spreadsheet, you'll see
21 there's a heading that says P&L Per Contract and
22 the one next to it that says P&L Per 3 Contracts.
23 Do you see that?
24    A   Correct.

Page 113

1    Q    All right.  So did you put that together?
2    A    I don't recall.
3    Q    All right.  And it looks there
4    like this says that there's a loss of $28.90 per
5    contract that's indicated in Exhibit 94.  Is that
6    your understanding of what's going on here?
7    A    That's what appears so ...
8    Q    All right.  Did you put charts like
9    this together and send them to the other brokers
10   at Long Leaf?
11   A    I may have.  I don't recall specifically.
12   Q    All right.  So would you turn, please,
13   to the second email in Group Exhibit 94.  And this
14   is from your email address, correct?
15   A    Yes.
16   Q    And it looks like it was sent later in
17   the day on June 9, 2017, right?
18   A    Correct.
19   Q    All right.  And it's to these other brokers
20   at Long Leaf Trading, right?
21   A    Correct.
22   Q    And the subject is TMM May Results again.
23   Do you see that?
24   A    Um-hmm.

Page 114

1    Q    Yes?
2    A    Correct.
3    Q    All right.  And then the email body
4    says, "Updated.  Don't share."  Did you write that?
5    A    I don't recall.
6    Q    All right.  And if you don't recall,
7    I'm asking you to speculate, but do you have any
8    recollection or knowledge of why you would have told
9    these other brokers don't share?
10   A    I don't recall.
11   Q    All right.  And if you look at the
12   second page of this email in Exhibit 121, we've
13   got another couple of charts.  Are these charts that
14   you put together?
15   A    Actually, going back, I can speculate.
16   Q    Okay.  Please do.
17   A    The reason why I tell people not to
18   share is because this is not the official record
19   of the account and this is just like my math in
20   another system that I use, so I don't want them like
21   giving it to a client or anything of that nature.
22   This is unverified calculations of what I believe I
23   would assume to be true or close to it or something
24   of that nature.  But as you can see, I make

Page 115

1    mistakes.  That's probably why I had to update
2    it 20 minutes later.
3    Q    Got it.  So looking at these charts here,
4    are these charts that you generated?
5    A    I would assume so.
6    Q    All right.  And it looks like this
7    indicates losses of $28.90 per contract, is that
8    right?
9    A    That's what it says, yep.
10   Q    All right.  And at the bottom
11   there's another chart that reflects losses of
12   28.89 through $375.57 depending on the number of
13   contracts that the customers entered into.  Am I
14   reading this correctly?
15   A    I think that's the idea behind that, yeah.
16   Q    All right.  So how did you put this
17   together?  Like how did you work out that this
18   was correct and incorrect, or incorrect what you
19   believed the P&L to be?
20       MR. MAY:  Actually, I think that
21       misstates his prior testimony.  I don't think
22       he said he recalled putting this together.
23   BY MR. BURDEN:
24   Q    Mr. Ruth, did you put this together?

Page 116

1    Is it in an email sent by you?
2    A    Yeah.  I don't recall specifically,
3    but there's a possibility that I could have done
4    such a thing.
5    Q    All right.  You know, do you recall
6    how you put this chart together?
7    A    No.  I think the chart, though,
8    tells you how I put it together.  Like isn't that
9    the --
10       MR. MAY:  It tells you how someone put
11       it together.
12   A    Right.  It says all the debits and credits,
13   right?
14   BY MR. BURDEN:
15   Q    Is that how you arrived at the --
16   A    I don't know.  I couldn't tell you
17   from this piece of paper.  I'd have to open up the
18   Excel file.
19   Q    All right.  You can put that one aside,
20   if you would, please, and I'm going to hand you what
21   I've marked as CFTC Exhibit 93.
22   A    (Witness complies).
23       MR. MAY:  We're a little over the one-
24       hour mark.  Do you guys have any idea about

Page 117

1  how much longer we're going to go before
2  a lunch break?
3      MR. BURDEN:  When would you like to have
4  a lunch?
5      MR. MAY:  Maybe I need to confer with
6  the witness.  It's hard to testify over an
7  hour.  That's always been my experience.
8      MR. BURDEN:  All right.  Well, I'll
9  tell you what.  Why don't we get through four
10  more documents and then we'll go to lunch right
11  after that.  Does that work for you guys?
12      MR. MAY:  Okay.  Yeah, I think so.
13  I mean, it's 12:30 now.  So maybe -- I don't
14  know how long you think it's going to take.
15  Maybe 1 o'clock?
16      MR. BURDEN:  I think so, yeah.  That sounds
17  right.
18      MR. MAY:  Okay.
19  BY MR. BURDEN:
20  Q    Okay.  Mr. Ruth, I want to hand you what
21  I've marked as Exhibit 93.
22      MR. MAY:  The last one was 94.
23      MR. BURDEN:  I know.  Thank you, though.
24      MR. MAY:  I just want to make sure I get

Page 118

1    it down correctly on my sheet.
2  BY MR. BURDEN:
3  Q    All right.  So, once again, please
4  review it, indicate to me when you've reviewed
5  it to your satisfaction and we'll get started.
6      MR. MAY:  Ready?
7      THE WITNESS:  (Nodding).
8      MR. MAY:  You're shaking your head yes.
9  So that's not going to come --
10      THE WITNESS:  Yes.
11  BY MR. BURDEN:
12  Q    There we go.  Mr. Ruth, do you recognize
13  Exhibit 93?
14  A    No.
15  Q    All right.  So jruth, that's your email
16  address, right?
17  A    Correct.
18  Q    All right.  And it looks like this email
19  was sent on May 9, 2017, is that right?
20  A    That's what it says.
21  Q    And it was sent to other brokers at
22  Long Leaf, is that right?
23  A    That's what it says, yep.
24  Q    All right.  So the subject is April

Page 119

1  2017 Results, and the email indicates it has an
2  attachment titled April 2017 Results.  Do you see
3  that?
4  A    I see that, yes.
5      MR. MAY:  Just for the record, I think
6  you said it was sent to other brokers at Long
7  Leaf.  It actually lists the three that it
8  was sent to.  I just want to make sure the
9  record's clear that it's not the "all brokers
10  at Long Leaf" kind of one that was in an
11  email address before.
12      MR. BURDEN:  I think the record will
13  probably reflect through the inclusion of the
14  exhibits --
15      MR. MAY:  Okay.
16      MR. BURDEN:  -- that Exhibit 94
17  was sent to Mr. Prieto, Mr. Leeney and
18  Mr. Halteh.
19  Q    All right.  Mr. Ruth, if you would,
20  look at the attachment to the email, please, which
21  is the second page of CFTC Exhibit 93.
22  A    Yes.
23  Q    Is this a chart that you put together?
24  A    Possibly.

Page 120

1  Q    Why do you say that?
2  A    Because I don't recall.
3  Q    All right.  So you'll see that there
4  are months listed.  We see March '17.  Do you see
5  that?
6  A    Correct.
7  Q    And then April '17, do you see that?
8  A    Correct.
9  Q    And then May '17, do you see that?
10  A    It's blank, but yes.
11  Q    Yes, all right.  So March '17 it says
12  soymeal, soybeans, gold and cattle.  Do you see
13  that?
14  A    Correct.
15  Q    Do you know what that refers to?
16  A    I would assume the four trades during
17  the month of March.
18  Q    And that net P&L we see down there,
19  what does that indicate to you?
20  A    Again, I don't know if -- the accuracy
21  of the number but it's -- it would be the net result
22  of the net P&L of the four trades above.
23  Q    And is that something that you calculated?
24  A    Possibly.

Page 121

1   Q    Do you remember calculating it?
2   A    No.
3   Q    So let's look at the April '17 column.
4 We see crude oil, U.S. T-bonds, cocoa and Euro.
5 Are those also contracts that were recommended to
6 customers for Time Means Money?
7   A    I have absolutely no clue.
8   Q    Well, it says net P&L at the bottom.
9 Do you know what that means?
10   A    Yes.
11   Q    What does that mean, please.
12   A    The net profit and loss.
13   Q    All right.  And what is the net profit
14 and loss here for customers who entered into one
15 trade?
16   A    I don't know if that is the net
17 profit and loss for customers, so I can't answer
18 that question.
19   Q    All right.  Well, you see at the
20 top it says -- we've got the date and then we have
21 numbers 1 through 13, right?  Do you see that?
22 Right?
23   A    Correct.
24   Q    All right.  So we've seen substantially

Page 122

1 this same format in Exhibits 94 and 121, the last
2 couple exhibits we looked at, is that right?
3   A    What are you asking?
4   Q    Well, this looks like the same format
5 as the other charts we've been looking at.  Do you
6 agree with that statement or do you disagree with
7 that statement?
8   A    Disagree, disagree.
9   Q    All right.  So why is this statement
10 in -- or the table in Exhibit 94 different than the
11 other ones that we were looking at?
12   A    I couldn't tell you.
13   Q    But you just did.  You just said it was
14 different.  So I'm asking you how is it different,
15 please.
16       MS. STREIT:  This is 93.
17   A    They're two different -- I mean, they're
18 significantly different.
19 BY MR. BURDEN:
20   Q    What's different about them, please.
21   A    Well, 94 lists the asset name, the month,
22 the expiration date, the clearing per side in, fees
23 per side out, commissions in, total fees in, point
24 collection, point multiplier, premium collection,

Page 123

1 net collection, gross risk, net risk, clearing
2 per side out, fees per side out, commissions out,
3 total fees out, premium realization, futures P&L,
4 P&L per contract and P&L per 3 contracts.  So that's
5 one table.  Then this table --
6   A    Yeah.  So let's --
7   A    -- has none of that information.
8 So it's significantly different.
9   Q    All right.  I see what you're saying.
10 I was focused on the P&L.  Let's just get back to
11 93, if we could, please.  So your testimony is that
12 you don't recall putting this chart together?
13   A    Correct.
14   Q    Do you recall sending this chart?
15 Did maybe somebody else put it together for you
16 and you distributed --
17   A    I'm not saying that somebody put
18 it together.  I just don't recall putting together
19 the chart.
20   Q    Right.  Do you recall sending this chart
21 to people?
22   A    No.
23   Q    Do you recall reviewing the chart?
24   A    No.

Page 124

1   Q    Okay.  Let's put this one aside, if we
2 could, please.
3   A    (Witness complies).
4       (Whereupon  CFTC  Exhibit No. 122 was
5       marked for identification, MM.)
6   Q    Mr. Ruth, I want to hand you what I've
7 marked as CFTC Exhibit 122.  So, once again, please
8 review it to your satisfaction and indicate to me
9 when you're done and I'll ask you questions about
10 it.
11       MR. MAY:  Ready?
12   A    Oh, yeah, yes.
13 BY MR. BURDEN:
14   Q    All right.  Mr. Ruth, do you recognize
15 Exhibit 122?
16   A    No.
17   Q    All right.  You see this is from
18 jruth@longleaftrading.com.  That was your email
19 address, right?
20   A    Correct.
21   Q    So it was sent July 25, 2017.  You
22 were working at Long Leaf at that point, right?
23   A    Correct.
24   Q    All right.  And it was sent to

Page 125

1  Tim Evans and he was your boss at Long Leaf,
2  correct?
3      A    Correct.
4      Q    And the subject is Harish Patel.  Do you
5  see that?
6      A    Correct.
7      Q    Who is Harish Patel, please.
8      A    He was a customer of mine.
9      Q    All right.  So if we look at the
10  top, it says started with $25,707.32, it says
11  ended with $9,249.72.  And then in bold it says
12  total loss $16,457.60 and then it says total
13  commissions $29,820.  Am I reading that right?
14      A    Yes.
15      Q    All right.  So is this an email that
16  you sent?
17      A    I don't recall.
18      Q    Do you remember -- well, I guess if
19  you don't remember sending it, you don't remember
20  why you sent it.
21      A    Harish Patel would refuse to talk to
22  me and wanted to talk to Tim Evans, so Tim Evans
23  had to step in.  I think he may have filed an NFA
24  complaint.  I don't know.  I don't have a complaint

Page 126

1  on my record and he was my customer.  So I don't
2  know exactly what happened, but I believe -- and
3  I might be speculating here -- but Tim probably
4  asked me for like give me the information on his
5  account so I have information to like talk to him
6  with.
7      Q    Got it.  So how were you able to
8  figure this out, if you recall, what the total
9  loss, total commissions and started and ended?
10  How did you figure all that stuff out?
11      A    So I went to his first statement and
12  I looked and seen how much money he deposited.  And
13  I looked at his last statement, which he didn't
14  have any open positions.  So his net liquidating
15  value would be his current value, you know.  It's
16  flat.  And I subtracted that number from what he
17  started with and I ended up with total loss.  And
18  then total commissions, I probably went to that
19  account sequence document that we talked about
20  earlier.
21      Q    And that totals up commissions, right?
22      A    Again, that one I don't think
23  is accurate either because I'm not sure if it
24  reflects like commission credits or anything of

Page 127

1  that nature.  So I probably pulled that information
2  from there, but I don't know if that's actual --
3  how that's calculated.
4      Q    Got it.  So did you perform an analysis
5  like this with respect to any other clients' profits
6  or losses?
7      A    No.  I think this was just specific
8  to the situation because I was handing it off to
9  somebody else.
10      Q    Got it.
11      A    But to go back, how do you generate
12  $29,000 in commissions if you're not making any
13  money for the client when they only put in 25,000?
14      Q    I don't know, and I can't answer
15  questions anyway.  You can put that one aside,
16  if you could, please.
17      A    (Witness complies.)
18          (Whereupon CFTC Exhibit No. 123 was
19           marked for identification, MM.)
20      Q    All right.  Mr. Ruth, I want to hand
21  you what I've marked as CFTC Exhibit 123.  Please
22  review it to your satisfaction and indicate to me
23  when you've finished.
24          THE WITNESS:  I'm ready when you are.

Page 128

1          MR. MAY:  Give me a second.  Okay.
2  BY MR. BURDEN:
3      Q    All right.  Mr. Ruth, do you recognize
4  CFTC Exhibit 123?
5      A    No.
6      Q    All right.  So it's an email, is what
7  it appears to be, and it appears to be sent from
8  jruth@longleaftrading.  That's your email address,
9  right?
10      A    Correct.
11      Q    All right.  And it's from --
12          MR. MAY:  Did you say is or was?
13          MR. BURDEN:  Was.
14          MR. MAY:  Okay.  I thought you said is.
15          MR. BURDEN:  I might have.
16      Q    This was your email address, correct?
17      A    Yes.
18      Q    All right.  So the date that it appears
19  to have been sent is July 20, 2017, right?
20      A    Correct.
21      Q    And you worked there during that time?
22      A    Yes.
23      Q    And it was to Mr. Evans, who was your
24  boss at Long Leaf Trading, correct?

Page 129

1   A   Correct.
2   Q   And the subject there is Emailing: TMM
3 2017 Win-Loss. Do you see that?
4   A   Yeah.
5   Q   And then there's an attachment and
6 that's a spreadsheet, and that spreadsheet is titled
7 in the face of the email --
8   A   Yeah.
9   Q   -- TMM 2017 --
10      MR. MAY: Wait. You can't answer
11   his question until he's done asking it.
12      MR. BURDEN: Thanks.
13      MR. MAY: Sorry.
14      MR. BURDEN: That's all right.
15   Q   So TMM 2017 Win-Loss and it's a
16 spreadsheet. Do you see that?
17   A   Yes.
18   Q   All right. So is this an email that
19 you sent to Mr. Evans?
20   A   It appears so.
21   Q   Is it an email that you remember sending?
22   A   No.
23   Q   All right. So let's turn the page,
24 if we could, please. Do you see this table?

Page 130

1   A   Yes.
2   Q   Is this a table that you generated?
3   A   I don't recall specifically.
4   Q   All right. Do you have any knowledge
5 or understanding of -- and you'll have to forgive
6 my vague question -- what's going on here?
7   A   Yeah, this has nothing to do with
8 like account performance. I think Tim Evans,
9 if I recall, at the time Tim Evans I think was
10 trying to contemplate whether or not doing like
11 a CTA. And I think this is just like minus
12 commissions, fees or whatever did the trade win
13 or lose because he was going to do like a -- set
14 up a CTA like in a fee-free environment. So what
15 would it, like, look like in the event that that
16 happened. And I gave him basic information whether
17 or not a trade won or lost, meaning did it make
18 a dollar or lose a dollar, but that has nothing
19 to do with -- or like aided anything of knowing
20 about account performance. I think it was for
21 that purpose.
22   Q   Got it. So Mr. Evans wanted to
23 explore the idea of setting up a CTA and he asked
24 you to put this analysis together?

Page 131

1   A   Yeah, but I don't know if -- I don't
2 know. I don't know if it's a good analysis or
3 whatever. But essentially, yeah, he was trying
4 to figure out do we win more than we lose.
5   Q   All right. And what's the result of that
6 analysis that we see here?
7   A   It looks like we're 50/50, but yeah.
8 But it doesn't -- I mean, that's the thing. It's
9 incomplete information because you could lose
10 $5 million on sugar and win a dollar on crude oil
11 but you're still an overall loser. So it doesn't
12 really -- I don't think this is -- I don't think
13 this was helpful at all.
14   Q   Got it. No, no, and you answered my
15 next question before I asked it. Did you talk to
16 Mr. Evans about this analysis we see in Exhibit 123?
17   A   I don't recall specifically. I mean,
18 I don't recall.
19   Q   Well, do you have any general recollection
20 of discussions with Mr. Evans?
21   A   I would assume that I handed it to
22 him and then -- or it looks like I emailed it
23 to him and I probably said did you get my email.
24 That's about it.

Page 132

1   Q   Well, do you recall any other discussions
2 you had with Mr. Evans about it? Like did Mr. Evans
3 say, you know, oh, great work, thanks or did he have
4 questions or did he not like it?
5   A   I don't recall.
6   Q   All right. So let's put this one aside,
7 if we could, please.
8   A   (Witness complies).
9   Q   And I want to show you what's been
10 marked as CFTC Exhibit 95. And, again, please
11 take a look at it and indicate to me when you've
12 looked at it.
13      MR. MAY: Ready.
14 BY MR. BURDEN:
15   Q   All right. Mr. Ruth, do you recognize
16 CFTC Exhibit 95?
17   A   Nope.
18   Q   All right. This email is sent from your
19 email address, correct?
20   A   Was my email address, yes.
21   Q   Was your email address. And it's
22 sent in August of 2017. And at that time you were
23 working for Long Leaf, right?
24   A   Correct.

Page 133

1    Q    And you're sending it -- or it purports
2  to be sent by you to James Leeney, is that correct?
3    A    Correct.
4    Q    And he's a broker at Long Leaf Trading,
5  correct?
6    A    Correct.
7    Q    All right.  So the subject is Copy of
8  Time Means Money 2017 Win-Loss.  Do you see that?
9    A    Correct.
10   Q    And the email bears an attachment with
11 the same file name.  Do you see that?
12   A    Correct.
13   Q    All right.  Turn the page, if you would,
14 please.  Do you know what this is?
15   A    Yeah.  Me and James Leeney were
16 plotting to leave Long Leaf Trading Group, and
17 this is the same document as before I think with
18 an extra month on it.  And it's how are we losing
19 money if we're not -- basically it was more of like
20 sell me on how you're going to design this strategy
21 when we go off on our own where if we're hitting
22 these numbers, that our clients are profitable.
23   Q    Got it.  So you sent this to Mr. Leeney
24 so you could see what was going on and improve upon

Page 134

1  it when you went on your own?
2    A    Correct.
3    Q    All right.  So did you have any
4  discussions with Mr. Leeney about this?
5    A    Just, I mean, like, you know,
6  we need to decrease the amount of risk that
7  we're taking on the trades so that these losers
8  aren't -- I mean, as you can see, 50 percent is
9  pretty good, 75 percent is excellent.  So how can
10 we -- if we -- it's, you know, there's a trend that
11 we win 50 percent of the time, how can we still be
12 profitable for our clients and win 50 percent of
13 the time.
14   Q    All right.  And when did you have this
15 discussion with Mr. Leeney?
16   A    I mean, my desire to leave Long
17 Leaf Trading Group occurred either in like June
18 or July, and me and him started like plotting on
19 making the move.
20   Q    Did Mr. Leeney ultimately agree to make
21 that move with you?
22   A    Yeah.
23   Q    And you guys both left for Postrock?
24   A    Correct.

Page 135

1    Q    Have you had discussions with
2  Mr. Leeney about joining your GIB if you can
3  get that started?
4    A    No.
5    Q    So did you make any conclusions?
6  I think your testimony is that you were looking
7  for ways to sort of do better for customers,
8  is that right?
9    A    Well, it was more specific about our
10 operation, like how -- you know, just we were
11 talking about he was going to be in charge of
12 trading.  So I wanted to figure out how we can,
13 you know, I mean, what we do all day is try to
14 improve results for clients.
15   Q    So what conclusions did you reach
16 as to how you could improve results for clients?
17   A    From this?
18   Q    Sure.
19   A    I mean, if I were designing trades,
20 which I never did, like I just said, the -- we've
21 got to make sure that these losers don't wipe out
22 all the winners.
23   Q    And how did you determine or how
24 did you -- what ways did you identify to sort of

Page 136

1  make that happen?
2    A    I mean, the amount of risk that was --
3  like if it was a full loss, I mean, going back
4  to like Exhibit let's say 94, you can't have like
5  $1,000 losses, $900 losses.  So I wanted to make
6  sure that number's smaller.
7    Q    Got it.  So the table on Exhibit 50,
8  it appears to go back from January 2017 through
9  August of 2017, is that right?
10        MR. MAY:  I think you said Exhibit 50,
11    but it's Exhibit 95 I think you're looking at.
12 BY MR. BURDEN:
13   Q    Wait, Exhibit 95.  Let's look at
14 Exhibit 95.
15   A    Yeah.  I mean, again, this isn't for --
16 I think, I mean, if you're going down the path of
17 this is like --
18        MR. MAY:  Well, let him ask the question.
19    That way you know what you're answering.
20 BY MR. BURDEN:
21   Q    Yeah.  So Exhibit 95 here, this shows
22 winning and losing trades from January through
23 August of 2017, is that right?
24   A    I can't answer that question.  I don't

Page 137

1 know.
2    Q    Well, do you recall what this was supposed
3 to tell people?
4    A    It's not supposed to tell.  It's just
5 for me and Jamie that, hey, where we're at right
6 now, we're not that far off.  There's some tweaks
7 that we need to make in order to increase account
8 performance.  That's basically I think the premise
9 behind this.
10    Q    Okay.  I don't mean to ask a question --
11    A    Like that's what I'm trying to say.
12    Q    Yeah.
13    A    Like if I can provide a narrative,
14 I'd like to say that this isn't me knowing that
15 the accounts were not performing well or anything
16 of that nature.  This is me just analyzing like,
17 you know, can we do this and like, if so, how are
18 we going to do this for another operation that me
19 and him were planning on.
20    Q    Got it.  So looking again at Exhibit 95,
21 the one you've got in front of you, how did you
22 determine, for example, for January that 50 percent
23 were winners or for February that 50 percent were
24 winners?

Page 138

1    A    I don't specifically recall, but
2 maybe -- I don't know if you want to call it
3 speculating, but I think it just had to be like
4 one cent in the black or one cent in the red to
5 be considered a winner or loser.
6    Q    But how do you know, like what do you
7 look at to determine if a trade is in the red or
8 in the black?
9    A    I can't tell from this information,
10 but I don't know if that was net commissions and
11 fees or if it was inclusive of them or anything of
12 that nature, but maybe it was just the idea itself.
13 I don't know.
14    Q    Well, did you --
15    A    I would assume that this, since it's
16 similar to the one that I sent to Tim Evans, I
17 think, if I recall correctly, that was not including
18 commissions and fees or maybe it was including
19 fees but not commissions because he was trying
20 to simulate a fee-free environment.  And this
21 looks like this is the same result, so I would
22 assume that it doesn't account for commissions
23 as well.
24    Q    Got it.  Did you review account

Page 139

1 statements, customer account statements to determine
2 whether a trade was in the red or in the black?
3    A    I mean, I probably didn't just pick
4 them out of a hat and guess, but I don't recall
5 specifically how I came to that information.
6    Q    All right.  So I've been asking you
7 questions and showing you exhibits sort of designed
8 to gauge your knowledge and understanding of trading
9 results at Long Leaf.  You picked up on that, right?
10    A    Yes.
11    Q    Yeah, that's the point of this line
12 of questioning.  So did Mr. Evans ever tell you
13 how customers were doing?
14    A    No.  I mean, it was kind of like an
15 unwritten rule, like don't talk about it because,
16 you know, you've got to manage people's emotional
17 states so ...
18    Q    When you say unwritten rule, like whose
19 rule was it?
20    A    Like let me give you an example.
21 Let's say you're a quarterback of a football team
22 and you just threw an interception.  You don't go
23 up to the quarterback and say so how about that
24 last play.  Like the guy is going to be very upset,

Page 140

1 angry, things of that nature.  Like you're step --
2 you know, you're kicking somebody while they're
3 down.  Like they're not happy that they threw an
4 interception or they lost a trade or whatever.
5 So you don't really -- you don't talk about that
6 kind of stuff.
7    Q    But what I'm asking is did Mr. Evans
8 tell you how the trades were doing?  Like did
9 Mr. Evans say our trades this month made this much
10 money or lost this much money?
11    MR. MAY:  So did Mr. Evans recap the
12 trades, is that --
13    MR. BURDEN:  Sure.
14    A    I mean, I don't recall specifically.
15 I would assume part of the reason why I'm making
16 these charts is because I don't have that
17 information so ...
18    Q    Is that why you were making the charts?
19    A    Probably at those times, yeah.
20    Q    Did you ever ask Mr. Evans for P&L numbers
21 for trades or for customers?
22    A    I mean, I would assume at some
23 point, yeah.  But then I think it turned into
24 like go figure it out on your own, and that's

Page 141

1  when I learned -- that's when I actually learned
2  how to read a statement.
3     Q   So let me drill down on that.  Do you
4  recall the first instance where you asked Mr. Evans
5  how the customers were doing?
6     A   No.
7     Q   Did you ever ask Mr. Evans how are
8  the customers doing or anything to that effect?
9     A   I mean, he would -- I don't know.  Like,
10  I mean, I would have to report to them what was
11  going on.  So I don't know exactly how and when and
12  what periods of time I obtained that information.
13  But if we did well, I would tell somebody we did
14  well and if we did poorly, I would tell somebody
15  we did poorly.
16     Q   All right.  What I'm asking about,
17  though, is what Mr. Evans told you, right?  Like
18  every month Long Leaf Trading would recommend four
19  trades to customers, right?
20     A   Yeah.
21     Q   So at the end of every month did
22  Mr. Evans say or otherwise communicate to you this
23  is how the trades did?
24     A   Yeah.  But that's the thing, is like

Page 142

1  I don't want to say I'm a black-and-white person
2  but I'm like a -- as you can tell, I like dollars
3  and cents.  He would be, oh, about 500.  So I
4  wouldn't get like a specific number, and so I always
5  felt like invaluable or unintelligent talking to a
6  customer when I'm not -- like you're giving them
7  like round numbers and stuff.  It just sounds odd
8  to me.  So --
9     Q   How -- sorry, keep going.  I didn't mean
10  to cut you off.
11     A   Yeah, it sounds odd to me.  But I think --
12  I don't know what you're getting at, but it's not
13  like I sat here and knowingly knew that our clients
14  were losing money month after month and I didn't
15  care.
16     Q   Well, did you think they were making
17  money month after month?
18     A   I think they were making money at
19  times, yeah.  That's the thing is, again, going
20  back to my mentality, is we live like month to
21  month.  So, you know, somebody can't generate
22  $30,000 in commissions when they only started
23  with 25,000.  So in my opinion they had to be
24  making money at some point.

Page 143

1       MR. MAY:  What exhibit are you pointing
2  at?
3       THE WITNESS:  Sorry, Exhibit 122.
4  BY MR. BURDEN:
5     Q   Yeah.  So, Mr. Ruth, what I want to
6  try to figure out is what did Mr. Evans tell you
7  about the profitability of the recommended trades,
8  if anything, if you remember?
9     A   I mean, he wasn't like deceitful of them
10  but --
11     Q   Well, let me ask you this.  Did Mr. Evans
12  tell you every month how the recommended trades
13  wound up doing?
14     A   Yes, but it's like a ballpark --
15     Q   Got it.
16     A   -- very vague situation.  So sometimes
17  I don't like that answer, so I would go out and then
18  I would go to the statements and come down to the
19  specific penny.
20     Q   So every month Mr. Evans would provide
21  you with how the recommendations did from the month
22  before, but it was sort of round numbers, is that
23  right?
24     A   I can't say every month, but yeah.

Page 144

1  Like where I gathered the information, the idea
2  of are we having a winning month or a losing month
3  started from Tim Evans.
4     Q   There we go.  So what did Mr. Evans say
5  to you?
6     A   Either we have a profitable month,
7  you know, or a bad month.
8     Q   And would he do this every month on
9  a regular basis so you knew?
10     A   Yeah, yeah.
11     Q   Okay.  So every month --
12     A   I mean, you would have -- you can't
13  just pick up the phone and call somebody and not
14  have that information so ...
15     Q   Right.  So every month Mr. Evans would
16  tell you how customers had done with the last set
17  of recommendations?
18     A   In the sense of whether it was a
19  positive month, which means one cent more, or if
20  it was a negative month, which meant one cent less.
21     Q   So your testimony is that Mr. Evans
22  would tell you if customers made money or lost
23  money but not how much?
24     A   Correct.

Page 145

1    Q    Did you ever ask him --
2    A    Sometimes, sometimes he could say it
3 but like it wasn't like regular, you know, policy
4 or anything.
5    Q    Did you ever ask him how much money
6 did they make or how much money did they lose?
7    A    Yeah.  But, I mean, I wouldn't get an
8 answer necessarily that satisfied me.
9    Q    What kind of answer would he give that
10 didn't satisfy you?
11   A    Anything that doesn't have anything
12 to the specific penny.
13   Q    All right.  I mean, do you feel
14 like Mr. Evans didn't want to tell you, like --
15   A    No, no.  It's just that like he's not
16 an attention-to-detail guy.
17   Q    All right.  So and this forced you to
18 go out and figure out --
19   A    Maybe it was his play of like getting
20 me to learn on my own and learn the statements so
21 I didn't have to ask.  I don't know.  Maybe that was
22 like his style of teaching.  I don't know exactly
23 what his intentions are, but yeah.  I mean, you
24 guys have seen my emails.  I think I'm more of

Page 146

1 an attention guy than he is.  So he's very vague.
2 I mean --
3        MR. MAY:  We're almost to 1 o'clock.
4 I don't know if you have any more exhibits.
5        MR. BURDEN:  It sounds like Mr. Ruth
6 was saying something.
7    Q    But if you want to finish your thought,
8 we can break for lunch.
9    A    I mean, just from like a customer
10 satisfaction standpoint, I think that my customers
11 appreciated hearing $536.97 instead of about $600,
12 you know.  So I -- I don't know.  I guess I take
13 my job more seriously or I, you know, wouldn't
14 appreciate that if I was a customer.  So that's
15 why I would do it.
16   Q    Did you call your customers and tell
17 them how the trade recommendations had turn out?
18   A    I mean, I was constantly talking to my
19 customers.  So, yeah, that's part of the process.
20   Q    So how did you know then what that number
21 was to tell them?
22   A    Well, first, it depended like throughout
23 my career at Long Leaf evolved.  So in the beginning
24 I started off with like, all right, we did well this

Page 147

1 month.  And why did we do well, because Tim Evans
2 told me we did well.  How well did we do?  I think
3 we made about $300, and that's what I would tell
4 them.
5    Q    Okay.
6    A    And then as I matured and became
7 more knowledgeable, I think at the end I got down
8 to the penny and I like prided myself on that.
9    Q    And that was something you were able to
10 figure out yourself from the statements, correct?
11   A    Yeah.  But, I mean, obviously I'm telling
12 them like, you know, your account statement's the
13 official record.  I can make mistakes but I think,
14 to the best of my knowledge, that this is the actual
15 number.
16   Q    So did you tell your customers, you
17 know, regularly whether they had made money or lost
18 money on trades and how much?
19   A    I don't -- I mean, I don't recall
20 exactly the frequency in which I did it and whether
21 or not it was standard to everyone.  But, I mean,
22 I tried to have -- I tried to treat everybody,
23 deal with everybody the same way so that you
24 don't miss anything.

Page 148

1    Q    So your practice at Long Leaf Trading
2 as a general matter would be to communicate with
3 clients and tell them whether they had made or lost
4 money, correct?
5    A    On the individual month --
6    Q    Got it.
7    A    -- the specific trades that I have
8 information on, correct.  Now, if a trade went
9 into the next month, I don't have that information.
10 So I would either speculate as to where I think it
11 could go or I would say here's where it's at now,
12 you know.  Either we're going to lose everything
13 or if it stays there, we're going to make it,
14 whatever.  But I would give the information going
15 back to the realized P&L that I had or if it
16 happened that day, I would say it expired worthless,
17 so maybe I'm off by like 20, 30 bucks.  I don't know
18 until I see the clearing fees on the statement the
19 next day or two.
20   Q    So was it your practice to tell clients
21 how they were doing at the end of every month?  Like
22 when do you do this call?
23   A    Yeah.  I mean, I think it's -- yeah,
24 I think it's important.  I think that was the

Page 149

1 whole purpose of the program is is that in a
2 managed situation the only time you know about
3 account performance is when you look at your
4 account statement and not -- people don't
5 necessarily do that regularly. And I don't want
6 them to go, oh, shit, what happened, you know,
7 when they could have stopped it five months ago.
8 So yeah, I mean, that's kind of the premise behind
9 it. But, I mean, some clients, like they like to
10 be treated differently or whatever. So I'm not
11 going to say under oath that every single time I
12 did it this exact same way to every single person.
13 Like everybody -- that was the whole purpose of it,
14 was we'd customize the way in which we interacted
15 with you.
16    Q    Got it. So how could you -- one
17 more and then we ought to do our lunch. So how
18 did you know how customers were doing? Was it just
19 from looking at the statements?
20    A    When you say "were doing," to me
21 that makes it sound how are you doing overall.
22    Q    No, no. Let's make it month to month.
23 I'm not trying to get you to say something you don't
24 want to say.

Page 150

1    A    Yeah, I only live month to month in this
2 situation.
3    Q    So, yeah.
4    A    I don't think about what happened
5 before it. I don't think about what's happening.
6 I only live in that one month. That's all I --
7    Q    Got it.
8    A    -- worry about. So if you were to say
9 is this client making money, I would say, well, are
10 our trades making -- yes, then this client's making
11 money.
12    Q    But how would you figure that out?
13    A    It would start off from Tim Evans
14 saying we're either making money or losing money.
15 And then as my career evolved, it got down to me
16 being able to know how to utilize the statement
17 to be able to figure that information out to the
18 specific penny.
19    Q    Did Mr. Evans ever tell you that
20 customers were making money and you found out they
21 weren't?
22    A    I think like one time I calculated it
23 where he said that like we're going to make like a
24 hundred bucks this month or something or basically

Page 151

1 break even, and then I actually did the math and
2 we lost like 40 or something. So it was because
3 of the fact that he was ballparking it that --
4 and it was so close to the line of made money or
5 didn't make money, like I can recall where that
6 wasn't the case or whatnot. But, no, I don't think
7 he would be -- he wouldn't tell us that we made
8 money and not --
9    Q    Got it. So Mr. Evans didn't misrepresent
10 customer results to you?
11    A    I mean, you could make -- I mean,
12 a blanket statement like that, you could say
13 that he did because of the fact that he didn't give
14 me accurate numbers. He gave me ballpark numbers.
15    Q    Got it. So it sounds like your
16 testimony is that Mr. Evans accurately told you
17 whether trades had won or lost, save it sounds like
18 for one occasion where a position hadn't been closed
19 out yet?
20    A    Well, and the other thing you've got to
21 consider too is sometimes those four trades don't
22 close in that month, right? So if somebody were to
23 say how did we do this month and I have two of the
24 trades that closed, even though I know the other

Page 152

1 two are losers, well, technically this month
2 we did what we did and let's say those two were
3 winners. So then that person says, well, oh, okay.
4 Well, all right. Well, let's do the next four
5 trades. And then those two, you know, let's say
6 they're currencies. So it's like the first week
7 into next month they come and they're both losers
8 and they get walloped. And then, you know, the next
9 time you talk to them it's a little bit different.
10 So, you know, those results can change if they're
11 not realized. And so at the time, you know, that
12 you communicate with them you're trying to give
13 them as much information as possible to know where
14 they could end up and get them to understand that
15 these are unrealized, you know. They're where
16 we need them to be right now. They could change.
17 Best case scenario you're looking at this, worst
18 case scenario we're looking at that, you know.
19 We feel comfortable about it. That's why the
20 position's still open. If we didn't think it
21 was, you know, going to stay in that spot and
22 we bleed more time decay off the option then, you
23 know, why would we -- we wouldn't keep it open.
24 So -- but then there's times where, you know,

Page 153

1 that all changes in those next couple weeks and
2 the realized P&L becomes a significant loss and
3 then the whole month becomes a loss but you already
4 told them that it was a winner. And so then
5 they're like, well, you told me we were making
6 money. Well, I was, sir, but we were talking about
7 the realized ones. So that's where there could be
8 confusion on something of that nature and between
9 Tim Evans and clients.
10     Q   Got it.
11         MR. BURDEN: Well, I'll tell you what.
12 I promised you guys a lunch and then I kept
13 going, so my apologies. Let's go off the
14 record, please.
15         (Whereupon a lunch recess was taken
16             from 1:15 p.m., to 2:34 p.m., after
17             which the following proceedings were
18             had:)
19
20
21
22
23
24

Page 154

1         A F T E R N O O N   S E S S I O N
2             JEREMY RUTH,
3 called as a witness herein, having been previously
4 sworn and examined, testified further as follows:
5         FURTHER EXAMINATION (Cont'd.)
6 BY MR. BURDEN:
7     Q   All right. I want to follow up on
8 some testimony you gave before the break. You
9 testified that you were a dollars and cents guy,
10 is that right?
11     A   In certain circumstances.
12     Q   All right. And that you were detail
13 oriented, or at least more detail oriented than
14 Mr. Evans, is that right?
15     A   In certain circumstances, yeah.
16     Q   All right. So did Mr. Evans ever tell
17 you some trading results and you went and checked
18 and you felt like they were wrong?
19         MR. MAY: I think that's been asked
20     and answered, but you can go ahead and answer
21     it.
22     A   I didn't check because I thought they
23 were wrong. I just was doing the calculations and
24 it turned out it was wrong.

