CFTC Ex. 539

# Long Leaf Trading Group

# *Gecas, Scott 2019-08-15*

### *8/15/2019 10:15 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Friday, November 5, 2021

Page 1

1          UNITED STATES OF AMERICA
                 BEFORE THE
2     COMMODITY FUTURES TRADING COMMISSION
3
4  IN THE MATTER OF:         )
                      )
5  LONG LEAF TRADING GROUP, INC.  )
6
7
8
9
10
11       The examination under oath of SCOTT GECAS,
12  taken pursuant to subpoena and the rules of the U.S.
13  Commodity Futures Trading Commission, reported by
14  Mary Maslowski, a Certified Shorthand Reporter and
15  Notary Public within and for the County of Cook and
16  State of Illinois, at 525 West Monroe Street, 11th
17  Floor, Chicago, Illinois, commencing at the hour of
18  10:15 o'clock on August 15, 2019.
19
20
21
22
23
24

Page 2

1  A P P E A R A N C E S:
2
      MR. ASHLEY J. BURDEN, Senior Trial Attorney
3     MS. ELIZABETH M. STREIT, Trial Team Leader
      MR. JOSEPH J. PATRICK, Investigator
4     U.S. COMMODITY FUTURES TRADING COMMISSION
      DIVISION OF ENFORCEMENT
5     525 West Monroe Street, Suite 1100
      Chicago, Illinois 60661
6     (312) 596-0700
7
      On behalf of the U.S. Commodity
8     Futures Trading Commission.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23  CSR License No. 084-003278.
24

Page 3

1          I N D E X
    WITNESS          EXAMINATION
2  SCOTT GECAS
3
    By Mr. Burden        5, 21, 24, 32,
4                 42, 51, 63, 67,
                 75, 116, 118,
5                141, 199, 205,
                 215
6
    By Mr. Patrick       21, 23, 30, 40,
7                50, 62, 66, 74,
                115, 117, 140,
8               190, 204, 207
9
10      E X H I B I T S
    CFTC EXHIBIT      MARKED FOR ID
11   No. 23             7
12   No. 24            15
     No. 25            26
13   No. 26            42
     No. 27            76
14   No. 28            78
     No. 29            82
15   No. 30            83
     No. 31            89
16   No. 32            90
     No. 33            94
17   No. 34            98
     No. 35            100
18   No. 36            131
     No. 37            148
19   No. 38            159
     No. 39            162
20   No. 40            166
21
22
23
24

Page 4

1      E X H I B I T S (Cont'd.)
2  CFTC EXHIBIT      MARKED FOR ID
3   No. 41            173
  ** No. 42          181
4   No. 43            182
     No. 44            185
5   No. 45            188
     No. 46            190
6   No. 47            193
     No. 48            215
7   No. 49            219
     No. 50            222
8   No. 51            227
     No. 52            234
9   No. 53            240
     No. 54            243
10
11
12
13
14
15
16    ** NOTE:  Exhibit No. 42 was an audio file
          which was not tendered for inclusion
17       in the transcript.
18
19
20
21
22
23
24

Page 5

1           SCOTT GECAS,

2 called as a witness herein, having been first duly

3 sworn, was examined and testified as follows:

4           EXAMINATION

5 BY MR. BURDEN:

6    Q   All right.  Mr. Gecas, I'm Ashley

7 Burden.  This is my colleague, Joe Patrick and

8 Elizabeth Streit.  We are officers of the Commission

9 for purposes of this proceeding.  This is an

10 investigation by the United States Commodity Futures

11 Trading Commission in the matter of Long Leaf

12 Trading Group to determine whether there have been

13 violations of certain provisions of the Commodity

14 Exchange Act and regulations.  However, the facts

15 developed in this investigation might constitute

16 violations of other federal or state civil or

17 criminal laws.

18           I'm handing you what I've marked

19 as CFTC Exhibit 1.  This is the CFTC's Statement to

20 Persons Providing Information.  Prior to the opening

21 of the record you were provided a copy of Exhibit 1

22 in connection with the subpoena you received.  Have

23 you had an opportunity to review the Statement to

24 Persons?

Page 6

1    A   Yes.

2    Q   Yeah?

3    A   Yes.

4    Q   All right.  Do you have any questions

5 about it?

6    A   No.

7    Q   Mr. Gecas, are you represented by counsel?

8    A   No.

9    Q   Mr. Gecas, you have the right to be

10 accompanied, represented and advised by counsel.

11 This means that you may have an attorney present

12 and that your attorney can advise you before, during

13 and after your examination here today.  Do you

14 understand this?

15    A   Yes.

16    Q   Since you're not represented by

17 counsel, there are certain matters discussed in

18 Exhibit No. 1, the Statement to Persons you have,

19 that I want to highlight for you.  Do you understand

20 that upon your request these proceedings will be

21 adjourned so that you may obtain counsel?

22    A   Yes.

23    Q   Do you understand that the statutes set

24 forth in Exhibit No. 1 provide criminal penalties

Page 7

1 for knowingly providing false testimony or knowingly

2 using false documents in connection with this

3 investigation?

4    A   Yes.

5    Q   Do you understand that you may assert your

6 rights under the Fifth Amendment to the Constitution

7 and refuse to answer any question which may tend to

8 incriminate you?

9    A   Yes.

10    Q   Do you wish to adjourn the testimony to

11 retain counsel at this time?

12    A   No.

13           (Whereupon  CFTC  Exhibit No. 23 was

14           marked for identification, MM.)

15    Q   All right.  Mr. Gecas, I want to hand

16 you what I've marked as CFTC Exhibit 23.  This is

17 a copy of the subpoena that you're appearing here

18 pursuant to today, correct?

19    A   Yep, yes.

20    Q   All right.  Mr. Gecas, have you ever

21 given sworn testimony before?

22    A   No.  Well, I just got divorced.  That's

23 about it.

24    Q   Oh, I'm sorry to hear that.  Were

Page 8

1 you deposed in connection with the divorce?

2    A   What do you mean?

3    Q   Well, did you have to give testimony before

4 a court reporter like you are now?

5    A   Yes.

6    Q   All right.  So let me familiarize you

7 with some of the rules of the road.  So the first

8 thing is if I ask you a question, please respond

9 verbally with a yes or a no rather than shaking

10 or nodding your head.

11    A   Okay.

12    Q   Also, let's you and I please try

13 not to talk over each other because it muddies up

14 the record.  We're already doing a little bit of

15 that and I think it's natural, but just relax and

16 try not to answer before I finish the question,

17 all right?

18    A   Yes.

19    Q   All right.  I don't want to confuse

20 you with any points.  So if I ask you a question

21 and you don't understand it I want you to say,

22 Ashley, I don't understand the question.  Will you

23 do that?

24    A   Yes.

Page 9

1    Q    All right.  So let's talk a little bit
2  about your personal background just very briefly.
3    A    Sure.
4    Q    Tell me about your education, if you
5  would, please.
6    A    I have very light college education.
7  I graduated high school, and I went to St. Mary's
8  briefly.
9    Q    How briefly?
10   A    About a year.
11   Q    Any associate's degree?
12   A    No.
13   Q    Tell me about your professional
14 background, please.  Where did you work prior to
15 Long Leaf Trading?
16   A    Several different place.  What year do
17 you want me to start?
18   Q    Why don't we just say what did you do
19 immediately before joining Long Leaf?
20   A    I was working for Trading Advantage.
21   Q    What did Trading Advantage do?
22   A    They were an education firm.
23   Q    And what did they provide education with
24 respect to?

Page 10

1    A    Financial markets all across the board.
2    Q    Including commodities and futures?
3    A    In the beginning, yes.
4    Q    Do you hold any professional licenses,
5  such as a Series 3?
6    A    Yes.
7    Q    What licenses do you hold, please.
8    A    Series 3.
9    Q    Any others?
10   A    No.
11   Q    And when did you obtain the Series 3?
12   A    June of '17, I believe.
13   Q    Have you ever traded options for your
14 own account?
15   A    Yes.
16   Q    During what period, please.
17   A    I was a floor trader on the Chicago Board
18 of Options.
19   Q    During what period?
20   A    2000 to 2007, I believe.
21   Q    2000 to 2007, correct?
22   A    Yes.
23   Q    And for whom were you trading?
24   A    It was Letco.

Page 11

1    Q    How do you spell that, please.
2    A    L-e-t-c-o.
3    Q    So you were a floor trader at Letco
4  from 2000 to 2007.  Any other trading experience?
5    A    Yes.  I traded off floor for Greenmoor
6  Financial.
7    Q    How do you spell that, please.
8    A    G-r-e-e-n Financial.
9    Q    Oh, sorry.  I thought you said Greenmoor.
10   A    Oh, Greenmoor.  I'm sorry, yeah.
11 Greenmoor, G-r-e-e-n-m-o-o-r, Financial.
12   Q    And during what period of time did you
13 do that, please.
14   A    From 2007 to 2014.
15   Q    All right.  And any other trading
16 experience?
17   A    I traded from Simplex in 2014-15.  Simplex
18 Investments, I believe it was.
19   Q    And were you a floor trader for Simplex
20 as well?
21   A    No, it was off floor.
22   Q    When you say off floor, you'll have
23 to excuse my ignorance.  What does that mean?
24   A    Onscreen, on the computer.

Page 12

1    Q    So what did you do after 2015?
2    A    That's when I went to work for Trading
3  Advantage.
4    Q    All right.  During your time trading
5  options, how did you do?
6    A    I was successful as a floor trader,
7  I was successful at Greenmoor Financial, and I was
8  breakeven at Simplex.
9    Q    So why did you decide to go into this
10 trading education field?
11   A    In my trying to find another job with
12 trading, prop firms no longer existed, which they
13 still don't.
14   Q    All right.  And that brings us I think
15 up to the period of time when you worked at Long
16 Leaf Trading, is that right?
17   A    In '17 I started with them.
18   Q    All right.  So what month in '17, please.
19   A    June, I believe, June of '17.
20   Q    All right.  And when did you stop working
21 at Long Leaf Trading, please.
22   A    December of '18.
23   Q    All right.  What was your role at Long
24 Leaf Trading?

Page 13

1    A    I was just a commodities broker in the
2  beginning.  The firm was sold to James Donelson, and
3  then I was more or less a trade designer.
4    Q    So when did you start working as a trade
5  designer?
6    A    I'm not sure of the exact date when the
7  firm switched over to Jim Donelson.
8    Q    Can you remember, was it fall or winter?
9  It doesn't have to be exact.
10    A    I think it was at the end of winter,
11  I believe.
12    Q    So does the end of winter mean --
13    A    I think it was around January.
14    Q    I would have said that was the middle
15  of winter.
16    A    Or middle of winter, sorry.
17    Q    So you think it was January '18 you
18  started work as a trade designer?
19    A    Yeah.
20    Q    And did you continue in the role of trade
21  designer until you left?
22    A    Until I left, yes.
23    Q    And where do you work now, please.
24    A    Walsh Trading.

Page 14

1    Q    All right.  And is that where you went
2  after departing --
3    A    I went back to -- well, I went
4  to Prosper Trading Academy for a short period
5  of time.
6    Q    And from there to Walsh?
7    A    Yes.
8    Q    All right.  So what I'd really
9  like to talk about during the first part of the
10  testimony is your work as a trade designer, as
11  you described.  But let's take a step back and
12  pretend I don't know anything and just tell me what
13  did Long Leaf Trading do?  What's your elevator
14  pitch for Long Leaf Trading, please.
15    A    Well, it's taking advantage of options
16  in the commodity markets, discrepancies on options.
17    Q    All right.  So would it be fair to say
18  that Long Leaf Trading offered options transactions
19  to retail investors?
20    A    Yes.
21    Q    What is Time Means Money?  Is that a phrase
22  that's familiar to you?
23    A    Yeah.  I don't really -- I mean, that
24  was a -- the Time Means Money program was developed

Page 15

1  by Tim Evans.  He was the first owner that I worked
2  with.
3    Q    So what was that?
4    A    It was taking advantage of time decay
5  with options.
6    Q    And this Time Means Money, this
7  was something that Long Leaf Trading offered to
8  customers, is that right?
9    A    Yes.
10    Q    In your time as a broker for Long
11  Leaf Trading, did you offer this Time Means Money
12  program to investors?
13    A    Yes.
14    Q    What percentage of your customers
15  when you were a broker were Time Means Money
16  participants?
17    A    As far as I know, most of them.  All
18  of them I think.  We did have some self-directed,
19  but I had no contact with them.
20          (Whereupon CFTC Exhibit No. 24 was
21            marked for identification, MM.)
22    Q    Okay.  Mr. Gecas, I want to hand you what
23  I've marked as CFTC Exhibit 24.  Do you recognize
24  this document?

Page 16

1    A    Yes.
2    Q    Can you tell me what it is, please.
3    A    It looks like their trade recommendations.
4    Q    All right.  Do you see it says from Scott
5  Gecas at the top?
6    A    Yes.
7    Q    And it says to finneganent@wwdb.org.
8  Do you know who that is?
9    A    Yes.
10    Q    Who's that?
11    A    He was one of my clients.
12    Q    Do you remember his name?
13    A    Larry Finnegan, I believe.
14    Q    So you say this is a recommendation.
15  What's it a recommendation for?
16    A    Based on the allocation, what the
17  customer was okay with the risk, we recommend the
18  trades and then we have to call them or email them
19  and get their authorization to place the trade for
20  them.
21    Q    All right.  So this recommendation
22  we see in Exhibit 24 is a recommendation that you
23  would send out to customers?
24    A    Yes.

Page 17

1    Q    Did every customer get the same
2  recommendation?
3    A    Yes.
4    Q    Who came up with the recommendations?
5    A    In the beginning it was Tim Evans, and then
6  I was the trade designer.
7    Q    All right.  So you say you took over
8  as trade designer in December -- oh, sorry, in
9  January of 2018?
10   A    January, I believe so, yes.
11   Q    Was that after Tim Evans sold the business
12  to Jim Donelson?
13   A    Yes.
14   Q    All right.  So let's just take a look --
15   A    Well, to be clear, so how the transition
16  worked, Tim Evans did the recommendations.  Jim
17  Donelson started doing the recommendations.  He
18  outsourced those recommendations, which he wasn't
19  happy with, and then he asked -- he approached me
20  to do the recommendations.
21   Q    Okay.  Who did Mr. Donelson -- and
22  we'll come back to this -- but who did Mr. Donelson
23  outsource the recommendations to?
24   A    I have no idea.

Page 18

1    Q    All right.  So let's just stick
2  with Exhibit 24 for the moment, if we could,
3  please.  So you'll see it says Recommendation 1,
4  Recommendation 2, Recommendation 3 and
5  Recommendation 4, if you flip to the second page.
6  So why do we have four recommendations here?  Does
7  the customer get to choose one?  What's going on?
8    A    Yes, the customer is always in control.
9  He can choose or pick what he wants to do.  The Time
10  Means Money program was based on four trades per
11  month.
12   Q    When you say the Time Means Money
13  program was based on four trades per month, what
14  do you mean?
15   A    Four recommendations per month.
16   Q    And is that every month during the time
17  that you worked at Long Leaf Trading?
18   A    Correct.
19   Q    All right.  So are you recommending
20  in this email that's marked Exhibit 24 that the
21  customer take all four recommendations?  Are you
22  recommending --
23   A    Yes.
24   Q    Describe to me how this works.

Page 19

1    A    Yeah, so we send out the recommendations.
2  We recommend four trades per month and the customer
3  can choose to take one, to take four, whatever they
4  want to do.  And then they respond back to either,
5  yes, I want to take all four or, no, I just want to
6  take all four and I just want this, this and that.
7    Q    All right.  So turning again to Exhibit 24,
8  in these little tables you see Max Reward/Max Risk.
9  What does that mean?
10   A    Based on the position, max reward
11  is the most that position can make.  Max risk is the
12  most that the customer can lose.
13   Q    And how is that determined?
14   A    Just based on the width of the strikes.
15   Q    And who determines that?
16   A    It depends on if you're asking before
17  me or when I was doing it.  Well, like pretty much
18  this is how it worked out.  So the trade would be --
19  it would be designed and then it would be put into
20  some platform that would determine the risk and
21  reward.  That was done by either Tim Evans or
22  Jim Donelson.
23   Q    What was the name of that platform?
24   A    QuikStrike.

Page 20

1    Q    All right.  So we're looking again
2  at Exhibit 4.  You're sending this out to this
3  client Larry Finnegan, right?
4    A    24, yes.
5    Q    What did I say?
6    A    4.
7    Q    Oh, thank you.
8    A    That's okay.
9    Q    So how would you send out recommendations
10  to your clients at Long Leaf Trading?
11   A    In an email.  If they did not respond in
12  the email, we would give them a call.
13   Q    Looking again at Exhibit 4 --
14   A    24.
15   Q    Sorry, thank you, 24.  You'll see
16  there's an offer price.  Do you see that listed in
17  that table?
18   A    Yes.
19   Q    All right.  So was there ever an
20  occasion where Long Leaf Trading didn't get that
21  offer price?
22   A    It was or better.  So, yes, there
23  is an occasion -- there were several occasions that
24  we had better prices.

Page 21

1 Q What about worse prices?
2 A No, not to my knowledge at least.
3 EXAMINATION
4 BY MR. PATRICK:
5 Q Were there times that you weren't able
6 to get that price or better?
7 A Yes.
8 Q What happened to those trades?
9 A Nothing. They weren't executed.
10 Q So they just wouldn't be executed?
11 A (Shaking head).
12 MS. STREIT: Is that a yes?
13 A Yes.
14 BY MR. PATRICK:
15 Q How often did it happen that you would
16 put a trade on for a customer at an or better price
17 and it didn't get executed?
18 A Not very often.
19 Q So would you say most of your trade
20 entries were executed?
21 A Within that price limit, yes.
22 FURTHER EXAMINATION
23 BY MR. BURDEN:
24 Q So I'm sorry. I think there must have

Page 22

1 been some disconnect. So what I meant to --
2 what I was asking you is were there times when
3 Long Leaf Trading was not able to get an execution
4 at the offer price listed in the recommendation?
5 A Yes.
6 Q Okay. What happened then?
7 A Nothing. The trade was not executed.
8 Q But the customer had presumably agreed
9 to do that trade, correct?
10 A Correct.
11 Q So was the trade just not done for the
12 customer?
13 A If it was above the offer price, correct.
14 Q Well, wouldn't the customer be disappointed
15 or left out from the trades recommendation that he
16 or she thought they were agreeing to?
17 A I don't know how their feelings would
18 be with that but, yes, they would be left out of
19 that trade.
20 Q So would you ever call the customer and
21 say we --
22 A We missed the price, yes.
23 Q So you did that?
24 A Yes.

Page 23

1 Q What did they say?
2 A Okay.
3 Q Do you remember the names of any of those
4 customers?
5 A No, that didn't happen very often.
6 FURTHER EXAMINATION
7 BY MR. PATRICK:
8 Q Would the firm then choose to enter in the
9 trade at a different price?
10 A If it was within the limits, yes, but never
11 above the limit.
12 Q So the limit would have never --
13 A Exceeded.
14 Q -- exceeded or adjusted. So a new trade
15 is put in at an adjusted or better price?
16 A Or better it would be less than the, right,
17 price.
18 Q Right.
19 A So we have gotten filled or better,
20 meaning a lower cost of entry, but we never exceeded
21 the cost of entry that was recommended.
22 Q Okay. I'm thinking about a situation
23 where, you know, you offer the trade to the client.
24 The client says proceed. You put in the trade at

Page 24

1 an or better price, doesn't execute because the
2 market's not at that price. So you go back to the
3 customer and do you ever say to the customer, well,
4 we might be able to get this trade done if we adjust
5 the price, move it up or down depending on what
6 direction, and see if you can get executed there?
7 A Not that I recall. That wouldn't make
8 sense to me.
9 Q And why not?
10 A Because if we're within their risk
11 limits, we have to stay within their risk limits.
12 We wouldn't exceed their risk limits.
13 FURTHER EXAMINATION
14 BY MR. BURDEN:
15 Q So, Mr. Gecas, we're looking again at
16 Exhibit 24 here. When these trades were entered for
17 customers, how do you know when to exit the trades
18 on behalf of the customer?
19 A It depends on the customer. We would
20 tell them that target prices are anywhere between
21 25 percent to 50 percent of that position.
22 Q And at that point would Long Leaf Trading
23 get out of the trade on behalf of the client?
24 A If it hit the targeted price, yes.

Page 25

1    Q    What if it didn't?

2    A    Then nothing.  We couldn't get out of it.

3    Q    What I'm asking is would you let the

4  options expire?

5    A    On occasion, yes.

6    Q    So we're looking here at Exhibit 24.

7  This is a trade recommendation that you made to

8  customers, correct?

9    A    Correct.

10    Q    And were there customers that accepted

11  this trade recommendation?

12    A    Yes.

13    Q    All right.  So how did you gain

14  approval from the customer to exit this trade

15  when it came time to take a profit or a loss, as

16  the case may be?

17    A    It would either be a phone call or an

18  email.  More often than not, it would be a phone

19  call.

20    Q    And would you always seek customer

21  approval through a phone call before exiting the

22  trade?

23    A    Yes.

24    Q    And who told you to do that?

Page 26

1    A    Either Tim Evans or Jim Donelson.

2    Q    All right.  So I think we've finished

3  with this exhibit for the time being.  When we're

4  finished with an exhibit, you can just put them in

5  the middle of the table because our court reporter,

6  Ms. Maslowski, will take them with her and make them

7  part of the record.

8        (Whereupon CFTC Exhibit No. 25 was

9         marked for identification, MM.)

10    Q    All right.  Mr. Gecas, I want to

11  hand you what I've marked as CFTC Exhibit 25.  Do

12  you recognize this document?

13    A    Yes.

14    Q    Can you tell me what it is, please.

15    A    A trade recommendation.

16    Q    All right.  Is this a trade

17  recommendation that you sent to a customer at

18  Long Leaf Trading?

19    A    Yes.

20    Q    All right.  So I want to direct

21  your attention to the bottom of that first page,

22  and you'll see there are two fields here that says

23  Target Gain and Target Max Loss.  Do you see that?

24    A    Yes.

Page 27

1    Q    So what does that mean, target gain?

2    A    That means if -- depending on the

3  number of contracts, we would exit the order at the

4  targeted gain or the targeted loss.

5    Q    Who determined the target gain and the

6  target max loss?

7    A    Jim Donelson.

8    Q    All right.  So is this a field that

9  was included in recommendations when Jim Donelson

10  was in charge of Long Leaf?

11    A    Yes.

12    Q    Was this target gain and target

13  max loss, was this something that was included in

14  recommendations during Mr. Evans' tenure?

15    A    No.

16    Q    So do you know how Mr. Donelson

17  determined the target gain and the target max

18  loss?

19    A    Through QuikStrike, to my knowledge.

20    Q    How do you know that?

21    A    That's what he told me he was using,

22  QuikStrike.

23    Q    So why is there a target gain and a

24  target max loss?  It seems like there's a max gain.

Page 28

1  Do you see that?

2    A    Yes.

3    Q    It seems like what you want is the

4  max gain, and it seems like you don't want to have

5  a loss.

6    A    Right.

7    Q    So what's this target gain and target max

8  loss?  Why even put this in here?

9    A    Well, target gain was for customers

10  that had more than one contract that we would exit

11  out of partial positions and let the last piece run

12  to try to get the max gain.  Targeted loss was --

13  that was our loss that we were -- either that's the

14  width of the strikes where that would be worst case

15  scenario.

16    Q    So help me figure this out.  So let's

17  look at -- we've got max gain in Exhibit 25.  Do you

18  see that?

19    A    Yes.

20    Q    So what's the max gain there?

21    A    Max gain is 1348.40.

22    Q    All right.  So you see the target gain,

23  right?

24    A    Yes.

Page 29

1    Q    What's the target gain here?
2    A    Target gain is 1,011.30.
3    Q    All right.  So I don't understand
4  this.  Why is the target gain less than the max
5  gain?
6    A    Because the target gain was the
7  target that Jim Donelson determined to take off
8  partial positions, so we can capture some gain in
9  that position.
10    Q    All right.  Let's take a look at the max
11  loss.  What's the max loss for this recommendation
12  here?
13    A    The max loss, because it's a debit,
14  would be the price that we paid.  That's how much
15  it cost to get into the spread.
16    Q    And how much is that in Exhibit 25 here?
17    A    438.26.
18    Q    I'm not looking at the target loss.
19  I'm looking at the max loss in that third column
20  from the left.  Do you see Max Gain and Max Loss,
21  right?
22    A    Max loss is 674.20.
23    Q    All right.  And what does that represent,
24  please.

Page 30

1    A    If the options had to expire worthless.
2    Q    All right.  So let's take a look at
3  our target max loss.  What's the target max loss?
4    A    Target max loss is 438.26.
5    Q    So why are those different?
6    A    Because if we could take a partial
7  loss and not a full loss, that would be in the best
8  interests of the customer.
9            FURTHER EXAMINATION
10  BY MR. PATRICK:
11    Q    So in that circumstance is what you're
12  saying that at some point prior to expiration you
13  would take the client that is in that position out
14  of the position?
15    A    If it hit that negative number, yes.
16    Q    And that's a target that's predetermined
17  or preset before the trade's executed?
18    A    Yes.
19    Q    And who monitors those targets for the
20  firm at the time that you were there?
21    A    Tim Evans and Jim Donelson.
22    Q    And so when the market reached one of those
23  targets, what would happen then?
24    A    They would try to exit the position.

Page 31

1    Q    And is that the point then, they would
2  look to you for your clients and the other salesmen
3  for their clients to reach out to those clients and
4  get authorization to exit those positions?
5    A    Well, with the targeted gains and
6  losses when the trade went out, the customers were
7  agreeing to those targets and exits as well as the
8  entry.
9    Q    Okay.  Because I thought you had
10  testified earlier that you had gotten approval for
11  all exits of positions, to your knowledge.
12    A    Right, and through this email.
13    Q    So some of the approvals that you received
14  to exit positions were --
15    A    On the initial --
16    Q    -- on the initial trade on the in
17  to the trade?
18    A    Yes.
19    Q    And was that a policy-wide --
20    A    Yes, that was a policy-wide when Jim
21  Donelson came on.  And that was to remove the time
22  aspect of getting ahold of customers so that they
23  can exit in a timely manner.
24

Page 32

1            FURTHER EXAMINATION
2  BY MR. BURDEN:
3    Q    All right.  So looking at Exhibit 25, where
4  are we seeing the permission to exit?
5    A    Where it says Trade Approval, good til
6  cancel, and then the max target and the max loss.
7  When they agree to their trade recommendation, they
8  are also agreeing to the gains and losses as well.
9    Q    All right.  And this was something
10  that -- and if you look, actually, below this,
11  you'll see it says Exit:  15 OB Good until Cancel,
12  which I guess is that target max loss as well,
13  is that right?
14    A    Yes.
15    Q    All right.  So you said that this
16  practice of getting permission to exit a particular
17  price was instituted by Jim Donelson, is that
18  correct?
19    A    Yes.
20    Q    And approximately when did Mr. Donelson
21  institute this?
22    A    Sometime when he took control of the firm
23  in I believe it was January.
24    Q    Did he explain to you why he wanted

Page 33

1 to do this?

2    A    Yes.

3    Q    Why did he say?

4    A    To remove the time aspect of getting

5 ahold of customers.  Some customers wouldn't be

6 able to be getting ahold of and they would not be

7 able to take advantage of the gain.

8    Q    So looking again at Exhibit 25,

9 if you look at the very top of the email, it

10 looks like you forwarded this trade recommendation

11 to compliance, is that right?

12    A    Yes.

13    Q    Who's compliance?

14    A    I have no idea.

15    Q    Okay.  Why did you forward it to

16 compliance?

17    A    That was Jim Donelson's practice.  That's

18 what he told us to do.

