CFTC Ex. 540

# Long Leaf Trading Group

## *Hatzigiannis, James 2021-01-13*

*1/13/2021 9:25 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Friday, November 5, 2021

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION
 3  COMMODITY FUTURES TRADING      )
    COMMISSION,                    )
 4                                 )
            Plaintiff,     )
 5                                 )
         vs.        ) No. 20 C 3578
 6                                 )
    LONG LEAF TRADING GROUP,      )
 7  INC., et al.,          )
                                   )
 8        Defendants.      )
 9
10
11      The remote video deposition of
12  JAMES HATZIGIANNIS, called by the Plaintiff for
13  examination, pursuant to subpoena and pursuant to
14  the Federal Rules of Civil Procedure for the United
15  States District Courts pertaining to the taking of
16  depositions, taken before Mary Maslowski, Certified
17  Shorthand Reporter and Notary Public within and
18  for the County of Cook and State of Illinois with
19  the witness located at 200 South Wacker Drive,
20  Suite 3100, Chicago, Illinois, commencing at the
21  hour of 9:25 o'clock on January 13, 2021.
22
23
24
```

Page 2

```
 1  A P P E A R A N C E S :
 2
       (Appearing via videoconference)
 3  MR. ASHLEY J. BURDEN, Senior Trial Attorney
    MR. JOSEPH C. PLATT, Trial Attorney
 4  MS. NINA RUVINSKY, Trial Attorney
    MR. JOSEPH J. PATRICK, Senior Investigator
 5  U.S. COMMODITY FUTURES TRADING COMMISSION
    DIVISION OF ENFORCEMENT
 6  525 West Monroe Street, Suite 1100
    Chicago, Illinois 60661
 7  (312) 596-0700
    aburden@cftc.gov
 8  jplatt@cftc.gov
    nruvinsky@cftc.gov
 9  jpatrick@cftc.gov
10     On behalf of the U.S. Commodity
       Futures Trading Commission;
11
       (Appearing via videoconference)
12  HINSHAW & CULBERTSON, LLP
    BY MR. ANDREW S. MAY
13  151 North Franklin Street, Suite 2500
    Chicago, Illinois 60606
14  (312) 704-3400
    amay@hinshawlaw.com
15
       On behalf of the Defendant Jeremy Ruth;
16
    FALVEY LAW OFFICE
17  BY MR. JAMES M. FALVEY
    200 South Wacker Drive, Suite 3100
18  Chicago, Illinois 60606
    (312) 404-5839
19  jimfalvey@yahoo.com
20     On behalf of Long Leaf Trading Group,
       Inc., and the Witness.
21
22
23  CSR License No. 084-003278.
24
```

Page 3

```
 1             I N D E X
 2  WITNESS           DX CX _RDX RCX
 3  JAMES HATZIGIANNIS
 4  By Mr. Burden        6
 5
 6         E X H I B I T S
           (Previously Marked)
 7
    CFTC EXHIBIT          FIRST REFERENCE
 8
 9  No. 71               168
    No. 145              132
    No. 177              6
10  No. 178              8
    No. 179              26
11  No. 181              52
    No. 183              80
12  No. 184              100
    No. 185              105
13  No. 186              110
    No. 189              81
14  No. 190              113
    No. 191              126
15  No. 192              138
    No. 195              165
16  No. 196              166
    No. 200              141
17  No. 201              147
    No. 203              170
18  No. 206              171
    No. 207              172
19  No. 208              175
    No. 211              178
20  No. 212              180
    No. 213              184
21  No. 214              185
    No. 215              186
22
23
24
```

Page 4

```
 1         E X H I B I T S
           (Previously Marked)
 2
    CFTC EXHIBIT          FIRST REFERENCE
 3
 4  No. 216              188
    No. 217              189
    No. 218              190
 5  No. 219              191
    No. 221              192
 6  No. 222              195
    No. 223              199
 7  No. 224              200
    No. 225              201
 8  No. 226              203
    No. 227              206
 9  No. 229              208
    No. 232              209
10  No. 233              211
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

1      MR. BURDEN:  Mary, will you swear in the
2   witness, please.
3      THE REPORTER:  Pursuant to Section 319
4   of the Public Health Service Act, and in
5   conjunction with Governor Pritzker's Executive
6   Order 2020-14 regarding Illinois Notaries
7   Public, I will ask counsel to agree on the
8   record that there is no objection to this
9   Certified Shorthand Reporter administering a
10  binding oath to the witness remotely.  I will
11  ask each of you to state your agreement on the
12  record, starting with counsel for the witness
13  first, and at the same time, please identify
14  yourself for the record.
15     MR. FALVEY:  Starting right now?
16     THE REPORTER:  Sure.
17     MR. FALVEY:  Okay.  My name is Jim
18  Falvey.  I'm with the Falvey Law Office and
19  I represent Mr. Hat -- sorry, Hatzigiannis,
20  the defendant -- or, I'm sorry, witness in
21  this matter.  And I agree with the order that
22  you referenced with respect to allowing you
23  to swear in the witness remotely.
24     THE REPORTER:  Thank you.

Page 6

1      MR. MAY:  This is Andrew May.  I'm
2   with the law firm of Hinshaw & Culbertson
3   representing Defendant Jeremy Ruth.  I have
4   no objection to the remote swearing in of the
5   witness.
6      MR. BURDEN:  Ashley Burden for the CFTC.
7   No objection.
8          JAMES HATZIGIANNIS,
9   called as a witness herein, having been first duly
10  sworn, was examined and testified as follows:
11        DIRECT EXAMINATION
12  BY MR. BURDEN:
13     Q   All right.  Just one moment, please.  All
14  right.  Is it Mr. Hatzigiannis or Mr. Hatzigiannis?
15     A   No, the first one you said was right.
16     Q   Very good, Mr. Hatzigiannis.
17  Mr. Hatzigiannis, would you turn, please, to CFTC
18  Exhibit 177.
19     MR. FALVEY:  We're pulling it out.
20     MR. MAY:  Ashley?
21     MR. BURDEN:  Yes.
22     MR. MAY:  I only have Exhibit 40.
23     MR. BURDEN:  I'm sorry.  Is that Mr. May?
24     MR. MAY:  It is.  Could you tell me which

Page 7

1   exhibits we're going to be using because I only
2   got Exhibit 40.
3      MR. BURDEN:  Yeah, so I think that --
4   so what we've got here, you've got them all.
5   It's a PDF portfolio.  So if you go over to
6   the left-hand side, there'll be a collapsible
7   index bar and if you open it up, the first one
8   is Exhibit 40.  But you can then navigate down,
9   like you would in like a PDF of a big brief,
10  and click on the exhibits.  So the first one's
11  40 because some exhibits were used with previous
12  witnesses.  Have you got it?
13     MR. MAY:  I see what you're saying,
14  yeah.  Yeah, I see exactly what you're saying.
15  You pointed to Exhibit 177.
16     MR. BURDEN:  177.
17     MR. MAY:  Okay, very good.  Go ahead
18  and proceed.
19  BY MR. BURDEN:
20     Q   All right.  Mr. Hatzigiannis, do you
21  recognize CFTC Exhibit 177?
22     A   Yes.
23     Q   All right.  And this is the subpoena
24  pursuant to which you're appearing here today,

Page 8

1   correct?
2      A   Correct.
3      Q   All right.  I'd like you to turn next
4   to CFTC Exhibit 178, please.
5      A   I've got it.
6      Q   All right.  Do you recognize this document?
7      A   Yeah.
8      Q   All right.  So this is the document
9   subpoena that the CFTC served upon you, correct?
10     A   Right.
11     Q   All right.  And you've produced documents
12  in response to this subpoena, correct?
13     A   Right.
14     Q   Have you produced all documents responsive
15  to the requests in the subpoena?
16     A   Yes.
17     Q   All right.  All documents within your
18  possession, custody or control?
19     A   Right.
20     Q   All right.  Are you withholding any
21  documents on the basis of the Fifth Amendment or
22  attorney-client privilege or anything like that?
23     MR. FALVEY:  Ashley, there are --
24  James, is -- well, I mentioned it to him, but

Page 9

1   there are five pages from the text messages that
2   we are withholding pursuant to attorney-client
3   privilege, and I will get you a privilege log
4   on those.
5      MR. BURDEN: Okay. Thank you, Counsel.
6   Q  Mr. Hatzigiannis, is that correct?
7   A  I'm sorry?
8   Q  Is your counsel's statement correct,
9   you are withholding some text messages on the basis
10   of the attorney-client privilege?
11   A  Yes, yes, sorry.
12   Q  All right. Are there any other
13   documents that you have failed to produce or are
14   otherwise withholding?
15   A  No.
16   Q  What did you do to search for the
17   documents to collect the documents that you've
18   produced in response to the subpoena.
19   A  Yeah, I searched in my personal email
20   and my cell phone for text messages. That's it.
21   Q  All right. Mr. Hatzigiannis, have you
22   ever given sworn testimony before?
23   A  No.
24   Q  All right. Well, I'm sure your counsel

Page 10

1   went over the basics with you, but I'm going to
2   do that here too. You and I should try to talk --
3   try not to talk over each other. This is really
4   a reminder for me, since I tend to do it a lot.
5   It's important to remember to respond verbally
6   with a yes or a no rather than the shaking or
7   nodding of the head. I mean, today your testimony
8   is being recorded, but still for the stenographer
9   we should -- you should try to respond verbally,
10   if you would, please. Additionally, you know, I
11   don't want to confuse you. I don't want you to not
12   know what I'm talking about if I'm asking questions.
13   So do you promise that you will tell me if you don't
14   understand my question?
15   A  Of course, yeah.
16   Q  All right. And you're represented
17   by counsel here today, isn't that right,
18   Mr. Hatzigiannis?
19   A  That's correct.
20   Q  And who is your counsel, please.
21   A  Jim Falvey.
22   Q  Do you have any other counsel?
23   A  No.
24   Q  All right. Mr. Hatzigiannis, I want

Page 11

1   to talk for a little bit about your personal and
2   professional background, and then we're going to
3   move on to Long Leaf Trading.
4   A  Sure.
5   Q  So tell me, if you would, please, about
6   your education. I understand you attended college
7   at the University of Missouri, Columbia. Have I got
8   that right?
9   A  Right.
10   Q  And what degree did you get there?
11   A  It was business administration, emphasis
12   in management.
13   Q  All right. Did you take any courses on
14   futures?
15   A  Not that I recall.
16   Q  Any courses on options?
17   A  Not that I recall.
18   Q  Any courses on trading any financial
19   instrument, including, but not limited to, equities?
20   A  Yes.
21   Q  All right. And what courses did you take
22   on that, please.
23   A  I don't know the exact names so --
24   but I did take courses.

Page 12

1   Q  Okay. How many do you think?
2   A  I would say at least five.
3   Q  All right. And when -- I ought to
4   know this, but when did you graduate from college,
5   please.
6   A  2016.
7   Q  All right. Any postgraduate degrees?
8   A  No.
9   Q  All right. So let's talk next, if we
10   could, please, about professional licenses. You're
11   a Series 3, correct?
12   A  Right.
13   Q  And for the record, please, what is a
14   Series 3?
15   A  Commodities and futures.
16   Q  Commodities and futures what?
17   A  What do you mean?
18   Q  Well, a Series 3 is a license, correct?
19   A  Sure, yeah.
20   Q  It's a license to do what?
21   A  Be a broker in futures and options.
22   Q  Okay. And when did you obtain your
23   Series 3 license, please.
24   A  I believe it was August of 2016.

Page 13

1    Q    And do you maintain that license?
2    A    No, I do not.
3    Q    All right.  When did it lapse, please.
4    A    I don't know the exact date.  Sometime
5    maybe three months ago.
6    Q    How intensive is the Series 3 examination?
7    A    How intensive?
8    Q    Yeah.  Is it hard?
9    A    Depending on how much you study.  I don't
10   think --
11   Q    Did you study a lot?
12   A    I studied a good amount, yeah.  I passed
13   it, so ...
14   Q    All right.  As part of your studies
15   for the Series 3 exam, did you learn to read FCM
16   statements?
17   A    FCM statements?
18   Q    Yeah.
19       MR. FALVEY:  Objection on clarity.
20   BY MR. BURDEN:
21   Q    Do you know what an FCM is,
22   Mr. Hatzigiannis?
23   A    Yes.
24   Q    What is it, please.

Page 14

1    A    Futures clearing merchant.
2    Q    All right.  And do you know what an
3    FCM does?
4    A    Yes.
5    Q    What does it do, please.
6    A    It clears trades.
7    Q    All right.  And for customers of the
8    FCM they will receive account statements from the
9    FCM, is that correct?
10   A    Yes.
11   Q    Can you read those statements?
12   A    I mean, I understand the net liquidation
13   value.  They're tough to read, to be honest.
14   Q    So this is what I'm getting at.  You've
15   got your Series 3.  You've taken your Series 3 exam.
16   Was any part of the Series 3 exam dependent on you
17   knowing how to read FCM statements?
18   A    I don't recall.  I mean, it was a long
19   time ago when I took the test, 2016.  I don't --
20   Q    Okay.  So your testimony is that
21   you've seen -- or I should ask you instead, so
22   strike that.  Mr. Hatzigiannis, you've seen FCM
23   statements, correct?
24   A    I've seen them, yeah.

Page 15

1    Q    Right.  And you saw them when you worked
2    at Long Leaf Trading, correct?
3    A    Right.
4    Q    Did you understand those statements?
5    A    I understood it, yeah.
6    Q    Is your testimony that you understood
7    the FCM statements that you received?
8       MR. FALVEY:  Asked and answered.  Go ahead.
9    A    Yes.
10   BY MR. BURDEN:
11   Q    Did you understand all of it or just net
12   liquidating value?
13   A    I understood positions and net liquidating
14   value.
15   Q    Did you understand the rest of the
16   statement?
17   A    I would need to look at a statement.
18   Q    Got it.  Well, we'll look at one in
19   a little bit.
20   A    All right.
21   Q    Prior to joining Long Leaf Trading did
22   you have any experience trading options or futures?
23   A    No.
24   Q    All right.  So very quickly, you left

Page 16

1    Long Leaf Trading in December of 2019, is that
2    right?
3    A    Right.
4    Q    And what did you do after that, please.
5    A    I'm just trading myself now.  I've got an
6    eCommerce business as well.
7    Q    Got it.  And are you trading futures
8    or options?
9    A    I am not trading futures but I am trading
10   options.
11   Q    Are the options commodity options?
12   A    They're not commodity options.
13   Q    So presumably they're equity options?
14   A    Right.
15   Q    All right.  So after leaving Long
16   Leaf Trading, did you do any commodity futures
17   or commodity options trading?
18   A    No.
19   Q    Why not?
20   A    Why didn't I?
21   Q    Yeah.
22   A    Just a hassle to get a license, you know,
23   approved through the brokerage -- broker.
24       MR. FALVEY:  Hey, Ashley, I'm sorry.

Page 17

1      Did you ask if he was trading on behalf of
2   someone else or for himself?
3         MR. BURDEN:  I didn't, but that was my
4   next question.
5         MR. FALVEY:  Oh, sorry.  Okay.
6         MR. BURDEN:  No, no, no.  I appreciate it.
7      Q    Mr. Hatzigiannis, after leaving Long
8   Leaf Trading, did you trade on behalf of any clients
9   or customers?
10     A    No.
11     Q    On behalf of any friends or family members?
12     A    Nope.
13     Q    Did you advise any person with respect to
14  trading commodity futures or options?
15     A    No.
16     Q    All right.  You mentioned you had
17  an eCommerce business.  What does that business
18  do, please.
19        MR. FALVEY:  Yeah, it's permissible
20   to answer.
21     A    It's just selling of bracelets, lava
22  bracelets.
23  BY MR. BURDEN:
24     Q    All right.  So does the eCommerce business

Page 18

1   have anything to do with trading?
2      A    No.
3      Q    All right.  So, Mr. Hatzigiannis, I want
4   to move on to Long Leaf Trading.
5      A    Sure.
6      Q    And we'll talk about that, if we
7   could, please, for a little bit sort of generally
8   and then I want to talk after that about Long Leaf
9   Trading's trading programs.  So Long Leaf Trading,
10  Mr. Hatzigiannis, you started in September of '16,
11  is that right?
12     A    Right.
13     Q    And what was your job title there, please,
14  when you started?
15     A    I believe it was a junior futures
16  associate.
17     Q    All right.  And who hired you, please.
18     A    Tim Evans.
19     Q    All right.  And to whom did you report
20  while you were working as a junior futures broker?
21     A    Yeah, I reported to Tim Evans.
22     Q    All right.  And what were your --
23  you said you were a junior futures broker?  That
24  was your title?

Page 19

1      A    Yeah.  Junior futures associate, junior
2   futures broker.
3      Q    Okay, thanks.  So what were your job
4   responsibilities as a junior futures associate at
5   Long Leaf Trading, please.
6      A    Cold calling.
7      Q    All right.  And what were you cold calling
8   for, please.
9      A    For clients.
10     Q    Well, what were you offering those clients?
11     A    To set up an appointment.
12     Q    And what was that appointment for, please.
13     A    Basically an introductory meeting.  Called
14  it a demo.
15     Q    All right.  So the cold calling that
16  you were doing as a junior broker, that was to get
17  customers or potential customers to sign up for a
18  more involved sales pitch down the line, right?
19     A    Yeah, just a sales presentation
20  appointment.
21     Q    Got it.  And so as a junior broker,
22  you know, you did this initial call and the people
23  at Long Leaf referred to it as the demo, right?
24     A    Right.

Page 20

1      Q    And so after the demo, the bigger,
2   more involved sales presentation you're trying to
3   set the customers up to attend, that's called the
4   custom, right?
5      A    Right.
6      Q    All right.  So this demo was for
7   the purposes of getting people involved or getting
8   people to sign up for Long Leaf Trading's Time Means
9   Money program, is that right?
10        MR. FALVEY:  I'd just object in terms
11   of facts not in evidence, but go ahead.
12     A    Sorry.  Could you repeat the question?
13        MR. BURDEN:  Yeah.  Mary, would you read
14   that one back, please.
15        (Whereupon the portion of the record
16         was read as requested.)
17     A    It was for the Time Means Money program,
18  but no one signed up from that presentation.
19     Q    Sorry.  So your testimony is that the
20  demo presentation was to solicit customers to sign
21  up for the Time Means Money program but they didn't
22  actually sign up during your demo presentation,
23  is that right?
24     A    Yep.

Page 21

1    Q   All right.  And the idea is that you
2  would cold call these guys, you would set them up
3  for a custom and one of the senior brokers would do
4  the custom and you hoped, you know, they'll sign up
5  for the Time Means Money program after the custom.
6  Have I got that right?
7    A   I didn't run demos at that time.
8    Q   Sorry?
9    A   I was not running the demo presentation
10  during that time.
11    Q   You mean the custom?
12    A   No, both.
13    Q   All right.  Got it.  Oh, I see.  So you're
14  cold calling people to set up the demo?
15    A   Right.
16    Q   Got it.  So during the time that you
17  were a junior broker, you would cold call people to
18  set up the demo but you didn't do the demo yourself?
19    A   I did the demo down the road, probably
20  like a year later.  But, yeah, you've got the gist.
21    Q   Got it.  All right.  So from September
22  of 2016 to maybe September of 2017 you worked as
23  a junior broker and you did cold calls to set up
24  demo appointments, right?

Page 22

1    A   Correct.
2    Q   All right.  So what did you say to
3  customers on these cold calls?
4    A   I don't recall.  I mean, that's a long
5  time ago.
6    Q   How did you know what to say?
7    A   We had a script.
8    Q   All right.  And who gave you the script?
9    A   Tim Evans.
10    Q   All right.  Do you have a copy of that
11  script anywhere?
12    A   No.
13    Q   All right.  So it sounds like your
14  job responsibilities changed after September of
15  2017, is that correct?
16    A   That is correct.
17    Q   All right.  So after September of 2017
18  you started doing the demo presentation, is that
19  right?
20    A   Right.
21    Q   What did the demo presentation entail,
22  please.
23    A   Just basic information about Long
24  Leaf's background, background on Tim.  That's about

Page 23

1  it from what I recall.
2    Q   All right.  And was the demo presentation
3  made for the purposes of getting people interested
4  in the Time Means Money program?
5    A   Right.
6    Q   All right.  And the purpose of the demo
7  presentation was to set people up for the custom
8  presentation down the road, correct?
9    A   Yes.
10    Q   At what point did you start doing the
11  custom presentation?
12    A   I don't know the exact date, but I would
13  say January -- I mean, no, like March 2018 maybe.
14    Q   All right.  So I want to keep talking
15  about the demo presentation, if you could -- if we
16  could, and we'll look at some scripts and listen to
17  some calls later.  But I was wondering, can you tell
18  me, please, what you told customers in this demo
19  presentation?
20    A   Yeah.  Like I said, it was a background
21  of Long Leaf, a background on Tim Evans, the ebooks
22  and a little bit about the custom, you know.  I had
23  an agenda asking questions at the beginning.  I'd
24  try to get to know more about them, basically Know

Page 24

1  your Customer.
2    Q   All right.  While you were doing the
3  cold calls from September of '16 to September of
4  '17, how many calls do you think you'd make in a
5  day?
6    A   We were required to make at least 200.
7    Q   Wow.  Did you actually make 200?
8    A   Yeah.
9    Q   All right.  So September 2017 through
10  March of 2018 you're mostly doing these demo
11  presentations, right?
12    A   Yeah, primarily.
13    Q   How many of those do you do in a day?
14    A   At least two, sometimes four.
15    Q   Did you do this every day or did you have
16  other job responsibilities?
17    A   Did this every day.
18    Q   All right.  Now, at some point you
19  were promoted to a senior broker, is that right?
20    A   Yes.
21    Q   When was that, please.
22    A   I don't know the exact date.  Probably
23  at the same time I was doing customs.
24    Q   All right.  So earlier 2018?

Page 25

1    A    Yeah.
2    Q    And who promoted you, please.
3    A    Jim.
4    Q    Jim who?
5    A    Donelson.
6    Q    All right.  And to whom did you report
7    once you had been made a senior broker?
8    A    Jim Donelson.
9    Q    All right.  So Jim Donelson was your boss?
10   A    Right.
11   Q    All right.  So your job responsibilities
12   as a senior broker consisted of giving these custom
13   presentations, is that right?
14   A    Yes.
15   Q    Any other responsibilities that you had?
16   A    Pitching trades, account management for
17   sure, yeah.
18   Q    Okay.  Any other responsibilities as senior
19   broker?
20   A    No.
21   Q    All right.  And as senior broker, how
22   many of these custom presentations would you do in
23   a day?
24   A    Sometimes zero, sometimes two, sometimes

Page 26

1    three.
2    Q    So what's the difference between
3    the demo presentation and the custom presentation?
4    Why is the custom presentation its own thing?
5    A    Custom presentation gets more in depth
6    with strategy.
7    Q    All right.  And this custom presentation,
8    this was a solicitation to -- for customers or
9    prospective customers to sign up for this Time Means
10   Money program, is that accurate?
11   A    Right.
12   MR. FALVEY:  May I ask at that --
13   at what time, Ashley?
14   MR. BURDEN:  No, you can't.
15   MR. FALVEY:  Okay.  I'm just asking for
16   time reference purposes.  That's all.
17   BY MR. BURDEN:
18   Q    All right.  Mr. Hatzigiannis, I'd
19   like you to go to CFTC Exhibit 179, if you would,
20   please.
21   MR. FALVEY:  Almost there.  It's kind of
22   hard to see.
23   THE WITNESS:  Is it the LinkedIn?
24   MR. FALVEY:  I'm sorry.  Excuse my

Page 27

1    language, yeah.
2    MR. BURDEN:  You know, you guys can
3    just -- if it's small and hard to see, which
4    it is, just navigate to the bottom of the PDF
5    and zoom in on it with the little plus button.
6    MR. FALVEY:  Yeah.
7    MR. BURDEN:  Got it?
8    THE WITNESS:  I know what's on there.
9    MR. FALVEY:  Okay.
10   THE WITNESS:  It's my LinkedIn.
11   BY MR. BURDEN:
12   Q    All right.  So, Mr. Hatzigiannis,
13   would you take a moment to look over Exhibit 179
14   and when you have, will you please tell me if this
15   is a complete and accurate copy of your current
16   LinkedIn profile.
17   MR. FALVEY:  Okay.  Pull it up.
18   A    It is accurate, yes.  That's my LinkedIn.
19   BY MR. BURDEN:
20   Q    All right.  Is it also complete?
21   A    Is it complete?
22   Q    Yeah.
23   A    What do you mean by that?
24   Q    Did I leave anything out when I copied

Page 28

1    it or had the forensics people copy it?  Is there
2    a page missing?  Does everything look like it's
3    there?
4    A    Yeah, everything looks like it's there.
5    MR. FALVEY:  Scroll down.
6    A    Yes, everything is there.
7    BY MR. BURDEN:
8    Q    Okay.  No, sorry.  Sometimes I'll be
9    quiet for a bit because I'm finding something I need
10   to talk about.
11   A    All right.
12   Q    As your counsel observed, the print
13   is very small.  All right.  So I want to direct
14   your attention, if I could, please, to your junior
15   commodities associate blurb here.  And it says here,
16   it says that you are knowledgeable and well versed
17   in all financial account disclosures and procedural
18   policy.  Did you write that?
19   A    No, I did not write that.
20   Q    All right.  Well, who wrote it then,
21   please.
22   A    I forget the guy's name, but I hired
23   somebody to do my LinkedIn.
24   Q    Oh, all right.  Well, he'll be pleased to

Page 29

1  know it's an exhibit. Is this statement true? Is
2  it true that you are knowledgeable and well versed
3  in all financial account disclosures and procedural
4  policy?
5     A   With all?
6     MR. FALVEY: Yeah, I'd just object on
7  broad. But if you can answer, go ahead.
8     A   I wouldn't say all, no.
9  BY MR. BURDEN:
10    Q   All right. So this statement is --
11    A   For the sake of this deposition, I wouldn't
12 say all.
13    Q   Okay. So this is just something you paid
14 some guy to write, correct?
15    A   Right.
16    Q   All right. It says also here that you
17 professionally created the why of why the prospect
18 would open an account at Long Leaf Trading and
19 reported the why as well as financial information
20 of prospects to senior associates. Do you know
21 what that means?
22    A   Yes.
23    Q   What does that mean, please.
24    A   Basically figuring out, you know, why they

Page 30

1  would open an account with Long Leaf.
2     Q   Got it. So does this mean that you
3  worked on sales or promotional materials, that you
4  developed them for Long Leaf Trading?
5     A   No.
6     Q   All right. Who did that?
7     A   Who worked on the promotional material?
8     Q   Yes.
9     A   We didn't have any promotional material
10 that I know of.
11    Q   Well, scripts, right? Scripts are
12 promotional material.
13    A   Oh, who wrote the scripts?
14    Q   Yeah.
15    A   Jeremy Ruth, I'm pretty sure, and Tim
16 Evans.
17    Q   All right. There were Power Point
18 presentations too, right?
19    A   Right.
20    Q   Did you develop those?
21    A   I did not.
22    Q   Did you help develop them?
23    A   No.
24    Q   All right. So it says here

Page 31

1  successfully opened $1,160,000 in total account
2  value from clients at Long Leaf Trading. Is that
3  true?
4     A   That's an estimated value.
5     Q   Do you think it's pretty accurate or is it
6  false?
7     A   I think it's around there.
8     Q   All right. Let's move up, if we could,
9  please, in Exhibit 179 to your blurb about being
10 a senior investment sales specialist and financial
11 advisor. So do you see that bit?
12    A   Right.
13    Q   All right. So it says here recognized
14 as top producing sales associate at Long Leaf with
15 the highest closing percentage. Is that true?
16    A   Yes.
17    Q   All right. It says you led extensive
18 closing sales presentations and single handedly
19 closed 35 percent of the company's revenue, of Long
20 Leaf Trading's revenue. Is that true?
21    A   It's an estimated number.
22    Q   Is the estimate reasonably accurate?
23    A   I believe so.
24    Q   All right. And you've got a couple of

Page 32

1  bullet points here that sort of relate to designing
2  trades or assisting in managing positions. And I
3  want to sort of talk about those together, if we
4  could, please. So what role did you have at Long
5  Leaf Trading, if any, in designing the trades that
6  were recommended to customers?
7     A   Yeah, that was towards the end --
8  end of the tenure of Long Leaf. Jim, I worked
9  closely with Jim on trades. He taught me the
10 strategy, how to develop it, how to develop trades,
11 his strategy. So, you know, I would scan the
12 markets for trades and discrepancies and volatility
13 and design the trade, and he would have the final
14 say or approve it and execute it.
15    Q   All right. So, Mr. Hatzigiannis, when did
16 you start assisting in this trade design?
17    A   I would say sometime in the summer of 2019.
18    Q   All right. So what did Mr. Donelson
19 tell you about the strategy of designing trades for
20 Long Leaf, please.
21    A   He taught me the volatility discrepancies
22 between the front month and back month, what markets
23 to look at, strangles, straddles, gut strangle,
24 basically those type of strategies.

