CFTC Ex. 541

# Long Leaf Trading Group

## *Leeny, James 2019-09-16*

*9/16/2019 9:10 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Friday, November 5, 2021

Page 1

1          UNITED STATES OF AMERICA

             BEFORE THE

2     COMMODITY FUTURES TRADING COMMISSION

3

4  IN THE MATTER OF:      )

                    )

5  LONG LEAF TRADING GROUP, INC.  )

6

7

8

9

10

11       The examination under oath of JAMES

12  LEENEY, taken pursuant to subpoena and the rules

13  of the U.S. Commodity Futures Trading Commission,

14  reported by Mary Maslowski, a Certified Shorthand

15  Reporter and Notary Public within and for the County

16  of Cook and State of Illinois, at 525 West Monroe

17  Street, 9th Floor, Chicago, Illinois, commencing at

18  the hour of 9:10 o'clock on September 16, 2019.

19

20

21

22

23

24

Page 2

1  A P P E A R A N C E S :

2

      MR. ASHLEY J. BURDEN, Senior Trial Attorney

3     MS. ELIZABETH M. STREIT, Trial Team Leader

      MR. JOSEPH J. PATRICK, Investigator

4     U.S. COMMODITY FUTURES TRADING COMMISSION

      DIVISION OF ENFORCEMENT

5     525 West Monroe Street, Suite 1100

      Chicago, Illinois 60661

6     (312) 596-0700

7

      On behalf of the U.S. Commodity

8     Futures Trading Commission;

9

      MR. GARY M. SINCLAIR

10    2043 North Mohawk Street

      Chicago, Illinois 60614

11    (773) 871-4389

      gary@garyslaw.com

12

13     On behalf of the Witness.

14

15

A L S O   P R E S E N T :

16

      MR. MATTHEW EDELSTEIN

17

18

19

20

21

22

23  CSR License No. 084-003278.

24

Page 3

1           I N D E X

2  WITNESS          EXAMINATION

3  JAMES LEENEY

4  By Mr. Burden      5, 132, 192

5  By Mr. Patrick     129, 188

6

7       E X H I B I T S

      CFTC EXHIBIT       MARKED FOR ID

8

      No. 1          5

9     No. 82         6

      No. 83        65

10    No. 84        90

      No. 85        92

11    No. 86        93

      No. 87        94

12    No. 88        98

      No. 89       101

13    No. 90       103

      No. 91       108

14    No. 92       113

      No. 93       126

15    No. 94       132

      No. 95       134

16    No. 96       141

      No. 97       143

17    No. 98       144

      No. 99       145

18

19

20

21

22

23

24

Page 4

1       E X H I B I T S   (Cont'd.)

2  CFTC EXHIBIT       MARKED FOR ID

3  ** No. 100      156

      ** No. 101      164

4    No. 102      174

      No. 103      175

5    No. 104      177

      No. 105      180

6    No. 106      183

      No. 107      185

7    No. 108      192

      No. 109      195

8    No. 110      202

      No. 111      205

9    No. 112      208

      No. 113      214

10   No. 114      217

      No. 115      219

11

12

13

14

15

16

17    ** NOTE:  Exh bit Nos. 100 and 101 are audio

18        files which were not tendered for

         inclusion in the transcript.

19

20

21

22

23

24

Page 5

1           JAMES LEENEY,
2 called as a witness herein, having been first duly
3 sworn, was examined and testified as follows:
4           EXAMINATION
5 BY MR. BURDEN:
6    Q   All right.  Mr. Leeney, I'm Ashley
7 Burden.  This is Joe Patrick and Beth Streit.
8 We're officers of the Commission for the purposes
9 of this proceeding.  This is an investigation by the
10 United States Commodity Futures Trading Commission
11 in the matter of Long Leaf Trading to determine
12 whether there have been violations of certain
13 provisions of the Commodity Exchange Act and
14 regulations.  However, the facts developed in
15 this investigation might constitute violations
16 of other federal or state civil or criminal laws.
17          (Whereupon CFTC Exhibit No. 1 was
18          marked for identification, MM.)
19    Q   Prior to the opening of the record
20 you were provided with a copy of the Commission's
21 Statement to Persons Providing Information about
22 Themselves to the CFTC.  So I'm handing you a
23 copy of that, which I have marked as Exhibit 1.
24          Mr. Leeney, have you had the

Page 6

1 opportunity to read the Statement to Persons?
2    A   Yes, I have.
3    Q   All right.  And do you have any questions
4 about it?
5    A   No.
6    Q   Mr. Leeney, you're represented by counsel?
7    A   Yes.
8        MR. BURDEN:  Counsel, will you please
9 identify yourself.
10       MR. SINCLAIR:  My name's Gary M.
11 Sinclair, 2043 North Mohawk Street, Chicago,
12 Illinois, 60614, telephone (773) 871-4389,
13 and I guess it's email address these days,
14 gary@garyslaw.com.
15          (Whereupon CFTC Exhibit No. 82 was
16          marked for identification, MM.)
17 BY MR. BURDEN:
18    Q   Mr. Leeney, I'm handing you what I've
19 marked as CFTC Exhibit 82.  Is this the subpoena
20 pursuant to which you're appearing here today?
21    A   I'm sorry?
22    Q   Is this the subpoena pursuant to --
23    A   Oh, I apologize.  Yes.
24    Q   All right.  Mr. Leeney, the subpoena

Page 7

1 calls for production of certain documents responsive
2 to the categories listed on Attachment A.  Have
3 you produced to CFTC staff all documents called
4 for by the subpoena?
5    A   Yes.
6    Q   And where did you find those documents,
7 please.
8    A   I found them on my old laptop.
9    Q   Got it.  Were there any other places you
10 looked for responsive documents?
11    A   Yes, I checked a drawer that
12 I keep documents at home as well as my primary
13 work computer.
14    Q   And did you check your email?
15    A   Yes.
16    Q   Did you find any responsive documents
17 in there?
18    A   No, I did not.
19    Q   Mr. Leeney, have you withheld any
20 documents called for by the subpoena based on any
21 claim of privilege?
22    A   No.
23    Q   Any documents called for by the
24 subpoena that were not produced for any reason

Page 8

1 other than privilege?
2    A   No.
3    Q   Do you know of any documents
4 responsive to the subpoena but not provided that
5 were in your possession at any prior time or that
6 were lost, destroyed or otherwise disposed of?
7    A   Not that I know of.
8    Q   All right.  Mr. Leeney, have you --
9 yeah.  When you've finished with exhibits that
10 we've marked, you can just put them in the middle
11 of the table and the court reporter, Mary Maslowski
12 will take them when she goes.
13    Q   Okay.
14    Q   Have you ever given sworn testimony
15 before, Mr. Leeney?
16    A   No, I have not.
17    Q   All right.  So in that case I'm
18 going to go over some rules of the road.  I'm
19 sure your counsel went over them in advance of
20 the deposition -- or the investigative testimony,
21 but I'm going to do it again.  So, first, when I ask
22 you questions, try to give a verbal response rather
23 than nodding or shaking your head.
24    A   Okay.

Page 9

1    Q    And also let's try not to talk over
2  each other.  This happens a lot and confuses the
3  record.  It's a thing that I do --
4    A    Okay.
5    Q    -- really more than anybody.  I don't
6  ever want to confuse you or ask you anything you
7  don't understand.  So if I ask you a question and
8  you're not sure if you understand it or you're
9  confused, do you promise you'll tell me?
10   A    Yes.
11   Q    All right.  So breaks, if you want
12 to take a break for any reason, you let me know.
13 We'll go off the record.  All I ask is that you
14 allow me to finish my line of questioning first,
15 unless of course you need to consult with your
16 counsel for something such as privilege or the
17 Fifth Amendment, all right?
18   A    Will you be able to clarify privilege?
19   Q    Sure.  So if I ask for, you know,
20 a question where the response calls for an
21 attorney-client communication, that would be
22 privileged and you might want to consult with your
23 client about that or if you feel Fifth Amendment
24 jeopardy, you may also want to consult with your

Page 10

1  attorney -- not your client -- about that.
2    A    Okay.
3         MR. BURDEN:  Gary, did you --
4         MR. SINCLAIR:  Beg your pardon?
5         MR. BURDEN:  Did you have something to
6    say there?
7         MR. SINCLAIR:  Well, yeah.  I mean,
8    you know, you and I talked about the issues
9    with self-incrimination and that type of thing
10   and that obviously things that you and I talk
11   about that are private among us are not
12   generally discoverable.
13        THE WITNESS:  Oh, okay.  I understand.
14        MR. BURDEN:  That's what it means.
15 BY MR. BURDEN:
16   Q    All right.  So, you know, we're here
17 to talk about Long Leaf Trading.
18   A    Um-hmm.
19   Q    Before we start talking about that,
20 I want to talk --
21        MR. SINCLAIR:  Make sure when you
22   answer, say yes instead of um-hmm because it's
23   hard for the court reporter to record that.
24        THE WITNESS:  Okay, my apologies.  Yes.

Page 11

1
2         MR. BURDEN:  That's all right.
3  Thanks, Gary.
4    Q    So before I talk about Long Leaf
5  Trading, I want to talk a little bit about your
6  personal background.  What's the highest education
7  level that you have obtained?
8    A    Bachelor's degree.
9    Q    And what was that in, please.
10   A    Finance.
11   Q    And where did you go and when did you
12 graduate, please.
13   A    I went to University of Iowa and
14 I graduated in July 2009.
15   Q    And what professional licenses do you
16 currently hold, please.
17   A    A Series 3 license.  I had insurance
18 licenses before.  I'm not aware if they expired
19 or not.
20   Q    Any other licenses you currently hold?
21   A    No.
22   Q    Any licenses that you've previously held
23 that have since lapsed?
24   A    No, I don't believe so.

Page 12

1    Q    All right.  So let's talk about
2  your previous employment.  When did you start
3  at Long Leaf Trading, please.
4    A    So I started at Long Leaf Trading Group
5  in June 2013.
6    Q    So what did you do before that, please.
7    A    Before Long Leaf Trading Group
8  I was working at a State Farm office in sales.
9    Q    Okay.  And how long were you at State
10 Farm for, please.
11   A    Roughly about a year and a half.
12   Q    And what did you do before that?
13   A    Before State Farm I worked at an
14 introducing broker, Kingsview Financial, as an
15 associated person.
16   Q    And what period of time, please, did you
17 work at Kingsview?
18   A    So this -- Kingsview was February 2011
19 until August 2011.
20   Q    And why did you leave Kingsview?
21   A    I left Kingsview -- I just never made
22 money there, never had clients.
23   Q    Got it.  So what did you do before
24 Kingsview, please.

Page 13

1    A    Before Kingsview I worked at an
2  introducing broker called Insignia Futures &
3  Options.
4    Q    And what period of time was that for,
5  please.
6    A    So Insignia was November 2009 until
7  January 2011.
8    Q    Got it.  So what did you do at Insignia,
9  please.  What was your job title there?
10    A    I was an associated person.
11    Q    And what were your roles at Insignia?
12    A    I primarily would help self-directed
13  day trading clients, onboarding, showing them the
14  trading platform.
15    Q    Did you provide trading recommendations
16  to those clients?
17    A    I did, but the recommendations that
18  I provided were from the owner there.
19    Q    And who was that, please.
20    A    His name was Joe Fallico.
21    Q    How do you spell Fallico, please.
22    A    F-a-l-l-i-c-o.
23    Q    Did you do trade executions there
24  at Insignia?

Page 14

1    A    Yes, I believe I did.
2    Q    And how did you accomplish those
3  executions?
4    A    Electronic execution.
5    Q    How many clients did you have at Insignia?
6    A    I think I only had two or three.
7    Q    Over the entire --
8    A    Yes.
9    Q    So Kingsview, same set of questions.
10  What did you do at Kingsview, please.
11    A    So at Kingsview I was primarily
12  a prospector.
13    Q    What does that mean, please.
14    A    So I would call leads, see what
15  market interest someone might have and then give
16  that lead to a senior broker with more experience.
17    Q    And was that your role throughout your
18  entire tenure at Kingsview?
19    A    Yes.
20    Q    And did you provide trade recommendations
21  to prospective clients or clients at Kingsview?
22    A    I believe I had one client that
23  I gave recommendations to, but I did not develop
24  the recommendations.  That was from someone else

Page 15

1  there.
2    Q    Got it.  So for the recommendations
3  at Insignia, were these sort of out-of-the-money
4  options, selling things?
5    A    Yeah, primarily.
6    Q    So how frequently at Insignia -- I know
7  we're going back to Insignia -- would you provide
8  those recommendations to customers?
9    A    Not more than a handful of times
10  a month.  Maybe even just a few, like one or two
11  recommendations per month.
12    Q    And was that sort of every month?
13    A    I don't remember if it was like each
14  and every month.  There wasn't necessarily like
15  a monthly thing that we did.
16    Q    Was it most months?
17    A    I would say it was most months, yes.
18    Q    And that was for these two to three clients
19  for your entire tenure at Insignia?
20    A    Correct.  I didn't have my first
21  client until well in my time there, you know.
22  Probably more than six months in there I didn't
23  have an initial client.
24    Q    So I think you testified before that

Page 16

1  the recommendations provided to clients at Insignia
2  came from above you, right?
3    A    Yeah.  So Joe was the one that would
4  give me, you know, specific positions to give to
5  a client.
6    Q    And did all of Insignia's clients receive
7  those same recommendations?
8    A    No, he didn't have like a uniform
9  recommendation.  He did run a CTA, so I believe
10  the recommendations were taken from the CTA that he
11  ran.
12    Q    Got it.  So your two to three clients,
13  did they each get the same recommendation?
14    A    I don't believe so.  I mean, there's
15  some that could have been the same but, yeah, I
16  don't really recall.
17    Q    Okay.  How did the out-of-the-money
18  option strategies do for the Insignia clients?
19  Did they make money overall or not?
20    A    They were making money for a while,
21  and then after the flash crash they lost money.
22    Q    So would you say they lost money overall
23  or they made money overall?
24    A    I think overall they were down but not

Page 17

1 significantly.
2    Q    And the flash crash was in -- I ought
3 to know this.
4    A    20 -- it was March of '10, 2010 I think.
5    Q    All right.  Well, March of 2010
6 is sort of almost a year before the end of your
7 time at Insignia, right?
8    A    Correct.
9    Q    Yeah.  So how did these out-of-the-money
10 options recommendations do for the rest of the year?
11    A    I don't recall what they were like
12 the rest of the year.  I may have lost most of my
13 clients after the flash crash, but I don't remember
14 what I had for the rest of the year.  In my time
15 at Insignia I do remember there were long periods
16 of time not even making a paycheck so ...
17    Q    All right.  So Kingsview, I think
18 your testimony is that you didn't -- you maybe
19 gave one trade recommendation, right?
20    A    One that I recall.  I remember
21 giving a trade recommendation that was given to
22 me from a principal there.
23    Q    Was Kingsview recommending to
24 customers that they do these out-of-the-money

Page 18

1 option strategies or were they doing something
2 different?
3    A    They were primarily providing
4 recommendations for out-of-the-money credit
5 spread strategies.
6    Q    So was that true for Insignia as well?
7 Were the recommendations for out-of-the-money credit
8 spreads?
9    A    No.  The recommendations at Insignia,
10 I do recall them being some naked options, no
11 spread.  I don't recall if a credit spread was
12 used.
13    Q    But surely they were buying options then
14 at Insignia, right, or no?
15    A    No, they were providing options selling
16 recommendations.
17    Q    All right.  So let's talk about
18 Kingsview.  Did you have any insight into how
19 customers were doing with those out-of-the-money
20 credit spread recommendations?
21    A    At Kingsview I did not.
22    Q    Did you ever ask?
23    A    No, I did not.
24    Q    Did anybody ever tell you?

Page 19

1    A    No, I don't believe so.
2    Q    So what are you doing now, please.
3    A    I'm an associated person at an
4 introducing broker called Heartland Management.
5    Q    And what's your role over there, please.
6    A    I work broker assisted with clients.
7    Q    When you say you work broker assisted
8 with clients, what does that mean?
9    A    That means I provide recommendations
10 to clients.
11    Q    And who generates those recommendations,
12 please.
13    A    I do.  And I also get -- will get
14 recommendation ideas from the principal, Nathan
15 Coleman, there too.
16    Q    All right.  And are these also
17 out-of-the-money type strategies?
18    A    My strategies I use are usually pretty
19 diverse, out-of-the-money strategies, in-the-money
20 strategies, calendar spreads.
21    Q    So it sounds like the recommendations
22 that you're providing to clients at Heartland
23 Management are more varied.  They're not limited
24 to out-of-the-money options, right?

Page 20

1    A    Correct.
2    Q    All right.  So I know we've talked
3 about your employment at these IBs, and we'll of
4 course devote more attention to Long Leaf Trading
5 in a moment, but have you traded options personally?
6    A    No, I have not.
7    Q    Why not?
8    A    I've never had the money to fund
9 an account.
10    Q    Have you ever traded for any friends
11 or family members?
12    A    No, I have not.
13    Q    Why not?
14    A    I've always preferred to keep business
15 and personal relationships separate.
16    Q    All right.  So let's turn to Long
17 Leaf Trading.  I want to talk, if we could, sort
18 of generally about what Long Leaf Trading does and
19 then about what you did there, and then we can drill
20 down with some documents.
21    A    Okay.
22    Q    All right.  And I think my interest
23 during the morning session will primarily be on
24 recommendations and how they're generated, but we'll

Page 21

1  get there, and then we'll do sales stuff in the
2  late morning or the early afternoon.
3    A    Okay.
4    Q    All right.  So you testified that
5  you started at Long Leaf Trading in June of '13,
6  right?
7    A    Correct.
8    Q    And when did you leave Long Leaf Trading?
9    A    I left Long Leaf Trading in September 2017.
10    Q    And why did you leave?
11    A    I left because I didn't agree with
12  the business model.  There was a number of issues
13  within there.
14    Q    All right.  So expand on that, if you
15  would, please.
16    A    So the first issue that I saw was that
17  Tim Evans' recommendations that he was giving us to
18  give to clients, I no longer believed in his ability
19  to give profitable recommendations.  Tim Evans
20  was also, from what I recall, pretty consistently
21  changing our pay structure.  And in August of 2017
22  after another broker had been fired, I was expected
23  to continually deliver recommendations to a lot
24  of clients that were upset and didn't want those

Page 22

1  recommendations, and I was no longer willing to
2  do that.
3    Q    Any other reasons why you left Long Leaf
4  Trading in September of '17?
5    A    Well, the timing for it in September
6  2017 is I knew I was leaving in August, but I knew
7  of former brokers having issues getting a final
8  paycheck from Tim.  So that's why I waited until
9  September 15th.
10    Q    Got it.  Well, I mean, it sounds
11  like your reason for leaving was because you
12  didn't like what Long Leaf Trading was doing, is
13  that fair to say?
14    A    Yes, it was -- or it is.
15    Q    All right.  So this is your big
16  chance to air your grievances.  Are there any other
17  reasons why you were angry or upset or disappointed
18  or otherwise disillusioned with Long Leaf Trading
19  or Mr. Evans?
20    A    It was becoming a very hostile
21  environment, pretty intimidating environment.
22  And at the end of the day when I had given him
23  my concerns on, you know, recommendations and
24  I had given him my concerns over upset clients,

Page 23

1    Tim said that he would look to change up
2  some things with either how we were doing the
3  recommendations, something along those lines, and
4  he never implemented any of those changes and that's
5  why I left.
6    Q    All right.  So I think you testified
7  that one of the reasons you left Long Leaf Trading
8  was because you no longer believed in Mr. Evans'
9  ability to deliver profitable recommendations to
10  clients, is that right?
11    A    That is correct.
12    Q    All right.  So at what point did
13  you develop this belief?  Like when did you say
14  to yourself Mr. Evans can't deliver profitable
15  recommendations to clients?
16    A    So I came to him with a concern --
17  I believe this was later in the spring of 2017 --
18  and I sat down with Tim.  I think at the time
19  there was maybe a bad month or two with his
20  recommendations, and I had given him my concerns
21  that clients were upset that, you know, things
22  were -- or recommendations were losing money.
23  And, you know, he had mentioned that maybe we'll
24  look to change the type of strategy that we're

Page 24

1  using, maybe we'll, you know, look to implement
2  some changes in that regard.  And then after that
3  conversation, the performance continued to be poor
4  through the summer.  And when I saw that those
5  changes would not be implemented in August,
6  that's when I decided to leave.
7    Q    Got it.  So this conversation you
8  had with Mr. Evans in late spring of '17, did you
9  have the conversation in the office?  Was it over
10  the phone?  Paint the picture for me.
11    A    So this was in an office.  So we
12  had an open office where everyone was in like
13  a larger room.  And myself and another broker,
14  Jeremy Ruth, we spoke with Tim in a side office
15  conference room where we had given him our concern.
16    Q    So Mr. Ruth can also testify to this
17  conversation?
18    A    Yes, he should be.
19    Q    All right.  And what did you say exactly
20  in the conversation, so far as you remember?
21    A    So from what I recall, I had mentioned
22  concern over the trade recommendations, over clients
23  being upset.  I gave concern over the compliance
24  aspect of it with losing positions, and I do

Page 25

1  remember in that conversation Tim letting
2  us know or having us understand that, you know,
3  we weren't doing anything wrong because these
4  were self-directed clients and they're accepting
5  recommendations from us.  We also discussed --
6  or I discussed possible ways to change the
7  recommendations.  I offered my assistance in
8  market research possibly, you know, providing
9  recommendations or a second set of eyes for him.
10  And after the conversation, after that conversation
11  is when he became increasingly hostile over the
12  next couple of months before I left.
13     Q    So let's stay on this conversation
14  that you had with Mr. Evans, if we could, please.
15  So you said that you expressed concern to Mr. Evans
16  about compliance, is that right?
17     A    Correct.
18     Q    All right.  So what did you say to him?
19  And don't summarize.  Try to think about what
20  exactly you said, if you would, please.
21     A    From what I recall, my main concern
22  with compliance was that a client that was unhappy
23  with trade recommendation performance would file
24  a complaint.

Page 26

1     Q    All right.  File a complaint with whom?
2     A    With the National Futures Association.
3     Q    To your knowledge, had that occurred?
4     A    No, not to my knowledge.
5     Q    All right.  And so you expressed concern
6  to Mr. Evans that unhappy clients could potentially
7  file complaints with NFA, is that right?
8     A    Yes, correct.
9     Q    So how is this -- and I'm not disagreeing
10  with your characterization in any way, but how is
11  that a compliance concern?
12     A    I mean, at the time this was the
13  first brokerage that I actually kind of worked
14  at.  So I wasn't aware of if that was a compliance
15  concern or if it was not.
16     Q    Got it.
17     A    But just judging off of working,
18  you know, with clients that were upset over the
19  performance, you know, that's why I addressed it
20  with him.
21     Q    Did you make any suggestions
22  for, I don't know, other types of compliance
23  improvements?
24     A    Suggestions that we primarily --

Page 27

1  or that I primarily had given him was in regards
2  to the actual trade recommendations.  So, you know,
3  using a different strategy or a different time
4  frame, things of that nature.
5     Q    Got it.  So what did Mr. Ruth say in
6  this meeting?
7     A    From what I recall, Mr. Ruth
8  brought up a concern over being sued from his
9  clients because recommendations were losing.
10     Q    How did Mr. Evans respond to that?
11     A    I believe the way that he responded
12  was that these were self-directed clients that
13  accepted recommendations but also that any liability
14  is with Mr. Evans and not the individuals.
15     Q    Did Mr. Ruth accept that?
16     A    I don't recall if he did or not.
17     Q    What else do you remember Mr. Ruth saying
18  in that spring 2017 meeting?
19     A    Particularly I don't remember what
20  like exactly he was saying.  At the time him
21  and Tim were having like a conflict and not getting
22  along very well, so I don't remember him saying
23  a lot during that meeting.  The big concern that
24  was brought up was in regards to the trade

Page 28

1  recommendations.
2     Q    What suggestions did you make for
3  how to improve the trade recommendations or what
4  did you say to Mr. Evans about it?
5     A    The main suggestions that I made was
6  to maybe use a larger time frame, use smaller risk
7  compositions.  We could also do a smaller quantity
8  of positions.
9     Q    What else, if anything?
10     A    Utilizing different markets.  And
11  then I offered my assistance with pretty much
12  being a second set of eyes and maybe coming up
13  with additional ideas that he could utilize.
14     Q    Did Mr. Evans take you up on that offer?
15     A    He never did, no.
16     Q    So Mr. Evans was like the CEO, right?
17     A    Correct.
18     Q    Did you have any other supervisors during
19  your tenure at Long Leaf?
20     A    No.  There was another individual,
21  Brian Adams, that we were led to believe that
22  was in more of an administrative type role where
23  he would distribute leads but not like a direct
24  supervisor.

Page 29

1    Q    Got it.  So going back to this
2 spring of 2017 conversation you had with Mr. Evans,
3 was this the first time that you had communicated
4 with Mr. Evans about the trade recommendations sort
5 of not being profitable for customers?
6    A    No.  I mean, we had done that before.
7    Q    On what occasions had you done that?
8 Sort of maybe a month before, two months before?
9 Try to, if you would, please, give me time periods
10 or at least how many times do you think you spoke
11 with Mr. Evans about your concerns about the trade
12 recommendations?
13       MR. SINCLAIR:  Would you put a time
14    frame on that?
15       MR. BURDEN:  Yeah, but that's what
16    I'm asking.
17       MR. SINCLAIR:  You mean before May,
18    right?  Before this meeting or after?
19 BY MR. BURDEN:
20    Q    I think during your entire tenure
21 at Long Leaf.  So we've got one.  How many other --
22    A    I don't recall exactly.  You know,
23 it wasn't like every day.  I would say over the
24 course of a year maybe three or four times, and

Page 30

1 that typically would come, you know, if he
2 had a bad losing month and I felt that, you know,
3 recommendations had, you know, too much risk or
4 maybe we should make an adjustment with that.
5    Q    So when's the first time you communicated
6 with Mr. Evans about concerns you had?
7    A    That I don't recall.
8    Q    So, I mean, you started in June of 2013?
9    A    June of 2013.
10    Q    And you left in September of '17, right?
11    A    Um-hmm.
12    Q    All right.  So when in here did you
13 first approach Mr. Evans about your concerns?
14    A    I believe there was -- I want to
15 say later 2015 or midway through the year 2015.
16    Q    What happened then?
17    A    So originally Tim Evans wanted to
18 begin to utilize out-of-the-money options selling.
19 And the initial recommendations that he would give,
20 I felt that they had too much risk.
21    Q    And did you say that to Mr. Evans?
22    A    Yes.
23    Q    Did you say it in an email, in person?
24    A    I think I just said it in person.

