CFTC Ex. 542

# Long Leaf Trading Group

## *Stemper, Alexander 2021-02-11*

### *2/11/2021 9:04 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Friday, November 5, 2021

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
 2                EASTERN DIVISION
 3  COMMODITY FUTURES TRADING     )
    COMMISSION,                   )
 4                                )
              Plaintiff,          )
 5                                )
           vs.         ) No. 20 C 3578
 6                                )
    LONG LEAF TRADING GROUP,      )
 7  INC., et al.,                 )
                                  )
 8         Defendants.    )
 9
10
11        The remote video deposition of
12  ALEXANDER STEMPER, called by the Plaintiff for
13  examination, pursuant to subpoena and pursuant to
14  the Federal Rules of Civil Procedure for the United
15  States District Courts pertaining to the taking of
16  depositions, taken before Mary Maslowski, Certified
17  Shorthand Reporter and Notary Public within and
18  for the County of Cook and State of Illinois with
19  the witness located at 200 South Wacker Drive,
20  Chicago, Illinois, commencing at the hour of
21  9:04 o'clock on February 11, 2021.
22
23
24
```

## Page 2

```
 1  A P P E A R A N C E S :
 2
      (Appearing via videoconference)
 3  MR. JOSEPH C. PLATT, Trial Attorney
    MS. ELIZABETH M. STREIT, Trial Team Leader
 4  MR. JOSEPH J. PATRICK, Senior Investigator
    U.S. COMMODITY FUTURES TRADING COMMISSION
 5  DIVISION OF ENFORCEMENT
    525 West Monroe Street, Suite 1100
 6  Chicago, Illinois 60661
    (312) 596-0700
 7  jplatt@cftc.gov
    estreit@cftc.gov
 8  jpatrick@cftc.gov
 9
      On behalf of the U.S. Commodity
10    Futures Trading Commission;
11
    FALVEY LAW OFFICE
12  BY MR. JAMES M. FALVEY
    200 South Wacker Drive, Suite 3100
13  Chicago, Illinois 60606
    (312) 404-5839
14  jimfalvey@yahoo.com
15
      On behalf of Long Leaf Trading Group,
16    Inc., and the Witness;
17
    (Appearing via videoconference)
18  MR. JEREMY RUTH
19
      Appearing Pro Se.
20
21
22
23  CSR License No. 084-003278.
24
```

## Page 3

```
 1              I N D E X
 2  WITNESS          DX  CX _RDX  RCX
 3  ALEXANDER STEMPER
 4  By Mr. Platt        6
 5  By Mr. Ruth        268
 6
 7        E X H I B I T S
 8  CFTC EXHIBIT          MARKED FOR ID
 9  No. 266                10
    No. 267                16
10  No. 268                18
    No. 269                32
11  No. 270                34
    No. 271                42
12  No. 272                44
    No. 273                49
13  No. 274                56
    No. 275                65
14  No. 276                80
    No. 278                90
15  No. 279                99
    No. 280                103
16  No. 281                107
    No. 282                112
17  No. 283                117
    No. 284                119
18  No. 285                140
    No. 286                145
19  No. 287                159
    No. 288                185
20  No. 289                195
    No. 290                203
21
22
23
24
```

## Page 4

```
 1        E X H I B I T S
 2  CFTC EXHIBIT          MARKED FOR ID
 3  No. 291                211
    No. 292                215
 4  No. 293                217
    No. 294                221
 5  No. 295                225
    No. 296                239
 6  No. 297                245
    No. 298                251
 7  No. 299                257
    No. 300                259
 8  No. 301                228
    No. 302                167
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

1    THE REPORTER:  Pursuant to Section 319
2  of the Public Health Service Act, and in
3  conjunction with Executive Order 2020-14
4  regarding Illinois Notaries Public, I will
5  ask counsel to agree on the record that there
6  is no objection to this Certified Shorthand
7  Reporter administering a binding oath to the
8  witness remotely.  I will ask each of you to
9  state your agreement on the record, starting
10  with counsel for the witness first, and at the
11  same time, please identify yourself for the
12  record.
13    MR. FALVEY:  Yes, good morning.  My name
14  is Jim Falvey from the Falvey Law Office and
15  I represent Mr. Stemper in this matter, and we
16  have no objection to the rules as you've laid
17  them out.
18    MR. PLATT:  My name's Joseph Platt on
19  behalf of the CFTC.  I'm joined by Chief Trial
20  Attorney Beth Streit and Commission Investigator
21  Joseph Patrick, and we have no objection.
22    (Witness duly sworn.)
23    MR. PLATT:  So, Mr. Ruth, would you
24  please identify yourself for the record as

Page 6

1  an attendant.
2    MR. RUTH:  I'm Jeremy Ruth.
3    MR. PLATT:  Thanks.  This is
4  a deposition being conducted in Federal
5  court pursuant to the Federal Rules of Civil
6  Procedure and the local rules of the United
7  States District Court for the district of --
8  Northern District of Illinois.  This is the
9  CFTC's deposition, and I will conduct my
10  examination of the witness first.  When I'm
11  done with my examination and I've stated on the
12  record that the examination is concluded, other
13  parties may ask questions if they wish pursuant
14  to the rules.
15    ALEXANDER STEMPER,
16  called as a witness herein, having been first duly
17  sworn, was examined and testified as follows:
18    DIRECT EXAMINATION
19  BY MR. PLATT:
20    Q    Mr. Stemper, have you given a deposition
21  before?
22    A    No, sir.
23    Q    Okay.  So I'd like to go over some rules
24  that might make this go a little more smoothly,

Page 7

1  particularly with respect to the videoconference
2  setting.  Please try to give a verbal answer to the
3  questions.  That's a yes or a no rather than a shake
4  of the head.  And to avoid talking over one another,
5  I'd ask you to please wait until I'm done asking
6  my question before you give an answer.  I know on
7  my part I'll wait until you're done answering the
8  question before I ask another one.  And if you
9  don't understand the question, please just say so
10  and I'll try to rephrase it in a way that makes it
11  more intelligible.
12    Because we're conducting this
13  deposition by videoconference, I'm going to show
14  you exhibits.  Normally I would hand you a piece of
15  paper, but today I'm going to share my screen with
16  you.  I'll have the document up and we'll make sure
17  that we're all looking at the same thing and you can
18  read it before you proceed.  And today you're being
19  represented by Mr. Falvey, right?
20    A    That's correct.
21    Q    Who's paying Mr. Falvey's legal bills?
22    MR. FALVEY:  If you know.
23    A    I don't know.
24

Page 8

1  BY MR. PLATT:
2    Q    Are you paying his legal bills?
3    A    No.
4    Q    Do you know if Jim Donelson is paying
5  his legal bills?
6    MR. FALVEY:  Asked and answered.
7    A    I would assume, but I'm not totally sure.
8  BY MR. PLATT:
9    Q    Did you meet with Mr. Falvey to prepare
10  for this deposition?
11    A    Yes.
12    Q    How many times?
13    A    Once.
14    Q    Did you look at any documents to prepare
15  for the deposition?
16    A    Yes.
17    Q    What documents did you look at?
18    MR. FALVEY:  Objection, attorney-client
19  privilege, and this we'll -- I'm going to
20  instruct the witness not to answer.
21    MR. PLATT:  So I don't think it really
22  matters a whole lot here but I think, you know,
23  the document itself is not privileged.  Your
24  discussions about the document would be, but

Page 9

1   we'll move on.
2       MR. FALVEY:  Thank you.
3   BY MR. PLATT:
4       Q   Mr. Stemper, are you currently employed?
5       A   Yes.
6       Q   Where do you work?
7       A   Wurth.
8       Q   What is Wurth?
9       A   Wurth Industry.  They're like fasteners,
10  tools, jigs.  They're a national -- or a worldwide
11  distributor of all that stuff.
12      Q   What's your current residential address?
13      A   It's 3660 North Lake Shore Drive.
14      Q   Is that in Chicago?
15      A   Yes.
16      Q   And what kind of position do you have at
17  Wurth?  Is it a sales position or is it something
18  else?
19      A   Like business development, yeah.
20      Q   What is business development?
21      A   Expanding business, I guess.
22      Q   What kind of duties do you do as a --
23  in that role?
24      A   I talk to people who are interested

Page 10

1   in Wurth and what they're capable of and figure
2   out if it would be a good fit for them basically.
3       Q   Okay, great.
4           MR. PLATT:  I'm going to mark our first
5       exhibit as I think it's Plaintiff's Exhibit 266
6       and show you a document.  So let's see if this
7       works.
8           (WhereuponCFTC Exhibit No. 266
9               was marked for identification.)
10          MR. FALVEY:  Okay.
11  BY MR. PLATT:
12      Q   Mr. Stemper, let me know if you can see
13  a document on your screen.
14          MR. FALVEY:  Bigger here.
15      A   Yeah, I can see it.
16  BY MR. PLATT:
17      Q   Okay, great.  And can you -- so review the
18  portion of the document that you can see.  I know
19  you can't see the whole thing, but do you recognize
20  this document?
21      A   Yeah, I believe so, yes.
22      Q   This is a subpoena directed to you, right?
23      A   Yes.
24      Q   And the caption in this part up at the

Page 11

1   top says Commodity Futures Trading Commission vs.
2   Long Leaf Trading Group, right?
3       A   Yes.
4       Q   What is Long Leaf Trading?
5       A   It's a company -- or it was.
6       Q   How do you know that Long Leaf Trading
7   was a company?
8       A   They hired me.
9       Q   When did you work at Long Leaf?
10      A   From late 2017 to late 2019.
11      Q   What was the nature of Long Leaf's business
12  model?
13          MR. FALVEY:  Do you understand?
14      A   I don't know if I necessarily understand
15  the question.
16  BY MR. PLATT:
17      Q   What does Long Leaf do?
18      A   Can you be more specific?
19      Q   Sure.  What did Long Leaf do?
20      A   They traded options.
21      Q   Did Long Leaf trade options for its own
22  account?
23      A   No, they had clients.
24      Q   Does the term Time Means Money mean

Page 12

1   anything to you?
2       A   It's vaguely familiar, yes.
3       Q   What does Time Means Money mean?
4       A   That was the -- I don't know how
5   to explain it.  It was the strategy I guess you
6   could say that Tim Evans, the original owner, was
7   responsible for.  It was his thing.
8       Q   It's a trading program, right, Mr. Stemper?
9       A   Yeah, yes.
10      Q   And when you worked at Long Leaf,
11  Long Leaf had a trading program the whole time you
12  worked there, right, whether or not it was called
13  Time Means Money or something else, correct?
14      A   Yeah.
15      Q   And when you first started working there,
16  I think you said the program was called Time Means
17  Money?
18      A   Yes.
19      Q   Who are the people you remember working
20  with at Long Leaf Trading?
21      A   To start?  At the beginning?
22      Q   The whole time.
23      A   The whole time?  So when I first got
24  into the office, let's see, Tim Evans was there.

Page 13

1 He was the owner. I didn't really have much
2 of a relationship with him. James Hatzigiannis,
3 Connor Campo, Andrew Nelson, Scott Gecas, Shawn
4 Mooney, and there might have been one or two other
5 gentlemen but I can't remember their names.
6    Q    And you worked with Jim Donelson, right?
7    A    And, of course, yeah, Jim Donelson,
8 Vicki Donelson. I was thinking at the beginning.
9 Then there was Ben Cybulski, Brian Adams. That's
10 another name, yeah.
11    Q    Okay. When's the last time you interacted
12 with Jim Donelson?
13    A    Define interacted.
14    Q    Spoke to, emailed with, met with, in the
15 broadest possible term interacted with.
16    A    Okay. I texted with him just about
17 Jim here.
18    Q    And when did that occur?
19    A    He offered up Jim's services. That's what
20 it was.
21    Q    Okay. Do you still have that text message?
22    A    Yeah, I sent it to Jim.
23    Q    Okay. And before that text message,
24 when was the next most recent time you interacted

Page 14

1 with Mr. Donelson?
2    A    Pretty -- it was right around when they
3 shut down the company.
4    Q    And when was that?
5    A    December of 2019.
6    Q    And so after Long Leaf shut down, did you
7 interact with Mr. Donelson at all?
8    A    He had offered up some contacts, I think
9 it was Walsh Trading, but that was it.
10    Q    And that was the extent of your
11 interactions with Donelson after Long Leaf closed?
12    A    Yeah, from what I can remember, yeah.
13    Q    When's the last time you interacted with
14 James Hatzigiannis?
15    A    Not sure. It's been a while.
16    Q    Have you interacted with James Hatzigiannis
17 after Long Leaf closed?
18    A    Yeah, we've had conversations here and
19 there but we don't keep in touch.
20    Q    Did you ever discuss Long Leaf Trading
21 with Mr. Hatzigiannis after Long Leaf Trading
22 closed?
23    A    No, not really I don't think.
24    Q    What about Ben Cybulski? That's

Page 15

1 another name you mentioned. When's the last time
2 you interacted with Ben Cybulski?
3    A    Two days ago.
4    Q    What did you talk about with Mr. Cybulski?
5    A    Just our current work.
6    Q    And what does he do for work?
7    A    He works for the same company as I do.
8    Q    So do you see Mr. Cybulski frequently?
9    A    No, we work remotely.
10    Q    Do you interact with Mr. Cybulski
11 frequently?
12    A    Yes, I would say so.
13    Q    How often?
14    A    A few times a week.
15    Q    Do you ever talk about Long Leaf Trading
16 with Mr. Cybulski?
17    A    No, sir.
18    Q    Not since Long Leaf Trading closed, you
19 haven't talked with Mr. Cybulski about Long Leaf
20 Trading one time?
21    A    That's correct.
22    Q    So are you aware that the CFTC sued Long
23 Leaf Trading?
24    A    Yeah, I guess. I don't know.

Page 16

1    Q    Well, you got a subpoena that
2 says Commodity Futures Trading Commission vs. --
3    A    I didn't --
4    Q    -- Long Leaf Trading, right?
5    A    I didn't know that they were being sued.
6    Q    You did not know about the lawsuit until
7 you received the subpoena?
8    A    That's right.
9    Q    Have you discussed the CFTC's lawsuit
10 against Long Leaf Trading with anyone other than
11 Mr. Falvey?
12    A    No.
13       MR. PLATT: I'm going to mark CFTC
14    Exhibit 267 and show you another document.
15        (Whereupon  CFTC Exhibit No. 267
16         was marked for identification.)
17    Q    Do you recognize this document,
18 Mr. Stemper?
19    A    It looks familiar.
20    Q    This is a subpoena to you to produce
21 documents, correct?
22    A    Yeah, but I just saw my name.
23    Q    And it's in connection with the same
24 CFTC vs. Long Leaf Trading Group case, right?

Page 17

1   A   It looks like it.
2   Q   Did you produce responsive documents
3 to the CFTC in response to this subpoena?
4   A   Yes.
5   Q   Where did you look for responsive
6 documents?
7   A   Looked in my email, looked in my phone
8 just for text messages and then looked to see if
9 I had anything physical, which I did not.
10   Q   What email addresses do you use?
11   A   It's alexstemper@gmail and
12 alander@protonmail.
13   Q   And you searched those two email addresses
14 for documents related to Long Leaf Trading?
15   A   What was the question?
16   Q   You searched those email addresses
17 for documents related to Long Leaf Trading, is that
18 right?
19   A   Yes.
20   Q   Did you interview for your job at
21 Long Leaf?
22   A   Yeah.
23   Q   Who did you interview with?
24   A   Brian Adams.

Page 18

1   Q   Describe the interview process.
2   A   He -- before the interview or --
3   Q   Just describe the process, please.
4   A   I applied.  I believe he emailed me and
5 we connected over email, and then they invited me
6 to the office in which we had an in-person interview
7 and he offered me the job.
8   Q   What did Mr. -- you interviewed with
9 Mr. Adams, right?
10   A   Yeah.
11   Q   What did Mr. Adams tell you about the
12 position?
13   A   I don't remember exactly what he said.
14   Q   Do you remember anything that was discussed
15 during the interview?
16   A   Not really.
17       MR. PLATT:  Okay.  I'm going to mark
18 CFTC Exhibit 268.
19       (Whereupon  CFTC Exhibit No. 268
20           was marked for identification.)
21   Q   Let me know when you can see this document.
22   A   Yep, I can see it.
23   Q   So, Mr. Stemper, when I show you
24 emails -- you may be familiar with this from

Page 19

1 your office job -- the later-in-time email usually
2 appears at the bottom of the document.  So I'm going
3 to scroll down to the first-in-time email of this
4 email chain.  Does that make sense?
5   A   Yep.
6   Q   So this is an email from your email
7 address to Brian Adams dated September 14, 2017,
8 right?
9   A   That's correct.
10   Q   So you wrote this.  The subject line is
11 Post-Interview, correct?
12   A   Yes.
13   Q   And you write in the second sentence
14 to Mr. Adams, "You mentioned that not every month
15 is a winning one, so I was curious how well your
16 trading system is working overall."  Do you remember
17 that?
18   A   Only -- no, I don't remember it.  I just --
19 I mean, I know I wrote it.
20   Q   And then Mr. Adams -- I'm going to
21 scroll up -- Mr. Adams replies to you and he
22 says, "Give me a call when you get a chance so I can
23 clarify regarding our strategy."  Do you remember
24 that discussion?

Page 20

1   A   No.
2   Q   Do you remember anything about what
3 Mr. Adams told you about Long Leaf's trading
4 strategy before you started that job?
5   A   I'm sorry.  I really don't remember.
6   Q   Well, at least part of what they
7 told you was about whether or not the trades were
8 winners or losers, right?
9   A   Say that again.
10   Q   At least part of what Mr. Adams told you
11 was that some months were winning months and some
12 months were losing months, right?
13   A   Yeah, yeah, I guess.
14   Q   And it was important enough to you
15 to follow up with him and ask a question about it,
16 right, in an email before you got the job?
17   A   I was curious.
18   Q   Yeah.  Why were you curious?
19   A   Because I didn't understand it at the time.
20   Q   Mr. Adams' title here is sales manager,
21 right?
22   A   Yes.
23   Q   What was the title of the job you were
24 applying to, do you remember?

Page 21

1    A    Commodities associate.
2    Q    Do you remember if Mr. Adams provided
3 you with any information about the trading system
4 before you started?
5    A    If he did, I don't remember.
6    Q    Didn't provide you any documents showing
7 how the trading system performed?
8    A    I don't think so.
9    Q    As a commodity associate, what were your
10 duties and responsibilities at Long Leaf?
11    A    Cold calling really.
12    Q    To solicit customers, right?
13    A    Yep.
14    Q    Describe the solicitation process to me
15 at Long Leaf.
16    A    Well, from my perspective --
17        MR. FALVEY:  And should we -- I'll
18    object on the basis of not having a specific
19    time frame, Jody -- or, sorry, Mr. Platt.  But
20    with that, if you can answer, please fire away.
21    A    Yeah.  So the process, I basically
22 sat at a computer and I had a bank of people that
23 I called and I had a script that I read from.
24

Page 22

1 BY MR. PLATT:
2    Q    And if you opened an account, if you
3 were successful in your solicitations, a customer
4 would fund an account, right, and that was like
5 the goal?
6    A    Yeah.
7    Q    So thinking back, Mr. Stemper, to the
8 accounts that you opened and the customers that
9 funded accounts, about how much would customers put
10 into Long Leaf Trading accounts when they funded
11 them?
12    A    I think that would range anywhere from
13 10,000 to -- I can't remember seeing anyone put over
14 100.  I'm not sure.
15    Q    So does it sound likely an accurate
16 generalization that $25,000 was a common amount for
17 customers to fund accounts with?
18    A    I would --
19        MR. RUTH:  Can I interject here?
20        MR. PLATT:  No.
21        MR. RUTH:  Okay.
22        THE WITNESS:  That was Jeremy.
23        MR. FALVEY:  Was that Mr. Ruth?
24        MR. RUTH:  (Inaudible) he could even

Page 23

1 open accounts, so I don't understand how he
2 can answer that question.
3        MR. PLATT:  Mr. Ruth, Mr. Ruth,
4 if you want to object you may, you know,
5 succinctly state your objection on the record.
6 You can't -- you can't offer any information
7 to the witness or try to clarify the witness'
8 answers.  That's not your role here.  You can
9 ask questions at the end of the deposition.
10 Do you understand?  Mr. Ruth, do you understand?
11        Mary, can you please read back the
12 last question to the witness.
13        (Whereupon the portion of the record
14        was read as requested.)
15    A    Yes, but I don't know.
16    Q    Customers that you solicited opened
17 accounts at Long Leaf Trading, right?
18    A    Eventually, yes.
19    Q    And some of them, you know, funded accounts
20 with $25,000, right?
21    A    Yes.
22    Q    And, Mr. Stemper, another of your duties
23 as a commodity associate at Long Leaf Trading was to
24 manage accounts, right?

Page 24

1    A    No.
2    Q    So you didn't have any duties with
3 respect to the trading program and helping --
4 and offering the trade -- trade recommendations
5 to customers?
6    A    Not at the beginning.  Are we talking about
7 the beginning or when specifically?
8    Q    Well, it sounds like at some period
9 of time your duties expanded to include account
10 management, right?
11    A    Yeah.
12    Q    Approximately when did that happen?
13    A    I don't remember exactly.
14    Q    Was it in 2018 do you think?
15    A    No.
16    Q    Do you think it was in 2019?
17    A    I would lean that direction, yes, yes.
18    Q    So if you opened an account in 2018,
19 who would be responsible for interacting with the
20 customer after the account was opened?
21    A    Either Scott Gecas, Andrew Nelson or --
22 I don't know.  I think that's -- I can't remember if
23 there was another person or not.
24    Q    Earlier --

Page 25

1   A   (Inaudible).
2   Q   Yeah, sure.  So earlier you testified that
3   Time Means Money or Long Leaf's trading program
4   involved trade recommendations, right?
5   A   Yes.
6   Q   How were those trade recommendations
7   communicated to customers?
8   A   Email, over the phone.
9   Q   And they were -- the trade recommendations
10  were generally multi-legged option spread trades,
11  right?
12  A   Say that again.  Multi what?
13  Q   The trade recommendations were multi-legged
14  option spread trades, right?
15  A   Yes.
16  Q   Tell me what you remember about
17  the structure of the trading recommendations at
18  Long Leaf Trading.
19  A   I don't remember.
20  Q   You don't remember anything about the
21  structure of the trades?
22  A   I can -- they had four legs.  I know that.
23  Q   Before you worked at Long Leaf Trading,
24  did you have any sales experience?

Page 26

1   A   Yes.
2   Q   What was it?
3   A   An internship and if you want to count
4   being a server and a bartender throughout college.
5   Q   What was the internship where you gained
6   sales experience?
7   A   What was it?
8   Q   Yeah.
9   A   Can you clarify?
10  Q   Where was the internship?
11  A   It's a company called Smart Circle
12  International.
13  Q   What product did you sell there?
14  A   They had a variety of products.
15  Q   What were they?
16  A   For one example, I sold a car wax.
17  Q   Who designed the trades that Long Leaf
18  recommended to customers?
19  A   Excuse me.  The trades?
20  Q   Yes.
21  A   Can you clarify your time frame?
22  Q   The whole time.
23  A   Well, when I just started, I would guess
24  it was Tim Evans and then eventually Jim Donelson

Page 27

1   and Scott Gecas.
2   Q   And Long Leaf's trading program generally
3   recommended four trades per month, right?
4   A   Yeah, that sounds right.
5   Q   And for any particular trading
6   recommendation isn't it true that the trade
7   structure was the same but you might recommend
8   a different number of contracts to a particular
9   customer?
10  A   Say that again.  Sorry.
11  Q   Isn't it true that for any trade
12  recommendation the structure of the trade was
13  the same, but to the extent there was any variance
14  in the recommendation it had to do with the number
15  of contracts recommended to the customer?
16  A   I wouldn't agree with that.
17  Q   What was -- what's wrong with it?
18  A   They -- there would be a difference
19  in the commodity as well, the specific commodity,
20  the price of the commodity.
21  Q   So I'm talking about for any particular
22  recommendation, different customers had different
23  trades recommended to them.  Is that your testimony?
24  A   No, no.

Page 28

1   Q   Okay.  So --
2   A   I'm sorry.  I misunderstood.
3   Q   Sorry, go ahead.  I spoke over you.
4   I apologize.  Go ahead.
5   A   I just said no to your statement.
6   Q   Okay.  So all the -- so for any particular
7   trade recommendation, all the customers received the
8   same trade recommendation, right?
9   A   Yes.
10  Q   With the exception maybe of the number
11  of contracts that were recommended to be executed,
12  right?
13  A   Yes.  Sorry, I didn't understand your
14  question the first time.
15  Q   Probably a bad question.  Who determined
16  how many contracts to recommend to a customer?
17  A   The seniors, the owner.
18  Q   And the owner was Donelson, right?
19  A   After Tim, yeah.
20  Q   Yeah.  And when did that ownership change
21  take place?
22  A   I don't know exactly.
23  Q   Approximately?
24  A   I'll give you a range from December

Page 29

1  2017 to January-February of 2018, somewhere around
2  there.
3      Q    Do you know how the number
4  of contracts that were recommended to a customer
5  for any particular trade was determined?
6      A    No, I don't remember.
7      Q    Isn't it the case that customers with
8  more equity in their accounts were recommended to
9  trade more contracts?
10     A    Yeah, I think so.
11     Q    How did Long Leaf generate revenue?
12     A    They charged for their trade
13  recommendations if they were executed.
14     Q    And they charged --
15         MR. FALVEY:  Sorry.  We're just having
16     a temperature issue in here.  That's the trouble
17     with an all-window office.
18         (Discussion off the record.)
19  BY MR. PLATT:
20     Q    So I think you said that, you know,
21  Long Leaf charged for its recommendations.  The
22  revenue came in the form of commissions, right?
23     A    Yes.
24     Q    And for every trade that was executed

Page 30

1  a customer was charged four round-trip commissions
2  generally, right?
3      A    I don't remember exactly.
4      Q    Options commissions are charged on a
5  per contract basis, right?
6      A    Yes, per contract I believe.
7      Q    How were you compensated at Long Leaf
8  Trading?
9      A    I was paid a flat $1,500, and then I
10  don't remember exactly how the structure was set.
11     Q    Was it a commission structure?
12     A    Yeah.
13     Q    And you were paid a portion of your
14  customers' commissions, right?
15     A    Yes.
16     Q    Did you ever make any bonuses at Long Leaf?
17     A    Actually, yeah, there was one bonus
18  Jim gave us around Christmas.
19     Q    What year was that, do you remember?
20     A    2018 going into '19, December 2019.
21     Q    Do you remember how much it was?
22     A    Yeah, it was $1,000 I think.
23     Q    Do you remember approximately how much
24  you made at Long Leaf Trading?

Page 31

1      A    What do you mean?
2      Q    Well, you made income at Long Leaf Trading,
3  right?
4      A    Yeah.  Are you talking my entire tenure
5  there?
6      Q    Sure, or on a month-to-month basis.
7  Whatever you remember.
8      A    Month to month it would range, but
9  I made 1500 for a while and then it was 2,000 a
10  month, and I think the most I ever made was around
11  4,000.
12     Q    You had a Series 3 license, right?
13     A    Yes.
14     Q    What's a Series 3 license?
15     A    It's a license for commodities and futures.
16     Q    The license -- a Series 3 license requires
17  you to follow NFA's rules, right?
18     A    Yes.
19     Q    What's the NFA?
20     A    National Futures Association.
21         MR. PLATT:  I'm going to mark CFTC
22     Exhibit 269 and share this document with you.
23
24

Page 32

1         (Whereupon  CFTC Exhibit No. 269
2             was marked for identification.)
3      Q    Mr. Stemper, can you see this document?
4      A    Yes.
5      Q    Do you recognize it?
6      A    I don't remember it.
7      Q    Do you recognize this as an email
8  you received when you worked at Long Leaf Trading?
9      A    Yes, must have been.
10     Q    Do you recognize that -- you
11  recognize that because you used the email address
12  astemper@longleaftrading.com, right?
13     A    Yeah.
14     Q    And the date is November 14, 2017, right?
15     A    That's right.
16     Q    And there's an attachment that says
17  Alexander Stemper Ethics Initial.  Do you see that?
18     A    Ethics initial, is that what you said?
19     Q    Alexander Stemper Ethics Initial --
20     A    Oh, yeah.
21     Q    -- 10-02-2017, I think is the title.
22     A    Yes.
23     Q    I'm going to scroll down to that
24  attachment.  Can you see it?

1   A   Yes.

2   Q   This is -- it's titled Certificate of
3 Ethics presented to you, right?

4   A   Yes.

5   Q   Coursework included, there's bullet
6 points that say disclosure of material information,
7 sales practices.  Do you see that?

8   A   Yes.

9   Q   Acting fairly and honestly in the best
10 interests of customers, do you see that?

11   A   Yes.

12   Q   Follow CFTC and NFA rules, do you see
13 that bullet point?

14   A   No.

15   Q   The bottom right bullet point.  It says
16 rules and regulations of Commodity Futures --

17   A   Yep.

18   Q   -- Trading Commission, the NFA and
19 commodity exchanges.  Did I read that correctly?

20   A   I see it.

21   Q   Did you receive any sales training when
22 you joined Long Leaf?

23   A   Yes.

24   Q   Describe the training that you received

1 at Long Leaf.

2   A   From what I remember, it was about
3 sales cadence, being able to effectively read the
4 script basically.

5       MR. PLATT:  I'm going to mark CFTC
6   Exhibit 270.

7       (Whereupon CFTC Exhibit No. 270
8           was marked for identification.)

9   Q   Let me know when you can see this document,
10 Mr. Stemper.

11   A   Yeah.

12   Q   So this is a group exhibit, which
13 means it's a bunch of different emails put into
14 one PDF.  It's not one single email chain.  So I'm
15 going to scroll through it just so you can see what
16 it's composed of.  Here there's a November 14, 2017
17 email from Dillman to you, is that accurate?

18   A   Looks to be.

19   Q   The next email is from Adams to Janyk,
20 Mooney, you and Dillman on January 9, 2018, correct?

21   A   Yes.

22   Q   And then there's one from Campo to you,
23 Janyk, Gunther, Dillman and Mooney from January 3,
24 2018, right?

1   A   Yeah.

2   Q   So it's three emails.  And did you
3 notice that they all had attachments that were sound
4 recordings?

5   A   I didn't notice that, no.

6   Q   Did not?

7   A   No.

8   Q   Okay.  We'll scroll through.  Do you see
9 what's attached to Dillman's November 14th email?

10   A   I see a bunch of -- it just looks like
11 gibberish to me.  I don't know that it's recordings.

12   Q   What's the subject line?

13   A   Oh, okay.  Demo sets to listen to.

14   Q   So does that give you enough information to
15 understand that these are sound recordings attached
16 to Dillman's email?

17   A   Yes.

18   Q   What's a demo set?

19   A   It's what happens when you have an
20 initial call and the person agrees to sit through
21 a demonstration.

22   Q   And the demo set is the demonstration
23 you're referring to?

24   A   Say that again.  The demo set --

1   Q   So you said the person agrees to have
2 a demonstration.  Demo is short for demonstration,
3 right?

4   A   Yes.

5   Q   And before the demo set there was also
6 a step called -- that you described as an initial
7 call?

8   A   Sure.  That's, yeah, just what I called
9 it now.

10   Q   What term would you have used to describe
11 that at Long Leaf Trading?

12   A   A cold call.  I don't know.

13   Q   Cold call?  Cold call or an initial call?

14   A   Yeah, same difference.

15   Q   Okay.  I'm just trying to get the
16 concept correct.  And then after -- if the cold
17 call or initial call was successful, you would set
18 up a demonstration or a demo, is that right?

