CFTC Ex. 543

# Long Leaf Trading Group

## *Cybulski, Benjamin 2021-03-29*

*3/29/2021 10:05 AM*

**Condensed Transcript**

**Prepared by:**

Ashley Burden
CFTC

Friday, November 5, 2021

Page 1

1       IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION
3  COMMODITY FUTURES TRADING     )
   COMMISSION,              )
4                           )
        Plaintiff,      )
5                           )
        vs.        ) No. 20 C 3578
6                       )
   LONG LEAF TRADING GROUP,     )
7  INC., et al.,         )
                        )
8      Defendants.     )
9
10
11      The remote video deposition of
12 BENJAMIN CYBULSKI, called by the Plaintiff for
13 examination, pursuant to subpoena and pursuant to
14 the Federal Rules of Civil Procedure for the United
15 States District Courts pertaining to the taking of
16 depositions, taken before Mary Maslowski, Certified
17 Shorthand Reporter and Notary Public within and
18 for the County of Cook and State of Illinois, with
19 the witness located at 555 West Jackson Boulevard,
20 Suite 700, Chicago, Illinois, commencing at the
21 hour of 10:05 o'clock on March 29, 2021.
22
23
24

Page 2

1 A P P E A R A N C E S:
2
   (Appearing via videoconference)
3  MR. JOSEPH C. PLATT, Trial Attorney
   MS. ELIZABETH M. STREIT, Trial Team Leader
4  U.S. COMMODITY FUTURES TRADING COMMISSION
   DIVISION OF ENFORCEMENT
5  525 West Monroe Street, Suite 1100
   Chicago, Illinois 60661
6  (312) 596-0700
   jplatt@cftc.gov
7  estreit@cftc.gov
8     On behalf of the U.S. Commodity
      Futures Trading Commission;
9
   FALVEY LAW OFFICE
10 BY MR. JAMES M. FALVEY
   200 South Wacker Drive, Suite 3100
11 Chicago, Illinois 60606
   (312) 404-5839
12 jimfalvey@yahoo.com
13    On behalf of Long Leaf Trading Group,
      Inc.;
14
   (Appearing via videoconference)
15 EDWARD JOHNSON AND ASSOCIATES, P.C.
   BY MR. EDWARD JOHNSON
16 555 West Jackson Boulevard, Suite 700
   Chicago, Illinois 60661
17 (708) 606-4386
   edward@edwardjohnsonlaw.com
18
      On behalf of the Witness;
19
   (Appearing via videoconference)
20 MR. JEREMY RUTH
21    Appearing Pro Se.
22
23 CSR License No. 084-003278.
24

Page 3

1            I N D E X
2  WITNESS          DX  CX _RDX  RCX
3  BENJAMIN CYBULSKI
4  By Mr. Platt        5
5
6
        E X H I B I T S
7
   CFTC EXHIBIT           MARKED FOR ID
8
   No. 303            7
9  No. 304            8
   No. 305            14
10 No. 306            19
   No. 307            23
11 No. 308            34
   No. 309            46
12 No. 310            52
   No. 311            63
13 No. 312            65
   No. 313            67
14 No. 314            70
   No. 315            73
15 No. 316            74
   No. 317            76
16 No. 318            84
   No. 319            85
17 No. 320            90
   No. 321            93
18 No. 322            103
19
20
21
22
23
24

Page 4

1       THE REPORTER:  Pursuant to Section 319
2  of the Public Health Service Act, and in
3  conjunction with Executive Order 2020-14
4  regarding Illinois Notaries Public, I will
5  ask counsel to agree on the record that there
6  is no objection to this Certified Shorthand
7  Reporter administering a binding oath to the
8  witness remotely.  I will ask each of you to
9  state your agreement on the record, starting
10 with counsel for the witness first, and at the
11 same time, please identify yourself for the
12 record.
13      MR. JOHNSON:  No objection.
14 Edward Johnson, for the record, on behalf of
15 Mr. Benjamin Cybulski, who's to the right of me
16 in a blue tie, no glasses.
17      MR. PLATT:  Joseph Platt on behalf of the
18 CFTC.  No objection.
19      MR. FALVEY:  Jim Falvey on behalf
20 of Long Leaf Trading and Jim Donelson and no
21 objection.
22      (Witness duly sworn.)
23      MR. PLATT:  Thank you.  For the record, I'm
24 also joined by Beth Streit, who's an attorney at

Page 5

1 the CFTC, and I see that Mr. Ruth may have just
2 joined. Mr. Ruth, are you present?
3     MR. RUTH: Yes. Can you hear me?
4     MR. PLATT: Yes, thanks.
5     MR. RUTH: All right.
6     MR. PLATT: So we're just getting started,
7 Mr. Ruth.
8     MR. RUTH: Yep.
9         BENJAMIN CYBULSKI,
10 called as a witness herein, having been first duly
11 sworn, was examined and testified as follows:
12         DIRECT EXAMINATION
13 BY MR. PLATT:
14    Q   So, Mr. Cybulski, my name's Joseph
15 Platt, as I mentioned, and this deposition is
16 being conducted pursuant to the Federal Rules of
17 Civil Procedure and the court's local rules. So
18 we're proceeding today by videoconference, as you
19 know, pursuant to Rule 30(b)(4) because of the
20 Covid-19 pandemic. Usually we'd do these in person.
21 Mr. Cybulski, have you ever been deposed?
22    A   No.
23    Q   Are you under the influence of any
24 medications or substances that would impair your

Page 6

1 ability to testify truthfully today?
2    A   No.
3    Q   So one thing about depositions, we'll
4 have to try not to talk over one another for the
5 benefit of the court reporter, and this is
6 especially important in the videoconference setting.
7 So to accomplish that, I'll do my best to wait until
8 you're done answering any question before I ask
9 another, and I'll ask that you wait until I'm done
10 asking my question before you begin your answer.
11 Is that okay?
12    A   Yes.
13    Q   And also today, your lawyer has
14 probably told you, but it's important to take a
15 beat and take a pause before you answer the question
16 so he can have the opportunity to object if he wants
17 to, okay?
18    A   Yes.
19    Q   And, finally, you know, if you don't
20 understand a question that I ask, just ask me to
21 clarify it and I'll do my best, okay?
22    A   Okay.
23    Q   So as we went over before the deposition,
24 I'm going to show you some documents by sharing my

Page 7

1 screen with you. So I'm going to do that right
2 now, and let me know if you can't see the document.
3     MR. JOHNSON: Yeah, we can see that.
4    A   Yeah, we can see it.
5     MR. PLATT: Okay, great. So I'm going
6 to mark this document as CFTC Exhibit 303.
7         (Whereupon  CFTC Exhibit No. 303
8         was marked for identification.)
9    Q   This is the subpoena that we sent
10 to you to testify at deposition in connection
11 with the CFTC's case against Long Leaf, right?
12     MR. JOHNSON: Yeah, this is everything.
13     MR. PLATT: Yeah. So I'm asking the
14 witness if he recognizes this as the subpoena
15 that we sent to him.
16    A   Yes.
17    Q   Okay, thanks. Sorry. And you're
18 appearing here today pursuant to the subpoena,
19 right?
20    A   Yes.
21     MR. PLATT: Okay. I'm going to mark
22 CFTC Exhibit 304, which is a document that
23 looks very similar.
24

Page 8

1         (Whereupon  CFTC Exhibit No. 304
2         was marked for identification.)
3    Q   Do you recognize this as the document
4 subpoena that the CFTC sent to you in connection
5 with its case against Long Leaf Trading?
6    A   Yes.
7    Q   So, Mr. Cybulski, your lawyer produced
8 about 198 pages worth of documents to the CFTC in
9 response to that subpoena. Does that sound right
10 to you?
11     MR. JOHNSON: And we're going to
12 object to that. I mean, at what point do
13 you want us to have him invoke here into it?
14 Like we stipulate to those documents being
15 produced there. That was everything he had
16 in his control per the request of the documents.
17 But -- and I did speak with Ashley about that,
18 so I don't know what else you need to clarify.
19 But whatever we can, we're willing to do that.
20     MR. PLATT: Okay, sure. I'm just
21 going to ask the witness a couple questions
22 about it, and if you think that the answer --
23 a truthful answer to the question could result
24 in evidence in a criminal proceeding, you can

Page 9

1    object on that basis and instruct your client
2    not to answer.  Is that okay to proceed?
3        MR. JOHNSON:  All right.  Let's do it.
4    That sounds good.
5        MR. PLATT:  Great, great.
6    Q    Did you withhold any responsive documents
7    on the basis of any privilege, Mr. Cybulski?
8        MR. JOHNSON:  And we would just object
9    for the record, and then you invoke.
10       THE WITNESS:  So I should answer?
11       MR. JOHNSON:  As the, you know, as the
12   Fifth Amendment.
13   A    Yeah.  So on the advice of counsel,
14   I invoke my Fifth Amendment privilege against
15   self-incrimination and respectfully decline to
16   answer your question.
17   BY MR. PLATT:
18   Q    Do you know what a Google document is,
19   Mr. Cybulski?
20       MR. JOHNSON:  Do you?
21       THE WITNESS:  Yes.
22   A    Yes.
23   BY MR. PLATT:
24   Q    Did you search your Google drive for

Page 10

1    any potentially responsive documents?
2        MR. JOHNSON:  We would object.
3    A    So on the advice of counsel, I invoke my
4    Fifth Amendment privilege against self-incrimination
5    and respectfully decline to answer your question.
6    BY MR. PLATT:
7    Q    So, Mr. Cybulski, I'm not authorized
8    to compel you to give evidence or testimony as
9    to which you assert your privilege against
10   self-incrimination.  I have no intention of doing
11   so here today.  In addition, I don't have the
12   authority to compel your testimony by granting you
13   immunity from any prosecution.  Any question that
14   I ask going forward will be with the understanding
15   that if you wish to assert your privilege, you must
16   state that you refuse to answer on the grounds that
17   your answer may tend to incriminate you.  In other
18   words, you are not compelled to answer any further
19   questions if you believe that a truthful answer to
20   the question could be used in a criminal prosecution
21   against you and you wish to assert your privilege
22   against self-incrimination.  Accordingly, if you
23   answer any questions, you will be doing so
24   voluntarily.  Do you understand that?

Page 11

1    A    Yeah, I do, yeah.
2    Q    Did you graduate from college,
3    Mr. Cybulski?
4    A    On the advice of counsel, I invoke my
5    Fifth Amendment privilege against self-incrimination
6    and respectfully decline to answer your question.
7    Q    Can you please describe your work history
8    before Long Leaf Trading starting from college
9    graduation going forward?
10   A    On the advice of counsel, I invoke my
11   Fifth Amendment privilege and respectfully decline
12   to answer your question.
13   Q    Are you presently employed?
14   A    On the advice of counsel, I invoke my
15   Fifth Amendment privilege against self-incrimination
16   and respectfully decline to answer your question.
17   Q    Have you ever held any professional
18   licenses?
19   A    On the advice of counsel, I invoke my
20   Fifth Amendment privilege against self-incrimination
21   and respectfully decline to answer your question.
22   Q    You were a broker at Long Leaf Trading,
23   right?
24   A    On the advice of counsel, I invoke my

Page 12

1    Fifth Amendment privilege against self-incrimination
2    and respectfully decline to answer your question.
3    Q    When you were a broker at Long Leaf
4    Trading, you held a Series 3 license, correct?
5    A    On the advice of counsel, I invoke my
6    Fifth Amendment privilege against self-incrimination
7    and respectfully decline to answer your question.
8    Q    To obtain an NFA license you had to pass
9    an examination, right?
10   A    On the advice of counsel, I invoke my
11   Fifth Amendment privilege against self-incrimination
12   and respectfully decline to answer your question.
13   Q    You received ethics training as an employee
14   at Long Leaf Trading, right?
15   A    On the advice of counsel, I invoke my
16   Fifth Amendment privilege against self-incrimination
17   and respectfully decline to answer your question.
18   Q    The ethics training you received at
19   Long Leaf Trading covered material relating to
20   misleading sales practices and compliance with NFA
21   and CFTC rules, right?
22   A    On the advice of counsel, I invoke my
23   Fifth Amendment privilege against self-incrimination
24   and respectfully decline to answer your question.

Page 13

1    Q    Based on your ethics training and
2  professional Series 3 license, you were aware that
3  you had to be truthful and not misleading in your
4  communications and interactions with customers and
5  prospects at Long Leaf, right?
6        MR. JOHNSON:  We would object as to the
7    form of the question.
8    A    And on the advice of counsel, I invoke my
9  Fifth Amendment privilege against self-incrimination
10  and respectfully decline to answer your question.
11        MR. PLATT:  Okay.  Let's just go off the
12    record for five minutes, and then we'll start
13    back up again at 10:20.
14        MR. JOHNSON:  Okay.
15        MR. PLATT:  Thanks.
16          (Whereupon a recess was taken from
17            10:16 a.m., to 10:20 a.m., after
18            which the following proceedings
19            were had:)
20        MR. PLATT:  Okay.  Let's go back on the
21    record, please.
22    Q    Mr. Cybulski, when you joined Long Leaf
23  Trading, you had no relevant industry experience,
24  correct?

