## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

|  |  |  |
|---|---|---|
| Commodity Futures Trading Commission, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 20-3758 |
| Long Leaf Trading Group, Inc., James A.Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) ) ) ) ) ) | Hon. Thomas A. Durkin |
| Defendants. | ) ) ) | |

### DEFENDANT JAMES A. DONELSON'S RESPONSE TO
### LOCAL RULE 56.1(a)(3) STATEMENT OF UNDISPUTED FACTS

### General Objection

Local Rule 56.1 requires the moving party to submit a statement of undisputed material facts. The Commodity Futures Trading Commission's ("Commission") L.R. 56.1 Statements are not undisputed. As set forth in more detail below, several alleged facts are legal and/or factual conclusions not based on citation to the record. Therefore, defendant James A. Donelson ("Donelson") objects to the Commission's L.R 56.1 Statements numbers (**insert numbers**) on the basis that the facts alleged are conclusory and do not include proper citations .

## I.      RELEVANT PARTIES

1.      Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") is an independent federal regulatory agency charged by Congress with administering and enforcing

the Commodity Exchange Act ("Act") and accompanying Regulations. (Doc. 30, Donelson Corrected Ans. ¶ 15.)

**Response:** Donelson admits this statement.

2.     Defendant Long Leaf Trading Group, Inc. ("Long Leaf") is an Illinois corporationwith its principal place of business in Chicago, Illinois.  (*Id*. ¶ 16.)

**Response:** Donelson admits this statement.

3.     Long Leaf was at all times relevant to the motion, and continues to be, registered with the Commission as an introducing broker ("IB").  (*Id*.)  Long Leaf has never been registered with the Commission as a commodity trading advisor ("CTA"). (*Id*. ¶ 105.)

**Response: Response:** Donelson admits this statement but clarifies that Long Leaf was registered as an IB with the National Futures Association, not the Commission.

4.     Defendant James A. Donelson has been the CEO of Long Leaf from December 2017 through the present. (*Id*. ¶ 18.)  During that period, Donelson possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Long Leaf.  (*Id.*, e.g., ¶ 86.)  As such, Donelson controlled Long Leaf during that period.  (*Id*.)  Donelson was also a principal of Long Leaf during that period.  (*Id*. ¶ 1.)

**Response:** Donelson admits this statement.

5.     Donelson was registered with the Commission as an associated person ("AP") of Long Leaf from June 2018 through December 2019.  (*Id*. ¶ 18.)

**Response:** Donelson admits this statement.

## II.     JURISDICTION

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).

**Response:** Donelson admits this statement.

7.      In addition, 7 U.S.C. § 13a-1(a) provides that U.S. district courts have jurisdictionto hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

**Response:** Donelson admits this statement.

8.      Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants transacted business in this District, and certain of the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.  (Doc. 30, Donelson Corrected Ans. ¶ 14.)

**Response:** Donelson admits that Venue is proper but denies any violations occurred.

## III.     LONG LEAF INTRODUCED ACCOUNTS AND GENERATED COMMISSIONS

9.      Throughout the Relevant Period, Long Leaf was an IB, and was registered as such with the Commission.  (*Id.* ¶ 21.)

**Response:** Donelson admits this statement but clarifies that Long Leaf was registered as an IB with the National Futures Association, not the Commission.

10.     An IB cannot place customer orders on a designated contract market. (*Id*. ¶ 22.) Rather, an IB introduces its customers to a futures commission merchant ("FCM"), where each customer must open an account for trading on a designated contract market. (*Id*.)

**Response:** Donelson admits this statement.

11.     An IB earns revenue in the form of a commission when a customer places a trade (or when the IB places a trade on behalf of the customer) in an account with the FCM. (*Id*. ¶ 23.)

**Response:** Donelson admits this statement but clarifies that an IB can earn revenue in ways other than via commission.

12.     Commissions are typically assessed on a per-trade basis, on whatever terms are agreed to between the IB and the customer. (*Id*. ¶ 24.) Commissions are deducted from the customer's account by the FCM, with a portion retained by the FCM and the balance forwarded to the IB. (*Id*.)

**Response:** Donelson admits this statement.

13.     During the Relevant Period, Long Leaf introduced customers to certain FCMs and received commissions for orders executed in those customer accounts. (*Id*.)