Page 155

1 BY MR. BURDEN:
2     Q   In one instance, is that right?
3     A   That I recall, yes.
4     Q   Got it. Are there any other instances
5 you recall where Mr. Evans told you something and
6 then you did some work and found out, you know,
7 it wasn't true?
8     A   Not that I recall.
9     Q   All right. And that instance
10 where you'd found Mr. Evans said something about
11 results that wasn't right to you, when was that
12 approximately, please.
13     A   I don't recall.
14     Q   All right.
15     A   I can give you a year.
16     Q   That would be great, yeah.
17     A   2017.
18     Q   Mr. Ruth, did you receive regular --
19 you know, I keep saying regular. I'll just ask
20 you did you receive complaints from customers about
21 account performance while you were at Long Leaf?
22     A   How do you define complaints?
23     Q   Customers expressing displeasure about
24 poor account performance.

Page 156

1     A   Yeah, all the -- frequently, yeah.
2     Q   Okay. How frequently would you say?
3     A   I don't know. I don't know if frequently's
4 the right word. But, yes, I did receive complaints
5 about account performance.
6     Q   And did you receive those complaints sort
7 of consistently throughout your tenure?
8     A   I don't know. No.
9     Q   When did the complaints start?
10     A   I mean, if I like were to say like
11 notable stuff, it would probably be in 2017.
12     Q   Got it. Was that early 2017, late 2017?
13     A   I don't know exactly.
14     Q   I'm sorry?
15     A   I don't know exactly.
16         (Whereupon CFTC Exhibit No. 124 was
17             marked for identification, MM.)
18     Q   All right. Well, let me hand you what
19 I've marked CFTC Exhibit 124. And let me know when
20 you've looked at it, please.
21         MR. MAY: Okay.
22 BY MR. BURDEN:
23     Q   All right. Mr. Ruth, do you recognize
24 Exhibit 124?

Page 157

1    A    No.
2    Q    Do you know who Rob Mixer is?
3    A    Yes.
4    Q    Who's Rob Mixer, please.
5    A    He was a customer of mine.
6    Q    All right.  So if you look at the bottom --
7        MR. MAY:  Did you say is a customer or was?
8        THE WITNESS:  Was.
9        MR. MAY:  Okay.
10  BY MR. BURDEN:
11    Q    All right.  So if you look at the
12  bottom of Exhibit 124, it reflects an email sent
13  from Rob Mixer to you, is that correct?
14    A    Yes.
15    Q    All right.  So Mr. Mixer writes,
16  and I'm looking at the middle paragraph here,
17  "I need to cut my losses.  My account is down
18  33 percent when I look at my cash balance.
19  At this point I need a 50 percent return on current
20  capital just to get back to where we started a year
21  ago.  Even if you met the targeted 20 percent return
22  per year that we initially discussed, it will be
23  two plus years to recover.  Also, I have not had
24  a single account review and the initial agreement

Page 158

1    was at least quarterly reviews."
2        So is what Mr. Mixer is writing
3    here, is that accurate?  Was Mr. Mixer's account
4    down 33 percent at this point, August 2016?
5    A    I would assume not.
6    Q    Why do you think that?
7    A    Because he says something about cash
8    balance, and a cash balance doesn't reflect the
9    value of the account.
10    Q    Do you recall the balance or the value
11  of Mr. Mixer's account at that point?
12    A    Couldn't tell you.
13    Q    All right.  So you write back, "Rob,
14  thanks for reaching out.  I want to address this
15  immediately.  What time are you available tomorrow
16  to take my call?"  Did you write that?
17    A    It appears so.
18    Q    All right.  Do you recall having
19  any discussion with Mr. Mixer about this email?
20    A    Do I recall the conversation?
21    Q    Yeah.
22    A    No.
23    Q    Do you remember if you had one or not?
24    A    Couldn't tell you.

Page 159

1    Q    All right.
2    A    Did I?
3    Q    I'm sorry?
4    A    Do you know if I did?
5    Q    I can't testify.  I can't tell you.
6    A    Right.  I don't know.
7    Q    So I think you testified that you
8    received complaints from customers.  What did you
9    do with those complaints?
10    A    I gave them to Tim Evans.
11    Q    And how did you give them to him?
12    A    Either verbally, I'd print out the
13  email, show it to him, forward it to him.  I don't
14  know.  Many different ways.
15    Q    So you didn't always forward it, right?
16    A    Not -- my job is immediately when
17  a complaint comes in is to notify the compliance
18  officer.
19    Q    And that's Mr. Evans?
20    A    Yeah.
21    Q    And did you --
22    A    How I do it, I don't -- it's not --
23  there's no specific policy, but it was my job to
24  bring it to the attention of the compliance officer.

Page 160

1    Q    And did you always do that?
2    A    Yes.
3    Q    All right.  So how did Mr. Evans respond
4    to these complaints?
5    A    I mean, I don't necessarily recall.
6    Q    Do you know if Mr. Evans would call that
7    customer?
8    A    He would generally have us like brokers
9    do it.
10    Q    Got it.
11    A    Sometimes he would -- I mean, going
12  back to that Harish Patel guy, I mean, he did in
13  that situation.
14    Q    So as a general matter, would Mr. Evans
15  have you call customers that complained?
16    A    I think it depends on the nature of the
17  complaint.
18    Q    All right.  Well, was there a policy?
19    A    Each -- no.
20    Q    Can you break it down?
21    A    I think each individual instance
22  is evaluated and a determined course of action
23  is taken.
24    Q    So how did you know what to say

Page 161

1 to customers that were complaining or unhappy?
2    A   I listened to Comcast recorded phone calls.
3    Q   What do you mean by that?  What's a Comcast
4 recorded phone call?
5    A   Comcast is a company that is known
6 to have very poor customer service, and I would
7 listen to their phone calls and see how they would
8 interact with people.
9    Q   Oh, so you mean you would listen
10 to calls that people had recorded with Comcast
11 customer service?
12    A   Yes.
13    Q   And where did you find these calls?
14    A   YouTube.
15    Q   And what did you learn from these calls?
16 Like --
17    A   What not to say.
18    Q   All right.  Well, how did you know what
19 to say?
20    A   I mean, I would state what I would know
21 to be factual if they asked me questions.  Yeah,
22 I don't know.  I mean, I don't recall specifically
23 what I said or if I even had a conversation with
24 Rob Mixer so ...

Page 162

1    Q   Well, setting aside the specific
2 example of Rob Mixer, when you talked to customers
3 that had complained did Mr. Evans say, hey, you
4 know, say this or otherwise give you a script
5 or instructions?
6    A   I mean, yeah.  I mean, I think the
7 purpose of going to the compliance officer is so
8 he could tell you how we're going to deal with the
9 situation.  I would assume at times he gave me like
10 guidelines or something of that nature, but I don't
11 recall specifically.
12    Q   Got it.  So there was no sort of
13 playbook on how to deal with a complaining customer.
14 It was --
15    A   No.
16       (Whereupon CFTC Exhibit No. 125 was
17       marked for identification, MM.)
18    Q   All right.  I want to hand you
19 what I've marked as CFTC Exhibit 125.  And, again,
20 please review it and when you've reviewed it to your
21 satisfaction, you can indicate that to me and we'll
22 talk about it.
23       MR. MAY:  Okay.
24

Page 163

1 BY MR. BURDEN:
2    Q   All right.  Mr. Ruth, do you recognize
3 CFTC Exhibit 125?
4    A   No.
5    Q   All right.  So jruth@longleaftrading.com
6 was your email address, correct?
7    A   Yes.
8    Q   All right.  So who's Steve Beranek,
9 do you know?
10    A   Steve Beranek was a customer of mine.
11    Q   All right.  So it looks like he's
12 sending you an email on October 29, 2016, and I'm
13 looking at the middle of Exhibit 125.  Do you see
14 that?
15    A   Yep.
16    Q   All right.  So Mr. Beranek writes,
17 "Your firm's business model is very impressive.
18 It looks like the commissions and fees for the
19 year will surpass my entire $20K in investments, and
20 I have only lost about 20 percent of my investment.
21 At this rate in ten years my account balance will
22 be zero and your firm will have made 200K.  Steve."
23 Do you remember receiving this email?
24    A   Now that I see it, yeah.

Page 164

1    Q   Okay.  So if you look at the next email
2 up, it looks like you forward this to Mr. Evans on
3 January 29, 2017, is that right?
4    A   That's what it says, yep.
5    Q   Do you remember doing that?
6    A   I don't recall.
7    Q   So what's written in the body of that
8 email is, "I just got a good laugh reading this
9 again." Did you write that?
10    A   That's what it appears, that I did, yeah.
11    Q   But do you remember writing it?
12    A   No.
13    Q   So, I'm sorry.  I want to go back,
14 if I could, please, for one more quick question.
15 You can just pull it off the top of the pile, if you
16 would.
17    A   Are we done with this one?
18    Q   Yeah, you can put that one aside.
19    A   I want to talk about this one now.
20    Q   You do?
21    A   I'm still getting a good laugh today.
22    Q   Why?  Tell me why.
23    A   The guy's an RIA.
24    Q   What does that mean?

Page 165

1    A    He's a -- what is it?
2         MR. MAY:  Can I suggest --
3         MR. BURDEN:  No.
4    Q    Is it a registered investment advisor?
5    A    Yeah, that's it.
6         MR. MAY:  That's exactly what I was
7    going to say.
8         MR. BURDEN:  I knew you'd have the
9    right answer.
10   A    That's why I find it -- like he's
11   not complaining.  I can't -- I don't know.  He's
12   just -- I'm speculating here, but he's either being
13   very sarcastic or he was actually complimenting,
14   I guess, the business model.  I don't know.
15   Q    Did you talk to Mr. Beranek about that
16   email?
17   A    No, never brought it up.
18   Q    Did Mr. Beranek continue to trade at Long
19   Leaf Trading --
20   A    I believe so.
21   Q    -- after this email?
22   A    That's the other thing I find -- yeah,
23   that's why I'm laughing.
24   Q    Did he continue to lose money?

Page 166

1    A    I'm not -- I don't know.
2    Q    All right.  So if you could put that
3    one aside.
4    A    All right.
5    Q    So I thought that one was funny too.
6    A    Yeah.
7    Q    Let's take a look at 124, if we could,
8    please.
9    A    Sure.
10   Q    Are you back on that?
11   A    Yeah.
12   Q    There we go.  All right.  So I want
13   to focus back in on this email from Rob Mixer
14   to jruth@longleaftrading.com.  In this middle
15   paragraph in the last sentence Mr. Mixer appears
16   to write, "Even if you met the targeted 20 percent
17   return per year that we initially discussed, it
18   will be two plus years to recover."
19        Did you tell Mr. Mixer that he
20   could expect a return of 20 percent per year?
21   A    No.
22   Q    You could put that one aside.
23   A    All right.
24

Page 167

1         (Whereupon CFTC Exhibit No. 126 was
2         marked for identification, MM.)
3    Q    I want to hand you what I've marked
4    as CFTC Exhibit 126.  Do you recognize this -- oh,
5    take a moment to review it, please, and then I'll
6    ask you questions about it.
7         MR. MAY:  Ready?
8         THE WITNESS:  Oh, yeah.
9    BY MR. BURDEN:
10   Q    So, Mr. Ruth, do you recognize CFTC
11   Exhibit 126?
12   A    Nope.
13   Q    All right.  Do you know who Joe Hermanson
14   is?
15   A    I'm going to assume he's a client of mine.
16   Q    Why do you think that?
17   A    Because he's addressing the email to
18   me and he has an account number in his -- on the
19   attachment.
20   Q    All right.  So in Exhibit 126 it
21   appears to reflect Mr. Hermanson writing to you
22   in June of 2017.  And he says, "Jeremy," and there's
23   some weird little symbol that I think is a glitch,
24   "The reality of all this is finally hitting me as

Page 168

1    you've managed to take 13K and turn it into 5K.
2    I could have done that bad all by myself."
3         MR. MAY:  Actually, I'm going to take
4         issue with some of -- I think you're making
5         corrections for some of the errors that are
6         on the document.
7         MR. BURDEN:  So is that an objection,
8    Mr. May?
9         MR. MAY:  It's an observation.
10        MR. BURDEN:  All right.  I'm going to
11   continue then.
12        MR. MAY:  Well, we're going to make
13        this part of the exhibit and part of the
14        record, yes?
15        MR. BURDEN:  It is part of the record,
16   correct --
17        MR. MAY:  Wonderful.
18        MR. BURDEN:  -- though you will not
19   have access to the record.
20        MR. MAY:  Unless --
21        MR. BURDEN:  Litigation --
22        MR. MAY:  Right.
23        MR. BURDEN:  -- proceeds.
24        MR. MAY:  Okay.  I knew the answer.

Page 169

1    I just wanted him to hear that.
2  BY MR. BURDEN:
3    Q   All right.  So the email notes for
4  Mr. Hermanson, "I also noted that of the last four
5  positions you placed me in, I was not consulted.
6  You just did it.  That said, can you see that
7  what is left here is sent back to Midland."
8          Is Mr. Hermanson correct here that
9  his account went from 13K to 5K?
10   A   No clue.  I don't recall.
11   Q   All right.  Did you follow up with
12  Mr. Hermanson about this email?
13   A   I don't recall, but I would assume so
14  because you have to close down an account so ...
15   Q   All right.  Well, do you recall any
16  subsequent discussions or emails with Mr. Hermanson?
17   A   No.
18   Q   All right.  So Mr. Hermanson complains
19  here that he was not consulted with respect to
20  four positions that he writes that he was placed
21  in.  Do you know if that's correct?  Was he put into
22  positions that he didn't provide consent for?
23   A   I'm going to let you in on a little
24  secret.  Every single time somebody loses money

Page 170

1  and there's a broker involved they start saying
2  and making up things.  Every single time.  I'm sure
3  you've figured that out by now, right?
4    Q   I don't answer questions here.
5    A   No, of course I wouldn't do it, but
6  I could see why you would think that.  But in
7  my experiences being a commodity broker, when it
8  comes to the point where you're going to part ways
9  it always starts off with you promised me a return
10  of X amount of dollars, this, this and that, and
11  they totally, you know, misconstrue everything
12  that happened.  So the answer is no, he wouldn't
13  be consulted -- of course he's consulted, but yeah.
14   Q   Do you specifically remember consulting
15  Mr. Hermanson about the positions for June, May,
16  April and March of 2017?
17   A   I can't specifically recall.
18   Q   Would there be any written record
19  of Mr. Hermanson providing his consent for those
20  positions?
21   A   Can't -- I don't recall how it was done.
22   Q   You can put that one aside, if you would,
23  please.
24   A   Oh, I didn't realize you provided the --

Page 171

1          MR. MAY:  Statement?
2          THE WITNESS:  Yeah.
3    A   So, no, he didn't go to 5K.  He went to
4  $5,189.72.
5          (Whereupon CFTC Exhibit No. 127 was
6          marked for identification, MM.)
7    Q   All right.  Mr. Ruth, I want to provide you
8  with a document that I've marked CFTC Exhibit 127.
9  Please look at it and tell me when you've looked at
10  it.  I'll ask you some questions about it.
11         MR. MAY:  Ready?
12         THE WITNESS:  Yes.
13  BY MR. BURDEN:
14   Q   All right.  Mr. Ruth, do you recognize the
15  document marked as CFTC Exhibit 127?
16   A   No.
17   Q   All right.  Do you know who Kurt Pfost is?
18   A   After reading the document, yes.
19   Q   Who is he?
20   A   He is an original customer of Long Leaf
21  who then eventually became my customer, I believe.
22   Q   And when did Mr. Pfost become your
23  customer, please.
24   A   According to the document, Monday,

Page 172

1  April 3, 2017.
2    Q   Why do you say that?
3    A   Because that's what the document says.
4    Q   So I'm afraid I didn't see that.  Where
5  are you seeing that, please.
6    A   On the third page effective today,
7  Monday, April 3, 2017, I wish to rescind my letter
8  of direction for futures trading.  Let it be known
9  I wish to move into a broker style assisted service
10  and work with broker Jeremy Ruth of Long Leaf
11  Trading Group, Incorporated.  You didn't read that?
12  It's right there.
13   Q   I see that.  That's good.  So this
14  letter of direction, what did this give you the
15  ability to do?
16   A   It isn't a letter of direction.
17  It is the rescinding of a letter of direction
18  that he had previously with a broker at the firm.
19   Q   I see.  And was that with Mr. Evans or
20  do you not know?
21   A   I don't -- it could be Mr. Evans or Tony
22  Klancic or both.
23   Q   Let's put that one aside, please.
24   A   I never had any letter of direction

Page 173

1  accounts.
2          (Whereupon  CFTC  Exhibit  No. 128 was
3          marked for identification, MM.)
4      Q   All right.  I want to hand you what
5  I've marked as CFTC Exhibit 128.  Again, take
6  a look at it, please, and let me know when you've
7  looked at it.
8      MR. MAY:  Ready.
9      THE WITNESS:  One second.
10  BY MR. BURDEN:
11     Q   Ready to go?
12     A   Yeah.
13     Q   So, Mr. Ruth, do you recognize CFTC
14  Exhibit 128?
15     A   No.
16     Q   Who's Shane Allen?
17     A   Shane Allen was a customer of mine.
18     Q   All right.  Do you see in Exhibit 128
19  it reflects an email from Shane Allen --
20     A   Well, correction.  Shane Allen was
21  a customer of Tony Klancic.  After Tony Klancic
22  left, he became a customer of mine.
23     Q   Got it.  And when did Tony Klancic leave,
24  please.

Page 174

1      A   I don't know.  But my point is I wasn't
2  involved in the solicitation of him.
3      Q   All right.  So let's stay on Exhibit 128,
4  if we could, please.  So Mr. Allen writes to you
5  in May of 2017, "This is a written notification to
6  cancel all future orders based on performance over
7  the past year and a half," and then he requests
8  termination of his account.  Do you recall receiving
9  this email?
10     A   No.
11     Q   Do you know how Mr. Allen's account
12  did at Long Leaf Trading?
13     A   No clue.
14     Q   All right.  Let's put that one aside,
15  please.
16     A   (Witness complies).
17          (Whereupon CFTC Exhibit No. 129 was
18          marked for identification, MM.)
19     Q   All right.  I want to hand you what
20  I've marked as CFTC Exhibit 129.  Look it over,
21  please, and let me know when you're ready.
22     MR. MAY:  Ready?
23     THE WITNESS:  Yes.
24

Page 175

1  BY MR. BURDEN:
2      Q   All right.  Mr. Ruth, do you recognize
3  Exhibit 129?
4      A   No.
5      Q   All right.  Who is Dan Snyder?
6      A   It appears he is a client of mine.
7      Q   Why do you think that?
8      A   Because he is writing an email to me
9  talking about his account performance.
10     Q   All right.  And what's he saying about
11  his account performance?
12     A   It says, "Based on the recent account
13  statements, the balance has reduced from 25099 to
14  19131, a 24 percent reduction in three months."
15     Q   Do you know if what Mr. Snyder is writing
16  there is correct?  Did he lose 24 percent of his
17  account in three months?
18     A   I have no clue.
19     Q   All right.  So if you look at the
20  last sentence of -- I guess the first paragraph
21  of Mr. Snyder's email to you he says, "When we
22  have gains, they are not maximum gains.  Yet every
23  loss has been a maximum loss.  I am afraid I don't
24  see the value in your option selection process."

Page 176

1          Do you know if that's right for
2  Mr. Snyder, for Mr. Snyder's trading at Long Leaf?
3  Was every loss a maximum loss?
4      A   I would not recall that.
5      Q   For your clients at Long Leaf Trading
6  generally is this true?  Were the maximum losses
7  realized and the gains sort of much less than the
8  maximum gains?
9      A   I don't know.
10     Q   All right.  So it looks here like you're
11  responding to Mr. Snyder.  You write, "My apologies.
12  I didn't realize you were waiting on comments from
13  me.  I'll call you on Monday to discuss."  Did you
14  write that?
15     A   I don't know.
16     Q   Do you recall having any discussions
17  with Mr. Snyder about his account?
18     A   No.
19     Q   All right.  So --
20     A   I don't even remember who that guy is.
21     Q   I'm sorry?
22     A   I don't even remember who he is.
23     Q   All right.  So --
24     A   Like generally I could tell you

Page 177

1  something about each client, but I've got nothing
2  on that one.
3            (Whereupon CFTC Exhibit No. 130 was
4            marked for identification, MM.)
5    Q    Okay.  Well, let me hand you what
6  I've marked as CFTC Exhibit 130.  And look at it,
7  please, and tell me when you're ready to talk about
8  it.
9    A    All right.
10           MR. BURDEN:  Shall we proceed?
11           MR. MAY:  Sure.
12  BY MR. BURDEN:
13   Q    Yeah, all right.  Mr. Ruth, do you
14  recognize CFTC Exhibit 130?
15   A    Nope.
16   Q    All right.  Who is David Thibert?
17   A    I'm going to assume he's a client of mine.
18   Q    Why do you think that?
19   A    Because he is using Gain Capital support
20  to try to contact me.
21   Q    All right.  And did you ever get in touch
22  with Mr. Thibert?
23   A    I would assume so.
24   Q    So why do you think that?

Page 178

1    A    Because I don't avoid anybody's phone
2  calls and I work more hours than anybody in the
3  industry.
4    Q    So, yeah, so that's my question right
5  there.  So if you look at the first email in the
6  chain in Exhibit 130, it reflects a message from
7  GFSupport@gaincapital, and it looks like they're
8  forwarding an email from Mr. Thibert.  Is that what
9  you understand that to mean?
10   A    Yeah.
11   Q    And Mr. Thibert writes, "I want my
12  funds frozen until I can contact Mr. Ruth.  He
13  seems to be avoiding me.  Do not trade any more
14  options until they are discussed with me."  And it
15  looks like ultimately this gets sent to Mr. Evans,
16  who forwards it to you, is that correct?
17   A    Yeah.
18   Q    All right.  So did you talk to Mr. Evans
19  about this at all?
20   A    I would assume so.
21   Q    Well, do you remember talking to Mr. Evans
22  about it?
23   A    I mean, not specifically.  But I think this
24  guy was calling the wrong phone number or something

Page 179

1  of that nature.
2    Q    Why do you think that?
3    A    Because the fact that he was calling --
4  if I remember correctly, he was calling -- if you
5  go back to Exhibit 120, I think he was calling like
6  that phone number (indicating), which is Gain
7  Capital, trying to find Jeremy Ruth.
8    Q    So why do you think -- I'm not
9  disagreeing with you, but why do you think he
10  was doing that?
11   A    I think the guy's older and he's not
12  technologically savvy.
13   Q    But did anybody tell you that?  Did you
14  come to find that out --
15   A    Yeah, through this email, yeah.
16   Q    Okay.  So where does the email say that?
17   A    Well, once I got on the phone with
18  him I'm like, hey, I haven't -- I haven't received
19  a call from you.  I got this email.  What's going
20  on.
21   Q    But is that a discussion you had with
22  Mr. Thibert?
23   A    I don't remember the exact, specific
24  thing, what I said or whatever, but I know that

Page 180

1  that was the nature of what the issue was.
2    Q    Got it.  So you remember calling
3  Mr. Thibert --
4    A    Yeah, this isn't an instance of me
5  like avoiding somebody's phone call or anything.
6    Q    Got it.  So your testimony is you
7  received this email and you did get in touch with
8  Mr. Thibert --
9    A    Yes.
10   Q    -- correct?
11   A    I never -- and my testimony also
12  is is that I never avoided his phone call in the
13  first place.
14   Q    Got it.  And you learned from Mr. Thibert
15  that he was calling the wrong number?
16   A    Yes, or something of that nature.
17   Q    That's your recollection?
18   A    Yes.
19   Q    All right.  Let's put that one aside.
20   A    (Witness complies).
21           (Whereupon CFTC Exhibit No. 131 was
22           marked for identification, MM.)
23   Q    All right.  I want to hand you what
24  I've marked as CFTC Exhibit 131.  Take a look at

Page 181

1  it, please, and indicate for me when you have
2  reviewed it.
3       MR. MAY:  Are you ready?
4       THE WITNESS:  Yes.
5  BY MR. BURDEN:
6    Q   All right.  Mr. Ruth, do you recognize
7  CFTC Exhibit 131?
8    A   No.
9    Q   Who's Suzanne Clemons?
10   A   I don't know exactly.  I don't recall.
11   Q   All right.  Was Ms. Clemons a customer
12  of yours?
13   A   To be honest with you, I don't know
14  if I have the right person, but there's one --
15  either she is but we never did any trades
16  together or -- or, sorry, maybe she was like
17  a client of somebody else's that was given to me.
18  I don't know if we did any trades.  There's one
19  that's like that.
20   Q   Is that Suzanne Clemons?
21   A   I can't remember.  I mean, I only had
22  like a few females.  So I think -- I don't know.
23  I don't know if it's her but ...
24   Q   Okay.  Well, let's take a look at 131

Page 182

1  anyway.
2    A   Yeah.
3    Q   So the email reflects -- or Exhibit 131
4  reflects an email from a Suzanne Clemons to your
5  email address at Long Leaf when you were there,
6  is that right?
7    A   Yeah.
8    Q   All right.  And Ms. Clemons writes,
9  "Jeremy, please close out all positions by
10  August 11th and return funds to me on or before
11  August 18th.  I am very disappointed in your claims
12  to generate positive returns."  Do you recall any
13  discussions with Ms. Clemons?
14   A   No.
15   Q   All right.  So do you know if you
16  followed up with Ms. Clemons from this email?
17   A   I would assume so.
18   Q   Do you have any recollection of following
19  up with Ms. Clemons?
20   A   No.
21   Q   All right.  Did you represent
22  to Ms. Clemons that Long Leaf Trading generated
23  positive returns for customers?
24   A   Nope.

Page 183

1    Q   Did you represent that to any other
2  customers of Long Leaf Trading?
3    A   Nope.
4    Q   All right.
5       MR. MAY:  Can I ask him one question?
6       MR. BURDEN:  You know, if you want to,
7  I don't mind.  We usually provide opportunity
8  at the end.
9       MR. MAY:  At the end, yeah.  It's really
10  just one question.
11      MR. BURDEN:  Sure, go right ahead.
12      MR. MAY:  Yeah.  Directing your
13  attention to Exhibit 131, do you see an
14  email that indicates that you sent an email
15  on or about June 29, 2017 at 3:39 p.m.?
16      THE WITNESS:  Yeah, I see that.
17      MR. MAY:  Could you tell me from looking
18  at Exhibit 131 who the email was sent to in the
19  middle of the page?
20      THE WITNESS:  No one.
21      MR. MAY:  Why do you say that?
22      THE WITNESS:  Because it doesn't have
23  anybody on the To line.
24      MR. MAY:  So you couldn't tell looking

Page 184

1  at Exhibit 131 who the recipient of that
2  email is?
3       THE WITNESS:  Correct.
4       MR. MAY:  Okay.  Thanks for indulging me.
5       MR. BURDEN:  Of course.
6    A   Just going back --
7    Q   Yeah.
8    A   -- I think the last question you asked
9  me, can you repeat that?
10      MR. BURDEN:  Mary, if you would, please.
11      (Whereupon the portion of the record
12       was read as requested.)
13   A   Yeah.  I'd like the record to reflect
14  that my answer to the last question is I don't
15  recall.
16      (Whereupon CFTC Exhibit No. 132
17       was marked for identification, MM.)
18   Q   Okay.  Let me hand you what I've marked
19  as CFTC Exhibit 132.  Take a look at Exhibit 132,
20  please, and tell me when you've looked at it.
21      MR. MAY:  Ready?
22      THE WITNESS:  Yes.
23  BY MR. BURDEN:
24   Q   All right.  Mr. Ruth, do you recognize

Page 185

1 CFTC Exhibit 132?
2     A    Nope.
3     Q    All right.  Do you know who Karl Reimer is?
4     A    Yes.
5     Q    Who's that, please.
6     A    He was originally a customer of Vince
7 Prieto's, and then after Vince Prieto left he became
8 a customer of mine.
9     Q    All right.  When did he become a customer
10 of yours, please.
11    A    I don't know the exact date.
12    Q    All right.  So Exhibit 132 appears
13 to reflect an email from Mr. Reimer to you dated
14 August 28, 2017.
15    A    I didn't work at Long Leaf Trading
16 Group then.
17    Q    In August 28th of 2017?
18    A    Correct.
19    Q    Yeah.  So it looks from the email like
20 jruth@longleaftrading.com forwarded this to --
21    A    Yeah, Tim Evans forwarded it to James
22 Leeney after I left.
23    Q    Got it.  So you can put that one aside,
24 please.

Page 186

1     A    Which means that Tim Evans has access
2 to my email account and sends things on my behalf.
3     Q    Did Mr. Evans ever do that while you
4 were at Long Leaf?
5     A    Yes.
6     Q    When?
7     A    I don't know specifically but --
8     Q    Well, can you think of any instances
9 of Mr. Evans sending things under your --
10    A    Not false --
11    Q    You've got to let me finish.
12        MR. MAY:  Yeah, because you can't answer
13    his question --
14        THE WITNESS:  I'm sorry, I'm sorry,
15    I'm sorry.
16        MR. MAY:  -- if you don't know the
17    question.
18 BY MR. BURDEN:
19    Q    While you were at Long Leaf Trading
20 did Mr. Evans send emails from your email address?
21    A    I have reason to believe, yes.
22    Q    Why do you think that?
23    A    Because I've seen emails that are being
24 sent that I didn't send.

Page 187

1     Q    All right.  And when did you see those
2 emails, please.
3     A    Throughout my tenure at Long Leaf Trading
4 Group.
5     Q    Okay.  Can you give me an example of
6 some of them?
7     A    I don't -- haven't thought about it or
8 looked at them in years.
9     Q    Well, did you ever talk to --
10    A    Actually, I can give you an example.
11 Right here (indicating).
12    Q    Yeah.  So what email are you holding
13 up there, Mr. Ruth?  What exhibit was that, please.
14    A    Exhibit 132.
15    Q    All right.  So you testified that that
16 was after you had left, right?
17    A    Yes, I left the Friday before.
18    Q    All right.  So what I'm interested
19 in is learning about emails that Mr. Evans may
20 have sent --
21    A    Like I said, I don't recall.
22        MR. MAY:  Okay.  Let him finish asking
23    the question to make sure that you actually
24    don't recall, okay?

Page 188

1        THE WITNESS:  Okay.
2 BY MR. BURDEN:
3     Q    All right.  So, Mr. Ruth, did
4 Mr. Evans send emails from your address while
5 you were at Long Leaf Trading?
6     A    I have reason to believe that he did.
7     Q    Why do you think that?
8     A    Because he did it after I left, and
9 I have seen emails that have been generated from
10 my account that I don't recall sending.
11    Q    When did you see those emails?
12    A    Some of them today.  Some of them two,
13 three years ago.
14    Q    All right.  Well, what emails did
15 you see today that you don't think you wrote?
16    A    The reason why I don't think I wrote
17 them is because I don't recall them.  This one.
18    Q    And what exhibit is that, please, Mr. Ruth.
19    A    119.
20    Q    Very good.
21    A    This one I don't recall writing.
22    Q    And what exhibit is that, please.
23    A    122.  That's -- those are the ones
24 I have seen today that I don't recall sending.

Page 189

1    Q    Okay.  So you don't recall sending
2 them, but why do you think that Mr. Evans sent
3 them, if that's what you think?
4    A    My gut.  That's it.
5    Q    Sorry?
6    A    My gut tells me that he did.
7    Q    But why do you think that?  What's your
8 basis for saying that?
9    A    I feel like I've already answered that
10 question.
11    Q    Well, indulge me and do it again
12 because I'm not sure why you think Mr. Evans
13 sent those two emails other than the fact that you
14 don't remember sending them.  I'm not disagreeing
15 with you.  I just want to know why you think
16 Mr. Evans sent them.
17    A    Because I don't recall sending them.
18 He has access to my email.  He's the only one
19 that has access to my email that I know of besides
20 myself, and I have information that shows that he
21 sent emails from my account.  So one reasonable
22 person would believe that that is a possibility.
23    Q    Do you have any other reasons to believe
24 that that's a possibility?

Page 190

1    A    I think that's more than a reasonable
2 reason to believe.
3    Q    I'm not disagreeing with you, but I want
4 to know are there other reasons?
5    A    Not that I can think of at this time.
6    Q    Did you ever confront Mr. Evans at
7 any time about writing emails, you know, from your
8 email address or on your behalf?
9    A    Not that I recall.
10    Q    All right.  So if I wanted to find
11 like a written record of that or you emailing
12 Mr. Evans and saying don't do this anymore, would
13 I find anything like that?
14    A    I don't -- possibly.  I don't know.
15    Q    Do you recall sending any emails
16 to Mr. Evans about suspicions you had that he was
17 sending emails on your behalf?
18    A    No.  I probably wouldn't have
19 a conversation like that over email.
20    Q    How would you have that type of
21 conversation?
22    A    In person.
23    Q    Do you recall any such conversations?
24    A    Not -- I don't recall.

Page 191

1    MR. BURDEN:  All right.  I'll tell
2 you what.  Do you guys want to take a little
3 break?
4    MR. MAY:  Yeah.
5    MR. BURDEN:  Okay.
6    MR. MAY:  Just wondering if this is the
7 opportunity for me to go back to my office and
8 get my notebook or not.
9    MR. BURDEN:  Oh, man.  How long do you
10 think that'll take?
11    MR. MAY:  Round trip, ten minutes.
12    MR. BURDEN:  Yeah, go ahead.  That's
13 fine -- or, I mean, you can have somebody
14 bring it over.
15    MR. MAY:  Well, I don't know how clean
16 or messy my office really is.
17    MR. BURDEN:  All right.  Go, go, go.
18 I'll see you guys in ten minutes.
19    (Whereupon a recess was taken from
20    3:30 p.m., to 3:55 p.m., after which
21    the following proceedings were had:)
22    Q    All right.  Mr. Ruth, are you aware
23 that your outgoing calls at Long Leaf Trading were
24 recorded by their CRM?

Page 192

1    A    No.
2    Q    You didn't know that?
3    A    I don't think all of them were recorded.
4    Q    Yeah.  I think it's just the outgoing
5 sort of sales calls to customers when you dial
6 electronically, is that right?
7    A    I don't know the exact details,
8 but I know that it's an unreliable system and
9 it's not -- there's not a lot of -- there's less
10 recordings than there are recordings.
11    Q    What do you mean by that?
12    A    Like if you were to try to find
13 like recordings of clients, you would find more --
14 you'd have more instances of not being able to find
15 the recording than you could find the recording.
16    Q    Got it.  So why do you think that?
17    A    Because it's a poorly designed system.
18    Q    Well, like did you ever try to get
19 a customer call and you couldn't find it or --
20    A    Yeah, yeah, all the time.
21    Q    All right.  So you knew the calls were
22 recorded and you could look them up if you wanted
23 to, right?
24    A    Correct.  But I think the point I'm

Page 193

1 trying to make here is is that a majority of the
2 calls are not recorded.
3     Q    Got it.
4     A    Or they're not library'd or indexed
5 or something of that -- stored properly. I don't
6 know what the answer is.
7     Q    Okay. Well, Long Leaf Trading
8 produced the calls that were recorded to us.
9 And so I'm going to show you a couple of them --
10    A    Okay.
11    Q    -- not too many, and we'll see how we do.
12        MR. BURDEN: All right. I want to show
13 you an audio recording. I'm marking it for the
14 record as CFTC Exhibit 133.
15        (Whereupon CFTC Exhibit No. 133 was
16        marked for identification, MM.)
17        MR. BURDEN: So this is an audio file
18 produced by Long Leaf Trading and the name of
19 the file is 07-06-2017_JJKUMPEL_3609415560_(1).
20 And the date on this call is, according to the
21 file, is July 6th of 2017.
22    Q    Is that name familiar to you, Kumpel?
23        MR. MAY: What was the name of the
24 exhibit again?

Page 194

1        MR. BURDEN: 133.
2     A    Is what familiar with me?
3     Q    The name Kumpel, K-u-m-p-e-l.
4     A    No.
5     Q    All right. So let's listen to some of
6 this call, if we could.
7        MR. MAY: Is this the entire call?
8        MR. BURDEN: No, I'm going to be playing
9 excerpts from the call.
10        MR. MAY: Okay.
11        MR. BURDEN: The entire call is 103 minutes
12 long. Bear with me and we'll see if I can get
13 this to work. It does not always work on the
14 first try. All right. So I want to start us
15 off in Exhibit 133 at 43 minutes and 52 seconds.
16        THE WITNESS: Do we know the first name
17 of this person?
18        MR. BURDEN: I don't off the top of my
19 head, no.
20        MR. MAY: The file is J-J-K-U-M-P-E-L,
21 so my hypothesis is it starts with a J.
22        (Whereupon the audio was played.)
23        MR. BURDEN: All right. So I'm going
24 to stop it there at 46 minutes and 31 seconds.