19    Q    But you don't know who compliance was?

20    A    No.

21    Q    Did anybody from compliance ever come

22 and talk to you about anything?

23    A    I don't believe we ever had a compliance

24 person.

Page 34

1    Q    So whose email address is that?

2    A    Compliance?

3    Q    Yeah.

4    A    It's something Jim made up, Jim Donelson

5 made up.

6    Q    All right.  When you say it's something

7 Jim Donelson made up, what do you mean by that?

8    A    That's how he instilled the whole

9 process of getting permission from the clients.

10 And when they responded yes, he said forward that

11 to compliance.

12    Q    Got it.  So looking again at

13 Exhibit 25, so this is being sent to a client

14 whose email address is dhmuters@gmail.com.  Do you

15 know who this customer is?

16    A    Darlene Muters, I believe.

17    Q    All right.  And this was a customer

18 of yours?

19    A    I believe so.

20    Q    All right.  So how many contracts

21 are being recommended here for this customer?

22    A    I don't recall offhand.

23    Q    Well, just take a look at the email,

24 if you would, please, and let me know what it

Page 35

1 says.

2    A    It looks like it's one contract --

3 or, no, it's Recommendation 1.  It says that we

4 recommend a total of zero contracts, which I don't

5 understand that.

6    Q    Yeah.  Why would it say zero contracts?

7    A    I have no idea.

8    Q    All right.  Let's look back at

9 Exhibit 24, if we could, please.  Pull it out

10 of that pile.  Thank you.  So we're looking at

11 Exhibit 24 here and this is a recommendation you

12 sent to a customer, Larry Finnegan, correct?

13    A    Correct.

14    Q    All right.  So how many contracts

15 here are you recommending that Mr. Finnegan enter

16 into?

17    A    I don't believe it says.

18    Q    So how would you know how many contracts

19 to put Mr. Finnegan in?

20    A    Jim Donelson would send us an

21 allocation per customer, each individual customer

22 with the trade recommended number of contracts.

23    Q    And would he do that before the

24 recommendation went out?

Page 36

1    A    Yes.

2    Q    Did the customers know how many contracts

3 they were going to be put in?

4    A    Yes.

5    Q    How did they know?

6    A    Either through the recommendations

7 or through the initial account orientation when

8 they first came on.

9    Q    All right.  So you said the customer's

10 going to know how many contracts they're in because

11 of, one, the recommendation?

12    A    Yeah.  Sometimes the recommendations

13 would go out and say the exact number of contracts.

14 Sometimes they wouldn't.

15    Q    Okay.  So when did the recommendations

16 start saying the number of contracts that were being

17 recommended?

18    A    I don't recall.

19    Q    Was that during Mr. Evans' tenure,

20 Mr. Donelson's tenure?

21    A    Both would send out allocation numbers to

22 each individual broker of their registered clients

23 that they were dealing with.

24    Q    Well, so we're looking at Exhibit 24

Page 37

1  and I don't see any number of contracts here,
2  do you?
3     A   I don't.
4     Q   And I'll tell you this. I have
5  looked at all of these, and at least for many of
6  them I don't see any contracts, numbers of contracts
7  that are recommended. Is that consistent with your
8  recollection?
9     A   Yes.
10    Q   So how are customers supposed to know
11 from the recommendations how many contracts they're
12 going to be in?
13    A   In the initial call -- or the initial
14 orientation when they first signed up, they were
15 told about the risks involved as well as they had
16 a rule of thumb about I think it was $10,000 per one
17 contract. But the customers could also increase or
18 decrease, whatever they needed.
19    Q   So did you have these orientation calls
20 with customers?
21    A   Yes.
22    Q   Did you tell them that they were going
23 to be put in one contract for every $10,000 they
24 had in their account?

Page 38

1     A   Yes.
2     Q   Did you know that all your calls were
3  being recorded?
4     A   I was told -- under Tim Evans they were.
5  Under Jim Donelson they were not.
6     Q   Okay. Who told you that?
7     A   Jim Donelson.
8     Q   So I've listened to a lot of your
9  calls, and I did not hear any discussion of you
10 telling customers that they would be placed into
11 one contract for every $10,000 in their account.
12 Maybe I missed it. But is that surprising to you?
13    A   Well, it depends. I mean, the initial
14 to get them in, they would either agree to it or
15 not, but we never discussed number of contracts
16 until they were approved. Once they were approved,
17 once the money was sent, then that was the
18 orientation call where we would tell them one
19 contract per 10,000.
20    Q   And how did they know how much
21 money they had in their contract over time? I mean,
22 of course they knew when they made their initial
23 deposit, right?
24    A   Right.

Page 39

1     Q   They know how much they're putting in,
2  right?
3     A   Right.
4     Q   But that number would change over time,
5  wouldn't it?
6     A   Yes.
7     Q   So how would they know how many
8  contracts they were being entered into, say, six
9  months into the program?
10    A   It was still determined by what they
11 had in their account, regardless if the account
12 went up or down. If the account went down below
13 that 10,000, they would stay with one contract.
14 If it was below 20,000, they would go from two to
15 one contract.
16    Q   And would you advise them of this?
17    A   Yeah.
18    Q   How would you advise them?
19    A   Either through the email or on a phone
20 call.
21    Q   And did you advise every client if
22 their account changed in the number of contracts --
23 let me rephrase that. If the client's account
24 balance changed such that the number of contracts

Page 40

1  they were going to be entered into was different
2  than when they started, would you advise the client
3  of that?
4     A   Yes.
5     Q   Did you do that every time?
6     A   I don't recall. I believe so, but I don't
7  recall every time.
8            FURTHER EXAMINATION
9  BY MR. PATRICK:
10    Q   When you sent emails to customers
11 requesting approval for a particular trade or
12 set of trades, at that time did you let them know
13 how many contracts they would be trading?
14    A   Through the email -- the emails were
15 forwarded to me to send, so I did not write the
16 email. Jim Donelson wrote the email, and that's
17 what was our practice.
18    Q   Before you sent it did you say, hey,
19 just to let you know --
20    A   He would give us the allocation, so the
21 allocation would change based on that.
22    Q   So when you say allocation, do you
23 mean like the number of contracts that particular
24 client would be engaging in for that trade?

Page 41

1    A    Yes.
2    Q    And so Mr. Donelson would make that
3  determination for each customer?
4    A    Yes.
5    Q    Do you know what Mr. Donelson used to
6  make that determination?
7    A    I do not.
8    Q    Did he ever tell you he had some sort
9  of a, you know, worksheet or a program, a computer
10  program?
11    A    He said he had some type of program.
12  I didn't really get to see it, and I never got any
13  information on any of that.
14    Q    What did he say about this program?
15    A    He just said it's something I built on
16  an Excel spreadsheet.  That's the only information
17  I ever got on that.
18    Q    So your understanding was Mr. Donelson
19  was using this spreadsheet to determine what number
20  of contracts each of Long Leaf's customers would be
21  trading, participating in that --
22    A    Yes.
23    Q    -- particular trade or set of trades?
24    A    Yes.

Page 42

1         (Whereupon CFTC Exhibit No. 26 was
2          marked for identification, MM.)
3         FURTHER EXAMINATION
4  BY MR. BURDEN:
5    Q    All right.  Mr. Gecas, I'm handing
6  you what I've marked as CFTC Exhibit 26.  Do you
7  recognize this document?
8    A    The top I do not.  I do not recommend
9  Mid Month Trade Summary.
10    Q    So look at the attachments to this
11  email and tell me if you recognize those, please.
12    A    Okay, yes.  The one headline, yes, I do.
13    Q    All right.  Can you tell me what that is,
14  please.
15    A    It looks like it's a trade recommendation.
16    Q    All right.  So if you're looking
17  at Exhibit 26, you'll see that it's an email to
18  you from Mr. Donelson dated April 9, 2018.
19    A    Correct.
20    Q    And it's got a bunch of attachments.
21  Do you see those listed on the cover email?
22    A    Okay, yes.
23    Q    So it looks like we've got a Trade
24  Summary 1 contract, a Trade Summary 2 contracts,

Page 43

1  Trade Summary 3 contracts, Trade Summary 5 contracts
2  and a Trade Summary 10 contracts.  Do you see that?
3    A    Yes.
4    Q    So do you know what's going on here?
5    A    Yes.  It's the allocation number for
6  the client of one contract, five contracts, whatever
7  the contract number says.
8    Q    So Mr. Donelson would determine
9  how many contracts each customer was going to be
10  entered into, correct?
11    A    Correct.
12    Q    And he would send these recommendations
13  to you and the other brokers, correct?
14    A    Correct.
15    Q    And you would then send them to your
16  clients, right?
17    A    Correct.
18    Q    And so if the client had ten grand in
19  his account, he'd get the recommendation for one
20  contract, correct?
21    A    Correct.
22    Q    If he had 20 grand, he'd get the
23  recommendation for two contracts, correct?
24    A    Correct.

Page 44

1    Q    And if he or she had $100,000 in their
2  account, they'd probably get the ten-contract
3  recommendation, right?
4    A    Correct.
5    Q    All right.  So I want to talk a little
6  bit about how the trades at Long Leaf were actually
7  entered.  So I think your testimony is that you
8  would send out these recommendations to customers
9  and if they accepted the recommendations, they would
10  write you back, correct?
11    A    An email or a phone call, yes.
12    Q    All right.  So let's say a customer
13  wants to take your recommendation.  What would
14  happen next?  What do you do next?
15    A    We would fill out an order ticket,
16  time stamp it, and I would hand it to either Tim
17  Evans or Jim Donelson.
18    Q    What would Tim Evans or Jim Donelson
19  then do?
20    A    Execute the trades.
21    Q    All right.  Did you ever execute any
22  trades on behalf of Long Leaf customers?
23    A    On occasion when we were with Gain
24  Financial, I did have to call the order desk.

Page 45

1   Q    And how many times did that happen?
2   A    Not very often.
3   Q    Did it ever occur -- and if you don't
4   know, you should say.  Did it ever occur that trades
5   were executed at different prices?
6   A    If it was under the limit, yeah.
7   Q    What happened if trades were
8   executed at different prices?  How were those
9   prices allocated among the various customers, if you
10  know?
11  A    I do not know.
12  Q    All right.  I think you testified
13  before that you -- or I should rephrase it and say
14  you testified before that in approximately January
15  of 2018 you began working for Long Leaf Trading as
16  a trade designer, is that right?
17  A    Yes.
18  Q    Did you continue working as a broker?
19  A    Yes.
20  Q    So let's talk about -- I want to learn
21  how these trades were designed.  So if you would,
22  please, give me a broad overview.
23  A    That's more -- well, okay.  So when
24  Tim Evans came on -- or when he brought me on,

Page 46

1   you know, the first thing I asked him is, well,
2   how do they do and he said that they've done very
3   well.  They've had bad months and good months, but
4   overall they did fairly well.  However, they were
5   only doing credit spreads and iron condors and
6   broken wing -- or not broken wing but butterflies,
7   credit spreads, collecting money, which I did not
8   agree with.
9   Q    Why?
10  A    I just think the risk or the probability
11  of credit spreads and stuff like that -- or those
12  types of spreads are not high probability trades.
13  Q    What do you mean by that, high probability
14  trades?
15  A    For them to actually be profitable.
16  Q    Did you tell Mr. Evans this?
17  A    Yes.
18  Q    When did you tell him that?
19  A    Right away.
20  Q    What did he say in response?
21  A    Well, I have a proven track record that
22  this does work.
23  Q    So let's talk about that.  This proven
24  track record, that's what Mr. Evans said to you,

Page 47

1   that he had a proven track record that these
2   spreads made money?
3   A    That's what he said, but I've never seen
4   a track record.
5   Q    Did you ask to see a track record?
6   A    No.
7   Q    So why not?
8   A    At that point I was new in the
9   business, on the broker side at least, and
10  he's been in business for a lot longer than I have.
11  So I had no reason not to trust him.
12  Q    Well, I want to push you on this
13  a little bit because I think you just testified
14  that you felt that these credit spreads were not
15  a good way to make money, correct?
16  A    Based on my -- well, based on that type
17  of market condition, yes.
18  Q    So he's telling you, Mr. Evans is telling
19  you that he's done well and he's got a good track
20  record.  He told you that, right?
21  A    Yes.
22  Q    So it sounds like you had reason
23  to think that maybe he was wrong, is that fair
24  to say?

Page 48

1   A    Yes.
2   Q    What did you do to check into that?
3   A    I just had to wait for the trades to play
4   out to see what was going to happen.
5   Q    What happened?
6   A    And Tim Evans, he's had good months and
7   he's had bad months.
8   Q    So during the time that you were
9   at Long Leaf Trading, did customers lose money or
10  did they make money overall?
11  A    On a monthly basis it was mixed.
12  Overall under Tim Evans, I believe there were
13  losses.
14  Q    What about during Mr. Donelson's tenure?
15  A    It was all over the place.  Customers
16  that were inherited, you know, they had good months
17  and bad months.
18  Q    But overall --
19  A    Overall I believe there were losses.
20  Q    You mean across the board?
21  A    No, not across the board.  I mean,
22  they had some accounts that were -- like I said,
23  the inherited accounts were all over the place,
24  you know.  I wasn't aware what they started with

Page 49

1 or, you know, where they were but --
2    Q   We're going to come back to this, as
3 you might imagine, but let's stick for the moment
4 on how these trade recommendations are developed.
5 So you testified that Mr. Evans was putting together
6 these credit spreads, is that right?
7    A   Yes.
8    Q   How did he design these credit spreads?
9    A   No idea.
10   Q   Did you ever ask him?
11   A   No.
12   Q   Did you ever ask to see trading results
13 for Long Leaf Trading's customers firmwide?
14   A   No.
15   Q   Why not?
16   A   I don't know.  I don't know why
17 I didn't.  I mean, I just trusted Tim Evans as
18 far as, I mean, he was the owner.  He's been in
19 business for a long time.  There was no reason for
20 me not to trust him.
21   Q   All right.  So let's talk about when
22 you started designing trades in January of 2018.
23 How did you design trades for Long Leaf Trading
24 customers?

Page 50

1    A   I would use debit spreads because
2 they were a lot less riskier than credit spreads,
3 but I was also told to design them, that they had to
4 be four-legged spreads.
5    Q   Who told you that you have to design them
6 to be four-legged spreads?
7    A   Jim Donelson.
8    Q   Did he explain to you why they have to
9 be four-legged spreads?
10   A   No.
11   Q   Did you ask him?
12   A   Well, I did ask and he said, well, that's
13 just what we are doing.
14   Q   But did you ask him why that's what Long
15 Leaf Trading was doing?
16   A   And that was his response.
17       FURTHER EXAMINATION
18 BY MR. PATRICK:
19   Q   Was every trade recommendation four legged?
20   A   Yes.
21   Q   So there were never any positions
22 that you recall that were put on that might have
23 been three legged or something less than a four-leg
24 spread?

Page 51

1    A   Well, a three -- well, I don't know
2 how to explain this.  We did do three-legged spreads
3 as like a butterfly, so there were three strikes.
4 But it was one contract would equal one -- it would
5 equal four contracts.
6    Q   So it might be, you know, two longs and
7 then a short of two contracts?
8    A   Yes, or some -- yeah.  I mean --
9    Q   Some derivative of that?
10   A   Yes.
11       FURTHER EXAMINATION
12 BY MR. BURDEN:
13   Q   So it sounds like you wanted to design
14 trades to have less than four legs and Mr. Donelson
15 said, no, we do four-legged trades, is that right?
16   A   Yes.
17   Q   So why did you initially want to
18 design them such that they had -- I don't know.
19 How many legs did they have?  If you got to design
20 whatever trades you wanted, what would it look like
21 for Long Leaf Trading?
22   A   Well, I didn't get the chance to do
23 whatever I wanted.
24   Q   Okay.  Well, the first trade that

Page 52

1 you designed for Mr. Donelson, what did it look
2 like?
3    A   I have no idea what the first trade
4 I designed.  I know it was four legs.  It was
5 either a broken wing butterfly with a directional
6 bias or it was a double calendar.  I mean, there's
7 a lot of different things that you can do.
8    Q   So how did you wind up with this job for
9 Mr. Donelson designing trades?
10   A   I was the only one in the office that had
11 any knowledge about options.
12   Q   Can you expound on that?  What do
13 you mean, the only person who had any knowledge
14 of options?
15   A   When I came on with Tim Evans,
16 he had very little option experience.  The brokers
17 that were there when I was there had zero option
18 experience.  And then when Jim Donelson came on,
19 he hired younger kids out of college that had zero
20 market experience or option experience, and Jim
21 Donelson didn't have any option experience either.
22       MR. PATRICK:  So you're including Jim
23   Donelson in that?  You're saying that Jim --
24       THE WITNESS:  Correct.

Page 53

1       MR. PATRICK:  -- did not have options
2   knowledge either?
3       THE WITNESS:  Correct.
4   BY MR. BURDEN:
5       Q    So you were really the only guy at Long
6   Leaf Trading who knew anything about options?
7       A    More or less.
8       Q    So I think you testified before
9   that Mr. Donelson initially tried to outsource the
10  recommendation, is that right?
11      A    Yes.
12      Q    But after that he turned to you, correct?
13      A    Correct.
14      Q    And you agreed to design trades?
15      A    Yes.
16      MR. PATRICK:  Were the trades that
17  the outsourced firm, were they similar to the
18  trades that you guys were recommending after you
19  no longer used to do the outsource service?
20      THE WITNESS:  No, they were -- continued
21  to be credit spreads like Tim Evans did.
22  BY MR. BURDEN:
23      Q    So I want to explore this a little
24  bit more.  So your testimony is that all Tim Evans'

Page 54

1   recommendations were credit spreads, is that right?
2       A    To my knowledge, yes.
3       Q    All right.  And when you took over
4   designing trades, you made them debit spreads,
5   is that right?
6       A    Correct.
7       Q    So why did you not want to do credit
8   spreads?
9       A    No. 1, I didn't like the risk involved
10  in credit spreads.  I didn't like the probability,
11  No. 2.
12      Q    All right.  So I want to expound
13  on that a little bit.  When you say you didn't
14  like the risk inherent in credit spreads, what do
15  you mean by that?
16      A    When you -- are you familiar with credit
17  spreads?
18      Q    Yeah.
19      A    Okay.  So normal credit spreads are
20  collecting premium and risking more than the premium
21  you're collecting.
22      Q    When you say that you don't like
23  the probability of credit spreads, what do you
24  mean by that?

Page 55

1       A    The credit spreads that he was
2   using were bracketing markets, meaning that he was
3   implying that the market would stay in a certain
4   range.
5       Q    And if it didn't, what would happen?
6       A    The customer would lose money.  The credit
7   spread would not work.
8       Q    Did you share these concerns with
9   Mr. Evans?
10      A    Yes.
11      Q    And how did he respond?
12      A    I've made money doing this.
13      Q    And when did you share these concerns
14  with Mr. Evans?
15      A    Probably within the first three
16  months that I was there.  I mean, I didn't have
17  any experience with any of that, so I was very shy
18  in all of that and I was the new guy there as well.
19      Q    So you didn't sort of push Mr. Evans on
20  it because you were new at the job and didn't want
21  to antagonize him?
22      A    Yes, yes.
23      Q    When you talked to customers -- I should
24  ask you first.  Did you talk to customers on the

Page 56

1   telephone for Long Leaf Trading?
2       A    Yes.
3       Q    When you talked to them, did you tell
4   them about your reservations with respect to credit
5   spreads?
6       A    No.
7       Q    Why not?
8       A    I was told not to.
9       Q    Who told you not to?
10      A    Tim Evans.
11      Q    What did he say to you exactly?
12      A    He said read the script.
13      Q    What script?
14      A    The script that he gave me.
15      Q    When did he give you the script?
16      A    After I passed my Series 3.
17      Q    Did you ever tell customers that
18  the credit spreads being offered by Long Leaf
19  Trading risked more than the money that was being
20  collected?
21      A    Yes.
22      Q    When did you tell them that?
23      A    On every initial call when we were
24  going into the trade design or the trades that

Page 57

1 were recommended.
2    Q    Did you tell customers that you felt
3 like the probabilities of credit spreads were
4 unfavorable?
5    A    No.
6    Q    Why not?
7    A    Because that's what I was told to do.
8    Q    Who told you to do that?
9    A    Tim Evans.
10    Q    So why would you agree not to sort
11 of disclose your reservations to customers if you
12 were concerned about credit spreads?
13    A    Well, No. 1, I was new and I didn't want
14 to antagonize Tim.  But, No. 2, he said that he's
15 had success with that.
16    Q    All right.  Mr. Gecas, I want to
17 hand you what I've marked as CFTC Exhibit 4, and
18 you'll see it's an email from Jim Donelson to Andrew
19 Nelson, but it's got a document attached to it and
20 I want to ask you if you recognize that document.
21    A    Yes.
22    Q    Where do you recognize it from?
23    A    This was the script that Tim Evans gave us.
24    Q    So this was the script that you read from

Page 58

1 on calls?
2    A    Yes.
3    Q    And that you were instructed by Tim Evans
4 to stick to?
5    A    Correct, as well as Jim Donelson when
6 he took over.
7    Q    So Jim Donelson used the same script
8 as Mr. Evans?
9    A    To my knowledge, yes.
10    Q    I'm going to embarrass myself and ask if
11 I can see that back, please.
12    A    (Tendering).
13    Q    Thank you.  See, I didn't have a copy of
14 this one for myself.
15    A    That's okay.
16    Q    I want to show you a passage on page 6 of
17 Exhibit 4 and it says, "These three principles are
18 what we have built our company upon and everything
19 that we do since our inception.  At Long Leaf we
20 measure our success by our clients' success.  There
21 is no way we would have the ability to work with
22 hundreds of clients month after month for over nine
23 years and oversee millions of dollars if we weren't
24 being profitable for them."  Do you see that in

Page 59

1 Exhibit 4?
2    A    Yes.
3    Q    So is that something you said to customers
4 on calls?
5    A    Yes.
6    Q    Who instructed you to say that?
7    A    Tim Evans.
8    Q    All right.  And did you say that to
9 customers on calls?
10    A    Yes, I did.
11    Q    Did you say it to some of the customers,
12 most of them, all of them?
13    A    Some of them.
14    Q    All right.  Did you say that to
15 customers consistently throughout the period you
16 worked at Long Leaf Trading?
17    A    Yes.
18    Q    So you said Tim Evans instructed you
19 to say it to customers, correct?
20    A    Yes.  I shouldn't say I did continue
21 to say that because, I mean, I didn't see the track
22 record and I didn't see that.  The only thing I went
23 on was Tim Evans' word, and I had no reason not to
24 believe him but after time I did stop saying that.

Page 60

1 I didn't say it every single time.
2    Q    So when did you stop saying this bit
3 about --
4    A    I don't recall.
5    Q    All right.  So let's go back to designing
6 the trades --
7    A    Okay.
8    Q    -- when you were in charge of it,
9 please.  So you were instructed by Tim Evans to
10 design spread trades that have four legs, correct?
11    A    That was incorrect.
12    Q    Well, what did he tell you then?
13    A    Tim Evans, I never designed trades for
14 Tim Evans.
15    Q    Oh, I'm sorry.  Jim Donelson?
16    A    Yes.
17    Q    Jim Donelson instructed you to design
18 spread trades that had four legs, correct?
19    A    Correct.
20    Q    Was the purpose of these four-legged
21 trades relating to the collection of commissions?
22    A    I can only assume so, but I don't know
23 for sure.
24    Q    Why do you think that?

Page 61

1    A    Just because four legs generates more
2  commissions.
3    Q    Did you ever ask Mr. Donelson about this?
4    A    No.
5    Q    So you say four legs generates more
6  commissions.  That's correct?
7    A    Yes.
8    Q    Well, does it do anything else?
9  Is there any other reason you can think of to
10  do a four-legged trade?
11    A    Yes, a lot of reasons.
12    Q    Okay.  What are those reasons?
13    A    To reduce the cost of entry, to limit
14  the risk and to take advantage of time decay as well
15  as the volatility increase.
16    Q    All right.  Did Mr. Donelson ever
17  intimate to you or did Mr. Donelson ever say
18  that these are the reasons why we're doing these
19  four-legged trades?
20    A    No.
21    Q    Did you think that those were the
22  reasons why you were doing the four-legged trades?
23    A    Those were the only reasons I could
24  come up with based on my experience with options.

Page 62

1    Q    Well, why do you think you were
2  instructed to do the four-legged trades?  Was it
3  commissions?
4    A    I mean, taking advantage of the --
5  reducing the costs was my initial thought of why
6  to do four-legged spreads, which made complete sense
7  to me.
8    Q    Why did that make sense to you?
9    A    Because it reduces the cost of entry.
10    Q    How does it do that?
11    A    By selling options to finance higher
12  probability options.
13    Q    When you say higher probability options,
14  do you just mean the opposite --
15    A    Closer to the money.
16    Q    You've got to let me finish.
17    A    Okay.
18    Q    If you would, please.
19          FURTHER EXAMINATION
20  BY MR. PATRICK:
21    Q    Does putting those positions on to help
22  finance a higher probability transaction, does that
23  also affect profitability?
24    A    On occasion, yes.

Page 63

1    Q    Can you talk about how that affects
2  profitability?
3    A    It depends on the strategy.  Like
4  if we do a ladder where you're buying two, selling
5  one, selling one, it reduces the cost of entry but
6  it also increases the delta versus a regular call
7  spread or put spread.
8    Q    And can you explain what the delta is
9  on an option?
10    A    The delta is the rate of change
11  per dollar move in the underlying, in the option.
12          FURTHER EXAMINATION
13  BY MR. BURDEN:
14    Q    So it seems to me like by selling
15  options to purchase higher probability options,
16  you're potentially -- you're not potentially.
17  You're sort of limiting the amount of profit you
18  can make from those higher probability options,
19  is that fair to say?
20    A    Every spread has limited profitability.
21    Q    So in reviewing the recommendations
22  that were sent to customers by Long Leaf Trading,
23  is it fair to say that Long Leaf Trading recommended
24  contracts in a wide variety of instruments?

Page 64

1    A    Yes.
2    Q    So there's coffee in there, right?
3    A    Yes.
4    Q    T-bonds?
5    A    Yes.
6    Q    Hogs?
7    A    Yes.
8    Q    Soybeans?
9    A    Yes.
10    Q    So how did you determine when you were
11  in charge of designing trades what contracts would
12  be recommended to clients?
13    A    Based on the market conditions, based on
14  the chart patterns, based on the volatility levels,
15  based on the delta.
16    Q    And how would you sort of --
17  I understand it's -- how would you determine what
18  instruments, which options on which commodities
19  should be entered into sort of broadly?  Was there
20  any rule that sort of guided your designing of the
21  trades?
22    A    The only rule was really I had was
23  the position could not exceed a thousand dollars.
24    Q    Who told you that rule?

Page 65

1   A   Jim Donelson.
2   Q   And did he explain why?
3   A   No.
4   Q   Do you have any understanding of why?
5   A   No.
6   Q   Is it perhaps because that's what sort
7 of the customers with the smallest accounts could
8 participate in?
9   A   That would make sense, but that wasn't
10 explained to me.
11   Q   All right.  So you'll have to forgive
12 my ignorance again.  How do you design a position
13 that can't cost more than a thousand dollars?  How
14 do you back into that?
15   A   You take the price of the spread.
16 If it's more than a thousand dollars, it's not a
17 good trade.
18   Q   So what do you do if it's more than
19 a thousand dollars?  What do you do to make it less
20 than a thousand dollars?
21   A   Adjust the strikes.
22   Q   You move them out, correct?
23   A   Or down or wherever it makes sense to
24 be within that parameter.