Page 33

1    Q   Did Mr. Donelson explain to you why --
2  and I'm putting the cart before the horse a little
3  bit, but we'll get to the ins and outs of the trade
4  recommendations.  Did Mr. Donelson ever explain
5  to you -- yeah, I'll tell you what.  Strike that.
6  We'll get there in a minute.
7         All right.  So, Mr. Hatzigiannis, I
8  want to talk now about Long Leaf's trading program,
9  the recommendations that were offered to customers
10  and I want to sort of do an overview, and I hope
11  that you will help me with that.  So when you
12  started at Long Leaf Trading in September of '16,
13  Long Leaf Trading was offering customers a program
14  called Time Means Money, is that correct?
15    A   Right.
16    Q   All right.  And so this Time Means
17  Money program, it entails a number of things, and
18  I want to sort of sift through them.  So first it
19  involved four 4-legged spread trade recommendations,
20  in other words, 16 trades per month that were
21  recommended to clients.  Have I got that right?
22    A   Yes.
23    Q   All right.  And these were all options
24  on futures trades, correct?

Page 34

1    A   Right.
2    Q   And these recommendations were provided
3  to clients, you know, by brokers through texts or
4  email or phone calls, is that right?
5    A   At that time it was not text.
6    Q   Just emails and phone calls?
7    A   Yeah.
8    Q   All right.  And did you provide customers
9  with recommendations during the -- I'll just say the
10  time when Evans was in charge?
11    A   No.
12    Q   So during that time you were strictly
13  cold calling and then doing those opening demo
14  presentations?
15    A   Right.
16    Q   All right.  So under the Time Means
17  Money program the client gets a recommendation by
18  phone or email.  If the client agrees to the trade,
19  Long Leaf makes the trade on the client's behalf,
20  is that correct?
21    A   Right.
22    Q   All right.  And everybody who's involved
23  in the Time Means Money program, they get the same
24  trade recommendations, is that correct?

Page 35

1    A   I'm pretty sure, yeah.
2    Q   Now, everybody gets the same trade
3  recommendations under the Time Means Money program,
4  but some customers might be advised to trade more
5  contracts or fewer contracts, right?
6    A   Yes.
7    Q   All right.  And the amount of
8  contracts that the customer is advised to trade,
9  that was driven primarily during the Time Means
10  Money program by the amount of equity in that
11  client's account, is that correct?
12    A   Yes.
13    Q   So how do you know that?
14    A   I wasn't part of the trade process,
15  so I don't know.
16    Q   Well, you just said yes.  You know,
17  why do you -- why is the answer yes and not I don't
18  know or no?
19    A   You asked me if it was part of the
20  equities, depending on the equity size?
21    Q   Yeah.
22    A   And what was the question after that
23  again?
24    Q   Yeah.  So what I'm getting at here,

Page 36

1  you know, my question was, you know, customers
2  are being -- they're being given the same trade
3  recommendations.  So some customers, they might
4  be told, hey, you know, you need to trade one
5  contract.  Other customers are going to be told,
6  you know, you should trade five contracts, right?
7    A   Right.
8    Q   And the amount of, you know, contracts
9  the customer is sort of told that they should trade,
10  that is dependent on the amount of equity, the
11  amount of value in that customer's account, correct?
12    A   Right.
13    Q   Yeah.  So my question to you is how do you
14  know that?
15    A   Just -- just being in the room.
16    Q   Got it.  So when you say being in the
17  room, you mean you overheard people at Long Leaf
18  talking about this?
19    A   Right.
20    Q   All right.  So who did you hear talking
21  about it?  How did you gain this understanding?
22    A   Tim Evans, communication with Tim to
23  the senior associates.
24    Q   And what did that communication say?

Page 37

1    A    This is the trade we're doing.  This is
2  the reason we're doing it.
3        MR. FALVEY:  Just objection if it was in
4  writing or --
5        MR. BURDEN:  That's not an objection, Jim.
6    Q    Keep going.
7        MR. FALVEY:  Clarification.
8    A    That's all I got.
9  BY MR. BURDEN:
10   Q    All right.  So it's -- your testimony
11 is that you came to understand through working at
12 Long Leaf that the amount of contracts recommended
13 to clients was driven by the size of their account,
14 is that right?
15   A    Right.
16   Q    And you came to learn this sort of
17 through being in the office and hearing Mr. Evans
18 and others talk about that, correct?
19   A    Right.
20   Q    Did you receive emails to that effect,
21 emails --
22   A    No.
23   Q    Sorry.  Say it again.
24   A    I did not receive any emails from Tim Evans

Page 38

1  about trades that I recall.
2    Q    Got it.  All right.  During Tim Evans'
3  period, which I, you know, I understand to be -- let
4  me ask it this way.  So Tim Evans was, you know, in
5  charge of the company when you started in September
6  of 2016, right?
7    A    Right.
8    Q    So when did Donelson take over, please.
9    A    I believe it was January of 2018.
10   Q    All right.  So, you know, during the
11 time that Evans was in charge, do you have a sense
12 or do you know how many customers participated in
13 the Time Means Money program?
14   A    No idea.
15   Q    All right.  Did every client participate,
16 or almost every client participate in the Time Means
17 Money program?
18   A    I would say almost every client did,
19 not every client.
20   Q    All right.  And your testimony is that
21 Donelson took over in January of 2018, correct?
22   A    That's what I believe, yeah.
23   Q    Okay.  Well, that's what you remember,
24 and that's the important thing.

Page 39

1    A    Right.
2    Q    So did Long Leaf Trading continue to
3  offer this Time Means Money program when Donelson
4  took over in 2018?
5    A    I think it was for the first month.  Then
6  they scrapped it.
7    Q    All right.  And what was it replaced with,
8  please.
9    A    Something kind of similar except, you
10 know, Time Means Money was options selling, but Jim
11 didn't like options selling strictly.  He liked
12 actively managing the position, so it was more
13 debit spreads, you know.
14   Q    Got it.  So is it fair to say that
15 after Mr. Donelson took over at Long Leaf, Long
16 Leaf transitioned to a different kind of trading
17 program that was based on debit spreads?
18   A    Right.
19   Q    Otherwise, though, the trading program
20 offered by Long Leaf under Donelson was pretty much
21 the same as before, is that fair to say?
22        MR. FALVEY:  Objection.
23   A    I don't know.  It was pretty abrupt.
24 What do you mean the same as before?  There's a lot

Page 40

1  of differences.
2  BY MR. BURDEN:
3    Q    Well, I'm going to ask
4  you about those differences.  So, Mr. Hatzigiannis,
5  during the time that Mr. Donelson was in charge,
6  Long Leaf continued to recommend to customers
7  16 trades a month, four 4-legged options on future
8  spread trades, is that correct?
9    A    Not every time.
10   Q    But most months?
11   A    Yeah, I guess, sure.
12   Q    All right.  And recommendations were
13 still provided to customers by emails or calls,
14 but during the Donelson era also by text, is that
15 correct?
16   A    Correct.
17   Q    All right.  And the client agrees and
18 Long Leaf Trading makes the trade on behalf of the
19 customer, correct?
20   A    Right.
21   Q    And under Donelson all the clients get the
22 same recommendations, is that right?
23   A    The majority of the clients, yeah.
24   Q    All right.  And the number of contracts

Page 41

1  that the clients were advised to trade, once again,
2  is based on the equity in their account, correct?
3      A   Right.
4      Q   All right.  And while Donelson was in
5  charge you sort of got to a point where you were
6  providing these trade recommendations to clients,
7  correct?
8      A   Correct.
9      Q   And during your tenure at Long Leaf
10  Trading, how many clients did you have?
11     A   Maybe 20, 20 clients, 22.  I don't know.
12  Something like that.
13     Q   And these were clients that you provided
14  trade recommendations to?
15     A   Yep.
16     Q   All right.  You testified before that
17  there were differences between the trading program
18  offered under Evans and the trading program offered
19  under Donelson.  What were the differences there,
20  please.
21     A   Sure.  So with Tim the strategy
22  was just selling options, letting them expire
23  worthless or not.  Jim is more debit spreads, you
24  know, volatility swaps actually.  I was more

Page 42

1  involved with the trading, so I know more in
2  depth of the strategy.  And also he liked actively
3  managing it, just not, you know, sitting on your
4  hands and watching it expire worthless.  I guess
5  that was the main difference.  It was more actively
6  managed.
7      Q   All right.  Any other differences
8  between Evans' and Donelson's trade recommendations
9  to customers?
10     A   Yeah.  Jim also was doing, you know,
11  a gut strangle, you know, straddles, strangles.
12  Tim was just doing iron condors.
13     Q   Any other differences?
14     A   Not that I can think of right now.
15     Q   Got it.  So it sounds like, you know,
16  Evans and Donelson had different kinds of trades
17  that they recommended, is that fair to say?
18     A   Yeah.
19     Q   With Evans it was credit spreads with
20  a view to letting the options expire, is that right?
21     A   Right.
22     Q   With Donelson it was debit spreads, and
23  those debit spreads were actively managed because
24  you wouldn't want something like that to sort of

Page 43

1  go all the way, is that fair to say?
2      A   Right, yeah.
3      Q   But under Donelson there were still
4  16 trades approximately that were recommended to
5  customers each and every month, is that right?
6      A   I mean, that wasn't like -- that
7  wasn't that strict.  We weren't -- it was not like
8  a program like, hey, we're doing 16 trades a month.
9  Like Tim, it could be -- it varied depending on,
10  you know, if there was opportunities out there,
11  how many positions we still had on and things
12  like that.
13     Q   Yeah, so let me drill down on that
14  a little.  So during Donelson's era there were
15  trades that were described as core trades, is that
16  right?
17     A   Yes.
18     Q   All right.  And there were also
19  trades that were described as opportunistic trades,
20  is that right?
21     A   Right.
22     Q   All right.  And there were also trades
23  that were described as cash management trades, is
24  that right?

Page 44

1      A   Right.
2      Q   Any other types of trades during
3  Mr. Donelson's tenure?
4      A   Not that I can think of.
5      Q   All right.  So what are the core trades?
6      A   Core trades are volatility swap strangles
7  or straddles, yeah.
8      Q   So these core trades, these are 4-legged
9  spread trades, is that fair to say?
10     A   Sometimes, sometimes not.
11     Q   All right.  These opportunistic trades,
12  what are they?
13     A   Just something he sees in the market.
14  If he sees an edge that's, you know, obvious, we
15  recommend it.  Sometimes -- and those were rarely
16  used and it would take -- it's very fast.  We need
17  the clients to respond right away, so that's why
18  they were rarely used.  They're just something that
19  he sees funny going on in the market, that he sees
20  a nice edge that's an obvious opportunity and he's
21  trying to get as many clients as possible.
22     Q   All right.  And what are the cash
23  management trades, please.
24     A   That's called a gut strangle.  Basically

Page 45

1    an in-the-money call, in-the-money put and then
2    you're selling weekly options against it, collecting
3    premium and financing the guts.
4        Q    All right.  So I want to talk about
5    commissions, but I want to go back to Evans and
6    talk about the Evans era.  Then I want to talk about
7    the Donelson era.  So during Evans' tenure customers
8    were charged commissions on every trade, is that
9    right?
10       A    That's what I was led to believe, yes.
11       Q    All right.  And you got a piece of that,
12   right, or wrong?
13       A    I got -- yes, yeah.
14       Q    All right.  How big a piece?
15       A    You're asking like commission percentage
16   wise?
17       Q    Yes.
18       A    20 percent commission of my client that
19   I opened.
20       Q    All right.  So you testified before
21   you had 20 to 22 clients.  Does that include clients
22   that you opened?
23       A    No.
24       Q    All right.  So you had 20 to 22 clients

Page 46

1    under Donelson that you're responsible for giving
2    recommendations for, right?
3        A    Right.
4        Q    But you opened a lot more accounts than
5    that, right?
6        A    Yeah, I believe.  I mean, that was such
7    a long time ago.  I really don't know the number
8    offhand.
9        Q    Got it.  Well, it sounds from your
10   LinkedIn profile like it was 35 percent of at least
11   all of the revenue, right?
12       A    That was for closing, not opening.
13       Q    Oh, so it's even more for opening?
14       A    Yeah, I don't know offhand.
15       Q    All right.  Back to commissions.
16   So under Evans clients paid commission when they
17   traded.  Did they pay commission -- and they paid
18   commission regardless of whether the trade made
19   money or not, correct?
20       A    Right.
21       Q    All right.  Under Donelson's tenure
22   clients were charged commission on trades, correct?
23       A    Right.
24       Q    And they were charged commissions

Page 47

1    regardless of whether the trades made money or
2    not, correct?
3        A    Right.
4        Q    Did Long Leaf Trading have like a
5    success fee?  Like if clients made money would,
6    you know, Donelson charge them more --
7        A    No.
8        Q    -- or take a piece of that?
9        A    No.
10       Q    Same question for Evans.  Any success fee?
11       A    Not that I know of.
12       Q    Got it.  So is it fair to say that
13   for Long Leaf Trading under Evans and Donelson, the
14   company makes money when customers trade?
15       A    Right.
16       Q    Does the company make money when customers
17   win?
18       A    It's just strictly trading, whether they
19   win or not.
20       Q    So the answer's -- all right.  Sorry.
21   Let me ask that question again.  I did exactly what
22   I said we shouldn't do, which is talk over you, and
23   it's because I can't see you because I've got other
24   stuff up.

Page 48

1        MR. BURDEN:  Mary, what was my question
2    again, please.  You know what, never mind.
3        Q    I'll do it again.
4        A    All right.
5        Q    Did Long Leaf Trading under Donelson
6    or Evans make money if customers were profitable
7    trading?
8        A    Are you asking if there's like a
9    separate fee if they were profitable or just --
10       Q    Yeah.
11       A    There wasn't a separate fee.  It was just
12   strictly on the execution on the trade.
13       THE WITNESS:  I've got to use the bathroom.
14       MR. FALVEY:  Hey, Ashley, James needs
15   to take a break.
16       MR. BURDEN:  Oh, okay.  When do you guys
17   want to come back?
18       THE WITNESS:  Like three minutes.
19       MR. FALVEY:  Like we can -- what time
20   is it, 10:20?  Do you want to say 10:30?
21       MR. BURDEN:  Let's do that.  All right.
22   I'll see you guys at 10:30.  Off the record.
23       MR. FALVEY:  Okay, thank you.
24

Page 49

1     (Whereupon a recess was taken from
2     10:22 a.m., to 10:36 a.m., after
3     which the following proceedings
4     were had:)
5     MR. BURDEN:  All right.  Back on the
6  record, please.
7     Q    All right.  Mr. Hatzigiannis, how did
8  customers at Long Leaf Trading do?
9     A    Yeah.  What do you mean by -- I mean, like
10 percentage wise, were they profitable?
11    Q    Yeah.  Did customers at Long Leaf Trading
12 make money?
13    A    At the end it seems like they did not.
14    Q    All right.  And, in fact, 95 percent of
15 Long Leaf's customers lost money, is that correct?
16    A    I'm not aware of that.
17    Q    All right.  Well, let's drill down
18 a little bit then on your personal knowledge.  You
19 said that you had 20 to 22 customers that you were
20 responsible for, is that correct?
21    A    Yes.
22    Q    All right.  So how many of them made money?
23    A    I'm not sure.
24    Q    Well, did any of them make money?

Page 50

1     A    Jim shut down the business in December.
2  They didn't tell me a thing.
3     Q    Yeah.  But how long were they your
4  customers for?
5     A    Since I started running the customs,
6  I mean, I acquired more clients over time.  So it
7  varies between client to client.
8     Q    All right.  So it sounds like you
9  started acquiring these customers that were yours
10 in March of '18, right?
11    A    Right.
12    Q    And some of these customers you had
13 through December of 2019 when the firm shut down,
14 right?
15    A    Right.
16    Q    So are you going to tell me you
17 don't know if they made or lost money?  Is that
18 your testimony?
19    A    It seems like they lost money.
20    Q    What do you mean it seems like they lost
21 money?
22    A    I don't know for a fact.  I'm only saying
23 facts.  I don't know for a fact.
24    Q    All right.  What was the monthly rate

Page 51

1  of return for your 20 or so customers at Long
2  Leaf Trading?
3     A    I have no idea.
4     Q    All right.  Annual rate of return for
5  your customers at Long Leaf Trading?
6     A    No idea.
7     Q    Do you know how many accounts were
8  opened or closed by you with positive lifetime
9  rates of return?
10    A    I'm not sure.
11    Q    Can you tell me the name of any client
12 you had that made money at Long Leaf Trading?
13    A    Gary Taft (phonetic).
14    Q    Anybody else?
15    A    Not off the -- I can't think of any right
16 now, no.
17    Q    And how much did Gary Taft make during the
18 life of his account?
19    A    It was a long time ago.  I don't really --
20 maybe 2,000, 3,000.
21    Q    And how long was his account active for?
22    A    I think it was six months, four months.
23    Q    All right.  And all your other customers,
24 you don't know if they made money or not?

Page 52

1     A    Don't know.  It seems like they lost money.
2     Q    You say it seems like.  Why do you say
3  that?
4     A    Because I don't know if they closed the
5  account, what the ending account balance was.  I was
6  left without any of that knowledge.
7     Q    All right.  I'll tell you what.  I'd
8  like you to turn for me, if you would, please,
9  to CFTC Exhibit 181.  So tell me when you're there,
10 please.
11    A    All right.
12    Q    All right.  Do you recognize CFTC
13 Exhibit 181?
14    A    Yep.
15    Q    What is it, please.
16    A    Looks like the complaint and the decision
17 on that complaint.
18    Q    By whom?
19    A    The NFA.
20    Q    All right.  And this was a complaint by
21 the NFA that you settled, correct?
22    A    Right.
23    Q    And what did you do to settle the NFA's
24 complaint?

Page 53

1    A    What did I do to settle it?
2    Q    Yeah.  What did you give them?
3    A    Not ever applying for NFA membership.
4    Q    So for the folks at home what does that
5  mean?
6    A    Folks at home what does that mean?
7    Q    For the record, what does it mean?
8        MR. FALVEY:  He's being colloquial.
9    A    Not to apply for a Series 3.
10  BY MR. BURDEN:
11    Q    It means you can't trade for other people,
12  correct?
13    A    No.
14    Q    What do you think it means then?
15    A    I can't trade for other people in futures.
16    Q    I see.  No, that's -- yeah, that's
17  right.  Okay.  So let's look, if we could, please,
18  to the bottom of page 1 here.  It says --
19    A    Yeah.
20    Q    The complaint alleges, "that
21  Hatzigiannis, while an AP of Long Leaf, made
22  misleading sales solicitations to prospective
23  customers that exaggerated profit potential; failed
24  to explain the fundamentals and risks of options

Page 54

1  trading; failed to adequately explain the firm's
2  commissions and fee charges or how those charges
3  impacted profitability; and failed to disclose
4  that over 95 percent of Long Leaf's customers
5  lost money."  So do you see that?
6    A    Yeah, I see that.
7    Q    All right.  And so these are the charges
8  you settled by the NFA, correct?
9    A    Right.
10    Q    All right.  So is that right, is that
11  true, that you failed to disclose over 95 percent
12  of Long Leaf's customers lost money?
13    A    No, it's not true.
14    Q    Why did you agree to it then?
15    A    Because I don't have a lot of money
16  to hire a lawyer to fight the case and take it
17  to trial.
18    Q    You've got a lawyer now, don't you?
19    A    I do have a lawyer.
20    Q    Who's paying that lawyer?
21    A    And I did have a lawyer before as well.
22    Q    Oh, so who's paying this lawyer,
23  Mr. Hatzigiannis?
24    A    Jim Donelson.

Page 55

1    Q    All right.  Now, you said in this
2  statement that you failed to disclose that over
3  95 percent of Long Leaf's customers lost money, you
4  said that that's not true.  That's your testimony?
5    A    That's my testimony.
6    Q    Even though you settled these allegations
7  and agreed to this finding?
8    A    Right.
9    Q    All right.  So why is it not true?  What
10  about that is wrong?
11    A    There's no facts and I never was
12  aware of any of this.  I don't know.  I never saw
13  a piece of paper or anything that says 95 percent
14  of clients lost money, no numbers.  So I can't tell
15  you if that's true or not.
16    Q    But you can't tell me if it's false either,
17  can you?
18    A    No, I can't.
19    Q    All right.  So I want to drill down
20  on that a little bit.  You know, your testimony
21  just now was you never saw a piece of paper, you
22  know, that says 95 percent of Long Leaf's customers
23  lost money.  Do you have any reason to believe that
24  this statement in Exhibit 181 about 95 percent of

Page 56

1  Long Leaf's customers losing money, do you have
2  any reason to believe that that's wrong?
3    A    It seems -- well, it seems very high.
4    Q    Yeah, I think so.  But do you have any
5  reason to believe that it's wrong?
6    A    Do I have any reason to believe that
7  it's wrong.  I mean, I was involved in the trading
8  and I don't think we lost that much, to be honest.
9    Q    How much do you think that you lost for
10  Long Leaf customers?
11    A    I don't know.
12    Q    So did you present any evidence to
13  that effect to the NFA?  Did you say, hey, this
14  95 percent is wrong.  It's some other number.  Did
15  you do that?
16    A    I was rarely involved with that, with
17  that case.
18    Q    All right.  Let me repeat my question.
19  Did you present any evidence or have your attorney
20  present any evidence to the NFA that this 95 percent
21  number is wrong?  Did you say, hey, it's a different
22  number.  That's too high?
23    A    I was never -- I didn't -- I was not
24  aware of that number until the settlement, and

Page 57

1    I'm not sure what my lawyer presented them or the
2    documents or I didn't present any of those documents
3    myself because that was -- this fact -- well, not
4    a fact, but this number was not presented to me.
5         Q    So you're telling me that you didn't
6    know this was going to be in the decision when you
7    settled it?
8         A    Correct.
9         Q    So this is the first time you're seeing
10   this?
11        A    It's not the first time I'm seeing this.
12   I obviously saw the, you know, the end result.
13        Q    Did your lawyer send this to you in advance
14   of you agreeing to the settlement?
15        A    I would have to look at it.  I don't
16   recall.
17        Q    All right.  And who was your attorney
18   in the NFA proceeding?
19        A    Nick Iavarone.
20        Q    All right.  Well, now that you know
21   about this 95 percent, are you going to do anything
22   to dispute it?
23        A    If I have the money, I'm going to try.
24   Trying very hard, but it puts --

Page 58

1         Q    So you're going to -- what --
2         A    -- puts a big damper on finding jobs.
3         Q    Yeah.  So what are you going to
4    do to challenge this 95 percent number, this --
5    go ahead.
6         A    I'm not sure.
7         Q    All right.  So let's turn away from
8    Exhibit 181 for a moment, if we could, please.
9    And, you know, I want to follow up on something
10   you said about not seeing the piece of paper, and
11   I want to talk about pieces of paper that you saw.
12        A    All right.
13        Q    All right.  So while you were working
14   at Long Leaf Trading did you get customer account
15   statements?
16        A    Yes.
17        Q    All right.  And where did you get those
18   statements from, please.
19        A    Cunningham I think, yeah, Cunningham
20   Commodities.
21        Q    Okay.  And Cunningham Commodities was
22   the FCM during Donelson's tenure, is that correct?
23        A    Right.
24        Q    All right.  And how frequently would

Page 59

1    you get these statements from Cunningham?
2         A    About every day.
3         Q    All right.  And they came to your email
4    inbox, correct?
5         A    Right.
6         Q    And you got one of these account
7    statements for each and every single one of your
8    customers, correct?
9         A    Right.
10        Q    And I think I just asked this, but
11   it's one of those days.  You got them every day,
12   right?
13        A    Right.
14        Q    So you could see how your customers were
15   doing on a day-by-day basis?
16        A    Yeah, I was looking at the net liq,
17   yeah.
18        Q    All right.  And did you get statements
19   for customers that had been trading with Long Leaf
20   before they became your customers?  You know, let
21   me do that differently and just ask, you know, when
22   you started taking on, you know, your own customers
23   in March of 2018, did you inherit customers from
24   other brokers?

Page 60

1         A    Yeah.
2         Q    All right.  Can you think of the names
3    of any of those customers, please.
4         A    Dennis Nations, Shahzad Qureshi,
5    Clayton Logomasini.  That's about it that I can
6    think of.
7         Q    So you inherited more clients than
8    just those three, but those are the three that you
9    remember?
10        A    Oh, yeah.  Alan Kirsch too I'm pretty sure,
11   yeah.
12        Q    All right.
13        A    (Inaudible).
14        Q    All right.  Sorry about that.  It's
15   me that's doing it and it's because I can't --
16   I can only see the exhibits and not you.  Sorry.
17   All right.  So, Mr. Hatzigiannis, your testimony
18   is that when you started taking on your own clients
19   at Long Leaf in March of 2018, you inherited
20   a number of clients and you can remember four
21   of them, right?
22        A    Right.
23        Q    Nations, Qureshi, Logomasini and Kirsch,
24   right?

Page 61

1    A    Right.
2    Q    And there were more, but you can't
3 maybe remember their names just at this moment,
4 is that right?
5    A    Right.
6    Q    So how many more do you think that
7 you sort of inherited in March of 2018 or around
8 there?
9    A    Well, I didn't inherit those until
10 later, like later in the summer, summer.  I don't
11 know.  Actually, I didn't inherit those until,
12 you know, most of those until Scott left, which
13 I forget when Scott Gecas left.  I didn't really
14 inherit those until then.  But, I mean, more of
15 those maybe -- I think maybe I inherited I would
16 say eight accounts.
17    Q    Now, Mr. Hatzigiannis, those eight
18 accounts that you inherited, was that when you
19 started taking on clients in March of '18 or was
20 it like later on?
21    A    No, it was later on.
22    Q    Got it.  All right.  So talking about
23 these statements you got from Cunningham, did you
24 understand the statements?  Could you read them?