Page 31

1    Q    All right.  And you said this to Mr. Evans
2 in mid to late 2015?
3    A    I would -- I'm a little hazy.  I would
4 estimate somewhere around there.
5    Q    Got it.
6    A    When he wanted to start utilizing options
7 selling.
8    Q    So was mid to late '15 when this
9 options selling program at Long Leaf was born?
10    A    Yeah, somewhere in that period, you know,
11 like, yeah, mid to late 2015.
12    Q    And what was Mr. Evans or what was Long
13 Leaf Trading doing before that?
14    A    So Tim Evans would give swing trading
15 trade recommendations.
16    Q    What's that mean?
17    A    So that's a buy or sell futures,
18 and the whole time was usually maybe two or three
19 days.  So just a shorter time period trading.
20    Q    All right.  So are you familiar with the
21 Time Means Money program?
22    A    Yes, I am.
23    Q    What's that, please.
24    A    The Time Means Money program was

Page 32

1 the option selling recommendation program that
2 Tim developed.
3    Q    And your testimony is that this
4 program was first developed in mid to late '15,
5 is that right?
6    A    Yes, I believe so.
7    Q    And prior to Time Means Money, Mr. Evans
8 was providing recommendations to customers to use
9 swing trades, these short-term options trades, is
10 that right?
11    A    Yes.  Some clients we would provide
12 the call to provide the recommendation to.  We also
13 had other clients that utilized that with letter of
14 direction.
15    Q    So prior to the institution of
16 Time Means Money, Mr. Evans was generating these
17 short-term options trading recommendations and you
18 were passing those on to clients, is that right?
19    A    I'm sorry.  They weren't short-term
20 options trading.  It was more of a short-term
21 futures trading.
22    Q    So the swing trades that you're
23 describing -- I've just never heard that term
24 before.

Page 33

1    A    It usually means like a two- to five-day
2  time frame instead of, you know, a day trade.
3    Q    And so these trades that were recommended
4  prior to Time Means Money, these were all futures
5  trades?
6    A    Yes, I believe so.  He may have
7  incorporated an options trade here and there.
8  I don't recall exactly, but primarily futures
9  trades.
10   Q    Got it.  So when you first started
11 in June of 2013 at Long Leaf Trading, this is what
12 you were working with, is recommendations to clients
13 for these swing trades, is that right?
14   A    Yes.  I'm sorry.  You mentioned June 2013
15 when I started?
16   Q    Yeah, yeah.
17   A    Yes.  So my first year he -- the way
18 that he had marketing for it was someone would
19 sign up by email for a 90-day trial to view the
20 recommendations.  And the first year I would call
21 people, make sure that they're receiving the emails,
22 see if they had any questions.  And then for people
23 that had interest, either Tim or another senior
24 broker would actually work with them.

Page 34

1    Q    All right.  So how were these
2  recommendations for the swing trades provided to
3  customers?
4    A    When I started in June 2013, over
5  that first year I believe all clients that utilized
6  that service did it through letter of direction.
7    Q    And what about after June of 2014?
8    A    After June of 2014, from what I recall,
9  those clients still primarily utilized letter of
10 direction with that.
11   Q    All right.  So the recommendations
12 weren't really sent out.  Brokers at Long Leaf
13 Trading would trade pursuant to this letter of
14 direction, is that right?
15   A    Tim would do that.
16   Q    Tim would do that?
17   A    Yeah, we did not execute trades.
18   Q    So did the customers have an understanding
19 of what the recommendations were, even if they --
20 the customers weren't sort of approving each trade
21 as we saw later?
22   A    Yes, because most customers opted
23 to stay on the email that was sent out along with
24 the recommendation.  So they were following those

Page 35

1  recommendations or those types of recommendations
2  for 90 days before they would actually utilize them
3  in a live trading account.
4    Q    Got it.  And who sent out these emails?
5    A    Tim did.
6    Q    Did he copy you on them?
7    A    He sent them to me.
8    Q    Okay.  So is it fair to say that from
9  the time you started in June of 2013 through mid
10 to late 2015, Long Leaf Trading was trading client
11 accounts pursuant to letters of direction, is that
12 right?
13   A    Not every client.  For that futures
14 trading service, yes.  But I also after my first
15 year, I did have individual clients that, you know,
16 I would more customize strategies to.  So they might
17 do futures trading or options trading, just
18 depending on what they were looking for.
19   Q    Got it.  So it sounds like not everybody
20 participated in the swing trading program?
21   A    No, not everyone.
22   Q    All right.  What percentage
23 of customers, of your customers participated in
24 swing trading?

Page 36

1    A    If I were to guess at that time,
2  maybe 60 or 70 percent.  My other client list was
3  very small that did other stuff.
4    Q    All right.  And the 30 or 40 percent of
5  your clients that didn't participate in the swing
6  trading program, did you give them recommendations?
7    A    Yes, I did.
8    Q    And who generated those recommendations?
9    A    Both myself and Tim did.  So if I had
10 a recommendation, and it wasn't every time, but
11 I would typically run it by Tim to get his thoughts
12 on it as well.
13   Q    All right.  And were these -- can
14 you characterize these recommendations that
15 you provided?  I mean, we were talking before,
16 you know.  I said what kind of recommendations
17 were, you know, given to people at Insignia
18 and you said oh, out-of-the-money options
19 recommendations.
20        Can you similarly characterize
21 your own recommendations to clients at Long Leaf
22 or is it all over the place?
23   A    Kind of all over the place.  So
24 option buying recommendations, option selling

Page 37

1 recommendations, individual futures trades. I did
2 not do naked option selling recommendations. It was
3 pretty all over the place.
4    Q    And did all of your customers who
5 received your recommendations, did they all get
6 the same recommendations or is it kind of person
7 by person?
8    A    It was kind of person by person.
9    Q    Got it. All right. So it sounds like
10 things changed in mid to late December at Long Leaf
11 Trading, right?
12    A    Yes.
13    Q    All right. And that was the advent of
14 this Time Means Money program, correct?
15    A    That is correct.
16    Q    So after the Time Means Money
17 program came into being, did you still provide
18 your individualized recommendations to customers?
19    A    I did. But from there after the
20 program was launched, Tim didn't want me to do
21 that much anymore, go after that type of business,
22 because we wanted my focus to be on sales where he
23 would have the focus of trading.
24    Q    And Mr. Evans said this to you?

Page 38

1    A    Yes.
2    Q    And approximately when did he say that?
3    A    I don't know specifically. I would
4 guess around 2015 when the program was started.
5    Q    Got it. So do you have any knowledge
6 or understanding of where this program came from?
7 Like whose idea was it? It seems like you guys were
8 doing business and then it completely changed.
9    A    Yes. So at Kingsview Financial they
10 had a similar program -- or it was at another
11 company, LaSalle, I believe before that. But
12 where the program came from was a contact I had at
13 Kingsview Financial. I reached out to him because
14 Tim was interested in being able to do interviews
15 on like Fox Business for those TV spots. So my
16 contact from Kingsview had those relationships
17 and knew like who to refer him to.
18    Q    So how did that turn into Time Means Money?
19    A    So I know that Tim worked with him on
20 the TV stuff, and I believe he gave him the idea
21 for the Time Means Money idea.
22    Q    So who's this person at Kingsview? What's
23 his name, please.
24    A    His name was Matt Zeman.

Page 39

1    Q    How do you spell the last name, please.
2    A    Z-e-m-a-n. M, as in "Mary," a-n. Sorry.
3    Q    All right. So how do you know that
4 Matt Zeman gave Tim Evans the idea for this option
5 selling strategy?
6    A    That was just my understanding from
7 Tim. I don't remember him specifically saying that,
8 but that Matt had brought it up or gave him the idea
9 to develop an options program like that.
10    Q    Did Tim ever tell you why he
11 wanted to make this change, this change from,
12 you know, the swing trading and more individualized
13 recommendations to a more standardized program
14 of recommendations?
15    A    It was my understanding that he wanted
16 for us to be more focused on sales.
17    Q    And what's your basis for thinking that?
18    A    Because through the new approach, he
19 would be able to do all the trade recommendations,
20 and the brokers would primarily be able to both
21 deliver those recommendations but also focus on
22 getting additional clients.
23    Q    Got it. So I want to go back and
24 talk a little more about this swing trading. So

Page 40

1 the swing trading that you saw from June of '13
2 when you started, you know, to mid to late '15,
3 how did clients do?
4    A    There were periods where it actually
5 performed very well, and then he also had periods
6 where if he went a month or two with a drawdown,
7 then we would lose a lot of clients.
8    Q    What do you mean by a drawdown?
9    A    Where he had a period where recommendations
10 were consistently losing money.
11    Q    So why do you call that a drawdown?
12 I'm sure you have a good reason.
13    A    Because giving the recommendations,
14 you know, if you have a period of like three or
15 four losers, I would call that a drawdown in the
16 performance of those recommendations.
17    Q    Got it. So during your tenure
18 at Long Leaf, were there any customers that made
19 money from these swing trading recommendations?
20    A    There were.
21    Q    What were their names, please.
22    A    I remember -- and it's because it's
23 my very first client -- Kathleen Tarnoff I believe
24 the name was.

Page 41

1    Q    And how much did Ms. Tarnoff make,
2  expressed either as a percentage or as a dollar
3  figure or both?
4    A    I think $1,000 on a $10,000 account.
5    Q    And that was over what time period?
6    A    I think it was a few months.
7    Q    Was Ms. Tarnoff then able to realize
8  and utilize that $1,000 profit or was it sort of
9  later traded away?
10   A    No, she closed her account after that.
11  That's how I remembered it from my first client.
12   Q    So she got out while the getting was
13  good, is that fair to say?
14   A    Yes, that's fair to say.
15   Q    Other than Ms. Tarnoff, any other
16  persons you're aware of, customers who made money
17  with these swing trading recommendations?
18   A    I remember there were. I don't remember
19  specific names.
20   Q    Do you remember how many?
21   A    No, I don't remember.
22   Q    Was it do you think more than ten,
23  less than ten?
24   A    I would think more than ten.

Page 42

1    Q    Do you think more than 20?
2    A    No, not more than 20.
3    Q    So between 10 and 20?
4    A    Yeah, I'd estimate it right around there.
5    Q    So between 10 and 20 customers made
6  money from these swing trading recommendations while
7  you were at --
8    A    Well, what I meant was like, you know,
9  they would make money and a lot of people would
10  close their accounts after they made money. Clients
11  that stuck with like the swing trading over a long
12  period of time ended up losing money.
13   Q    And was that the majority of Long Leaf's
14  clients that you're aware of?
15   A    The majority that -- can you clarify --
16  that tried out the recommendation service?
17   Q    Yeah.
18   A    I don't know. The recommendation
19  service, a lot of people would do it for two or
20  three months and then, you know, they might leave,
21  whether they were up money or down money. In terms
22  of the number of clients that stayed with it for
23  a long period, I'm not sure.
24   Q    Okay. So how many clients did --

Page 43

1  well, I guess I should just ask did you have clients
2  that participated in this swing trading program?
3    A    Yes, I did.
4    Q    All right. How many, please.
5    A    I don't recall specifically. Maybe not
6  more than ten.
7    Q    And that's over the course of the
8  entire like year and a half that this was going on?
9    A    Yeah, yes.
10   Q    All right. And of those ten you
11  remember one client, Kathleen Tarnoff, made money,
12  right?
13   A    Yes.
14   Q    And she made $1,000 on a $10,000 account,
15  right?
16   A    I believe so, yes.
17   Q    And that's basically because she
18  traded for a month and got out while the getting
19  was good, is that accurate?
20   A    Yep, that is accurate.
21   Q    All right. Of your remaining nine
22  customers, did any of them walk away with money
23  from this swing trading program?
24   A    I don't recall if people walked away

Page 44

1  making money.
2    Q    Did the rest of them lose money swing
3  trading?
4    A    I don't know if the rest of them
5  lost money. I know some did lose money swing
6  trading.
7    Q    All right. So you had ten customers
8  that were doing this swing trading thing. How
9  many customers did you have that were taking your
10  recommendations?
11   A    I believe it may have been five.
12   Q    How did they do?
13   A    Those customers lost money.
14   Q    Did they all lose money?
15   A    Yes, I believe so.
16   Q    All right. So let's talk about the
17  rest of the firm, and I'm focusing in this pre
18  Time Means Money period.
19   A    Okay.
20   Q    So June of 2013 through mid to late
21  2015. How many other brokers were working at Long
22  Leaf Trading during that time?
23   A    So June 2013 until May -- or until
24  June 2014 it was myself, Brian Booth and Tony

Page 45

1 Klancic.
2    Q    All right.
3    A    In May 2014 Brian Booth was fired.
4    Q    What was he fired for?
5    A    He was planning on moving to Las Vegas
6 and switching careers and gave Tim notice that he
7 would be leaving at some point in the near future,
8 and it was my understanding that Tim fired him.
9    Q    All right.  So do you have an
10 understanding of how many clients the firm had
11 total that were participating in this swing trading
12 program?
13    A    I don't.
14    Q    Do you have any understanding of how
15 those clients did?
16    A    I know over -- for clients that stayed
17 with it for a longer time, like over a year, they
18 ended up losing money.
19    Q    So how do you know that?
20    A    Because we had periods where clients
21 would close after -- close their accounts after
22 a month or two of poor performance.
23    Q    Well, could you see how your clients
24 were doing in the swing trading program?  Did you

Page 46

1 like get their account statements?
2    A    My first year my senior broker would
3 get their account statements, and then I would
4 just -- I didn't have access to an online account
5 or anything like that.
6    Q    But would your senior broker forward those
7 statements to you so you could see?
8    A    Not that I recall in my first year.
9    Q    Well, it sounds like -- so here's
10 what I'm getting at, right?  You're telling me
11 that you understood that the recommendations weren't
12 profitable because you had customers that closed
13 their accounts after a short period of time,
14 correct?
15    A    Correct.
16    Q    Yeah.  Now, your testimony was that
17 customers who stuck with the swing trading program,
18 say for a year or more, your testimony is that they
19 all lost money, right?
20    A    Yes, correct.
21    Q    So how do you know that?  I mean,
22 those are guys that are participating over a longer
23 period of time, right?
24    A    Well, after -- yeah.  So after

Page 47

1 a year and a -- or after that first year I would
2 get account statements.  But also it was, you know,
3 Tim would let us know, you know.  It was very
4 evident when trades were losing or if a client
5 closed his account.
6    Q    When you say it's very evident -- well,
7 let me run it back.  So I think you said Tim would
8 let you know, is that right?
9    A    Well, not like specifically come
10 out and let us know, but he would make it evident.
11    Q    How?
12    A    You know, he would be upset.  He would,
13 you know, scream a vulgar term.
14    Q    That could have been anything.  How do
15 you know it was because of poor trade performance?
16    A    Because you would inquire about what
17 it was about, and he would say it was a poor trade
18 or a trade lost.
19    Q    I asked you before and you told me,
20 and I can't find where I wrote it.  When's the
21 first time that you confronted Mr. Evans about the
22 poor performance of these trade recommendations?
23    A    I believe it was that two -- well,
24 I don't remember if I confronted him about the

Page 48

1 swing trade recommendations.  But in terms of the
2 Time Means Money recommendations, that was when it
3 was first started, around 2015.
4    Q    And maybe confronted is the wrong word,
5 you know, communicated.  Did you ever communicate
6 with Mr. Evans about any concerns you had regarding
7 the swing trade recommendations?
8    A    Not that I recall.  That was a period
9 where I was still relatively green and kind of
10 intimidated by them.  So I don't think that I would
11 have approached him about that, especially in the
12 first year.
13    Q    Got it, got it.  So when's the first
14 time you communicated with Mr. Evans about concerns
15 you had about trade recommendations?
16    A    From -- the one I recall was in 2015.
17    Q    And what month, please, or time of year.
18 I'll take a spring or a summer.
19    A    I believe it was around the fall.
20 It was after the start of the Time Means Money
21 program.
22    Q    And what happened?
23    A    Tim had -- I believe it was the first
24 month or two that he provided the recommendations

Page 49

1 for Time Means Money, and I felt that they had
2 way too much risk in them, or the recommendations
3 did.
4    Q   And did you communicate that to Mr. Evans?
5    A   I did.
6    Q   How did you communicate that?
7    A   I believe it was a discussion, just
8 letting him know that he should make adjustments
9 to find a less risky type position.
10    Q   And how did Mr. Evans respond?
11    A   I don't recall exactly how he
12 responded with it. Some changes were eventually
13 made. I don't know if they were made like right
14 after that.
15    Q   And what changes were made in response
16 to the concerns that you expressed?
17    A   So the primary change that was
18 made was -- from what I recall, it was using a
19 less risky position, so a smaller spread position.
20    Q   And when was that instituted?
21    A   I don't remember the time frame that
22 that would have been instituted.
23    Q   Got it. So in fall of 2015 when you
24 had this first conversation with Mr. Evans about

Page 50

1 the Time Means Money recommendations, did you say
2 anything else? So you expressed concern about risk,
3 right?
4    A   Um-hmm.
5    Q   Yes?
6    A   Oh, sorry. Yes, I gave concern about
7 risk.
8    Q   All right. Any other concerns you
9 addressed with Mr. Evans?
10    A   Not that I recall at the time.
11    Q   All right. So when is the next
12 conversation you had with Mr. Evans about the
13 trade recommendations under the Time Means Money
14 program?
15    A   I don't remember the last time --
16 or the time after that that I spoke with him
17 about it.
18    Q   Do you remember any other occasions
19 where you addressed concerns with Mr. Evans about
20 the Time Means Money program?
21    A   On occasion. It may have been
22 bimonthly or every few months I would give a
23 concern if we were in a period where recommendations
24 had lost.

Page 51

1    Q   Do you remember the specifics of any
2 of those instances?
3    A   I don't.
4    Q   So how did you express this to Mr. Evans?
5    A   I would -- the way that I would express
6 it was typically offering my assistance, kind of
7 like a second set of eyes on positions or I might
8 recommend using, you know, a different time frame
9 or a different type of strategy.
10    Q   And did Mr. Evans ever take you up on that?
11    A   I don't remember. Like in those earlier
12 ones, I don't believe so. I don't think he ever
13 changed the way that he did the recommendations.
14 A lot of the times when -- from what I remember,
15 when I would come to him with a concern, he would
16 pretty much have me understand that it's just been,
17 you know, like a rough period for options selling
18 and, you know, he thinks it will change.
19    Q   Did you accept that?
20    A   I did. He taught me kind of the basics
21 of the markets and things like that. So I looked
22 up to him as, you know, a figure that knew what he
23 was talking about with trading.
24        MR. BURDEN: Gary? Oh, sorry. You're

Page 52

1    leaning forward like you --
2        MR. SINCLAIR: No, no, no. Thanks for
3    checking but, no, I'm fine.
4 BY MR. BURDEN:
5    Q   All right. You know, I got way ahead
6 of myself and I didn't really sort of ask you to
7 explain to me what Time Means Money is. So let me
8 ask you, if I could, please, could you describe the
9 nature of the Time Means Money program.
10    A   Yes. So the Time Means Money program
11 was a recommendation service that gave clients
12 options selling recommendations.
13    Q   All right. And how many times a month
14 did clients receive -- there's no good way to ask
15 this, but how many recommendations did clients get
16 a month? How about that?
17    A   They got four recommendations per month.
18    Q   Got it.
19    A   When the program was started, I don't
20 remember if they got four. But towards the end
21 before I left, clients got four recommendations
22 per month.
23    Q   Got it. And is it fair to characterize
24 these as out-of-the-money options spread trades?

Page 53

1    A   Correct, yes.
2    Q   All right.  And during your tenure
3  at Long Leaf Trading, the recommendations were
4  for credit spreads, is that correct?
5    A   Initially when he started the Time
6  Means Money program they were credit spreads, and
7  then he eventually transitioned the recommendations
8  to primarily being iron condors.
9    Q   Is an iron condor not a credit spread?
10   A   Well, it's two credit spreads.
11   Q   Got it, okay.  I meant as opposed to --
12   A   Well --
13   Q   -- debit spreads.
14   A   Yeah, so technically it was a credit
15  spread.
16   Q   Okay.  And what was the reason for this
17  transition?  Did Mr. Evans tell you?
18   A   He didn't -- I don't recall him
19  telling me specifically why he did that transition
20  into the iron condor positions.
21   Q   Got it.  So did Mr. Evans ever tell
22  you why customers got four recommendations a month
23  as opposed to like two or six?
24   A   Yes.  He -- the way I understood

Page 54

1  it, it was how he -- it was diversification.
2    Q   Okay.  What did Mr. Evans say to you
3  about that?
4    A   You know, I don't recall exactly.  But
5  it was to use four different positions, you know,
6  that wouldn't be real like influenced by each other.
7    Q   Got it.  And do you know if that's correct?
8    A   I don't know if that's correct.
9    Q   And what I'm getting at here is
10  like did Mr. Evans ever explain to you why
11  four recommendations and not two or six?  Like
12  diversification, sure, I get it.  Why not eight?
13   A   He did.  He gave -- the explanation
14  that I remember was in reference to a marginal --
15  like a marginal benefit.  And at some point that
16  marginal benefit became less, so that's why he would
17  stop it at four.
18   Q   Do you know why four and not some
19  other number?
20   A   No, I don't know.
21   Q   Did you ever ask?
22   A   No, because when he trained us
23  on it and gave us that explanation of marginal
24  benefit, you know, that's what I understood it as.

Page 55

1    Q   All right.  And during your tenure at Long
2  Leaf Trading, did your roles or responsibilities
3  change?
4    A   So after my first year, that's when
5  I began a role of a senior broker, so actually
6  working with clients.  And after the Time Means
7  Money program was started, there was a time after
8  that that Tim wanted to hire junior brokers that
9  were supposed to work with us and, you know, give
10  us leads to run appointments with.
11   Q   And did you receive junior brokers?
12   A   Yes, I did.
13   Q   And who were they, please.
14   A   My first junior broker was Mark Burns.
15   Q   Okay.
16   A   And my second junior broker was Jack
17  Konrath.
18   Q   And that's with a K?
19   A   With a K, yes.
20   Q   And any others?
21   A   No.
22   Q   All right.  And did you have the
23  ability to -- did you supervise these guys, Burns
24  and Konrath?

Page 56

1    A   The training that we did was in
2  a group environment.  So the way that it operated
3  was Tim trained and ran group training with the
4  guys, and then I would assist with training them,
5  with learning Long Leaf's scripts and things like
6  that.
7    Q   Did you fire Burns or Konrath?
8    A   No, I did not.
9    Q   Did you have the ability to fire them?
10   A   I did not.
11   Q   Did you hire them?
12   A   I interviewed Mark Burns over the
13  phone, and Tim interviewed him in person and
14  decided to hire him.  John Konrath, he was actually
15  a friend of mine's younger brother.  So I brought
16  him in to speak with Tim and Tim hired him.
17   Q   Got it.  All right.  So it sounds
18  like at Long Leaf Trading you started as a junior
19  broker, is that right?
20   A   Yes.
21   Q   And after your first year there, you
22  transitioned to a senior broker, is that right?
23   A   Yes.
24   Q   And you were working with clients in

Page 57

1 that capacity?
2    A    Correct.
3    Q    All right.  And did you have any
4 other roles at Long Leaf Trading after that?
5    A    No.
6    Q    And as a senior broker, your
7 responsibility was to be on sales calls with clients
8 and deliver the recommendations that Mr. Evans
9 generated, is that fair to say?
10   A    Yes, correct.
11   Q    Any other responsibilities as a senior
12 broker at Long Leaf Trading?
13   A    No, I don't believe so.  It was sales
14 and recommendations.
15   Q    Got it.  So what is the -- what
16 was the basis for your compensation at Long Leaf
17 Trading?  And what I want to try to get at here is
18 what's the breakdown between, you know, salary or
19 commissions, things like that.  And it sounds like
20 maybe it changed over time?
21   A    Quite a few times.
22   Q    Yeah.  So walk me through it, if you would,
23 please.
24   A    So when I started as a junior broker,

Page 58

1 the way that I was paid was a $1500 monthly salary.
2 And any clients that I helped bring on, I got
3 10 percent of the commission from that client.
4    Q    And did you bring on any clients?
5    A    That first year I brought on some.
6 I don't remember how many.  It wasn't very many.
7    Q    Got it.  So when you transitioned
8 to a senior broker, what was the comp structure
9 then, please.
10   A    So the senior broker compensation
11 structure was no salary and a 40 percent commission.
12   Q    And that 40 percent commission, is that
13 40 percent of Long Leaf's cut?
14   A    It was never really clear to me.
15 It wasn't -- I know it wasn't the gross commission
16 that -- Long Leaf's like fees and things like that
17 were taken out.
18   Q    Got it.
19   A    But I was never very clear on that.
20   Q    All right.  So did that no salary,
21 40 percent commission structure change over time?
22   A    Yes, it did.
23   Q    And when did it change, please.
24   A    So when Tim hired additional junior

Page 59

1 brokers after the program had been started in 2015,
2 those junior brokers, they received a $1500 salary
3 and a 20 percent commission and I was responsible
4 for $750 of that salary.
5    Q    So you had to pay them 750?
6    A    Yes, and then they -- and then I received
7 a 20 percent commission on those accounts.
8    Q    So that seems like a worse deal to me.
9 Is that a worse deal or did the volume make up for
10 it?  What's going on there?
11   A    It got worse.  So after Tim hired
12 more brokers, he bumped up the amount that we
13 had to pay to -- I forgot how much it was, but we
14 had to pay for junior brokers that we didn't agree
15 that were there and that didn't even work directly
16 with us.  And then there was a number of times
17 through 2015 -- or, I'm sorry, 2016 and '17 that
18 Tim had adjusted our pay structure.  And in August
19 before I left he sent out a -- I believe it was
20 a memo or an email that said the new top tier
21 commission rate is 20 percent, regardless of
22 who's working with it.
23   Q    Isn't that what it was already, though?
24   A    No.  So when you worked with a --

Page 60

1 when a junior broker gave you a lead, you and
2 the junior broker each got 20 percent.  If you
3 had a client that was taken on like by yourself
4 without a junior broker, that could still be
5 a 40 percent commission rate but he had adjusted
6 it to be 20 percent.
7    Q    Got it.  So after you became a senior
8 broker, there was really no more salary and, in
9 fact, you were sort of making contributions toward
10 the salaries of the junior brokers?
11   A    Correct, yes.
12   Q    And all other income that you would
13 see accruing to you would be commission, is that
14 correct?
15   A    Yes.
16   Q    So that 750 you've got to pay,
17 does that come out of your paycheck or did you
18 have to provide it to them, I don't know, in cash,
19 with a check or something?
20   A    No, that came out of my paycheck.
21   Q    Got it.
22      MR. PATRICK:  Were the commissions
23   that were paid by customers, your customers
24   while you were at Long Leaf, were they all

Page 61

1   the same or was that set at the time that the
2   account was opened?
3       THE WITNESS:  It was set at the time.
4   I believe the rate was $35.  I'm not clear
5   on if that changed or not.  I don't believe
6   it went higher than $35, but I don't really
7   remember that.
8       MR. PATRICK:  Were all of your customers
9   paying a $35 rate?
10      THE WITNESS:  Well, actually, so
11  clients that would do, for example, like
12  an individual future option, they would
13  pay a $50 rate.  And then if it was part of
14  a spread, then the rate was $35.  From what
15  I recall, that's how my clients were set up.
16  BY MR. BURDEN:
17      Q   All right.  Mr. Leeney, I want to
18  switch gears a little bit and talk about the Long
19  Leaf Trading office space.
20      A   Okay.
21      Q   What's it look like, please.
22      A   So which time period are we referring to?
23      Q   Did it change?
24      A   A few times, yes.