19   A   That's right.

20   Q   And then after the demo, were there any
21 other steps?

22   A   There was a custom.

23   Q   What's a custom?

24   A   A custom is the final presentation.

Page 37

1    Q    Okay.  So it sounds like the solicitation
2  process at Long Leaf had three general parts, a cold
3  call, a demo and a custom, is that right?
4    A    Yes.
5    Q    And would the same broker generally give
6  all those calls?
7    A    No, no.
8    Q    So sometimes one broker would give the
9  demo and a different broker would give the custom?
10    A    Yeah.
11    Q    Did you ever do both?
12    A    Did I myself?
13    Q    Yes.
14    A    Yes.
15    Q    So there were times when different
16  brokers gave the demo and the custom and there were
17  times when the same broker gave the demo and the
18  custom, is that fair?
19    A    Yes.
20    Q    Okay.  And you'd mentioned earlier
21  that there were scripts for the demos.  Was there
22  also a script for the custom?
23    A    Yes.
24    Q    Was there a script for the opener or the

Page 38

1  initial call?
2    A    Yes.
3    Q    Where did you get these scripts?
4    A    From management, from the seniors, owner.
5    Q    So let's turn back to CFTC Exhibit 270,
6  which is this group exhibit of three emails
7  attaching recordings of demo sets.  And these
8  emails, Mr. Stemper, are dated November 2017 and
9  January of 2018.  Is it fair to say that these were
10  sort of part of your onboarding or training process
11  at Long Leaf?
12    A    I'm sorry.  Say that again.
13    Q    What were the dates of these emails in
14  this group exhibit, do you remember?
15    A    The dates of the emails?
16    Q    Yeah.  What's the date of this email?
17    A    It's November 14th.
18    Q    What year?
19    A    2017.
20    Q    What's the date of this email?
21    A    January 19, 2018.
22    Q    And that's Adams' email, right?
23    A    BAdams.
24    Q    Yeah.  That's Brian Adams, right?

Page 39

1    A    Yeah.
2    Q    And then the final email, what's the date
3  there?
4        MR. FALVEY:  Sorry, Jeremy.  On the last
5  one I think the date was incorrectly stated.
6    A    Oh, did I read that wrong?
7  BY MR. PLATT:
8    Q    The date is January 9, 2018, right,
9  of Mr. Adams' email?
10    A    Yeah.  Did I say 19th?
11    Q    I'm not sure, but it's correct now.
12  And then the last email is January 3, 2018, right?
13    A    January 3rd, yes.
14    Q    Of 2018, correct?
15    A    Yes.
16    Q    And you started at Long Leaf I think
17  you said in or around October-November of 2017.
18  Do I have that right?
19    A    Yes.
20    Q    So is it fair to say that this was sort
21  of your onboarding or training process to listen to
22  these Long Leaf recordings?
23    A    Yes.
24    Q    And I'm going to scroll up to the Adams

Page 40

1  January 9th email.  Adams was the sales manager,
2  right?
3    A    Yes.
4    Q    And he says, "We can go through it this
5  afternoon," right?
6    A    Yeah.
7    Q    Mr. Stemper, do you recognize that
8  the email that Adams sent to you is a forward of
9  an email that he sent on June 22, 2017?
10    A    Yes.
11    Q    So the demo sets that were attached must
12  have --
13    A    Actually, no.
14    Q    No, you don't recognize that that's
15  a forwarded email?
16    A    It looks like the one above it is
17  forwarded, but I don't recognize the one you just
18  mentioned is forwarded.
19    Q    So do you think that maybe Mr. Adams
20  was forwarding the June 22, 2017 email on January 9,
21  2018?
22    A    Maybe.  I don't know.
23    Q    You don't know?
24    A    No.

Page 41

1   Q   You use email, right?
2   A   Say that again.
3   Q   You use email, right?
4   A   Yes.
5   Q   In the subject line do you see the two
6   letters, FW?
7   A   Yes.
8   Q   What does FW mean in the context of email?
9   A   Forward.
10  Q   Okay. So do you have any reason
11  to think that Mr. Adams isn't forwarding an email
12  that you sent on January 22, 2017?
13  A   No. The line there, I didn't know
14  if it was a separate email. I think you said this
15  is a PDF we're looking at. I don't know what you've
16  got jumbled together exactly, so I was confused.
17  Q   Okay, I understand. So do you agree
18  that Adams' January 9, 2018 email is a forward
19  of a different email that Adams sent on June 22,
20  2017?
21  A   Sure.
22  Q   So the recordings that he's sending you
23  in January of 2018 predated June 22, 2017, right?
24  A   Yeah.

Page 42

1   Q   And part of your onboarding and
2   training at Long Leaf was to listen to calls,
3   recordings of sales calls from before June of 2017,
4   right?
5   A   From this email, yes.
6       MR. PLATT: I'm going to mark Exhibit --
7   CFTC Exhibit 271.
8       (Whereupon CFTC Exhibit No. 271
9       was marked for identification.)
10  Q   Let me know when you can see this email,
11  Mr. Stemper.
12  A   Got it.
13  Q   Do you recognize this as an email
14  from Dillman to you on November 10th of 2017?
15  A   Yes.
16  Q   And, incidentally, who is Ryan Dillman?
17  A   He was an associate who was hired the same
18  time I was.
19  Q   Did you have the same job he did?
20  A   Yeah.
21  Q   And there's an attachment, SLP Action Book.
22  Do you see that?
23  A   Yeah.
24  Q   So I'm going to scroll down to the

Page 43

1   attachment. Do you see where it says Jordan Belfort
2   Straight Line Persuasion?
3   A   Yes.
4   Q   Do you know who Jordan Belfort is?
5   A   Yes.
6   Q   Who is he?
7   A   He's an investor -- or he was. I don't
8   know if he still is.
9   Q   He's the Wolf of Wall Street, right?
10  A   Sure.
11  Q   You know that he's the Wolf of Wall Street,
12  right?
13  A   Yeah.
14  Q   Did you review this material that
15  Mr. Dillman sent to you?
16  A   I don't really remember.
17  Q   Do you know what kind of sales practices
18  Jordan Belfort espouses in materials like this?
19  A   No.
20  Q   What about generally, do you know what
21  kind of sales practices Jordan Belfort is known for?
22  A   No.
23  Q   Have you ever like viewed sales videos
24  featuring Jordan Belfort?

Page 44

1   A   I might have. I don't remember.
2   Q   Have you ever seen the movie the Wolf of
3   Wall Street?
4   A   When it came out.
5   Q   So yes?
6   A   Yeah.
7   Q   What kind of sales practices were featured
8   in that movie?
9   A   I don't know.
10      MR. PLATT: Okay. I'm going to mark
11  CFTC Exhibit 272.
12      (Whereupon CFTC Exhibit No. 272
13      was marked for identification.)
14  Q   Do you recognize this as an email
15  that you sent to Craig Pace on the same day that
16  Dillman sent you the Straight Line Persuasion book,
17  November 10, 2017?
18  A   Yeah.
19  Q   What's the subject line there?
20  A   Belfort.
21  Q   What's in the body of the email?
22  A   It's a YouTube link.
23  Q   So you're sending Pace a link to
24  a video of Belfort on the same day that Dillman

Page 45

1 sends you materials related to Belfort, right?
2    A    Looks like it.
3    Q    Who's Craig Pace?
4    A    He was a senior associate there.
5    Q    At Long Leaf Trading did the brokers
6 try to put into practice lessons that they learned
7 from successful stock brokers?
8    A    I don't know.
9    Q    What was your goal as a broker at Long
10 Leaf?
11    A    Help people diversify their portfolios
12 and to give them access to something that they
13 didn't have.
14    Q    Your goal was to open accounts, right?
15    A    You could put it that way.
16    Q    And how did you open accounts?
17    A    Through the sales process.
18    Q    Does Long Leaf require its brokers to
19 meet sales targets?
20    A    What do you mean?
21    Q    Do you know what a sales target is?
22    A    Generally.
23    Q    So generally does Long Leaf require its
24 brokers to meet sales targets?

Page 46

1    A    Hard to say.
2    Q    Did Long Leaf require its brokers to make
3 a minimum number of calls per day?
4    A    Yes.
5    Q    How many?
6    A    150 to 200.  I think 200 might have been
7 a minimum at one point.
8    Q    Were there performance targets for
9 delivering a certain number of demos per day or
10 per week?
11    A    Yeah.
12    Q    What were those?
13    A    Three -- set three demos a day.
14    Q    Set three.  So that's schedule?
15    A    Yeah.
16    Q    And what about delivering demos,
17 setting aside any performance requirements?
18 Can you put a number on approximately how many
19 demos you would deliver either on a normal day or
20 on a normal week?
21    A    Demos I would deliver as in present or set?
22    Q    Present.
23    A    I don't know.
24    Q    Can you ballpark it?

Page 47

1    A    Maybe one a day.  I'm not sure.
2    Q    Did that change over time?  Did
3 you do more towards the end of your tenure at
4 Long Leaf or fewer or just about one per day sort
5 of consistent?
6    A    I would say one per day.  I don't know.
7 I don't remember exactly.
8    Q    Were there ever any days where you would
9 give like four demos or five demos?
10    A    It could have been like that, yes.
11    Q    How were the requirements related
12 to the number of calls and the number of demos
13 communicated to you?
14    A    How were they communicated?  Verbally.
15    Q    By whom?
16    A    The seniors, owner.
17    Q    So Donelson would tell you what the
18 requirements were?
19    A    It started with Tim.
20    Q    So Tim and Donelson would tell you what
21 the requirements were?
22    A    If you want to throw the sales manager
23 in there, you can.
24    Q    Sure.  And who's that, Adams?

Page 48

1    A    Brian, yeah.
2    Q    Okay.  So those three are the folks who
3 dealt with sales targets?
4    A    Well, actually, Scott Gecas.  He was --
5 he took part in that as well.
6    Q    Do you know if your calls were recorded,
7 Mr. Stemper?
8    A    Yeah, I think they were.
9    Q    Did you ever listen to them?
10    A    Not really.
11    Q    And I mean -- sorry.  To follow up,
12 is that a no or maybe you did?
13    A    I'm sure I did, but I can't really remember
14 doing it a lot or actively.
15    Q    Do you know if anyone else at Long Leaf
16 listened to your calls?
17    A    I don't know.
18    Q    So you don't know if Donelson ever listened
19 to your calls?
20    A    No idea.
21       MR. PLATT:  I'm going to mark CFTC
22    Exhibit 273 and share this with the group.
23
24

Page 49

1      (Whereupon  CFTC Exhibit No. 273
2      was marked for identification.)
3   A   Could you make the font larger somehow?
4   Q   I can try.  One sec.  Does that help?
5   A   Yes.
6   Q   Okay, great.
7      MR. FALVEY:  Alex recognizes that I'm
8   an old man and can't see.
9      MR. PLATT:  That's fine.  And, you
10  know, if you can't see the exhibits, please
11  just continue to speak up.  It's important
12  that we're all looking at the same thing.
13  Q   So this is another group exhibit,
14  Mr. Stemper.  I'm going to scroll through it
15  really quickly just to show you what the emails
16  are that are making up this group.  So the first
17  one is from Donelson to a group including Janyk,
18  you, Campo, Hatzigiannis, Gunther, Mooney, Dillman,
19  Nelson and Pace on December 14, 2017, is that right?
20  A   Yeah.
21  Q   The second one is from Donelson to
22  Dillman, Janyk, you and Mooney on January 5, 2018,
23  is that correct?
24  A   Yes.

Page 50

1   Q   And then the last one is from Donelson
2   on January 16, 2018 to a big, long group of folks.
3   It looks like almost everyone at Long Leaf, is that
4   fair?
5   A   Yep.
6   Q   I'm going to go back up to this
7   first exhibit, the December 14th Donelson email.
8   The subject is Sales Meeting, right?
9   A   Yeah.
10  Q   Does this refresh your recollection that
11  Donelson started at least no later than December 15,
12  2017?
13  A   That's right.
14  Q   Donelson writes, "I want to have
15  a meeting about restarting and engaging you on
16  sales targets, data quality improvement and training
17  tomorrow.  Donuts will be provided.  Any specific
18  donut requests will need to be made today before
19  4:45 p.m.," correct?
20  A   Yeah.
21  Q   And the "donuts will be provided" is in
22  bold, right?
23  A   Yeah.
24  Q   So what was Donelson's role at Long Leaf?

Page 51

1   A   Owner.
2   Q   And like what sorts of tasks did he do
3   as the owner?
4   A   Traded, designed trades, led us.
5   Q   So when you say "us," this email, is it
6   correct to say that this email is directed to the
7   brokers, all the brokers at that time?
8   A   To everyone that worked there.
9   Q   Well, this one's not to Gecas, right?
10  Maybe it's before Gecas worked there?
11  A   Oh, no, Gecas was working there when
12  I was there.
13  Q   So this one's not to Gecas and Adams.
14  This is just to the brokers, right?
15  A   Well, Gecas was a broker.
16  Q   But I think you also said that he was
17  like sort of a senior guy?
18  A   A senior broker, sure.
19  Q   So I guess my point is, Mr. Stemper,
20  this December 14th email is not addressed to Adams
21  and it's not addressed to Gecas, right?
22  A   Doesn't look like it.
23  Q   So -- and the subject is Sales Meeting.
24  So -- and Mr. Donelson is saying I want to engage

Page 52

1   you on sales targets, data quality improvement and
2   training tomorrow, right?
3   A   Yeah.
4   Q   So Donelson is working with the broker
5   team on sales targets and on training, right, and
6   on improving processes, right?  Is that what this
7   email reflects?
8   A   Yeah.
9   Q   And is that consistent with your
10  recollection about what Donelson -- one of the
11  things that Donelson did at Long Leaf?
12  A   Yeah.
13  Q   And so just to be clear, and I'm sorry
14  to belabor the point, Donelson communicated sales
15  targets to the brokers, right?
16  A   Yes.
17  Q   And before that I think you testified
18  that Tim Evans also did that task.  Tim Evans
19  communicated sales targets to the brokers, right?
20  A   Yeah.
21  Q   Now I'm on the second exhibit here --
22  the second document of Exhibit 273.  This is a
23  February -- this is a January 5, 2018 email again
24  from Donelson but now it's just to four guys,

Page 53

1  Dillman, Janyk, you and Mooney.  And what is the
2  common thread between Dillman, Janyk, you and
3  Mooney?
4     A   We were all just starting there.
5     Q   Were you guys called openers?
6     A   Yeah.
7     Q   So this is a new opener meeting and
8  Donelson is telling the new openers that he wants
9  to discuss expectations and goals with you guys,
10 right?
11    A   Yeah.
12    Q   Do you remember what the new process
13 that he's describing here, do you remember what
14 that is?
15    A   No.
16    Q   Donelson comes on board.  He's the new
17 boss.  He's the owner.  He wants to meet with you.
18 You're a new employee and he says we're going to put
19 in place this new process.  No recollection of that?
20    MR. FALVEY:  Asked and answered, but go
21    ahead if you know.
22    A   I'm sorry.  I lost the question.
23    MR. PLATT:  Mary, can you please read
24    the question back.

Page 54

1        (Whereupon the portion of the record
2             was read as requested.)
3     A   I don't remember.
4     Q   So scrolling down to this final
5  email in Group Exhibit 273, this is from Donelson
6  to what looks to me to be everyone at Long Leaf
7  on January 16, 2018.
8     A   Okay.
9     Q   And Donelson -- in the second paragraph
10 here Donelson writes, and I'm going to scroll over
11 so you can see it, "The key this week is to get the
12 money in the door before our next set of trades."
13 Did I read that correctly?
14    A   Yes.
15    Q   Why was that important to Donelson?
16    A   I don't know.
17    MR. FALVEY:  I'm just going to object
18    as to speculation.
19 BY MR. PLATT:
20    Q   Is it fair to say that that was always
21 a concern for Donelson?
22    A   What's that?
23    Q   Getting money in the door.
24    A   A concern, I don't know.

Page 55

1     Q   Was it important to Donelson?
2     MR. FALVEY:  Objection, speculation.
3     You can answer, though.
4     A   Oh, was it important to him?  I'd say yeah.
5  BY MR. PLATT:
6     Q   Yeah.  What's your basis for saying that
7  it was important to him?
8     A   He's the owner.
9     Q   But beyond the owner, you know,
10 you were in the office with him every day, right?
11 So like what made you think -- what makes you think
12 sitting here today that getting money in the door
13 was important to Donelson?
14    A   Isn't it important for any business owner
15 to get money in the door?
16    Q   Well, Mr. Stemper, I just want to push
17 back on that a little bit.  Long Leaf's revenue, as
18 you testified, didn't come from getting money in the
19 door, right?  It came from executing trades, right?
20    A   Well, one has to happen before the other.
21    Q   True enough.
22    MR. FALVEY:  Oh, hey, Mr. Platt, can we
23    take a five-, ten-minute break?
24    THE WITNESS:  I have to use the restroom

Page 56

1  real quick.
2     MR. PLATT:  Yeah.  Let's take five,
3  but let's try and get back as quickly as
4  possible.  We've got a lot to get through
5  today.
6     THE WITNESS:  Yeah, no problem.
7     MR. FALVEY:  Okay, thanks.
8     (Whereupon a recess was taken from
9        10:10 a.m., to 10:22 a.m., after
10       which the following proceedings
11       were had:)
12    MR. PLATT:  Mr. Stemper, I'm going
13 to mark CFTC Exhibit 274 and show you another
14 group exhibit.  So it's another couple of
15 emails.
16    (Whereupon  CFTC Exhibit No. 274
17       was marked for identification.)
18    Q   Let me know when you can see the exhibit.
19    A   I can see it.
20    Q   So this first -- this is a group exhibit
21 composed of, I believe, two emails.  And this first
22 email is from Donelson to Dillman, Hatzigiannis,
23 Gunther and Stemper on July 27, 2018 at 1:04 a.m.,
24 right?

Page 57

1    A    Yeah.
2    Q    And Donelson fires off this late
3 night email and he says, "These call volumes are
4 unacceptable.  200 per day is the number and we
5 better start hitting it," right?
6    A    Yep.
7    Q    And Dillman, Hatzigiannis, Gunther
8 and you in July 27 -- on July 27, 2018, you were
9 the brokers at Long Leaf, right, that group of four?
10   A    There were more people that worked there.
11   Q    Who else worked there at that time?
12   A    Andrew Nelson, Scott.  I don't know if
13 Craig was still there or not.
14   Q    At that time did Andrew Nelson make calls
15 to customers?
16   A    Not like this.
17   Q    So I'm going to scroll down --
18 it looks like Donelson is forwarding you a report
19 from InsideSales, right?
20   A    I don't know, maybe.  Scroll down.
21   Q    Well, let's look at the subject line of
22 Donelson's email.  I jumped the gun there.  It says
23 Forward:  InsideSales.com - Broker - Call Results.
24 And then it attaches a spreadsheet, right?

Page 58

1    A    I can't see the spreadsheet.
2    Q    Do you know what a CSV file is?
3    A    CSV?
4    Q    Do you know what the file extension
5 CSV denotes?
6    A    No.
7    Q    This is an email from InsideSales
8 to Donelson, right, that he's forwarding to you?
9    A    I don't know.
10   Q    Do you know how email works?
11   A    He forwarded it to me, yes.
12   Q    Yes, you know how email works?
13   A    Somewhat.
14   Q    Let's look at the subject line of
15 Donelson's email.  Do you see where it says FW?
16   A    Okay.
17   Q    We went over this a little earlier.  What
18 does FW mean?
19   A    You tell me.
20      MR. PLATT:  Mr. Falvey, would you please
21   instruct your client to answer the question.
22   A    It means forward.
23   Q    And Donelson's forwarding you an email
24 and the subject line is InsideSales.com - Broker -

Page 59

1 Call Results, right?
2    A    Yes.
3    Q    And what is the email that Donelson
4 is forwarding you?  If you can't read that next
5 header, let me know and I can scroll down, but I
6 think you can read it.
7    A    All brokers call results.
8    Q    Right.  And the email is from
9 reports@insidesales.com, correct?
10   A    Okay, yeah.
11   Q    What is InsideSales?
12   A    It's a service website.
13   Q    What kind of service?
14   A    For sales.
15   Q    Did you use InsideSales at Long Leaf?
16   A    Yes.
17   Q    How did you use it?
18   A    To call people.
19   Q    How did you use InsideSales to call people?
20   A    I don't know how to answer that.
21   Q    What information did InsideSales provide
22 to you that enabled you to call people?
23   A    It was a system that had a database of
24 people that we called.

Page 60

1    Q    Did you use InsideSales for any other
2 purpose other than accessing this database that you
3 just referenced?
4    A    We made our calls through them.  That would
5 be that, I'd say.
6    Q    I'm going to scroll down.  Do you agree
7 that this is the report that Donelson is forwarding
8 to you?  Do you see this table?
9    A    Yeah.
10   Q    It lists five names, Dillman, Gecas,
11 Gunther, Hatzigiannis and yourself, right?
12   A    Yep.
13   Q    And information related to total
14 number of dials and talk time, were those two of
15 the columns in this report?
16   A    Yep.
17   Q    And that's all the brokers as of July 2018,
18 right?
19   A    I think so.
20   Q    So do you remember we looked at an
21 exhibit where Donelson emailed a group of brokers
22 to hold a sales meeting from December 14, 2017?
23   A    Yeah.
24   Q    It looks like there are far fewer

Page 61

1 brokers as of July 2018 than in December 2017,
2 correct?
3    A   Yeah.
4    Q   Do you remember the number of brokers
5 decreasing over time at Long Leaf?
6    A   Um-hmm.
7       MR. FALVEY:  Remember to say yes.
8    A   Yeah, sorry.  I was biting my lip.
9       MR. FALVEY:  That's okay.
10 BY MR. PLATT:
11   Q   Thanks.  I'm going to keep scrolling
12 down to the second email in this group exhibit and
13 this is Donelson to Hatzigiannis, Dillman, you and
14 Gunther on July 27, 2018, the same day.  And he's
15 copying Nelson and Gecas, and the subject line is
16 Cleanup of InsideSales.  Is that all correct?
17   A   Yes.
18   Q   And Donelson writes, "From this day
19 forward I will be transferring better leads based
20 on effort.  If you are not dialing, you will not be
21 getting leads transferred to you," is that correct?
22   A   Yep.
23   Q   He says I'll be keeping an eye on the
24 statistics so I know where everyone is, is that

Page 62

1 right?
2    A   Yeah.
3    Q   So earlier we looked at a document
4 that I think you testified reflected Donelson's
5 interest in getting money in the door, and that was
6 January 2018, right?
7    A   Yeah.
8    Q   And here we see him, you know, seven
9 months later and he's still pretty focused on
10 getting money in the door, right?
11   A   Yeah.
12   Q   So we've looked at a bunch of documents
13 now, Mr. Stemper, where Donelson is discussing sales
14 targets and he's meeting with the brokers.  I want
15 to talk about the people who you've described as
16 seniors and what their duties were.  So I think you
17 mentioned Scott Gecas was a senior.  What did he
18 do at Long Leaf Trading?
19   A   He was a chief market strategist at
20 one point I remember, and he dealt with clients.
21 He did the custom presentation.
22   Q   Andrew Nelson is another name we've
23 seen on the emails.  What did Andrew Nelson do at
24 Long Leaf Trading?

Page 63

1    A   He's pretty much like Scott, except
2 he didn't design trades.  He was responsible for
3 monitoring them at one point, but that's all I
4 can -- that I know about that.
5    Q   And we saw the sales manager, Brian Adams.
6 What did Adams do at Long Leaf Trading?
7    A   He just monitored us.  He was a compliance
8 officer at one point.
9    Q   So what do you mean when you say he,
10 Adams, monitored you?
11   A   He was the sales manager.
12   Q   And like what kinds of duties did he
13 perform as sales manager?
14   A   I really don't remember exactly what he
15 did.
16   Q   Did you deal with Adams frequently on
17 a day-to-day basis?
18   A   Yeah.  I think he -- he would -- he would
19 divvy out the leads.
20   Q   So one of the things that Adams was
21 responsible for was sort of making sure that the
22 leads got apportioned between the brokers?
23   A   Yeah, that's right.
24   Q   Can you describe, you know, any other

Page 64

1 interactions that you had with Adams at Long Leaf
2 on a regular basis?
3    A   I don't really remember him and what
4 exactly he did.
5    Q   Doesn't sound like you had a very prominent
6 role there, is that fair?  Almost administrative in
7 nature?
8       MR. FALVEY:  Objection as to the
9    characterization of prior testimony.
10      MR. PLATT:  Mr. Falvey, that's not
11   a valid objection.
12   Q   You can answer the question, Mr. Stemper.
13      MR. FALVEY:  You can answer the question.
14   A   Can you say it one more time?  Sorry.
15      MR. PLATT:  Mary, can you read the question
16 back, please.
17       (Whereupon the portion of the record
18        was read as requested.)
19   A   It depends on how you define prominent.
20 Administrative, maybe.
21   Q   But you weren't the boss, right?
22   A   He was there every day.
23   Q   I'm sorry.  Go ahead.
24   A   I said he was there every day.

Page 65

1    MR. PLATT:  I'm going to mark CFTC
2  Exhibit 275.
3         (Whereupon  CFTC Exhibit No. 275
4         was marked for identification.)
5    Q   This is another group exhibit.
6  I think it's two calendar invitations, Mr. Stemper.
7  The first one is from Donelson to what looks like a
8  group of brokers on April 17, 2018, is that correct?
9    A   Yes.
10    Q   And the second one is an invitation
11  from Donelson to you and Gecas on June 4, 2018,
12  is that right?
13    A   Yep.
14    Q   Going back to the first email in Group
15  Exhibit 275, which is Donelson's April 17, 2018
16  email to the brokers, the subject is Performance
17  Review and Tracking, is that right?
18    A   Yeah.
19    Q   Describe the performance review process
20  at Long Leaf.
21    A   As you saw in the email, it's in the
22  breakout room.  So we met in the breakout room and
23  Jim and Scott, from what I remember, they went over
24  like the numbers of demo sets and calls.

Page 66

1    Q   So the performance review process was
2  largely focused on numbers of calls that the brokers
3  delivered?
4    A   Yes.
5    Q   Any other topics included in the
6  performance reviews for the brokers at Long Leaf?
7    A   Demo sets.
8    Q   Anything else besides number of calls
9  and demo sets that you can remember at this time?
10    A   No.
11    Q   And this is Donelson's meeting, right?
12  It's his invitation?  You met with Donelson?
13    A   And Scott, but yeah.
14    Q   Was Adams there?
15    A   No.
16    Q   Scott didn't send the invite, right?
17  Donelson sent it, correct?
18    A   I think so, yeah.
19    Q   I'm going to scroll down to the
20  second email in CFTC Group Exhibit 275.  This is
21  Donelson to you and Scott on June 4, 2018, correct?
22    A   Yep.
23    Q   Title is Monthly Discussion, right?
24    A   Yeah.

Page 67

1    Q   What were the monthly discussions with
2  Donelson about?
3    A   I don't remember.  I don't know that
4  they even occurred monthly, to be honest.  I don't
5  know.
6    Q   Well, the subject line reflects that they
7  occurred monthly, right?
8    A   Did it, though?
9    Q   I'm asking you.  I wasn't there.
10    A   I don't think it did.  You have
11  the emails.  Are there more emails with monthly
12  discussions?
13    Q   I'm asking you about this email,
14  Mr. Stemper.  If you don't remember monthly
15  discussions happening and that's your testimony --
16  is that your testimony, you do not remember this
17  meeting?
18    A   I think it might have happened once
19  or twice, but I don't remember.
20    Q   That makes sense to me, that maybe
21  Mr. Donelson started setting monthly meetings after
22  this performance review meeting and they just sort
23  of fell by the wayside?
24    A   Yeah.

Page 68

1    Q   So the goal was to have Donelson
2  continue to offer regular oversight of your sales
3  duties, but it just sort of trickled off?
4    A   Yes.
5    Q   And this was in the spring of 2018, right?
6    A   Yeah.
7    Q   Did you ever get a copy of the Long Leaf
8  compliance manual?
9    A   I'm not sure.
10    Q   Do you know if Long Leaf had a compliance
11  manual?
12    A   I think so.
13    Q   If you got it, where would you have gotten
14  it from?
15    A   Jim, Brian.
16    Q   You think someone would have emailed it
17  to you?
18    A   Possibly.
19    Q   Was there a shared drive at Long Leaf?
20    A   I don't remember.
21    Q   Do you know what I mean by a shared drive?
22    A   Yeah.
23    Q   So if you wanted to access documents
24  from a central repository, did something like that

Page 69

1 exist?

2   A   I don't remember.

3   Q   You don't remember if Long Leaf used

4 a shared drive? You worked there for two years.

5   A   I want to say they did, but I really --

6   Q   If they had one, it doesn't sound like

7 it's something that you had access to or access on

8 a regular basis, is that fair?

9   A   Yeah. You know what, they did. I remember

10 they did.

11   Q   What kinds of documents or information were

12 stored in the shared drive?

13   A   That's what I can't remember exactly.

14   Q   What about generally?

15   A   I don't know.

16   Q   Did you ever hear Donelson or Gecas discuss

17 storing material in the shared drive?

18   A   Not that I remember.

19   Q   Okay. Is it generally true that

20 most of your day was focused on InsideSales and

21 if you got information from Donelson, it was mostly

22 by email?

23   A   Or just through talking.

24   Q   Verbally?

Page 70

1   A   Yeah.

2   Q   Did you guys use hardcopy documents

3 at Long Leaf?

4   A   Scripts were hardcopy.

5   Q   Where were they stored?

6   A   Just at the desks.

7   Q   So each broker had a copy of the relevant

8 scripts? The scripts --

9   A   Yes.

10   Q   Oh, sorry. You've got to give a verbal

11 answer. I apologize.

12   A   I said yes.

13   Q   And each broker had a copy of the custom

14 script and the demo script?

15   A   Yeah.

16   Q   And that's like out in the open laying

17 on people's desks, right?

18   A   Yeah.

19   Q   Describe Long Leaf's office environment

20 to me -- office space, excuse me.

21   A   It was an open room with glass walls and

22 the desks were sectioned off in fours.

23   Q   One room?

24   A   Yeah.

Page 71

1   Q   And Donelson walked through this room,

2 I take it, every day?

3   A   Yeah, yeah.

4   Q   Walked around the four desk partitions?

5   A   (Nodding).

6   Q   You've got to give a verbal answer. Sorry.

7   A   Yeah, sorry.

8   Q   And so it was out in the open for

9 Donelson to see what was on everyone's desk at any

10 given time, right?

11   A   Yes.

12   Q   Did people try to hide or secrete documents

13 from Donelson?

14   A   No.

15   Q   So I asked you about Long Leaf's

16 compliance manual. I think your answer was you

17 might have gotten it -- you might have gotten it

18 from Brian or Jim, is that right?

19   A   Yeah.

20   Q   Did Long Leaf Trading have a compliance

21 department when you worked there?

22   A   No.

23   Q   Did Long Leaf Trading have any compliance

24 offices when you worked there?

Page 72

1   A   Brian was.

2   Q   Any other compliance officers?

3   A   I don't know if Vicki or -- if Vicki was

4 a compliance officer or not.

5   Q   When did Vicki start working there?

6   A   After Brian left.

7   Q   Do you know if Vicki had any experience

8 as a compliance officer?

9   A   No idea.

10   Q   And Brian left in June of 2018,

11 is that about consistent with your recollection?

12   A   Sounds right.

13   Q   Brian Adams, sorry. And when you're

14 talking about Vicki, just so the record's clear,

15 you're talking about Vicki Donelson, Jim's wife,

16 right?

17   A   Yeah.

18   Q   So you said that she started working

19 there after Brian Adams left. Do you remember if

20 there was a gap in between when Vicki started and

21 Brian Adams was terminated?

22   A   No, I don't remember.

23   Q   What did Brian Adams do as a compliance

24 officer? What compliance duties did he perform?

Page 73

1    A    I don't know.

2    Q    Did he perform any compliance duties?

3    A    I just can't really remember what he did.

4    Q    So why are you saying he was the compliance

5 officer?

6    A    I think that was his title when he came

7 back. Don't quote me on that. I'm not 100 percent

8 positive, but I don't know.