Page 14

1    A    On the advice of counsel, I invoke my
2  Fifth Amendment privilege against self-incrimination
3  and respectfully decline to answer your question.
4    Q    When you joined Long Leaf Trading, you
5  relied on sales practices and sales solicitation
6  materials provided to you by other brokers, right?
7    A    On the advice of counsel, I invoke my
8  Fifth Amendment privilege against self-incrimination
9  and respectfully decline to answer your question.
10        MR. PLATT:  I'm going to mark CFTC
11    Exhibit 305.
12          (Whereupon CFTC Exhibit No. 305
13            was marked for identification.)
14    Q    Mr. Cybulski, can you see Exhibit 305
15  in front of you?
16    A    Yes.
17    Q    This is an email that you received
18  from Scott Gecas on October 3, 2018.  Did I read
19  that information correctly at the top of the email?
20    A    Yes.
21    Q    There are two attachments that are .jpg
22  files, correct?
23        MR. JOHNSON:  I mean, that's what it
24    says on there.

Page 15

1        MR. PLATT:  Yeah, so I'm just asking
2    the witness.
3    Q    There are two attachments that are .jpg
4  files, right, Mr. Cybulski?
5        MR. JOHNSON:  It looks like it.
6    A    Yes.
7  BY MR. PLATT:
8    Q    Do you see where it says Attachments?
9    A    I do.
10    Q    Do you see that there are two items listed
11  to the right of the word Attachments?
12    A    Yes.
13    Q    And they're files with extension .jpg,
14  correct?
15    A    I believe that's what that means, but I'm
16  unfamiliar with exactly that, but yes.
17    Q    The letters jpg are at the end of each
18  file name, right?
19    A    Yes.
20    Q    I'm going to scroll down to those
21  attachments and I'm going to rotate the document
22  so you can read it, just so you know what I'm doing.
23  Can you read that, Mr. Cybulski?
24    A    Yes.

Page 16

1    Q    October 3, 2018 was your first day of work
2  at Long Leaf Trading, right?
3        MR. JOHNSON:  Could I chime in here,
4    Mr. Platt?  What was the -- could you go back
5    to that first page real quick?  I just haven't
6    seen this document before, so I'm just trying
7    to -- all right.  I'm sorry.  Thank you.
8  BY MR. PLATT:
9    Q    So the question was October 3, 2018
10  was your first day of work at Long Leaf Trading,
11  right, Mr. Cybulski?
12    A    On the advice of counsel, I invoke my
13  Fifth Amendment privilege against self-incrimination
14  and respectfully decline to answer your question.
15    Q    And Scott Gecas sent you an email with
16  the subject line Script.  Did I read that correctly?
17    A    On the advice of counsel, I invoke my
18  Fifth Amendment privilege against self-incrimination
19  and respectfully decline to answer your question.
20    Q    I'm going to scroll down to the attachments
21  to the email, and I'm rotating it so you can read
22  it.  The attachment to Mr. Gecas' October 3rd email
23  is titled Long Leaf Trading Time Means Money Demo
24  Set Script Tier 2, correct?

Page 17

1    A    Yeah.  On the advice of counsel,
2  I invoke my Fifth Amendment privilege against
3  self-incrimination and respectfully decline to
4  answer your question.
5    Q    So on the second page of the two-page
6  attachment there's a heading titled Transition.
7  Did I read that correctly?
8    A    On the advice of counsel, I invoke my
9  Fifth Amendment privilege against self-incrimination
10  and respectfully decline to answer your question.
11    Q    There are three options listed on
12  this page, one set of scripted responses if the
13  prospect is currently trading futures, one set of
14  scripted responses if the prospect has previously
15  traded futures and one set of responses if the
16  prospect has never traded futures, correct?
17    A    On the advice of counsel, I invoke my
18  Fifth Amendment privilege against self-incrimination
19  and respectfully decline to answer your question.
20    Q    Each set of scripted responses answers
21  with the clause, quote, "they want a conservative
22  trade strategy that promotes the theory of 'slow and
23  steady wins the race.'" Did I read that correctly?
24    A    On the advice of counsel, I invoke my

Page 18

1  Fifth Amendment privilege against self-incrimination
2  and respectfully decline to answer your question.
3    Q    And then scrolling down to the bottom
4  portion of this document, there's a heading called
5  Transition Summary and the transition summary
6  states, "What we have done here at Long Leaf," and
7  then there's like a little place for you to insert
8  the person's name, "is put together a program to
9  answer that calling which you inquired about called
10  Time Means Money." Did I read that transition
11  summary correctly?
12    A    On the advice of counsel, I invoke my
13  Fifth Amendment privilege against self-incrimination
14  and respectfully decline to answer your question.
15    Q    The term "that calling" in the transition
16  summary refers to the theory of slow and steady wins
17  the race, correct?
18    A    On the advice of counsel, I invoke my
19  Fifth Amendment privilege against self-incrimination
20  and respectfully decline to answer your question.
21    Q    And then all the way down at the bottom,
22  Mr. Cybulski, you see that this document says Demo
23  Set-Script-Tier 2, Revised December 28, 2015.
24  Did I read that correctly?

Page 19

1    A    On the advice of counsel, I invoke my
2  Fifth Amendment privilege against self-incrimination
3  and respectfully decline to answer your question.
4    Q    You used this script at Long Leaf Trading
5  when you solicited customers, right?
6    A    On the advice of counsel, I invoke my
7  Fifth Amendment privilege against self-incrimination
8  and respectfully decline to answer your question.
9      MR. PLATT:  I'm going to mark CFTC
10  Exhibit 306.
11      (Whereupon  CFTC Exhibit No. 306
12      was marked for identification.)
13    Q    Mr. Cybulski, this is an email chain
14  between you and Vicki Donelson on October 5, 2018,
15  is that correct?
16    A    On the advice of counsel, I invoke my
17  Fifth Amendment privilege against self-incrimination
18  and respectfully decline to answer your question.
19    Q    So I'm going to start down at the
20  bottom of the email chain, which is the first
21  email in time.  You write to Vicki Donelson, "Could
22  you send an App to Allen Bencomo?" Did I read that
23  correctly?
24    A    On the advice of counsel, I invoke my

Page 20

1  Fifth Amendment privilege against self-incrimination
2  and respectfully decline to answer your question.
3    Q    And, Mr. Cybulski, next to the From
4  line in this email is your name, Ben Cybulski, and
5  then an email address bcybulski@longleaftrading.com.
6  Is that the email address you used at Long Leaf to
7  conduct business?
8    A    On the advice of counsel, I invoke my
9  Fifth Amendment privilege against self-incrimination
10  and respectfully decline to answer your question.
11    Q    Who is Vicki Donelson?
12    A    On the advice of counsel, I invoke my
13  Fifth Amendment privilege against self-incrimination
14  and respectfully decline to answer your question.
15    Q    App, as you used that term in this
16  email to Vicki Donelson, means account opening
17  application, correct?
18    A    On the advice of counsel, I invoke my
19  Fifth Amendment privilege against self-incrimination
20  and respectfully decline to answer your question.
21    Q    And then a couple emails up you write
22  to Vicki, "I don't know how this all works, but I
23  was the only one to talk to him.  Scott was telling
24  me what to say." Did I read that correctly?

Page 21

1    A    On the advice of counsel, I invoke my
2  Fifth Amendment privilege against self-incrimination
3  and respectfully decline to answer your question.
4    Q    Scott is Scott Gecas, right?
5    A    On the advice of counsel, I invoke my
6  Fifth Amendment privilege against self-incrimination
7  and respectfully decline to answer your question.
8    Q    You learned how to solicit customers
9  at Long Leaf Trading by listening to Scott Gecas,
10  right?
11    A    On the advice of counsel, I invoke my
12  Fifth Amendment privilege against self-incrimination
13  and respectfully decline to answer your question.
14    Q    You solicited customers at Long Leaf
15  Trading by saying what Mr. Gecas told you to say,
16  right?
17    A    On the advice of counsel, I invoke my
18  Fifth Amendment privilege against self-incrimination
19  and respectfully decline to answer your question.
20    Q    Did you know that Scott Gecas settled
21  fraud charges with the CFTC based on misleading
22  sales practices he used as a broker at Long Leaf?
23    A    On the advice of counsel, I invoke my
24  Fifth Amendment privilege against self-incrimination

Page 22

1  and respectfully decline to answer your question.
2    Q    In Vicki's response, Vicki Donelson's
3  response to you at 3:14 p.m. she writes, "Is this
4  a demo you set?  Did Scott do the custom?"
5    A    On the advice of counsel --
6    Q    The demo and the custom were two steps
7  in the customer solicitation process at Long Leaf
8  Trading, each occurring on a different phone call,
9  correct?
10    A    On the advice of counsel, I invoke my
11  Fifth Amendment privilege against self-incrimination
12  and respectfully decline to answer your question.
13    Q    The demo had a script and Power Point
14  presentation, right?
15    A    On the advice of counsel, I invoke my
16  Fifth Amendment privilege against self-incrimination
17  and respectfully decline to answer your question.
18    Q    And the custom used a different script
19  and a different Power Point presentation, correct?
20    A    On the advice of counsel, I invoke my
21  Fifth Amendment privilege against self-incrimination
22  and respectfully decline to answer your question.
23    Q    Long Leaf Trading provided you with those
24  scripts and Power Points, right?

Page 23

1    A    On the advice of counsel, I invoke my
2  Fifth Amendment privilege against self-incrimination
3  and respectfully decline to answer your question.
4    Q    As a general matter, you followed
5  the scripts and you used the Power Points when
6  you solicited customers at Long Leaf, correct?
7    A    On the advice of counsel, I invoke my
8  Fifth Amendment privilege against self-incrimination
9  and respectfully decline to answer your question.
10        MR. PLATT:  I'm going to mark CFTC
11    Exhibit 307.
12            (WhereuponCFTC Exhibit No. 307
13            was marked for identification.)
14        MR. PLATT:  Do you see a new email?
15    Can you guys see Exhibit 307?
16        MR. JOHNSON:  Yep, we can see it.
17  BY MR. PLATT:
18    Q    Mr. Cybulski, this is an email sent
19  from Andrew Nelson to you on October 11, 2018
20  attaching a document called Info and Links.  Did
21  I read that information correctly?
22    A    On the advice of counsel, I invoke my
23  Fifth Amendment privilege against self-incrimination
24  and respectfully decline to answer your question.

Page 24

1    Q    Andrew Nelson was a Long Leaf employee,
2  right?
3    A    On the advice of counsel, I invoke my
4  Fifth Amendment privilege against self-incrimination
5  and respectfully decline to answer your question.
6    Q    I'm going to scroll down to the attachment.
7  Can you read this attachment?
8    A    Yes.
9    Q    Up at the top the info and links document
10  that Mr. Nelson sent you reads, "The Time Means
11  Money utilizes various premium-collecting strategies
12  that focus on consistent monthly income based on the
13  fact that 76.5 percent of options that are purchased
14  held to expiration expire worthless."  Did I read
15  that correctly?
16    A    On the advice of counsel, I invoke my
17  Fifth Amendment privilege against self-incrimination
18  and respectfully decline to answer your question.
19    Q    You used this concept, that is, tying
20  consistent monthly income from selling -- from
21  Long Leaf's trading program to the purported fact
22  that 76.5 percent of options expire worthless when
23  you solicited prospective customers at Long Leaf
24  Trading, right?

Page 25

1    A    On the advice of counsel, I invoke my
2  Fifth Amendment privilege against self-incrimination
3  and respectfully decline to answer your question.
4    Q    You said this over the phone to prospects,
5  right?
6    A    On the advice of counsel, I invoke my
7  Fifth Amendment privilege against self-incrimination
8  and respectfully decline to answer your question.
9    Q    Mr. Cybulski, isn't it true that the
10 purported fact that 76 percent of options expire
11 out of the money has nothing to do with whether Long
12 Leaf's trading strategies can generate net trading
13 returns for customers?
14   A    On the advice of counsel, I invoke my
15 Fifth Amendment privilege against self-incrimination
16 and respectfully decline to answer your question.
17   Q    In December of 2018 Long Leaf Trading
18 revised its demo and custom solicitation materials,
19 right?
20       MR. JOHNSON:  Can you say that date again?
21 I'm sorry.  You broke up.
22       MR. PLATT:  Oh, sure.  Sorry.
23   Q    In December 2018 Long Leaf Trading
24 revised its demo and custom solicitation materials,

Page 26

1  correct?
2        MR. JOHNSON:  Just the whole month,
3    meaning just December?
4  BY MR. PLATT:
5    Q    Generally in December 2018.
6    A    On the advice of counsel, I invoke my
7  Fifth Amendment privilege against self-incrimination
8  and respectfully decline to answer your question.
9    Q    Mr. Cybulski, in December 2018 you
10 participated in revising the solicitation materials
11 used by Long Leaf Trading, right?
12   A    On the advice of counsel, I invoke my
13 Fifth Amendment privilege against self-incrimination
14 and respectfully decline to answer your question.
15   Q    The other Long Leaf brokers also
16 participated in revising the solicitation materials
17 in December 2018, right?
18   A    On the advice of counsel, I invoke my
19 Fifth Amendment privilege against self-incrimination
20 and respectfully decline to answer your question.
21   Q    James Donelson participated in the
22 December 2018 revision process concerning Long
23 Leaf's sales materials, right?
24   A    On the advice of counsel, I invoke my

Page 27

1  Fifth Amendment privilege against self-incrimination
2  and respectfully decline to answer your question.
3    Q    Mr. Cybulski, I'm going to show you
4  what's been previously marked as CFTC Exhibit 289.
5  Do you see Exhibit 289?
6    A    Yes.
7    Q    This is an email that James Donelson
8  sent -- Jim Donelson sent to James Hatzigiannis,
9  Alexander Stemper, you and Vicki Donelson on
10 January 7, 2019, correct?
11   A    On the advice of counsel, I invoke my
12 Fifth Amendment privilege against self-incrimination
13 and respectfully decline to answer your question.
14   Q    So Long Leaf brokers began using these
15 solicitation materials as of this date and going
16 forward, correct?
17   A    On the advice of counsel, I invoke my
18 Fifth Amendment privilege against self-incrimination
19 and respectfully decline to answer your question.
20   Q    Can you see what's been marked as CFTC
21 Exhibit 290?
22       MR. JOHNSON:  You can see that, right?
23   A    Yes.
24

Page 28

1  BY MR. PLATT:
2    Q    Mr. Cybulski, this is an email from
3  you to Alexander Stemper and James Hatzigiannis
4  on January 28, 2019, correct?
5    A    On the advice of counsel, I invoke my
6  Fifth Amendment privilege against self-incrimination
7  and respectfully decline to answer your question.
8    Q    The subject line is New Custom Stuff
9  and there are two attachments, the custom final
10 addition 2019 Power Point and the custom script
11 new strategies Word document, is that correct?
12   A    On the advice of counsel, I invoke my
13 Fifth Amendment privilege against self-incrimination
14 and respectfully decline to answer your question.
15   Q    As of the date of this email and going
16 forward, you and the other Long Leaf brokers used
17 these revised materials for custom solicitations,
18 correct?
19   A    On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22   Q    Jim Donelson directed you to use
23 these new materials from January 28th going forward,
24 correct, January 28, 2019, right?