**Response:** Donelson admits this statement.

## IV.     LONG LEAF'S TRADING PROGRAM

14.     During the period that Donelson was CEO of Long Leaf, Long Leaf recommended trades to customers as part of a "trading program." (CFTC Ex. 528[1], Long Leaf's

---

[1] All exhibits cited herein are appended to this statement of facts unless otherwise noted. All page numbers for exhibits other than transcripts are to the PDF exhibit and not to any internal pagination the exhibit may have.

Ans. and Objs. to CFTC's First RFAs at 4.)

**Response:** Donelson admits this statement.

15.     Long Leaf provided customers that agreed to participate in the trading program with trading recommendations, typically four recommendations every month. (Doc. 30, Donelson Corrected Ans. ¶ 27; *see also* CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 4; CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 120:23–121:4.)

**Response:** Donelson admits this statement.

16.     Each recommendation was for a different spread trade, with each trade typically involving four out-of-the-money options on futures contracts traded on designated contract markets, i.e., exchanges, such as the Chicago Mercantile Exchange and New York Mercantile Exchange. (Doc. 30, Donelson Corrected Ans. ¶ 27; *see also* CFTC Ex. 530, Donelson Test. 106:21–107:4; CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 109:23–110:7.)

**Response:** Donelson admits this statement.

17.     Every customer participating in the trading program received the same recommendations as every other customer. (CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 150:6–150:20; *see also*, *e.g.*, CFTC Ex. 65, Email from J. Donelson to various associated persons ("APs"), March 27, 2018, attaching "trade recommendations"; CFTC Ex. 66, Email from J. Donelson to APs, attaching "trade recommendations" and "customer analysis," May 24, 2018; CFTC Ex. 67, Email from J. Donelson to APs attaching "trade recommendations," Jan. 24, 2019; CFTC Ex 530, Donelson Test. 172:23–175:12, 196:13–199:11, 202:8–202:12.)

**Response:** Donelson denies this statement as it mischaracterizes the cited testimony. The cited testimony refutes the statement "Every customer participating in the trading program received

the same recommendations as every other customer". (CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 150:6– 150:20) The testimony reveals that the trade structure was the same but that there was "variance among the number of contracts that were recommended to particular customers". (*Id.*)

18.     The only difference was in the number of contracts recommended per spread trade; customers with more equity, i.e., value, in their accounts would be advised to trade more contracts; customers with less equity would be advised to trade fewer contracts. *Supra* citations to para. 17.

**Response:** Donelson denies this statement.   (*See Id.* and Doc. 30, Donelson Corrected Ans. ¶ 29.)

19.     Long Leaf's APs typically provided the recommendations to Long Leaf customers by email or over the phone. (Doc. 30, Donelson Corrected Ans. ¶ 30.)  Long Leaf's APs instructed customers to simply respond "yes" in a text or email to accept the recommended trades.  (*Id*. ¶ 31; *see also* CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 5.)

**Response:** Donelson admits this statement.

20.     Long Leaf would forward the customer orders to its FCM, either over the phone or via an electronic trading platform.  (Doc. 30, Donelson Corrected Ans. ¶ 32; CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 4.) The FCM would then place the orders on the exchange to be executed. (Doc. 30, Donelson Corrected Ans. ¶ 32; CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 5.)

**Response:** Donelson admits this statement.

21.     Long Leaf provided these recommendations to customers for compensation on a per-trade basis if those recommendations were accepted and acted upon by customers. (Doc. 30, Donelson Corrected Ans. ¶ 88; *see also id*. ¶ 51.)

**Response:** Donelson admits this statement.

22.     The trading program was instituted in June 2015 by Long Leaf's prior management, from whom Donelson had bought the firm. (*See* Doc. 30, Donelson Corrected Ans. ¶ 26.) The trading program had been continuing in substantially the same form, i.e., four recommended spread trades per month, since that time.  (*Id.* ¶¶ 26-32.)

**Response:** Donelson objects to this statement because it is compound and draws conclusions about the form of the trading program that are not supported by the citation. Subject to and without waiving this objection, Donelson admits the trading program was instituted in June 2015 by Long Leaf's prior management, from whom Donelson had bought the firm. Donelson denies the remainder of this statement.  (Doc. 30, Donelson Corrected Ans. ¶ 26-32.)