Page 195

1     Q    So, Mr. Ruth, is that your voice on the
2 call?
3     A    I believe so.
4     Q    All right. So I want to ask you
5 about this bit we heard you talking about, that
6 you told Mr. Kumpel something to the effect that --
7     A    Hold on. Sorry, go ahead.
8     Q    What were you going to say?
9     A    I don't know that the guy's name is
10 Mr. Kumpel.
11    Q    Okay. Well, whoever you were talking
12 to on the call, it sounds like you're telling this
13 person -- you say something to the effect of it's
14 easy to accomplish 12 percent on an annual basis.
15 So that's approximately what you said on the call,
16 correct?
17    A    No.
18    Q    What did you say on the call?
19    A    I'm talking about a hypothetical
20 situation in which the specific example that's
21 in front of him, the person got a 6 percent return.
22 And then like I'm showing him through another visual
23 that if you were to add another contract, it's
24 scaleable so it would move him to a 12 percent

Page 196

1 return, but I'm not referring to him. I'm referring
2 to a hypothetical situation.
3     Q    Got it. So were there any customers
4 of yours at Long Leaf that obtained a 6 percent
5 annual return?
6     A    Couldn't tell you.
7     Q    Any customers of yours at Long Leaf that
8 obtained a 12 percent annual return?
9     A    I don't -- I mean, not only could
10 I not tell you, but I don't understand how that's
11 applicable to the situation. I think you're
12 misunderstanding what I just said in that statement,
13 that it's a hypothetical situation that has nothing
14 to do with them.
15    Q    No, I understand.
16    A    Then why would you ask that question?
17    Q    I don't answer your questions about
18 my questions, Mr. Ruth. I ask you questions and
19 you answer them.
20        MR. MAY: I could come up with a theory,
21 but I'd rather not.
22        MR. BURDEN: Not unless you want to
23 testify. All right. So I want to restart
24 Exhibit 133. And let's start it, if we could,

Page 197

1    at 50 minutes and 37 seconds.  So here we go.
2        (Whereupon the audio was played.)
3        MR. BURDEN:  All right.  So I'm going
4    to stop it there at 55:23.
5    Q   And there's two statements I want to
6    focus in on, Mr. Ruth.  So the first is I think
7    we heard you say a couple times in there that --
8    something to the effect of we're very good at what
9    we do or we're successful.  Did you say that on the
10   call?
11   A   I don't know.  It was a long segment there.
12   I don't necessarily recall.
13   Q   All right.  So I think we can play
14   it back if you wanted to.  Would you like me to?
15   A   No.
16   Q   All right.  So you remember telling
17   this person that --
18   A   No.
19   Q   -- from listening to the call --
20       MR. MAY:  Okay.  You can't answer his
21   question before he's done asking it, okay?
22       MR. BURDEN:  So thanks.
23   Q   So, Mr. Ruth, what basis do you have
24   for telling this customer that Long Leaf Trading

Page 198

1    is successful or good at what we do?
2    A   I think you misconstrued what I just
3    said on that phone call.
4    Q   Okay.  Well, set me straight.
5    A   I'm telling him that basically if
6    I were to cherry -- I could make this compelling
7    case that I am very good at what I do because I
8    could cherry pick which trades I want to share with
9    him and share those trades and be like, oh, I've
10   got a winning trade.  The point I'm trying to make
11   is is that I don't want you to sign up for this
12   program because of that because it's not going to
13   be indicative of what is going to actually happen
14   in your account.
15   Q   Was Long Leaf Trading successful?
16   Was Long Leaf Trading --
17   A   Long Leaf Trading --
18   Q   You've got to wait until I finish,
19   remember?  Remember my tip.  It's good to take
20   a breath when I finish the question.
21       MR. MAY:  There was a little pause.
22       MR. BURDEN:  I'm sorry?
23       MR. MAY:  There was a little bit of
24   a pause in your question.  I thought you were

Page 199

1    done too.
2        MR. BURDEN:  Oh, all right.  Well, that's
3    okay.  I'm not mad about it.
4    Q   So, Mr. Ruth, was Long Leaf Trading
5    successful for customers?  Were they good at what
6    they did?
7    A   Long Leaf Trading had moments of
8    success.  Just like a baseball player, a baseball
9    player goes up 500 times a season and they get
10   three -- you know, one-third of the time they get
11   a hit or less.  That's how we are.
12   Q   All right.  Was Long Leaf Trading --
13       MR. MAY:  Are you saying --
14   A   I'm saying --
15       MR. MAY:  -- one out of three?
16   A   -- the way you define success, which
17   is this -- kind of all day we've been battling
18   over it is you look at the end result, okay?  I
19   don't look at the end result.  I look at it as did
20   I have a successful trade -- or I should say did Tim
21   Evans have a successful trade.  And if the answer
22   is yes, then I consider that a success.  So if you
23   were to ask me like -- I know what you're getting
24   at here, is am I representing to this guy that we

Page 200

1    do have moments of success.  Yes, we do have moments
2    of success.  Am I representing to him that every
3    single client that we take on has a winning account?
4    No, I'm not saying that, nor would I say that.
5    BY MR. BURDEN:
6    Q   Right.  But we heard you say on
7    the call that Long Leaf Trading had success for
8    clients --
9    A   We did.
10   Q   -- and we've also heard you say on
11   the call that Long Leaf Trading is very good at
12   what they do.
13   A   Yeah.
14   Q   And I guess what I'm asking is, is that
15   true?
16   A   Yes.
17   Q   All right.  What's your basis for saying
18   that?
19   A   Going back to Exhibit 123, that's better
20   than you can do it.
21   Q   And Exhibit 123 reflects 50 percent winners
22   and 50 percent losers, correct?
23   A   I don't know if that's accurate, but sure.
24   Q   Well, you're the one that --

Page 201

1      MR. MAY:  You can't agree with it if you
2   don't know if it's accurate.
3      A    Sure, yes.
4   BY MR. BURDEN:
5      Q    All right.  Well, I'll tell you what.
6   We heard you say on the call as well that over
7   the course of 48 trades, Long Leaf Trading is
8   going to be profitable for the customer.  That's
9   substantially what you said, correct?
10     A    I'm sorry.  What?
11     Q    What you said on the call to this
12  customer, prospective customer is that over the
13  course of 48 trades you'll get your specifically
14  targeted return.
15     A    That's not what I said.
16     Q    What did you say?
17     A    I said that -- I don't think we even
18  listened to that portion.
19     Q    Sure, we did.  Do you want me to play it
20  back again?
21     A    Sure.
22     Q    All right.
23     MR. MAY:  Could you tell us when
24   you're starting and when you're ending?

Page 202

1      MR. BURDEN:  What do you mean?
2      MR. MAY:  In the tape.  You said it's
3   103 minutes long.
4      MR. BURDEN:  Yeah, I have been and will --
5      MR. MAY:  I know, yeah.
6      MR. BURDEN:  -- continue to do so.
7      MR. MAY:  Okay.
8      MR. BURDEN:  All right.  So I'm going to
9   start this at 54:22.
10     (Whereupon the audio was played.)
11     MR. BURDEN:  All right.  So that's
12  where I want to stop it to revisit the piece
13  I'm talking about.  So I just stopped it at
14  55:06.
15     Q    So it sounds like you're saying on the
16  call, Mr. Ruth, that over the course of 48 trades,
17  we're going to be profitable.  Am I getting that
18  right --
19     A    Nope.
20     Q    -- or what are you saying there?
21     A    You're -- that question you're asking,
22  you're asking it based off a different part of that
23  phone call, which is not the recording that you're
24  providing right now.  So I can't answer your

Page 203

1   question.
2      Q    All right.
3      A    But, no, I did not say that, nor does
4   that recording say that.
5      MR. BURDEN:  All right.  I'll tell
6   you what.  Let's keep listening.  I'm going
7   to start this at 1:09:44, and hopefully it
8   won't go on for too long.
9      MR. MAY:  1:09:44?
10     MR. BURDEN:  You got it.
11     THE WITNESS:  I thought it was 105 minutes.
12     MR. MAY:  I thought it was 103 minutes.
13     MR. BURDEN:  Oh, it's 143 minutes
14  and 28 seconds.  I was looking at the wrong
15  thing.
16     MR. MAY:  143 minutes and 28 seconds?
17     MR. BURDEN:  Yes, these are long calls.
18  All right.  So I'm starting this at 1:09:44.
19     (Whereupon the audio was played.)
20     MR. BURDEN:  So I want to stop it there
21  at 1:12:17.
22     Q    I let it go on for a bit long.  I
23  didn't write down where it started, like I should
24  have done, but it's the bit at the end I want to

Page 204

1   talk about.
2      A    I'd love to talk about it.
3      Q    So, Mr. Ruth, at the end of this it
4   sounds like you're saying something to the effect
5   that if you do what we need to do, then 76.5 percent
6   of the time you'll get your targeted return.
7   Did I get that right?
8      A    No, that's incorrect.  That's not what
9   it says.
10     Q    All right.  So what did you say?
11     A    I said that in the event that
12  76.5 percent of options expire worthless and we
13  stay consistent with the amount of premium that
14  comes in and then obviously the amount of premium
15  that comes out, like meaning we're not changing
16  up the risk tolerance and things of that nature
17  and 76.5 percent of the options expire worthless,
18  I'm very confident that we would hit your
19  specifically targeted return.
20     Q    Got it.  So how many of your customers
21  achieved their specifically targeted return over
22  the course of their own investment with Long Leaf?
23     A    Again, I look at things on a monthly
24  basis.  So you can't -- I don't know.  I don't have

Page 205

1 that information.
2    Q   Okay.  So I think we heard you say
3 there that -- something to the effect that you are
4 confident that, and I'm paraphrasing here, over time
5 you would achieve the client's specifically targeted
6 return.  Did I get --
7    A   That's not at all what that said.
8    Q   All right.  So what did you say?
9    A   Again, I said that in the event
10 that 76.5 percent of options expire worthless
11 and we don't change anything in terms of the number
12 of contracts we're doing or the premium, the risk
13 to reward, I'm very confident that we would hit
14 your specifically targeted return.
15    Q   So my question then is what is the
16 basis for that confidence?  Like why did you tell
17 this guy --
18    A   Because if you win 75 percent of
19 your trades and the amount of premium that you
20 collect is constant, then you would have a profit --
21 you would be profitable.
22    Q   All right.  Did that happen for
23 any of your clients while you were at Long Leaf?
24    A   It did at times, yes.

Page 206

1    Q   All right.  For whom?
2    A   I don't know.  I don't know specifically.
3    Q   And did that hold true over the life of
4 their accounts?
5    A   I don't -- I don't know specifically.
6       MR. BURDEN:  All right.  So I want to pick
7 up Exhibit 133 at 1:17:36.
8       (Whereupon the audio was played.)
9       MR. BURDEN:  All right.  So I want to
10 stop it there.  I'm stopping it at 1:43:28.
11    Q   So, Mr. Ruth --
12       MR. MAY:  I'm sorry.  1:43 --
13       MR. BURDEN:  28.
14       MR. MAY:  You started at 1:17:36?  That
15 can't be right.  We didn't -- that's like a
16 minute maybe of playing the conversation.
17       MR. BURDEN:  Oh, very good.  Thanks,
18 guys.  All right.  So I'm reading the wrong
19 thing.  There's a bunch of numbers up here.
20 So we did start --
21       MR. MAY:  Do you want me to come over
22 and help you?
23       MR. BURDEN:  Thank you.  You know
24 what, if you're familiar with Nexidia,

Page 207

1    I'd be tremendously grateful for your help.
2 Are you familiar with Nexidia?
3       MR. MAY:  I don't have to answer questions
4 either.
5       MR. BURDEN:  Very good.  All right.
6       THE WITNESS:  Got him.
7       MR. BURDEN:  So 1:17:36 is where we
8 started and where we finished was 1:18:35.
9    Q   All right.  So now that we've got that
10 straight.  So, Mr. Ruth, we heard you talk on this
11 call I think and say to this client something to
12 the effect that if our clients weren't making money,
13 we wouldn't be in business, is that right?  Did you
14 say that?
15    A   I don't think so.
16    Q   All right.  Do you want to listen
17 to it again or do you want to kind of correct me
18 and tell me what you did say?
19    A   I don't have -- sure, let's listen
20 to it again.
21       MR. BURDEN:  All right.  So I'm going
22 to start at 1:17:36.
23       (Whereupon the audio was played.)
24       MR. BURDEN:  And then I stopped it again

Page 208

1 at 1:18:35.
2    Q   All right.  So, Mr. Ruth, it sounds
3 like you're saying to this person, you know, if
4 clients weren't making money, they wouldn't make
5 it to Month 11.  If they didn't make it to Month 11,
6 or whatever month you said on the call, Long Leaf
7 Trading wouldn't be in business.  So have I got that
8 basically right?
9    A   Yeah, but that's not what you said earlier.
10    Q   Okay.  That's all right.  I've got it right
11 this time, right?
12    A   Yeah.
13    Q   Okay.  So what's your basis for saying
14 that clients at Long Leaf were making money?
15    A   Again, I analyze things on a monthly
16 basis, so there are some months that they make
17 money.  There are some months that they don't make
18 money.
19    Q   But overall --
20    A   I don't look --
21       MR. MAY:  Okay.  He didn't finish his
22 question, so you can't answer it.
23    A   Like can you get this concept, that
24 I don't -- you and I look at this completely

Page 209

1 different?
2 BY MR. BURDEN:
3    Q   Overall -- so rather than say overall,
4 isn't it true that during your tenure at Long Leaf
5 clients lost more money on more months than they
6 made money?
7    A   I can't say that.
8    Q   And wouldn't it be fair to say that
9 during your tenure at Long Leaf, clients lost more
10 money than they made in total?
11    A   I couldn't speak to that at all.  I don't
12 know that.
13        FURTHER EXAMINATION
14 BY MR. PATRICK:
15    Q   Do you know what you meant when you
16 said in the recording that we just listened to
17 if we don't get to Month 11, we don't make money?
18 Do you remember that?
19    A   Yeah, we're a business.
20    Q   Right.
21    A   That requires money to operate a business,
22 and it takes -- we have to make a certain amount of
23 money on a client in order for our business to be
24 profitable.

Page 210

1        MS. STREIT:  But that's not dependent
2    on whether the client is profitable or not,
3    is it?
4    A   Well, yeah, because the client
5 isn't -- if a client goes five months in a row
6 without winning, they're probably not going to be
7 like, yeah, I approve the trades for the next month.
8 Do you get what I'm saying?  So like let's say you
9 go one month.  You lose money, okay?  It's a bad
10 month.  It's going to happen.  Then the next month
11 you make money.  You're like all right, well, let's
12 go ahead the next month.  Then the next month you
13 lose money, and then like you keep going like that.
14 So the profitability of the account -- that's why
15 you guys keep looking at the end result, but you
16 have to understand the journey that went through
17 there of why somebody would logically stay -- I
18 think my average account stays like 13 months.  You
19 guys probably figured that out.  If not, somewhere
20 around there.  So why -- if everybody loses money,
21 why would they stay 13 months when they get to
22 approve the trades is what I'm trying to say.  And
23 if they lost every single month, nobody would do
24 that.  Plus, they wouldn't even be able to have

Page 211

1 the account capital required to be able to do
2 these trades if they lost five months in a row.
3 So what I'm saying is is that no sane person is
4 going to say yes to these four trades when all you
5 do is call them and say, hey, Mr. Customer, you lost
6 money this month.
7 BY MR. PATRICK:
8    Q   Is there something significant about
9 Month 11?  Is that like a breakeven point?  I'm
10 just trying to -- I'm really trying to get at what
11 the significance of Month 11 is in that statement,
12 if we don't get to Month 11, we don't make money.
13    A   It was represented to me that if
14 you take the expenses of Long Leaf Trading Group,
15 somewhere -- it costs like $20,000 a client to
16 operate it.  And so I look at it as somewhere
17 around Month 11 is when we generally generate around
18 like $20,000 in commissions.  So that's why Month 11
19 is significant.
20        FURTHER EXAMINATION
21 BY MR. BURDEN:
22    Q   So who told you that, Mr. Ruth?
23    A   Tim Evans.
24        MR. MAY:  So you didn't pick Month 11

Page 212

1 out of a hat?
2        THE WITNESS:  No.
3    A   And just for the record, to like --
4 I'm not saying that because you bring on a client,
5 you're automatically like 20 grand in the hole.
6 It's like if you factor in like the cost of offices
7 and attorneys and audits and just the cost of doing
8 business for an IB and if you were to divide it by
9 the amount of clients we have, that's where we came
10 up with that number.
11        MR. MAY:  Don't forget about phones.
12    You need those.
13        THE WITNESS:  Oh, yeah, phones.
14 BY MR. BURDEN:
15    Q   Well, I'll tell you what.  I want to
16 do one more piece from Exhibit 133, and then we'll
17 move on to another call.
18        MR. BURDEN:  So I'm going to restart
19    Exhibit 133 at 1:37:51.
20        (Whereupon the audio was played.)
21        MR. BURDEN:  So I want to stop there
22    and we'll restart it.  I'm stopping it at
23    1:38:54.
24    Q   So I think we heard you telling this

Page 213

1 person on the call that you're very confident you
2 can do well for them, is that right?
3 A Yes.
4 Q All right. So what was the basis for
5 that confidence?
6 A I take pride in my job, and I was
7 confident about the outlook of Long Leaf Trading
8 Group.
9 Q All right. So, you know, it seems
10 here like you have been able to testify, to tell
11 us whether your customers made or lost money over
12 the life of their accounts, is that right?
13 MR. MAY: I'm going to object. That
14 misstates the testimony.
15 MR. BURDEN: Well, I'm asking if that
16 is Mr. Ruth's testimony. If it misstates it,
17 I'm sure he'll correct me.
18 MR. MAY: Could you read it back to the
19 witness.
20 (Whereupon the portion of the record
21 was read as requested.)
22 THE WITNESS: Could you do it again?
23 I'm sorry.
24

Page 214

1 (Whereupon the portion of the record
2 was read as requested.)
3 MR. MAY: She can read it again. I know
4 it's hard to testify all day.
5 MR. BURDEN: How about I just do a better
6 job with the question.
7 MR. MAY: I actually like that question
8 really well. I think I want to stick with it,
9 but if you want.
10 BY MR. BURDEN:
11 Q So, Mr. Ruth, our analysis has shown
12 that substantially all Long Leaf Trading customers
13 lose money. And I keep asking you, you know, do
14 customers make or lose money overall. And it seems
15 like you haven't been able to tell me, that you sort
16 of don't know overall, is that right?
17 A Am I allowed to just like go off the
18 record and explain something to you so I could help
19 you here?
20 Q You can't go off the record, but you
21 can definitely explain stuff. That's why you're
22 here.
23 A Why can't we go off the record?
24 Q We're not going to go off the record.

Page 215

1 A I think it would help you ask better
2 questions.
3 MR. MAY: They actually control the
4 record, so I can't tell her to go off the
5 record. Only they can tell her to go off
6 the record.
7 A Can I use that dry erase board to show you?
8 BY MR. BURDEN:
9 Q You can, but I can give you a piece of
10 paper as well. Would that be helpful?
11 A Sure.
12 Q Great. And how about a red marker,
13 will that be helpful?
14 A Perfect.
15 MR. MAY: Why don't you answer his
16 questions, and then at the end I'll have
17 the opportunity to ask you questions.
18 THE WITNESS: I'm confident I'm okay here.
19 MR. MAY: I'm confident this is not
20 what we discussed, so you don't have to draw
21 him an illustration.
22 THE WITNESS: No, I understand. I just
23 want to --
24 MR. MAY: And you're not answering his

Page 216

1 question when you do that.
2 THE WITNESS: I know I'm not answering
3 his question. In my opinion, I'm going to help
4 him ask better questions.
5 MR. MAY: Well, I don't know that that's
6 your job.
7 MR. BURDEN: I've never been in this
8 situation before.
9 MR. MAY: Are we on the same page?
10 Is there a pending question?
11 MR. BURDEN: There is.
12 Q Mr. Ruth, you testified you'd like to
13 help me ask better questions, right?
14 A Yes, and I'm not trying to insult you.
15 Q I am not insulted. I want you to help me.
16 A Okay.
17 Q And you had intimated that you could
18 make a drawing or a diagram that you think would
19 help me ask questions to get better, more meaningful
20 responses from you, correct?
21 A Yes, yes.
22 Q So would you draw me whatever you're going
23 to draw me, please.
24 A Okay. Well, I'm going to draw and

Page 217

1  I'm going to provide a narrative here.  So the
2  first thing I want to say is I know what you're
3  getting at is is that if you know that the account
4  performance is that people have lost money, which
5  I don't know, but if that's --
6      MR. MAY:  That's the premise to his
7      question.
8      A   -- the premise, yes, then how can you
9  say to somebody during the solicitation process
10 that you are doing well and that you have these
11 great moments and all this kind of stuff.  And I'm
12 going to explain to you how that is the case.
13 BY MR. BURDEN:
14     Q    Thank you.
15     A   Am I kind of on the right page here,
16 right track?
17     Q    I think we are absolutely on the same
18 page, yes.  Draw away, please.
19     MR. MAY:  I disagree.
20     A   All right.  So let's say you bring on
21 a client and he's got $25,000, okay?
22     MR. MAY:  Are you creating a
23     hypothetical --
24     THE WITNESS:  Yes.

Page 218

1      MR. MAY:  -- in response to his question?
2      THE WITNESS:  Yes.
3      MR. MAY:  I don't know that he wants
4      a hypothetical.
5  BY MR. BURDEN:
6      Q   I'd like a hypothetical.  Mr. Ruth,
7  please draw me whatever it is you would like to
8  draw me.
9      MR. MAY:  I don't really know that
10     there's a pending question.  So he's not
11     really --
12     THE WITNESS:  I feel like I can save us
13     like five hours if I just --
14     MR. MAY:  Well, here's --
15     THE WITNESS:  -- explain this to him
16     one time.
17     MR. MAY:  That -- I don't know that
18     you're actually going to save us five hours.
19     You get enough attorneys in a room and actually
20     you end up using up all the time.
21     MR. BURDEN:  You guys are already coming
22     back.
23     THE WITNESS:  I know, but I'm also
24     getting kind of frustrated.  I want to alleviate

Page 219

1  my frustration.
2      MR. MAY:  Well, I don't know that you're
3  going to -- I think he's got a never-ending
4  supply of questions --
5      THE WITNESS:  Oh, yeah.
6      MR. MAY:  -- and you're not saving
7  yourself any time by doing this.  That's my
8  gut instinct.
9      THE WITNESS:  Yeah, but they're just not
10 getting this concept.
11     MR. BURDEN:  Mr. Ruth, would you like to
12 go off the record and consult with your counsel
13 and come back or would you like to --
14     MR. MAY:  Yeah, I think we need a bathroom
15 break.
16     THE WITNESS:  Yeah, yeah.
17     MR. BURDEN:  Okay, let's do that.
18     MR. MAY:  Because I don't really know that
19 there's a pending question.
20     THE WITNESS:  Do you think I need to bring
21 this with me?
22     MR. MAY:  No.
23     MR. BURDEN:  There doesn't have to be a
24 pending question.  He can do whatever he wants

Page 220

1  in this record.
2      MR. PATRICK:  It's just a piece of paper.
3      (Whereupon a recess was taken from
4          4:37 p.m., to 4:52 p.m., after which
5          the following proceedings were had:)
6      MR. BURDEN:  Back on the record, please.
7      Q   Before we broke for you to consult
8  with your counsel, Mr. Ruth, you were going to
9  draw me an illustration that you felt would help
10 me ask better questions.
11     A   I've decided to put the ball back
12 in your court and let you ask me questions.  I think
13 you're more than capable of asking me the right
14 questions.
15     MR. BURDEN:  All right.  So I'll tell
16 you what.  I had a couple more questions about
17 the last call that we listened to and I think
18 rather than try to remember it, I'll just play
19 that same bit again.  So we're looking at
20 Exhibit 133.
21     MR. MAY:  We're listening, yeah.
22     MR. BURDEN:  That's right.  Very good.
23 We're listening to Exhibit 133.  I'm starting
24 it at 1:37:51.

Page 221

1          (Whereupon the audio was played.)
2          MR. BURDEN:  So let me stop it there
3     at 1:39:17.
4     Q     So it sounds like you're talking to
5     this customer here and you're saying that you're
6     confident you can do well for them, is that right?
7     A     I don't know if I said that verbatim
8     but ...
9     Q     It's definitely not verbatim, but is that
10    the gist of it?
11         MR. MAY:  The gist --
12    A     No.  I think the gist of it is really
13    to talk about that there's volatility in the market
14    and it gives me the ability to do better than the
15    2:1 risk-reward ratio.
16    BY MR. BURDEN:
17    Q     All right.  And at the end where you
18    were talking about exceeding something, what were
19    you talking about exceeding there?
20    A     Well, the whole equation is based off of
21    risking $2 for every dollar in premium collection.
22    If there's an increase in volatility when you're
23    selling an option, it gives you the ability to
24    collect more premium.  When you collect

Page 222

1     premium, you increase the profitability -- the
2     potential profitability of a trade and you decrease
3     the amount of risk.  So essentially when you win,
4     if the trade pans out, you could win more and when
5     you lose, you lose less.
6     Q     Got it.
7          MR. BURDEN:  So let's pick this back up
8     at 1:39:21.
9          (Whereupon the audio was played.)
10         MR. BURDEN:  So I want to stop it there
11    at 1:40:19.
12    Q     And the part I want to ask you about
13    is you're talking about showing this customer that
14    using these Time Means Money strategies, though you
15    don't say that in those words, you can add an
16    income-generating component to their portfolio.
17    Did I summarize that accurately?
18    A     I wasn't listening that intently to be
19    able to say if that's true or not.
20         MR. BURDEN:  All right.  Well, I'll
21    tell you what.  Let's listen to it again.
22         MR. MAY:  Can you go back to 39:17,
23    which is where we left off before?  I don't
24    really see the need to omit four seconds.

Page 223

1     Do you?  Does anyone else?
2          MR. BURDEN:  Because it's hard to put
3     the mouse there.
4          MR. MAY:  Oh, okay.
5          MR. BURDEN:  Yeah, I tried to do that.
6     I'm not skipping that four seconds for any
7     particular reason.
8          MR. MAY:  Okay.
9          MR. BURDEN:  If I can get it to do that,
10    I will.  Yeah, and I can.  So we'll start at
11    1:39:21 again.  Sorry.
12         (Whereupon the audio was played.)
13         MR. BURDEN:  All right.  So I'm stopping
14    it there at 1:40:19.
15    Q     So, Mr. Ruth, the part I want to talk
16    about is where you say to this customer, prospective
17    customer that you want to show them that they can
18    get a consistent income-generating component to
19    their portfolio from Time Means Money.  Is that
20    about what you said?  Did I get that right?
21    A     No, no.  Not only that, but I don't
22    think that this snippet is reflective of what
23    you're trying to say.  But you would have to listen
24    to the whole entire phone call in its entirety

Page 224

1     to understand what is going on in that snippet
2     that you have.
3     Q     Got it, got it.
4     A     But I think, from what I'm gathering
5     from this, is that this guy's an equity options
6     trader or he does equity options, and he is maybe
7     amazed by the premium collection and amount of
8     risk that you're taking on that we're getting in
9     futures options is I guess what's going on here.
10    But I wouldn't know that unless you went to probably
11    five minutes into the phone call.
12    Q     Got it, got it.  So the question I want
13    to ask you about that, though, the snippet we just
14    heard, is did you have any clients who were able
15    to achieve a consistent income-generating component
16    to their portfolio from Long Leaf Trading?
17    A     I mean, are you asking this question
18    on its own or are you asking it because we played
19    this?  Because, I mean, it's not applicable to that.
20    Q     Well, I'll tell you what.  Let's pretend
21    we didn't listen to the call --
22    A     Okay.
23    Q     -- and I'll ask you were there
24    any clients you had that achieved a consistent

Page 225

1 incoming-generating component to their portfolios
2 from the Long Leaf trading recommendations?
3    A    Well, it depends how you define consistent
4 income-generating component.  But I understand that
5 as having -- I mean, you're bringing in premium and
6 you're selling it using options, so one can make
7 the argument that it's consistent income generation.
8 Whether it's realized or not I don't think is part
9 of that statement so ...
10    Q    Got it.  So I think that's a pretty
11 significant difference, though, the difference
12 between --
13    A    Right, yeah.
14    Q    Well, let me ask, if you would, please.
15    A    Yeah.
16    Q    The difference between realized income
17 and -- what's the best way to describe it, paper
18 profits or unrealized gains and --
19    A    Cash balance.
20    Q    There we go, cash balance.  So what's
21 the difference between cash balance and realized
22 income in your mind?
23    A    Cash balance is the account equity
24 plus the amount of premium that you've collected.

Page 226

1    Q    And that premium could ultimately
2 before expiration leave the account, correct?
3    A    Yes.
4    Q    Or it might stay, in which case it would
5 be realized, correct?
6    A    Correct.
7    Q    All right.  So which of your clients
8 achieved a consistent income-generating component
9 to their portfolio in the form of realized gains
10 from Long Leaf Trading?
11    A    I couldn't -- I don't recall.
12    Q    Is it fair to say that none of them did?
13    A    Not fair at all.
14    Q    All right.  So why do you dispute that
15 characterization?
16    A    Why do I dispute it?
17    Q    Yeah.
18    A    Because I don't recall if they did,
19 which doesn't mean that I'm willing to say that
20 nobody did.
21    Q    Okay.  Well, can you recall anybody
22 who was able to achieve consistent realized gains --
23    A    If you asked me in 2017 about things that
24 happened in 2017, probably.  But this is September

Page 227

1 of 2019, and it's been two or three years.  I don't
2 know.
3    Q    Do you recall what percentage of your
4 clients at Long Leaf Trading --
5    A    No.
6    Q    -- were able to achieve an
7 income-generating component to their portfolio
8 from realized gains at Long Leaf Trading?
9    A    No, I don't recall.
10       MR. BURDEN:  All right.  Sorry.  This
11    takes a while to like load up another call.
12    I'll tell you what.  While we're waiting, let's
13    just look at some other documents because
14    knowing the tech around here, it may never
15    load.
16       (Whereupon CFTC Exhibit No. 134 was
17       marked for identification, MM.)
18    Q    All right.  Mr. Ruth, I want to hand
19 you what I've marked as CFTC Exhibit 134.  Take
20 a moment, if you would to review it, please, and
21 then indicate to me when you have reviewed it to
22 your satisfaction.
23       MR. MAY:  Ready?
24       THE WITNESS:  Yes.

Page 228

1 BY MR. BURDEN:
2    Q    All right.  Mr. Ruth, do you recognize
3 the document I marked as CFTC Exhibit 134?
4    A    Yes.
5    Q    What do you recognize it to be, please.
6    A    It's a document entitled Time Means Money
7 Demo Script, Revised July 13, 2016.
8    Q    All right.  So what is this thing, if you
9 know, please.
10    A    This is the Time Means Money demo script.
11    Q    All right.  But what is that?  What is it
12 used for?
13    A    It is used for solicitation of clients
14 in the Time Means Money program.
15    Q    So who wrote this script?
16    A    I don't think one person wrote it.
17    Q    Okay.  Well, who contributed to it,
18 if you know?
19    A    Tim Evans.  I mean, I don't know.
20 I guess I could have some input into it.  James
21 Leeney, Tony Klancic, Vince Prieto.
22    Q    So it sounds like all of the brokers
23 at Long Leaf at the time contributed to this script,
24 is that right?

Page 229

1   A   Essentially, yeah.
2   Q   And you contributed as well, correct?
3   A   Yeah. I mean, I don't know in what
4 capacity, but yeah.
5   Q   Well, that's my next question. What did
6 you contribute, if you remember?
7   A   I added the line are you married and do
8 you have kids.
9   Q   Okay. Do you remember anything else that
10 you added or took away?
11  A   No, that's it.
12  Q   Is that the sum total of your contributions
13 to the script or is that just --
14  A   From what I recall.
15  Q   Okay. Is it possible you contributed
16 more and you just don't remember or do you just
17 specifically remember that line about being married
18 and you didn't contribute anything else?
19  A   From what I recall, that's the only thing
20 I contributed.
21  Q   Did you ever tell anybody that you wrote
22 this script?
23  A   It's possible.
24  Q   Who would you have told? Let me rephrase

Page 230

1 that question.
2   A   Okay.
3   Q   Who did you tell that you wrote this
4 script?
5   A   I don't recall.
6   Q   Did you tell Mr. Leeney that you wrote
7 this script?
8   A   It's possible.
9   Q   But why --
10  A   Mr. Leeney was there so ...
11  Q   Did you tell Mr. Gecas that you wrote
12 this script?
13  A   I don't think I've ever talked to
14 Mr. Gecas.
15  Q   Oh, that's right. Did you tell Mr. Prieto
16 that you wrote this script?
17  A   It's possible.
18  Q   Did you write this script?
19  A   I contributed to it.
20  Q   Well, it sounds like your testimony
21 before is that you added this line about being
22 married, right?
23  A   Um-hmm.
24  Q   Yes?

Page 231

1       MR. MAY: And having kids.
2 BY MR. BURDEN:
3   Q   Very good. That's what you contributed,
4 Mr. Ruth?
5   A   From what I recall, that's one thing that
6 I can say that I contributed, yes.
7   Q   Okay. Did you contribute more than that
8 to the script?
9   A   There's a possibility.
10  Q   So we're looking at Exhibit 134 here.
11 You know, it's a script that it looks like it's
12 30 pages long. Do you recall what percentage of
13 this you contributed, if you can break it down like
14 that?
15  A   No.
16  Q   Was it a lot of the script or not much
17 of the script?
18      MR. MAY: Do you want to change your
19  prior testimony?
20  A   My answer to all this is I don't know
21 what I contributed to the script.
22 BY MR. BURDEN:
23  Q   Got it.
24  A   Besides the fact that I can tell you

Page 232

1 that I did add the line, "Are you married and do you
2 have any kids?"
3   Q   Okay. And this script was used by the
4 brokers at Long Leaf Trading to solicit clients,
5 correct?
6   A   I don't think I can speak to that.
7   Q   Okay. What did you use this script for?
8   A   I used it to solicit people for the Time
9 Means Money program.
10  Q   All right. Do you know if other brokers
11 at Long Leaf Trading also used the script?
12  A   I don't know. How do you define using
13 the script?
14  Q   Well, did you ever overhear any brokers
15 use it, read from it?
16  A   Parts of it, yeah.
17  Q   Okay. Did you ever give the script to
18 any of the other brokers?
19  A   I don't think so.
20  Q   Did you ever -- sorry.
21  A   Not that I know of.
22  Q   Did you ever talk to any of the other
23 brokers about this script we see in Exhibit 134?
24  A   Talk to them about it?

Page 233

1    Q    Yeah.
2    A    Sure.
3    Q    Okay.  Who did you talk to, please.
4    A    I don't -- no clue.
5    Q    And do you recall what any of these
6  brokers said to you or what you said to them about
7  the script?
8    A    No.
9    Q    All right.  So let's take a look at the
10  script, if we could, please.  So would you turn,
11  please, to page 3 of the script in Exhibit 134.
12    A    (Witness complies).
13    Q    Are you with me?
14    A    Yep.
15    Q    All right.  So I want to direct your
16  attention to Bullet 5 and it says 76.5 percent
17  of all options expire worthless.  Let's skip down
18  to B.  It says, "Okay.  The Time Means Money program
19  utilizes short option strategies as the investment
20  vehicle to drive results.  Now, the reason this is
21  so important is because it's a fact that on average
22  of 76.5 percent of all options held to expiration at
23  the Chicago Mercantile Exchange expire worthless."
24  Is this a piece that you contributed?