Page 66

1           FURTHER EXAMINATION
2 BY MR. PATRICK:
3   Q   Do you typically move the strikes further
4 away from the money if you're trying to reduce the
5 overall cost of the trade?
6   A   On occasion, yes.
7   Q   Are there occasions that you would
8 move the strikes closer to the money in order to
9 reduce the price of the trade?
10   A   On occasion, yes.
11   Q   And what circumstances would those be?
12   A   Based on the strategy.
13   Q   So can you describe a strategy where
14 in order to reduce the cost of the trade you'd
15 have to move the strike prices on the legs closer
16 to the money?
17   A   The short strike would make sense
18 to be closer to the money because it's higher
19 premium.
20   Q   Does the short strike being closer
21 to the money change the margin requirements for
22 that account?
23   A   The margin requirements were not
24 an issue when I was designing trades because

Page 67

1 they were debits.
2   Q   Because the trade netted to a debit?
3   A   Correct, and they had equal-sided
4 contracts.
5           FURTHER EXAMINATION
6 BY MR. BURDEN:
7   Q   All right.  So your testimony
8 is that Mr. Donelson gave you two rules for
9 designing trades.  The first is that they have to
10 have four legs, is that right?
11   A   Yes.
12   Q   The second is that the position
13 taken together has to be a thousand dollars or
14 less, is that correct?
15   A   Yes.
16   Q   Any other rules or constraints imposed
17 upon your designing contracts by Mr. Donelson?
18   A   Never naked short options for sure
19 but, I mean, that's something I would do anyway.
20 I would never put anybody in a naked option.  It
21 doesn't make sense.
22   Q   Okay.  Any other rules?
23   A   No.
24   Q   Any other guiding principles?

Page 68

1   A   No.
2       MR. PATRICK:  Was the cost of position
3 that you referred to, that rule about a thousand
4 dollars or less, was that inclusive of all
5 commissions and fees or was that just the gross
6 cost of the trade?
7       THE WITNESS:  When I designed the
8 trades, I would give him the gross cost of
9 the trade.
10      MR. PATRICK:  And that was the number
11 that had to be less than a thousand dollars?
12      THE WITNESS:  Yes.
13      MR. PATRICK:  Or a thousand dollars or
14 less?
15      THE WITNESS:  Correct.
16 BY MR. BURDEN:
17   Q   So your testimony is that you come up
18 with a trade recommendation first based on market
19 information, is that correct?
20   A   Yes.
21   Q   And then you would sort of change
22 the trade recommendation so it came in under that
23 thousand dollar limit, is that correct?
24   A   Yes.

Page 69

1    Q    So every month under Mr. Donelson you
2  had to design how many trades?
3    A    Four.
4    Q    And each trade has four legs, correct?
5    A    Yes.
6    Q    That's a lot of trades.
7    A    Four trades a month?
8    Q    With four contracts in them each?
9    A    That's a lot of contracts.  I wouldn't
10 say a lot of trades.
11   Q    All right.  So when would you start
12 designing -- what I want you to do is kind of walk
13 me through -- and if we have a specific example, we
14 can use that -- but walk me through what you would
15 sort of do to design the trades.  When would you
16 start designing trades --
17   A    I would look at the market every day.
18   Q    Well, let's say for the next -- when
19 would the trade recommendations go out?  Is it like
20 the same time every month or --
21   A    Within the last two weeks of the month.
22   Q    That's when the new trade recommendations
23 go out?
24   A    Yes.

Page 70

1    Q    All right.  So when do you start designing
2  the trades for like the next month?
3    A    Depends on market conditions.  I mean,
4  I would watch the market every single day.
5    Q    So what are you looking for?
6    A    High volatility, directional, time decay.
7    Q    So let's talk about volatility.
8  What would you be looking for to start designing
9  a trade?  Would you be looking for high volatility
10 or low volatility --
11   A    Both.
12   Q    -- in particular markets?
13   A    Both.
14   Q    So I understand why you would want
15 low volatility.  I'm not sure why you would want
16 high volatility.
17   A    High volatility you collect more premium.
18   Q    So you would look and see what markets
19 were more or less volatile?
20   A    Yes.
21   Q    And so if a market -- I mean, what are you
22 looking for here as a general matter?
23   A    It just depends on the condition of the
24 market.  It depends on the situation.

Page 71

1    Q    Well, what would be a favorable
2  condition for one of your trades?  Like if you
3  were to -- let me see if I have one that you --
4  a trade that you designed close at hand.  If not,
5  I'll get one after lunch.
6    A    Grab from 24, 25, one of these
7  recommendations and I can break it down.
8    Q    Yeah.  You know, 25 I think is the
9  right one because that's from February, so let's
10 look at Exhibit 25.  Was this a trade that you
11 designed, Mr. Gecas?
12   A    Yes.
13   Q    All right.  So it looks like we've got
14 two recommendations here, right?
15   A    Yes, yes.
16   Q    And one is a U.S. T-bond volatility swap,
17 right?
18   A    Yes.
19   Q    And Recommendation 2 is a British pound
20 volatility swap, is that right?
21   A    Yes.
22   Q    All right.  So let's take a look at this
23 first one, this T-bond volatility swap.
24   A    They're both the same premise.

Page 72

1    Q    Okay.  What's the premise, please.
2    A    The front month volatility is much
3  higher than the back.  I don't recall why it was,
4  but that would be the only reason why I would
5  recommend this.
6    Q    All right.  Is that a thing that
7  you were looking for in trying to decide trades,
8  if the front month volatility was higher than the
9  back?
10   A    Yes.
11   Q    Was that something if you saw that
12 in a particular instrument, would you design a trade
13 around that?
14   A    Yes.
15   Q    All right.  So what else would you look
16 for to design trades around?
17   A    Directional basis.
18   Q    What do you mean by directional basis?
19   A    Whatever the chart pattern was.
20   Q    And what else would you look at in
21 designing trades?
22   A    Chart patterns, volatility and time decay.
23      MR. PATRICK:  Can you tell me what you
24 mean by time decay?  Is that the number of days

Page 73

1    until expiration on the options contract or --
2        THE WITNESS: It's the theta number.
3        MR. PATRICK: The theta number. And can
4    you explain what that means, the theta number?
5        THE WITNESS: Theta is the amount of the
6    decay the option has per day.
7        MR. PATRICK: So is that like the
8    percentage of the options value that's decaying
9    each day?
10       THE WITNESS: Yes.
11   BY MR. BURDEN:
12       Q    So if you're designing trades, how
13   do you determine what prices you want to exit the
14   trade at?
15       A    That is Jim Donelson. That's what he
16   used QuikStrike for. I gave him the recommendations
17   and he would do all the max gain and max loss.
18       Q    So your role in designing trades
19   was to come up with the instruments that were
20   going to be traded and to make sure that it was
21   not going to cost customers more than a thousand
22   dollars a contract, is that right?
23       A    Correct.
24       Q    And then Mr. Donelson would take care

Page 74

1    of the rest?
2        A    Yes.
3            FURTHER EXAMINATION
4    BY MR. PATRICK:
5        Q    So how did you get those costs to
6    show -- how did you ensure that it was going to
7    be a thousand dollars or less if you weren't looking
8    at the prices and strikes? It sounds like --
9        A    I was looking at the prices and strikes.
10       Q    So what was Mr. Donelson doing in
11   QuikStrike?
12       A    He would take the design that I came up
13   with, plug it into QuikStrike, and then QuikStrike
14   would give him the numbers and then he would say yes
15   or no.
16       Q    What numbers was he getting out of
17   QuikStrike?
18       A    Total or max return, max loss, all the
19   Greeks of the position.
20       Q    So when you gave him one of your
21   recommended trades, it also included the strikes
22   and the prices that you thought --
23       A    Would fit.
24       Q    -- would fit the trade strategy?

Page 75

1        A    Yes.
2            FURTHER EXAMINATION
3    BY MR. BURDEN:
4        Q    I apologize if I asked you this, but
5    during Mr. Donelson's tenure, did this rule of one
6    contract for every $10,000 in the account continue?
7        A    Yes.
8        Q    All right. I think you testified
9    that margin didn't really play any role during the
10   period that you were designing trades because they
11   were net debits to the account, is that right?
12       A    Yes.
13       Q    What about during Mr. Evans' tenure,
14   do you know what role margin played in recommending
15   trades?
16       A    Well, if they were credit spreads, yes.
17   I mean, the margin was definitely an issue.
18       Q    So do you know how Mr. Donelson
19   made sure his recommendations would not cause the
20   customers to experience a margin call?
21       A    No, I don't. I mean, I would assume
22   because they're debits there wasn't many margin
23   issues.
24       Q    I'm sorry. Mr. Evans. Did I say

Page 76

1    Mr. Donelson?
2        A    Yes.
3        Q    I meant Mr. Evans. So during
4    Mr. Evans' tenure, those credit spreads could
5    potentially result in margin calls for customers,
6    correct?
7        A    Yes.
8        Q    So do you know how Mr. Evans made
9    sure that customers weren't going to get margin
10   calls?
11       A    No idea.
12       Q    So what role did you have in designing
13   trades during Mr. Evans' tenure?
14       A    None.
15       Q    By the way, if you want to take a break
16   at any point, we can take a break.
17       A    As soon as we can get out of here,
18   that would be fine.
19           (Whereupon CFTC Exhibit No. 27 was
20           marked for identification, MM.)
21       Q    All right. Mr. Gecas, I want to
22   hand you what I've marked as CFTC Exhibit 27. Do
23   you recognize this document?
24       A    Yes.

Page 77

1   Q   Can you tell me what it is, please.
2   A   These were all the customers that
3   I had -- that I was responsible for.  Some were --
4   most them were inherited.
5   Q   Inherited from whom?
6   A   Tim Evans.
7   Q   All right.  So looking here at
8   Exhibit 27, we see it's an email from Mr. Donelson
9   to you and it's titled Expected Trades, is that
10  right?
11  A   Right.  This is the allocations.
12  Q   So when you say the allocations,
13  this is Mr. Donelson telling you how many contracts
14  each customer should be in, correct?
15  A   Correct.
16  Q   What would you do with this information?
17  A   This is what I would recommend to the
18  client.
19  Q   So looking at Exhibit 27, we've
20  got Terry Groom and it says Total 3.  That means
21  Mr. Groom can do three contracts based on the amount
22  of money in his account, correct?
23  A   Yes.
24  Q   So you would then send Mr. Groom

Page 78

1   a recommendation for whatever trade is being
2   recommended but it would say we recommend three
3   contracts, right?
4   A   Correct.
5   Q   So what about Francis Abbey?  Francis
6   Abbey, it says Total, zero.  What does that mean?
7   A   He would not get the recommendations.
8   Q   So you wouldn't send out a recommendation
9   to Mr. or Ms. Abbey?
10  A   No.
11  Q   And Mr. Donelson would send you one of
12  these every month, correct?
13  A   Correct.
14      (Whereupon  CFTC  Exhibit No. 28 was
15          marked for identification, MM.)
16  Q   Mr. Gecas, I'm going to hand you what
17  I've marked as CFTC Exhibit 28.  Do you recognize
18  this document?
19  A   Yes.
20  Q   Can you tell me what it is, please.
21  A   Yes, another allocation.
22  Q   All right.  So you'll see this is an
23  email from Mr. Donelson to you and Mr. Nelson and
24  Mr. Hatzigiannis and Mr. Campo.  It says Contracts

Page 79

1   Available.  So this is another example of
2   Mr. Donelson's allocation?
3   A   Yes.
4   Q   So this looks a little bit different
5   than Exhibit 27, isn't that right?
6   A   Yes.
7   Q   So what's going on here?  There's some
8   new information.
9   A   Right.  So margin excess, that's
10  what was available to trade with, I'm guessing.
11  I don't know.  Where it says Class F and N, N
12  means -- I don't remember what N means, that they
13  can do partials, and F means that they can do the
14  full trade amount.
15  Q   So what does that mean, partial?
16  A   They cannot take all four recommendations.
17  They can take some.
18  Q   How do you know which ones they get
19  to take?
20  A   They choose.
21  Q   So you would have a conversation
22  with a customer and say you can't do all but you
23  can do some?
24  A   Yes, or we would just present them

Page 80

1   with the best opportunity based on market
2   conditions.
3   Q   All right.  You'll see there's
4   a Margin Needed column.  What's going on there?
5   A   I'm guessing that's the cost of the trade
6   that they would need to place.
7   Q   That makes sense.
8       MR. PATRICK:  So that's not really margin.
9   It's just --
10      THE WITNESS:  Right.
11      MR. PATRICK:  It's the cost of that
12  particular --
13      THE WITNESS:  Position.
14      MR. PATRICK:  -- trade recommendation
15  and whether or not the customer has enough in
16  its account to participate?
17      THE WITNESS:  To my knowledge, yes.
18  BY MR. BURDEN:
19  Q   You know, I want to clear something
20  up, Mr. Gecas.  I think you said before that one
21  of your guiding principles in designing trades was
22  that the position had to be a thousand dollars or
23  less, is that right?
24  A   Correct.

Page 81

1    Q    So every month you send out four
2 recommendations, right?
3    A    Yes.
4    Q    So is each recommendation a thousand
5 dollars?
6    A    Or less.
7    Q    Okay.  So if a person says, Mr. Gecas,
8 I want to take all four recommendations, that's
9 going to cost them $4,000, correct?
10   A    Yes.
11   Q    So do you know why the magic number
12 was a thousand dollars?
13   A    No.
14   Q    Did you ever ask?
15   A    No.  We did have -- I mean, very few
16 trades I think did exceed a thousand dollars, but
17 it was a special occasion.  I don't remember what
18 the actual was.  I do know that -- I don't believe
19 it ever exceeded 1500.  I think there was one or
20 two that were I think 1100 or 1200, but I'm not
21 positive.
22   Q    Yeah.  I mean, I guess my question is why
23 not 500?  Why not 2,000?
24   A    Yeah, I don't know.  I think there

Page 82

1 have been trades that were those dollar amounts.
2         (Whereupon CFTC Exhibit No. 29 was
3         marked for identification, MM.)
4    Q    I want to hand you what I've marked
5 as CFTC Exhibit 29.  Do you recognize this document?
6    A    Yes.
7    Q    Can you tell me what it is, please.
8    A    It looks like the clients as well as
9 their liquidating balance, margin needed, available
10 trades, what they agreed to, what's expected, the
11 net liq and then the number of contracts that were
12 for those four trades.
13   Q    All right.  So this Exhibit 29 is an email
14 from you -- I'm sorry, from Mr. Donelson to you from
15 February 22, 2018, is that right?
16   A    I believe so.
17   Q    So it's got an attachment.  It says
18 Scott List, and it's this Excel spreadsheet that's
19 on the second page of the exhibit.  Do you see that?
20   A    Yes.
21   Q    All right.  So what's going on here?
22 This looks like the allocations that we were looking
23 at in Exhibits 27 and 28 but, you know, there's more
24 fields.  Do you recall what's going on here?

Page 83

1    A    I mean, Jim Donelson was the
2 spreadsheet guy, and he was changing things
3 all the time.  He had full control over all this.
4 We never had any input or access to any of this
5 other than what he sent.
6    Q    So what were you supposed to do
7 with this information?  What did you do with this
8 information?
9    A    I'm not sure if these were trades
10 that were already on or if these are recommended
11 trades.  It looks like they're recommended trades
12 and it looks like that's what they agreed to.  I'm
13 not sure what this is, to be honest with you.
14   Q    Okay.  Let's put that one aside then,
15 please.
16   A    (Witness complies.)
17         (Whereupon CFTC Exhibit No. 30 was
18         marked for identification, MM.)
19   Q    All right.  Mr. Gecas, I want to
20 hand you what I've marked as CFTC Exhibit 30.
21 I'm going to ask you if you recognize it and please
22 answer when you've had a chance to review it.
23   A    Yes.
24   Q    All right.  What is it, please.

Page 84

1    A    That looks like it's another allocation
2 sheet.
3    Q    All right.  And this is an email from
4 Mr. Donelson to you and the other brokers dated
5 5/24/18, is that right?
6    A    Yes.
7    Q    All right.  So you'll see this
8 first attachment is titled May 24, 2018 Customer
9 Analysis, and it's the spreadsheet on the second
10 page of Exhibit 30.  So your testimony is that this
11 is another one of the allocations from Mr. Donelson,
12 correct?
13   A    I don't see the -- or what did you say
14 the last one was?
15   Q    Yeah.  So it doesn't -- you know,
16 we print these out and they don't have file names
17 on them, right?
18   A    Right.
19   Q    Because if you print out a document,
20 it doesn't have --
21   A    It looks like an allocation sheet then.
22   Q    Yeah.  So this is the first attachment
23 to Exhibit 30.  So what I'm looking at here is --
24 your testimony is it's another one of these

Page 85

1  allocations where Mr. Donelson tells you how many
2  contracts a customer can do and if they can do all
3  four recommendations or just some, is that correct?
4      A    Correct.
5      Q    All right.  So I'm looking at this and
6  we have a margin excess column.  Do you see that?
7      A    Yes.
8      Q    And then a net liq after trades.  Do you
9  see that?
10     A    Yes.
11     Q    So what's the relationship between these
12 two columns?
13     A    Well, margin excess is what they
14 have in their account, margin needed would be
15 the cost of the trade, and net liq after the trades
16 is -- I assume it's net liq after the trades were
17 placed.
18     Q    All right.  It's all coming together.
19 So it sounds like on these allocation spreadsheets
20 the margin excess, Mr. Donelson considers that net
21 liquidation to be margin excess, is that fair to
22 say?
23     A    I don't know what he assumes.
24     Q    In this margin needed, this is what

Page 86

1  it's going to cost the customer to get into this
2  trade?
3      A    I believe so, yes.
4      Q    So do you know where Mr. Donelson gets
5  this information from that we see on the allocation
6  sheets, as you described them?
7      A    I can only assume off other statements.
8      Q    Did you ever watch Mr. Donelson --
9      A    Do this, no.  We had no control over
10 anything Mr. Donelson did.  He was completely a
11 control guy.  He wouldn't let anyone do anything.
12     Q    Well, it sounds like he let you design
13 the trades.
14     A    Well, he let me come up with the
15 ideas.  And then if they fit the profile, then he
16 would say yes or no.
17     Q    Was there ever a time where you
18 recommended a trade to Mr. Donelson and he said,
19 you know, no or do it differently or otherwise sent
20 you back to the drawing board?
21     A    If it was -- depending on where the
22 price change was.  If the price was too much, then
23 yeah.
24     Q    Any other reasons why Mr. Donelson

Page 87

1  sent you back to the drawing board?
2      A    No.
3      Q    So if the price was around a thousand
4  dollars per trade, your recommendation would be
5  accepted by Mr. Donelson?
6      A    Correct.
7      Q    So did you ever recommend to Mr. Donelson
8  when to exit the trade?
9      A    No.
10     Q    How was that determined?
11     A    Well, yes.  I shouldn't say no.
12 Yes, I have on more than one occasion, and it
13 was on more than one occasion he did not agree with
14 me.
15     Q    All right.  So let's unpack that a little
16 if we could, please.  So your recommendations to
17 Mr. Donelson, those recommendations didn't include
18 the exit price, correct?
19     A    Correct.
20     Q    Did they include the exit time?
21     A    No.
22     Q    Who determined the exit price or
23 the exit time for the trades you recommended?
24     A    Jim Donelson.

Page 88

1      Q    And do you know how he did that?
2      A    I can only imagine through QuikStrike.
3      Q    Did he ever show you that he did it with
4  QuikStrike?
5      A    I have seen QuikStrike before.
6      Q    But has Mr. Donelson ever said,
7  you know, hey, Mr. Gecas, watch me use QuikStrike
8  to determine --
9      A    No.  I have used QuikStrike while I was
10 there.
11     Q    And I think you testified just now
12 that there were occasions when you recommended the
13 time and the price at which trades should be exited
14 to Mr. Donelson, correct?
15     A    I have, yeah.
16     Q    How many times do you think you did that?
17     A    Two that I can specifically recall.
18     Q    And when were those, please.
19     A    I don't remember the times or dates,
20 but one was a coffee trade and the other one was
21 a bond trade.
22     Q    All right.  And with respect to the
23 coffee trade, what did you say to Mr. Donelson?
24     A    It maxed out and I told him we should

Page 89

1  get out, and he said no because there's more time.
2    Q   And what happened after that?
3    A   He didn't exit it.
4    Q   What was the result of the trade?
5    A   I don't remember offhand.
6    Q   All right.  With respect to the bond
7  trade, same thing?
8    A   The bond trade ended up being a loss,
9  and I told him to exit the loss immediately and he
10  refused to.
11    Q   Were there any other occasions
12  where you made a recommendation to Mr. Donelson
13  about exiting trades?
14    A   Not that I can recall.  I'm sure I did.
15  I just don't have specifics.
16        (Whereupon  CFTC  Exhibit No. 31 was
17            marked for identification, MM.)
18    Q   All right.  Mr. Gecas, I want to show
19  you what we've marked as CFTC Exhibit 31.  Do you
20  recognize this document?
21    A   Yes.  This is QuikStrike, I believe.
22    Q   All right.  So Exhibit 31 is -- it's
23  an email that you're sending to Tim Evans dated
24  November 2, 2017 and the title is 11/1 Chart

Page 90

1  Explanations.  So is this an email that you sent?
2    A   Yes.
3    Q   So what is it?  What's going on here?
4    A   It looks like I'm just showing him
5  an example of what QuikStrike is.  I recommend Tim
6  Evans to use it and I don't believe he ever did.
7    Q   All right.  So is this sort of a sample
8  trade you designed?  What is this?
9    A   Yes.
10    Q   Did Mr. --
11    A   I believe so at least.  I don't remember.
12    Q   Did Mr. Evans use this?
13    A   Not to my knowledge.
14        (Whereupon  CFTC  Exhibit No. 32 was
15            marked for identification, MM.)
16    Q   All right.  Mr. Gecas, I want to hand
17  you what I've marked as CFTC Exhibit 32.  Do you
18  recognize this document?
19    A   Yes.
20    Q   Can you tell me what it is, please.
21    A   This was an email that Jim sent to
22  us to send to all of our guys, all of our clients.
23    Q   So if you look at Exhibit 32, it
24  looks like it's from Scott Gecas, which is you,

Page 91

1  to Jim Donelson and the attachment is January
2  Trade Recap.  So it looks like you're sending this
3  to Mr. Donelson?
4    A   Right.  So I did do a trade recap of
5  the positions that we had on, and then he would
6  take the email, adjust it and reword it and send it
7  back.
8    Q   So this Exhibit 32, the trade recap,
9  is something that you drafted, is that correct?
10    A   I believe so.
11    Q   So these trade recaps or trade
12  updates get sent out pretty regularly by Long Leaf
13  to customers, is that right?
14    A   No, it would happen on occasion.  It
15  wouldn't happen all the time.
16    Q   I thought it happened monthly, is that
17  not right?
18    A   It's supposed to.  It did not happen
19  monthly.
20    Q   What was the reason -- did Mr. Donelson
21  ask you to draft these recaps?
22    A   On occasion, yes.
23    Q   All right.  So it sounds like you
24  drafted some of them but not all of them, is that

Page 92

1  right?
2    A   Yes.
3    Q   How did you draft this?  Like what's
4  your basis for saying the things you say about
5  January trades in here?
6    A   Just whatever was going on in the
7  market and the reason why we have that spread
8  and just everything that was going on in the market
9  at that time.
10    Q   Did you ever use an options simulator?
11    A   No.  Well, I guess QuikStrike's an options
12  simulator.
13    Q   You know, I've got an email and I can
14  grab it and mark it as an exhibit, but I have a
15  feeling that you're going to have an easy answer
16  for it.  I have an email dated December 6, 2017
17  where Mr. Evans sends to you a spreadsheet called
18  Options Simulator and it's got equations in the
19  cells that you can plug things in.  Do you know
20  what I'm talking about here?
21    A   Very vaguely, and I believe that I told
22  him that it was worthless.
23    Q   Why did you --
24    A   Because I tried to use it -- if I recall

Page 93

1  correctly, I tried to use it and it didn't work.
2      Q    Was this options simulator something
3  that Mr. Evans used?
4      A    I don't know.
5      Q    When you were designing trades during
6  Mr. Donelson's tenure, did you use QuikStrike to
7  design the trades?
8      A    I did not use QuikStrike to design them,
9  no.
10     Q    You had login credentials for QuikStrike,
11 correct?
12     A    Correct.
13     Q    What did you use those login credentials
14 for?
15     A    To plug the numbers in after the
16 trades that I recommended were okayed to then
17 use QuikStrike for all the Greeks, what the position
18 had in delta, what the position had in gamma, theta,
19 rho.
20     Q    So I'm confused.  I thought your
21 testimony was that Mr. Donelson figured out the
22 Greeks, as you call them, and that was --
23     A    In the beginning he figured out
24 the Greeks.  Well, actually, no, he didn't.  But

Page 94

1  in the beginning he didn't use QuikStrike until
2  I recommended QuikStrike to him.  As I was using
3  QuikStrike to show him, then he took over QuikStrike
4  to completely take control over that.
5          (Whereupon  CFTC  Exhibit No. 33 was
6          marked for identification, MM.)
7      Q    Mr. Gecas, I want to hand to you what
8  I've marked as CFTC Exhibit 33.  Do you recognize
9  this document?
10     A    Yes.
11     Q    Can you tell me what it is, please.
12     A    It's a breakdown of the trade positions
13 that we had on at that period of time.
14     Q    All right.  So you'll see it's an
15 email from Mr. Donelson to you dated January 30,
16 2018 and the attachment -- the subject is Trade
17 Color and the attachment is January Trade Color.
18 And Mr. Donelson writes, "Here is the color behind
19 the trades for the month.  Please give me your
20 feedback."  So what's going on here?
21     A    This is like I said with the other
22 ones, so he would come up with this to send out
23 to the clients.  He would have me look over it,
24 if it actually made sense.  And then he would either

Page 95

1  adjust what I said or not, and then we would have
2  to send this out to the customers.
3      Q    Did you provide any feedback with respect
4  to this writing?
5      A    I'm sure I did on occasion.  I do not
6  recall specifically.
7      Q    All right.  I think in Exhibit 32 we
8  were looking at that January trade recap.  Remember
9  that?
10     A    Correct.
11     Q    So is this Exhibit 33, this is just
12 an earlier draft of that trade update it sounds
13 like, right?
14     A    Correct.
15     Q    All right.  So --
16     A    Yeah, it looks like it.
17     Q    I mean, let's stay on 33, if we
18 could, please.  So this is what was sent out
19 to customers explaining the trades for that month,
20 right?
21     A    Um-hmm.
22     Q    Yes?
23     A    Yes.
24     Q    So is this explaining trades

Page 96

1  that already happened or trades that were being
2  recommended that were going to happen?
3      A    That I don't recall.
4      Q    All right.  So what I really want to
5  get at is who comes up with this trade color as
6  it's described and where that information comes
7  from, but I think maybe the easiest way to do that
8  is to look at what's written.  So let's look at this
9  US --
10     A    Okay.  So I can explain that right away.
11     Q    Okay.
12     A    So what he would do is he would ask me
13 why I would look at those trades, and then I would
14 give him an explanation of why I looked at those and
15 then he would put in his own words.
16     Q    So you would sort of orally convey to
17 Mr. Donelson why you were recommending the trades
18 you recommended and then he would --
19     A    Yes.
20     Q    -- he would reduce that to writing?
21     A    Correct.
22     Q    And if you felt he did it incorrectly,
23 you would provide him with edits?
24     A    Right, correct.

Page 97

1    Q    So let's take a look at this passage
2 on U.S. T-bond broken wing butterfly.  So it reads,
3 "FOMC begins meeting tomorrow through Wednesday.
4 Expectation is that they will begin laying the
5 groundwork for a Q2 rate hike and will not signal
6 a Q1 hike.  The wording will most important" -- I
7 think that's supposed to say, "The wording will be
8 most important, as it will provide future guidance
9 on number of rate hikes for the year.  Current
10 expectation is three hikes."
11           So this was your explanation
12 for this trade that you provided to Mr. Donelson?
13    A    I believe so, yes.
14    Q    All right.  So where do you get this from?
15 It says there's an expectation that --
16    A    A number of news outlets.
17    Q    So you're reading news and that forms
18 part of your basis for making recommendations, is
19 that right?
20    A    Correct.
21    Q    So what news sources would you look to
22 for recommending trades?
23    A    A wide variety.  Bloomberg, Reuters,
24 MarketWatch, CME website.