Page 62

1    A    Yes, I could read most of them.  Yeah,
2 most of --
3    Q    Sorry, go ahead.
4    A    I'm sorry.  Most of it.
5    Q    Could you understand from the statements
6 you received from Cunningham how your customers were
7 doing?
8    A    Yes.
9    Q    That's the important thing.  Let me
10 just circle back a little bit and ask about Gain.
11 Did you receive customer account statements from
12 Gain, the FCM that was there when Evans was in
13 charge?
14    A    Yeah, I did, yeah.
15    Q    All right.  And how frequently did you
16 receive them?
17    A    Every business day.
18    Q    All right.  And these were statements
19 that you received from -- for accounts that you had
20 opened, is that correct?
21    A    I believe, yeah.  There's some accounts
22 I closed too.
23    Q    So every day really from the time you
24 started in September of 2016 through the time Long

Page 63

1 Leaf folded in December of 2019 you were getting
2 daily statements for all your client accounts,
3 is that correct?
4    A    I think I didn't have an account
5 until probably 2017, so not from August 2016.
6    Q    Got it.  Thank you.  So from -- sorry.
7 Did you say August 2017?
8    A    No, I'm saying I didn't receive
9 any statements.  When you said August 2016 through
10 December 2019, I didn't start in August 2016.
11 I forget the exact date.  I think it was sometime
12 in 2017, early 2017 and once I started receiving
13 the statements.
14    Q    Got it.  Thank you.  So from early 2017
15 through December of 2019 you got statements every
16 single day for your customers' accounts, correct?
17    A    Right.
18    Q    And you understood those statements.
19 You could tell how your customers were doing, right?
20    A    I didn't really understand the statement
21 until Jim came in.
22        MR. FALVEY:  Hey, guys, we're going
23    to go use the restroom.  We'll be right back.
24

Page 64

1        (Whereupon a recess was taken from
2        10:57 a.m., to 11:02 a.m., after
3        which the following proceedings
4        were had:)
5        MR. BURDEN:  Sorry for the interruption.
6    Mary, back on the record, please, if we were
7    ever off.
8        MR. FALVEY:  I hope we were off.
9 BY MR. BURDEN:
10    Q    All right.  So, Mr. Hatzigiannis,
11 so your testimony is you were receiving customer
12 account statements from early 2017 onwards, correct?
13    A    Right.
14    Q    And you're getting them on a daily basis,
15 correct?
16    A    Right.
17    Q    And you're getting them for customers
18 whose accounts you opened in your earlier days at
19 Long Leaf Trading?
20    A    I forget.  I think so.
21    Q    And later on when you had your
22 own clients, you were getting statements for those
23 clients, right?
24    A    Right.

Page 65

1    Q    All right.  So your testimony
2   is that you didn't understand those statements
3   until Mr. Donelson came along, is that correct?
4    A    Yeah, a little after that.
5    Q    All right.  So before Mr. Donelson
6   came along you would get these account statements
7   and, I mean, could you tell how clients were doing
8   or was it just, you know, gibberish to you?
9    A    It was really gibberish to me.
10    Q    All right.  So did you ask anybody
11   at Long Leaf, hey, can you help me read this?
12    A    I don't recall.  I mean, I don't remember.
13    Q    Do you remember if anybody tried to show
14   you?
15    A    No.
16    Q    I'm sorry.  I asked that question badly.
17   Did anybody try to show you?
18    A    I don't think so.
19    Q    All right.  So, you know, you're sitting
20   there every day for like a year it sounds like just
21   getting these statements and not understanding them.
22   Is that what happened?
23    A    Yeah, basically.  I really didn't open
24   those up, to be honest.

Page 66

1    Q    Why not?
2    A    Because I didn't understand them,
3   so I didn't -- and it was not part of my job.
4   I was account --
5    Q    Was it --
6    A    -- opening, open.
7    Q    So during the time that you worked
8   for Long Leaf under Evans, you know, until you
9   were taught to read these statements, did you have
10   any idea of how Long Leaf's customers were doing,
11   if they were making money, if they were losing
12   money?
13    A    To me it sounded like they were losing
14   money.
15    Q    Why do you say that?
16    A    Because some people, some accounts
17   were getting closed, yeah.  Just based on the
18   conversations of what I remember, I don't know the
19   exact words that were said, but it just didn't sound
20   like clients were profitable.
21    Q    All right.  And with whom did you have
22   these conversations where you gleaned that, you
23   know, trading was not profitable?
24    A    The other junior associates.

Page 67

1    Q    And what were their names, please.
2    A    Mark Burns, Luis Molina and Jack Konrath.
3    Q    And you learned from conversations with
4   these other junior associates that customers were
5   losing money at Long Leaf?
6    A    Yeah.
7    Q    So, you know, what did they say about it?
8    A    Just saying, you know, I don't know
9   if I want to do this any longer, stuff like that.
10    Q    And who said that?  Who said I don't know
11   if I want to do this any longer?
12    A    Mark Burns.
13    Q    All right.  But you kept doing it, didn't
14   you?
15    A    Obviously, yeah.
16    Q    All right.  So you said that you
17   didn't really understand these customer statements
18   you were getting.  You really weren't opening them
19   until Donelson came along, is that right?
20    A    Yeah, until I, you know, had a good --
21   you know, until I actually closed a client, yeah.
22    Q    All right.  And when did you close that
23   first client, please.
24    A    I believe once the money came in

Page 68

1   it was February of 2018, I believe.
2    Q    Got it.  And do you remember the name
3   of that first client?
4    A    Yeah, Marc Sola-Cruz.
5    Q    All right.  And so after you opened
6   that first client, did Mr. Donelson teach you how
7   to read these account statements?
8    A    Actually, Tim was still there and
9   Tim told me to look at the net liq, just pay
10   attention to the net liq.  And then over time Jim,
11   you know, finally -- after I got more clients, you
12   know, I started, you know, asking more questions,
13   and over time I finally figured out how to actually
14   read it.
15    Q    All right.  So when would you say you
16   finally figured out how to read your customers'
17   account statements?
18    A    I don't remember.  I really don't.
19    Q    Well, do you think it was like a year
20   after?  Do you think it was -- well, thank you.  Do
21   you think it was a year after you started bringing
22   in clients, longer, shorter?
23    A    I would say maybe middle 2018, summer.
24    Q    All right.  So by summer of 2018 you

Page 69

1  were getting these statements and for the first time
2  you understood them, right?
3      A   Yeah, I under -- yeah, exactly.
4      Q   And you could tell how customers were
5  doing, right?
6      A   Right.  I mean, I could see the net liq,
7  how it was changing daily, yeah.
8      Q   All right.  So summer of 2018 you
9  understand these statements.  Did you understand
10 them before that or was it all just a total mystery
11 to you and you had no idea how customers were doing?
12     A   Like I said, I was not opening those
13 statements before then.
14     Q   All right.  So I want to switch gears --
15 well, you know what, never mind.  All right.  So by
16 summer of 2018 you could read and understand these
17 account statements, right?
18     A   Yes.
19     Q   All right.  So now that you can
20 understand the account statements, you can see how
21 customers are doing, right?
22     A   Yeah.
23     Q   How did customers do?  How did your
24 customers do?

Page 70

1      A   They were doing really good, and then
2  I think it was December of 2018 where there was --
3  I think the stock market went down about 20 percent,
4  the whole U.S./China thing, and we got a lot of
5  positions that -- I mean, a couple positions that
6  went underwater, I believe, poor risk management.
7      Q   All right.  When you say your customers
8  were doing well, what do you mean by that?
9      A   They were profitable.
10     Q   All right.  So I want to sort
11 of press you a little on that because according
12 to the trading records that we have -- and this
13 is not your customers alone.  This is all of Long
14 Leaf's customers lost $54,000 in July, made another
15 52 in August, lost 4, made a little money October-
16 November, and then December and then substantially
17 all of 2019 were massive losses.  Is that consistent
18 with your recollection?  Do you think that's right?
19     A   Yeah, I think that's -- it sounds right
20 I think.
21     Q   All right.  So let me -- I want to
22 switch gears a little bit and talk about trades.
23 So your testimony earlier is that you helped design
24 some of Long Leaf's trades, is that right?

Page 71

1      A   Yeah, that was towards the end of my
2  tenure.
3      Q   Got it.  And when did that start, please.
4      A   I can't give you -- I can give you
5  an estimate.  I think I said summer of 2019.
6      Q   Is it fair to say that while you
7  were working at Long Leaf Trading you received
8  complaints from customers that they were losing
9  money?
10     A   Yeah, sometimes.
11     Q   Is it fair to say you received those
12 complaints on a regular basis?
13     A   No, it's not fair.
14     Q   How many customer complaints do
15 you think that you received about customers losing
16 money or complaining about their account value?
17     A   To me personally?
18     Q   Yeah.
19     A   I think there was about four guys that
20 gave me trouble.
21     Q   What do you mean by trouble?
22     A   Talking to me every day.
23     Q   And what did they talk about?
24     A   How's my -- why's my net liq dropping,

Page 72

1  what's going on, stuff like that.
2      Q   What did you tell them?
3      A   I don't really recall.  I mean, I would
4  try to, first of all, calm them down and tell
5  them that, you know, these are option positions,
6  these are debit positions.  We have a lot of time
7  on them, you know, over a month or two.  So let them
8  materialize and we're going to try to exit at the
9  best point of your best interests.
10     Q   So is that usually what you would tell
11 clients if they complained about net liq being down?
12     A   Yeah, primarily.
13     Q   So if a customer calls and they're
14 saying I'm losing money, you would tell them we
15 have open positions, you know, wait and see how it
16 turns out?
17     A   No.  I mean, not like that.  You've
18 got to -- we gave them a fundamental breakdown,
19 a technical breakdown on what was going on in the
20 market, what we were trading, how much time was left
21 on the option position.  I mean, there's a lot of
22 different catalysts, you know, different variables
23 with that.
24         MR. BURDEN:  All right.  You guys,

Page 73

1  we're going to switch now and talk about --
2      Q    You know what, before we do that, did
3  you ever talk to Mr. Donelson about how customer
4  accounts were performing?
5      A    Yes.
6      Q    All right.  Did you have those
7  conversations regularly or maybe just a few of them?
8      A    I would say it was quite often.
9      Q    All right.  Like on a weekly basis?
10     A    I would say more than that, more frequently
11 than that.
12     Q    And did Mr. --
13     A    Probably on a daily basis, actually.
14     Q    All right.  So, I mean, on a daily
15 basis, was this like a meeting or would you just
16 talk to him?
17     A    I sat across from him, so really close
18 with him.  We would talk back and forth -- and this
19 is towards the end of my tenure at Long Leaf, again,
20 yeah.  If I saw the net liq going down dramatically,
21 then I would question Jim, yeah.
22     Q    Did Mr. Donelson ever express to you
23 that customer accounts were losing money?  Did he
24 ever say that to you?

Page 74

1      A    Did he ever say that word for word, that
2  they were losing money?
3      Q    Not word for word.  I mean, did
4  Mr. Donelson and you ever discuss how customer
5  accounts were not profitable?
6      A    Yeah.  I mean, but there were still
7  positions on, you know.  He never said they were
8  not profitable but he said, you know -- I would
9  just question him and he'd say, well, we're trying
10 to do four of these positions and, you know, they're
11 losing positions.  Some of them are underwater.
12 This is what we're trying to do.
13     Q    All right.  Did you ever press Mr. Donelson
14 and ask, you know, why are customers losing money?
15     A    I pressed him towards the end, like
16 really, really at the end.  But he just was calm and
17 I couldn't understand it, to be honest.
18     Q    Well, what did you say to him?
19     A    I would just repeatedly ask him until --
20 I would just repeatedly ask him, you know.  I would
21 ask him the same questions over and over again, like
22 what are we going to do with these, what should
23 I tell, you know, customers, things like that.
24     Q    So you asked Mr. Donelson what

Page 75

1  am I going to tell customers?  That's one of the
2  things you asked him?
3      A    Yeah.
4      Q    What did he tell you?
5      A    The same thing I was telling you.
6  We have open positions on, have to let them
7  materialize.  And whatever was going on with the
8  market at that point, whatever market we were in,
9  if there was big catalysts coming up, like crop
10 reports or Trump meeting with President Xi, that
11 could affect the markets, FOMC meetings.  Just so
12 many different variables.
13     Q    Got it.  So is it fair to say that
14 through 2019 you understood that customer accounts
15 were losing money across the board?
16     A    Towards the end, like all the way towards
17 the end.
18     Q    When was that, please.
19     A    Like winter of 2019.
20     Q    And your testimony is that before winter
21 of 2019 you had no idea that all the customers were
22 losing money?
23     A    Right.
24     Q    Is that what you're telling me?

Page 76

1      A    Right.
2      Q    Even though you're getting statements
3  every day?
4      A    Right.
5      Q    That doesn't make a lot of sense to
6  me.  Can you reconcile that?  How can this have
7  been news to you?  How could you have first learned
8  in December of 2019 that all the accounts were
9  losing money when you were getting daily statements
10 for your clients?
11         MR. FALVEY:  Objection, argumentative,
12 compound, et cetera.  Go ahead.
13     A    Yeah.  So, sorry, can you ask the question
14 again?
15 BY MR. BURDEN:
16     Q    Yeah, sure.  So you're getting statements
17 for your clients every day, right?
18     A    Right.
19     Q    So how can it have been a surprise
20 to you in December of 2019 that all of the customer
21 accounts were down?
22     A    I thought you meant like they lost
23 money, like they're out, like I closed an account,
24 they're done, it's official, they've lost money.

Page 77

1  I understood that obviously the net liq's going
2  down, but I wouldn't say they lost it. They were
3  losing and sometimes they'd come back up, you know.
4  It's big swings, especially with options on futures,
5  especially debit spreads.
6     Q   So it sounds like in your mind a customer
7  doesn't lose money until like the account's
8  completely closed, right?
9     A   Yes.
10    Q   But there were a bunch of accounts
11 at Long Leaf that were completely closed, right?
12    A   I'm not aware. I'm not sure.
13    Q   Were any of your customers' accounts
14 completely closed during the time you were there?
15    A   The inherited ones, yeah.
16    Q   All right. And how many of those got
17 closed?
18    A   I don't know an exact number. I don't
19 know, maybe four. I don't know.
20    Q   So those were customers that lost
21 substantially all their money, right?
22    A   Yeah, that was primarily with Tim Evans.
23    Q   But they were your customers, weren't they?
24    A   I inherited them, yeah, and they closed

Page 78

1  their account right after I inherited it. I didn't
2  even have a chance.
3     Q   Yeah, and you inherited them in summer
4  of 2018. That's your testimony, right?
5     A   Summer of 2018, yeah.
6     Q   All right. So that was when Donelson
7  was in charge, wasn't it?
8     A   That's when he started putting the
9  strategy -- implementing the strategy, yeah.
10    Q   Got it. So you had seen at least four
11 of your customers lose all of their money at Long
12 Leaf, correct?
13    A   Yeah, but you're acting like I made them
14 lose money.
15    Q   Now --
16    A   You're acting like I knew they lost
17 money before then. I was assigned their account
18 that was depleted when I got their account. That
19 was the first time I was aware of it.
20    Q   Right. And after you got more customer
21 accounts and you learned to read and understand
22 their statements, you saw the accounts decline
23 steadily in value, particularly through 2019,
24 isn't that right?

Page 79

1     A   I saw them decline. Sometimes I saw them
2  increase a lot too.
3     Q   Well, what months did they increase a lot?
4     A   I don't know. I need to see the record.
5  I need to see -- but I know for a fact they were.
6     Q   Yeah, there were a couple of months where
7  customers were up, isn't that right?
8     A   Yeah, that's correct, yes.
9     Q   Yeah. But most of the months customers
10 were way down, isn't that right?
11    A   I don't know.
12    Q   Well, you should know because you got the
13 statements every day, didn't you?
14       MR. FALVEY: Objection.
15    A   That was so long ago.
16 BY MR. BURDEN:
17    Q   It was December of 2019.
18    A   December 2019, yeah, that's when they
19 lost -- they lost -- that's when they closed shop.
20 That's when the positions went big time loss, yeah.
21    Q   All right. So we've done enough with
22 this. Let's move on to some recorded calls.
23    A   All right.
24    Q   Here goes nothing.

Page 80

1        MR. BURDEN: I'm going to try to play
2  this to you guys and we'll see if it works.
3  All right. Can you guys see this dashboard?
4        MR. FALVEY: Yes. Sorry, you should
5  answer.
6     A   Yes.
7        MR. BURDEN: All right. I want
8  to show you what I'm marking for the record
9  as CFTC Exhibit 183. This is a recorded call
10 produced to us by Long Leaf Trading between
11 James Hatzigiannis and customer Patrick
12 Campbell. At least that's what the metadata
13 reflects. It's dated in the metadata May 23,
14 2018. So let's give it a listen, and I'm going
15 to start it at -- you know, I'll start it at
16 7:34, but we're going to listen for a little
17 bit.
18       (Whereupon the recording was played.)
19       MR. BURDEN: All right. You guys
20 are shaking your heads. Can you hear this?
21       MR. FALVEY: It's really hard to hear.
22 I just turned it up a little bit if you want
23 to try it again. I don't know if you can turn
24 it up on your side a little.

Page 81

1     MR. BURDEN:  Yeah, I can't control the
2  volume on your side.
3     MR. FALVEY:  Okay.
4     MR. BURDEN:  Yeah, this works pretty
5  well in person but not maybe over the, you
6  know, not maybe over the -- over the web.
7  All right.  Well, I'll tell you what.  Maybe
8  we don't need to play it right now anyway.
9  Could you guys go to your PDF portfolio, please,
10  and turn to CFTC Exhibit 189.
11     MR. FALVEY:  Yep.
12     MR. BURDEN:  And let me know when you're
13  there, please.
14     MR. FALVEY:  Sure.  Okay, we have it.
15  BY MR. BURDEN:
16     Q   Great.  So, Mr. Hatzigiannis, would
17  you take a look at this exhibit, please, and tell
18  me if you recognize it.
19     A   Yeah, I recognize it.
20     Q   All right.  Can you tell me what
21  Exhibit 189 is, please.
22     A   Yeah.  It's a bunch of ideas that
23  I put together, or all of us put together, shared
24  documents, basically talking points for the demo

Page 82

1  presentation.  It's basically ideas, yeah, basically
2  ideas for the demo presentation.
3     Q   Okay.  So the title of the file is
4  New Demo Script.  So was this a script that you used
5  in your demo presentations?
6     A   No.
7     Q   So what script did you use?
8     A   The one that was approved, not this one.
9     Q   Got it.  All right.  So your --
10  this draft here we see in Exhibit 189, was this
11  incorporated into the approved version or what was
12  this?
13     A   No.  This was -- so, you know,
14  I read that script a lot and I basically made
15  my own version of talking points from that script
16  for the demo because I didn't read it word for word
17  over time, you know.  It was basically what I was
18  comfortable with saying and -- but it wasn't a
19  script.  It's just, you know, something I was
20  helping out the other brokers with.
21     Q   So that they could sort of have your
22  CliffsNotes for the script?
23     A   Yeah, something like that, yeah.
24     Q   Got it.  All right.  So let's look at

Page 83

1  page 2 of Exhibit 189.
2     A   Okay, got it.
3     Q   And one of the things it says here
4  is, "We utilize our option strategies with defined
5  risk to generate consistent income month over month
6  for our clients no matter the market movement."
7  Did you come up with this or was this in the
8  original script?
9     A   That was in the original script.
10     Q   All right.  Is that something that
11  you said to prospective customers on your calls?
12     A   I don't remember, to be honest.
13     Q   All right.  Let's turn to page 4, if we
14  could, please.
15     A   Okay.
16     Q   You know what, I'll tell you what.
17  Let's not worry about that.
18     MR. BURDEN:  I want to go off the
19  record because I think just playing this
20  call is going to be a lot better and easier
21  than fumbling through these scripts, so I'm
22  sure we can get some speakers in here.  So off
23  the record, please, for ten minutes.
24     MR. FALVEY:  All right.

Page 84

1     MR. BURDEN:  Thanks.
2     (Whereupon a recess was taken from
3     11:30 a.m., to 11:47 a.m., after
4     which the following proceedings
5     were had:)
6     MR. BURDEN:  All right.  Could we go back
7  on the record, please.
8     MR. FALVEY:  Yeah.
9     MR. BURDEN:  All right.  So I want
10  to play a recorded call.  I have marked it
11  as CFTC Exhibit 183.  It's a call Long Leaf
12  produced between Mr. Hatzigiannis and customer
13  Patrick Campbell, and the call is in the
14  metadata marked as having occurred on May 23,
15  2018.  So I'm starting it here around seven
16  minutes, and we're going to listen for a
17  little bit.
18     (Whereupon the recording was played.)
19     MR. BURDEN:  All right.  So I'm going
20  to stop it there at 8:02.
21     Q   So, Mr. Hatzigiannis, is that you on the
22  call?
23     A   Yes.
24     Q   All right.  So I want to talk about

Page 85

1   this statement you make on the call that Long
2   Leaf utilizes option strategies with defined risk
3   to generate that consistent income month over month.
4   Is that something you said on substantially all of
5   your calls with customers?
6       A   I don't remember.
7       Q   Is it something that was part of the
8   script you followed?
9       A   I believe so.
10      Q   All right.  And did you continue
11  to follow that script while Donelson was in charge
12  of Long Leaf Trading?
13      A   Which -- is this a demo?
14      Q   I couldn't say.
15      A   Okay.  It seems like it was a demo, to my
16  knowledge.  I was not reading a script at that time.
17  So that was all me, but yeah.
18      Q   Okay.  Well, you say here in the call
19  we listened to that Long Leaf Trading utilizes
20  option strategies with defined risk to generate
21  that consistent income month over month.  How did
22  you know to say that?  Like where did you get that
23  idea from to say that?
24      A   That's what I was led to believe and

Page 86

1   taught to say --
2       Q   All right.  And who told you to say --
3       A   -- by Tim Evans.  Tim Evans.
4       Q   All right.  Now, this call occurred
5   in May of 2018 and Donelson was in charge at that
6   time, wasn't he?
7       A   Yes.
8       Q   All right.  So during Donelson's
9   tenure did you continue to tell customers that
10  Long Leaf generated consistent income month over
11  month?
12      A   I don't remember.
13      Q   All right.  Were there any customers
14  you're aware of who did enjoy consistent income
15  month over month from Long Leaf Trading?
16      A   Was there customers who would generate --
17  got consistent income, is that what you're asking?
18      Q   Yeah.
19      A   Not to my knowledge, no.
20      Q   All right.  Let's keep listening, if we
21  could, please.
22          MR. MAY:  Ashley, where are you picking
23  up from?
24          MR. BURDEN:  I'll tell you in just

Page 87

1   a moment.
2       MR. MAY:  Sure.
3       MR. BURDEN:  All right.  So I'm going
4   to pick it up here a little bit further in at
5   approximately ten minutes in, ten minutes and
6   four seconds or so.
7       (Whereupon the recording was played.)
8       MR. BURDEN:  All right.  I'm going to stop
9   it there at 11 minutes in.
10      Q   Mr. Hatzigiannis, this statement
11  you're making to the customer, and I'm paraphrasing,
12  that 76.5 percent of all options expire worthless
13  according its the CME and that's what Long Leaf is
14  basing its strategy on, how did you know to say
15  that?  Where did that come from?
16      A   Tim Evans.  It was part of a demo script.
17      Q   All right.  And did you -- sorry?
18      A   Yeah.  I mean, that's what Tim -- Tim was
19  very -- emphasized that a lot.
20      Q   All right.  And did you continue to
21  say that to customers during Donelson's tenure?
22      A   No, I stopped using it after that.
23      Q   Well, this call is dated May 23, 2018
24  and we just heard you say that 76.5 percent of

Page 88

1   options expire worthless and that's what Long Leaf
2   bases its strategy on, right?
3       A   Yeah, he must have implemented to take
4   that out after I had this conversation.
5       Q   Okay.  So at some point that came out
6   of the presentation?
7       A   Right.
8       Q   Do you remember when that was?
9       A   I don't.  Not exactly, no.
10      Q   Well, was it like in 2019 do you think
11  or 2018?
12      A   It could have been like right after that
13  call, to be honest.
14      Q   Do you know if it was?
15      A   I don't know.  I can't tell you.
16      Q   So before that time, this 76.5 percent
17  statistic, did you say that to substantially all
18  of the customers you talked to?
19      A   Yes.
20      Q   So did 76.5 percent of all of Long Leaf's
21  trades make money for customers?
22      A   That's tough to say, but I believe that
23  they didn't.
24      Q   Did not?

Page 89

1      A   I don't know.  I don't know.
2      Q   Well, substantially all of them lost
3  money, so is it fair to assume that 76.5 percent
4  of the trades were not profitable?
5      A   I don't know.
6          MR. BURDEN:  All right.  Let's pick
7  this right back up at 11 minutes.
8          (Whereupon the recording was played.)
9          MR. BURDEN:  All right.  So let me stop
10  that there at 11:50.
11     Q   So this statement you make here,
12  Mr. Hatzigiannis, that Long Leaf measures its
13  success based on its clients' success and Long
14  Leaf wouldn't able to manage millions of dollars
15  and work with all these customers if they weren't
16  being profitable for them, you know, how did you
17  know to say that?
18     A   That's what I was taught to say.
19     Q   By whom?
20     A   Tim Evans.
21     Q   And you continued saying that to customers
22  during Donelson's tenure, isn't that right?
23     A   No.  I mean, at that point I did.
24     Q   When did you -- yeah.

Page 90

1      A   I would have stopped, like I said,
2  after that call, but I remember Jim scrapping that
3  at some point.
4      Q   Do you remember what point that was?
5      A   To be honest, I thought it was earlier
6  than this call, but I guess not.  I don't know the
7  exact date, so I don't know.
8      Q   What -- so did Mr. Donelson tell you to
9  stop telling people, you know, that clients were
10  profitable in this manner?
11     A   I don't know.
12     Q   Is there any evidence of that?  Like
13  did he send that to you in emails?  Did he say don't
14  use that old script?
15     A   I'm not sure.
16     Q   All right.  And this business about
17  bringing a strong return for clients and measuring
18  success based on clients' success and that Long
19  Leaf wouldn't be able to work with clients and
20  manage millions of dollars if they weren't being
21  profitable, you said that to substantially all
22  of the people that you talked to, at least through
23  May of 2018, is that right?
24     A   Right.

Page 91

1      Q   All right.  What reason did you have
2  to believe that that was true?  It seems like you
3  knew that it wasn't.
4      A   No, that was -- that's what I believed.
5  That's what I was taught and that's --
6      Q   Who told you that?
7      A   Tim Evans.
8      Q   What did he say to you?
9      A   He said stick to the script.
10     Q   All right.  Did Mr. Evans tell you that
11  all of the customers were making money?
12     A   No.
13     Q   Did Mr. Evans tell you that customers
14  were being profitable?
15     A   No, he didn't.
16     Q   So Mr. Evans gave you this script and
17  you read the script, right?
18     A   Right.
19     Q   And that's what he told you to do?
20     A   Right.
21     Q   And you continued to follow this
22  script at least until May of 2018 because that's
23  what we're listening to here, correct?
24     A   Right.

Page 92

1      Q   All right.  So I feel a bit bad.
2  I've got to bust your chops here.  But, you know,
3  why did you do that?  By May of 2018 we've already
4  established you were reading and understanding
5  customer statements.  You had certainly been
6  receiving them.  It doesn't seem like you had
7  any basis to tell customers that.  So why did
8  you do it?
9          MR. FALVEY:  Objection, argumentative.
10  Go ahead.
11     A   Because I wanted to keep my job.
12  BY MR. BURDEN:
13     Q   Even though you knew that these statements
14  were wrong?
15     A   The statements were wrong?
16         MR. FALVEY:  Objection, mischaracterizes
17  testimony.  Go ahead.
18     A   What do you mean the statements were
19  wrong?
20  BY MR. BURDEN:
21     Q   Well, Long Leaf Trading's recommendations
22  to clients were not profitable, were they?
23     A   Some of the trades were profitable, some
24  of them were not.

Page 93

1    Q    But overall the clients lost money,
2  95 percent of it, correct?
3    A    Again, I don't know.
4    Q    So you don't know, but you're telling
5  customers that you wouldn't be able to work with
6  all these clients unless they were being profitable.
7  We just heard you say that, right?
8    A    Right.
9    Q    But it doesn't sound like you had any
10  basis to say this.  It sounds like you didn't really
11  know if customers were doing well or not, is that
12  fair to say?
13    A    That's fair to say.
14    MR. BURDEN:  All right.  Let's keep
15    listening to this call.  All right.  I'm going
16    to skip some of this for the sake of brevity,
17    and I'm going to move on to 35:22.
18    (Whereupon the recording was played.)
19    MR. BURDEN:  All right.  I want to stop
20    it there at 36:13.
21    Q    So, Mr. Hatzigiannis, this thing
22  you're saying that you'd like for Mr. Campbell
23  to give some thought to the return he would want,
24  20 -- you know, 10, 15, 20, 30 percent, how did you

Page 94

1  know to say that?
2    A    It was in the script.
3    Q    All right.  And you continued to tell
4  this to substantially all of your customers at least
5  through May of 2018, correct?
6    A    Right.
7    Q    Is there any client at Long Leaf who
8  successfully got the 10 percent returns that you're
9  aware of?
10    A    That closed?  No, I'm not.  I'm not aware.
11    Q    15 percent?
12    A    I'm sorry?
13    Q    Are you aware of any clients of Long
14  Leaf that enjoyed a 15 percent return on their
15  investments?
16    A    No.
17    Q    20 percent?
18    MR. FALVEY:  No, you're not aware or --
19    A    No, I'm not aware.
20    MR. FALVEY:  Not aware.
21  BY MR. BURDEN:
22    Q    All right.  And certainly you're not aware
23  of any customer of Long Leaf who got 30 percent
24  return, correct?