Page 62

1       Q   Okay.  Did you guys move buildings
2   or were you always in that address that I forget?
3       A   So we originally were in the
4   Monadnock Building.  We were there when I started
5   in 2013, and I believe we -- so we were in a very
6   small office there my first year.
7       Q   You know, let me stop you.  I'm
8   familiar with the Monadnock Building because my
9   wife works there.  Where were you working in January
10  of -- let's say September of '14?
11      A   September '14 would be at the Monadnock
12  Building.
13      Q   Okay.  And when did you move to the
14  Board of Trade building?
15      A   That would be -- or I think it
16  was June 2016, I want to say.  I'm not sure.
17      Q   So the Monadnock Building, how big --
18  well, was it one big office?
19      A   It wasn't big.  We were in two offices
20  at the Monadnock Building.  The first office was
21  very small.  It had a main room that was roughly
22  about the size of this conference room and then
23  a separate office.
24      Q   And who was in that separate office?

Page 63

1       A   Tim was in the separate office.
2       Q   And did you share that main office
3   with other brokers?
4       A   Yes.  Tony Klancic, Brian Booth and myself.
5       Q   And so when they were talking on the
6   phone to clients, could you hear what they were
7   saying?
8       A   Yes.
9       Q   Could they hear what you were saying,
10  do you think?
11      A   Yes, they could.
12      Q   So would Mr. Evans, would he come out
13  and listen to people on calls?
14      A   So his office was attached to that
15  main room, and he would leave his office door open
16  or come out and listen to people.
17      Q   Got it.  Could you hear what
18  Mr. Evans was saying on the phone if the door
19  was open?
20      A   Yes.  It would just depend on how loud
21  he would be.
22      Q   Got it.
23      A   I was kind of like further like away
24  from the door.  So I wouldn't say like everything

Page 64

1   but --
2       Q   A lot of things?
3       A   Yeah.
4       Q   All right.  So in June of '16 Long Leaf
5   moved from the Monadnock Building to the Board of
6   Trade, is that right?
7       A   Yes.  Before that we moved into a bigger
8   office in the Monadnock Building and then moved to
9   the Board of Trade after that.
10      Q   Got it.  So that bigger office in the
11  Monadnock, describe that for me, please.
12      A   So that was a bigger space with
13  a kitchen in there.  There was a main bullpen-
14  type area where the brokers would sit.  And then
15  there was a separate office within that office,
16  which was Tim's office.
17      Q   Got it.  And so could you hear the other
18  brokers?
19      A   I could.  But there were partitions
20  like in that office, so that was a little tougher.
21      Q   Got it.  Did the partitions go all the
22  way to the ceiling?
23      A   No, only -- like the space I was in
24  was -- it was kind of like almost a separate office,

Page 65

1  but it was open like with a partition.  There like
2  wasn't a wall.
3      Q    How high is the partition, like eye height?
4      A    Up to my chest maybe.
5      Q    Got it.  So when you moved to the
6  Board of Trade office, what did that look like,
7  please.
8      A    So the first office at the Board of
9  Trade was a Regus suite, so Tim had three separate
10  Regus offices.  So some brokers were in one, some
11  brokers were in another, and then Tim had a separate
12  office in there.
13      Q    Got it.  So who were you in with?
14      A    The arrangement changed a lot.
15  I was in my suite with Mark Burns, Jack Konrath,
16  Vince Prieto and I believe James Hatzigiannis.
17      Q    Hatzigiannis?
18      A    Hatzigiannis.  The other -- there was
19  another broker in there, Brendan Sears.  I don't
20  think he was in there very long, though.
21      Q    And was this another open office plan?
22      A    Well, in our individual office it was,
23  but there were doors to these because they were
24  technically separate like Regus suites.  They were

Page 66

1  all just kind of next to each other.
2      Q    Got it.  So in your office that you shared
3  with your two junior brokers, Mr. Hatzigiannis,
4  Mr. Sears, Mr. Prieto, could you hear what they
5  were saying?
6      A    Yes.
7      Q    Could they hear what you were saying,
8  do you think?
9      A    Yes.
10      Q    All right.  So it sounds like -- oh, so
11  I should ask did Mr. Evans come and periodically
12  tour your office?
13      A    He would.
14      Q    Listen to calls?
15      A    Yeah, we typically -- I believe we
16  would keep like the doors open.  But they were
17  closed, they were open sometimes.  So he would be
18  in and out, from what I remember.
19      Q    And it sounds like maybe you had this
20  suite of three offices at the Board of Trade, right?
21      A    Yes.
22      Q    Did you move to a different suite at some
23  point?
24      A    Yes, we did.  So I believe it was

Page 67

1  June 2017 we moved to the -- it was like a large
2  open space where everyone was in one room.
3      Q    And did everyone include Mr. Evans?
4      A    Yes, he was in there as well.
5      Q    So just one big bullpen?
6      A    Correct.
7      Q    And how many brokers do you guys have
8  in there?
9      A    I would estimate 11 or 12.
10      Q    That must have been very noisy.
11      A    Very.
12      MR. SINCLAIR:  Can I ask one question
13  because I'm sort of familiar with the Regus
14  suites.  Was this your own separate suite or
15  was it within that whole Regus bullpen area?
16      THE WITNESS:  No, this was in our
17  own separate suite.  They put up like walls
18  or they did like a new construction for it.
19      MR. BURDEN:  Got it.  And, by the way --
20  you'll probably remember this -- at the end
21  I'll ask you if you have any questions for
22  your client.  So don't worry about missing
23  opportunities.
24      MR. SINCLAIR:  No, I just wanted to

Page 68

1  help clarify it.  That's all.
2      MR. BURDEN:  Thank you.  All right.
3  Tell you what.  We've been going for an hour
4  and a half.  Why don't we take a quick break
5  and we'll come back and do some documents.
6      MR. SINCLAIR:  Sounds great.
7      (Whereupon a recess was taken from
8        10:42 a.m., to 11:08 a.m., after
9        which the following proceedings
10        were had:)
11      MR. BURDEN:  I want the record to
12  reflect that Mr. Leeney and Mr. Sinclair have
13  graciously agreed to allow Matt Edelstein to
14  sit briefly in on the testimony, though he is
15  not on the formal order.  Is that still all
16  right with you guys?
17      MR. SINCLAIR:  It is.
18      THE WITNESS:  Yes.
19      MR. BURDEN:  Very good.  Thank you.
20      (WhereuponCFTC Exhibit No. 83 was
21        marked for identification, MM.)
22      Q    Mr. Leeney, I want to hand you what
23  I have marked as CFTC Exhibit 83.  I want you to
24  take a look at this document, if you would, please.

Page 69

1    A    Okay.

2    Q    And do you recognize this document,

3 Mr. Leeney?

4    A    Yes, this would be a trade recommendation

5 email.

6    Q    All right.  And this is an email that

7 you sent, correct?

8    A    Yes.

9    Q    To whom?

10   A    To Jose -- I believe this was Jose Luciano.

11   Q    Is that a customer of yours?

12   A    He was, yes.

13   Q    All right.  This is the first trade

14 recommendation that I saw in your emails.  Were

15 there trade recommendations that you emailed out

16 prior to September of 2016?

17   A    I don't recall.

18   Q    I think your testimony was that the

19 Time Means Money program started in mid to late

20 2015, is that right?

21   A    Yes, that's correct.

22   Q    So how do recommendations go out initially?

23   A    So initially when we started it, I believe

24 it was a phone call.

Page 70

1    Q    All right.  And at some point you

2 started sending emails to the customers, is that

3 right?

4    A    Yes, correct.

5    Q    And don't take my word for it.  Does

6 September of 2016 sound like about the time when

7 that happened?

8    A    I would estimate it was around that time.

9    Q    Okay.  So why the transition from phone

10 calls to emails, if you know?

11   A    It was just a matter of getting the

12 recommendation approval quicker.

13   Q    And you found that it was quicker to

14 send by email?

15   A    Yes.

16   Q    All right.  So looking at 83, we see

17 some text here talking about the first initial

18 three positions for your portfolio and it describes

19 some trades, is that right?

20   A    That is correct.

21   Q    All right.  So who wrote this?

22   A    I wrote this email.

23   Q    All right.  And who came up with the trade?

24   A    These trades would have been from Tim

Page 71

1 Evans.

2    Q    So what was the basis for this

3 recommendation?  Like you'll see the first one

4 it says, "We will be selling 2 November 1350

5 to 1360 call spread and purchasing 2 December 1375

6 to 1385 call spread.  We will be collecting a net

7 credit of $320 with a maximum profit potential of

8 $1600."  Did I read that right?

9    A    Yes.

10   Q    All right.  So who -- why is that the

11 recommendation for this email?

12   A    So the November call spread would

13 be sold with the thought that the market would

14 be below that call spread at expiration, and then

15 the further call spread would be purchased with the

16 expectation that the market would be above that call

17 spread at that December expiration.

18   Q    Got it.  And these spreads are in gold,

19 is that correct?  The first recommendation anyway.

20   A    Oh, yes.

21   Q    Yeah.  So this recommendation came from

22 Mr. Evans, right?

23   A    Yes, it looks like it.

24   Q    So do you have any knowledge or

Page 72

1 understanding as to why Mr. Evans is recommending

2 this trade in gold, as opposed to anything else,

3 you know, oil, and why Mr. Evans expects the market

4 to do what it ought to do for this to be profitable?

5    A    I don't know.

6    Q    Did you ever ask Mr. Evans what the basis

7 for his recommendations are?

8    A    We would ask for an explanation before

9 we gave the recommendation.  His explanation was

10 usually pretty brief, maybe, you know, kind of a

11 couple of sentences.  We think gold will go up for

12 this reason or we think gold will go down for this

13 reason.

14   Q    Do you recall what the reason was for

15 the gold spread in Exhibit 83?

16   A    No, I don't recall what the reason was.

17   Q    All right.  So do you have any

18 understanding of whether Mr. Evans had some kind

19 of method for his recommendations?

20   A    In terms of a method, no.  He would

21 usually look for an iron condor based off of like

22 volatility or technical analysis, and it was my

23 understanding that he structured the positions

24 primarily around like technical analysis.

Page 73

1    Q    Got it.  So did Mr. Evans ever
2  explain this technical analysis to you for a
3  particular trade?  Did he ever talk about what he
4  did to research the trade?
5    A    There were trades that he would give
6  like a general explanation, we're expecting this
7  resistance and this support to hold.  In terms of
8  really in depth, not that I recall.
9    Q    So I want to take a step back.  You
10 said the basis for Mr. Evans' recommendations as
11 you understand it is historical volatility, is that
12 right?
13   A    It was current market volatility.
14   Q    Got it.  And technical analysis, right?
15   A    Yes, I believe so, yeah.
16   Q    So when you say that you understood
17 Mr. Evans' recommendations to be based on current
18 market volatility, what does that mean?  What's he
19 looking at, if you know?
20   A    He would look for a big move in a
21 market, you know, a big rally or a big selloff.
22   Q    And what would he do with that information
23 if he found a big rally or a big selloff?
24   A    He would try to sell an option to collect

Page 74

1  like an overinflated premium.
2    Q    All right.  So how do you know this is
3  what Mr. Evans was doing?
4    A    When he gave us recommendations, you know,
5  if he was giving us that brief explanation, part of
6  the explanation would be, you know, the market moved
7  X so we can take advantage of volatility by selling
8  an option and collecting a premium.
9    Q    All right.  So you mentioned as well
10 that Mr. Evans you understood relied on technical
11 analysis, is that right?
12   A    Yes.
13   Q    So that's a pretty broad term.  What
14 does that mean or what do you understand it to mean?
15   A    I understand it to mean historical price
16 analysis.  So finding, you know, areas of support,
17 resistance, chart patterns.
18   Q    All right.  So why do you think that's
19 what Mr. Evans was doing?
20   A    Like why is he basing it off of technical
21 analysis?
22   Q    No.  Like did he show you?  Did he tell
23 you?  Like did you surmise that?
24   A    Well, my first year at Long Leaf Trading

Page 75

1  Group, a lot of my training was him teaching me
2  like technical analysis.
3    Q    Continue, please.
4    A    So basic technical analysis, support,
5  resistance, momentum indicators, what different
6  chart patterns are.
7    Q    All right.  How do you know that
8  Mr. Evans used that technical analysis to come
9  up with trades for customers?
10   A    When he would give a recommendation to
11 us and he was giving the explanation, sometimes he
12 would include technical analysis, whether we would
13 have, you know, support in the market here or this
14 market was trending, you know, this direction.
15   Q    And how would he deliver this explanation
16 to you?
17   A    He would do it in person.
18   Q    All right.  Were you aware of any other
19 factors that Mr. Evans reviewed in determining trade
20 recommendations?
21   A    Not that I'm aware of.
22   Q    All right.  What role, if any, does
23 customer liquidity and margin availability play in
24 determining what trades to recommend?

Page 76

1    A    So Tim -- in terms of which trades
2  or quantities of trades to recommend, Tim had it
3  set at different account funding levels.  So, for
4  example, a $10,000 account would trade one spread at
5  a time or that's what, you know, the recommendation
6  would be.  A $20,000 account would trade two -- or
7  get two recommendations or the quantity of two in
8  there and so on and so forth.
9    Q    Got it.  So we're looking back at
10 Exhibit 83.  It looks like, you know, you're
11 recommending two spreads to Jose, is that right?
12   A    Correct.
13   Q    All right.  And that's probably
14 because he's got $20,000 in his account, is that
15 correct?
16   A    Well, that was -- so if a client
17 started with $20,000, the initial recommendations
18 would be for a quantity of two.  And as balances,
19 you know, if like balances worked lower or if they
20 worked higher, then Tim would give us the updated
21 quantities for it.
22   Q    Got it.  So when you're making this
23 recommendation for two spreads to Jose, Mr. Evans
24 gave you that number?

Page 77

1   A   Yeah.  So he would monitor the net
2  liquidating values and if he came to -- came with
3  a recommendation, he would give us, you know, the
4  quantities.  You have this guy do this, have this
5  guy do this.
6   Q   So it sounds like sort of the method
7  to Mr. Evans' recommendations, or at least as far
8  as the number of spreads goes, is you get one spread
9  for every 10,000 in your account?
10   A   Roughly, yes.
11   Q   So why is that the magic number?
12   A   The reason being is because he wanted the
13  total risk to be like a certain like percentage of
14  the account.  So that way if the recommendations had
15  a bad month, things didn't get turned upside down
16  or anything like that.
17   Q   So do you have an understanding of what
18  percentage of the account that the total risk was
19  supposed to be?
20   A   In the original -- the sales material
21  they have like a recommended cash management they
22  called it, and that was up to 18 percent.  And
23  when a client came aboard, before we got started
24  we discussed like quantities and stuff with them.

Page 78

1  We would give them a recommended quantity.  So, you
2  know, if they were at 10,000, we would recommend
3  this quantity of -- or spreads at a time to do.
4   Q   So it sounds like the quantity
5  recommended to a client would be such that if the
6  trades went bad that month, that it's not supposed
7  to eat up more than 18 percent of their account,
8  is that right?
9   A   Well, it just depended on what like
10  the client gave us in the orientation I guess
11  because that appointment, it was supposed to be
12  kind of a discussion on expectations.  So during
13  that appointment there were some clients that would
14  be comfortable with higher than 18 percent, other
15  clients that, you know, wanted to be at that
16  18 percent.  But in general like their understanding
17  was, you know, an 18 percent down period if the
18  recommendations were performing poorly.
19   Q   But why 18 percent?  Like is that when
20  you get a margin call or something?  Is there any
21  magic behind that number?
22   A   I'm not sure.
23   Q   Okay.  So you've been talking about
24  maximum sort of risk of loss from the recommended

Page 79

1  positions, and I want to look again at 83.  Where
2  on 83 does it say what the maximum risk is for the
3  recommendations?
4   A   It does not have maximum risk on this.
5   Q   Does that maximum risk show up in
6  later recommendations during your tenure or was
7  it always sort of omitted?
8   A   So the maximum risk, after we put like
9  the -- had the recommendations executed, we sent the
10  clients a chart of each of the recommendations that
11  would include the profit potential and the maximum
12  risk.
13   Q   Got it.  Now, 83 does include the profit
14  potential, though, correct?
15   A   Correct.
16   Q   All right.  And what is the basis for
17  this maximum profit potential that we see in 83?
18   A   The -- can you rephrase the basis?
19   Q   Yeah.  So you're looking at 83,
20  Exhibit 83 and it says, "We will be collecting
21  a net credit of $320 with a maximum potential profit
22  of $1600."  So a person reading this would think,
23  oh, the most I can make, I could potentially make
24  is $1600, is that right?

Page 80

1   A   Yes.
2   Q   So why is the maximum profit potential
3  $1600?
4   A   The maximum profit potential would
5  be $1600 if we made money on the November call
6  spread and made money on the December call spread.
7   Q   Got it.  And how frequently was
8  the maximum profit potential achieved for customers
9  on these recommendations?
10   A   None that I could recall.  Well, the
11  maximum profit potential, like a higher one like
12  this, nothing that I can recall.  A maximum profit
13  potential on a credit spread or like a spread like
14  that, when -- from what I remember, when we won on
15  those positions, it was pretty close.
16   Q   Sorry, so I don't follow.
17   A   Let me see.
18   Q   I asked you how often was the maximum
19  profit potential achieved on recommendations.
20   A   Oh, okay.
21   Q   And what's the answer?
22   A   How often would be not very often.
23   Q   Okay.  Was the maximum profit potential
24  ever achieved on Long Leaf Trading recommendations?

Page 81

1    A    Yes, I believe so.
2    Q    And how frequently, please.
3    A    I don't recall.  If I were to estimate,
4  we may have one of those positions per month, maybe
5  one every two months.
6    Q    Maybe one every two recommendations?
7    A    Or one out of every like four
8  recommendations, I would say.
9    Q    Got it.  So your testimony is that
10  during your tenure at Long Leaf, one out of every
11  four recommendations achieved the maximum profit
12  potential?
13    A    I would estimate about like one
14  out of four the maximum profit potential because
15  other trades, you know, they may have been at like
16  a percentage of the profit potential or something
17  like that.
18    Q    Got it.  And is there a reason why
19  this maximum profit potential was achieved only
20  maybe a quarter of the time?  Was there something
21  in the structure of the trades that made it less
22  likely?
23    A    Not that I know of.  It was typically
24  that, you know, Tim was looking to take a profit

Page 82

1  of a recommendation earlier if he was getting out
2  before it reached like a maximum profit potential.
3    Q    All right.  So looking again at 83,
4  in this first recommendation it says, "We will be
5  collecting a net credit of $320."
6    A    Um-hmm.
7    Q    Do you see that?
8    A    Yes.
9    Q    All right.  So how is this net
10  credit determined?  I mean, it seems like that
11  number is a mix of four different trades, is that
12  right?
13    A    Yes, it is.
14    Q    All right.  So how do you combine those
15  to get a net credit of 320?
16    A    So the credit is being -- a credit
17  is being taken on the November call spread and
18  a debit is occurring for the December call spread,
19  and the $320 is the net credit between those two.
20    Q    Got it.  So what I'm asking -- and if
21  you don't know, then that's a fine answer, as it
22  is to any question.  But is there a means by which
23  prices are sort of apportioned?  Like it seems like,
24  you know, if a customer accepts this recommendation,

Page 83

1  that Long Leaf Trading is going to have to sell
2  these call spreads at prices that are available
3  and then they will have to purchase another spread
4  at prices that are available, and the idea is that
5  it nets out to 320, right?
6    A    Yes, I believe so.
7    Q    So that seems to me like a lot of moving
8  parts.  How do you make it all work?
9    A    For like actually executing the position?
10    Q    Yeah.
11    A    So for that position, from what
12  I recall, he would sell the November 1st, the call
13  spread, and then he would purchase the December.
14  I don't remember if you were able to execute the
15  entire thing as like a spread electronically or
16  what but --
17    Q    So does the customer know what prices
18  his or her trades are being sort of executed to net
19  out to this 320?
20    A    From what I remember, they did.
21    Q    How?
22    A    So it would be through their statements
23  after it was executed, but the reason why he would
24  have us lay it out like this is so that way they

Page 84

1  understood like the dollar amounts behind the
2  prices.  So instead of saying collecting a net
3  credit of 4 or 3, you know, you're given the actual
4  like dollar amount of that credit.  So that's,
5  from what I remember, like why we laid that out
6  like that.
7    Q    Got it.  So in advance of execution
8  customers were just given a net number, but then
9  after execution they learned what particular prices
10  each leg of the trade were purchased or sold at,
11  is that correct?
12    A    Yes.
13    Q    All right.  So let's talk about
14  exiting positions.  So we're looking at 83 and
15  83 talks about getting into spreads, is that right?
16    A    That is correct.
17    Q    All right.  So during your tenure
18  at Long Leaf, did you guys just always let the
19  options expire or did you try to close them out
20  sometimes?
21    A    A lot of the times it was letting the
22  options expire, but there were positions that he
23  would close out.
24    Q    All right.  So how was customer

Page 85

1  approval obtained for positions that were closed
2  out, if it was?
3      A    So typically it would be a time
4  and price discretion on each position.  It wasn't
5  very specific time and price discretion but,
6  you know, it was kind of the client giving us the
7  ability to close this out when you see fit.
8      Q    All right.  So what's your -- and
9  I'm not disagreeing in any way with this.  But
10  what's your basis for saying that clients gave
11  Long Leaf Trading the authority to close out of
12  a position, you know, when and how they see fit?
13      A    They would -- from like what I remember,
14  you know, clients would tell us to get out when we
15  saw fit or give us like the discretion to do so.
16      Q    But how was this discretion provided?
17  Like was it -- how about let's break it down.  So
18  in connection with the Time Means Money program, did
19  any clients execute powers of attorney?
20      A    No, no powers of attorney.
21      Q    All right.  And I'm pretty sure this
22  is the same thing.  But letters of discretion, I've
23  heard that term used.
24      A    Yeah, I don't believe any were on letter

Page 86

1  of direction.
2      Q    So if Mr. Evans wanted to close out
3  a position rather than letting it expire, would
4  Mr. Evans send emails to customers or ask you to
5  send emails to customers soliciting permission
6  to exit a position?
7      A    No, he would not.
8      Q    Would Mr. Evans call customers or have
9  you call customers to solicit their permission to
10  exit positions?
11      A    No, he would not.
12      Q    So was there any documents or account
13  statements or any agreement that a customer signed
14  that would provide this time and price discretion
15  to exit positions, as you described it?
16      A    Not that I know of.  Not in writing.
17      Q    What about orally?
18      A    Orally typically was how we had
19  that discretion.  So after we had the positions
20  on for a client, we sent out a chart of each of the
21  positions that had like the maximum profit, maximum
22  loss layout, would call them to make sure that they
23  received that and that's where, you know, the client
24  was essentially giving us -- or essentially giving

Page 87

1  us the discretion on the exit.
2      Q    All right.  So would the client -- sorry.
3      A    I was going to say if -- whether or not
4  like all clients did, like I don't really recall,
5  but we did not call like individually to get
6  exit prices.
7      Q    Or permission to exit?
8      A    Correct.
9          MR. SINCLAIR:  Done with this?
10          MR. BURDEN:  Yeah, thanks.
11      Q    All right.  So I want to talk about
12  these charts.  And if I have to go get them, I will.
13  But when did Long Leaf Trading first start sending
14  out these charts that you described with the maximum
15  profit potential but also the losses?
16      A    So I believe the charts were started --
17  they were in place -- I'm pretty confident that
18  they were in place in 2016.  So I'd say like later
19  in 2015, a bit after we actually started it out.
20      Q    So pretty shortly your testimony
21  is after starting the Time Means Money program,
22  Long Leaf Trading would send customers these charts
23  you described?
24      A    Yes.