9    Q    It sounds like you're guessing.

10    A    Going off my memory, yeah.

11    Q    So you said when Adams came back.

12 Can you tell me about when Adams left the first

13 time before he was terminated?

14    A    What do you want to know?

15    Q    Just tell me about it.

16    A    I don't really know what to say.

17    Q    Why did Adams leave the first time?

18    A    I think he was fired.

19    Q    What was he fired for the first time?

20    A    I don't know.

21    Q    Do you remember approximately when that

22 happened?

23    A    You said he was hired or he was --

24 he left in June 2018?

Page 74

1    Q    I think I asked you if it was consistent

2 with your recollection that Adams was fired around

3 June of 2018. Does that sound correct to you?

4 I can't testify.

5    A    Yeah. Yeah, I really don't remember.

6    Q    You don't remember when he was fired the

7 first time?

8    A    No.

9    Q    Was it like in 2018, do you think?

10    A    It must have been, yeah.

11    Q    So Adams worked there when you started,

12 right? We saw the emails where he was forwarding

13 you the demo recordings.

14    A    Yes.

15    Q    And then at some point he was fired,

16 correct?

17    A    Yes.

18    Q    Then he came back, right?

19    A    Yeah.

20    Q    And then he was fired again around --

21    A    Yes.

22    Q    -- June of 2018, right?

23    A    Yes. June of 2019 or 2018?

24    Q    '18, 2018.

Page 75

1    A    I think you've got the date wrong

2 because --

3    Q    Which date do you think I have wrong?

4    A    Was that the first time he was fired

5 or the second time he was fired, June 2018? It

6 sounds like it was the first time.

7    Q    So I'm asking you if your recollection

8 is that Brian Adams was permanently terminated from

9 Long Leaf Trading around June of 2018.

10    A    Yeah.

11    Q    And there was a time before June of 2018

12 where he was fired and then he came back, right?

13    A    It might have been after June 2018.

14    Q    So my earlier question was is it your

15 recollection that Adams was permanently fired from

16 Long Leaf Trading in June of 2018.

17    A    Yeah. Whether it be the first or the

18 second time, I don't know.

19    Q    So I'm using the word permanent to mean

20 that he was not rehired.

21    A    I don't remember. I'm sorry.

22    Q    Did Brian Adams ever provide any compliance

23 training to you?

24    A    What do you mean by compliance training?

Page 76

1    Q    You're a Series 3 licensed broker,

2 Mr. Stemper. If you don't have a recollection that

3 he provided compliance training to you, then I'm not

4 sure how to ask the question.

5    A    I would say that he did. I just don't

6 remember what it was.

7    Q    So you think that Brian Adams provided

8 compliance training to you, but you don't remember

9 what that was?

10    A    Yeah.

11    Q    Why do you think he provided you compliance

12 training?

13    A    I remember him training us. I just don't

14 remember exactly what it was on.

15    Q    Well, you saw he gave you sales training,

16 right?

17    A    Yeah.

18    Q    Are you thinking about something else?

19    A    Well, maybe that's what I'm thinking of.

20    Q    Sales training, not compliance training?

21    A    Yeah.

22    Q    Do you know if Mr. Adams performed any

23 anti-money laundering duties at Long Leaf Trading?

24    A    Yeah, that I do remember. We had to do

Page 77

1 something I think once a year for that.
2    Q    And what did Adams do in connection with
3 that?
4    A    Made sure that we did it.
5    Q    Any other compliance duties that
6 Mr. Adams performed at Long Leaf Trading other than
7 anti-money laundering related activities?
8    A    Not that I'm aware of.
9    Q    And the extent of that training was
10 an online course, right?  And Brian Adams just made
11 sure that you completed it, is that correct?
12    A    Yes.
13    Q    So he was delivering the content?
14    A    You said he didn't deliver any of the
15 content?
16    Q    Did Mr. Adams deliver any of the anti-money
17 laundering training content to you?
18    A    He might have emailed it to me.
19    Q    Understood.  Do you know if Jim Donelson
20 ever performed any compliance duties at Long Leaf?
21    A    I don't know.
22    Q    Did Donelson ever review sales calls?
23    A    What do you mean by that, like listen
24 to them?

Page 78

1    Q    Yes.
2    A    I don't know.
3    Q    Did he ever tell you that he listened
4 to your sales calls?
5    A    Not that I can remember.
6    Q    Did Donelson ever talk to you about your
7 sales calls?
8    A    No.
9    Q    Let's switch gears here.  Enough about
10 compliance.  I apologize for that.  Mr. Stemper,
11 Long Leaf Trading customers received account
12 statements, correct?
13    A    Yeah.
14    Q    How did customers receive account
15 statements?
16    A    Via email.
17    Q    From whom?
18    A    Was it Cunningham or -- I'm blanking
19 on the name.
20    Q    So Cunningham is the futures commission
21 merchant with which Long Leaf was associated,
22 correct?
23    A    Yeah.
24    Q    And your recollection is that Cunningham

Page 79

1 emailed customer statements to Long Leaf customers,
2 right?
3    A    Yeah.
4    Q    And Long Leaf brokers received something
5 called an equity run from Cunningham, right?
6    A    I don't know what that is.
7    Q    Never heard the term equity run?
8    A    No.
9    Q    Never heard the term run?
10    A    No.
11    Q    Did you have a broker number at Long Leaf?
12    A    Yes.
13    Q    What was it?
14    A    I don't remember.
15    Q    Was it LLT002?
16    A    That sounds right.
17    Q    Do you know what the term net liquidating
18 balance means?
19    A    Yes.
20    Q    What does it mean?
21    A    It's what's in an individual's account
22 at any moment in time, I guess, or that day over
23 time.
24    Q    And I apologize if I misspoke,

Page 80

1 Mr. Stemper.  I meant to ask that question using
2 the term net liquidating value.  So does that change
3 your answer in any way?
4    A    For what exactly?
5    Q    When you answered that question,
6 did you mean to define net liquidating value or
7 net liquidating balance or would those two things
8 be the same to you?
9    A    Yeah, I don't know the difference.
10       MR. PLATT:  Okay.  So here's -- I'm
11    going to share a document that I'm marking
12    as CFTC Exhibit 276.
13          (Whereupon CFTC Exhibit No. 276
14           was marked for identification.)
15    Q    Can you see this?
16    A    Yeah.
17    Q    This is an October 14, 2019 email from
18 you to James Hatzigiannis, right?
19    A    Yeah.
20    Q    And you're forwarding him an email
21 which has the subject line Statement for Friday,
22 October 11, 2019, right?
23    A    Yeah.
24    Q    And the attachment is a PDF that contains

Page 81

1 the alphanumeric characters LLT002, is that right?
2    A    Yeah.
3    Q    And that's your broker number at Long Leaf,
4 correct?
5    A    Yes.
6    Q    What are you forwarding to James
7 Hatzigiannis in this email?
8    A    I don't remember exactly.
9    Q    Okay.  Well, I'll scroll down and
10 I'll show you the attachment.  Do you know what
11 this document is?
12    A    It's a statement.
13    Q    What kind of a statement?
14    A    Statement from Cunningham.
15    Q    This is a run, right?
16    A    I don't know what you mean by run.
17    Q    Okay.  And so this is a statement
18 from Cunningham, and I'm going to scroll back up.
19 It says the daily statement -- or Statement for
20 Friday, October 11th, is that right?
21    A    Yeah.
22    Q    How did you obtain this statement?
23    A    I would get emails daily.
24    Q    So describe the forwarded email to me

Page 82

1 because I don't understand.  There's no Long Leaf
2 recipient here.  How did you get this?
3    A    The statement?
4    Q    Yeah.
5    A    It was emailed to me.
6    Q    To your Long Leaf email address?
7    A    Yes.
8    Q    Okay.  And do you know what this bit
9 about back office, chicagobackoffice.com, do you
10 know what that means?
11    A    No.
12    Q    So every day you received the Long Leaf
13 statements to your Long Leaf email address?
14    A    Yes.
15    Q    Or the Cunningham statements, excuse me.
16    A    Yeah.
17    Q    Sorry.  Let me just -- sorry.  I
18 think we talked over each other.  Let me just ask
19 that cleanly.  On a daily basis, Mr. Stemper, you
20 received Cunningham statements emailed to your Long
21 Leaf Trading email address, correct?
22    A    Yeah, yes.
23    Q    And I'm just going to scroll down.
24 This first statement, this isn't for a particular

Page 83

1 customer, right?
2    A    It doesn't look like it.
3    Q    This is the aggregate balances for your
4 customer accounts, isn't it, on this first page?
5    A    It looks like it, yeah.
6    Q    And then I'm going to scroll down a
7 little more, and we get to page 2 of the Cunningham
8 statement.  And this looks like it's Ben Powell's
9 statement, right?
10    A    Yes.
11    Q    Part of the same document?
12    A    Yes.
13    Q    You got one long statement from
14 Cunningham every day and it had your aggregate
15 totals and then it had the totals for each of your
16 customers, correct?
17    A    Yes.
18    Q    Do you remember why you forwarded this
19 to James Hatzigiannis?
20    A    I don't.
21    Q    Did Long Leaf Trading tell
22 customers to look at the net liquidating balance
23 or net liquidating value when assessing the value
24 of their account?

Page 84

1    A    Yeah.
2    Q    And did you do that because Jim Donelson
3 told you to do that or was this the practice in the
4 office?
5    A    Hard to say.  I think Jim read the,
6 you know, what we did.
7    Q    So he was aware that brokers were
8 telling customers to refer to the net liquidating
9 value when assessing the value of their accounts,
10 correct?
11    A    Yeah.
12    Q    So, Mr. Stemper, you know, earlier
13 you testified that you weren't managing accounts
14 at the beginning of your time as a Long Leaf broker
15 and that your duties changed a little bit over time
16 to where you were managing accounts, right?
17    A    Yes.
18    Q    As part of your account management
19 duties, you know, would you interact with customers
20 if they had questions about their account?
21    A    Yes.
22    Q    What other kinds of things would you do
23 in your account management role?
24    A    Send out trade recommendations and get

Page 85

1  approvals for those.
2     Q    Anything else?
3     A    Other than -- yeah, no.  That's it I think.
4     Q    Well, the first category is pretty broad.
5  You would email with customers?
6     A    Yeah.
7     Q    What is your understanding of how Long
8  Leaf Trading's trade recommendations performed?
9     A    I don't know.  What do you mean?
10    Q    What does the term performance mean
11 to you when we're talking about trading options?
12    A    I guess it could be termed as a win or
13 a loss.
14    Q    When I use the term performance
15 going forward, unless I sort of redefine it, I mean
16 net profit and loss.  Do you understand?
17    A    Yeah, yep.
18    Q    What is your understanding of how
19 Long Leaf's trading recommendations performed over
20 time?
21    A    From my recollection, they did well.  It
22 was good performance and it went south.
23    Q    By "went south" you mean performed poorly,
24 lost money on a net basis, right?

Page 86

1     A    Yeah.
2     Q    And you just testified that you recall
3  Long Leaf's trading recommendations performing well.
4  When did Long Leaf's trading recommendations perform
5  well?
6     A    I would say it was in 2019.  I don't know
7  the exact months.
8     Q    So you think there was some period of time
9  in 2019 where Long Leaf's trading recommendations
10 performed well, correct?
11    A    Yes.
12    Q    What about before 2019?
13    A    I didn't know much before.  I don't know.
14    Q    You didn't pay attention to the performance
15 of Long Leaf's trading recommendations before 2019,
16 is that your testimony?
17    A    I know that there were good months
18 and -- there were performance-wise winning months
19 and I know performance-wise there were losing
20 months, but it wasn't my primary focus.
21    Q    So let's talk about 2018 because
22 I think you're sort of bucketing 2019 as a separate
23 time period, is that fair, separating 2018 and 2019?
24    A    Sure.

Page 87

1     Q    In 2018 your testimony is Long
2  Leaf's performance was not your primary focus and
3  you think there were some winning months and some
4  losing months, correct?
5     A    Yeah.
6     Q    What about on the aggregate, up or down?
7     A    What do you mean?
8     Q    2018 in the aggregate, do you think
9  that Long Leaf's trading recommendations performed
10 well or performed poorly?
11    A    I don't know.
12    Q    Do you remember anyone at Long Leaf
13 in 2018 discussing the performance of Long Leaf's
14 trading recommendations?
15    A    You said 2019?
16    Q    2018.
17    A    No, not exactly.  Not really.
18    Q    So I just want to clarify for the record,
19 Mr. Stemper -- and this is maybe a fine point -- is
20 your testimony about 2018's trading performance at
21 Long Leaf, is your testimony that you don't know and
22 never knew or you might have known at the time and
23 now you don't remember?
24    A    At the time it really wasn't a part

Page 88

1  of my job and I didn't speak to clients, so I wasn't
2  fully aware of all of that.
3     Q    So your testimony is that it wasn't part
4  of a Long Leaf broker's job duties to understand the
5  performance of the trading system in 2018, is that
6  what you're saying?
7     A    Sure, yeah.
8     Q    And is that something that people
9  at Long Leaf told you, like don't worry about the
10 trading system, just go out and do the demos and the
11 customs?
12    A    No.
13    Q    Well, were you ever curious about how the
14 trades performed?
15    A    Yeah.
16    Q    Did you ask anyone?
17    A    I don't remember.
18    Q    Did you ever look for information
19 that would give you an understanding of the
20 performance of Long Leaf's trading in 2018 as you
21 were performing your solicitation duties?
22    A    Say that again.
23    Q    In 2018 your job was to solicit,
24 was primarily to solicit clients I think is your

Page 89

1 testimony, is that correct?
2    A   Yes.
3    Q   And you've also testified that
4 it wasn't part of your job duties in 2018 to know
5 how the trading system was performing, correct?
6    A   Yeah.
7    Q   And I think you've also testified
8 that you may have wondered how it was doing but
9 you didn't seek out any information about its true
10 performance, is that right?
11    A   I just don't remember it being a focus of
12 mine.  I was focused on calling people and setting
13 demos.
14    Q   And some of your demos and customs in 2018
15 were successful, right?
16    A   I think so.
17    Q   Resulting in accounts being opened with
18 Long Leaf?
19    A   Yeah.
20    Q   So you weren't curious to know
21 how the Long Leaf recommendations were doing for
22 the customers that you solicited?
23    A   I mean, I was curious but, like I said,
24 I wasn't managing accounts so I wasn't dealing with

Page 90

1 the clients.
2        MR. PLATT:  So let's look at a document
3 that I'm going to mark as CFTC Exhibit 278.
4        (Whereupon  CFTC Exhibit No. 278
5          was marked for identification.)
6    Q   And before I show you this, I'd like
7 to just make sure I understand your testimony
8 correctly.  In 2018 you didn't have an understanding
9 of how Long Leaf Trading's trading system performed
10 because in your view it wasn't part of your job,
11 correct?
12    A   That's right.
13    Q   And then in 2019 you think
14 there was a period of time where Long Leaf's
15 trading recommendations performed well and then
16 they performed poorly, correct?
17    A   Yes, yes.
18    Q   But you don't know -- do you remember
19 approximately when they started performing well?
20 Was it all of 2019?
21    A   I want to say it was from the beginning of
22 2019 up until, you know, when things started going
23 bad.
24    Q   Can you ballpark for me what your

Page 91

1 recollection is about when they started going bad?
2    A   I would be guessing.
3    Q   Was it the summer?  Was it the fall?
4 Was it the spring?
5    A   Fall, I would say.
6    Q   So your recollection is that Long
7 Leaf's trading recommendations were doing pretty
8 well for all of 2019 until the fall, is that fair?
9    A   Yes, but I don't remember exactly.
10    Q   I understand.  You're going off sort of
11 your recollection, right?
12    A   Yes.
13    Q   Okay.  So CFTC Exhibit 278 is
14 a PDF, a 45-page PDF, and we're going to do
15 our best to go through it quickly.  I just want
16 to draw your attention to a few specific data
17 points.  But before we start, do you recognize this
18 as a Cunningham account statement for one of your
19 customers, Mr. Stemper?
20    A   Yeah.  Could you zoom in a little bit?
21    Q   Yeah, let me know if this is better.
22    A   A little bit.
23    Q   And so you recognize this as the
24 account statement of Mark Carmichael, your Long

Page 92

1 Leaf customer, right?
2    A   Yes.
3    Q   And the date in the top left is October 29,
4 2018, correct?
5    A   Yes.
6    Q   And month to date you can see everything's
7 sort of zeroed out at 25,000.  Is it fair to say
8 that this is approximately when Mr. Carmichael
9 opened his account?
10    A   Yes.
11    Q   And he funded it with $25,000, which is --
12 does this, you know, refresh your recollection that
13 many of your customers funded accounts with $25,000?
14    A   I don't know how many is, but I know some
15 people did.
16    Q   That was a common amount for Long
17 Leaf customers to fund accounts with, isn't that
18 true?
19    A   Sure.
20    Q   So after one full month of trading --
21 I'm just going to skip down just to save us time
22 here.  And I don't know if you can see there's tabs
23 on the left, Mr. Stemper?
24    A   Yeah.

Page 93

1    Q    December 3rd, which is the first
2 trading day in -- after one full month of trading
3 for Mr. Carmichael's account, can you read the net
4 liquidating balance into the record, please.
5    A    It's really hard to.  Can you zoom in?
6 I think it's 16,000.
7    Q    So the net liquidating balance
8 on Carmichael's account for December 3, 2018
9 is 16,934, right?
10    A    You have to go down.  Yeah, yeah, I see it.
11    Q    So after one full month of trading it's
12 down about $8,000?
13    A    Yeah, I guess.  I don't remember.
14    Q    Do you remember November of 2018 being
15 a bad trading month for Long Leaf?
16    A    No, I don't remember it.
17    Q    Did you ever get, you know, emails
18 from customers complaining about account losses
19 in November of 2018?
20    A    I don't remember.
21    Q    So the next page I'm going to show
22 you on CFTC Exhibit 278 is Carmichael's statement
23 from January 2, 2019.  Can you please read the net
24 liquidating value into the record.

Page 94

1    A    You're going to have to zoom in again.
2    Q    Let me try and do something here.
3 Whoops, I don't want to do that.  Does that help?
4 No, I don't think so.
5         MR. FALVEY:  Actually, we're zooming, or
6    Mr. Stemper is.
7 BY MR. PLATT:
8    Q    You can zoom on your side?
9    A    Yeah, I did, yeah.  It's easier but it's
10 still blurry.  I think it reads 15,889.
11    Q    So I'm just going to reopen this
12 document and see if I can get it into better focus
13 for you.  Mr. Stemper, do you see Carmichael's
14 January 2, 2019 statement?
15    A    No.
16    Q    You don't?
17    A    No.
18    Q    I'm sorry.  Do you see it now?
19    A    Yeah.
20    Q    The net liquidating value for
21 January 2, 2019 for Carmichael is $15,889, right?
22    A    Yeah.
23    Q    So it's down another thousand dollars after
24 December 2018 trading?

Page 95

1    A    Right.
2    Q    Now we're going to go to February,
3 February 1st statement for -- 2019 statement for
4 Carmichael.  The net liquidating value is $14,997.
5 Did I read that correctly?
6    A    Yep.
7    Q    So it's down another thousand after
8 January 2019, Mr. Stemper?
9    A    Yeah.
10    Q    March 1, 2019, Carmichael's statement,
11 the net liquidating value is $14,032.  Down another
12 thousand dollars after February 2019's trading,
13 is that correct?
14    A    Looks like it.
15    Q    April 1, 2019 statement, net liquidating
16 value is $9,704, correct?
17    A    Yep.
18    Q    So the trading activity from March 2019
19 in Carmichael's account resulted in a $4,000 loss,
20 is that accurate?
21    A    Yeah.
22    Q    So now May 1, 2019, Carmichael's
23 statement, the net liquidating value is $11,242.
24 There was a bit of an uptick there.  Do you agree

Page 96

1 with that?
2    A    Yeah.
3    Q    June 3rd, Carmichael's statement, net
4 liquidating value $11,200?
5    A    Yeah.
6    Q    About net net.  No real gains or losses
7 for May 2019, is that a fair summary?
8    A    Yep.
9    Q    July 1st Carmichael's net liquidating
10 value is $9,643.  Down over another thousand
11 dollars, correct?
12    A    Yeah.
13    Q    That's for June 2019, right?
14    A    Yes.
15    Q    August 1, 2019, Carmichael's statement,
16 net liquidating value $9,081.  So he's down again,
17 down 600 bucks for July's trading activity, is that
18 correct?
19    A    Yes.
20    Q    September 3rd, the net liquidating
21 value after August's trading activity is up a little
22 bit, $9,835.  So do you agree he made, you know,
23 about 7 or $800 for July -- for August's trading
24 activity?

Page 97

1    A    Yeah.
2    Q    October 1st, Mr. Carmichael's net
3 liquidating value is $9800 and -- $9,893, correct?
4    A    Yeah.
5    Q    So not much changed between -- or after
6 September's trading activity. It's another one
7 that's sort of net net, pretty neutral, correct?
8    A    Yeah.
9    Q    So now we'll get to the fall,
10 which I think is where you'll start to remember
11 you characterized as the downturn. Net liquidating
12 value for Carmichael after October 2019, the net
13 liquidating value is $3,745, is that right?
14   A    Yep.
15   Q    And so that is a loss of over $6,000 for
16 October 2019, right?
17   A    Yeah.
18   Q    So overall, Mr. Stemper, we've just
19 reviewed Carmichael's statements that show he lost
20 over $21,000 in about a calendar year, right?
21   A    Yes.
22   Q    And Carmichael was your customer.
23 Do you recall Carmichael following Long Leaf's
24 trading recommendations?

Page 98

1    A    What do you mean following?
2    Q    Long Leaf's -- or Carmichael's
3 trading activity was based on Long Leaf's trading
4 recommendations, correct?
5    A    Yes.
6    Q    And so month on month I think for this
7 time period, October 2018 through November 2019,
8 every single month was down except for two, which
9 were relatively small increases. Is that an
10 accurate summary?
11   A    Yeah.
12   Q    And from January 2019 through November 2019
13 Carmichael lost $13,000, right?
14   A    Yeah.
15   Q    Over half the value of his account in 2019
16 was drained down, correct?
17   A    Yeah.
18   Q    You had a customer named Brian Milne,
19 right?
20   A    I think so. These customers, I wasn't
21 managing them for their entirety of being at Long
22 Leaf.
23   Q    Milne was your customer, right?
24   A    Huh?

Page 99

1    Q    Milne was your customer, correct?
2    A    He was given to me, yes.
3    Q    And from the point at which he was given
4 to you forward, you were responsible for managing
5 his account, right?
6    A    Yeah.
7    Q    So you can see Milne's September 25,
8 2018 Cunningham account statement on your screen,
9 right?
10   A    Yeah.
11   Q    It starts with the net liquidating value
12 of $27,528?
13   A    Okay.
14   Q    Is that correct?
15   A    Yeah. I wasn't managing it at this point.
16       MR. PLATT: I just marked for the record
17 I believe --
18   Q    Sorry, go ahead.
19   A    I wasn't managing him at this point.
20       MR. PLATT: But for the record, I'm marking
21 this document as CFTC Exhibit 279.
22       (Whereupon CFTC Exhibit No. 279
23        was marked for identification.)
24   Q    And, Mr. Stemper, your testimony was that

Page 100

1 you agreed that this is Brian Milne's Cunningham
2 account statement, correct?
3    A    Yeah.
4    Q    Starting balance of, at least as of
5 September 25, 2018 the net liquidating value, over
6 $27,000. Then after one full month of trading,
7 the November 1, 2018 statement reflects a net
8 liquidating value of $25,686, is that right?
9    A    Yeah.
10   Q    After November 2018's trading,
11 the December 3, 2018 statement reflects
12 a net liquidating value of $17,831, is that right?
13   A    Yeah.
14   Q    January 2nd, after the December 2018
15 trading activity, net liquidating value is $15,133,
16 correct?
17   A    Yep.
18   Q    February 1st, after January 2019's
19 trading activity, Mr. Milne's net liquidating value
20 is $14,034, is that right?
21   A    Yeah.
22   Q    After February 2019's trading activity
23 we see Mr. Milne's net liquidating value is $13,054,
24 right?

Page 101

1   A   Yeah.

2   Q   So down another thousand dollars on that
3   month. April 1st, consistent with Mr. Carmichael's
4   statement, we see on Mr. Milne's statement he
5   lost -- or, excuse me, he had a very, very bad
6   month in March of 2019. His net liquidating value
7   is $8,725, correct?

8   A   Yep.

9   Q   The May 1st statement for your customer
10  Brian Milne reflects a net liquidating value of
11  $8,673, right?

12  A   Yes.

13  Q   So that's, again, down month on month.
14  June 3, 2019, Cunningham account statement for your
15  customer Brian Milne reflects a net liquidating
16  value of $5,944, is that right?

17  A   Yep.

18  Q   So now July 1, 2019, following June 2019's
19  trading activity, Mr. Milne's account reflects a net
20  liquidating value of $1,659, is that right?

21  A   Um-hmm, yeah.

22  Q   August 1, 2019 statement, Mr. Milne's
23  net liquidating value following July 2019's trading
24  activity, $2,024, right?

Page 102

1   A   Yeah.

2   Q   So a small gain for July of 2019.
3   I think we saw that with Carmichael too, he was
4   up a couple hundred bucks for that month. And then
5   the September 2, 2019 Milne statement after August
6   2019's trading activity is $97, correct?

7   A   Yeah.

8   Q   October 1, 2019 statement, looks like he's
9   pretty much zeroed out at $97, right?

10  A   Yeah.

11  Q   And Brian Milne followed Long Leaf's
12  trading recommendations, right?

13  A   Yes.

14  Q   And from September 2018 through
15  September 2019 we see the value of his account
16  pretty much wiped out completely, correct?

17  A   Yep.

18  Q   And from January 2019 through September
19  2019 you agree that Mr. Milne lost $14,000?

20  A   Yeah.

21  Q   And there was one month in there
22  where Milne made a little bit of money, made about
23  400 bucks in July of 2019, correct?

24  A   Um-hmm, yeah.

Page 103

1       MR. PLATT: I'm going to show you
2   what's been marked -- what I am marking as
3   CFTC Exhibit 280.

4       (Whereupon CFTC Exhibit No. 280
5       was marked for identification.)

6   Q   Can you see on your screen an email
7   from Jim Donelson to you from December 27, 2018?

8   A   Yeah.

9   Q   The subject is Accounts and there's two
10  attachments, right?

11  A   Yeah.

12  Q   I'm going to scroll down and show
13  you the attachments, Mr. Stemper. The first looks
14  like a letter and it's addressed to Long Leaf
15  Trading Client, correct?

16  A   Yeah.

17  Q   We'll come back to this. But I'm going
18  to focus on the second attachment, I'm scrolling
19  down, which was a document titled Alex Accounts.
20  And this is the table that Mr. Donelson forwarded
21  to you in December of 2018. Do you recognize this?

22  A   Yes.

23  Q   What is this?

24  A   What you just said it was.

Page 104

1   Q   This is a document called Alex Accounts
2   sent to you by Donelson, correct?

3   A   Yeah. It shows the balances of the
4   accounts that I inherited.

5   Q   Which ones did you inherit?

6   A   All of them.

7   Q   Do you see on the left there's two
8   columns? One is titled Broker and the other is
9   titled New Broker. Do you see those two columns?

10  A   Yeah.

11  Q   And on the broker column there's
12  a bunch of fields that are populated with LLT002.
13  Do you see that?

14  A   Yeah.

15  Q   That's you, right?

16  A   Yeah.

17  Q   And there are some that are LLT028, right?

18  A   Um-hmm. I inherited --

19  Q   So those are the ones that you're
20  (inaudible) --

21  A   -- those other ones before. Huh?

22  Q   -- right? Sorry, I cut you off. What was
23  your response?

24  A   I said I inherited all of them, but

Page 105

1 I inherited those ones with my broker ID before
2 this one.
3    Q    I understand.  And when did you inherit
4 the first tranche of customers?
5    A    When Craig Pace got fired I think.  I don't
6 remember exactly.
7    Q    Do you remember approximately when that
8 was?
9    A    No.
10    Q    Was it in 2018?
11    A    Yes.
12    Q    Was it in the summer of 2018?
13    A    I don't know.
14    Q    So you had a set of customers that
15 you inherited from Pace, and then here it looks
16 like you're inheriting a new set of customers, is
17 that right?
18    A    Yes.
19    Q    Who did you inherit the customers from
20 in December of 2018?
21    A    Either Andrew or Scott.
22    Q    That's Nelson or Gecas, just to be clear?
23    A    Yeah, yeah.
24    Q    And so in the beginning cash balance

Page 106

1 on the right, what does that represent?
2    A    How much cash they have in their account.
3    Q    So 10 of the 18 accounts on this file have
4 less than $5,000, right?
5    A    Yes.
6    Q    Only 5 of the accounts, 5 of the 18
7 accounts in this file have balances of greater than
8 $10,000, right?
9    A    Yeah.
10    Q    It looks like Fred Peek is a new account,
11 right?
12    A    Yeah.
13    Q    Do you recall him being new at the time?
14 Did you solicit him?
15    A    Yes.
16    Q    And there's one account with a balance
17 of over $20,000, right?
18    A    Yes.
19    Q    Do you think that the accounts -- the
20 account balances reflected on this file are more
21 or less than the amounts that these accounts were
22 funded with?
23    A    Less.
24    Q    A lot less, right?

Page 107

1    A    They're less.
2        (Whereupon  CFTC Exhibit No. 281
3        was marked for identification.)
4    Q    I've marked CFTC Exhibit 281.  Can you see
5 this email on your screen, Mr. Stemper?
6    A    Yeah.
7    Q    This is a June 5, 2019 email from
8 Donelson to you, Hatzigiannis and Cybulski, right?
9    A    Yes.
10    Q    And by June of 2019 you were the only three
11 brokers left, right?
12    A    Yes.
13    Q    Donelson attaches an Excel spreadsheet that
14 is titled Net Liq 6-3, right?
15    A    Yes.
16    Q    Do you think he means June 3rd net
17 liquidating value?
18    A    I think so.
19    Q    I'm going to scroll down here.  The
20 attachment to the email, we've turned it into a PDF,
21 and you can see there's a column on the left called
22 Broker and this first one is LLT001.  Do you know
23 who that was?
24    A    No.