Page 29

1   A   On the advice of counsel, I invoke my
2 Fifth Amendment privilege against self-incrimination
3 and respectfully decline to answer your question.
4   Q   Exhibit 290, I've included the two
5 attachments to this email.  I'm going to scroll
6 down and we'll just go through them briefly.  Page 5
7 of 290, it's a slide titled Your Objectives.  Do you
8 see that?
9   A   Yes.
10   Q   The first objective reads,
11 "Target 12 percent returns on an annual basis
12 after commissions and fees."  Do you see that?
13   A   Yes.
14   Q   And there's also an objective bullet point
15 titled Manage Downside Risk.  Do you see that?
16   A   Yes.
17   Q   This is Long Leaf's custom Power Point
18 presentation from 2019, right?
19   A   On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22   Q   On page 30 of Exhibit 290, this is the
23 first page of the revised Long Leaf Trading custom
24 script from 2019, is that correct?

Page 30

1   A   On the advice of counsel, I invoke my
2 Fifth Amendment privilege against self-incrimination
3 and respectfully decline to answer your question.
4   Q   Do you see the heading titled Risk
5 Disclosure?
6   A   I see that.
7   Q   You would tell customers that past
8 performance is not necessarily indicative of future
9 performance.  Did I read that correctly?
10   A   On the advice of counsel, I invoke my
11 Fifth Amendment privilege against self-incrimination
12 and respectfully decline to answer your question.
13   Q   That was the only risk disclosure that
14 Long Leaf provided to prospective customers in 2019,
15 correct?
16   A   On the advice of counsel, I invoke my
17 Fifth Amendment privilege against self-incrimination
18 and respectfully decline to answer your question.
19   Q   Scrolling down to the -- do you see the
20 Agenda heading, Mr. Cybulski?
21   A   Yes.
22   Q   Under Agenda you would tell customers
23 that you would, quote, discuss their objectives
24 and the roadmap to achieving those objectives,

Page 31

1 is that right?
2   A   On the advice of counsel, I invoke my
3 Fifth Amendment privilege against self-incrimination
4 and respectfully decline to answer your question.
5   Q   So we saw up on the Power Point
6 that the Your Objectives slide referenced
7 targeting 12 percent returns with low to moderate
8 risk preference and the ability to manage downside
9 risk, correct?
10   A   On the advice of counsel, I invoke my
11 Fifth Amendment privilege against self-incrimination
12 and respectfully decline to answer your question.
13   Q   Page 33 of Exhibit 290 there's a heading,
14 The Core Strategy.  Do you see that?
15   A   Yes.
16   Q   And then Point A under that heading
17 says, "Our Core Strategy is our most conservative
18 trade with a risk profile similar to a 30-year bond,
19 but it can target much higher returns."  Do you see
20 that?
21   A   I see that line.
22   Q   A 30-year bond is a very safe financial
23 instrument, correct?
24   A   On the advice of counsel, I invoke my

Page 32

1 Fifth Amendment privilege against self-incrimination
2 and respectfully decline to answer your question.
3   Q   The reason that you told prospects
4 that Long Leaf's trading had the risk profile
5 of a 30-year bond was to make prospects think it
6 was highly unlikely they would lose money if they
7 followed Long Leaf's trading recommendations, right?
8     MR. JOHNSON:  We would just object to the
9 question.
10   A   On the advice of counsel, I invoke my
11 Fifth Amendment privilege against self-incrimination
12 and respectfully decline to answer your question.
13     MR. PLATT:  And, Mr. Johnson, what was the
14 basis of the objection?
15     MR. JOHNSON:  It calls for speculation,
16 an improper opinion.
17 BY MR. PLATT:
18   Q   You used this script and these
19 talking points every time you delivered a custom
20 presentation after January 28, 2019, right,
21 Mr. Cybulski?
22   A   On the advice of counsel, I invoke my
23 Fifth Amendment privilege against self-incrimination
24 and respectfully decline to answer your question.

Page 33

1    Q   After January 28, 2019 you told every
2  Long Leaf prospect to whom you delivered a custom
3  presentation that Long Leaf's trading strategy
4  would target double-digit returns and have the risk
5  profile of a 30-year bond, right?
6    A   On the advice of counsel, I invoke my
7  Fifth Amendment privilege against self-incrimination
8  and respectfully decline to answer your question.
9       MR. PLATT:  And we're going to try
10       something here.  I'm going to try and play a
11       recording and I want to just test it out and
12       make sure that you guys can hear it clearly,
13       okay?
14       MR. JOHNSON:  Sure.
15       (Whereupon the recording was played.)
16  BY MR. PLATT:
17    Q   Mr. Cybulski, can you hear that clearly?
18    A   I can.
19    Q   Was that your voice?
20    A   Yes.
21    Q   I'm just going to play a couple clips.
22  So I'll let it play and then I'll ask you some
23  questions about it, okay?  The first clip is about
24  45 seconds long.

Page 34

1       (Whereupon the recording was played.)
2       MR. PLATT:  So I'm going to -- I forgot
3       to mark this recording as CFTC Exhibit 308.
4       And, Mary, I can give you the long file name
5       offline.
6       (Whereupon  CFTC Exhibit No. 308
7            was marked for identification.)
8    Q   I'll represent to you, Mr. Cybulski,
9  that this is a recording produced to us by Long
10  Leaf Trading that occurred on August 15, 2019.  And
11  on the recording you say -- you warn the prospect
12  understand that past performance is not necessarily
13  indicative of future performance, right?
14    A   On the advice of counsel, I invoke my
15  Fifth Amendment privilege against self-incrimination
16  and respectfully decline to answer your question.
17    Q   And then you tell the prospect I'm
18  going to go through the results of our strategy
19  that I'm going to recommend for you.  Understand
20  these are results that have happened, but they are
21  in no way guaranteed for you.  Did you say that on
22  the phone call?
23    A   On the advice of counsel, I invoke my
24  Fifth Amendment privilege against self-incrimination

Page 35

1  and respectfully decline to answer your question.
2    Q   So the part of this -- this is a custom
3  presentation, right, Mr. Cybulski?
4    A   On the advice of counsel, I invoke my
5  Fifth Amendment privilege against self-incrimination
6  and respectfully decline to answer your question.
7    Q   Part of the custom presentation was,
8  according to your words there, was to provide the
9  results that have happened from Long Leaf's trading
10  strategy, right?
11    A   On the advice of counsel, I invoke my
12  Fifth Amendment privilege against self-incrimination
13  and respectfully decline to answer your question.
14       MR. PLATT:  I'm going to play another
15       clip starting at about 6 minutes and I'll let it
16       run for about 20 seconds.  That first clip was
17       from approximately 3 minutes in the recording
18       until 3 minutes and 45 seconds in the recording.
19       So this is the clip starting at 5 minutes and
20       54 seconds.
21       (Whereupon the recording was played.)
22    Q   So on this clip, Mr. Cybulski, you
23  said -- you told the prospect keep in mind we are
24  only paid when you trade.  It is in our interest

Page 36

1  to keep making you profits because if you're not,
2  then you're not making trades, then we're not making
3  money and this relationship is null and void at that
4  point.  Do you agree that that's what you said on
5  that clip?
6    A   Before I answer that, my attorney had
7  a question.
8       MR. JOHNSON:  Yes.  Is that Exhibit 308
9       still?
10       MR. PLATT:  Yeah, the same recording.
11       I'll let you know when I move on.  Different
12       clips but the same recording.
13       MR. JOHNSON:  Oh, okay.
14    A   Then on the advice of counsel, I invoke my
15  Fifth Amendment privilege against self-incrimination
16  and respectfully decline to answer your question.
17  BY MR. PLATT:
18    Q   In fact, Mr. Cybulski, Long Leaf made
19  lots of money in commissions whether or not its
20  customers made or lost money, correct?
21    A   On the advice of counsel, I invoke my
22  Fifth Amendment privilege against self-incrimination
23  and respectfully decline to answer your question.
24    Q   You personally earned a lot of money

Page 37

1  in commissions paid by your customers in connection
2  with losing trades, right?
3      A   On the advice of counsel, I invoke my
4  Fifth Amendment privilege against self-incrimination
5  and respectfully decline to answer your question.
6          MR. PLATT:  I'm going to move forward,
7      still on Exhibit 308, starting at 12 minutes
8      and 10 seconds in the recording.
9          (Whereupon the recording was played.)
10         MR. PLATT:  So I just stopped at --
11     I just stopped the recording at 13 minutes
12     and 30 seconds.
13     Q   Mr. Cybulski, you say discussing the
14 Core trades, you told prospects that statistically
15 speaking, 76.5 percent of options that are sold
16 expire worthless so we are using that to our
17 advantage.  Did you hear the recording where
18 you said that?
19     A   On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22     Q   And then you told the prospects Edge
23 strategy is similar to that but it is designed for
24 more medium and higher volatility items.  It allows

Page 38

1  for higher returns.  This is our most effective
2  strategy.  You said that to the prospect on the
3  recording, right?
4      A   On the advice of counsel, I invoke my
5  Fifth Amendment privilege against self-incrimination
6  and respectfully decline to answer your question.
7      Q   So, Mr. Cybulski, during custom
8  presentations in 2019, you told prospects that
9  both the Core strategy and the Edge strategy took
10 advantage of this purported 76.5 percent of options
11 expire worthless statistic, right?
12     A   On the advice of counsel, I invoke my
13 Fifth Amendment privilege against self-incrimination
14 and respectfully decline to answer your question.
15         MR. PLATT:  So I'm going to restart the
16     recording right where we left off.
17         (Whereupon the recording was played.)
18     Q   So, Mr. Cybulski, in that little bit
19 of the recording you told the prospect if you
20 remember, I told you about a customer who invested
21 about $650,000.  He's up quite a bit, tens of
22 thousands of dollars in the last six months.
23 Do you remember saying that?
24     A   On the advice of counsel, I invoke my

Page 39

1  Fifth Amendment privilege against self-incrimination
2  and respectfully decline to answer your question.
3      Q   The customer you're referencing
4  was Long Leaf's largest customer by far, correct?
5      A   On the advice of counsel, I invoke my
6  Fifth Amendment privilege against self-incrimination
7  and respectfully decline to answer your question.
8      Q   In 2019 it was part of Long Leaf's custom
9  presentation to highlight the purported performance
10 of Long Leaf's largest customer, correct?
11     A   On the advice of counsel, I invoke my
12 Fifth Amendment privilege against self-incrimination
13 and respectfully decline to answer your question.
14     Q   When you told prospects that Long Leaf's
15 largest customer made tens of thousands of dollars,
16 that was not representative of the performance of
17 most of Long Leaf's customer accounts, correct?
18     A   On the advice of counsel, I invoke my
19 Fifth Amendment privilege against self-incrimination
20 and respectfully decline to answer your question.
21         MR. PLATT:  I'm going to restart this
22     same  recording, Exhibit 308, at 14 minutes
23     and 25 seconds.
24         (Whereupon the recording was played.)