23.     When Donelson started at Long Leaf, approximately 80% of the firm's customers participated in the trading program. (CFTC Ex. 530, Donelson Test. 97:16–97:23.) After July 2018, all new Long Leaf customers were participants in the trading program. (CFTC Ex. 531, Donelson Dep. 131:19–131:24; *see also* CFTC Ex. 530, Donelson Test. 97:16–98:2.)

**Response:** Donelson objects to this statement because it is compound. Subject to and without waiving this objection, Donelson admits this statement.

24.     The customers who participated in trading program accepted Long Leaf's trading recommendations 80% to 85% of the time. (CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 121:10–121:19; *see also* CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 6.)

**Response:** Donelson admits this statement.

25.     If a customer did not accept a trading recommendation, it was because he or she failed to respond in time, elected not to trade at all, or, approximately 5% of the time, elected to trade fewer contracts than recommended. (CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 121:24–122:7.) No participant in the trading program ever sought to change the structure of the recommended trade, i.e., by requesting an option on a different future, or different strikes on the option. (*Id*. at 122:8–123:7.)

**Response:** Donelson objects to this statement because it is compound, conclusory, calls for speculation as to the state of mind of third parties and draws conclusions about why a customer did not accept a trading recommendation that are not supported by the citation. Donelson further objects because the assertion that the structure could be changed is unclear and does not reflect the limitations of option trading as stated. Subject to and without waiving this objection, Donelson denies this statement. (CFTC Ex. 529, Long Leaf 30(b)(6) Dep. 121:24– 122:7.)

## V.     CUSTOMER LOSSES

26.     By the time Donelson started as CEO in December 2017, customers participating in Long Leaf's trading program had lost $3,390,407.  (Ex. 535, Patrick Decl. ¶ 18.)

**Response:** Donelson admits this statement.

27.     Substantially all Long Leaf customers who participated in the trading program lost money during Donelson's tenure as well.  (CFTC Ex. 531, Donelson Dep. 97:17–97:19.)

**Response:** Donelson admits this statement.

28.     In 2018, Long Leaf customers lost $1,511,837.  (CFTC Ex. 535, Patrick Decl., Ex. C.)

**Response:** Donelson admits this statement.

29.    In 2019, Long Leaf customers lost $915,564.  (*Id.*)

**Response:** Donelson admits this statement.

30.    During the period Donelson was CEO, customers who participated in the program lost a total of $2,376,738.  (*Id*. ¶ 23.)

**Response:** Donelson admits this statement.

31.    During that same period, Long Leaf collected $1,235,413 in commissions from customers who participated in the trading program.  (*Id.* ¶ 29.)

**Response:** Donelson admits this statement.

## VI.    DONELSON'S AWARENESS OF CUSTOMER LOSSES

32.    Donelson started receiving customer account statements on a daily basis shortly after starting at Long Leaf. (CFTC Ex. 530, Donelson Test. 217:20–218:2 *see also* Doc. 30, Donelson Corrected Ans. ¶ 40.) When Donelson reviewed the statements, he saw that substantially all customers who participated in Long Leaf's trading program had been losing money.  (CFTC Ex. 530, Donelson Test. 221:3–222:3.)

**Response:** Donelson admits this statement.

33.    In January 2018, Donelson did a "five-month look-back," and saw that customers were "consistently losing money."  (CFTC Ex. 531, Donelson Dep. 62:7–62:22.)

**Response:** Donelson admits this statement.

34.    Donelson began receiving calls and emails from customers complaining about account performance almost as soon as he arrived at Long Leaf.  (*Id*. at 62:2–62:6; *see also* Doc. 30, Donelson Corrected Ans. ¶ 40.) In his first few months at Long Leaf, Donelson received

emails from customers complaining:

    a.    "It appears my account which started at $25,000 is now worth less than $5,000."(CFTC Ex. 71, group exhibit of customer complaints, at 2.)

    b.    "I agreed to try your trading/investment service for a year with an initial investment of $25,000. I have seen the account value diminish precariously over the last 12 months by roughly 90%, combining trade losses, fees and commissions." (*Id*. at 3.)

    c.    "I am not sure if you know, but I went with every recommendation in 2017 and lost over $31,000 after having lost $9,000 from 2016." (*Id.* at 8.)

**Response:** Donelson objects to the statement because it is compound. Subject to and without waiving this objection, Donelson admits that he receives the cited correspondence.