Page 234

1    A    No.
2    Q    All right.  So is this a thing that
3  you said on calls with customers or prospective
4  customers?
5    A    If I'm using the script and it's part
6  of the script, then yes.
7    Q    All right.  So do you know if this
8  is true, that on average 76.5 percent of all options
9  held to expiration expire worthless?
10    A    According to one study by the CME Group.
11    Q    All right.  Did you read that study?
12    A    Yes.
13    Q    All right.  What is the time period
14  for that study?
15    A    1997 through 1999.
16    Q    All right.  So do you know if that
17  fact has continued from 1999 through the date that
18  this script was utilized?
19    A    I don't know.  You tell me.
20    Q    I don't tell you things.  You tell me
21  things.
22    MR. MAY:  I think the standard is
23    that he's not testifying and you are.  So,
24    I mean, we can have --

Page 235

1    THE WITNESS:  No, I understand.
2    MR. MAY:  We can have the court reporter --
3    THE WITNESS:  You guys bring this up
4  every year like.
5    MR. MAY:  Okay.  But you've never talked
6  to the CFTC before.
7    THE WITNESS:  Yeah, I understand.
8    MR. MAY:  I think you're confusing them
9  with another regulator.  So okay.  Do you even
10  recall the question anymore?  Do you want
11  the court reporter --
12    THE WITNESS:  Yeah, can you --
13    MR. MAY:  -- to read it back to you?
14    THE WITNESS:  -- read back the question?
15    (Whereupon the portion of the record
16        was read as requested.)
17    A    I don't think it's relevant because
18  I think you're referring to one specific study
19  which is noted on the slide.
20  BY MR. BURDEN:
21    Q    But that's not my question.  My question
22  is do you know if this statistic held through the
23  later period?
24    A    I stand behind my testimony.  I don't

Page 236

1  think it's relevant.
2    Q    But that's not an answer to my question.
3  Would you like to answer my question?
4    A    I don't know.
5    Q    Okay.
6    A    I don't know.
7    Q    All right.  Well, I'll tell you what.
8  Let's turn to page --
9    MR. MAY:  Is it possible it could be
10    higher or lower?
11    THE WITNESS:  Yeah.  I mean, it's possible
12    it could be -- yeah, there's many possibilities.
13  BY MR. BURDEN:
14    Q    All right.  So --
15    A    I think, though, saying on average and
16  citing the specific source is sufficient, though.
17    Q    All right.  So let's turn to page 7, if we
18  could, please, of the script.
19    A    Sure.
20    Q    All right.  I want to direct your
21  attention to the top part of the page where
22  there's a bullet that says, "10.  Introduce the
23  Three Principles."  And it says, A, "Since 2009
24  Long Leaf was founded on three principles.  One,

Page 237

1 futures and options on futures should be easy
2 to understand. Two, we should be 100 percent
3 transparent and conduct ourselves with integrity
4 at all times. Three, we should provide our clients
5 a strong return on their investment." So is this
6 a piece that you contributed, Mr. Ruth?
7    A   Nope.
8    Q   All right. Do you know who wrote this bit?
9    A   I don't know, man. Like this is
10 approved by the compliance department. It's given
11 to me. I do my job. So I don't know exactly who
12 contributed what, what pieces or what. But it's
13 the job of the compliance department at Long Leaf
14 Trading Group to approve or disapprove any sales
15 solicitation materials.
16    Q   And who was in the compliance group?
17    A   Tim Evans is the chief compliance officer.
18    Q   Was there anybody else in that compliance
19 group during your tenure at Long Leaf?
20    A   Maybe Brian Adams at the end. I don't
21 know. I don't know.
22    Q   Okay. Anybody other than those two guys?
23    A   I don't know the process. My process
24 is, you know, I had like a manual that says what

Page 238

1 I'm supposed to do, like send in this or do that
2 or, you know, get the documents, only use stuff
3 that's approved by the compliance department.
4    Q   Got it. So is this something you said
5 to clients on calls, that one of the principles of
6 Long Leaf is that we should provide our clients with
7 a strong return on their investment?
8    A   If it's on a script and I'm approved --
9 it's approved by the compliance department and I'm
10 supposed to utilize it in the solicitation, then it
11 would have been said.
12    Q   All right. So what is your basis for --
13 or what was your basis for saying to customers that
14 Long Leaf, one of Long Leaf's principles is to --
15 you know, scratch that. I think a better way to ask
16 this question is just did Long Leaf in fact provide
17 clients with a strong return on their investment?
18    A   I don't think that's what the statement
19 says.
20    Q   I understand. But my question is did
21 Long Leaf --
22    A   I think you're missing out on the word
23 should.
24    Q   Right. But did Long Leaf in fact

Page 239

1 ultimately provide clients with --
2    A   I don't find it applicable because
3 it says the word should. You're disregarding that
4 word.
5    Q   Well, let's not worry about Exhibit 134,
6 all right? I'm just going to ask my question in a
7 vacuum, all right? Did Long Leaf Trading provide
8 clients with a strong return on their investment?
9    A   I mean, you're disregarding -- you're
10 only asking the question because it's in the script
11 and you want to disregard the script.
12       MR. MAY:  Let's back up.
13       THE WITNESS:  Yeah.
14       MR. MAY:  Okay. Let's put away
15 Exhibit 134. And you've been asked this all
16 day, okay?
17       THE WITNESS:  Yep.
18       MR. MAY:  Do you want to change your
19 testimony about whether you know --
20    A   I don't know.
21       MR. MAY:  -- the results?
22    A   I don't know the results specifically.
23 BY MR. BURDEN:
24    Q   All right. So let's pick 134 back

Page 240

1 up, if we could, please, and get back to page 7.
2 Are you there?
3    A   Yep.
4    Q   All right. So let's look at 10(B).
5 And 10(B) says, "Now, these three principles are
6 what we have built our company upon and everything
7 that we do since our inception. At Long Leaf we
8 measure our success by our clients' success. As a
9 company we wouldn't have the ability to work with
10 hundreds of clients month after month for six years
11 and oversee millions of dollars if we weren't being
12 profitable for them. Does that make sense?" So
13 do you know who wrote that piece of the script?
14    A   Again, no, I don't know.
15    Q   So it wasn't you then?
16    A   The only thing that I can tell you
17 that I wrote with 100 percent certainty is what
18 I previously testified to, that are you married or
19 do you have any kids.
20    Q   Got it. So this piece we just read --
21 and the statement I want to focus on is we wouldn't
22 have the ability to work with hundreds of clients
23 month after month for six years and oversee millions
24 of dollars if we weren't being profitable for

Page 241

1 them -- is that something you said to customers
2 and prospective customers on solicitation calls?
3    A    The policy at Long Leaf Trading Group
4 is that the solicitation process is approved by the
5 compliance department, and it is my duty to carry
6 out the solicitation process in accordance with the
7 script that I've been given.
8    Q    Did you do that?
9    A    So in the event that it's on the script,
10 then -- and approved by the compliance department,
11 then I said it.
12    Q    All right.  So was this script approved
13 by the compliance department?
14    A    I don't know if this specific one was.
15 I don't have the ability to determine that.
16    Q    Do you recall telling customers that
17 Long Leaf wouldn't have the ability to work with
18 hundreds of clients month after month for six years
19 and oversee millions of dollars if Long Leaf weren't
20 being profitable for them?  Do you remember saying
21 that to people?
22    A    No, I don't recall.  But, again, if it's
23 in an approved script by the compliance department
24 and I was soliciting a client, everything that's

Page 242

1 in the script would have been said by me.
2    Q    Got it.  In fact, Long Leaf was
3 not profitable for customers, is that correct?
4    A    I can't answer that question.  I don't
5 know.
6    Q    All right.  So if you don't know, why
7 would you say this to clients?
8    A    I don't know because it's 2019,
9 and I don't know the specifics of what's going
10 on.  The other thing too is clients start and stop
11 at different times.  So if you have a client -- ten
12 clients who started the first month and they all
13 made money, then that line would be correct.
14    Q    Got it.
15    A    So I don't know.
16    Q    So how many clients started the first
17 month and just traded and left with a profit?  How
18 many of your clients did that?
19    A    I'm not saying that they had to leave,
20 but it's at the time this statement was made they
21 could be profitable.
22    Q    Got it.  So was there ever a period
23 of time when all of your clients at Long Leaf
24 were up?

Page 243

1    A    Yes.
2    Q    When was that, please.
3    A    I want to say it was June, July, August,
4 September, October of 2016 maybe.
5    Q    All of those months or --
6    A    No.
7    Q    -- somewhere in there?
8    A    Somewhere in there I remember that
9 we had like a big surge, and I even had clients
10 deposit more money from their initial investments
11 and things of that nature so ...
12    Q    Do you recall what month that was?
13    A    It's somewhere in that time period.
14 I know it was probably -- it was probably before
15 November of 2016.
16    Q    All right.  So when do you think it was
17 then that client accounts were --
18    A    Somewhere between the summer of 2016
19 and November of -- and October of 2016, the end
20 of October of 2016.
21    Q    All right.  And was that just for one
22 month or was that for multiple months?
23    A    I couldn't tell you, but I know that
24 there was a time where people were moving in the

Page 244

1 right direction and were above their initial
2 equity levels.
3    Q    Was that the only month where customers
4 were --
5    A    From my recollection --
6    Q    You've got to let me finish the question.
7       MR. MAY:  You can't answer his question --
8       THE WITNESS:  Yeah, yeah, yeah.
9       MR. MAY:  -- until he's done answering --
10       THE WITNESS:  All right.
11       MR. MAY:  -- asking it.
12       THE WITNESS:  I was faster.
13       MR. MAY:  Now, but we are at 5:26.
14 How much longer are we going to go?
15       MR. BURDEN:  As long as you guys can stand.
16       MR. MAY:  We might have to -- I mean,
17 do you know how many more exhibits you have?
18       MR. BURDEN:  You're looking at it.
19       MR. MAY:  So there's a lot.
20       MR. BURDEN:  Yeah.  So I'll tell you what,
21 you know.  I don't --
22       THE WITNESS:  You never had any intentions
23 of this being a one-day thing.
24       MR. MAY:  Well, he has no idea how

Page 245

1    quickly or long it's going to go.
2        MR. BURDEN: Yeah. So as a general
3    matter, I don't answer questions. But, yeah,
4    definitely I was hopeful that --
5        MR. MAY: Okay. We're still on the
6    record. Do we need to be on the record for
7    this part?
8        MR. BURDEN: Do you want to go off the
9    record?
10       MR. MAY: Sure, yeah.
11       MR. BURDEN: Yeah, okay. Could we go
12   off the record, please.
13           (Whereupon a recess was taken from
14             5:30 p.m., to 5:40 p.m., after which
15             the following proceedings were had:)
16       MR. BURDEN: Back on the record, please.
17       MR. MAY: Okay. Ashley, I think we're
18   going to take you up on your offer that this
19   is as convenient a place as any to cease for
20   today, continue to be under subpoena and you'll
21   contact me about what your available dates are.
22   And I'll check my calendar and I'll bring
23   Mr. Ruth back with me, and we'll kind of
24   take it from there.

Page 247

1    WHICH WERE ALL THE PROCEEDINGS
2    HAD OR OFFERED AT SAID HEARING
3    OF THE ABOVE-ENTITLED CAUSE.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 246

1        MR. BURDEN: Thank you. I read this
2    so I don't screw it up. Let me read the bit
3    I've got to read and then --
4        MR. MAY: Okay.
5        MR. BURDEN: -- we'll go off the record.
6    Mr. Ruth, at this time we're adjourning to a
7    date to be determined later. Although your
8    testimony is adjourned, you remain under
9    subpoena. Mr. Ruth, is there anything that
10   you wish to clarify or add to the statements
11   that you have made today?
12       THE WITNESS: Not at this time.
13       MR. BURDEN: All right. Counsel, anything
14   that you would like to add or clarify to --
15       MR. MAY: No, I think it makes sense.
16   And pursuant to what I understand the rules
17   for the CFTC is when you're done, I'll have
18   some clarifying questions at that time. It
19   doesn't really make sense to do them now.
20       MR. BURDEN: Okay. Well, I'll tell
21   you what. We are off the record at 5:35 on
22   September 26th.
23
24

Page 248

1 STATE OF ILLINOIS  )
                     ) SS.
2 COUNTY OF C O O K  )
3
4        I, MARY MASLOWSKI, CSR, do hereby
5 certify that I reported in shorthand the proceedings
6 had at the examination under oath aforesaid, and
7 that the foregoing is a true, complete and accurate
8 transcript of the proceedings at said examination
9 under oath as appears from the stenographic notes
10 so taken and transcribed on the 4th day of October
11 2019.
12
13
14
15            Certified Shorthand Reporter
16
17
18
19
20
21
22
23
24

# Long Leaf Trading Group

# *Ruth, Jeremy 2019-10-11*

### *10/11/2019*

#### Condensed Transcript

#### Prepared by:

Ashley Burden
CFTC

Friday, October 29, 2021

Page 249

1      UNITED STATES OF AMERICA
             BEFORE THE
2    COMMODITY FUTURES TRADING COMMISSION
3

4  IN THE MATTER OF:          )
                              )
5  LONG LEAF TRADING GROUP, INC.  )
6
7
8
9          VOLUME II
10
11      The continued examination under
12  oath of JEREMY RUTH, taken pursuant to subpoena
13  and the rules of the U.S. Commodity Futures Trading
14  Commission, reported by Mary Maslowski, a Certified
15  Shorthand Reporter and Notary Public within and
16  for the County of Cook and State of Illinois,
17  at 525 West Monroe Street, 9th Floor, Chicago,
18  Illinois, commencing at the hour of 9:50 o'clock
19  on October 11, 2019.
20
21
22
23
24

Page 250

1  A P P E A R A N C E S:
2
      MR. ASHLEY J. BURDEN, Senior Trial Attorney
3    MS. ELIZABETH M. STREIT, Trial Team Leader
      MR. JOSEPH J. PATRICK, Senior Investigator
4    U.S. COMMODITY FUTURES TRADING COMMISSION
      DIVISION OF ENFORCEMENT
5    525 West Monroe Street, Suite 1100
      Chicago, Illinois 60661
6    (312) 596-0700
7
         On behalf of the U.S. Commodity
8        Futures Trading Commission;
9
      CHUHAK & TECSON, P.C.
10   BY MR. ANDREW S. MAY
      30 South Wacker Drive, Suite 2600
11   Chicago, Illinois 60606
      (312) 855-6105 (direct)
12   amay@chuhak.com
13
         On behalf of the Witness.
14
15
16  A L S O  P R E S E N T:
17
      MS. NICOLE KRAAI, Intern.
18
19
20
21
22
23  CSR License No. 084-003278.
24

Page 251

1            I N D E X
2  WITNESS              EXAMINATION
3  JEREMY RUTH
4  By Mr. Burden          252, 442
5  By Mr. May             400
6
7  CFTC EXHIBIT          MARKED FOR ID
8  135                   253
      136                259
9  137                   262
      138                268
10  139                  278
      140                281
11  141                  286
      142                298
12  143                  305
      144                308
13  145                  310
      146                320
14  147                  327
      148                338
15  149                  345
** 150                   357
16  151                  364
      152                368
17  153                  372
18
19
20  ** NOTE:  Exhibit No. 150 is an audio file
             which was not tendered for inclusion
21           in the transcript.
22
23
24

Page 252

1          JEREMY RUTH,
2  called as a witness herein, having been previously
3  sworn and examined, testified further as follows:
4       FURTHER EXAMINATION (Cont'd.)
5  BY MR. BURDEN:
6    Q   All right.  Mr. Ruth, I'm Ashley
7  Burden.  This is Joe Patrick and Elizabeth
8  Streit.  We're members of the staff of the CFTC.
9  We're officers of the Commission for the purposes
10  of this proceeding.  We are today resuming the
11  examination of Jeremy Ruth which was adjourned
12  on September 26th.  Mr. Ruth, are you represented
13  by counsel?
14    A   Yes.
15       MR. BURDEN:  All right.  Counsel, will
16    you please identify yourself.
17       MR. MAY:  Sure.  Andrew May, Chuhak &
18    Tecson.
19  BY MR. BURDEN:
20    Q   All right.  And also with us
21  today is Nicole Kraai, an intern for the CFTC,
22  appearing with the gracious permission of Mr. May
23  and Mr. Ruth.  Testimony today is pursuant to a
24  Commission subpoena which has been previously

Page 253

1 marked as Exhibit 116. And let the record reflect
2 that a copy of the formal order of investigation
3 in this matter has been made available and will
4 continue to be made available for examination by
5 counsel and the witness during the course of this
6 proceeding.
7         Mr. Ruth, thanks for coming
8 back. I want to start today by looking at a
9 couple of the documents that you produced to us
10 on the 26th.
11         MR. MAY: And, Ashley, you continue to
12 have copies for counsel?
13         MR. BURDEN: Of course.
14         (Whereupon CFTC Exhibit No. 135
15                 was marked for identification.)
16     Q   All right. Mr. Ruth, I'm handing you
17 what I've marked as CFTC Exhibit 135. And take
18 a moment to look at it, if you would, please, and
19 when you finish, I'll ask you if you remember what
20 it is and what it's all about.
21     A   (Witness complies).
22         MR. MAY: Ashley, while we're doing
23 that, do you still have the exhibits that
24 we used last time? I'm going to need a copy

Page 254

1     of those so when you're done with your
2     examination, I can ask Mr. Ruth questions
3     about those.
4         MR. BURDEN: Okay. Well, I'll tell
5     you what. Why don't you -- do you have a list
6     of the ones that you want to talk about?
7         MR. MAY: Possibly, but I'm probably
8     going to need to see all of them.
9         MR. BURDEN: Okay. Let's talk about
10     that on the break.
11         MR. MAY: Sure.
12         MR. BURDEN: We'll be able to do that
13     in one way or another.
14     Q   All right. Mr. Ruth, do you recognize
15 Exhibit 135?
16     A   Yes.
17     Q   Can you tell me what it is, please.
18     A   I think it's just emails back and
19 forth between me and Tim Evans after I left Long
20 Leaf Trading Group.
21     Q   All right. So this is an email and
22 attachments that you produced to us, correct?
23     A   Yes.
24     Q   All right. So there's references

Page 255

1 in here -- it looks like in Exhibit 135 there
2 is a release signed by a person named Okey Oteh,
3 and that's Ruth 037. Do you know who Okey Oteh is?
4     A   Yeah, he was a customer at Long Leaf
5 Trading Group.
6     Q   Was he a customer of yours?
7     A   Yes and no. He was originally solicited
8 by Tony Klancic, and after Tony Klancic left the
9 firm he was on letter of direction. And after a
10 while being on letter of direction, I became his
11 broker.
12     Q   All right. And it looks like this
13 is a release and Long Leaf paid him $3,134.31, is
14 that right?
15     A   That's what it says, yeah.
16     Q   So did you pay that money?
17     A   No, I have no clue, anything about this.
18     Q   So how did this release come to be in
19 your possession?
20     A   I was owed money that was not paid
21 to me on my final paycheck and I reached out to
22 Tim Evans to inquire why, and this is one of the
23 things that he, I guess, deducted from my paycheck.
24     Q   All right. So Mr. Evans had deducted

Page 256

1 or claimed to have deducted this $3,000 payment
2 to Mr. Oteh from your final paycheck you were owed,
3 correct?
4     A   Correct.
5     Q   So did Mr. Evans ever tell you what
6 the basis for that was, like why you should have
7 to pay for that?
8     A   I think in here it says something
9 about -- I think it's in another email that we
10 produced to you, but it says something of the nature
11 that, I don't know, some sort of complaint from
12 Mr. Oteh Okey, which I never heard firsthand.
13     Q   Do you know what the basis is for
14 this release and this payment to Mr. Oteh from
15 Long Leaf?
16     A   No, I don't. To be honest with you,
17 I don't even think it's -- in my opinion, I don't
18 think it's even like a real document. I don't think
19 Mr. Oteh Okey signed this.
20     Q   Why do you think that?
21     A   Because of the date that it was
22 signed, the date that the money was taken from
23 my paycheck.
24     Q   Did you ever ask Mr. Evans about that

Page 257

1 or accuse him of ginning up a fake document?
2    A   I mean, I had suspicions -- I don't
3 know if I ever said anything.  But, you know,
4 I've thought about it and I'm still considering,
5 you know, trying to use some sort of legal action
6 to recover all the damages.
7    Q   From whom?
8    A   From Long Leaf Trading Group.
9    Q   All right.  And it looks as well here
10 like in Exhibit 135 Mr. Evans attached -- well,
11 it looks like a bill from an attorney named Thomas
12 Burke.  What do you know about Mr. Burke's work for
13 Long Leaf?
14    A   I think that that was just like his
15 general NFA or I guess like futures-related legal
16 issue counsel.
17    Q   All right.  So why did he send that
18 to you?  Was this something else he deducted from
19 your paycheck?
20    A   Yeah.  He had mentioned another
21 deduction with like Harish Patel, a legal bill or
22 something of that nature.
23    Q   And is that what this -- that was my
24 next question here.  So is that what this legal

Page 258

1 bill is for?
2    A   I think so.
3    Q   All right.
4    A   It doesn't really say, but I think we're
5 supposed to assume that.
6    Q   All right.  And who is -- yeah,
7 that's what I assumed.  Who is Harish Patel, please.
8    A   Harish Patel was a client of mine
9 who at the end of like, I don't know, maybe like
10 the last weeks I was there he had complained about
11 the trading and he -- I guess he refused to speak
12 with me.  So Tim Evans took over interacting with
13 him and he just had a complaint about like the
14 performance of the account.  And Tim had told me
15 that, you know, at the time I wasn't responsible
16 for anything because I don't have anything to do
17 with the performance of the account -- and he said
18 this in front of everybody -- and that he would
19 handle all the legal fees and all that kind of
20 stuff.  And then when we had this falling out,
21 all of a sudden this was deducted from my check
22 and I was presented with this as evidence, I guess.
23    Q   Do you know if Mr. Evans or Long Leaf paid
24 a settlement to Mr. Patel?

Page 259

1    A   No.  I know that -- my understanding
2 is that they weren't able to come to terms and
3 they had some like heated argument and then he
4 filed maybe something with the NFA, and then the
5 NFA had called like an initial check on, you know,
6 I guess the situation.  And then I don't know if
7 anything -- I never heard anything and I don't have
8 any complaints and nobody asked me any questions,
9 so I don't really know.
10    Q   Got it, okay.
11        (Whereupon CFTC Exhibit No. 136
12         was marked for identification.)
13    Q   All right.  Mr. Ruth, I want to hand
14 you next what I've marked as CFTC Exhibit 136, and
15 this is a group exhibit consisting of a letter from
16 Mr. Schena to you and others and then a settlement
17 agreement and release relating to Mr. Schena's
18 client, Priscilla Lamar.
19        MR. MAY:  The official one's yours.
20        MR. BURDEN:  Yours is next, Andrew.
21        THE WITNESS:  Sorry.
22        MR. MAY:  Oh, okay.  There's two documents.
23 Is that all 136?
24        MR. BURDEN:  Yeah, yeah, it's a group

Page 260

1    exhibit.
2        MR. MAY:  Oh, okay.
3 BY MR. BURDEN:
4    Q   And take a moment to look this over
5 for me, please.  And when you've finished, please
6 indicate and I'll ask you some questions about it.
7    A   (Witness complies.)
8        MR. MAY:  Okay, I'm ready.
9 BY MR. BURDEN:
10    Q   All right.  Mr. Ruth, do you recognize
11 CFTC Exhibit 136?
12    A   Yes.
13    Q   All right.  Can you tell me what it is,
14 please.
15        MR. MAY:  Oh, that was the last exhibit?
16        MR. BURDEN:  Correct.
17        MR. MAY:  Okay.  What was the prior one,
18    135?
19        MR. BURDEN:  Correct.
20        MR. MAY:  All right.
21    A   I obtained this --
22        MR. MAY:  He asked if you recognize it.
23        THE WITNESS:  I said yes.
24

Page 261

1 BY MR. BURDEN:
2    Q    All right.  So this letter looks like
3 it was sent after you had departed from Long Leaf,
4 is that correct?
5    A    Yes.
6    Q    So who is Priscilla Lamar?
7    A    Priscilla Lamar was a client of mine
8 at Long Leaf.
9    Q    And did you pay any money towards
10 this settlement with Ms. Lamar that's reflected
11 in this settlement agreement and release we see
12 starting at Ruth 024?
13    A    Absolutely not.
14    Q    So how did you come to be in possession
15 of this, please.
16    A    I sent you -- we also provided other
17 emails, so I don't know the exact dates.  Either
18 February or March of this year I think I got some
19 weird correspondence from an attorney named Rebecca
20 Wing, who I think is Long Leaf's counsel, and she
21 was trying to collect money from me for I guess
22 this settlement.  And that's the first time I heard
23 about it.
24    Q    Got it, okay.  Have you had any subsequent

Page 262

1 interactions with Ms. Wing?
2    A    What is subsequent?  What do you mean
3 by that?
4    Q    Well, like I want to go back to 136
5 but -- sorry, yeah, 136.  But, yeah, just so we're
6 on the same page, I didn't realize this was all
7 together.
8         (Whereupon  CFTC  Exhibit No. 137
9          was marked for identification.)
10    Q    Let me hand you what I've marked
11 as CFTC Exhibit 137, and this is the email you
12 produced from Rebecca Wing.  So take a moment to
13 look it over, please, and we'll all be on the same
14 page.
15       MR. MAY:  Are you done reviewing it?
16       THE WITNESS:  Yes.
17       MR. MAY:  Okay.
18 BY MR. BURDEN:
19    Q    All right.  So, Mr. Ruth, do you recognize
20 Exhibit 137?
21    A    Yes.
22    Q    Can you tell me what it is, please.
23    A    It's an email and then a response to
24 an email that I wrote to Tim Evans and a response

Page 263

1 from Tim Evans.
2    Q    All right.  So in the email dated
3 February 25, 2019 you were suggesting to Mr. Evans
4 that an attorney by the name of Rebecca Wing
5 was asking for money on behalf of Long Leaf Trading.
6 Is that what happened?
7    A    Yeah.
8    Q    So you didn't give her any money, right?
9    A    No.
10    Q    All right.  So, you know, after the
11 conversation that's memorialized in Exhibit 137
12 with Ms. Wing, did you talk to her again?  Did she
13 bug you more for money?  What came of this?
14    A    Yeah.  I mean, again, I think
15 I submitted the emails to you about this.  I had
16 asked her for more details about the whole situation
17 and, you know, I think her position was somewhere in
18 my employment contract that I have to indemnify --
19 is that the right word?
20       MR. MAY:  Indemnify.
21    A    -- indemnify them and, you know,
22 the language says off of like gross negligence
23 or wrongful misconduct or something of that nature.
24 And so I was trying to essentially ask her to tell

Page 264

1 me why she'd think that I acted negligently or
2 with gross misconduct and, you know, send me proof
3 of the settlement.
4 BY MR. BURDEN:
5    Q    I did not see that email in the production.
6 Did Ms. Wing respond?
7    A    Kind of.  Not really.  I mean --
8    Q    What did she say?
9    A    Well, that's how I got the --
10    Q    Exhibit 136?
11    A    -- 136.  And then -- yeah, that's how
12 I got Exhibit 136.
13    Q    All right.  So Ms. Wing sent you the
14 documents we see in 136, correct?
15    A    Yes.
16    Q    Did she send you anything else?
17    A    No, I don't think so.
18    Q    All right.  Did Ms. Wing follow up
19 at all or try to explain why you should pay this
20 money or what other money you owed?
21    A    Not really.
22    Q    When you say not really, does that
23 mean no or there was some halting communication?
24 Let me close this out.

Page 265

1   A   I don't think -- I don't know.  I can't
2 speak for her, but I don't -- it was basically she
3 gave this to me and said pay it or we could do this
4 the easy way or the hard way and, you know, either
5 pay it or we're going to file a lawsuit against you.
6   Q   And did they do that?
7   A   Not to my knowledge.
8   Q   Were there any other settlements
9 with Long Leaf customers that you were aware of?
10 And they don't have to be your clients, just however
11 you became aware of them.
12   A   I think there's like a couple
13 like people who wrote like bad reviews on like
14 Google or something, and there might have been
15 like settlements to take down the reviews, things
16 of that nature.
17   Q   So what do you remember about that?
18 Do you remember what customers were paid to take
19 down reviews on Google?
20   A   I wouldn't say they were paid to take
21 down reviews on Google.  I think what the customers
22 had done was wrote some things that were not
23 factual.  And so it was more of like, hey, you need
24 to take this down because this isn't true.

Page 266

1   Q   Do you remember the names of those
2 customers?
3   A   I mean, I think Harish Patel might even
4 be one of them.  I'm not sure.
5   Q   Do you remember any others?
6   A   I couldn't tell you the names.
7   Q   So did you ever read those reviews that
8 were posted?
9   A   Did I ever read them?
10   Q   Yeah.
11   A   Possibly.  I don't necessarily recall.
12   Q   Okay.  Other than Harish Patel, were
13 they customers of yours that wrote these reviews?
14   A   No, I think there were others.
15   Q   All right.  And so I think you testified
16 before just now that the reviews the customers wrote
17 were untrue, is that correct?
18   A   Yeah.  I mean --
19   Q   Okay.  So what's your basis for saying
20 that?
21   A   Like, for example, somebody will
22 say like, oh, I lost -- like I'm just giving you
23 a hypothetical situation, but they'll say I lost
24 like 80 percent of my money in three months or

Page 267

1 something like that and, you know, well, you
2 lost 60 percent of your money in five months or,
3 you know.  So it's that -- yeah, like that's why
4 it's untrue or ...
5   Q   Well, how did you know that the
6 reviews were untrue?  It sounds like from your
7 testimony that only maybe one of them was your
8 customer or you don't remember if you read it.
9 Like how do you know if the reviews were, you know,
10 true or false?
11   A   Tim Evans told me.
12   Q   Okay.  And so these customers that
13 posted these Google reviews, did they pay Long Leaf
14 Trading as part of a settlement or did Long Leaf
15 Trading pay them, if you know?
16   A   I'm not intimately familiar but, I mean,
17 I think Long Leaf Trading --
18       MR. MAY:  Well, okay.  He doesn't want
19       you to guess or speculate, I imagine.
20       THE WITNESS:  All right.
21       MR. MAY:  So if you know, then you know.
22   A   Yeah, I'm not intimately familiar or
23 I don't recall.
24

Page 268

1 BY MR. BURDEN:
2   Q   Well, did anybody tell you?  Did you
3 come to know?  Like I understand that you didn't
4 pay them or receive money from them, but was there
5 talk of it around the office?  Is there anything
6 you recall about it?
7   A   Yeah.  I think this -- going back
8 to like 135, if you look at the release that
9 Oteh Okey signed, I think I've seen one before of
10 somebody else signing.
11   Q   All right.  So your recollection is
12 that Long Leaf Trading paid the people who wrote
13 the Google reviews and not the other way around?
14   A   Correct.
15       (Whereupon CFTC Exhibit No. 138
16       was marked for identification.)
17   Q   Mr. Ruth, I want to hand you what I've
18 marked as CFTC Exhibit 138.  Take a look at it for
19 me, if you would, please, and indicate to me when
20 you've finished reviewing it.
21   A   I'm ready.
22   Q   Mr. Ruth, do you recognize CFTC
23 Exhibit 138?
24   A   Yes.

Page 269

1    Q    Can you tell me what it is, please.
2    A    It's more emails between me and Tim
3  Evans post my employment with Long Leaf Trading
4  Group.
5    Q    All right.  And so this is an email
6  that you produced to the CFTC, right?
7    A    Correct.
8    Q    So what's Operation Frosty, please.
9    A    We were -- I guess it's just like
10  preparation of documents or preparation for an
11  NFA exam.
12    Q    Well, you're talking about a file folder
13  labeled Operation Frosty, right?
14    A    Yes.
15    Q    So what's in that file folder, please.
16    A    Just recordkeeping and -- I think it
17  was just recordkeeping for the, yeah, for the NFA
18  exam that we had coming up.
19    Q    All right.  Well, it sounds like
20  you're saying that something is not good about
21  Operation Frosty because you write, "Your attempts
22  to rule over those by installing fear are no longer
23  effective.  During the PC diagnostic did you find
24  the file folder labeled Operation Frosty?  Have

Page 270

1  you made the NFA aware of Operation Frosty?  It
2  is surprising that a person with clear ethical
3  shortcomings would try to imply someone has acted
4  unethically."  So what are you talking about here,
5  please.
6    A    What am I talking about?
7    Q    Yeah.
8    A    I mean, I'm just going back with Tim
9  Evans about the fact that I'm upset that he screwed
10  me out of my paycheck.
11    Q    Got it.  So when you're talking
12  about Operation Frosty or the file folder labeled
13  Operation Frosty, who gave the file folder that
14  name?
15    A    I don't recall.
16    Q    Was it you?
17    A    I don't recall.
18    Q    All right.  So how many files were in
19  that folder?
20    A    I have absolutely no clue.
21    Q    Did you put any files in that folder?
22    A    Probably, yeah.
23    Q    Okay.  How many files?
24    A    I have no clue.

Page 271

1    Q    Was it more than one, let's say?
2    A    Yes.
3    Q    Okay.  More than five?
4    A    I would assume.  I can't say.
5    Q    All right.  So what kind of files
6  did you put into the Operation Frosty file?  Like
7  were they Word documents, PDFs?
8    A    Yeah, they're Word documents.
9    Q    All right.  Any other types of files?
10    A    Not that I recall.
11    Q    All right.  Do you remember the names
12  of any of those Word docs, like, you know, the file
13  name?
14    A    Yeah, they're like order ticket templates.
15    Q    So are order ticket templates the
16  only files that you put in this Operation Frosty
17  file folder?
18        MR. MAY:  I'm sorry.  Could I ask
19    the court reporter to read back the question.
20        MR. BURDEN:  Sure.
21            (Whereupon the portion of the record
22              was read as requested.)
23    A    I don't recall.
24    Q    All right.  On whose computer was this

Page 272

1  Operation Frosty file folder?
2    A    I think it's in the Cloud.
3    Q    So was it a shared, like a shared drive?
4    A    Yeah, you could say that.
5    Q    And who had access to it?
6    A    Everybody on the broker team.
7    Q    And that includes you, correct?
8    A    Yes.
9    Q    Did other people -- do you know
10  if other people on the broker team contributed
11  files to the Operation Frosty file folder?
12    A    I mean, I can't recall specifically but ...
13    Q    All right.  I think you testified
14  before that Operation Frosty was something to do
15  with preparation for an NFA audit.  Did I get that
16  right?
17    A    Correct.
18    Q    All right.  So what form did that
19  preparation take?
20    A    What do you mean?
21    Q    Well, why was it -- why was there sort
22  of a specially designated folder for this effort?
23  Why was it called Operation Frosty?
24        MR. MAY:  Okay.  That's two questions.

Page 273

1    Do you want to take them one at a time?  Are
2    you aware of both questions that are pending?
3        THE WITNESS:  Yeah.
4    MR. MAY:  Okay.
5    A    So what's the first question?
6  BY MR. BURDEN:
7    Q    All right.  So how was Operation Frosty
8  used to prepare for an NFA audit?
9    A    I think when you -- I'm not a compliance
10 guy, so I don't really deal with the audits.
11   Q    No, I understand.
12   A    Yeah.
13   Q    What do you understand?  What do you know?
14   A    I think it's just preparing all the
15 things that they're going to ask you for.  I think
16 they give you like a checklist of the things that
17 they want, right?
18       MR. MAY:  Okay.  That sounds like you're
19   asking him a question.
20   A    Well, I mean, yeah, I guess I don't know.
21 BY MR. BURDEN:
22   Q    All right.  So you'll have to forgive
23 my suspicion, though it sounds like you didn't have
24 much to do with it from your testimony.  You know,

Page 274

1  you say, "Have you made the NFA aware of Operation
2  Frosty?"  Why did you write that?  Why would it be
3  necessary or good or bad for Mr. Evans to make the
4  NFA aware of Operation Frosty?
5    A    I don't necessarily recall why
6  specifically I felt that way at the time.  I
7  think it was just kind of in like a heated argument
8  about the fact that I didn't get my paycheck or my
9  paycheck wasn't what I was expecting it to be, and
10 I think I'm just going back and forth trying to
11 score points with him.
12   Q    So why would you be scoring points
13 by bringing up this Operation Frosty?  It seems
14 to me like it's good to prepare for an NFA audit,
15 and it seems to me like you're suggesting that
16 Operation Frosty is unethical from the next line.
17 Am I reading that right?
18   A    That's the thing, is I don't know --
19 I don't know if preparation for an NFA audit is
20 ethical or unethical because I don't know what was
21 being done or what was presented to the NFA.  So
22 I can't answer that question.
23   Q    All right.  I don't want to ask you
24 what the file directory address for the Operation

Page 275

1  Frosty folder is, but that's really my question.
2  Is it part of a larger drive?  Where could we find
3  it?
4    A    I have no --
5        MR. MAY:  Didn't he already answer that?
6        MR. BURDEN:  No.
7    Q    So, Mr. Ruth --
8        MR. MAY:  He actually said that it
9    was in the Cloud or it was a shared drive.
10       MR. BURDEN:  Well --
11       MR. MAY:  You're asking him where it is
12   on the computer system.
13       MR. BURDEN:  Yeah, that's part of the
14   computer system.  Watch this.  We'll walk
15   through it and if Mr. Ruth knows, we'll know
16   too soon.  And if he doesn't, then we'll move
17   on to the next exhibit.
18   Q    So, Mr. Ruth, you testified that
19 this Operation Frosty folder was on the Cloud,
20 is that right?
21   A    I believe so, yes.
22   Q    All right.  So are there other file
23 folders that were on the Cloud that you used at
24 Long Leaf Trading?

Page 276

1    A    Yes.
2    Q    Okay.  Just for illustrative purposes,
3  what were some of the other file folders that were
4  on the Cloud?
5    A    We had Power Point presentations
6  that we used during the solicitation process,
7  and those were represented to us as the official
8  ones from the compliance department that we were
9  allowed to use during the solicitations.
10   Q    So you've got Power Points on the Cloud?
11   A    Yes.
12   Q    What else have you got on the Cloud?
13   A    The official script that you had --
14 we talked about last time.
15       MR. MAY:  Do you have a reference
16   number?  You don't see it in front of you,
17   do you?
18       THE WITNESS:  No, I don't have the
19   exhibit.
20 BY MR. BURDEN:
21   Q    Okay.  So let's say you're sitting
22 at your computer at Long Leaf Trading.  Did you have
23 a computer at Long Leaf Trading?
24   A    I did.

Page 277

1    Q    So you log on to your computer, right?
2  You start it up at the beginning of the day?
3    A    Yes.
4    Q    All right.  So how do you navigate to the
5  Cloud?
6    A    I would use Office 365.
7    Q    All right.  So you open Office 365, right?
8    A    Yes.
9    Q    So how do you get to the Cloud from there?
10   A    I mean, it's a tab within the website.
11   Q    So like the intranet for Long Leaf Trading,
12  is that right?
13   A    I wouldn't necessarily say that.
14   Q    All right.  What does the tab say that
15  you go to?
16   A    I don't know exactly.  Shared folder or
17  something?  I don't know.
18   Q    Okay.  So within that shared
19  folder there are a number of other folders,
20  and Operation Frosty is one of those folders,
21  is that right?
22   A    I don't know.  I don't know.  This
23  is two years ago, and I don't know the directory
24  of Long Leaf and I don't know if it's still there.

Page 278

1  I don't know.  I don't know anything.
2    Q    Well, let's put that one aside then,
3  please.
4    A    (Witness complies).
5         (Whereupon  CFTC  Exhibit No. 139
6         was marked for identification.)
7    Q    Mr. Ruth, I want to hand you what I've
8  marked as CFTC Exhibit 139.  Take a moment to look
9  at the document and tell me -- and I'll ask you if
10  you recognize it, but tell me when you've finished
11  reviewing it, please.
12   A    I'm ready.
13   Q    Mr. Ruth, do you recognize CFTC
14  Exhibit 139?
15   A    No.
16   Q    All right.  I want to talk about it
17  anyway, if we could, please.  So you'll see this
18  is from Mr. Evans to jruth@longleaftrading.com.  And
19  Mr. Ruth writes, "Jeremy, I need an accounting for
20  all LLTG scripts" --
21       MR. MAY:  Did you say that Mr. Ruth writes?
22       MR. BURDEN:  If I did, I meant Mr. Evans.
23       MR. MAY:  Okay.
24

Page 279

1  BY MR. BURDEN:
2    Q    And Mr. Evans here in Exhibit 139
3  appears to be asking for an accounting of all
4  LLTG scripts, and he asks you to email him a
5  bunch of scripts.  And then he writes, "Any and
6  all other versions of documents outstanding need
7  to be deleted."  He also writes, "I also need
8  confirmation from you that you are not keeping
9  any of these documents or other Long Leaf material
10  outside of Long Leaf provided accounts."
11       Do you have any knowledge or
12  understanding of why Mr. Evans was asking you to
13  send him all LLTG scripts?
14   A    I have no recollection.
15   Q    All right.  Do you have any knowledge
16  or understanding of why Mr. Evans says that any
17  and all other versions of documents outstanding
18  need to be deleted?
19   A    No.
20   Q    Do you recall deleting any --
21  or I guess shredding or destroying any scripts
22  or any other promotional documents at Long Leaf?
23   A    No.
24   Q    No, you didn't do it or no, you don't

Page 280

1  remember?  Sorry.
2    A    No, I don't remember.
3    Q    All right.  Do you have any knowledge
4  or understanding of why Mr. Evans asked you for
5  confirmation that you're not keeping any of these
6  documents, you know, at home?
7    A    No, I have no recollection.
8    Q    All right.  Do you recall any
9  subsequent conversations with Mr. Evans about his
10  request for these scripts or that certain scripts
11  be deleted?
12   A    No.
13   Q    Do you know if this was -- this
14  email was sent prior to an NFA audit of Long Leaf
15  Trading?
16   A    I have no -- I don't recall this email
17  at all.
18   Q    Okay.  Did you in fact have any scripts
19  or promotional materials at home?
20   A    No.
21   Q    Let's put that one aside, if we could,
22  please.
23   A    (Witness complies).
24

Page 281

1     (Whereupon CFTC Exhibit No. 140
2         was marked for identification.)
3     Q    Mr. Ruth, I want to hand you what I've
4 marked as CFTC Exhibit 140.  And take a moment to
5 look it over, please, and let me know if you recall
6 it.
7     MR. MAY:  Do we have any idea about the
8 length of this one?  It's not consecutively
9 Bates stamped.
10    MR. BURDEN:  Once again, it kind of is.
11 Remember we'd said last time about control
12 numbers?
13    MR. MAY:  Right.  To me it appears to
14 be about 75 pages.
15    MR. BURDEN:  Yeah, it's an email and
16 its attachments.
17    MR. MAY:  My pen just ran out of ink.
18    MR. BURDEN:  Could we go off the record,
19 please.
20       (Discussion off the record.)
21    MR. BURDEN:  Okay.  Back on the record,
22 please.
23    MR. MAY:  Are you done reviewing it?
24    THE WITNESS:  Yes.