Page 98

1    Q    All right.  I mean, is it fair to say
2 that you would sort of come up with a recommendation
3 for the trades based on the requirements of having
4 a four-legged trade and the requirement that it
5 cost around a thousand dollars and then sort of look
6 for this justification to provide to clients after
7 the fact?
8    A    I don't know if I would say after
9 the fact, but I would use the market information
10 that was available to make the recommendations and
11 explain those recommendations to the customer.
12    Q    So what comes first for you in
13 designing trades, the consideration of the price
14 and the necessity of having four legs or the color
15 that we see here in Exhibit 33?
16    A    I would say the color that you
17 are seeing, then go out in the marketplace, look
18 for those opportunities based on the criteria and
19 the technical -- I mean, it's a wide range.  So
20 I would use news, technical analysis, volatility,
21 time decay.  All those things go into trade design.
22           (Whereupon CFTC Exhibit No. 34 was
23              marked for identification, MM.)
24    Q    Mr. Gecas, I want to hand you what

Page 99

1 we've marked as CFTC Exhibit 34.  Do you recognize
2 this document?
3    A    Yes.
4    Q    Can you tell me what it is, please.
5    A    It's what my recommendations are
6 to Jim for -- I don't know which approval it
7 is.  Oh, it looks like the -- a couple different
8 things.  But, yes, it's an email I sent to Jim with
9 my understanding of what we should do with those
10 positions.
11    Q    All right.  So you see the email
12 on February 12, 2018 at 11:10 a.m. Mr. Donelson
13 writes, "We may need to adjust the hogs again to
14 14.  Below that number the trade doesn't cover the
15 fees."  Do you see that?
16    A    It says we may need to adjust the hogs
17 again to 4.
18    Q    Oh, I said 14, didn't I?
19    A    Yes.
20    Q    All right.  So Mr. Donelson writes
21 here --
22    A    Right.
23    Q    -- "We may need to adjust the hogs
24 again to 4.  Below that number the trade doesn't

Page 100

1 cover the fees."  What is Mr. Donelson talking
2 about here?
3    A    I'm guessing that the adjustment
4 is going to be -- I'm not really sure what this
5 is.  I'm guessing the fees are referring to the
6 commission fees based on what they were charging,
7 but it didn't make sense to do the adjustment based
8 on those fees.  I'm guessing.
9    Q    Okay.  You can put that one aside.
10    A    (Witness complies).
11           (Whereupon CFTC Exhibit No. 35 was
12              marked for identification, MM.)
13    Q    All right.  Mr. Gecas, I'm going
14 to hand you what I've marked as CFTC Exhibit 35.
15 Do you recognize this document?
16    A    No, I don't.  I mean, I don't --
17 I mean, I'm on it.  I just don't remember it.
18    Q    Yeah.  So Exhibit 35 is an email here
19 from you dated October 6, 2017 to Mr. Evans, and you
20 are asking on behalf of a customer named Bill Sing.
21 Do you remember that customer?
22    A    I do not.
23    Q    All right.  It sounds like Mr. Sing
24 is interested in having a fully managed account.

Page 101

1    A    Right.

2    Q    I really want to use this document as a
3  jumping-off point to ask about powers of attorney.
4  Were there any powers of attorney executed by Long
5  Leaf trading customers?

6    A    Not to my knowledge at all because no
7  one was able to.

8    Q    When you say no one was able to, why was
9  no one able to?

10    A    No one had their Series 3 longer than
11  two years.

12    Q    So your understanding is that brokers
13  can't trade on behalf of a client if they've had
14  a Series 3 for less than two years?

15    A    That is my understanding.

16    Q    What's the basis of that understanding?

17    A    I thought that's what it says on all
18  the Series 3 material.

19    Q    So this wasn't something Mr. Evans told
20  you?

21    A    No.

22    Q    Did you ever ask Mr. Evans why
23  Long Leaf Trading wasn't registered as a CTA,
24  a commodity trading advisor?

Page 102

1    A    No, I did not.

2    Q    Did Mr. Evans ever talk to you or
3  otherwise communicate with you about registering
4  Long Leaf Trading as a commodity trading advisor?

5    A    No.

6    Q    Did he ever talk to you about why,
7  you know, if he planned to or if he wanted to or
8  didn't want to?

9    A    No.  Tim Evans did not explain anything
10  to me about the future or process, anything new with
11  Long Leaf at all.

12        MR. BURDEN:  All right.  You know what,
13    we've been going for two hours.  It's 12.  I'd
14    like to go off the record, if we could, please,
15    and take a break, not just for lunch but so we
16    can set up some other things.  Can I let you out
17    and we'll see you back at 1?

18        THE WITNESS:  Sure.

19        MR. BURDEN:  Thanks, Mr. Gecas.

20        (Whereupon a lunch recess was taken
21          from 12:06 p.m., to 1:08 p.m., after
22          which the following proceedings were
23          had:)

24

Page 103

1        A F T E R N O O N   S E S S I O N

2          SCOTT GECAS,

3  called as a witness herein, having been previously
4  sworn and examined, testified further as follows:

5        FURTHER EXAMINATION (Cont'd.)

6  BY MR. BURDEN:

7    Q    All right.  I want to the record
8  to reflect that the witness did not have any
9  substantive discussions with myself or any other
10  member of the team.  In the hallway Mr. Gecas asked
11  if I knew what was going to happen or what was next,
12  and I said that I didn't know.  Isn't that correct,
13  Mr. Gecas?

14    A    Correct.

15    Q    All right.  Mr. Gecas, I want to follow
16  up on a couple of points from your testimony about
17  designing trades for Long Leaf Trading.  I think you
18  testified that all of the trades were four-legged
19  spreads, is that right?

20    A    Yes.

21    Q    When you were an option trader yourself,
22  did you ever use four-legged spreads?

23    A    Yes.

24    Q    When?

Page 104

1    A    Several occasions.  I was more or less
2  an inventory trader, so my legs consisted of one to
3  many, much more than four.

4    Q    Would you say you used four-legged
5  spreads on how many occasions during your career,
6  a dozen, a few hundred, too many to count?

7    A    Too many to count.

8    Q    So with respect to Long Leaf Trading,
9  you know, why not just sort of use that thousand
10  dollars in the customer's account to buy an option?
11  Did you ever propose that to Mr. Evans or
12  Mr. Donelson?

13    A    I don't understand the question.  What
14  do you mean by buying an option?

15    Q    You can buy an option, correct?

16    A    Yeah.

17    Q    So why not just do that with the money
18  in the customer's account?

19    A    Well, we could, but I was told
20  not to.  And if you buy just a single, it's purely
21  directional.

22    Q    I understand that.  Did you ever
23  suggest to Mr. Evans that the Long Leaf Trading
24  customers might benefit from just buying options

Page 105

1  rather than spreads?
2    A    No.
3    Q    Did you ever suggest that to Mr. Donelson?
4    A    No.
5    Q    Do you think that's true?  Do you think
6  that's right or no?
7    A    I don't understand the question.  What
8  is right?
9    Q    Would it be more advantageous
10  for retail customers like Long Leaf Trading's
11  customers to purchase options --
12    A    Purchase of single options, no, I don't.
13    Q    Why not?
14    A    Because of the time decay factor
15  as well as depending on which option you want
16  to buy or sell, it could be very expensive or not
17  expensive.
18    Q    So I want to go back for a moment,
19  if we could, please, to Exhibit 25, which is --
20    A    Okay.
21    Q    -- the February 22, 2018 recommendation
22  sent by you to a customer.  Are you with me?
23    A    Yes.
24    Q    So let's look at max gain and max

Page 106

1  loss here.  With respect to the max gain, that's
2  the top number, the 1348.40, is that right?
3    A    Correct.
4    Q    All right.  So was that max gain realized?
5    A    I don't recall.
6    Q    During your time at Long Leaf,
7  were the max gains that were set forth in these
8  recommendations, were they ever achieved?
9    A    Ever, yes.
10    Q    How many occasions?
11    A    I don't recall.
12    Q    Was it most of the time?
13    A    No.
14    Q    Some of the time?
15    A    I believe so.
16    Q    Is that fair to say that the max
17  gain was achieved only very rarely at Long Leaf
18  Trading?
19    A    While my time was there, I would say yes.
20    Q    Yes, it was pretty rare for the max gain
21  to be achieved?
22    A    On occasion, yes.
23    Q    What do you mean on occasion, yes?
24    A    Well, I mean, it just depends on which

Page 107

1  one.  I mean, we would have several that would
2  have their max gain, but others would not.  I mean,
3  I don't know how to respond to that as far as a
4  percentage goes or rarely, sometimes or often.
5    Q    Well, you see that it says max gain
6  and it sets forth a number?
7    A    Right.
8    Q    And it does that for every recommendation
9  you sent out, correct?
10    A    Correct.
11    Q    So surely you must know if the max
12  gain was achieved for recommendations you yourself
13  sent out?
14    A    Yes, yeah, I do recall the max gain being
15  reached.  I just don't know how often.
16    Q    Is it fair to say that it did not happen
17  often?
18    A    Yes.
19    Q    All right.  So I want to focus on
20  this max gain number that we see in Exhibit 25
21  and which is in the other recommendations.  What is
22  the likelihood of that maximum gain being achieved?
23    A    I don't have those percentages.
24    Q    Is that fair to say with respect to these

Page 108

1  spread traits that Long Leaf Trading recommends,
2  that it's not very likely that the max gain will
3  be achieved?
4    A    No, I would not say that.
5    Q    Why?  Why do you disagree with that
6  statement?
7    A    Because the max gain is there based
8  on a probability number of the spread which we try
9  to implement.
10    Q    But how likely is it -- let's just look
11  at Exhibit 25.  How likely is it that this 1,348.40
12  number is going to be achieved?
13    A    I don't have the actual numbers in front
14  of me, so I can't give you that percentage.
15    Q    So how could you -- and you'll have to
16  forgive me as a non-option trader -- how could you
17  determine whether that's likely or not?  It seems
18  like --
19    A    It's based on the probability of the
20  spread.
21    Q    So looking at this -- well, what do you
22  mean it's based on the probability of the spread?
23    A    The Greeks that go along with the spread.
24    Q    So how is a person who's looking at

Page 109

1  this recommendation supposed to know how likely
2  it is that this max gain is going to be realized?
3     A   Based on this information, they're not.
4  They don't have that information.
5     Q   Why not?
6     A   Because it wasn't given to them based
7  on the recommendation.
8     Q   Okay.  Was that information, was the
9  information likelihood of achieving the max gain
10 provided to customers?
11    A   Not to my knowledge.
12    Q   Did you ever provide it to customers?
13    A   No.
14    Q   Why not?
15    A   It was not part of the process that we
16 went through.
17    Q   And I think I'm betraying my ignorance
18 here, but the probability of achieving the max gain,
19 was that a number that you had?
20    A   Yes and no.
21    Q   What do you mean by that?
22    A   Yes, the probability is based on the
23 mathematical equation based on the options spread
24 based on the underlying, which is not provided here,

Page 110

1  so that is a math number that is provided.
2     Q   Who provides it?
3     A   The math on the options spread.
4     Q   So it comes out of QuikStrike, right?
5     A   Yes.
6     Q   So did you see that probability number?
7     A   I don't think they have the probability
8  number as far as the potential of reaching the max
9  gain.  When they say probability on those numbers,
10 it's a probability of the spread being in the money
11 by a single penny.
12    MR. PATRICK:  And was that probability,
13 was it expressed as a percentage?
14    THE WITNESS:  I don't recall.  I haven't
15 used QuikStrike in quite some time, so I don't
16 remember.
17 BY MR. BURDEN:
18    Q   Well, when you were putting together
19 the trades after January of 2018, was that something
20 you looked at, the probability of the max gain
21 being achieved?
22    A   No.
23    Q   Why not?
24    A   When we were looking at the spreads,

Page 111

1  we would look at the delta as far as the expected
2  move, what the options were saying.  And if
3  that expected move was based on the spread, then
4  it was -- if the market reacted that way then, yeah,
5  it would hit that probability number.  It would hit
6  that max target if the market went that way.
7     Q   Well, so if I'm a customer and
8  I receive this recommendation, I see there's a max
9  gain here of approximately $1300, right?
10    A   Um-hmm.
11    Q   That's in Exhibit 25, right?
12    A   Yeah.
13    Q   So I want to know is that likely or
14 is that unlikely?  You know, if there's a 5 percent
15 chance I can get this $1300 gain, that doesn't seem
16 very likely to me.  That's just my opinion --
17    A   Correct.
18    Q   -- as a hypothetical customer.  If
19 the likelihood is like 80 percent, then to me
20 as a hypothetical customer, that seems like a pretty
21 good probability I'm going to get that max gain.
22    A   Correct.
23    Q   So --
24    A   That was not expressed to the customers.

Page 112

1     Q   But was it something that was available
2  to you?  Did you know that?
3     A   No.
4     Q   Why?
5     A   Based on the software and the tools that
6  I had, it wasn't given to me.
7     Q   Did you ever go and look for it and
8  try to figure out what the probability would be?
9     A   No.
10    Q   So I don't understand why not.
11 I mean, it seems to me that you're making these
12 recommendations to customers, correct?
13    A   Um-hmm.
14    Q   Yes?
15    A   Yes.  Based on the market information
16 that was given to me at that time, I thought that
17 was the best opportunity for the customer to realize
18 a gain.
19    Q   But when you say the best opportunity
20 to realize a gain, it sounds like -- did you know
21 what that probability was that that max gain would
22 be achieved?
23    A   No, I didn't have that exact number, no.
24    Q   So how can you say that this

Page 113

1 recommendation, Exhibit 25, or any other
2 recommendation was, you know, the best chance they
3 have of making a profit?
4    A    Well, it was based on the market conditions
5 at that point in time.
6    Q    What do you mean by market conditions?
7    A    Well, if the chart is in a strong up
8 trend, then being long that instrument and with
9 options, it's a higher probability of it making
10 money versus it going lower.
11    Q    But you don't know what that probability
12 is?
13    A    No.
14    Q    All right.  So really same set
15 of questions with respect to the max loss.  So
16 Exhibit 25, I want to make sure I'm looking at this
17 right.  This max loss is $674.20 here, right?
18    A    Correct.
19    Q    All right.  So were customers told what
20 the likelihood is of that max loss being realized?
21    A    The probability, no.  At worst case
22 scenario if the options had to go expire worthless,
23 that was their max loss.
24    Q    But I'm a hypothetical customer.

Page 114

1 I care how likely that loss is, right?
2    A    Right.
3    Q    So if I'm not very likely to lose $674,
4 that's great news.  I probably want to take that
5 bet, right?
6    A    Correct.
7    Q    Now, if I'm very likely to lose $674,
8 like 80 percent likely, I probably wouldn't want
9 to take that bet, do you agree?
10    A    Correct.
11    Q    So did you understand what the
12 percentage likelihood is, what the probability was
13 of that max loss being realized?
14    A    No.
15    Q    Why not?  Is that something you asked
16 for from Mr. Donelson or Evans?
17    A    No, I never asked those questions.
18    Q    Is that a number that QuikStrike could
19 generate for you?
20    A    I don't believe so.  It doesn't have
21 a probability number.  It bases it off of delta.
22    Q    And the delta is -- indulge me and explain
23 it for me, please.
24    A    The delta is the rate of change

Page 115

1 in the option per dollar move in the underlying.
2    Q    All right.  How frequently during your
3 time at Long Leaf Trading did this max loss come to
4 occur?
5    A    It did occur.  I wouldn't say often, but
6 it did occur.
7          FURTHER EXAMINATION
8 BY MR. PATRICK:
9    Q    So I just want to go back to
10 something that I think you said earlier, which
11 was that the max gain that was contained in the
12 trade recommendations was partially a function
13 of the probability number that the spread would,
14 you know, be profitable.
15    A    No, that's not correct.  The max
16 gain of the spread would be the difference between
17 strikes.
18    Q    Okay.  So, I'm sorry, I probably
19 said max gain when I should have said target gain.
20    A    Okay.  The target gain is based off
21 of what Jim Donelson said that he wanted to start
22 reducing the position at that point.  That was not
23 a number that was given based on probability, based
24 on anything.  That was just a number he picked.

Page 116

1    Q    Okay.  So what does that probability
2 number that we've been talking about here for the
3 last couple of minutes, what does that probability
4 number go into calculating in --
5    A    That's basically delta.
6    Q    Delta.
7          FURTHER EXAMINATION
8 BY MR. BURDEN:
9    Q    Where is delta reflected in Exhibit 25?
10    A    It's not.
11    Q    All right.  I really want to get to the
12 bottom of delta because I don't understand it, and
13 this may be my best chance to get it on the record.
14 Explain to me, if you would, please, as if I didn't
15 know at all -- because I don't -- what delta is and
16 use if you would, please, Exhibit 25 as a reference.
17    A    Well, I don't have the delta of these,
18 so I can't.
19    Q    So what is the delta measuring?  And
20 I know you've said it before but --
21    A    Delta's the rate of change in the
22 option per dollar move in the stock.  So if the
23 delta is 50, the stock moves -- or the underlying
24 moves a dollar, the option should increase by 50.

Page 117

1 There's a lot of other variables that go into that,
2 but that's a basic understanding of delta.
3      MR. PATRICK: I understand it, yes.
4      MR. BURDEN: Okay. I do now. I guess
5 what I don't -- sorry, go ahead.
6           FURTHER EXAMINATION
7 BY MR. PATRICK:
8   Q   So, again, I'm going to go back
9 to this probability number. So I think you said
10 earlier that the probability number in the spread
11 is the reason that that number is there, and you
12 were referring to the target gain.
13   A   Yeah. Well, the target gain is the
14 delta of the spread that can max out the max gain
15 based on the width of the strikes.
16   Q   Okay. But I think when we asked about
17 the probability, you said it was the probability
18 of that option moving even one penny into the money
19 pre-expiration, correct?
20   A   Correct.
21   Q   Is that the same as delta?
22   A   Yes, but there's a lot of other
23 variables that go along with those prices. So it
24 really depends.

Page 118

1   Q   Okay. And what are those other
2 variables, the other Greeks? Are you referring to
3 the other Greeks, like theta --
4   A   And vega.
5      MS. STREIT: Anything else?
6      THE WITNESS: As far as?
7      MS. STREIT: Other variables. You said
8 theta --
9      THE WITNESS: Gamma, theta, vega,
10   rho, omega, all the Greeks that go along
11   with options.
12           FURTHER EXAMINATION
13 BY MR. BURDEN:
14   Q   All right. So I want to switch gears
15 and talk about Long Leaf Trading's track record,
16 and I hope you'll forgive me if this is somewhat
17 duplicative, but we'll get back to a place where
18 it's not. So during your time at Long Leaf Trading,
19 did customers make money?
20   A   Some did, some did not.
21   Q   What customers made money?
22   A   I can't recall exact customers.
23   Q   Were they customers of yours?
24   A   I don't recall.

Page 119

1   Q   Did any of your customers make money?
2   A   Some did.
3   Q   Who?
4   A   I don't recall exact.
5   Q   When you say that customers made money,
6 do you mean they made money in one month and not the
7 next or overall?
8   A   One month and not the next.
9   Q   So you've got to know that when I ask
10 you this question, I'm asking net net.
11   A   Net net, I don't have those answers.
12 I don't recall.
13   Q   During the time that you worked
14 at Long Leaf Trading, did any of your customers
15 make money overall, that is to say, during the life
16 of their trading at Long Leaf?
17   A   I don't recall.
18      MR. PATRICK: Can you think of even one?
19      THE WITNESS: Well, I don't have --
20   I can't recall hardly any of those customers.
21   I had so many, I don't recall their exact names.
22 BY MR. BURDEN:
23   Q   Well, how many customers made money
24 during the time they were trading at Long Leaf?

Page 120

1   A   I don't have those numbers. I didn't
2 have access to any of their statements. We get
3 their statements emailed to us, but they were also
4 emailed to Jim and we -- you know, Jim handled all
5 of that.
6   Q   I'll show you those in a minute.
7 Is it fair to say that while you were at Long Leaf
8 Trading all of your customers lost money?
9   A   I don't think that's accurate. I'm not
10 positive, though.
11   Q   You're not positive. How many customers
12 made money of yours?
13   A   I don't recall.
14      MR. PATRICK: So you're not positive
15   because you think it's possible all of your
16   customers may have lost money during the time
17   you were at Long Leaf?
18      THE WITNESS: I'm not positive. To be
19   honest, I really don't know, I mean, because
20   a lot of those accounts that were handed to me,
21   they were already debit. So, you know, I did
22   have an increase in their account since I've
23   had them, but I think overall they were debit.
24

Page 121

1 BY MR. BURDEN:
2   Q   So when you say overall the customers you
3 inherited were debit, you mean overall the customers
4 you inherited lost money, is that right?
5   A   I believe so, yes.
6   Q   And when you inherited those customers,
7 their accounts were down, right?
8   A   Yes.
9   Q   And by the time you left Long Leaf
10 Trading their accounts were down further, is that
11 fair to say?
12   A   Some of them, yes.
13   Q   Which ones weren't?  Who was up?
14   A   I don't know.
15   Q   Was anyone up?
16   A   I don't recall.  Honestly, I don't.
17   Q   They were all down, weren't they?
18   A   I don't recall.
19   Q   All right.  Were there months
20 where customers at Long Leaf Trading made money?
21   A   Yes.
22   Q   What months?
23   A   I don't recall.
24   Q   Were those months during your tenure

Page 122

1 at Long Leaf?
2   A   Some of them, yes.
3   Q   Do you remember maybe the season or what
4 was going on?
5   A   No, I don't.
6   Q   Do you know if other customers
7 at Long Leaf, or I should say customers other
8 than your customers, made money trading while you
9 were at Long Leaf?
10   A   No, I don't.
11   Q   Did you ever ask Mr. Evans what
12 the firmwide results were for customer trading?
13   A   When I first started and interviewed,
14 I did.
15   Q   And what did he tell you?
16   A   He said he's had positive months and
17 bad months.  Overall he said he's had great years
18 and he's had poor years.
19   Q   Well, did you ask Mr. Evans overall if
20 customers made or lost money net net?
21   A   Well, I don't know.  I did ask him,
22 but I don't know what his track record that he was
23 basing it off.  He said he's had great years and
24 bad years.  That was his answer to me.

Page 123

1   Q   Did you ask Mr. Evans for any proof
2 of this track record?
3   A   No.
4   Q   Did you ask Mr. Evans for customer
5 statements?
6   A   No.
7   Q   Why not?
8   A   I don't know.
9   Q   Later on when you were working at
10 Long Leaf Trading when you'd been there for a few
11 months, did you ask Mr. Evans again if you could see
12 performance data for the firm's customers?
13   A   Yes, and he wouldn't give me any of that.
14   Q   So when did you ask him for that?
15   A   I would say -- so I started in June.
16 Maybe around July and August.
17   Q   So around July and August your testimony
18 is you asked Mr. Evans for firmwide trading results
19 for clients?
20   A   Yeah.
21   Q   What exactly did you ask him?
22   A   How was everyone doing.  And judging by
23 what I've seen, they're not doing well.  You said
24 you did have positive months.  Can you show me any

Page 124

1 of that?
2   Q   What did Mr. Evans say to you?
3   A   No.
4   Q   Did you just let that go?
5   A   Yes.
6   Q   Why?
7   A   Because I was brand new and I didn't want
8 to -- I still wanted a job.
9   Q   And I think you testified that
10 by July or August of 2017 you had seen customers
11 losing money at Long Leaf, is that correct?
12   A   Some did, some didn't.  It just
13 depended on when they came in and how long they
14 were there.
15   Q   But these losses were why you asked
16 Mr. Evans about firmwide trading results, correct?
17   A   Yes.
18   Q   Did you ever ask Mr. Evans again for
19 firmwide trading results?
20   A   No.
21   Q   Sorry?
22   A   No.
23   Q   When Mr. Donelson came on board,
24 did you ask Mr. Donelson for firmwide trading

Page 125

1 results?
2    A    No.
3    Q    Why not?
4    A    Because they were the same results from
5 Tim Evans, I would assume.
6    Q    Yeah.  But the firm, it keeps on trading,
7 right?
8    A    Right.
9    Q    So every month --
10    A    But the results change all the time
11 because based on when the customers come in or
12 how long they've been there.
13    Q    But later on there would be more of
14 a track record, right?
15    A    Right.
16    Q    Gains or losses that were aberrant
17 would be smoothed out over time, is that fair to
18 say?
19    A    I would think.
20    Q    So why didn't you ask Mr. Donelson for
21 firmwide performance records?
22    A    I don't know.
23    Q    Weren't you interested?
24    A    Yes and no.

Page 126

1    Q    What do you mean by that?
2    A    I mean, yes, I was interested, of course,
3 but, no, I wasn't interested in overall.
4    Q    Why not?
5    A    Just because, you know, based on
6 what I was told with his expertise and everything,
7 that -- and the changes that were made, I was
8 promised that everything was going to be moving
9 better forward while under his management.
10    Q    Who told you that?
11    A    Jim Donelson.
12        MR. PATRICK:  Did your customers ever
13    ask you how the firm's trading results were
14    on an overall basis?
15        THE WITNESS:  Yes.
16        MR. PATRICK:  And what did you tell them?
17        THE WITNESS:  They varied from customer
18    to customer.
19 BY MR. BURDEN:
20    Q    That's what you told customers?
21    A    Yeah.
22    Q    Is that what you told them every time
23 they asked?
24    A    No.  Sometimes I told them we're not

Page 127

1 able to give a track record because -- and this
2 was told to me by Tim Evans, is if customers ask
3 for that, tell them that we're not able to give
4 those track records because we're not a CTA or
5 a hedge fund or a commodity pool.
6    Q    When did Mr. Evans tell you that?
7    A    It was right -- I would say right away,
8 between June and July -- between July and August.
9    Q    So between July and August of 2017
10 Mr. Evans told you that if customers asked for
11 a track record or performance for firm customers,
12 you were to tell them that you couldn't distribute
13 those results?
14    A    I could not talk about those results
15 based on our customers, right.
16    Q    Did you push back on that at all?
17    A    No.
18    Q    Why not?
19    A    Because I was new to the business
20 and I didn't understand it, and the explanation that
21 he gave me sounded legit at that time.
22    Q    It's not.  What did you --
23    A    I understand that now.
24    Q    Why do you understand that now?

Page 128

1    A    Well, because I'm here.
2    Q    Well, why do you think that you wouldn't
3 be able to share, you know, the performance of the
4 firm's recommended trades with customers?  Like why
5 would you believe Mr. Evans?
6    A    Because the explanation that he gave
7 me, saying that we're not a CTA, a hedge fund or
8 a commodity pool.
9    Q    But you're a Series 3 license holder,
10 right?
11    A    Yes.
12    Q    I mean, did anybody ever tell you
13 that in the course of your employment or your
14 training?
15    A    No.
16    Q    So why believe Mr. Evans?
17    A    Because he was my boss and he had more
18 experience than I did.
19    Q    So over time you came to see that Long
20 Leaf Trading customers were losing money overall,
21 is that fair to say?
22    A    Yes.
23    Q    So did you continue to refuse to
24 provide Long Leaf's track record to customers?

Page 129

1    A    Based on what I was told to say, yes.

2    Q    But don't you think that's misleading

3 to the customers?

4    A    Well, I mean, markets change, you

5 know, whenever -- you know, second by second.

6 I mean, they could realize a gain one day and

7 a loss the next day.