Page 95

1    A    Right.
2    Q    All right.  So -- sorry, give me
3  just a moment here.  All right.  So let me ask
4  you this, Mr. Hatzigiannis.  Why did you say this
5  to customers?  Why did you ask customers to tell
6  you what return they want so you can show them how
7  you'd target it?
8    A    That was in the script.
9    MR. BURDEN:  All right.  I'm going
10    to do one more bit from this, and we're going
11    to start it at approximately 16 minutes in.
12    (Whereupon the recording was played.)
13    MR. BURDEN:  All right.  So I'm going to
14    stop it there at 18 minutes.
15    Q    So, Mr. Hatzigiannis, this piece in
16  the presentation where you talk about how 90 percent
17  of, you know, individual traders lose money and Long
18  Leaf has a better way, is that something you said
19  to substantially all the customers you talked to,
20  at least through May of 2018?
21    A    Yes.
22    Q    All right.  And why did you say that?
23    A    In the script.
24    Q    All right.  So when -- Mr. Donelson

Page 96

1  took over in December of 2018, is that right?
2    A    I think it was January 2018.
3    Q    Okay.  So when Mr. Donelson took over,
4  and you're right, in January of 2018, did he give
5  you like new scripts or new presentations to use?
6    A    Over time he -- yeah, he gave us --
7    Q    Okay.
8    A    -- over time.
9    Q    All right.  When did -- what I want
10  to try to do, Mr. Hatzigiannis, is figure out,
11  you know, how long you used the old script, when
12  the new ones came in.  So I'm going to press you
13  on dates and we're going to look at some emails.
14  So with that sort of roadmap in mind, let me start
15  over a little bit and ask, you know, when
16  Mr. Donelson took over in January of 2018, in that
17  month did he give you any new scripts or promotional
18  materials to follow?
19    A    No.
20    Q    All right.  And for a while anyway,
21  and I'll ask you for how long, you just continued
22  saying the same things from the scripts you used
23  under Evans, is that right?
24    A    Right.

Page 97

1    Q    And at some point you testified
2    Mr. Donelson gave you a new script, is that right?
3    A    It wasn't a new script.  It was --
4    basically it was no script.  Like I said, he
5    implemented a different strategy, so it wasn't
6    really scripted at that time when we actually
7    put that strategy out there.  It was more of a
8    conversation almost.
9    Q    Well, when was that?
10   A    It had to be after December 2018.
11       MR. FALVEY:  December?
12       THE WITNESS:  Yeah.
13   BY MR. BURDEN:
14   Q    So as far as you can recall, before
15   December of 2018 you were just using that same
16   script that Evans had given you?
17   A    Yes.
18   Q    And basically saying the same stuff to
19   customers that we heard in Exhibit 183?
20   A    Yes.
21   Q    All right.  So I want to talk
22   a little bit more about Exhibit 183, and I won't
23   torture you with listening to it more.  But you're
24   talking to a customer named Patrick Campbell, right?

Page 98

1    A    Right.
2    Q    Patrick Campbell sounds old.  Was Patrick
3    Campbell old?
4    A    I mean, he was old but he was a sharp,
5    sharp guy.  He actually came in --
6    Q    Yeah.
7    A    He knows his stuff.  He came in to
8    visit me.  We had a good relationship.  He was old,
9    but he was still very sharp.
10   Q    Got it.  So how much money did Patrick
11   Campbell lose?
12   A    No idea.
13   Q    It sounds like you had a great
14   relationship.  Now, Mr. Campbell, how old do you
15   think he was, if you knew?
16   A    What was that?
17       MR. FALVEY:  How old?
18   BY MR. BURDEN:
19   Q    How old was Mr. Campbell?
20   A    I never saw him.
21   Q    Is it fair to say that a lot of your
22   customers were older, 65 or older?
23   A    65 or older?
24   Q    Yeah.

Page 99

1    A    Yeah, that's fair.
2    Q    All right.  And is it fair to say too
3    that your customers were investing their retirement
4    money with Long Leaf Trading?
5    A    No, that's not fair to say.
6    Q    What money -- well, let me ask you
7    a different way.  So is it fair to say that Long
8    Leaf Trading solicited customers to invest their
9    IRA funds?
10   A    If that's a route they wanted to go,
11   that was available, yes.
12   Q    All right.  Well, I'm asking you.
13   Did your customers invest their IRA funds with
14   Long Leaf Trading?
15   A    Some of them did, yes.
16   Q    Okay.  What percentage would you say
17   invested IRA funds --
18   A    I don't know.
19   Q    -- of your customers?
20   A    I don't know.
21   Q    Was it most of them?
22   A    No.
23   Q    Was it half of them?
24   A    I don't know.

Page 100

1    Q    All right.  Would you turn for me,
2    please, to CFTC Exhibit 184, and this is in your --
3    A    Yeah.
4    Q    -- PDF portfolio.
5    A    Yep.
6    Q    All right.  Can you take a moment to
7    look over the document, please, and then tell me
8    if you recognize it.
9    A    Yeah, I know what it is.
10   Q    What is it, please.
11   A    It's an orientation I -- kind of
12   ideas I put in my head but, you know, I typed it
13   out before a call.  This was my first orientation
14   I ever did with any client, so I wanted to get all
15   my ideas together and, you know, prepare for the
16   call.
17   Q    And what was the name of the client
18   you spoke to?
19   A    Marc Sola-Cruz.
20   Q    All right.  And it looks like you're
21   sending this document titled Orientation to Brian
22   Adams, is that right?
23   A    It says Connor Campo.
24   Q    Yeah.  Are you looking at the right one?

Page 101

1  I'm looking at 184.
2      A   Yeah, 184.  Oh, I see Brian Adams.
3  Yeah, sorry.
4      Q   There you go.  That's all right.  Who's
5  Brian Adams, please.
6      A   Brian Adams was almost like the sales
7  manager there.
8      Q   So why did you send Mr. Adams this
9  orientation script, as it says in the subject line?
10     A   He wanted it.  I showed it to him and
11 he liked it, and I sent it to him and that's it.
12     Q   All right.  So this orientation
13 script we're seeing in Exhibit 184, did you say
14 the things in this script to Mr. Sola-Cruz?
15     A   I would think I said most of it.  I don't
16 know.
17     Q   All right.  So -- well, we'll play
18 that call another time.  So let's go down to the
19 second page of Exhibit 184 here and you'll see
20 there's a paragraph and it says, "Now, the only
21 way I've seen people lose money in this program
22 is when they bring emotions into the process.
23 They are skewing the results that the program
24 was built around."  So is this something you said

Page 102

1  to customers?
2      A   I said that to Marc Sola-Cruz, yeah.
3      Q   Did you say it to anybody else?
4      A   Not that I remember.  I don't think so.
5      Q   So did you come up with this?
6      A   No.
7      Q   Who came up with this?
8      A   Tim Evans.
9      Q   All right.  Is it true that the only
10 way you've seen people lose money with this program
11 is when they bring emotions into the process?
12     A   No.
13     Q   Why did you say it?
14     A   That's what I was told to say.
15     Q   So let's go down, if we could, please --
16     A   Yeah.
17     Q   -- and you say, "There are going to be
18 bumps in the road."  This is the second sentence on
19 page 2 in the --
20     A   What paragraph?
21     Q   Sorry, this is a mess.  It was my
22 fault.  So Exhibit 184, page 2, fifth paragraph
23 down.  And the one I'm looking at the paragraph
24 reads, "So remember we are obviously not going to

Page 103

1  win all 48 trades in this upcoming year.  There are
2  going to be so bumps in the road."
3      A   Yeah, I see that.
4      Q   "So I cannot stress this enough.
5  In order for you to have success in this program,
6  which means you are making money, you are going to
7  have to stick to the plan that we have developed
8  over the years by us and that has proven to make
9  our clients money."
10     A   Right.
11     Q   So did you write that?
12     A   Did I what?
13     Q   Did you write that?
14     A   I wrote that, yeah.
15     Q   All right.  So is that something you said
16 to Mr. Sola-Cruz?
17     A   I don't remember.
18     Q   Is that something you said to other
19 customers?
20     A   I don't remember.
21     Q   Is this statement true?
22     A   I'm not -- I don't think so, no, no.
23     Q   Why did you say it?  Or, you know,
24 I guess you didn't testify you said it.  Why did

Page 104

1  you include this in your script?
2      A   That's what I was -- believed,
3  led to believe.  That's what I was trained to say.
4      Q   All right.  So let's shift down
5  this Exhibit 184, and I'm looking here at page 4,
6  and it looks like you're forwarding this script to
7  Connor Campo.  Is that what you're doing?
8      A   Yes.
9      Q   And you sent this to Mr. Campo so he could
10 use it, right?
11     A   No.
12     Q   Why did you send it to him?
13     A   I sent it to him because he looked
14 over it too and he wanted to, you know, make his
15 own -- or write his own ideas, take some of it,
16 things like that.
17     Q   It's a collaborative work environment
18 it sounds like with respect to the drafting of
19 promotional materials, is that correct?
20         MR. FALVEY:  Object.
21         MR. BURDEN:  Are you going to object
22 to something in particular, Mr. Falvey, or are
23 you just going to say object?
24         MR. FALVEY:  No, I will.

Page 105

1      MR. BURDEN:  No?  All right.
2      MR. FALVEY:  I'm sorry.  I didn't hear
3   what you said, Ashley.
4   BY MR. BURDEN:
5      Q   Let's turn to Exhibit 185, if we could,
6   please.
7      MR. FALVEY:  185, there you go.
8   BY MR. BURDEN:
9      Q   All right.  Mr. Hatzigiannis, look this
10  over, if you would, please, and then tell me if you
11  recognize it.
12     A   Yeah, I recognize it.
13     Q   Can you tell me what it is, please.
14     A   The custom script.
15     Q   All right.  And this is from Brian Adams
16  to you and it's dated March 15, 2018, is that right?
17     A   That's what it says.
18     Q   All right.  So it's attaching this
19  document titled Custom Script.  Did you use this
20  script?
21     A   Yes.
22     Q   All right.  Now, I want to scoot down
23  here a little.  Sorry.  Give me just a minute to
24  find what I'm looking for here.  All right.  So this

Page 106

1   Exhibit 185, when Mr. Adams sent this to you, that
2   was after Donelson had taken over, is that right?
3      A   Right.
4      Q   All right.  And this is a script that you
5   used with customers, correct?
6      A   Yes.
7      Q   All right.  And did you follow the script
8   closely?
9      A   Yeah.
10     Q   All right.  So I want you to -- all
11  right.  I want you to go down to the presentation
12  page.  It's page 12 and at the top it says Review
13  Customized Variables No. 1 through 4 with Asset
14  Weight & Risk to Reward.
15     A   Do you know what number that is?
16  I see -- on page 12 I see 20, Establish 30 Days
17  is the Optimal Time Frame.  Oh, I see.  Page 11?
18     Q   No, no, it's page 26.  So the page
19  for this presentation is in the bottom right-hand
20  corner.
21     A   Gotcha.  Yeah, I see it.
22     Q   All right.  So let's go to the bottom of
23  that page.  So it says Creating Image of Portfolio
24  and it says, "So flowing that math over those four

Page 107

1   assets, on the three you can expect to be right
2   in the long run would generate $1500 and the one
3   you're wrong losing" -- you know what, I'm screwing
4   this up.  Let's have you do it.  So this was a
5   presentation you delivered to clients, correct?
6      A   Yes.
7      Q   All right.  So this bit from page 26
8   to 27, how would you present this to a client?  How
9   did you present it to clients, please.
10     A   Just read it.
11     Q   And you just read it straight, even though
12  it makes almost no sense?
13     MR. FALVEY:  Do you know what's on 27?
14     A   Yeah, I just read it.
15  BY MR. BURDEN:
16     Q   Okay.  Well, I'll tell you what.  Let's
17  look at the first paragraph on page 27.  It says,
18  "Continue the income-generating process.  You carry
19  that on for a year, you're looking at $6,000, which
20  is a 6 percent return.  Obviously these positions
21  are scaleable, so it's very easy to duplicate that
22  to accomplish the 12 percent on an annual basis."
23  Did you say that to customers?
24     A   Yes.

Page 108

1      Q   Did you say it to substantially all of
2   the customers you talked to?
3      A   Yes.
4      Q   During what period of time were you
5   making this particular representation to clients
6   about the 6 percent, 12 percent?
7      A   When I started reading the custom to
8   probably, yeah, almost a year.
9      Q   All right.  So really through 2018 and
10  then 2019 you stopped this 6 percent, 12 percent
11  bit, is that your testimony?
12     A   Yes.
13     Q   All right.  So were there any customers
14  at Long Leaf that you can name for me who enjoyed
15  a 6 percent return?
16     A   I just know Gary Taft.
17     Q   What was his return?
18     A   I don't know exactly.
19     Q   And your testimony was he traded for four
20  to six months, correct?
21     A   Somewhere around there, yeah.
22     Q   All right.  So this says, "Continue
23  the income-generating process.  You carry that
24  on for a year, you're looking at $6,000, which is

Page 109

1  a 6 percent return." So did you have any customers
2  that traded for a year who got 6 percent?
3     A  No.
4     Q  Any who got 12 percent?
5     A  Nope.
6     Q  So this statement is false?
7     A  Yeah. I mean, it's not saying we're doing
8  it but, yeah, it's false.
9     Q  Why did you say it?
10    A  Script.
11       MR. FALVEY: Objection, argumentative.
12    A  Tim Evans told me to say it.
13 BY MR. BURDEN:
14    Q  But this was in a script that you
15 received when Donelson was the boss, isn't that
16 right?
17    A  I mean, Tim gave me this script.
18    Q  Well, it looks like Mr. Adams sent you
19 this particular script, isn't that right?
20    A  Yeah, while working with Tim Evans, yes.
21    Q  But this script was sent to you in March
22 of 2018, isn't that right?
23    A  Right. Tim created the script.
24    Q  But Tim was gone by March, wasn't he?

Page 110

1     A  Yeah, but this script is very old. Very
2  old script.
3     Q  Oh, I see. So this is an older script
4  that was re-sent to you in --
5     A  Right.
6     Q  -- March of 2018?
7     A  Right.
8     Q  And you continued using it through the
9  end of 2018 at least, right?
10    A  Right.
11    Q  All right. Let's look at 186, if
12 you would, please. And this is a group exhibit
13 consisting of three emails.
14    A  Okay.
15    Q  I want you to take a look at it, if you
16 would, please, and then tell me if you recognize it.
17       MR. FALVEY: Make sure you read it.
18    A  Yeah, I recognize it.
19 BY MR. BURDEN:
20    Q  All right. Could you tell me what
21 the emails in -- well, tell me what 186 is, please.
22    A  It looks like a wife rebuttal.
23    Q  What's the wife rebuttal?
24    A  If someone brings up, hey, I've got

Page 111

1  to speak to my wife, you know, how to effectively
2  reply to that.
3     Q  And it looks like you've got a couple
4  wife rebuttals. You've got one from June of 2018.
5  You sent that to yourself, right?
6     A  Yeah.
7     Q  Is this something that you had occasion
8  to use?
9     A  I'm sorry?
10    Q  Is this wife rebuttal that we see
11 on the first page of Exhibit 186 something you
12 actually used?
13    A  I didn't use it word for word, but I would
14 assume I used it at some point.
15    Q  Do you remember if it worked?
16    A  Do I remember if it worked?
17    Q  Yeah.
18    A  I'm not sure.
19    A  It wouldn't have worked on my wife.
20 So let's look at the --
21    A  Nice.
22    Q  Yeah. -- the second page here,
23 and this is an email from you, again, to you from
24 June of 2018 and it's Wife Rebuttal 2. What's Wife

Page 112

1  Rebuttal 2?
2     A  This is the second wife rebuttal. Exactly
3  how it looks like, exactly how --
4     Q  Okay. So -- and if you go to the third
5  page of Exhibit 186, what's going on here, please.
6     A  It looks like I sent it to that Connor
7  Campo.
8     Q  So let me ask you this. Is this
9  something that you sort of thought of, this wife
10 rebuttal, or where did this come from, please.
11    A  I must have gotten it multiple
12 times from prospects and didn't have a good reply,
13 so I researched it and figured out different ways
14 salesmen handle it.
15    Q  So why do you need a wife rebuttal?
16    A  Why do you need a wife rebuttal?
17    Q  Yeah.
18    A  I mean, what are you supposed to say,
19 just yes, okay? You need a rebuttal. I mean, this
20 is a sales career. I'm trying to be the best --
21    Q  So I --
22    A  -- and just trying to handle it.
23    Q  Sorry. I can hear you're -- maybe
24 I think my question was not that good. You know,

Page 113

1  so what I'm getting at is, you know, the purpose
2  of the wife rebuttal is if a customer or a prospect
3  says I don't know or I have to talk to my wife or,
4  you know, let me get my wife on the phone, the wife
5  rebuttal is a way to sort of avoid that?
6      A   No, it's not to avoid it.  It's just,
7  you know, a professional way to handle it instead
8  of saying okay.
9      Q   Well, why don't you just say okay?
10     A   I don't think that's effective.
11     Q   Effective for what?
12     A   Effective way of handling the rebuttal.
13         MR. BURDEN:  Sorry.  I'm -- give me
14  a few minutes, please.  I'm just looking --
15  I think I can skip some exhibits here.
16         MR. FALVEY:  Sure.
17  BY MR. BURDEN:
18     Q   All right.  Let's turn, if we could,
19  please, to CFTC Exhibit 190.  Mr. Hatzigiannis,
20  you've got it?
21     A   Yeah.
22         MR. FALVEY:  Yeah.
23  BY MR. BURDEN:
24     Q   All right.  Take a look at it, please,

Page 114

1  and take your time and tell me if you recognize it.
2      A   Yeah, I recognize it.
3      Q   Can you tell me what it is, please.
4      A   Looks like a demo Power Point.
5          MR. BURDEN:  Wait.  I'm getting some rustle
6  in here so maybe --
7          MR. FALVEY:  Yeah, it's over the phone.
8      A   A demo, it looks like a demo Power Point
9  presentation.
10  BY MR. BURDEN:
11     Q   All right.  So CFTC Exhibit 190, now,
12  this is an email from Mr. Donelson to you and the
13  other salesperson, is that right?
14     A   Right.
15     Q   And it's dated January 7, 2019, is that
16  right?
17     A   Right.
18     Q   And it says New Demo and Talking Points.
19  Do you see that?
20     A   Yep.
21     Q   So is this the first time that Donelson
22  sent you, you know, a new presentation and a new
23  script?
24     A   I believe so, yes.

Page 115

1      Q   All right.  And so before this,
2  before Exhibit 190 in January of 2019, you're using
3  the old Evans script and presentation that we've
4  already talked about, right?
5      A   Right.
6      Q   So let me rephrase that.  Before
7  January of 2019 you're using the scripts and
8  presentations from when Evans was in charge, right?
9      A   Right.
10     Q   All right.  So let's take a look at
11  the new materials.  So I want you to scroll down, if
12  you could, please, in this Power Point presentation
13  and I want you to stop where it says Our Services
14  and let me know when you're there, please.
15     A   Okay.
16     Q   All right.  So is this a presentation that
17  you gave to customers?
18     A   Yes.
19     Q   And did you give this presentation
20  to substantially all of your prospects
21  between January --
22     A   Yes.
23     Q   Sorry, you've got to let me finish,
24  sorry.  -- between January of '19 and December of

Page 116

1  '19?
2      A   Yeah.
3      Q   All right.  So this was like the
4  new presentation from Mr. Donelson, correct?
5      A   Right.
6      Q   All right.  So the slide that says Our
7  Services, it says individualized options portfolio
8  design.  What is that?
9      A   Just saying, you know, we're going
10  to design an option strategy to fit your portfolio.
11  It shouldn't be your whole portfolio.  It should
12  be, you know, somewhere about, you know, 15 to
13  20 percent max of your overall portfolio.
14     Q   So let's skip down to the next slide, if we
15  could, please, where it says Portfolio Strategies.
16     A   Okay.
17     Q   And you see there's like four -- there's
18  four leaves there.  Do you see the leaves?
19     A   Yeah.
20     Q   So it says -- one of the leaves is income
21  generating --
22     A   Right.
23     Q   -- active trading strategies, dividend
24  stocks, annuities, rental properties, et cetera.  So

Page 117

1 what did you say about income-generating strategies
2 here? What was this part of the pitch?
3    A  I was basically telling them how your
4 portfolio should be designed, you know. As the
5 value grows and there's income generating, there's
6 wealth preservation and, you know, there's hedging.
7 That's about it.
8    Q  So let's skip down, if we could, please,
9 to there's the slide that says Retail Trader
10 Success.
11    A  Which slide is that?
12    Q  Don't make me give you a page number
13 because my page number thing is somehow on the
14 blink, but scroll down. It says -- the slide says
15 Retail Trader Success and it's got a bunch of
16 small --
17      MR. FALVEY: We've got it.
18 BY MR. BURDEN:
19    Q  All right. Very good. So
20 do you see the slide that says Retail Trader
21 Success, 70 percent of retail investors make money.
22 Emotionally driven, lack of trader discipline, one
23 size fits all strategies. So, you know, what did
24 you say here to customers? What was this piece of

Page 118

1 the presentation, please.
2    A  Yeah, it's actually 7 percent
3 of retail investors make money. Basically telling
4 them, you know, retail traders, you know, try to
5 do it themselves and most of them, you know, lose
6 money.
7    Q  What percentage of Long Leaf Trading
8 customers make money?
9    A  I don't know.
10    Q  Do you think it's more than 7 percent?
11    A  I don't know.
12    Q  All right. So let's go down to
13 the next slide and it says, "We can offer your
14 portfolio" -- sorry. The next slide says What
15 We Can Offer your Portfolio, and it says income-
16 generating strategies, active trading, hedging,
17 access to other markets. So is this a slide that
18 you showed customers?
19    A  Yes.
20    Q  What did you say to customers about these
21 income-generating strategies, please.
22    A  Income-generating strategies, honestly,
23 I don't remember.
24    Q  Did you tell customers that Long Leaf

Page 119

1 Trading could provide income-generating strategies?
2    A  On this slide or overall?
3    Q  On the call when you made this
4 presentation.
5    A  I don't remember.
6    Q  All right. So let's scroll down, if we
7 could, please, to the Long Leaf talking points, the
8 Word documents.
9    A  Is that a different exhibit?
10    Q  So it's the same exhibit, but the exhibit
11 is like the email for Donelson with --
12    A  Oh, I see it, yeah. I see it.
13    Q  Thank you. So let's look at the third page
14 of this script.
15    A  All right.
16    Q  And it says Slide 15: Long Leaf Option
17 Strategies. Do you see that?
18    A  Yes.
19    Q  All right. So where it says cash
20 management, you know, what would you tell clients
21 here?
22    A  The cash management strategy replaced --
23 primarily used to replace traditional fixed income
24 products. It's supposed to replicate almost like

Page 120

1 a bond yield return. It had the same risk profile.
2 It's a gut strangle strategy. You're buying an
3 in-the-money option -- you're buying an in-the-money
4 call, buying an in-the-money put and then selling
5 weekly out-of-the-money strangles, collect premium,
6 finance. And then we're looking for quarterly
7 futures, weekly options, low historical volatility,
8 adequate volumes. It is cash intensive,
9 nondirectional, not picking a direction. That's
10 all I can remember.
11    Q  That's a lot. That's a good memory.
12 So these representations to customers that you
13 made about this cash management, you told them it
14 replicated a traditional fixed income portfolio.
15 Have I got that right?
16    A  It's meant to replace that by having the
17 same risk profile as those products but targeting
18 a little better return.
19    Q  Got it. And what return did you tell
20 customers that these cash management trades were
21 targeting?
22    A  6 to 10 percent.
23    Q  All right. Did those cash management
24 trades in fact ultimately provide returns of 6 to

Page 121

1    10 percent for customers?
2        A    Some of the trades did, some of them
3    didn't.
4        Q    But net net they were losers for customers,
5    is that fair to say?
6        A    Overall, yeah, but it was only one year.
7    I mean, you know, one year is not a good measurement
8    of a strategy.
9        Q    Well, let's drill down on that.  So
10   you're telling me that these cash management trades
11   were only offered to customers for a year, is that
12   right?
13       A    Right.
14       Q    And when did that start, please.
15       A    It could have even been less than a year.
16   I want to say like April, March 2019.
17       Q    So your testimony is that these
18   cash management trades were offered to clients
19   in sort of spring of 2019, is that right?
20       A    Right.
21       Q    So, I mean, this script was sent
22   to you by Mr. Donelson in January of 2019.  So how
23   can you reconcile those two things?  I'm not saying
24   you're wrong at all.  I'm just asking you how you

Page 122

1    can reconcile those dates.
2        A    I don't think he saw any opportunities from
3    January to March to implement the cash management
4    trade because you want low volatility, and we were
5    just coming off December 2018, which was obviously
6    elevated volatility.
7        Q    Got it.  So at the time you got this
8    script from Mr. Donelson in January of 2019 there
9    hadn't been any cash management trades that had
10   been made, correct?
11       A    Not to my knowledge.
12       Q    All right.  That was a terrible
13   question and as a result, your very good answer
14   made no sense.  So let me try to do that again.
15   I apologize.  By the time you received this script
16   from Mr. Donelson in January of 2019, had Long Leaf
17   done any of these cash management trades for
18   customers?
19       A    I don't think so.
20       Q    Your recollection is that they didn't
21   start doing them until spring of 2019, is that fair
22   to say?
23       A    Yeah.
24       Q    So do you know what basis there was

Page 123

1    to tell customers that these trades were targeting
2    a return of 6 to 10 percent a year?
3        A    Just based off Jim's experience with the
4    strategy and what he told me.
5        Q    Yeah.  So what did Jim tell you about his
6    experience with the strategy?
7        A    I know he was a CFO of a pension fund at --
8    and I think he said a lot of large institutions used
9    the strategy for cash that's not in positions
10   instead of not working for them.
11       Q    Do you know if Jim ever actually did any
12   of these trades?
13       A    I don't have proof, but I don't --
14       Q    Well, I'm not asking for proof.  I'm
15   just asking if you know whether Mr. Donelson has
16   done any trading himself for the companies that he
17   worked at.
18       A    I don't.
19       Q    Did you ever ask him, hey, Mr. Donelson,
20   did you ever actually trade?
21       A    I know he traded, but I don't know if he
22   traded for any companies.
23       Q    You said you know he traded.  How do you
24   know he traded?

Page 124

1        A    He told me, and he's told me a bunch of
2    trades he's made before.
3        Q    Yeah, so tell me about that.  What did he
4    tell you about trades he made before?
5        A    I know he likes interest rates a lot.
6    He talks about bonds a lot and option trades he
7    made, but I can't tell you offhand an exact trade.
8        Q    Did Mr. Donelson tell you that he had
9    traded profitably?
10       A    Yes.
11       Q    Did Mr. Donelson tell you that he had
12   traded options profitably?
13       A    He told me options, but I don't know
14   about profitably.  I would assume, but I don't
15   know.  Yeah, I don't think he ever told me.  Like
16   all the -- everybody, you know, talks about their
17   winners but no one says their losers.  But, yeah,
18   I would assume he told me about some profitable
19   trades.  Yes, he did.
20       Q    Okay.  What did Mr. Donelson tell you about
21   these profitable trades he made?
22       A    I don't remember.  Just -- I just remember
23   a little gist of it.
24       Q    Tell me what you remember.