Page 88

1      Q    All right.  So did these charts
2  include sort of prices at which customers -- at
3  which Long Leaf would exit on behalf of customers?
4      A    No, there wasn't an indication of
5  an exit on the chart.  So the chart would have
6  the symbol of the position, the expiration date,
7  the maximum profit on the position which was net
8  of the commission fees, and then also the maximum
9  loss of the position that included the commissions
10  and fees.  And then the actual chart drawing would
11  have like lines and kind of shaded areas of this
12  is where the position's profitable or this is where
13  it would lose money.
14      Q    So I just want to explore this idea
15  that these charts that customers received sort
16  of provide some kind of consent by the customer to
17  exit the position.  So did customers respond to the
18  chart and say, yeah, get me out at this price?
19      A    No, they didn't respond to the
20  chart with a specific instruction.  So where
21  that discretion occurred is if we gave them a call
22  after we entered into the position and discussed,
23  you know, the position or, you know, how things
24  were going.  And that's where we would let them

Page 89

1 know like, you know, we're going to get out of
2 the position where we see fit, if that's all right
3 with you.
4    Q    All right.  So your testimony is that
5 you called customers and asked them for permission
6 to exit positions?
7    A    Not all customers, but for the ones that
8 we did call like after those charts, yes.
9    Q    All right.  That's a confusing answer.
10    A    I'm sorry.  So, yeah, I didn't mean to
11 get you mixed up here.
12    Q    That's all right.
13    A    So the charts -- the point of the
14 charts was not like an authorization to exit
15 positions.  It was more I think kind of like a
16 trade fill, like this is what the position looks
17 like, this is the maximum risk, the maximum profit
18 potential and all that stuff.  When we actually
19 like would get discretion is if we called a client
20 to catch up with them, let them know how things were
21 going, and that's where we would get it.  But it was
22 very like loose discretion.  It wasn't specifically
23 we're going to look to get gold out at this price
24 but can I have a little leeway, you know.  It was

Page 90

1 much more general, like all right, you know, get
2 out when you guys see fit.
3    Q    So it sounds like for the most part
4 you and the other brokers at Long Leaf did not
5 solicit permission from clients to exit trades
6 as a general matter?
7    A    Yes, correct.
8    Q    But sometimes you would call customers
9 and talk to them and sometimes when you talked to
10 them, they would indicate that you should exit the
11 position as you saw fit?
12    A    Yeah, that's correct.
13         (WhereuponCFTC Exhibit No. 84 was
14          marked for identification, MM.)
15    Q    All right.  Mr. Leeney, I want to hand
16 you what I've marked as CFTC Exhibit 84.  Do you
17 recognize this document, Mr. Leeney?
18    A    This was an email from myself to Tim Evans.
19    Q    All right.  So what's going on here,
20 please.  It looks like the email was sent from
21 you to Mr. Evans Friday, May 26th of 2017 and it
22 says, "Was looking at some positions for my guys,
23 think I found a few good ones," and then there's
24 some text following that.

Page 91

1    A    Um-hmm.
2         MR. SINCLAIR:  Yes?
3    A    Oh, I'm sorry.  Yes.
4 BY MR. BURDEN:
5    Q    So what's going on here?
6    A    So this is giving Tim some trade ideas
7 I had for individual clients.
8    Q    So what happened to these ideas?
9    A    With these ideas I don't recall what
10 happened, but what I would -- what the point of the
11 email from Tim was to get his viewpoint on these
12 recommendations.
13         MR. SINCLAIR:  Sorry.  The point of
14         your --
15         THE WITNESS:  Oh, I'm sorry.
16    A    The reason I sent this to Tim was
17 to get his viewpoint on the recommendations that
18 I developed.
19 BY MR. BURDEN:
20    Q    Did Mr. Evans give you any feedback?
21    A    I don't recall.
22    Q    Were these recommendations provided
23 to clients?
24    A    I don't recall if they were or not.

Page 92

1    Q    Did you provide recommendations to
2 Mr. Evans that were then incorporated into the Time
3 Means Money program?
4    A    I don't remember.  These could have been
5 ideas that I sent him like in -- like to utilize for
6 the Time Means Money program.
7    Q    Do you know if Mr. Evans did, in fact,
8 utilize them?
9    A    I do not, no.
10         MR. SINCLAIR:  Done with that one?
11         MR. BURDEN:  Yes.
12         (Whereupon  CFTC Exhibit No. 85 was
13          marked for identification, MM.)
14    Q    All right.  I want to hand you what I've
15 marked as CFTC Exhibit 85.  And do you recognize
16 this document, please.
17    A    Yes, so this is giving Tim again some
18 recommendation ideas.  I don't know if these were
19 for the Time Means Money program or not.
20    Q    Were these ideas accepted by Mr. Evans?
21    A    I don't recall.
22    Q    Did you receive any feedback from
23 Mr. Evans?
24    A    I don't recall.

Page 93

1    Q   All right.  So with respect to the
2  Time Means Money program, is it fair to say that
3  substantially all of Long Leaf Trading's clients
4  during your tenure there participated in that
5  program?
6    A   Yes, that's fair to say.
7        (Whereupon  CFTC Exhibit No. 86 was
8           marked for identification, MM.)
9    Q   I want to hand you what I've marked
10  as CFTC Exhibit 86.  Do you recognize this document,
11  Mr. Leeney?
12    A   This looks like a chat measure or a
13  chat conversation, like a Skype chat conversation.
14    Q   Between yourself and Mr. Evans, correct?
15    A   Correct.
16    Q   So what's going on here, please.
17    A   It looks like I was giving
18  a recommendation idea to Tim, and the second
19  one looks like I wanted to make 10,000 this week
20  and I finally have room in the accounts to do it.
21    Q   All right.  So what does that mean?  What
22  does the room in the accounts mean?
23    A   That they had room to place positions.
24  I may have been offsetting a position before or

Page 94

1  maybe the account was down and, you know, the equity
2  went back up.
3    Q   Got it.  When you say, "I gotta do
4  like 10 Gs," do you mean like worth of commissions
5  or for yourself or what does that indicate?
6    A   That would most likely indicate worth
7  of commissions.
8        (Whereupon  CFTC Exhibit No. 87 was
9           marked for identification, MM.)
10    Q   Got it.  I want to hand you what
11  I've marked as Exhibit 87.  Do you recognize this
12  document?
13    A   So this is an email from me to Jeremy
14  Ruth, Vince Prieto and Tim Evans.
15    Q   So what's going on here?  Are you
16  recommending more trades?
17    A   So this is an email that I put together
18  for Jeremy Ruth and Vince that is giving them Tim's
19  recommendation for the Time Means Money program that
20  month.
21    Q   Got it.  So this was Mr. Evans'
22  recommendation and you were just laying it out for
23  Mr. Ruth and Mr. Prieto, correct?
24    A   Yes.  They didn't have much trading

Page 95

1  experience or really in depth like market knowledge
2  or know how to price out a spread necessarily, so
3  I would clarify things for them sometimes.
4    Q   Got it.  So looking here, it says
5  900 net risk for this first trade.  What does that
6  indicate?
7    A   So $900 net risk would be the risk
8  of a position, plus the commission and fees for the
9  position.
10    Q   What role if any did commissions and
11  fees play in trade recommendations, if you know?
12    A   I mean, I would imagine pretty --
13        MR. SINCLAIR:  Would you ask the question
14  again, please.
15        MR. BURDEN:  Mary, what was that, please.
16        (Whereupon the portion of the record
17           was read as requested.)
18    A   Are you referring to the design or how
19  they were recommended?
20    Q   Yes.
21    A   Typically a position when it was
22  recommended, the way Tim wanted to have it done
23  was to have for every $1 in profit potential, at
24  most $2 in risk.

Page 96

1    Q   So talk to me, though, about the role
2  of commissions.  What role did commissions play,
3  if any, in designing trades, if you know?
4    A   Oh, so I think that they did play
5  a role, you know, when they went to the four-way
6  strategies and things like that, you know.  They
7  did reduce risk on positions as well, but you were
8  doing extra transactions with it.
9    Q   Could you expound on that for me, please.
10    A   Expand on the risk or the --
11    Q   Yeah.  So it sounds like Mr. Evans
12  was working to design trades and you, know, in
13  determining how risky or profitable a trade might
14  be, there's also the element of commissions which
15  will eat away at any profit you get, right?
16    A   Correct.
17    Q   And, additionally, if the trade is
18  unsuccessful and it loses money, those commissions
19  will still be assessed against customers and to the
20  benefit of Long Leaf Trading, correct?
21    A   Yeah, that is correct.
22    Q   All right.  So do you know if Mr. Evans
23  considered commissions in putting together these
24  trades?

Page 97

1    A    I don't know.

2    Q    So I want you to look, if you could,

3    please, at the second page of Exhibit 87. You'll

4    see this is a group exhibit.

5    A    Okay.

6    Q    So what's going on in this second

7    page of Exhibit 83? It's an email from you to

8    Mr. Ruth dated June 23, 2017. What is this, please.

9    A    This email, I was giving Jeremy

10   Ruth an example of how I recommended a position.

11   Q    And was the idea that Mr. Ruth would

12   forward this on to his own clients?

13   A    No, because Jeremy used pretty much

14   all telephone call for recommendations. He may have

15   just been curious on how I did recommendations.

16   Q    Did you provide the narrative for the

17   recommendations for other brokers or junior brokers

18   at Long Leaf Trading?

19   A    When Tim would give a recommendation,

20   sometimes if he didn't have like a lot of detail,

21   I would help them with clarifying it if they had,

22   you know, questions or something like that.

23   Q    So would this help include drafting the

24   email for them?

Page 98

1    A    No, I didn't draft the emails for them.

2    Q    Were the brokers all responsible for

3    drafting their own emails?

4    A    Yes, they were all responsible for

5    making their own calls with clients and drafting

6    their own emails with clients.

7         (Whereupon  CFTC Exhibit No. 88 was

8         marked for identification, MM.)

9    Q    I want to hand you what I've marked

10   as CFTC Exhibit 88. Do you recognize this document

11   and, if so, can you tell me what it is, please.

12   A    So this is an email -- or a Skype message

13   I think from me to Tim.

14   Q    And what are you doing in this message,

15   please.

16   A    Sending him a trade idea.

17   Q    And was this trade idea accepted by

18   Mr. Evans?

19   A    I may have been just looking for

20   feedback. I don't know if it was accepted or not.

21   Q    So why were you trying to come up

22   with trades and sort of get feedback if all these

23   trades are coming from Mr. Evans? It seems sort

24   of superfluous to me.

Page 99

1    A    So at the time I still had a few clients

2    that I worked with, like broker assisted, outside

3    of Time Means Money. So I would still bounce

4    ideas off of Tim if I had like an additional

5    recommendation for those clients. There was also

6    times where I would send him ideas, you know, if

7    performance was suffering or just to give him like

8    a different viewpoint or something like that.

9    Q    And who were the names of the clients

10   you were working with outside of the Time Means

11   Money program, please.

12   A    I believe -- so one client was

13   a Paul Kelly. I can't recall the other names.

14   Q    About how many do you think there were?

15   A    I don't think that there was more than

16   five.

17   Q    And how many clients did you have

18   that participated in the Time Means Money program?

19   A    A number of clients have participated

20   in the Time Means Money program. I would estimate

21   around 15.

22   Q    That was for your entire tenure at

23   Long Leaf?

24   A    No, not my entire tenure.

Page 100

1    Q    Total.

2    A    Total?

3    Q    Yeah.

4    A    I don't know specifically. I would

5    estimate maybe around 25 or 30.

6    Q    Got it. And then another five who

7    didn't trade under Time Means Money, correct?

8    A    Yeah, about that amount.

9    Q    And those other clients, you gave

10   them your own personal recommendation outside of

11   the Time Means Money program, correct?

12   A    Sometimes I would give them a Time

13   Means Money recommendation. Other times I would

14   give them, you know, a personal recommendation from

15   myself.

16   Q    And were those, your own personal

17   recommendations, were they sort of also options

18   credit spreads?

19   A    Primarily options credit spreads.

20   I may have been doing some different stuff, but

21   I think it was primarily the options credit spreads.

22   Q    So the same type of recommendation that

23   was provided to clients under the Time Means Money

24   program?

Page 101

1    A   Yes, same type of recommendation.
2        (Whereupon  CFTC Exhibit No. 89 was
3        marked for identification, MM.)
4    Q   All right.  I want to hand you what
5 I'm going to mark as CFTC Exhibit 89, and this also
6 is a group exhibit.  I want you to take a moment to
7 look at it, if you would, please, and tell me if you
8 recognize it.
9    A   All right.  Yeah, so this is the charts
10 that we would send our clients at the end of the
11 month -- or after the four positions were accepted.
12   Q   Got it.  So if we look at Exhibit 89,
13 we've got an email here from you to Mr. Evans dated
14 September 1, 2017.  Do you see that?
15   A   Yes.
16   Q   And you're attaching a bunch of these
17 charts and the subject is 2nd Review.  So do you
18 create the charts and send them to Mr. Evans to
19 review?
20   A   Well, before this Jeremy Ruth created
21 the charts, and then he would share them with the
22 rest of us after Tim approved those charts.  But
23 before this time period Jeremy Ruth was fired, so
24 Tim had asked me to create the charts and then

Page 102

1 I would send it to them.
2    Q   So how do you create the charts?
3    A   So the way I created a chart was just
4 through I think it was like a Windows snipping tool
5 or like a screen capture type software.
6    Q   What did you snip and capture?
7    A   So I'd snip and capture a daily chart of
8 that market, and then on that chart I would outline
9 what we sold, what we bought and then also where the
10 position was profitable and where the position would
11 lose money.
12   Q   So this isn't like from QuikStrike.  This
13 is just something you did manually?
14   A   Yes, this is just manually.
15   Q   All right.  And the second email in
16 Exhibit 89, it looks like that's Mr. Evans approving
17 the charts, is that right?  No, it isn't.
18   A   So the second email?
19   Q   Yeah.  What's going on in the second
20 email in 89, please.
21   A   So the second email was an explanation
22 that I wrote up for each of those positions.  I
23 don't recall if we used this explanation before,
24 but the reason I sent it to Tim is I figured it

Page 103

1 would be an extra benefit for a client to be able
2 to look up a price.  So this was just making sure
3 that was okay with him to send out.
4    Q   All right.  And did you then send this
5 out to clients?
6    A   I believe so.  I don't recall exactly,
7 though.
8    Q   Did the other brokers send out your
9 descriptions to clients?
10   A   They may have.  I'm not sure.
11   Q   Did you forward these descriptions to
12 other brokers?
13   A   I would imagine so.
14   Q   Okay.  Why did you do that?
15   A   Just to -- it was a team effort, sharing
16 what I had, so they didn't have to do that.
17   Q   So they could then send that to their
18 clients if they wanted to, correct?
19   A   Correct.
20       (Whereupon  CFTC Exhibit No. 90 was
21       marked for identification, MM.)
22   Q   All right.  Sir, I want to hand
23 you what I've marked as CFTC Exhibit 90.  This
24 is another group exhibit consisting of two emails.

Page 104

1    A   Yeah, so this is an email that I sent
2 to Mark Burns.
3       MR. BURDEN:  Oh, sorry (tendering).
4       MR. SINCLAIR:  Thank you.
5    A   That I sent to Mark Burns, who is a junior
6 broker.
7 BY MR. BURDEN:
8    Q   All right.  And it looks like it's
9 providing some criticism here for Mr. Burns'
10 conduct, is that --
11   A   Yes.  Tim had us -- kind of like
12 a quota every month for a specific amount of dials
13 and appointment sets that a junior broker would
14 have.  And when the junior brokers were working
15 with us, you know, we had to stay on top of them
16 for reaching those measures that Tim put in place.
17   Q   Got it.  So it says requirement through
18 the end of April and what has been produced through
19 the end of April.  So how is Mr. Burns doing here
20 in this first email in Exhibit 90?
21   A   Poorly.
22   Q   And it sounds like you're sort of taking
23 him to task for that, is that fair to say?
24   A   Yes, that is.

Page 105

1   Q   All right.  So let's turn, if we could,
2 please, to the next email in Exhibit 90, which is
3 from you to Mr. Konrath.
4   A   Okay.
5   Q   And you're providing some feedback to
6 Mr. Konrath, is that right?
7   A   Yes.
8   Q   All right.
9   A   This is my other junior broker that was
10 working with me at the time.
11   Q   Got it.  And how's Mr. Konrath doing?
12   A   Mr. Konrath looks like he's doing good.
13   Q   Yeah.  So he was doing much better, right?
14   A   Um-hmm.
15   Q   Yes?
16   A   Yes.
17   Q   All right.  And then the final exhibit --
18 the final email in Exhibit 90 is another email
19 from you to Mr. Burns.  And Mr. Burns continues
20 to struggle and you're holding him accountable
21 for that, is that fair to say?
22   A   Yes.
23   Q   All right.  So these two junior brokers,
24 they worked under you, correct?

Page 106

1   A   Correct.
2   Q   What did they do for you, please.
3   A   So they would call leads and
4 set appointments, and eventually they would
5 take a prospective client through the introductory
6 appointment, and then they would pass off the lead
7 from there.
8   Q   Pass it off to you, correct?
9   A   Correct.
10   Q   So Mr. Burns and Mr. Konrath, did they
11 work for other brokers or just for you?
12   A   So initially just for me and then Tim
13 changed it when we moved to the new Regus spot --
14 or the new Regus suite where all the junior brokers
15 kind of worked in a bullpen together, and they
16 didn't work with anyone in particular.  So in that
17 suite the junior brokers would set an appointment
18 and then Brian Adams, who worked in like an
19 administrative role, he would put that on, you
20 know, a senior broker's calendar.
21   Q   Got it.  So Exhibit 90, is this like
22 a review for Mark Burns and Konrath?
23   A   Yeah, so just letting them know like
24 where they're at and what they should work on.

Page 107

1   Q   I mean, is it like an annual review or
2 is it like a monthly review or did you -- like why
3 this now?
4   A   I don't think I did this on
5 a monthly basis.  I think it was just kind of
6 a sporadic review.  I would -- from what I remember,
7 I would do them here and there but nothing very
8 regularly.
9   Q   All right.  Did Mr. Evans provide reviews
10 to Mr. Burns or Mr. Konrath?
11   A   Yes, he did.
12   Q   And were those written or verbal?
13   A   Usually verbal.  If he wanted something
14 a junior broker to understand, feedback or something
15 like that, he would call me in and let me know what
16 to say to the junior brokers or what they need to
17 work on.  Then I would take that to them.  There was
18 other things, like if we were training, like I would
19 give them feedback on, you know, doing like a sales
20 call or something like that.
21   Q   So were you sort of the person
22 who immediately kind of supervised their calls?
23   A   Well, Tim supervised all the calls
24 obviously.  But I would give them feedback because,

Page 108

1 you know, working with me was supposed to be kind
2 of like a mentorship type of role.  But in terms
3 of like the content of their calls, I didn't have
4 control over that.  That was part of Tim's process.
5      (Whereupon CFTC Exhibit No. 91 was
6       marked for identification, MM.)
7   Q   Got it.  All right.  Mr. Leeney,
8 I want to hand you what I've marked CFTC Exhibit 91.
9 This is another group exhibit consisting of multiple
10 emails.  Do you recognize this document?
11   A   Yes.  So this was from me to another
12 junior broker.
13   Q   Is that broker Connor Campo?
14   A   Yes, that is correct.
15   Q   All right.  And what's the purpose of this
16 email?  What are you saying here?
17   A   So the purpose of this email was
18 we would get what was called a customization
19 appointment that the junior broker section would
20 set up.  And then if -- for example, if we had
21 someone that came on to a customization program and
22 they weren't qualified or, you know, if they weren't
23 a good fit or even if we were listening to a demo
24 appointment before the customization to get an

Page 109

1  idea of who that guy was, we would give feedback
2  to the junior brokers.
3      Q    All right.  So Exhibit 91, this email
4  from you to Mr. Campo, it sounds like you were
5  listening in on a demo appointment that Mr. Campo
6  had with somebody named Grant Thompson, is that
7  right?
8      A    Yes, correct.
9      Q    All right.  And you're giving him some
10 feedback on this, right?
11     A    Yes.
12     Q    And your feedback is that this demo
13 went pretty well it sounds like, is that fair
14 to say?
15     A    Yes, that's fair to say.
16     Q    Right.  And so you say, "You identified
17 his path.  You've turned his fear into a selling
18 point.  You've knocked down the objection that
19 you will hear at the end a lot of the time, which
20 is, 'well, I have to read a little more and learn
21 first.'  You've qualified him and now with the
22 demo you can start to put him in buying mode."
23 So you wrote that?
24     A    Yes.

Page 110

1      Q    All right.  So it sounds like the
2  focus -- so let's turn, if we could, please, to
3  the next email in Exhibit 91.  And this is an email
4  from you to Mr. Konrath, correct?
5      A    That is correct.
6      Q    All right.  And it looks like you're
7  giving Mr. Konrath some feedback on a call you
8  listened to with a potential customer named Dave
9  Curry, is that right?
10     A    Yes.
11     Q    All right.  So how did Mr. Konrath do
12 on this call?
13     A    It looked like he did okay but not great.
14     Q    All right.  So what did you tell him
15 to improve things?
16     A    I told him to improve things by giving
17 him a sense of urgency.
18     Q    Why is a sense of urgency important?
19     A    Well, the sense of urgency to do the next
20 appointment or for -- to actually do a customization
21 appointment.
22     Q    Got it.  So is it fair to characterize
23 in Exhibit 91 that the focus of these critiques for
24 your junior brokers was improving sales talks or to

Page 111

1  be more persuasive?
2      A    Yeah, correct.
3      Q    All right.  And I don't have it in front
4  of me.  I should, but I don't.  Did you develop a
5  junior broker development plan at Long Leaf Trading?
6      A    Yes, that was a proposal that I had given
7  to Tim.
8      Q    All right.  So why did you make this
9  proposal?
10     A    I made that proposal because at the
11 time I wasn't very happy with the environment that
12 the junior brokers were working in.  When we went to
13 the new Regus space, they were kind of all crammed
14 into a bullpen and, you know, I felt that it was
15 just kind of a sweat shop environment.  So I sent
16 him that as a proposal of how he can do things
17 different.
18     Q    All right.  And you talked as
19 well in the development plan about transitioning
20 to an entrepreneurial environment, is that right?
21     A    Correct.
22     Q    So what did you mean by that?
23     A    What I meant by that is an environment
24 where everything doesn't have to be like uniform

Page 112

1  and standardized, you know.  You can work with
2  clients the way you see fit.  You can work with
3  junior brokers or junior brokers can actually
4  develop into, you know, a senior broker.
5      Q    So what made you want to do this?
6  I mean, we have junior people here at the CFTC and
7  I don't care about them.
8      A    Well, part of it was I brought on John
9  Konrath, who was a friend's younger brother, and
10 I felt bad that he was going in under the impression
11 that he'd have the opportunity to kind of grow into
12 a more senior role.  And it was clear that that was
13 not happening with any of these guys, even though
14 that that's what they were led to believe coming
15 in.  So I felt that that, you know -- I didn't like
16 that part of it, but also more of an entrepreneurial
17 environment, like being able to customize a service
18 to the client and not just, you know, fit a square
19 peg in a round hole.  So if people were looking
20 to learn more, do more educational stuff or do
21 different types of recommendations or -- yeah,
22 so that's what I meant.
23     Q    How was your development plan received
24 by Mr. Evans?