Page 108

1    Q    Here we have LLT002.  That's you, right?
2    A    Yeah.
3    Q    And then we see LLT003 and LLT017, right?
4    A    Okay.
5    Q    Do you know who 3 and 17 are?
6    A    Well, if you scroll back down maybe.
7 I don't know.
8    Q    Sure.
9    A    Keep going down.  I don't remember.
10    Q    So this is a document that Donelson
11 created a little over six months after the Alex
12 Accounts spreadsheet that we just looked at, is that
13 right?
14    A    Yes.
15    Q    And you can see there's three
16 columns that have substantial information or
17 relevant information.  There's the name of the
18 broker, there's the accountholder in the middle
19 and then there's the net liquidating value of the
20 account, correct?
21    A    Yeah.
22    Q    And for LLT002 -- I'm not sure if you
23 can see it all on your screen -- I'll represent to
24 you that there's 20 accounts.  Does that sound about

Page 109

1 right?
2   A   Yeah.
3   Q   Two appear to be closed, Hanson and
4 D'Ambrosio.  Those look like they're closed at this
5 point?
6   A   Yes.
7   Q   Eleven of these accounts have net
8 liquidating value under $2,000, right?
9   A   Yes.
10   Q   Eighteen of your twenty accounts have
11 net liquidating value under $10,000, if I've counted
12 them up right, is that correct?
13   A   Yeah.
14   Q   And it looks like Laws is pretty new around
15 that time, is that your recollection?
16   A   Yes.
17   Q   None of the customers have net
18 liquidating values above 25,000 as of June 2019,
19 correct?
20   A   Yes.
21   Q   Laws is close but he's just opened his
22 account.  So I'm going to toggle back and forth
23 between CFTC Exhibit 280 and CFTC Exhibit 281, which
24 is this table.  280 is the Alex Accounts table that

Page 110

1 we just looked at that Donelson sent you in December
2 of 2018.  So what is the Gogineni account value as
3 of December 22, 2018?
4   A   What did you say?  Oh, I see.
5   Q   What is the value for -- I'm not
6 sure if I'm pronouncing this accountholder's name
7 correctly.  It looks like Gogineni.  Do you see
8 that?
9   A   Yes.  It reads 2,115.
10   Q   And then fast forward six months, what's
11 the account value as of June 3, 2019?
12   A   There is no value.  Oh, wait.  991.
13   Q   Let's go back to December 22, 2018.
14 Accountholder Von Glinow, this is -- the balance
15 is $6,019, right?
16   A   Yeah.
17   Q   Fast forward to June 2019, Von Glinow's
18 account value is $670, right?
19   A   Yes.
20   Q   Samar, Customer Samar, in December
21 2018 his account value is $9530.  Am I reading that
22 correctly, this line here?
23   A   That's what it reads.
24   Q   Fast forward six months, Samar's account

Page 111

1 value is 5800, right?
2   A   That's what it reads.
3   Q   Let's go back to the Alex Accounts
4 file.  December 22, 2018, Customer Godwin, account
5 value $15,406, right?
6   A   That's what it reads.
7   Q   Do you have any reason to think that these
8 account values are incorrect?
9   A   No.
10   Q   Okay.  This is information you got from
11 Donelson, right?
12   A   Yes.
13   Q   Fast forward six months, June 3, 2019,
14 Godwin's account value is $7,238, right?
15   A   Yes.
16   Q   Now let's look at Peek.  This is
17 a customer who you solicited and started -- funded
18 his account with $15,000 as of December 22, 2018.
19 Fast forward in time to June 3, 2019, what is Peek's
20 account balance?  Can you read that, please, the
21 third from the bottom.
22   A   Your cursor.  It reads 8,720.
23   Q   Now let's look to Carmichael.  We
24 looked at his statements.  As of December 22, 2018

Page 112

1 Donelson sent you his account balance and it was
2 $16,089, correct?
3   A   That's what it reads.
4   Q   June 2019 Donelson sends you Carmichael's
5 account balance again.  It's $10,859, right?
6   A   That's what it reads.
7   Q   And Hanson's account is closed in June
8 of 2019.  As of December 2018 he had a little over
9 $21,000, right?
10   A   Yes.
11   Q   So it looks like your customers are
12 performing poorly between December 22, 2018 and
13 June 3, 2019.  Do you agree with that?
14   A   That's what it seems, yeah.
15       (Whereupon  CFTC Exhibit No. 282
16       was marked for identification.)
17   Q   I'm going to show you what's been marked
18 as CFTC Exhibit 282.  Exhibit 282, Mr. Stemper, is
19 an email to you from your customer Alan Godwin on
20 February 19, 2019, right?
21   A   Yes.
22   Q   The subject, all caps, IMPORTANT:  Please
23 Review my Account, correct?
24   A   Yes.

Page 113

1    Q    Let's focus on this first paragraph
2  from Mr. Godwin.  He writes on July 23, 2018 Long
3  Leaf received over $28,000 from me.  Within the past
4  six months this account has dwindled below $14,000
5  (greater than 50 percent drop).  Did I read that
6  correctly?
7    A    Yes.
8    Q    So Godwin is describing losses that
9  stretched back to July of 2018, right?
10    A    Say that again.
11    Q    Godwin is describing losses that stretched
12  back to July of 2018, correct?
13    A    Yeah.
14    Q    Then down at the bottom, second paragraph
15  from the bottom Godwin writes, "I am quite concerned
16  about the way money has disappeared from my account,
17  and I think this should be looked into more fully."
18  Did you look into Godwin's trading losses?
19    A    I don't remember.
20    Q    Did you tell Donelson about your client's
21  concerns?
22    A    Probably.
23    Q    How would you have told him about them?
24    A    I probably would have forwarded this email

Page 114

1  to him.
2    Q    Was that your normal practice, to forward
3  customer emails to Mr. Donelson?
4    A    Yeah, I made him aware of everything of
5  concern.
6    Q    Do you know if Donelson took any steps
7  to look into these losses more fully?
8    A    I'm sure he did.
9    Q    What's your basis for that statement?
10  Why do you think he did?
11    A    I just -- well, I don't know exactly.
12    Q    What kind of steps would Donelson
13  have taken in the normal course after you forwarded
14  him a customer email that discussed losses?
15    A    He would speak to the customer.
16    Q    What would he say?
17    A    I don't remember.
18    Q    What was the gist of it?
19    A    I don't remember.
20    THE WITNESS:  I think he's frozen.
21  BY MR. PLATT:
22    Q    No, I'm sorry.  I'm just taking a second
23  to think.  So you don't ever remember anything about
24  what Donelson would do when you would tell him about

Page 115

1  substantial customer losses?
2    A    I just remember him talking to the
3  customer.
4    Q    But you don't remember the content of those
5  discussions?
6    A    No.
7    Q    Was it common for him to talk to customers
8  about losses?
9    A    I don't know about common.
10    Q    How often did it happen?
11    A    I don't know.
12    Q    Once a week?
13    A    I don't know.
14    Q    Did it happen more than once?
15    A    Yeah.
16    Q    Did it happen more than ten times?
17    A    I don't know.
18    Q    But you remember Donelson talking
19  to customers about losses at least one time, but
20  you don't recall exactly how many times or even
21  generally?
22    A    Yeah.
23    Q    Could it have been more than ten times?
24    MR. FALVEY:  Asked and answered.

Page 116

1    MR. PLATT:  It's not asked and answered,
2  Mr. Falvey.
3    MR. FALVEY:  Say again?
4    MR. PLATT:  It's not -- that question has
5  not been asked.
6    Q    Mr. Stemper, is it possible that
7  Mr. Donelson talked to customers about losses for
8  more than ten times?
9    A    It's possible.  I don't remember.
10    Q    Let's go back to CFTC Exhibit 281,
11  which is the June 3rd net liquidating value table
12  that Donelson sent you.  In Exhibit 282 Godwin tells
13  you that his account has gone down by more than
14  half, so his account value as of February 19, 2019
15  was $14,000.  Do you agree with that generally?
16    A    Yeah.
17    Q    Then in June of 2019 Godwin's account
18  value is $7238.  Did I read that correctly?
19    A    Yes.
20    Q    So he lost another approximately $7,000
21  in the intervening three or four months, correct?
22    A    Yes.
23    Q    Did you respond to Mr. Godwin?
24    A    Yes.  I don't remember what, though.

Page 117

1 Actually, I don't remember how we responded.

2    Q    But you do remember that there was a

3 response provided to Mr. Godwin?

4    A    Yes.  At the very least Jim spoke to him.

5    Q    And whatever was said by either

6 you or Mr. Donelson convinced Godwin to stick

7 with the program, right?

8    A    Looks like it.

9    Q    And he lost another $7,000 between this

10 date and June 3, 2019, correct?

11    A    Yeah.

12        MR. PLATT:  I'll mark CFTC Exhibit 283

13    and share this with you.

14        (Whereupon  CFTC Exhibit No. 283

15            was marked for identification.)

16    Q    Do you see an email from Dan Heinemann

17 to you on December 27, 2018?

18    A    Yeah.

19    Q    Heinemann was one of your customers, right?

20    A    Yeah.

21    Q    Heinemann writes, "I'm down 80 percent

22 in two years.  I hope you guys are getting your

23 transaction fees at least ..."  Did I read that

24 correctly?

Page 118

1    A    Yes.

2    Q    So over the life of his account, which

3 stretched back from -- you know, to before 2018, it

4 looks like his account is down 80 percent.  Do you

5 agree with that reading?

6    A    I don't know.

7    Q    Do you have any reason to believe

8 that Heinemann was lying to you in this email?

9    A    No.

10    Q    Is this the kind of email that you would

11 have forwarded to Donelson, that kind of complaint?

12    A    Yes, I would have let him -- made him

13 aware.

14    Q    Either by forwarding or verbally?

15    A    Yeah.

16    Q    Did you ever discuss customer complaints

17 with other brokers?

18    A    I don't remember.

19    Q    Did you ever forward customer emails

20 discussing trading losses to other brokers?

21    A    I don't remember.

22        MR. PLATT:  I'm going to share with

23    you a document that's being marked CFTC

24    Exhibit 284.

Page 119

1        (WhereuponCFTC Exhibit No. 284

2            was marked for identification.)

3    Q    This is a January 8, 2019 email from

4 Hatzigiannis to you, right?

5    A    Yes.

6    Q    And Hatzigiannis was another Long Leaf

7 broker, right?

8    A    Yes.

9    Q    And he's forwarding you an email, right?

10    A    Looks like it.

11    Q    And he's forwarding you an email from his

12 customer Dennis Nations, correct?

13    A    Yeah.

14    Q    The first two sentences of Mr. Nations'

15 email to Hatzigiannis are, "I am more than a little

16 upset by your very poor performance on my behalf.

17 Long Leaf/Cunningham Financial have managed to lose

18 all but $400 of a trading account that I funded

19 with $71,000 a little over a year ago."  Did I read

20 that correctly?

21    A    Yep.

22    Q    Does this refresh your recollection

23 that Long Leaf brokers discussed trading losses?

24    A    I don't know that we discussed it.

Page 120

1 I don't remember this.

2    Q    Does this refresh your recollection

3 that Long Leaf brokers forwarded customer complaints

4 among one another?

5    A    Maybe in this circumstance, but I don't

6 know about anything else.

7    Q    Why do you think Mr. Hatzigiannis forwarded

8 you Customer Nations' complaint in January of 2019?

9    A    I don't know.

10    Q    Do you remember discussing Mr. Nations'

11 account with Hatzigiannis?

12    A    No.

13    Q    What is your understanding --

14 and keep in mind that we've just reviewed some

15 emails from early 2019 and late 2018 where customers

16 report losses of 80, 50 and 97 percent of their

17 account's value.  What is your understanding of the

18 performance of Long Leaf Trading's recommendations

19 in 2018?

20    A    They ended up in losses overall.

21    Q    Have we looked at any documents yet

22 that would suggest that any customers' accounts

23 performed well over any significant stretch of time?

24    A    No.

Page 121

1    Q    Do you have any reason to believe
2  that any customers' accounts performed well over
3  any significant stretch of time?
4    A    Yeah.
5    Q    What is your basis for that belief?
6    A    I just remember there being
7  a string of good trades that were positive for
8  clients.  I don't know if all the clients were in
9  on those trades or not but ...
10   Q    All the clients got the same trading
11 recommendations, right?
12   A    No, not all of them, now that I think
13 about it.
14   Q    Well, it your testimony earlier.  Can you
15 clarify how they differed among clients?
16   A    Yeah, I was -- when you asked me the
17 question earlier, I was thinking about the beginning
18 of my tenure there, but towards the end Jim started
19 recommending different trades for different clients.
20 Not all the clients were included into all the
21 trades.
22   Q    What was Donelson's basis for excluding
23 some customers from some trading recommendations?
24   A    I'm not sure.  Might have to do with how

Page 122

1  much was in their account.
2    Q    But it was still the case that if
3  Donelson disseminated a trading recommendation to
4  a subset of customers, the recommendation was always
5  the same, right?
6    A    I don't know.
7    Q    Well, you sent the trading recommendations,
8  right, Mr. Stemper?
9    A    Yeah.
10   Q    So do you remember Donelson saying
11 here is Trade A for Customer 1, here's Trade B for
12 Customer 2 and those trades were different?  Do you
13 ever remember a single time that happening?
14   A    Yeah.
15   Q    Okay.  Describe that to me.  When did
16 that happen?
17   A    When?
18   Q    Yeah.  When did that happen?
19   A    I don't know exactly when.
20   Q    What were the differences between the
21 trades?
22   A    I don't remember.
23   Q    It's very infrequent that that occurred,
24 correct?

Page 123

1    A    Infrequent?
2    Q    It did not happen often, correct?
3    A    I wouldn't agree with that.
4    Q    Mr. Stemper, earlier you testified that
5  all the trades that were recommended were the same
6  to all the customers.  How can you now say that he
7  was just sending out different recommendations to
8  different customers?  It doesn't make any sense.
9    A    Well, like I just told you, Joseph,
10 when you asked me the question to begin with, I was
11 thinking of when I first started with Long Leaf and
12 all the trade recommendations were exactly the same
13 for all the customers, and then at one point Jim was
14 offering different trades to different clients.
15 That is what I stand by.
16   Q    And you think that that happened often
17 where different clients got different trades?
18   A    I don't know exactly.
19   Q    How many times did it happen?
20   A    I don't know.
21   Q    More than once?
22   A    Yes.
23   Q    More than ten times?
24   A    I don't know.

Page 124

1    Q    How did you know that Donelson was
2  sending out different recommendations to different
3  customers?
4    A    Because I think a couple of my clients
5  got those different trades and some clients of the
6  other brokers got those trades.
7    Q    Are you aware of any customer accounts
8  that made money over the life of their existence?
9    A    I know there was a period of time
10 where customer accounts were making money, yes.
11   Q    Which customer accounts made money?
12   A    I think Michael Laws made money for
13 a period of time and another client that wasn't
14 my customer.
15   Q    Okay.  We'll go back and look at
16 Mr. Laws' statements a little later.  Over the
17 life of their accounts are you aware of any Long
18 Leaf customers that made money?
19   A    I don't remember.
20   Q    Do you think you would remember if such
21 a thing happened?
22   A    I don't know.
23   Q    Did Donelson -- so let me back up.
24 You described Donelson sending out different

Page 125

1 recommendations to different customers based
2 on the amount of equity that was in their account.
3 Did Donelson talk directly to those customers?
4    A   I'm sure he did.
5    Q   What did he talk about with them?
6    A   I don't remember.
7    Q   And who are the clients that you remember
8 getting different trades?
9    A   Like I said, Michael Laws, and I can't
10 remember any -- who else.
11   Q   Did those trade recommendations go through
12 you, Mr. Stemper?
13   A   What do you mean?
14   Q   Earlier you testified that you emailed
15 out trade recommendations to customers. Did you
16 email out this subset of trades where Donelson only
17 sent trade recommendations to a handful of customers
18 based on the amount of equity in their accounts?
19   A   Yeah, I would email them out.
20   Q   Approximately how many of the customers
21 got those special trades?
22   A   I don't remember.
23   Q   Was it more than five customers?
24   A   I would say yeah.

Page 126

1    Q   More than ten customers?
2    A   I don't know.
3    Q   So your testimony, Mr. Stemper, is
4 you don't know if any customers made money over
5 the life of their accounts at Long Leaf, is that
6 correct?
7    A   Say that again.
8    Q   Is your testimony that you do not
9 know if any customers made money over the life of
10 their accounts at Long Leaf?
11   A   Yeah, I don't know. Long Leaf was open
12 long before I started working there.
13   Q   Okay. Let's focus on the time period
14 when you worked at Long Leaf. When you worked at
15 Long Leaf, are you aware of any customers that made
16 money following Long Leaf's trading recommendations
17 over the life of their accounts?
18   A   I don't remember any.
19   Q   And we've looked at a bunch of exhibits
20 now that show massive drawdowns across all of your
21 customers, correct, for the period of January 2019
22 through June 2019, is that right?
23   A   You showed me a couple of them.
24   Q   Should we go back and look at all of them?

Page 127

1    A   I don't know.
2    Q   Well, Mr. Stemper, do you remember
3 any customers making money between January 2019
4 and June 2019?
5    A   January 2019? I do remember people
6 making money, yeah.
7    Q   Well, we just looked at like 6 of a
8 total of 20 and they were all more than 50 percent
9 drawdowns. So which ones made money?
10   A   I know there was a customer that wasn't
11 my client that made money.
12   Q   Okay. Who was it?
13   A   I don't remember his name.
14   Q   Whose client was it?
15   A   Ben's.
16   Q   Ben Cybulski's client made money in
17 the January 2019 through June 2019 time period?
18   A   I don't know exactly. I just know --
19 I remember him making money, and I remember there
20 were periods of time when people did make money.
21   Q   But not for your customers for the
22 period of January 2019 through June 2019, correct?
23 Those customers lost money in that six-month time
24 period?

Page 128

1    A   The ones that you showed me, yeah.
2    Q   Can you name a customer who made money
3 during that time period?
4    A   Like I say, I remember Michael Laws
5 having some good returns on trades. I don't know
6 if it was -- I don't think it was overall, you
7 know, he made more than he started with, but I know
8 he was making money on good trades. I don't know.
9    Q   So I want to be very careful and
10 distinguish between making money on some trades
11 and making money on a net basis after tallying up
12 all the trades. So I'm not interested in whether
13 some trades won some of the time at Long Leaf.
14 Does that make sense? You've got to give a verbal
15 answer, Mr. Stemper. Sorry.
16   A   Yes.
17   Q   I'm interested in whether or not you
18 remember any customers making money in the aggregate
19 for any period of time. I think you've mentioned
20 Michael Laws, but we'll look at his statements
21 later. Any other customers besides Laws?
22   A   I can't remember their names.
23   Q   But you think customers -- there were
24 other customers who you think made money?

Page 129

1    A    I think there's at least one.
2    Q    Was it your customer?
3    A    No.
4    Q    So none of your customers, except maybe
5  Laws, ever made money, correct?
6    A    After starting balance, no.
7    Q    Yeah, I think that's the important
8  marking point for purposes of our discussion.  So
9  you discussed a customer of Cybulski's that made
10  money.  How did you learn about that?
11    A    I just remember it being spoke of.
12    Q    Who spoke of it?
13    A    Jim, I think.
14    Q    What did Jim say about it?
15    A    I don't remember.
16    Q    I'd like to turn back to the email
17  that Donelson sent you and the brokers in June
18  of 2019.  And we saw there were three brokers as
19  of that date, right?
20    A    Yeah.
21    Q    And in Donelson's December 2017 sales
22  meeting there were, I don't know, eight or nine
23  brokers, is that fair?
24    A    Yeah.

Page 130

1    Q    Why did they all leave?
2    A    They were fired, I want to say.
3    Q    They were all fired?
4    A    Yeah.
5    Q    None of them left voluntarily?
6    A    Connor, he left voluntarily.
7    Q    That's Connor Campo, right?
8    A    Yeah.
9    Q    Why did Connor Campo leave?
10    A    He got a different job.
11    Q    Did you ever hear other brokers discussing
12  customer losses in the office?
13    A    I don't really remember.
14    Q    You don't remember the specific
15  conversations or you don't remember whether or
16  not people discussed customer losses?
17    A    Both.
18    Q    Did it concern you that all your customers
19  lost money over time, Mr. Stemper?
20    A    Yeah.
21    Q    So what did you do about that concern?
22  Did you talk to Donelson?  Did you ever say, hey,
23  Jim, all my customers are losing money.  What are we
24  going to do about this?

Page 131

1    A    Yeah.
2    Q    What did he say?
3    A    I don't remember exactly what he said.
4  I just know that I had faith.  He's a smart person
5  and I trusted him.
6    Q    When did you have this conversation
7  with Mr. Donelson?
8    A    I don't remember.
9    Q    Was it in 2019?
10    A    Probably.
11    Q    And he knew that customers were losing
12  money, right?
13    A    Um-hmm.
14    Q    So you both sit down?
15    A    Yeah.
16    Q    Did this conversation happen in the office?
17    A    Yeah.  It might -- it might not have been
18  just between Jim and I.
19    Q    The whole group?
20    A    Yeah.
21    Q    So there's a group meeting.  Who was there
22  Cybulski, Hatzigiannis and Jim?
23    A    Yeah.
24    Q    Was Vicki there?

Page 132

1    A    She might have been.
2    Q    This is a team meeting sometime in 2019.
3  Was it early in 2019 or like midway through 2019?
4    A    I don't remember.
5    Q    You can't ballpark it?
6    A    What was that?
7    Q    You can't ballpark, you know, approximately
8  when the conversation took place?  It sounds like a
9  big event.
10    A    No, no, I don't remember exactly.
11    Q    So what was said at this meeting to
12  discuss customer losses between the entire Long
13  Leaf staff?
14    A    I can't remember what was said.
15    Q    Were there any, you know, documents shared
16  among you guys?
17    A    I don't know.
18    Q    Was there a sense in the room that
19  everybody understood that customers were losing
20  money at that point?
21    A    I don't know.
22    Q    Well, what was the purpose of the meeting?
23    A    I don't think it was a meeting.  I just
24  think people were talking.

Page 133

1   Q   What was the purpose of the discussion?

2   A   I don't think there was a purpose.

3   Q   What topics were discussed?

4   A   I don't know all the topics.

5   Q   Customer losses were one of them, right?

6   A   A concern for that.

7   Q   Yeah.  So did Donelson ever tell you,

8 no, I don't think customers are losing money?  Was

9 that his response?

10   A   No.

11   Q   But he had knowledge that, yeah, customers

12 are losing money and I'm worried about it, is that

13 fair?

14   A   I don't know.

15   Q   What was his tone?  What did he say?

16   A   I don't remember exactly.

17   Q   What did you say?

18   A   I don't remember what I said.  I recall --

19   Q   Sorry, I cut you off.  Go ahead.

20   A   I was just concerned that our trades

21 weren't going well when they weren't.

22   Q   And you have no recollection of

23 what Donelson said in response to that concern?

24   A   Something along the lines to ease our

Page 134

1 concerns.

2   Q   How did he ease your concerns?

3   A   I don't remember exactly.

4   Q   Did Donelson tell you that customers

5 were making money at that discussion?

6   A   No.

7   Q   Did he discuss like a plan forward,

8 this is how we're going to make money for clients?

9   A   Maybe his trading strategy.

10   MR. PLATT:  So this might be a good time

11 to take lunch.

12   MR. FALVEY:  Okay.

13   MR. PLATT:  Do you guys want to take

14 a break?

15   THE WITNESS:  Yeah, sure.

16   MR. PLATT:  So I really don't want to

17 go to like 6 o'clock.  So if we can make this --

18 can we all get back by 1 p.m.?

19   MR. FALVEY:  Yeah.

20   MR. PLATT:  Great, thank you.

21   THE WITNESS:  Yeah.

22   MR. FALVEY:  Yeah, sounds good.

23   MR. PLATT:  See you shortly.

24

Page 135

1   (Whereupon a lunch recess was taken

2   from 12:12 p.m., to 1:04 p.m., after

3   which the following proceedings were

4   had:)

5   A F T E R N O O N   S E S S I O N

6   ALEXANDER STEMPER,

7 called as a witness herein, having been previously

8 sworn and examined, testified further as follows:

9   DIRECT EXAMINATION (Cont'd.)

10 BY MR. PLATT:

11   Q   Mr. Stemper, I'd like to turn to two

12 documents we looked at earlier, CFTC Exhibit 280

13 and CFTC Exhibit 281.  And 280 is the document that

14 Donelson sent you in December of 2018 showing your

15 customers' cash balances as of that date, and 281 is

16 the document Donelson sent you in June of 2019 with

17 your customers' cash balances.

18   Now, for the record -- and we are in a

19 videoconference setting due to the Coronavirus -- I

20 think Mr. Falvey has CFTC Exhibit 280 on his monitor

21 so you can see that document, and I'm going to share

22 CFTC Exhibit 281 with you through my computer so you

23 can see that document and that way you can look at

24 them side by side.  Whoops, shared the wrong doc

Page 136

1 there.

2   MR. FALVEY:  Yeah, I was going to say

3   it didn't look right.

4 BY MR. PLATT:

5   Q   So I'm sharing document -- or CFTC

6 Exhibit 281.  Can you see that clearly, Mr. Stemper?

7   A   Yes.

8   MR. FALVEY:  Let me see if I can get

9   it a little bigger even or -- shoot.  I didn't

10   mean to do that.  Yep.

11 BY MR. PLATT:

12   Q   So before lunch we discussed -- or

13 I drew your attention to a handful of customers'

14 balances between December 22, 2018 and June 3, 2019,

15 and there was some question regarding whether or not

16 that was an exhaustive set.  So now, Mr. Stemper,

17 I want to give you an opportunity to look at both

18 documents side by side, and I want you to take your

19 time and let us know if you see any balances for

20 any of your customers that increased between

21 December 22, 2018 and June 3, 2019.

22   So just go ahead and let us know

23 when you've had a chance to review for that purpose.

24 And if I need to scroll my document down, just let

Page 137

1 me know.
2     MR. FALVEY:  Okay.  Just a quick question,
3 Mr. Platt.  Is there just one column in the
4 document that you have up with the --
5     MR. PLATT:  Yeah, and I'll scroll
6 to the right.
7     MR. FALVEY:  Okay.
8     MR. PLATT:  It's just one.  You can see
9 there's --
10     MR. FALVEY:  Okay.
11     MR. PLATT:  -- you know, no substantial
12 information to the right of where the screen
13 is focused.
14     MR. FALVEY:  Okay, perfect.
15  A   I don't see what you're -- I don't see
16 any that have increased.  That was your question?
17 BY MR. PLATT:
18  Q   Correct.  And that's all of your accounts
19 for this time period, correct, Mr. Stemper?
20  A   From December 2018 to what date?
21  Q   The second document is dated June 3, 2019.
22  A   All right.  Okay.
23  Q   Do you agree that these two documents
24 reflect all of your customers as of those dates?

Page 138

1  A   Yeah, I think so.
2     MR. PLATT:  Okay.  Mr. Falvey, you can
3 put that aside.  That's all I really wanted
4 to do there.
5  A   There's just some people that aren't on
6 the list that are on this list to the left.
7  Q   Okay.  And if I scroll down, are they on
8 there?
9  A   Yeah.
10     MR. FALVEY:  Oh, they're there, yeah.
11 BY MR. PLATT:
12  Q   And do you see any that increased?
13 I have the June document.  Mr. Falvey has the
14 December document.
15  A   No.
16  Q   Do you see any in that subset that
17 were off of the page originally that had values
18 that increased in that time period?
19  A   No.
20  Q   And we see Mr. Laws' account.  He's a
21 new account?
22  A   Right.
23     MR. FALVEY:  Yeah.
24

Page 139

1 BY MR. PLATT:
2  Q   And I think your testimony was you
3 thought that Laws' account increased for some period
4 of 2019, is that accurate?
5  A   Yes.  I don't know -- I don't think it
6 ever exceeded 25,000, though.
7  Q   Okay.  So there was really no time where
8 Laws experienced net gains, correct?
9  A   Yeah.
10     MR. FALVEY:  I put the other one away.
11 Is that okay, Jody?
12     MR. PLATT:  Yeah, that's fine.
13 We're done with those exhibits.  Thank you
14 for facilitating, Mr. Falvey.
15     MR. FALVEY:  Yeah, no problem.
16 BY MR. PLATT:
17  Q   Mr. Stemper, did prospective customers
18 ever ask you about the performance of Long Leaf
19 Trading's trading program?
20  A   Yes.
21  Q   What did you tell them?
22  A   I don't remember exactly what we said.
23  Q   Did you provide information that would
24 describe Long Leaf Trading's performance history?

Page 140

1  A   I don't really remember what exactly
2 was shared.
3  Q   Do you remember that some things were
4 shared?
5  A   Yeah, I just don't know what was shared.
6  Q   Did Donelson know that prospective
7 customers requested performance information?
8  A   Yes.
9  Q   What did Donelson tell you to respond
10 to clients with when they asked about performance?
11  A   I don't remember.
12  Q   Was there ever a rule within Long Leaf
13 that you were not permitted to share track record
14 information because it was against regulations?
15  A   Say that again.
16  Q   You know what, strike that question.
17 It was a poorly formed question.  I'm going to
18 show you a document instead.
19     MR. PLATT:  So I'm marking CFTC
20 Exhibit 285.
21     (WhereuponCFTC Exhibit No. 285
22     was marked for identification.)
23  Q   And this is an email from you to Donelson,
24 you know, on October 24th of 2018, right?

Page 141

1    A    Yeah.
2    Q    And I'm going to scroll down to the
3  bottom of the chain.  There's some blue text.  It
4  looks like a prospective customer is emailing you.
5  Do you agree with that?
6    A    Yeah.
7    Q    He's asking for information about how
8  the strategies work?
9    A    Okay.
10    Q    Do you agree?
11    A    Yep.
12    Q    And you forward this to Donelson.
13  I'm scrolling up a little bit, and let me know
14  if you can't follow.  You say, "Good Morning, Jim.
15  Under regulations what can I send this gentleman?"
16  Why would a regulation restrict your ability to
17  provide information to a prospective customer?
18    A    I don't remember.
19    Q    Do you remember withholding
20  information from prospective customers on the
21  basis of regulations or rules?
22    A    No.
23    Q    Well, it looks in this document like
24  that would be the basis why you would only provide

Page 142

1  some information but not other information, right?
2    A    Say that again.
3    Q    In this document you're asking
4  Mr. Donelson what you're allowed to send, correct?
5    A    Yes.
6    Q    And the basis of that request
7  is you think some information is not allowed to
8  be circulated by regulations, correct?
9    A    I don't know that.
10    Q    How do you read it?  It's your words,
11  Mr. Stemper.
12    A    What's that?
13    Q    How do you read this email?  These
14  are your words that you wrote to Donelson.  How do
15  you read it?
16    A    What do you mean?
17    Q    What do regulations have to do with
18  providing information about the trading strategy?
19    A    I don't remember.  I don't remember this
20  particular case or what it was about.
21    Q    What about generally?  Generally did
22  you think that regulations restricted your ability
23  to circulate information to prospects?
24    A    Not sure.

Page 143

1    Q    What are you sure about?
2    A    Huh?
3    Q    What are you sure about?
4    A    I'm just not sure.
5    Q    Well, sitting here today reading
6  the words that you wrote where you say under
7  regulations what can I send, what do you think
8  that means?
9    A    I was just asking what I was allowed
10  to send.  That's it.
11    Q    But you're omitting the first clause
12  in the sentence, Mr. Stemper, where you say under
13  regulations what can I send.  So what regulations
14  are you talking about?
15    A    NFA potentially.
16    Q    Yeah.  And what about NFA regulations
17  would apply in this instance?
18    A    I'm not sure.
19    Q    Why would you have thought that?
20    A    I don't remember.
21    Q    Sitting here today do you think that
22  NFA regulations restrict the kind of information
23  that you could have provided to a prospective
24  client?

Page 144

1    A    I'm not sure what you mean.
2    Q    What's unclear about it?
3    A    I mean, could you repeat it?
4    Q    Sitting here today do you believe that
5  NFA regulations restrict the kind of information
6  that a broker can provide to a prospective client?
7    A    I don't know.  I'm not sure.
8    Q    But you wrote it to Mr. Donelson anyway,
9  right?
10    A    Okay.
11    Q    Right?
12    A    Okay, yeah.
13    Q    But you didn't -- you don't
14  remember why you wrote it, you don't know why
15  you wrote it now, and you can't think of a reason
16  why a regulation would impact Long Leaf's ability
17  to provide information to customers, is that your
18  testimony?
19    A    I'm not sure.  I'm a little confused.
20    Q    How do regulations impact Long Leaf's
21  ability to send information to customers?
22    A    How does it?
23    Q    Yeah, how.
24    A    Drawing a blank.