Page 40

1      Q   So, sorry, that was a long clip and
2  I'll just go through it bit by bit.  Mr. Cybulski,
3  you discussed trading performance between minutes
4  14:30 and 17:05 of the recording that is
5  Exhibit 308, right?
6      A   On the advice of counsel, I invoke my
7  Fifth Amendment privilege against self-incrimination
8  and respectfully decline to answer your question.
9      Q   Describing a specific trade to
10 a prospect, you said this one costs $6,423.
11 Target profit on this one, on this just one contract
12 was $736.  I'll show you in a minute.  We actually
13 exceeded that.  Did you hear on the recording when
14 you said that to the prospect?
15     A   On the advice of counsel, I invoke my
16 Fifth Amendment privilege against self-incrimination
17 and respectfully decline to answer your question.
18     Q   And then, Mr. Cybulski, you said let me
19 pull this up, and you were referring to a document
20 that you shared with the prospect, and you said
21 these are the results of the trade.  These are all
22 closed trades.  We have the dates they were entered,
23 entry cost, exit cost and overall profit and loss.
24 Some of the profits are going to be smaller.  You

Page 41

1  also see some losses.  Generally we'll win a lot
2  more than we lose.  Did you say that to the prospect
3  on the recording?
4      A    On the advice of counsel, I invoke my
5  Fifth Amendment privilege against self-incrimination
6  and respectfully decline to answer your question.
7      Q    Mr. Cybulski, in 2019 Long Leaf
8  explained its trading strategy to prospects by
9  highlighting a trade that purported to risk $6423
10  and purported to earn over $736, right?
11      MR. JOHNSON:  What was the date?  What
12  was the date on that?
13      MR. PLATT:  I said in 2019.
14      MR. JOHNSON:  2019, okay.
15      A    On the advice of counsel, I invoke my
16  Fifth Amendment privilege against self-incrimination
17  and respectfully decline to answer your question.
18  BY MR. PLATT:
19      Q    And in 2019, Mr. Cybulski, Long Leaf's
20  custom presentation relied on a purported summary
21  document showing some subset of closed trades that
22  were net positive, right?
23      A    On the advice of counsel, I invoke my
24  Fifth Amendment privilege against self-incrimination

Page 42

1  and respectfully decline to answer your question.
2      Q    In 2019 Long Leaf's custom presentation
3  told prospects that Long Leaf won a lot more than
4  Long Leaf lost, correct?
5      A    On the advice of counsel, I invoke my
6  Fifth Amendment privilege against self-incrimination
7  and respectfully decline to answer your question.
8      MR. PLATT:  All right.  One more short
9  clip and then we'll be done with this one.
10  This is still Exhibit 308 starting at 20 minutes
11  and 5 seconds.  We'll listen for about another
12  minute.
13      (Whereupon the recording was played.)
14      MR. PLATT:  Sorry, I started at the wrong
15  spot.  I want to start it at 22:08.  Sorry about
16  that.
17      (Whereupon the recording was played.)
18      Q    Mr. Cybulski, on this recording you
19  told the prospect this is a pretty advanced trade.
20  When Jim bought this business, it's been around
21  since 2009, Jim took it over almost two years
22  ago.  He had the idea of bringing in the kind of
23  strategies you see with accredited investors.
24  We've had incredible success and as a business,

Page 43

1  we're moving more in that direction.  You said
2  that to the prospect, right?
3      A    On the advice of counsel, I invoke my
4  Fifth Amendment privilege against self-incrimination
5  and respectfully decline to answer your question.
6      Q    In 2019 it was part of Long Leaf's
7  custom presentation to tell prospects that Long
8  Leaf's trading strategies were, quote, pretty
9  advanced, right?
10      A    On the advice of counsel, I invoke my
11  Fifth Amendment privilege against self-incrimination
12  and respectfully decline to answer your question.
13      Q    In 2019, Mr. Cybulski, it was part of
14  Long Leaf's custom presentation to tell prospects
15  that Long Leaf's trading strategies had been having,
16  quote, incredible success, right?
17      A    On the advice of counsel, I invoke my
18  Fifth Amendment privilege against self-incrimination
19  and respectfully decline to answer your question.
20      MR. PLATT:  So do you guys want to take
21  a five-minute break, keep going?  It's up to
22  you.
23      MR. JOHNSON:  Yeah, let's take a little
24  break.

Page 44

1      MR. PLATT:  Sure.  Let's -- how about we
2  come back at like quarter past?
3      MR. JOHNSON:  Okay, you got it.
4      MR. PLATT:  Thanks.
5      (Whereupon a recess was taken from
6      11:05 a.m., to 11:17 a.m., after
7      which the following proceedings
8      were had:)
9      Q    Mr. Cybulski, when you worked at
10  Long Leaf Trading, the only product sold by Long
11  Leaf was its trading program, right?
12      A    On the advice of counsel, I invoke my
13  Fifth Amendment privilege against self-incrimination
14  and respectfully decline to answer your question.
15      Q    Long Leaf's trading program consisted
16  of options on futures trades, trade recommendations
17  provided by Long Leaf to customers, right?
18      A    On the advice of counsel, I invoke my
19  Fifth Amendment privilege against self-incrimination
20  and respectfully decline to answer your question.
21      Q    Long Leaf's trading recommendations
22  generally comprised multi-legged options strategies
23  featuring at least four options per trade, right?
24      A    On the advice of counsel, I invoke my

Page 45

1  Fifth Amendment privilege against self-incrimination
2  and respectfully decline to answer your question.
3     Q    All the customers generally received the
4  same trade recommendations, right?
5     A    On the advice of counsel, I invoke my
6  Fifth Amendment privilege against self-incrimination
7  and respectfully decline to answer your question.
8     Q    And Long Leaf generally made four
9  recommendations per month, right?
10    A    On the advice of counsel, I invoke
11 my privilege against -- or I invoke my Fifth
12 Amendment privilege against self-incrimination
13 and respectfully decline to answer your question.
14    Q    But Long Leaf's trade recommendations
15 might be tailored to each particular client in the
16 sense that Long Leaf would recommend more or fewer
17 contracts to a particular customer depending on the
18 amount of equity in the customer's account, right?
19    A    On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22       MR. PLATT:  I'm going to mark CFTC
23    Exhibit 309 and share this with the witness.
24

Page 46

1        (Whereupon CFTC Exhibit No. 309
2           was marked for identification.)
3     Q    Mr. Cybulski, are you able to see
4  Exhibit 309?
5     A    Yes.
6     Q    This is an email sent from Jim Donelson
7  to you, James Hatzigiannis and Alexander Stemper on
8  June 27, 2019, right?
9     A    On the advice of counsel, I invoke my
10 Fifth Amendment privilege against self-incrimination
11 and respectfully decline to answer your question.
12    Q    Do you see that the subject line is CADUSD
13 Trade Recommendation?
14    A    On the advice of counsel, I invoke my
15 Fifth Amendment privilege against self-incrimination
16 and respectfully decline to answer your question.
17    Q    Then there's a bunch of attachments
18 that I'm sure you recognize.  I'm going to scroll
19 down.  I only included one of the attachments.  I
20 omitted multiple attachments from Exhibit 309.  The
21 attachment that I included is a customer list that
22 shows how many contracts each Long Leaf customer
23 was going to execute for this particular trade,
24 right?

Page 47

1     A    On the advice of counsel, I invoke my
2  Fifth Amendment privilege against self-incrimination
3  and respectfully decline to answer your question.
4     Q    On the customer list attached to
5  Jim Donelson's June 27th email, the customers
6  are separated out into groups based on the broker
7  who had responsibility for managing their account,
8  right?
9     A    On the advice of counsel, I invoke my
10 Fifth Amendment privilege against self-incrimination
11 and respectfully decline to answer your question.
12    Q    Each Long Leaf associated person was
13 responsible for managing a set of accounts, right?
14    A    On the advice of counsel, I invoke my
15 Fifth Amendment privilege against self-incrimination
16 and respectfully decline to answer your question.
17    Q    Account management included communicating
18 trade recommendations to customers, correct?
19    A    On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22    Q    Account management included helping
23 customers understand the performance of their
24 accounts, right?

Page 48

1     A    On the advice of counsel, I invoke my
2  Fifth Amendment privilege against self-incrimination
3  and respectfully decline to answer your question.
4     Q    Account management included responding to
5  customers' questions about the recommended options
6  trades, right?
7     A    On the advice of counsel, I invoke my
8  Fifth Amendment privilege against self-incrimination
9  and respectfully decline to answer your question.
10    Q    Long Leaf received compensation from
11 customers in the form of commissions, correct?
12    A    On the advice of counsel, I invoke my
13 Fifth Amendment privilege against self-incrimination
14 and respectfully decline to answer your question.
15    Q    Long Leaf's revenues were a function of the
16 number of contracts executed, right?
17    A    On the advice of counsel, I invoke my
18 Fifth Amendment privilege against self-incrimination
19 and respectfully decline to answer your question.
20    Q    Long Leaf received compensation whether
21 or not its trade recommendations were profitable,
22 right?
23    A    On the advice of counsel, I invoke my
24 Fifth Amendment privilege against self-incrimination

Page 49

1 and respectfully decline to answer your question.
2    Q    Your personal compensation was based
3 on the number of contracts that your customers
4 executed, right?
5    A    On the advice of counsel, I invoke my
6 Fifth Amendment privilege against self-incrimination
7 and respectfully decline to answer your question.
8    Q    You personally received transaction-based
9 compensation whether or not Long Leaf's trading
10 recommendations were profitable, correct?
11    A    On the advice of counsel, I invoke my
12 Fifth Amendment privilege against self-incrimination
13 and respectfully decline to answer your question.
14    Q    You received account statements on
15 a daily basis from Cunningham Commodities, right?
16    A    On the advice of counsel, I invoke my
17 Fifth Amendment privilege against self-incrimination
18 and respectfully decline to answer your question.
19    Q    And when you worked at Long Leaf,
20 Cunningham Commodities was Long Leaf's FCM, right?
21    A    On the advice of counsel, I invoke my
22 Fifth Amendment privilege against self-incrimination
23 and respectfully decline to answer your question.
24    Q    You received the Cunningham statements

Page 50

1 to your business email, right?
2    A    On the advice of counsel, I invoke my
3 Fifth Amendment privilege against self-incrimination
4 and respectfully decline to answer your question.
5    Q    Cunningham Commodities emailed you
6 daily account statements for all of your customers,
7 right?
8    A    On the advice of counsel, I invoke my
9 Fifth Amendment privilege against self-incrimination
10 and respectfully decline to answer your question.
11    Q    Those daily account statements that you
12 received from Cunningham Commodities reflected each
13 customer account's net liquidating value, right?
14    A    On the advice of counsel, I invoke my
15 Fifth Amendment privilege against self-incrimination
16 and respectfully decline to answer your question.
17    Q    Net liquidating value is a measure of an
18 account's equity, right?
19    A    On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22    Q    If a Long Leaf Trading customer asked
23 about the value of their account, Long Leaf would
24 sometimes direct them to look at their account's

Page 51

1 net liquidating value, right?
2    A    On the advice of counsel, I invoke my
3 Fifth Amendment privilege against self-incrimination
4 and respectfully decline to answer your question.
5    Q    Mr. Cybulski, you deleted the daily
6 emails you received from Cunningham Commodities
7 with your customers' account statements, right?
8    A    On the advice of counsel, I invoke my
9 Fifth Amendment privilege against self-incrimination
10 and respectfully decline to answer your question.
11    Q    And you also deleted other business-related
12 emails during your employment as a Long Leaf
13 associated person, right?
14    A    On the advice of counsel, I invoke my
15 Fifth Amendment privilege against self-incrimination
16 and respectfully decline to answer your question.
17    Q    Did James Donelson direct you to delete
18 emails from your Long Leaf business email account?
19    A    On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22       MR. PLATT:  I'm going to show you what
23 I'm marking as Exhibit 310.
24

Page 52

1         (Whereupon  CFTC Exhibit No. 310
2             Was marked for identification.)
3    Q    Please let me know when you can see
4 Exhibit 310.
5    A    It looks like it.
6    Q    Exhibit 310 is an email from Jim
7 Donelson to you on December 27, 2018, subject line
8 Accounts with two attachments.  The first one is
9 a document titled Ben Accounts and the second is a
10 document titled December Update.  Do you see that?
11    A    On the advice of counsel, I invoke my
12 Fifth Amendment privilege against self-incrimination
13 and respectfully decline to answer your question.
14    Q    So I'm going to scroll down to the
15 attachment titled Ben Accounts.  This is a table
16 showing nine accounts, right?
17    A    On the advice of counsel, I invoke my
18 Fifth Amendment privilege against self-incrimination
19 and respectfully decline to answer your question.
20    Q    These nine accounts were your accounts
21 as of December 27, 2018, correct?
22    A    On the advice of counsel, I invoke my
23 Fifth Amendment privilege against self-incrimination
24 and respectfully decline to answer your question.

Page 53

1    Q    The table on the Ben Accounts document
2  shows the balances in those nine accounts as of
3  December 22, 2018, correct?
4    A    On the advice of counsel, I invoke my
5  Fifth Amendment privilege against self-incrimination
6  and respectfully decline to answer your question.
7    Q    There were no other brokers at Long Leaf
8  named Ben, correct?
9    A    On the advice of counsel, I invoke my
10  Fifth Amendment privilege against self-incrimination
11  and respectfully decline to answer your question.
12    Q    On the left side of this table there's
13  a column titled New Broker and the code is -- for
14  all these accounts is LLT003.  LLT003 was your Long
15  Leaf broker number, right?
16    A    On the advice of counsel, I invoke my
17  Fifth Amendment privilege against self-incrimination
18  and respectfully decline to answer your question.
19    Q    For six of the nine accounts on the
20  Ben Accounts document the account balance is less
21  than $7500.  Do you see that?
22    A    On the advice of counsel, I invoke my
23  Fifth Amendment privilege against self-incrimination
24  and respectfully decline to answer your question.

Page 54

1    Q    Do you agree that no account balance on
2  the Ben Accounts document is greater than $25,000?
3    A    On the advice of counsel, I invoke my
4  Fifth Amendment privilege against self-incrimination
5  and respectfully decline to answer your question.
6    Q    Mr. Cybulski, I'm going to show you
7  what's been previously marked as CFTC Exhibit 281.
8  Do you see Exhibit 281?
9    A    Yes.
10    Q    This is an email sent from Jim Donelson
11  to you, James Hatzigiannis and Alexander Stemper on
12  June 5, 2019, subject Net Liq 6-3 and attaching one
13  document titled Net Liq 6-3.  Do you see that?
14    A    On the advice of counsel, I invoke my
15  Fifth Amendment privilege against self-incrimination
16  and respectfully decline to answer your question.
17    Q    And just to clarify who these folks
18  are, Jim Donelson was the boss at Long Leaf Trading,
19  right?  He was the owner?
20    A    On the advice of counsel, I invoke my
21  Fifth Amendment privilege against self-incrimination
22  and respectfully decline to answer your question.
23    Q    And throughout the time period when Long
24  Leaf conducted business operations in 2019, James

Page 55

1  Hatzigiannis and Alexander Stemper were brokers at
2  Long Leaf Trading, right?
3    A    On the advice of counsel, I invoke my
4  Fifth Amendment privilege against self-incrimination
5  and respectfully decline to answer your question.
6    Q    The subject line is Net Liq 6-3.  Net liq
7  means net liquidating value, correct?
8    A    On the advice of counsel, I invoke my
9  Fifth Amendment privilege against self-incrimination
10  and respectfully decline to answer your question.
11    Q    Scrolling down to the attachment
12  here, I'm just going to scroll through the
13  whole thing.  Scrolling back up, the Net Liq 6-3
14  table is -- document is a series of tables showing
15  customer account balances as of June 3, 2019,
16  correct?
17       MR. JOHNSON:  Could you scroll down
18  a little bit?
19       MR. PLATT:  Down?
20       MR. JOHNSON:  Yes, please.  Okay.
21  BY MR. PLATT:
22    Q    So, Mr. Cybulski, the question is the
23  attachment titled Net Liq 6-3 shows account balances
24  as of June 3, 2019, correct?