35.    As Long Leaf and its trading program continued under Donelson's leadership, Donelson continued to receive daily account statements showing losses in substantially all customer accounts. ((Doc. 30, Donelson Corrected Ans. ¶ 40.) Donelson also monitored the performance of Long Leaf's recommended trades in real time. (*Id.*)

**Response:** Donelson admits this statement.

36.    Donelson likewise continued to receive emails and phone calls from customers complaining of poor account performance. (*Id.*; *see also* Ex. 530, Donelson Test. 247:23–248:2; Donelson Corrected Ans. ¶ 40; CFTC Ex. 71 at 20-41.)

**Response:** Donelson admits this statement.

37.    In those emails, customers complained as follows:

    a.    "In reviewing my statements I am reading you have lost about $50,000 in

the time I have been with you. This is TOTALLY unacceptable and I want to know where the 78% winning rate has been all this time." (CFTC Ex. 71 at 23.)

b.      "I'm down [approx.] $10,000, and not happy about the loss as you can imagine. The strategy that was explained to me is there would be multiple trades made that could generate some wins and some losses, but overall gains.  All I've seen overthe past few months are losses." (*Id.* at 36.)

**Response:** Donelson objects to the statement because it is compound. Subject to and without waiving this objection, Donelson admits that he receives the cited correspondence.

## VII.      AP SOLICITATIONS

38.     Long Leaf marketed its trading program to the general public through the firm's website.  (CFTC Ex. 528, Long Leaf's Ans. and Objs. to CFTC's First RFAs at 7-8.)

**Response:** Donelson admits this statement.

39.     Long Leaf also employed a staff of APs whose duties included soliciting members of the general public to participate in the trading program through oral and written presentations. (*Id.* at 8.)

**Response:** Donelson admits this statement.

40.     Donelson required the APs to make 200 calls to prospective customers per day. (CFTC Ex. 274, Email from Donelson to APs, July 27, 2018, at 2.)  Donelson assigned leads to the APs "based on effort," and reviewed statistics to see which APs were soliciting the most customers.  (*Id.* at 4.)

**Response:** Donelson objects to use of the word calls because it implies a conversation and most dialed calls were not answered. Subject to and without waiving this objection, Donelson denies this statement because he did not require 200 calls a day but recognizes that 200 dials per day was the goal.

41.  At the end of each month, Donelson would review all written communications that APs made to customers and prospective customers. (CFTC Ex. 536, Donelson's Resp. to CFTC's 3d RFP at 4.)

**Response:** Donelson admits this statement.

42.  Donelson also listened to recorded calls between APs and customers on a monthly basis. (*Id.* at 5; *see also* CFTC Ex. 531, Donelson Dep. 37:5–39:24.)

**Response:** Donelson admits this statement.

43.  Long Leaf APs told prospective customers that "76.5 percent of options expired worthless," which "increased the customer's statistical likelihood of success." (CFTC Ex. 531, Donelson Dep. 12:10–12:17.) Donelson was aware that APs were telling customers this. (*Id.*)

**Response:** Donelson admits this statement.

44.  Long Leaf APs told prospective customers that "one of Long Leaf's values was to create a strong return for customers." (*Id.* at 41:10–41:17.) Donelson overheard APs saying this to prospective customers, and was okay with it. (*Id.*)

**Response:** Donelson admits this statement.

45.  In August 2018, a power point presentation was distributed to the Long Leaf APs by Donelson or at Donelson's direction. (CFTC Ex. 397; CFTC Ex. 531, Donelson Dep. 102:23–104:2, 113:1–113:5.) The presentation was intended for use in soliciting prospective customers

and featured slides showing returns of 6% to 12% on a hypothetical trading account at Long Leaf. (CFTC Ex. 397 at 12, 14; *see* CFTC Ex. 531, Donelson Dep. 102:23–104:2, 113:1– 113:5.)

**Response:** Donelson admits this statement.

46.     Consistent with the presentation, Long Leaf APs told customers that their "strategies" "target 6 to 12 percent return on an annual basis." (CFTC Ex. 531, Donelson Dep. 42:12–42:18.) Donelson was aware that APs were saying this and approved of it. (*Id.*)

**Response:** Donelson admits this statement.

## VIII.    PAST PERFORMANCE OMISSION

47.     Although substantially all Long Leaf customers lost money in the trading program, customers and prospective customers were not told this. (*Id.* at 97:17–97:21.)