Page 282

1     MR. BURDEN:  Ready to go?
2     MR. MAY:  Yeah.
3 BY MR. BURDEN:
4     Q    All right.  Mr. Ruth, do you recognize
5 CFTC Exhibit 140?
6     A    No.
7     Q    All right.  So you'll see it purports to
8 be an email from jruth@longleaftrading to Tim Evans
9 dated January 23, 2017.  And jruth@longleaftrading
10 was your email address at Long Leaf, correct?
11    A    Yes.
12    Q    All right.  And do you see the subject
13 is Emailing Time Means Money Documents and then
14 there's a zip file attached to it?  And the contents
15 of the zip file I will warrant you are the documents
16 that are appended to the cover email in Exhibit 140.
17 Do you recall sending this email, Mr. Ruth?
18    A    No.
19    Q    All right.  So you looked over the
20 documents in Exhibit 140, right?
21    A    Correct.
22    Q    All right.  So what are these documents,
23 please.
24    A    These documents are the approved

Page 283

1 documents from our compliance department to use in
2 the solicitation for Time Means Money.
3     Q    Got it.  And so were these documents that
4 you used in connection with your own solicitations?
5     MR. MAY:  Do you have a time frame that
6     you were going to ask him about?
7 BY MR. BURDEN:
8     Q    During any period that you worked at
9 Long Leaf Trading.
10    A    Yeah, I guess my -- I don't know if I'm
11 answering your question, but my role is to utilize
12 the program solicitation documents that are approved
13 by the compliance department.
14    Q    And did you do that?
15    A    Yes.
16    Q    And you'll have to forgive me if
17 I asked this question last time.  But when you
18 refer to the compliance department at Long Leaf
19 Trading, who was that, please.
20    A    Tim Evans.
21    Q    Anybody else?
22    A    No.
23    Q    All right.  So did you share any of these
24 documents in Exhibit 140 with NFA?

Page 284

1     A    I wouldn't do that.  That's the compliance
2 department's job.
3     Q    And by compliance department you mean
4 Mr. Evans?
5     A    Yes.
6     Q    All right.  So do you know if Mr. Evans
7 ever showed these documents to NFA?
8     A    I don't know.
9     Q    All right.  Let's put 140 aside, if we
10 could, please.
11    A    Are we trying to infer that 139 is a
12 response -- or, sorry, 140 is a response to 139?
13    Q    Is it?
14    A    I've never seen this 139, nor have
15 I ever seen this 140.  I mean, I'm not saying I
16 haven't seen like the document.  I'm talking about
17 like the actual emailing of these two things so ...
18 But I'm just curious if that's what you're -- I
19 mean, if you look at this, the 16th and the 23rd.
20 I don't think I would take, me personally would
21 take six days to respond to a superior's request
22 for information.  So, I mean, that's just not my
23 style.
24    Q    So since we're back on 140, do you

Page 285

1 recall where you obtained these solicitation
2 documents from that you forwarded to Mr. Evans or
3 that the email reflects that --
4    A   Yeah.  Again, like I don't think
5 I sent this email and I don't think I received
6 this.  But these documents, like the reason why
7 this doesn't also make sense to me is because
8 these documents are in the shared folder like in
9 Office 365.  So I don't get this whole --
10    Q   So you think you didn't send Exhibit 140?
11    A   No.
12    Q   So why?
13    A   Because why would I send something that's
14 already in a shared folder?
15    Q   So other than that, do you have any
16 reason to believe that you didn't send 140, that
17 it's a fake document or that maybe that somebody
18 else sent it?
19    A   I mean, reading 139, to me -- I don't
20 know why -- but this looks like a CYA type email
21 that was sent.
22    Q   By whom?
23    A   By Tim Evans and --
24       MR. MAY:  Could you -- I'm sorry.

Page 286

1    Could you state for the record what CYA --
2    what you mean by when you say CYA?
3       THE WITNESS:  Like cover-your-ass type
4    email.
5       MR. MAY:  Okay.
6    A   That's what it looks like to me.  And
7 like he has all this -- like it doesn't make sense
8 because he has all this information because he's the
9 one who approves it.  So --
10       MR. MAY:  So there's no reason for him
11    to --
12       THE WITNESS:  Yeah.
13    A   And I don't recall ever seeing this
14 email.  I don't recall ever sending that, and
15 he's the only one who has access to my email,
16 which we've talked about before.
17 BY MR. BURDEN:
18    Q   Yeah.  You can put those aside, if you
19 would, please.
20    A   (Witness complies).
21       (Whereupon CFTC Exhibit No. 141
22       was marked for identification.)
23    Q   All right.  Mr. Ruth, I want to hand
24 you what I've marked as CFTC Exhibit 141.  Take

Page 287

1 a moment to look it over and tell me when you've
2 looked it over, please.
3    A   What are these red things that are marked?
4    Q   Oh, you know what?  I gave you my
5 copy.  But you know what, I think you should hang
6 on to it because I think the little red tabs will
7 help us.
8    A   All right.
9       MR. MAY:  Can I see your version?
10       MR. BURDEN:  I don't know that I'm going
11    to ask about the tabbed ones.  But if you want
12    to tab them, you can.
13       MR. MAY:  Yeah, I was going to.
14    I should have picked a different color tab.
15    Okay.
16 BY MR. BURDEN:
17    Q   All right.  Mr. Ruth --
18       MR. MAY:  We're ready.
19 BY MR. BURDEN:
20    Q   -- do you recognize CFTC Exhibit 141?
21    A   Yes.
22    Q   Can you tell me what it is, please.
23    A   Well, I'd like to correct that.
24 I recognize the attachment, but I don't -- I guess

Page 288

1 this is an email being sent.
2    Q   All right.  And it appears to have
3 been sent from jruth@longleaftrading.com, right?
4    A   Correct.
5    Q   All right.  To Tim Evans, right?
6    A   Yes.
7    Q   So do you remember sending this email?
8    A   No.
9    Q   All right.  But you do recognize the
10 attachment, which is this Custom Version 3 Power
11 Point, right?
12    A   Yes.
13    Q   All right.  So what's the Custom Version 3
14 Power Point, please.
15    A   It's the visual Power Point for the
16 custom portion of the solicitation process for the
17 Time Means Money program.
18    Q   So this is something that you would
19 show to clients or prospective clients as part of
20 your presentation, correct?
21    A   Yes.
22    Q   All right.  Did you draft or create this
23 Power Point we see?
24    A   No.

Page 289

1    Q    Who did, please.
2    A    Some guy in India.
3    Q    What makes you say that?
4    A    He outsourced it to some guy in India.
5    Q    Do you remember the guy's name?
6    A    No.  He's like a designer that you find
7  like on like a website.
8         MR. MAY:  And who's "he"?  You said he
9    outsourced it.
10        THE WITNESS:  Tim Evans.
11 BY MR. BURDEN:
12    Q    All right.  Did this person from
13 India to whom the Power Point presentation was
14 outsourced, did this person email the presentation
15 to you?
16    A    No.
17    Q    So why is this -- do you recall why
18 you were sending this presentation to Mr. Evans?
19    A    No clue.
20    Q    All right.  So let's take a look, if
21 we could, please, at a part of the presentation.
22 I want to go sort of to the end, and I bet there's
23 a red tab on it.  And it's the page that says
24 Portfolio Management and there's a win column

Page 290

1  and a lose column.
2    A    Um-hmm.
3    Q    I think it's the fourth from the end,
4  if you would, please.
5    A    I'm ready.
6         MR. MAY:  Yes, ready as well.
7  BY MR. BURDEN:
8    Q    All right.  So, Mr. Ruth, this portfolio
9  management page -- what are you looking at there?
10 It looks like you've got a different exhibit.
11    A    Yeah, Exhibit 140.
12    Q    Oh, well, let's just look at Exhibit 141,
13 if we could, please.
14    A    Yep.
15    Q    And if there's something you want to
16 talk about with Exhibit 140, we can just go right
17 back to that.
18    A    All right.
19    Q    All right.  So let's look at Exhibit 141,
20 if we could, please.  We're on the fourth page from
21 the end.  It says Portfolio Management.  It says
22 Win 500, 500, 500 and then it totals to 1500 and
23 then it says Lose 1,000.  That totals to 1,000 and
24 then there's an equation at the bottom.  What's

Page 291

1  going on here, please.
2    A    What do you mean by that?
3    Q    Well, this is something that you would
4  show to clients, correct?
5    A    Yes.
6    Q    So is this meant to show that Long
7  Leaf expects or anticipates that they'll win three
8  out of four trades?
9    A    No.
10    Q    What's it meant to show?
11    A    It's talking about the -- it's visualizing
12 that goes along with the words the amount of money
13 that you -- the 1:2 risk-to-reward ratio.
14    Q    Got it.  So what would you say to
15 clients when you showed them this, or prospective
16 clients when you showed them this particular slide,
17 please.
18    A    What's ever on the customer --
19    Q    Well, let's pretend on a client's, if you
20 would, please.
21    A    I would have to go to Exhibit 140 in order
22 to tell that you.
23    Q    Okay, great.  Let's do that.  Very good.
24 And is that because 140 reflects a script that

Page 292

1  accompanied this slide show?
2    A    Yes.  It says right -- yeah.  So let's
3  say based on the risk preferences, a person who
4  owned --
5         MR. MAY:  Are you reading from Exhibit 140?
6         THE WITNESS:  Yeah.
7         MR. MAY:  But these numbers -- these
8  documents aren't sequentially Bates stamped,
9  so we all can't be on the same page as you
10 very easily.
11        MR. BURDEN:  I don't need to be.  And,
12 Mr. May, take whatever time you need to get
13 on the same page as Mr. Ruth.
14        MR. MAY:  Okay.  Well, you know, I think
15 we're about at the hour mark.  We still don't
16 have any water.
17        MR. BURDEN:  Would you like water?
18        MR. MAY:  Yeah, I would love it.
19        MR. BURDEN:  Well, why don't we
20 quickly finish this question and you can
21 do your pitch and I'll secure some water for
22 both of you.
23        MR. MAY:  Okay.  So let me see if
24 I can't find Exhibit 140 so we're all looking

Page 293

1    at the same page.
2        MS. STREIT:  What's the Bates number
3    at the bottom, the last two digits?  Then you
4    can find it.
5        THE WITNESS:  27.
6        MS. STREIT:  It says Conclusion on it?
7        THE WITNESS:  No.
8        MS. STREIT:  No, okay.
9        MR. MAY:  Is there a question pending?
10   I don't think there is.
11   BY MR. BURDEN:
12   Q    Yes.  The question was, Mr. Ruth, if you
13   would, please, deliver me the pitch that you would
14   deliver to a client along with the fourth slide from
15   the end in Exhibit 141.
16   A    Yeah.  I mean, I think it's --
17       THE WITNESS:  Am I allowed to go there?
18       MR. MAY:  If you want to.
19   A    Let's just say based on the risk
20   preferences of a person who owns this hypothetical,
21   yeah, theoretical portfolio we're talking about,
22   that would have us bring in $500 per position.
23   That would mean each position had a maximum outlay
24   of $1,000 worst case scenario.  If we design our

Page 294

1    positions --
2        MR. MAY:  She's got to take down
3    everything that you're saying, so you've got
4    to read it not like you're talking to somebody.
5    You have to read it very slowly so she can take
6    it all down, so very slowly.  So maybe we should
7    just start from the beginning.
8        THE WITNESS:  I mean, can't we just
9    reference G and H and then just write it in?
10   Do I have to say it?
11       MR. MAY:  Yeah, that would be fine.
12   BY MR. BURDEN:
13   Q    Say it, if you would, please.
14   A    All right.  So let's say based on
15   the risk preferences of a person who owns this
16   theoretical portfolio we are talking about, would
17   have us bring in $500 per position.  That would
18   mean that each position had a maximum outlay of
19   $1,000 worst case scenario.  If we design our
20   positions to bring in $500 and we've already
21   determined the maximum amount of risk exposure
22   that we're ultimately going to take on is $1,000
23   per position because 1:2 is the worst risk parameter
24   we can accept.

Page 295

1    Q    All right.  So let's look at the bottom
2    of this portfolio management slide in Exhibit 141,
3    please.  So it says $500 times 12 equals 6,000.
4    Is this meant to communicate to clients that for
5    a hypothetical portfolio of the type you describe,
6    they can expect to receive $6,000 a year?
7    A    No.
8    Q    What's it meant to communicate to clients,
9    please.
10   A    In the event that you win three
11   and lose one position on a monthly basis in a
12   hypothetical situation, that -- and you have a
13   1:2 risk-to-reward ratio and all the assets are
14   equally weighted, in this hypothetical situation
15   then you would win $500 per month.  And if you
16   carry that on every single month perfectly in
17   a hypothetical situation, you would make $6,000
18   a year.
19   Q    All right.  Now, were there any
20   real clients that you're aware of who achieved
21   results such as this at Long Leaf Trading?
22       MR. MAY:  I'm sorry.
23   A    There's no --
24       MR. MAY:  I'm sorry.  Hold on.  Didn't

Page 296

1    you ask him this last time?
2        MR. BURDEN:  I don't know, but we're
3    going to ask him again.
4        MR. MAY:  Okay.  We can keep asking,
5    but I think he's answered it.
6    A    It has nothing --
7        MR. MAY:  I'm sorry.  Could you read back
8    the question.
9        (Whereupon the portion of the record
10           was read as requested.)
11   A    It's not applicable to this situation.
12   BY MR. BURDEN:
13   Q    Why do you say that?
14   A    Because what you're -- real results
15   and what this is talking about, this is talking
16   about a hypothetical situation.  It has nothing to
17   do with the program.
18   Q    Well, set aside Exhibit 141, if you
19   would, please, and just let me ask you the question
20   were there any clients of yours at Long Leaf that
21   made $6,000 in investment income in a year in --
22   let me finish.
23       MR. MAY:  Yeah.  You can't answer
24   his question until he's done asking it.

Page 297

1 BY MR. BURDEN:
2   Q   -- in 12 months from Long Leaf Trading?
3   A   It's not applicable.  It has no --
4 either you're not understanding what is being said
5 here or --
6   Q   Well, I want to get away from
7 Exhibit 141 because I hear what you're saying
8 and I understand.  But I'm asking you a separate
9 question, which is did you have any clients that
10 made $6,000 in profit over the course of a year at
11 Long Leaf Trading?
12   A   It's possible.
13   Q   Okay.  What were the names of those
14 clients, please.
15   A   I don't recall.
16       MR. BURDEN:  I'll tell you what.
17   Let's take a break then, if we could, please.
18   I'll fetch you guys some water.
19       (Whereupon a recess was taken from
20       10:30 a.m., to 10:55 a.m., after
21       which the following proceedings
22       were had:)
23       MR. BURDEN:  Back on, please, Mary.
24   Thanks.

Page 298

1       (Whereupon  CFTC  Exhibit  No.  142
2       was marked for identification.)
3   Q   All right.  Mr. Ruth, I want to hand
4 you what I've marked as CFTC Exhibit 142.  Take
5 a moment to look over the document, please, and let
6 me know when you're finished.
7   A   I'm ready.
8       MR. MAY:  I'm ready as well.
9 BY MR. BURDEN:
10   Q   Mr. Ruth, do you recognize the documents
11 we've marked as CFTC Exhibit 142?
12   A   No.
13   Q   All so.  Did you and Mr. Evans while
14 you were working at Long Leaf Trading use a chat
15 system in the office?
16   A   Possibly.
17   Q   All right.  So I want to show you this
18 document and ask you some questions about it.  It
19 says here -- it says Jeremy Ruth 1:13 p.m., and it
20 reflects a chat that says -- and I'm skipping ahead
21 in the chat.  It essentially says that a customer
22 "was looking for a track record and you were trying
23 to give him live rec's instead.  Did you send
24 anything to him?"  And Mr. Evans writes, "No, we

Page 299

1 don't do track records," and you wrote, "Understood.
2 How are we going to approach him from here on out?"
3 And then Mr. Evans appears to write, "Same as all
4 customers.  We will have to present him new trade
5 rec's as they come out."
6       Do you recall any discussions
7 with Mr. Evans about providing track records to
8 customers?
9   A   No.
10   Q   All right.  Did you ever provide a track
11 record to any customer of yours?
12   A   Not that I recall.
13   Q   Was that pursuant to a policy at Long Leaf
14 Trading?
15   A   Yes, I guess.
16   Q   Why do you say that?
17   A   Well, there is no track record for what
18 we do.
19   Q   Why do you say that?
20   A   Because it doesn't meet the requirements
21 from like either the CFTC or NFA in regards to track
22 records, the style of trading.
23   Q   All right.  So when you say it doesn't
24 meet the requirements for the CFTC, what do you

Page 300

1 mean?  What requirements are you referring to?
2   A   I don't know.  I think like it has --
3 you know, everybody has to be doing the same thing
4 or the same -- I think it more applies to like CTAs
5 and CPOs than what we were doing.
6   Q   So this CFTC requirement that you're
7 discussing, did you ever read that requirement, that
8 regulation?
9   A   About track records?
10   Q   Sure.
11   A   Yeah, I think it's in -- I don't know
12 if it's a CFTC thing.  Maybe it's an NFA thing.
13 I'm not quite sure, but I've read something about
14 it.
15   Q   All right.  And where did you read
16 that?  Like did you read it at work or somewhere
17 else?
18   A   Yes.
19   Q   Was this something that Mr. Evans showed
20 you?
21   A   No.  I think it was -- I read it in
22 preparation for the Series 3.
23   Q   Okay.  Well, let's set aside your
24 interpretation of track record for a moment, and

Page 301

1 I'll ask did you ever provide any of your customers
2 with historical trading results for Long Leaf
3 customers?
4    A    Not that I recall.
5    Q    So why not?
6    A    Why did I not do it?
7    Q    Yeah.
8    A    Because, I don't know, past performance
9 isn't indicative of future performance. I don't
10 think it benefits you.
11    Q    Why don't you think it benefits
12 a person to know what a firm's previous trading
13 history did for their customers?
14    A    Because you can't -- there's no indication
15 it's going to happen in the future.
16    Q    But don't you think it would be relevant
17 to customers to know if a firm had no track record
18 or if the historical results for customers was bad?
19 Do you think that would be important to a customer?
20       MR. MAY:  That's --
21    A  I don't --
22       MR. MAY:  Hold on.  There's two
23    questions pending.  Do you want me to have
24    the court reporter read it back to you because

Page 302

1    I think it's a compound question.  So you
2    might be a little confused.
3 BY MR. BURDEN:
4    Q    Are you confused?
5    A    I'm not confused.  You're on both
6 sides of the fence.  You're telling me that you
7 don't want me to send out a track record, and then
8 now you're saying why don't you send out a track
9 record.
10    Q    No, no, no, I'm not telling you anything.
11    A    Yeah, you are.
12    Q    I'm just asking you questions.
13       MR. MAY:  Don't look for any implicit
14    meaning.  Just answer his questions, okay?
15    A    I have no comment.
16 BY MR. BURDEN:
17    Q    All right.  Was there a policy at
18 Long Leaf to not provide customers with historical
19 trading results?
20    A    I can't answer that because there
21 is not historical trading results because it's
22 individualized for each individual person.  So
23 there's not -- some people have different strikes.
24 Some people have different, you know, premium

Page 303

1 collection and things of that nature.  So there
2 isn't like a set standard for what is going on.
3 So like the question just doesn't apply to those
4 situations.
5    Q    Well, you see why I'm asking
6 this question because, you know, it appears
7 in Exhibit 142 like you were asking to provide
8 a customer with a track record.  And it sounds
9 like Mr. Evans says -- in fact he writes here, no,
10 we don't do track records.  Do you recall any
11 discussions with Mr. Evans about that?
12    A    I don't think that's what this says
13 at all.
14    Q    What do you think it says?
15    A    It says Harry Kaplan -- I think I'm
16 memorializing a conversation with him.
17    Q    Got it, okay.  So what are you
18 memorializing then, please.
19    A    That Harry Kaplan was a guy that he
20 talked to that wouldn't let you do a real demo
21 and requested that you send him information, was
22 looking for a track record and you were trying to
23 give him live rec's instead.  Did you send him
24 anything.

Page 304

1    Q    And so how does Mr. Evans respond in
2 Exhibit 142?
3    A    "No, we don't do track records."
4    Q    Do you have any understanding of why
5 Mr. Evans would say that?
6    A    Why?
7    Q    Yeah.
8    A    I mean, you've got to understand I've
9 been a licensed commodity broker here for like
10 30 days.  So I think I'm just like learning what's
11 going on.
12    Q    Okay.  So it sounds like you don't know
13 why he said that?
14    A    I'm asking him how we're supposed to
15 proceed with soliciting this customer, potential
16 customer.
17    Q    Got it.  And did you ever talk
18 to Mr. Evans about providing track records to
19 customers?
20    A    No.
21    Q    Why not?
22    A    Because you -- we don't -- from a
23 solicitation standpoint and the program doesn't fit
24 the requirements to be able to lawfully or within

Page 305

1 regulations provide a track record.
2    Q   Did you consult an attorney about that
3 question?
4    A   Me?  No.
5    Q   All right.  Let's put this one aside,
6 if we could, please.
7    A   (Witness complies).
8           (Whereupon CFTC Exhibit No. 143
9           was marked for identification.)
10    Q   I want to hand you what I've marked as
11 CFTC Exhibit 143, and take a moment to look it over,
12 if you would, please.
13    A   I'm ready.
14    Q   All right.  Mr. Ruth, do you recognize
15 CFTC Exhibit 143?
16    A   No.
17    Q   All right.  So I'm going to ask you
18 some questions about it anyway.  Do you recall
19 this exchange?
20    A   No.
21    Q   All right.  Exhibit 143 reflects that
22 Jeremy Ruth at 8:48 a.m. on November 4, 2015 writes,
23 "Any word on my grandpa's check?"  And it looks like
24 this is a series of messages with Mr. Evans.  Do you

Page 306

1 know what this might be referring to?
2    A   I don't recall.
3    Q   Did your grandpa, your grandfather invest
4 with Long Leaf Trading?
5    A   No.  He had an account at Long Leaf
6 Trading.
7    Q   Sorry.  He did?
8    A   Yeah, he was a customer.
9    Q   Oh, what was your grandfather's name,
10 please.
11    A   Mike Bruno.
12    Q   Did you have any other family members
13 that had accounts at Long Leaf Trading?
14    A   No.
15    Q   How did your grandfather's account perform
16 at Long Leaf Trading?
17    A   I don't recall.
18    Q   Did you not talk to your grandfather
19 about it?
20    A   I just don't recall.  This was four years
21 ago.
22    Q   Do you know how much Mr. Bruno invested?
23    A   I don't know.  Maybe $5,000.
24    Q   All right.  And how much of that did

Page 307

1 Mr. Bruno get back when he closed his account?
2    A   I don't recall.
3    Q   Were you Mr. Bruno's broker?
4    A   Yes.
5    Q   All right.  And did Mr. Bruno trade
6 pursuant to the Time Means Money program?
7    A   I don't recall.
8    Q   Did you give your grandfather any special
9 recommendations?
10    A   I don't recall.
11    Q   Where does your grandpa live?
12    A   My grandpa's deceased.
13    Q   I'm sorry to hear that.  Did you have
14 any other family members that invested with Long
15 Leaf Trading?
16    A   No.
17    Q   Did you invest with Long Leaf Trading?
18    A   When you say "invest with," what do you
19 mean by that?
20    Q   Yeah.  I guess the right way to put
21 it is did you give any of your money to Long Leaf
22 Trading to trade pursuant to the Time Means Money
23 program?
24    A   No.

Page 308

1    Q   All right.  So let's look at the
2 second line of Exhibit 143, please.  Jeremy Ruth
3 writes, "Also, can I get a performance statement
4 to go over with Art Rieck?"  Do you know who Art
5 Rieck is?
6    A   No.
7    Q   Let's put this one aside, if we could,
8 please.
9    A   (Witness complies).
10    Q   Who is Luis Molina?
11    A   He's a broker at Long Leaf.  I think
12 it's Luis, though.
13    Q   Oh, thanks.  So was he a junior broker
14 or a senior broker, please.
15    A   I don't know his title.
16           (Whereupon CFTC Exhibit No. 144
17           was marked for identification.)
18    Q   All right.  I want to hand you what
19 I've marked as CFTC Exhibit 144.  And take a look
20 at it, please, and tell me when you're done looking
21 at it.
22           MR. MAY:  Are you ready, Jeremy?
23           THE WITNESS:  Yes.
24

Page 309

1 BY MR. BURDEN:
2    Q    So, Mr. Ruth, I want to direct
3 your attention to the second numbered item on
4 Exhibit 144. If you look at the top, Mr. Molina
5 writes -- it says, "Write three questions you have
6 about Time Means Money, any investment vehicle,
7 geopolitical issues, politics, market correlations,
8 historical events, et cetera," and then it looks
9 like he's writing three questions here.
10        Did you ask Mr. Molina to write these
11 three questions?
12    A    No.
13    Q    Do you have any knowledge or
14 understanding of why he would have written these
15 questions to you rather than, you know, somebody
16 else?
17    A    I think if I recall, I don't know
18 specifically, but we would have like a morning
19 meeting. And I think he is giving me questions
20 to -- and I would put questions together from
21 everybody to then ask Tim Evans so that he could
22 like explain the stuff to people.
23    Q    Got it. So the second item here
24 Mr. Molina writes, "I had a prospect yesterday

Page 310

1 that insisted on a track record. I explained
2 to him that past performance is not indicative of
3 future performance. Also, that everything we do
4 here is custom to each individual, so everyone's
5 return is different. He said he is looking for
6 consistency and without a track record, wouldn't do
7 business. What would be a better way to approach
8 this?" Do you recall answering this question?
9    A    No.
10    Q    Do you remember what Mr. Evans'
11 answer was to this question, if he answered it?
12    A    I don't recall.
13    Q    All right. Let's put that one aside,
14 if we could, please.
15    A    (Witness complies).
16        (Whereupon CFTC Exhibit No. 145
17        was marked for identification.)
18    Q    All right. I want to hand you what
19 I've marked as CFTC Exhibit 145, and let me know
20 when you're ready to talk about this, please.
21    A    I'm ready.
22    Q    All right. Mr. Ruth, do you recognize
23 CFTC Exhibit 145?
24    A    No.

Page 311

1    Q    All right. Who's James Hatzigiannis?
2    A    He's a broker at Long Leaf.
3    Q    All right. So Exhibit 145 appears to be an
4 exhibit from Mr. Hatzigiannis to you and Mr. Prieto,
5 and the subject is Super Team Assignment. Do you
6 have any knowledge or understanding of what super
7 team refers to?
8    A    Don't recall.
9    Q    All right. So Mr. Hatzigiannis
10 begins the email by addressing it to you and to
11 Vince, and there's some questions at the bottom
12 and I want to focus in on the last question here.
13 So Mr. Hatzigiannis writes, "If someone says
14 I won't set the appointment unless you tell me
15 your annual return, do we tell him or just not set
16 him?" Did you respond to this question?
17    A    I don't recall.
18    Q    Do you recall if anybody else, such as
19 Mr. Prieto, responded to this question?
20    A    I don't recall.
21    Q    All right. So, you know, we've
22 been sort of going back and forth about your
23 definition of track record and why you feel like
24 it's not applicable. So I think this might be a

Page 312

1 good jumping-off point to find some common ground
2 on that. Mr. Hatzigiannis talks here about an
3 annual return.
4        Did you ever provide an annual
5 return or average annual return for customers
6 in the Time Means Money program to anybody you were
7 soliciting?
8    A    Not that I recall.
9    Q    Why not?
10    A    Because it's not appropriate.
11    Q    Why do you think that?
12    A    Because I'm a -- well, I was a licensed
13 commodity broker and it's not appropriate.
14    Q    But what is your basis for saying that
15 it's not appropriate?
16    A    I don't know. Everything in that book
17 probably tells you not to.
18    Q    What book are you referring to?
19    A    The CFTC Exchange Act, the Commodity
20 Futures Exchange Act.
21    MR. MAY: Which color book are you
22 referring to?
23 BY MR. BURDEN:
24    Q    What --

Page 313

1    MR. MAY:  Well, no.  That actually is
2  a real question because there are two books
3  over there.
4    THE WITNESS:  Both of them.
5    MR. MAY:  Okay.
6  BY MR. BURDEN:
7    Q   All right.  So what provisions
8  of the Commodity Exchange Act or accompanying
9  regulations do you believe make it inappropriate
10  to share average annual returns of customers
11  participating in the Time Means Money program?
12    A   Well, I don't know specifically
13  like what sections of the Act or anything of
14  that nature, but there is no average annual return
15  because everybody does -- not everybody has the same
16  trades.  And, furthermore, you have people coming in
17  and out of the program at different times and things
18  of that nature so ...
19    Q   Well, you had suggested before
20  that you think that there's something in the Act
21  or the regs that would prohibit you from sharing
22  customer returns.  Is that what you're getting at?
23    A   That would prevent you from sharing
24  customer returns?

Page 314

1    Q   Yeah.
2    A   Yeah.  It's my understanding that
3  there's certain things that have to I guess
4  qualify in order for you to be able to put together
5  some sort of document that shows what your annual
6  return is.
7    Q   Okay.  So --
8    A   And this program and the way that
9  it's run and the customers that are involved and the
10  results, they don't fit in any of the requirements
11  needed to qualify to be able to do so.
12    Q   So where did you get that idea from?
13  Did somebody tell you?  Did you read it?
14    A   The internet, speaking with people.
15    Q   Who did you speak with?
16    A   Tim Evans.
17    Q   Okay.  What else?  Sorry I interrupted you.
18    A   I don't know.  Just, again, studying
19  for the Series 3 from like a textbook.  I think it
20  says it on like some sort of disclosures and things
21  of that nature.  I don't know.  It's -- a lot of
22  places.
23    Q   All right.  Did you consult any attorneys
24  about that?

Page 315

1    A   No, I -- the compliance officer at my
2  firm told me that.
3    Q   And that's Tim Evans?
4    A   Yes.
5    Q   So Tim Evans told you that you were
6  forbidden from providing average rates of return
7  for customers participating in the Time Means Money
8  program?
9    A   I don't know if he said that
10  specifically, but essentially giving people results
11  is not something -- we don't meet the requirements
12  in order to be able to do so.
13    Q   Okay.  Did Mr. Evans tell you this in
14  like an email or a chat?
15    A   I don't recall.
16    Q   Do you know when he --
17    A   Actually, I can tell you one time he
18  told me.  Going back to Exhibit 142 it says, "No,
19  we don't do track records," on 6/1/2015 at 1:22 p.m.
20    Q   No.  Yeah, I understand.  We talked about
21  that one.
22    A   Well, that's an example -- that answers
23  your question.
24    Q   Well, what I'm interested in is when

Page 316

1  Mr. Evans told you that this was precluded by the
2  CFTC Act or regs.
3    A   I don't know specifically.  This is four
4  to -- two to four years ago.
5    Q   All right.  Do you remember if it was a
6  conversation in person?
7    A   I don't recall.
8    Q   Was anybody else present during --
9    A   I don't recall.
10    Q   -- that conversation?  You've got to
11  let me finish, if you would, please.  Was anybody
12  else present during the conversation?
13    A   I don't recall.
14    Q   All right.  Let's put that one aside,
15  if we could, please.
16    A   (Witness complies).
17    Q   All right.  Mr. Ruth, I want to hand you
18  what I've marked as CFTC Exhibit 110.
19    MR. MAY:  110?  Did we use -- is
20  this one of the ones you used last time?
21    MR. BURDEN:  No.
22    Q   So take a look at it for me, if you
23  would, please, and tell me when you're ready to
24  proceed.

Page 317

1      MR. MAY:  Are you ready, Jeremy?
2      THE WITNESS:  Yes.
3 BY MR. BURDEN:
4    Q    Mr. Ruth, do you recognize CFTC
5 Exhibit 110?
6    A    No.
7    Q    All right.  So if we look at CFTC
8 Exhibit 110, the first email in the chain purports
9 to be from Jeremy Ruth.  It's dated April 27, 2017
10 to Mr. Leeney and Mr. Prieto and the subject is
11 Calls to Review and the email reflects Jeremy
12 Ruth writing, "Bros, here are some calls I think
13 are worth the listen," and then I guess it talks
14 about some calls.  Was reviewing calls something
15 that you would do with other brokers at Long Leaf?
16    A    What do you mean by reviewing calls?
17    Q    Well, the calls that you made were
18 recorded, correct?
19    A    Some.
20    Q    And you understood that, right?
21    A    That some were recorded?
22    Q    Yeah.
23    A    Yes.
24    Q    Well, would you go back and listen

Page 318

1 to them by yourself with other brokers?
2    A    At times.
3    Q    All right.  So do you know who Jerry
4 Krantz is?
5    A    No.
6    Q    All right.  So in this email that
7 purports to be from Jeremy Ruth in Exhibit 110
8 it says, "Jerry Krantz:  Broker Premier, started
9 from a Pierre fuck-up but the value in this call
10 is how to get around a request for a track record
11 and how to show empathy so he feels you understand
12 him."  And you say, "Let me know if you have any
13 questions," and then Mr. Leeney responds, "Thanks,
14 Bra."  So did you write this?
15    A    It appears so.
16    Q    All right.  This suggests, or suggests
17 to me anyway, that there's value in getting around
18 a request for a track record and showing empathy.
19 What is that value?
20    A    I don't agree with that statement.
21    Q    Okay.  Well, correct me, if you would,
22 please.
23    A    I mean, I don't think you're -- what
24 did you say exactly?

Page 319

1      MR. MAY:  Do you want to the court
2 reporter to read it back?
3      THE WITNESS:  Yeah.
4      MR. BURDEN:  You know what, I think
5 I can probably ask it a little bit better.
6    Q    So what is the value in getting around
7 the request for a track record?
8    A    I don't think -- I think you need to take
9 away the word value.
10    Q    Okay.  So --
11    A    I think the value is in listening to
12 the call.
13    Q    You say --
14    A    I don't think the value is in getting
15 around a track record.
16    Q    But it says, "The value in this call
17 is how to get around a request for a track record."
18    A    Yeah.  So it's referring to like from
19 a development standpoint that you can get value from
20 this call by learning how to get around a request
21 for a track record.
22    Q    All right.  But why is that valuable?
23 Like why is that a good thing that other brokers
24 would want to learn?

Page 320

1    A    Because, I mean, you can't give out
2 a track record, and so a lot of people get stumped
3 by that question.  And so how to get around it is by
4 telling them that you can't give out a track record
5 and being honest about it.
6    Q    All right.  Let's put this one aside then.
7    A    (Witness complies).
8        (Whereupon CFTC Exhibit No. 146
9        was marked for identification.)
10    Q    All right.  Mr. Ruth, I want to hand
11 you what I've marked as CFTC Exhibit 146, and please
12 read the document and let me know when you've
13 finished reviewing it.
14      THE WITNESS:  Are you ready?
15      MR. MAY:  Not yet.  Ready.
16    A    Yes.
17 BY MR. BURDEN:
18    Q    All right.  Mr. Ruth, I want to ask you
19 if you recognize CFTC Exhibit 146.
20    A    I don't.
21    Q    All right.  So I'm going to ask you
22 some questions about it anyway.  So there's an
23 email here from Mr. Evans dated September 19, 2016
24 to the broker team.  Were you a member of that

Page 321

1 broker team?
2    A    It appears so.
3    Q    All right.  So Mr. Evans writes here,
4 "Going through the numbers, there are some obvious
5 and urgent changes that need to be made.  First off,
6 the junior guys suck on the phone.  This needs to
7 change and these guys need to know that they need
8 to.  I did my best today with Mark, Brendan, Luis
9 and James to make them understand their performance
10 is shit and it needs to change now."  Who are Mark,
11 Brendan, Luis and James?
12    A    They're brokers at Long Leaf.
13    Q    All right.  What's Mark's last name,
14 please.
15    A    Couldn't tell you.
16    Q    What's Brendan's?
17    A    Maybe Brendan Sears.
18    Q    Luis is Luis Molina, correct?
19    A    Yeah.
20    Q    Yes?
21    A    Yes.
22    Q    And James is -- is that James Leeney?
23    A    That's probably James Hatzigiannis.
24    Q    Very good, thank you.  So are these

Page 322

1 the junior guys that Mr. Evans is referring to?
2    A    I believe so.
3    Q    All right.  So are there junior brokers
4 and senior brokers?
5    A    Yeah, I guess.
6    Q    So --
7    A    It's like a team-based environment, yeah.
8    Q    Got it.  So why are Mark, Brendan, Luis
9 and James junior guys and you're a senior guy?
10    A    I think it's just because I've been there
11 longer.
12    Q    Is there a division of roles or was
13 there a division of roles between the junior brokers
14 and the senior brokers?
15    A    Yeah.  It was, like I said, a team-based
16 environment.
17    Q    All right.  So what did the junior
18 brokers do that the senior brokers didn't do?
19    A    Nothing.
20    Q    What did the senior brokers do that the
21 junior brokers didn't do?
22    A    Communicate with clients and I guess
23 broker accounts, if you want to call it that.
24    Q    Got it, okay.  And the junior guys didn't

Page 323

1 do those things?
2    A    Correct.
3    Q    What did they do then?  That seems like
4 the whole job.
5    A    They would be the beginning stages of
6 the sales solicitation process.
7    Q    Got it.  And what are the beginning stages
8 real quick?
9    A    Like setting up an initial appointment
10 through like a cold call and running what we call
11 like a demonstration.
12    Q    Okay, thanks.  So let's continue on
13 in this first paragraph in Exhibit 146.  Mr. Evans
14 refers to the junior guys' performance as not being
15 good and he says, "But it is going to require
16 follow-through from you guys to make sure when
17 they come back to you as changes people" -- I think
18 that's a typo -- "that we go down a different path.
19 Let's get rid of the idea we are all pals.  They
20 work for you.  You pay them.  They should do what
21 you tell them to do.  Unless they are producing,
22 they are taking money out of your pocket and
23 putting it in theirs.  This shit isn't supposed
24 to work like that, clearly."