8    Q    But you didn't see fit to tell customers

9 that Long Leaf Trading loses money for its clients

10 overall?

11    A    No, I did not.

12    Q    Why?

13    A    Just because I know the markets change

14 and opportunity changes.

15    Q    But did you ever --

16    A    Based on the strategies, one strategy

17 will work one day and it wouldn't work the next

18 based on market conditions.

19    Q    I mean, did it ever bother you to

20 try to sell these investments to people and not to

21 tell them about Long Leaf's track record?

22    A    Well, like I said, the market conditions

23 change.  So if market conditions change, one trade

24 that was a loss could be a winner based on different

Page 130

1 market conditions.

2    Q    That's not what I asked you.  I asked

3 did it bother you?

4    A    Yes, it bothered me, of course.

5    Q    Why did it bother you?

6    A    Because I didn't like the past

7 performance, but past performance is not necessarily

8 indicative of future performance.

9    Q    All right.  Did you receive statements

10 from Gain for your customers?

11    A    Yes.

12    Q    How frequently did you receive them?

13    A    I believe I received them daily.

14    Q    All right.  Did you look at the statements?

15    A    Not often.

16    Q    Why?

17    A    Because I was told that Jim -- that

18 either Tim Evans would handle the statements or

19 Jim Donelson would handle the statements.

20    MR. BURDEN:  All right.  But I'm going

21    to hand you one, just so we have something to

22    talk about.

23

24

Page 131

1    (Whereupon CFTC Exhibit No. 36 was

2    marked for identification, MM.)

3    Q    All right.  Mr. Gecas, I'm going

4 to hand you what I've marked as CFTC Exhibit 36.

5 Do you recognize this document?

6    A    Yes.

7    Q    Can you tell me what it is, please.

8    A    It's a statement.

9    Q    All right.  And is this a statement for

10 your customers?

11    A    I don't recall.

12    Q    So we've got a sales code here --

13    A    Well, if it's mine, yes.  Then I just

14 don't remember every single one of my customers,

15 especially that long ago.

16    Q    All right.  So what I've handed to

17 you is a Gain statement that was emailed to you

18 on November 1st of 2017.

19    A    Well, it says Kingsview and I don't know

20 why it says Kingsview.

21    Q    Yeah, I don't know why either.

22    MR. BURDEN:  You know what, give

23    me a second.  Could we go off the record.

24

Page 132

1    (Whereupon a recess was taken from

2    1:38 p.m., to 1:45 p.m., after which

3    the following proceedings were had:)

4    MR. BURDEN:  Back on the record, please.

5    Q    All right.  Sorry for the delay, but

6 it'll clear up some confusion.  So here's Exhibit 36

7 back.  Mr. Gecas, I've handed you what we've marked

8 as Exhibit 36.  You can see it's a cover email with

9 an attachment.  Do you recognize this document?

10    A    Yes.

11    Q    Can you tell me what it is, please.

12    A    It looks like the account statements.

13    Q    All right.  These are account statements

14 you received every day from Gain, correct?

15    A    I believe so.  Not every day.  Some --

16 I don't know what happened sometimes.  But, yeah,

17 for the most part every day.

18    Q    Okay.  So I was asking you before did you

19 review these statements?

20    A    On occasion.

21    Q    How occasionally?

22    A    Not -- I would say less than once a week.

23    Q    And you know how to read these statements,

24 correct?

Page 133

1    A    In the beginning I had no clue how to
2  read these statements.  What was explained to me
3  how to read these statements was still a little bit
4  unclear, but I got the gist of it.  I was only told
5  to look at net liquidating value.
6    Q    Okay.  Who told you that?
7    A    Tim Evans and Jim Donelson.  How it
8  was communicated to me, the only number you need
9  to worry about is net liquidating value.
10   Q    What did Mr. Evans say to you exactly, or
11  as close as you can remember?
12   A    Oh, God.  As far as I can remember,
13  they both said the same thing.  The only thing
14  you've got to worry about is net liquidating value.
15   Q    So what do you mean, the only thing
16  you've got to worry about is net liquidating value?
17  What do you mean, worry about it?  Why is that the
18  only number you've got to care about?
19   A    If anyone asks what their account
20  is at that point in time, it's the net liquidating
21  value.
22   Q    And that's what Mr. Evans told you?
23   A    Yes.
24   Q    And Mr. Donelson told you the same thing?

Page 134

1    A    Yes.  And if there was any issue, refer
2  the client to either one of them.
3    Q    Got it.  So, you know, it sounds like
4  you have quite a long history as an actual options
5  trader, correct?
6    A    Right.  My statements had nothing to do --
7  look nothing like this.
8    Q    So that was my next question.  Like
9  why did you have trouble reading this?  It seems
10  like you ought to be able to.
11   A    Well, for a lot of reasons.  So, No. 1,
12  it was in equities when I was trading.  No. 2, it
13  would be P&L plus/minus 10 percent, 20 percent,
14  30 percent, 50 percent as well as haircut as well
15  as margin.
16   Q    All right.  So when you received
17  these Gain statements, you were told just to
18  look at net liq and that was the indicator of what
19  was in the account?
20   A    Yes.
21   Q    All right.  So did you later come
22  to have a more detailed appreciation for these
23  statements?
24   A    Not really, no.

Page 135

1    Q    So to this day net liq is sort of the
2  thing you understand that's important?
3    A    To this day I understand a little bit
4  more about these statements now than I did before.
5    Q    All right.  So let's turn, if we
6  could, in Exhibit 36 to really the middle of it.
7  And what I want to show you is Account Sequence
8  Status Report.  And if you sort of flip through the
9  pages until they go from like vertically oriented
10  to horizontally oriented, you'll find it.
11   A    Okay.
12   Q    All right.  So you see this Account
13  Sequence Status Report?
14   A    Yes.
15   Q    What do you understand this to mean?
16   A    Other than --
17   Q    What is this?
18   A    I'm guessing it's account sequence
19  status report.
20   Q    Well, is this a part of the daily
21  statements from Gain that you looked at while you
22  were at Long Leaf?
23   A    No, this is not anything I looked at.
24   Q    Okay.  Why not?

Page 136

1    A    I don't know.
2    Q    So let's look at this first page.
3  You'll see it's -- the account is Midland IRA FBO
4  Shaver.  Do you see that?  It's in the top left-hand
5  corner (indicating).
6    A    Oh, yes.
7    Q    So you'll see there's MTD, YTD and LTD
8  amounts.  Do you see that?
9    A    Yes.
10   Q    Do you know what that means?
11   A    No, I don't.
12   Q    Do you see where it says Profit & Loss
13  towards the bottom?  Do you understand what that
14  means?
15   A    Well, I understand what profit and loss is.
16   Q    Well, so do you understand this to indicate
17  that the MTD for this account --
18   A    Is that month-to-date amount?
19   Q    I'm asking you if you know.  I can't --
20   A    That's the only thing I could -- I would
21  say month-to-date amount.
22   Q    All right.  And it looks like --
23   A    I don't know what LTD is.
24   Q    Do you think life to date is what it

Page 137

1 could be?
2    A    It could be.
3    Q    What's YTD?  Do you know what that is?
4    A    Is that year to date?
5    Q    Is that an acronym you've heard before,
6 YTD?
7    A    In the past, yes.
8    Q    Okay.  And what did it mean then?
9    A    Year to date.
10    Q    All right.  So let's assume for
11 the purposes of looking at Exhibit 36 that that
12 indicates year-to-date amounts.  So what's the
13 profit and loss for this account for the year to
14 date?
15    A    Is that a debit of 749.50?
16    Q    What are you looking at there?
17    A    Or is that the fees?  No, that's fees.
18    Q    All right.  So it sounds like you do not
19 know how to read this at all.
20    A    Okay.
21    Q    Is that correct?
22    A    Okay.  Well, year-to-date amounts,
23 negative 45,004.03.
24    Q    So that's what I was looking at.

Page 138

1    A    Okay.
2    Q    And my question is are those the
3 losses from the year to date on this account and --
4    A    I would assume so.
5    Q    Why do you think that?
6    A    Because that's what it says.
7    Q    All right.  So if you flip through
8 this, you will see that there are losses for every
9 account on a year-to-date basis.  Is that a surprise
10 to you?
11    A    Yes.
12    Q    Why?
13    A    Because I was under the impression that
14 some of the clients did make money.
15    Q    Where did you get that impression from?
16    A    From Tim Evans as well as Jim Donelson.
17    Q    All right.  Did you ever go and check
18 to see if that was true?
19    A    No, I did not.
20    Q    Why not?
21    A    Because I have no reason not to trust
22 them.  Well, until now.
23    Q    Well, you're making recommendations
24 to customers every month that you're at Long Leaf

Page 139

1 Trading, correct?
2    A    Yes.
3    Q    And you make them to dozens of customers
4 correct?
5    A    Yes.
6    Q    And those customers mostly take
7 those recommendations, is that fair to say?
8    A    For the most part.
9    Q    So do you check and see how those
10 recommendations turn out for people?
11    A    On occasion.
12    Q    Only on occasion?
13    A    I was not in charge of the exit,
14 so I was charged in designing the trade.  And Jim
15 Donelson or -- well, I didn't design anything for
16 Tim, but Jim Donelson would handle the exits.
17    Q    But you're recommending these trades
18 to people.  Didn't you want to know if those trades
19 were profitable?
20    A    Yes.
21    Q    Well, why didn't you check and see
22 if they were?
23    A    I don't know.  Because it wasn't -- I don't
24 know.

Page 140

1          FURTHER EXAMINATION
2 BY MR. PATRICK:
3    Q    So during the time that you were
4 making trade recommendations on behalf of Long
5 Leaf Trading's customers or you were putting
6 those --
7    A    Right.
8    Q    -- proposed recommendations together
9 and then providing them to Mr. Donelson for his
10 approval, you were doing that every month and four
11 trades per month, right?
12    A    Correct.
13    Q    And that was roughly from about you said
14 February of 2018?
15    A    Right.
16    Q    Through the time that you left the
17 firm, which was --
18    A    Right, December.
19    Q    -- December of '18.  So 10 months
20 or so, 4 trades per month, that's about 40 trade
21 recommendations that you did.  Does that sound about
22 right?
23    A    Right.
24    Q    And so as month to month you're making

Page 141

1 these recommendations, are you ever going back
2 to see how those recommendations turned out for the
3 customers?
4    A    Yes.
5    Q    And how did they turn out?
6    A    It really depended on the month and it
7 depended on -- some of the positions worked out,
8 some of them did not.
9    Q    And so your recollection is there were
10 some months where the recommendations did work out
11 and customers made money?
12    A    Correct.
13    Q    Do you remember which months those were?
14    A    No, I don't.  Not offhand.
15          FURTHER EXAMINATION
16 BY MR. BURDEN:
17    Q    Did you keep track of how customers
18 were doing overall, not just on a month-to-month
19 basis?
20    A    I did not keep track, no.
21    Q    But you can see it in the statements that
22 are sent to you every day, correct?
23    A    Yeah, but I did not look at the statements
24 every day.

Page 142

1    Q    I don't understand why.
2    A    I was just told to refer any of the
3 statement questions to Jim Donelson or Tim Evans.
4    Q    But you're making these recommendations,
5 and after January of 2018 you were the one that
6 generated the recommendations, correct?
7    A    Yes.
8    Q    And you have no idea if customers were
9 making or losing money with these?
10    A    Some of them did make money.
11    Q    Which ones?
12    A    I don't know.
13          MR. PATRICK:  How did you know that some
14 of them were making money?
15          THE WITNESS:  Some of the positions worked
16 out.
17          MR. PATRICK:  How did you know that --
18          THE WITNESS:  I mean, not every position
19 lost money.  I know that.
20          MR. PATRICK:  But, I mean, how did you
21 know that some of them worked out?
22          THE WITNESS:  Because just from me watching
23 the market.
24          MR. PATRICK:  So you were looking back

Page 143

1    at them?
2          THE WITNESS:  I was looking at the markets,
3    yes.
4 BY MR. BURDEN:
5    Q    But were you looking at customer
6 statements?
7    A    No.
8    Q    So you're just looking at the market,
9 and you sort of intuit from that that customers
10 made money?
11    A    Yes.
12    Q    But why didn't you check?
13    A    I don't know.
14    Q    Also I think you just testified that
15 Mr. Donelson and Mr. Evans were responsible for
16 exiting the trades, correct?
17    A    Yes.
18    Q    So how could you tell from looking
19 at the market if the trade is profitable or not?
20 You don't watch them exit the trade, do you?
21    A    I don't watch them exit it, no.  But
22 if the market is going in that direction, positions
23 should be profitable at that point.
24    Q    Did you know if they were?

Page 144

1    A    I didn't know specifically if they were.
2 I know that some of the positions did lose money and
3 some of them did make money.
4    Q    So I want to drill down on this idea
5 that some of the positions made money.  So every
6 month you recommend four trades to your client,
7 correct?
8    A    Yes.
9    Q    So when you say that some months
10 the positions made money, do you mean that some
11 months one of those four trades made money or two
12 of those four trades made money or do you mean all
13 four trades made money?
14    A    It was very rare that all four trades
15 made money.
16    Q    But I'm asking you what you're --
17 when you describe a position, when you say these
18 positions -- your testimony was that there were
19 positions that made money, correct?
20    A    Yes.
21    Q    And you can't recall any of those positions
22 sitting here today, right?
23    A    Right.
24    Q    So when you say a position made money,

Page 145

1  you just mean that one or more of those four
2  trades was profitable, is that correct?
3      A   Yes.
4      Q   But it was rare -- was there ever
5  a time where all four trades were profitable?
6      A   I believe so, yes.
7      Q   When was that?
8      A   I don't recall.
9      Q   Was it during your tenure?
10     A   I believe so, yes.
11     Q   And you don't remember when?
12     A   No.
13         MR. PATRICK:  Do you remember
14     if it was trades that you recommended, was
15     it during that time period where these were
16     trades that you were constructing?
17         THE WITNESS:  I believe so.
18  BY MR. BURDEN:
19     Q   You know, these trades were made
20  on a month to month -- I should say there was
21  a recommendation of four trades made to Long Leaf
22  customers every month, correct?
23     A   Yes.
24     Q   Would it be fair to refer to all

Page 146

1  four of those together as -- I'm not doing a good
2  job of this.
3         MS. STREIT:  Was the idea that the four
4     together would make money?
5         THE WITNESS:  As a combined, yes.
6         MR. PATRICK:  What about trades within
7     the particular trade, so legs of the spread?
8     I mean, you would not refer to a particular
9     leg as being profitable, even though the spread
10    itself was unprofitable?
11        THE WITNESS:  No.
12        MR. PATRICK:  You wouldn't look at that
13    as a profitable trade, correct?
14        THE WITNESS:  No.
15        MR. PATRICK:  Because only one of
16    the spread legs might have actually had P&L,
17    positive P&L but the rest of them lost.  That
18    would still be in your view a losing trade,
19    correct?
20        THE WITNESS:  Correct.
21        MS. STREIT:  And when you considered
22    whether the trade as a whole was profitable
23    or not profitable, would you consider the
24    commissions the customer paid?

Page 147

1         THE WITNESS:  I did not.  That was
2     not part of my design.  I was not designing
3     the commission rate into the spread.  That was
4     Jim Donelson.
5  BY MR. BURDEN:
6      Q   All right.  So my question to you is
7  during your time at Long Leaf, how many months were
8  profitable for customers?  And I'm not referring to
9  calendar months.  I'm referring to --
10     A   Honestly, I don't know.
11     Q   Well, I think you testified just
12  now that there was at least one occasion where all
13  four recommended trades were profitable, correct?
14     A   Yes.
15     Q   So there must have been some months where
16  everybody made money, is that right?
17     A   I would assume if all four trades
18  worked out, yes.  I don't recall which month that
19  was.
20     Q   So when you say there were months
21  where a trade was profitable, you're not including
22  commissions in that?
23     A   My trade design did not include
24  commissions.

Page 148

1      Q   All right.  So did customers ever
2  call you and complain that their accounts were
3  down?
4      A   Yes.
5      Q   How many times do you think that happened?
6      A   I don't recall.
7      Q   Was it more than ten?
8      A   I would think so, yes.
9      Q   Was it more than -- well, I should
10 ask would it be fair to say that you got complaints
11 from customers that their accounts were down on
12 a weekly basis?
13     A   I would not say on a weekly basis, no.
14     Q   How frequently do you think?
15     A   I don't know.  I don't recall.
16     Q   Is it fair to say that you frequently
17 received complaints from customers that their
18 accounts were down?
19     A   I wouldn't say frequently.  I would
20 say -- if I had to guess, I would say every other
21 month, every three months.
22         (Whereupon CFTC Exhibit No. 37 was
23         marked for identification, MM.)
24     Q   All right.  I want to hand you what I've

Page 149

1 marked CFTC Exhibit 37, and you'll see it's a group
2 exhibit comprised of many emails. I want you to
3 take a look at it and tell me if you recognize
4 the emails in Group Exhibit 37.
5    A   Yes.
6    Q   All right. Do you recognize the documents
7 in Exhibit 37?
8    A   Yes.
9    Q   All right. Is it fair to characterize
10 these as customer complaints to you about poor
11 account performance?
12    A   Yes.
13    Q   So what did you do with these complaints?
14    A   I gave them to Jim Donelson.
15    Q   Why did you do that?
16    A   Because that's -- or Tim Evans. That was
17 what I was told to do.
18    Q   Who told you to do that?
19    A   Tim Evans and Jim Donelson.
20    Q   And do you know what Mr. Evans would
21 do with the customer complaints?
22    A   He would call them either in the
23 office or walk outside of the office and talk to
24 them.

Page 150

1    Q   Okay. Did you ever hear what Mr. Evans
2 was saying to these complainants?
3    A   Bits and pieces and not enough
4 to recall any type of straight conversation.
5    Q   Yeah. So this is what I'm getting
6 at, is do you know how Mr. Evans dealt with these
7 complaining customers?
8    A   No, I don't.
9    Q   All right. Same question for Mr. Donelson.
10    A   He would do the same thing.
11    Q   Did you ever hear --
12    A   Or he would write them an email, but
13 I would never see the email.
14    Q   Did you ask to see the email?
15    A   No.
16    Q   So did you ever say to Mr. Evans,
17 you know, how did you deal with, you know,
18 Jim McDaniel, who as you'll see in Exhibit 37
19 is complaining in November of 2017 that his account
20 is down 80 percent?
21    A   He would tell me that that's part
22 of the risk in trading, that you're not going
23 to win 100 percent. The market conditions change
24 second by second, what was on, markets changed and

Page 151

1 it went the other way and that's what was explained
2 to me.
3    Q   So did you ever deal with, you know,
4 an angry customer, a customer who's complaining
5 that their account was down?
6    A   I have taken calls from angry customers
7 and then I had to refer them to either Tim or Jim
8 Donelson.
9    Q   All right. So can you remember the names
10 of any of those customers?
11    A   No.
12    Q   Was there a way that you were instructed
13 to deal with those customers?
14    A   Talk to them very nicely, don't get
15 upset, don't insult them. I mean, basic customer
16 service.
17    Q   Well, was there anything that you said
18 to them that Mr. Evans told you to say?
19    A   Just based on market conditions and
20 how everything changes second by second and stuff
21 like that.
22    Q   Well, what did Mr. Evans tell you to say
23 to angry customers?
24    A   He tried to calm them down and say we're

Page 152

1 going to try to do better next time.
2    Q   That's what Mr. Evans told you to say?
3    A   Yes.
4    Q   What did Mr. Donelson tell you to say?
5    A   Pretty much the same thing as well as
6 refer the client to them. I do believe there was
7 one instance where we had all four trades lose in
8 a single month, and Jim Donelson wrote a big email
9 and sent it out to all of them.
10    Q   Was that maybe January of '18?
11    A   Could have been. I don't remember.
12    Q   So I want you to, if you would,
13 please, take a look at the dates of the emails
14 in Exhibit 37, our Group Exhibit 37. So we've got
15 a complaint from Jim McDaniel saying the account is
16 in trouble, down by 80 percent. Jim McDaniel,
17 was he one of your customers?
18    A   I believe so.
19    Q   And the date on that is November 29th
20 of 2017, right?
21    A   Yes.
22    Q   All right. So if you look at the next
23 email, that's from John Dugan. Is he a customer of
24 yours?

Page 153

1    A    I believe so.
2    Q    All right.  And he says, "It appears
3  my account which started at 25,000 is now worth
4  less than $5,000."  And what's the date on that?
5    A    January 19, 2018.
6    Q    All right.  So next email, this is
7  another one from someone named Clint.  Do you know
8  who this customer is?
9    A    I believe so.
10    Q    Who is that?
11    A    He was one of my customers.
12    Q    Do you remember his last name?
13    A    I don't.  I do not.
14    Q    All right.  So he says, "How long
15  until my account goes to zero?  Is it time to
16  just close it?"  What's the -- he says, "Send
17  me an email telling me what's been going on and
18  why I should stay.  No phone calls."  Did you send
19  Mr. Clint --
20    A    I referred it to Jim Donelson.
21    Q    Did you send anything to Clint?
22    A    I'm not positive.  If I did, it was
23  something Jim wrote, sent to me to send to him.
24    Q    And what's the date on this email?

Page 154

1    A    January 26th.
2    Q    All right.  Let's look at this next
3  one.  This is an email from Terry Groom.  Is Terry
4  a customer of yours?
5    A    I believe so.
6    Q    He says, "It looks like we are still
7  losing ground, and I still haven't seen anything of
8  Sherryl's IRA yet."  Do you know what he's talking
9  about there, this IRA?
10    A    He did have two accounts.  One was in his
11  name, one was in his wife's name.
12    Q    Was that his wife's IRA?
13    A    I believe so.
14    Q    And what's the date on that email?
15    A    January 29th.
16    Q    So let's look at the next one here.
17  Oh, it's another Jim McDaniel one.  Let's skip
18  that.  And if you look at this next one, we've got
19  an email from geomac5.  Who's geomac5?
20    A    I don't recall.
21    Q    Is that the email address of a client
22  of yours?
23    A    Yes.
24    Q    All right.  So this person is complaining

Page 155

1  about an $18,000 loss, is that right?
2    A    It looks like that, yes.
3    Q    And he sent this email to you?
4    A    I believe so.
5    Q    What's the date on that?
6    A    2/13.
7    Q    All right.  Another one from Clint.  Who
8  is Larry Rea?
9    A    He was a client.
10    Q    Is he a client of yours?
11    A    Yes.
12    Q    All right.  And it looks like he's
13  complaining here, "In reviewing my statements I am
14  reading you have lost about $50,000 in the time I
15  have been with you.  This is totally unacceptable
16  and I want to know where the 78 percent winning
17  rate has been all this time."  Did you respond
18  to this email?
19    A    I don't recall.  I don't know where he
20  got the 78 percent winning rate, though.
21    Q    I think he probably meant 76.5 percent,
22  don't you think?
23    A    It might be.
24    Q    Because you told him that, right?

Page 156

1    A    No, that's not what I told him our
2  win rate is.  76-1/2 percent of options expire
3  worthless, which is true, but that has nothing to
4  do with the win rate.
5    Q    So what's the date on this email for
6  Mr. Rea?
7    A    3/14.
8    Q    All right.  Let's take a look at the
9  next page, if we could, please.  Who is David Owens?
10    A    He's a client.
11    Q    Is he a client of yours?
12    A    Yes.
13    Q    So he says, "Scott, this has not been
14  a fun ride.  I am down over 50 percent and don't see
15  any way to keep up."  What did you do about this?
16    A    I asked him to continue, lower his
17  contracts to one contract and see if we can make
18  some ground.
19    Q    Did you make some ground?
20    A    I don't recall.
21    Q    What's the date on this email?
22    A    6/1.
23    Q    All right.  So let's look at the next page.
24  Who's John Conlon?

Page 157

1    A    He's a client.
2    Q    Is he a client of yours?
3    A    Yes.
4    Q    So he's saying, "I am wondering
5  if all the accounts at Long Leaf had performed
6  as poorly as mine."  What's the date on that email,
7  please.
8    A    6/5.
9    Q    All right.  So let's look at the
10 next page.  It's another one from Mr. Clint and he
11 says, "Do not make any further trades in my account.
12 Please close all positions.  It's pretty simple.
13 I've lost 55 percent in the last year and 46 percent
14 since the end of 2017."  What's the date on that
15 email from Mr. Clint?
16   A    7/17.
17   Q    All right.  So let's look at the next
18 page.  Ken Bernstein, is that a customer of yours?
19   A    I don't recall.
20   Q    Well, he sent this email to you, didn't he?
21   A    Yeah.  Well, then yeah, I guess he is.
22   Q    All right.  So he says, "Hello, Scott:
23 Do not implement your firm's recommendations for
24 further trades in my account.  Since inception six

Page 158

1  months ago your firm's recommendations have led to
2  a 35 percent decline in the value of my holdings.
3  My remaining holdings include another disaster
4  in silver futures."  I guess that last sentence
5  wasn't that relevant.  What's the date on this
6  email?
7    A    7/25.
8    Q    So let's look at the next email.  Who's
9  Liliana Zhu?
10   A    I can't recall.
11   Q    Is that a customer of yours?
12   A    I don't recall.
13   Q    So if you look Liliana says, "Who is the
14 new broker?  My $10,000" --
15   A    Oh, yeah.
16   Q    So does that jog your memory?
17   A    Apparently I am, yeah.
18   Q    Okay.  "Who is the new broker?  My
19 $10,000 account only has around $3,000 balance
20 left.  I want to leave Long Leaf Trading Group and
21 trade on my own."  What's the date on that email?
22   A    8/13.
23   Q    All right.  And then another one
24 from Jim McDaniel.  So looking at Group Exhibit 37,

Page 159

1  is it fair to say that you consistently received
2  complaints from customers about losses in their
3  accounts during --
4    A    Yes.
5    Q    -- your tenure at Long Leaf?
6    A    Yes.
7    Q    And you continued to pitch Long
8  Leaf's services to customers, is that correct?
9    A    Yes.
10   Q    Why did you do that?
11   A    Because the market conditions do change.
12   Q    Did they change for these customers?
13   A    I don't recall.
14        (Whereupon  CFTC  Exhibit No. 38 was
15        marked for identification, MM.)
16   Q    All right.  I want to hand you what
17 I've marked as CFTC Exhibit 38.  Do you recognize
18 this document?
19   A    I guess -- I don't recognize it.  I know
20 I got it in my email but, no, I don't recognize it.
21   Q    Okay.  So it's an email from Mr. Donelson
22 to you dated January 19, 2018 and the title is Dugan
23 Analysis.  Do you know who Dugan is?
24   A    He was, I'm guessing, one of my clients.

Page 160

1    Q    Why are you guessing that?
2    A    Because I don't recall every client's
3  name.
4    Q    Okay.  So I want to show you the
5  second page of this exhibit, this Dugan Analysis
6  Spreadsheet as it's titled.  And I just want to ask
7  you if you recognize this, if you've seen it before,
8  if you can tell me what it is.
9    A    It looks like an overall account statement
10 or results of trades or something.
11   Q    So do you know how Mr. Donelson generated
12 this?
13   A    I have no idea how he did this.
14   Q    Yeah.  You know what, if you don't
15 know, I won't press you on it further.  But the
16 thing I'm most interested in is it looks like if
17 you see the A column and the B column, you see
18 there's a trade month and an exit month?
19   A    Yes.
20   Q    Right, so then you see this contract.
21 Do you see that?
22   A    Yes.
23   Q    So what I'm trying to figure out is what
24 that indicates.  Can you tell me?