Page 125

1      A   I really don't remember anything.  I just
2    know that he was talking about trading options.
3      Q   Do you recall if he -- well, let me --
4    did Mr. Donelson tell you that his options trading
5    was profitable?
6      A   He never gave me like an annual return
7    or anything like that.  He told me about profitable
8    trades.
9      Q   Did he give you any specifics for those
10   trades?
11     A   Not that I remember, no.
12     Q   Did Mr. Donelson tell you that
13   these cash management trades we see described
14   in Exhibit 190, if he had achieved returns of 6
15   to 10 percent on similar trades?
16     A   I don't remember.
17     Q   Did you ask Mr. Donelson, hey, where
18   did you get this from?  I'm going to say this to
19   customers?
20     A   I told you he has experience with,
21   you know, pension funds and institutional traders,
22   and that's where he said he got the strategy from.
23     Q   Right.  That's not my question, but it
24   might be an answer to another question.  So let me

Page 126

1    ask it again.  Did Mr. Donelson ever tell you that
2    he made 6 to 10 percent doing these cash management
3    trades?
4      A   No, he never said that.
5      Q   Did you ever ask Mr. Donelson, hey, where
6    are you getting these numbers from?
7          MR. FALVEY:  Objection, asked and answered.
8          MR. BURDEN:  But it wasn't answered.
9      Q   So maybe you'd like to answer it now.
10         MR. FALVEY:  He said he didn't know before.
11     A   Yeah, I mean --
12   BY MR. BURDEN:
13     Q   Mr. Hatzigiannis, answer the question,
14   please.
15     A   Repeat the question, please.
16         MR. BURDEN:  Mary?
17             (Whereupon the portion of the record
18             was read as requested.)
19     A   I did not.
20     Q   See, there we go.  That's an answer.  All
21   right.  Mr. Hatzigiannis, would you turn, please,
22   to CFTC Exhibit 191.
23     A   All right.
24     Q   Take a look at it for a moment, if you

Page 127

1    would, please, and then tell me if you recognize it.
2      A   Yeah, I recognize it.
3      Q   Can you tell me what it is, please.
4      A   Looks like an outline for the
5    customization.
6      Q   All right.  So Exhibit 191, this
7    is an email from Mr. Donelson to you and the other
8    APs, right?
9      A   Yeah.
10     Q   And you can see it's dated April 8, 2019,
11   right?
12     A   Correct.
13     Q   So the subject here is Approved
14   Solicitation and it's got some attachments.  So
15   do you understand what Mr. Donelson meant when he
16   indicated that this was an approved solicitation?
17     A   Yeah, it was approved by the NFA.
18     Q   All right.  And is this a solicitation
19   that you used on calls from this point forward?
20     A   Yes.
21     Q   All right.  And did you continue after
22   April of 2019, you know, telling customers about
23   the 76.5 statistical average?
24     A   I don't believe I did, no.

Page 128

1      Q   All right.  After April of 2019 did you
2    tell customers that Long Leaf desired to obtain a
3    strong return for customers?  Is that something you
4    kept saying?
5      A   Not that I believe.  Not that I remember.
6      Q   So after this date did you tell
7    customers that Long Leaf wouldn't be in business
8    if they weren't being profitable for customers?
9      A   No, I didn't say that.
10     Q   So after April 2019 your testimony
11   is you just stuck strictly to this script in this
12   presentation, is that right?
13     A   Yes.
14     Q   And you stopped saying all of
15   the things that you were saying before, is that
16   correct?
17     A   Yep, yes.
18     Q   After April 2019 did you tell customers
19   that Long Leaf could provide income-generating
20   strategies?
21     A   I don't believe I did.  No, I didn't.
22   I don't think so.
23     Q   All right.  So did Mr. Donelson
24   ever -- all right.  This is going to sound like

Page 129

1  a silly question, but bear with me.  While you were
2  working for Long Leaf did you ever tell any customer
3  that customers lose money trading with Long Leaf?
4      A   No.
5      Q   Did you tell any customers or prospective
6  customers on calls that your customers lost money
7  trading with Long Leaf?
8      A   Actually, backtrack on that question.
9      Q   Sure.
10     A   The other question.  I did -- I'm sure
11  at some point I said that customers lost money.
12     Q   Who did you say that to?
13     A   I think prospects, like not every one
14  of our clients makes money.  Yeah, definitely said
15  that.
16     Q   Yeah, but that's not what I'm asking.
17  I'm asking did you tell customers when you spoke to
18  them my other customers lose money?
19     A   No, I didn't.
20     Q   Why not?
21     A   Because they never asked.
22     Q   Do you think that if you told customers
23  that, that they would want to invest with Long Leaf?
24     A   If I told them other customers lost money?

Page 130

1      Q   Yeah.
2      A   Do I think they would want to invest?
3      Q   Yeah.
4      A   No, I do not.
5      Q   Did you --
6          MR. FALVEY:  For the record -- I'm sorry,
7      Ashley.  For the record, he did say that he
8      represented to customers that their clients
9      have lost money as well.
10         MR. BURDEN:  Sorry, Jeff.  Are you
11     testifying or is that an objection?  What are
12     you contributing here?
13         MR. FALVEY:  Just clarifying the record.
14         MR. BURDEN:  Well, you can do that when
15     it comes back to you.
16     Q   All right.  Mr. Hatzigiannis, did you
17  tell customers how much money Long Leaf Trading
18  clients lost in 2018?
19     A   No, I -- it was not known.
20     Q   Hey, sorry, I didn't hear that bit.
21  So let me ask the question again.  Mr. Hatzigiannis,
22  did you tell customers how much money Long Leaf
23  Trading had lost for its clients in 2018?
24     A   No, I did not, no.

Page 131

1      Q   Did you tell customers how much money
2  Long Leaf had lost for its clients in 2019?
3      A   No.
4      Q   Did you tell customers how much money
5  Long Leaf Trading lost for its clients in 2017?
6      A   No.
7      Q   Did you tell customers how much
8  commissions Long Leaf Trading generated in 2018?
9      A   No.  I mean, all these numbers I don't
10  even know.
11     Q   Did customers ever ask you how much
12  money the average Long Leaf customer makes or, you
13  know, if customers are doing well?
14     A   I don't remember.
15     Q   Yeah, I guess -- and what I want
16  to ask you is, you know, when customers asked you
17  that, if they did ask you that, you know, how did
18  you respond?  And right now your testimony is you
19  don't remember, you know, if any customer asked
20  you how, you know, Long Leaf's recommendations
21  performed.  Is that your testimony?
22     A   My testimony is I don't remember anybody
23  asking that question.
24     Q   I'm not asking if you remember

Page 132

1  specific people.  You talked to a lot of people.
2      A   Right.
3      Q   All I'm asking is do you remember
4  if any of the customers said, hey, Mr. Hatzigiannis,
5  do customers make money doing this?
6      A   Prospects I'm pretty sure, yeah.
7      Q   Okay.  So when they asked you that, what
8  did you say, please.
9      A   I don't remember.
10     Q   Did you tell them that customers lose
11  money?
12         MR. FALVEY:  Objection, asked and answered.
13     If you can answer, go ahead.
14     A   I never said that.
15  BY MR. BURDEN:
16     Q   All right.  So I want to show you --
17  I want to show you CFTC Exhibit 145.  So could you
18  navigate to that, please, in your portfolio.
19         MR. FALVEY:  Hey, Ashley, were you
20     thinking about lunch at some point soon or
21     what's your plan?
22         MR. BURDEN:  I'm happy to break
23     for lunch whenever you guys want to do that.
24     I can keep going indefinitely.  But if you guys

Page 133

1 want to take a break, that's fine with me.
2     MR. FALVEY:  You're like a camel.  So are
3 you getting hungry, James?
4     THE WITNESS:  Yeah, I am.
5     MR. FALVEY:  Okay.  Do you want to take
6 like a 40-minute break?
7     MR. BURDEN:  Whatever you guys want.
8 We're doing good on time.  You can have an
9 hour if you want.  I mean, whatever.
10     MR. MAY:  I would say 45 minutes.
11 This is Andrew.  I've got a bunch of calls
12 and stuff to make.
13     MR. FALVEY:  Okay.
14     MR. BURDEN:  All right, you guys.  Back at
15 1:45.  Off the record, please.
16     MR. FALVEY:  Okay.
17     MR. BURDEN:  Thanks.
18     MR. FALVEY:  Thank you.
19         (Whereupon a lunch recess was taken
20         from 1:04 p.m., to 2 p.m., after
21         which the following proceedings were
22         had:)
23
24

Page 134

1     A F T E R N O O N   S E S S I O N
2     MR. BURDEN:  All right.  Can everybody
3 hear me?
4     MR. FALVEY:  Yes.
5     MR. BURDEN:  Thank you.  All right.
6 Let's go back on the record, if we could,
7 please.
8     MR. FALVEY:  Sure.
9         JAMES HATZIGIANNIS,
10 called as a witness herein, having been previously
11 sworn and examined, testified further as follows:
12         DIRECT EXAMINATION (Cont'd.)
13 BY MR. BURDEN:
14     Q   All right.  Mr. Hatzigiannis, would
15 you please turn to CFTC Exhibit 145, and take a look
16 at it and let me know if you recognize it, please.
17     A   All right.  Yeah, I see it.
18     Q   All right.  Do you recognize this document?
19     A   I do.
20     Q   Could you tell me what it is, please.
21     A   Yeah.  Jeremy had us, you know, listen
22 to tapes, got to work the -- you know, figure out
23 why the person either flaked the appointment or held
24 the appointment.  That's about it.  And questions,

Page 135

1 three questions.
2     Q   All right.  So that's what I want to
3 talk about, Mr. Hatzigiannis, your questions at
4 the bottom.  So your third question you write, "If
5 someone says I won't set the appointment unless you
6 tell me your annual return, do we just tell him or
7 just not set him."  Did you write that?
8     A   It looks like it.
9     Q   Did you get an answer to this question?
10     A   I don't remember.
11     Q   Did anybody tell you that it was
12 Long Leaf's policy not to provide track records
13 to customers?
14     A   Yeah, they said not to say the,
15 you know, annual return because of how strict NFA
16 and regulatory bodies are with that.
17     Q   And who told you not to say the annual
18 return?
19     A   Tim Evans.
20     Q   Anybody else?
21     A   Not that I remember.
22     Q   So did this change under Mr. Donelson
23 when Mr. Donelson took over in January of 2018?
24 Were you allowed to share Long Leaf Trading's track

Page 136

1 record with customers?
2     A   No.  I didn't even know the track record,
3 to be honest, anyway.
4     Q   Well, that's good to know.  But my
5 question is after Mr. Donelson took over, did this
6 prohibition on sharing track records continue?
7     A   Yeah, we couldn't say the number because
8 I didn't even know it.
9     Q   Did Mr. Donelson instruct you that
10 you couldn't share Long Leaf's annual returns
11 with customers?
12     A   Yeah, we couldn't say our return.
13     Q   Did Mr. Donelson tell you that you were
14 not permitted to say your return to customers?
15     A   I don't remember if he said that word
16 for word.
17     Q   Well, what did Mr. Donelson tell you,
18 if anything, about sharing Long Leaf's returns with
19 customers?
20     A   He said to answer it in this way,
21 which was, you know, I have a client targeting
22 different returns, someone's targeting, you know,
23 5 to 10 percent, another one's targeting 20 to
24 25 percent, you know, everyone's targeting a

Page 137

1    different return.
2        Q    That's what Mr. Donelson told you to say?
3        A    That's what Tim Evans told me to say and
4    Mr. Donelson carried that over.
5        Q    How did he carry it over?
6        A    How did he carry it over?
7        Q    Yeah.
8        A    He just agreed with that, the way
9    we handled that question.
10       Q    Well, did he email that to you?  Did
11   Mr. Donelson tell you in person to handle questions
12   about the track records by saying, oh, everybody has
13   different returns?
14       A    It was actually Scott Gecas who told
15   us to do that, and he learned that from Tim Evans.
16   So Tim Evans started that and it got carried over.
17   Jim never said anything about it.  He wasn't really
18   involved with that.
19       Q    And when did Mr. Gecas tell you to keep
20   telling, you know, customers that everybody's got
21   different returns if customers asked about returns?
22       A    I don't know when he said that.
23       Q    Was it after Mr. Donelson had taken over?
24       A    Yes.

Page 138

1        Q    All right.  What if anything did
2    Mr. Donelson tell you about sharing Long Leaf's
3    track record with customers?
4        A    He said we can't share that information.
5    That's about it.
6        Q    So when did Mr. Donelson say that to you?
7        A    I don't remember.
8        Q    Did he say it to you in person?  Did he
9    email it to you?  How was this communicated?
10       A    It was communicated in person.
11       Q    All right.  So Mr. Donelson told you
12   in person that you were not to share Long Leaf's
13   track record with customers, correct?
14       A    He just said we don't have -- there was
15   no track record to show.
16       Q    But Long Leaf, in fact, had been
17   in operation for quite some time when Mr. Donelson
18   took over, correct?
19       A    Yeah, I think since 2009 it was.
20       Q    All right.  Let's take a look at
21   Exhibit 192, if we could, please.
22       A    All right.
23       Q    All right.  Do you recognize this document?
24       A    Yeah, it looks like an email.

Page 139

1        Q    All right.  And it's an email between
2    you -- that's your email address, right?
3        A    Right.
4        Q    -- and someone named Vivian, right?
5        A    Right.
6        Q    And it looks like it's dated June 20, 2018.
7    So do you know who this Vivian is?
8        A    It was a prospect, I believe.
9        Q    Got it.  So you write here, and I'm
10   looking at the second sentence, "Unfortunately,
11   we cannot provide a track record.  Let me know if
12   you have questions."
13       A    Right.
14       Q    So this business of not providing
15   a track record, this was communicated to you first
16   by Evans and then by Gecas, is that correct?
17       A    Right.
18       Q    And this policy of not providing a track
19   record, how long did it continue for?
20       A    It was forever.
21       Q    All right.  So through the end of the
22   firm, right?
23       A    Right.
24       Q    All right.  And so your testimony

Page 140

1    is that you were told by Evans and by Gecas that
2    you're not allowed to provide a track record because
3    of regulations.  That's your testimony?
4        A    That's my testimony, yeah.
5        Q    All right.  So what did you do to confirm
6    that?
7        A    Confirm what they said?
8        Q    Yeah.
9        A    You mean looking into the NFA website
10   and the rules?
11       Q    Sure.
12       A    I was just following what Tim said,
13   Tim told me.
14       Q    Yeah.  So would it surprise you
15   to learn that in fact for trading programs like
16   this, the regulations require you to disclose
17   a track record?  Is that a surprise to you?
18       A    That's not a surprise to me.
19       Q    Okay.  Why not?
20       A    I mean, that should be part of an
21   investment decision.
22       Q    Yeah, so I agree completely.  And,
23   you know, my question then is why did you accept
24   Mr. Evans' and Mr. Gecas' claims that track records

Page 141

1  couldn't be shared?
2      A   It's just what I was led to believe
3  at that time.
4      Q   But it sounds like you didn't believe
5  it at that time.  It sounds like you thought this
6  was an important thing that investors ought to know,
7  right?
8      A   Yeah.  I mean, I would tell my
9  senior associate at that time, asking him why
10  we shouldn't do this, and he said it's just due to
11  regulatory purposes.  It gets messy once you start
12  sharing return numbers and that was just the company
13  policy that Tim implemented.
14      Q   And it continued under Mr. Donelson,
15  correct?
16      A   Correct.
17      Q   All right.  I want you to turn, if you
18  would, please, to Exhibit 200.
19      MR. BURDEN:  Guys, I've got to go off
20      the record for two minutes.  We've got somebody
21      here.  Off the record.  I'll be back on in five.
22      Sorry.
23      MR. FALVEY:  Okay.
24

Page 142

1          (Whereupon a recess was taken from
2          2:11 p.m., to 2:14 p.m., after which
3          the following proceedings were had:)
4      MR. BURDEN:  All right.  Sorry.  Can we go
5      back on the record, please.
6      MR. FALVEY:  Yes.
7  BY MR. BURDEN:
8      Q   All right.  So, Mr. Hatzigiannis,
9  we're looking at Exhibit 200.  Are you there with
10  me?
11      A   Yes.
12      Q   All right.  So do you recognize this
13  document?
14      A   Yes.
15      Q   Could you tell me what it is, please.
16      A   Looks like a followup email to prospects
17  with some closed trades.
18      Q   Got it.  So this is an email you sent in
19  September of 2019, is that right?
20      A   Yeah, that's what it says, yeah.
21      Q   What does the subject say, please.
22      A   Track Record Update, See Attach.
23      Q   Okay.  So all of a sudden you can send
24  track records to clients, right?

Page 143

1      A   I mean, I just called it that.
2  It was just performance of that new strategy that
3  Jim implemented.
4      Q   Got it.  And it says here, "Attached
5  is a track record of our recent performance."
6  You wrote that, right?
7      A   Yes.
8      Q   All right.  So let's skip down to the
9  attachment.  And what does the attachment show here,
10  please.
11      A   It just shows closed trades from June 2019
12  to September 2019 on the 6th.
13      Q   All right.  And does it show a profit
14  or does it show a loss?
15      A   It shows a profit.
16      Q   All right.  And how much of a profit does
17  it show?
18      A   About $6,000.
19      Q   All right.  So is this -- does this show
20  all of the trades that Long Leaf placed between June
21  and September of 2019?
22      A   That are closed, yeah.
23      Q   How do you know that?
24      A   Because that's what Jim sent out and

Page 144

1  I trust Jim.
2      Q   All right.  So did you do anything
3  to check and see if this is an exhaustive list of
4  trades from June through September of 2019?
5      A   Yeah, I did my best to check out --
6      Q   How did you do that?
7      A   I'm sorry?
8      Q   How did you do that?
9      A   I just looked at from the dates it
10  says.  I looked at the Cunningham statement and
11  then seeing how much we entered in and how much we
12  got out for.
13      Q   All right.  And you determined that the
14  customers made $6,000 during that period of time?
15      A   I don't remember my calculations coming
16  out, but I definitely trusted and still trust Jim
17  Donelson.
18      Q   All right.  So let me ask you this.  This
19  Edge strategy trade, what is that?
20      A   That was our core trades basically.
21      Q   All right.  And did the core trades start
22  in June of 2019?
23      A   I don't recall.  I really don't.
24      Q   And the core -- I know you did this

Page 145

1 already so -- but I'm going to ask you to do it
2 again. What are the core trades, please. Can you
3 describe what they are?
4 A Yeah. Just the strangle, 4-legged trade.
5 It's a volatility swap. The front month they're
6 selling a weekly strangle, back month you're buying
7 a strangle.
8 Q Got it. So is it fair for me to
9 describe these core trades broadly as 4-legged
10 spread trades?
11 A Most of them weren't. Some of them were.
12 Q All right. So why is it that only the
13 results from June through September were provided
14 to this customer?
15 A I think that's when we spoke, left
16 off speaking, and this is when I sent the email.
17 So that's probably why.
18 Q Yeah. I guess what I'm asking for
19 is -- you know, let me do it another way. So the
20 attachment to Exhibit 200, this track record update,
21 did you just make that?
22 A I did not make this, no.
23 Q Who made it?
24 A Jim.

Page 146

1 Q Did he tell you to send it to people?
2 A He said it was okay to send it to people.
3 Q All right. And, in fact, you did --
4 A That's one contract for each trade, and he
5 put this disclaimer here.
6 Q Got it. And you did send this to dozens
7 of people, is that fair to say?
8 A Yeah, that's fair to say.
9 Q All right. So I noticed that these
10 results show trades between June and September.
11 Why don't they show trades before that? Why don't
12 they show trades between January and May?
13 A I'm not sure. My guess would be that
14 we started talking in June and I had already showed
15 him results from January to then, and I just wanted
16 to give him an update of what we'd been doing since
17 we last spoke.
18 Q So your testimony is you think
19 shared with this customer results from Long Leaf's
20 trading from January through May of 2019?
21 A Right.
22 Q So am I going to find that in an email
23 somewhere?
24 A Probably not.

Page 147

1 Q Why not? You just told me you sent it.
2 A No, I said I spoke to him about it.
3 Q All right. Now, according to our records,
4 between January and May of 2019 Long Leaf Trading
5 lost $281,870 for customers. Is that what you told
6 this customer when you spoke to him earlier in the
7 year?
8 A No, I was unaware of that number.
9 Q Well, what do you think you told him?
10 A I don't know.
11 Q All right. So we're going to do another
12 similar one. Could you look at Exhibit 201, please.
13 A Yeah.
14 Q All right. So, once again, this is
15 an email from you to a prospect, is that right?
16 A Looks like it.
17 Q And it looks like you sent this on
18 October 7th of 2019, is that right?
19 A That's right.
20 Q And it says, "We have closed out 26
21 of our past 30 trades for a profit. This attachment
22 shows results for our most conservative client."
23 Who is that client, please.
24 A It was somebody who only took one contract.

Page 148

1 Q What's that person's name?
2 A That only took one contract?
3 Q Whose account is this that you're now
4 sharing with other customers?
5 A I don't remember.
6 Q Was this a customer of yours?
7 A I don't remember.
8 Q All right. So if you're going to send
9 this track record -- well, I should ask you the same
10 question I asked you for the first one. So with
11 respect to CFTC Exhibit 201, this update that's
12 attached, this account, does this reflect all of
13 the trades between -- I don't know what it reflects,
14 so let me ask you. What are we looking at here?
15 It doesn't look like any of the dates match up.
16 They're not in chronological order. Maybe they
17 are for the exits. What is this supposed to
18 represent?
19 A These are all closed trades.
20 Q So are these all of the closed trades for
21 a particular period? Is that what you understood?
22 A Yeah.
23 Q So what was that period?
24 A It looks like June 18th to October 20th.

Page 149

1    Q    All right.  So why not show this customer
2  the trades that were made by Long Leaf before June
3  of 2019?
4    A    I'm not 100 percent sure on that.
5    Q    All right.  So let me ask you this.
6  You know, we heard you testify before -- we heard
7  you testify before that you were told by Gecas and
8  Evans that you weren't allowed to send out track
9  records or customers' trading results and that
10  that continued for a time under Donelson.  That's
11  what you said, right?
12    A    Right.
13    Q    Now all of a sudden you're sending
14  out these track records, which you label as track
15  records, to dozens of customers.  And we're seeing
16  you do this in late 2019, is that right?
17    A    That's right.
18    Q    So did you ever go to Mr. Donelson
19  and say what are we doing here?  Like I thought
20  we couldn't do this.  Now we can?  I mean, did you
21  question this?
22    A    Yeah.  I mean, I think this is
23  actually the time period we actually implemented,
24  100 percent rolled out the new type of strategies.

Page 150

1  And Jim started to -- had the Microsoft Excel
2  program keeping track of these trades, and this
3  is when Jim implemented the new procedure.
4    Q    Yeah, that's not what I'm asking.
5  What I'm asking you, Mr. Hatzigiannis, is did you
6  ever talk to Mr. Donelson about why you didn't used
7  to be able to send track records and now you can?
8    A    I never asked that question, no.
9    Q    Why not?
10    A    It didn't cross my mind.
11    Q    All right.  How frequently would you
12  send out these track records to customers like we
13  saw in Exhibits 200 and 201?
14    A    I'm not entirely sure.  Probably sent
15  it out to like -- maybe after every eight trades
16  or so.
17    Q    And when did that start, please.
18    A    It looks like in June I think.  I'm not --
19  I don't know.  I really don't know.
20    Q    You know, I'm going to tell you what
21  I think, Mr. Hatzigiannis, and I want you to tell
22  me if I'm right.  I think that you sent out these
23  so-called track records between June and September
24  because some of the trades during that period were

Page 151

1  basically positive for some customers, and I think
2  you didn't send any other track records because
3  Long Leaf lost so much money for customers during
4  every other month of 2019.  Is that correct?
5    MR. FALVEY:  Objection, argumentative,
6  but go ahead.
7    A    Yeah, I could see why you'd think that,
8  but it's not true.
9  BY MR. BURDEN:
10    Q    So tell me why that's wrong.
11    A    No comment.  I mean, to --
12    Q    What do you mean, no comment?
13    A    I'm not going to explain why I think
14  this is -- why you think that's wrong.
15    Q    It doesn't -- I just made a statement
16  to you.  You said that statement is wrong.  I'm
17  asking you why that statement is wrong.  If you'd
18  like to invoke the Fifth Amendment, that's within
19  your rights.  Otherwise you've got to answer.
20    A    I just told you the whole time of what
21  we were doing.  It was the implementation of that
22  new strategy.  I'm repeating information.
23    Q    So your testimony is that the reason
24  that you sent those track records showing trades

Page 152

1  from June to September is because those were the
2  months when the new strategy was going on?
3    A    Right.
4    Q    I thought you testified before that
5  you didn't know when the new strategy started.
6    A    I didn't know at that time when you asked
7  me that question, but now I see the documentation
8  here.
9    Q    All right.  So your testimony is that this
10  Edge strategy began in June of 2019?
11    A    That's what it looks like.
12    Q    I'm not asking you what it looks like.
13  I'm asking you what you know and what you remember
14  Do you know --
15    A    I don't --
16    Q    Do you know when the Edge strategy started?
17    A    No.
18    Q    Do you know if the Edge strategy of these
19  core trades, if they started in June of 2019?
20    A    No.
21    Q    There we go.  All right.  I'm going
22  to slow this way down, Mr. Hatzigiannis, and ask
23  you some easy questions about your office and what
24  it looked like.

Page 153

1    A   All right.
2    Q   Yeah, these are all --
3    A   Go ahead.
4    Q   So when Mr. Donelson took over
5  in January of 2018, where were you guys working,
6  please.
7    A   The Board of Trade, a Regus office.
8    Q   All right.  So tell me, if you would,
9  please, what that office looked like.  Like were
10  there offices?  Were there cubicles?  Where did
11  people sit?  How big was it?
12    A   There's no cubicles.  There's a section
13  for four people, so there's about three tables for
14  four people.  There was a big table for Jim.  I'm
15  not sure what else you need.
16    Q   All right.  So how many -- when you
17  started, how many other brokers were in the office?
18    A   When I started?
19    Q   Yeah.
20    A   In 2016?
21    Q   You know what, I'll tell you what.  So
22  thank you, 2018.  In January of 2018 how many people
23  were in this office space, please.
24    A   I believe there was 10 or 11.

Page 154

1    Q   And it was all just one big room?
2    A   Right.
3    Q   And so Mr. Donelson was in that room
4  with you?
5    A   Correct.
6    Q   And he had a big table, right?
7    A   Right.
8    Q   And the other nine or ten people sort
9  of shared tables, is that right?
10    A   Yeah, except for Scott.
11    Q   Did Scott have his own room?
12    A   He did not have his own room.  He just
13  had -- it was just one table, one computer.  It was
14  kind of next to Jim's.
15    Q   So how big was the room, please.
16    A   I don't know.  Like 20 by 40 feet maybe.
17    Q   So if you'll forgive the characterization,
18  that sounds like pretty close quarters to me.  Is
19  that fair to say?
20    A   Sure, that's fair.
21    Q   And all you guys are on the phone in there
22  all the time, right?
23    A   Most of us, yeah.
24    Q   So can you hear what other people are

Page 155

1  saying on the phone?
2    A   Sometimes.
3    Q   Do you think Mr. Donelson could hear what
4  you were saying on the phone?
5    A   No, that would be tough for him.  There's
6  a lot of people speaking over each other.  I mean,
7  he was --
8    Q   How far away from Mr. Donelson were you
9  in this office?
10    A   At that time I was about 15 feet away
11  or so.
12    Q   All right.  And you think he probably
13  couldn't hear you?
14    A   I think he could hear me if I was speaking
15  myself and no one else was speaking.
16    Q   All right.  So did Mr. Donelson ever
17  stop by and listen to you, you know, do your thing
18  on calls?
19    A   Rarely.
20    Q   Does that mean he did it occasionally?
21    A   Rarely is barely.
22    Q   So like maybe he did it once or twice,
23  but you really can't remember?
24    A   Sure.