Page 113

1    A    I don't believe it was received.
2  I think it was ignored.
3    Q    You sent it to him, though?
4    A    Yes, I sent it to him.  I should say --
5  I'm sorry.  To the best of my knowledge, I sent it
6  to him.  I found that on my laptop, but I'm fairly
7  confident that I gave it to him.
8            (Whereupon  CFTC Exhibit No. 92 was
9              marked for identification, MM.)
10   Q    Yeah.  So let me hand you what I've
11  marked as CFTC Exhibit 92, and 92 is another --
12  a group exhibit comprised of three emails.  And when
13  you've had a chance to review it, I'd like to ask
14  you about them, please.
15   A    Okay.
16   Q    All right.  So do you see the first
17  email in 92?  It looks like it's dated August 28,
18  2017 and it's from you to Hayden Alexander, is that
19  right?
20   A    Yes, that's correct.
21   Q    So who is Hayden Alexander?
22   A    He was a client of mine.
23   Q    All right.  So you're writing to
24  Mr. Alexander and you're saying -- and this is

Page 114

1  the second paragraph I'm reading from --
2  "Looking forward, at least for the next month, I
3  think the opportunities are dried up, which is why
4  we wanted to hold tight for a month or two until we
5  get a better feel on outlook."  Do you see that?
6    A    Yes.
7    Q    All right.  So I want you to flip,
8  if you could, to the next email in Exhibit 92.
9  And it's between you and Mr. Andy Dingler, and I
10  think it actually starts on page 4 of Exhibit 92.
11  There's an email dated August 29, 2017 from you to
12  Mr. Dingler.  Who's Mr. Dingler, please.
13   A    Andy Dingler, I don't recall if he
14  was one of my clients or a client of another broker.
15  In this time frame there was a few brokers that had
16  left right before this, and then I was responsible
17  for having to give the recommendations to their
18  old clients.
19   Q    So Mr. Dingler you don't remember
20  and that may be because you inherited him, is that
21  right?
22   A    That's -- yes.
23   Q    All right.  So I want to direct
24  your attention to the second paragraph.  And

Page 115

1  you're saying the same thing you said in the
2  email to Hayden Alexander which is, "We were down
3  in June and found a few different positions that
4  had higher premium at the same risk level in July
5  that we felt would give us a good opportunity to
6  make up for that loss, but we did not end up keeping
7  all of it as profit, only a smaller portion of it."
8            Well, I guess that's not quite
9  the same thing.  So -- okay.  I remember what I was
10  looking at here.  So looking further down the email
11  chain from you to Mr. Dingler --
12   A    Okay.
13   Q    -- it's the email dated August 28, 2017
14  but at 10:42 a.m.  So this is on the --
15   A    On the --
16   Q    -- on the fifth page of Exhibit 92.
17   A    Okay.
18   Q    All right.  So you're saying here the
19  same thing you said to Mr. Hayden Alexander which
20  is, "I would prefer not to add any new positions for
21  this next month.  We want to make sure that we have
22  the utmost confidence in potential opportunities
23  they we would look to take advantage of" -- I think
24  that's a typo -- "and we just simply aren't seeing

Page 116

1  enough right now."
2            And if you turn the page again,
3  you know, it looks like there's an email two days
4  later on August 30th to you from Chandra.  Who's
5  Chandra, please.
6    A    Chandra, I don't recall.
7    Q    All right.  And it looks like you're
8  sending a trade recommendation to this customer
9  Chandra, is that right?
10   A    Yes, that's correct.
11   Q    All right.  So what's going on here?
12  We've got two emails in Exhibit 92 from August 28th
13  where, you know, you're telling two of the clients
14  we're going to hold off for a while and then a
15  couple days later you've got -- recommendations
16  go out it seems to all of the other clients.
17           Do you recall this instance?  Can
18  you tell me about it?
19   A    I don't recall it.  You know, it's
20  possible after losing positions, those two other
21  clients, you know, we felt they shouldn't take
22  on any more risk.  So that's why I was not giving
23  the recommendations.
24   Q    So when you talk about holding off

Page 117

1 on trading in your emails to Mr. Alexander and
2 Mr. Dingler, Long Leaf Trading wasn't holding
3 off trading for all of the clients, just those
4 two, right?
5    A   I believe so. I don't know if there was
6 anyone in addition.
7    Q   Okay. And after this do you recall,
8 did customer recommendations continue to go out?
9    A   After this, from what I recall, yes.
10   Q   Did customer recommendations go out
11 to Mr. Dingler or Mr. Alexander or were they sort
12 of done?
13   A   I don't know. I left shortly after this.
14   Q   Okay. So I want to switch gears
15 a little bit and ask about how did your customers
16 do with the Time Means Money trades? Did they make
17 money? Did they lose money?
18   A   No, they didn't do well.
19   Q   Could you elaborate? How badly did they
20 do?
21   A   Many clients, from what I remember,
22 were -- probably lost over 50 percent of their
23 account, some right around there.
24   Q   Okay. Were there any customers of yours

Page 118

1 that made money doing the Time Means Money trading?
2    A   No, not that I recall.
3    Q   All right. What about the other
4 customers at Long Leaf, do you have any knowledge
5 or understanding of how they did?
6    A   Outside of the Time Means Money program?
7    Q   No, no. When I asked about your clients,
8 I'm going to ask you if you have knowledge of what
9 other people's clients did, the firm's clients as
10 a whole.
11   A   Yes, because in August -- or July
12 and August of 2017 two brokers left, and then
13 in August I had to give the recommendations to
14 almost like all the clients in the Time Means Money
15 program. And a lot of them -- or most them were
16 down pretty significantly.
17   Q   And how could you tell?
18   A   They were upset, not happy with the
19 results at all. There was, you know -- usually
20 if someone was upset then, you know, I had to send
21 them over to Tim for him to talk to them. Some
22 people wanted to talk to Tim in regards to that.
23   Q   All right. So did you talk to
24 anybody about -- at Long Leaf Trading about the

Page 119

1 poor performance of these recommendations?
2    A   I did with Tim, you know, in like that
3 late spring, that summer meeting.
4    Q   Yeah.
5    A   And it was very evident after a
6 couple months that he was not going to be making
7 any changes, and I just did not see it getting any
8 better.
9    Q   And that was spring and summer of what
10 year, please.
11   A   '17, so 2017.
12   Q   Did you share your knowledge of the
13 results with anybody else, Mr. Ruth, other brokers?
14   A   The results of --
15   Q   The fact that the trades were going so
16 badly for customers.
17   A   Well, I didn't share that knowledge,
18 but it was common knowledge because their clients
19 were doing Tim's recommendations as well.
20   Q   Well, what I'm asking is did you talk
21 about that with any of your fellow brokers, right?
22 Like did you say Jeremy --
23      MR. SINCLAIR: Excuse me. Could you
24   put a time frame on this because he testified

Page 120

1 that Ruth left sometime in late July --
2      THE WITNESS: Or it was August.
3      MR. SINCLAIR: -- or early August.
4 They're talking about August, so he may not
5 have been there to talk to him. So I'm just
6 looking for a time frame between I guess May,
7 the May '17, the May meeting in '17 and going
8 forward, if that's what you're looking for.
9 BY MR. BURDEN:
10   Q   Well, I think what I'm seeking is
11 instances when this happened, and I'll ask you
12 for times and when. During your tenure at Long
13 Leaf, did you have discussions with any of the other
14 personnel there about these trade recommendations?
15 Like did you say to Mr. Konrath, right, who's a
16 friend of -- your brother's friend, right, or
17 friend's brother?
18   A   Friend's brother, yeah.
19   Q   Yeah. Did you ever talk to these guys
20 and say I can't believe how badly this is going?
21   A   I don't remember specifically, but
22 we definitely openly had complained to each other
23 about it.
24   Q   All right. And when did these complaints

Page 121

1 start?
2   A   I don't recall exactly but -- you
3 know, because you're kind of talking about banter
4 between --
5   Q   Yeah.
6   A   -- guys at the office.  So I don't really
7 recall specifically.
8   Q   All right.  Well, let me ask you this.
9 Did you receive daily client account statements for
10 all of your customers?
11   A   Yes.
12   Q   All right.  And did you review those
13 statements?
14   A   Not every day.
15   Q   How frequently did you review them?
16   A   I would say maybe once or twice a week.
17   Q   And did you understand those statements?
18   A   I did, yes.
19   Q   And you received those statements from
20 Gain Capital, correct?
21   A   Correct, yes.
22   Q   All right.  So when did you come to
23 understand that the Time Means Money recommendations
24 were not resulting in profitable trades for clients?

Page 122

1   A   It became very prevalent in like --
2 you know, I forgot if it was the first part of
3 2017 that performance was suffering or if it was
4 like a little bit after that, you know.  Previously
5 like we, you know, sometimes would be up and down
6 where you'd make money with recommendations in a
7 month, you'd lose money in a month, but there was
8 a period where it felt very prolonged that most
9 of the recommendations were losing money.
10   Q   Got it.  So your testimony is that
11 from the inception of the Long Leaf Trading program
12 through early 2017 there were up months and there
13 were down months, is that correct?
14   A   From what I recall.  I don't recall
15 like specific like results and things like that.
16   Q   Got it.  But from the early part of
17 '17 -- or at the early part of 2017 you sort of
18 were coming out of a long period of losing trades
19 and that caused you to question whether these trades
20 were any good, is that fair to say?
21   A   Yeah, that's fair to say.
22   Q   All right.  So I want to go back to this
23 early period, which is mid 2015 through early 2017.
24 And that's a period when Time Means Money was being

Page 123

1 you know, offered to customers, right?
2   A   Yeah, mid 2015, yes.
3   Q   All right.  So during this period were
4 customers up?  Did customers make money?
5   A   I'm not sure of what the performance was
6 like.  From what I recall, the performance actually
7 started out relatively strong.  I remember after he
8 initially started the program, there was a really
9 bad like month where he was taking on too much risk
10 with positions, and that's when I went to them with
11 that concern.  But I think there was a period
12 shortly after that that the trading was -- the trade
13 recommendations were pretty consistent for a period.
14 I don't remember how long it was for, though.
15   Q   So for the period mid 2015 through early
16 2017, if you recall, did profits on trades outstrip
17 losses or did losses outstrip profits?
18   A   From mid 2015 to early 2017?
19   Q   Yeah.
20   A   I would say that losses probably
21 outstripped profits.
22   Q   All right.  And how do you know
23 that?  Because you got the statements every day,
24 right?

Page 124

1   A   Yeah.
2   Q   All right.  Inside Long Leaf Trading
3 did you have a way to keep track of the trades?
4   A   I had a delayed news feed through
5 Gain Capital, like their platform, where you can
6 look at prices and charts.
7   Q   All right.  Well, how did you have this
8 set up?
9   A   The -- well -- or, actually, I don't
10 think it was a delayed news feed.  I think it was
11 just like the live feed, but it was like through
12 Gain's platform.  And I believe I just had a quote
13 board and one chart set up on like two individual
14 screens.
15   Q   So let me -- you know, what I'm asking
16 about is these trade recommendations that Long Leaf
17 provides and that you sent to customers, you know,
18 Long Leaf would send out four recommendations
19 a month, right?
20   A   Um-hmm.
21   Q   Yes?
22   A   Yes.
23   Q   There you go.
24   A   I'm sorry.

Page 125

1   Q   And each recommendation would have
2 four trades within it, two option sales and two
3 option purchases, is that correct?
4   A   Yes, correct.
5   Q   So you're talking about 16 individual
6 trades a month, right?
7   A   Yes.
8   Q   So that is a lot to keep track of.  It's,
9 you know -- the value of the contracts is changing
10 throughout the month, right?
11   A   Correct.
12   Q   And at some point they're going to expire,
13 right?
14   A   Yes.
15   Q   Or you're going to trade out of those
16 positions, right?
17   A   Correct.
18   Q   So I know you're getting the statements
19 every day.  I know you're getting the statements on
20 a weekly and monthly basis as well, right?
21   A   Yes.
22   Q   But that's complicated.  Did you have
23 a way of monitoring how those recommendations were
24 performing?

Page 126

1   A   No, we didn't have like an online
2 login portal that would lay things out.  Tim's
3 primary responsibility was for monitoring those and
4 tracking them.
5   Q   Did he share that tracking with you?
6   A   No, he did not.
7       (WhereuponCFTC Exhibit No. 93 was
8       marked for identification, MM.)
9   Q   All right.  So I want to hand you what
10 I've marked as CFTC Exhibit 93.  Do you recognize
11 these documents?
12   A   Yes.  This is an email from Jeremy Ruth
13 to myself, Vince Prieto and Pierre Halteh showing
14 the results --
15   Q   All right.  So --
16   A   -- of the recommendations.
17   Q   Got it.  So Jeremy Ruth is sending
18 this to you and some of the other brokers in May
19 of 2019, right?
20   A   Yes.
21   Q   All right.  And so there's a spreadsheet
22 attached to the email, right?
23   A   That's correct.
24   Q   So it appears to show three months,

Page 127

1 March of '17, April of '17 and then May of '17,
2 which is blank.  Am I reading that right?
3   A   Yes, correct.
4   Q   So, you know, was this something that
5 Mr. Ruth sent out regularly?
6   A   From what I recall, he did.
7 And what it is is that would be the result of
8 the four recommendations from the month with the
9 corresponding quantity of positions that a client
10 was doing.  So, for example, in the first column,
11 that's if they were trading one spread, second
12 column, two spreads and so on.
13   Q   All right.  So it looks like -- so in
14 May of '17 if you traded all four recommendations,
15 you would have lost $970.21 for every spread you
16 did, right?
17   A   Or for March of '17?
18   Q   Yeah.
19   A   Yeah, for March, correct.
20   Q   All right.  Let me do that again.  So for
21 March of '17, according to Mr. Ruth's spreadsheets
22 customers if they took the recommendation, they
23 would lose $970.21 for every spread they entered
24 into, is that correct?

Page 128

1   A   Yes, correct.
2   Q   All right.  So April '17 we have larger
3 losses, is that correct?
4   A   Yes, that is correct.
5   Q   So in April of '17 for a customer
6 who took the recommendations and did one spread,
7 they would lose $1105.36 for every spread, right?
8   A   Yes, that is correct.
9   Q   All right.  So do you know if these
10 numbers are correct, Mr. Ruth's spreadsheet?
11   A   I don't know.
12   Q   So what did you do when you received
13 this information?
14   A   This was -- you know, I don't know.  I
15 don't remember specifically what I did, but I think
16 this may have led to mine and Jeremy's conversation
17 with Tim that I had referenced before.
18   Q   Got it.  So do you know how Mr. Ruth
19 worked this out?
20   A   I do not.
21   Q   Did you ever ask him?
22   A   No, not that I recall.
23   Q   So this doesn't seem tremendously
24 hard to do.  Did you have one of these yourself?

Page 129

1  Did you sort of track the performance of
2  recommendations?
3      A   I didn't have one of these, no.
4      Q   So why not?  It seems like you ought
5  to be able to do it.
6      A   I don't know.  It was just never something
7  I looked into.
8      Q   Well, let me push back on that
9  a little and ask, you know, why not?  It seems
10  like you're giving clients these recommendations.
11  You speak with them on the phone, sometimes for
12  hours.  Didn't you want to know how the
13  recommendations were turning out?
14      A   Yes.  But I typically -- you know,
15  if we offset a position, I would check my statement.
16  But in terms of compiling the data month over month,
17  I guess I just never really did that.
18      Q   Did you have the ability to do that?
19      A   Yeah, I had the ability to do that.
20              EXAMINATION
21  BY MR. PATRICK:
22      Q   Did you ever talk to customers during
23  one of the trades that was put on -- and this would
24  have been, say, before the option was offset or that

Page 130

1  it expired -- and have to explain to them or, you
2  know, they might have asked you what the current
3  value of that option position was?  Did you ever
4  get those kind of calls?
5      A   I mean, I don't recall.  Like we
6  typically didn't get those types of calls.  A lot
7  of clients didn't really call in, you know.  They
8  would just wait for us to call them.
9      Q   Do you recall any conversations with a
10  customer where they asked, hey, how is whatever
11  particular recommendation that you might have
12  working in that customer's account, how that
13  particular trade's performing or what it's worth
14  right now?
15      A   So from like what I remember, like
16  we would have people asking like where -- how like
17  a position is doing.  And I would on my quote board
18  and my chart, I would discuss with them like the
19  price of the future versus like where the spread's
20  at and give them the update that way.
21      Q   So you would send them a chart to tell
22  them what the value of the option position was?
23      A   I wouldn't send them a chart.  I would
24  look up like my chart and like my pricing and just

Page 131

1  do it like on my platform just over the phone.
2      Q   So you would have that conversation
3  with a customer over the phone --
4      A   Yes.
5      Q   -- typically?
6      A   Correct.
7      Q   And would you give them the value
8  of that particular position then over the phone?
9      A   Not that I remember, the value of
10  the actual position over the phone.  But the way
11  that I would explain the position is if they sold
12  this credit spread, this is where the market is at,
13  so that's where we want it to be or this is where
14  the market's at, that's where we don't want it to
15  be and we want it to go up from there.  So that's
16  typically how I would update a position.
17      Q   So it wasn't an actual value for the
18  position.  It was just a recap of the current market
19  conditions, is that what you're saying?
20      A   Yes, so just like an update on like
21  where the like market is at like at that moment.
22  So an update on that.
23
24

Page 132

1           (Whereupon  CFTC Exhibit No. 94 was
2            marked for identification, MM.)
3           FURTHER EXAMINATION
4  BY MR. BURDEN:
5      Q   Mr. Leeney, I want to hand you what
6  I've marked as CFTC Exhibit 94, and this is a --
7  yeah, this is a group email consisting -- a group
8  exhibit consisting of two emails.  Do you recognize
9  Exhibit 94, Mr. Leeney?
10      A   Yeah.  So this is another results
11  spreadsheet that Jeremy Ruth had sent over.
12      Q   All right.  And it says it's from
13  Mr. Ruth to you dated June of 2017 and it says,
14  "For your info only," right?
15      A   Well, he had Pierre Halteh and Vince
16  Prieto on there too.
17      Q   Yeah, yeah, yeah.  That's right.
18      A   Yes.
19      Q   So if you look at the next email in
20  Exhibit 94, he provides some updated results and he
21  says, "Updated.  Don't share."  Do you see that?
22      A   Yes.
23      Q   So do you have any knowledge or
24  understanding of why Mr. Ruth sent this to you

Page 133

1  and the other brokers and said for your info only
2  or don't share?
3      A   I don't remember.  You know, maybe
4  it was --
5          MR. SINCLAIR:  Well, if you want to
6      speculate, that's up to you.  But if you
7      remember, you should tell him what you remember.
8      A   Okay.  I don't remember why this was
9  updated or said not to share.  I would imagine it
10  was to -- for Tim not to see it.
11  BY MR. BURDEN:
12     Q   But why, if you know, and if Mr. Ruth
13  ever expressed that to you?
14     A   Well, at the time Tim and Jeremy,
15  they developed kind of a hostile relationship and
16  weren't talking to each other too much.  So it may
17  have been something around that.
18     Q   So with respect to the results that
19  Mr. Ruth appended to this June 9, 2017 email, the
20  one at 12:19:57 p.m., this shows losses of $28.90
21  per recommendation that month, is that fair to say?
22     A   Yes.
23     Q   So looking at Exhibit 94 and Exhibit 93,
24  these results that Mr. Ruth generated, did you share

Page 134

1  any of these results with any of your customers
2  or clients?
3      A   Not that I recall.
4      Q   So why not?
5      A   I don't remember why.
6      Q   Well, I mean --
7      A   Like the actual -- the spreadsheet are
8  you referring to?
9      Q   Yeah.  Did you share the spreadsheet with
10  any of your customers that we see in Exhibits 93 or
11  94?
12     A   No, I did not share the spreadsheet.
13     Q   Did you share the results with your
14  customers, the losses that Mr. Ruth details in these
15  spreadsheets?
16     A   If I was working with those customers,
17  I would imagine I would have like when I was talking
18  with them, but I'm not sure.
19     Q   Do you recall the names of any customers
20  that you shared these loss results with?
21     A   No, I don't recall.
22         (Whereupon  CFTC Exhibit No. 95 was
23         marked for identification, MM.)
24     Q   All right.  Mr. Leeney, I want to hand

Page 135

1  you what I've marked as CFTC Exhibit 95.  Do you
2  recognize this document, Mr. Leeney?
3      A   This was from Jeremy Ruth to me and
4  details the percentages of recommendations making
5  or losing money.
6      Q   All right.  And it looks like for
7  January Mr. Leeney identifies 50 percent of the
8  trades as winners and 50 percent as losers but
9  doesn't say how much by, right?
10     A   Correct.
11     Q   All right.  Same for February, right?
12     A   Yes.
13     Q   Same for March, is that right?
14     A   Yes.
15     Q   Same for April, is that right?
16     A   Yes.
17     Q   May it looks like 75 percent were
18  winners but doesn't say how much by, is that right?
19     A   Yes.
20     Q   And then 25 for June and 50 for July,
21  is that right?
22     A   That is right.
23     Q   And it looks like August it says 50, but
24  then there's a grand total that says 50 percent?

Page 136

1      A   Yes.
2      Q   So did you and Mr. Leeney talk about this
3  document?
4          MR. SINCLAIR:  Mr. Who?
5  BY MR. BURDEN:
6      Q   I'm sorry.  You're Mr. Leeney.  Thank you.
7  Did you and Mr. Ruth talk about this document?
8      A   I don't recall specifically talking
9  about this document, but I believe Mr. Ruth was
10  going back to see how often Tim's recommendations
11  were performing.
12     Q   All right.  So does this -- and, you
13  know, do you have any knowledge or understanding of
14  whether this analysis relates to the representation
15  in the Time Means Money sales material that
16  76.5 percent of options expire worthless?
17     A   Yes, I believe that these percentages were
18  showing that it was against that representation.
19     Q   All right.  So why do you think that?
20  I mean, that was the first thing that occurred to
21  me, but why do you think that?
22     A   Because a lot of months were 50/50,
23  and then one month was one out of four and only one
24  month was three out of four.

Page 137

1    Q   All right.  So -- and I know
2  I just asked you this, but did you ever talk about
3  this with Mr. Ruth and did you ever talk about that
4  76.5 percent statistic we'll be talking about later
5  in the sales materials?
6    A   I don't recall specifically.
7  But when me and Mr. Ruth met with Tim in that
8  like late spring-summer meeting, it may have been
9  brought up then.  And then since that point Mr. Ruth
10 was obviously analyzing the performance of the
11 program more and more and looking at the percentages
12 of like winners versus losers.
13   Q   All right.  So I want to go to this
14 early 2017 meeting that you and Mr. Ruth had with
15 Mr. Evans.  It was early 2017 you said, right?
16   A   Oh, not early.  I apologize.  It was
17 like the late spring, early summer.  So somewhere
18 around like April-May, something like that.
19   Q   Got it.  So this April-May 2017
20 meeting that you and Mr. Ruth had with Mr. Evans,
21 is this something that was discussed at the meeting,
22 Mr. Evans' analysis of how many trades win?  Is it
23 one out of four, three out of four?
24   A   I don't think that was specifically

Page 138

1  discussed there.  The meeting was more so that,
2  you know, clients were unhappy with results and
3  essentially letting Tim know that, you know, we
4  think that, you know, things should change and
5  we should reevaluate the way that we're doing
6  recommendations and the way that we're going
7  about doing business.
8    Q   Got it.  Did you perform any analysis
9  of the Long Leaf Trading recommendations along the
10 lines that Mr. Ruth did?
11   A   I don't believe so.  Jeremy typically
12 would and then, as you've seen, would send over like
13 a results page or something like that.
14   Q   Did you do anything to check to see if
15 Mr. Ruth was right or wrong about this assessment?
16   A   I don't believe so.
17   Q   Why not?
18   A   I am not sure.  Just took his word for
19 what he found.
20   Q   So you believed Mr. Ruth.  You thought
21 this was probably right?
22   A   Yes.  I didn't have any reason to think
23 that he would lie sending me this.
24      MR. PATRICK:  Do you know how Mr. Ruth

Page 139

1  put this table together?
2      THE WITNESS:  I do not.
3      MR. PATRICK:  If you were to put
4  a table together like this for the time that
5  you were at Long Leaf, do you know how you
6  would have done it?
7      THE WITNESS:  With Microsoft Excel.
8      MR. PATRICK:  But where would you have
9  looked to find the information to put into the
10 Microsoft Excel spreadsheet?
11     THE WITNESS:  Oh, on the statements.
12     MR. PATRICK:  So you would have used
13 the statements that you were receiving from
14 the carrying broker?
15     THE WITNESS:  Correct, yes.
16 BY MR. BURDEN:
17   Q   So I want to switch topics for
18 a little bit to customer complaints, which is
19 something I think you've alluded to earlier in your
20 testimony.  When did you start receiving complaints
21 from customers about the performance of their
22 trading accounts?
23     MR. SINCLAIR:  Could you please qualify
24 that, as to whether it's his customers or other

Page 140

1  customers?
2  BY MR. BURDEN:
3    Q   Yeah, sure.  I'll tell you what.
4  Let's start with that.  When did you start receiving
5  complaints from customers about I'll say performance
6  in any trading accounts, whether it's yours or ones
7  you inherited?
8    A   From what I recall, the client
9  complaints, started to hear more and more in the
10 year 2017.  Previous to then, you know, you may
11 have a client complain about poor performance here
12 and there, but they weren't -- from what I know,
13 they weren't very prevalent in that period.  It was
14 more so the 2017 period on that we were hearing more
15 and more about that.
16   Q   Got it.  So why do you think that was,
17 if you know?  I mean, it seems like your testimony
18 is that you were servicing, you know, some Time
19 Means Money accounts from mid 2015, is that right?
20   A   Yes, correct.
21   Q   You know, through early 2017 when you
22 started seeing a lot more complaints.  Why do those
23 complaints kind of surface in 2017, if you know?
24   A   So in 2017 the performance I think

Page 141

1 just suffered, you know, multiple bad months of
2 recommendations in a row, and especially looking
3 at that statement reminded me I think July 2017
4 was especially bad.  So typically we wouldn't have
5 a complaint if, you know, we had a down month.  It
6 was more so if we had a few bad months in a row is
7 when people would be upset.
8          (Whereupon  CFTC Exhibit No. 96 was
9          marked for identification, MM.)
10   Q    Got it.  Well, let me hand you what
11 I've marked as CFTC Exhibit 96.  Do you recognize
12 this document?
13   A    Yes.  This is an email to a client,
14 Avjyot Boparai.
15   Q    And is Ms. Boparai a customer of yours?
16   A    I believe so, yes.
17   Q    All right.  So it looks like on
18 September 20th of 2016 Ms. Boparai wrote to
19 Mr. Evans sort of complaining.  And she writes
20 here in the middle, "You literally had told me that
21 you could easily get me 20 percent and go as high as
22 40 percent on a return and just come on board with
23 your guys.  So after scrambling the money together
24 from my 401(k) and my parents, I decided to.  From

Page 142

1 where I am sitting now, I wish I had 2 to 4 percent
2 return I would be happy, let alone a 20 percent
3 return.  It's more like negative 100 percent
4 now, since all the money has been lost."
5          So it looks like Mr. Evans is
6 forwarding this to you without comment, is that
7 right?
8   A    Yes.
9   Q    All right.  So what did you do about
10 this customer?
11   A    I believe I forwarded this customer to Tim.
12   Q    Well, he's forwarding it to you, see?
13   A    Yes, I think he was letting me know
14 of the complaint.  But from my recollection, Tim
15 I believe would primarily speak with this client.
16   Q    Got it.  So did you speak to this client?
17   A    I did.
18   Q    What did you say?
19   A    I don't recall exactly what I said to
20 the client.
21   Q    So was this client correct that she
22 had lost substantially 100 percent of her money in
23 the Long Leaf Trading account?
24   A    I don't remember, but I would imagine so.