Page 145

1   Q   Well, you wrote those words,
2  Mr. Stemper. It's not -- I'm not making it up.
3  This is your email that you wrote to your boss --
4   A   Yeah.
5   Q   -- in the course of performing your duties.
6  So what did you mean?
7   A   I don't remember.
8      MR. PLATT:  I'm going to mark CFTC
9   Exhibit 286.
10     (Whereupon  CFTC Exhibit No. 286
11       was marked for identification.)
12   Q   Let me just turn back to the email
13  we just looked at.  I think you testified that, you
14  know, maybe NFA rules applied in that situation,
15  is that fair?
16   A   Sure.
17   Q   Do you understand that NFA has rules
18  regarding sales practices?
19   A   Yes.
20   Q   Do you have an understanding that
21  those rules prohibit the provision of certain kinds
22  of information to prospective customers?
23   A   I don't remember what they are.
24   Q   Okay.  I'm going to share CFTC

Page 146

1  Exhibit 286 with you.  This is a group exhibit.
2  I'm just going to go through these one by one.
3  The top email is from a person named Martin Postma
4  to you from October 27, 2018, right?
5   A   Yep.
6   Q   Postma says in the first paragraph
7  what I am requesting is a more comprehensive
8  description of the strategies that are used and
9  the circumstances that you use to -- that you look
10  for to implement them, is that right?
11   A   Yes.
12   Q   And down at the bottom this prospective
13  customer writes, "Also of great importance will
14  be a summary of all positions and their resulting
15  profit/loss over the course of time (at least a
16  year)."  Did I read that correctly?
17   A   Yep.
18   Q   I'm going to scroll down to the
19  second email in this group exhibit.  This is from
20  you to Donelson on December 6, 2018.  The subject
21  line is Prospect - Richard Johnson.  Did I read that
22  correctly?
23   A   Yes.
24   Q   Was this part of your normal practices,

Page 147

1  to provide information to Donelson about prospects?
2   A   Yes.
3   Q   One of the things that Richard --
4  that you're providing to Donelson about prospect
5  Richard Johnson is that he wants to know, "What
6  kind of returns and what am I getting out of it?"
7  Did I read that correctly from that third to the
8  bottom bullet point?
9   A   Yeah.
10   Q   He's asking about returns, right?
11   A   Yes.
12   Q   So this next -- this next, third
13  email in this group exhibit is from Gary D to
14  you on March 14, 2019, and it looks like he's a
15  prospective customer.  You don't recognize this
16  guy's name, right?
17   A   No.
18   Q   And he's responding to an email that
19  you wrote on March 13, 2019 at 3:02 p.m.  In the
20  middle of this page you write to a prospect, "I was
21  planning on showing you a performance review of our
22  cash management strategy when we spoke.  It would
23  not go back as far as two years because the strategy
24  has not been traded within our company for that

Page 148

1  long."  Did I read that correctly?
2   A   Yeah.
3   Q   And that's in response to Gary D asking
4  for a review of the trading performance results of
5  the last few years.  Did I read that email
6  correctly?
7   A   Yes.
8   Q   You say that you want to provide
9  him some information but you can't go back beyond
10  whenever the cash management strategy started,
11  right?
12   A   Yep.
13   Q   And then finally we have an email
14  from prospect Tim Sullivan to you from April 8,
15  2019.  There's this big, long solicitation email
16  from you, which you may or may not recognize.  I
17  should just ask you do you recognize this kind
18  of solicitation email that you sent out?
19   A   Yeah, kind of.
20   Q   Not this specific email, Mr. Stemper.
21  Just generally did you send out emails of this kind?
22   A   Yeah.
23   Q   Mr. Sullivan, the prospective customer,
24  responds one sentence, "Can you send me your track

Page 149

1  record," right?
2    A   Um-hmm.
3    Q   So I'm going to go back up to the
4  first email in the exhibit.  That's from prospective
5  customer Martin Postma.  Did you provide Postma
6  with a profit and loss summary?
7    A   Say that again.
8    Q   Did you provide your prospective
9  customer Postma with a profit and loss summary
10  as he requested?
11    A   I don't remember.
12    Q   What information did you provide to Postma
13  in response to this email?
14    A   I am not sure.
15    Q   Was there a profit and loss summary at Long
16  Leaf Trading to use for the purpose of providing to
17  prospective customers?
18    A   For the cash management strategy,
19  I believe so.  I forgot about that cash management.
20    Q   So you might have sent that to Postma?
21    A   I don't know.
22    Q   You don't know if you provided that
23  information to this -- well, look at the date.
24  Will that sort of help you understand whether or

Page 150

1  not you provided any track record information to
2  Mr. Postma?
3    A   I'm not sure.  Would it be an email?
4    Q   Well, when was the cash management strategy
5  in effect?
6    A   What?
7    Q   When was the cash management strategy
8  in effect?
9    A   It might have been late 2018, early 2019.
10  I don't remember.
11    Q   Do you remember ever providing profit and
12  loss summary information to prospects?
13    A   Not really.
14    Q   I mean, is that a no, you don't?
15    A   I'm trying to think.  I don't know if
16  I've ever sent one.  I don't remember.
17    Q   Have you ever seen one?
18    A   Yeah.
19    Q   And just so the record's clear,
20  the question is have you ever seen a profit
21  and loss summary document from Long Leaf's trading
22  recommendations.
23    A   Yes.
24    Q   Where did you see that kind of information

Page 151

1  in a document?
2    A   Jim created it.
3    Q   Did he create them regularly?
4    A   Not sure.
5    Q   When did he create them?
6    A   I don't remember.
7    Q   How did he provide them to you?
8    A   Email, I would guess.
9    Q   Did you ever provide the profit and
10  loss summaries that Donelson emailed to you to
11  prospective customers?
12    A   Say that again.
13    Q   Did you ever provide the profit and
14  loss summary documents that Donelson provided to
15  you that you just described, did you ever provide
16  those to prospective customers?
17    A   I don't really remember.
18    Q   It's not something you remember doing
19  regularly?
20    A   Yeah.
21    Q   It was your whole job to interact with
22  prospective customers, right, or a significant part
23  of your job?
24    A   Yes.

Page 152

1    Q   So if you did it, you would probably
2  remember?
3    A   Um-hmm.
4        MS. STREIT:  Is that a yes?
5  BY MR. PLATT:
6    Q   You've got to answer verbally, sorry.
7  Was that a yes, Mr. Stemper?
8    A   I'm not sure.
9        MR. PLATT:  Mary, can you read back my
10    last question.  Sorry.
11        (Whereupon the portion of the record
12          was read as requested.)
13    A   I think that's an inappropriate question.
14    Q   You know, that's not really an appropriate
15  response, Mr. Stemper.  You just have to answer it.
16    A   Yes.
17    Q   So let's go down to the second email
18  in CFTC Exhibit 286.
19        MR. FALVEY:  Hey, Jody, can we take five
20    minutes, literally?
21        MR. PLATT:  Sure.
22        MR. FALVEY:  I mean, yeah, literally
23    it'll just be five minutes.
24        MR. PLATT:  Sure.  Let's go off the record.

Page 153

1    MR. FALVEY:  Okay, thank you.
2        (Whereupon a recess was taken from
3        1:25 p.m., to 1:33 p.m., after which
4        the following proceedings were had:)
5    MR. PLATT:  Let's go back on the record.
6    Q    Mr. Stemper, we were looking at
7  Exhibit 286.  I'm going to pull that back up.  And
8  this second email in Exhibit 286 is your summary to
9  Donelson of a prospect who's requesting track record
10 information.  Do you remember providing track record
11 information to this prospect?
12   A    No.
13   Q    And then the third of four emails,
14 your email to Gary D, you know, you described
15 how you will provide information about the cash
16 management strategy but you can't go back before
17 the cash management strategy started.
18       Is it fair to say that even
19 if you did provide track record information to
20 Gary D, you didn't provide him the kind of track
21 record information that he was requesting?
22   A    No, I -- I don't know what you mean.
23   Q    This prospective client requests
24 trading performance results of the last few years,

Page 154

1  correct?
2    A    Yeah.
3    Q    And you say --
4    A    To answer your question, I think the
5  cash management strategy is what we were primarily
6  using.
7    Q    So the question, Mr. Stemper, is
8  if you provided track record information to this
9  prospect, it would have only been related to the
10 cash management strategy and not related to the
11 trading that occurred before the cash management
12 strategy, right?
13   A    Um-hmm, right.
14   Q    And then, finally, did you send any
15 track record information to prospect Tim Sullivan
16 in April of 2019?
17   A    I don't remember.
18   Q    Did Tim Sullivan open an account at
19 Long Leaf?
20   A    I don't think so.
21   Q    Did Gary D open an account at Long Leaf?
22   A    No.
23   Q    Did Richard Johnson open an account at
24 Long Leaf?

Page 155

1    A    No.
2    Q    Did Martin Postma open an account at
3  Long Leaf?
4    A    Maybe.
5    Q    But you don't remember him being --
6    A    I don't remember -- his name looks
7  familiar, but I'm not sure.
8    Q    Okay.  But you don't know whether or not
9  he opened one or not?
10   A    Yeah.
11   Q    Why do you think a prospective
12 customer of a trading system would want track
13 record information?
14   A    I don't know.
15   Q    Why did you ask for track record
16 information when you were in the hiring process for
17 the job?
18   A    I was curious of the strategy.
19   Q    How the strategy performs, correct?
20   A    And the strategy in general.
21   Q    These prospective customers are
22 asking for track record information because
23 it's an important piece of information when you're
24 deciding whether to make an investment, right?

Page 156

1    A    Is that a question?
2        MR. PLATT:  Mary, can you please read
3    back the question.
4        (Whereupon the portion of the record
5        was read as requested.)
6    A    I can't speak for everyone.
7    Q    Your testimony, Mr. Stemper,
8  is that track record information is not important
9  for someone investing in a trading strategy?
10   A    I don't know.
11   Q    You held a Series 3 license, right?
12   A    Yeah.
13   Q    You worked at a broker that sold
14 a trading strategy to the general public, right?
15   A    Um-hmm, yeah.
16   Q    You know about options trading?
17   A    Yeah.
18   Q    And you don't think track record
19 is an important piece of information for selling the
20 kind of product that Long Leaf was selling?
21   A    It could be.
22   Q    Would it be important to you if you were
23 investing any money?
24   A    Yeah.

Page 157

1   Q   Why?
2   A   To understand the history.
3   Q   Why would you want to understand
4 the history of a trading strategy?
5   A   To see if it works.
6   Q   Would you invest your own money in
7 a strategy that didn't work?
8   A   If I knew it didn't, no.
9   Q   And one way that you would know that
10 it didn't work is if the track record was poor,
11 correct?
12  A   Yeah.
13  Q   I'm going to switch gears here,
14 Mr. Stemper. This may seem like an obvious
15 question. The people you were cold calling all
16 day every day, they were not preexisting customers
17 of Long Leaf, right? They were just members of the
18 general public.
19  A   Yeah.
20  Q   And you testified earlier that
21 Long Leaf provided its brokers with materials to
22 use in soliciting customers, right?
23  A   Yep.
24  Q   Who provided those materials to you?

Page 158

1   A   The owner.
2   Q   Donelson, right?
3   A   Yeah.
4   Q   And Evans?
5   A   Yeah.
6   Q   They knew what was in those scripts, right?
7   A   Yeah.
8   Q   They told you to follow the scripts,
9 correct?
10  A   Yeah.
11  Q   So you gave these pitches a lot, right?
12 Like the demo and the custom pitch, you've given
13 them each, you know, dozens or hundreds of times,
14 right?
15  A   Yeah.
16  Q   What do you remember about
17 the disclaimers that were included with those
18 solicitation materials?
19  A   Past performance is not indicative
20 of future.
21  Q   Is that sort of the only statement
22 about risk that you remember from the demo and
23 custom scripts?
24  A   I don't remember. I think there's more,

Page 159

1 but I'm not sure.
2   Q   But sitting here today, having given
3 this -- these pitches, you know, sort of all day
4 every day, that's what's in your head, that's what
5 you remember?
6   A   Yeah.
7       (Whereupon  CFTC Exhibit No. 287
8       was marked for identification.)
9   Q   I'm going to share with you what's been
10 marked as CFTC Exhibit 287. This is a December 1,
11 2017 email from you to Dillman, right?
12  A   Yeah.
13  Q   And you send him a Word document titled
14 Notes, is that correct?
15  A   Yes.
16  Q   I'm going to scroll down to these. Do you
17 recognize this document?
18  A   Yes.
19  Q   What is it?
20  A   It's a script.
21  Q   At what stage in the three-stage Long
22 Leaf process was this version of the script used?
23  A   I don't remember exactly when.
24  Q   Is this the demo script?

Page 160

1   A   It could have been.
2   Q   Is this the custom script?
3   A   I think it's the demo.
4   Q   You think this is the demo?
5   A   Yeah.
6   Q   Could this be the opener script? Was there
7 a script for openings?
8   A   There was.
9   Q   Is that what this is?
10  A   Yeah. Actually, it might be the opening
11 script, yep.
12  Q   And so this was part of the solicitation
13 materials that Long Leaf provided to brokers,
14 correct?
15  A   Yes.
16  Q   You didn't create this document, right?
17  A   No.
18  Q   So in this first sentence here the
19 last bit says there's no cost for the program.
20 Is that true?
21  A   Not for the -- yeah, that's true.
22  Q   Are there any statements about the
23 impact of commissions on an options trading account
24 in this opener pitch?

Page 161

1    A    Doesn't look like it.
2    Q    Commissions were a cost to the program,
3 right?
4    A    If you trade, not of the program.  You
5 could be in the program and not trade.
6    Q    So you're drawing a distinction
7 between someone who has an account that has no
8 trading activity and someone who has a Long Leaf
9 account and follows the trade recommendations?
10    A    Right.
11    Q    I understand.  So then just read,
12 you know, read this next paragraph to yourself.
13 I'm sure you've seen this many times and you've
14 said this many times, and then we'll talk about it.
15 Just please review it and let me know when you're
16 done.
17    A    You can go ahead.
18    Q    So part of the pitch was that you would
19 describe this fact that 76.5 percent of options
20 expire worthless, correct?
21    A    Yeah.
22    Q    How would that stat relate to the
23 trading recommendations that Long Leaf provided
24 to customers?

Page 162

1    A    I don't remember.
2    Q    Did this stat relate to the profitability
3 of Long Leaf's trading recommendations?
4    A    I think so, but I don't remember exactly
5 how.
6    Q    Right.  So when you first started, Long
7 Leaf used iron condors, right?
8    A    I'm not sure.
9    Q    You're not sure if Long Leaf used iron
10 condors?
11    A    I remember the term being thrown around
12 but -- maybe.
13    Q    Did you think that Long Leaf was only
14 selling options?
15    A    Yes.
16    Q    Sitting here today, do you think that
17 Long Leaf only sold options?
18    A    I'm pretty sure.
19    Q    What's an iron condor?
20    A    I'm not --
21    Q    Sorry, go ahead.
22    A    I don't remember.  I don't remember.
23    Q    You don't remember what an iron condor is?
24    A    No.

Page 163

1    Q    Did you ever tell a prospective
2 customer about the likelihood -- or strike that
3 question.  Did you ever tell a prospective customer
4 about the potential magnitude of loss associated
5 with the other 23.5 percent of options?
6    A    I don't remember.
7    Q    It's not in the pitch, though, so you
8 probably didn't say it, correct?
9    A    Right.
10    Q    Third paragraph.  You would tell
11 customers the beauty of the program is that it's
12 an income-generating strategy with limited risk,
13 correct?
14    A    Yep, that's what it reads.
15    Q    You've said that thousands of times
16 probably, right?
17    A    I don't know.
18    Q    You said this on most of the opener calls
19 that you made, correct?
20    A    Yes.
21    Q    Did you have any basis to believe that
22 Long Leaf generated income for its customers when
23 you gave this pitch?
24    A    I don't remember.

Page 164

1    Q    Do you remember ever being provided
2 information that would have reflected the generation
3 of income for Long Leaf's customers?
4    A    I don't remember, no.
5    Q    You don't remember if you were provided
6 information or you weren't provided any information?
7    A    I don't remember.
8    Q    So just to clarify, you have no
9 recollection of anyone ever providing you
10 information that would have reflected income
11 generation based on Long Leaf's trading strategy,
12 correct?
13    A    Yeah.
14    Q    So why did you say that to customers?
15    A    It's what we had to say.
16    Q    Because it was in the script, correct?
17    A    Yeah.
18    Q    Did anybody ever give you information
19 about the limitation on risk that you described to
20 customers here?
21    A    I wouldn't remember.
22    Q    So you don't remember ever receiving that
23 kind of information?
24    A    What kind of information?

Page 165

1    Q    In this pitch you would say over
2  and over again the beauty of the program is that
3  it's an income-generating strategy with limited
4  risk.  Did I read that correctly?
5    A    Yes.
6    Q    Did anybody at Long Leaf ever provide
7  you with information to support that statement that
8  says Long Leaf's trading strategy had limited risk?
9    A    Yes.
10    Q    What information was provided to you about
11  Long Leaf's risk limitations?
12    A    I don't remember.  I know it was discussed.
13    Q    But you don't remember what that
14  information was?
15    A    No.
16    Q    Who discussed it?
17    A    Jim.
18    Q    Jim Donelson discussed risk limitations
19  with you?
20    A    Yeah, with everyone.
21    Q    Tell me about those discussions, please.
22    A    I don't remember what was said.
23    Q    What was the context of the conversation?
24    A    I don't remember.  It's just limited risk,

Page 166

1  positive context.
2    Q    So in the demo set, Mr. Stemper, which
3  you also said had a script and it also had a Power
4  Point, correct?
5    A    Yes.
6    Q    Did the demo set also rely on this
7  76.5 percent of options expire worthless statistic?
8    A    Yes.
9    Q    Do you remember making the statement
10  that that statistic gave Long Leaf customers a
11  predictable path to success?
12    A    Say that again.
13    Q    Do you remember telling customers
14  during the demo set that the 76.5 percent of
15  options expire worthless statistic would lead to a
16  predictable path to success for Long Leaf customers?
17    A    Do I remember saying that?
18    Q    As part of demo set, yep.
19    A    Yeah, I don't --
20    Q    You said it lots of times, correct?
21    A    Where are you reading?
22    Q    It's not in this exhibit.  I'll take
23  it down.  I'm just asking you if you remember it.
24    A    No.

Page 167

1    Q    You don't remember making that statement
2  or you do remember making that statement?
3    A    What was the statement again?
4        MR. PLATT:  Mary, can you please read
5    back the question about the predictable path
6    to success.
7        (Whereupon the portion of the record
8        was read as requested.)
9    A    I don't remember.
10        MR. PLATT:  So we're going to play
11    a recording at this stage.  I'm going to
12    mark a recording from January 12, 2018 as
13    CFTC Exhibit 288.
14        (Whereupon CFTC Exhibit No. 288
15        was marked for identification.)
16        (Whereupon CFTC Exhibit No. 288
17        was remarked as CFTC Exhibit
18        No. 302 for identification.)
19    Q    Sorry.  I'm going start this recording
20  at the time stamp 7:50 and I'm going to let it run
21  until about 10:50.  So we're going to listen to
22  about three minutes of this call, okay, Mr. Stemper?
23    A    Okay.
24        (Whereupon the recording was played.)

Page 168

1        MR. PLATT:  Can you hear that?
2        MR. FALVEY:  Yes.
3        MR. PLATT:  Okay, sorry.  I actually --
4    I started the wrong call, so I'll going to queue
5    up the other call.  This may take a minute for
6    the recording to load.  So, again, I'm going to
7    start the recording right around 7 minutes and
8    50 seconds and let it play for about 3 minutes.
9    Q    Let's listen to the recording, Mr. Stemper,
10  and then I'll ask you some questions about it, okay?
11    A    Yep.
12        (Whereupon the recording was played.)
13    Q    Mr. Stemper, was that your voice?
14    A    Yes.
15    Q    That's the demo set, right?
16    A    It sounds like a demo.
17    Q    Yeah.  And you delivered the demo hundreds
18  of times, correct?
19    A    I don't know how many times.
20    Q    Well, I think earlier you estimated about,
21  you know, once per day?
22    A    Yeah.
23    Q    And you worked at Long Leaf for two years,
24  correct?

Page 169

1   A   Yeah.
2   Q   And you were reading from a script on that
3 call, right?
4   A   Correct.
5   Q   So I'm going to summarize some of
6 your statements, and let me know if you think I've
7 got them wrong.  I think you said the Time Means
8 Money program utilizes short options strategies as
9 the investment vehicle to drive results.  Does that
10 sound familiar?
11  A   Um-hmm, yeah.
12  Q   What results was Time Means Money driving?
13  A   I don't remember.
14  Q   Do you ever remember being provided
15 any information that would have indicated that Time
16 Means Money had positive results for its customers?
17  A   Just from what I was told.
18  Q   You were told that Time Means Money
19 resulted in positive trading returns for customers?
20  A   Yeah.
21  Q   Who told you that?
22  A   I don't remember who.  I don't remember
23 exactly.  I just remember it being the idea that it
24 was successful.

Page 170

1   Q   But you don't remember who told you
2 that, what information they gave you or when those
3 conversations took place?
4   A   No, sir.
5   Q   But generally in the office the discussions
6 were that Time Means Money was successful, is that
7 what you're saying?
8   A   No, I just remember thinking that it was.
9   Q   What was the basis for those thoughts?
10 Why did you think that?
11  A   I don't know.  I don't remember exactly.
12  Q   Were you thinking that like this
13 is on the script.  My bosses gave me the script.
14 I'm just going to say it because it's probably true?
15  A   Yeah.
16  Q   But no sort of independent documents
17 or information about this -- about the performance
18 of the strategy?
19  A   Right.
20  Q   And I'm referring in this line
21 of questioning to sort of 2018 during the time
22 period where you testified that you weren't actively
23 managing accounts.  Is that how you've been
24 answering these questions?

Page 171

1   A   What do you mean?
2   Q   So I've been referring to the Time Means
3 Money program.
4   A   Yeah.
5   Q   It's my understanding that Long Leaf
6 sort of stopped doing the Time Means Money program
7 at a certain point in time.
8   A   Right.
9   Q   And so my questions in this last
10 five minutes, Mr. Stemper, have only been about
11 the program when it was called Time Means Money.
12 Is that how you've been answering these questions?
13  A   That's right.
14  Q   Okay.  So another thing in the
15 demo script that I heard you say, he asked
16 the customer, the prospective customer do you
17 agree that being a seller and taking advantage
18 of the likelihood -- of that likelihood would give
19 you a predictable path to success.  Do you remember
20 saying that as part of the demo script to lots of
21 customers?
22  A   I don't remember it, but I just heard it.
23  Q   You don't ever remember making that
24 statement?

Page 172

1   A   Not really.  It's a blur.
2   Q   If it's on the recording, it's probably
3 in the script, right?
4   A   Yes.
5   Q   So you probably said it in substantially
6 all the demo sets that you conducted, right?
7   A   Right.
8   Q   And did you have any independent basis
9 to believe that Time Means Money would create a
10 predictable path to success other than what was
11 in the script?
12  A   No.
13  Q   And then towards the end of the
14 call, you know, the customer asks you a question.
15 He says I would hate to see what would happen if
16 you had to deliver or if the option expired, and
17 you said you won't have to do it.
18      Why would you tell a prospective
19 customer that they didn't have to worry about the
20 risk of an option expiring in the money?
21  A   I wasn't aware of it.
22  Q   You didn't know what the difference
23 between in the money or out of the money was?
24  A   I don't remember.

Page 173

1    Q    Well, you had options trading experience
2  before you joined Long Leaf, right?
3    A    No.
4    Q    If we looked at your resumé, it wouldn't
5  show options trading experience?
6    A    That's right.
7    Q    And you never received any training
8  about the fundamentals of options that would have
9  told you what the difference between in the money
10  or out of the money was?
11   A    I may have.  I don't remember it now.
12   Q    So I want to drill down on this,
13  Mr. Stemper.  Your testimony I think is -- and
14  correct me if this is wrong -- that you didn't know
15  basic concepts like in the money or out of the money
16  at the time you were delivering a solicitation pitch
17  for Time Means Money?
18   A    I wouldn't say that.
19   Q    Okay.  Well, then correct me, please.
20   A    At the time I might have known
21  or had studied -- had studied it.  But speaking
22  with that person on that recording we listened to,
23  I don't think I really knew really what the -- what
24  was -- I was just reading the script.  I wasn't sure

Page 174

1  what his question entailed.
2    Q    It was a question, so it's not on
3  the script.  You just delivered a pitch to this
4  customer about this three out of four options
5  expire worthless, correct?  That's what we just
6  listened to?
7    A    Yeah.
8    Q    And then your customer is saying, well,
9  what about the one out of four and you say don't
10  worry about that, correct?
11   A    Is that what I said?
12   Q    Yeah, let's listen back.
13       (Whereupon the recording was played.)
14   A    Okay.  So when he said you have
15  to deliver, I'm thinking that he meant deliver
16  a physical commodity, which you wouldn't have to
17  do -- or he wouldn't have to worry about that.
18   Q    So you were talking about the futures, not
19  the options on the futures, is that your testimony?
20   A    Yeah.  From my understanding, that's what
21  I was talking about.
22   Q    I see.  So I'm going to just do one
23  more quick bit of this.  Sorry.  I'm going to start
24  this recording, same recording at 12 minutes and

Page 175

1  10 seconds and we're going to let it run for about
2  30 seconds.
3       (Whereupon the recording was played.)
4    Q    So, Mr. Stemper, on that recording do
5  you agree that you told the prospective customer
6  at Long Leaf we measure our success by our clients'
7  success.  As a company we wouldn't have the ability
8  to work with hundreds of clients month after month
9  for eight years and oversee millions of dollars if
10  we weren't being profitable for them?
11   A    That was a part of the script, yeah.
12   Q    And you said that in all the demo sets
13  that you delivered, correct?
14   A    The demo set what?
15   Q    You said that line in all the demo sets
16  you delivered, correct?
17   A    I don't know.
18   Q    Substantially all, because it was in the
19  script, right?
20   A    Is that the demo script or the demo set
21  script?
22   Q    Why don't you tell me.  What is that?
23   A    I -- I don't remember which one it was
24  a part of.

Page 176

1    Q    What's the difference between those two
2  things?
3    A    The demo set is before the demo.
4    Q    So this call is about 45 minutes long.
5  Did most of the demo sets last 45 minutes?
6    A    Somewhere around there.
7       MR. RUTH:  No.
8       MR. PLATT:  Mr. Ruth, you're not supposed
9    to speak during the -- while the witness has
10    a question pending.
11       MR. RUTH:  Can I get a point of
12    clarification here?
13       MS. STREIT:  No, no.
14       MR. PLATT:  No.  You can ask questions
15    at the end.
16       MR. RUTH:  I mean, you have no clue what
17    you're talking about, buddy.
18       MR. PLATT:  Mr. Ruth, Mr. Ruth, Mr. Ruth,
19    you should not be talking to the witness like
20    this.
21       MR. RUTH:  I'm talking to you.
22       MS. STREIT:  You can't.
23       MR. PLATT:  Mr. Ruth, you can ask questions
24    of the witness at the end --

Page 177

1      MR. RUTH:  Why don't you learn the
2   difference between the demo set and the demo
3   so you can make it easier for everybody here.
4   You're confusing everybody.  You don't even
5   know what's going on.
6      MR. PLATT:  Hey, Ken, can you please mute
7   Mr. Ruth?  Mr. Ruth, if you have objections, you
8   can chat them into the chat bar, but you can't
9   disrupt the questioning like this.
10     A   I do have to say I kind of agree with
11  Ruth about what you -- about the difference between
12  demo and demo set.  I think you're kind of --
13     Q   Okay.  Well -- so, Mr. Stemper, why don't
14  you clarify it for me, please.
15     A   What do I need to clarify?
16     Q   What's the distinction that I'm missing
17  because I want to know.
18     A   The demo set is one phone call in itself
19  and the demo is another.
20     Q   Okay.  And is the demo set different from
21  the opener call?
22     A   No.
23     Q   Okay.  So it's the opener or the demo set
24  synonymous, right, first?

Page 178

1      A   Yeah.
2      Q   And then the demo, right?  And then the
3   custom, correct?
4      A   (Nodding).
5      Q   And what is the call that we just listened
6   to?
7      A   I think that was the demo.
8      Q   Okay.  I think we're on the same page.
9   That's how I've been referring to it.  And so the
10  statement that you wouldn't have the ability to work
11  with hundreds of clients month after month for eight
12  years and oversee millions of dollars if we weren't
13  being profitable for them, does that make sense?
14  That's a statement that you delivered during the
15  demo time and time again, correct?
16     A   I don't remember.  If it was in the
17  script ...
18     Q   Do you think you would have said
19  something like that if it wasn't in the script?
20     A   No.
21     Q   So that call occurred in January
22  of 2018, Mr. Stemper.  Do you think you continued
23  to use that same demo script, you know, kind of
24  throughout the year?

Page 179

1      A   Yeah.
2      Q   And how did you get the custom script?
3      A   What do you mean how did I get it?
4      Q   You used the custom script, right?
5      A   Yeah.
6      Q   How did you receive that script?
7      A   From our seniors.
8      Q   Did Mr. Donelson know about the custom
9   script?
10     A   Yeah.
11     Q   Do you think Mr. Donelson has ever reviewed
12  the custom script?
13     A   Yeah.
14     MR. FALVEY:  Sorry.  Mr. Platt -- do
15  you need ten minutes or five minutes?  I don't
16  know if you're going to dig into something new,
17  Mr. Platt, or if --
18     MR. PLATT:  I am moving to a new topic.
19  If you'd like to take a break, we can.  But, you
20  know, I do -- I am mindful of time here.
21     MR. FALVEY:  Understood.  Do you want to
22  say literally ten minutes and no more?
23     MR. PLATT:  Yeah, yeah, that's fine.
24     MR. FALVEY:  Okay, 2:20 then.  Okay,

Page 180

1   thanks.
2      (Whereupon a recess was taken from
3      2:10 p.m., to 2:22 p.m., after which
4      the following proceedings were had:)
5      MR. PLATT:  Just so the record's clear,
6   no parties are muted at this time.  We're going
7   to continue with the CFTC's examination.
8      MR. FALVEY:  Great.
9   BY MR. PLATT:
10     Q   So, Mr. Stemper, do you remember
11  when we saw some statements that reflected large
12  customer losses in November of 2018?
13     A   What was that?
14     Q   Do you remember when we walked through
15  the statements earlier, the customer statements?
16     A   Yes.
17     Q   And for November '18 we saw some fairly
18  large losses, correct?
19     A   Yeah.
20     Q   Do you remember what caused those?
21     A   No.
22     Q   Was there ever any discussion in the office
23  about those losses?
24     A   I think there was, but I can't remember

Page 181

1 the context of what was discussed.
2    Q    So I'm going to show you what's already
3 been marked as Exhibit 280.  Do you remember this
4 email that we looked at earlier from Donelson to you
5 from December 27, 2018?
6    A    Yeah.
7    Q    And there's two attachments.  One's called
8 December update PDF.  Do you see that?
9    A    Yeah.
10   Q    So this is a December update.  It's
11 a letter addressed Dear Long Leaf Trading Client.
12 Do you remember that client letter?
13   A    Not in particular, but go ahead.
14   Q    What about generally?
15   A    I remember we sent out client letters,
16 yeah, or Jim had wrote them and we sent them out.
17   Q    So in bullet point 1 here Jim
18 writes I'll be fully managing the trading strategy.
19 Going forward, our chief market strategist is no
20 longer part of the team.  Do you see that?
21   A    Yes.
22   Q    Chief market strategist is Gecas, right?
23   A    Yes.
24   Q    Why did Gecas leave Long Leaf Trading?