Page 56

1    A    On the advice of counsel, I invoke my
2  Fifth Amendment privilege against self-incrimination
3  and respectfully decline to answer your question.
4    Q    So we see your accounts here under your
5  broker code LLT003.  Do you see that?
6    A    On the advice of counsel, I invoke my
7  Fifth Amendment privilege against self-incrimination
8  and respectfully decline to answer your question.
9    Q    This document was created approximately
10  six months after the Ben Accounts table that was
11  attached to Donelson's December 27, 2018 email that
12  we just reviewed as CFTC Exhibit 310, correct?
13    A    On the advice of counsel, I invoke my
14  Fifth Amendment privilege against self-incrimination
15  and respectfully decline to answer your question.
16    Q    So I'd like to compare these two
17  documents, first on the one hand Exhibit 310,
18  which has your customer account balances as of
19  December 22, 2018, and on the other hand, CFTC
20  Exhibit 281 which lists your customer balances
21  as of June 3, 2019.  So I'm going to toggle back
22  and forth.  Let me know if you guys are having
23  a hard time following along and I can make sure
24  that we're all looking at the same thing, okay?

Page 57

1    So first I'd like to focus your
2  attention on Account F3803.  Do you see that,
3  Mr. Cybulski?
4    A   On the advice of counsel, I invoke my
5  Fifth Amendment privilege against self-incrimination
6  and respectfully decline to answer your question.
7    Q   For Account F3803, the December 22, 2018
8  balance is $2,068, correct?
9    MR. JOHNSON:  Joe, I think you're on
10   the wrong exhibit there.
11 BY MR. PLATT:
12   Q   So this is the document that has the
13 December 22, 2018 balance, and for Account F3803
14 the beginning cash balance is $2,068.  Do you see
15 that, Mr. Cybulski?
16   MR. JOHNSON:  You have Exhibit 281 up
17   that we're looking at.
18   MR. PLATT:  Oh, it can't toggle?  When I do
19   that, nothing happens?
20   THE WITNESS:  Nothing's happening.
21   MR. JOHNSON:  No.  I think you clicked
22   over to like another tab there, 09, and I think
23   that was what you first showed us.
24   MR. PLATT:  So when I'm toggling back --

Page 58

1    let's go off the record for a minute, please.
2      (Discussion off the record.)
3    MR. PLATT:  Let's go back on the record
4    then.
5    Q   Mr. Cybulski, I'd like to focus
6  your attention on Account F3803.  As of December 22,
7  2018 on CFTC Exhibit 310, the beginning account --
8  the beginning cash balance is $2,068, correct?
9    A   On the advice of counsel, I invoke my
10 Fifth Amendment privilege against self-incrimination
11 and respectfully decline to answer your question.
12   Q   And then on CFTC Exhibit 281, Account 3803,
13 the balance as of June 3, 2019 is $591, correct?
14   A   On the advice of counsel, I invoke my
15 Fifth Amendment privilege against self-incrimination
16 and respectfully decline to answer your question.
17   Q   Going back to Exhibit 310, the account
18 balance for Account 3861 is $2,168 and then moving
19 forward to CFTC Exhibit 281, the June 3, 2019
20 balance for Account F3861 is $689.  Do you see that?
21   A   On the advice of counsel, I invoke my
22 Fifth Amendment privilege against self-incrimination
23 and respectfully decline to answer your question.
24   Q   On Exhibit 310 the account balance

Page 59

1  for Account F3960 is $23,010.  Do you see that?
2    A   On the advice of counsel, I invoke my
3  Fifth Amendment privilege against self-incrimination
4  and respectfully decline to answer your question.
5    Q   And on CFTC Exhibit 281 as of June 3,
6  2019, Account F3960 appears to be closed.  There's
7  no balance listed for the net liq value for that
8  account, correct?
9    A   On the advice of counsel, I invoke my
10 Fifth Amendment privilege against self-incrimination
11 and respectfully decline to answer your question.
12   Q   Mr. Cybulski, other things being equal,
13 you agree that Long Leaf's customers would not
14 close their accounts if the Long Leaf trading
15 recommendations had been profitable for them, right?
16   A   On the advice of counsel, I invoke my
17 Fifth Amendment privilege against self-incrimination
18 and respectfully decline to answer your question.
19   Q   Long Leaf customers, including your
20 customers, closed their accounts because their
21 accounts lost money, correct?
22   A   On the advice of counsel, I invoke my
23 Fifth Amendment privilege against self-incrimination
24 and respectfully decline to answer your question.

Page 60

1    Q   Going back to CFTC Exhibit 310, for
2  Account F3962 the December 22, 2018 balance is
3  $5,101.  Do you see that?
4    A   On the advice of counsel, I invoke my
5  Fifth Amendment privilege against self-incrimination
6  and respectfully decline to answer your question.
7    Q   And as of June 3, 2019 the balance for
8  Account F3962 was $1,017, right?
9    A   On the advice of counsel, I invoke my
10 Fifth Amendment privilege against self-incrimination
11 and respectfully decline to answer your question.
12   Q   As of December 22, 2018, Account F3973 had
13 a balance of $7,360.  Do you see that?
14   A   On the advice of counsel, I invoke my
15 Fifth Amendment privilege against self-incrimination
16 and respectfully decline to answer your question.
17   Q   For Account F3973, on June 3, 2019 the
18 balance was $5,083, right?
19   A   On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22   Q   As of December 22, 2018, Account F4110 had
23 a balance of $7,064, correct?
24   A   On the advice of counsel, I invoke my

Page 61

1  Fifth Amendment privilege against self-incrimination
2  and respectfully decline to answer your question.
3      Q    As of June 3, 2019, the same account, F4110
4  had a balance of $3,603, right?
5      A    On the advice of counsel, I invoke my
6  Fifth Amendment privilege against self-incrimination
7  and respectfully decline to answer your question.
8      Q    Account F4115 on December 22, 2018 had a
9  balance of $7,370.  Do you see that?
10      A    On the advice of counsel, I invoke my
11  Fifth Amendment privilege against self-incrimination
12  and respectfully decline to answer your question.
13      Q    The same account, F4115, on June 3, 2019
14  had a balance of $12,899.  Did I read that correctly
15  from this table?
16      A    On the advice of counsel, I invoke my
17  Fifth Amendment privilege against self-incrimination
18  and respectfully decline to answer your question.
19      Q    All right.  Last one.  Account F4120
20  as of December 22, 2018 has a balance of $21,250.
21  Do you see that?
22      A    On the advice of counsel, I invoke my
23  Fifth Amendment privilege against self-incrimination
24  and respectfully decline to answer your question.

Page 62

1      Q    And then as of June 3, 2019, F4120 was
2  closed, correct?
3      A    On the advice of counsel, I invoke my
4  Fifth Amendment privilege against self-incrimination
5  and respectfully decline to answer your question.
6      Q    Exhibits 310 and 281 are emails you
7  received from James Donelson, right?
8      MR. JOHNSON:  We already -- we'll just
9  object.  He's already answered that question.
10  BY MR. PLATT:
11      Q    Mr. Cybulski, when you worked at Long Leaf,
12  Mr. Donelson was your boss, correct?
13      A    On the advice of counsel, I invoke my
14  Fifth Amendment privilege against self-incrimination
15  and respectfully decline to answer your question.
16      Q    And you read emails you received from
17  your boss when you worked at Long Leaf, correct?
18      A    On the advice of counsel, I invoke my
19  Fifth Amendment privilege against self-incrimination
20  and respectfully decline to answer your question.
21      Q    According to the information
22  contained on the documents that Donelson sent to
23  you on Exhibits 310 and 281, for accounts that are
24  listed on both of those documents, Mr. Cybulski,

Page 63

1  two of the accounts were closed between December
2  2018 and June 3, 2019 and the balance of all of the
3  other accounts went down during that approximately
4  six-month time period, correct?
5      A    On the advice of counsel, I invoke my
6  Fifth Amendment privilege against self-incrimination
7  and respectfully decline to answer your question.
8      Q    Mr. Cybulski, I'm going to show you
9  what I'm marking as CFTC Exhibit 311.
10          (Whereupon  CFTC Exhibit No. 311
11           was marked for identification.)
12      Q    This is an email chain between you and
13  Larry Rea beginning in -- on January 21, 2019.  Do
14  you see that?
15      A    I can see what you're showing us.
16      Q    Do you agree that this is an email chain
17  between you and Larry Rea?
18      A    On the advice of counsel, I invoke my
19  Fifth Amendment privilege against self-incrimination
20  and respectfully decline to answer your question.
21      Q    Larry Rea was one of your customer accounts
22  at Long Leaf Trading, right?
23      A    On the advice of counsel, I invoke my
24  Fifth Amendment privilege against self-incrimination

Page 64

1  and respectfully decline to answer your question.
2      Q    Scrolling all the way to the bottom
3  here, you can see that the first email in this chain
4  is your email to Mr. Rea.  You write, "We are going
5  to be putting on a trade within our Cash Management
6  Strategy."  And then in large, bold, highlighted
7  font you write, "Please respond Yes to this email
8  for us to execute."  Did I read your email
9  correctly?
10      A    On the advice of counsel, I invoke my
11  Fifth Amendment privilege against self-incrimination
12  and respectfully decline to answer your question.
13      Q    At Long Leaf Trading it was common
14  for brokers to use large fonts, highlighting and
15  exclamation points in their emails to customers
16  seeking permission to execute trades on their
17  behalf, right?
18      A    On the advice of counsel, I invoke my
19  Fifth Amendment privilege against self-incrimination
20  and respectfully decline to answer your question.
21      Q    Long Leaf brokers used large fonts,
22  highlighting and exclamation marks to make customers
23  feel a sense of urgency, correct?
24      A    On the advice of counsel, I invoke my

Page 65

1 Fifth Amendment privilege against self-incrimination
2 and respectfully decline to answer your question.
3    Q    I'm going to scroll up just so you
4 can see Mr. Rea's response here on January 21, 2019.
5 Mr. Rea writes to you, "Not really keen on bonds.
6 Most of your trades on bonds have been losers.
7 We are headed the wrong direction on my account.
8 I may need to cut my losses before I have no
9 retirement." Did I read Mr. Rea's email to you
10 correctly?
11    A    On the advice of counsel, I invoke my
12 Fifth Amendment privilege against self-incrimination
13 and respectfully decline to answer your question.
14       MR. PLATT:  I'll show you what I'm marking
15 as CFTC Exhibit 312.
16          (Whereupon CFTC Exhibit No. 312
17            was marked for identification.)
18    Q    Do you see an email -- well, the top
19 email in this chain is from you to Jim Donelson on
20 March 6, 2019.  Do you see that?
21    A    On the advice of counsel, I invoke my
22 Fifth Amendment privilege against self-incrimination
23 and respectfully decline to answer your question.
24    Q    I'll show you the whole document

Page 66

1 here.  On March 6, 2019, which is a few months
2 after Exhibit 311, Larry Rea writes back to you
3 and he says, "I am still losing and do not want to
4 make any future trades.  I will roll over my balance
5 when you have the opportunity to close all of the
6 positions at optimal times.  Your call, but I am
7 no longer in the aggressive investment mood since
8 I have lost so much more money than you have made
9 in commissions.  I have lost something like 60K with
10 your company and am tired of this."
11          Did I read Mr. Rea's March 6, 2019
12 email to you correctly?
13    A    On the advice of counsel, I invoke my
14 Fifth Amendment privilege against self-incrimination
15 and respectfully decline to answer your question.
16    Q    And then you forwarded Mr. Rea's email
17 describing his losses to Jim Donelson, your boss,
18 correct?
19    A    On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22    Q    As a matter of practice, Long Leaf brokers
23 forwarded customer complaints to Jim Donelson,
24 right?