**Response:** Donelson admits this statement.

48.     By February 2018, the results from Long Leaf's trading recommendations were "very bad." (*Id.* at 65:22–66:2.) Early that month, Donelson held a "sales meeting" with Long Leaf's APs. (*Id.* at 63:19–65:6.) At that meeting Donelson instructed the APs not to provide customers with any information in response to requests for "past performance." (*Id.*)

**Response:** Donelson admits this statement and explains further that he was adopting a new trading model. (CFTC Ex. 531, Donelson Dep. 66:3-4, 66:15-24)

49.     If customers asked about it, Donelson told the APs they should say that it is Long Leaf's policy not to provide information on past performance. (*Id.* at 65:16–65:21.)

**Response:** Donelson admits this statement.

50.     This was consistent with Long Leaf's existing policy, instituted by prior management, not to provide such information to customers or prospective customers. (*Id*. at 63:19–65:6.)

**Response:** Donelson admits this statement.

51.     This prohibition against providing customers or prospective customers with past performance requests continued until June of 2019, when Donelson started telling his APs to provide customers with the "track records" described below in paragraphs 58-66. (*Id*. at 64:24–65:5.)

**Response:** Donelson admits this statement.

52.     Long Leaf did not provide disclosures required by 17 C.F.R. § 4.31(a) to customers or prospective customers required by. (Doc. 30, Donelson Corrected Ans. ¶ 34.)

**Response:** Donelson objects to this statement because it is unintelligible and, to the extent it is capable of being understood, the citation asserts a fact that the record doesn't support. Specifically, Donelson answer denies the accuracy of this statement. Subject to and without waiving this objection, Donelson denies this statement. (Doc. 30, Donelson Corrected Ans. ¶ 34.)

## IX.     QUALIFICATIONS OMISSION

53.     On February 22, 2018, Donelson drafted a letter to Long Leaf's customers, whichhe distributed via the APs. (CFTC Ex. 52, *see also* CFTC Ex. 531, Donelson Dep. 68:2–68:10.) In the letter, Donelson writes that he has "10 years of financial and business development experience at two of the largest proprietary trading companies." (CFTC Ex. 52.) The letter goeson to say that Donelson is "working closely with Scott Gecas," then a Long Leaf AP, "on redesigning the trading processes to provide improved returns …." (*Id*.) "Scott and Jim

share in the development of the monthly trades and management of the trades after they are made." (*Id*.)

**Response:** Donelson admits this statement.

54.     Consistent with the letter, Donelson and Gecas worked together on the trade recommendations through December 2018, when Gecas left Long Leaf. (CFTC Ex. 531, Donelson Dep. 69:9–69:12, 74:20–75:5.) After that, Donelson alone generated the trade recommendations that were provided to Long Leaf customers. (*Id*. at 74:20–75:5.)

**Response:** Donelson admits this statement.

55.     Before joining Long Leaf, Donelson's only prior experience in options trading was limited to a single trade in 2016 in which he lost $30,000. (*Id*. at 75:10–77:1, 79:23–80:12.) To the extent Donelson had done any futures trading, that trading was not profitable. (*Id*. at 75:10–77:1.)

**Response:** Donelson admits this statement.

56.     Donelson's association with "two of the largest proprietary trading companies" was in an accounting role. (CFTC Ex. 530, Donelson Test. 10:9–11:15.) Donelson had not done any trading for those companies, and in fact had never worked as a trader for any company. (CFTC Ex. 531, Donelson Dep. 75:10–77:1, 75:10–75:13.)

**Response:** Donelson objects to this statement because it mischaracterizes the cited testimony. Subject to and notwithstanding this objection, Donelson admits that he had not done trading for the cited companies and that he had never worked as a trader for any company but denies the remainder of this statement. (CFTC Ex. 530, Donelson Test. 10:9–11:15 and CFTC Ex. 531, Donelson Dep. 75:10–77:1, 75:10–75:13)

57. Donelson did not share any of this information with customers or prospective customers. (*Id.* at 80:13–80:16; CFTC Ex. 537, LLT's Answers and Objections to CFTC's 2d RFAs at 5.) Donelson acknowledged that Long Leaf customers would not have wanted to take his recommendations if they knew that he had no profitable experience trading. (CFTC Ex. 531, Donelson Dep. 81:19–81:23.)