Page 324

1        So Mr. Evans appears to write
2 here that you pay them.  Did you pay junior brokers?
3    A    I don't know how to explain this, but
4 like he paid them but he would deduct money from us
5 to pay them I guess or -- yeah.
6    Q    So it didn't come out of your pocket?
7    A    It did.
8    Q    Okay.
9    A    Technically.  Like it would be on
10 your payout, though.  It wasn't -- so I think like
11 maybe we went like half and half, so I think they
12 had like a set salary of like 1500 bucks a month
13 or something like that.
14    Q    So did you have your own junior guys or
15 did everyone kind of share them?
16    A    They kind of shared them I guess,
17 but I think his idea originally was we were supposed
18 to have our own.  I don't think it worked.
19    Q    So who was originally supposed to be yours?
20    A    I don't know.  I don't recall.  I know
21 maybe Luis if I -- but then, I mean, I don't know.
22 I think I might have had them all.  I don't know.
23    Q    All right.  So could you hire or fire these
24 junior brokers?

Page 325

1    A    I don't know.

2    Q    Did you fire any of these junior brokers?

3    A    I don't think so.

4    Q    Were any of the junior brokers fired?

5    A    What, like these four?

6    Q    Any junior broker.

7    A    Oh, I would assume, yeah.

8    Q    Well, who?

9    A    I don't know their names, but there

10   was other ones.  I mean, I think you try to --

11   you know, you hire seven and like some guy doesn't

12   show up.  I think he gets fired, you know,

13   something like that.

14   Q    Well, did you fire anybody?

15   A    I think -- if I recall, maybe one

16   time Tim had asked me to, you know, like pass

17   a message to somebody that they were no longer

18   working there.  But I don't -- I mean, it wasn't

19   like I made that decision or anything of that

20   nature.

21   Q    And who was it that you passed this

22   message to?

23   A    What is this kid -- I don't remember what

24   the kid's name was.

Page 326

1    Q    And was he a junior broker?

2    A    Yeah.

3    Q    All right.  Did you get to hire any

4    junior brokers?

5    A    No.

6    Q    Did you get to interview any prospective

7    junior brokers?

8    A    I would sit in like with Tim on interviews

9    sometimes.

10   Q    Did you have like a say in who got hired,

11   like a vote or input?

12   A    Not that I'm aware of.

13   Q    Well, did you tell Mr. Evans who

14   you thought did well or didn't do well or who he

15   should hire or not?

16   A    No.

17   Q    So why did you sit in on the interview

18   then?

19   A    I don't -- I mean, I don't know.

20   Q    All right.  Let's put this one aside,

21   if we could, please.

22   A    (Witness complies).

23

24

Page 327

1            (Whereupon CFTC Exhibit No. 147

2            was marked for identification.)

3    Q    All right.  Mr. Ruth, I want to hand

4    you what I've marked as CFTC Exhibit 147.  Let me

5    know when you've finished reviewing it, please.

6         MR. MAY:  Are you ready, Jeremy?

7         THE WITNESS:  Yes.

8    BY MR. BURDEN:

9    Q    Mr. Ruth, do you recognize CFTC

10   Exhibit 147?

11   A    No.

12   Q    All right.  So it's an email that appears

13   to be from you from jruth@longleaftrading.com to a

14   bunch of other people dated February 6, 2017.

15   Who is Michael Bauer, please.

16   A    He was a broker at Long Leaf Trading Group.

17   Q    All right.  So all the guys in the To field

18   are brokers, correct?

19   A    Yes.

20   Q    All right.  And the subject is Demo

21   Flake Attempting Reschedule New List.  And the

22   email reflects that Jeremy Ruth is writing, "Team,

23   we have not been doing a good job resetting demos.

24   The resets are not of quality and they are not

Page 328

1    happening.  To change this outcome I have created

2    a new dialer list for all of you to access entitled

3    'Demo Flakes - Be Relentless.'"  Is this something

4    that you wrote?

5    A    It appears so.

6    Q    So this Demo Flakes Be Relentless dialer,

7    what's that, please.

8    A    It's like a -- through the CRM you

9    can create lists for, you know, people to call.

10   Q    And did you do that here?

11   A    That's what it says, yeah.

12   Q    All right.  So jumping to the next

13   paragraph the email says that Mr. Ruth is writing,

14   "We need to hit this list and hit it hard.  If

15   you are smart, you would go ham on this list sooner

16   rather than later.  It's first come first served.

17   I'll be keeping stats on this list and making

18   adjustments to my strategy in regards to demo

19   flakes attempting reschedule based on those stats."

20   How did you keep track of these stats, please.

21   A    I don't recall.

22   Q    What adjustments did you make to the

23   strategy regarding demo flakes?

24   A    I don't recall.

Page 329

1   Q   Was this program a success?

2   A   I don't recall.

3   Q   So why are you the guy that's

4 sort of taking charge of this attempt to reduce

5 demo flaking?

6   A   Why am I?

7   Q   Yeah.

8   A   Well, it's a team-based environment.

9 So these guys set demos and if the people don't show

10 up, then I don't have anything to do.  So I probably

11 wanted something to do.

12   Q   All right.  Let's put that one aside,

13 if we could, please.

14   A   (Witness complies).

15   Q   All right.  So, Mr. Ruth, how were

16 your customers at Long Leaf Trading able to keep

17 track of the profit and loss from their trading?

18   A   How were they?

19   Q   Yeah.

20   A   I would assume from their account

21 statements.

22   Q   Okay.  So the customers get account

23 statements from -- when you were there -- Gain,

24 right?

Page 330

1   A   Yes.

2   Q   All right.  So did they get any kind

3 of statement from Long Leaf saying how they're

4 doing?

5   A   No.

6   Q   Why not?

7   A   Because the official record of their

8 account is the account statement.

9   Q   All right.  Did customers express

10 confusion to you about the account statements they

11 received from Gain?

12   A   Yes.

13   Q   Was that a fairly frequent occurrence?

14   A   I think it's a frequent occurrence for

15 everybody who has a futures account.

16   Q   Why is that?

17   A   Because the statements are confusing.

18   Q   All right.  You just saved yourself four

19 exhibits.

20      MR. MAY:  Want to share them with me just

21 in case I want to use them?

22      MR. BURDEN:  Yeah.  I mean, they're

23 customers complaining about how the statements

24 are confusing.

Page 331

1      MR. MAY:  Okay.

2      THE WITNESS:  I don't think that's a me

3 issue or a Long Leaf issue, though.

4      MR. MAY:  Yeah.  I think you said it was --

5      THE WITNESS:  Yeah.

6 BY MR. BURDEN:

7   Q   So this is what I want to ask about.

8 I'm not allowed to have an opinion on this in

9 testimony, but you can imagine what it is since

10 everybody thinks that these Gain statements are

11 confusing and difficult to follow.  And you think

12 that, right?

13   A   I did at one time, yeah.

14   Q   Yeah.  But you get them now?

15   A   Yeah.

16   Q   But imagine if you're a retail

17 customer, it would be hard to make heads or tails

18 of.  Do you think that's right?

19   A   Yeah, I agree.

20   Q   All right.  So my question is why

21 didn't Long Leaf as a company -- I'm not talking

22 about you in particular necessarily, though we'll

23 get to that.  So did you -- do you have an

24 understanding of why Long Leaf didn't tell clients

Page 332

1 sort of how they were doing on a day-to-day or

2 month-to-month or trade-by-trade basis?

3   A   Well, the official record of the

4 account is the account statement.  So I don't

5 think you're allowed to within regulations provide

6 them anything else besides their account statement

7 and --

8   Q   So -- sorry.

9   A   So they had daily statements.

10 They have access to a platform that can show

11 them I guess what's going on in real time.

12 I mean, there's many different ways that they

13 could obtain that information, and I think it's

14 the responsibility of the client to know what

15 they're doing as well.

16   Q   All right.  Well, let me ask you this.

17 Did you ever ask Mr. Evans why Long Leaf didn't

18 just tell customers how the trades did after they

19 closed?

20   A   Did I ever ask him why?

21   Q   Yeah.

22   A   Not that I recall.

23   Q   Did you ever wonder?

24   A   I mean, I already know the answer,

Page 333

1 though.  So --
2    Q    What's the answer?  What's the answer?
3    A    You can't provide a client anything outside
4 of the account statement.
5    Q    Why do you think that?
6    A    Because I think that's the rules and
7 regulations call for that.
8    Q    Well, what rules or regulations say that?
9    A    I don't know specifically, but I know
10 it's somewhere in there.
11    Q    All right.  So is this something that
12 somebody told you?  Did you find it yourself?
13    A    I've -- in preparation for the Series 3,
14 I think I read about it.  I've read about it in
15 other things.  Look at -- reading NFA complaints
16 and decisions I get the impression that, you know,
17 people are giving false statements to clients.
18 I don't know.  Reading about Bernie Madoff and
19 him providing false statements to his clients,
20 I think --
21    Q    Well, I want to --
22    A    -- it's pretty obvious that you
23 shouldn't give anybody anything except for the
24 official statement of their account, which is a

Page 334

1 statement provided by Gain Capital which is sent
2 to them.
3    Q    So I want to push --
4    A    And we confirm that they can open the
5 statements and that they've read statements and
6 things of that nature periodically throughout the
7 account.
8    Q    So I want to push back on that a little
9 and explore.  Certainly you can't provide customers
10 with false statements.  You understand that, right?
11    A    Yes.
12    Q    But what about true statements
13 of how their trades did?  Your testimony is that
14 you believe it's against the rules?
15    A    Yes.
16    Q    All right.  What rules is it against?
17    A    I don't know specifically.
18    Q    Did somebody tell you it was against
19 the rules?
20    A    Yes.
21    Q    Who told you that?
22    A    Tim Evans.
23    Q    Anybody else?
24    A    During the time period that we're talking

Page 335

1 about, no, that would be it.
2    Q    All right.  What about after the time
3 period?
4    A    I mean, Ryan Griffith told me.
5    Q    All right.  And who's Ryan Griffith?
6    A    He's an AP at Postrock Trading Group.
7    Q    All right.  Anybody else tell you that
8 you can't share true information with customers
9 about account performance?
10    A    No.
11    Q    All right.  So when Mr. Evans
12 told you that you can't provide customers with
13 truthful information about how their trades did --
14    A    Oh, that's not what I'm saying.
15    Q    Okay.  What are you saying?
16    A    I'm saying that you can't make
17 a document, outside of their account statement,
18 and send it to them that has anything to do with
19 account performance.
20    Q    Got it, okay.  So did Mr. Evans tell
21 you that?
22    A    Yes.
23    Q    When did he tell you that?
24    A    Since the day I started.

Page 336

1    Q    All right.  Well, am I going to find
2 any emails or texts or chats?
3    A    I don't recall.
4    Q    All right.  Did he tell you this verbally?
5    A    I don't recall.
6    Q    Do you recall if there were other people
7 there when he told you this?
8    A    A lot of times when things were
9 communicated of this nature, it would be like
10 senior brokers around.  So it could be Tony Klancic,
11 Vince Prieto, James Leeney.  I don't recall
12 specifically, but those would be the people.
13    Q    Got it.  Did you consult an attorney
14 with respect to this?  Did you ever ask an attorney,
15 hey, is it okay to provide customers with things --
16    A    No, I never had an attorney as an
17 AP.  I have a compliance department.  I go to
18 the compliance department.  If I have any questions,
19 the compliance officer tells me that is the rule
20 of the law.
21    Q    All right.  And that compliance department
22 is Tim Evans, right?
23    A    Yes.
24    Q    Is Tim Evans an attorney, do you know?

Page 337

1    A    Not that I know of.
2    Q    Did you ever call the NFA and ask if it
3 was okay to provide --
4    A    No, it's not -- it's inappropriate
5 because it's -- again, I have an internal compliance
6 department.  I go to the compliance department.
7 The compliance department tells me what to do.
8    Q    So you never called the NFA and asked?
9    A    No.  It's not appropriate for an AP
10 to do that because an AP has a chain of command,
11 which is to go to your compliance department.
12    Q    Well, I want to push back a bit
13 on this, your view that it's inappropriate,
14 or let's say explore it.  So you think that it's
15 inappropriate for you to ask questions of the NFA
16 because there's a chain of command?
17    A    Yes.
18    Q    But do you think that the NFA would have
19 refused to answer your question?
20    A    I don't even know if there's a form for
21 the NFA to answer my question as an AP.
22    Q    Well, they have a phone number, right?
23    A    Correct.
24    Q    And they have a market regulation

Page 338

1 department that you're familiar with, correct?
2    A    No, I'm really not.  Do they actually
3 have one?
4    Q    Well, you've recently been subject
5 I understand to some interviews by NFA, correct?
6    A    Yes.
7    Q    And do you know what division of the
8 NFA that was or what department?
9    A    No clue.  Is that who I would call,
10 though?
11    Q    I can't answer your questions,
12 but I'll bet you can talk to your counsel about
13 it.
14    A    All right.
15        (Whereupon  CFTC  Exhibit No. 148
16         was marked for identification.)
17    Q    All right.  Mr. Ruth, I want to show you
18 what I've marked as CFTC Exhibit 148.  And please
19 review the document and indicate for me when you've
20 finished reviewing it.  And I should have mentioned
21 148 is a group exhibit.
22        MR. MAY:  I'll be ready in a few minutes.
23    Are you ready, Jeremy?
24        THE WITNESS:  Yes.

Page 339

1 BY MR. BURDEN:
2    Q    All right.  Mr. Ruth, do you recognize
3 the emails in Group Exhibit 148?
4    A    No.
5    Q    So I want to ask you some questions about
6 them anyway.  Let's turn, if we could, please, to
7 the second and third emails in the exhibit.  I'm not
8 going to ask you about the first one.  If you look,
9 there's an email from jruth@longleaftrading.com
10 dated June 22, 2017 to this odd string of characters
11 and numbers at route@ihance.net.  Do you know what
12 that is?
13        MR. MAY:  I'm sorry.  Could you --
14    are you referring -- there's two emails
15    apparently to that email address.  Are you
16    referring to the one at 12:21 p.m. or to the
17    one at 11:57 a.m.?
18        MR. BURDEN:  Well, let's just say
19    12:21 p.m. because it's the same for both.
20    Q    I just want to ask if you know what this
21 address is.
22    A    No.
23    Q    All right.  So it says Subject:
24 Long Leaf Trading Group Position Update and it

Page 340

1 says Barry.  Did you have a customer named Barry?
2    A    Not that I recall.
3    Q    All right.  So let's look, if we
4 could, please, to the second paragraph.  And I
5 want to focus on the last couple sentences in this
6 paragraph.  And the email reflects that Mr. Ruth is
7 writing, "When we are holding positions and a market
8 turns unexpectedly, obviously it's not a good thing.
9 But when we are then reinitiating the portfolio,
10 we are now capturing that existing volatility with
11 higher premiums on our option sales.  This is why
12 we tend to perform well coming out of these periods
13 where we take a loss."  Did you write that?
14    A    James Leeney wrote it.
15    Q    Well, what does that mean?
16    A    What do you mean?
17    Q    Well, did he send this email?  Did you
18 send the email?
19    A    I think it's -- he writes -- I think
20 going back to the first one, he like writes these.
21    Q    Yeah, so don't let this first one
22 trip you up.  I'm not sure why I attached it to
23 the group exhibit.  I'll just be honest with you --
24    A    I know.  But James Leeney -- like I don't

Page 341

1  do -- I wouldn't do market stuff.
2      Q    Got it.
3      A    So like he would write these emails
4  and then I would, you know, sometimes send it out
5  to the clients before I got on the phone with them.
6      Q    All right.  So now you'll see that
7  this email from Mr. Leeney to you, the first email
8  in 148, it's dated June 23, 2017.
9      A    Yeah.
10     Q    And you're sending these out on the
11  22nd.  I put these together, and maybe I shouldn't
12  have done.  That's the nature of a group exhibit.
13  I just want to make sure that you're testifying from
14  memory and not because you're looking at my goofy
15  exhibit and trying to figure out what it means.
16     A    Yeah.  I'm not saying that this
17  specific -- this is an example of an email that
18  he would send to me and then I would take -- like
19  copy, you know, portions of --
20         MR. MAY:  You're pointing to a page.
21      Perhaps we should identify which page in
22      Group Exhibit 148 that you're pointing to.
23  BY MR. BURDEN:
24     Q    All right.  So I think I can help

Page 342

1  with this.  So let's take a look, if we could,
2  please, at the --
3         MR. MAY:  Well, I cut you off, Jeremy.
4      Did you want to keep going?  I mean, I just
5      wanted you to clarify you were pointing to
6      the first page --
7         THE WITNESS:  Yeah.
8         MR. MAY:  -- of Group Exhibit 148.
9      A    The email would have been sent by me.
10  The content of the email is written essentially
11  by James Leeney.  This specific -- I'm not saying
12  that because of the, you know --
13  BY MR. BURDEN:
14     Q    Got it, okay.  That's what I'm making
15  sure of.
16     A    Because of this email, but like this
17  type of language isn't -- it's not necessarily
18  mine.
19     Q    Got it.  All right.  So looking at
20  this portion of Exhibit 148, it's Bates labeled
21  Long Leaf Trading 362715, and that's the email from
22  Jeremy Ruth sent June 22, 2017.  So your testimony
23  is that you sent this email but Mr. Leeney wrote
24  the text?

Page 343

1      A    Again, he sends like a blanket email
2  that's similar to the one on the first page, and
3  then I pick like a portion of it to put into my
4  message.
5      Q    Got it.  So is that Mr. Leeney's like
6  assigned job?  Like why does --
7      A    No, it was just --
8      Q    -- he do that?
9      A    This is like a month or two before
10  I left.  And, you know, I believe we were getting
11  more concerns about like performance, and these are
12  trades that I didn't like design or I didn't have
13  anything to do with.  So I'm just lending him
14  this like process of transferring information.
15  So I think it was more of he was assisting in that
16  because he's like the market guy I guess or next
17  in line to Tim.
18     Q    All right.  So when you talk about
19  concerns with performance I think you said, what
20  concerns did you have?
21     A    I didn't have concerns.
22     Q    So what are you talking about?
23     A    Like a client would come to me and
24  ask me more questions.  Like they were asking

Page 344

1  me deeper questions at the time about specifics
2  about the actual trade, and so I reached out to
3  other people to gather that knowledge because I
4  didn't have it firsthand because they're not my
5  trades.
6      Q    Got it.  So I want to point to this
7  last sentence -- I was going with this before --
8  where you say "we tend to perform well coming
9  out of these periods where we take a loss."  So
10  is that sort of Mr. Leeney's verbiage?
11     A    Yeah.  I think what he's saying is
12  is that you're getting lots of volatility at
13  the end of the option period, which is bad for
14  the current positions, but it's good for the next
15  positions because of the fact that if there's an
16  increase in volatility, that means there's increase
17  in premium collection, which means that when you
18  do win, you can win more and when you lose, you
19  can lose less because of the fact that you're
20  collecting more premium.
21     Q    All right.  And did that happen for
22  customers while you were at Long Leaf Trading?
23  Did their accounts tend to perform better coming
24  out of losing trades?

Page 345

1    A    I think there's times, yeah.

2    Q    And when were those times?

3    A    I couldn't tell you specifically.

4    Q    How many times did that happen,

5 that there was better performance after a period

6 of loss?

7    A    I couldn't tell you specifically, but it

8 happened.

9    Q    All right.  Let's put this one aside,

10 if we could, please.

11    A    Just to reiterate, all of these

12 communications that like when somebody does --

13 like, for example, James Leeney is designing

14 that email, that's all being routed through the

15 compliance department before it's going out to

16 a customer and being approved.  So it's not --

17 nothing like goes to a customer without it being

18 approved by the compliance department.

19    Q    And by that you mean Mr. Evans?

20    A    Yes.

21        (Whereupon  CFTC  Exhibit  No.  149

22            was marked for identification.)

23    Q    All right.  I want to hand you what

24 I've marked as CFTC Exhibit 149.  And take a minute

Page 346

1 with it, please, and let me know when you've

2 looked at it.

3        MR. MAY:  Hey, Ashley, we're about at

4    the 1 hour and 15-minute mark.  Do we -- and

5    it's around lunchtime.  Do we have an idea about

6    maybe when we're going to take a break, how long

7    we're going to break?

8        MR. BURDEN:  I mean, we're doing great

9    here.  If you want to take a break after this

10    exhibit, I'm happy to do that.  We'll come back

11    and do --

12        MR. MAY:  Okay.  I think maybe

13    when we're off the record, maybe we could

14    go through the exhibits that maybe I plan on

15    using this afternoon and narrow them down.

16        MR. BURDEN:  Okay.

17        MR. MAY:  But we don't have to do that

18    on the record.

19        MR. BURDEN:  All right.  Well, I'll

20    tell you what.  Do you want to do a break

21    after this exhibit?

22        MR. MAY:  I think it's, yeah, probably

23    time.  I probably want to check my emails.

24        MR. BURDEN:  Great, okay.  So let me

Page 347

1 know --

2        MR. MAY:  Check in with the office.

3        MR. BURDEN:  -- when you guys are ready

4    to talk about this one, please.

5        MR. MAY:  This is Exhibit 149?

6        MR. BURDEN:  Correct.

7        MR. MAY:  Are you ready, Jeremy?

8        THE WITNESS:  Yes.

9 BY MR. BURDEN:

10    Q    All right.  Mr. Ruth, do you recognize

11 CFTC Exhibit 149?

12    A    Yes.

13    Q    What is it, please.

14    A    It's an email --

15    Q    All right.

16    A    -- chain.

17    Q    And who's Chris Zolton?

18    A    He was a customer of mine.

19    Q    All right.  So Exhibit 149 reflects

20 Mr. Zolton writing to you and he says, "Hi, Jeremy.

21 What kind of return are we looking for?  Was it

22 12 percent annually or monthly?  Chris."  And you

23 see the email at the top which says, "You will get

24 to design that.  Normally with a 10K account my

Page 348

1 clients target $500 to $1,000 per month.  Obviously

2 there are going to be months when we don't win,

3 but getting an average of win in that range is

4 a realistic target."  So did you write that top

5 bit?

6    A    It appears so.

7    Q    All right.  So how many of your

8 clients at Long Leaf Trading had an average win

9 rate of 12 percent?

10    A    Well, if you read what I'm --

11        MR. MAY:  I'm sorry.  Did you --

12    was the question an average win rate of

13    12 percent?

14        MR. BURDEN:  Sure.

15    A    I'm not -- I don't know.  I don't --

16 I mean, you're inferring that by my statement

17 I'm saying that I represented that to him, which

18 I didn't.

19    Q    Okay.  Well, you say here, "Normally

20 with a 10K account my clients target $500 to $1,000

21 a month.  Obviously there are going to be months

22 where we don't win, but getting an average of win

23 in that range is a realistic target."

24        So what customers did you have

Page 349

1  that had an average win of let's say 500 to $1,000
2  per month?
3      A    Again, I'm not saying that.
4      Q    Okay.  So what are you saying here?
5  Help me out with this, please.
6          MR. MAY:  Well, okay.  Is the question
7  what's written on Exhibit 149 or is the question
8  what he recalls?
9          MR. BURDEN:  It's not either one of those
10  things.
11     Q    Mr. Ruth, set me straight.  What are you
12  talking about in this email?
13         MR. MAY:  Do we -- I'm sorry.  That's
14  another question.  Is the prior question
15  stricken because now I think there's multiple
16  questions floating --
17         MR. BURDEN:  Are you going to be
18  really formal about investigative testimony?
19         MR. MAY:  No.  I just want to -- I just
20  want to make sure that --
21         MR. BURDEN:  What are you doing here?
22  Are you objecting?  Are you just talking?
23         MR. MAY:  Well, okay.  No, I'm not
24  objecting.  I'm observing that it might be --

Page 350

1  his response might be difficult later when
2  we're looking at the transcript to see which
3  response he's responding to if there are
4  multiple questions pending.
5          MR. BURDEN:  Yeah, let's assume
6  there's one pending at a time and it's the
7  last question I asked.  So --
8          MR. MAY:  I'm okay with that.
9          MR. BURDEN:  -- to accommodate you,
10  Mr. May, I'll make it very clear that previous
11  questions are stricken.
12         MR. MAY:  Thank you.
13 BY MR. BURDEN:
14     Q    And, Mr. Ruth, I would like you to
15  tell me what you're communicating to Mr. Zolton
16  in this email.
17     A    I am telling him that based off
18  of the premium collection of my clients who have
19  $10,000 accounts, that it is possible for a win to
20  be in the range of 500 to $1,000 when that does --
21  when there is a win because of the fact of the
22  premium collection.
23     Q    All right.  And so for how many of your
24  clients did this happen for?

Page 351

1      A    That's not what I'm saying.
2          MR. MAY:  Okay.  Do you mind if
3  I actually state that you've kind of been
4  asking him that since the last time, and this
5  time --
6          MR. BURDEN:  So is this an objection?
7          MR. MAY:  It is not.
8          MR. BURDEN:  What do you think is going
9  to happen with it then?
10         MR. MAY:  Well, okay.  My point is
11  is that he's answered the question each and
12  every time.
13         MR. BURDEN:  Have you seen this exhibit
14  before?
15         MR. MAY:  This exhibit?
16         MR. BURDEN:  Yes.
17         MR. MAY:  Okay.  But you're asking him
18  how many of his clients, and every time he's
19  asked -- you've asked him that question he said
20  he can't recall and he gives you the reasons
21  why he can't recall.
22         MR. BURDEN:  Yeah, I don't think
23  that was his testimony.  I think we're still
24  working through this.

Page 352

1          MR. MAY:  I think you're ignoring all
2  the other exhibits then.
3          MR. BURDEN:  Have you seen this exhibit
4  before?
5          MR. MAY:  No.
6          MR. BURDEN:  Was this used previously?
7          MR. MAY:  No, I don't think it was.
8          MR. BURDEN:  No, it wasn't.  That's right.
9          MR. MAY:  Right.
10         MR. BURDEN:  So we're going to go
11  through this one just like the rest of them,
12  and there's more.
13         MR. MAY:  Okay.  I'm sure there are
14  but, I mean -- okay.  I just think that,
15  again, I think --
16         MR. BURDEN:  I know what you think.
17         MR. MAY:  -- his testimony's not going
18  to change no matter how many exhibits you
19  show him because he's given you reasons why
20  he can't recall.  And you're upsetting his dog.
21         MR. BURDEN:  Yeah.  I want the record
22  to reflect that Mr. Ruth brought his dog.
23     Q    Is that correct, Mr. Ruth?
24     A    Yes.

Page 353

1    MS. STREIT:  I'm surprised he was let
2  into the building.
3    MR. MAY:  Yeah.  Maybe now that's
4  reflected, that Mr. Ruth's dog is in an airline
5  container where the dog is not able to leave
6  the bag I guess is the best way to describe
7  it -- I've never had this happen before.
8    MR. BURDEN:  The CFTC has no objection
9  to the dog and doesn't care at all.
10    Q    All right.  So let's return, if we
11  could, please, to Exhibit 149.  How many of your
12  clients at Long Leaf Trading enjoyed wins of 500
13  to $1,000 per month?
14    A    I would -- is every single one of them.
15    Q    All right.  And so did they have an
16  average win rate of 500 to $1,000 a month over the
17  course of the life of their accounts?
18    A    No, but that's not what's being
19  represented in this statement.
20    Q    So what are you trying to tell Mr. Zolton?
21    A    That based off of the premium
22  collection that you can get with a $10,000
23  account and the four positions, that I can say
24  it's realistic for -- in the event that you were

Page 354

1  to have a winning month, that it could be within
2  that 500 to $1,000 range.
3    Q    All right.  So I want to draw attention
4  to your use of the word average, and that's sort
5  of the source of my line of questioning here.  You
6  write, "Obviously there are going to be months where
7  you don't win, but getting an average of win in that
8  range is a realistic target."
9       So when you talk about an average
10  of win in that range, do you mean an average of win
11  in the 500 to $1,000 a month range?
12    A    Can you repeat the question?
13    Q    Sure.  So when you talk about getting
14  an average of win in that range, the range you're
15  referring to is 500 to $1,000 per month, is that
16  correct?
17    A    Yeah, but you're taking out the word "is a
18  realistic target."
19    Q    Yeah, right.
20    A    That's an important part of the whole
21  statement.
22    Q    No, yeah, we got the statement.  So
23  my question is how many of your customers had an
24  average of 500 to $1,000 profit a month in their

Page 355

1  accounts?
2    A    I don't -- that's not -- I'm saying
3  that in the event let's say you have a winning
4  month, it is realistic for that winning month to
5  be in the range of 500 to $1,000.
6    Q    Got it.  So let's put that aside
7  for a second and let me just ask you separate
8  and apart from Exhibit 149 --
9    A    Okay.
10    Q    -- how many of your clients had
11  an average profit of 500 to $1,000 per month in
12  their account over the life of the account?
13    A    That's -- I don't -- again, this
14  is going back to my previous testimony is that
15  we only look at one month at a time.
16    Q    But it says here -- and I've got
17  to push back on this a little bit.  You're talking
18  about an average and that's why I'm focused on
19  averages.  So how many of your clients had average
20  profits of 500 to $1,000 per month in their account
21  over the life of the account?
22    A    Well, that's not the intention of
23  the statement.  The intention of the statement
24  is to say that in the event that you have a winning

Page 356

1  month, based off the premium collection that you
2  could collect on a $10,000 account, it is realistic
3  for it to be in the target range of 500 to $1,000.
4    Q    But what customers did you have that
5  enjoyed that average?
6    A    I have -- I had customers that had
7  winning months where the winning month profits
8  were in the range of 500 to $1,000.
9    Q    And did those customers have average
10  profits on a monthly basis over the life of their
11  account --
12    A    I don't know.
13    Q    You've got to let me finish.
14    MR. MAY:  You can't answer his question
15  until he's done asking it.
16    THE WITNESS:  All right.
17  BY MR. BURDEN:
18    Q    -- of 500 to $1,000 a month?
19    A    I don't know.  I don't recall.
20    MR. BURDEN:  All right.  Do you guys want
21  to do your lunch?
22    MR. MAY:  That works for me.
23    MR. BURDEN:  Great, okay.  Let's go off
24  the record, please.

Page 357

1      (Whereupon a lunch recess was taken
2      from 12:25 p.m., to 2:05 p.m., after
3      which the following proceedings were
4      had:)
5      A F T E R N O O N   S E S S I O N
6          JEREMY RUTH,
7  called as a witness herein, having been previously
8  sworn and examined, testified further as follows:
9      FURTHER EXAMINATION (Cont'd.)
10 BY MR. BURDEN:
11  Q   All right.  So, Mr. Ruth, I'm going
12 to play you an audio file produced by Long Leaf
13 Trading.
14      MR. BURDEN:  I'm going to mark
15 it as CFTC Exhibit 150.  The file name is
16 05-03-2017_JAYCALDWELL --
17      MR. MAY:  Could you do the dates again,
18 Ashley?
19      MR. BURDEN:  Sure.  05-03-2017_JAYCALDWELL
20 _3527464855.
21      (Whereupon CFTC Exhibit No. 150
22      was marked for identification.)
23  Q   So, Mr. Ruth, does the name Jay Caldwell
24 ring any bells for you?

Page 358

1  A   No.
2      MR. BURDEN:  All right.  So I want
3  to start this at 1 hour, 18 minutes and
4  40 seconds.  Let's see how --
5      MR. MAY:  Could you tell me how long
6  the whole thing is?
7      MR. BURDEN:  113 minutes and 8 seconds.
8      MR. MAY:  113 minutes and 8 seconds.
9      MR. BURDEN:  Or, you know what, I
10 take that back.  I'm reading the wrong field.
11 It's 1 hour, 53 minutes and 8 seconds.
12      THE WITNESS:  And we're starting where?
13      MR. BURDEN:  At 1:18:40, if I can get
14 it to work.  So we're starting at 1:18:19,
15 which is close enough.
16      (Whereupon the audio was played.)
17      MR. BURDEN:  So I want to stop it there
18 at 12:04.
19      MR. MAY:  12:04?
20      MR. BURDEN:  Yeah.
21  Q   So, Mr. Ruth, is that your voice on the
22 call?
23  A   Yes.
24  Q   All right.  So did you have any

Page 359

1  customers at Long Leaf who made $45,000 on a
2  $150,000 account?
3   A   Are you asking me this in relation to
4  the video -- the audio you just played?
5   Q   Yes.
6   A   I mean, that's not what the audio is
7  talking about.
8   Q   All right.  So what's that audio talking
9  about?
10  A   I think it's talking about a commission
11 discount and how that affects the bottom line in the
12 event that there's a return.
13  Q   All right.  Well, did you have any
14 customers that achieved the return that you're
15 describing to Mr. Caldwell on the call?
16  A   Well, Mr. Caldwell is completely
17 different from all my other clients because
18 it's a significant amount more money than any
19 other client that I think I've had.
20  Q   All right.  So did you have any clients
21 who achieved a $30,000 return over the course of
22 a year?
23      MR. MAY:  Course of a year?
24      MR. BURDEN:  Yeah.

Page 360

1  A   I don't know.  But, again, this
2  guy's got four times the amount of money that
3  like my average client had.  So I don't think
4  that's -- I don't -- yeah, I mean, I don't recall
5  anybody having a $30,000 return.
6   Q   Did anybody that was your client have
7  more than a $30,000 return?
8   A   I don't recall.
9   Q   Did anybody who was your client have
10 a 20 percent return or anything close to that over
11 the life of their account?
12  A   I don't do anything over the life of
13 the account.  We live -- as I've testified before,
14 we live on a month-to-month basis when we talk about
15 results with our clients.
16  Q   All right.  And do you say that to
17 the client?  You know, and I'm talking generally
18 about calls, you know.  I hear you kind of telling
19 me that you look at things on a month-to-month
20 basis, is that right?
21  A   Correct.
22  Q   So when you're talking to clients,
23 am I going to hear calls where you tell them,
24 listen, this only relates to one month at a time?

Page 361

1  A   Yeah, I only talk about the results
2  from -- I mean, if there's multiple -- like let's
3  say there's multiple bad months in a row or multiple
4  good months in a row.  Then maybe I like reference,
5  you know, well, it's two months in a row that we've
6  done well or that it's two months in a row that,
7  you know, we've done poorly.  But I don't talk
8  about necessarily the overall performance of the
9  account over the time period because what's relevant
10  is reporting the results of what was done in that
11  month.
12     Q   So when you're talking to this
13  prospective client, Mr. Caldwell, we just heard
14  this small snippet of the call where you talk about
15  how a customer could achieve almost a 20 percent
16  return with a $150,000 account and with the
17  commission --
18     A   Well, that's almost a two-hour phone
19  call, and I think you cut off the part before it
20  where we're not talking about giving him a return.
21  We're talking about in a hypothetical situation if
22  he were to achieve a 12 percent return but then he
23  got a commission discount because of the amount
24  of money that he put into the account, what effect

Page 362

1  that would have on the bottom line.
2     Q   Yeah.  I know the part of the call
3  you're talking about, but what I'm asking is sort
4  of more general, right?  Like if you're telling
5  customers, as you were telling Mr. Caldwell --
6     A   Sorry, go ahead.
7     Q   -- about returns, do you make it
8  clear that you're only saying that these returns
9  are achieved sort of in one month rather than
10  overall?
11     A   I'm not talking to him about returns,
12  though.  I'm talking to him about commission
13  discounts based off the amount of money that he
14  puts into the account on his initial deposit.
15     MR. BURDEN:  All right.  I'm going to
16        move on to the next part of this call I want
17        to talk about at 1:36:35.  All right.  We're
18        going to start at 1:36:33.
19           (Whereupon the audio was played.)
20     MR. BURDEN:  All right.  So let me stop
21        it at 1:36:57.
22     Q   So why did you ask Mr. Caldwell
23  if any of his family members were part of the NFA
24  or SEC?

Page 363

1     A   As part of the application.
2     Q   What application?
3     A   The Gain Capital application.
4     Q   Is that -- that's funny.  I didn't
5  see that.  Where is that on the application?
6     A   I don't know.  In the application.
7     Q   Okay.  Well, you can imagine --
8     MR. MAY:  You don't have a page number?
9     THE WITNESS:  No.
10  BY MR. BURDEN:
11     Q   Yeah.  Well, you could imagine how
12  I'd be really interested in that.  So what part
13  of the application is it in?  Tell me what you can
14  remember, if you would, please.
15     A   If you go online to a Gain Capital
16  application, they ask that question probably to
17  this day.
18     Q   Okay.  So did you ask other customers
19  the same question?
20     A   Yeah.  Every customer fills out the
21  same application, the same -- that application while
22  I worked there was -- evolved over time.
23     Q   Yeah.
24     A   Was provided by Gain Capital.