Page 161

1    A    What the contract is?
2    Q    No.  You know, what this looks like
3  to me -- and I want you to tell me if you know or
4  if you agree -- is that Mr. Donelson has generated
5  a history for Mr. Dugan's account, but the history
6  importantly is not laid out in terms of individual
7  trades but of trades as they were recommended by
8  Long Leaf Trading.  So if you look, he's got his
9  trade month and you see it just says August.
10   A    Right.
11   Q    Right?  And it says August T-bond,
12  and then it says exit month and it says September.
13  Then it has a contract and it has a strike, it
14  has a factor.  And then it goes on to provide other
15  information we've seen in other spreadsheets, such
16  as --
17   A    Right.
18   Q    -- you know, net liq and stuff like
19  that.  And what I want to know is have you seen
20  this document before or other documents like it?
21   A    I'm sure I have, but I don't recall any
22  of them.  I don't remember any of this.
23   Q    Okay.  Well, you can put it aside then.
24   A    (Witness complies).

Page 162

1         (Whereupon CFTC Exhibit No. 39 was
2            marked for identification, MM.)
3    Q    All right.  So, Mr. Gecas, I'm handing
4  you what I've marked as CFTC Exhibit 39.  Do you
5  recognize this document?
6    A    Yes.
7    Q    Can you tell me what it is, please.
8    A    The spreadsheet or --
9    Q    Let's just start with the email, the
10  spreadsheet, whatever you recognize.
11   A    Yes, I recognize the email.
12   Q    I mean, is this something that you
13  remember or do you just recognize it as an email?
14   A    I just recognize it as an email.
15   Q    Got it, okay.  So you'll see in
16  Exhibit 39 there's an email from Gerry Drayer
17  to you and to Mr. Donelson.  Who's Gerry Drayer,
18  please.
19   A    He's a client.
20   Q    Of yours?
21   A    I'm guessing, yes.
22   Q    Why are you guessing that?
23   A    Because it's on an email.
24   Q    So Mr. or Ms. Drayer says, "As

Page 163

1  discussed, please send me ASAP a complete recap of
2  all trading activity and related P&L per position
3  since inception of my account.  You said I would
4  have this by end of last week."  And it looks
5  like Donelson is forwarding this to you, is that
6  right?
7    A    It looks like it.
8    Q    All right.  And then Donelson writes
9  to you again and said, "Just need to update through
10  current month.  Same story as most, May was a huge
11  loss."  Do you see that?
12   A    Yes.
13   Q    All right.  So did you discuss with
14  Mr. Donelson what he meant by same story as most,
15  May was huge loss?
16   A    I know May was a huge loss.  I believe
17  that was when we had all four contracts being a
18  loss.  I mean, that's what I would assume.
19   Q    So same story as most?
20   A    That I don't know what he means.
21   Q    You can put this one aside.
22   A    (Witness complies).
23   Q    You know, did Mr. Evans -- I mean, it
24  sounds like during the time you worked at Long Leaf,

Page 164

1  at least during Mr. Evans' tenure, is it fair to
2  say that losses mounted in customer accounts, which
3  is to say customers had lost more overall by the
4  time Mr. Evans left?
5    A    Honestly, I don't recall but I think
6  that is correct.
7    Q    Why do you think that's correct?
8    A    Just based on the strategies that he
9  was using, overhearing other brokers complaining,
10  and that would be my idea of what happened.
11   Q    So did Mr. Evans ever express surprise
12  or dismay that his customers were losing money?
13   A    No.
14   Q    Did he ever say anything about it?
15   A    No.
16   Q    Did you ever ask him if he knew customers
17  were losing money?
18   A    No.
19   Q    Why?
20   A    Because he said that his strategies
21  work but they don't work all the time.  So if they
22  do lose money, it's understandable but the next
23  opportunity will arise.
24   Q    Is that what he told you?

Page 165

1   A   That's what he told me.

2   Q   It seems odd to me that customers
3 could lose so consistently and the person in
4 charge of the firm would not express surprise
5 or displeasure.  Were you surprised by that?

6   A   I was a little bit surprised but,
7 I mean, it wasn't my place to confront the owner
8 of the company.

9   Q   But why not?

10   A   Because I was brand new to being
11 in this business and trying to learn what was
12 going on.

13   Q   But, I mean, you're your own man.  You can
14 quit and get another job, can't you?

15   A   Yeah.

16   Q   Why didn't you?

17   A   Just because this was brand new and
18 this was something I was learning.  So I was taking
19 the opportunity to learn and learning how to handle
20 losses as well as gains.

21   Q   And I think we established that
22 you can't tell me when any gains were achieved?

23   A   Yeah, I can't recall.

24   Q   Or who achieved them?

Page 166

1   A   Correct.

2       (Whereupon CFTC Exhibit No. 40 was
3       marked for identification, MM.)

4   Q   All right.  Mr. Gecas, I want to hand
5 you what I've marked as CFTC Exhibit 40.  Do you
6 recognize this document?

7   A   Yes.

8   Q   Could you tell me what it is, please.

9   A   It looks like the script from Tim Evans.

10   Q   All right.  So if you look at the
11 first page of Exhibit 40, you'll see this is
12 an email from Mr. Evans dated September 20, 2017 to
13 you and a bunch of other people and it says Current
14 Demo Deck, and it says Attachments Long Leaf Demo
15 Deck.pptx.  That's a Power Point presentation, as
16 I'm sure you know, and the second page through the
17 end of Exhibit 40 is that presentation.  So is this
18 a presentation you used with clients?

19   A   Yes.

20   Q   With prospective clients?

21   A   Yes.

22   Q   How did you use it?

23   A   By just walking them through the Power
24 Point and explaining options.

Page 167

1   Q   So these customers, they have to log
2 on to their computer to look at this presentation,
3 right?

4   A   Yes.

5   Q   So how do you show them this presentation?
6 They're not in the office with you, right?

7   A   No.  It was a GoToMeeting or join.me or
8 TeamViewer or some screen-sharing thing.

9   Q   And you would show this to customers?

10   A   Yes.

11   Q   All right.  So let's flip, if we could,
12 to the fifth page of Exhibit 40.

13   A   Okay.

14   Q   And it says Option Probabilities.
15 "An average of 76.5 percent of all options held
16 to expiration at the Chicago Mercantile Exchange
17 expired worthless."  Was this something you told
18 to clients?

19   A   Yes.

20   Q   All right.  So why did you tell them this?

21   A   It's true.

22   Q   How do you know it's true?

23   A   It's based on a CME study.

24   Q   All right.  So have you ever looked at

Page 168

1 that study?

2   A   Yes.

3   Q   And it said 76.5 percent of options
4 expire worthless?

5   A   I believe so, yes.

6   Q   Does that mean that 76.5 percent of all
7 options are profitable for the seller?

8   A   No.

9   Q   So how are those two things in dissonance?

10   A   I don't know how to explain that.

11   Q   So 76.5 percent of all Long Leaf
12 Trading's trades while you were there, were they
13 profitable?

14   A   No, not at that percentage.

15   Q   At what percentage?

16   A   That 76.5, that's not a percentage of
17 success rate.

18   Q   So my question then is why would
19 a customer care about this number if it's not a
20 percentage success rate?

21   A   Because if -- depending on the strategy,
22 what Tim Evans was using, were credit spreads and
23 selling premium.  So that's -- he would say that
24 it's more advantageous to be an options seller

Page 169

1 than buyer.
2    Q    But why would this be important information
3 for a customer?
4    A    Because of the option -- if the
5 customer's selling options, he had a higher
6 probability of those options decreasing in value.
7    Q    So does this mean that 76.5 percent
8 of all options will be profitable for the seller?
9    A    No.
10    Q    Did you explain that to customers?
11    A    On occasion.  I don't recall.  I know --
12 I don't remember who I've said that to, but I have
13 said that this is not a success rate.  It's just
14 a study based on the CME that 76-1/2 percent of
15 options expire worthless.
16    Q    All right.  So is that something you told
17 to many customers?
18    A    Yes.
19    Q    What were their names?
20    A    No idea.
21    Q    So if I listen to your calls, or more
22 of your calls than I've listened to, am I likely to
23 come across you saying that to them?
24    A    Saying that 76-1/2 percent of options

Page 170

1 expire worthless, yes.
2    Q    No, I heard that.  Saying that 76.5 percent
3 is not a success rate, is not profitability.
4    A    No, no, I haven't -- I rarely said that
5 on the phone.
6    Q    Why?
7    A    Because I was told to follow the script.
8    Q    You know, it seems to me that a normal
9 customer would hear this 76.5 percent and assume
10 that it refers to a success rate or a profitability,
11 and I think we see that reflected in Exhibit 37, and
12 the customer that sort of says that is Mr. Larry
13 Rea.  So you must have known that this is what
14 customers were thinking, right, that this was
15 76.5 percent profits?
16    A    I don't know what the customers were
17 thinking.
18    Q    Did you ever ask them what their impression
19 was of that?
20    A    No.
21    Q    Didn't it seem to you that this
22 number is designed to mislead customers, to make
23 them think that they were going to win 76.5 percent
24 of the time?

Page 171

1    A    No, I did not.
2    Q    What did you think it was supposed
3 to give to customers that was valuable for them to
4 know?
5    A    Statistic.
6    Q    But how does this statistic help inform
7 what they're supposed to do?
8    A    If they're an option seller, that's the
9 expiring worthless rate.
10    Q    But does expiring worthless, does
11 that mean that customers are going to make a profit
12 76.5 percent of the time?
13    A    No.
14    Q    What percentage of the time are customers
15 going to make a profit at Long Leaf?
16    A    I don't have that answer.
17    Q    All right.  Let's keep flipping,
18 please, until we get to the part where it talks
19 about custom account design.  There we go, all
20 right.  So we're looking at a page in Exhibit 40
21 that says custom design.  It says custom execution
22 plan, custom education plan, custom communication
23 plan.  What is this custom design that Exhibit 40
24 is referring to?

Page 172

1    A    Well, the execution plan is based on
2 what their risk tolerances would be, if they want to
3 be more aggressive, less aggressive.  The education
4 plan was giving them all their ebooks, and then
5 the communication plan would be when they're able to
6 take calls, communicate at what their -- whatever
7 they can do based on their time constraint.
8    Q    So my question with respect to this
9 custom design and custom execution plan, so your
10 testimony before was that every customer gets the
11 same recommendations, right?
12    A    Correct.
13    Q    So help me understand, if you
14 would, please, how there's custom design or custom
15 execution.  It seems like it's the same thing to me
16 for everyone.
17    A    Well, it is but it isn't because
18 we've had clients that don't want to take their
19 full contract amount based on the money they have.
20 So if a guy opens the account with 25,000 and only
21 wants to trade one contract, that's based on his
22 preference.
23    Q    So this custom execution just refers
24 to how many contracts the customer wants to buy,

Page 173

1 right?

2   A  Or sell, correct.

3   Q  And whatever, you know, based on what
4 they tell you they want to do, that's what you'll
5 do, correct?

6   A  Yes.

7   Q  And as a general rule, customers are
8 recommended to enter into one contract for every
9 $10,000, right?

10   A  Yes.

11   Q  But you might depart from that and that's
12 the custom piece, right?

13   A  Based on what their preferences are, yeah.

14   Q  You can put that one aside, if you would,
15 please.

16   A  (Witness complies).

17        (Whereupon CFTC Exhibit No. 41 was
18        marked for identification, MM.)

19   Q  All right. Mr. Gecas, I want to hand
20 you what I've marked as CFTC Exhibit 41, and you'll
21 see it's an email and attachment.

22   A  Okay.

23   Q  Do you recognize this document?

24   A  Yes.

Page 174

1   Q  Can you tell me what it is, please.

2   A  It's another demo script.

3   Q  All right. So who developed this demo
4 script?

5   A  Tim Evans.

6   Q  So if you look at the date on this
7 email, it says from Scott Gecas to rdillman. Who's
8 rdillman?

9   A  Ryan Dillman.

10   Q  All right. And you'll see the date on
11 this is March 12, 2018, correct?

12   A  Um-hmm.

13   Q  And it says Cust Deck, and that's custom
14 deck, right?

15   A  Custom deck, yeah.

16   Q  All right. So it looks like you're
17 sending this to Ryan. Did you write this or did
18 someone else?

19   A  Tim Evans wrote it.

20   Q  All right. How can that be when this
21 is dated March 12, 2018?

22   A  I don't know. I know Tim -- I had
23 nothing to do with this deck. I know Tim Evans
24 gave it to me.

Page 175

1   Q  You were just passing this on to
2 Mr. Dillman?

3   A  Yes.

4   Q  So let's look, if we could, please,
5 at the custom deck. Is this something that you
6 used with clients?

7   A  I have.

8   Q  All right. So I want you to turn
9 to the tenth page of the Power Point presentation
10 in Exhibit 41. It says Portfolio Management.

11   A  Okay.

12   Q  So did you show this presentation to
13 clients?

14   A  Yes.

15   Q  How many?

16   A  I don't recall.

17   Q  Was it like most of them?

18   A  A lot of them.

19   Q  All right. So it says Portfolio
20 Management $100,000 risk capital, 12 percent annual
21 return, $12,000 income generation. What would you
22 say to a client about this slide?

23   A  That this is a hypothetical
24 portfolio based on the options that are placed

Page 176

1 in credit spreads. That's why this came from Tim.

2   Q  That's what you would tell customers?

3   A  I wouldn't say this came from Tim,
4 but I would have said based on a credit spread
5 type strategy, this is what the goal of this is
6 on a hypothetical basis.

7   Q  All right. So it says annual return
8 12 percent. What customers at Long Leaf Trading
9 achieved a 12 percent annual return?

10   A  I don't recall.

11   Q  Were there any?

12   A  Not that I was aware, I believe.

13   Q  What do you think the annual return
14 for Long Leaf customers was on average during your
15 tenure?

16   A  No idea.

17   Q  What was the annual return for your
18 customers during your tenure at Long Leaf?

19   A  I don't know.

20   Q  Would it surprise you to learn that it
21 was negative?

22   A  Yes.

23   Q  Why would it surprise you?

24   A  Just based on the strategies with some

Page 177

1 wins, some losses, I didn't think that the customers
2 were overall negative.
3    Q    Really?
4    A    Yeah.
5    Q    That's your testimony?
6    A    Yeah.
7    Q    Despite all the complaints that we showed
8 you?
9    A    I mean, I -- well, I understand all the
10 complaints, but I don't think all the customers were
11 in the same spot.
12    Q    But you could have figured out --
13    A    I would say a lot of them did lose money.
14    Q    But you could have figured out what
15 the average annual return of at least your Long Leaf
16 Trading customers are, isn't that right?
17    A    I guess I could have.  I did not.
18    MR. PATRICK:  Did you try to do
19    that for even one customer during the whole
20    time that you were a salesperson at Long Leaf?
21    THE WITNESS:  No.
22    MR. PATRICK:  You never went back
23    and tried to recalculate the profits and losses
24    for even a single customer that you had?

Page 178

1    THE WITNESS:  No.
2    MR. PATRICK:  And so why would it surprise
3    you so much to learn that all of your customers,
4    or all of Long Leaf's customers in general lose
5    money?
6    THE WITNESS:  I was told that that
7    wasn't based -- from Tim Evans, especially
8    Tim Evans, he said that they weren't -- not
9    everybody lost money.  And then Jim Donelson
10    was very vague on the overall results of
11    everything.
12 BY MR. BURDEN:
13    Q    But you could have looked yourself?
14    A    I could have.  I did not.
15    Q    You've got to understand how this
16 looks to us.  Like why would you not have looked?
17 I am forced to conclude from that it's because you
18 didn't care, is that right?
19    A    That is not correct, no.
20    Q    In that case I'm forced to conclude
21 it's because you knew that they would be negative
22 returns, is that correct?
23    A    No, that's not correct.
24    Q    All right.  So let's look, if we could --

Page 179

1    A    I mean, when I was at Long Leaf,
2 I mean, I was basically just doing what I was told
3 to do.
4    Q    So let's turn, if we could, please,
5 to I think two more pages over in Exhibit 41.
6 It says Portfolio Management, but it's got more
7 numbers on it.
8    A    Okay.
9    Q    There you go.  So we're looking at
10 a slide in Exhibit 41, Power Point presentation.
11 It says Portfolio Management.  It says $100,000 risk
12 capital, 12 percent annual return, $12,000 income
13 generation, 12 option sale 30 days, and then $1,000
14 monthly income.  Are we on the same slide?
15    A    Yes.
16    Q    So was this a slide you showed to
17 customers?
18    A    Yes.
19    Q    All right.  So you showed this to a lot
20 of customers, right?
21    A    Yes.
22    Q    So what did you tell them about this slide?
23    A    Based on the data that was provided to me,
24 this is a hypothetical portfolio.

Page 180

1    Q    All right.  What else did you tell
2 them?  So a customer's looking at this.  There's
3 a bunch of numbers.  You're a sales guy.  Do your
4 pitch.
5    A    Based on the portfolio that is
6 designed, that this is -- could be -- this could
7 be a hypothetical scenario for you.
8    Q    You told customers that this could
9 be a hypothetical scenario for them, this portfolio
10 management page in Exhibit 41?
11    A    Yeah.  But, I mean, nothing -- I always
12 tell them nothing's guaranteed and there's always
13 risk for loss.
14    Q    All right.  So it seems to suggest
15 here that there's $1,000 monthly income in this
16 hypothetical portfolio, is that correct?
17    A    Yes.
18    Q    Were there any customers of Long
19 Leaf that enjoyed a $1,000 monthly income from
20 Long Leaf Trading?
21    A    Overall, no, I don't believe so.
22    MR. BURDEN:  Yeah.  I want to -- I'm
23    just going to play this call and we'll see how
24    we do with it.  If it runs too long, I'll skip

Page 181

1    through it.
2        (Whereupon CFTC Exhibit No. 42 was
3        marked for identification, MM.)
4    Q   All right.  So I want to play for
5 you an audio file, Mr. Gecas, that we've marked
6 as CFTC Exhibit 42.  It is a file produced by Long
7 Leaf Trading.  The title of the file is 11-06-2017_
8 James Johnson_3609894516.
9        (Whereupon the audio was played.)
10   Q   All right.  I want to pause that for
11 just a brief moment.  Whose voice is that on the
12 call?
13   A   Mine.
14   Q   All right.  I'm going to try speeding
15 this up.  And if you want me to slow it down, tell
16 me, okay?
17   A   Yes.
18   Q   1.6 is about as fast as I can take it.
19       (Whereupon audio was played.)
20       MR. BURDEN:  I'm going to take a break.
21       Why don't we do a couple more exhibits, and
22       then we'll go off the record and I'll make this
23       easy for everyone.  I promise it'll be quick.
24

Page 182

1        (Whereupon CFTC Exhibit No. 43 was
2        marked for identification, MM.)
3    Q   All right.  Mr. Gecas, I want to hand
4 you what I've marked as CFTC Exhibit 43.  Do you
5 recognize this document?
6    A   Yes.
7    Q   Could you tell me what it is, please.
8    A   It looks like somebody saying positive
9 things about Long Leaf Trading.
10   Q   So if you look, it's an email from you
11 to sgecas2000@gmail.com.  That's your personal email
12 address, right?
13   A   Yes.
14   Q   So you're sending this to yourself,
15 correct?
16   A   It looks that way.
17   Q   All right.  So who's Jeff K?
18   A   That I don't know.  That might have came
19 off of a Twitter feed or something.
20   Q   So it looks like this piece says, "The
21 team at Long Leaf Trading are very knowledgeable and
22 provide excellent service.  Scott Gecas is able to
23 boil down the complexities of global trading markets
24 into easily digestible, actionable intelligence.

Page 183

1 Their trading platform is sophisticated, yet easy to
2 use.  I highly recommend them for anyone interested
3 in derivatives."  So who said this to you?
4    A   That might -- I use Twitter all the time
5 and I go back and forth with hundreds and hundreds
6 of people that I go back and forth with and just
7 talk about regular trading.
8    Q   But what I'm asking is who said this very
9 nice thing about you?
10   A   Jeff K.  I don't know who Jeff K is.
11   Q   All right.  Is he a client of yours?
12   A   I think he was one of the guys I was
13 trying to get.  I don't believe he ever came on,
14 though.
15   Q   Oh, so why did you -- is this something
16 he wrote or is this something you wrote and sent to
17 yourself?
18   A   I did not write that.  That would not
19 make sense.
20   Q   So why did you send this email to yourself?
21 Like what did you do with it?
22   A   I probably passed that on to Jim.
23 I mean, this is one of those guys, like I said,
24 on Twitter that I go back and forth with.  When

Page 184

1 I used to work with a different trading firm, we
2 used Twitter all the time to connect to different
3 people around the world.
4    Q   So what's the K in Jeff K?
5    A   I have no idea.
6    Q   Was this a guy you knew?
7    A   Probably based on the Twitter feed.
8 I don't know what his Twitter handle is or anything
9 like that.  I probably copied and pasted from
10 Twitter.
11   Q   Did you post this review online anywhere?
12   A   I did not.  I never had access to the Long
13 Leaf website or anything like that.
14   Q   Perhaps --
15   A   So if I did -- well, I did not post
16 it for sure, but I probably forwarded it to Jim.
17   Q   Do you know if Jim posted it anywhere?
18   A   I do not know if he did offhand.
19   Q   All right.  So are you aware of any
20 incident with Mr. Evans attempting to manage Long
21 Leaf Trading's online reputation?
22   A   No.
23   Q   Perhaps paying an aggrieved customer
24 to take down a Yelp review?

Page 185

1    A    I vaguely remember something about it,
2 but I don't recall him paying him to do anything.
3    Q    What do you recall about that episode?
4    A    I know it was an argument and I remember
5 him specifically walking out of the office on his
6 cell phone not very happy, talking about -- saying
7 you've got to get that review off.
8    Q    Do you know if he got the review off?
9    A    I do not.
10         (Whereupon CFTC Exhibit No. 44 was
11            marked for identification, MM.)
12    Q    Do you know if there were other
13 attempts to manage Long Leaf's online reputation?
14    A    Not that I'm aware of.  I know we
15 tried to do all kinds of different things with
16 LinkedIn and tried to just promote, well, Long Leaf.
17 But other than that, no.
18    Q    So what did you do to promote Long Leaf
19 on the internet?
20    A    Just I would post all my TV spots.
21    Q    Anything else?
22    A    I tried to get them to set up
23 something on Twitter where we could show option
24 trades and what was going on with realtime, but

Page 186

1 that's about it.
2    Q    All right.  So you can put that one
3 aside, if you would, please.
4    A    I believe I did have one recommendation
5 that I know was posted from one of my clients in
6 the very beginning stages of him working with me.
7 I don't remember who he exactly was, though.
8    Q    Yeah, so this might be the next thing
9 I show you.  So I want to hand you what we've marked
10 as CFTC Exhibit 44.  Do you recognize this document?
11    A    Yes.
12    Q    Can you tell me what it is, please.
13    A    That -- yeah, Alberto Grosmark.  He
14 was the one that was happy with me, I guess, at the
15 time.
16    Q    All right.  So he writes to you on
17 April 9th of 2018 Just Posted in Google.  "The
18 persistent marketing of Long Leaf Trading really
19 pays off.  This trading group has the client in
20 mind, even at the CEO level, who gets personally
21 involved to make investors satisfied."  And then
22 there's some more and then he said, "Finally, after
23 a couple of trading weeks, the total return was
24 way above the double digits.  So far the best

Page 187

1 and recommendable experience and the profits are
2 there."  So this was something Mr. Grosmark sent to
3 you?
4    A    Yes.  Well, he posted it on Google,
5 I guess.
6    Q    Did you ask him to do that?
7    A    I said if you're happy, it would be
8 helpful if you wrote something nice.
9    Q    All right.  And had Mr. Grosmark started
10 trading by this point with you?
11    A    Yes.
12    Q    What happened?  Is that true?  Was
13 Mr. Grosmark's total return way above the double
14 digits?
15    A    In the beginning, yes, it was.  That's
16 what I mean by saying it's hard to differentiate
17 returns for everybody because if they came in, we
18 had a bad month, they're going to be down.  If we
19 have a good month, they're going to be up.
20    Q    What happened to Mr. Grosmark in the end?
21    A    I believe he pulled his money.  He was not
22 happy overall at the end.
23
24

Page 188

1         (Whereupon CFTC Exhibit No. 45 was
2            marked for identification, MM.)
3    Q    All right.  So I want to show you what
4 I've marked as CFTC Exhibit 45.  Do you recognize
5 this document?
6    A    Yes.
7    Q    All right.  Can you tell me what it is,
8 please.
9    A    It's an email from Alberto to me.
10    Q    All right.  And this is just a few
11 months after his Google review, is that right?
12    A    I believe so.
13    Q    And he says, "Good morning, Scott.
14 Being the beginning of September and, regretfully,
15 still under water about 20 percent of my original
16 investment, I am kindly requesting the report that
17 you said was going to be ready by of August.  I hope
18 that this report will help me understand what has
19 happened and where we are going.  So far I cannot
20 figure this out."  So did you give Mr. Grosmark
21 the report he requested?
22    A    I asked -- I requested Jim Donelson
23 to do the account breakdown, like he's done in the
24 past.  I don't know if he ever got it, though.

Page 189

1    Q    All right.  So in the end Mr. Grosmark
2  lost a lot of money with Long Leaf Trading, is that
3  fair to say?
4    A    He pulled his money, being not happy
5  with the results.
6    Q    All right.  Were there any other
7  customers who wrote favorable online reviews for
8  you or for Long Leaf that you're aware of?
9    A    Not that I can recall.
10    MR. BURDEN:  I'd like to go off the
11  record.  And if you'd give us like a 15-minute
12  break, please, I'll queue up my disastrous
13  recording and I'll confer with my colleagues.
14        (Whereupon a recess was taken from
15            2:54 p.m., to 3:20 p.m., after which
16            the following proceedings were had:)
17    MR. BURDEN:  Could we go back on the
18  record, please.  All right.  I want the record
19  to reflect that neither I nor any member of the
20  team had any substantive conversations with the
21  witness during the break, though we did advise
22  the witness that we wouldn't be playing any
23  calls for him because I couldn't -- I didn't
24  record the times.

Page 190

1    Q    Is that right?
2    A    True.
3    Q    Yes?
4    A    Yes.
5    MR. BURDEN:  All right.  Joe, take it away.
6        (Whereupon CFTC Exhibit No. 46 was
7            marked for identification, MM.)
8        FURTHER EXAMINATION
9  BY MR. PATRICK:
10    Q    Mr. Gecas, I'm going to hand you
11  a document that is marked CFTC Exhibit No. 46.
12    A    Okay.
13    Q    Just let me know when you've had a chance
14  to take a look at that.
15    A    I have.
16    Q    Do you recognize Exhibit 46?
17    A    Yes.
18    Q    And it appears to be an email dated
19  January 10, 2018 from you to someone called Chris
20  Abbey.  Do you know who Chris Abbey is?
21    A    One of my clients.
22    Q    Okay.  And in this email it appears you
23  are responding to Mr. Abbey, I believe.  Is Chris
24  Abbey a man or a woman, do you know?