Page 156

1    Q   Is that a yes?
2    A   Yes.
3    Q   All right.  And so was that true for
4  the entire time you were at Long Leaf, you were
5  sort of allowed to do calls with no supervision
6  from Mr. Donelson?
7    A   Yeah, but towards the end I sat right
8  across from him.  So everybody could hear each other
9  at that time when it got dwindled down to only five
10  people in the office.
11    Q   Okay.  Well, I'll tell you what.
12  We'll get to that because I want to ask you,
13  Mr. Hatzigiannis, how your office setup changed.
14  But just during the time you worked at Long Leaf
15  from January of 2018, you know, through December
16  of 2019, Mr. Donelson really didn't listen in or
17  check up on your calls at all, is that fair to say?
18    A   That's what I was led to believe.
19  He could have listened to calls on recordings or
20  live recordings, things like that.
21    Q   Do you know if he ever did that?
22    A   I know he did it, but I don't know how
23  many times did he that.
24    Q   Do you know if he listened to any of your

Page 157

1  recorded calls?
2      A   Yes, I know he did.
3      Q   How do you know that?
4      A   He told me.
5      Q   When did he tell you?
6      A   I don't remember exactly.
7      Q   All right.  Well, what did he say about
8  the recorded calls that he listened to of yours?
9      A   I don't remember, to be honest.  I just
10  remember having the interaction.
11     Q   You don't remember anything about that
12  interaction?
13     A   No.
14     Q   Did Mr. Donelson ever provide you with
15  any criticism of what you were doing on the phone?
16     A   Yes.
17     Q   What did he say to you?
18     A   I forget, but he did.
19     Q   What did he say?
20     A   I forget.
21     Q   Well, did he say good God?  Did he say --
22  you know, was the gist of it you were doing well?
23     A   If he's criticizing, he's not saying
24  good job.  But there was something I said and he

Page 158

1  didn't like it, and he said I'm not allowed to say
2  that.
3      Q   Do you remember what that was?
4      A   No, I don't, unfortunately.
5      Q   All right.  Was there anything that
6  Mr. Donelson told you about your calls or your
7  discussions with customers that you weren't allowed
8  to say or that, you know, that you had done that was
9  bad?
10     A   Is that the same question?
11         MR. FALVEY:  Yeah, asked and answered.
12  BY MR. BURDEN:
13     Q   You know, I think it's more just
14  that it's a terrible question.  Did Mr. Donelson
15  ever -- well, let me ask you this instead.  What did
16  Mr. Donelson do to make sure that you stuck to the
17  NFA-approved script, if anything?
18     A   I don't know.  If he heard something
19  that was not legal, he would say something about
20  it, from what I could remember.
21     Q   All right.  Well, when did that happen?
22     A   I don't remember.
23     Q   How many times did it happen?
24     A   For me or for everybody?

Page 159

1      Q   For you.
2      A   For me, maybe -- I don't know, to be
3  honest.
4      Q   Well, what did you say that wasn't
5  legal or that Mr. Donelson told -- you've got to let
6  me finish.  What did you say that Mr. Donelson told
7  you wasn't legal?
8      A   I don't remember.
9      Q   Did Mr. Donelson ever tell you
10  that something you said wasn't legal in writing?
11  Like am I going to find emails about this?
12     A   I don't think so.
13     Q   All right.  And I think you were
14  describing for me -- all right.  So when you
15  started in January of 2018, you testified that you
16  were in a Regus rented office in the Board of Trade,
17  is that right?
18     A   Right.
19     Q   So did you guys change offices at some
20  point?
21     A   Yes, we did.
22     Q   And when was that, please.
23     A   I believe it was in the summer of 2019
24  or the spring of 2019.

Page 160

1      Q   All right.  And where did you guys move
2  to, please.
3      A   I don't know the exact address, but it's
4  right by the Willis Tower on Wacker.  It was another
5  Regus office.  It was a smaller office.
6      Q   All right.  So did the office have
7  individual rooms or was it like all one big room
8  again?
9      A   It was all one big room.
10     Q   All right.  And who sat in that room?
11     A   It was me, Jim, Vicki, Alex and Ben.
12     Q   Anybody else?
13     A   No.
14     Q   So could you hear other people while they
15  were talking?
16     A   Yes.
17     Q   Do you think that Mr. Donelson could hear
18  you while you were talking on the phone?
19     A   Yes.
20     Q   All right.  Did Mr. Donelson ever
21  discipline anybody, to your knowledge, at Long Leaf
22  Trading for saying things on the phone to clients
23  that they shouldn't?
24     A   No, I can't think of any instances.

Page 161

1    Q    And certainly that didn't happen to you?
2    A    No.
3    Q    What did Mr. Donelson do, if anything,
4    to make sure you didn't make misrepresentations
5    to customers?
6    A    Like I said, he would just -- if he heard
7    something that was off, he would say something about
8    it and that's about it.
9    Q    All right.  And did Mr. Donelson
10   ever hear anything you said that was off, as you
11   put it?
12   A    Yeah.  Like I said, that's happened before.
13   I just don't remember what it was exactly.
14   Q    Do you remember what it was generally?
15   Do you have a vague idea?
16   A    I'm trying to help you out, but I don't.
17   Q    Don't worry.  You're definitely helping
18   me out.  Did you receive performance reviews at Long
19   Leaf Trading, Mr. Hatzigiannis?
20   A    In 2018, yeah.
21   Q    And who gave you that performance review?
22   A    Jim and Scott.
23   Q    All right.  And what did they tell you?
24   A    They were just talking about, you know,

Page 162

1    sales numbers and things of that nature.
2    Q    Did you get a good review?
3    A    In the beginning I didn't.
4    Q    Why?
5    A    I don't know.
6    Q    Well, it sounds like the basis for
7    these reviews were sales numbers, is that correct?
8    A    Right.
9    Q    So did you get a bad review because your
10   sales numbers weren't good?
11   A    I guess to them it wasn't.  I thought they
12   were.
13   Q    Okay.  Did you get a performance review
14   in 2019 at all?
15   A    Occasionally here and there.  Not as often
16   as 2018.
17   Q    And who gave you those performance reviews?
18   A    Scott.
19   Q    Did Mr. Donelson give you any performance
20   reviews in 2019?
21   A    Yeah, he's the one who created them.
22   And I think Scott and I had talked, and then I think
23   Jim was there sometimes as well.
24   Q    Got it.  So Jim and Scott would give

Page 163

1    you -- Jim Donelson and Scott Gecas would give you
2    performance reviews sort of sporadically throughout
3    2019, is that fair to say?
4    A    That's fair to say.
5    Q    And these reviews were focused on sales
6    numbers, is that fair to say?
7    A    It's fair to say, yeah.
8    Q    All right.  So, you know, I'm not going
9    to show you an exhibit on this because it's just
10   boring, but I've seen some emails that are written
11   by you or to you that copy compliance.  Do you know
12   what I'm talking about there?
13   A    Not really.  I need more information.
14   Q    Okay.  Well, let me ask you this instead.
15   Did Long Leaf Trading have a legal or regulatory
16   compliance person?
17   A    I think it was Rebecca.
18   Q    All right.  And -- Rebecca Wing?
19   A    I don't recall her last name.
20   Q    Did you ever meet with this person?
21   A    I did not meet one on one, but I was
22   introduced.
23   Q    And when were you introduced?
24   A    I think when Jim first started.

Page 164

1    Q    And did you have occasion to speak with
2    Ms. Wing?
3    A    I never really spoke with her, no.
4    Q    All right.  So it sounds like you met
5    Ms. Wing in like January of 2018-ish, is that right?
6    A    Right.
7    Q    All right.  Did you ever have occasion to
8    meet with her after that?
9    A    I mean, when she would come in the office,
10   I would say hi.  That's about it.
11   Q    All right.  So she came in more than once,
12   but you didn't really talk to her, right?
13   A    Right.
14   Q    Was Ms. Wing in the office with you guys
15   on a regular basis?
16   A    No.
17   Q    Were there any other compliance personnel
18   at Long Leaf Trading?
19   A    I guess Jim was -- could be compliance.
20   I don't know.
21   Q    Well, why do you say that?  I don't
22   disagree.  I'm just asking why you say that.
23   A    Just because of all those instances
24   of when he stopped us from saying something or,

Page 165

1   you know, we had meetings before saying, you know,
2   you can't say this or this is how you handle a
3   question from a prospect, stuff like that.
4       Q    Got it.  Now, can you remember any of
5   the things that Mr. Donelson told you not to say?
6       A    No, I can't.
7       Q    All right.  I want to -- I'd like you to
8   turn, please, to CFTC Exhibit 195.
9       A    Okay.
10      Q    Do you recognize this document?
11      A    I don't remember this document.
12      Q    All right.  So you'll see it's from Jim
13  Donelson and it's to a bunch of people.  And is that
14  your email address, jhatzigiannis --
15      A    Yeah, at Long Leaf, yeah.
16      Q    All right.  So Mr. Donelson writes,
17  "After my discussion on Tuesday, these call volumes
18  are unacceptable.  200 per day is the number and
19  we'd better start hitting it."  Do you remember
20  Mr. Donelson sending this email?
21      A    Vaguely.
22      Q    All right.  So did you start hitting that
23  number?
24      A    No.

Page 166

1       Q    What happened to people who didn't hit
2   their numbers at Long Leaf Trading?
3       A    Depending on who they were, some of them
4   got cut.  That's about it.
5       Q    And by cut you mean fired, right?
6       A    Yeah, let go.
7       Q    Who fired them?
8       A    Jim.
9       Q    Donelson?
10      A    Yes.
11      Q    All right.  So let's take a look at
12  Exhibit 196.  Do you recognize this document?
13          MR. FALVEY:  Just a sec.
14      A    I do not.
15  BY MR. BURDEN:
16      Q    All right.  Well, was that your email
17  address, jhatzigiannis@longleaftrading.com?
18      A    Yes.
19      Q    All right.  And this was sent by
20  Mr. Donelson on July 27th of '18 and he writes,
21  "From this day forward I will be transferring
22  better leads based on effort.  If you are not
23  dialing, you will not be getting leads transferred
24  to you.  Effort equates to success and the effort

Page 167

1   over the last two weeks hasn't been there.  I am
2   keeping my eye on the statistics today so I know
3   where everyone is."  Where did these leads come
4   from, if you know?
5       A    To my knowledge, it was Traders Advantage
6   I think.
7       Q    What is that?
8       A    I think it's an educational firm.
9       Q    So did Long Leaf Trading purchase these
10  leads from this educational firm?
11      A    That's what I was led to believe, but I was
12  never told that by Jim or Tim.
13      Q    Okay.  So why do you -- like how did you
14  come to believe that?
15      A    I was told by other associates there.
16      Q    All right.  So it looks here like
17  Mr. Donelson was pretty focused on bringing in --
18  on bringing in customers, is that fair to say?
19      A    Yes.
20      Q    And did he continue to focus on bringing
21  in customers, you know, throughout 2018?
22      A    I think he was always focused on bringing
23  in customers.
24      Q    Yeah.  I mean, did he ever say anything

Page 168

1   to you to suggest that maybe you should slow down or
2   stop bringing in customers when the trades weren't
3   doing well?
4       A    No.
5       Q    You were just supposed to keep bringing
6   them in because that is your job, correct?
7       A    Right.
8           MR. BURDEN:  All right.  You guys,
9       I want to go off the record to take a quick
10      breather, and then we're going to launch into
11      something else.  So back at 3, please.
12          MR. FALVEY:  Okay.
13          (Whereupon a recess was taken from
14          2:52 p.m., to 3:10 p.m., after which
15          the following proceedings were had:)
16          MR. BURDEN:  All right.  Back on the
17      record, please.
18      Q    All right.  Mr. Hatzigiannis --
19  Hatzigiannis.  I'm going to keep screwing this
20  up.  Mr. Hatzigiannis, would you turn, please, to
21  CFTC Exhibit 71.
22      A    All right.  I see it.
23      Q    Have you got it?
24      A    Yeah, I've got it.

Page 169

1    Q   All right.  So who's Alan Kirsch?
2    A   He's one of the clients I inherited.
3    Q   Got it.  And from whom did you inherit
4  Mr. Kirsch?
5    A   I think it was from Scott Gecas.
6    Q   All right.  So Exhibit 71, you can see
7  it's an email from Mr. Donelson to Mr. Kirsch and
8  you're being carbon copied on it, right?
9    A   Right.
10   Q   So what's the date on that?
11   A   Looks like March 28, 2019.
12   Q   All right.  So scroll down a little.
13  Mr. Kirsch is complaining here.  What's Mr. Kirsch
14  complaining about?
15   A   It looks like I did a quick calculation.
16  It is down 68 percent, down 38 percent since Jim
17  took over from Scott just a few months ago.  Would
18  you like me to read the rest?
19   Q   Please.
20   A   It's okay.  No, you can go ahead.
21   Q   Sorry?
22   A   Oh, "You guys are doing a terrible job!"
23   Q   All right.  So let's go -- and the
24  date on that is March 28, 2019.  So let's go to

Page 170

1  CFTC Exhibit 203, please.
2    A   All right.
3    Q   All right.  And what's this document?
4    A   It looks like an email to Don Scata.
5    Q   From you?
6    A   Right.
7    Q   And what's the date on that?
8    A   April 6, 2018.
9    Q   All right.  So that's, you know, that's
10  eight or nine days after this email from Mr. Kirsch,
11  right?
12   A   Right.
13   Q   All right.  So what are you telling
14  Mr. Scata in this second paragraph of your email
15  here?
16   A   What my job is to do for him.
17   Q   Yeah.  I want you to read it for me,
18  please.
19   A   My job is to get a return on your capital.
20  With our recent past two-month performance the time
21  is now, and at the end of the day we are a team.
22  I need you to do your part and complete the Long
23  Leaf app and Midland application as soon as possible
24  so we can get -- start getting you that 20 percent

Page 171

1  return annually.
2    Q   All right.  And did you have any customers
3  that got a 20 percent return?
4    A   No, I did not.
5    Q   Are you aware of any?
6    A   I am not aware of any.
7    Q   All right.  So let's go to Exhibit 206,
8  if you would, please.
9    A   All right.
10   Q   All right.  What's this email, please.
11   A   It looks like an analysis of trades from
12  March to June 2018 for Shahzad.
13   Q   And is that a customer of yours?
14   A   I don't recall, actually.
15   Q   All right.  So let's scroll down.
16  What's this analysis showing for this customer?
17  What are we looking at here?
18   A   His trades.  We're looking at up four
19  trades in April, five trades in April, four trades
20  in May, three -- four trades in June.  Or, no, one
21  is still open.
22   Q   Are these trades profitable?
23   A   Some of them are and some of them aren't.
24  Overall it doesn't look like it.

Page 172

1    Q   Yeah.  Overall it looks like this
2  is negative by more than a thousand, is that fair
3  to say?
4    A   Yeah, a little over a thousand, yeah.
5        MR. FALVEY:  Dollars or percent?
6        THE WITNESS:  Dollars, dollars, dollars.
7  BY MR. BURDEN:
8    Q   Dollars.  All right.  And so this is
9  an email that Donelson sent to you on August 1st,
10  correct?
11   A   Yeah.  It could have been a mistake,
12  though.  I don't understand why he would send me
13  this email.
14   Q   Well, in any event, you got it, didn't you?
15   A   Yes.
16   Q   And you saw that Mr. Qureshi suffered
17  net losses for trades March 2018 through June 2018,
18  isn't that correct?
19   A   Yeah, overall net loss, yeah.
20   Q   Got it.  So let's go to Exhibit 207, if we
21  could, please.
22   A   Okay.
23   Q   All right.  So what's this, please.
24   A   It looks like a trade pitch.

Page 173

1    Q   From you?
2    A   Right.
3    Q   To whom?
4    A   David Arquitt.
5    Q   Got it.  And it looks like you're
6  sending this on August 14, 2018, two weeks after
7  that Qureshi email you got, is that right?
8    A   Right.
9    Q   All right.  So what are you saying to
10 Mr. Arquitt in this email?
11   A   We've got two new trades, strong
12 month in July, looking to keep that momentum going
13 for us here, look at that attachment, respond ASAP
14 and then gave him updates on it looks like positions
15 that we took off in July.
16   Q   Yeah, so I want to drill down on this
17 statement that we had a strong month in July.  So,
18 you know, I want to know what your basis is for that
19 because our records reflect that Long Leaf Trading
20 customers lost $54,977.49 just during the month of
21 July.  Does that sound correct to you?
22   A   It's too long ago to tell you.
23   Q   Yeah, you can't know.  So what basis
24 did you have to say to Mr. Arquitt that July was

Page 174

1  a strong month?  Why did you tell him that?
2    A   That's what I was told.
3    Q   Who told you that?
4    A   Jim and Scott.
5    Q   And that's Jim Donelson?
6    A   That is Jim Donelson.
7    Q   All right.  And we saw in the Qureshi
8  analysis that the trading between March and June
9  was net negative for Long Leaf Trading accounts,
10 is that fair to say?
11   A   For Shahzad in particular, I know he
12 barely had any money in his account at that time.
13 So I don't know if he -- we were taking the same
14 trades.  I don't know if that reflects all the Long
15 Leaf clients or most of them from that time period.
16   Q   Well, it looks like he's getting
17 the same four recommendations.  He looks like he's
18 getting four recommendations a month, doesn't he,
19 this Mr. Qureshi in Exhibit 206, right?
20   A   It looks like it, yeah.
21   Q   So why do you think -- it looks to me
22 like he's getting the same trades as everybody else.
23 Don't you think so?
24   A   I mean, I can see how you'd think that,

Page 175

1  yeah.
2    Q   Do you think that?
3    A   I don't know, to be honest.
4    Q   All right.  So let's look at Exhibit 208.
5    A   Okay.
6    Q   All right.  What's this document, please.
7    A   It looks like an email to an individual
8  named Hamid asking him to give me five minutes,
9  saying I assure you with the results we've seen
10 this year it will be well worth your time.
11   Q   All right.  And did you ever open up an
12 account for Hamid?  I can't remember.
13   A   I don't believe so.
14   Q   All right.  And what's the date on this
15 email?
16   A   August 24, 2018.
17   Q   All right.  So according to the
18 records that we have from Gain, from January through
19 August of 2018 Long Leaf Trading lost $1,279,468.08
20 for customers.  Does that sound right to you?
21 Is that surprising?
22   A   That's very surprising.
23   Q   Yeah.  So why is that a surprise to you?
24   A   I think it's a lot of money.

Page 176

1    Q   I think so too.
2    A   It's a lot of money.  I don't know.
3    Q   Yeah.  So when you tell Mr. Hamid here,
4  "I assure you with the results we have seen this
5  year it will be well worth your time," what could
6  you possibly be talking about?
7    A   Probably the recent performance from
8  July and August.
9    Q   Oh, okay.  So how much did they --
10 did Long Leaf make for clients in July and August
11 of 2018?
12   A   I have no idea.  I was led to believe we
13 had some good trades.  That was such a long time
14 ago.  I just don't know.
15   Q   All right.  If I was to tell you that
16 in July and August Long Leaf Trading made negative
17 $2,000 for its customers and $179,892.99 for itself
18 in commissions, would that surprise you?
19   A   Can you repeat those numbers again?
20   Q   Yeah, sure.  So if I was to tell you that
21 in July and August Long Leaf Trading made negative
22 $2,000 for its customers, would that surprise you?
23   A   Of 2018?
24   Q   Yeah.

Page 177

1    A    A little bit.
2    Q    All right.  Now, if I was to tell you --
3    and this is what the Gain records reflect -- that
4    Long Leaf Trading during July and August of 2018
5    made $179,892.99 for itself in commissions, would
6    that come as a surprise to you?
7    A    Yes.
8    Q    All right.  Well, let me ask you this.
9    What basis did you have to tell Mr. Hamid here
10   that the results we have seen this year will be
11   well worth your time?
12   A    I guess I was just led to believe we were
13   doing well.
14   Q    Who led you to believe that?
15   A    Jim and Scott.
16   Q    What did Jim tell you to make you
17   believe that -- Jim Donelson.  What did Jim Donelson
18   tell you to make you believe that you were doing
19   well in 2018?
20   A    Just looking back at that email from --
21   to David Arquitt, those closed position percentages.
22   Q    So your testimony is that Mr. Donelson
23   related to you some closed position percentages for
24   July, and you inferred from that that Long Leaf was

Page 178

1    doing well for the whole year?
2    A    It was such a long time ago.  I don't
3    know what my basis was for that.  But just from
4    looking at all these exhibits you pulled up, I see
5    that it looks like we had some winning trades in
6    July and that's probably where I got the basis from.
7    This is all speculation.
8    Q    Okay.  Well, you know, I'll tell you
9    what.  I don't want you to speculate, and it's
10   not a violation of the rules.  You can speculate,
11   but I don't want you to try to speculate.  I want
12   you to tell me what you know and what you remember.
13   A    Okay.
14   Q    All right.  It's not your job -- and
15   I'm sure your capable attorney explained this to
16   you -- to try to find explanations for stuff, you
17   know.  If you know and you remember, tell me and if
18   you don't, you say that, all right?
19   A    Sure.
20       MR. FALVEY:  Sorry.  Is there a question
21   pending?
22   BY MR. BURDEN:
23   Q    I'd like you to turn to CFTC Exhibit 211,
24   if you would, please.

Page 179

1    A    Okay.
2    Q    All right.  What's Exhibit 211, please.
3    A    It looks like another email to Dave Arquitt
4    explaining some things about his account.
5    Q    All right.  And I want you to go down to
6    the earlier, like the previous email in the chain
7    dated October 1, 2018.  Do you see that?
8        MR. FALVEY:  Wait, I'm sorry.
9    A    October or, I'm sorry, what did you say,
10   August?
11   BY MR. BURDEN:
12   Q    Let's turn to page 2 of Exhibit 211,
13   please.
14   A    All right.
15   Q    All right.  Are you there?
16   A    I'm there.
17   Q    What's this, please.
18   A    He's saying I've been with you guys
19   for a while, seeing account not growing at all,
20   only making enough for commissions.  I'm ready see
21   little growth.
22   Q    All right.  And this is an email from Dave
23   Arquitt to you, correct?
24   A    Right.

Page 180

1    Q    And what's the date on that?
2    A    October 1, 2018.
3    Q    All right.  So I'd like you to turn, if you
4    would, please, to CFTC Exhibit 212.
5    A    Okay.
6    Q    All right.  Do you recognize this document?
7    A    Hold on.
8    Q    I'm sorry.  213, 213.  Wait, hang on.
9        MR. FALVEY:  213?
10       MR. BURDEN:  Nope, nope.  I was right the
11   first time.
12       MR. FALVEY:  212?
13       MR. BURDEN:  212, sorry.  I've got dozens
14   of these, so I'm trying to race through them.
15   I'll slow down.
16   Q    All right.  So, Mr. Hatzigiannis --
17       MR. FALVEY:  No worries.
18       MR. BURDEN:  Thank you.
19   Q    -- please turn to Exhibit 212 and indicate
20   for me when you are there.
21   A    Yeah, I see it.
22   Q    All right.  What's Exhibit 212, please.
23   A    Basically explains the steps to fill
24   out a Midland IRA and then giving updates of what we

Page 181

1    did in September and a couple trades from October,
2    a couple trades still managing.  That's about it.
3        Q    All right.  So this is an email to Krishna
4    Jaligama.  Who's that?
5        A    Just a prospect.
6        Q    All right.  And you sent this email, right?
7        A    Right.
8        Q    And you sent it on October 12, 2018, right?
9        A    Right.
10       Q    All right.  So I want to go to the bit
11   where you talk to them about September.  You say,
12   "We are coming off a very strong summer."  Would you
13   read that paragraph to me, please.
14       A    Sure.  Coming off a very strong summer.
15   September we made about 4 to 5 percent net profit
16   for our client depending on their risk tolerance.
17   Also we have already taken two trades off here in
18   October.  One was a broken wing put butterfly spread
19   in the Aussie dollar.  We exited out for about a
20   49 percent net profit.  The other one we got out
21   of was a broken wing call butterfly spread in
22   wheat.  We exited out of the position for about a
23   27 percent net profit.  Three other trades still
24   on we're actively managing.  Note, the profit is

Page 182

1    on the capital we used on the trade and not on the
2    whole account itself.
3        Q    All right.  So I want to ask, you write
4    here, "In September we made about a 4-5 percent net
5    profit for our clients."  What clients of yours got
6    a 4 to 5 percent return in September?
7        A    I don't remember.
8        Q    All right.  Because according to our
9    records, Long Leaf Trading customers lost a total
10   of $4,074.93 in September whereas Long Leaf itself
11   made more than $36,000 in commissions.  Did you know
12   that?
13       A    I did not know that.
14       Q    All right.  So why did you tell this
15   person that in September we made 4 to 5 percent
16   net profit for our clients depending on their risk
17   tolerance?
18       A    I don't know.
19       Q    What's your basis for saying that?
20       A    I don't remember.
21       Q    I mean, did you just make it up?
22       A    No.
23       Q    Where did it come from?
24       A    I don't remember.

Page 183

1        Q    All right.  So I put the cart before
2    the horse a bit.  So your first sentence here was,
3    "We are coming off a very strong summer."  So this
4    is not a rhetorical question, for the record.  I
5    actually don't know.  How long is summer?  Is summer
6    like May through July?  Like what's summer to you?
7        A    Per this email, no idea.  Don't remember.
8        Q    Well, all right.  So, you know, according
9    to our records, between May and August -- maybe
10   that's summer -- yeah, between May and August Long
11   Leaf Trading customers lost $86,448.95.  So I guess
12   I want to know what's your basis for telling poor
13   Krishna that you're coming off a very strong summer?
14       A    I mean, this is all stuff I was told
15   via the trade team, which is Jim and Scott, so ...
16       Q    All right.  So did Jim Donelson tell you
17   this, that they had a very strong summer?
18       A    I don't remember.
19       Q    Could you maybe have been referring
20   to the commissions that Long Leaf Trading generated
21   for itself, which between May and August totaled
22   $333,672.17?  Is that maybe what you meant?
23       A    Absolutely not, no.
24       Q    Yeah, I wouldn't think so.  All right.

Page 184

1    Would you turn for me, please, to CFTC Exhibit 213.
2        A    Okay.
3        Q    All right.  And I want you to direct
4    your attention, please, to the second email in the
5    chain, which starts on page 1 and then goes on to
6    page 2.
7        A    Um-hmm, okay.
8        Q    All right.  So we've got an email here.
9    It's from Dennis Nations to you.  Who's Dennis
10   Nations?
11       A    A client I inherited.
12       Q    Got it.  And what's the date on this email?
13       A    January 8, 2019.
14       Q    All right.  And what does Mr. Nations have
15   to say here?
16       A    He's frustrated about performance.
17       Q    Yeah.  Why don't you read this first
18   paragraph for us, please.
19       A    "To be honest, I'm more than a little
20   upset by your very poor performance on my behalf.
21   Long Leaf/Cunningham Financial have managed to lose
22   all but 400 of a trading account that I funded with
23   71,000 a little over a year ago.  When Cunningham
24   took over for Long Leaf, I was promised there would

Page 185

1  be changes for the better, which has turned out to
2  be more smoke and mirrors.  My retirement IRA has
3  depreciated a full 25 percent."
4      Q    All right.  You could probably stop
5  there.  Let's turn, if we could, please, to CFTC
6  Exhibit 14.
7          MR. FALVEY:  Exhibit 14?
8          MR. BURDEN:  I'm sorry.  Exhibit 214.
9          MR. FALVEY:  Okay.
10     A    Okay.
11 BY MR. BURDEN:
12     Q    All right.  What is CFTC Exhibit 214,
13 please.
14     A    It looks like an email from David
15 Arquitt saying something about after we close this
16 trade, I'm going to have to stop the new ones, save
17 what I have left.  I have not -- no been looking at
18 statements, was trusting you guys.  Now I see lost
19 half account.
20     Q    All right.  So who did Mr. Arquitt write
21 this email to?
22     A    Me.
23     Q    So what's the date on this email?
24     A    January 16, 2019.