Page 143

1   Q    All right.  So it says here, "You
2 literally had told me that you could easily get
3 me 20 percent and go as high as 40 percent on a
4 return and just come on board with your guys."
5 Is that something that you told Ms. Boparai?
6   A    No, that was to Tim.
7   Q    No, I know.  But Ms. Boparai is writing
8 about something that she believes Long Leaf told
9 her.  Did you say that to Ms. Boparai, that she
10 could get returns of 20 to 40 percent?
11   A    Not that I recall.
12          (WhereuponCFTC Exhibit No. 97 was
13          marked for identification, MM.)
14   Q    All right.  So I want to hand you
15 another exhibit, if I could, please, along similar
16 lines.  I've marked it as Exhibit 97.  Do you
17 recognize this document?
18   A    Yes.  This is from a client, Thomas J.
19 Bates.
20   Q    And is that a client of yours?
21   A    Yes, he was.
22   Q    And Mr. Bates is writing to you and
23 saying, "Still not very happy with performance.
24 I'm down over $12,000.  How much have you (your

Page 144

1 firm) earned in commissions?"  What did you do with
2 this complaint from Mr. Bates?
3   A    I believe I gave the complaint to
4 Tim Evans.
5   Q    And did you speak with Mr. Bates after
6 he made this complaint in November of 2016?
7   A    I don't recall.  But Mr. Bates was
8 a letter of direction client from the original
9 letter of direction service.
10   Q    So was Mr. Bates trading the Time Means
11 Money program?
12   A    I think Tim was doing the Time
13 Means Money trades for him, but he had a letter
14 of direction or a letter of direction client.  So
15 I didn't talk to him too often.
16          (Whereupon  CFTC Exhibit No. 98 was
17          marked for identification, MM.)
18   Q    Got it.  All right.  I want to hand
19 you what I've marked as CFTC Exhibit 98.  Do you
20 recognize this document?
21   A    This is an email to a client, Yvette Huang.
22   Q    So I want to direct your attention
23 to the first email in the chain in Exhibit 98, and
24 it's an email from Ms. Huang to you on March 16th

Page 145

1  of 2017. So who's Yvette Huang?
2     A   She was a client of mine. Particularly
3  who, I don't really recall.
4     Q   Got it. So she's writing here,
5  "Hi, James. I don't have any position in my account
6  and my cash balance is down to less than one-third
7  of my initial investment. Any update and strategy?"
8        So is Ms. Huang right there? Was
9  her account down by more than -- to less than a
10  third of what it had started at?
11    A   I would imagine so.
12    Q   All right. Was that pretty typical of
13  Long Leaf customers at that point?
14    A   March 2017, yeah.
15        (WhereuponCFTC Exhibit No. 99 was
16         marked for identification, MM.)
17    Q   I want to hand you another similar
18  email that I have marked as CFTC Exhibit 99.
19  The highlighting is in the original copy. Do you
20  recognize this document?
21    A   I do.
22    Q   Can you tell me what it is, please.
23    A   This was an email from a client of mine,
24  Andre Williams.

Page 146

1     Q   And what's the date on it?
2     A   This is September 1, 2017.
3     Q   All right. So Mr. Williams writes there,
4  "All I have left is $5,157.73. I mean, this is
5  amazing. I congratulate your company on being the
6  worst traders I have ever encountered in my life.
7  I did better with options in my account than your
8  company did. I truly regret signing up with your
9  company. I hope you all fire the master trader.
10  It's obvious he does not have a clue. Have a
11  great weekend."
12        So did you speak with Mr. Williams
13  about this communication?
14    A   I don't recall if I did over the phone
15  or by email after that or not.
16    Q   So what did you do with this complaint?
17    A   In this period, especially in August
18  of 2017, right before this is when I had to call
19  all the clients to give the recommendations, and
20  people that were upset I was to send to Tim for
21  him to speak with them.
22    Q   Got it. And did you send Mr. Williams
23  to Tim?
24    A   I do not recall if I did or not.

Page 147

1     Q   All right. So did you listen in on
2  any of Mr. Evans' calls with disappointed customers?
3     A   I didn't. He was kind of like in a --
4  like a different like part of the office. So it
5  was tough to hear from over there because it was so
6  crowded and like noisy in general.
7     Q   All right. So was there a policy about
8  what to do with these complaints?
9     A   So the policy for complaints was
10  always to allow Tim to speak with them, you know.
11  If someone was upset over trade recommendation
12  results, they would typically ask to speak with
13  Tim since the clients understood that he designed
14  the recommendations.
15    Q   I mean, were they logged anywhere for
16  NFA purposes? Was there any compliance procedure
17  around complaints?
18    A   I don't know.
19    Q   Did you do anything with them? Did
20  you have like a special folder you were supposed
21  to put them in or anything like that?
22    A   No. He just had us give the client
23  complaint to him -- or the client that complained
24  to him.

Page 148

1     Q   So would you always forward the complaint
2  or would you sometimes just call Mr. Evans and say,
3  hey, you know, this customer is --
4     A   Sometimes it was verbal. Sometimes,
5  you know, I would forward it.
6     Q   So I think you testified that at
7  some point you had to call a bunch of customers?
8     A   Um-hmm.
9     Q   And that was in 2017?
10    A   Yeah, that was August of 2017.
11    Q   So what happened there? It seems like
12  you were sort of emailing with people and something
13  changed?
14    A   No. So I had some clients that
15  would do the recommendations over email. I also
16  had some that did it by phone as well. But in --
17  somewhere around mid August 2017 is when Tim had
18  fired Jeremy Ruth, and Jeremy had a very large
19  amount of clients. And Tim had let me know that,
20  you know, it's my job now to give the
21  recommendations to both mine and his clients.
22    Q   And Mr. Ruth's clients, he had not been
23  emailing. He had been calling them. So you had to
24  call them, right?

Page 149

1    A    Yes, correct.
2    Q    Got it.  So it seems like dealing
3  with irate customers became sort of a fixture
4  of your day-to-day existence sort of at least
5  from 2017 onward, is that fair to say?
6    A    I wouldn't necessarily say day to day
7  but pretty regularly, yes.
8    Q    So was there -- I mean, were you
9  always able to just send them to Mr. Evans?  Like
10  did you ever have to deal with them?
11    A    No, sometimes I would speak with
12  them.  But if they indicated that they wanted to
13  speak with, you know, Tim or a principal or someone
14  like that, that's when I would give it to Tim.
15    Q    Well, was there sort of a playbook
16  for what you have to say to calm them down?  I mean,
17  I wouldn't know what to say if somebody called me
18  up mad about trades.  Like did Mr. Evans give you
19  any instruction on how to deal with them?
20    A    Yeah.  You know, the instruction that
21  he would give us would be to focus on, you know,
22  the aspect that it was kind of a small data sample
23  of positions in a given month.
24    Q    Did Mr. Evans tell you anything else

Page 150

1  about how to deal with disappointed or frustrated
2  customers?
3    A    You know, he always would -- he'd
4  always tell us to, you know, utilize, you know,
5  current market conditions or like market conditions
6  going forward to re-excite people.
7    Q    What do you mean by that?  Give me
8  an example, if you would, please.  How would you
9  use current market conditions to re-excite people?
10    A    So, for example, we anticipate an
11  interest rate decrease in the next month.  This
12  is how we think we're going to -- it's going to
13  affect the markets and we feel that will give us
14  good opportunity.
15    Q    Yeah.  So I want to look back at
16  Exhibit 94, if I could, please.  Is this an example
17  of -- oh, that's my copy.  You guys can have this
18  one.  You can keep that one.  That's fine.  Wait.
19  Is this Exhibit 94?  No, hang on.  I'm sorry, 98.
20  Can you guys look at Exhibit 98 for me, please.
21  There we go.
22    MR. SINCLAIR:  This one?
23    MR. BURDEN:  Yes, thank you.
24    Q    So Exhibit 98 we looked at before,

Page 151

1  and it's a March 16, 2017 email from Yvette Huang
2  to you complaining about her cash balance being down
3  to less than one-third of her initial investment and
4  you write her back a pretty long email here in
5  Exhibit 98.  Is this an example of sort of the type
6  of thing that Mr. Evans --
7    A    Yeah, he would --
8    Q    -- directed you to say?
9    MR. SINCLAIR:  Go ahead now.
10    THE WITNESS:  I'm sorry?
11    MR. SINCLAIR:  I said you've got to
12  wait until he finishes his question.  That's
13  all.
14    A    Yeah.  This is an example of talking
15  points that, you know, he would have us say to
16  clients that might be wavering or, you know, looking
17  to not take recommendations.
18  BY MR. BURDEN:
19    Q    Got it.  So I think you characterized one
20  of Mr. Evans' prescriptions as re-exciting customers
21  about the market.  Are you doing that here?
22    A    I believe so.
23    Q    Yeah.  So where do we see that, please.
24    A    Oh, no, I guess there isn't re-exciting.

Page 152

1    Q    Well, if you look at Exhibit 98,
2  you know, you talk about Long Leaf Trading being
3  caught off guard by bad trades, right?
4    A    Yes, correct.
5    Q    Yeah.  And so then you go on to say
6  in the third paragraph, "We have moved exposure
7  away from financials/stocks completely into other
8  fundamentally strong markets this time of year."
9  So is that an example of sort of re-exciting
10  a disappointed customer?
11    A    Yes.
12    Q    All right.  And so then you go
13  on to say, "We recently took a maximum profit
14  on our Euro position two weeks ago as well as a
15  profit on our coffee position one week ago.  These
16  'outside' markets, like foreign currency, metals,
17  energies, et cetera, have been where we are seeing
18  the best results.  Going forward, this is where we
19  will want to concentrate our portfolio on."  I think
20  there's a little typo in there.  So you wrote that,
21  right?
22    A    Correct, yes.
23    Q    All right.  So that sounds like -- was
24  that designed to get Ms. Huang sort of re-excited

Page 153

1 about the market, as you put it?
2   A   Yes.
3   Q   All right.  So talking about a maximum
4 profit on this Euro position and a profit on the
5 coffee position, do you recall if there were other
6 positions that were pending during that same period?
7   A   No, I do not recall.
8       MR. BURDEN:  All right.  Well, I think
9 now is as good a time as any to break for lunch.
10 Any objection?
11      MR. SINCLAIR:  No.
12      (Whereupon a lunch recess was taken
13         from 1:10 p.m., to 2:15 p.m., after
14         which the following proceedings were
15         had:)
16    A F T E R N O O N   S E S S I O N
17         JAMES LEENEY,
18 called as a witness herein, having been previously
19 sworn and examined, testified further as follows:
20      FURTHER EXAMINATION (Cont'd.)
21 BY MR. BURDEN:
22   Q   Mr. Leeney, were you aware that
23 while you were at Long Leaf Trading your calls
24 were taped?

Page 154

1   A   Yes, I was.
2   Q   And who made you aware of that?
3   A   Tim Evans made us aware of it.
4   Q   Did he explain why he was doing that?
5   A   From what I understood, he said he was
6 doing this to monitor and just as a way to supervise
7 our activity.
8   Q   Got it.  And that's what he told you?
9   A   Yes.
10   Q   Did he ever tell you or intimate
11 or suggest that it was required by law or it was
12 for compliance purposes or anything like that?
13   A   He never said that it was required by
14 law.  He did it, however -- or he had mentioned
15 he did it for compliance purposes.
16   Q   Did he say what that meant?
17   A   No, not that I recall.
18   Q   Do you know if Mr. Evans ever reviewed
19 any of your calls that you made?
20   A   I know he did pretty regularly.
21   Q   Why do you think that?
22   A   Just as supervision over my calls.
23   Q   But did he ever like talk to you about any
24 of the calls or anything like that?

Page 155

1   A   Usually the calls that he would talk to
2 me about would be sales solicitation calls.
3   Q   All right.  Well, would he meet with
4 you regularly?  Would he tell you if something
5 went wrong?  If you guys were talking about your
6 calls, you know, what did you talk about?
7   A   I remember a specific time where I was
8 calling through some prospects that I had that
9 I had been working for a while and set up, you know,
10 an appointment with them to kind of catch back up,
11 talk about the markets.  And Tim had called me into
12 his office and he was listening to those calls as I
13 was making them, and he was telling me that I should
14 be trying to talk to those people about what I want
15 to talk about like right then and there.  So that
16 was an example -- or that was a specific time that
17 I recall.  Otherwise it was feedback, do this, you
18 know, don't do that, this is how you fix this.
19   Q   What kind of things did Mr. Evans tell
20 you about what to do or what not to do?
21   A   I don't remember.
22   Q   Well, I'll tell you what.  Let's play you
23 some calls.
24   A   Okay.

Page 156

1   Q   So I am going to play a call that I'm
2 going to mark as CFTC Exhibit 100, and it was a file
3 produced to us by Long Leaf Trading and the name of
4 the file is 09-08-2017_KENNETHPALMEN_7194940999
5 and the date on that call is September 8th of 2017.
6      (Whereupon CFTC Exhibit No. 100 was
7         marked for identification, MM.)
8   Q   Do you know who Mr. Kenneth Palmen is?
9   A   He rings a bell.  I believe he was
10 a client of Jeremy Ruth's that I had to call with
11 recommendations after Jeremy had left.
12   Q   Got it, okay.
13      MR. BURDEN:  So I'm going to start
14 at 3 minutes and 25 seconds into this call and
15 we'll see how we do with it.  This is supposed
16 to be coming out of these speakers.  Hang on.
17      (Discussion off the record.)
18      MR. BURDEN:  So Exhibit 100, I'm going to
19 start Exhibit 100 at 3 minutes and 30 seconds.
20      (Whereupon the audio was played.)
21      MR. BURDEN:  So I want to stop there.
22   Q   So, Mr. Leeney, is that you on the call?
23   A   Yes, it is.
24   Q   So I want to ask you about this

Page 157

1 part where you talk about how Long Leaf Trading
2 is looking to accomplish monthly income generation.
3 So is that something you said to customers on the
4 phone?
5    A   Yes.
6    Q   Did Long Leaf Trading achieve monthly
7 income generation for customers?
8    A   No, they did not.
9       MR. BURDEN:  So I'm going to keep going
10 sort of in a similar vein, and I'm going to
11 restart it at 6 minutes and 9 seconds.
12       (Whereupon the audio was played.)
13       MR. BURDEN:  All right.  So I'm going
14 to stop it there.
15    Q   So, Mr. Leeney, it seems like you're
16 telling this customer, Kevin Palmen, that Long Leaf
17 Trading has found that short options are a good way
18 of generating income, is that right?
19    A   Yeah, I'd like to make a correction here.
20    Q   Sure.
21    A   I got this guy mixed up.  He was
22 a prospective client, not a current client.  But,
23 yeah, so this was a sales solicitation.  I just want
24 to make sure that was cleared up.

Page 158

1    Q   Got it, thanks.  So you're telling
2 Mr. Palmen that Long Leaf Trading has found that
3 short options is a good way of generating income.
4 Is that a fair summary of your statement to him
5 just there?
6    A   Yes, that's fair.
7    Q   All right.  So is that true?
8    A   That options are a good way of generating
9 income?
10    Q   That Long Leaf Trading has found that
11 short options is a good way of generating income.
12    A   No, that is not true.
13    Q   So if you'll forgive me for asking,
14 why did you say these things to Mr. Palmen about
15 Long Leaf Trading?
16    A   That was the sales materials that we were
17 given to give that presentation.
18       MR. BURDEN:  So I want to restart
19 this again, if I could, please, Exhibit 100,
20 at 23 minutes and 15 seconds.
21       (Whereupon the audio was played.)
22       MR. BURDEN:  So I want to stop that
23 Exhibit 100 there again.
24    Q   It sounds like you're telling this

Page 159

1 prospective customer in September of 2017 that
2 Long Leaf Trading wins 76.5 percent of the time.
3 Is that a fair summary of your statement?
4    A   Yes.
5    Q   But that's not true, is it?
6    A   No, it's not true.
7    Q   And you knew that wasn't true?
8    A   Yes.
9    Q   So why did you say it?
10    A   That was in our sales script that we were
11 required to use for our appointments.
12       MR. BURDEN:  All right.  I'm going
13 to restart this at 1 -- sorry.  I'm going
14 to restart Exhibit 100 here at 35 minutes
15 and 13 seconds.
16       (Whereupon the audio was played.)
17    Q   So you're talking here, you say
18 that Long Leaf Trading can still generate a good
19 return.  For whom did Long Leaf Trading generate
20 a good return?
21    A   No one that I can recall.
22    Q   So why did you say that then, please.
23    A   That was in our script in our sales
24 materials.  That's what we had to do the calls with.

Page 160

1       MR. BURDEN:  And I want to return
2 to Exhibit 100, if I could, and I'm going
3 to restart it at 56 minutes and 45 seconds.
4       (Whereupon the audio was played.)
5       MR. BURDEN:  So I want to stop that
6 there and focus on a couple of comments here.
7    Q   So you're telling Mr. Palmen that
8 customers can receive, you know, $6,000 or 6 percent
9 over the course of the year.  That's what you're
10 telling him here, right?
11    A   Yes.  It's supposed to be like a trading
12 plan, to achieve that.
13    Q   Got it.  Were there any customers
14 at Long Leaf Trading who enjoyed 6 percent returns
15 over the course of the year?
16    A   Not that I can recall.
17    Q   All right.  And you tell Mr. Palmen
18 here that it is very easy to scale and duplicate
19 the process for a 12 percent return, right?
20    A   Yes, that is correct.
21    Q   All right.  Were there any customers
22 who got a 12 percent return over the course of
23 the year?
24    A   Not that I recall.

Page 161

1    Q   So I want to focus in on these things
2 you're saying about returns over the course of the
3 year.  Why a year?  Where did you get that from?
4    A   That was just the sales material and
5 what our script entailed.  So when Tim had designed
6 it, that's what he designed it around.
7    Q   Got it.
8       MR. BURDEN:  So Exhibit 100, I want to
9 return to at 1 hour, 4 minutes and 37 seconds.
10      (Whereupon the audio was played.)
11      MR. BURDEN:  All right.  So I'm going
12 to stop it there.
13   Q   So, Mr. Leeney, you're talking
14 to Mr. Palmen here, who sounds old.  Is he old?
15   A   He sounds older.
16   Q   Yeah.  You're telling him that
17 the program is unmatched and it's successful
18 because of the structure of it.  What's your basis
19 for saying that the program is unmatched or
20 successful?
21   A   That was in our script for that
22 appointment, so that's why I used it with that
23 question, the structure actually referring to the
24 predefined risk, knowing the quantities every month

Page 162

1 and just knowing what to expect.
2    Q   So what is your basis for saying
3 to Mr. Palmen that the program was successful
4 because of the structure?
5    A   I don't have a specific basis for it,
6 you know.  That was just in that script that we have
7 for that part of the call.
8    Q   So it sounds like the program was really
9 not successful, is that fair to say?
10   A   Yeah, that's fair to say.
11   Q   And you knew that, right?
12   A   Yes.
13   Q   So why did you tell this guy that?
14   A   That was in our sales material.
15   Q   All right.  And you're talking here
16 in this last piece we listened to in Exhibit 100
17 about -- and you're speaking in the first person.
18 You say something to the effect of I will, you know,
19 identify assets or give them to you.  So were you
20 doing that?
21   A   No.
22   Q   So that's Mr. Evans and you're passing
23 it along, right?
24   A   Correct.

Page 163

1       MR. BURDEN:  I want to restart this
2 Exhibit 100 at 1 hour, 19 minutes and
3 40 seconds.
4       (Whereupon the audio was played.)
5       MR. BURDEN:  So I want to stop that
6 there.
7    Q   So in Exhibit 100 you're telling
8 Mr. Palmen that you're confident in your ability
9 to meet or exceed his expectations.  Is that about
10 what you're saying?
11   A   Yes, that is correct.
12   Q   So what's the basis for that confidence?
13   A   The basis for that confidence was that
14 was our sense-of-urgency script that we utilized
15 with the program.
16   Q   So you didn't think you could get good
17 results for Mr. Palmen, correct?
18   A   No.  I mean, I had -- I did have
19 hope when I would bring on a client or a new client
20 coming in.  So, you know, I may have had some
21 confidence that we could get good results.
22   Q   Were you seeing goods results at
23 that point in September of 2017?  I guess I'm
24 sort of challenging your expression of confidence.

Page 164

1 And confidence is sort of a subjective thing --
2    A   Yeah.
3    Q   -- but it doesn't seem like you
4 would have much reason at this point to think
5 that Long Leaf could generate returns for clients,
6 is that right?
7    A   Yeah, that's right.
8       MR. BURDEN:  All right.  These take
9 forever to load.  Give me just a moment, but
10 I promise I'll only torment you with one more
11 call.
12      (Whereupon CFTC Exhibit No. 101
13       was marked for identification, MM.)
14   Q   All right.  Mr. Leeney, I want to
15 show you what I've marked as CFTC Exhibit 101,
16 and this is a file of a call that was produced
17 to us by Long Leaf Trading.  The name of the file
18 is 07-06-2017_AINSWORTHOSBOURNE_3214438291, and the
19 date of that call is July 6th of 2017.
20      Mr. Leeney, do you know who Ainsworth
21 Osbourne is?
22   A   No, I don't recall.
23      MR. BURDEN:  So let's see how we do
24 this.  I'm going to start us at 18 minutes and

Page 165

1    49 seconds into this call, which is 50 minutes
2    and 30 seconds total.
3         (Whereupon the audio was played.)
4         MR. BURDEN:  So I want to stop that
5    there, and we're going to keep going.
6    Q    But this 100 percent clean track
7    record with NFA relating to customer accounts,
8    were you aware of any customer complaints with
9    NFA at that point?
10   A    No, I was not.
11   Q    Did you inquire as to whether any
12   complaints had been filed?
13   A    No, I did not.
14   Q    Do you know if Long Leaf would
15   necessarily be aware of customer complaints that
16   were filed with NFA?
17   A    I think that they would have been.
18   Q    Why do you think that?
19   A    The NFA I would think would notify
20   Long Leaf.
21   Q    But why do you think -- I'm not disagreeing
22   with you, but why do you think that?
23   A    I would think that if a customer
24   contacted the National Futures Association,

Page 166

1    the first one that they would contact would
2    be the principal of the firm that there was a
3    complaint about it.
4    Q    But did somebody tell you that?
5    A    Oh, yeah, yeah.  I mean, that was
6    Tim Evans when he was taking us through like the
7    regulatory section of the --
8    Q    So Mr. Evans told you that Long
9    Leaf would be immediately notified if there was
10   a customer complaint?
11   A    He didn't say that like verbatim that
12   you'd be immediately notified, but he said that
13   Long Leaf would be notified.
14   Q    Now, this call that we've been listening
15   to is from July 6 of 2017.  And at this point it's
16   fair to say that you received quite a few complaints
17   from customers, is that right?
18   A    Yes, correct.
19   Q    So why would you, you know, tell
20   people that no complaints have been filed with the
21   NFA knowing that you had received so many yourself?
22   A    So what I was -- what I was -- my
23   understanding of a complaint, like an official
24   complaint was something filed with the NFA, you

Page 167

1    know.  Our understanding from Tim was if someone
2    was upset about performance, that necessarily wasn't
3    like a complaint or like an official complaint, you
4    know.  It might be someone who's upset about
5    performance and wants to speak to a manager or
6    something like that to resolve it.
7    Q    But you were nonetheless aware
8    of many such complaints being made to you during
9    this period?
10   A    July 2017, not as much.  Certainly August
11   of 2017, but right in that period.
12   Q    But in that period you had received
13   complaints from customers, correct?
14   A    Yes, that is correct.
15        MR. BURDEN:  So let's keep listening.
16   We're going to pick this right back up where
17   we left off in Exhibit 101 at 19 minutes and
18   53 seconds.
19        (Whereupon the audio was played.)
20        MR. BURDEN:  You know what, I screwed
21   this up.  All right.  So we're going to do,
22   if we could, please -- and we may be listening
23   for a couple minutes.  Exhibit 101 I'm going
24   to start at 17 minutes and 32 seconds.

Page 168

1         (Whereupon the audio was played.)
2         MR. BURDEN:  All right.  So I want
3    to stop it there.
4    Q    So, Mr. Leeney, you're talking
5    to Mr. Ainsworth about the principals of Long Leaf
6    and them providing a strong return to customers.
7    Did Long Leaf in fact provide a strong return to
8    customers?
9    A    No, they did not.
10   Q    All right.  And you knew that, right?
11   A    I did, yes.
12   Q    So why did you tell this guy that?
13   A    That was on our script for that part of
14   the sales process.
15   Q    Got it.  So the next piece that we heard
16   you talk about with Mr. Ainsworth, that Long Leaf
17   wouldn't be able to work with hundreds of clients
18   and oversee millions of dollars for the past six
19   years if we weren't being profitable.  Is that
20   statement true?
21   A    No, it is not.
22   Q    Why did you say it?
23   A    Because it's on our script for that
24   part of the sales material, or the sales process.

Page 169

1    Q    All right.  So, you know, let me ask you
2  this, Mr. Leeney.  I understand that you're making
3  these representations to customers because they're
4  on the script, right?
5    A    Um-hmm.
6    Q    Yes?
7    A    Yes.
8    Q    But you don't have to say what's on
9  the script, do you?
10   A    We actually had to stick to that.
11 Otherwise, you know, part of the -- Tim would
12 listen to our calls.  And if we went off that
13 or ventured away from it, you know, we were told
14 that we have to stick to it.
15   Q    Right.  But you could have quit, right?
16   A    Oh, yeah.  Of course.
17   Q    Yeah.  You could have refused to make these
18 representations to clients, correct?
19   A    Yeah, that's correct.
20   Q    I mean, you probably wouldn't have
21 lasted long, right, but you could have refused,
22 right?
23   A    Yes, I could have refused.
24   Q    So why didn't you?

Page 170

1    A    I eventually did in September 2017.
2  But part of me held out hope that, you know, my
3  recommendations I gave Tim before, that we'd be
4  able to turn things around.  I think it started
5  with the recommendations suffering.  And when it
6  was very evident that, you know, he was stuck doing
7  business that way, then I left.
8    Q    All right.  And did you ever --
9  and it sounds like you're sort of getting here.
10 Did you ever object, express any reservations to
11 Mr. Evans about the sales material?  Did you ever
12 say, you know, I don't feel right saying this, this
13 isn't true, I don't like the script?
14   A    I actually was not a fan of the script
15 and he knew that.  I made that -- I brought that
16 to him a number of times.  And my sales process, I
17 prefer to be a little bit more question and answer,
18 conversational versus just, you know, saying --
19 putting people in a box and talking for 45 minutes
20 and just, you know, throwing everything at them
21 at once.
22   Q    All right.  Well, you know what I'm
23 getting at.  I mean, did you ever tell Mr. Evans
24 I don't like the script because it is false or

Page 171

1  something to that effect?
2    A    I brought up concerns about it before,
3  but it was also my understanding that that was --
4  everything was approved.  So he always made an
5  emphasis on that.
6    Q    Who did Mr. Evans say approved these
7  representations?
8    A    The NFA, National Futures Association.
9    Q    Did he provide you with any corroboration
10 of that?
11   A    No, but he just -- it was pretty
12 clear to me that the sales materials were approved
13 or that was my understanding at the time.
14   Q    But it was also clear to you that
15 these representations in the sales materials were
16 false, correct?
17   A    Yes, that's correct.
18   Q    So did you push back with Mr. Evans?
19 Did you ever say, you know, have a conversation with
20 him or send him an email that I have somehow managed
21 to not find where you say, you know, these are
22 misrepresentations?
23   A    I don't recall.  I'm not sure.
24   Q    Did you ever have any conversations

Page 172

1  with other people at Long Leaf Trading, maybe
2  Mr. Ruth or the other brokers, where you sort
3  of suggested that what you were doing wasn't
4  right or you didn't agree with the script or you
5  felt like there was misrepresentations?  Any
6  conversations with other people?
7    A    Not that I recall.  I don't know.
8    Q    Did Mr. Evans ever -- you know, how
9  did he sort of get you to keep doing this?  I mean,
10 it seems to me that, you know, you understand that
11 if you -- you're a Series 3 registrant, correct?
12   A    Yes, that's correct.
13   Q    And you worked at other IBs, right?
14   A    Um-hmm.
15   Q    Yes?
16   A    Yes.
17   Q    So two of them, right?
18   A    Yes.
19   Q    So you've got to -- I mean, did you
20 understand at the time that if you were making
21 misrepresentations to customers, saying things
22 that weren't true, you could be exposing yourself
23 to let's just say liability?  You understood that,
24 right?