Page 182

1    A    I don't remember.
2    Q    Was it because of the large losses?
3    A    I don't think so.  I don't know.
4    Q    So Donelson said he's going to take over
5 and he's going to be fully in charge of the trading.
6 Is that an accurate summary?
7    A    Yes.
8    Q    What experience did Donelson have
9 trading options before he bought Long Leaf Trading?
10   A    I have no idea.  I think he had traded them
11 before, but I don't know to what extent.
12   Q    Did Donelson ever tell you that he had
13 traded options?
14   A    I remember one occasion in which he did,
15 yeah.
16   Q    What did he tell you about his options
17 trading experience?
18   A    I can't remember the story exactly.  I just
19 think it was --
20   Q    Sorry, go ahead.
21   A    I think it was just a winning trade that
22 he had made.
23   Q    So your recollection of Donelson's
24 description of his options trading experience is

Page 183

1 a story about a winning trade?
2    A    And he -- I know he worked for
3 a trading firm in which he dealt with options.
4 I'm not totally sure but --
5    Q    What was Donelson's professional experience
6 before Long Leaf, do you know?
7    A    He's a CPA and, like I said, he worked
8 for I think two different trading firms, Getco being
9 one of them.
10   Q    Did Donelson ever tell you that he engaged
11 in any trading when he worked at Getco or the other
12 trading company?
13   A    I don't remember.
14   Q    So bullet point 3 here Donelson
15 writes to customers -- in an update letter after
16 significant trading losses he writes, "We have
17 tested a low-risk/low-return model that has shown
18 positive performance and returns."  Do you know what
19 Donelson is referring to there?
20   A    The cash management strategy I think.
21   Q    What's the testing that he's talking about?
22   A    The what?
23   Q    Donelson writes that he tested -- he
24 has tested a strategy as of December 2018 and that

Page 184

1 testing has shown positive performance and returns.
2 Do you know what he's talking about with the
3 testing?
4    A    I think he had done some trading of it.
5 I'm not sure.
6    Q    So from this letter onward is it just you,
7 Hatzigiannis, Cybulski and Jim Donelson?
8    A    And Vicki.
9    Q    And Vicki also, the five of you?
10   A    Yeah, yeah, I think so.  When was this
11 sent?  This is --
12   Q    This letter is dated -- let me scroll
13 up.  I'll show you.  This letter is -- the email to
14 which this letter is attached is dated December 27,
15 2018 and the letter is titled December Update.  So
16 I'm not sure when it was sent.  It looks like it
17 was sent in December.
18   A    Okay.  I stand by it.
19   Q    And so from this point forward Donelson
20 is in charge of the brokers and he's in charge of
21 the trading, right?
22   A    Yeah.
23   Q    Tell me what you remember about the cash
24 management strategy.

Page 185

1    A   What you're reading right there. I don't
2  remember much.
3    Q   How did you pitch it to prospective
4  customers?
5    A   That it was low risk and low return.
6    Q   And that it had shown positive performance?
7    A   I don't remember how I pitched it.
8           (Whereupon  CFTC Exhibit No. 288
9             was marked for identification.)
10   Q   Okay. I'm going to turn to what's
11  been marked as CFTC Exhibit 288. So I just toggled
12  between it, Mr. Stemper, and you can see an email
13  from James Hatzigiannis to you from January 9, 2019,
14  Subject: Cash Mgmt, Attachments: Cash Management Q3.
15  Do you recognize this email?
16   A   What do you mean do I recognize it?
17  It's my email.
18   Q   This is an email that you received,
19  correct?
20   A   Yeah.
21   Q   So I'm going to scroll down to the
22  attachment. It's a one-page sort of table that
23  Hatzigiannis attached here. What information is on
24  this exhibit -- is on this attachment?

Page 186

1    A   Previous trades. I think these are
2  the cash management trades.
3    Q   So Hatzigiannis sends you this in
4  January of 2019 right after Donelson describes
5  a testing of that strategy to Long Leaf's clients,
6  is that correct?
7    A   Yeah.
8    Q   Is this the testing that Donelson is
9  referring to?
10   A   I'm not sure.
11   Q   Well, these are cash management trades,
12  right?
13   A   Yeah, but I don't know.
14   Q   Are you aware of any other cash
15  management trading activity from before Donelson
16  sent out his December 27, 2018 client letter?
17   A   No.
18   Q   So the only potential testing of that
19  strategy that you're aware of is reflected on this
20  table which has four trades, right?
21   A   Yeah.
22   Q   Three winners and one loser, correct?
23   A   Yes.
24   Q   And how do you read -- on the total

Page 187

1  line on the bottom here, Mr. Stemper, on the right
2  it says Gain/Loss percentage. How do you read that?
3    A   It reads 1.57.
4    Q   And what does that mean to you?
5    A   Well, looking at the graph, it means it's
6  a gain of 1.57 percent.
7    Q   Like on how much, though? 1.57 percent of
8  what?
9    A   I'm not sure I understand.
10       MS. STREIT: Oh, Jesus Christ.
11       MR. PLATT: Ms. Streit, you're not on mute.
12       MS. STREIT: Oh, I'm not? Okay, I'm sorry.
13       Yeah, okay. I'll be quiet.
14  BY MR. PLATT:
15   Q   So, Mr. Stemper, this total return is
16  expressed as a percentage, right?
17   A   Say that again? Sorry.
18   Q   The total return is expressed as a
19  percentage, right?
20   A   Right.
21   Q   And is this like the total return
22  of a hypothetical account or like the amount that's
23  been invested? Like what does this mean?
24   A   I think it's the profit -- I'm not sure.

Page 188

1  I don't remember. I can't guess.
2    Q   I'm going to turn back to what's
3  been marked as CFTC Exhibit 286, and these are
4  the customer requests for a track record. And
5  you'll recall, Mr. Stemper, that there was one
6  request from prospective client Tim Sullivan on
7  April 8, 2019. In the final paragraph -- and he's
8  responding to your solicitation email. Do you agree
9  with that?
10   A   Who's -- Tim is responding? Can you send
11  me your track record, yeah.
12   Q   And your email to Mr. Sullivan is
13  like a long email that -- it's like a pitch email.
14  I don't know how you would describe this, but it's
15  your solicitation, correct?
16   A   I don't know if I would describe it that
17  way.
18   Q   How would you describe it?
19   A   As an email.
20   Q   What's the content of the email?
21   A   It's talking about the cash management
22  strategy.
23   Q   Yeah. Are you trying to get Mr. Sullivan
24  to open a Long Leaf account in this email?

Page 189

1    A    No, I'm just sharing information.
2    Q    What's the goal of that information
3 sharing?
4    A    I mean, if he wanted to open an account,
5 he can.  If he doesn't want to, he doesn't have to.
6    Q    So your testimony, Mr. Stemper, is that
7 this is not a solicitation?  Do I have that correct?
8    A    No.  I mean, is it a solicitation
9 technically?  I don't know.
10    Q    What's it to you?  Is it a solicitation?
11    Q    How do you define solicitation?
12    Q    How do you define solicitation?
13    A    Trying to sell something.
14    Q    Yeah.  So is this a solicitation email?
15    A    Yeah, I guess.
16    Q    Thank you.  So down at the bottom
17 of this email -- this is April 8, 2019 -- in
18 your solicitation email to prospective customer
19 Tim Sullivan you write about Donelson.  He was
20 the global controller for prop trading for Getco.
21 He was the VP of strategic cost management at
22 R.R. Donnelley, treasurer and CFO of the United
23 Methodist Church pension fund.  And then you write,
24 Mr. Stemper, "Throughout his experience he was

Page 190

1 exposed to and designed unique strategies that
2 focus on efficiently using capital in a limited
3 risk environment."  Did I read that correctly?
4    A    Yeah.
5    Q    Why would you tell a prospective
6 client that Mr. Donelson had experience designing
7 unique trading strategies?
8    A    From what I understood, he did.
9    Q    And the basis of that understanding is what
10 Donelson told you, is that right?
11    A    Yes.
12    Q    Donelson told you that he had experience
13 trading options and designing unique options trading
14 strategies in his professional experience?
15    A    Yeah, I -- I don't even know if
16 I wrote this myself.  It's just something that we --
17 I responded with.
18    Q    Well, you sent it, right?
19    A    Yeah.
20    Q    Do you often send emails without reading
21 them?
22    A    Go ahead.
23    Q    Do you send emails without reading them?
24    A    No, no.

Page 191

1    Q    So if you didn't write this, who wrote it?
2    A    I don't remember but -- I don't remember.
3    Q    So I'm just going to try and circle back
4 because I want to get a cleaner answer, Mr. Stemper.
5 Why did you describe Mr. Donelson's experience as
6 including designing unique options trading
7 strategies?
8    A    It's what I was told.
9    Q    By whom?
10    A    All this is what I was told.
11    Q    By -- who told you this?
12    A    Jim.
13        MR. PLATT:  So, Mr. Ruth, I see
14 that you noted an objection.  You should
15 not be muted now.  So if you want to state an
16 objection, you can.  The concern on our end,
17 Mr. Ruth, is interjecting information to the
18 witness while there's a question pending, so
19 we would ask that you please refrain from doing
20 that.
21    Q    I'm going to go back to your email from
22 Mr. Sullivan, Mr. Stemper.
23        MR. RUTH:  You're changing the words of the
24 email that's the exhibit.  It says, "Throughout

Page 192

1 his experience he was exposed to and designed
2 unique strategies."  It doesn't say anything
3 about trading and it doesn't say anything
4 about --
5        MR. PLATT:  Mr. Ruth, the only objection
6 that you're allowed to lodge is literally to
7 say the word objection under the rules.  You'll
8 have a chance to question the witness.  And if
9 you would like to go back and clean up any
10 perceived technical issues, you will be able
11 to do that after I'm done with my questioning.
12 Do you understand?
13        MR. RUTH:  No, I don't.
14        MR. PLATT:  Okay.  So under the rules
15 if you disrupt the deposition, we can ask the
16 Court to have you pay for the costs associated
17 with the deposition.  And if you continue to
18 be disruptive, then we will make a motion and
19 you may be --
20        MR. RUTH:  I don't -- I don't feel that
21 it's disruptive.
22        MR. PLATT:  -- required to pay for the
23 court reporter's time and the attorneys' time.
24 Do you understand that?

Page 193

1    MR. RUTH:  I just -- I think that
2  the biggest disruption here is that you're
3  misquoting the words of the exhibit.  That's
4  a disruption in itself.
5    MR. PLATT:  Mr. Ruth, you're not allowed
6  to discuss the questioning other than to say
7  the word objection, and you may ask questions
8  at the end.
9    MR. RUTH:  I would hope that you would
10  operate under good faith and actually if you're
11  going to quote the exhibit that's in front of
12  you, that you properly quote it.  You're adding
13  words --
14  BY MR. PLATT:
15    Q    Mr. Stemper -- Mr. Stemper, we're going
16  to --
17    MR. PLATT:  Mr. Ruth, Mr. Ruth, please stop
18  interrupting the examination.
19    MR. RUTH:  It's not an interruption.
20  BY MR. PLATT:
21    Q    Mr. Stemper, we're going to continue
22  with Exhibit 286.  Turning back to your email to
23  Mr. Sullivan you write in this second paragraph,
24  "Our cash management strategy targets an annual

Page 194

1  return of 10 to 15 percent with a similar risk
2  profile to a 30-year bond."  Do you see that?
3    A    Yeah.
4    Q    What was your basis for writing that
5  sentence to a prospective customer?
6    A    It's what I was told.
7    Q    By whom?
8    A    Jim.
9    Q    So this is in April of 2019, correct?
10    A    Yes.
11    Q    Did you have any reason to believe
12  that the cash management strategy was returning
13  10 to 15 percent annually for customers as of that
14  date?
15    A    I don't remember.
16    Q    Well, we've looked at emails that you
17  received from customers complaining of significant
18  losses around that same time, correct?
19    A    Yes.  But were they in the cash management
20  strategy?
21    Q    What's the risk profile of a 30-year bond?
22    A    I don't remember.
23    Q    If you're comparing a financial
24  instrument risk profile to a 30-year bond, are you

Page 195

1  trying to say that it's risky or safe?
2    A    I think it's safer.
3    Q    And this notion that the cash management
4  strategy targeted 10 to 15 percent annual returns
5  with a risk profile of a 30-year bond, Donelson
6  told you to say that, right?
7    A    Yes.
8        (Whereupon  CFTC Exhibit No. 289
9        was marked for identification.)
10    Q    I'm going to show you what's been
11  marked as CFTC Exhibit 289.  Do you recognize this
12  as an email from Donelson to you, Hatzigiannis,
13  Cybulski and Vicki Donelson on January 7, 2019?
14    A    Yes.
15    Q    Subject line, New Demo and Talking Points
16  and it attaches a Power Point and a Word document,
17  right?
18    A    Yeah.
19    Q    And Donelson is directing you to use these
20  for demo presentations, correct?
21    A    Yeah.
22    Q    I'm just going to scroll down.
23  Do you remember that this is around the time when
24  Long Leaf changed its solicitation materials?

Page 196

1    A    Sounds right.
2    Q    How were these materials created,
3  do you remember?
4    A    No.
5    Q    Did you play a role in creating the
6  new materials?
7    A    The presentation a little bit, but I can't
8  remember what I actually did.
9    Q    What about the script?
10    A    I don't remember.
11    Q    So how were these created?  Did the
12  Long Leaf employees trade drafts?  Did Donelson just
13  write them himself?  What's your recollection?
14    A    I think it was -- I can't remember if it
15  was based on the script before that or we might have
16  added some stuff.  I can't remember.
17    Q    So this is a demo Power Point I'm going
18  to scroll through here that Donelson sent to you.
19  There's an agenda slide.  On page 13 of this PDF, I
20  can't read the page number of the presentation, but
21  the slide is called Why Don't More People Do This.
22  What is "this" that the slide is talking about?
23    A    Why don't more people trade.
24    Q    Just generally trade?

Page 197

1    A    Yeah.
2    Q    So one of the rationales is retail
3  investor success rate and one is lack of knowledge
4  So I'm just going to scroll to the next slide, and
5  part of the new Long Leaf demo was to cite that
6  retail traders only make money 7 percent of the
7  time, is that correct?
8    A    That's what it reads.
9    Q    And you used this slide in connection
10  with demo presentations, right?
11    A    Yes.
12    Q    What was the purpose of telling prospective
13  customers the retail trader success rate?
14    A    I don't remember.
15    Q    Was it to draw a comparison and say
16  Long Leaf could do better than 7 percent or Long
17  Leaf could do better than retail investors?
18    A    I don't know.
19    Q    Did Long Leaf do better than retail
20  investors?
21    A    I don't know.
22    Q    Well, in this slide there's a stat that
23  says 7 percent of retail investors make money.  And
24  I think we've established through your testimony

Page 198

1  that none of your Long Leaf customers made money
2  between December 22, 2018 and June 3, 2019, right?
3    A    Okay.
4    Q    And none of them made money over the
5  life of their accounts, right?  You testified to
6  that earlier?
7    A    Right.
8    Q    So do retail investors do better on average
9  than Long Leaf customers or worse?
10    A    Yeah, I guess.
11    Q    They do better, right?
12    A    Maybe.
13    Q    Well, what's better, zero or 7 percent?
14    A    Seven.
15    Q    Right.  Next slide, Slide 14 of the
16  new demo deck that Donelson sent you says What We
17  Can Offer Your Portfolio.  The first big bullet is
18  called income-generating strategies.  What were the
19  income-generating strategies in January 2019 that
20  Donelson wanted you to tell prospective customers
21  about?
22    A    I don't remember.
23    Q    Were there any income-generating strategies
24  at Long Leaf at that time?

Page 199

1    A    I'm not sure.  I don't remember.
2    Q    Well, we've looked at information that
3  would reflect that all the customers lost money,
4  right?
5    A    Right.
6    Q    So is it fair to say that none of
7  the strategies applied by Long Leaf at this time
8  generated income for customers?
9    A    Yeah.
10    Q    So why would you say this to customers?
11    A    I'm -- I think it had to do something
12  more so with the future of the trading being an
13  income-generating strategy.
14    Q    So your testimony is that when you
15  made this statement in connection with this slide,
16  it was your hope that Long Leaf would generate
17  income in the future?
18    A    Yeah, I had faith in Jim.
19    Q    But there was no information that
20  would lead you to believe that this statement was
21  accurate at the time you delivered it, right?
22    A    No.
23    Q    It was aspirational, correct?
24    A    I guess.

Page 200

1    Q    Next slide.  It says Long Leaf options
2  trading strategy and there are like three buckets
3  here, opportunistic, cash management and core.  Were
4  these the strategies that Long Leaf was applying
5  at this time?
6    A    I think so.
7    Q    What's the difference between cash
8  management and core?
9    A    I can't really remember the difference.
10  I'm just reading what it says.
11    Q    I'm going to keep scrolling down to the
12  second attachment to this email.  This is I think
13  the -- I can't remember the title of the document
14  but the title -- or the title of the attachment,
15  but the document bears the title Long Leaf Trading
16  Talking Points.  Do you see that?
17    A    Yeah.
18    Q    Do you recognize this?
19    A    Yep.
20    Q    This is the script that you used
21  in connection with the demo presentation from
22  January 7th onward, right?
23    A    I don't remember.
24    Q    Well, what is it?

Page 201

1   A   Huh?
2   Q   If you don't remember -- if that's
3   not accurate, what is this document?  You said you
4   recognized it.
5   A   I'm confused.  What's your question?
6   Q   What is this document?
7   A   It's Long Leaf Trading talking points.
8   Q   When did you use this document?
9   A   I'm not sure.  It might have been in the
10  demo.
11  Q   Okay.  I'm just going to scroll back
12  up to the top to Donelson's email.  What's the title
13  of the attachments?
14  A   The demo, new demo, new demo talking
15  points.
16  Q   I'm going to go back down to -- what's
17  the title of this document?
18  A   I just read it.
19  Q   Please read it again.
20  A   Long Leaf Trading Talking Points.
21  Q   So what is this document?
22  A   I just read it.
23  Q   When did you use this document?
24  A   Throughout the demo.

Page 202

1   Q   Thank you.  And you used it because
2   Donelson sent it to you, correct?
3   A   Yes.
4   Q   Under this second heading, this bold
5   Slide 2 Risk Disclosure heading, under Point A
6   there's a sentence that says, "Past performance
7   is not indicative of future performance.  Past
8   performance not indicative of future gains."
9   Is that the risk disclosure you remember giving
10  to prospective clients?
11  A   Yeah.
12  Q   Were there any other disclosures or
13  statements about risk in this demo or this set of
14  talking points other than what's under this heading
15  Risk Disclosure?
16  A   I don't remember.
17  Q   So I'm asking you about this document.
18  Do you see any others?
19  A   No.
20  Q   So scrolling down, Mr. Stemper,
21  and the bold headings are titled Slide and then
22  like a little statement.  These talking points were
23  keys to the slides of the deck, right?
24  A   Yeah.

Page 203

1   Q   So under Slide 15, Long Leaf option trading
2   strategies, under A2 we see the cash management
3   strategy.  Do you see that?
4   A   Yeah.
5   Q   And there again we see targeted return
6   of about 6 to 10 percent per year after commissions
7   and fees, right?
8   A   Yeah.
9   Q   And so this is something that was
10  not only used in emails, but this was part of the
11  demo and you would say this to substantially all the
12  prospective customers, right?
13  A   If they went through a demo.
14  Q   Yeah, fair qualification.  All the
15  customers, prospective customers who received demo
16  presentations, you would make this statement?
17  A   Right.
18  Q   Because Donelson included it in his talking
19  points, right?
20  A   Right.
21      (Whereupon CFTC Exhibit No. 290
22      was marked for identification.)
23  Q   So I'm going to show you another
24  email that we've marked Exhibit 290.  Do you see

Page 204

1   an email from Cybulski to you and Hatzigiannis
2   on your screen?
3   A   Yes.
4   Q   The date is January 28, 2019, right?
5   A   Yep.
6   Q   Subject: New Custom Stuff, and it
7   attaches Final Addition 2019 Custom Power Point
8   and Custom Script New Strategies document, right?
9   A   Yeah.
10  Q   Where did Cybulski get these?
11  A   I don't know.
12  Q   Do you think he got them from Donelson?
13  A   Maybe.
14  Q   Did Donelson, you know, approve the new
15  custom materials?
16  A   I think so.
17  Q   Isn't it true that any of the custom
18  materials you were using after you received this
19  email included the material that Donelson wanted
20  you to say, correct?
21  A   Yeah.
22  Q   So on Slide 4 we see objectives,
23  target 12 percent return on an annual basis
24  after commissions and fees, low to moderate risk

Page 205

1  preference, add consistency to your trading, right?
2      A    Yeah.
3      Q    And also manage downside risk, correct?
4      A    Yeah.
5      Q    And this slide is titled Your Objectives,
6  right?
7      A    Yeah.
8      Q    That's like a prospective customer?
9      A    Right.
10      Q    And the purpose of this slide was to
11  explain how Long Leaf could help a customer meet
12  their objectives, right?
13      A    Yeah.
14      Q    So I'm going to go down to Slide 7,
15  Long Leaf Option Strategies. And this is like
16  a tree that says Strategies at the top. On the
17  left is cash management, on the right is market
18  driven. On cash management is core and edge.
19  On the previous deck cash management and core were
20  listed separately. Are the core trades just like
21  a subcategory of cash management, Mr. Stemper?
22      A    I don't really remember, but it looks
23  like it.
24      Q    What's the difference between core and

Page 206

1  edge, do you remember?
2      A    No.
3      Q    So from January 2019 on cash management
4  was the most frequently used trading strategy at
5  Long Leaf, right?
6      A    I don't know.
7      Q    I'm going to scroll down to the
8  second attachment to Cybulski's email, which is
9  the Donelson-approved custom script, which starts
10  at page 30 of Exhibit 290. What's the title of this
11  document?
12      A    Long Leaf Trading Custom Script.
13      Q    And under agenda it says, "We are going
14  to be discussing your objectives and the roadmap
15  to achieving those objectives," right?
16      A    Yeah.
17      Q    And remember in the slide deck the
18  objectives were to achieve a 10 to 12 percent annual
19  return? Am I remembering that correctly?
20      A    Yeah.
21      Q    So under the heading The Plan
22  here, bullet B it says, "It is also important
23  to understand what your cost structure and what
24  your future revenue structure looks like. Then

Page 207

1  we can move forward, plugging in those variables,
2  giving you a very tight projection of where you'll
3  be at any given point in the future." Did you make
4  this statement to customers?
5      A    I don't remember.
6      Q    Well, it's on the script, right?
7      A    Yeah.
8      Q    And you followed the script, correct?
9      A    Yeah. I might have, must have.
10      Q    What does the term tight projection mean?
11      A    A good idea.
12      Q    So is it fair to say that this custom
13  script is saying that you can give prospective
14  customers a good idea of where they'll be at any
15  given point in the future?
16      A    That's what it says.
17      Q    So under the Long Leaf Option
18  Strategies heading, does this generally discuss
19  the distinction between market-based trades and cash
20  management trades?
21      A    Say that again? Sorry.
22      Q    Strike that. So The Core Strategy
23  in bold here, under Heading A it says the core
24  strategy is our most conservative trade with a

Page 208

1  risk profile similar to a 30-year bond but it can
2  target much higher returns, correct?
3      A    That's what it reads.
4      Q    So this is that same line that we saw
5  in the email that you had sent out to prospective
6  customers?
7      A    Right.
8      Q    This is a line that came from Donelson,
9  correct?
10      A    Right.
11      Q    And then under the core strategy,
12  please review points J through N and let me know
13  after you've read through that.
14      A    Okay.
15      Q    This is sort of a strange analogy
16  about a house. Does this make sense to you? Do you
17  know what this -- can you explain this in words?
18      A    I can read it.
19      Q    Is that what you'd do with prospective
20  customers, you would just read it?
21      A    Yeah.
22      Q    Does it make sense to you?
23      A    Yeah, it makes sense.
24      Q    Does this analogy about the $50,000

Page 209

1 house account for the risk that the house could
2 burn down?
3    A    Doesn't seem to.
4    Q    Does this script discuss commissions
5 anywhere?
6    A    I don't remember.
7    Q    Do you remember ever talking
8 to prospective customers after you received
9 this custom script in 2019 about the impact of
10 commissions on their account?
11    A    Sorry, say that again.
12        MR. PLATT:  Mary, can you please read
13    back the question.
14        (Whereupon the portion of the record
15            was read as requested.)
16    A    I'm not sure I understand the question.
17 Sorry.
18    Q    A commission is a per transaction charge,
19 right?
20    A    Yeah.
21    Q    And Long Leaf customers were charged
22 commissions, correct?
23    A    Yeah.
24    Q    In connection with the custom

Page 210

1 presentation did you ever discuss the impact
2 of commissions charges on a customer's account?
3    A    I don't remember.
4    Q    That's because it doesn't mention
5 commissions, right?
6    A    Huh?
7    Q    You don't remember because it doesn't
8 mention commissions, correct?
9    A    Yeah.
10    Q    Under this heading called Portfolio
11 Calculator Walkthrough, do you remember what the
12 portfolio calculator was?
13    A    Yeah, it's something that Jim designed.
14    Q    What was the purpose of the portfolio
15 calculator walkthrough?
16    A    I don't remember exactly.
17    Q    What about generally?
18    A    I think he'd put an amount in and
19 it would show you what you could target, depending
20 on how much risk you wanted to take.
21    Q    So it sounds like it was a tool
22 that a customer -- that you would use in connection
23 with a custom to help explain the possible returns
24 associated with Long Leaf's trading?

Page 211

1    A    Yeah.
2        (Whereupon  CFTC Exhibit No. 291
3            was marked for identification.)
4    Q    I'm going to show you what's been
5 marked as Exhibit 291, Mr. Stemper.  This is an
6 email from you to Cybulski in September of 2019.
7 The subject line is Custom PPT.  Do you see that?
8    A    Yeah.
9    Q    And you sent this, correct?
10    A    Yeah.
11    Q    And it looks like you got a title
12 change to senior strategist.  What's the difference
13 between senior strategist and commodity associate?
14    A    I was just managing accounts that were
15 given to me.
16    Q    And it looks like Long Leaf got a new
17 logo around this time, is that right?
18    A    Yeah.
19    Q    What was the purpose of the new logo?
20    A    Rebranding.
21    Q    What was wrong with the old brand?
22    A    I think Jim wanted to do something,
23 just something new that didn't have to do with
24 Tim Evans.

Page 212

1    Q    Why did Jim want to do that?
2    A    I don't know.
3    Q    Did he ever discuss the firm's reputation
4 with you?
5    A    I don't think he was happy with the
6 way that Tim traded, so he wanted to get away from
7 that into what he was trying to do.
8    Q    So the attachment here is Final
9 Custom.ppt.  I'm going to scroll down and show
10 you the attachment here.  Do you agree that this
11 is a custom deck similar to the custom deck we just
12 reviewed that you received in January 2019?
13    A    Yeah.
14    Q    And this is September 2019, correct?
15    A    I don't know.
16    Q    Well, let's look at the email.
17    A    Yeah.
18    Q    And under a slide titled Our
19 Objectives there's a bullet point called Target 10
20 to 20 percent annual return after commissions and
21 fees and a bullet called Manage Downside Risk.
22 Do you see those?
23    A    Yeah.
24    Q    So as of, you know, September 2019

Page 213

1 this concept of a targeted annual return is still
2 part of the custom pitch, right?
3    A    I think so.
4    Q    That's because it was always part of the
5 custom pitch, right?
6    A    Wait.  I'm not sure I understand.
7    Q    Do you see this top bullet point on the
8 Our Objectives slide?
9    A    Yeah.
10    Q    What does it say?
11    A    Target 10 to 20 percent annual return after
12 commission and fees.
13    Q    And we saw a similar bullet point
14 on the custom deck from January of 2019, correct?
15    A    Yeah.
16    Q    So the question is that bullet point or
17 that concept continued to be a part of the custom
18 presentation throughout 2019, correct?
19    A    Well, can we look back at it to compare
20 the two?
21    Q    Sure.  I'm going to toggle back to
22 Exhibit 290, which is the -- I'll show you the
23 email.  This is Cybulski to you and Hatzigiannis,
24 January 28, 2019.  The title is Custom Final

Page 214

1 Addition 2019 Power Point.  Option Portfolio is
2 the title slide.  Then there's a risk disclosure
3 slide, agenda slide.  Your objectives is the fourth
4 slide.  Do you see that?
5    A    Yeah.
6    Q    What's the top bullet?
7    A    It's different than the one I just read.
8    Q    Please read it into the record.
9    A    It reads target 12 percent returns on
10 annual basis after commission and fees.
11    Q    So what are the differences between
12 the custom deck in January 28, 2019 and September
13 of 2019?
14    A    The percentage.
15    Q    One says 12 percent and one says a range
16 of 10 to 20 percent, is that fair?
17    A    Right, yeah.
18    Q    But this concept of targeted annual returns
19 is included in both decks, correct?
20    A    Right.
21    Q    Because that was always a component of the
22 custom pitch, right?
23    A    I don't remember if it always was.
24    Q    Yeah.  Do you remember a time when this

Page 215

1 wasn't a part of the custom deck?
2    A    I don't remember much from it to begin
3 with, but I don't know.
4            (WhereuponCFTC Exhibit No. 292
5            was marked for identification.)
6    Q    I'm going to show you a document that
7 I've marked CFTC Exhibit 292.  This is an email
8 from James Hatzigiannis to you and Cybulski from
9 March 21, 2019, right?
10    A    Yeah.
11    Q    It's a Google Doc.  He's sending you a link
12 to a Google Doc, right?
13    A    Open in Docs is what it says, yeah.
14    Q    Then down at the bottom do you see where
15 it says Google Docs?
16    A    Yeah.
17    Q    Do you know what a Google Doc is?
18    A    Yeah.
19    Q    What is a Google Doc?  And you can just
20 give a general answer.
21    A    It's where you have documents on Google.
22    Q    It's not on the Long Leaf server, right?
23 He's using Google Docs?
24    A    Yeah.

Page 216

1    Q    What is the pitch?  What is that document
2 Hatzigiannis is sending to you?
3    A    I'm not sure.
4    Q    Did you search the Google Docs
5 to which you have access when you searched for
6 responsive documents related to the CFTC's subpoena?
7    A    I went through my emails.
8        MR. FALVEY:  But you don't have access.
9    A    Yeah, I don't know if I have access to it.
10 BY MR. PLATT:
11    Q    So, Mr. Stemper, on the record I'm
12 going to ask you to look and see if you still have
13 access to any Google documents related to Long Leaf
14 Trading on any account to which you have access.
15        MR. PLATT:  And, Mr. Falvey, I'm sure
16    you'll assist him with that search.
17        MR. FALVEY:  Yes, will do.
18        MR. PLATT:  If you guys want to take
19    like a five- or ten-minute break, I think we're
20    close to the end and we can make a push after
21    like a five-minute break.
22        MR. FALVEY:  Sure.
23        MR. PLATT:  We'll come back at 3:20?
24        MR. FALVEY:  You got it.

Page 217

1    MR. PLATT:  Thanks, guys.
2    MR. FALVEY:  Thank you.
3        (Whereupon a recess was taken from
4        3:12 p.m., to 3:30 p.m., after which
5        the following proceedings were had:)
6    MR. PLATT:  Okay.  Let's go back on the
7  record, please.
8    Q    So, Mr. Stemper, before that break we
9  looked at materials related to the demo and custom
10 presentations from Long Leaf that were circulated in
11 January of 2019.  Do you remember those docs?
12   A    Yeah.
13   Q    I just -- I think it should be obvious,
14 but I just want to get your answer.  You used those
15 documents when you solicited customers, right?
16   A    The demo script?
17   Q    Both, the demo and the custom.
18   A    Yeah.
19       (Whereupon  CFTC Exhibit No. 293
20       was marked for identification.)
21   Q    I'm going to show you what's been marked
22 as CFTC Exhibit 293.  I'm going to share my screen
23 again.  This is an email from your customer Gaylord
24 Hanson sent on April 3, 2019.  Do you see that?