Page 67

1    A    On the advice of counsel, I invoke my
2 Fifth Amendment privilege against self-incrimination
3 and respectfully decline to answer your question.
4    Q    Jim Donelson was aware that lots of
5 Long Leaf customers complained about trade losses,
6 correct?
7    A    On the advice of counsel, I invoke my
8 Fifth Amendment privilege against self-incrimination
9 and respectfully decline to answer your question.
10          (Whereupon CFTC Exhibit No. 313
11            was marked for identification.)
12    Q    Mr. Cybulski, I'm showing you what's been
13 marked as CFTC Exhibit 313.  CFTC Exhibit 313 is an
14 email chain between you and customer Larry Finnegan
15 on March 11, 2019, subject line, how is my account
16 really doing?  Do you see that?
17    A    On the advice of counsel, I invoke my
18 Fifth Amendment privilege against self-incrimination
19 and respectfully decline to answer your question.
20    Q    So Mr. Finnegan, who was your customer,
21 writes, "I'm still not able to make any sense of my
22 account balance and whether or not we're gaining any
23 ground (making money or losing money).  Can you call
24 me about this?  It looks like my balance is all the

Page 68

1 way down below $2500."  And then you respond -- let
2 me ask you, Mr. Cybulski, did I read Mr. Finnegan's
3 email to you correctly?
4    A    On the advice of counsel, I invoke my
5 Fifth Amendment privilege against self-incrimination
6 and respectfully decline to answer your question.
7    Q    And then the next day, March 12, 2019,
8 you respond to Mr. Finnegan, quote, "Since we have
9 switched to the new strategy, we have been by and
10 large profitable."  Did I read that part of your
11 response correctly?
12    A    On the advice of counsel, I invoke my
13 Fifth Amendment privilege against self-incrimination
14 and respectfully decline to answer your question.
15    Q    You didn't tell Mr. Finnegan what
16 his account's net liquidating value was in your
17 response, did you?
18    A    On the advice of counsel, I invoke my
19 Fifth Amendment privilege against self-incrimination
20 and respectfully decline to answer your question.
21    Q    Even though Mr. Finnegan says he
22 couldn't make any sense of his account balance,
23 you did not try to clarify for Mr. Finnegan how his
24 account was performing, right?

Page 69

1    A    On the advice of counsel, I invoke my
2 Fifth Amendment privilege against self-incrimination
3 and respectfully decline to answer your question.
4    Q    Instead, you told him that Long
5 Leaf's trading recommendations were by and large
6 profitable, right?
7    A    On the advice of counsel --
8         MR. RUTH:    These guys are --
9    A    -- I invoke my Fifth Amendment privilege --
10        MR. RUTH:    You guys were using past
11 performance of clients to sell --
12        MR. PLATT:    Mr. Ruth, Mr. Ruth, can
13   you please mute yourself?  So, Mary, can
14   you please read back -- there was a question
15   pending.  Can you please read it back to the
16   witness.
17        (Whereupon the portion of the
18         record was read as requested.)
19    A    On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22    Q    All right.  Mr. Cybulski, I'm going to
23 show you what I'm marking as CFTC Exhibit 3-1-4,
24 314.

Page 70

1         (Whereupon  CFTC Exhibit No. 314
2          was marked for identification.)
3    Q    Do you see Exhibit 314 is an email
4 from Jim Donelson to you on May 1, 2019, Subject:
5 Finnegan.  Attachments is a PDF titled Finnegan.
6 Do you see that?
7    A    On the advice of counsel, I invoke my
8 Fifth Amendment privilege against self-incrimination
9 and respectfully decline to answer your question.
10    Q    This is the same Finnegan who had emailed
11 you in March that we saw on Exhibit 313 asking you
12 how his account was performing, right?
13    A    On the advice of counsel, I invoke my
14 Fifth Amendment privilege against self-incrimination
15 and respectfully decline to answer your question.
16    Q    I'm going to scroll down to the
17 attachment, Mr. Cybulski.  This one-page attachment
18 titled Finnegan doesn't have any dates on it that
19 I can tell.
20        (Whereupon the internet connection
21         was lost, after which the following
22         proceedings were had.)
23        MR. PLATT:    Mr. Cybulski, I apologize.
24   We'll do those two questions over.

Page 71

1         THE REPORTER:  I'm sorry.
2         MR. PLATT:  No problem, no problem.
3    Q    So, Mr. Cybulski, you agree that this
4 document reflects the beginning cash balance of
5 $4,612, right?
6    A    On the advice of counsel, I invoke my
7 Fifth Amendment privilege against self-incrimination
8 and respectfully decline to answer your question.
9    Q    And the total change reflected on this
10 document down at the bottom is negative $3,595.
11 Did I read that correctly?
12    A    On the advice of counsel, I invoke my
13 Fifth Amendment privilege against self-incrimination
14 and respectfully decline to answer your question.
15    Q    According to this year-to-date summary of
16 your customer Finnegan's performance, as of May 1,
17 2019 his account was down about 75 percent year to
18 date, correct?
19    A    On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22    Q    On Exhibit 313 we saw you respond to
23 your customer Finnegan on March 12th saying that
24 Long Leaf's trading strategy was profitable by and

Page 72

1 large.  Do you remember that?
2    A    On the advice of counsel, I invoke my
3 Fifth Amendment privilege against self-incrimination
4 and respectfully decline to answer your question.
5    Q    At the same time you told Mr. Finnegan that
6 Long Leaf's trading was profitable by and large, his
7 account was experiencing significant losses, right?
8    A    On the advice of counsel, I invoke my
9 Fifth Amendment privilege against self-incrimination
10 and respectfully decline to answer your question.
11    Q    You didn't tell your customer,
12 Mr. Finnegan, that an account balance on March 12,
13 2019 -- strike that.  You didn't tell your customer,
14 Mr. Finnegan, his account balance on March 12, 2019
15 because it was Long Leaf's practice to avoid telling
16 customers that Long Leaf's trading recommendations
17 were losing money, correct?
18    A    On the advice of counsel, I invoke my
19 Fifth Amendment privilege against self-incrimination
20 and respectfully decline to answer your question.
21    Q    Mr. Cybulski, in 2019 did James
22 Donelson direct you to tell customers that Long
23 Leaf's trading was profitable whether or not that
24 was actually true for any particular account?

Page 73

1    A    On the advice of counsel, I invoke my
2 Fifth Amendment privilege against self-incrimination
3 and respectfully decline to answer your question.
4    Q    Mr. Cybulski, I'm going to show you
5 what I'm marking as CFTC Exhibit 315.
6         (Whereupon CFTC Exhibit No. 315
7           was marked for identification.)
8    Q    Can you see Alfred Springer's email
9 to you on July 4, 2019, Subject: Close account?
10   A    On the advice of counsel, I invoke my
11 Fifth Amendment privilege against self-incrimination
12 and respectfully decline to answer your question.
13   Q    And your customer, Alfred Springer,
14 writes to you, "I have incurred too much loss at
15 the ineffectiveness of Long Leaf since I entrusted
16 my hard-earned assets to be handled respectfully.
17 I feel that I have to take back what little I have
18 left in the account and self-manage my value back
19 up.  Please make arrangements to transfer the
20 balance to one of my personal accounts and close
21 my Long Leaf account."
22        Did I read your customer Alfred
23 Springer's email to you correctly?
24   A    On the advice of counsel, I invoke my

Page 74

1 Fifth Amendment privilege against self-incrimination
2 and respectfully decline to answer your question.
3    Q    I'm showing you what I'm marking as CFTC
4 Exhibit 316.
5         (Whereupon CFTC Exhibit No. 316
6           was marked for identification.)
7    Q    Mr. Cybulski, do you see an email
8 between -- from you to jmweb79@gmail.com dated
9 September 5, 2019?
10   A    On the advice of counsel, I invoke my
11 Fifth Amendment privilege against self-incrimination
12 and respectfully decline to answer your question.
13   Q    jmweb79@gmail.com is the email address used
14 by your customer James Stuart, right?
15   A    On the advice of counsel, I invoke my
16 Fifth Amendment privilege against self-incrimination
17 and respectfully decline to answer your question.
18   Q    I'm going to scroll down to the
19 attachment, which is titled Stuart update 9-5.
20 Do you see the attachment, Mr. Cybulski?
21   A    On the advice of my counsel, I invoke my
22 Fifth Amendment privilege against self-incrimination
23 and respectfully decline to answer your question.
24        MR. PLATT: So you guys are able to

Page 75

1 view this?  I scrolled down.  I just want to
2 make sure you can see it.
3        MR. JOHNSON:  Yeah, we can see it.
4 BY MR. PLATT:
5    Q    Scrolling down to the attachment,
6 it shows that Mr. Stuart's beginning net liq was
7 $20,000, correct?
8    A    On the advice of counsel, I invoke my
9 Fifth Amendment privilege against self-incrimination
10 and respectfully decline to answer your question.
11   Q    And according to this document, the
12 first trade executed was entered on March 4, 2019,
13 correct?
14   A    On the advice of counsel, I invoke my
15 Fifth Amendment privilege against self-incrimination
16 and respectfully decline to answer your question.
17   Q    So according to this PDF that you sent
18 to your customer James Stuart, between March 2019
19 and September 5, 2019 his $20,000 account had lost
20 approximately $1700, correct?
21   A    On the advice of counsel, I invoke my
22 Fifth Amendment privilege against self-incrimination
23 and respectfully decline to answer your question.
24

Page 76

1         (Whereupon CFTC Exhibit No. 317
2           was marked for identification.)
3    Q    Mr. Cybulski, I'm showing you what I've
4 marked as CFTC Exhibit 317.  This is an email from
5 Jim Donelson to you on June 26, 2019.  The subject
6 is Bret Anderson, and there's one attachment titled
7 Trading Summary Data - BAnderson.  Do you see that?
8    A    On the advice of counsel, I invoke my
9 Fifth Amendment privilege against self-incrimination
10 and respectfully decline to answer your question.
11   Q    According to the attachment to Donelson's
12 June 26th email, Bret Anderson's beginning net liq
13 was $25,000, right?
14   A    On the advice of counsel, I invoke my
15 Fifth Amendment privilege against self-incrimination
16 and respectfully decline to answer your question.
17   Q    According to this document that
18 Donelson sent to you, the first trade executed in
19 Mr. Anderson's account occurred on March 1, 2019,
20 correct?
21   A    On the advice of counsel, I invoke my
22 Fifth Amendment privilege against self-incrimination
23 and respectfully decline to answer your question.
24   Q    According to Exhibit 317, which is

Page 77

1  a document prepared by James Donelson and sent to
2  you, the total performance of Mr. Anderson's account
3  between March 1, 2019 and June 26, 2019 is about
4  a $7500 loss, right?
5      A    On the advice of my counsel, I would
6  like to invoke my Fifth Amendment privilege against
7  self-incrimination and respectfully decline to
8  answer your question.
9      Q    Mr. Anderson -- according to this document,
10 Mr. Anderson experienced approximately a 30 percent
11 loss in four months, right?
12     A    On the advice of counsel, I would
13 like to invoke my Fifth Amendment privilege against
14 self-incrimination and respectfully decline to
15 answer your question.
16     Q    And according to this summary document,
17 $4800 of those losses in Mr. Anderson's account are
18 attributed to so-called Core trades, right?
19     A    At the advice of my counsel,
20 I'd like to invoke my Fifth Amendment right to
21 not self-incriminate and decline to answer your
22 question.
23         MR. JOHNSON:  We're having some technical
24 difficulties.  The video just froze.

Page 78

1          MR. PLATT:  Do you want to see if you
2  can sign out and sign back in again?  That
3  seemed to fix it the last time.  Let's go off
4  the record.
5          MR. JOHNSON:  Yeah, do you think --
6  could we take just a break for five minutes?
7  Hold on.
8          MR. PLATT:  Yeah, that's fine.  I think
9  I've got like an hour more.  So I don't know if
10 you want to just take ten minutes and then power
11 through.  I'd rather do that than take a lunch
12 break.
13         MR. JOHNSON:  Okay.
14         MR. PLATT:  I mean, what do you think,
15 Mr. Johnson?
16         MR. JOHNSON:  We can get through it
17 for sure.
18         MR. PLATT:  Okay, let's do that.  Let's
19 come back at like 12:20.
20         MR. JOHNSON:  Okay, 12:20.  Sure, you
21 got it.
22
23
24

Page 79

1          (Whereupon a recess was taken from
2          12:08 p.m., to 12:22 p.m., after
3          which the following proceedings
4          were had:)
5  BY MR. PLATT:
6      Q    So, Mr. Cybulski, before we took
7  a break we looked at several documents, including
8  Exhibits 312 through 317, that show that your
9  customers were losing lots of money consistently
10 in 2019, correct?
11     A    On the advice of counsel, I invoke my
12 Fifth Amendment privilege against self-incrimination
13 and respectfully decline to answer your question.
14     Q    Exhibits 312 through 317 and other
15 documents reflect that your customers were losing
16 thousands of dollars over numerous overlapping
17 periods of time in 2019, correct?
18     A    On the advice of counsel, I invoke my
19 Fifth Amendment privilege against self-incrimination
20 and I would like to respectfully decline to answer
21 your question.
22     Q    Those summary tables Donelson emailed
23 to you in December 2018 and June 2019 reflecting
24 customer balances show all the customers from

Page 80

1  December 2018 through June 2019 were either down
2  or had closed their accounts, correct?
3      A    On the advice of counsel, I invoke my
4  Fifth Amendment privilege against self-incrimination
5  and respectfully decline to answer your question.
6      Q    We just looked at emails that you
7  received in January, March and July of 2019 from
8  customers complaining about trading losses and
9  poor account performance, right?
10     A    On the advice of counsel, I invoke my
11 Fifth Amendment privilege against self-incrimination
12 and respectfully decline to answer your question.
13     Q    The documents you received from
14 James Donelson in May, June and September of
15 2019 reflected account drawdowns of thousands
16 of dollars in their respective accounts based
17 on trading activity that occurred only in 2019,
18 correct?
19     A    On the advice of counsel, I invoke my
20 Fifth Amendment privilege against self-incrimination
21 and respectfully decline to answer your question.
22     Q    At some point in 2019 you participated
23 in a companywide meeting at the Long Leaf office
24 during which the brokers and James Donelson