**Response:** Donelson objects to this statement because it is miscited and mischaracterizes the citation it attempts to cite. Subject to and notwithstanding this objection, Donelson denies this statement. (*Id.* at 80:13–80:16; CFTC Ex. 537, LLT's Answers and Objections to CFTC's 2d RFAs Par. 31 and CFTC Ex. 531, Donelson Dep. 81:19–81:23.)

## X.    2019 HYPOTHETICAL AND CHERRY-PICKED TRACK RECORDS

58. On February 18, 2019, Donelson sent prospective customer "eric" an email attaching a description of a "bond replacement strategy" used by Long Leaf.  (CFTC Ex. 409.) In the description, Donelson claims that "[]the targeted return for this type of trade is 6-10% per year after fees and commissions." (*Id.*)  Donelson tells "eric" that, "[t]he profitability is primarily driven by the time decay variable and therefore creates a higher probability of success." (*Id.*) The email includes a "trade history" which reflects seven trades from August 2018 through January 2019 with a net P&L of $701.99 and an average return of 1.68% over a seventh month period. (*Id.*)

**Response:** Donelson admits this statement.

59. The results reflected in the "trade history" represent a small number of the trades made by Long Leaf on behalf of customers. (CFTC Ex. 531, Donelson Dep. 144:17–145:24 (noting this is history of "gut strangle" trades made by three customers).) During the period

16

August 2018 through February 2019—the period reflected in the "trade history"—customers lost $323,932. (CFTC Ex. 535, Patrick Decl., Exs. A, C.) By February 2019, Long Leaf customers had lost a total of more than $1.57 million since the start of Donelson's tenure, and over $4.9 million since the start of Long Leaf's trading program. (*Id.*) Donelson did not disclose these losses to "eric" or any other prospective customer. (*See* CFTC Ex. 531, Donelson Dep. 147:20–148:14.)

**Response:** Donelson objects to this statement because it is compound and cites a person who never became a client of Long Leaf and is therefore hypothetical. Subject to and notwithstanding this objection, Donelson admits the cited figures are approximately accurate.

60.     On May 20, 2019, Donelson sent an email to his APs titled "new track record," and attaching a file named "track record – core strategy – 5-20-2019." (CFTC Ex. 414.) The attached file reflects a series of trades from July 2018 through May 2019 reflecting a total P&Lof $460.23. (*Id*.) Donelson sent this email to the APs so they could distribute the "new track record" to customers and prospective customers. (CFTC Ex. 531, Donelson Dep. 159:22– 160:14.) The APs did so. (*Id*.; *see also, e.g.*, CFTC Ex. 470, email from J. Hatzigiannis to "ejshafter," May 20, 2019.)

**Response:** Donelson admits this statement.

61.     This new "track record" reflects hypothetical results from a subset of trades that Long Leaf recommended during the period July 2018 through May 2019. (CFTC Ex. 531, Donelson Dep. 157:15–158:21, 159:22–162:14, 169:20–170:11.) In reality, Long Leaf customers lost $538,618 during that period. (CFTC Ex. 535, Patrick Decl., Exs. A, C.) By May 2019, Long Leaf customers had lost $1.74 million during Donelson's tenure and $5.1 million since the start

of the trading program. (*Id.*) These facts were not disclosed to customers or prospective customers. (CFTC Ex. 531, Donelson Dep. 162:11 – 163:21.)

**Response:** Donelson admits that he sent the cited emails and that the figures are approximately accurate but objects to the characterization of the trades as hypothetical because it implies that these trades did not occur - these trades did occur. Donelson also objects to the structure of the calculations used by the CFTC. Donelson denies the remainder of the Response (CFTC Ex. 531, Donelson Dep. 157:15–158:21, 159:22–162:14, 169:20–170:11, 172:8-173:23)

62. On August 28, 2019, Long Leaf AP Alexander Stemper sent an email to prospective customer Jack Lattner. (CFTC Ex. 300.) Stemper's email included an "updated performance report for one of our larger accounts." (*Id.*) The "performance report" shows trades from April through August 2019, and reflects profits of $37,719.45. (*Id.*) The attached report was created by Donelson, and provided to Stemper to give to Mr. Lattner. (CFTC Ex. 531, Donelson Dep. 171:5–172:4.)