Page 364

1     Q   Well, I'm asking a simpler question,
2  which is just did you ask other customers if they
3  had family members who were the SEC or NFA?
4     A   If I was assisting them in filling out
5  the application, then yes.
6     Q   Okay.  Did anybody ever say, yes,
7  I do have a family member that's at the SEC or the
8  NFA?
9     A   No, not to my knowledge.
10     Q   What would you have done if they had
11  said yes?
12     MR. MAY:  Is that a hypothetical?
13     MR. BURDEN:  Yeah.
14     A   I would have hypothetically selected
15  yes on the application or advised them to put --
16  disclose that on the application.
17     Q   Got it.
18           (Whereupon CFTC Exhibit No. 151
19             was marked for identification.)
20     Q   Mr. Ruth, I want to hand you what I've
21  marked as CFTC Exhibit 151.  And take a look at it
22  for me, if you would, please.
23     A   (Witness complies).
24     MR. MAY:  Are you ready, Jeremy?

Page 365

1     THE WITNESS: Yes.
2 BY MR. BURDEN:
3     Q   Do you recognize CFTC Exhibit 151?
4     A   No.
5     Q   So CFTC Exhibit 151 purports to be an
6 email from Luis Molina to you and it says Questions,
7 and the first question is what I'm interested in.
8 Mr. Molina appears to write, "Can we have access
9 to the Jordan Belfort videos for our own training?"
10 What are these videos that he's referring to?
11    A   The Jordan Belfort -- there's like
12 a sales system called the Straight Line Persuasion,
13 and there's videos that go along with that and
14 that's what he's referring to.
15    Q   All right.  So did Long Leaf have them,
16 these videos?
17    A   No, they're on YouTube.
18    Q   So why is he saying can we have access
19 to them?
20    A   Again, like going back to like that
21 Monday -- like the morning meeting thing, these
22 are like questions that -- they're supposed to
23 like -- they were supposed to submit questions
24 to me every morning for me to then present them

Page 366

1 to Tim for Tim to answer them during the morning
2 meeting.
3     Q   Did Tim answer this question?
4     A   I would -- I don't recall, but I would
5 assume so.
6     Q   Did you watch any of these Straight Line
7 Persuasion videos?
8     A   Yes.
9     Q   Where did you watch them?
10    A   YouTube.
11    Q   But like at work or at home?
12    A   Both.
13    Q   And why did you watch them?
14    A   I don't know.  It's a motivational
15 video for development of sales skills.  I don't
16 know.
17    Q   Were these recommended to you by somebody?
18    A   Tim Evans, yeah.
19    Q   All right.  Who's Jordan Belfort?
20    A   He's the Wolf of Wall Street.
21    Q   That's right.
22    Q   Have you ever seen the videos, though?
23    Q   After reading that email, I watched all
24 of them.

Page 367

1     A   Yeah, all right.
2         MR. MAY:  Wait.  You're not supposed to
3 be testifying.
4         MR. BURDEN:  I answer the questions
5 that I want to or that I think are funny.
6 That's my policy.
7     A   I mean, I just think --
8         MR. MAY:  You answered his question.
9 You don't really need to elaborate.
10        THE WITNESS:  I just want to --
11        MR. MAY:  Do you want to elaborate?
12        THE WITNESS:  I do.  I want to say
13 something.
14 BY MR. BURDEN:
15    Q   Okay.  Go ahead.
16        MR. MAY:  Please don't.
17    A   I get that like having you associated
18 with Jordan Belfort, if you knew his story, doesn't
19 sound good from a regulation standpoint.  But since
20 you have watched the movies, he does talk about like
21 the ethical stuff of it every five seconds, that he
22 was basically a POS and that you shouldn't be a POS
23 in the future.  I just want to point that out.
24        MR. MAY:  I'm sorry.  Just so we're

Page 368

1 clear for the record, POS?
2         THE WITNESS:  Piece of shit.
3         (Whereupon CFTC Exhibit No. 152
4             was marked for identification.)
5 BY MR. BURDEN:
6     Q   All right.  I want to hand you what I've
7 marked as CFTC Exhibit 152.
8         MR. MAY:  Ready, Jeremy?
9         THE WITNESS:  Yes.
10 BY MR. BURDEN:
11    Q   Mr. Ruth, do you recognize CFTC
12 Exhibit 152?
13    A   No.
14    Q   All right.  So it looks like an email
15 sent from you to somebody at this string of numbers
16 and letters sent April 3, 2017 and it looks like
17 you're corresponding with this Alexander Krone.
18 Who's Alexander Krone?
19    A   It seems like -- appears to be some
20 guy who was, I don't know, inquiring to work at
21 Long Leaf.
22    Q   I mean, do you remember him?  We can both
23 read the email.
24    A   I mean, after reading the email, I mean,

Page 369

1 I kind of know who he is, yeah.
2     Q    Okay.  So do you remember corresponding
3 with him?
4     A    Yes.
5     Q    All right.  So my question here
6 is you write to him, "I'll make 370K this year
7 if I do not open up another account."  Is that true?
8     A    Well, I got fired three months later
9 so --
10     Q    All right.
11     A    -- no.
12     Q    You know, I guess what I ought to ask
13 is how much money did you make at Long Leaf Trading?
14 And if you have to break it down by year, if that's
15 easier, then go right ahead.
16     A    I don't know.  I have no clue.
17     Q    Was it more than $100,000 a year?
18     A    I don't know.
19     Q    More than $50,000 a year?
20     A    I would assume so.  Hopefully, yeah.
21 Here's one thing you've got to understand.  When
22 it comes to like my compensation with Long Leaf --
23     Q    Yeah.
24     A    -- I was never properly compensated.

Page 370

1 And, yeah, so it's what do I think I should have
2 been paid and --
3     Q    Well, my question is what were you paid,
4 right?
5     A    Like physically paid?  I mean, I don't
6 remember off the top of my head.
7     Q    All right.  Can you give us a ballpark,
8 right, because all we have to go on --
9     A    I think in 2017, which -- and I
10 understand I only worked there for half a year --
11 I think it was somewhere around 200 grand was --
12 which I was actually physically paid.
13     Q    All right.  So 2016, what did Long Leaf
14 pay you in 2016?
15     A    I don't know.
16     Q    Was it more or less than 200K?
17     A    I don't know.  I couldn't tell you off
18 the top of my head.
19     Q    What about 2015?
20     A    Maybe like $10.
21     Q    Why only $10?
22     A    Because I was -- I don't know.  I was new
23 in the industry so I didn't make anything.
24     Q    When did you start in 2015?

Page 371

1     A    Technically I got my license like
2 April 24th I think it was.
3     Q    Well, that's a long -- I mean, surely
4 they didn't pay you $10 for --
5     A    Yeah, it was --
6     MR. MAY:  Are you being facetious when
7 you --
8     THE WITNESS:  Yeah.
9     MR. MAY:  -- testified that $10 --
10     THE WITNESS:  I don't know.  I don't
11 know.
12 BY MR. BURDEN:
13     Q    Definitely do not be facetious, please.
14     A    Okay.
15     Q    Was it more than $100,000?
16     A    No.
17     MR. MAY:  And, Ashley, does your question
18 relate to 2015?
19     MR. BURDEN:  Yes.
20     MR. MAY:  Okay.
21 BY MR. BURDEN:
22     Q    So the question again, in 2015 did you
23 make more than $100,000?
24     A    I don't recall.

Page 372

1     (Whereupon CFTC Exhibit No. 153
2     was marked for identification.)
3     Q    All right.  So I want to hand you what
4 I've marked as CFTC Exhibit 153.  This is a group
5 exhibit, and the group exhibit is an email that
6 purports to have been sent by you.  And the email's
7 got a link in it, and I'm handing you what's in that
8 link and we've printed it.
9     MR. MAY:  This is now 153?
10     MR. BURDEN:  Yeah.
11     A    All right.
12     MR. MAY:  Hold on.  I'm not ready.
13     THE WITNESS:  I'm curious where this
14 is going.
15     MR. MAY:  Are you ready, Jeremy?
16     THE WITNESS:  Yes.
17 BY MR. BURDEN:
18     Q    Mr. Ruth, do you recognize CFTC
19 Exhibit 153?
20     A    Yes.
21     Q    What is it, please.
22     A    It's an email that I sent to Tim Evans
23 with a link.
24     Q    And the subject line is Case I was talking

Page 373

1  about.  Do you see that?
2      A    Um-hmm.
3      Q    Yes?
4      A    Yes.
5      Q    Thanks.  So what's the case you were
6  talking about and why were you talking about it?
7      A    James Cordier is an option sellers
8  principal.  And when I would solicit people a lot
9  and talk about Time Means Money, sometimes I'd run
10  into people who either were option sellers clients
11  or had gone through their solicitation process,
12  and they would bring it up.  So I studied, you
13  know, their process and what they did so I could
14  talk educatedly about like what the difference is
15  between what we did and what they did.  And what
16  was the question?
17      MR. MAY:  There were two.
18  BY MR. BURDEN:
19      Q    Yeah.  So it was what was the case?
20      MR. MAY:  I think you've dealt with
21      the first one.
22  BY MR. BURDEN:
23      Q    Yeah, and supply that.  Then I asked,
24  you know, why did you send this to --

Page 374

1      A    Oh, Tim?
2      Q    Yeah, to Mr. Evans.
3      A    Yeah.  I think it was more of like --
4  if you read in here, they like showed examples
5  of emails that James would send out to his
6  clients I was interested in because I think at
7  that time I was talking about Tim to write like
8  emails to the clients on a monthly basis as opposed
9  to me doing it when I don't represent his trades,
10  you know, if that makes sense.  So I think it was
11  like showing him like, hey, this has been done in
12  the past, this is how it's done, and this is how
13  the CFTC feels about it.
14      Q    All right.  Did you have any followup
15  discussions with Mr. Evans after you sent the email?
16      A    I don't know exactly.
17      Q    Well, do you remember if you had any
18  or not?
19      A    No.  I mean, that was -- from the
20  period of around this time, like me and him were
21  in like a -- I don't know if you want to call it
22  a feud.
23      Q    Well, I want to get into that in a minute.
24  But right now --

Page 375

1      A    Yeah.
2      Q    -- if we could, let's just please
3  focus on 153.  So it seems like you did some real
4  diligence here.  I didn't know that.  I didn't
5  know that this James Scott Cordier was part of an
6  option selling group.  But I see that you sent this
7  link to your boss and that he got in trouble for
8  unauthorized trading, which is what's reflected in
9  this order.  And I want to know did you have any
10  discussions with Mr. Evans about it?
11      A    Yeah.  I mean, like I had talked
12  to him about it after I read it, and then I sent
13  it to him so that he could, I guess, read it.  I
14  don't know if he read it or I don't recall what
15  happened after that.
16      Q    Got it.
17      A    Yeah.
18      Q    So when you were talking to Mr. Evans
19  about it, what did you say, please.
20      A    Just like, hey, this -- I read this.
21  This is what happened, you know.  Now, you know,
22  I get why we do this.  Like stuff like that.  I'm
23  like --
24      Q    Well, what was the stuff that you got --

Page 376

1      A    I don't remember specifically, but
2  I would have to read the whole entire thing again
3  to -- but I don't know.  Like --
4      MR. MAY:  When you say the whole
5      entire thing, could you elaborate on that?
6      A    The whole entire -- I don't know.
7  BY MR. BURDEN:
8      Q    Decision?
9      A    Yeah, I guess.
10      MR. MAY:  Starting at page 1 and ending
11      at page 33?
12      THE WITNESS:  Yeah, yes.
13      A    You know, and I would ask him
14  questions too.  Like you've got like the whole
15  PFG, MF Global, all that stuff happened before I
16  was in the industry, but like people talked to me
17  about it.  And if I don't know about it, then why
18  would they want to invest their money with that
19  person.  So I tried to learn stuff and be an expert
20  in the industry.  So, yeah, I think it was more of
21  a development of myself.
22  BY MR. BURDEN:
23      Q    So did Mr. Evans do anything different
24  or make any changes in response to your email?

Page 377

1    A    I couldn't tell you.
2    Q    Were you trying to suggest by
3 this email that Long Leaf Trading shouldn't make
4 certain solicitations?  Was that the point of this?
5    A    No.
6    Q    Was the point of the email to
7 suggest that Long Leaf Trading might be engaged
8 in unauthorized trading and so not to do that?
9    A    No, no, not that I -- no.
10    Q    All right.  Let's put this one aside then.
11    A    (Witness complies).
12    Q    So I don't think I asked you this last
13 time, other than maybe very briefly.  I haven't --
14 I just haven't reviewed the transcript yet.  Why
15 were you let go from Long Leaf Trading?
16    A    I mean, it's kind of like a buildup.
17 But the specific -- on the specific day that I was
18 let go was the day where I think like a majority
19 of the accounts were down like eighty some percent
20 and we had to, you know, pitch the trades that
21 Tim had designed.  And I want to say, if I recall
22 correctly -- I could be wrong -- I had like
23 67 clients at the time and those -- this
24 conversation was longer than normal.  Like most

Page 378

1 of them are, you know, maybe like two, three minutes
2 every month.  Well, this was like a significant
3 point in these people's accounts where these were
4 30-minute, hour-long conversations.
5    Q    So when you're talking about these
6 conversations, you're talking about conversations
7 with clients?
8    A    Yes.  And it's where I'm giving them
9 results, telling them, hey, I guess, you know,
10 we're trying to get this turned around.  Here's what
11 we're doing, da, da, da, da, da, da, give them the
12 whole spiel and trying to obtain their permission to
13 do the next trades.  And it was a very difficult --
14 very difficult conversations to have and very
15 lengthy.  And I had 67 clients and he didn't like
16 the speed in which I was moving and I didn't like
17 the trading results.  So he, you know, told me
18 to leave the office and I left and then he wanted
19 like -- he wanted stuff from me.  Basically I got
20 the impression that he didn't want to pay me for --
21 he didn't want to pay me the commissions that
22 I would have generated from there.  So he figured
23 out that it would be easier to fire Jeremy and
24 then he got to keep all the commissions.  That's

Page 379

1 all I got.
2    Q    So when you said that Mr. Evans didn't
3 like the speed that you were going, what did he say
4 to you?
5    A    Like hurry the fuck up.
6    Q    Got it.  So you were going too slow
7 for him?
8    A    I wasn't, but for him because he's
9 trying to execute and I'm trying to make sure that
10 I have permission and that these people understand
11 what's going on.
12    Q    So your testimony I think just now
13 is that you were calling up customers and you were
14 giving them the results.  And that was bad news at
15 this point, is that right?
16    A    It was a bad -- it was a terrible month,
17 yeah.
18    Q    Got it.
19    A    And so, yeah, it was a terrible month
20 on top of I think maybe a terrible month before
21 then.  So it was pretty bad, yeah.
22    Q    Did you usually provide clients with
23 trading results, i.e., call them and tell them how
24 their trades had done?

Page 380

1    A    Yeah.
2    Q    And was that sort of every time the
3 trades were closed?
4    A    Yeah, pretty much, yeah.  I mean,
5 every client liked to be talked to differently.
6    Q    Got it.  And how did you know what those
7 results were?
8    A    From Tim Evans.
9    Q    And you also knew them because you got
10 the Gain statements every day, right?
11    A    Well, yeah, but --
12    Q    And would you give them the results
13 sort of for the life of their account or just that
14 month?
15    A    Just that month I think would be
16 more specific.  Sometimes I might be -- you know,
17 sometimes somebody might like -- it wasn't the same
18 thing for every single person.  So if somebody
19 said -- you know, there could be a time where like
20 maybe it was like the second month they're in.
21 Well, are we up overall since we started?  And
22 then I would say either yes or no, which probably
23 at that time would be no.  But it was mostly on
24 a monthly basis.

Page 381

1    MR. PATRICK:  Was it Tim Evans that
2  told you -- I think you testified earlier
3  that the majority of the accounts were down
4  more than 80 percent.  Was that something that
5  Tim told you?
6    THE WITNESS:  Yeah, yeah.  Like that
7  morning he pulled us into like a conference
8  room and was like, all right, you guys are going
9  to have a really shitty day, you know.  This
10  is where your accounts are at.  But, you know,
11  I need you to soldier up and make these phone
12  calls and da, da, da, da, da, like trying to
13  huddle around.  Like we need to make sure
14  that -- you know, we're going to lose people,
15  people are going to be upset but, you know,
16  you need to like make it the best as possible.
17  And it just so happened it took me a while
18  to do that.
19    MR. BURDEN:  All right.  You know,
20  that's all I've got.  If we could go off the
21  record for a couple minutes, I'll confer with
22  my colleagues.  And if you guys want to get
23  your exhibits together, I know, Mr. May, you
24  wanted to ask some questions.

Page 382

1    MR. MAY:  I did, yeah.
2    MR. BURDEN:  How much time should we take
3  a little break here for?
4    MR. MAY:  Like 15 minutes?
5    MR. BURDEN:  Okay, that sounds good.
6  Off the record, please.
7    (Whereupon a recess was taken from
8    2:45 p.m., to 3:20 p.m., after which
9    the following proceedings were had:)
10    MR. BURDEN:  Let's go back on the record,
11  please.
12    Q    All right.  So, Mr. Ruth, when did you
13  leave Postrock?
14    A    May 2nd.
15    Q    All right.  And what were the circumstances
16  for your departure?
17    A    I was starting my own occupation.
18    Q    So did you quit or were you fired?
19    A    It's interesting because I thought
20  that I quit, and I think Postrock's attorney might
21  have represented to my previous counsel that I was
22  fired.  So I don't know the answer.
23    Q    Who was your previous counsel, please.
24    A    Do you mind if I --

Page 383

1    Q    Yeah, go right ahead.
2    A    Jake Cahn, C-a-h-n.
3    Q    All right.  And do you know the name
4  of Postrock's counsel that you're referring to?
5    A    Yeah, I have that one in here.
6  Matthew Kluchenek.
7    Q    All right.  And I should know this,
8  but I can't remember.  Did you go over to Postrock
9  with Mr. Leeney?
10    A    We went over separately.  But, yeah, we
11  both were at --
12    Q    So who from Long Leaf was at Postrock?
13    A    Me, James Leeney, Luis Molina was
14  at one point, Vince Prieto was at one point,
15  what's his name, Brendan Sears was at one point,
16  and there was one other.  I forgot his name.
17    Q    All right.  So when you were
18  at Postrock, were you sort of making trade
19  recommendations to customers in the same kind of
20  way that Long Leaf was?
21    A    How was Long Leaf making trade
22  recommendations?
23    Q    Well, you know, we've seen Long Leaf
24  make these recommendations through the Time Means

Page 384

1  Money program, right?
2    A    Yeah.
3    Q    All right.  And they're recommending
4  trades to customers and customers can participate
5  in those trades or not, right?
6    A    Correct.
7    Q    So -- and I think we established
8  too that these trades recommended by Long Leaf
9  were spread trades typically, is that also right?
10    A    Yes.
11    Q    All right.  And these customers
12  really all get the same recommendations, though
13  they may participate in them differently, is that
14  fair to say?
15    A    No.
16    Q    What's wrong about that?
17    A    The word same recommendation.  The word
18  "same" is what's wrong with that.
19    Q    Okay.  So my understanding, and
20  I thought we've been looking at these emails
21  together, is that the same sort of spread trade
22  recommendation goes out to everybody and the thing
23  that's different is the number of contracts that's
24  recommended.

Page 385

1    A    No.
2    Q    Okay.  So what else is different?
3    A    The fill prices, which means that
4  it's completely different, and sometimes even the
5  strike prices.
6    Q    You know, my understanding was that
7  the Long Leaf Trading recommendations had the same
8  strike and fill prices for all customers.  Is that
9  not right?
10   A    No.
11   Q    So if I compare all of the Long Leaf
12 trading recommendations, I'll see different strike
13 prices recommended to customers?
14   A    At times, yes.
15   Q    All right.  Well --
16   A    That's why there's no track record,
17 is what we're trying --
18   Q    Well, I'm not sure if I agree with
19 that characterization.  That's new to me and I think
20 contradicts previous testimony, but we're going to
21 look into it.  You know, what I want to get at here
22 is what --
23   A    Like there's -- yeah.  So there's
24 like a quote/unquote block order.  I don't know

Page 386

1  if block's the right term, but a mass order where
2  generally I think those are like APS'd.  But then
3  there's trades that are done that are outside of
4  that block order, that those people are still part
5  of the program, and so they're getting different
6  fill prices.  And in some cases, because those
7  fill prices aren't available, it makes sense for the
8  program or that client, they're getting different
9  strikes prices.
10   Q    I see.  All right.
11   A    Yeah, so you're right.  A majority
12 of them try to like -- try to be done in like
13 a mass, you know, quantity.  But, I mean, that's
14 not the case.  I don't think there's a single month
15 where every single person was traded the same way.
16   Q    So what I want to try to figure out --
17 and that's helpful -- is did Postrock do this same
18 type of thing?
19   A    Yeah.  I mean, we -- like James Leeney
20 and I did something similar to the Time Means Money
21 program, yeah, but it's not the exact same thing.
22   Q    So when you say that you and Mr. Leeney
23 did something that was similar to the Time Means
24 Money program at Postrock, who came up with the

Page 387

1  trade recommendations there?
2    A    I mean, they were constantly evolving.
3  We had -- I mean, James Leeney hired a couple
4  different like chief market strategists, a lot
5  of people involved and constantly trying to, you
6  know, figure out a way to make it work.
7    Q    Got it.  So it sounds like at Postrock
8  those recommendations didn't come from somebody
9  way up high at Postrock.  They were generated
10 by Mr. Leeney or somebody hired by Mr. Leeney,
11 is that right?
12   A    Yeah.  I mean, yeah -- no, nobody
13 at like Postrock -- yes, not like there's one
14 principal at Postrock.  No, he wasn't -- I mean,
15 he might have like given his two cents on a trade
16 or something of that nature but not -- like he
17 wasn't the designer of a trade.
18   Q    Did you come up with any trades
19 at Postrock that were recommended to customers?
20   A    Yeah, probably.
21   Q    Did you when you were at Postrock
22 use -- did you use any of the old sales materials
23 from Long Leaf Trading?
24   A    I don't know how you could because

Page 388

1  I don't work for Long Leaf, though.
2    Q    Well, you got scripts, right?  Like
3  did you bring them over or adapt them or anything
4  like that?
5    A    I mean, the scripts at Long Leaf
6  say Long Leaf on them.  So if you call and say
7  I'm with Long Leaf but you're really with Postrock,
8  that wouldn't really work.
9    Q    Right.  But did you use the same script
10 or a similar script but change it to Postrock?
11   A    I mean, there's similarities but
12 I wouldn't say that -- I guess you could say like
13 the Postrock pitch was a derivative of the Long Leaf
14 one, but it's not -- there's a lot of enhancements
15 and differences as well.
16   Q    Got it.  And who developed that pitch?
17 Who wrote that pitch?
18   A    Me, James Leeney, compliance, Ryan
19 Griffith.  We got feedback from Turnkey Partners
20 I think it's called.  Bunch of people involved.
21   Q    All right.  Do you have any of those
22 scripts or sales materials that you used while you
23 were at Postrock?
24   A    I don't know.  I don't know.

Page 389

1    Q    Okay.  So I don't think those fall
2  within the ambit of the subpoena that we've served
3  upon you, so we'll be serving another one for those
4  but --
5    A    I mean, I don't have access to --
6  like the same thing.  I got cut off from all my
7  Postrock stuff.
8    Q    No, I understand.
9    A    Yeah.
10   Q    But I'm admonishing you not to destroy
11 them.  And I'll send you guys a subpoena and you
12 can look for them.  If you've got them, we'll look
13 at them and if you don't, you don't.
14   A    All right.
15   Q    So did Postrock terminate you for making
16 misrepresentations to clients?
17   A    No, I've never been told by Postrock that
18 I've been terminated so ...
19   Q    How did you quit?
20   A    Well, I'd been planning for like months
21 to go out on my own with their help, and I was going
22 to leave on May 1st.  And then they got a call from
23 the NFA saying, hey, we want to interview Jeremy
24 Ruth and they came in.  So I didn't move over that

Page 390

1  day, and I came in on May 2nd and -- or maybe
2  it was May 1st, I don't know, May 1st maybe and
3  the NFA interviewed me.  And then the next day I got
4  to the office and I was like, all right, I'm moving
5  over to, you know, my new operation today.  And they
6  said okay, and he goes let me know when you hit the
7  submit button and then I'll drop you on our end,
8  and that was it.
9    Q    So did anybody say anything to you
10 about misrepresentations or misbehavior of any
11 kind?
12   A    At Postrock?
13   Q    Yeah.
14   A    I mean, the nature of the NFA
15 coming to talk to me, they didn't -- I mean,
16 I don't know what you'd call that, but they I guess
17 made some allegations but not -- Postrock never said
18 anything.
19   Q    Yeah.  What I'm asking you is did
20 Postrock ever admonish you or otherwise accuse you
21 or misconduct or fraud?
22   A    No, no.
23   Q    So your testimony is that you learned
24 through your counsel that -- your former counsel

Page 391

1  that Postrock had been claiming that they had
2  fired you?
3    A    Yeah.  He had talked, yeah, to their
4  counsel.  He goes -- he had asked me like, you
5  know, how did it end and I told him.  He goes, all
6  right, well, their official position is is that they
7  terminated you.
8    Q    That doesn't sound right, though.
9    A    Why?
10   Q    Well, it doesn't sound like they
11 terminated you.  It sounds like your testimony is
12 that they didn't terminate you.
13   A    They didn't, no, but that was what I was
14 told through --
15   Q    Yeah.
16   A    -- my previous counsel, yeah.
17   Q    All right.  Have Postrock come back to
18 you at all with demands or trying to contact you?
19   A    No.  I've tried to contact them, though.
20   Q    What did you try to contact them about?
21   A    I got screwed out of another paycheck
22 at the end.
23   Q    Did they respond?
24   A    No.

Page 392

1    MR. MAY:  See if we can't do something
2  about that.
3  BY MR. BURDEN:
4    Q    So I think you testified that you were
5  planning on leaving Postrock but that Postrock was
6  going to help you, is that right?
7    A    Postrock had been.  I'd been working on
8  trying to leave for months.
9    Q    So what kind of help were they giving you?
10   A    Oh, everything.  Like contacts, like
11 advice, consulting, everything.
12   Q    But why did they want you to do that?
13 Were they going to make money off it somehow?
14   A    Off me leaving?
15   Q    Yeah.
16   A    When I originally went over there,
17 there was never the intentions of like me being
18 there forever.  It was kind of like a steppingstone.
19   Q    Well, like why would they want to
20 help you out with that?  It seems like you were
21 a tremendously productive salesperson at Long Leaf.
22   A    Because I wasn't in a position to --
23 I had learned under one person, and I knew myself --
24 like that was my pitch to them.  I'm not --

Page 393

1  I mean, I'm not ready to start my own firm.
2  I want to start my own firm, but I want to learn
3  from other people as well before I do so.  So, you
4  know, it just turned out to be a very good fit
5  because Ryan Griffith I think is a very good mentor.
6  And, you know, when it comes to like compliance and
7  regulations and things, I've learned a ton from him.
8      Q    And he's the principal at Postrock?
9      A    No, Kevin Meyer.
10     Q    Who's he?
11     A    He's, I don't know, Kevin Meyer's
12  right-hand man type AP slash -- I don't know.
13     Q    And, sorry, is he at Postrock?
14     A    Yeah.
15     Q    Okay.
16     A    He's also on like the, I don't know,
17  the independent introducing broker like association.
18  Like he's -- yeah.  Like Friday night most people
19  go out and -- go out to dinner go out and eat,
20  cocktails.  He sits at home and reads like the CFTC
21  Exchange Act and stuff like that so ...
22     Q    Another quick one, if we could, please
23  on Postrock, which is while you were at Postrock
24  how many other brokers were there?

Page 394

1      A    Postrock is very like secretive
2  in telling me like about their -- they have like
3  multiple brokers all across the country I think in
4  various different locations, but I don't -- I didn't
5  really get involved.  Like Postrock's primary focus
6  is commercial hedging and they don't do retail,
7  except for I think they might do like managed
8  futures through some other plan.  And so I only saw
9  like the people that are in the Chicago office.
10     Q    But you continued to do sort of retail
11  work for them, right?
12     A    Yeah, correct.
13     Q    All right.  So how many other people
14  were in the Chicago office?  So what I'm trying
15  to get a feel for is like what percentage this group
16  of Long Leaf guys constituted.  Was it just a few
17  brokers or a lot?  It sounds like you don't know
18  nationwide, but in Chicago --
19     A    I don't know.  Yeah, I don't know
20  how many brokers they have but it's, you know --
21  how many -- I'm sorry.  You were trying to figure
22  out how many we represented?
23     Q    Yeah.
24     A    Well, there's --

Page 395

1      MR. MAY:  So I'm guessing the question
2  is the percentage of the Chicago office of
3  Postrock, the percentage of Long Leaf -- former
4  Long Leaf traders who were at Postrock, the
5  percentage of the total of Postrock --
6      A    I don't -- yeah.
7      MR. MAY:  -- reps.
8      A    I mean, it was either me and James Leeney
9  and one other person or me and one other person for
10  the most part.  So we were -- our "operation" was
11  either two or three brokers at a time, and I don't
12  know how many there is.  Five maybe in the Chicago
13  office, seven.  I don't know.
14  BY MR. BURDEN:
15     Q    So these other former Long Leaf
16  brokers, Mr. Prieto, Luis Molina, Mr. Sears, did
17  they work with you and Mr. Leeney on continuing to
18  solicit for these spread trades?
19     A    I mean, we don't -- I don't know.
20  It's kind of a weird question because we're not --
21  we're just soliciting.  Like I don't think the
22  trade is for the spread trades.  I don't know --
23     Q    Let me ask you a different way.
24     A    Yeah.

Page 396

1      Q    You know, did you and Mr. Leeney work
2  with Mr. Prieto, Mr. Sears and Mr. Molina while you
3  were at Postrock?
4      A    Yeah, yeah.  Like we kind of did the same
5  system where like they would set up appointments.
6      Q    Got it.
7      A    Yeah.
8      MR. BURDEN:  All right.  Thank you.
9  Mr. May, if you want to --
10     Q    This is actually the part I'm supposed
11  to say, Mr. Ruth, is there anything you wish to
12  add to your testimony or to clarify with respect
13  to your testimony?
14     MR. MAY:  Prior to me asking you
15  questions.
16     A    There was one thing.  Oh, I know
17  we kept talking a lot about like the compliance
18  department and then I would -- you would say
19  Mr. Evans.  Towards the end of my tenure there
20  was another gentleman who was I guess part of that
21  operation.  I don't know what his official role was,
22  but it would be Brian Adams.
23  BY MR. BURDEN:
24     Q    And he was part of the compliance group?

Page 397

1    A    I guess, because there was things --
2    or I don't know if he was just like an assistant
3    to Mr. Evans. I don't know. It was -- I don't
4    know. It was a weird situation.
5    Q    Is there anything else with respect
6    to your testimony that you would like to clarify
7    or expound upon?
8         MR. MAY: Why don't you hold that --
9         THE WITNESS: Yes.
10        MR. MAY: -- and I'll ask you the
11   questions. And then if you feel that you
12   still want to add something after that,
13   we'll come back to it.
14        THE WITNESS: Sure.
15        MR. MAY: How's that sound?
16        MR. BURDEN: The reason I'm doing this
17   is I have never been in testimony, and it's
18   not sort of enshrined in our procedures, where
19   counsel for the witness gets a redirect, you
20   know. And I guess I don't mind and there's no
21   reason not to, except that we never ever do it.
22   And I sort of thought it was a good vehicle,
23   since he's represented by counsel, to sort
24   of clarify or set -- you know, correct any

Page 398

1    previous testimony. But it kind of sounds
2    like Mr. Ruth has made the corrections that
3    he wants to make or expound to the extent he
4    wants to, and I wanted to close that out. And
5    if what you're doing is something else --
6         MR. MAY: Well, can you -- I think I'm
7    probably going to be a lot more thorough than
8    he is. I don't know if he can recall the prior
9    testimony. I mean, do you want to ask him about
10   adding anything to his testimony today? I think
11   that might be easier for him.
12   BY MR. BURDEN:
13   Q    Sure. Do you want to add something to
14   your testimony today?
15        MR. MAY: About your testimony today.
16   A    No. I mean, off the stuff you gave me,
17   no.
18   BY MR. BURDEN:
19   Q    What about your testimony generally?
20   A    I mean, the things I would like to add is
21   some of the documents that I provided you.
22   Q    Okay. Well, do you want to take a
23   look at those again? If you want to confer with
24   your counsel, you can.

Page 399

1         MR. BURDEN: I'll tell you guys what I am
2    not going to let happen is a lengthy redirect of
3    all the exhibits from the last two. If there's
4    something you want to clarify or add to your
5    testimony, we can do that. Do you guys want
6    some time?
7         MR. MAY: I have some questions I want
8    to ask him about the documents.
9         MR. BURDEN: Yeah, you don't get
10   to ask those questions in my investigative
11   testimony. Why don't you guys confer, see
12   if there's something you want to add to your
13   testimony or correct, and we'll go back. And
14   if you want to trot those out, we can do that.
15        MR. MAY: All right. So I'm not going to
16   be able to ask him the questions that I want?
17        MR. BURDEN: No. Have you not done one
18   of these before?
19        MR. MAY: Sure, I have.
20        MR. BURDEN: When?
21        MR. MAY: All the time.
22        MR. BURDEN: Yeah. With whom?
23        MR. MAY: CFTC, NFA, FINRA.
24        MR. BURDEN: Who in this office has

Page 400

1    let you do a lengthy redirect?
2         MR. MAY: I'm not doing a redirect.
3    I'm asking him some clarifying questions.
4         MR. BURDEN: Okay. Let me give you guys
5    a couple minutes to confer.
6         MR. MAY: Sure.
7         (Whereupon a recess was taken from
8         3:42 p.m., to 3:48 p.m., after which
9         the following proceedings were had:)
10   BY MR. BURDEN:
11   Q    All right. Mr. Ruth, is there anything
12   you wish to add to your testimony or clarify or
13   correct?
14   A    Yeah. I'm going to do some clarifications
15   with the help of my counsel here.
16        MR. BURDEN: All right.
17             EXAMINATION
18   BY MR. MAY:
19   Q    So, Mr. Ruth, I've got the documents
20   from our first time on September 26th, and we're
21   going to share them. So I'm going to put them
22   between you and I. Can you tell us again when you
23   worked for Long Leaf Trading?
24   A    I think my first day was March 13,

Page 401

1 2015 through maybe the last Friday in August
2 of 2017.
3    Q   So that's approximately --
4    A   Two and a half years maybe.
5    Q   From the end of your tenure at Long Leaf?
6    A   Yeah, beginning to end.
7    Q   Okay.  And what about the beginning?
8 So you worked there for two and a half years.  How
9 long ago from March of '15 to today?
10   A   Four and a half years ago.
11   Q   Okay.  And you were asked a number
12 of questions, a number of emails, a number of
13 documents, and you were shown some of them.  Would
14 it be difficult for you to answer some of those
15 questions based on the length of time that's
16 transpired?
17   A   Yes.
18   Q   I have another clarifying question for
19 you, and I believe this was part of your testimony
20 but I want to make sure.  Did you come up with trade
21 ideas at Long Leaf Trading?
22   A   No.
23   Q   When you were an associated person
24 at Long Leaf Trading, what were your primary job

Page 402

1 responsibilities?
2    A   I mean, to -- I guess the primary
3 responsibility was open up accounts specifically
4 for the Time Means Money program.
5    Q   And is there anything else?
6    A   I mean, that's my primary duty, yeah.
7    Q   Okay.  Who was responsible at Long Leaf
8 Trading for obtaining authorization from the clients
9 to trade?
10   A   Whoever the assigned broker is for the
11 account.
12   Q   So if it was your assigned account, that
13 would be your responsibility?
14   A   Correct.
15   Q   I believe you talked about maybe
16 the difference between time versus -- TMM, what
17 does TMM stand for again?
18   A   Time Means Money.
19   Q   Okay.  And maybe traditional brokerage.
20 Do you recall that testimony?
21   A   Parts of it.
22   Q   How is TMM different than traditional
23 brokerage?
24   A   TMM is like a system that the

Page 403

1 broker knows what's going on and the client knows
2 what's going on before it happens in terms of the
3 structure, like the number of trades, when things
4 are going to happen and things of that nature
5 whereas traditional brokerage, everything is at
6 random.
7    Q   Okay.  I'll make a statement.  You
8 tell me if it's true.  And I believe you mentioned
9 this before, but I want to clarify it.  For a Time
10 Means Money client, would they know going in what
11 they -- what the maximum amount they could lose was?
12   A   For a specific trade?
13   Q   Yes, or let's say for a specific month.
14   A   Yeah.  I mean, when we obtain their
15 permission, we would generally tell them what the
16 profit potential and the loss potential was on the
17 specific trade.
18   Q   And how could you know what the loss
19 potential was?
20   A   Because we only use spread positions.
21   Q   Anything else?
22   A   No.
23   Q   Would you know -- were you writing
24 options with Time Means Money or were you buying

Page 404

1 options?
2    A   We were selling options, yeah.
3    Q   Okay.  Would that tell you --
4    A   Well, actually --
5    Q   -- how much you could lose or gain?
6    A   -- the net position is that we're
7 selling options, but in an option spread you are
8 buying and selling an option so ...
9    Q   Okay.
10   A   But we were credit spreads, meaning
11 that there was a net, you know, credit balance
12 based off the option position.
13   Q   Okay.  And do you recall any
14 testimony about -- just asking you a clarifying
15 question about the number -- let's talk about the
16 total number of accounts you had while you were
17 at Long Leaf Trading Group.
18   A   I would say somewhere around a hundred.
19   Q   Okay.  And what was the most you had
20 at any one time?
21   A   From what I recall, 67.
22   Q   I had a question about you and another
23 clarifying question.  You were presented with a
24 number of emails that were sent out and a number

Page 405

1 of scripts or a number of documents. Were the
2 documents that you used in talking to clients
3 at Long Leaf Trading, were those approved by the
4 compliance department before you would use them?
5   A   Yes.
6   Q   Can you direct your attention
7 to Exhibit 122. That would have been from the
8 first time we came. We have to share. Familiarize
9 yourself with the email.
10   A   Yep.
11   Q   Do you recall the CFTC presenting you
12 with this email in your prior testimony?
13   A   Yes.
14   Q   Okay. And who was the email from?
15   A   Myself.
16   Q   And who is it to?
17   A   Tim Evans.
18   Q   And who's the subject?
19   A   Harish Patel.
20   Q   What can you glean from this email?
21   A   What do you mean by glean?
22   Q   Okay. So this is the amount that was
23 started with and the amount that it was ended with.
24 Can you tell what the P&L is?