Page 191

1    A    I believe it's a guy.
2    Q    Okay.  So from Mr. Abbey to you.  And
3  it appears that he is asking you to close a trade
4  based on the recommendation that you sent to him,
5  is that right?
6    A    Yes.
7    Q    Okay.  And at the top of the email
8  you'll see there that it says you wrote to Chris
9  Abbey, "Got it.  We got out at 24/64.  Great trade,
10  500 percent."  Do you know what you mean -- or what
11  you meant when you wrote that to him?
12    A    If that's what I said, that was the result
13  of the trade, excluding commissions.
14    Q    Okay.  So where would you have gotten
15  that 500 percent number?  Would that have been your
16  own calculation?
17    A    No, that was from Jim Donelson.
18  I never did any of those calculations.  Jim had
19  control over the exits and gave us the information
20  to send to them.
21    Q    Okay.  How often did you get an email like
22  this from a client who may have been involved in an
23  options trade and, you know, when they responded to
24  you to say, yes, please go ahead and do that trade

Page 192

1  or exit that position, how often were they getting
2  back to you or were you providing information to
3  them about the results of the trade or the
4  profitability?
5    A    It would vary from client to client.
6  Sometimes it would be instantaneous.  Sometimes it
7  would be days.
8    Q    Okay.  But typically most clients would
9  ask you as their broker, hey, how did that trade go
10  or how did we do?
11    A    Not necessarily.  They wouldn't
12  necessarily ask the results of that.  We would
13  just -- you know, I was given this information and
14  typically the information would be just on the
15  winners.
16    Q    So this information, did you have to
17  ask Mr. Donelson to provide you the information on
18  this trade?
19    A    No, he just sent that to everybody.
20    Q    So he sent this sentence, this sentence
21  you included, "Got it.  We got out at 24/64.  Great
22  trade, 500 percent"?
23    A    I don't think he said those exact
24  words.  He would just say 500 percent return on XYZ

Page 193

1 trade or something along those lines.
2    Q    Did you do anything to confirm that number?
3    A    No.
4    Q    You just communicated it on to your client?
5    A    Yeah.
6    Q    So you don't know independently of what
7 Mr. Donelson reported to you about the results of
8 the trade whether or not it was profitable?
9    A    No, that was just based on the information
10 he gave me.
11    Q    Okay.  Would it surprise you to know that
12 that trade was not profitable?
13    A    It would be very surprising to me if
14 that trade was not profitable if I had to write
15 that, yes.
16         (Whereupon  CFTC  Exhibit No. 47 was
17            marked for identification, MM.)
18    Q    Okay.  I'm going to show you another
19 document that we've marked as CFTC Exhibit No. 47.
20 Take a look at that and let me know when you've had
21 a chance to review it.
22    A    Okay.
23    Q    Have you seen Exhibit No. 47 before?
24    A    I don't recall if I've seen this before.

Page 194

1    Q    Do you know what it is?
2    A    It's a statement.
3    Q    And do you see up in the upper left-hand
4 corner there seems to be a name and address of an
5 individual there named Francis Abbey?
6    A    Francis Abbey.
7    Q    Is that the same as Chris Abbey?
8    A    I believe so.
9    Q    And the first page of this document,
10 Exhibit 47, it shows up in the -- well, kind of
11 about midway up the first page it'll say trade
12 confirmations from 1st November '17 through 30th
13 November '17.
14    A    Yes.
15    Q    So this November statement, if you
16 go to the second page of the November statement, at
17 the bottom of the page you'll see a section called,
18 "The following trades have been executed as of 29th
19 November '17."  Do you see that?
20    A    Yes.
21    Q    And there are one, two, three, four
22 trades in U.S. T-bond options with a January and
23 February 18 expiration.  Do you see that?
24    A    Yes.

Page 195

1    Q    Does that look to be legs of a single
2 option trade to you?
3    A    It's legs of a spread.
4    Q    Okay.  An options spread trade?
5    A    Yes.
6    Q    And do you know what kind of trade this
7 is, like what options strategy is being employed
8 here by the --
9    A    It looks like a vol swap or a double
10 calendar, however you want to call it, yeah, selling
11 front month, buying back month.
12    Q    Okay.  And on the far right column
13 do you see that section called Debit and Credit?
14    A    Yes.
15    Q    And are those the prices that were either
16 paid or received for those options?
17    A    I believe so.
18    Q    Okay.  And you can see that for that
19 first option, the 153 call, that there was a $734
20 credit --
21    A    Correct.
22    Q    -- in that account, plus some commissions
23 and fees as well.  Do you see that?
24    A    I do.

Page 196

1    Q    And then on down through the other
2 transactions you can see that the -- that the
3 long 154 call was a premium of 437.50, that the
4 short Feb 18 put at a 146 strike was a 218.75 credit
5 and then that 148 put on the February 2018 option is
6 421.88.  Do you see that?
7    A    Correct, yes.
8    Q    Okay.  Now, if you can forward a few
9 pages, on the fifth page from there you'll see it's
10 page 2 of the January -- or I'm sorry.  It's page 2
11 of the December 2018 statement.  And it starts --
12 at the top it'll say Trade Confirmations from 1st
13 December through 31st December.
14    A    1st of December of '17, okay.
15    Q    And about midway down you'll see some
16 trades dated December 6, 2017, and there's some --
17    A    December -- okay, December 6th.
18    Q    And you'll see some soybean options
19 and then at the end, at the bottom of that section
20 you'll see U.S. T-bond options, two U.S. T-bond
21 options, a 53 call and a 54 call?
22    A    Yes.
23    Q    And you see those are offsets to
24 those transactions that were entered into back on

Page 197

1  December 6th?
2     A   Okay.
3     Q   So it looks like there were two of those
4  legs of that transaction taken off on December 6th.
5  Is that typical for a spread transaction like that?
6  Why would --
7     A   For that, yes.
8     Q   And why is that?
9     A   Well, maybe not. I don't -- hold on.
10 Let me look. I mean, typically what we would do
11 would be sell the front month, have it either expire
12 worthless or decay, have that off with an unlimited
13 opportunity for the back month.
14    Q   So do you think based on what you see
15 here in Exhibit 47, was that what was being done on
16 this particular transaction?
17    A   It does not look like that.
18    Q   Because I can take you a little bit further
19 into this document --
20    A   No, I'm just trying to figure out the
21 entry of the short strikes. Okay. I'm following
22 you.
23    Q   Okay. So it looks like two of the
24 four options that were put on on November 29th were

Page 198

1  taken off on December 6th of 2017?
2     A   Right.
3     Q   And that there was an additional two
4  contracts. If you go to the second-to-the-last
5  page in Exhibit 47, you'll see the offset of the
6  other two legs of that particular options spread
7  were taken off on January 10, 2018. And you can
8  see to the very right either the premiums that were
9  paid to get out of those options or the credits
10 that were put into the account when the option was
11 offset. Do you see those?
12    A   I believe so.
13    Q   And so I'm looking at this whole
14 transaction and I'm seeing that accounting for
15 this transaction and commissions and fees, the net
16 result of the trade was a loss of $282.50. So I'm
17 trying to understand how it could be --
18    A   That doesn't make sense to me. I mean,
19 I definitely would not have written saying that we
20 were profitable if we were not. Again, I mean, if
21 that is the case, either that was what I was told
22 to do or -- it had to have been what I was told to
23 do. I would never say that we made money on a loss.
24 I would never do that, regardless of who I was

Page 199

1  working for.
2     Q   Do you know how it was that Mr. Donelson,
3  or even Mr. Evans before him, calculated these kinds
4  of returns?
5     A   No, I have no idea.
6     Q   Do you believe that they used these monthly
7  statements to calculate the returns?
8     A   Obviously they did not.
9     Q   So I'm just trying to understand how a --
10    A   Yeah, I don't understand that.
11    Q   -- trade can go from a loss of roughly
12 $300 --
13    A   Right.
14    Q   -- you know, net of commissions
15 and fees to a 500 percent return reported to the
16 customer.
17    A   That does not make sense at all to
18 me, and that's something I would never do. That's
19 something -- regardless of how new I am, that's
20 something I would never do.
21         FURTHER EXAMINATION
22 BY MR. BURDEN:
23    Q   So I want to follow up on something
24 you said before, Mr. Gecas. I think you testified

Page 200

1  that Mr. Donelson would send around information on
2  winning trades, is that right?
3     A   Yeah, he was the one that would calculate
4  all of that.
5     Q   So what form did that take? Did he
6  send you an email that said we made this much money
7  on this trade or this percent return? Like did it
8  happen every week, every month? Tell me about that,
9  if you would, please.
10    A   I mean, typically if he was talking
11 about winners, it was only winners and not losses.
12    Q   And he would send you an email about
13 winning trades, correct?
14    A   Yeah, either it was an email or
15 it was a verbal discussion with the whole group.
16    Q   And with the whole group, you mean the
17 other brokers?
18    A   Yes.
19    Q   But he wouldn't tell you about losses?
20    A   No.
21    Q   Would he tell you to pass on information
22 about these winners to customers?
23    A   Well, obviously, yes.
24    Q   Well, I don't know how obvious it is.

Page 201

1    A    Well, I mean, with this email, yes.
2    Q    So give me an example of a discussion
3 that you recall where Mr. Donelson told you about
4 a winning trade and told you what to do with that
5 information.
6    A    Depending on what the winning trade
7 was and how big of a winner it was or not, he would
8 say, okay, well, we made X percent on this trade,
9 you know, convey that to your customers.
10   Q    And you would do that?
11   A    Yes.
12   Q    And what did you do to confirm that the
13 number was correct?
14   A    I didn't.
15   Q    And you understood that there were
16 trades that were occurring that were losses,
17 correct?
18   A    Yes.
19   Q    Did you ask him about those?
20   A    I've asked how do we handle the
21 customers reacting to the losses when we call
22 them.  I know we call them about the gains, and he
23 says, well, focus on the winners.
24   Q    When did you have that discussion with

Page 202

1 Mr. Donelson?
2    A    I don't recall exactly what time of the
3 month or what month it was.
4    Q    Was it in person or was it in writing?
5    A    It was in person.
6    Q    Well, why did you agree to go along with
7 that?
8    A    Because that's what I was told to do.
9    Q    But you must have known that that was
10 not good to do, right?
11   A    Well, it's always good to focus on
12 positives, I mean, but obviously the negatives
13 outweighed the positives.
14   Q    Then why did you do it?
15   A    Because that's what I was told to do.
16   Q    Yeah.  But you don't do everything you're
17 told to do, right?
18   A    For the most part.  Being new to that
19 business at that time, I had no reason not to trust
20 him.
21   Q    When you say you were new to the
22 business, that seems wrong to me.  I think you
23 testified earlier that you were an options trader
24 for many years.

Page 203

1    A    But I've never done any type of brokerage
2 before.
3    Q    So that's the part of the business you
4 were new to?
5    A    Correct.
6    Q    You know, and it seems as well that --
7 you know, I don't recall exactly what your words
8 are, but it was something to the effect that
9 Mr. Donelson didn't know anything about options,
10 is that fair to say?
11   A    Well, he -- from my understanding
12 he worked for Jump Trading, which he was in the
13 back office doing statements -- or I don't know
14 what he was doing, but he did something in the back
15 office and he had a vague understanding of options,
16 but he had no idea about the Greeks.
17   Q    It sounds like you did understand options
18 quite well and you had a good understanding of the
19 Greeks, is that fair to say?
20   A    Yes.
21   Q    So why are you doing what Mr. Donelson
22 tells you?  It sounds like you ought to --
23   A    Because he owned the company.  He was the
24 boss.

Page 204

1         FURTHER EXAMINATION
2 BY MR. PATRICK:
3    Q    Did Mr. Donelson ever ask you to say
4 something to the customers or communicate something
5 to your customers that you didn't feel comfortable
6 doing and that you told him, no, I've got to push
7 back on that, that that's not right or I can't say
8 that?
9    A    Not that I recall.  I mean, yes, but
10 I can't recall specifics.
11   Q    Was it something that happened often?
12   A    Not exactly.  I mean, I've had
13 heated arguments with him about certain trades
14 and certain exits, and he would not take my advice
15 or my understanding of when to exit it.
16   Q    Right.  Well, that's a little different,
17 though.  That's not something that he's asking you
18 to communicate to your customers --
19   A    Right.
20   Q    -- that you're saying, no, that's not
21 right.  I'm not going to do that.  You said you
22 recall something, but you don't remember what it is?
23   A    Yeah, I -- yeah, I don't know.  I don't
24 recall the specifics.  Honestly, I don't.  I know,

Page 205

1  I mean, in the beginning, you know, I was very
2  passive with him.  Towards the end I was a little
3  bit more outspoken and it didn't get anywhere so --
4         FURTHER EXAMINATION
5  BY MR. BURDEN:
6    Q    All right.  I want to hand you what
7  we've marked as CFTC Exhibit 5, and you'll see
8  it's an email from Jim Donelson to Andrew Nelson
9  and not to you.  But there's an attachment and the
10  attachment is titled Rebuttals, and I want to know
11  if you recognize that document, please.
12    A    Yes.
13    Q    Where do you recognize it from?
14    A    These are the rebuttals that I believe
15  Tim Evans had, and he used them for rebuttals versus
16  for whatever the client said.
17    Q    So is this a document that you used?
18    A    No, I did not.
19    Q    So how come you've seen this before?
20  Why is it familiar to you?
21    A    Because Tim Evans gave it to everybody.
22    Q    Did he give it to you?
23    A    Yes, he did give it to me.
24    Q    Why didn't you use it?

Page 206

1    A    Because I didn't feel like I needed it.
2    Q    So I want to direct your attention,
3  if I could, please, to page 4 of this script and
4  it's --
5    A    I mean, I might have used some of them
6  but not all of them.
7    Q    Yeah.  So the thing I'm interested
8  in that I want to ask about is on page 4, and
9  it's -- Request for Past Performance is the
10  headline.
11    A    Yes, I have used that one and that's
12  the reason why I've used it, is because I was told
13  to use it.
14    Q    All right.  What would you say to customers
15  when it was a past performance request?
16    A    What is stated.
17    Q    Can you summarize it for me, please,
18  for the record.
19    A    Past performance is not necessarily
20  indicative of future performance.  Markets change
21  all the time.  Certain situations would not --
22  something that would make 100 percent return one
23  day would not necessarily have the same result on
24  another day.

Page 207

1    Q    And you would also tell customers
2  that you can't provide them with Long Leaf Trading's
3  track record for customers, correct?
4    A    Correct.
5    Q    And that's based on what Tim Evans told
6  you to say?
7    A    Well, Tim and Jim told me to say that.
8         FURTHER EXAMINATION
9  BY MR. PATRICK:
10    Q    I think you said you're currently working
11  at Walsh Trading?
12    A    Um-hmm.
13    Q    What are you doing for Walsh?
14    A    I'm a broker over there.
15    Q    Broker.  Is it similar type of, you know,
16  trades that you're offering?
17    A    Yes and no.  So we have a lot of different
18  things.  We do a lot of commercial hedging for
19  farmers, so it's a completely different client base.
20  I do some type of these trades.  I don't always do
21  four-legged spreads.  I do a lot of credit spreads
22  or two-legged credit spreads.
23    Q    So your clients are hedgers mostly
24  at Walsh?

Page 208

1    A    More or less.
2    Q    So are you using options in hedging?
3    A    Yes.
4    Q    You left Long Leaf in December --
5    A    Yes.
6    Q    -- of 2018?  Why did you leave?
7    A    For a lot reasons.  No. 1, in December
8  he decided just not to pay me, which was ridiculous.
9  But I had a big argument with him about a big error,
10  and he wanted me to pay half of it and I told him
11  that was unacceptable.
12    MR. BURDEN:  Is that why he didn't pay you?
13    THE WITNESS:  I would assume so.
14  BY MR. PATRICK:
15    Q    What was the error?
16    A    We had a bond trade, bond option that got
17  expired that we're not supposed to ever be subject
18  to exercise our assignment, and it was expired --
19  or we got assigned on it.  It was a small loss
20  at one time.  I expressed my concern to get out
21  immediately and he did not.  He said, well, I think
22  it's going to come back.  I said that's the wrong
23  answer to have.  That went on for a day or two.
24  When he said no, he wasn't going to get out of it,

Page 209

1  I did not work. I did not do anything. I told him
2  I did not want to have anything to do with it until
3  he gets out of it. I left the office. I actually
4  went out of town to not be around it. And when I
5  came back from out of town, I think it was five or
6  seven days later, he still wasn't out of it. I told
7  him you can't do that. That's not how you're
8  supposed to be running errors or anything like
9  that. He said, well, what do you think about this.
10 I said, well, either -- I go -- he was short a
11 38 put that got assigned. So he ended up being
12 long or he was -- I don't know. It was something
13 with the bonds being future related. So obviously
14 it's an expensive error and, you know, anything
15 could happen overnight. And I told him your
16 overnight risk of trading bonds in that environment
17 is ridiculous. There's not reason -- I don't care
18 how much it is. Just get out of it. And he refused
19 to get out of it, and then he said it was capped by
20 another option so he could only lose a thousand
21 points -- or, I mean, one full tick, which is a
22 thousand dollars a contract, which he said that
23 he was okay with. And then that option expired
24 worthless and he still had the future, and then

Page 210

1  he went out and he tried to cover his risk by
2  buying an open-ended call just to do that. I mean,
3  he completely screwed that whole trade up. In
4  everything I've ever seen, I've never seen anyone
5  mismanage something like that.
6      MR. BURDEN: Did he get customer consent
7  to cover this futures position that he wound
8  up with?
9      THE WITNESS: Not to my knowledge.
10 I know I never called any of my customers with
11 an offset, something like that.
12     MR. BURDEN: Do you know what he ultimately
13 did with this trade, Mr. Donelson?
14     THE WITNESS: I think that we were
15 short from -- no. We were long from 138 and he
16 ended up buying a 141 call or 140 call. I can't
17 recall exactly what strike and it maxed out and
18 he owed -- I think at one point it was only like
19 a $5,000 error. It turned out to be well over
20 a hundred.
21     MR. BURDEN: Well, what did he do with
22 that? Did the customers eat it or did it go in
23 the error account?
24     THE WITNESS: As far as I know, he did

Page 211

1  not put it in the error account. To my
2  knowledge, I think what he told me is he left
3  it in the customers' accounts, which I told
4  him right off the bat, I said that's -- I mean,
5  from taking the Series 3 the first thing I ever
6  said was if you have an error, get out of it
7  immediately. Everybody knows that. So --
8  BY MR. PATRICK:
9      Q   Was it really an error, though? I mean,
10 to get assigned is not really an error, is it?
11     A   Right. See, that's a little bit
12 of confusion that I have because I was not on the
13 execution desk. I didn't do any execution at the
14 time. That was -- we moved to Cunningham and we
15 were electronically placing orders instead of
16 calling to the floor. So I thought that it was
17 entered as an error. I could be wrong. But from
18 my understanding, we were never ever in a position
19 where we were -- as long as there was a debit
20 spread, we were never subject to exercise our
21 assignment. That was one of the things that I
22 made very clear on all the trade designs that I did,
23 is I never want to be subject to that or never naked
24 short options ever. And so it got assigned so

Page 212

1  that's -- I think that was entered an error. I
2  can't confirm that. I mean, that's just how I view
3  it. But, you know, he came back and -- he was in
4  and out of the office during that time. Sometimes
5  he would be in, sometimes he wouldn't. He wasn't
6  managing that position the way he should, and we
7  were stuck with the future and that's how we
8  did it. That's how all that unfolded and I was
9  absolutely upset about it, refused to work, refused
10 to do anything until he got out of that and handled
11 it the correct way. And it ended up being, I don't
12 know, 7 or 11 days or something like that.
13     Q   And do you know, did he make the customers
14 whole for their loss?
15     A   I think that he did. I was under
16 the understanding that he had to borrow money or
17 something that he put and he refunded the customers.
18 I don't know if he refunded them all of it, though.
19 I'm not sure.
20     Q   So that was sort of the last piece --
21     A   That was the end for me, yes.
22     Q   That was the end. And so why did he
23 think -- if you didn't have a really -- I mean,
24 did you have anything to do with either the trade

Page 213

1 itself or the error or any of it? I don't
2 understand why it is that he was asking you to pay
3 for half of the mistake.
4     A  I have no idea.
5     Q  Did he tell you why?
6     A  No.
7         MR. BURDEN: Were you like his partner
8 or something?
9         THE WITNESS: No, I had no financial
10 responsibility to that firm whatsoever other
11 than just being a broker.
12        MR. BURDEN: Was your compensation entirely
13 commissions?
14        THE WITNESS: No. He did -- in January
15 when he took over, I wasn't comfortable with
16 staying on with somebody who wasn't familiar
17 with the business too well. So in order for
18 him to keep me, he paid me $10,000 a month.
19        MR. BURDEN: In addition to commissions?
20        THE WITNESS: In addition to commissions,
21 based on my TV spots as well as trade design.
22        MR. BURDEN: During Mr. Evans's tenure,
23 was your comp just commissions?
24        THE WITNESS: Yes.

Page 214

1 BY MR. PATRICK:
2     Q  Mr. Gecas, earlier you said when we were
3 talking about online and social media presence and
4 you mentioned Twitter. Do you use Twitter or did
5 you use Twitter while you were at Long Leaf to
6 promote Long Leaf Trading or to solicit --
7     A  Not to promote Long Leaf Trading,
8 but I had a network that I used to use for when
9 I was trading on my own with just different traders,
10 and we would always bounce ideas back and forth.
11    Q  Because you had mentioned that there was
12 a lot of --
13    A  Yeah, so that's --
14    Q  You were getting a lot of information
15 from Twitter?
16    A  Yeah. I never plugged Long Leaf on
17 any of mine because I was under the understanding
18 that it's got to be approved, so I never did that.
19    Q  Do you know, did Long Leaf have
20 any policies on using social media as a broker?
21    A  Not as far as I know. I know we
22 tried to implement it towards the end, like I said,
23 just not any opinions. It's just trade data coming
24 through, and I was under the impression that that

Page 215

1 was approved to do that. But as far as I know,
2 it didn't -- it never took off. It never -- they
3 stopped that.
4         (Whereupon  CFTC  Exhibit No. 48 was
5         marked for identification, MM.)
6         FURTHER EXAMINATION
7 BY MR. BURDEN:
8     Q  All right. Mr. Gecas, I want to show
9 you what we've marked as CFTC Exhibit 48. Do you
10 recognize this document?
11    A  No.
12    Q  All right. So this is a letter dated
13 May 17, 2018 from NFA to Jim Donelson. And if you
14 look at the first and second pages, you'll see that
15 it states that NFA's compliance staff conducted,
16 for lack of a better word, undercover calls with
17 you and Mr. Gunther and they say that you made
18 misrepresentations and misleading representations,
19 and those are set forth in detail on the second
20 page. Have you seen this letter before?
21    A  I have not.
22    Q  Are you aware that NFA sent this letter
23 to Mr. Donelson?
24    A  He did mention something about it,

Page 216

1 told me not to worry about it, told me that it
2 was just -- I don't know the exact words, but he
3 told me not to worry about it.
4     Q  Okay. And did he approach you with this
5 letter?
6     A  He did not.
7     Q  Did he ever show you a copy of it?
8     A  No.
9     Q  All right. So if you turn the page,
10 Exhibit 48 is a group exhibit. So it also includes
11 Mr. Donelson's response, and he writes about the
12 representations made by that were highlighted
13 in the previous letter. Did Mr. Donelson show you
14 his letter to NFA?
15    A  No.
16    Q  Have you ever seen this before?
17    A  I don't believe so, no.
18    Q  Did he ever consult you in connection
19 with this response to NFA?
20    A  He did ask me about something along
21 these lines and asked me if I made any misleading
22 statements, and I told him I did not.
23    Q  So I really want to drill down to
24 what Mr. Donelson said to you about this because

Page 217

1 it's quite serious, as you can see.
2    A    Yeah, this is the first time I'm seeing
3 this.
4    Q    And it comes as a surprise to me that
5 he wouldn't have shared it with you or been more
6 worried himself.  So Mr. Donelson's words to you
7 were the NFA wrote me a letter and don't worry?
8    A    Yeah.
9    Q    Did he tell you what was in the letter?
10    A    No.  He just said that it was about
11 me talking about the Time Means Money program, and
12 he did mention that the NFA was not happy with the
13 76-1/2 percent of options expire worthless.
14    Q    What else did Mr. Donelson say to you
15 about the NFA?
16    A    That's pretty much it.  He told me
17 that this is nothing to worry about, that this
18 is normal in this business, which I had no idea that
19 it wasn't.
20    Q    Did you consult an attorney in connection
21 with this NFA inquiry?
22    A    No.
23        MR. PATRICK:  At the time of the dates
24    that are on the first page of this Exhibit 48,

Page 218

1    February 22 and 23 and then April 11 and 12,
2    you guys would have already been -- Long Leaf
3    Trading would have already switched from sort
4    of a credit spread strategy to a debit spread
5    strategy, is that right?
6        THE WITNESS:  Right.  I think in --
7    what were the dates?
8        MR. PATRICK:  February of '18 and April
9    of '18.
10        THE WITNESS:  Yeah, I think it was
11    like towards the end of February, beginning
12    of March because that's when he was outsourcing
13    it.
14        MR. PATRICK:  Okay.  So part of February
15    you may still have been engaging in the credit
16    spreads, correct?
17        THE WITNESS:  Yeah, he was picking and
18    choosing between me and his other outsource
19    person.
20 BY MR. BURDEN:
21    Q    All right.  Mr. Gecas, we can put
22 this aside.  At some point Long Leaf Trading
23 switched from Gain to Cunningham, is that right?
24    A    Yes.

Page 219

1    Q    Do you remember approximately when that
2 was?
3    A    I don't.
4    Q    I'll show you an email to refresh your
5 recollection.
6        (Whereupon CFTC Exhibit No. 49 was
7          marked for identification, MM.)
8    Q    I'm handing you what we've marked as
9 CFTC Exhibit 49.  Do you recognize this document?
10    A    Yes.
11    Q    Can you tell me what it is, please.
12    A    It was just Jim sending the customers --
13 explaining why we switched to Cunningham versus
14 Gain.
15    Q    Okay.  And if you look at the date
16 on that, it's September 6th and, you know, let's
17 instead look at the actual attachment, Change in
18 Clearing Firm.  It says, "On September 7th you
19 will receive a negative consent letter from
20 GAIN Capital."  It essentially goes on to say
21 we moved over to Cunningham after the close on
22 September 21st.  As far as you know, is that
23 correct?
24    A    I believe so.

Page 220

1    Q    Does that refresh your recollection
2 as to when the transition occurred?
3    A    Yeah, it's -- yes.
4    Q    All right.  Did you send this
5 change in clearing firm notice to your clients?
6    A    I believe so.  It was sent to everybody.
7    Q    All right.  And you sent it to your
8 clients?
9    A    I believe so, yes.
10    Q    Donelson didn't send it to your clients.
11 You sent it?
12    A    Yes.
13    Q    All right.  So what was your
14 understanding of why Long Leaf was switching from
15 Gain to Cunningham?
16    A    My understanding was just to remove the --
17 calling the floor for the trades so we could do it
18 electronically.  Gain did not have that capability.
19    Q    Who told you that?
20    A    Jim Donelson.
21    Q    Did you ask him why you were switching
22 clearing firms?
23    A    That's the reason he gave me.
24    Q    Did Mr. Donelson ever mention anything

Page 221

1 to you about Long Leaf Trading's failure to fulfill
2 its net capital requirements?
3    A   Never once.
4    Q   Did Mr. Donelson ever explain or
5 say or otherwise suggest to you that the change
6 in clearing firms was occasioned by the need for
7 Long Leaf to become a guaranteed IB?
8    A   Never once.
9    Q   Did you understand that in going
10 from Gain to Cunningham, Long Leaf Trading was
11 transitioning from an independent IB to a guaranteed
12 IB?
13    A   No.
14    Q   Did he ever say anything to you about
15 that stuff?
16    A   Not that I recall.  I do remember him
17 saying something about that it was more advantageous
18 being with Cunningham than Gain because it's a
19 guaranteed, but I can't remember exactly.
20    Q   Do you know when Mr. Donelson said that
21 to you?
22    A   Right around this time.  I had no
23 idea about the capital requirements, though.  Never
24 once was that mentioned.  I don't think that was

Page 222

1 mentioned to anybody.  Probably for good reason.
2          (Whereupon  CFTC  Exhibit No. 50 was
3          marked for identification, MM.)
4    Q   All right.  I want to hand you what
5 we've marked as CFTC Exhibit 50.  Do you recognize
6 this document?
7    A   Yes.
8    Q   Can you tell me what it is, please.
9    A   It's a complaint from Chris Fischer.
10 That was one of my clients.
11    Q   All right.  And so Mr. Donelson is
12 writing to you and he's saying, "I just received
13 a notification from NFA that Chris Fischer has filed
14 a formal complaint with NFA."  He says can you talk
15 to this guy, what a pain in the ass.  Did you talk
16 to Mr. Fischer?
17    A   Yes.
18    Q   What did you say to him?
19    A   I told him that, you know, he only took
20 one trade.  It was a small loss.  He was unhappy
21 because he didn't understand that.  He wanted me to
22 get out of a position that had no bid, so I couldn't
23 sell it.  And I tried to explain that to him and he
24 didn't understand that, and I tried to explain it

Page 223

1 to him several different times and he didn't
2 understand that.  He started the account with a
3 $10,000 account, took one trade and then left after
4 that trade.
5    Q   What other complaints to the NFA
6 are you aware of about Long Leaf Trading or any
7 of the brokers therein?
8    A   Any other brokers, I don't know.  I know
9 when I came on with Tim, he explained to me that he
10 had an NFA complaint due to misfiling of paperwork,
11 which was what I was told.
12    Q   Did Mr. Evans ever tell you that other
13 customers had complained to the NFA?
14    A   No.
15    Q   Did Mr. Donelson -- other than Fischer,
16 did Mr. Donelson say that other customers had
17 complained to the NFA?
18    A   No.
19    Q   Did you otherwise learn of complaints
20 made to the NFA by customers?
21    A   Specifically I don't know the name.
22 I know there was one that was a customer with
23 a broker named Jeremy Ruth, and then that was all
24 I was told about that.