Page 186

1      Q    All right.  So let's look, if we could,
2  please, at CFTC Exhibit 215.
3      A    Okay.
4      Q    So what's this email, please.
5      A    Looks like a confirmation for appointment
6  to Nick.
7      Q    And who's the appointment with, please.
8      A    Nick, Nick.  I don't know.
9      Q    No, no, no, sorry.  I meant it's with
10 you, right?  You sent this appointment confirmation?
11     A    Yeah, it's going to be with me, right.
12     Q    All right.  So read the first paragraph
13 of this for me, if you would, please.
14     A    It's a meeting confirmation for that
15 date, how we -- in regards to how people manage
16 their existing downside risk within their current
17 portfolio, mitigate capital losses and add income
18 stream that specialized in nondirectional methods
19 with defined risk.  I'm excited to share more with
20 you.
21     Q    All right.  So let me ask you this.
22 You know, how can you write to this guy Nick
23 and tell him you can add an income stream that
24 specializes in nondirectional methods with defined

Page 187

1  risk when you've got Mr. Arquitt and Mr. Nations in
2  Exhibits 213 and 214 complaining that their accounts
3  are depleted?
4      A    Those guys started with a very small
5  amount of money.  Mr. Nations is -- I inherited
6  with about $600 I think.  David Arquitt, I forget
7  what he started with, but this was -- I was led to
8  believe that there were changes being made with Jim
9  taking over.  And I believed in Jim and this was --
10 that's what I was told to say.
11     Q    Who told you to say this about the income
12 stream?
13     A    Tim.  It's just something that was --
14 been carried over.
15     Q    Yeah.  Look at the date on this email,
16 though.
17     A    Okay.
18     Q    What's the date on that email?
19     A    January 28, 2019.
20     Q    So is that your testimony, that Tim Evans,
21 who had left a year ago, told you to say this and so
22 you're saying it now?
23     A    Yes.
24     Q    All right.  Let's take a look at

Page 188

1  Exhibit 216.
2      A    Okay.
3      Q    All right.  You know, I've got to jump in
4  and ask.  Mr. Hatzigiannis, do you have a conflict
5  waiver with your attorney?
6          MR. FALVEY:  Yes.
7          MR. BURDEN:  And that conflict waiver has
8  been executed?
9          MR. FALVEY:  Not yet.
10 BY MR. BURDEN:
11     Q    All right.  Let's turn to CFTC Exhibit 216.
12     A    Okay.
13     Q    All right.  What's this, please.
14     A    It looks like a reply to Dennis Nations.
15     Q    All right.  And who wrote the reply?
16     A    I wrote the reply.
17     Q    And what's the date on that reply?
18     A    February 19, 2019.
19     Q    All right.  So what is Mr. Nations
20 complaining about here?
21     A    I'm not sure.  Is it the last email he
22 wrote?
23     Q    You know, I think if you -- I'll tell
24 you what.  Let's sort of do it with baby steps.

Page 189

1  Turn, if you would, please, to the second page of
2  Exhibit 216.
3      A   All right.
4      Q   All right.  So what does Mr. Nations write
5  to you here?
6      A   Something -- you managed to use a full
7  third of my 401(k) in 15 months, complained about
8  losing almost the 71,000, no changes, more excuses,
9  living out my golden years in poverty.
10     Q   All right.  We can probably step there.
11 So how did you respond to Mr. Nations?
12     A   Basically telling him, you know, I wasn't
13 in charge of his account.  I just inherited it at
14 that point and it was a little over 500 bucks he
15 had left over and, yeah.
16     Q   All right.  So let's turn to CFTC
17 Exhibit 217.
18     A   Okay.  All right.
19     Q   All right.  So what's this document,
20 please.
21     A   It looks like this individual reviewed
22 Long Leaf and does not want to trade futures, and
23 it looks like they're canceling an appointment.  And
24 I replied to it saying we're dealing with options,

Page 190

1  using futures as the underlying, explaining why,
2  so on.
3      Q   Would you read for me, please, the last
4  sentence in that first paragraph.
5      A   "Let me know if you'd like to keep the
6  appointment.  I assure you the 15 minutes it takes
7  will be well worth your time."
8      Q   No.  I mean the other -- the last sentence
9  of the first paragraph, please.
10     A   Oh, it could target returns from
11 anywhere between 10 to 15 on the low risk side and
12 higher returns with obviously scaled-up risk well
13 known around the hedge fund industry.
14     Q   All right.  So at this point whom among
15 your clients has gotten 10 to 15 percent return?
16     A   I'm not aware of anybody.
17     Q   All right.  Would you turn for me, please,
18 to CFTC Exhibit 218.
19     A   Okay.
20     Q   So -- all right.  Sorry.  All right.
21 So let's go to the first email, second email in
22 the chain, please, the one from Robert McAllister
23 to you on February 27, 2019.
24     A   Um-hmm.

Page 191

1      Q   All right.  Are you with me?
2      A   Yeah.
3      Q   All right.  So who's Mr. McAllister?
4      A   I think he was a client I inherited.
5      Q   All right.  And what does he have to say
6  here, please.
7      A   Hold on.  He wants to get his money back.
8      Q   I want you to read the email, please.
9      A   "Thanks for the meeting today.
10 I think it's time to end my association with
11 Long Leaf.  Please close my account.  I'm doing
12 far better trading my two $100,000 accounts myself.
13 I had hoped that your company could have done a
14 better job, but I'm not willing to invest any more
15 money with you."
16     Q   Do you know how much money Mr. McAllister
17 lost trading with Long Leaf?
18     A   No.
19     Q   All right.  Could you turn, please, to CFTC
20 Exhibit 219.
21     A   Okay.
22     Q   All right.  So I want you to --
23 it looks like you're forwarding an email to
24 Mr. Donelson here.  But the second email in the

Page 192

1  chain, who is it from, who is it to, what's the date
2  on it, please.
3      A   It looks like it's from Jeff Bechtold
4  to myself.  It's on March 18, 2019, him complaining
5  about his account and performance.
6      Q   What does he say specifically?  Why don't
7  you read it for the record, please.
8      A   Started with 10K.  It's down to just
9  over 2K.  What a total joke this is.  How in the
10 world can you lose so much money.  My 12-year-old
11 could have done better.
12     Q   All right.  And the date on that -- sorry
13 if you already said -- is March 18, 2019, right?
14     A   Right.
15     Q   All right.  So who is Mr. Bechtold, please.
16     A   That's another account I inherited.
17     Q   All right.  I want you to turn, if you
18 would, please, to CFTC Exhibit 221.
19     A   Okay.
20     Q   All right.  So this is a new email.
21 It's dated April 4, 2019 and it's from you to who?
22     A   It looks like a prospect named Sam.
23     Q   All right.  So is this an email you sent?
24     A   Yes.

Page 193

1    Q   All right.  So there's a piece here that
2  says Target.  Would you read that for the record,
3  please.
4    A   Okay.  "Investors looking for
5  slightly higher returns than traditional fixed
6  income products with the same risk and taking
7  direction out of the equation.  Looking to target
8  6 to 15 percent after fees and commissions
9  annually."
10   Q   All right.  So you're sending this email.
11 Did you write this email?
12   A   Yeah, I wrote this email.
13   Q   All right.  Was there anybody here
14 who -- at Long Leaf Trading who made 6 to 15 percent
15 on an annualized basis?
16   A   No, not overall, no.
17   Q   All right.  So let's go down a little bit
18 to where it says Trade Structure.
19   A   Okay.
20   Q   Would you read the second paragraph
21 under Trade Structure into the record for us,
22 please.
23   A   "Using a very common covered trade
24 strategy, we construct option spreads of both

Page 194

1  a covered call and a covered put, which creates
2  the futures asset.  By buying in-the-money options
3  the resulting trade creates an asset with a known
4  intrinsic value, and by selling out-of-the-money
5  options we generate financing process to create
6  profits."
7    Q   Now, this isn't true, is it?
8    A   What do you mean?
9    Q   Well, did Long Leaf Trading generate
10 profits for its customers?
11   A   I think he's talking specifically about
12 the out-of-the-money options he's selling.
13   Q   Well, you wrote this, didn't you?
14   A   I wrote it, yeah, but it was from
15 Jim's explanation of the gut strangle strategy.
16   Q   So this last sentence, by selling
17 out-of-the-money options we generate financing
18 process to create profits, for whom did Long Leaf
19 Trading create profits?
20   A   I think you're taking it out of context.
21   Q   Why do you think that?
22   A   Because I think you're saying
23 it's the overall trade.  He's talking about the
24 part of the trade which is selling the options and

Page 195

1  collecting premium.
2    Q   Oh, okay.  For whom did that generate
3  profits?  What customer got --
4    A   I'm not sure.
5    Q   You don't know anybody, do you?
6    A   No.
7    Q   All right.  Let's do some more of these.
8  All right.  Would you turn for me, please, to CFTC
9  Exhibit 222.
10   A   Okay.
11   Q   All right.  So what is this, please.
12   A   It's a trade summary for Gary Wells.
13   Q   Who's Gary Wells, please.
14   A   Another client I inherited.
15   Q   All right.  So this is an email that
16 Mr. Donelson sent you on May 14, 2019, is that
17 right?
18   A   That's what it looks like.
19   Q   All right.  Do you have any specific memory
20 of this email?
21   A   A vague, little bit.
22   Q   All right.  So why, you know -- do you
23 have any understanding of why Mr. Donelson sent you
24 this summary for customer Gary Wells?

Page 196

1    A   Yeah.  I think he wanted a breakdown of
2  his closed trades.
3    Q   The customer you mean, Mr. Wells?
4    A   Yes.
5    Q   All right.  So let's go to the breakdown,
6  which I think is on the second page of the exhibit.
7  Is that what we're looking at?
8    A   Yeah, that's what I'm looking at, right.
9    Q   All right.  So help me out here.  Do
10 you have an understanding of what this indicates?
11 We have columns Trade, Date, Count, Entry, Exit,
12 Profit.  What are we looking at here, please.
13   A   Yeah.  We're just looking at closed
14 trades, the dates.  I don't remember if it was
15 the entry dates or the exit dates.  The count
16 is a contract amount for each trade.  The entry
17 is how much it cost to enter the trade.  The exit,
18 how much you got out of that trade and with the
19 result, ending result.  You've got a section for
20 the quarter section, and the other is probably maybe
21 the opportunistic trades.  I don't really remember.
22   Q   All right.  So it looks to me like
23 based on the date column that we've got trades from
24 January of 2019 through May of 2019.  Is that what

Page 197

1　it looks like to you?
2　　A　Yep.
3　　Q　All right.  So how much money does
4　this show that Mr. Wells made in 2019 from the
5　core trades?
6　　A　It looks like he lost about just under
7　2,500.
8　　Q　All right.  So what does this show
9　Mr. Wells made on the other trades in 2019 through
10　May anyway?
11　　A　Looks like he lost just under 200 bucks.
12　　Q　All right.  So this indicates what are
13　Mr. Wells' total losses for closed trades in 2019?
14　　A　Just a little over 2,500.
15　　Q　All right.  So let's scroll down,
16　because this is a group exhibit, and there's an
17　email in here between you and Mr. Gary Wells dated
18　May 15, 2019.  So I want you to flip to that and
19　tell me when you get there, please.
20　　A　Okay.
21　　Q　All right.  So do you remember sending
22　this email?
23　　A　Where is his initial email?  Is it the
24　last one?

Page 198

1　　Q　I mean, it's below it.
2　　A　So I'm replying, saying I would have to see
3　the results of the trade to --
4　　Q　Well, you know what, this is a mess.
5　Just go all the way down, if you would, please, to
6　the first email in the chain.
7　　A　Okay.
8　　Q　All right.  So what's going on there,
9　please.
10　　A　I think he's trying to get an understanding
11　of where his account stands.
12　　Q　And what do you tell him?
13　　A　I said I would have to see the results
14　of the trade, hard to estimate it without seeing
15　the results.  Let them play out and we'll reconvene
16　the next time we speak.
17　　Q　All right.  So it looks here like
18　Mr. Wells is complaining to you that he estimates
19　the account is down about 40 percent.  That's what
20　he's saying, right?
21　　A　Right.
22　　Q　All right.  And your response to
23　him is let's see how it plays out, is that right?
24　　A　I mean, that's part of the response.

Page 199

1　　Q　What's the rest of the response?
2　　A　Rest of the response is I don't know
3　the exact number.  I want to see how these trades
4　play out and then get to speak after that close.
5　　Q　Did you ever tell Mr. Wells what he
6　had lost here?  It looks like you did on the next
7　email up.  Did you subsequently discuss that with
8　Mr. Wells?
9　　A　Yeah, I did over the phone.
10　　Q　All right.  What did you say to him?
11　　A　I just told him the truth.
12　　Q　How did he respond?
13　　A　I think he closed his account.
14　　Q　So when you tell people the truth, do they
15　tend to close their accounts?
16　　A　From the inherited, yeah, inherited
17　accounts, yeah.
18　　Q　What about accounts that aren't inherited?
19　　A　No, I didn't have a problem with those
20　until the very, very end.
21　　Q　All right.  So let's look at CFTC
22　Exhibit 223.
23　　A　Okay.
24　　Q　All right.  What's this document, please.

Page 200

1　　A　Another email to Jim, or maybe I forwarded
2　this email from Jeff Bechtold trying to liquidate
3　his account.
4　　Q　All right.  And it looks like Mr. Bechtold
5　is complaining here about his account.  What does he
6　say to you?
7　　A　You guys almost lost almost all my money.
8　That's about it.
9　　Q　All right.  And when did he send you that
10　email?
11　　A　June 22, 2019.
12　　Q　And did he then close his account shortly
13　after that?
14　　A　Looks like it.
15　　Q　All right.  Do you know when Mr. Bechtold
16　opened his account?
17　　A　Not offhand, no.
18　　Q　All right.  Let me ask it a different way.
19　Was Mr. Bechtold a customer that you inherited?
20　　A　Yes.
21　　Q　And when did you inherit him?
22　　A　Probably right around this time, actually.
23　　Q　All right.  So let's look at CFTC
24　Exhibit 224.

Page 201

1      A    Okay.
2      Q    All right.  What is this document, please.
3      A    An email from Alan Kirsch, does not want
4  to take any more trades, him complaining about --
5  I don't know.  He's going off the wall here.
6      Q    All right.  So the stuff that's in caps,
7  what's he say there, please.
8      A    No more trades.  My account has been
9  severely depleted thanks to your great strategies.
10  Don't tell me that I have not participated in most
11  of the trades or that you've been successful in 11
12  of the last 13.  That's simply bullshit.
13     Q    Keep going.
14     A    Those are all caps.  Oh, you want the
15  non-caps too?
16     Q    Please, let's move on to those.
17     A    Okay.  Since January 2019 it is down
18  more than 50 percent and since August 2018 it is
19  down 75 percent.  With friends like you, who needs
20  enemies, three exclamation marks, Alan Kirsch.
21     Q    All right.  Let's move to CFTC Exhibit 225,
22  please.
23     A    Okay.  All right.
24     Q    So what's this email, please.

Page 202

1      A    Looks like closed trades for Larry Davis.
2      Q    All right.  And who is Larry Davis?
3      A    He was a client.
4      Q    Of yours?
5      A    Yes.
6      Q    All right.  So what's the date on this
7  email, please.
8      A    July 2, 2019.
9      Q    All right.  So do you remember
10  getting this email or, you know, talking about it
11  with Mr. Donelson or anybody else?
12     A    Yeah.
13     Q    All right.  So let's look at this
14  attachment, Davis completed trades.  What's going
15  on here, please.
16     A    That's just completed trades for
17  Larry Davis.  He wanted to see his completed closed
18  trades.  I explained it to him over the phone, I
19  sent it to him, and I think he paused trading at
20  this point.
21     Q    Got it.  So it looks like the
22  CFTC Exhibit 225 reflects core closed trades
23  for Mr. Davis, and we've got trade dates here from
24  April through June.  Am I reading that right?

Page 203

1      A    Yeah, it looks like it.
2      Q    So how much money did Mr. Davis make
3  on these trades?
4      A    He lost about $5,000.
5      Q    All right.  And that's total, right?
6      A    Right.
7      Q    Okay.  Would you turn, please, to CFTC
8  Exhibit 226.
9      A    Okay.
10     Q    All right.  What's this one, please.
11     A    Another closed trade report for Anand,
12  David Ekland, Norm Clavio.
13     Q    All right.  So what's the date on this
14  email?
15     A    It is July 23, 2019.
16     Q    All right.  Do you remember receiving
17  this email?
18     A    Yes.
19     Q    Yeah.  So why did you get this email,
20  please.  Why -- you know, what was the purpose of
21  it?
22     A    These individuals wanted to see their
23  closed trades.
24     Q    All right.  And were these, all three

Page 204

1  of these people customers of yours?
2      A    Yes.
3      Q    All right.  So let's look first at
4  Mr. Ekland's little summary here.  What is this
5  reflecting?
6      A    It looks like he lost about $10,000 here.
7      Q    So this appears to be all of Long
8  Leaf's closed trades from January of 2019 through
9  June of 2019, is that -- am I reading that right?
10     A    Yeah, you're reading that right.
11     Q    All right.  So let's move to the next
12  guy, Norm Clavio.  He's another customer of yours,
13  right?
14     A    Right.
15     Q    So he didn't do quite as badly.  How much
16  money did he make?
17     A    He lost about $63 at this time.
18     Q    All right.  So, you know, it looks
19  like maybe Norm didn't do all the trades.  We see
20  trade dates here from March through June.  Am I
21  reading that right?
22     A    Yeah.  He started -- I think that's when
23  he started with us, March.
24     Q    Yeah, that makes sense.  All right.

Page 205

1    So let's go to this third person, Anand Venkatesh.
2        A    Right.
3        Q    All right.  So it looks like we've got
4    trades here from March through June of 2019.  Am I
5    reading that right?
6        A    Right.
7        Q    Were these all of Mr. Venkatesh's
8    closed trades for 2019?
9        A    I don't know.  I don't think it's all of
10   2019, but from that time period I think.
11       Q    Got it.  So it looks like March through
12   June, right?
13       A    Right.
14       Q    All right.  And how much money did
15   Mr. Venkatesh make during that period?
16       A    He lost about just under 6,000.
17       Q    So how come he did so much worse than
18   Norm Clavio, even though they kind of traded in the
19   same time period?
20       A    It looks like -- it looks like Anand took
21   other trades than Norm did.
22       Q    So it looks like he followed more of
23   Long Leaf's recommendations than maybe Norm Clavio
24   did, is that fair to say?

Page 206

1        A    Yeah, I think that's fair to say, yeah.
2        Q    All right.  So these little names
3    by the trades, Romeo, wheat, corn, alpha, gold,
4    bravo, do you have any knowledge or understanding
5    of what those mean?
6        A    Yeah, I think there was a lot of
7    bond trades so we went by the phonetic alphabet
8    by calling them --
9        Q    Got it, okay.  All right.  So let's look
10   at CFTC Exhibit 227.
11       A    Okay.
12       Q    So what's this document, please.
13       A    I think this is a followup email to
14   a prospect.
15       Q    Who sent the email?
16       A    I sent the email.
17       Q    What's the date on that email?
18       A    July 24, 2019.
19       Q    All right.  So that's the day right
20   after you got that email from Donelson with Ekland,
21   Clavio and Venkatesh's losses, right?
22       A    Right.
23       Q    All right.  So what do you say to this
24   prospect here?  And I want you to start -- I want

Page 207

1    you to read the second paragraph for me, please.
2        A    We've had great results as of late.
3    There's still a lot of volatility discrepancies
4    across various markets right now, which is great
5    for us.  I see that continuing all the way to
6    the results of the next presidential election.
7    I suggest we set up a time to speak.  I can provide
8    you an update, refresh you on our strategies and
9    process and go over your customized trading plan.
10       Q    All right.  So when you say -- did you
11   write that?
12       A    Yes, I wrote that.
13       Q    So when you say we have had great
14   results as of late, what on earth are you talking
15   about?
16       A    Yeah, I don't know.  I wish I could
17   go back in time and tell you, but I know I didn't
18   lie.  That's for a fact.
19       Q    It definitely looks like you did.
20   CFTC Exhibit 226 clearly shows all of these
21   customers generating nothing but losses for 2019,
22   and you're telling this guy CJ Patel we have had
23   great results as of late.  How is that not a lie?
24       A    Yeah, I don't know.  It looks like it,

Page 208

1    but that's not how I operate.
2        Q    That's not how you operate?
3        A    Right.
4        Q    All right.  We've got more of these.
5    Let's look at CFTC Exhibit 229, please.
6        MR. FALVEY:  229?
7        MR. BURDEN:  Yes, please.
8        A    All right.
9        Q    All right.  What's this email, please.
10       A    A closed report.
11       Q    All right.  And Mr. Donelson is sending
12   this to you, correct?
13       A    Um-hmm.
14       Q    And what's the date on that?
15       A    August 28, 2019.
16       Q    All right.  So what does this show, please.
17       A    Looks like a closed report for Ken
18   Newberry.
19       Q    Who is Ken Newberry, please.
20       A    Another client I inherited.
21       Q    All right.  And what does the closed report
22   show?
23       A    A loss of about 3,400 bucks.
24       Q    All right.  And that's on all the

Page 209

1 closed trades with Long Leaf between January 4th and
2 August 21st of 2019, is that right?
3    A   Right.
4    Q   All right.  So let's look at CFTC
5 Exhibit 230, please.
6    A   Okay.  All right.
7    Q   Hang on.  I'm looking at the wrong one
8 here.  All right.  Let's look at CFTC Exhibit 232.
9        MR. FALVEY:  232.
10       THE WITNESS:  All right.
11       MR. BURDEN:  All right.  Who's chuckling
12 over there?  I can't see you.
13       MR. FALVEY:  Oh, that was me.  Sorry.
14       MR. BURDEN:  Who is it?
15       MR. FALVEY:  It's Jim, sorry.
16       MR. BURDEN:  What could you possibly
17 be chuckling about?  It's okay.  It's fine.
18       MR. FALVEY:  No, it looked like he made
19 money.
20       MR. BURDEN:  Yeah.
21       MR. FALVEY:  Yeah.
22       MR. BURDEN:  For that one brief, brief
23 period.
24       MR. FALVEY:  Yeah, it's just ironic.

Page 210

1 That's all.  232?
2        MR. BURDEN:  Please.
3    A   Okay.
4    Q   All right.  Do you recognize this document?
5    A   Yes.
6    Q   What is it, please.
7    A   It looks like it's an email to
8 Gary Osborn.  Now this is coming back to me,
9 all this.  The Edge strategy was the new strategy
10 we implemented for the big account sizes for Pat
11 Campbell and the other guys, and that's what I was
12 referring to then when we were saying we have seen
13 good results.  It was the big accounts with the new
14 Edge strategy.
15   Q   All right.  Well, we can come back
16 to that.  All right.  So this is an email between
17 you and Gary Osborn, correct?
18   A   Right.
19   Q   All right.  And what's the date on that,
20 please.
21   A   October 8, 2019.
22   Q   All right.  And you're responding
23 to some -- wait.  Are you?  All right.  I screwed
24 this one up.  Never mind.  I'll spare you the misery

Page 211

1 of this one.  All right.  Okay.  So let's talk
2 about this Edge strategy thing.  So would you turn
3 to CFTC Exhibit 233 for me, please.
4    A   Yes, okay.
5    Q   All right.  So this is an email that you
6 sent to a prospect, right?
7    A   Yeah.
8    Q   What's the date on this one, please.
9    A   October 18, 2019.
10   Q   All right.  So it says, "Attached is an
11 update of what we have been doing."  Did you write
12 that?
13   A   Yeah.
14   Q   All right.  And below here there's a client
15 testimonial.
16   A   Right.
17   Q   Who's that client testimonial from?
18   A   Pat Campbell.
19   Q   All right.  So did Pat Campbell end
20 up making money or did he end up losing money?
21   A   I don't know.  He was still a client
22 until we shut down the business in December 2019.
23   Q   Do you know where he was at in December
24 2019?

Page 212

1    A   I don't -- I don't know.
2    Q   All right.  So there's an attachment here.
3 What's this attachment, please.
4    A   Looks like -- I'm not sure.
5    Q   All right.  Yeah, I don't know either.
6 I mean, do you have any recollection of what this
7 Long Leaf update was supposed to be that you sent
8 to this prospect?
9    A   I think it was one of the big
10 accounts.  It was utilizing the Edge strategy.
11 We had a couple clients in the Edge strategy and
12 we were trying to roll over all our clients into
13 that, and I was just showing him the performance
14 with the Edge trades that this individual was taking
15 with just one contract.
16   Q   All right.  And so this is just Pat
17 Campbell's account, right?
18   A   Yeah, and then there was another
19 individual.  Forgot his name.
20   Q   So it sounds like there's two people
21 who participated in this Edge strategy, is that
22 right?
23   A   Right.
24   Q   Now, is this Mr. Campbell's entire account

Page 213

1   or just the Edge trades?
2     A   This is not even anybody's account,
3 I don't think. It's just an example if somebody
4 took -- won the contract, but Pat Campbell was
5 actually taking five to eight contracts so closed
6 trades was even higher.
7     Q   So this performance that you were sending
8 to this prospect, this is not a real account,
9 correct?
10     A   It is a real account, but it's just one
11 contract.
12     Q   Whose account is it?
13     A   F4155. You could look it up, but I'm not
14 sure.
15     Q   Who is that person?
16     A   I don't know. I can't tell you.
17     Q   I thought you said there were two people
18 that did these trades, Campbell and another guy.
19     A   Okay. So you want me just to pick one
20 of them?
21     Q   No, I want you to tell me if you know
22 or not.
23     A   I told you I don't. How many times do you
24 want me to tell you?

Page 214

1     Q   Well, I've got it now. All right.
2 So this $6,000 gain that you sent in this Long Leaf
3 update to your prospect in October of 2019, was this
4 representative of Long Leaf customers overall?
5     A   No, this was for the Edge clients.
6     Q   Got it. And, in fact, by October
7 of 2019 substantially all of Long Leaf Trading's
8 customers were way down, is that fair to say?
9     A   Yeah, it's fair to say.
10     Q   All right. So I'm going to switch
11 gears and spare you the misery of more emails.
12 You know, you know that Long Leaf Trading and Jim
13 Donelson are defendants in our Enforcement action
14 here in the Northern District of Illinois and that's
15 why you're here, right?
16     A   Okay.
17     Q   Do you understand that?
18     A   Yes.
19     Q   Okay. You know, when did you find out
20 that the CFTC was investigating Long Leaf Trading?
21     A   This was all news to me until the
22 subpoena -- I mean, from the subpoena. It's the
23 first time I heard about it.
24     Q   Okay. Did Mr. Donelson or anybody

Page 215

1 else at Long Leaf Trading, you know, tell you that
2 Long Leaf had been subpoenaed by the CFTC?
3     A   No.
4     Q   Did Donelson or anybody at Long Leaf tell
5 you that Mr. Donelson produced all of your calls and
6 emails to the CFTC?
7     A   No.
8     Q   So is that news to you or did you sort
9 of find out about it later?
10     A   No, it's news to me. I just found out
11 today, to be honest.
12     Q   From me?
13     A   Yeah, from this whole -- all these
14 exhibits.
15     Q   Okay. So your testimony is that
16 Mr. Donelson didn't tell you --
17     A   Correct.
18     Q   -- that he produced all of your emails
19 and recorded phone calls to the CFTC in June of
20 2019? He didn't tell you that?
21     A   No, he didn't.
22     Q   All right. Well, you understand
23 that Long Leaf Trading and Donelson were subject
24 to, for lack of a better word, investigation by NFA.