Page 173

1    A    At the time I did not because it was
2  my understanding that everything that Tim provided
3  us from a sales perspective was compliant and, you
4  know, approved for us to use.
5    Q    Yeah.  I hear what you're saying and
6  I don't want to push back, but I really do want
7  to get your story on this.  Your testimony is that
8  Mr. Evans represented to you that these sales
9  materials were approved by the NFA, correct?
10   A    Yes, that's correct.
11   Q    But at the same time you acknowledge
12 that you knew these sales materials contained false
13 representations, right?
14   A    Yes, that's accurate.
15   Q    Yeah.  So surely you couldn't have
16 thought it's false but the NFA approved it.  I mean,
17 you must have understood that that couldn't be the
18 case, correct?
19   A    Well, at the time I think I was -- just
20 bought into, you know, what he was giving me, like
21 what he was telling me.
22   Q    I mean, did Mr. Evans like threaten you
23 or anything?
24   A    It was very clear to us if we didn't

Page 174

1  follow his process then, you know, he would cut us.
2  He would fire you.
3    Q    But, I mean, did he ever threaten you
4  like he would hurt you or he would hurt somebody
5  you knew?
6    A    I don't think so.
7    Q    So -- and I know I've asked this
8  question before, but sort of why continue to do
9  it?  Why not quit or seek another job earlier than
10 you did?
11   A    After, you know, I met with Tim and
12 kind of gave him my concerns, I was hopeful that
13 the company could turn around with what they were
14 doing.  But then when I saw that that was not
15 evident and it was evident from Tim that I had
16 to give recommendations to people that didn't want
17 to give clients anymore, I was not willing to do that.
18 So that's why I ultimately determined to leave.
19        (Whereupon  CFTC Exhibit No. 102
20         was marked for identification, MM.)
21   Q    All right.  I want to hand you what I've
22 marked as CFTC Exhibit 102.  And do you recognize
23 this document?
24   A    This is a Skype conversation with me

Page 175

1  and Tim Evans.
2    Q    All right.  And what does it say here?
3    A    This is a conversation regarding a wire,
4  a client wire transfer coming in.
5    Q    Got it.  So what do you write at the top?
6    A    "Did any wire hit for the Bruno -- for
7  Bruno this a.m. on the board?  I don't want to voice
8  it out loud for Wilky to be asking me about him."
9    Q    And what does Mr. Evans say?
10   A    "You know I would have confirmed that with
11 you already."
12   Q    And then what do you say?
13   A    "I didn't know if you had to go
14 into somewhere to check.  We'll hopefully see
15 something today.  That will cheer me up."
16   Q    What does Mr. Evans say?
17   A    "Yeah, me too.  The only thing better than
18 pussy is ..."
19   Q    And what do you say?
20   A    "Money."
21        (Whereupon  CFTC Exhibit No. 103 was
22         marked for identification, MM.)
23   Q    All right.  I want to hand you what
24 I've marked as CFTC Exhibit 103.  Do you recognize

Page 176

1  this document?
2    A    Yes, this is a Skype conversation with
3  Tim Evans.
4    Q    And you, right?
5    A    And myself, yes.
6    Q    All right.  So what's going on here?
7  What's this chat about, please.
8    A    I'm giving Tim an update on where new
9  accounts are coming in.
10   Q    All right.  So there's something here
11 about a bet.  I can't figure out what you guys are
12 talking about.  What are you talking about?
13   A    I'm not sure.  If I were to guess,
14 I may have had a bet with Jeremy Ruth to -- maybe
15 for a number of accounts that we would bring in.
16   Q    All right.  And it looks here like
17 you guys are talking about an IRA account, is that
18 right?
19   A    Yes, that's correct.
20   Q    All right.  So what percentage of your
21 clients -- and let's just focus on yours, if we
22 could, please -- at Long Leaf Trading were allowing
23 Long Leaf to trade their IRAs?
24   A    Percentage of my clients, I would guess

Page 177

1 about 50 percent.
2    Q    Okay.  So Mr. Evans says at 1:13 p.m.,
3 "I can see your morals aren't too solid."  And what
4 do you say in response?
5    A    "At the end of the day I'm here to make
6 money.  Futures brokers naturally have shaky morals.
7 Also, worse comes to worse, Jeremy will find grounds
8 to discredit the bet."
9    Q    All right.  I want to switch gears
10 for a minute from really embarrassing stuff to
11 just moderately embarrassing stuff.  So I'm going
12 to hand you what I'm marking as CFTC Exhibit 104.
13         (Whereupon  CFTC Exhibit No. 104 was
14         marked for identification, MM.)
15    Q    All right.  So do you recognize CFTC
16 Exhibit 104, Mr. Leeney?
17    A    I do.
18    Q    Can you tell me what it is, please.
19    A    This is a Skype message between myself
20 and Tim Evans.
21    Q    All right.  So you write to Mr. Evans,
22 "We should take one of the mornings this week to
23 at least go over the customization script I had
24 laid out so Tony can use it.  Sounds like he's

Page 178

1 kind of lost with it."  And Mr. Evans says, "Is he
2 brutalizing his call?  Okay."  So do you remember
3 this exchange?
4    A    I don't know -- I don't remember this
5 particularly, but I think this was in regards to
6 the original customization script that Tim had given
7 us for the program when it first started and got
8 off the ground.
9    Q    Got it.  So you know what, we've
10 been sort of talking about demos and customization
11 because I know what they are and you know what they,
12 but we should sort of lay it out for the record.
13    A    Yes.
14    Q    So if you would, please, what's the demo?
15 What's the customization?
16    A    The demo was an introductory
17 appointment for about 30 minutes that covered just a
18 general overview of the program.  The customization
19 appointment was the next appointment after the demo,
20 and that was where we would actually try to earn
21 someone's business by showing them the structure
22 of the program.
23    Q    Got it.  And so the junior broker would
24 typically do the demo call, right?

Page 179

1    A    Typically, yes.
2    Q    Okay.  And then the senior broker, which
3 was you, would handle the custom call, right?
4    A    Yes, correct.
5    Q    So why do you guys call it that?
6 Why is like the big sales call the custom call?
7    A    I'm not very sure.  It was just kind
8 of always called that from the jump, you know.
9 Originally when Tim started the Time Means Money
10 program, the customization appointment grew into like
11 having more of a conversation with someone on what
12 markets they want to trade or what their goals might
13 be and then we would customize it to them.  And then
14 over time that appointment grew into like a scripted
15 one-delivery-for-all type appointment.
16    Q    Got it.  So turning again to Exhibit 104
17 you say, "We should take one of the mornings this
18 week to at least go over the customization script I
19 had laid out so Tony can use it."  So did you create
20 a script for this?
21    A    No.  I actually had Tim's customization
22 script and I rewrote it, I believe, to one that was
23 a little bit easier like laid out.
24    Q    Got it.

Page 180

1    A    And that's what I believe I was referring
2 to.
3         (WhereuponCFTC Exhibit No. 105
4         was marked for identification, MM.)
5    Q    Mr. Leeney, I'm going to hand you what
6 I've marked as CFTC 105.  And do you recognize CFTC
7 Exhibit 105?
8    A    I do.
9    Q    Can you tell me what it is, please.
10    A    So these are transcriptions from
11 some of Jeremy Ruth's custom consultations or
12 custom appointments.  So I was struggling when we
13 went to the scripted process for the customization
14 appointment on getting clients.  So Tim wanted me to
15 listen to Jeremy Ruth's calls because he was having
16 success bringing on new clients and transcribed
17 questions and answers and just followup material
18 to use with that call from him.
19    Q    Got it.  And you're sending these notes
20 to Vince Prieto, is that right?
21    A    Yes.
22    Q    And you write, "I attached my notes
23 that I go off of at the end of the custom if you
24 want to look at them when you're listening to the

Page 181

1 calls."
2    A   Correct.
3    Q   All right.  So what are you doing here
4 for Mr. Prieto?
5    A   So after I wrote these notes -- or, yeah,
6 I wrote these notes off of Jeremy's calls.  I showed
7 Tim the notes and he had like approved them, okayed
8 them.  And then I offered to send these to the other
9 brokers that might need assistance because Vince was
10 struggling as well.
11    Q   Got it.  And did you do that?  Did you
12 send it to the other brokers?
13    A   To Vince I know because he was the
14 other one that was running that appointment as well.
15 I'm not sure at that time if anyone else was.
16    Q   Got it.  So, you know, where does it
17 sort of indicate in 105 -- and maybe it doesn't --
18 that this is from, you know, Jeremy's calls, that
19 this is what Jeremy Ruth is saying?
20    A   I don't know if it does or if it
21 lists his name particularly.  I just listened to
22 call recordings of his and saw how he was running
23 the followup section at the end of the custom.
24    Q   Got it.  And did you provide these notes

Page 182

1 to any of the other brokers?
2    A   I believe later on Tim distributed
3 it to Brian Adams and some of the junior brokers
4 that were beginning to try out the customization
5 call.  I'm not sure which ones, though.
6    Q   But did you send it to any of the other
7 brokers?
8    A   Not that I recall.  I think I only gave
9 it to Vince.
10    Q   All right.  So I've heard this before,
11 that Jeremy Ruth had a lot of clients.  Is that
12 right?
13    A   Yes.
14    Q   So do you have any knowledge or
15 understanding of why he had quite so many clients?
16    A   He was just good at sales and running
17 those appointments.  So I think he was just an
18 aggressive personality and that's why he ended
19 up having so many.
20    Q   Was there anything special that you
21 think he said or did that set him apart from the
22 other brokers?
23    A   Not that I can think of, you know,
24 because we all used the same sales process and

Page 183

1 talking points and everything.  I think he just
2 delivered it effectively.
3           (Whereupon  CFTC Exhibit No. 106
4            was marked for identification, MM.)
5    Q   Mr. Leeney, I want to hand you what
6 I've marked CFTC Exhibit 106.  And do you recognize
7 this document?
8    A   Yes.
9    Q   Can you tell me what it is, please.
10    A   So this is the transcribed notes or the
11 transcription of Jeremy Ruth's calls.
12    Q   And so you sent this to yourself?
13    A   Yes.
14    Q   All right.  So your testimony is
15 that the documents we see appended to the email
16 in Exhibit 106, Low Starting Amount.docx and Post
17 Custom Final.docx, your testimony is that these are
18 transcriptions from Mr. Ruth's calls?
19    A   Yes.
20    Q   And did you use these yourself on calls?
21    A   Yes, I did.
22    Q   Did you send these to any other brokers?
23    A   Not to my knowledge.
24    Q   So at what point -- and maybe the

Page 184

1 answer is just from the very beginning -- did you
2 start working from a script?  Because, you know,
3 your testimony is that the last couple of exhibits
4 that look like scripts that you're sending to other
5 people or to yourself were transcriptions of calls
6 that Mr. Ruth made, is that right?
7    A   Correct, yes.
8    Q   And those calls were good so you were
9 going to -- or effective anyway.  And so you were
10 going to use those notes for yourself, right?
11    A   Yes, correct.
12    Q   So like did you not have a script at
13 that point?  Like how did you know what to say?
14    A   No, we did have a script.  But on
15 the customization appointment, at the end of that
16 appointment when people would have questions or
17 you know, just things like that, this script was
18 used as a guide to go -- to like, you know, address
19 questions and things like that because we weren't
20 going through specific trade examples or anything
21 like that.  It was all kind of just conceptual.
22 So this would be like the Q and A section at the
23 end of the custom consultation.
24

Page 185

1        (Whereupon  CFTC Exhibit No. 107
2           was marked for identification, MM.)
3    Q    Got it.  Mr. Leeney, I want to hand
4  you what I've marked as CFTC Exhibit 107.  Do you
5  recognize this document?
6    A    Yes.  So this is the demo or introductory
7  appointment, the first appointment in the sales
8  process.  So this would be the script.
9    Q    Got it.  So you'll see this is in
10  Exhibit 107, this is an email from Tim Evans to
11  you, subject Demo Script, and it's dated January 23,
12  2017, right?
13    A    Yes, that is correct.
14    Q    So do you know who put this script
15  together?
16    A    So who wrote this script?
17    Q    Yeah.
18    A    Was Jeremy Ruth.
19    Q    How do you know that?
20    A    He had said so, and I know that Tim
21  enlisted his help in putting together the sales
22  process and the script.
23    Q    Did Mr. Evans enlist your help in
24  putting together the script for the sales process?

Page 186

1    A    Originally when we started up in 2015,
2  me and him were like trying out like different
3  appointment styles.  But from a script-writing
4  standpoint, no.  The only thing that I wrote
5  were the transcribed notes from Jeremy's calls
6  that I gave to Tim.
7    Q    Did those kind of get funneled into
8  this script that we see in Exhibit 107 or do you
9  not know?
10    A    The transcribed calls?
11    Q    Yeah.
12    A    Well, it wouldn't be in this one, in
13  107.  It would be in the customization appointment.
14    Q    Got it.
15    A    So those ended up becoming a part of that
16  customization appointment script.
17    Q    So let's focus our attention, if we
18  could, please, on Exhibit 107 and this script.
19  January of 2017, is this the first time you had
20  sort of seen this script that's attached here or
21  is this like a version of something that you saw
22  earlier?
23    A    No, this is just a revised version.
24  We've had something similar to this since 2015,

Page 187

1  around there.
2    Q    Got it.  So what was different
3  about the version we see in Exhibit 107, if you
4  remember?
5    A    I don't remember.  Honestly, the
6  revisions that would come out might be missing
7  a comma or something like that or an extra page
8  space.
9    Q    So when did you first see the -- what's
10  a good name for this script?
11    A    Demo script.
12    Q    Okay.  So when's the first time you saw
13  the demo script?
14    A    That would probably be, if I had
15  to estimate, fall of 2015, maybe past the midway
16  point of 2015.
17    Q    So very early in the program this was
18  distributed to you and other brokers, correct?
19    A    Correct.
20    Q    And who distributed it?
21    A    Tim Evans.
22    Q    And was this a script that you followed
23  in doing your calls?
24    A    Yes, it was.

Page 188

1        MR. BURDEN:  All right.  You know,
2  we've been going for an hour.  Why don't we
3  take a break and have a deep breath and we'll
4  come back in ten.
5        THE WITNESS:  Sounds good.
6          (Whereupon a recess was taken from
7          3:10 p.m., to 3:30 p.m., after which
8          the following proceedings were had:)
9        MR. BURDEN:  Joe, do you want to --
10        MR. PATRICK:  Sure, yeah.
11          FURTHER EXAMINATION
12  BY MR. PATRICK:
13    Q    Mr. Leeney, you testified earlier
14  that you received commissions from Long Leaf Trading
15  as part of your compensation, is that right?
16    A    Yes, that's correct.
17    Q    And for a period of time you also received
18  a small salary, is that right?
19    A    Yes.
20    Q    And can you refresh my memory on that?
21  What was your salary amount?
22    A    My salary amount was 1500, $1500 per month.
23    Q    Per month?
24    A    Yes.

Page 189

1    Q    And that wasn't a draw.  That
2 wasn't something that needed to be paid back
3 with commissions.  It was just a straight salary?
4    A    No.  Yeah, that was just a straight salary.
5    Q    And do you have a sense of how much
6 in commissions you earned while you were at Long
7 Leaf Trading?
8    A    I do not.
9    Q    Did you receive 1099s for your
10 commissions or were you an employee of Long Leaf
11 Trading?
12    A    It was a 1099.  If I think about
13 it, 2013 I would estimate that I may have made
14 around 25 or 30,000.  2014 and '15 I would estimate
15 maybe around 40 or 50,000.  2016-2017 I would
16 estimate maybe around 60 or 70,000.
17    Q    I think you said earlier that in '13
18 you made -- how much money?
19    A    I was just estimating it around like
20 25 or 30,000 or so.
21    Q    Okay.  And would that be at your
22 employer before Long Leaf because I thought you
23 started in June of '14 at Long Leaf Trading.
24    A    Oh, that's right.  So I was referring

Page 190

1 to my first like year at Long Leaf.  But, yeah,
2 I'm not sure offhand how much I would have made
3 that year then.
4    Q    Okay, I'm sorry.  You started June of '13?
5    A    Yeah, June of 2013.
6    Q    Oh, I apologize.  And you were a 1099
7 employee the whole time you were --
8    A    Yes, I was.
9    Q    Okay.  And do you have any sense
10 in total of how much in commissions you earned
11 for Long Leaf Trading?
12    A    No, I do not.
13    Q    You mentioned that your commission
14 rate while you were at Long Leaf was anywhere
15 from 20 percent up to a maximum of 40 percent on
16 certain accounts?
17    A    Well, as low as 10 percent, as high as
18 40 percent.
19    Q    And for the 10 percent commissions,
20 those would be commissions that you were sharing
21 with one of the junior brokers?
22    A    No.  The 10 percent commission
23 rate would be if you had -- if someone had left
24 and you were working with their clients or giving

Page 191

1 the recommendation to their clients, he gave you
2 a 10 percent payout rate on that or a 10 percent
3 commission rate.
4    Q    So if I were to give you a sum
5 for commissions, would you be able to tell me
6 if you thought that sounded like the correct amount
7 of commissions that were earned on accounts that
8 you were the salesperson for while you were at
9 Long Leaf?
10    A    Yeah, I could probably see if it's
11 relatively accurate.
12    Q    So the number I'm showing for
13 commissions earned -- and this is just the years
14 2014, 2015, 2016 and 2017, and you testified that
15 you left in September of 2017, is that right?
16    A    That is correct.
17    Q    Okay.  So the number would be approximately
18 788,000.
19    A    Okay.  Sounds accurate, but I don't know.
20    Q    You never saw anything while you were
21 at Long Leaf Trading that would have summarized or
22 totaled the commissions that you earned by year or
23 by month or anything like that?
24    A    No, I've never seen that.

Page 192

1    Q    Did you ever talk about commissions
2 or total sales while you were at Long Leaf Trading
3 with Tim Evans?
4    A    Not that I recall, no.
5         FURTHER EXAMINATION
6 BY MR. BURDEN:
7    Q    All right.  So, Mr. Leeney, I want to
8 talk about some of the documents that you produced
9 to us.  I'm supposed to do this dance where I show
10 it to you and I say do you recognize it, but that's
11 hard to do because they don't have names on them or
12 emails.  So I'll just tell you what the file names
13 are --
14    A    Okay.
15    Q    -- and you can just tell me what you
16 remember about them.
17         (Whereupon CFTC Exhibit No. 108
18          was marked for identification, MM.)
19    Q    So I want to hand you a document I've
20 marked as CFTC Exhibit 108.  And the title of this
21 file, and you don't see it on there, but the title of the
22 file that you produced is How Has the Program Worked
23 Rebuttal.  So do you know what that is?
24    A    Yes, this was --

Page 193

1    Q    What is it, please.
2    A    Yeah.  This was a transcribed phone
3  call from Jeremy Ruth that just addressed a question
4  that would pop up.
5    Q    And what was that question?
6    A    "I've liked what I've seen in the
7  program, but how has it worked?  What percentage
8  of the time do you actually win?"
9    Q    Oh, so actually it's written up here
10  at the top?
11    A    Yes, correct.
12    Q    I'd forgotten about that.  So I'm not
13  going to ask that we read Exhibit 110 all the way
14  through, but this sounds like a question that you
15  would probably get a lot from customers, is that
16  right?
17    A    I don't recall.  But, yeah, I mean,
18  we would get this question.
19    Q    Yeah.  I would expect that if you're
20  selling somebody an investment program, they would
21  ask how did it do, right?
22    A    Correct.
23    Q    And this is designed to answer that
24  question, correct?

Page 194

1    A    Yes.
2    Q    So is it fair to say that in Exhibit 110
3  it doesn't actually say how the program worked, does
4  it?
5    A    That is correct.
6    Q    And it doesn't say what percentage of the
7  time customers actually -- to use the language of
8  Exhibit 110 -- win, right?
9    A    No, it does not.  Tim, with these calls
10  he wanted us to focus on prospective clients buying
11  into the concepts, not necessarily like buying like
12  an individual trade.  So a lot of the back and forth
13  that we had, he wanted us to stay like concept
14  driven with it.
15    Q    Got it.  So like if a customer asked
16  how does the program work, you're supposed to tell
17  them what's in Exhibit 110?
18    A    Yes -- or I've got 108.
19    Q    What is it?  I thought it was 110.
20        MR. PATRICK:  No, it's 108.
21  BY MR. BURDEN:
22    Q    Sorry.
23    A    But, yes, that's correct.
24    Q    So let's look at another one, if we

Page 195

1  could, please.  So your testimony is that 108 is a
2  transcription you made from listening to Jeremy's
3  calls, is that right?
4    A    Yes, that's correct.
5    Q    And did you use this script when customers
6  asked how the program worked?
7    A    I believe so, yes.
8        (WhereuponCFTC Exhibit No. 109
9        was marked for identification, MM.)
10    Q    All right.  Mr. Leeney, I want
11  to hand you what I've marked as CFTC Exhibit 109.
12    A    Okay.
13    Q    And this is a document that you
14  produced to us, and the title on the document
15  is James Leeney Prospect List.  So can you tell me
16  what this document is, please.
17    A    So this was a document that I had of
18  prospects just in general.  So when I reviewed this,
19  I don't think I had any like clients or anything
20  like that.  These were just prospects that I was
21  speaking to about the program.
22    Q    Got it.  And did you write the notes here
23  about these guys?
24    A    Yes, correct.

Page 196

1    Q    All right.  So who is Nikhil Desai?
2  Does that name mean anything to you?
3    A    No, it does not.
4    Q    All right.  So the note there says,
5  "This guy is a dick now, wants a track record and
6  is real combative."  Did you write that?
7    A    Yes, I did.
8    Q    All right.  So this business of wanting a
9  track record, is that your basis for your assessment
10  of Nikhil Desai as a dick?
11    A    No, but that would be the basis why
12  he's no longer interested because we didn't have
13  a track record.
14    Q    Did you provide Mr. Desai with a track
15  record of any kind?
16    A    No, I did not.
17    Q    Was it Long Leaf's policy to refuse
18  to provide prospective customers with results of
19  previous trading?
20    A    Yes.  I mean, it was our understanding
21  that we were not able to provide a track record
22  unless we were a CTA.
23    Q    Who told you that?
24    A    That was my understanding from Tim Evans.

Page 197

1    Q    And when did Mr. Evans tell you this?
2    A    I don't recall, but that was the policy
3 that he had.
4    Q    All right.  I want to push back on that
5 a little.
6    A    Okay.
7    Q    You're a Series 3 registrant, correct?
8    A    Yep, that is correct.
9    Q    And you've worked for other IBs, right?
10   A    Yes.
11   Q    So did those IBs provide customers with
12 track records?
13   A    Insignia Futures & Options did for
14 their CTA program, not for stuff outside the CTA.
15 Kingsview Financial, not to my knowledge.
16   Q    Was it your understanding that
17 Long Leaf Trading was prohibited from providing
18 a track record because it was not a CTA?
19   A    Yes, that was my understanding.
20   Q    And what is your basis for that
21 understanding?
22   A    That was my understanding from Tim
23 Evans.  I don't recall like a specific conversation,
24 but that's my understanding.

Page 198

1    Q    And so if customers asked -- I should
2 ask you instead.  When you were talking to Long
3 Leaf customers, did they ever ask you how other
4 traders had done or if people made money?
5    A    They would, but I don't recall the
6 response or like the rebuttal that we would have
7 for it.
8    Q    Well, do you remember what you said to
9 them?
10   A    No, I don't.
11   Q    Did you ever tell them that you were
12 forbidden from providing that information because
13 you were not a CTA?
14   A    Not exactly like that, but I believe
15 that we did, yes.
16   Q    So what did you say exactly?  What
17 was your thing that you said when customers asked
18 how traders had done in the program?
19   A    Like they had in the script for people
20 that asked about a track record.
21   Q    And did you produce that script?
22   A    I believe I did.
23   Q    Yeah.  And was the title on that script --
24 and I'll get it in a minute -- Past Performance

Page 199

1 Requests?
2    A    Yes, I think so.
3    Q    So what did past performance requests,
4 what did that script instruct you to say?
5    A    I don't recall.
6    Q    All right.  Certainly it didn't instruct
7 you to tell customers that substantially all Long
8 Leaf customers lost money trading, right?
9    A    Yes, that's correct.
10   Q    So I want to explore this more.
11 So your testimony is you felt that you couldn't
12 tell customers what the real past performance of
13 Long Leaf customers was because it was forbidden by
14 the NFA because you were not a CTA, is that right?
15   A    Well, we actually -- I was just
16 thinking about it.  Before -- because Tim like in
17 the original like trade alert service would send
18 out like a recommendation by email.  That way like
19 people would be able to track like performance or
20 like satisfy that request, but for the Time Means
21 Money program we didn't have a track record.
22   Q    Well, but Long Leaf Trading had a track
23 record, did it not?
24   A    Not to my knowledge.