Page 218

1    A    Yeah.
2    Q    Mr. Hanson writes, "Please let me
3  know how I can get out of these trades as soon
4  as possible.  My net liquidating balance is down,
5  is showing a drawdown of about 50 percent.  There
6  hasn't been any trade that has yet resulted in any
7  net gains.  Those are dismal results."  Did I read
8  that correctly?
9    A    Yeah.
10   Q    So this is about, you know, three
11 months after we've seen Donelson take over the
12 trading.  Remember the December client update where
13 he said I'm in charge now?
14   A    Yeah.
15   Q    So were you concerned that three
16 months after Donelson takes over, a customer is
17 telling you that all the trades have been losers?
18   A    Was I concerned?
19   Q    Yeah.  Were you concerned about that?
20   A    I don't remember what I was thinking.
21   Q    Did you tell Donelson that a customer had
22 told you that all the trades were losers?
23   A    Probably.
24   Q    So it wasn't like a mystery to Donelson

Page 219

1  that the trades were losers, correct?
2    A    Right.
3    Q    Because you forwarded him customer
4  complaints, and we've already seen one from
5  February 19, 2019.  And now we see this one,
6  correct?
7    A    Right.
8    Q    So the beginning quarter of 2019,
9  is it fair to characterize those results as poor?
10   A    Yes.
11   Q    I'm going to turn back to Exhibit 286,
12 which we've seen a couple times.  And before I do,
13 I'd just note the date of Exhibit 293 is April 3,
14 2019.
15       MR. FALVEY:  Got it.
16 BY MR. PLATT:
17   Q    And now we're going to go to
18 Exhibit 286, and we've looked at this email a few
19 times.  The date is April 8, 2019.  And this is your
20 email to a prospective customer, right?
21   A    Yes.
22   Q    So this is about a week after your
23 customer, Mr. Hanson, tells you that all his trades
24 are losers, right?

Page 220

1    A    Yeah.
2    Q    And Mr. Hanson also says that his account
3  was down by about 50 percent overall, correct?
4    A    Right.
5    Q    And your email to Mr. Sullivan, the
6  prospective customer, is describing a strategy
7  that targets an annual return of 10 to 15 percent.
8  Why would you have sent this email when you knew
9  that customers were losing money?
10   A    I was told to.
11   Q    By whom?
12   A    Jim.
13   Q    And this email also contains the
14 statement that Long Leaf's trading strategy
15 has a risk profile similar to a 30-year bond.
16 Why would you have told a customer, a prospective
17 customer that when you knew that customers were
18 losing money and none of the trades were winners?
19   A    It's what I was told to say.
20   Q    What do you mean per se?  What is that
21 qualifier?
22   A    No, to say.
23   Q    Oh, to say.  I'm sorry.  I misheard
24 you.  So Sullivan asks for a track record, right?

Page 221

1    A    Yeah.
2    Q    Did you pull Long Leaf's track record and
3 send it to him at that point?
4    A    I don't know that I had access to a track
5 record at that point.
6    Q    Did you ask Donelson for a track record?
7    A    I don't know.  I don't remember.
8    Q    So Donelson told you to say -- Donelson
9 told you to describe Long Leaf's trading strategy
10 as targeting annual returns of 10 to 15 percent.
11 I just want to clarify was this 30-year bond risk
12 profile comparison, that was also Donelson's idea,
13 right?
14    A    Yeah.
15         (WhereuponCFTC Exhibit No. 294
16              was marked for identification.)
17    Q    I'm going to show you what's marked
18 as CFTC Exhibit 294, and you'll see it's an email
19 from your customer Alan Godwin to you on May 1,
20 2019, correct?
21    A    Yep.
22    Q    And earlier we saw Godwin send you
23 an email in February of 2019 telling you that his
24 account had been drawn down by half, correct?

Page 222

1    A    Yeah.
2    Q    And here he says, "Since I wrote you
3 a letter near the start of the year, Long Leaf has
4 lost me an additional $6,000 and I have to stop the
5 bleeding."  Did I read that correctly?
6    A    Yeah.
7    Q    So this is another month goes by,
8 another customer telling you that they're sustaining
9 significant losses based on the Long Leaf Trading
10 recommendations, right?
11    A    Right.
12    Q    And those include the cash management
13 strategy recommendations?
14    A    Yeah.  Or, wait, sorry.  What was the
15 question?
16    Q    Mr. Godwin followed Long Leaf's trading
17 recommendations, right?
18    A    Yeah, but I don't know if they were cash
19 management trades.
20    Q    What kind of trades do you think he did
21 if they weren't cash management?
22    A    I can't remember exactly, but it might have
23 been the market driven, but I'm not sure.
24    Q    Okay.  So it sounds like you don't have

Page 223

1 a firm recollection of what trades he was engaged
2 in?
3    A    Right, right.
4    Q    But cash management was one of the
5 strategies that Long Leaf was using at the time,
6 right?
7    A    Yes.
8    Q    And it was the one that you highlighted
9 in your emails to prospective customers, right?
10    A    In that one example, yeah.  I don't
11 remember others.
12    Q    The demo script and the custom script
13 both referenced the cash management strategy, right?
14    A    I believe so.
15    Q    So you forwarded this email to Donelson.
16 Do you see that at the top?
17    A    Yeah.
18    Q    How come you did that?
19    A    Anytime that I had concerns from a client
20 I made Jim aware.
21    Q    Do you think this was around the
22 time when the Long Leaf staff had the discussion
23 in the office to address concerns about the trading
24 performance?

Page 224

1    A    I don't know.
2    Q    At this time you were concerned about
3 trading performance, though, right?
4    A    I can't remember what I was thinking,
5 but probably.
6    Q    Well, you forwarded it to Donelson,
7 and I think your testimony was you forwarded things
8 to Donelson when you were concerned about them?
9    A    Right.  I said when a client was concerned.
10    Q    Okay.  And in this email your client,
11 Mr. Godwin, tells you that he's down $6,000 in two
12 or three months.  Did that concern you?
13    A    I needed to make Jim aware of it.
14    Q    I'm asking did it concern you.
15    A    I don't remember what I was thinking.
16    Q    Sitting here today, reading that
17 a customer lost $6,000 in two or three months, does
18 that concern you?
19    A    Yeah, it's concerning.
20    Q    Why?
21    A    Why wouldn't it be?
22    Q    I'm just asking you like what is the basis
23 for your concern?
24    A    That he's losing money.

Page 225

1    Q    And if you have that reaction now, is it
2  fair to say that you probably had that reaction in
3  May of 2019 when you got this email?
4    A    It's probably why I forwarded it to Jim.
5    Q    Because you were concerned, right?
6    A    Yeah.
7    Q    Because customers were losing money?
8    A    Right.
9            (Whereupon CFTC Exhibit No. 295
10              was marked for identification.)
11   Q    I'm going to click to what's been marked
12  as CFTC Exhibit 295.  And this is an email from
13  you and then the recipient is like a jumbled email
14  address on May 2, 2019, and tell me if you think
15  this is wrong.  I think this is an email that you
16  sent to a prospective client.  Do you think that's
17  accurate?
18   A    Right.
19   Q    So this is the day after you received
20  Godwin's email telling you that he's down $6,000
21  and you forwarded it to Donelson because of your
22  concern for customer losses.  And in your email to
23  prospective customer Clyde you write --
24       MR. FALVEY:  Did you ask the question,

Page 226

1  Jody?  I'm sorry.
2       MR. PLATT:  No, I'm trying to find
3  the quote.  Hold on for a second.  I'm sorry.
4       MR. FALVEY:  Oh, no worries.  Just
5  wanted to make sure we didn't miss it or
6  miss it.
7  BY MR. PLATT:
8    Q    So in the middle of this big block of text,
9  Mr. Stemper, you know, after you forward Godwin's
10  email to Donelson out of concern for customer losses
11  you write, "Our strategies are designed to help you
12  understand and manage your existing downside risk
13  to create a lower risk active trading strategy in
14  markets you may not have access to and, of course,
15  target nice, consistent returns."
16          What were the nice, consistent
17  returns you were talking about in this email to
18  a prospect the day after you received an email from
19  a customer reflecting $6,000 in losses?
20   A    One second.  Where does he say that?
21   Q    I'm going to highlight the beginning of
22  the sentence --
23   A    Yeah, yeah.
24   Q    -- because it's in the middle and it's

Page 227

1  hard to find.
2       MR. FALVEY:  It's our strategies, right?
3    A    Our strategies are designed.  Right.
4  That's what we were told to say to prospects, that
5  we were going to target consistent returns.
6  BY MR. PLATT:
7    Q    Did it ever strike you as odd that
8  you were telling prospects that the strategy
9  targeted consistent returns when in fact customers
10  were telling you that they were losing very large
11  sums of money?
12   A    Did it strike me a concern?  It was
13  just -- it was aspirational.  It's what we were --
14  the goal was.
15   Q    It wasn't grounded in reality, right?
16   A    Not in the history.
17   Q    Because there was never a time where
18  Long Leaf generated nice, consistent returns for
19  its clients, right?
20   A    I think there was a time.
21   Q    What time do you think Long Leaf generated
22  nice, consistent returns for its clients?
23   A    I don't remember, but I just remember
24  there being a string of winning trades.

Page 228

1    Q    So it must have been after June 3,
2  2019, right, because we already established that
3  no customers made money between December 2018 and
4  June 2019, right?
5    A    None of my customers.
6    Q    What's that?
7    A    None of my customers.
8    Q    So you think other customers made money
9  but your customers all lost, is that your testimony?
10   A    I don't remember exactly, but I just
11  know that there were other customers that were in
12  different trades that some of my customers might not
13  have been in.
14   Q    Well, you said that Laws was one of your
15  customers and he was in those different trades,
16  right?
17   A    I believe so.
18   Q    Let's look at Laws' trading statements.
19       MR. PLATT:  I'm going to mark Michael
20  Laws' trading statements as CFTC Exhibit 301.
21           (Whereupon  CFTC Exhibit No. 301
22              was marked for identification.)
23   Q    Can you see these?
24   A    Yeah.

Page 229

1    Q    Do you recognize this as a Cunningham
2  statement for Michael Laws from March 5, 2019?
3    A    Yeah.
4    Q    He opened his account with $29,750?
5    A    Yeah.
6    Q    So after March I'm going to show you
7  a statement from the end of March, March 29, 2019.
8  What's the net liquidating value?
9    A    I can't read it.
10   Q    Can you read it now?
11   A    It says 29,605.
12   Q    Is that higher or lower than 29,750?
13   A    It's lower.
14   Q    I'm going to go to the -- at the end
15 of next month, April 30, 2019.  What is your client,
16 Michael Laws' net liquidating value at the end of
17 April 2019?
18   A    27,352.
19   Q    Is that higher or lower than 29,750?
20   A    That's lower.
21   Q    I'm going to go to Michael Laws' statement
22 for May 31, 2019, after May 2019.  What is the net
23 liquidating value reflected on this statement?
24   A    It's 24,898.

Page 230

1    Q    Is that higher or lower than 29,750?
2    A    It's lower.
3    Q    So then after June's trading activity,
4  I'm going to go to the account statement for Michael
5  Laws from the last trading day of June, June 28,
6  2019.  What is the net liquidating value on this
7  statement?
8    A    21,550.
9    Q    I'm going to go to the statement for
10 the month end of July -- or the daily statement
11 for the last trading day in July, July 31, 2019
12 for your customer Michael Laws.  What's the net
13 liquidating value there?
14   A    24,847.
15   Q    I'm going to go to the August 30th
16 statement next.  What's the net liquidating value?
17   A    24,505.
18   Q    September 30th, the last trading day
19 in September of 2019, what's the net liquidating
20 value for Laws' statement?
21   A    20,908.
22   Q    October 31st, after the month
23 of October's trading activity what is Laws' net
24 liquidating value?

Page 231

1    A    14,993.
2    Q    November 29, 2019, after the trading
3  activity in November of 2019 what is Laws' net
4  liquidating value?
5    A    614.
6    Q    December 31, 2019, what is Laws' trading
7  value at the end of the year?
8    A    That's 577.  So that's --
9    Q    So he lost over $29,000, right?
10   A    Yeah.
11   Q    Where were the gains in Michael Laws'
12 account?
13   A    You saw he had one gain one month.
14 But when I was referring to -- I said it wasn't my
15 client that I was referring to that had a string of
16 successful trades.  I thought Michael might have.
17 But, honestly, I didn't remember how bad it was
18 or -- yeah, I just didn't remember.
19   Q    So you're right, Laws had one small
20 month.  But every other month was consistently down
21 and his account was always underwater, correct?
22   A    Yeah.
23   Q    So I'm going to go back to Exhibit 295.
24 This is your email to the prospect on May 2, 2019

Page 232

1  where you described nice, consistent returns.
2  In May there was really no basis to make this
3  statement, correct?
4    A    No.
5    Q    Because by then Donelson had had
6  four months directing the trading activity.  All
7  of them resulted in losses, correct, losses every
8  month for every customer from January 2019 --
9    A    Not every customer.
10   Q    -- to May 2nd?  There were customers that
11 made money during this stretch?
12   A    I can't remember his name, but it
13 was a client of Ben's that was making good money
14 and then up until the end where it was lost.
15   Q    So you're describing one customer?
16   A    Yeah.  And those were trades that
17 I don't know if Jim was -- I don't know if he
18 was sharing with all of the clients or if it was
19 just for that client and he was testing it with him
20 because he was okay with it.  But that's what I mean
21 when I said I have faith in Jim's trades, and I just
22 trusted Jim and I thought that he would be able to
23 turn it around.
24   Q    And the basis of that belief was your

Page 233

1 understanding that one customer, who wasn't your
2 customer, may have been making money in a strategy
3 that was only suggested to that one customer. Is
4 that like a fair summary?
5   A   Yeah.
6   Q   Why would Donelson only offer those
7 trades to one single customer, especially if they
8 were winners?
9   A   Well, this particular customer
10 or client, he was -- he was okay with doing --
11 I think it was presented to him as an alternative
12 strategy that wasn't being offered to everyone and
13 he was okay with it. And Jim was working towards
14 becoming a CTA and this was the strategy that he
15 was going to be utilizing, being more in and out
16 of the market as he saw fit.
17   Q   Tell me more about your understanding
18 of Jim working towards being a CTA.
19   A   I don't know too much. I just --
20 I know that's what he said the goal was, to become
21 a CTA. He wanted to become a CTA. That's really
22 all I knew.
23   Q   Did he say that to you sort of in the
24 office in a verbal discussion?

Page 234

1   A   Yeah.
2   Q   Was it like around this time period,
3 summer of 2019?
4   A   I would say so, if not before or a little
5 bit after. I think it was in the discussion before,
6 and I don't know why it didn't happen. I can't
7 remember exactly.
8   Q   What is a CTA?
9   A   Remind me. I cannot even remember what
10 it stands for.
11   Q   Do you -- would it refresh your
12 recollection if I said commodity trading advisor?
13   A   Right. Well, from what I understand,
14 a CTA, the -- Jim in this scenario would trade on
15 his own discretion for clients.
16   Q   As opposed to getting the clients' approval
17 on a trade-by-trade basis?
18   A   Right.
19   Q   And in Long Leaf's and Donelson's
20 understanding, what they were doing with the
21 trade-by-trade approvals was not acting as a CTA?
22   A   I'm sorry. Say that again.
23   Q   I think you testified that Donelson
24 told you that he wanted to work towards becoming

Page 235

1 a CTA. Is that a fair representation?
2   A   Yeah, yeah.
3   Q   And was it your understanding
4 at the time that what Long Leaf was doing
5 with the trade-by-trade recommendations, was it
6 everyone's understanding that that was not acting
7 as a commodity trading advisor?
8   A   I'm sorry. Could you repeat that one more
9 time? My brain's turning to mush.
10   Q   That's okay. Why did Donelson want to
11 become a CTA?
12   A   I don't know exactly why he wanted
13 to do it. I think he thought it would improve the
14 trading results.
15   Q   And your testimony is that in
16 connection with wanting to register as a CTA,
17 he proposed a subset of trades to one customer that
18 he didn't propose to other customers and that one
19 customer performed well?
20   A   Yes.
21   Q   But it wasn't your customer, right?
22   A   No.
23   Q   Did you ever take any steps to
24 determine whether or not that customer was

Page 236

1 actually making money?
2   A   Take any steps? I just thought he was,
3 from what I heard.
4   Q   So in the -- in this April 8, 2019
5 email to prospect Sullivan, you're not describing
6 Donelson's new CTA strategy, right? You're
7 describing the cash management strategy, correct?
8   A   Yeah.
9   Q   And you say that the cash management
10 strategy targets an annual return of 10 to
11 15 percent, right?
12   A   That's what we were told.
13   Q   So you're not referring to the
14 new testing strategy, Mr. Stemper, right? In all
15 these emails you're referring to the cash management
16 strategy and the demo and the custom decks refer to
17 the cash management strategy, right?
18   A   They do.
19   Q   And we've seen that the trading
20 strategies that were employed by Long Leaf in 2019
21 resulted in significant and consistent losses,
22 right?
23   A   Except for one month.
24   Q   Where it was flat, right?

Page 237

1    A    No, there was one month that he made
2 back some money.  It looks like he made 4,000.
3    Q    How much did he make back?  How much?
4    A    Michael Laws, thinking back to Michael
5 Laws, it looked like it went up 4,000.
6    Q    4,000?  Which month was that?
7    A    Try September.
8    Q    Okay, fair.  So I'm just going
9 to click -- I'm going to say, and you can agree or
10 not so the record's clear, June 28, 2019 statement
11 for Laws, the net liquidating value is 21,550.
12 July 31, 2019, net liquidating value is 24,847.
13    A    Right.
14    Q    So you're right.  There was a little bump
15 there.
16    A    Yeah.
17    Q    But over time you'll agree that the account
18 was decimated, correct?
19    A    Yeah.  Nice word for it.
20    Q    And this up month that you're
21 referring to is July of 2018.  And all the emails
22 we're looking at, CFTC Exhibits 292 through 295,
23 those all occurred in the spring before July
24 happened, right?

Page 238

1    A    I'm sorry.  Say that again.
2    Q    You described a month in July 2018,
3 and we're looking at the statement here, that shows
4 a gain for Laws, right?
5    A    Yes.
6    Q    July 2019.  I'm sorry.  I misspoke.
7 And the emails to the customers in which you
8 describe the cash management strategy as having --
9 as targeting nice, steady returns and 10 to
10 15 percent returns that we've just looked at in
11 CFTC Exhibits 294 and 296 -- or 294 and 295, those
12 occurred in the spring of 2019, right?
13    A    Yeah.
14    Q    So that's before you would have had
15 a basis based on Laws' July 2019 performance to
16 make those statements, right?
17    A    Yeah, I don't know.  Sorry.  I'm losing it.
18    Q    Well, let me see if I can rephrase.
19 In the spring of 2019 you're telling customers that
20 the cash management strategy can target 10 percent
21 returns, right?
22    A    That was the goal, yeah.
23    Q    That was part of the standard pitch,
24 correct?

Page 239

1    A    Yeah.
2    Q    But all the information available to
3 you suggested that Long Leaf only ever lost money
4 for its clients, correct?
5    A    No, because like I said, the client
6 that I didn't have, I remember he was making a
7 lot of money.
8    Q    But that wasn't the cash management
9 strategy, right?  That's Donelson's new test
10 strategy.  That's what you testified to?
11    A    Right, right.
12    Q    But in your emails you're describing the
13 cash management strategy, right?
14    A    Right.
15    Q    Right.  And that only resulted in losses,
16 correct?
17    A    It seems so.
18        (Whereupon  CFTC Exhibit No. 296
19            was marked for identification.)
20    Q    I'm going to show you what's been
21 marked as CFTC Exhibit 296.  This is from Donelson
22 to Hatzigiannis, you and Cybulski, the three Long
23 Leaf brokers, May 20, 2019, correct?
24    A    Yeah.

Page 240

1    Q    Subject line, New Track Record, right?
2    A    Yeah.
3    Q    And he attaches a document that
4 Donelson has titled Track Record Core Strategy
5 5-20-2019, right?
6    A    Yeah.
7    Q    What information is Donelson sending you
8 in this document?
9    A    It's a track record.
10    Q    Did Donelson keep track of his trading's
11 track record?
12    A    I believe so.
13    Q    Where did he keep track of it?
14    A    I'm not sure exactly.
15    Q    Did he email it out regularly?  Did he save
16 it on a database?  Do you have any idea?
17    A    I think he had it on a database, and I'm
18 not sure how often he sent it.  I can't remember.
19    Q    Okay.  Do you recognize this, you know,
20 this kind of document?  Not this specific one but
21 generally?
22    A    Yeah, yeah.
23    Q    And this is Donelson's track record
24 document, right?

Page 241

1    A    One of them.
2    Q    And there's 13 trades here, 4 of which
3  were from 2018, and those were also the trades that
4  were on Hatzigiannis' track record document, and
5  then we see 9 trades from 2019, is that right?
6    A    Yeah.
7    Q    What trades are these?
8    A    What do you mean?
9    Q    Are these cash management trades?
10    A    I think so because they were bonds, most
11  of them, and currencies.
12    Q    And do you see how he used like
13  these little code names, Yankee, XRAY, Victor?
14    A    Yeah.
15    Q    Is that what he did with cash management
16  trades?
17    A    Yeah.
18    Q    So the track record here, Mr. Stemper,
19  the total average shows that it's up .63 percent,
20  right?
21    A    Yeah.
22    Q    How can that possibly be true?
23    A    This is how Jim defined it.
24    Q    Can you explain how Jim defined it to me?

Page 242

1    A    I don't remember exactly how.  These are
2  just the cash management trades.
3    Q    But we've seen, you know, emails
4  from your customers right before this one that
5  say things like I have had no winning trades, my
6  account is down $6,000.  How do you square that with
7  this document which shows slightly positive overall
8  returns as of May 2, 2019?
9    A    How do I what?
10    Q    How do you square those two pieces
11  of information?
12    A    I don't remember.
13    Q    Do you think Donelson was telling you
14  the truth?
15    A    I would like to believe so.
16    Q    Did Donelson tell you to share this
17  information with prospective customers?
18    A    Yeah.
19    Q    How did he tell you to share it with them?
20    A    I can't remember exactly.
21    Q    By phone?
22    A    I don't remember.
23    Q    Did he tell you that you can email this
24  to customers?

Page 243

1    A    I don't remember.
2    Q    But you do remember that Donelson
3  authorized you to share this information reflected
4  in CFTC Exhibit 296 with prospective customers?
5    A    Yeah.
6    Q    Did you ever say, hey, Jim, what is this
7  information?  This is totally out of sync with what
8  I'm hearing from clients?
9    A    I can't remember if I did or not.
10    Q    Not in those exact words, but generally
11  did you call into question the discrepancy between
12  the information Donelson was giving you on the one
13  hand with information you had available to you from
14  customer complaints and customer statements on the
15  other hand?
16    A    I don't remember.
17    Q    Other than that one time you do --
18  you recall expressing a concern to Donelson and then
19  you had the big group discussion, right?
20    A    Yeah.
21    Q    Did you ever talk to the other brokers
22  about these track record documents?
23    A    I don't really remember if we did or not.
24    Q    Did you ever talk to other brokers

Page 244

1  about Long Leaf's trading performance generally?
2    A    I think, yeah, we spoke about it amongst
3  ourselves, but I can't remember what was said.
4    Q    What was the general nature of the
5  conversation?
6    A    Just expressing a concern that our clients
7  had been showing us, emailing us.
8    Q    Clients had been emailing you about losses,
9  right?
10    A    Just like the one you had -- the one you'd
11  showed me.
12    Q    Yeah, reflecting customer losses.  So
13  you remember having discussions with Hatzigiannis
14  and Cybulski about the losses that customers
15  reported to you, right?
16    A    I don't really remember the discussions.
17    Q    But generally you remember having them
18  or them taking place, right?
19    A    Yeah.
20    Q    I don't mean like a specific
21  conversation between you and Cybulski in an office
22  exactly what was said.  I mean the three of you,
23  Hatzigiannis, Cybulski and yourself, would generally
24  discuss the fact that customers were losing money,

Page 245

1 right?
2    A    Right.
3    Q    And were these track record documents
4 that Donelson provided to you, were those a part
5 of the discussion?
6    A    I don't remember.
7    Q    What about generally, did you ever
8 discuss with the other brokers Jim is telling us
9 that the results are positive, not negative?
10    A    I don't remember.
11    Q    And, again, I don't mean those
12 exact words.  I mean in the broadest possible sense
13 generally did you discuss those topics?
14    A    I'm not sure.
15        (Whereupon  CFTC Exhibit No. 297
16        was marked for identification.)
17    Q    I'm going to show you a document that's
18 been marked as CFTC Exhibit 297.  So this is an
19 email to Mark Carmichael from you dated August 7,
20 2019, right?
21    A    Yeah.
22    Q    And Carmichael's one of your customers,
23 correct?
24    A    Yes.

Page 246

1    Q    We looked at his statements earlier,
2 and his account was drawn down significantly over
3 about the course of a year?
4    A    Yeah.
5    Q    And you're telling Mr. Carmichael,
6 "I attached our trade recommendations as well as
7 a trading summary," right?
8    A    Yeah.
9    Q    So I want to look at that trading summary,
10 so I'm going to scroll down to the attachment.  This
11 is the trading recommendation, right?
12    A    Yes.
13    Q    And this is the trading summary, correct?
14    A    Yes.
15    Q    How did you get this document?
16    A    Jim created it.
17    Q    What information is included in this
18 document?
19    A    The trades and their profit or loss.
20    Q    And am I reading this document
21 correctly that Carmichael's net P&L year to date
22 through June 25, 2019 is negative $4,514?
23    A    From January 4, 2019 to, yeah, that
24 June 17, 2019.

Page 247

1    Q    And what's this disclaimer?
2    A    It's a disclaimer.
3    Q    What does it say?
4    A    Do you want me to read it?
5    Q    Generally why was this included?
6    A    I don't remember exactly why.  I just --
7 I think it was -- it had to be there.
8    Q    Do you think this information is
9 consistent with the information in the Cunningham
10 statements?
11    A    I don't know if it is or not.
12    Q    Did you ever confirm whether or
13 not Donelson's statements matched the information
14 in the Cunningham statements?
15    A    I can't remember.
16    Q    You can't remember doing it or you can't
17 remember whether or not --
18    A    I don't know.  Is that the same loss
19 like in that period of time that reflects in the
20 statement?
21    Q    Yeah, that's my question.  Did you ever
22 look to see if that was consistent?
23    A    I don't know.  I don't know.  Do you?
24    Q    And Donelson told you to send this to

Page 248

1 Carmichael, right?
2    A    Yeah.
3    Q    So looking at, you know, Donelson's
4 track record summary from Exhibit 296 that we just
5 looked at and then this Carmichael summary, are
6 these supposed to be net of commissions?
7    A    I think commissions are included in there,
8 but I don't know.  I can't remember.
9    Q    So you could have just told Carmichael
10 to pull up his statement, right?
11    A    I don't know what you mean.
12    Q    If Carmichael's asking you for this
13 information, his account performance --
14    A    He has his statements, yeah.
15    Q    Yeah.  So here's -- I'm going to really
16 shift gears here.  This is a super boring question.
17 Did Long Leaf customers ever receive any training
18 or information about how to read their statements?
19    A    Yeah.
20    Q    Tell me about that.
21    A    I remember when a client signed up,
22 basically it was read to them how to read it and
23 what everything meant.
24    Q    Who performed those -- who at Long Leaf

Page 249

1  was responsible for doing that?
2      A   Everyone did it.
3      Q   So the brokers did it with their new
4  clients?
5      A   Yeah.
6      Q   Okay.  So, Mr. Stemper, you know, we've
7  just looked at an email from a customer telling you
8  his account was down 50 percent and that he had had
9  no winning trades through April 1, 2019.  We've
10  looked at an email from a customer telling you
11  his account was down $6,000 between February 19,
12  2019 and May 1, 2019.  We've looked at documents
13  showing that all of your customers lost money
14  between December 2018 and June 2019.  We've looked
15  at Carmichael's documents showing that through
16  June --
17          (Whereupon there was a technical
18          interruption in the videoconference,
19          after which the following proceedings
20          were had:)
21      MR. PLATT:  Can you please just let us
22  know where you left off and we can backtrack.
23          (Whereupon the portion of the record
24          was read as requested.)

Page 250

1      MR. PLATT:  Okay, great.  I'll just --
2  I'll resume from there based on memory.  You
3  only missed about a sentence.
4      THE REPORTER:  Oh, great.
5  BY MR. PLATT:
6      Q   And I think it was we looked at
7  Carmichael's statement showing $4500 in losses
8  year to date.  And all these, all these customers
9  that we've just discussed, they followed Long Leaf's
10  trading recommendations, right, Mr. Stemper?
11      A   Yeah.
12      Q   So I just want to go back to it.  How
13  do you reconcile that track record document that
14  Donelson sent to you that showed overall positive
15  returns with this overwhelming indicia of
16  significant drawdowns?
17      A   What's the question?
18      Q   How do you square Donelson's track
19  record document which showed positive returns
20  with all these pieces of information that only
21  show significant drawdowns?  How do you square those
22  two things?
23      A   I think that the clients were taking
24  on other trades -- or trades other than what was

Page 251

1  represented in the cash management breakdown that
2  you saw.
3          (Whereupon  CFTC Exhibit No. 298
4          was marked for identification.)
5      Q   I see.  So on CFTC -- what's been
6  marked as CFTC Exhibit 298, this is an email from
7  you to thetaxman@sc.rr.com from August 8, 2019,
8  correct?
9      A   I can't see it.
10      MR. FALVEY:  It's not up.
11      MR. PLATT:  Oh, sorry.  I took it down.
12  Thank you.
13      Q   Do you see the document I just described?
14      A   Yes.
15      Q   And it's from one day after you sent
16  Carmichael his trading summary, correct?
17      A   I don't know.  Is it?
18      Q   This is August 8th and I'll just
19  toggle back to Exhibit 297 for a second.  What is
20  the date on the email you sent Carmichael?
21      A   Yeah, it's the day before.
22      Q   So one day after you sent Carmichael
23  his trading summary you say to Mr. Zimmerman,
24  "Your application was approved and we are ready

Page 252

1  to start trading when you are able to fund the
2  account."  What's going on here?
3      A   Your application was approved and we are
4  ready -- exactly what I wrote.
5      Q   So let me just summarize what I think
6  happened.  You successfully solicited Mr. Zimmerman.
7  He's sort of in a holding pattern.  He hasn't put
8  any money into his account yet, is that fair?
9      A   Yeah.
10      Q   Then in the second paragraph you write
11  to Mr. Zimmerman, "We've been posting great results.
12  I'd be more than happy to get you back up to speed."
13  Did I read that correctly?
14      A   Yeah.
15      Q   What great results were you describing
16  to Mr. Zimmerman to get him to fund his account?
17      A   The results that you had showed us.
18      Q   All the customer losses, is that what
19  you mean?
20      A   No, the trade breakdown.
21      Q   The Donelson document from May 2nd?
22      A   Yeah, yeah.
23      Q   That's what you were relying on when
24  you made this statement?

Page 253

1    A    Right.

2    Q    And you didn't tell Mr. Zimmerman

3 that many or all of your clients through at least

4 June had experienced major drawdowns, right?

5    A    Right.

6    Q    He probably wouldn't have funded his

7 account if you told him that, right?

8    A    I don't know.

9    Q    If you were opening an investment account

10 and your broker told you that their strategy had

11 resulted in losses across the board for all their

12 clients, would you have put money into the account?

13    A    I would have to believe in the future of

14 it, and I did at the time.

15    Q    So you would just take it on faith that

16 the track record would get turned around?

17    A    If you ever spoke to Jim and heard his

18 explanation for everything, then you might agree,

19 yeah.

20    Q    Tell me about Jim.  Why do you say that?

21    A    He was just really smart and he knew how

22 to explain things well.

23    Q    Was he a confident guy when you talked

24 to him?

Page 254

1    A    Yeah.

2    Q    Like confident in his convictions?

3    A    Sure.

4    Q    Where did that confidence come from

5 because, you know, you've explained earlier that

6 he used to be an accountant, right?  He's not -- he

7 doesn't have a career trading options or managing

8 money, right?

9    A    Well, he did manage money for that

10 one church thing, whatever that was.  I forgot.

11    Q    Your understanding is that Donelson managed

12 money for the United Methodist Church?

13    A    Right.

14    Q    Where did you come to that understanding?

15    A    It's what we were told.

16    Q    Donelson told you that?

17    A    Yeah, I'm pretty sure that it's --

18 I can't remember it exactly.  I'm just referring

19 to what I read earlier because I don't remember

20 it too much.

21    Q    So if you got that information from

22 anyone, it would have been from Donelson, right?