Page 81

1 discussed trading losses and poor account
2 performance, correct?
3      MR. JOHNSON: Could we just object
4 to foundation to the time of that meeting?
5 Do you think you could go more into that, Joe,
6 so we know when we're talking about?
7      MR. PLATT: I'm basing this on testimony
8 from another witness, and that's as detailed
9 as I can get, unfortunately.
10      MR. JOHNSON: And it's like a six-month
11 period you're saying, 2019?
12      MR. PLATT: 2019. I'm not sure when.
13      MR. JOHNSON: Okay. All right. Yeah,
14 go ahead. Answer the question.
15      A   On the advice of counsel, I invoke my
16 Fifth Amendment privilege against self-incrimination
17 and respectfully decline to answer your question.
18 BY MR. PLATT:
19      Q   Mr. Cybulski, in 2019 you knew that
20 substantially all Long Leaf customers were losing
21 money over any time period during your tenure as
22 a broker, right?
23      A   On the advice of counsel, I invoke my
24 Fifth Amendment privilege against self-incrimination

Page 82

1 and respectfully decline to answer your question.
2      Q   Let's go back to CFTC Exhibit 310.
3 You'll recall this document, Mr. Cybulski, because
4 it has the Ben Accounts table that we looked at.
5 Shortly after -- sorry. So shortly after you began
6 working at Long Leaf, Long Leaf started telling
7 its customers that it was going to deploy a new
8 trading strategy, correct?
9      A   On the advice of counsel, I invoke my
10 Fifth Amendment privilege against self-incrimination
11 and respectfully decline to answer your question.
12      Q   So the second attachment to Donelson's
13 December 27 -- December 27, 2018 email to you is
14 titled December Update. I'm going to scroll down
15 to it. It's a letter addressed to Long Leaf Trading
16 Client. Do you remember this letter?
17      A   On the advice of counsel, I invoke my
18 Fifth Amendment privilege against self-incrimination
19 and respectfully decline to answer your question.
20      Q   Donelson sent this letter to Long Leaf
21 clients because Long Leaf customers experienced
22 significant trading losses in November and December
23 of 2018, correct?
24      A   On the advice of counsel, I invoke my

Page 83

1 Fifth Amendment privilege against self-incrimination
2 and respectfully decline to answer your question.
3      Q   And you can see here in Donelson's
4 client letter he references those losses in the
5 second sentence. He writes, "We have seen our
6 trading model struggle, as evidenced by the last two
7 months." Did I read that correctly, Mr. Cybulski?
8      A   On the advice of counsel, I invoke my
9 Fifth Amendment privilege against self-incrimination
10 and respectfully decline to answer your question.
11      Q   And then Donelson outlines four
12 numbered items that he calls, quote, updates to the
13 business. In update No. 1 Donelson tells clients
14 that Scott Gecas has left the firm and Donelson
15 would be handling all trading strategy management
16 going forward. Did I read that item No. 1
17 correctly?
18      A   On the advice of counsel, I invoke my
19 Fifth Amendment privilege against self-incrimination
20 and respectfully decline to answer your question.
21      Q   Update No. 3, Donelson states that
22 he had, quote, tested a low risk/low return model
23 that has shown positive performance and returns
24 and he says that he plans to use that strategy

Page 84

1 to, quote, replicate interest for clients. Did
2 I read that update No. 3 correctly?
3      A   On the advice of counsel, I invoke my
4 Fifth Amendment privilege against self-incrimination
5 and respectfully decline to answer your question.
6      Q   And the model Donelson is referencing
7 in update Item 3 of his December 2018 client letter
8 is what would come to be known as the cash
9 management strategy, correct?
10      A   On the advice of counsel, I invoke my
11 Fifth Amendment privilege against self-incrimination
12 and respectfully decline to answer your question.
13      (Whereupon CFTC Exhibit No. 318
14      was marked for identification.)
15      Q   I'm going to show you what I've marked
16 as CFTC Exhibit 318. Exhibit 318 is an email from
17 you to James Hatzigiannis on December 21, 2018. The
18 subject line is Q3 Performance data, and there's one
19 attachment titled Cash Management Q3. Did I read
20 that correctly?
21      A   On the advice of counsel, I invoke my
22 Fifth Amendment privilege against self-incrimination
23 and respectfully decline to answer your question.
24      Q   I'm going to scroll down to the attachment.

Page 85

1 This is a document that James Donelson provided to
2 you, correct?
3     A    On the advice of counsel, I invoke my
4 Fifth Amendment privilege against self-incrimination
5 and respectfully decline to answer your question.
6     Q    This document purports to reflect
7 information about four trades that took place
8 over an approximate at least three-month time
9 period in 2018, correct?
10     A    On the advice of counsel, I invoke my
11 Fifth Amendment privilege against self-incrimination
12 and respectfully decline to answer your question.
13     Q    These four trades are the extent
14 of the testing that Donelson referred to in his
15 December 2018 -- in his December 2018 client letter,
16 correct?
17     A    On the advice of counsel, I invoke my
18 Fifth Amendment privilege against self-incrimination
19 and respectfully decline to answer your question.
20         (Whereupon  CFTC Exhibit No. 319
21           was marked for identification.)
22     Q    Mr. Cybulski, I'm going to show you what
23 I've marked as CFTC Exhibit 319.  This is an email
24 from James Hatzigiannis to you on January 22, 2019.

Page 86

1 The subject is Q3 Cash Management Explanation, and
2 there's one attachment titled Explanation of Q3 Cash
3 Management Performance.  Did I read that information
4 correctly?
5     A    On the advice of counsel, I invoke my
6 Fifth Amendment privilege against self-incrimination
7 and respectfully decline to answer your question.
8     Q    Long Leaf -- so I'm going to scroll
9 down so you can see the attachment.  Long Leaf
10 brokers used the explanation in James Hatzigiannis'
11 document to describe the purportedly new cash
12 management strategy to customers and prospects,
13 correct?
14     A    On the advice of counsel, I'd like
15 to invoke my Fifth Amendment privilege against
16 self-incrimination and respectfully decline to
17 answer that question.
18     Q    And in this first paragraph up at the
19 top we see that Mr. Hatzigiannis writes, "So as you
20 can see, this trade is pretty consistent, right?"
21 Did I read that correctly?
22     A    On the advice of counsel, I'd like
23 to invoke my Fifth Amendment privilege against
24 self-incrimination and respectfully decline to

Page 87

1 answer your question.
2     Q    And that's a conclusion that
3 Mr. Hatzigiannis was drawing from a sample of
4 four trades, correct?
5     A    On the advice of counsel, I'd like
6 to invoke my Fifth Amendment privilege to not
7 self-incriminate and I respectfully decline to
8 answer your question.
9     Q    Have you ever taken a statistics class,
10 Mr. Cybulski?
11     A    On the advice of counsel, I'd like
12 to invoke my Fifth Amendment privilege against
13 self-incrimination and respectfully decline to
14 answer that question.
15     Q    In 2019 Long Leaf brokers incorporated
16 this purported four-trade test into the custom
17 presentation to support the statement that Long
18 Leaf's cash management strategy would generate
19 consistent returns, correct?
20     A    On the advice of counsel, I'd like
21 to invoke my Fifth Amendment privilege against
22 self-incrimination and respectfully decline to
23 answer that question.
24     Q    So, Mr. Cybulski, I'm going to show you

Page 88

1 what's been marked as CFTC Exhibit 296.  Exhibit 296
2 is an email from Donelson to the Long Leaf brokers
3 on May 20, 2019.  The subject is New Track Record.
4 There's one attachment titled Track Record - Core
5 Strategy - 5-20-2019.  Do you see that?
6     A    Yes.
7     Q    I'm going to scroll down to the
8 attachment.  Donelson's track record core strategy
9 5-20-2019 document lists 13 trades.  Do you see
10 those 13 trades?
11     A    On the advice of counsel, I'd like
12 to invoke my Fifth Amendment privilege against
13 self-incrimination and respectfully decline to
14 answer your question.
15     Q    This document purports to reflect an
16 aggregate net profit under the row Total Average,
17 correct?
18     A    On the advice of counsel, I'd like
19 to invoke my Fifth Amendment privilege to not
20 self-incriminate and respectfully decline to answer
21 your question.
22     Q    Donelson told the Long Leaf brokers
23 to use this document with clients and prospects
24 to support statements that Long Leaf's trading

Page 89

1  recommendations generated net profits, right?
2      A    On the advice of counsel, I'd like
3  to invoke my Fifth Amendment privilege not to
4  self-incriminate and respectfully decline to answer
5  your question.
6      Q    And you made statements to prospects
7  and customers that Long Leaf generated positive
8  trade returns, correct?
9      A    On the advice of counsel, I'd like
10  to invoke my Fifth Amendment privilege not to
11  self-incriminate and respectfully decline to answer
12  your question.
13      Q    Donelson's track record document on
14  Exhibit 319 only includes some of Long Leaf's trades
15  between January 1, 2019 and May 20, 2019, correct?
16      A    On the advice of counsel, I'd like
17  to invoke my Fifth Amendment privilege against
18  self-incrimination and respectfully decline to
19  answer your question.
20      Q    Donelson's May 20th track record
21  document excludes lots of losing trades during that
22  time period, doesn't it?
23      MR. JOHNSON:  We're just going to object
24  to lack of personal knowledge to the question.

Page 90

1      A    And on the advice of counsel, I'd
2  like to invoke my Fifth Amendment privilege to
3  not self-incriminate and respectfully decline to
4  answer your question.
5  BY MR. PLATT:
6      Q    Donelson's May 20th track record
7  document provides an incomplete picture of Long
8  Leaf's track record between January 1, 2019 and
9  May 20, 2019, correct?
10      MR. JOHNSON:  And then we would object
11  again to lack of personal knowledge, and my
12  client just wasn't in charge of those accounts.
13  He wouldn't have that knowledge.
14      A    On the advice of counsel, I'd like
15  to invoke my Fifth Amendment privilege to not
16  self-incriminate and respectfully decline to answer
17  your question.
18      (Whereupon  CFTC Exhibit No. 320
19          was marked for identification.)
20  BY MR. PLATT:
21      Q    Mr. Cybulski, I'm going to show you what
22  I've marked as Exhibit 320, which is an email from
23  you to Stemper and Hatzigiannis on August 9, 2019.
24  The subject is Large account example.  There's one

Page 91

1  attachment titled Large Account Tracking 8-9.  Did
2  I read that information correctly?
3      A    It appears so.
4      Q    I'm going to scroll down so you can
5  see the attachment.  This is a document you received
6  from James Donelson, correct?
7      A    On the advice of counsel, I'd like
8  to invoke my Fifth Amendment privilege against
9  self-incrimination and respectfully decline to
10  answer your question.
11      Q    This document purports to show the
12  performance of an account between April 2019 and
13  August 2019, correct?
14      A    On the advice of counsel, I'd like
15  to invoke my Fifth Amendment privilege against
16  self-incrimination and respectfully decline to
17  answer your question.
18      Q    The account reflected on this document
19  was the largest by an order of magnitude account
20  under Long Leaf's management, correct?
21      A    On the advice of counsel, I'd like
22  to invoke my Fifth Amendment privilege not to
23  self-incriminate and respectfully decline to answer
24  your question.

Page 92

1      Q    You and the other Long Leaf brokers
2  used this document or documents similar to it during
3  your solicitations of prospective customers,
4  correct?
5      A    On the advice of counsel, I'd like
6  to invoke my Fifth Amendment privilege not to
7  self-incriminate and respectfully decline to answer
8  your question.
9      Q    This is the document that you were
10  referencing, or a document similar to it, on CFTC
11  Exhibit 308, which was the recording we listened to
12  earlier today, correct?
13      A    On the advice of counsel, I'd like
14  to invoke my Fifth Amendment privilege against
15  self-incrimination and respectfully decline to
16  answer the question.
17      Q    As a Long Leaf broker, Mr. Cybulski,
18  you represented to prospective customers that this
19  account's performance was representative of Long
20  Leaf's customers, right?
21      A    On the advice of counsel, I'd like
22  to invoke my Fifth Amendment privilege, sorry,
23  against self-incrimination and respectfully decline
24  to answer that question.

Page 93

1    Q   Exhibit 320 shows information concerning
2  the account of your customer Eric Reeves, right?
3    A   On the advice of counsel, I'd like
4  to invoke my Fifth Amendment privilege not to
5  self-incriminate and respectfully decline to answer
6  that question.
7    Q   I'm going to play another recording
8  at this time.  It's much shorter.  I'm going to
9  mark this recording as Exhibit 321, and the file
10  name is 04-16-2019_EricReeves_7045751420.  And I'll
11  represent to you, Mr. Cybulski, that we received
12  this recording from Long Leaf Trading.
13         (Whereupon CFTC Exhibit No. 321
14         was marked for identification.)
15      MR. JOHNSON:  We don't hear it.
16      MR. PLATT:  Yeah, I'm sorry.  I needed
17  to refresh my browser.  Just bear with me for
18  about a minute, please.
19      (Whereupon the recording was played.)
20      MR. PLATT:  Thank you for bearing
21  with me with those technical difficulties.
22    Q   On this recording there are two
23  voices and one of those voices belongs to you,
24  right, Mr. Cybulski?