**Response:** Donelson admits this statement.

63. The so-called performance report was based on an account belonging to a single Long Leaf customer, whose account was temporarily up (though it was eventually wiped out). (CFTC Ex. 531, Donelson Dep. 172:8–173:23.) During the period April through August 2019—the period reflected in the "performance report"—Long Leaf customers lost $148,234. (CFTC Ex. 535, Patrick Decl., Exs. A, C.) By this point, Long Leaf customers had lost a total of $1.78 million under Donelson and $5.1 million since the start of Long Leaf's trading program. (*Id.*) Customers were not apprised of these facts. (*See* CFTC Ex 300.)

18

**Response:** Donelson objects to this statement because it is compound and conclusory. Subject to and without waiving this objection, Donelson admits that the figures are approximately accurate.

64.     On September 10, 2019, Long Leaf AP Hatzigiannis sent an email to prospective customer "Wally." (CFTC Ex. 200.) Hatzigiannis writes "I wanted to provide you an update of what we have been doing. Attached is a track record of our recent performance." (*Id.*) Hatzigiannis goes on to say, "The reason we have seen so much success as of late is because of the current market conditions and the way we are able to manage this." (*Id.*)

**Response:** Donelson admits this statement.

65.     The attached track record shows trades from June through September 2019, and profits from those trades of $5,978.50. (*Id.*) The track record was created by Donelson, and provided to Hatzigiannis to distribute to prospective customers, which Hatzigiannis continued to do through October. (CFTC Ex. 531, Donelson Dep. 175:7–176:23, 179:9–180:13; *see also* CFTC Ex. 201, Email from Hatzigiannis to "Tim," Oct 7, 2019.)

**Response:** Donelson admits this statement.

66.     The track record does not reflect actual trading results; rather, it reflects hypothetical results. (CFTC Ex. 531, Donelson Dep. at 178:12–178:17.) By September 2019, Long Leaf customers had lost $1.63 million during Donelson's tenure and $5.02 million since the start of the trading program. (*Id.*) These facts were not disclosed to customers or prospective customers. (*See* CFTC Exs. 200, 201.)

**Response:** Donelson objects to the characterization as "track records" because it implies that these trades did not occur - these trades did occur. Donelson admits the cited figures are accurate

but denies the remainder of the statement. (CFTC Ex. 531, Donelson Dep. 157:15–158:21, 159:22–162:14, 169:20–170:11, 172:8-173:23)

## XI.    DONELSON PAYMENTS TO SELF

67.    During Donelson's tenure at Long Leaf, Long Leaf paid $240,000 to Donelson Enterprises, a company owned by Donelson, as a "management fee." (CFTC Ex. 529, Long Leaf30(b)(6) Dep. 21:12–22:15.)

**Response:** Donelson admits this statement.

68.    Long Leaf paid Donelson approximately $150,000 in wages. (*Id.* at 23:1–23:12.)

**Response:** Donelson admits this statement.

## XII.    NELSON AP REGISTRATION

69.    Andrew Nelson worked at Long Leaf from September 2017 through November 2018, soliciting customers for participation in the trading program. (Doc. 23, Long Leaf Ans. ¶ 20.)

**Response:** Donelson denies this statement. (Doc. 30, Donelson Ans. ¶20)

70.    Nelson was not registered as an AP of Long Leaf. (*Id.*)

**Response:** Donelson admits this statement.

71.    On July 18, 2018, NFA sent an email to Nelson, stating that, "based on NFA's discovery this week that you have been acting as an AP without being registered as such, staff will not be recommending to the Membership Committee that you be conditionally registered." (CFTC Ex. 538.) Nelson forwarded the email to Donelson the same day. (*Id.*)

**Response:** Donelson admits this statement.

72.     Donelson nonetheless allowed Nelson to continue soliciting customers for another four months without registration.  (Doc. 23, Long Leaf Ans. ¶ 20.)

**Response:** Donelson denies this statement. (Doc. 30, Donelson  Ans. ¶20)

Respectfully submitted,

/s/ James M. Falvey
James M. Falvey
Falvey Law Office
200 S. Wacker Drive, Suite 3100
Chicago, Illinois 60606
jimfalvey@yahoo.com
312-404-5839


Charlie McElvenny
Charles McElvenny, JD, MSA
Law Office of Charles E. McElvenny
33 N. Dearborn St.
Suite 1000
Chicago, IL 60602
312-291-8330
charlie@cemlawfirm.com