Page 406

1   A   Yeah.
2   Q   And what's that?
3   A   It's a total loss of $16,457.60.
4   Q   And what's the total commissions?
5   A   $29,820.
6   Q   In comparing the total loss and
7 the total commissions, can you reach any sort of
8 conclusion?
9   A   There was profitable trading at some point.
10   Q   Okay. Directing your attention to
11 CFTC Exhibit 125, can you take a look at that?
12   A   Yes.
13   Q   I want you to take a look. Okay.
14 And there's an email from a Steve Beranek --
15   A   Beranek.
16   Q   -- B-e-r-a-n-e-k, to Jeremy Ruth. I'm
17 talking about the one dated Saturday, October 2016.
18 Could you tell me who Steve Beranek is?
19   A   He was a customer of mine.
20   Q   Okay. And what is Mr. Beranek's email
21 address?
22   A   technicalmanagement@comcast.net.
23   Q   And what sort of business is Mr. Beranek
24 in?

Page 407

1   A   He's a resident -- or a registered
2 investment advisor.
3   Q   Okay. And so that's not a commodity
4 or futures designation, is it?
5   A   No. He's securities.
6   Q   And so is -- does he manage money for
7 other investors?
8   A   Yes.
9   Q   Do you recall some prior testimony
10 about opening up accounts at Gain, the FCM that
11 was for Long Leaf Trading?
12   A   Yes.
13   Q   In looking at the documents the CFTC
14 gave you either on the 26th or 27th of September
15 and today, did you see any account opening documents
16 for any of the customers you had at Long Leaf
17 Trading?
18   A   Yes.
19   Q   You did?
20   A   What do you like --
21   Q   Account opening documents, documents
22 you would need to open up a commodity account at
23 an FCM.
24   A   Yes.

Page 408

1   Q   What documents did you see?
2   A   A customer agreement, CFTC regulation
3 risk disclosures, NFA Rule -- I think it's like 2-30
4 risk disclosures, W-9s, electronic transmissions
5 trading, all the stuff required by the FCM.
6   Q   Okay. If some of those documents
7 were missing and not completed, would Gain Capital
8 open an account?
9   A   Absolutely not.
10   Q   And you mentioned some other disclosures.
11 Do you happen to know what some of the disclosures
12 are in, say, CFTC --
13   A   Yeah.
14   Q   Hold on. You've got to let me finish. --
15 CFTC Regulation 1.55?
16   A   I think it has to do with customers
17 attesting that they're using genuine risk capital
18 and that they understand that there's risk in
19 trading and loss and that spreads don't necessarily
20 put you in a better position or option spreads and
21 things of that nature.
22   Q   I believe in -- and we'll be getting
23 to this hopefully if we can hear one of the tapes.
24 But you used the term risk capital, and I believe

Page 409

1  I saw that in some of the documents.  What is
2  your understanding of risk capital?
3     A    It's money that you have that if you
4  were no longer to have it, you know, you wouldn't
5  have to shut down your operation or, I don't know,
6  change your lifestyle or anything of that nature.
7     Q    So let me see if I understand that.
8  The risk capital is if you were to lose that
9  capital, it wouldn't affect maybe the quality of
10  your life?
11     A    Correct.
12     Q    And explain to me -- using that term
13  risk capital and the customers you had at Long
14  Leaf Trading, I believe you mentioned it was a
15  high of 67 at one point and maybe an estimate of
16  around a hundred during your time period.  With
17  those customers, were you using their risk capital?
18  Were you using more than their risk capital?
19  I mean, walk me through that.
20     A    I mean, I would like to rephrase that
21  where they are using their risk capital.  I'm not
22  using anything.
23     Q    Okay.
24     A    But, yeah, it's -- you know, during

Page 410

1  the solicitation process we use the term risk
2  capital, you know.  They attest to that they're
3  using genuine risk capital.  It's disclosed multiple
4  times throughout multiple stages of the process, and
5  even after they still funded the account with their
6  risk capital we ask them again, you know, to make
7  sure that they understand that they're using their
8  risk capital.
9     Q    Do you have an understanding of maybe
10  an average amount that -- I believe you testified
11  today you were asked -- we listened to a second
12  phone call today, and I forget the name of the
13  gentleman, but I think you were talking about
14  maybe his account was aberrationally high.
15     A    Yeah, you're referring to the Jay
16  Caldwell call.  I think he started off an account
17  with a hundred thousand dollars of risk capital.
18  I think it was more normal for me to have like
19  $25,000.
20     Q    You anticipated my next question.
21     A    Yeah.
22     Q    Directing your attention to CFTC
23  Exhibit 132, could you take a look at that?
24     A    Um-hmm.

Page 411

1     Q    And I believe we mentioned this last
2  time, but there's an email from a Jeremy Ruth
3  to James Leeney on August 29, 2017 at 1:43 p.m.
4  Do you believe that you sent this email from --
5     A    No.
6     Q    -- the Long Leaf Trading email --
7     A    No.
8     Q    -- system?  And why is that?
9     A    Because I was no longer employed there.
10     Q    Did anyone else have access to your email?
11     A    Yeah, Tim Evans.
12     Q    Okay.
13     A    As the administrator.
14     Q    And after you were no longer working
15  for Long Leaf Trading, you didn't know whether
16  they continued to use that email address, is that
17  a fair statement?
18     A    Now I know that they did because I'm seeing
19  evidence of it right here.
20     Q    And did you ever have a client named
21  Karl Reimer?
22     A    That was a client that was maybe
23  passed on to me in the last month or so of me
24  being at Long Leaf.

Page 412

1     Q    Okay.  In your testimony I believe
2  from the 26th or 27th there was a percentage given
3  of option trades that expired worthless.  Do you
4  recall that testimony?
5     A    Yes.
6     Q    Okay.  And do you happen to know where
7  that percentage came from?
8     A    Yeah.  There was a study that the
9  CME Group put out that's based off of data that
10  they collected in some markets in '97, '98, '99.
11     Q    And did you read the study?
12     A    I've read the tables within the study, yes.
13     Q    Okay.  Directing your attention to
14  CFTC Exhibit 133, that's the phone call.
15     MR. MAY:  Can we play the phone call?
16     MS. STREIT:  What do you plan to do with
17  the phone call?
18     MR. MAY:  I just had to ask him a couple
19  questions about things that were in the phone
20  call.
21     MS. STREIT:  I mean, the phone call is
22  what the phone call is.
23     MR. MAY:  I know, but I was only
24  going to play it just on the portions that

Page 413

1  you played to him.  I think there was a couple
2  clarifying questions in that.  I'm not going
3  to ask about --
4      MS. STREIT:  Yeah, we're not going
5  to go through the whole hour-long phone call.
6      MR. BURDEN:  I can play it for --
7      MR. MAY:  Yeah, I was going to ask --
8  I have some time parts that you played and
9  they're very, very short snippets.  It's like,
10  you know, one minute or something like that.
11      MR. BURDEN:  Let me call it up.  It'll
12  take a couple minutes, though.
13      MR. MAY:  Sure thing.
14      MR. BURDEN:  Let's go off the record.
15          (Whereupon a recess was taken from
16              4:06 p.m., to 4:10 p.m., after which
17              the following proceedings were had:)
18      MR. BURDEN:  So we're going to start
19  at 1:37:18, if that's all right.
20      MR. MAY:  That's okay.
21      MR. BURDEN:  And this is Exhibit 133.
22          (Whereupon the audio was played.)
23      MR. MAY:  Can you pause it?  What are we
24  at now?

Page 414

1      MR. BURDEN:  We're at 1:41:06.
2  BY MR. MAY:
3      Q   Okay.  Mr. Ruth --
4      A   Yes.
5      Q   -- did you listen to the prior conversation
6  that was played?
7      A   Yes.
8      Q   Is that your voice?
9      A   Yes.
10      Q   Do you recognize the person who was on
11  the other end of the line?
12      A   No.
13      Q   Okay.  I just had some questions for
14  you.  There was some language used and everything
15  like that, and maybe you can kind of explain a
16  little bit what that sort of thing means.  There
17  was a reference to current market conditions.  Why
18  is that important?  Why would you be communicating
19  that to a client?
20      A   I don't know.  Maybe to talk about
21  volatility.
22      Q   Okay.  Well, why is volatility important?
23      A   Volatility is important when selling
24  options because an increase in volatility gives

Page 415

1  you the ability to collect more premium.  When
2  you collect more premium, you reduce more risk.
3      Q   Okay.  And there was a mention on
4  the call of a return to risk capital.  I believe
5  you mentioned that before but, again, why is that
6  important?  Why would you be communicating that
7  to a client?
8      A   I don't know.  Are you talking about why
9  am I using the word risk capital?
10      Q   Well, yeah.  Why are you using the word
11  risk capital and what are you communicating to the
12  client when you use that term?
13      A   Yeah.  I use the term risk capital
14  because I only want them to utilize risk capital
15  in their investment if they're going to be, you
16  know, opening an account with us or Long Leaf,
17  and yeah.
18      Q   I think you mentioned volatility.
19  You used the term if things go favorably.  I want
20  to ask you a question.  Based on the use of that
21  term, can you tell me if the thing that you were
22  talking about with this particular client was a
23  hypothetical?
24      A   Yes, yeah.  I mean, obviously because

Page 416

1  I'm using the terminology if things go favorably.
2  So "if" refers to a hypothetical.
3      Q   Okay.  And what about the term targeted
4  return?  Based on that, would that also indicate --
5  would it indicate or not indicate a hypothetical?
6      A   Yeah.  Well, the targeted return
7  is not a specific amount because the client gets
8  to determine what their targeted return is.
9      Q   Okay.  And what about the term "I think
10  I can show you"?  Does that indicate to you that
11  the conversation with the client is a hypothetical
12  or not?
13      A   Yes.
14      Q   Okay.  Directing your attention to
15  CFTC Exhibit 134, which I believe we're sharing.
16  Do you want to familiarize yourself with that again?
17      A   I'm good.
18      Q   This appears to be an email from
19  Tim Evans dated September 7, 2016 to Jeremy Ruth.
20  The subject is Demo Script Senior.  The attachments
21  are Demo Script Time Means Money Senior Broker.docx.
22  Directing your attention to page 1, do you see that
23  there's halfway down, approximately halfway down
24  under Title & Risk Disclosures there's some

Page 417

1 pictures?  Do you see that on this document?
2    A    Yes.
3    Q    Okay.  And the language looks pretty
4 small, but what sort of risk disclosures do you
5 think those are?
6    A    I believe that's the -- I think
7 there's multiple risk disclosures, but there's --
8 I don't know.  Those are the preapproved NFA risk
9 disclosures or combinations of them.
10    Q    And are those the same risk disclosures
11 that are used or required by Gain to open up an
12 account at an FCM?
13    A    Yeah.
14    Q    Directing your attention to page 7.
15 Well, strike that.  Directing your attention to
16 page 4, if you go all the way down to 7, Introduce
17 Time Decay, what is that referring to in this
18 document?
19    A    We're informing the potential
20 customer that -- about the concept of time decay --
21    Q    And what is that?
22    A    -- from an introductory standpoint.
23 Time decay?
24    Q    Yes.

Page 418

1    A    Time decay is, I don't know, an event
2 that occurs during an option period.
3    Q    And what is the result of time decay?
4    A    The option becomes less valuable.
5    Q    As it becomes -- as it gets closer to --
6    A    Expiration.
7    Q    Okay.  Directing your attention
8 to page 7, about halfway down it says, No. 11,
9 NFA Company Record.  What did that -- why is that
10 in this document?
11    A    For credibility purposes.
12    Q    Okay.  And so you're letting a prospect
13 know that the company doesn't have an NFA record?
14    A    At the time, yeah.  At one point I think
15 the company did have an NFA record.
16    Q    Well, let's talk about that NFA record.
17 Is it that the company at one point did not have
18 any adverse marks on its NFA record?  Is that what
19 it's referring to?
20    A    Yeah.  I mean, I don't know that of
21 this specific script at this time, but the company
22 did not have any adverse marks until an audit.  I
23 guess Tim Evans didn't do the AML annual audit and
24 they got -- he got fined by the NFA.

Page 419

1    Q    Okay.  And directing your attention
2 to page -- well, actually, let's stay on company
3 NFA record.  Let me ask you about your NFA record.
4 Do you recall the CFTC asking a bunch of questions
5 about maybe some potential customer complaints?
6    A    Correct.
7    Q    And I believe those were Mr. Okey,
8 is that right?
9    A    No.
10    Q    Okay.  What about Mr. Patel?
11    A    Yes.  Oh, Oteh Okey, is that what you're
12 saying?
13    Q    I believe that was the first one.
14    A    Yeah.
15    Q    Sitting here today, do you happen
16 to know if you have any adverse marks on your
17 NFA record?
18    A    I do not.
19    Q    No customer complaints?
20    A    Not that I know of.
21    Q    Directing your attention to CFTC
22 Exhibit 134 on page 24.  Oh, I'm sorry.  I think I
23 have the numbers mixed up.  Directing your attention
24 to page 16 on Exhibit 134, and this is a number that

Page 420

1 says 24, The Greeks.  Could you tell me why that's
2 in this document?  What does the Greeks refer to?
3    A    The Greeks refer to the option
4 Greeks, which were I guess mathematical terms of
5 how you determine values of option pricing.
6    Q    And directing your attention to page 25
7 of Exhibit 134, it's -- No. 36 says No Buying
8 Decision Today.  What does that mean?
9    A    We're informing the client that
10 we're not asking them to buy anything, to open
11 an account or anything, pressure them into doing
12 anything without giving them more information.
13    Q    Okay.  And would you describe that --
14 well, you had your prior testimony.  Does that
15 comport with what I'll call a low-pressure sales
16 process?
17    A    Yeah.  I mean, I don't think --
18 I don't talk to somebody -- I think I talk to
19 somebody probably for about four hours before I ask
20 them for their business.
21    Q    And directing your attention to CFTC
22 Exhibit 134, the attachments, pages 1 through 30,
23 was this a document that would have been approved
24 by the compliance department at Long Leaf Trading?

Page 421

1    A    This document?
2    Q    Yes.
3    A    Yes.
4    Q    Do you recall testimony or questions
5 you received about performance that customers at
6 Long Leaf Trading incurred or had?
7    A    Do I recall questions about performance?
8    Q    Yes.
9    A    Yeah.
10   Q    Okay.  Did you ever see anything from
11 a regulator or the AP or the firm that looked to be
12 something along the lines of official performance,
13 audited performance, anything like that during your
14 tenure -- or actually while you were at Long Leaf
15 or thereafter?
16   A    No.
17   Q    Do you recall questions or testimony about
18 the concept that past performance isn't indicative
19 of future results?
20   A    Yes.
21   Q    Okay.  And do you have any idea
22 of the origin of that concept?  Do you know where
23 it comes from?
24   A    It comes from CFTC and NFA disclosures.

Page 423

1    Q    And you're discussing --
2    A    It's not --
3    Q    Which page are you talking about?
4    A    The risk disclosure again is done
5 at the end of the presentation before --
6    Q    Okay.
7        MR. BURDEN:  Sorry.  Could I have the
8    page on that, please.
9        THE WITNESS:  It's not in the script.
10   It's in the slide.  So I think it would be
11   in the Power Point --
12       MR. BURDEN:  Got it.
13       THE WITNESS:  -- presentation.
14 BY MR. MAY:
15   Q    Okay.  We can put these away.
16 So directing your attention to the exhibits we
17 used today, CFTC Exhibit 135, can you take a look
18 at that?
19   A    Yeah.
20   Q    Directing your attention to the document
21 marked Ruth 037.
22   A    Yep.
23   Q    Do you recall testimony about negative
24 marks on your -- I believe you described it as your

Page 422

1    Q    And would that be the kind of
2 disclosures that were referenced in account opening
3 documents?
4    A    Yes, and as long -- and as part of the
5 sales solicitation process multiple times.
6    Q    Okay.  And do you think that that is
7 somewhere in what we were referring to, Exhibit 134,
8 page 1 where it says Title and Risk Disclosure?  Is
9 that where you're discussing it?
10   A    Yes.  If you look at subsection 2,
11 letter A, Risk Disclosure, and then verbally
12 saying in addition to the visual but first I want
13 to disclose that this is a solicitation to enter
14 into an investment opportunity and there are
15 risks associated with this and all investment
16 opportunities for that matter.  So understand
17 that past performance is not necessarily indicative
18 of future performance.
19   Q    So it's read as well as shown?
20   A    Yes, in the end of the presentation
21 as well.
22   Q    Could you direct me to that?
23   A    There (indicating).  It's brought up
24 as a visual right here if you look at the slides.

Page 424

1 NFA record or the lack of marks, negative marks
2 on your NFA record?
3    A    I don't have any marks on my NFA record --
4    Q    Right, okay.
5    A    -- that I know of.
6    Q    Okay.  And where would one go to look
7 for that?
8    A    I've seen something called BASIC through
9 the NFA website.
10   Q    Okay.  And directing -- well, do you
11 see on document Ruth 037 on CFTC Exhibit 135, could
12 you take a look at a document that says Liability
13 Release Form?
14   A    Yes.
15   Q    Okay.  Looking at the second paragraph
16 where it starts, "It is understood," do you see
17 that?
18   A    Correct.
19   Q    Okay.  Do you believe that looking
20 at that sentence, that this document would ban a
21 client from posting a negative review after signing
22 this document?
23   A    I don't think it bans them.  I just
24 think that it -- that they essentially could be

Page 425

1 subject to civil penalties in the event that they
2 did violate the terms of the release.
3    Q   Are they giving up the right to post
4 something negative, do you think, based on this
5 language?
6    A   Yes.
7    Q   Directing your attention to CFTC
8 Exhibit 135, document Ruth -- marked Ruth 038
9 and Ruth 039, these are I believe testimony
10 from a -- I'm sorry, documents from an attorney,
11 Thomas F. Burke.  Could you take a look at those
12 bills and see if there's a reference made to any
13 particular client in the services include portions?
14    A   It does not.
15    Q   Okay.  Directing your attention to
16 CFTC Exhibit 136, which I believe is Bates stamped
17 Ruth 017 through Ruth 023, could you direct your --
18 directing your attention to page Ruth 022, go down
19 to the third --
20    A   Wait.  Ruth 22?
21    Q   022.  It's on CFTC Exhibit 136.  I believe
22 you're looking at 135.
23    A   Oh, okay.  022?
24    Q   Yes, the third paragraph down.

Page 426

1    A   Yep.
2    Q   The third full paragraph down starting
3 with, "Securities brokers have a duty to, 1."
4 Have you found that?
5    A   Okay.
6    Q   Have you found that?
7    A   Yeah.
8    Q   Okay.  Let me back up.  Who is Priscilla
9 Lamar?
10    A   Priscilla Lamar was a customer of mine at
11 Long Leaf Trading Group.
12    Q   Okay.  And this is a letter from
13 her attorney, CFTC Exhibit 136, is that correct?
14    A   CFTC 136, yes, that's my understanding.
15    Q   Okay.  And were you a securities broker
16 to Priscilla Lamar?
17    A   No.
18    Q   What kind of broker were you?
19    A   Commodity broker.
20    Q   Directing your attention to CFTC
21 Exhibit 136, page Ruth 020, do you see that?
22    A   CFTC, I'm sorry, what?
23    Q   136.  The demand letter from Ms. Lamar's
24 attorney, the document Bates stamped in the bottom

Page 427

1 right corner Ruth 020.
2    A   Yep.
3    Q   Do you see the first full paragraph
4 starting with, "Mr. Ruth and other Long Leaf
5 employees on behalf of Long Leaf and through Gain
6 also engaged in churning in violation of California
7 Civil Code Section 3294 and SEC Rule 15c1-7"?
8 Do you see that?
9    A   Yes.
10    Q   Okay.  I believe you just testified
11 you're a commodities broker.  Are you subject to
12 SEC rules, to your knowledge?
13    A   Not to my knowledge.
14    Q   Directing your attention to
15 CFTC Exhibit -- well, I believe this is Group
16 Exhibit 136, the document entitled at the bottom
17 right corner Ruth 024.  Are you there?
18    A   Yep.
19    Q   Okay.  Halfway down on the first
20 numbered paragraph do you see the language that
21 says -- starts, "Nothing contained herein is to be
22 construed as an admission or evidence of liability
23 by LLTG and Gain"?  Do you see that?
24    A   Yes.

Page 428

1    Q   Okay.  And do you see the last
2 sentence in that paragraph, "Rather, each party
3 has entered into this Settlement Agreement solely
4 to avoid expense of litigation"?
5    A   Yes.
6    Q   Directing your attention to CFTC
7 Exhibit 136 and the document marked in the bottom
8 right corner Ruth 025.
9    A   25?
10    Q   Ruth 025.
11    A   Yep.
12    Q   Do you see the numbered paragraph that
13 starts with the No. 4?
14    A   Yeah.
15    Q   Could you read the first and second
16 sentence for me?
17    A   "Customer covenants not to disclose
18 the terms of this Settlement Agreement and Release.
19 Customer agrees to pay LLTG as liquidated damages
20 a sum equal to $500 for each such occurrence if
21 the terms of this Settlement Agreement and Release
22 are disclosed by Customer.  Notwithstanding the
23 foregoing, Customer release of information to the
24 Commodity Futures Trading Commission, the National

Page 429

1 Futures Association or in compliance with a lawful
2 subpoena shall not be construed as a violation of
3 this provision."
4    Q    Okay.  Looking at that -- signatures
5 lower down on that same page, did you sign this
6 document?
7    A    No.
8    Q    Directing your attention to CFTC
9 Exhibit 137, and in the bottom right corner this
10 is a one-pager that's marked Ruth 028.
11    A    Yep.
12    Q    Look at the bottom email from you.  Who
13 are you writing an email to?
14    A    Tim Evans.
15    Q    Okay.  And what was the purpose for this
16 email?
17    A    I'm trying to find out -- it was
18 brought to my attention over a phone call with
19 Rebecca Wing that Priscilla Lamar, you know, she
20 just told me about this.  I didn't have any of
21 the -- I didn't have, you know, the complaint from
22 the attorney, the settlement agreement and all this
23 kind of stuff, and she's very slow moving.  And so
24 I reached out to Tim because I wanted to find out

Page 430

1 about it now because this is -- I think it's odd
2 that something that happened, I don't know, like
3 a year ago was just brought to my attention a year
4 later.
5    Q    And what if anything did Mr. Evans
6 tell you?  And I'm directing your attention to
7 the third sentence in his response to your email.
8    A    "There is nothing to respond to,
9 as I and everyone at Long Leaf acted in a legal
10 and ethical manner while I owned the company."
11    Q    And the fourth sentence?
12    A    "That included the entirety of your
13 employment there."
14    Q    Okay.  Directing your attention to CFTC
15 Exhibit 140, do you have that one?
16    A    Which one?
17    Q    140.
18    A    All right.
19    Q    Actually, let's put 140 away for
20 a second.  Sorry about that.  Let's look at CFTC
21 Exhibit 139.
22    A    Okay.
23    Q    Do you recall your testimony and being
24 asked about this document?

Page 431

1    A    Yes.
2    Q    I believe your testimony was you
3 expressed some skepticism about this document?
4    A    That's correct.
5    Q    And what were the reasons for your
6 skepticism?
7    A    Tim Evans already had access to all the
8 documents because he's the compliance department.
9 He approves them all and they're on the shared
10 drive, so why would he ask me for a copy of them.
11 And then going back to 140, there's like six days
12 in between of my email address sending it to him.
13 Again, documents that he already has.
14    Q    What's the significance of six days?
15    A    That's not something -- I wouldn't respond
16 to a superior six days later.
17    Q    And you would respond sooner or later?
18    A    Sooner.
19    Q    Directing your attention to CFTC
20 Exhibit 141, and this is the email from Jeremy
21 Ruth to Tim Evans dated 4/8/2017.  Subject is
22 Custom.  The attachments are Custom Version 3.pptx.
23 Can you look at the second page of the attachment?
24    A    Yes.

Page 432

1    Q    What is this?
2    A    The risk disclosure slide.
3    Q    Have we seen this before?
4    A    Yes.
5    Q    Where?
6    A    In the senior broker demo script that
7 we were previously looking at.
8    Q    So this is a slide of a presentation,
9 is that correct, CFTC Exhibit 141?
10    A    Yes.
11    Q    And so walk me through how this is
12 displayed to a potential client.
13    A    We're on the phone with them.  They're
14 on their phone.  And then this is utilized over
15 online software called Join.me, which gives them
16 the ability to view this from their home computer
17 or laptop or tablet, whatever.
18    Q    Okay.  Could you turn to the page
19 that starts in this CFTC Exhibit 141, it says
20 Equally Weighted Assets and there's a circle that
21 says 76.5 percent asterisk.
22    A    I'm sorry.  Yes, yes.  Where are you
23 seeing that?
24    Q    It's towards the back.

Page 433

1    A    Oh, there we go.  Yep.
2    Q    What is being depicted on this slide?
3    A    It's talking about equally weighted assets.
4    Q    And the 76.5 percent, what's the importance
5 of that?
6    A    It's the study that's being cited.
7    Q    Okay.  And what does it mean that
8 76.5 percent of all options held to expiration at
9 the Chicago Mercantile Exchange expire worthless?
10 Why is that important?
11    A    Why is it important?
12    Q    Um-hmm.
13    A    Because it -- an investor, I guess
14 you could look at it as you have a -- it could tell
15 an investor -- I mean, you can tell a lot of things
16 from it.  An investor could say, well, the chances
17 of buying options and them becoming profitable is
18 not good.  You could say, well, it's a zero sum
19 game.  So for every winner -- loser there has to
20 be a winner.  So maybe if I'm on the other side
21 of the transaction, that can be advantageous for
22 me.  It's a lot of things.
23    Q    Okay.  And is it true that the study
24 source is cited in this slide?

Page 434

1    A    Yes.
2    Q    Okay.  And where else have we seen
3 or heard something about roughly 75 percent of
4 options expire worthless if held to expiration?
5    A    In the demo script, which is included
6 in Exhibit 140 and somewhere in there as well
7 (indicating).
8    Q    Have we heard any calls where maybe this
9 76.5 percent was cited?
10    A    I think in Exhibit 133, talk about
11 it in a recorded phone call that in the event
12 that 76.5 percent of options do expire worthless,
13 there's some quote about that in that phone call.
14    Q    Okay.  Directing your attention to
15 CFTC Exhibit 110 that's in your pile, it's from
16 today.
17    A    All right.  110, gotcha.
18    Q    I'm looking at the email from James
19 Leeney at Long Leaf Trading sent on 4/27/17 to
20 Jeremy Ruth at Long Leaf Trading.  Subject is Calls
21 to Review.  Do you see the part -- it looks like
22 there's a picture of a leaf or something along that
23 line under the language that's James Leeney, senior
24 market strategist, Long Leaf Trading Group.

Page 435

1    A    Yeah.
2    Q    Could you read the information in the
3 first paragraph under the leaf?
4    A    "Trading futures involves risk of
5 loss and is not suitable for all investors.  Past
6 performance is not necessarily indicative of future
7 results."
8    Q    Okay.  And I had a question for you.
9 Was that language included on every email that you
10 would have sent to a customer?
11    A    I'm going to say 99.9 percent of the
12 time.  If I sent an email from my cell phone would
13 be the only time that it didn't, but I rarely sent
14 an email from my cell phone.
15    Q    So was it prepopulated?  Did you need to
16 cut and paste it?  How did --
17    A    No.
18    Q    -- it get there?
19    A    It's the signature line of my Outlook
20 email.
21    Q    Well, directing your attention to
22 CFTC Exhibit 146, it's an email from Jeremy Ruth
23 to Tim Evans dated September 19, 2016.  And that
24 looks like a signature line for you, Jeremy Ruth,

Page 436

1 senior commodity associate, Long Leaf Trading
2 Group.
3    A    Yep.
4    Q    Is that disclosure language that you
5 just read from CFTC Exhibit 110 contained in this
6 email?
7    A    Yes.
8    Q    Directing your attention to CFTC
9 Exhibit 147 --
10    A    Got it.
11    Q    -- I'm going to read -- this
12 is an email purportedly from Jeremy Ruth at
13 longleaftrading.com dated February 6, 2017 to
14 a Vince Prieto and a number of other persons with
15 Long Leaf emails.  And the subject is Demo Flake
16 Attempting Reschedule - New List.  I'm going to
17 read some language, and I want you to kind of
18 explain what that means.  In the first paragraph,
19 "There are 400 leads on this list."  Do you see
20 that?
21    A    Correct.
22    Q    "I expect these to be either reset
23 or moved to not interested."  What does that mean?
24 What are you trying to communicate there?

Page 437

1    A    To either reset the appointment or
2 to disposition the lead record as not interested,
3 meaning that the client's not interested.
4    Q    What happens when the client's not
5 interested?  Do they ever get contacted again?
6    A    That would be up to Tim Evans, but
7 the solicitation process stops and the lead is
8 essentially dead, and I don't know if they're
9 recycled at a later time or what.
10    Q    Okay.  Directing your attention to CFTC
11 Exhibit 149.
12    A    Gotcha.
13    Q    So this -- I'm looking at the bottom
14 of the page.  It says it is an email from Jeremy
15 Ruth at Long Leaf Trading Company dated Monday,
16 July 24, 2017 to zinvesting@msn.com.  The subject
17 is Emailing Account Documents_Christopher Zolton.
18 What if anything is going on here?  And tell me
19 whether this is --
20    A    Yeah.  I made it part of my process
21 where, you know, during the account opening process,
22 during the application you have the ability as the
23 user to download the account documents.  I wanted
24 to make sure that I knew that they had a copy of

Page 438

1 their account documents.  So I would send them
2 their account documents through email in addition
3 to that so I can, you know, have a record of the
4 fact that they received the account documents.
5        MS. STREIT:  How much more do you have,
6    Mr. May?  It's almost 5 o'clock.
7        MR. MAY:  Yeah.  Maybe --
8        MR. BURDEN:  You can go for absolutely
9    as long as you want.
10       MR. MAY:  There's -- no.  I mean,
11    I probably have less than five minutes.
12       MS. STREIT:  All right.
13       MR. MAY:  Don't want to ruin anyone's
14    weekend.
15    Q    Mr. Ruth, did you have any -- do you
16 recall questions about maybe whether you hired an
17 attorney to assist you in understanding CFTC or NFA
18 rules and requirements?
19    A    When?
20    Q    Earlier today.  Do you recall any questions
21 like that?
22    A    Oh, do I recall?  Yes.
23    Q    Okay.  And what was your testimony on that?
24    A    No, I'm an AP.  I don't own the firm.

Page 439

1    Q    You don't what?
2    A    Own the firm.
3    Q    And do you recall testimony about
4 maybe the reason why account performance was or
5 was not allowed to be produced?
6    A    Yes.
7    Q    I'm going to make a statement and
8 you tell me if you think it's correct.  Do you
9 believe that maybe the CFTC laws or regulations
10 would prohibit production of account performance?
11    A    For -- specifically for the Time Means
12 Money program, yes.
13    Q    Okay.  And what would you expect
14 the possible ramifications if somebody produced
15 something for the Time Means Money program and
16 the performance was inaccurate, let's say either
17 too high or too low, what would be the possible
18 ramifications vis-a-vis a regulator?
19    A    I would assume substantial fines, loss
20 of licensing, things of that nature.
21    Q    Okay.
22    A    But --
23    Q    I believe I just have one more
24 question, Mr. Ruth.  Do you recall testimony --

Page 440

1 and it happened today.  I'll posit that -- about
2 maybe the last day you worked at Long Leaf Trading?
3    A    Do I recall the last day I worked at
4 Long Leaf Trading?
5    Q    No.  Do you recall your testimony about
6 the day --
7    A    Yes.
8    Q    -- last day you worked at Long Leaf
9 Trading?  And I believe you mentioned that the
10 performance was bad, is that --
11    A    Of the specific month, yes.
12    Q    Okay.  Well, that was one of my questions.
13 And --
14    A    And when I say bad, I just mean it's
15 a losing month.  I don't know how much.  I don't
16 know anything.  I think in my testimony I
17 represented that like accounts were down 85 percent.
18 To clarify, that would probably be -- I mean, some
19 accounts that I can, you know -- not everybody
20 starts at the same time.  Not everybody went through
21 that.  But I recall, I don't know, maybe a couple
22 people that were down that much.  But that's not
23 representative of all the clients that I had.
24    Q    Okay.  And then what month was the last

Page 441

1 month you were at Long Leaf Trading?
2    A    August 2017.
3    Q    Okay.  And during the time you were at
4 Long Leaf Trading with the spread trades, how many
5 positions were usually recommended by Mr. Evans?
6    A    Hundred percent.
7    Q    Well, how many positions would he
8 recommend, option positions?  Was it --
9    A    Four per month.
10    Q    Four per month, okay.  So if the
11 performance was bad on a particular month, could
12 you suggest to us, would that be a month where the
13 positions were half winning, half losing?
14    A    I mean, it could depend.  I mean,
15 you could win three positions and technically
16 you could still lose money on the month depending
17 on how the positions are designed, so ...
18    Q    Do you recall the exact specific
19 performance of the four positions in August of
20 2017?
21    A    I remember it being a bad month and
22 maybe they all lost.  I don't know specifically.
23    Q    Okay.
24    A    It's a while ago.

Page 442

1        MR. MAY:  Okay.  I don't have anything
2    else.
3        MR. BURDEN:  All right.  I've got one
4    more and then I'll ask you guys again if you
5    have followup.
6            FURTHER EXAMINATION
7 BY MR. BURDEN:
8    Q    Mr. Ruth, I'm going to read some
9 verbiage to you and I'm going to ask you if you've
10 heard this before, said it before, all right?
11    A    Sure.
12    Q    All right.  These results are based
13 on simulated or hypothetical performance results
14 that have certain inherent limitations.  Unlike
15 the results shown in an actual performance record,
16 these results do not represent actual trading.
17 Also, because these trades have not actually been
18 executed, these results may have over the -- may
19 have under or overcompensated for the impact, if
20 any, of certain market factors, such as lack of
21 liquidity.  Simulated or hypothetical trading
22 programs in general are also subject to the
23 fact that they are designed with the benefit
24 of hindsight.  No representation is being made

Page 443

1 that any account will or is likely to achieve
2 profits or losses similar to those being shown.
3 I know that's a mouthful, but have you heard that
4 before?
5    A    That's the disclosure with simulated
6 trading.
7    Q    Say that one more time, please.
8    A    Disclosure of simulated trading, I believe.
9    Q    All right.  Is that -- have you ever
10 related that orally to any customers or prospective
11 customers?
12    A    I don't think it's applicable to the --
13    Q    So let's get into that in a minute, but
14 let me ask you first.
15    A    It might have been done in writing through
16 the account forms.  I'm not familiar exactly.
17    Q    Did you personally --
18    A    It's on --
19    Q    -- make that disclosure --
20    A    No.
21    Q    -- to any customers?
22    A    I only make the disclosures that were
23 given to me in the script that's approved by the
24 compliance department.

Page 444

1    Q    All right.  Was this disclosure that
2 I just read from 17 CFR 4.41, was that in any of the
3 materials given to you by compliance?
4    A    Unless if they're in the account
5 forms for Gain Capital, that would be the only
6 place I could say.  I don't know.  Otherwise, no,
7 I did not -- it was not given to me.
8    Q    Okay.  So that will do it for me.
9 Mr. Ruth, anything else you want to clarify
10 or correct in your testimony over the last two
11 days we've been doing it?
12    A    My understanding is that you're
13 investigating Long Leaf Trading Group, and I wanted
14 to throw you a bone here.
15    Q    Great.  Let's have it.
16    A    I found this out from I think this
17 document, which is from Priscilla Lamar's attorney,
18 but it talks about some guy who's a broker at Long
19 Leaf.  Well, that brings me to my point.  He's not
20 a broker at Long Leaf Trading Group because I think
21 he was acting as a broker unlicensed.
22    Q    And who is that person, please.
23    A    Andrew Nelson maybe.  But I guess he
24 represented -- he talked about me to Priscilla

Page 445

1 Lamar in an untruthful manner.
2   Q   How do you know that?
3   A   Because I didn't mishandle -- first
4 of all, it said something about mishandling like
5 her funds.  Like I don't touch or see her money
6 and I don't make the trades, so I know that.  But,
7 yeah, I don't --
8       MR. MAY:  What document are you looking at?
9       THE WITNESS:  I think it's 136.
10      MR. MAY:  CFTC Exhibit 136?
11      THE WITNESS:  Yeah.
12      MR. MAY:  Okay.
13  A   But I think it might be missing the
14 page where it talks about him.  I don't know.
15 My point is is that there's an unlicensed broker
16 who, you know, not only through this.  I've heard
17 that, that he's been talking to people I know but
18 like, you know, through the grapevine he -- I've
19 been told that he's conducting himself as a broker.
20 So I'm sure you're aware of it, but if not --
21 BY MR. BURDEN:
22  Q   Thank you.
23  A   You're welcome.
24      MR. MAY:  Is that your good deed for

Page 446

1   the day?
2       THE WITNESS:  Yes.
3       MR. MAY:  Okay.
4 BY MR. BURDEN:
5   Q   All right.  Any other aspects of your
6 testimony you would like to clarify or correct?
7   A   No.  I just have a logistical question
8 off the record.
9       MR. BURDEN:  Mr. May, anything else?
10      MR. MAY:  No.  Thank you.
11      MR. BURDEN:  Off the record, please.
12          WHICH WERE ALL THE PROCEEDINGS
13          HAD OR OFFERED AT SAID HEARING
14          OF THE ABOVE-ENTITLED CAUSE.
15
16
17
18
19
20
21
22
23
24

Page 447

1 STATE OF ILLINOIS)
                  ) SS.
2 COUNTY OF C O O K)
3
4       I, MARY MASLOWSKI, CSR, do hereby
5 certify that I reported in shorthand the proceedings
6 had at the examination under oath aforesaid, and
7 that the foregoing is a true, complete and accurate
8 transcript of the proceedings at said examination
9 under oath as appears from the stenographic notes so
10 taken and transcribed on the 22nd day of October,
11 2019.
12
13
14
15              Certified Shorthand Reporter
16
17
18
19
20
21
22
23
24