Page 224

1    Q   Who told you about that?
2    A   Jim Donelson.
3    Q   What did Mr. Donelson tell you?
4    A   He just said that it's a big headache,
5 that this is a very large account that Jeremy Ruth
6 mishandled and he was placing trades without their
7 consent and I have to deal with it and this is Tim
8 Evans' fault and now it's passed on to me and I'm
9 going to try to sue Tim Evans for it.
10    Q   When did Mr. Donelson say that to you?
11    A   I don't know the exact time of --
12 I mean, I think that was, I don't know, maybe
13 August.  Maybe.  I'm not positive.  I don't know.
14    Q   So you think in August of 2018 Mr. Donelson
15 told you about this customer that --
16    A   He didn't exactly tell me.  He was
17 just on the phone talking about it, and I asked
18 him what it was about and that was just his basic
19 response.
20    Q   Did he tell you that that customer
21 that Jeremy Ruth had handled had filed a complaint
22 with the NFA?
23    A   No.
24    Q   You're just aware of a dissatisfied

Page 225

1  customer?
2    A   Right.
3    Q   Looking back at Exhibit 50, after the
4  date of Exhibit 50, May 17, 2018, you continued
5  to represent to customers in phone calls that
6  Long Leaf Trading had a 100 percent clean record
7  with NFA for servicing of customer accounts, is that
8  right?
9    A   Yeah, that's what I was told to say.
10   Q   But why did you say that?  You know that
11 they don't.
12   A   Right.  But I would also have to tell
13 them that the one mark was based on a misfiled piece
14 of paper, is what I was told to say.
15   Q   Yeah, but that's not what Chris Fischer
16 is complaining about in the account.  And it sounds
17 like you feel like that complaint's not justified,
18 but you know that NFA has a complaint from a Long
19 Leaf Trading customer, right?
20   A   Yes.
21   Q   So why are you telling people that
22 Long Leaf Trading has a 100 percent clean record
23 with NFA for servicing customer accounts?
24   A   That's what I was told to say.

Page 226

1    Q   Is it true?
2    A   No.
3    Q   Why did you say it?
4    A   I don't know.  I was told that this
5  is not considered an NFA complaint because it
6  didn't go on the website.  That's what I was told.
7    Q   Who told you that?
8    A   Jim Donelson.
9    Q   Did you ever ask Mr. Evans if there
10 were complaints filed with the NFA against Long
11 Leaf Trading?
12   A   No.
13   Q   Did you ever ask Mr. Donelson if
14 complaints were filed with the NFA against Long
15 Leaf Trading?
16   A   No.  I was only aware of the one with Tim
17 Evans, and that was all I was privy to.
18       MR. PATRICK:  Are you familiar with NFA's
19    BASIC system?
20       THE WITNESS:  Yes.
21       MR. PATRICK:  Have you ever checked Long
22    Leaf Trading's regulatory background on BASIC?
23       THE WITNESS:  Which that's why I was told
24    to say it's a misfiled piece of paper.

Page 227

1        MR. PATRICK:  Did you review the --
2        THE WITNESS:  No.
3        MR. PATRICK:  -- the complaint on NFA
4    BASIC?
5        THE WITNESS:  No.
6        MR. PATRICK:  So you didn't confirm
7    that it was a misfiled piece of paper?
8        THE WITNESS:  No.
9        (Whereupon  CFTC  Exhibit No. 51 was
10       marked for identification, MM.)
11 BY MR. BURDEN:
12   Q   All right.  I want to hand you what
13 we've marked as CFTC Exhibit 51.  Do you recognize
14 this document?
15   A   Yes.
16   Q   Can you tell me what it is, please.
17   A   It's an email to me with Tim Evans.
18   Q   All right.  Do you remember writing this
19 email?
20   A   No, I don't recall writing it.  Obviously
21 I did.
22   Q   So the part I want to ask you about
23 says, "Your guy Jeremy has been call customers."
24 I think that's supposed to say calling customers?

Page 228

1    A   Right.
2    Q   "And trying to take a few guys
3  from here to dial for him, that fat fuck scumbag.
4  Good to hear things are going well for you.  When
5  you get settled, you can invite me to your
6  compound."  Did you write that?
7    A   Yes.
8    Q   This reference to Jeremy is Jeremy Ruth,
9  right?
10   A   Yes.
11   Q   Did you get the opportunity to work with
12 Mr. Ruth?
13   A   Unfortunately, yes, in the very beginning.
14   Q   Okay.  How long did you and Mr. Ruth
15 overlap?
16   A   Maybe a few months, before I even started
17 talking to customers.
18   Q   All right.  So why do you say
19 unfortunately?
20   A   Because he's -- he's a scumbag.
21   Q   Why do you say that?
22   A   Just because the way he would carry
23 himself as an individual, as well as on the phone,
24 as well as anything related to him.  He would, you

Page 229

1  know -- when I first came in, I wasn't -- I didn't
2  know anybody in the office and I had to sit there
3  and just keep my mouth shut and my head down, and
4  he would belittle guys.  He would just -- I mean,
5  just the way he over -- I mean, he was awful.
6  And then, you know, later on I found out that
7  he was placing trades without consent.  He wouldn't
8  answer calls.  He wouldn't do that.  His phone would
9  be ringing.  He would literally say, oh, I know who
10 that guy is.  I know what he wants.  I'm not talking
11 to him.  I mean, he was just a bad person to be
12 around.
13    Q   So with respect to Mr. Ruth, you said
14 he was placing trades without consent.  Did you ever
15 see him do that?
16    A   I have never seen him do that.
17    Q   So why do you think he did that?
18    A   Some of the customers that I was --
19 inherited were from him, and that's what they have
20 told me.
21    Q   Do you recall what customers?
22    A   No, I don't.
23    Q   Were there like a lot of them or just
24 some of them?

Page 230

1    A   I would say a handful, as far as I can
2  remember.  Again, I don't know specifics.
3    Q   Do you know if Mr. Ruth was disciplined
4  for this?
5    A   I do not.
6    Q   It says here it sounds like in your
7  email you're saying that Mr. Ruth had tried to
8  recruit people from Long Leaf Trading.  Am I reading
9  that correctly?
10    A   Yeah.  He left the firm and went to
11 another firm and tried to bring the guys that were
12 still at Long Leaf over to work with him.
13    Q   Was he successful in doing that?
14    A   I don't think so.  I'm not positive,
15 though.
16    Q   So what firm is he at?  We ought to be able
17 to just figure this out but --
18    A   What firm he's at now, I have no idea.
19 I know he was at Postrock, but I don't know where
20 he's at now.
21    Q   Does Postrock do the same kind of thing
22 Long Leaf Trading does?
23    A   Not aware.  I have no idea.
24    Q   During your tenure at Long Leaf, did

Page 231

1  you ever have any communications with any person at
2  Gain or Cunningham other than like receiving monthly
3  statements?  Like did you ever talk to anybody
4  over --
5    A   Yes.  When we were with Gain and with
6  Tim I did have to place trades every now and then,
7  not very often, so I did have to talk to our trade
8  desk.  At Cunningham we went and I had to sit with
9  their guy to walk through the platform.
10    Q   So other than the interactions you
11 described, any other interactions with personnel
12 at Gain or Cunningham?
13    A   No.
14    Q   Did anybody from Gain ever forward to you
15 customer complaints?
16    A   Not that I remember.
17    Q   Subsequent to your parting from
18 Long Leaf Trading, have you spoken to or otherwise
19 communicated with anyone over there?
20    A   I have seen Andrew Nelson every now
21 and then.  I mean, it's a small area.  I've seen
22 a couple guys, but I haven't spoken with them.
23    Q   Okay.  Have you reached out to Mr. Donelson
24 at all?

Page 232

1    A   No.
2    Q   Mr. --
3    A   The only time I had to reach out to
4  Mr. Donelson was when I had to get my things and
5  he refused, and I actually had to call 911 to get
6  them back.
7    Q   Did you get them back?
8    A   Yeah.
9    Q   Other than that, have you had communicated
10 with Mr. Donelson?
11    A   No.
12    Q   What about his counsel?
13    A   She did send me a cease and desist
14 order so I didn't contact any other clients, which
15 I never did or wanted to anyway.
16    Q   Any other communications with
17 Mr. Donelson's counsel?
18    A   No.
19    Q   Same questions for Evans.
20    A   No, I haven't heard from Tim since he left.
21    Q   Has anyone, you know, other than us
22 talked to you about the CFTC's investigation of
23 Long Leaf Trading?
24    A   No.

Page 233

1    Q    Have you talked to anybody else about it?
2    A    No.  I talked to my girl friend/fiancée
3 saying that I got a subpoena from it.
4    Q    Oh, yeah.  I got it.  That doesn't count.
5 Anyone else?
6    A    No.
7    Q    All right.  Would you describe for me,
8 please, the office setup at Long Leaf Trading.
9    A    It was a small office.  Nine desks,
10 ten desks maybe.
11    Q    All in one room?
12    A    Yes.
13    Q    Can everybody hear what everybody else
14 is saying?
15    A    I believe so, yeah.
16    Q    Can you hear what the other brokers
17 are saying?
18    A    On occasion, yeah.  I mean, if I'm trying
19 to, yeah.
20    Q    Could Mr. Evans hear what you were saying,
21 do you think?
22    A    Yes, yes.
23    Q    Did Mr. Evans ever say to you, hey,
24 don't say that, you're misrepresenting something?

Page 234

1    A    No.
2    Q    Did Mr. Evans ever discipline you or
3 otherwise chastise you?
4    A    No.
5    Q    How about Mr. Donelson?
6    A    No.
7    Q    Other than for this colossal trade screwup.
8    A    Right.  Well, yeah, that was a big
9 difference.  I mean, but the coffee one, like I said
10 too, I mean, we -- that was a heated argument too.
11    Q    So what I'm getting at is, you know,
12 Mr. Donelson can hear what you're saying to
13 customers, right?
14    A    Yeah.
15    Q    Did he ever object?
16    A    No.
17    Q    Did he ever praise you or say great job?
18    A    Just if the guy committed to opening an
19 account he would say, oh, good job.
20        (Whereupon CFTC Exhibit No. 52 was
21        marked for identification, MM.)
22    Q    I want to hand you what I've marked
23 as CFTC Exhibit 52.  If you would take a moment
24 to look it over, please.

Page 235

1    A    Okay.
2    Q    Do you recognize this document?
3    A    Yes.
4    Q    Can you tell me what it is, please.
5    A    It's just an update I believe when we
6 switched over to Cunningham.
7    Q    Are you sure?
8    A    No, I'm not.
9    Q    Well, take a look at it and read it,
10 please.
11    A    I think this might be when Jim Donelson
12 took over and wanted to explain the changes to the
13 customers of what has been new since Tim Evans left
14 maybe.
15    Q    Okay.  Was this a document that you sent
16 to your customers?
17    A    Yes.
18    Q    All right.  So the part I want to ask
19 you about is it says in the middle, "Scott and Jim
20 share in the development of the monthly trades and
21 management of the trades after they are made.  Scott
22 will also provide leadership to the experienced
23 brokerage team."  Is that statement true?  Did you
24 provide leadership to the brokerage team?

Page 236

1    A    Yes.  In a very specific way, though.
2    Q    How did you do that?  Tell me about it,
3 please.
4    A    Well, I had to explain to them basic
5 options, what a call is, what a put is, because
6 they had zero understanding.  And then I would
7 also tell them to look at news feeds every day to
8 see what is going on so they can actually sound
9 somewhat intelligent on the phone when they're
10 talking to prospects.
11    Q    What other services did you provide in
12 terms of leadership for the broker team?
13    A    I did monitor some calls to make
14 sure that they were being clean on the phone and
15 not saying um and stuttering and stuff like that.
16    Q    All right.  So you were listening to
17 make sure they didn't stutter or say um, is that
18 correct?
19    A    More or less.
20    Q    Were you listening for anything else?
21    A    I mean, as long as -- as far as --
22 as long as they were following the script and didn't
23 go off script and not promising anything.
24    Q    So part of your job at Long Leaf

Page 237

1 after Mr. Donelson took over was to make sure the
2 other brokers were following the script?
3    A    Yes.
4    Q    So we looked at some scripts today,
5 didn't we?
6    A    Um-hmm.
7    Q    Yes?
8    A    Yes.
9    Q    And were those the scripts that the
10 brokers were following?
11    A    Yes.
12    Q    One of the scripts that we looked at
13 we marked as Exhibit 4.  Do you recall that one?
14    A    No. 4?
15    Q    Yeah.
16    A    Okay, I got it.
17    Q    All right.  So we were looking
18 at a part in this script.  Was this one of the
19 scripts that you made sure the brokers followed?
20    A    To an extent.
21    Q    What do you mean, to an extent?
22    A    Well, the one with the making millions
23 of dollars for the successful customers, I didn't
24 actually force that because I didn't necessarily

Page 238

1 understand where they were coming up with that,
2 but that's what I was told to do.
3    Q    All right.  So I want to drill down
4 on that.  So the part of Exhibit 4, the script
5 that I'm interested in is the part where it says
6 something to the effect of our success depends
7 on your success and we wouldn't be able to work for
8 all these clients and manage millions of dollars if
9 we weren't being profitable for them.  So you know
10 what part of the script that I'm referring to there,
11 correct?
12    A    Yeah, yes.
13    Q    All right.  So did you hear brokers saying
14 that to customers?
15    A    Yes.
16    Q    Did you tell them not to?
17    A    I didn't tell them not to, but I didn't
18 force them to.
19    Q    So you allowed --
20    A    I told them to use their judgment on that.
21    Q    Did you advise the brokers that
22 that statement was, in fact, untrue, that Long Leaf
23 Trading was not profitable for customers overall?
24    A    No, I did not because I did not know.

Page 239

1    Q    And one of the other scripts we looked
2 at was Exhibit 5, which is the rebuttal script.  Do
3 you remember that one?
4    A    Yes.
5    Q    So the part in there I want to ask
6 about is the past performance requests portion.
7 Do you remember that?
8    A    All right.
9    Q    And that part of the script says
10 something to the effect if customers ask for past
11 performance, you should tell them that the market
12 goes up and down, isn't that right?
13    A    Right.
14    Q    Is that a thing that brokers said to
15 customers?
16    A    Yes.
17    Q    And you heard them say that?
18    A    Yes.
19    Q    And you said that was okay?
20    A    Markets do go up and down.
21    Q    Did you advise brokers of the need to
22 tell customers that Long Leaf's overall trading
23 record for customers was strongly negative?
24    A    No, I did not.

Page 240

1    Q    Why not?
2    A    Because I was under the impression that
3 it was somewhat profitable in the past.
4    Q    What about currently at the time you
5 were supervising the brokers, was it profitable
6 then?
7    A    No, it was not.
8        (Whereupon  CFTC  Exhibit No. 53 was
9            marked for identification, MM.)
10    Q    All right.  So I want to hand you what
11 we've marked as CFTC Exhibit 53.  Do you recognize
12 this document?
13    A    Yes.
14    Q    Can you tell me what it is, please.
15    A    Based on the criteria that I was
16 given by Jim and Tim, that these guys -- or, well,
17 everything was set by Tim, implemented by Jim later
18 on.  So they're supposed to set three demos.
19    Q    What do you mean, they're supposed to
20 set three demos?
21    A    They're supposed to get clients to
22 agree to a phone call so they can walk them through
23 a demo.
24    Q    And the demo is that Power Point

Page 241

1 presentation we looked at --
2    A   Yes.
3    Q   -- before that was marked as CFTC
4 Exhibit 40, correct?
5    A   Yes.
6    Q   So looking at Exhibit 53, it's an
7 email from you to Mr. Dillman dated November 8,
8 2017.  And Mr. Dillman is a broker at Long Leaf,
9 right?
10    A   Yes.
11    Q   So you say, "Yo, not trying to be
12 a dick, but I need you to hit your demo sets.
13 I'll pull you aside as an individual later."
14 Did you write that?
15    A   Yes.
16    Q   So was that your responsibility,
17 to make sure that the brokers were hitting their
18 demo sets?
19    A   Not -- yes and no.  So they had a board
20 that reflected their daily production.  And if they
21 hit it, they hit it.  If they didn't, they didn't.
22 It wasn't a hard criteria, but that's what Jim would
23 push on me, to make sure that they hit them.
24    Q   All right.  And how would you make sure

Page 242

1 that the brokers hit their goals?
2    A   It would be reflected on that board.
3    Q   Yeah.  But what did you do to make sure
4 that these guys did their job?
5    A   Nothing.
6    Q   Well, it sounds like you pulled Mr. Dillman
7 aside, right?
8    A   Yeah.  Well, I pulled him aside and asked
9 him what he was struggling with.
10    Q   What did he tell you?
11    A   I'm just having a hard time getting through
12 the script.
13    Q   Did you give him tips for how to get
14 through the script?
15    A   Yeah.
16    Q   What did you tell him?
17    A   I just said try to memorize the
18 script as much as you can so when you get through
19 the script, it sounds natural.  It doesn't sound
20 scripted.  It doesn't sound like your reading from
21 a piece of paper.
22       MS. STREIT:  Did he say why he had trouble
23    getting through it?
24       THE WITNESS:  He just said it was something

Page 243

1 new to him.
2       (Whereupon CFTC Exhibit No. 54 was
3       marked for identification, MM.)
4 BY MR. BURDEN:
5    Q   I want to hand you what we've marked
6 as CFTC Exhibit 54.  And can you tell me if you
7 recognize this document, please.
8    A   Yes.
9    Q   Can you tell me what it is?
10    A   It's the criteria that Jim Donelson
11 gave to everybody that hit their 200 calls and three
12 demo sets, and he told me to sit them all down and
13 talk to them and make sure that they can do what
14 they're expected to do.
15    Q   All right.  So Exhibit 54 is an email
16 from you to Mr. Donelson dated July 7, 2018 and
17 you say, "I told them this a.m. that because the
18 call court" -- I think it's supposed to say count?
19    A   Count, right.
20    Q   -- "only hit 200 once this week, that
21 they need 200 calls, three sets.  Don't leave until
22 their numbers are hit.  I told them it's Friday and
23 dials will be tough, but because of lack of effort
24 this week, that they put themselves in this

Page 244

1 position," and Mr. Donelson writes, "Agreed."
2 So did you write that email?
3    A   Yes.
4    Q   All right.  So it looks here like
5 you were in charge of making sure that the other
6 brokers hit their numbers, is that right?
7    A   More or less.  But, I mean, it wasn't
8 like if they didn't hit their numbers, they would
9 be fired.
10    Q   How did you make sure that the brokers
11 hit their numbers?
12    A   It was all on the board.
13    Q   Yeah, but what did you do?  Guys were
14 falling behind, as reflected in the --
15    A   Right.  So that's the only thing I would
16 tell them, just make sure you hit your numbers.
17    Q   You didn't do anything special?
18    A   No.
19    Q   Did it work?  Did they hit their numbers?
20    A   No.
21    Q   Was there anybody else in the office
22 who was charged with -- is it fair to say you were
23 supervising these brokers?
24    A   Supervising is a very loose term,

Page 245

1 but I guess I was in the office to make sure that
2 they did what they were supposed to do.
3    Q   That sounds like supervising to me,
4 doesn't it?
5    A   I guess.  But, I mean, I couldn't
6 control what they did.  You know, you tell them
7 to hit their numbers.  If they did, they did.  If
8 they didn't, they didn't.  It wasn't like I would
9 sit there and scream and yell at them.  I mean, they
10 were adults.
11    Q   Were there other people at Long Leaf
12 other than Mr. Donelson who were in charge of making
13 sure the brokers did what they were supposed to do?
14    A   Yes.
15    Q   Who was that?
16    A   Brian Adams was there.  He was the
17 initial guy to be the compliance officer, supervisor
18 and all that, which didn't make any sense to me
19 either, but that's what his role was.
20    Q   So I want to come back to that.  But
21 other than Mr. Adams, were there any other persons
22 tasked with making sure the brokers did what they
23 were supposed to do?
24    A   Later on Jim's wife came in and she was

Page 246

1 starting to take over that role.
2    Q   Anyone else?
3    A   No.
4    Q   So Mr. Adams, what was Brian Adams' role
5 at Long Leaf?
6    A   Honestly, I don't know.  I really have
7 no idea.  I mean, he was there --
8    Q   Did you overlap?
9    A   Yeah.
10    Q   By how much?
11    A   I'm not really sure.  I mean, he was --
12 I'm not really sure.  He was there with -- I believe
13 he was there with Tim.
14    Q   Oh, so he was there a long time?
15    A   He was there, yeah, for a while.
16    Q   Was he there when you left?
17    A   He was not there when I left.
18    Q   Where did he go?
19    A   He had personal issues and never came
20 back one day.
21    Q   Were they personal issues that -- well,
22 what are you aware of?
23    A   Drugs.
24    Q   How did you become aware of that?

Page 247

1    A   Just heard it through the grapevine.
2    Q   Do you know if he was terminated?
3    A   I do not know.
4    Q   Was Mr. Adams a broker?
5    A   I think he started as a broker.
6    Q   What was he doing when you were there?
7    A   He was supposed to be the compliance
8 guy, and then he was also running applications for
9 customers that wanted to potentially be a customer.
10    Q   All right.  Did Mr. Adams have any
11 other duties while you were at Long Leaf Trading?
12    A   He was also a supervisor and he was a
13 little bit more aggressive than I thought he should
14 be, but it doesn't matter.
15    Q   Did you kind of take over from Mr. Adams
16 as supervisor?
17    A   Not in the application role or any of
18 that.  It was just more of try to get these guys
19 to do what they're supposed to do.
20    Q   When did Mr. Adams leave?
21    A   I don't recall exactly.
22    Q   What did Mr. Adams do to ensure compliance?
23    A   I have no idea.  Honestly, I don't know.
24    Q   Did Mr. Adams ever misappropriate

Page 248

1 money from customer accounts, to your knowledge?
2    A   Not to my knowledge.
3    Q   Prosper Trading Academy, did they
4 recommend any particular clearing firms or FCMs
5 or other institutions to its clients or customers?
6    A   Not to my knowledge.
7    Q   What did you do over there, if you would,
8 please.
9    A   I would be on just a regular trading -- or
10 sales desk and just get guys to see the presentation
11 that they had.
12    Q   And how would you characterize Prosper
13 Trading Academy's business?
14    A   An education firm.
15    Q   Did they recommend trades for customers?
16    A   Yes, they have a live trading room.
17    Q   So how do they do that?
18    A   The live trader would call out
19 recommendations throughout the day, and it was
20 up to the individual to choose to take them or not
21 take them.
22    Q   Any other forms of trade recommendations
23 provided by Prosper Trading Academy?
24    A   Not that I'm aware of.  I mean,

Page 249

1 it was all live and they would send -- after the
2 email was recommended, they would send the emails
3 with the recommendation.
4     Q    Did you come up with those recommendations?
5     A    No.
6     Q    Were they just in equities or were
7 they -- what I should ask is were Prosper Trading
8 Academy's recommendations for trades in commodities
9 or futures or options?
10    A    No.
11    Q    What were they?
12    A    Equities.
13    Q    So just stocks?
14    A    Stocks, penny stocks. They did do futures,
15 but they stopped.
16    Q    When did they stop?
17    A    I don't remember. I don't recall.
18    Q    Was it before you joined?
19    A    No. It was while I was there, but it
20 was never options. It was just straight futures.
21    Q    Do you know if they ever referred
22 customers to a particular clearing firm or FCM?
23    A    I was told never to do that, so I don't
24 know if they did or didn't.

Page 250

1     Q    Did you ever refer customers?
2     A    No.
3     Q    Did you ever hear anyone else refer
4 customers?
5     A    No.
6     Q    Anything else about Prosper Trading that
7 you think we ought to know?
8     A    No.
9     Q    Walsh Trading, I think you testified
10 that your clients there are hedgers, is that right?
11    A    Right. It's a wide gamut of their client
12 base. It's commercial hedging, some speculators,
13 some self-directed, some system trading.
14    Q    When you say system trading, what do you
15 mean by that?
16    A    Automated trades.
17    Q    Like algorithmic trading?
18    A    Yeah.
19    Q    Does Walsh Trading have sort of
20 a program of recommendations along the lines of
21 Time Means Money?
22    A    No.
23    Q    Is there any --
24    A    Walsh Trading is completely different

Page 251

1 than anything I've ever seen. They have the
2 compliance. They have a compliance guy in the
3 office. They have, you know, Straits Financial is
4 who they clear and everything is completely worked
5 over and it's, yeah, it's completely different than
6 anything I've ever experienced.
7     Q    Is there anything that you think we
8 ought to know about Walsh Trading?
9     A    Not as far as I'm aware of. I mean,
10 I have nothing but good things to say about them.
11        MR. BURDEN: All right. Well, I'll tell
12 you what. Why don't we go off the record. I
13 think we might be done with you, but I want to
14 confer with my colleagues. So if you would just
15 give us a few moments, and we'll call you back
16 in maybe five or ten minutes.
17        (Whereupon a recess was taken from
18        4:30 p.m., to 4:38 p.m., after which
19        the following proceedings were had:)
20        MR. BURDEN: On the record, please. I
21 want the record to reflect that neither myself
22 nor any member of my team had any substantive
23 discussions with the witness during the break,
24 isn't that right?

Page 252

1        THE WITNESS: Yes.
2        MR. BURDEN: All right. Mr. Gecas,
3 we have no further questions at this time.
4 We may, however, call you again to testify in
5 this investigation. Should this be necessary,
6 we will contact you directly. Mr. Gecas, is
7 there anything you wish to clarify or add to
8 the statements you've made today?
9        THE WITNESS: No.
10        MR. BURDEN: All right. We're off the
11 record.
12        WHICH WERE ALL THE PROCEEDINGS
13        HAD OR OFFERED AT SAID HEARING
14        OF THE ABOVE-ENTITLED CAUSE.
15
16
17
18
19
20
21
22
23
24

Page 253

1  STATE OF ILLINOIS)
        ) SS.
2  COUNTY OF C O O K)

3

4      I, MARY MASLOWSKI, CSR, do hereby

5  certify that I reported in shorthand the proceedings

6  had at the examination under oath aforesaid, and

7  that the foregoing is a true, complete and accurate

8  transcript of the proceedings at said examination

9  under oath as appears from the stenographic notes so

10  taken and transcribed on the 26th day of August,

11  2019.

12

13

14

15          Certified Shorthand Reporter

16

17

18

19

20

21

22

23

24