Page 216

1 Is that something you now know and understand?
2     A   Yeah.
3     Q   And as we talked about, you know,
4 you unfortunately got on the wrong side of that
5 too. You know, at what point did you find out that
6 NFA were investigating Long Leaf Trading sales
7 practices?
8     A   I think I remember an instance where
9 one of our associates, my associate Nick Gunther,
10 the NFA came in about his presentation to somebody
11 that went undercover from the NFA pretending he was
12 a prospect. I didn't think anything of it, and then
13 I didn't hear anything about it until I got that
14 complaint end of February of 2020.
15     Q   So did you know that NFA had served
16 Mr. Donelson with a complaint for fraudulent sales
17 practices by his APs I believe December 2018?
18 Were you made aware of that?
19     A   No, I was not made aware of anything.
20     Q   How do you feel about that?
21     A   I don't like that, to be honest.
22     Q   Yeah, I wouldn't either. So you said
23 Mr. Donelson's paying for your lawyer here today?
24     A   Right.

Page 217

1    Q   Did Mr. Donelson -- have you had any
2   communications with Mr. Donelson since December
3   of 2019?
4    A   Yes.
5    Q   All right.  So let's talk about it.
6   What did you guys talk about?  I'll tell you what.
7   Let me ask it a different and less difficult way.
8   Did you and Mr. Donelson discuss the CFTC's
9   Enforcement action against him or Long Leaf Trading?
10   A   Never, no.
11   Q   So if you talked to him or I guess
12  emailed or texted, what did you guys communicate
13  about?
14   A   Communicated about that NFA complaint, also
15  communicated about him helping me trying to gain
16  other employment.  What else.  We're in the middle
17  of a CFTC proceeding involving Patrick Campbell.
18  I think that's about it.
19   Q   All right.  Well, what did Mr. Donelson
20  offer to do for you in terms of future employment?
21   A   He tried sending me -- I mean, he didn't
22  really help me out with anything, to be honest.
23   Q   (Inaudible).
24   A   Walsh Trading was one of them.

Page 218

1    Q   What did he do -- we've got to take
2   it bit by bit, please.  What did Mr. Donelson do
3   for you at Walsh Trading?
4    A   He told the owner I'd be -- entertain a
5   phone call, but that didn't -- I didn't go through
6   with that, and that's about it.
7    Q   Why not?
8    A   I wasn't interested in going back in the
9   futures market.
10   Q   What else did Mr. Donelson do or offer to
11  do to help you get employment?
12   A   That's it.
13   Q   All right.  Did Mr. Donelson otherwise
14  offer to help you?
15   A   What do you mean?
16   Q   In any respect.  Did Mr. Donelson
17  offer to help you with, you know, with employment,
18  getting a job after the implosion of Long Leaf?
19   A   No.  He just helped me with the NFA case,
20  paid for that lawyer and that's about it.
21   Q   All right.  So Mr. Donelson paid for your
22  lawyer in the NFA case?
23   A   Correct.
24   Q   And that was Mr. Iavarone?

Page 219

1    A   Right.
2    Q   Okay.  Did Mr. Donelson make any other
3   payments to you or on your behalf?
4    A   No.
5    Q   Has he offered to?
6    A   Nope.
7    Q   Did Mr. Donelson ever intimate to you,
8   you know, that -- what you ought to say if we asked
9   you questions?
10   A   What I ought to say if you asked me
11  questions?
12   Q   Yeah.
13   A   No.
14   Q   It happens.  It's the real world.
15  All right.  Did Mr. Donelson tell you that just
16  in late December he finished producing the rest of
17  your recorded calls with customers as well as the
18  other APs?  Is that news to you?
19   A   This is news to me from today.  Like today
20  is when I first heard of it.
21   Q   Yeah, we got most of them in 2018 I think.
22  Maybe it was 2019.  We got the rest a couple weeks
23  ago.  Have you ever met in person with Mr. Donelson
24  after December of 2019?

Page 220

1    A   No.
2    Q   Do you consider Mr. Donelson a friend?
3    A   Close friend.  Not a close friend,
4   but he's definitely my mentor, I think he's one of
5   the most honest persons I know and one of the nicest
6   persons -- person I've ever met.
7    Q   So you consider Mr. Donelson a mentor?
8    A   Yes.
9    Q   In what respect?
10   A   I think he's the most intelligent person
11  I've ever met.
12   Q   You know, I think we talked about
13  how Long Leaf Trading imploded in December of 2019
14  and you found yourself out of a job, right?
15   A   Right.
16   Q   So, I mean, that's horrible.  Did it come
17  as a surprise to you?
18   A   Not really.  The last month --
19   Q   Why?
20   A   I mean, the last month I saw the net
21  liquidation value going down a lot for customers.
22  That's why it didn't come as a surprise to me when
23  he told us, but it was still obviously a surprise,
24  as you can imagine.

Page 221

1    Q    Yeah, yeah.  So what did Mr. Donelson tell
2  you about why the firm was closing?
3    A    He didn't tell us anything about it.
4  He just said he has to close shop.  I think it was
5  something with Cunningham.  I think that's all I
6  knew.  He didn't tell -- he didn't share anything
7  with me or us.  Just said he had to close shop.
8    Q    Did you ask him why?
9    A    I did not ask him why.  I just assumed
10  it was from the positions and poor risk management.
11  And, yeah, I just -- that's about it.
12    MR. BURDEN:  All right.  Look, I'll
13    tell you what.  You guys just turned off for
14    a second.  Oh, there, you're back on.  All
15    right.  I'm going to go off the record for a
16    couple minutes to confer with my colleagues.
17    MR. FALVEY:  Okay.
18    MR. BURDEN:  I might be done here.  So
19    could we take 15?  And then, Jim, if you'd like
20    redirect, of course I'll stay as long as you
21    want.
22    MR. FALVEY:  Okay, thanks.
23    MR. BURDEN:  All right.  Off the record.
24

Page 222

1    (Whereupon a recess was taken from
2      4:25 p.m., to 4:42 p.m., after which
3      the following proceedings were had:)
4    MR. BURDEN:  Back on the record, please.
5    All right.  I do have a couple extra ones.  All
6    right.  Back on the record.
7    Q    All right.  Mr. Hatzigiannis, how long did
8  you overlap with Mr. Ruth at Long Leaf?
9    A    I forget when he left, but I was --
10  he was there when I started, which was, you know,
11  August-September 2016.  I forget.  No idea when he
12  left.  I forget.
13    Q    All right.  Did you guys work together
14  sort of often?
15    A    For a period of time, yeah.
16    Q    All right.  What role did Mr. Ruth have in
17  drafting scripts that you used at Long Leaf?
18    A    To my knowledge, he was the main guy with
19  writing the scripts.
20    Q    What's your basis for saying that?
21    A    That was what I was told by other
22  associates and Tim told me that.
23    Q    So Mr. Evans and other associates
24  told you that Mr. Ruth drafted the scripts that

Page 223

1  you used?
2    A    Yeah, Tim wrote the custom.  I think
3  Jeremy wrote the demo.  I think both of them worked
4  together on it.
5    Q    Okay.  Did you ever get a script that
6  was titled rebuttal script?  Did you ever see that
7  one?
8    A    A rebuttal script?
9    Q    Yeah.
10    A    Yeah, there was some rebuttals.  There
11  were certain rebuttals, yeah.  There were some
12  scripts for that.
13    Q    And in this script was there
14  a rebuttal to when a customer asked for a track
15  record of performance?
16    A    I don't recall.  I think there was.
17  I think but I don't know.
18    Q    All right.  Do you remember what that
19  rebuttal said?
20    A    No.
21    Q    Do you ever recall Mr. Ruth expressing
22  concern about Long Leaf's performance --
23    A    No.
24    Q    -- saying it was -- okay.  Sorry, I jumped

Page 224

1  in.  What were you going to say?
2    A    I just said no.  I'm sorry.
3    Q    All right.  Have you spoken with Mr. Ruth
4  since he left Long Leaf in August of 2017?
5    A    No.
6    Q    And by spoken, I mean like emailed or
7  texted or anything really.
8    A    Nothing at all.
9    Q    Did Mr. Ruth ever tell you that he
10  had written the scripts for Long Leaf Trading?
11    A    Yes.
12    Q    When did he tell you that?
13    A    I don't remember.
14    Q    Did he tell you that in person or in
15  writing?
16    A    In person.
17    Q    Did Ruth ever complain to you about Long
18  Leaf's customers not doing well?
19    A    No, he didn't.
20    Q    Did he ever share with you bad trades that
21  he had tabulated showing losses?
22    A    Nope.
23    Q    All right.  So I want to talk about
24  a couple of exhibits we looked at, and if you need

Page 225

1   to go back to them, go back to them. And if you
2   can remember them, we can just talk about them.
3   So I'm going to talk about these track records that
4   you sent to customers or prospective customers,
5   Exhibits 200 and 201. And, you know, why don't you
6   just quickly click back to them, if you could,
7   please, so we're talking about the --
8       MR. FALVEY: Yes. We have the paper,
9   so we'll just have to find it. We already
10  talked about it, Ashley?
11      THE WITNESS: 200 and 201?
12      MR. FALVEY: Yeah, you may have it in
13  your stack there.
14      THE WITNESS: No, that's not it.
15      MR. FALVEY: No?
16      THE WITNESS: Nope.
17      MR. FALVEY: Here's 200 and 201.
18      MR. BURDEN: If you don't want to
19  go through the paper copies -- I've got all
20  night -- but if you have them in that PDF, you
21  can just click on the tabs on the side and
22  scroll down.
23      MR. FALVEY: Right. No, we found them.
24      MR. BURDEN: You've got them?

Page 226

1       MR. FALVEY: Yeah, good to go.
2   BY MR. BURDEN:
3       Q   So Exhibits 200 and 201, was it your
4   idea to send these track records or updates to
5   prospective customers?
6       A   It was my idea and another associate's
7   as well.
8       Q   All right. And did you tell Mr. Donelson
9   that you wanted to do this?
10      A   Yeah, we ran it by him.
11      Q   What did he say?
12      A   He said it's all right to do it,
13  just make sure it's one contract and then put that
14  disclaimer on there.
15      Q   So was it your idea to send them just
16  the small percentage of trades that are reflected
17  there rather than, say, a broader time frame? I'll
18  tell you what. Let's make this easy. So
19  Exhibit 200, right?
20      A   Okay, yeah.
21      Q   Shows a handful of trades between June
22  and September, right?
23      A   Right.
24      Q   So whose idea was it to just show this

Page 227

1   person the June to September trades?
2       A   Yeah. It was that new strategy we were
3   trying to roll over all the clients into, the Edge
4   strategy. And I don't -- I don't recall whose idea
5   it was, but we wanted to show them the Edge strategy
6   because that's where we were putting all our new
7   clients in from then on.
8       Q   Got it. And I think your testimony
9   before was that only two clients did that strategy,
10  is that right?
11      A   Right. I think a little more --
12  I think we had a couple others exposed to it towards
13  the end, but I don't know for sure.
14      Q   All right. So did Mr. Donelson
15  ever weigh in on, you know, whether it was okay
16  or not to just show this particular time frame or
17  this particular strategy, as the case may be?
18      A   I don't remember.
19      Q   Was it your idea to just focus on these
20  profitable trades?
21      A   I don't remember.
22      Q   The track records you sent in
23  Exhibit 200 and Exhibit 201, you know, did you
24  send these to prospective customers, you know, only

Page 228

1   if they asked or like did you kind of start doing
2   it routinely?
3       A   I did it when they asked.
4       Q   So if a customer asked you for
5   a track record, you would send them something
6   along the lines that we saw in Exhibit 200 and
7   Exhibit 201?
8       A   Not exactly. It was more of an excuse
9   of a followup and showing them, you know, our new
10  strategy we've implemented because that's what we
11  were talking about towards the end here, by the end
12  of 2019, and that's where we were trying to roll all
13  our clients into that strategy. So that's the
14  reason I was sending that.
15      Q   Yeah. But, you know, you can see that,
16  you know, these track records you sent, they show
17  winning trades, right?
18      A   Yeah. I mean, the majority of them
19  are the Edge trades. That's what we started doing
20  at the end.
21      Q   Yeah. But this thing you're sending
22  to customers in 200 and 201, this track record,
23  it shows people making a profit, right?
24      A   It shows the clients doing the Edge trades

Page 229

1    making a profit, yeah.
2        Q    All right.  Now, other trades didn't make
3    a profit, right?
4        A    I don't remember the core trades.
5    I don't even know if we put the core trades on in
6    this -- from that time period on, from June --
7        Q    So, you know, you show these customers
8    in Exhibits 200 and 201 a track record that reflects
9    profitable trading, you know, but you left out
10   the many, many, many, many, many trades that weren't
11   profitable.  And what I want to know is why did you
12   do that?
13       A    Yeah.  Like I said, we were trying
14   to get everybody into the Edge trades and we were
15   going to scrap the core trades out and just roll out
16   the Edge trades.  That's why I did that.
17       Q    Was that your idea to do?
18       A    I think it was a collective idea.
19       Q    What does that mean?
20       A    That means that we talked about it,
21   collaborated.  I don't know who initially first
22   came up with it.  I don't remember, but the people
23   that were left at that time, it's what we decided to
24   do.

Page 230

1        Q    Did you talk about this with Mr. Donelson?
2        A    Yes.
3        Q    Did Mr. Donelson understand that
4    you were showing customers only the track record
5    of profitable trades?
6        A    Only the Edge trades, not -- I mean,
7    I was just showing them the Edge trades from there
8    and --
9        Q    No, I get it.  Did you tell Mr. Donelson
10   you were doing that?  Did he know you were doing
11   that?
12       A    I believe so.
13       Q    Why do you think that?
14       A    Because he was making that document.
15   We were not making that document.
16       Q    You know what, I didn't think of
17   that.  Of course.  So I want to talk a little bit
18   about the document you're referring to, the track
19   record that we see appended to Exhibits 200 and 201.
20   So is there -- you know, this is a great-looking
21   spreadsheet.  Do you know if Mr. Donelson tracked
22   to the performance of all of Long Leaf's trades in
23   this manner?
24       A    I do not know that, no.

Page 231

1        Q    All right.  So he didn't show you anything
2    like that?
3        A    No.  I think he didn't -- I'm pretty
4    sure he didn't start doing this until January of
5    2019, but I'm not entirely sure.
6        Q    All right.  So Mr. Donelson would
7    generate these sort of closed trade summaries if
8    you asked him to for some reason, is that correct?
9        A    Yeah, exactly.
10       Q    All right.  So you talked about
11   your faith and your confidence in Mr. Donelson.
12   Do you know what Mr. Donelson did before he started
13   Long Leaf Trading -- or I should say bought Long
14   Leaf Trading?
15       A    To my knowledge, he was a -- worked
16   at R.R. Donnelley, he was a global controller at
17   Getco and he was -- I think for a little bit he was
18   a CFO of the United Methodist Church pension fund.
19   I'm not sure what else he did.
20       Q    Okay.  So what does R.R. Donnelley do?
21       A    I'm actually not entirely sure.
22       Q    Do you think it's a trading firm?
23       A    It doesn't sound like one.
24       Q    Yeah.  Do you know what Mr. Donelson

Page 232

1    did for R.R. Donnelley?
2        A    I would say it was something in accounting
3    maybe.
4        Q    Do you know what his job title was?
5        A    I don't remember, no.
6        Q    All right.  So it sounds like
7    you understood that Mr. Donelson worked for R.R.
8    Donnelley in an accounting capacity, is that right?
9        A    Yeah.  I'm just guessing that, though.
10       Q    What's that guess based on?
11       A    I'm sorry?
12       Q    What's that guess based on?
13       A    He's a CPA and he was a global controller.
14       Q    Yeah, so that's where I'm going with this.
15   What's a CPA?
16       A    Certified public accountant.
17       Q    There you go.  So do you understand that
18   Mr. Donelson, did you believe that he did options
19   or futures trading for R.R. Donnelley?
20       A    No.
21       Q    No.  He was their accountant, right?
22       A    Yeah.
23       Q    All right.  So you understood that
24   Mr. Donelson worked at Getco, right?

Page 233

1    A    Right.
2    Q    What's Getco do?
3    A    High-frequency firm.
4    Q    There you go.  So what did Mr. Donelson
5  do for Getco?
6    A    I think he was in charge of opening
7  different businesses internationally for them.
8    Q    All right.  Why do you think that?
9    A    Just based on the stories he told me.
10   Q    All right.  Did Mr. Donelson ever
11 tell you any stories about trading for Getco?
12 Did he ever tell you he was one of their traders?
13   A    No.
14   Q    All right.  In fact, Mr. Donelson made
15 it clear to you that he was the global controller
16 of Getco, right?
17   A    Right.
18   Q    What's a controller do?
19   A    It's got to be something with accounting.
20   Q    There you go.  All right.  So I guess
21 what I want to know is, you know, when I've pressed
22 you on things during the course of the examination,
23 one of your refrains has been that you had faith or
24 confidence in Mr. Donelson either to tell you the

Page 234

1  truth or to come up with trades.  And I guess
2  I want to know where this confidence comes from
3  because it doesn't seem like he has, or you believe
4  that he had, any trading experience at all.
5    A    Yeah.  I mean, he's got his master's
6  in economics and the way he handled himself and
7  the way he talked about trades, the stuff he knows
8  and the different option strategies he knew, it
9  just, you know -- I was led to believe that he was
10 turning the company for the better, and that's why
11 I stayed there.
12   Q    He sounds like a very confidence-inspiring
13 guy, is that fair to say?
14   A    Sure, yeah.  Very intelligent as well,
15 yeah.
16   Q    All right.  You talked about Mr. Donelson
17 turning the company around.  Did he ultimately do
18 that?
19   A    He had a small time frame.  I think
20 he could have, but I think he needed more time.
21   Q    Yeah.  So Mr. Donelson didn't turn the
22 company around, did he?
23   A    I mean, it's tough to do that in a year
24 or two but, yeah, he didn't.

Page 235

1    Q    Yeah.  And, in fact, October through
2  December of 2019 were some of Long Leaf Trading's
3  worst months, isn't that right?
4    A    Yeah, it sounds like it.
5    Q    Well, they were some of Long Leaf Trading's
6  worst months per customer, more accurately.  Would
7  you agree with that statement?
8    A    Yeah.  I mean, he had to shut down the
9  firm so, yeah, I believe that.
10   Q    But during that period would it
11 be fair to say that Long Leaf did pretty good for
12 commissions?
13   A    I would assume they did, yeah.
14   Q    Why do you think that they did?
15   A    Why do I think they did?
16   Q    Yeah.  What's your basis for that belief?
17   A    I mean, there was an individual with
18 a pretty large account size there.  I think it was
19 about 500,000.  And if you just do the math from the
20 commissions, that's just one customer.  You can do
21 the rest.
22   Q    Okay, so that makes sense.  But also you
23 got paid, right?
24   A    I got paid, yeah.

Page 236

1    Q    Yeah.  So, you know, your paycheck in
2  October and November, what was that like?
3    A    I don't remember.
4    Q    I'm sorry?
5    A    I don't remember.
6    Q    Was it any less than it had been throughout
7  the year?
8    A    Yeah.
9    Q    By how much?
10   A    I don't remember exact, but it was maybe --
11 I don't remember exact.
12   Q    Okay.  So the reason I'm asking
13 is because according to our records, Long Leaf
14 generated commissions -- and to be fair, this
15 includes FCM commission -- in October, November
16 and December totaling $121,000.  So that's not less
17 than they usually generate.  So do you have any, you
18 know, any understanding of why your paychecks should
19 have been less during those months?
20   A    I don't know why it was less then if that's
21 the case, but it was.
22   Q    Okay.  All right.  So you had a sense and
23 you knew and understood in October, in November, in
24 December that customers were losing a lot of money,

Page 237

1  is that fair to say?
2      A   I first noticed in November, sure.
3      Q   Yeah.  November was, I think you'll agree,
4  a pretty disastrous month for customers.  Is that
5  fair to say?
6      A   Yeah, probably the worst month.
7      Q   Yeah.  I mean, it was, it was.  So
8  according to our records, customers in November
9  lost $470,808.10.  So did you continue soliciting
10  customers during November and December to sign up
11  for accounts at Long Leaf?
12     A   I actually stopped.
13     Q   When did you stop?
14     A   Around that time period.
15     Q   So, I mean, did you tell Mr. Donelson,
16  hey, I'm not doing this anymore?
17     A   No.
18     Q   I mean, how did you manage to stop?
19     A   I actually didn't try to solicit
20  anybody because I didn't have any confidence in
21  the trading and I just tried to handle my clients.
22  And I didn't tell him straightforward, but he
23  definitely knew that I wasn't making as many calls
24  as typical.

Page 238

1      Q   So your testimony is -- well,
2  it sounds like you maybe made some calls.  Your
3  testimony is you didn't call any new clients from
4  November 2019 onwards?
5      A   I mean, I'm sure I made a couple calls,
6  but it definitely was not a legit solicitation
7  compared to what I was typically doing just to show
8  I was working.
9      Q   So did you send emails to any customers to
10  set up appointments or otherwise get them involved
11  with Long Leaf from November '19 forward?
12     A   I'm sure I did.
13     Q   All right.  Now, rather than looking
14  at my spreadsheet, I'm going to ask you did you
15  open any new customer accounts for Long Leaf after
16  November 1st of 2019?
17     A   I'm not sure.  The thing is it takes
18  a long time for someone to open an account.  So
19  I probably started that solicitation, if they were
20  to open an account, back in two months ago or three
21  months ago and they finally opened it.  They just
22  don't open an account right away.
23     Q   Got it.  Well, so it sounds like maybe
24  some clients of yours opened up accounts in November

Page 239

1  of 2019 or even December, is that right?
2      A   I'm not sure.  You're going to have to
3  look into it.
4      Q   Oh, I will.  Is John Haedrich one of your
5  customers?
6      A   No.
7      Q   How about John Lattner?
8      A   Nope.
9      Q   John Langan?
10     A   Yeah, that's one.
11     Q   All right.  So it looks like he opened
12  his account in November of 2019.  Do you remember
13  when you solicited him?
14     A   Yeah, it was a long one.  Maybe --
15  that could have been a year ago, to be honest.
16     Q   Yeah.  So did you stop him from opening
17  that account in November of 2019?
18     A   I did not stop him, no.
19     Q   No.  In fact, it looks like he was
20  in for a month and lost $962.26.  All right.  I'm
21  going to stop there.  All right.  So, you know,
22  another thing that I've kind of observed -- and you
23  can, you know, take issue with this because it's
24  probably not a proper question -- but, you know,

Page 240

1  we've seen throughout the course of the examination,
2  you know, emails and other -- you know, we've heard
3  at least one phone call, though we have many, many
4  more, you know, and it kind of suggests that, you
5  know, this is a foolproof method.  It doesn't ever
6  use that word, you know.  It sort of suggests that
7  this is a methodology of trading and there's a
8  strategy that's going to work, and I'm not going
9  to ask you to sign on to that characterization
10  because it's just asking too much of a witness.
11  But what I will ask you is, you know, do you have
12  any understanding of how things went so wrong with
13  Long Leaf Trading's trading for customers?
14     A   Well, I know it's just poor risk management
15  is what I've gotten -- gathered.
16     Q   So what -- and I'm not disagreeing
17  with you in any way.  What's your basis for saying
18  that?
19     A   I mean, if you look at the track record
20  for those reports, you could see that he has a good
21  success rate, but there's always that big loss that
22  deters the performance.
23         MR. FALVEY:  "He" is?
24         THE WITNESS:  Jim.

Page 241

BY MR. BURDEN:

1  Q   Do you have any idea or any theories
2  about why that is?  Because what you're saying
3  really is pretty consistent I think -- well, I won't
4  say it's consistent with what we've seen because
5  what we see are just consistent losses with the
6  exception of a few months here and there.  But, you
7  know, it sounds like your belief and understanding
8  is there were trades that made money, but then like
9  big ones would come and kind of wipe out the gains.
10 That's your understanding of how things went, right?
11 A   Exactly.
12 Q   So like do you have any knowledge or
13 understanding, you know, with a Series 3, as a guy
14 that went to college like -- and studied business
15 like why that was?  Like why did it shake out that
16 way?
17 A   I don't know why it was happening
18 like that, specifically with Jim.  He would just
19 be very calm and -- I don't know.  I really don't
20 know.  I don't know why it was like that.
21 MR. BURDEN:  Okay.  Well, I'll tell
22 you what.  That will do it for me.  Mr. Falvey,
23 any direct, or I guess redirect?

Page 242

1  MR. FALVEY:  No.  I think I'm going to
2  pass, Ashley, but thank you.
3  MR. BURDEN:  All right.  Mr. May, any
4  questions for the witness?
5  MR. MAY:  I'm just unmuting myself.  No,
6  Ashley, I have no questions for the witness.
7  MR. BURDEN:  All right.  I ran you
8  all ragged and it's only 5:11.  All right.
9  Mary, off the record, please.
10 (Discussion off the record.)
11 MR. BURDEN:  You know, can we go back
12 on for just one second.  I forgot something
13 really important.  I tell you, I've been taking
14 nothing about investigative testimony and I've
15 like forgotten how to do depositions.
16 Q   Mr. Hatzigiannis, is there anything
17 that you would like to add to with respect your
18 testimony or clarify?
19 A   Yeah.  Just on behalf of the Donelson
20 family, one of the nicest people I ever met, the
21 whole thing.  But it is what it is and that's it.
22 Q   Anything else?
23 A   No.
24 Q   Anything you want to correct?

Page 243

1  A   Nope.
2  MR. BURDEN:  All right.  And with that
3  we're off the record.
4  (WITNESS EXCUSED)

Page 244

1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3  COMMODITY FUTURES TRADING      )
   COMMISSION,                    )
4                                 )
        Plaintiff,                )
5                                 )
        vs.                       )  No. 20 C 3578
6                                 )
   LONG LEAF TRADING GROUP,       )
7  INC., et al.,                  )
                                  )
8        Defendants.              )
9
10
        I, JAMES HATZIGIANNIS, do hereby certify
11 that I have read the foregoing transcript of my
   deposition given on January 13, 2021, consisting of
12 pages 1 to 246, inclusive, and I do again subscribe
   and make oath that the same is a true, correct and
13 complete transcript of my deposition so given as
   aforesaid, and includes changes, if any, so made
14 by me.
15
        Corrections have been submitted
16      No corrections have been
        submitted
17
18
        JAMES HATZIGIANNIS, Deponent
19
   Subscribed and sworn to
20 before me this   day of
          , 20
21
   Notary Public
22
23
24

Page 245

1  NORTHERN DISTRICT OF ILLINOIS  )
   EASTERN DIVISION          )
2  STATE OF ILLINOIS         )
                      )  SS.
3  COUNTY OF COOK            )
4
5       I, Mary Maslowski, Certified Shorthand
6  Reporter and Notary Public in and for the County
7  of Cook, State of Illinois, do hereby certify that
8  on January 13, 2021, at 9:25 a.m., the remote video
9  deposition of the witness, JAMES HATZIGIANNIS,
10 called by the Plaintiff, was taken before me,
11 reported stenographically and was thereafter
12 transcribed by me.
13      The said witness, JAMES HATZIGIANNIS, was
14 first duly sworn to tell the truth, the whole truth,
15 and nothing but the truth, and was then examined
16 upon oral interrogatories.
17      I further certify that the foregoing
18 is a true, accurate and complete record of the
19 questions asked of and answers made by the said
20 witness, at the time and place hereinabove referred
21 to.
22      The signature of the witness was not waived
23 by agreement.
24      The deposition terminated at 5:14 p.m.

Page 246

1       Pursuant to Rule 30(e) of the Federal
2  Rules of Civil Procedure for the United States
3  District Courts, if deponent fails to read and sign
4  this deposition transcript within 30 days or make
5  other arrangements for reading and signing thereof,
6  this deposition transcript may be used as fully as
7  though signed, and the instant certificate will then
8  evidence such failure to read and sign this
9  deposition transcript as the reason for signature
10 being waived.
11      The undersigned is not interested in the
12 within case, nor of kin or counsel to any of the
13 parties.
14      Witness my official signature and seal as
15 Notary Public, in and for Cook County, Illinois on
16 this 26th day of January, A.D., 2021.
17
18
19          Mary Maslowski, CSR, RPR
            Notary Public
20          79 West Monroe, Suite 1001
            Chicago, Illinois  60603
21
22
23
24