Page 200

1    Q    Well, it had done previous trades for
2 customers, isn't that right?
3    A    Yeah, that's correct.
4    Q    Right.  So they had some kind of a track
5 record, didn't they?
6    A    Yes, but I was of the understanding
7 that track record was like an audited track record
8 for a CTA.
9    Q    What is your basis for that understanding?
10   A    That's what Tim had us understand
11 when we were there, that a track record was like
12 an audited, published track record.
13   Q    So is that your understanding of
14 what track record means from your training as
15 a Series 3, that it was quite such a formalistic
16 definition?
17   A    Not necessarily.  But I did come
18 to believe that it was, you know, a pretty formal
19 definition at Long Leaf Trading Group.
20   Q    But surely you must have understood
21 that when customers asked for past performance, they
22 didn't care if it was audited.  They just wanted to
23 know how people were doing, don't you think?
24   A    Yeah, I think so.

Page 201

1   Q   Did you tell them?
2   A   I don't recall, but I don't think so.
3   Q   Why not?
4   A   Because, again, that was the policy
5 that Long Leaf had.  And then, I mean, there were
6 periods where people were, you know, losing money
7 so ...
8   Q   So what?
9   A   So we didn't give our track record.
10   Q   Because people would not like that
11 customers were losing and thus would not invest,
12 correct?
13   A   But also it was a very strict policy
14 that Tim had with us too.  Like he did not want
15 us to talk about individual trades or performance
16 necessarily.  He wanted our sales process to be
17 focused on like a concept of the sales process.
18   Q   So this was Mr. Evans' policy?
19   A   Yes, correct.
20   Q   Did you ever deviate from the policy?
21   A   Not that I can recall.  I'm sure that
22 there was sometimes where I was like a little off
23 script or something like that, but it was his policy
24 that we had to follow the script pretty strictly.

Page 202

1   Q   Did you ever call NFA and ask whether
2 in fact you were precluded from giving out Long Leaf
3 Trading's past performance?
4   A   No, I did not.
5   Q   Did you ever reach out to anybody else?
6   A   No, not that I know of.
7       (Whereupon  CFTC Exhibit No. 110 was
8       marked for identification, MM.)
9   Q   All right.  Mr. Leeney, I want to hand you
10 what I've marked as CFTC Exhibit 110.
11       MR. SINCLAIR:  Back to 110, are we?
12       MR. BURDEN:  The second 110.  No, there's
13 only one 110.  There you go (tendering).
14   Q   So do you recognize this document?
15   A   Yes, this is an email from Jeremy Ruth.
16   Q   So Mr. Ruth writes to you and Vince
17 Prieto and the subject is Calls to Review, right?
18   A   Correct.
19   Q   And it's April of 2017.  What's going
20 on here, please.
21   A   So Jeremy included some different
22 types of calls that he did and sent them to us
23 to listen to.
24   Q   All right.  So do you know who Jerry

Page 203

1 Krantz is?
2   A   I do not.
3   Q   So Jeremy writes, "Bros, here are
4 some calls I think are worth the listen," and for
5 Jeremy Krantz he says, "Started from a Pierre fuck
6 up, but the value in this call is how to get around
7 a request for a track record and how to show empathy
8 so he feels you understand him.  Let me know if you
9 have any questions."  And then you respond, "Thanks,
10 Bra," right?
11   A   Correct.
12   Q   All right.  So do you have any
13 understanding of why Mr. Ruth thought it was
14 important to get around a request for a track
15 record?
16   A   Because that was a common question that
17 we would get on the program.
18   Q   The track record?
19   A   The track record, correct.
20   Q   And you interpreted this track record to
21 mean a request for an audited performance statement
22 in some formal way, right?
23   A   That was my understanding at the time.
24   Q   But you've got to know -- sorry.  I cut

Page 204

1 you off.
2   A   Oh, no.  That's all right.  But,
3 you know, the big emphasis that Tim always had on
4 the customization appointment was he wanted it to
5 be concept driven and not focused on necessarily
6 selling an idea or selling like a month's
7 performance or something like that.  So that's why
8 we had to, you know, essentially use those rebuttals
9 that got away from talking about like a specific
10 trade or a track record or something like that.
11   Q   Is it fair to say that the customers you
12 solicited were retail investors?
13   A   Yes, correct.
14   Q   So regular Joes, in other words?
15   A   I would say, I mean, for the most part,
16 you know, usually people with higher net worth, but
17 yeah.
18   Q   All right.  So when these people
19 are asking for a track record, did you really
20 think they meant they want some special NFA audited
21 track record that only CTAs give out that you're not
22 really sure about the details of?
23   A   No.  But, you know, a lot of -- because
24 this wasn't like a managed program, I didn't think

Page 205

1 that we were able to provide anything like that.
2    Q    But you knew what these customers
3 wanted, didn't you, when they asked for a track
4 record?
5    A    Yeah, they wanted to see performance but --
6    Q    Did you give that to them?
7    A    Not that I recall.
8    Q    And you knew what the performance was,
9 didn't you?
10    A    Yeah, at the time I did.
11    Q    And it wasn't good?
12    A    No.
13        (Whereupon  CFTC Exhibit No. 111
14            was marked for identification, MM.)
15    Q    I want to hand you what I've marked
16 CFTC Exhibit 111.  Do you recognize this document?
17    A    This was an email from Tim Evans to myself
18 and Brian Adams.
19    Q    All right.  And it looks like Mr. Evans is
20 forwarding an email from Dave Mook, is that correct?
21    A    That is correct.
22    Q    And who's Mr. Mook?
23    A    I don't know who Mr. Mook is.
24    Q    It looks like Mr. Mook is responding

Page 206

1 to some kind of email ad for Time Means Money.  Is
2 it fair to assume that he's a prospective customer?
3        MR. SINCLAIR:  If you ask him to
4 speculate, that's fine.
5        MR. BURDEN:  Ask him to speculate.
6    A    Yeah, I'd say that would be fair to assume.
7    Q    All right.  So Mr. Mook writes in
8 response to the Time Means Money email, "However
9 beautiful the strategy, you should occasionally
10 look at the results," and he cites Winston Churchill
11 for that.  Mr. Evans then forwards that to you and
12 Mr. Adams.  Did you talk about this email with
13 Mr. Evans or Mr. Adams?
14    A    No, I don't remember this.
15    Q    Did you sort of act on this humorous
16 email from Mr. Mook?  Did you look at the results
17 of the Time Means Money strategy?
18    A    I mean, I don't even remember seeing this
19 email.  I'm not sure, sorry.
20    Q    That's all right.  So I want to switch
21 gears a little bit and talk about the statements
22 that you and customers received from Gain.  Did you
23 find those statements confusing at all?
24    A    They could be confusing, yes.

Page 207

1    Q    Do you think that customers found them
2 confusing?
3    A    I think they did.
4    Q    Yeah.  And, in fact, customers expressed
5 that to you in phone calls and emails, correct?
6    A    Yes, that is correct.
7    Q    So was there any type of script or any
8 other prescription you were given on how to deal
9 with customer confusion?
10    A    So typically in the -- what was called
11 the orientation appointment, after a client came on
12 board to Long Leaf Trading Group, we would walk them
13 through the statements and what was where, get them
14 prepared on how to read the charts that we send out.
15 And after that, you know, if a client had a question
16 about a statement, you know, then we had to address
17 the question there.
18    Q    All right.  Like it seems like clients
19 if they're part of the program -- and I'll get you
20 some exhibits in a minute -- but they're typically
21 seeing pretty poor results month over month, if they
22 can read the statements, is that right?
23    A    Yes.
24    Q    But customers had trouble reading the

Page 208

1 statements, correct?
2    A    Not all customers.  Some did, some
3 didn't.  But, you know, even with poor results
4 month over month, a lot of people had kept being
5 customers because, again, you know, they were buying
6 into the concept of options selling that Tim wanted
7 us to sell.  So they felt that, you know, the
8 results could even out.
9    Q    And is that what you saw over the course
10 of the year?
11    A    No, that's not what I saw.
12    Q    What did you see?
13    A    I saw that the results weren't
14 improving.  I saw that, you know, it was an
15 environment that became more and more hostile and
16 unstable and which is why I left.
17    Q    Is it fair to say that Long Leaf Trading
18 was a sales-focused environment?
19    A    Yes, that's fair to say.
20        (Whereupon CFTC Exhibit No. 112 was
21            marked for identification, MM.)
22    Q    So I want to give you what I've marked as
23 CFTC Exhibit 112, and it's a group exhibit comprised
24 of three separate emails.  And you say the same

Page 209

1 thing, substantially the same thing to customers
2 in all three emails. And there's also three staples
3 in it for some reason, so watch yourself.
4    A    Okay.
5    Q    But I'm going to ask you about it.
6 So Exhibit 112, you'll see that the first email
7 in the exhibit is from Andy Trott to you. Who is
8 Andy Trott, please.
9    A    Andy Trott was a client of mine.
10    Q    All right. So he's asking you
11 on April 21st of 2017 what the current net position
12 is, right?
13    A    Correct, yes.
14    Q    And so you're responding, "Currently
15 negative 200 with these losing positions coming
16 off." And then you say, "This should set us up
17 for a strong May. Although the uptick in volatility
18 hurt those positions while we were holding them,
19 it will give us a more favorable situation
20 establishing new positions since we'll be able
21 to increase our margin of error even further."
22 And this is the statement I'll focus on, "That's
23 why we tend to see a lot stronger periods coming
24 off of a bad month."

Page 210

1        Is that true? Did you tend to
2 see a lot stronger period coming off a bad month?
3    A    Well, the reason I made that statement
4 is because typically volatility would increase
5 and, you know, a position would work against you.
6 So we felt that with that volatility increase, when
7 we established a new position we can get a more
8 favorable position for it.
9    Q    So in results where Long Leaf Trading
10 had a -- or in months where Long Leaf Trading had
11 bad results, did you tend to see better results the
12 next month?
13    A    I don't recall.
14    Q    So let's turn the page, if we could,
15 please, and go to page 3 of Exhibit 112. And we
16 see you corresponding with Mr. Hayden again, is that
17 right?
18    A    Yes.
19    Q    So it looks like you're writing to
20 Mr. Hayden and you say in June of 2017 substantially
21 the same thing as we saw you say in that email
22 to Mr. Trott. You say, "We tend to perform well
23 coming out of these periods where we take a loss,"
24 and that's in the final sentence of the second

Page 211

1 paragraph. Do you see that?
2    A    Yes.
3    Q    All right. And then you forward
4 it to Mr. Ruth with a picture of a fire extinguisher
5 going off, is that right?
6    A    Yes, that is correct.
7    Q    So what is that picture of a fire
8 extinguisher meant to indicate?
9    A    I think it was meant to indicate putting
10 out a fire.
11    Q    All right. And what's the fire that
12 you were putting out?
13    A    A client fire.
14    Q    All right. Final email, if we could,
15 please, from July of 2017. It's an email from you
16 to Mr. Williams. Who's Andre Williams?
17    A    He was a client of mine.
18    Q    All right. So Mr. Williams is asking,
19 "Are these trades high probability and how much
20 at risk per trade?" And you respond and say, "Yes,
21 they are," and you talk about designing the trade.
22 And then in the second paragraph of the email you
23 say, "You'll notice that premium collections are
24 higher this month than we have had before. This

Page 212

1 is because of that volatility that allows us to
2 position more favorably and one of the reasons
3 we tend to perform well after down periods."
4        So this statement that we've
5 seen you make three times in response to customer
6 inquiries about positions in Exhibit 112 that we
7 perform well after down periods, is this something
8 you came up with or is this something that you
9 were supposed to say to customers? Maybe it's
10 not a pattern. Maybe I'm seeing a pattern, but
11 it looks like a pattern.
12    A    It's something that we were trained to
13 say to customers. So when we had a down period,
14 Tim would let us know that, you know, when those
15 down periods occur, you know, it's because
16 volatility spiked up while we held some option
17 sales. So when we reinitiate the next positions
18 for the next month, even though those positions --
19 or the existing positions lost money, we should
20 be able to get a more favorable spot with the
21 new positions.
22    Q    Was that true in your experience?
23    A    I don't recall the periods coming off
24 of down months.

Page 213

1    Q    All right.  So what did you do to
2  figure out if this thing was correct that Mr. Evans
3  was trying to get you to say to people?
4    A    Well, conceptually I felt it was
5  correct because of that inflated volatility going
6  into that next month, but I don't recall anything
7  else I did.
8    Q    What do you know about CFDs of Long Leaf
9  Trading?
10    A    I've heard of Tim Evans having some type
11  of CFD client.
12    Q    What do you know about it?
13    A    That I'm not very sure of.  That
14  was business like Tim worked directly with, so
15  no one else like worked with that type of business.
16        MR. SINCLAIR:  I'm sorry.  Excuse me.
17  Did you say CFP?
18        MR. BURDEN:  CFD.
19        MR. SINCLAIR:  CFD?
20        MR. BURDEN:  Yeah, as in delta.
21    A    Yeah, I've never worked with anything
22  CFD myself, and I'm not very familiar with it.
23    Q    Do you know who Mr. Evans' client is?
24    A    No, I don't know like a client name.

Page 214

1  I believe it was someone may have been overseas
2  or something like that.
3        (Whereupon  CFTC Exhibit No. 113
4        was marked for identification, MM.)
5    Q    I want to hand you what I've marked as
6  CFTC Exhibit 113.  Do you recognize this document?
7    A    Yes, this is a Skype message from myself.
8    Q    And it looks like it's to Tim Evans, right?
9    A    Yes, to Tim Evans.
10    Q    All right.  So you say, "Look up our
11  new Google review.  See if it looks a little more
12  natural."
13    A    Um-hmm.
14    Q    Yes?
15    A    That's correct.
16    Q    All right.  So did you write a Google
17  review for Long Leaf Trading?
18    A    Yes.  Tim wanted me to write a Google
19  review in response to him having some negative
20  Google reviews from clients on there.
21    Q    And how many Google reviews did you write?
22    A    I believe I wrote two.
23    Q    And what were the names of those, please.
24    A    From what I recall, a John Little and

Page 215

1  Bob Diyori.
2    Q    And what do those reviews say, please.
3    A    One of the reviews said that they
4  were an S&P trader and liked the service.  The
5  other review said that the account process opening
6  was easy to use and the platform was easy to use.
7    Q    Did they say anything about profitability?
8    A    No, not that I recall.
9    Q    So why did you agree to do this?
10    A    You know, honestly, like in that
11  environment it was something that -- you know, Tim
12  over the years kind of became increasingly hostile
13  and unstable and it was pretty intimidating.  And,
14  you know, that's something that, you know, parts
15  of my tenure there was very manipulated by him.
16    Q    How tall is Tim?
17    A    Tim is about 5'10, 5'11".
18    Q    How tall are you?
19    A    I am 6'3".
20    Q    All right.  Were there any other fake
21  Google reviews?
22    A    I had asked my wife to write one.
23    Q    Did she?
24    A    She did.

Page 216

1    Q    All right.  Well, I'm sorry.  What was
2  the name on that one?
3    A    Kathleen Lynch.
4    Q    Did any of the other brokers write fake
5  Google reviews?
6    A    I tried to have her take it down, but
7  she wasn't able to.
8    Q    We're not going to bring her in.
9    A    Okay.  In terms of the other brokers,
10  I don't believe so.
11    Q    Why were you given this odious task?
12    A    I don't recall why it was my task.
13    Q    Were there any other sort of fake
14  reviews or similar efforts that Mr. Evans engaged
15  in to promote Long Leaf?
16    A    Nothing I recall.
17    Q    So this is going way back.  I should have
18  asked you this at the very beginning of testimony.
19  But this transition from the short swing sales to
20  Time Means Money, like did that result in a lot
21  more clients coming in?  Was it like better?
22    A    Initially, no, but eventually we did
23  consistently have more clients come in.
24

Page 217

1    (Whereupon  CFTC Exhibit No. 114
2      was marked for identification, MM.)
3    Q   So I want to hand you what I've
4 marked as CFTC Exhibit 114, and I want to ask
5 you if you recognize this document and what you're
6 talking about.
7    A   So this is a Skype message from myself
8 to Tim that I am describing part of the Time Means
9 Money benefit is a bigger account size.
10   Q   Yeah. So why is that? You say, "I knew
11 this setup would increase sales." Are you referring
12 to Time Means Money there?
13   A   Yes.
14   Q   "But the biggest thing has been
15 account size. My last four have been 10K, 50K,
16 25K and 50K." Like why should that be? You know,
17 why is this better than the previous iteration?
18   A   Well, Tim felt it was because of like
19 someone buying the concept of something versus an
20 individual idea. So instead of someone opening an
21 account for a smaller amount to do, you know, a gold
22 position, Tim wanted it to be where people were like
23 buying the concept of selling options.
24   Q   And so people did and that resulted in

Page 218

1 more deposits, is that right?
2    A   Yes, correct.
3    Q   So boring stuff now. I saw you
4 getting Gain statements with four different sales
5 codes on it. So LL07 is just James Leeney, right?
6    A   I don't remember the individual numbers,
7 but the reason I was getting four is -- so I think
8 at the time there was a statement where if you had
9 like a junior broker, they were on one run or
10 if I had one client to myself, that was one run.
11 But then also by the time I left, I had Vince and
12 Jeremy's statements I believe coming to me too.
13   Q   So here's the ones I saw, and I did
14 not do like -- no, I did an exhaustive analysis.
15 This is what I saw. So 007 is you, right? Does
16 that sound right?
17   A   What were the other numbers?
18   Q   003 is just Special, LL16 is Burns and
19 LL20 is Konrath. Those are the ones I saw coming
20 to your email inbox.
21   A   Yeah, so the 007 I recall was me.
22   Q   So when you get the Burns and Konrath
23 ones, I did not see overlap. I would have thought
24 with them being your junior brokers, you would have

Page 219

1 gotten the same clients under 007 and like Burns
2 would have gotten them under 16, but it seemed
3 not to be that way.
4    A   So are you asking like why are the
5 clients separate?
6    Q   Are they separate? Am I right?
7    A   They should be.
8    Q   Why?
9    A   I think it was because the payout
10 was different on each one, but that was never
11 really made too clear.
12   Q   So what's Special? What's the 003 Special
13 one? You start getting that like right away.
14   A   Oh, that might have been my -- like an
15 original or an old sales code.
16   Q   Okay.
17   A   Or the old 40 percent one maybe
18 because by the time I left he had changed the pay
19 structure a lot. So there was a different setup.
20    (Whereupon  CFTC Exhibit No. 115
21      was marked for identification, MM.)
22   Q   Mr. Leeney, I want to hand you what
23 I've marked as CFTC Exhibit 115. Do you recognize
24 this document?

Page 220

1    A   So this is an email to Steve Thompson.
2    Q   And who's that, please.
3    A   This was a client of mine.
4    Q   All right. So Mr. Thompson is writing
5 to you in March of 2017. He says, "Hi James, could
6 you please take a minute and tell me what kind of
7 spread I have. Also, what has to happen, or not,
8 to be profitable? Trying to educate myself, Steve."
9 So you send Steve the attached charts, correct?
10   A   Okay, yes.
11   Q   So you say, "It is not profitable yet.
12 Option selling strategies like an iron condor do
13 not usually become profitable until the last week
14 or week and a half until expiration (few more weeks
15 of wait time)."
16     So is this something that you
17 would sort of tell customers if they asked how
18 they were doing to suggest that you couldn't tell
19 if these positions were profitable until basically
20 they expire?
21   A   Not necessarily. If something was,
22 you know, really under water, like a position, there
23 was a strong move against us, we would tell that.
24 But in terms of profitability, because of the time

Page 221

1  decay aspect of an option, we would usually fill
2  them in on where the market was trading versus like
3  where the spread's at in the market.  So, for
4  example, if it's, you know, in the middle of like
5  where we want it to be but we still want to wait
6  for time to come off the option premiums for profit
7  potential to become available.
8          So typically when we updated
9  a client, it was more of a we'd just have to wait
10  and see until we get towards the end of the month,
11  and then we'd wait for Tim's offset and for his
12  update off of it.
13    Q    Got it.  All right.  Mr. Leeney,
14  we have no further questions at this time.  We
15  may, however, call you again to testify in this
16  investigation.  Should this be necessary, we will
17  contact Mr. Sinclair, your counsel.
18          Mr. Leeney, do you wish to clarify
19  anything or add anything to the statements you
20  have made today?
21    A    Yes, I would.  One thing that I wanted
22  to make sure was understood is, especially in 2017
23  year of Long Leaf Trading Group and when results
24  were declining more and more and that environment

Page 222

1  became more and more hostile, we did sit down
2  with Tim, myself and Jeremy Ruth, to discuss that
3  and to address that issue.  And the reason why I
4  stayed with Long Leaf after that meeting was because
5  I was under the impression that Tim Evans would
6  be changing the way that he did recommendations,
7  be changing the way that he did business.  And when
8  it was evident to me that that was not the case,
9  that is when I left.  When it was evident to me
10  that he was not going to change things there,
11  that's when I left.
12    Q    All right.  Now, I did not see anything
13  to sort of substantiate that in the email traffic,
14  but if I could, that might be helpful.  Can you
15  think of any communications you sent to him or any
16  chats that could help corroborate that?
17    A    I mean, previously I would send him,
18  you know, like just trade ideas to try to help out
19  in that regard.  But the big thing, the reason --
20  or I wouldn't say the reason, but the big thing
21  was when, you know, I sat down and I talked with
22  him and, you know, that was obviously in person.
23    Q    So were there any emails that you
24  sent after the fact or any memos that you wrote

Page 223

1  to the file?
2    A    Not to my knowledge, no.
3    Q    You don't happen to know where Mr. Evans
4  is these days, do you?
5    A    I saw an old junior broker about six
6  months ago on a city bus and kind of in passing he
7  had mentioned he was in Mexico, but I'm not sure.
8    Q    Have you had any, since leaving Long Leaf,
9  communications with Mr. Evans?
10    A    No, I have not.
11    Q    Or his counsel?
12    A    No, I have not.
13    Q    How about James Donelson or his counsel?
14    A    No, I have not.
15    Q    Any communications with Mr. Ruth?
16    A    Since leaving Long Leaf I did, but not
17  in the past year and a half.
18    Q    All right.  So I should ask you again,
19  since I kept asking questions, anything else you
20  want to clarify or add?
21    MR. SINCLAIR:  Would you explain your
22    concern about this information possibly becoming
23    public and what happened after this May meeting.
24    A    Yeah, so yeah.  One thing I wanted to see,

Page 224

1  is the information or my name on this deposition
2  public or is that confidential?
3  BY MR. BURDEN:
4    Q    So it's currently confidential and
5  we wouldn't tell anybody about it, including other
6  people at Long Leaf.  If it proceeds to litigation,
7  then it would be made public.  We would disclose
8  it to defendants as part of the normal discovery
9  process, if there were defendants.  If you were
10  a defendant, you would be named and it would be --
11  made public isn't the right way to do it.  We don't
12  release it into the world, but it's made available
13  to --
14    A    Yeah, because --
15    Q    -- respondents and we use it if we have
16  to in litigation.
17    A    Because in regards to that meeting
18  that, you know, we had referenced a few times,
19  you know, I had concerns over Tim because he was
20  becoming increasingly like hostile and just a very
21  volatile person, kind of a very threatening person
22  after that.  So I didn't want him to see my name
23  on a document and, you know, he's just an unstable
24  guy that I don't trust.

Page 225

1     MR. SINCLAIR: Did you feel threatened
2 after this May meeting in any way by Mr. Evans?
3     THE WITNESS: Yeah, I did. That's part
4 of why I left.
5     MR. SINCLAIR: Please explain.
6   A  Yeah. You know, after this May meeting
7 when, you know, we aired out like what we felt was
8 going to be fixed, you know, previously he would
9 be like a little bit more friendly with us. He was
10 very shut off, slamming things like, you know,
11 constantly yelling and just very -- became a
12 very berating atmosphere. So there was a very
13 sharp decline after that meeting, which led to
14 my departure there. So, you know, it was an
15 environment that -- I didn't want to be a part
16 of an intimidating environment like that so ...
17 BY MR. BURDEN:
18   Q  I asked you this before, but I'll
19 ask it again. Did Mr. Evans ever threaten you
20 personally?
21   A  Like physically threaten to like beat
22 me up or something?
23   Q  Sure.
24   A  Not that I recall.

Page 226

1   Q  Any other type of threat?
2   A  He would very regularly threaten
3 firing, threaten, you know, you'd better do
4 this, you'd better do that. I don't recall like
5 a physical threat.
6   Q  Any other type of threat? When he
7 says you'd better do this, you'd better do that,
8 you know, the followup question is always or what.
9 Did he ever intimate what?
10   A  I don't remember.
11     MR. PATRICK: Are you aware that he
12 physically threatened anybody else at the
13 office?
14     THE WITNESS: That he physically
15 threatened people, not that I'm directly
16 aware of. Like he's had some confrontations
17 that looked like they were about to get
18 physical, shouting at people, like getting
19 right up in their face, things like that.
20     MR. PATRICK: You witnessed these?
21     THE WITNESS: I'm trying to remember
22 exactly who it would have -- like who it
23 would be with. But he became like very
24 confrontational and very just volatile in

Page 227

1 that period. So I can't like recall exactly,
2 though. I'm sorry.
3 BY MR. BURDEN:
4   Q  Anything else you wish to clarify or add?
5   A  That's all.
6     MR. BURDEN: All right. We're off the
7 record, please.
8     WHICH WERE ALL THE PROCEEDINGS
9     HAD OR OFFERED AT SAID HEARING
10     OF THE ABOVE-ENTITLED CAUSE.

Page 228

1 STATE OF ILLINOIS)
          ) SS.
2 COUNTY OF C O O K)
3
4     I, MARY MASLOWSKI, CSR, do hereby
5 certify that I reported in shorthand the proceedings
6 had at the examination under oath aforesaid, and
7 that the foregoing is a true, complete and accurate
8 transcript of the proceedings at said examination
9 under oath as appears from the stenographic notes so
10 taken and transcribed on the 27th day of September,
11 2019.
12
13
14
15         Certified Shorthand Reporter
16
17
18
19
20
21
22
23
24