23    A    Yes.

24    Q    And by "that information," I mean the

Page 255

1 concept that Donelson had professional experience

2 managing money using complex options strategies,

3 right?

4    A    Right, but I don't know if he was

5 using options strategies for that or if he was

6 using something else.  I just know he was managing

7 it.  I can't remember.

8    Q    So just bear with me for one second,

9 Mr. Stemper.

10    A    One weird thing about that email was

11 that it didn't have the new logo.  It had the old

12 one.

13    Q    The logo to -- the email to Zimmerman?

14    A    Yeah.

15    Q    Weird.  So you told Mr. Zimmerman

16 we've been posting great results, right?  Did that

17 convince Mr. Zimmerman to fund the account?

18    A    I don't remember.

19    Q    You don't remember if he funded his

20 account?

21    A    I want to say he did, but I'm not totally

22 sure.

23    Q    Okay.  Well, I'll ask you a hypothetical.

24 If Mr. Zimmerman funded his account in August or

Page 256

1 September of 2019, how do you think that worked

2 out for him?

3    A    At what time?

4    Q    Let's say hypothetically that Mr. Zimmerman

5 funded his account in September of 2019.  How do you

6 think that worked out for him?

7    A    I can't remember.

8    Q    I'm just asking you to speculate, not give

9 me your memory.

10    A    I don't want to speculate.

11    Q    But unfortunately you have to.

12    A    Well, if he was in the same trades

13 as the losing trades were, then I would suppose

14 that he would be losing.

15    Q    Well, there was only one client who was

16 in the special trades, right, from your testimony

17 earlier?

18    A    Yeah.  If Will was a client, he might have

19 been in those.  I'm not sure.

20    Q    What's that?

21    A    Will might have been in those trades if he

22 was a client.  I can't remember, though.

23    Q    He might have been in the special

24 trades with the one other customer whose name you

Page 257

1  don't know?
2      A    Correct.
3          (Whereupon CFTC Exhibit No. 299
4              was marked for identification.)
5      Q    Okay.  Well, I'm going to show you
6  what's been marked as Exhibit 299 and represent to
7  you that Mr. Zimmerman in fact funded his account
8  after you told him that Long Leaf had been posting
9  great results.  And you'll see that on December 31,
10  2019 Mr. Zimmerman emails Vicki Donelson, right?
11      A    Yeah.
12      Q    And he writes, "Mrs. Donelson, Alex
13  Stemper is my representative, but I have not been
14  able to reach him.  You may or may not remember me,
15  but I am Willie Zimmerman, owner of Account 4158
16  with Commodities, LLC.  I see that my initial cash
17  investment of $15,000 on September 20, 2019 has
18  dwindled considerably with only one open position
19  to close."  And then he asks, "Please advise if
20  $4,679 is the true liquidating balance as of
21  December 31, 2019."  Did I read that correctly?
22      A    Right.
23      Q    Does this confirm your speculation
24  that if Zimmerman had in fact funded his account,

Page 258

1  it would have been disastrous for him?
2      A    Yeah.
3      Q    And he funded it after you told him
4  that Long Leaf was experiencing great results,
5  right?
6      A    I don't know when he did it exactly.
7      Q    Well, on August 8, 2019 he hadn't funded
8  his account yet, right?
9      A    I don't think so.
10      Q    That was the purpose of your email, was
11  to get him to fund his account, correct?
12      A    August of 2018?  2019?
13      Q    We'll go back to Exhibit 298 so you
14  can read it.  This is from you to Mr. Zimmerman,
15  right?  What's the date?
16      A    Right.  August 2019.
17      Q    And what was the purpose of this email?
18      A    To touch -- I don't remember.  Just to
19  reach back out.
20      Q    It was to get him to fund his account,
21  right?
22      A    Right.
23      Q    Right.  And you told him that Long Leaf
24  had been posting great results, right?

Page 259

1      A    Right.
2      Q    He did fund his account and then he
3  lost $10,000 in the span of three months, correct?
4      A    Yeah.
5      Q    And when you told him Long Leaf had
6  been posting great results, your customers had only
7  been experiencing losses, correct?
8      A    Yeah.  But when I was saying that, I
9  was referring to the string of -- well, the trades
10  that you showed that Jim created, that sheet, that's
11  what I was referring to and I believe that's what
12  I had intended on him trading in.
13      Q    The cash management strategy, right?
14      A    Yeah.
15      Q    And you believed Donelson because he was
16  a confident guy, right?
17      A    Right.
18          (Whereupon CFTC Exhibit No. 300
19              was marked for identification.)
20      Q    I'm going to show you what's been
21  marked as CFTC Exhibit 300.  This is an email
22  from you to Jack Lattner from August 28, 2019.
23  Do you know who Jack Lattner is?
24      A    Yeah.

Page 260

1      Q    Who is Jack Lattner?
2      A    He was a client.
3      Q    He was your client, right?
4      A    Right.
5      Q    You solicited his account, correct?
6      A    Right.
7      Q    And you attach a document called a trading
8  summary 8-23.pdf, right?
9      A    Right.
10      Q    And in the second sentence of your
11  email you write, "Since you will be trading with
12  $100,000, I attached an updated performance report
13  for one of our larger accounts," correct?
14      A    Yes, and this is what I was referring
15  to earlier.
16      Q    Yeah.  So we'll scroll down and take
17  a look at it.  So this is the performance update
18  that you attached and you sent to a prospective
19  client in August of 2019.  What information is
20  on here?
21      A    It's trades and wins and losses.
22      Q    Okay.  And the dates of the trades are
23  April 17, 2019 through August 21, 2019, is that
24  correct?

Page 261

1    A    Yes.
2    Q    And this document reflects net gains
3 of $37,719.  Is that the correct way to read it?
4    A    Yes.
5    Q    Which is, I'm going to just ballpark
6 it here, about a 5 percent return on equity for the
7 entire value of the account, correct?
8    A    Yeah.
9    Q    And that's over a four-month time period,
10 right?
11    A    Yes.
12    Q    This wasn't your -- this statement
13 does not -- strike that.  This document does not
14 reflect trading activity for one of your customers,
15 right?
16    A    Right.
17    Q    And it doesn't reflect performance
18 for January 2019 through the middle of April 2019,
19 right?
20    A    Right.
21    Q    And you don't send any documents
22 or performance information from any of your other
23 clients, all of whom lost money, up to that point
24 in 2019, right?

Page 262

1    A    Right.
2    Q    Did Donelson create this document?
3    A    Yes.
4    Q    Did you take any steps to confirm
5 whether or not this document contained accurate
6 information?
7    A    Like I said, this is what I was
8 referring to when I was talking about the client
9 that was making money, and this is all the trades
10 that he participated in.
11    Q    How did you get this document if it wasn't
12 your client?
13    A    It was given to me.
14    Q    By whom?
15    A    I don't remember.  I think it was Jim.
16    Q    So Jim gave you this document.  And
17 did he tell you to use this as indicative of Long
18 Leaf's track record?
19    A    I don't remember.
20    Q    Why would he have given you this document?
21    A    Why would he have?  Because it represented
22 a larger account and Jack would be in the larger
23 account.
24    Q    Did Donelson know that you were sending

Page 263

1 this to prospective customers?
2    A    I believe so.
3    Q    How did he know that?  Like did you discuss
4 it with him?
5    A    I don't remember, but it was not customers.
6 It was just Jack.
7    Q    Um-hmm.
8    A    From what I remember.
9    Q    But Donelson made this document, Donelson
10 gave you this document and Donelson authorized you
11 to give this document out to prospective customers?
12    A    I think so.  I can't remember exactly how
13 it all happened.
14    Q    So I'm not necessarily asking, you know,
15 how it happened.  I'm just asking if those three
16 things did happen.
17    A    I can't remember exactly.
18    Q    So who else would you have gotten it from
19 if you didn't get it from Donelson?
20    A    I don't know.
21    Q    So it sounds like you don't have any
22 reason to believe that you got this document from
23 any source other than Jim Donelson?
24    A    Right.

Page 264

1    Q    And Donelson created this document, right?
2    A    I believe so.
3    Q    And earlier you said that Donelson
4 authorized you to send this to Jack Lattner, right?
5    A    I can't remember exactly.  Like I said,
6 I think so.
7    Q    Did Donelson want the brokers to share
8 track record information with prospective customers?
9    A    He allowed us to.
10    Q    What does that mean, that he allowed
11 you to?  He was aware of it and he didn't stop you?
12    A    Yeah.
13    Q    And the track record information
14 that the brokers provided to prospects reflected
15 positive trading returns, correct?
16    A    Right.
17       MR. PLATT:  Okay.  Let's take five.
18 I'm almost done.  I might just have a couple
19 more wrap-up questions.
20       MR. FALVEY:  Okay.
21       MR. PLATT:  Let's really just try to
22 make it five, okay, because I don't want to
23 go too long.
24

Page 265

1      (Whereupon a recess was taken from
2         4:35 p.m., to 4:45 p.m., after which
3         the following proceedings were had:)
4      MR. PLATT:  Okay.  I just have a couple
5   more questions.
6   Q    You know, so before the break we
7   were discussing the provision of track record
8   information to prospective clients.  Did you ever
9   tell prospective clients the date that Long Leaf
10  began providing trading recommendations in
11  connection with the trading program?
12  A   I don't remember.
13  Q   Don't remember doing it, right?
14  A   I'm not really sure of the question.
15  Q   So there was a date when Long Leaf
16  began providing trading recommendations, right?
17  I don't know what it is, but there was a first
18  trade, right?
19  A   Sure, yeah.
20  Q   Did you ever tell any client what that
21  date was?
22  A   It would be self-explanatory on the
23  document, right?
24  Q   What document?

Page 266

1   A   The trading result document, right?
2   Q   I mean like Long Leaf overall.
3   A   I don't know.
4      MR. FALVEY:  Like from the beginning.
5   A   No then.
6   BY MR. PLATT:
7   Q   Did you ever tell prospective clients
8   what Long Leaf's largest monthly drawdown was for
9   its trading program?
10  A   I don't think so.  I don't remember.
11  Q   Do you know what the term peaks and valley
12  means?
13  A   Yeah.
14  Q   Did you ever provide information to
15  prospective customers concerning Long Leaf's largest
16  peak-to-valley drawdown?
17  A   I don't think so.
18  Q   Did you ever provide information
19  to prospective customers concerning actual annual
20  rates of return for Long Leaf's trading program?
21  A   I can't remember.
22  Q   So Long Leaf and Donelson provided you
23  with pitch materials, right, Mr. Stemper?
24  A   Yeah.

Page 267

1   Q    And most recently we saw a set
2   of materials circulated to you in January of 2019,
3   right?
4   A   A certain set of materials in January
5   of 2019?
6   Q   We saw two exhibits where demo and custom
7   materials were sent to you --
8   A   Right.
9   Q   -- in January 2019, right?
10  A   Yes, yeah.
11  Q   Did those materials contain any
12  information about Long Leaf's performance record?
13  A   No.
14  Q   To the extent Long Leaf brokers provided
15  track record information, Long Leaf brokers provided
16  positive track record information, correct?
17  A   For the trade strategy that we were told
18  to show.
19     MR. PLATT:  So that's all the questions
20  I have.  Mr. Ruth, do you have any questions
21  for the witness?  You're on mute I think, sir.
22     MR. RUTH:  Yes, I do.
23     MR. PLATT:  Mr. Ruth, do you have any
24  questions?

Page 268

1      MR. RUTH:  I do.
2      MR. PLATT:  Okay.  Go for it.
3         CROSS-EXAMINATION
4   BY MR. RUTH:
5   Q   Alex, first question I have for you,
6   how many steps were there in the sales solicitation
7   process from the period that you began working there
8   up until the rebrand happened?
9   A   I would say it was three all the way
10  through.
11  Q   Okay.  Can you tell me what those three
12  steps are?
13  A   To set the demo, to hold the demo and then
14  to hold the custom.
15  Q   Okay.  Have you ever been -- did you
16  ever participate or know of another step called the
17  account orientation?
18  A   Yeah, that too.
19  Q   Okay.  Would it be fair to say
20  that there's four steps to the sales solicitation
21  process?
22  A   Yeah.
23  Q   Okay.  At what --
24  A   The account orientation generally

Page 269

1 happened after someone had already funded an
2 account, so would it be a solicitation?
3    Q   I mean, I'm not here to answer any
4 questions for you. But my next question to you
5 is --
6    A   So it'll be three steps. Sorry.
7    Q   My next question to you is the first step
8 is called the demo set, is that correct?
9    A   Right.
10    Q   Okay. At what point did you start
11 doing demo sets at your career in -- at Long Leaf?
12    A   It was probably a month after being there.
13    Q   Okay. So is it fair to say that you
14 had like a 30-day training on how to do the demo
15 set?
16    A   Something like that. I can't remember.
17    Q   Okay. And then after the initial 30 days
18 of your employment with Long Leaf, how long were you
19 strictly just doing demo sets as a part of the sales
20 solicitation process?
21    A   I don't remember.
22    Q   Okay. Let me ask you this. At what
23 point did you start doing -- actually running your
24 own demos that you had set up?

Page 270

1    A   Maybe a year. I don't remember.
2    Q   Okay. During the demo did you actually
3 ask the client to open an account?
4    A   Not that I can remember.
5    Q   Okay. Out of the four sales processes
6 that we've identified, one being the demo set, two
7 being the demo, three being the custom, four being
8 the account orientation, what one of those steps of
9 the sales process do you actually ask the client
10 to open up an account?
11    A   It would be the custom, if anything.
12    Q   Okay. At what point did you start running
13 custom appointments?
14    A   I don't remember exactly.
15    Q   Did you ever run a custom appointment?
16    A   Yeah.
17    Q   Okay. Did you ever run a custom
18 appointment that resulted in opening an account?
19    A   Yes.
20    Q   How many custom appointments did
21 you run that it resulted in opening an account?
22    A   I don't know.
23    Q   How many accounts did you open on your
24 own?

Page 271

1    A   I don't remember. And by on my own,
2 Jim helped with a lot.
3    Q   Meaning he would run through the --
4    MR. FALVEY: You cut out, Jeremy.
5    MR. RUTH: Can you hear me now?
6    MR. FALVEY: You're back, yep.
7    MR. RUTH: My apologies.
8    Q   Meaning he would run through the
9 custom appointment, and then at some point it wasn't
10 resulting in opening an account and you passed it
11 off to Jim to finish the process?
12    A   Right.
13    Q   Okay. Did that happen every time
14 or did you ever -- were you ever successful in
15 opening an account fully on your own without the
16 help of Jim?
17    A   I don't remember. I think Jim always
18 spoke to the prospects prior to opening an account.
19    Q   Okay. So is it fair to assume that
20 you've never opened up a client account at Long Leaf
21 Trading Group?
22    A   Not on my own. I mean, it was always
23 a team effort.
24    Q   Sure. For the last -- were you ever

Page 272

1 the last person to ask them for their business and
2 they actually opened up an account as a result of
3 your sales solicitation efforts?
4    A   I can't remember if it was -- if I was
5 the last person to talk to them before they funded
6 an account.
7    Q   Okay. Is it more likely than not that
8 Jim was the last person to talk to them?
9    A   Probably.
10    Q   Okay. At what point during your career
11 at Long Leaf were you privy to trade strategy,
12 development, design, meetings with those that were
13 designing trades that were being recommended to the
14 customers through the program?
15    A   Never.
16    Q   Okay. Let's see here. So it's safe to
17 assume that you never -- you never designed a trade
18 recommendation or made one at all?
19    A   Right.
20    Q   Okay. You testified that Jim Donelson
21 had a desire to morph --
22    MR. FALVEY: You cut out again, Jeremy.
23    MR. RUTH: Sorry, sorry.
24    MR. FALVEY: Okay.

Page 273

BY MR. RUTH:

1  BY MR. RUTH:
2     Q   Yeah.  So you had testified that at
3  some point Jim Donelson expressed a desire to
4  morph the Time Means Money program into a CTA.
5  Do you recall testifying to that?
6     A   Yeah, that was -- yeah.
7     Q   At what point in your career were you
8  privy to strategic operational conversations about
9  Long Leaf Trading Group?
10    A   Never.
11    Q   Okay.  So you stating that his desire
12 to move into a CTA wasn't that he had told you that
13 directly.  That's just something you had heard from
14 being around the office, is that --
15    A   Well, he told it -- no, he said it
16 directly to everyone.  But the way to go about it,
17 I had no clue.
18    Q   Okay.  So it was a one-way conversation
19 between him and you or him --
20    A   Yeah.
21    Q    -- to the room?
22    A   Yeah, yeah.
23        MR. RUTH:  Jody, can you pull up the --
24 I don't know.  I guess let's go -- I think it

Page 274

1     might have been like PDF 42.  I don't know
2     the exhibit number, but it's the one that we've
3     been talking about the last 20 minutes about
4     I guess maybe like a $600,000 account that had
5     a $37,000 return.
6         MR. PLATT:  Sure.  There's no 42, but let
7     me pull up what I think you're talking about.
8     One second.
9         MR. RUTH:  Okay.
10        MR. PLATT:  Let me know if you think
11    this is correct.  Can you see that, guys?
12        MR. FALVEY:  Yep.
13        MR. PLATT:  There's an attachment too,
14    Mr. Ruth.
15        MR. RUTH:  Can you show me the actual
16    PDF?  Yeah.
17        MR. PLATT:  So this is the attachment to
18    the email.  Is that what you're talking about?
19        MR. RUTH:  Yep, yeah.
20    Q   All right.  So under -- in this table,
21 Alex, under I think the column says entry, there's
22 a figure.
23    A   Yeah.
24    Q   Yeah.  That figure, what unit of measure

Page 275

1  is that represented in?
2     A   I -- what unit of measure?  Dollars.
3     Q   Okay.  And how is the entry calculated?
4     A   The cost of the trade.
5     Q   What do you mean by the cost of the trade?
6     A   How much the trade cost to enter,
7  I believe.
8     Q   Okay.  So let's take an example.  I guess
9  we'll use trade alpha.  You're saying that it cost
10 $15,876.84 to enter into the trade?
11    A   I think that was the capital requirement,
12 but I can't remember.
13    Q   When you say capital requirement, what
14 do you mean by that?
15    A   It's the cost of the trade.
16    Q   Okay.  Is it possible that that could
17 be the premium paid in order to enter into the
18 option contract?
19    A   Potentially.
20    Q   Okay.  What other factors are
21 represented in that figure in addition to either
22 premium collection or premium paid?
23    A   I don't remember.
24    Q   Okay.  And then my next question to

Page 276

1  you is exit, what is that figure?  Is that -- what
2  unit of measure --
3     A   Premiums collected, I guess.
4     Q   Okay.  So is the alpha trade, is that
5  a short options or long options strategy?
6     A   Short I think, but I can't remember.
7  You're muted.
8         MR. FALVEY:  Jeremy, you cut out.  I don't
9     think that's us.
10        MR. PLATT:  No, it's Mr. Ruth I think.
11        THE REPORTER:  Yeah, I'm still here.
12    Can he hear us?
13        MR. PLATT:  Jeremy, can you hear us?
14        (Discussion off the record.)
15        MR. RUTH:  All right.  Can you guys
16    hear me?
17        MR. PLATT:  Yes.
18        MR. FALVEY:  Yeah.
19        MR. RUTH:  All right.  Is it okay if
20 I just pick it up from where I think I got
21 cut off or do we need to read it back or --
22        THE REPORTER:  Whatever you need.
23        MR. RUTH:  I don't know how to proceed
24    there, Jody.

Page 277

1    MR. PLATT: It's your examination,
2 Mr. Ruth, so you can pick up wherever you'd
3 like.
4    MR. RUTH: All right. I'm just going
5 to restate the whole entire question. Can
6 you bring up -- that PDF document back up?
7    Q  Okay. So, Jody, is it safe to assume
8 that you -- and like I said before, I don't want
9 you to think I'm insulting you here -- but you just,
10 you know, didn't have the expertise at the time, or
11 even now, to calculate what the entry figure
12 represents?
13   A  You mean me?
14   Q  Yes.
15   A  You said Jody but --
16   Q  Oh, I'm sorry. My apologies, Alex.
17   A  Do I have the knowledge to understand what
18 the cost entailed, is that your question?
19   Q  No. Do you have the expertise or the
20 knowledge to be able to calculate what the figure
21 is represented in the entry column as well as the
22 exit column?
23   A  I can't remember how. I don't know if
24 I ever even did.

Page 278

1    Q  Okay. So could we assume that you
2 don't have the ability to verify whether or not
3 this information that was given to you is accurate
4 since you didn't know how to calculate the actual
5 figures in the document?
6    A  Yeah, I guess.
7    Q  Okay. Beautiful.
8    MR. RUTH: Jody, can you bring --
9 again, I don't know the exhibit numbers, but
10 the one email that we were talking about around
11 2:36 p.m. today in regards to -- it's when I
12 objected when you were putting words in his
13 mouth about the options, you know. It talked
14 about how Donelson -- you know, a little bio
15 on his past history.
16   MR. PLATT: I'm sorry. I don't know
17 what document you're talking about, Mr. Ruth.
18   MR. RUTH: It would be in -- let's go
19 with like PDF 32 I think it is. No, it's
20 an email from Alex to a customer that he's
21 soliciting. The last paragraph talks about
22 a profile. It's probably about four or five
23 paragraphs and it's after -- I think it's
24 reasonably after Jim Donelson took over as

Page 279

1 director of, I don't know, trading or whatever
2 you want to call it.
3    MR. PLATT: Look, Mr. Ruth, I apologize.
4 We've looked at a lot of documents that resemble
5 that. Do you want to just ask him the question?
6 I don't know if we have time to just sit here
7 and click through docs. Like these are the
8 CFTC's exhibits. I'm happy to do you a courtesy
9 if you can just tell me what exhibit it is.
10   MR. RUTH: Yeah, just bring up PDF 33
11 through 40.
12   MR. PLATT: Yeah. Why don't you tell me
13 which one you want, Mr. Ruth.
14   MR. RUTH: I want the one that has
15 the email that I'm pretty sure -- I mean,
16 maybe Mary can help us. Do you time stamp
17 these documents?
18   MR. PLATT: Yeah, I don't think that's
19 her job. It's really your job as the party
20 to come prepared to ask questions, Mr. Ruth.
21   MR. RUTH: All right. Bring up PDF 33,
22 34, 35, 36, 37, 38, 39. We're going to talk
23 about them all.
24   MR. PLATT: Here's 34. You know,

Page 280

1 there is a seven-hour time limitation on the
2 deposition. I'm not sure how long we've been
3 going.
4    THE WITNESS: Eight hours.
5    MR. FALVEY: Minus lunch.
6    THE WITNESS: I didn't even have lunch.
7    MR. FALVEY: So we're getting close.
8    MR. PLATT: Can you see 34, Mr. Ruth?
9 Can you see 34?
10   MR. RUTH: Yep.
11   MR. PLATT: Okay.
12   MR. RUTH: Let's bring up 35.
13   MR. PLATT: Yeah. Why don't you just
14 start asking questions and I'll bring them up
15 as we go. Is this the document you wanted?
16   MR. RUTH: No, it's 36.
17   MR. PLATT: Is it 35? Is this the document
18 you wanted?
19   MR. RUTH: No.
20   MR. PLATT: I'm going to try 36 now.
21 Is this the document you wanted?
22   MR. RUTH: Yeah, that'll work.
23   MR. PLATT: Okay, great.
24

Page 281

1 BY MR. RUTH:
2     Q    All right.  So, Alex, this email,
3 did you physically type this email on your own
4 or was this given to you and you perhaps copy and
5 pasted it into an email and sent it?
6     A    Yeah, that's right.
7     Q    Just to clarify, you did copy and paste
8 it in?
9     A    Yeah, it's -- I mean, you could tell some
10 of the stuff is from the script.
11     Q    What script?
12     A    I think it's from the demo.
13     Q    Okay.  So from the new Donelson script
14 after the rebrand?
15     A    Yeah.
16     Q    Okay.  So -- all right.  So your
17 testimony is that you copy and pasted this
18 into an email and sent it.  All right.  Were you
19 ever allowed to email customers from a solicitation
20 standpoint without preapproved, you know, from
21 Donelson?
22     A    I don't really remember if I did.
23     Q    I guess from a company policy standpoint,
24 did you have to get permission from Donelson in

Page 282

1 order to do things outside of the set sales
2 solicitation process?
3     A    I don't think so.
4     Q    Okay.  I think you've testified today
5 that throughout your career at Long Leaf Trading
6 there's been multiple people that are in charge
7 of making tricky decisions as to what is going
8 to be recommended to the clients.  I think in the
9 beginning of your career you testified that it was
10 Tim Evans, followed by Scott Gecas, followed by a
11 combination of Scott Gecas and Donelson and then
12 finally with Donelson, is that correct?
13     A    Yeah.
14     Q    Okay.  Would you say that the trade
15 strategy for the Time Means Money program as well as
16 whatever trading program you had after the rebrand,
17 whatever you called it, that the trade strategy was
18 constantly evolving?
19     A    I guess that would be one way to put
20 it.  But it was more so Jim stepping away from
21 what Scott -- or not Scott, Jim and Scott -- or,
22 yeah, Jim and Scott were stepping away from what
23 Tim was doing and their strategy, yeah, I guess it
24 varied.

Page 283

1     Q    So Tim's strategy was different from
2 Scott Gecas' strategy, which was different from
3 Scott Gecas' and Jim's strategy, which was different
4 from Jim's strategy, is that correct?
5     A    Yeah.
6     Q    Okay.  So could we say that the trading
7 strategy evolved over the time period that you were
8 at Long Leaf Trading Group?
9     A    Yeah.
10     Q    Okay.  And were you ever privy to
11 under -- I guess conversations as to what resources
12 or what went into developing a strategy for any of
13 those time periods or those --
14     A    Not that I remember.
15     Q    Okay.  During the period of February --
16 sorry, January of 2019 and through the end of April
17 2019, how many trades were you recommending to
18 customer accounts on an annual -- on a monthly
19 basis?
20     A    Sorry.  What was the time frame again?
21     Q    January 2019 to -- through the end of April
22 2019.
23     A    I think it was still around four.
24     Q    Okay.  Out of -- obviously, you know,

Page 284

1 through testimony it's been established that,
2 you know, there's been customer losses during
3 that time period.  However, my question to you is
4 is that are you -- were you aware in each of those
5 individual funds if there was winning trades out of
6 those four trades?
7     A    Was I aware if there were winners and
8 losers of like individual trades?
9     Q    Yes.  Was there any individual winning
10 trades during that time period?
11     A    Yeah, of course.  I think so.
12     Q    Okay.  So you had testified that from
13 an emotional standpoint you were optimistic about
14 the trading in the future.  Did that optimism derive
15 from seeing that there are actual winning trades?
16     A    Yeah.
17     Q    All right.  Beautiful.
18         MR. RUTH:  All right.  Well, that's
19 all I've got.  I'm going to save the rest for
20 open court so I can embarrass Jody there.  But
21 I appreciate your time, Alex, and sticking with
22 quite the commitment you had to make.  Actually,
23 you know, one last question.
24     Q    At what point would you say -- at what

Page 285

1 point would you say that Donelson was your
2 supervisor?
3    A    January 2018.
4    Q    Okay.  And --
5    A    Or -- January or February.
6    Q    Okay.  Going back to the scripts, were you
7 ever given a binder full of scripts?
8    A    A binder.  I don't remember.
9    Q    Okay.  So the script, was it given
10 to you like loose paper with a staple?  Was it put
11 into a binder?
12    A    Yeah.  Like there could be the binder
13 of the demo set, the demo and the custom together.
14    Q    Okay.  So when you were a commodity
15 associate -- I understand later in your career
16 you got an upgrade.  You probably deserved it.  But
17 the period where you were just a commodity associate
18 doing a demo set, were you given the demo set, the
19 demo and the custom all at once or was it not until
20 later in your career that you were given the custom
21 script or the demo script?
22    A    It was later.  It was later.
23    Q    Okay.  So you didn't walk in on day one and
24 get all three scripts right away?

Page 286

1    A    No.
2    Q    Okay.  And you never -- you never
3 reviewed any other scripts until later into your
4 career, correct?
5    A    Right.
6    Q    Do you know if Donelson was aware in
7 January of 2018 that there was a demo set script,
8 a demo script and a custom script?
9    A    I don't -- I wouldn't know.
10    Q    Okay.  Were you aware that there was three
11 scripts in January 2018?
12    A    Yeah, I can't remember.  I think so.
13    Q    Okay.  And -- oh, yeah.  You also
14 testified that Brian Adams was the chief compliance
15 officer for the company.  How did you know that he
16 was the chief compliance officer of the company?
17    A    It's what I was told.
18    Q    By who?
19    A    Jim and Brian.
20    Q    Brian told you directly that he was the
21 chief compliance officer of the company?
22    A    I can't remember if he said it to
23 me directly or not.  I just -- that's just what
24 I remember, him being compliance the second time

Page 287

1 he was hired.
2    Q    Okay.  The second time that Brian
3 Adams was hired did he ever send you an email?
4    A    I'm sure he did.  I don't know.
5    Q    Okay.  During that time period did
6 any of his emails say that he -- his title was the
7 chief compliance officer?
8    A    I don't remember.
9    Q    Okay.
10        MR. PLATT:  So, Mr. Ruth, I just
11    want to put an objection on the record from
12    the CFTC.  None of this questioning is relevant
13    to the claims against you or your defenses, so
14    I just want to put that on the record.  You can
15    continue but, you know, please be mindful of the
16    witness' time.
17        MR. RUTH:  Okay.  Your objection is noted.
18    It's not valid but noted.
19    Q    All right.  So my question to you,
20 Alex, is the -- my question to you is as -- while
21 you were a commodity associate, if you were to
22 receive a complaint who would you refer that
23 complaint to from a customer?
24    A    Jim.

Page 288

1    Q    Okay.  Why didn't you give it to the
2 chief compliance officer?
3    A    I don't know if I had complaints to
4 give to Brian while he was there.  He might have
5 only been there for a month or two the second time.
6        MR. RUTH:  Okay.  All right.  That's all
7    I've got.
8        MR. PLATT:  Okay, great.  So, Mr. Falvey,
9    do you have any questions for your client?
10        MR. FALVEY:  I do not.  Thank you, though.
11        MR. PLATT:  The CFTC has no further
12    questions.  Thank you, Mr. Stemper, for your
13    time and patience.
14        THE WITNESS:  Have a good one.
15        MR. FALVEY:  Thank you.
16        MR. PLATT:  Take care.
17        MR. FALVEY:  Good night.
18            (WITNESS EXCUSED)
19
20
21
22
23
24

Page 289

1 STATE OF ILLINOIS  )
     ) SS:
2 COUNTY OF C O O K  )

3

4   I, MARY MASLOWSKI, a Notary Public within

5 and for the County of Cook, State of Illinois, and a

6 Certified Shorthand Reporter of said state, do

7 hereby certify:

8   That previous to the commencement of the

9 examination of the witness, the witness was duly

10 sworn to testify the whole truth concerning the

11 matters herein;

12   That the foregoing deposition transcript

13 of ALEXANDER STEMPER was reported stenographically

14 by me on February 11, 2021, was thereafter

15 transcribed under my personal direction and

16 constitutes a true record of the testimony given and

17 the proceedings had;

18   That the said deposition was taken

19 remotely before me at the time and place specified;

20   That the signature of the witness

21 was waived by agreement and that the deposition

22 terminated at 5:15 p.m.;

23   That I am not a relative or employee or

24 attorney or counsel, nor a relative or employee of

Page 290

1 such attorney or counsel for any of the parties

2 hereto, nor interested directly or indirectly in the

3 outcome of this action.

4   IN WITNESS WHEREOF, I do hereunto set my

5 hand and affix my seal of office this 19th day of

6 February, 2021, at Chicago, Illinois.

7

8

9

10     Mary Maslowski, CSR, RPR
     Notary Public
11     79 West Monroe, Suite 1001
     Chicago, Illinois 60603

12

13

14

15

16

17

18

19

20

21

22

23

24