Page 94

1    A   Yes.
2    Q   The other one is Eric Reeves, right?
3    A   On the advice of my counsel, I'd like
4  to invoke my Fifth Amendment privilege against
5  self-incrimination and I'd like to decline to
6  answer that question.
7      MR. PLATT:  I'm going to start this
8  recording at 2 minutes and 30 seconds.
9      (Whereupon the recording was played.)
10    Q   Mr. Cybulski, the other voice on the
11  recording asks a very specific question.  It says
12  in the last year, including the 12 percent, what's
13  the total rate of return for the account?  Did you
14  hear that -- the prospect ask you that question?
15    A   On the advice of counsel, I invoke my
16  Fifth Amendment privilege to not self-incriminate
17  and respectfully decline to answer that question.
18    Q   And your response was probably
19  close to 1 percent per trade, in that area.
20  Before it was 1.83 percent with our biggest
21  drawdown of 5.23 percent.  I don't know what
22  the new calculation will be, but it's going to
23  be in the area of 1 percent per trade, which is
24  what we're targeting.  Is that an accurate summary

Page 95

1  of your response?
2    A   On the advice of counsel, I'd like
3  to invoke my Fifth Amendment privilege not to
4  self-incriminate and respectfully decline to answer
5  your question.
6    Q   Between April 2018 and April 2019,
7  which is the time period this customer was asking
8  about, the total rate of return for Long Leaf
9  accounts was not positive, correct?
10      MR. JOHNSON:  Objection, lack of
11      personal knowledge.  He wasn't -- doesn't
12      know all the accounting and he wouldn't have
13      this information.
14    A   On the advice of counsel, I'd like
15  to invoke my Fifth Amendment privilege not to
16  self-incriminate and respectfully decline to answer
17  your question.
18      MR. PLATT:  Mr. Johnson, I'm going
19      to admonish you against offering speaking
20      objections into the record.  You can note your
21      objection and its basis on the record, but you
22      shouldn't be offering extensive rationales
23      underpinning your objection during a deposition
24      setting.

Page 96

1      MR. JOHNSON:  Is personal knowledge
2      enough, lack of personal knowledge?
3      MR. PLATT:  Yes, I think that would
4      suffice.
5      MR. JOHNSON:  Okay, thank you.
6  BY MR. PLATT:
7    Q   In fact, Mr. Cybulski, the rate of
8  return for all Long Leaf accounts between April
9  2018 through April 2019 was negative, right?
10      MR. JOHNSON:  We would object to lack
11      of personal knowledge.
12    A   On the advice of counsel, I'd like
13  to invoke my Fifth Amendment privilege not to
14  self-incriminate and respectfully decline to answer
15  your question.
16  BY MR. PLATT:
17    Q   When you opened his account at
18  Long Leaf, your customer Eric Reeves was under the
19  impression that Long Leaf's accounts experienced
20  a 1 percent return per trade for the 12 months
21  preceding April 2019, correct?
22      MR. JOHNSON:  Objection, calls for
23      speculation.
24    A   On the advice of counsel, I'd like

Page 97

1 to invoke my Fifth Amendment privilege not to
2 self-incriminate and respectfully decline to answer
3 your question.
4 BY MR. PLATT:
5    Q   He was under that impression because
6 that's what you told him in response to a very
7 specific question, right?
8    A   On the advice of counsel, I'd like
9 to invoke my Fifth Amendment privilege not to
10 self-incriminate and respectfully decline to answer
11 that question.
12    Q   Do you know how Eric Reeves' account
13 performed over its lifetime?
14    A   On the advice of counsel, I'd like
15 to invoke my Fifth Amendment privilege against
16 self-incrimination and respectfully decline to
17 answer your question.
18    Q   Eric Reeves' two accounts in the aggregate
19 lost over $150,000 in approximately nine months
20 following Long Leaf's trading recommendations,
21 correct?
22    A   On the advice of counsel, I'd like
23 to invoke my Fifth Amendment privilege against
24 self-incrimination and respectfully decline to

Page 98

1 answer your question.
2    Q   Over that same nine-month time period,
3 Long Leaf earned about $70,000 in commissions off
4 of Mr. Reeves' trading, right?
5        MR. JOHNSON:  And we would object to
6    lack of personal knowledge.
7    A   On the advice of counsel, I'd like
8 to invoke my Fifth Amendment privilege not to
9 self-incriminate and respectfully decline to answer
10 that question.
11 BY MR. PLATT:
12    Q   And you personally profited off of
13 Mr. Reeves' trading activity, correct?
14    A   On the advice of counsel, I'd like
15 to invoke my Fifth Amendment privilege not to
16 self-incriminate and respectfully decline to answer
17 that question.
18    Q   Even though everyone at Long Leaf knew
19 that substantially all of Long Leaf's customers lost
20 money over substantially all time periods, Long Leaf
21 never provided complete and accurate track record
22 information to prospective clients, correct?
23        MR. JOHNSON:  And we would just object
24    to personal knowledge.

Page 99

1    A   On the advice of counsel, I'd like
2 to invoke my Fifth Amendment privilege not to
3 self-incriminate and respectfully decline to answer
4 your question.
5 BY MR. PLATT:
6    Q   Even if a prospect asked for track record
7 information, Long Leaf did not provide complete and
8 accurate performance information, right?
9        MR. JOHNSON:  We'd object to lack of
10    personal knowledge.
11    A   On the advice of counsel, I'd like
12 to invoke my Fifth Amendment privilege not to
13 self-incriminate and respectfully decline to answer
14 your question.
15 BY MR. PLATT:
16    Q   Even if a prospect asked you for
17 track record information, you did not provide
18 complete and accurate track record information,
19 right?
20    A   On the advice of counsel, I'd like
21 to invoke my Fifth Amendment privilege against
22 self-incrimination and respectfully decline to
23 answer that question.
24    Q   You never once told a prospect that

Page 100

1 you never had a customer close an account with
2 more money than they had funded the account with,
3 correct?
4    A   On the advice of counsel, I invoke my
5 Fifth Amendment privilege against self-incrimination
6 and respectfully decline to answer your question.
7    Q   You never once provided accurate
8 information to a prospect concerning Long Leaf's
9 annual rates of return, right?
10    A   On the advice of counsel, I'd like
11 to invoke my Fifth Amendment privilege against
12 self-incrimination and respectfully decline to
13 answer your question.
14    Q   You never once attempted to provide
15 a Long Leaf prospect with accurate information
16 concerning Long Leaf's largest peak-to-valley
17 drawdown, correct?
18    A   On the advice of counsel, I'd like
19 to invoke my Fifth Amendment privilege not to
20 self-incriminate and respectfully decline to answer
21 your question.
22    Q   Track record information is important
23 to prospective customers, right?
24    A   On the advice of counsel, I'd like

Page 101

1 to invoke my Fifth Amendment privilege against
2 self-incrimination and respectfully decline to
3 answer your question.
4     Q    You personally would never invest your
5 own money with a manager if you knew the manager
6 consistently lost their clients' money, isn't that
7 right?
8     A    On the advice of counsel, I'd like
9 to invoke my Fifth Amendment privilege against
10 self-incrimination and respectfully decline to
11 answer that question.
12     Q    You didn't open a Long Leaf account with
13 your own personal money, right?
14     A    On the advice of counsel, I would
15 like to invoke my Fifth Amendment privilege not
16 to self-incriminate and respectfully decline to
17 answer your question.
18     Q    You never asked your parents to open
19 a Long Leaf Trading account, right?
20     A    On the advice of counsel, I'd like
21 to invoke my Fifth Amendment privilege against
22 self-incrimination and respectfully decline to
23 answer your question.
24     Q    You never provided complete and accurate

Page 102

1 track record information to prospects because you
2 knew if you disclosed Long Leaf's true performance
3 to prospective customers, it would have been highly
4 unlikely that anyone would have opened an account
5 with Long Leaf Trading, correct?
6     A    On the advice of counsel, I'd like
7 to invoke my Fifth Amendment privilege against
8 self-incrimination and respectfully decline to
9 answer that question.
10     Q    Mr. Cybulski, not only did you
11 fail to disclose complete and accurate track
12 record information to prospects, you affirmatively
13 represented to prospects in 2019 that Long Leaf's
14 trading was generating positive net returns for
15 actual customers, right?
16     A    On the advice of counsel, I'd like
17 to invoke my Fifth Amendment privilege against
18 self-incrimination and respectfully decline to
19 answer your question.
20     Q    And did you make those representations
21 along with the implication that those positive
22 returns were representative of Long Leaf Trading,
23 right?
24     A    On the advice of counsel, I'd like

Page 103

1 to invoke my Fifth Amendment privilege against
2 self-incrimination and respectfully decline to
3 answer that question.
4     Q    You made those affirmative
5 representations that Long Leaf was generating
6 positive trading returns even though you were
7 actually aware that most of your clients were
8 losing thousands of dollars or closing their
9 accounts, right?
10     A    On the advice of counsel, I'd like
11 to invoke my Fifth Amendment privilege against
12 self-incrimination and respectfully decline to
13 answer your question.
14     MR. PLATT:  I'm going to share what
15 I'm marking as Exhibit 322.
16     (WhereuponCFTC Exhibit No. 322
17     was marked for identification.)
18     Q    Mr. Cybulski, Exhibit 322 is an email
19 from you to James Hatzigiannis on April 3, 2019.
20 The subject line is Re:  Tax Advantages - Followup
21 correct?
22     A    On the advice of counsel, I'd like
23 to invoke my Fifth Amendment privilege not to
24 self-incriminate and respectfully decline to answer

Page 104

1 your question.
2     Q    And the entire body of the email
3 is one sentence written in all caps in large font
4 and your sentence says, "Give us your money."  Did
5 I read your email correctly?
6     A    On the advice of counsel, I'd like
7 to invoke my Fifth Amendment privilege against
8 self-incrimination and respectfully decline to
9 answer your question.
10     Q    In Exhibit 322 the "us" is Long Leaf
11 and the "your" refers to prospective customers,
12 correct?
13     A    On the advice of counsel, I'd like
14 to invoke my Fifth Amendment privilege against
15 self-incrimination and respectfully decline to
16 answer your question.
17     Q    Taking customers' money was the goal of
18 Long Leaf's solicitations, correct?
19     A    On the advice of counsel, I'd like
20 to invoke my Fifth Amendment privilege not to
21 self-incriminate and respectfully decline to answer
22 your question.
23     Q    Long Leaf took customers' money
24 through commissions charged on the recommended

Page 105

1 trades, right?
2   A   On the advice of counsel, I'd like
3 to invoke my Fifth Amendment privilege against
4 self-incrimination and respectfully decline to
5 answer your question.
6   Q   Your income at Long Leaf was directly
7 correlated to the amount of trading conducted in
8 your customers' accounts, right?
9   A   On the advice of counsel, I'd like
10 to invoke my Fifth Amendment privilege not to
11 self-incriminate and respectfully decline to answer
12 your question.
13   Q   Mr. Cybulski, not one of your clients
14 experienced any returns on their accounts over the
15 life of their accounts, right?
16     MR. JOHNSON:  We would object.  We've
17   already asked and answered this question.
18   A   On the advice of counsel, I'd like
19 to invoke my Fifth Amendment privilege not to
20 self-incriminate and respectfully decline to answer
21 that question.
22 BY MR. PLATT:
23   Q   Mr. Cybulski, by failing to disclose
24 complete and accurate track record information, Long

Page 106

1 Leaf was more likely to be able to take customers'
2 money through commissions, right?
3     MR. JOHNSON:  And we would object,
4   asked and answered.  Asked and answered.
5   A   On the advice of counsel, I'd like
6 to invoke my Fifth Amendment privilege not to
7 self-incriminate and respectfully decline to answer
8 your question.
9     MR. PLATT:  All right.  That's the
10   end of my examination.  I'll pass to any other
11   parties or counsel who are present and wish to
12   examine the witness.  Mr. Falvey or Mr. Ruth,
13   do you have any questions?
14     MR. FALVEY:  I don't.  Thanks, Jody --
15   Mr. Platt.  I apologize.
16     MR. PLATT:  Oh, no problem.  Mr. Ruth,
17   do you want to ask any questions of the witness?
18   I'm not sure if you're still on.  Hearing
19   nothing from Mr. Ruth --
20     MR. RUTH:  I have no questions, if you
21   can hear me.
22     MR. PLATT:  Yes, okay.  Thank you,
23   Mr. Ruth.  Mr. Johnson, I'm assuming that
24   you don't have any questions for your client.

Page 107

1     MR. JOHNSON:  No, I do not.  Thank you.
2     MR. PLATT:  Okay, thanks.  That's -- we
3   can go off the record.  Thank you, Mr. Cybulski,
4   for appearing pursuant to the subpoena, and
5   I think that's all we have.
6     MR. JOHNSON:  Okay.  Then we'll be in
7   touch with you.  Any questions, let us know.
8     MR. PLATT:  Great, thanks.
9       (WITNESS EXCUSED)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 108

1 NORTHERN DISTRICT OF ILLINOIS)
  EASTERN DIVISION            )
2 STATE OF ILLINOIS           )
                             ) SS.
3 COUNTY OF COOK              )
4     I, Mary Maslowski, Certified Shorthand
5 Reporter and Notary Public in and for the County of
6 Cook, State of Illinois, do hereby certify that on
7 March 29, 2021, the deposition of the witness,
8 BENJAMIN CYBULSKI, called by the Plaintiff, was
9 taken before me remotely, reported stenographically
10 and was thereafter transcribed by me.
11     The said witness, BENJAMIN CYBULSKI, was
12 first duly sworn to tell the truth, the whole truth,
13 and nothing but the truth, and was then examined
14 upon oral interrogatories.
15     I further certify that the foregoing
16 is a true, accurate and complete record of the
17 questions asked of and answers made by the said
18 witness, at the time and place hereinabove referred
19 to.
20     The signature of the witness was waived
21 by agreement.
22     The deposition terminated at 1:02 p.m.
23     The undersigned is not interested in the
24 within case, nor of kin or counsel to any of the

Page 109

1   parties.

2          Witness my official signature and seal

3   as Notary Public, in and for Cook County, Illinois

4   on this 7th day of April, A.D., 2021.

5

6

7

8              Mary Maslowski, CSR, RPR
               Notary Public

9              79 West Monroe, Suite 1001
               Chicago, Illinois  60603

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24