# In The Matter Of:

*COMMODITY FUTURES TRADING COMMISSION v.*
*LONG LEAF TRADING GROUP, INC., et al.*

---

*JOHN F. BURNSIDE*
*September 30, 2021*

---

*Mary Maslowski, CSR, RPR*
*79 West Monroe Street, Suite 1001*
*Chicago, Illinois 60603*
*312.726.7600*
*mmmrpr@sbcglobal.net*

Original File Burnside.txt
Min-U-Script® with Word Index

JOHN F. BURNSIDE

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
 2                EASTERN DIVISION

 3  COMMODITY FUTURES TRADING    )
    COMMISSION,                  )
 4                               )
                 Plaintiff,      )
 5                               )
           vs.                   )  No. 20 C 3758
 6                               )
    LONG LEAF TRADING GROUP,     )
 7  INC., et al.,                )
                                 )
 8               Defendants.     )

 9

10

11        The remote 26(b)(4)(A) deposition

12  of JOHN F. BURNSIDE, called by the Plaintiff for

13  examination, pursuant to subpoena and pursuant to

14  the Federal Rules of Civil Procedure for the United

15  States District Courts pertaining to the taking of

16  depositions, taken before Mary Maslowski, Certified

17  Shorthand Reporter and Notary Public within and

18  for the County of Cook and State of Illinois with

19  the witness located in Indianapolis, Indiana,

20  commencing at the hour of 8:35 o'clock on

21  September 30, 2021.

22

23

24
```

---

**Page 2**

```
 1  A P P E A R A N C E S :

 2

 3        (Appearing via videoconference)
        MR. JOSEPH C. PLATT, Trial Attorney
 4      MR. ASHLEY J. BURDEN, Senior Trial Attorney
        MS. ELIZABETH M. STREIT, Trial Team Leader
 5      MR. JOSEPH J. PATRICK, Senior Investigator
        U.S. COMMODITY FUTURES TRADING COMMISSION
 6      DIVISION OF ENFORCEMENT
        525 West Monroe Street, Suite 1100
 7      Chicago, Illinois 60661
        (312) 596-0700
 8      jplatt@cftc.gov
        aburden@cftc.gov
 9      estreit@cftc.gov
        jpatrick@cftc.gov
10        On behalf of the U.S. Commodity
            Futures Trading Commission;
11
        (Appearing via videoconference)
12      FALVEY LAW OFFICE
        BY MR. JAMES M. FALVEY
13      200 South Wacker Drive, Suite 3100
        Chicago, Illinois 60606
14      (312) 404-5839
        jimfalvey@yahoo.com
15
          On behalf of Long Leaf Trading Group,
16          Inc., and James A. Donelson;

17      (Appearing via videoconference)
        MR. JEREMY RUTH
18
          Appearing Pro Se.
19

20

21

22

23  CSR License No. 084-003278.

24
```

---

**Page 3**

```
 1                I N D E X

 2  WITNESS                    DX  CX _RDX  RCX

 3  JOHN F. BURNSIDE

 4  By Mr. Platt               4

 5

 6                E X H I B I T S

 7  CFTC EXHIBIT                   MARKED FOR ID

 8  No. 507    Expert Report            5
    No. 508    Declaration             16
 9  No. 509    Curriculum Vitae        19
    No. 510    Saliba NFA BASIC        29
10  No. 511    Freeboard Capital       32
    No. 512    Trading Summary        137
11  No. 513    ALFA QuikStrike        144
    No. 514    Corn Detail 3-15-2019  150
12  No. 515    Gold Trade 7-24-2019   156
    No. 516    EURUSD 7-18-2019       158
13  No. 517    Excel Trading Details  159
    No. 518    April ALFA Trade       172
14  No. 519    ALFA 4-23-2019         176
    No. 520    Corn 3-15 Analysis     177
15  No. 521    Corn Trades 3-15       178

16

17

18

19

20

21

22

23

24
```

---

**Page 4**

```
 1        MR. PLATT: Ms. Maslowski, would you

 2  please swear in the witness.

 3        (Witness duly sworn.)

 4        MR. PLATT: We're on the record at 8:35

 5  Central Time on September 30, 2021.  My name's

 6  Joseph Platt.  I'm a trial attorney with the

 7  CFTC.  This is the deposition of John Burnside

 8  in the case captioned CFTC vs. Long Leaf Trading

 9  Group, et al., Case No. 20 C 3758 pending in the

10  United States District Court for the Northern

11  District of Illinois.  We're proceeding by

12  videoconference today due to travel restrictions

13  that are still in place related to the

14  Coronavirus pandemic.

15            JOHN F. BURNSIDE,

16  called as a witness herein, having been first

17  duly sworn, was examined and testified as follows:

18        DIRECT EXAMINATION

19  BY MR. PLATT:

20    Q   Mr. Burnside, we're going to try

21  something out right away.  I know you've done

22  this before.  In person during a deposition the

23  witness will be handed a paper copy of exhibits,

24  but since we're proceeding by videoconference
```

---

**JOHN F. BURNSIDE**

1  I'm going to share my screen with you so you
2  can --
3  A   Okay.
4  Q   Let's try it out.
5      MR. PLATT: Mr. Burnside, I'm marking
6  an exhibit as CFTC Exhibit 507.
7          (Whereupon CFTC Exhibit No. 507
8          was marked for identification.)
9  Q   Can you see the document on your screen?
10  A   Yes, I can.
11  Q   Is the text large enough for you to read?
12  A   Not really, but we can -- I know it's mine
13  that I wrote, you know.  Do I hit got it?
14      MR. FALVEY: Yeah, hit got it and
15  I think we can make it bigger.  Try hitting
16  control and plus.
17      THE WITNESS: Oh, there you go.
18  Thank God I've got my IT department with me.
19      MR. FALVEY: That's right.
20      THE WITNESS: If not, I can increase
21  it again.
22  BY MR. PLATT:
23  Q   Mr. Burnside, do you recognize this
24  document?

1  A   I do.
2  Q   And how do you recognize it?
3  A   I wrote it.
4  Q   And what is it?
5  A   It was just an overview of options
6  trades and analysis of what Long Leaf was doing.
7  Q   Is it fair to say that this is
8  a report that you created for Long Leaf Trading
9  as an expert witness in connection with this
10  litigation?
11  A   I would agree with that.
12  Q   You can see that I'm scrolling down
13  to the second page.  There's a date August 9, 2021,
14  then your name and a signature.  Is that your
15  signature?
16  A   It is.
17  Q   You were retained by Long Leaf Trading to
18  create this report, right, Mr. Burnside?
19  A   That is correct.
20  Q   Are you represented by counsel today?
21  A   No.
22  Q   I see someone else is in the room with
23  you.  Who's accompanying you today?
24      MR. FALVEY: You can answer that.

1  A   Okay.  Jim, who is the attorney for
2  Long Leaf.
3  BY MR. PLATT:
4  Q   And that's Mr. Falvey, right?
5  A   Yeah.
6  Q   Also present this morning are my
7  colleagues Beth Streit and Joseph Patrick.
8  They are my colleagues at the CFTC.  We may
9  be joined later on by another trial attorney at
10  the CFTC named Ashley Burden.  Let the record
11  reflect that Mr. Jeremy Ruth, who's a defendant
12  in this action, was invited to participate.  He's
13  not present.
14      Mr. Burnside, I understand
15  that you've been deposed before so you may know
16  the basics, but I'll just go over them anyway so
17  the record's clear.
18  A   Great.
19  Q   We've got a stenographer writing
20  down everything that we're saying.  And so she
21  can take down an accurate record, there's just
22  a couple things to be mindful of.  The first is
23  everything's got to -- all the answers have to be
24  verbal in nature.  No nods or shakes of the head.

1  You're already doing a really good job with that
2  one.  I'll do my best to let you finish your answer
3  before I ask another question, and it's helpful if
4  you will just wait to answer my question -- wait
5  until I'm done asking my question before you start
6  to answer it, okay?
7  A   Fair enough.
8      MR. PLATT: And let the record
9  reflect that it appears that Defendant Jeremy
10  Ruth has joined the videoconference as a passive
11  participant in this deposition.
12  Q   So the next rule, Mr. Burnside,
13  to keep in mind is if you don't understand my
14  question, tell me that you don't understand it
15  and I'll try and ask it in a way that makes better
16  sense, okay?
17  A   Yes.
18  Q   And if you answer the question,
19  I'll assume that you understand it.  If you'd
20  like to take a break, feel free to just let me
21  know and we can go off the record for five or ten
22  minutes.  The only thing I'd ask about breaks is
23  that if there's a question pending, just please
24  answer the pending question before we go off the

**JOHN F. BURNSIDE**

Page 9

1 record.
2 A Okay.
3 Q Did you do anything to prepare for this
4 deposition, Mr. Burnside?
5 A I just reviewed some documents that
6 Mr. Donelson sent me.
7 Q Which documents did you review?
8 A I believe it was just the trading documents
9 that he sent forth to me.
10 Q And what form did they take? Were they
11 Excel files? Were they QuikStrikes? Anything stand
12 out in your memory?
13 A I would say they were Excel.
14 Q Anything beyond Excel files?
15 A No, not that I'm aware of.
16 Q Okay. Did you meet with Mr. Falvey before
17 this deposition?
18 A Just to find out how to get on the
19 computer and --
20 THE WITNESS: Go ahead.
21 MR. FALVEY: You can --
22 A Yeah. I mean, we also talked about,
23 you know, just kind of trying to figure out what
24 kind of questions you guys might ask and general

Page 10

1 questions in regards to that. Nothing in specifics.
2 I'm not -- I don't do this every day so ...
3 BY MR. PLATT:
4 Q I understand. How much time did
5 you spend with Mr. Falvey in preparing for this
6 deposition?
7 A Well, I've been trading stock options
8 for 35 years and commodity options for 5 years,
9 so I'm pretty -- or maybe 4 years. So I'm pretty
10 versed in options trading. So just being able to
11 look at the trades, I'm pretty astute on what goes
12 on so ...
13 MR. FALVEY: Jody, can we have two
14 seconds? I'll do it on the record. Listen
15 to his question and answer --
16 A How much time? Oh, I would say
17 approximately five hours.
18 BY MR. PLATT:
19 Q Okay. And when was that?
20 A It was over the last two weeks.
21 Plus when I made the -- when I did the analysis,
22 which was a long time ago, back in -- when was that,
23 like the end of '19 or the beginning of '20? I did
24 some more analysis on that. So maybe all in, ten

Page 11

1 hours.
2 Q So we'll get to the time you
3 spent drafting the report. But in terms of your
4 preparation with Mr. Falvey, it sounds like you had
5 about five hours of prep time for this deposition?
6 A Oh, God, no, no, no, no. He and I --
7 no, no. It was about 20 minutes.
8 Q Okay.
9 A Or maybe 30 minutes.
10 Q Have you ever met Jim Donelson?
11 A I have.
12 Q How did you meet Jim Donelson?
13 A I met -- well, I've only seen him
14 once, and I have talked to him on the phone a few
15 times. And the way that I met, I was introduced to
16 him, was through Nick -- and I'm going to butcher
17 his last name -- Iavarone, who I believe Nick's --
18 which was -- Nick was Jim's previous attorney.
19 Q So before Mr. Iavarone introduced
20 you to Donelson, had you ever met Jim Donelson?
21 A No.
22 Q Do you know what Jim Donelson's
23 professional background is?
24 A No.

Page 12

1 Q Did you ask him?
2 A No.
3 Q Do you know when Jim Donelson purchased
4 Long Leaf Trading and became its principal?
5 A He sent me a document that stated
6 that he purchased it I want to say in -- like
7 sometime in '17, or was in negotiations with the
8 other individual in '17, if I recall correctly.
9 Q So it sounds like you don't know one
10 way or another whether or not before Jim Donelson
11 purchased Long Leaf Trading he had any experience
12 trading financial products on a professional basis?
13 A No.
14 Q What was Long Leaf's business model?
15 A To trade -- in essence, to trade options
16 and for the most part limit risk while giving the
17 clients an opportunity to get -- to make money.
18 Q And how did you come to that understanding?
19 A Just reviewing the trades that were
20 executed.
21 Q From information provided to
22 you by Donelson or Donelson's lawyers, right?
23 A Correct, yes.
24 Q Do you know who designed Long Leaf's

JOHN F. BURNSIDE

Page 13

1  trades?
2      A   No.  I think it was like Evan or
3  something Evans.  I don't.  I don't.  I don't know
4  that answer.
5      Q   Do you know a guy named Timothy Evans?
6      A   No.
7      Q   Do you know a guy named Scott Gecas?
8      A   No.
9      Q   And you're aware that the CFTC sued
10 Long Leaf Trading and Donelson and some of the
11 Long Leaf brokers?
12     A   That's why I'm here, I'm guessing.
13     Q   I think your report says that you reviewed
14 the complaint in the case?
15     A   I reviewed the trades of the case
16 because I'm not an attorney.  I'm just a trader.
17     Q   Okay.
18     A   But I reviewed some -- but I did
19 review some of the complaint and -- to make sure
20 that I -- that they were in connection to the
21 trades.
22     Q   Okay, yeah.  We'll get to those
23 docs in a little while.  I'm just asking if
24 you've reviewed the CFTC's complaint in this --

Page 14

1      A   I wouldn't say (inaudible).  Just in
2  general, though, yes.
3      Q   Sorry.  We're talking over each
4  other a little bit, and I think it's my fault.
5  I'll just clarify.  Are you aware that the CFTC
6  sued Long Leaf?
7      A   I'm sorry.  I didn't hear that question.
8      Q   Are you aware that the CFTC sued Long Leaf?
9      A   Yes.
10     Q   Do you have an understanding of the
11 nature of the CFTC's claims against Long Leaf?
12     A   Yes.
13     Q   What is that understanding?
14     A   In my opinion, it's that the trades
15 that were made were -- could never be profitable
16 for the clients.
17     Q   How did you form that understanding?
18 And I understand you're not an attorney, and I'm
19 not asking you for your legal analysis.  But how
20 did you form your understanding of the nature of the
21 CFTC's claims against Long Leaf?
22     A   I thought I read it in one of the --
23 as I was perusing the documents.
24     Q   Are you engaged by Jim Donelson personally

Page 15

1  or by Long Leaf Trading?
2      A   Long Leaf Trading.
3      Q   Is there a written agreement between
4  you and Long Leaf?
5      A   No.  When Nick introduced us, we just
6  agreed to work together.
7      Q   And you're being compensated for this
8  engagement, I take it?
9      A   Yes.
10     Q   And what are you charging Long Leaf?
11     A   $600 an hour.
12     Q   Is that the same rate that you
13 charged in connection with the report that you
14 submitted during the Wells process back in 2020?
15     A   I believe so.
16     Q   Has Long Leaf paid your invoices?
17     A   I'm sorry?
18     Q   Has Long Leaf paid your invoices for your
19 services rendered in this case?
20     A   Yes, we are current.
21     Q   I just mentioned a document that I'd
22 like to show you real quick.  So, Mr. Burnside,
23 I'm showing you an exhibit that I'll mark as CFTC
24 Exhibit 508.

Page 16

1          (Whereupon CFTC Exhibit No. 508
2          was marked for identification.)
3      Q   It's a document that's titled Declaration
4  of John Burnside at the top, and I'll scroll down
5  to the bottom.
6      A   Hold on, hold on.  Yeah, okay.
7      Q   So at the top you can see that
8  Exhibit 508 says Declaration of John Burnside.
9  It's a three-page PDF.  I'm just going to scroll
10 through it quickly just to show that it's dated and
11 signed by you.
12     A   Okay.
13     Q   Do you see that it's dated January 22,
14 2020, your name, and do you recognize that as your
15 signature?
16     A   I do.
17     Q   Okay.  So this document is titled
18 a declaration.  So can we agree to call this your
19 declaration and then we can call Exhibit 507 your
20 report, if there's any confusion today?
21     A   Sure.
22     Q   It's important to keep these two documents
23 separate in our minds.
24     A   Okay.

**JOHN F. BURNSIDE**

Page 17

1    Q   So we've got our declaration from 2020
2    and your report from 2021.  Did you write those
3    documents?
4    A   The declaration I did not write, but
5    the report I did.  Again, I'm not an attorney.
6    Q   Who wrote the declaration?
7    A   I honestly do not recall.
8    Q   Is it fair to summarize the declaration
9    as a document that you received, you've reviewed
10   and then you executed?
11   A   Yes.
12   Q   Do you agree with all the things that
13   are written in there?
14   A   I haven't looked at it in two years --
15   or a year and a half or whatever.
16   Q   At the time you signed it back in
17   January 2020, do you think it's probably correct
18   that you agreed with the content of the document
19   when you executed it?
20   A   I would agree with that.
21   Q   And so Exhibit 507 is your report from
22   August of 2021.  Can you describe the process by
23   which you actually drafted it?
24   A   Sure.  I reviewed some of the trades --

Page 18

1    some of the trades that were made and lumped them
2    into certain categories and then gave some specific
3    examples -- or some general examples of how things
4    could work in that regard, and that was why I put
5    it together as I did.
6    Q   When you drafted your August 2021
7    report, did you start with your declaration and
8    work off of that document?
9    A   I just -- what I did was review the
10   trades that were made and started to write down
11   what the general trading practices were and how
12   they would be lumped together as a general trading
13   practice.  There were different kinds of trades that
14   were made and, therefore, I tried to segregate them
15   in that document.
16   Q   My question is a little more mechanical.
17   When you actually sat down to put pen to paper or
18   fingers to keyboard --
19   A   Right.
20   Q   -- did you start with the declaration and
21   work off of that document?
22   A   No.
23   Q   Did you incorporate any of the content
24   of the declaration into your August 2021 report?

Page 19

1    A   No.  I honestly had forgotten about the
2    declaration.
3        MR. PLATT: I'm going to show you
4    a document that I'm going to mark as CFTC
5    Exhibit 509, and this was sent to us by Long
6    Leaf Trading.
7        (Whereupon CFTC Exhibit No. 509
8        was marked for identification.)
9    Q   I believe it's -- do you recognize this
10   as your resumé?
11   A   Yeah, my CV, sure.
12   Q   Is this a complete and accurate
13   description of your employment history from 1999
14   through the present?
15   A   It is.
16   Q   I'll scroll down here.  And do you
17   hold any professional licenses or registrations?
18   A   I do not.
19   Q   Have you ever held any professional
20   licenses or registrations?
21   A   Yes, when I was with -- when I had
22   a broker-dealer, I had to have a Series 7.
23   Q   Did you ever have any memberships
24   with the NFA?

Page 20

1    A   I did.
2    Q   When was that?
3    A   I owned a com seat -- I owned a com
4    seat for a few months back, I think it was in 1989,
5    and then I tried to get another trading system up
6    and running in -- when in the hell was that.  That
7    might have been 2010 of a trading system, but it
8    never got off the ground and so we just dissolved
9    that company.
10   Q   So on your CV here the first entry
11   is Susquehanna, and you were the lead trader in
12   a pit centered on providing quality markets.  What
13   pit were you trading in at Susquehanna?
14   A   It so states right there, in the McDonald's
15   trading pit.
16   Q   What were the products that traded in
17   that pit?
18   A   There was Anadarko Petroleum, Xerox,
19   Halliburton, JPMorgan.  Those are the ones that
20   come to mind, Trans Oceanic.  That was a long time
21   ago.
22   Q   Were you trading single name securities
23   options?
24   A   I'm sorry?

JOHN F. BURNSIDE

Page 21

1    Q    Were you trading single name securities
2  options?
3    A    Yes.
4    Q    Were there any options on futures that
5  traded in that pit?
6    A    No, sir.
7    Q    Were you making markets when you worked
8  at Susquehanna?
9    A    Absolutely.  I was the lead market maker.
10    Q    Describe the role of a market maker.
11    A    To make a bid and offer for public to
12  trade off of.
13    Q    Would you describe a market maker's
14  role as short-term trading or long-term trading?
15    A    Really, it wasn't based on that.
16  It was based on providing liquidity to the
17  marketplace.
18    Q    And the next entry is TD Options.
19  When you worked at TD Options, what kind of trading
20  were you doing?
21    A    Same, same trading.
22    Q    Market making in single name securities
23  options?
24    A    Yes, and I was the lead trader in that

Page 22

1  as well.
2    Q    And then the next entry in your CV here
3  is G-Bar, LLC.  What was G-Bar?
4    A    G-Bar's a company that would back
5  market makers.  So I left the lead market maker
6  status and just became a regular market maker at the
7  Chicago Board Options Exchange.
8    Q    What products did G-Bar make markets in?
9    A    At the time I was making markets
10  in single stock, just like I was in at TD or
11  Susquehanna, but I was not the lead market maker
12  in this case.
13    Q    How about Saliba Portfolio Management,
14  what were you doing at Saliba?
15    A    So at Saliba, I left Saliba --
16  I mean, I left the floor and went to work with
17  the Saliba Portfolio Management, and they were --
18  they had a fund that traded stock options for their
19  fund and they needed someone that had experience
20  with options trading.
21    Q    And at Saliba it says that you
22  developed and implemented profitable hedging
23  strategies for multi-asset hedge fund portfolio.
24    A    Right.

Page 23

1    Q    Describe the hedging strategy that
2  you developed and implemented at Saliba Portfolio
3  Management.
4    A    Sure.  So -- well, if you -- in order
5  to hedge a stock position, you may want to buy
6  a put or sell a call or do a little bit of both,
7  which is considered a collar strategy.  And in
8  regards to that, you can own the stock and the
9  puts, which is similar to owning a call, and that
10  was the implementation that I was trying to get
11  Saliba Portfolio Management to encounter so that
12  they could actually say when they were going to
13  their client or their prospective meetings that
14  they owned the stock and they hedged their stock
15  position.
16    Q    So was Saliba all securities options
17  as well?
18    A    They were.
19    Q    Was all your trading done at Saliba in
20  the context of hedging?
21    A    Well, not all of it.  Sometimes you
22  had to roll a position.  But, yes, inevitably it
23  was to hedge a position.
24    Q    Just so the record's clear, a bunch

Page 24

1  of non-traders are going to read this transcript.
2  When you use the term hedging, what do you mean?
3    A    So, again, you can either buy the stock
4  itself and buy puts, which hedges the downside, and
5  then sell calls on the upside, which hedges -- it's
6  called a collar strategy or, as opposed to buying
7  the puts and stock, you can just buy the calls and
8  still sell calls above it -- in this case that would
9  be considered a call spread -- and get the same risk
10  parameters but at the same time hedge the underlying
11  asset that you're trying to protect.
12    Q    Picking up on that -- sorry, I cut you
13  off.  Sorry.
14    A    No, no, no.  So in either way the
15  underlying -- the asset may move and you would have
16  to readjust your hedge based upon time.
17    Q    So picking up on that last concept in
18  your answer, Mr. Burnside, is it fair to say that
19  hedging is more focused on protecting preexisting
20  positions in other asset classes?
21    A    No.
22    Q    Okay.  Why don't you explain what
23  my summation is -- what's incorrect about my
24  summation?

JOHN F. BURNSIDE

Page 25

1    A   You can open a position at any time and
2  do the same thing.
3    Q   So the problem with my question
4  is that I inserted the concept of a preexisting
5  position into it?
6    A   Right.
7    Q   Okay, so let's back up. Is it fair
8  to summarize your description of a hedging strategy
9  as the use of options in connection with positions
10  in other asset classes to protect against movement?
11    A   The protection would come from the
12  actual underlying of the same security. So you
13  would hedge -- hypothetically you would hedge an
14  Apple position with Apple options. You would hedge
15  an IBM position with IBM options.
16    Q   Let me put the question a little
17  bit differently. If an options trader is engaged
18  in hedging activity, is the options trader trading
19  options for the purpose of generating profits
20  independent of other trading activity?
21    A   No, because they can be getting dividend
22  income or something as well.
23    Q   So have you ever entered a hedging
24  strategy for the purpose of generating profits

Page 26

1  independent of other trading activity?
2    A   Yes.
3    Q   Okay. How about Freeboard Capital,
4  what did you do at Freeboard Capital?
5    A   I was the risk manager/founder of the
6  Freeboard Capital model.
7    Q   Freeboard Capital is a registered
8  investment advisor, right?
9    A   That is correct. Federally registered.
10    Q   That's two employees, one of whom is you?
11    A   I'm sorry?
12    Q   That's two employees, right, one of whom
13  is you?
14    A   That's correct.
15    Q   $120 million in assets under management,
16  is that generally right?
17    A   We have approximately 150 million of
18  notional value that we trade.
19    Q   What financial products does Freeboard
20  Capital trade?
21    A   Stocks.
22    Q   Anything besides stocks?
23    A   There are no futures. There's no
24  commodities. There's no -- I don't know what

Page 27

1  else you could say. Currencies, there's nothing
2  like that.
3    Q   Are there any other products at
4  Freeboard Capital -- does Freeboard Capital trade
5  any other products other than securities?
6    A   No, sir.
7    Q   So we've looked at your experience
8  from 1999 through the present. And I think you
9  testified that during that time period you didn't
10  trade futures options at all, is that right?
11    A   That is correct.
12    Q   Have you ever traded futures options?
13    A   I have.
14    Q   When did you trade futures options?
15    A   Again, it was a long time ago. I think
16  it was in 1989 during the drought, and I traded in
17  corn and soybeans.
18    Q   How many trades did you make in futures
19  options?
20    A   Then?
21    Q   Ever.
22    A   That was a busy summer. Probably 5,000,
23  10,000.
24    Q   So your experience in trading futures

Page 28

1  options was limited to one summer in '88 or '89.
2  Do I have that right?
3    A   That's correct.
4    Q   In '88 and '89 futures options traded only
5  in pits, right?
6    A   That's right.
7    Q   They didn't trade on screens, right?
8    A   That's correct.
9    Q   Did traders in the pits in 1988 and '89
10  rely on any electronic devices?
11    A   I don't recall any.
12    Q   No computers, right?
13    A   There might have been a few people
14  that had sheets which were computer generated,
15  but I did not.
16    Q   No one was using a computer on the floor
17  in 1988 and '89, right?
18    A   Right, correct.
19    Q   Did anybody use a handheld tablet in
20  '88 or '89?
21    A   Not to my knowledge.
22    Q   As compared to now, did options on
23  futures trade faster or slower in '88 and '89?
24    A   I would say slower.

JOHN F. BURNSIDE

Page 29

1  Q  I agree with that.
2      MR. PLATT: So I'm going to show you
3  what I'm going to mark as CFTC Exhibit 510.
4      (Whereupon CFTC Exhibit No. 510
5          was marked for identification.)
6  Q  I just want to go back to your time at
7  Saliba Capital real quick.  Are you able to see CFTC
8  Exhibit 510, Mr. Burnside?
9  A  Sure.
10  Q  Do you know what NFA BASIC is?
11  A  NFA what?
12  Q  NFA BASIC, do you know what that
13  functionality is?
14  A  No.
15  Q  Do you see at the top of CFTC
16  Exhibit 510 it says NFA ID: 0330807 and then it
17  says --
18  A  I do.
19  Q  -- Saliba Portfolio Management, LLC?
20  A  I do.
21  Q  Is that the company you worked for?
22  A  It was.
23  Q  So I just scrolled down to the second
24  page of Exhibit 510.  Do you see there's a series

Page 30

1  of dated entries?  There's an entry, April 1, 2011,
2  commodity trading advisor registered?
3  A  Okay, yes.
4  Q  Does this refresh your recollection that
5  Saliba Capital Management was a commodity trading
6  advisor?
7  A  I did not know that.  I was not -- I'm
8  not a partner, nor a principal of that entity, so
9  I would have no idea what they're doing.
10  Q  Did Saliba recommend trades to customers?
11  A  Did they what?
12  Q  Recommend trades to customers.
13  A  I honestly don't know.
14  Q  How did Saliba make money?
15  A  We had a couple -- we had -- for the
16  fund that I was working with, they had a couple
17  clients and that's all I traded.
18  Q  Saliba was trading --
19  A  Other than that, they could have
20  a lot of things going on in their world that
21  I don't know about, that I'm not involved in.
22  Q  I understand.  I'm only asking you about
23  the things that you know.
24  A  Right.

Page 31

1  Q  So at Saliba, you were aware that
2  Saliba traded client money.  That was at least part
3  of their business, right?
4  A  Correct, correct.
5  Q  Was that trading -- do you know
6  what I mean when I -- have you ever heard the term
7  discretionary trading?
8  A  Yes.
9  Q  What does that mean to you?
10  A  It means that you're trying to do the
11  best trades for the clients.
12  Q  Do you also understand that it means
13  that the advisor has authority to execute trades
14  without seeking permission from the client?
15  A  Yes.
16  Q  Was Saliba's trades discretionary
17  or nondiscretionary?
18  A  I would get orders from my boss to make
19  trades.
20  Q  Do you have an understanding as to
21  whether or not Saliba's trading was done on behalf
22  of clients in a discretionary manner?
23  A  I do not know that.
24  Q  Okay, yeah.  That's the answer then.  What

Page 32

1  about at Freeboard, does Freeboard have discretion
2  to trade for clients?
3  A  We do.
4      MR. PLATT: I'm going to show you what
5  I'm marking as CFTC Exhibit 511.
6      (Whereupon CFTC Exhibit No. 511
7          was marked for identification.)
8  Q  Mr. Burnside, I'll represent to you that
9  this is a printout of Freeboard Capital's website,
10  and I'll scroll down to the About Us portion.  Do
11  you see your bio there?
12  A  I do.
13  Q  It says that you created the basis
14  of the Freeboard Capital income investment strategy
15  to create returns while managing risk.  What is
16  Freeboard's --
17  A  That is correct.
18  Q  What is Freeboard Capital's investment
19  strategy?
20  A  To purchase stocks that pay dividends
21  while at the same time hedging the stocks that
22  we purchase.  Most of the time our stocks pay
23  dividends.
24  Q  How does Freeboard Capital hedge its

JOHN F. BURNSIDE

Page 33

1 stock positions?
2   A   With options.
3   Q   Are there any other components
4 of Freeboard Capital's investment strategy other
5 than buying stocks that may pay dividends and
6 hedging those stocks?
7   A   You could -- in the simplest terms
8 you could call it a collar strategy.
9   Q   But there's no other components
10 of Freeboard Capital's investment strategy other
11 than what we've just discussed?
12   A   Some clients have asked to get into some
13 ETFs, but that's a -- you know, it's just a bundle
14 of stocks together or what have you, but all of them
15 are always covered with downside puts to protect the
16 capital of the clients. Oh, by the way, I will say
17 unless someone has a different agenda with their
18 own account.
19   Q   Can you explain a little further what
20 you mean?
21   A   Sure. So like I have one client that he
22 wants to be long in the stock, so he doesn't follow
23 the protocol of our normal trading. He actually
24 likes to sell those puts so they can generate cash

Page 34

1 flow for his account. And if the stock goes down,
2 he wants to buy more stock. And he takes more risks
3 than any other client, and I've so told him that and
4 he understands.
5   Q   To the extent that he's deviating
6 from the normal strategy at Freeboard, that's this
7 particular client's own decision making, is that
8 right?
9   A   That's correct.
10   Q   When is the last time Freeboard Capital
11 got a new client on board?
12   A   Well, this individual that I speak of,
13 he was referred to me -- I believe they came over --
14 well, that guy came over in January. I just got
15 another one in -- I think his money transferred
16 earlier this month into the account, yeah. I mean,
17 that's my newest one, this gentleman from Austin,
18 Texas. If it wasn't in September, it was in late
19 August. I think you get the idea.
20   Q   When Freeboard Capital gets new clients,
21 do they want to know how the fund has performed in
22 the past?
23   A   I'm sorry. Do the clients want to
24 know how?

Page 35

1   Q   Yeah.
2   A   Yeah. Well, the one thing is --
3 with Freeboard Capital is we don't have many
4 clients, so we definitely communicate with the
5 clients regularly. We don't try to be everything
6 to everybody. We try to just help the people that
7 we have as clients.
8   Q   When Freeboard Capital gets new
9 customers, do they want to know how the fund has
10 performed in the past?
11   A   Well, they do, but each individual
12 account is different as -- for example, someone
13 might deposit a concentrated stock position and they
14 don't want to lose their stock. That's a different
15 kind of a trade than someone that may just deposit
16 just plain cash and we go out and purchase stocks
17 and hedge those stocks.
18   Q   When a prospective customer asks
19 Freeboard Capital about its track record, what
20 kind of information does Freeboard Capital provide?
21   A   It's funny you ask that question
22 because people say we don't have any one set
23 way to denominate that. We're trying to get that
24 established, but it's more difficult than you

Page 36

1 think.
2   Q   Did you ever provide any --
3   A   Because people want to take different
4 risks and people have different investments and
5 people have different assets that they're bringing
6 to the table.
7   Q   Does Freeboard Capital provide
8 any information about historical performance
9 to prospective clients?
10   A   I'm sure that there has been, but
11 at the same time it is -- it's difficult when you
12 have many different investment philosophies going
13 at the same time but utilizing the same underlying
14 premises.
15   Q   So what information does Freeboard
16 Capital provide about historical performance to
17 prospective customers?
18   A   What we do provide is trying to limit
19 risk and try to create returns and yet at the same
20 time many -- you know, many of my people want to
21 know how much they have at risk in the marketplace
22 on a regular basis.
23   Q   So I'm not asking about existing
24 customers. I'm asking about prospective customers.

**JOHN F. BURNSIDE**

1  So when --
2     A   And that is the case as well
3  because many people that we communicate may
4  not want necessarily the high returns.  They just
5  don't want to have the big losses.  They want to
6  know that their downside is protected.
7     Q   I think your testimony, Mr. Burnside, is
8  that Freeboard Capital does not provide historical
9  performance information to prospective clients?
10    A   We have in the past, but it has been --
11  my business partner has his account and we offer
12  his account as a sampling, but then he ran out --
13  he needed the money to live, so that account has
14  been dwindled down.  And, therefore, we have enough
15  clients at this point that they feel comfortable
16  with what we're doing.
17    Q   It sounds like you can't provide
18  a clear answer about the track record information
19  that Freeboard Capital provides to its customers,
20  so I'm just going to move on.
21    A   Okay.
22    Q   Does Freeboard Capital create annual
23  or quarterly performance reports for the fund?
24    A   There is no fund itself.  I think

1  that's maybe where you're getting hung up on.
2  We had a -- we had my business partner's account,
3  which was kind of the starter pit, shall I say, for
4  this project.  But then, as I said, other clients
5  have come in, felt comfortable.  They brought other
6  stock.  They brought other risk parameters.  They
7  brought dynamics to the table where it is not --
8  this is -- what the problem is with our business
9  model is, it's not scaleable.  This is why we only
10  have a certain number of clients.  It's not a
11  scaleable event that people always want to talk
12  about.
13    Q   Does Freeboard Capital create quarterly
14  or annual reports?
15    A   No, it comes from the broker-dealer.
16  I do help clients when they're looking for those
17  returns.  I do help them to get to that because
18  sometimes they're challenged, shall I say, finding
19  it in the report status.
20    Q   I'm just going to go back to your CV,
21  Mr. Burnside, which is Exhibit 509.  You've got
22  some bullets here under a heading called Subject
23  Matter Expertise Engagements.  Do you see that?
24    A   Yep.

1     Q   On the second bullet point it
2  says:  "Expert witness on trading strategies
3  and procedures."  Can you list all the engagements
4  where you've acted as an expert witness on trading
5  strategies and procedures, please.
6     A   Sure.  No. 1 was the Quiddity
7  when Quiddity was being -- I don't know what
8  the right word choice is, was having discussions
9  with the CFTC.  I was brought in there.  I was
10  also -- when I was the business conduct chairman
11  of the Chicago Board Options Exchange, I was asked
12  many times to come up with why people would be doing
13  things because it was during 9/11, and many of the
14  market reg slash people would come up and ask me
15  what I thought of different trades, and I gave my
16  personal opinion on the trading strategies and what
17  they meant and what I perceived as a trade.  And
18  in many other situations just -- I've also been
19  in a case involved with people just establishing
20  a class on options trading and the procedures on
21  how to enter orders and so on and so forth.
22    Q   Have any of those engagements been in the
23  last ten years?
24    A   Well, yeah, the Quiddity one was in '13.

1  So that was eight years ago or whatever.  I think
2  it was '13.
3     Q   That's the only one that's been in the
4  last decade?
5     A   Sure.
6     Q   And the third bullet here under Subject
7  Matter Expertise Engagements --
8     A   I'm sorry?
9     Q   So just to circle back to your expert
10  witness engagements, were those matters before a
11  court or a tribunal or to whom were you providing
12  your expert opinion?
13    A   In the Quiddity case it was just
14  as I'm doing now, having a deposition.  In the --
15  when I was dealing with the 9/11 stuff, it was
16  for the benefit of, I guess you'd call it Homeland
17  Security because they wanted to know how those
18  trades -- if those trades were planned ahead of
19  time.  And I was trying to help them as much as I
20  could to see if there was people that were making
21  trades in that -- in defense stocks ahead of time,
22  that they might have been available to create money,
23  profitable trades.  And then finally in regards to
24  the writing the procedures, the classes that I've

JOHN F. BURNSIDE

Page 41

1  developed for other people.  I mean, whether they
2  used them or not, they paid me for them, and that
3  was what my point was.
4  **Q    So was the development of the**
5  **procedures, that wasn't in connection with a**
6  **litigation or dispute, right?  That was helping**
7  **someone create a set of policies?**
8  A    Yeah, I -- yes, that's correct.
9  **Q    And so the third bullet point here on**
10 **your Subject Matter Expertise Engagements is that**
11 **you served on the CBOE Business Conduct Committee.**
12 **What is the --**
13 A    Yeah.
14 **Q    -- CBOE?**
15 A    Chicago Board Options Exchange.
16 **Q    And what is the Business Conduct Committee**
17 **at the CBOE responsible for?**
18 A    It's a liaison committee between the
19 SEC and the Department of Justice and the Chicago
20 Board Options Exchange.
21 **Q    What's it responsible for?**
22 A    Rules and regulations, new procedures,
23 pretty much -- ethics on the floor.  That's pretty
24 much a catchall for like -- I'll say like an

Page 42

1  attorney environment for the exchange.
2  **Q    So does it deal with disciplinary matters**
3  **at the exchange level?**
4  A    It does.
5  **Q    And you were the chair from 2001 to 2003,**
6  **right?**
7  A    That's correct.
8     **MR. PLATT:** Let's take a break.
9  We've been going for about an hour.  Maybe
10 ten minutes.
11    **THE WITNESS:** Sure, whatever.
12    **MR. PLATT:** Let's go off the record.
13    (Whereupon a recess was taken from
14       9:30 a.m., to 9:47 a.m., after which
15       the following proceedings were had:)
16    **MR. PLATT:** It's 9:47.  We're back on the
17 record with the deposition of John Burnside.
18 Let the record reflect that Mr. Falvey is no
19 longer present with Mr. Burnside and we'll
20 proceed.
21 **Q    Let's go through some background terms,**
22 **Mr. Burnside, because when we get to your report**
23 **and discuss that, I want to make sure that we're**
24 **all on the same page about what these technical**

Page 43

1  terms mean.
2  A    Sure.
3  **Q    What is an option?**
4  A    The right to buy or sell a security
5  or asset at a certain price at a certain time.
6  **Q    What does the term underlier mean in the**
7  **context of options?**
8  A    Underlier is the -- whatever asset you're
9  trading.
10    **MR. PLATT:** Let the record reflect
11    that Mr. Falvey's returned to Mr. Burnside's
12    office.
13    **MR. FALVEY:** Apologies.
14 **BY MR. PLATT:**
15 **Q    So the underlier can be the security**
16 **or the future that the option references.  Do you**
17 **agree with that?**
18 A    I agree.
19 **Q    What does it mean for an option to be**
20 **in the money?**
21 A    That it has intrinsic value.
22 **Q    What's intrinsic value?**
23 A    The amount of money that the option
24 is worth in relation to the underlying asset.

Page 44

1  **Q    What does it mean for an option to expire?**
2  A    Is that it either becomes worthless
3  or it turns into the asset that it is representing.
4  **Q    It's the date on which the holder of the**
5  **option can exercise the option, right?**
6  A    It's automatically -- it's automatically
7  if it's in the money.
8  **Q    What are some of the reasons that people**
9  **trade options?**
10 A    You can hedge previous positions.
11 You can speculate.  You can speculate on future
12 movements.  You can create strategies to limit risk
13 while generating profits.  Many different reasons
14 to trade options.
15 **Q    Other than the three that you just**
16 **mentioned, hedge positions, speculate on future**
17 **movement or create strategies to generate profit**
18 **while limiting risk, can you think of any other**
19 **commonly employed options strategies or commonly**
20 **employed reasons that people trade options?**
21 A    I'm sure there's some but none come to
22 the top of my head.
23 **Q    If it was common, do you think it**
24 **would be at the top of your head right now, given**

JOHN F. BURNSIDE

Page 45

1   your experience trading securities options?
2       A   Well, my experience in trading
3   options is pretty lengthy, and so I'm sure that
4   I'm missing -- I could miss something just because
5   of the environment of trying to answer the question
6   so ...
7       Q   I'm not sure what that means, but we'll
8   move on.  Options can be puts or calls, right?
9       A   I'm just saying I don't do this every day.
10      Q   I understand.  My question is simply
11  you've explained that you have a long history of
12  trading securities options.  You listed three common
13  reasons that people trade options.  And my question
14  is if there are other common options and you can't
15  think of them, they probably don't exist, right?
16      A   That's not true.  I mean, I guess the
17  other option -- the other alternatives are just
18  buying options outright and betting on a direction
19  of the underlying.
20      Q   So you said speculate on future
21  movements.  So maybe that would fall under that
22  category?
23      A   Yep, that's right.
24      Q   Okay.  Options can be puts or calls,

Page 46

1   correct?
2       A   Correct.
3       Q   What's the difference between a put
4   and a call?
5       A   Call gives you the right to buy the
6   asset at a certain price at a certain time, and
7   a put gives you the right to sell the asset at a
8   certain price at a certain time.
9       Q   And a strike price is what you mean
10  when you say the right to buy or sell the underlier
11  at a certain price, right?
12      A   That's correct.
13      Q   How do you determine whether an option
14  is profitable?
15      A   If you make money on it.
16      Q   How do you know if you make money on
17  an option?
18      A   If you sell it for more than you buy it
19  or buy it for less than you sold it.
20      Q   Is it correct to say that every option
21  expires in the money or out of the money?
22      A   No.
23      Q   What's incorrect about that statement?
24      A   Some expire both worthless.

Page 47

1       Q   I didn't understand that.  What was that?
2   What was the answer?
3       A   So both puts and calls can expire
4   worthless if the asset class goes out at strike.
5       Q   Okay.  So that would be out of the money?
6       A   Well, no.  That would be at the money.
7       Q   Okay.  So an option can either
8   expire in the money, at the money or out of the
9   money, right?
10      A   That is correct.
11      Q   And if an option expires at the money,
12  does the holder of the option realize a trading
13  gain?
14      A   So are you saying that they're long or
15  short?
16      Q   If the holder of an option that expires
17  at the money exercises the option at expiration,
18  is that going to result in profits?
19      A   No.
20      Q   I'm just trying to put this in a way
21  that makes sense.  Do you agree that any option is
22  capable of being profitable?
23      A   I do.
24      Q   In the case of, for example, a single

Page 48

1   name security call option, if the underlier goes up,
2   does that mean that the option will be profitable?
3       A   No.
4       Q   Why not?
5       A   Volatility could be too high when the
6   purchaser bought the call.  It may not have gone up
7   far enough to become -- even though the call option
8   is in the money, it may not have gone up as much as
9   they paid in premium.  Those are the examples -- so
10  you could in theory lose money on the option, yet
11  the price of the underlying went the proper
12  direction.
13      Q   So I agree with you, Mr. Burnside.
14  Is it fair to say that to determine whether any
15  particular option is profitable, you need to analyze
16  a whole bunch of factors?
17      A   Yes.
18      Q   Including, you know, the movement
19  of the underlier, the strike price, the premium,
20  costs and commissions and potentially other factors,
21  right?
22      A   The costs and commissions I'm not as
23  familiar with because things have really come down
24  due to the electronic trading.  But definitely in

**JOHN F. BURNSIDE**

Page 49

1  the other cases, you definitely have -- the other
2  thing that you're missing is time.
3  **Q  We've used the term premium.  What do you**
4  **mean by premium?**
5  A  Premium's the amount of the price of the
6  option.
7  **Q  How are options priced?**
8  A  Well, there's many different ways to price
9  options, but the most common way is Black-Scholes.
10  **Q  What's Black-Scholes?**
11  A  It's a formula that Dr. Black and
12  Dr. Scholes developed in the early '70s that took
13  five different variables to figure out the pricing
14  of the underlying -- excuse me, of the option.
15  **Q  Do you have an understanding of what**
16  **those variables that impact the price of an option**
17  **under the Black-Scholes model are?**
18  A  Strike, stock price, time, dividend,
19  interest rate.
20  **Q  Are you familiar with the term implied**
21  **volatility?**
22  A  I am.
23  **Q  What does implied volatility mean?**
24  A  Where the at-the-money volatility is

Page 50

1  trading of the option and of the asset.
2  **Q  What about historic volatility, what does**
3  **that mean?**
4  A  Historic volatility is where the asset has
5  historically moved on a volatility basis.
6  **Q  How is the implied volatility of a futures**
7  **contract determined?**
8  A  Well, there's really two ways.  The
9  real way that it's established is through supply
10  and demand, and until supply and demand are met you
11  really don't know what the volatility will be.
12  **Q  What role does implied volatility play in**
13  **options pricing?**
14  A  A significant role.
15  **Q  Do you agree that -- and I'm going to**
16  **speak a little bit in laymen's terms here, so**
17  **correct me if this is too general.  Do you agree**
18  **that implied volatility is based into the price of**
19  **an options premium?**
20  A  The implied volatility is where the option
21  is actually created, right?  That's it.
22  **Q  You tell me.  What does implied volatility**
23  **mean to you?  I think you gave a slightly different**
24  **response earlier.**

Page 51

1  A  Implied volatility is where the
2  option's trading.  And, again, this goes back to
3  the supply and demand.
4  **Q  Isn't the price of the premium where an**
5  **option is trading?**
6  A  I'm sorry?  What was that question?
7  **Q  You said that implied volatility is**
8  **where the option is trading.  And my question is**
9  **isn't the price of the premium where the option is**
10  **trading?**
11  A  The price of the premium is equal to
12  the implied volatility of the underlying.  Implied
13  volatility and premium are basically synonymous, and
14  it depends on what contract you're referring to and
15  how long you're going out on what the premium is
16  versus what the implied volatility is.
17  **Q  Do you agree that different underliers**
18  **have different implied volatilities?**
19  A  Absolutely.
20  **Q  Future events may cause implied volatility**
21  **to fluctuate for any particular underlier, correct?**
22  A  Correct.
23  **Q  For example, like if there's a release**
24  **of news, that might increase implied volatility**

Page 52

1  **because traders expect the news will have some**
2  **impact on the instrument, right?**
3  A  Correct.
4  **Q  Do you agree that any event-driven**
5  **increase in volatility is automatically reflected**
6  **in the price of the option?**
7  A  Not automatically, but it has a tendency
8  to do so.
9  **Q  Because the market recognizes the supply**
10  **and demand, right?**
11  A  That's correct.
12  **Q  Are implied volatilities between different**
13  **futures contracts ever correlated?**
14  A  Well, they have -- it could -- the
15  different futures contracts could have different
16  meanings.  It's almost like a different asset class.
17  So they could be correlated or they could not be
18  correlated.
19  **Q  Can you think of an example where**
20  **futures contracts have correlated volatilities?**
21  A  Sure.  Let's just -- let's say that --
22  let's say that a crop, we have a crop and the new
23  crop comes out in November but you're trading the
24  June and the September options contracts, which

**JOHN F. BURNSIDE**

1  is the old crop.  Those are correlated together.
2  But this new contract, call it the November
3  contract, may have a different correlation to
4  these other two, which could be because there's
5  some kind of event or something that's going on.
6  **Q    So I think you're describing potential**
7  **correlation in the same futures contract but over**
8  **different time horizons?**
9  A    Correct.
10  **Q    And what about for different futures**
11  **contracts?  Like could gold be correlated to silver**
12  **futures?**
13  A    I'm sure that there is some
14  correlation, but at the same time -- I know
15  that there's a correlation to the two of them in
16  this case, in your example.  But at the same time,
17  remember sometimes those correlations do fall apart.
18  **Q    Is the volatility of soybean futures**
19  **correlated to the volatility of Treasury bond**
20  **futures?**
21  A    I would say no.  They're independent
22  events.
23  **Q    Is the volatility of corn futures**
24  **correlated with the volatility of gold futures?**

1  A    Not that I've ever traded, but I'm going
2  to say no.
3  **Q    You've never traded those two markets,**
4  **is that your testimony?**
5  A    I've traded corn and I've traded
6  gold, but I've not ever -- but I would never do a
7  correlated trade unless I did a bunch of backtests,
8  you know, on how it was correlated, and I just have
9  never done that.
10  **Q    Is it your testimony that corn futures**
11  **are not correlated to gold futures?**
12  A    In general, yes.
13  **Q    Are oil futures correlated to wheat**
14  **futures?**
15  A    Again, I don't know the correlation.
16  I've not done any research, but in general I would
17  say no.
18  **Q    Is the volatility of Japanese yen**
19  **futures correlated with the volatility of lean**
20  **hog futures?**
21  A    I will say the same response.  In general
22  I don't know, but I would say no.
23  **Q    What does it mean to be long an option?**
24  A    It means they own a call or a put.

1  **Q    And the owner of the call or put pays**
2  **the premium, right?**
3  A    That's correct.
4  **Q    What does it mean to be short an option?**
5  A    That the person that sold the option
6  collects that money and is liable for any movement
7  beyond that price.
8  **Q    Earlier you mentioned commissions.**
9  **In the context of options trading, do you agree**
10  **that a commission is generally a per contract**
11  **transaction-based fee?**
12  A    Again, it could be or it could be
13  a general fee.  I don't know.  It depends on your
14  clearing firm.
15  **Q    In the case of a transaction-based**
16  **fee, what is your understanding of prevailing market**
17  **rates for one options contract?**
18  A    I don't have any knowledge of the
19  values because we try to get our option fees for
20  free.
21  **Q    Are you successful in getting your option**
22  **fees for free?**
23  A    Not always, but sometimes.
24  **Q    When you do pay commissions on your**

1  **options, can you ballpark how much your firm pays?**
2  A    Somewhere in the vicinity of 40¢, I want
3  to say.
4  **Q    Per contract?**
5  A    Yeah, I think that's right.
6  **Q    So it varies between 40¢ and free per**
7  **options contract for the trading you do?**
8  A    It depends, yeah.  There's lots
9  of dependence upon what you're doing, whether
10  you're closing a very nominal valued option and
11  getting it off your sheets, things on those natures.
12  But, again, I'm not a commission knowledgeable
13  individual.
14  **Q    Other than the extent to which**
15  **you pay commissions for the trading that you do in**
16  **a professional capacity, right?**
17  A    That is correct.
18  **Q    So we've discussed this a little bit,**
19  **but some options trades are composed of multiple**
20  **options together, right?**
21  A    Correct.
22  **Q    Is it fair to call that a multi-legged**
23  **strategy?**
24  A    I would call it a multi-legged strategy.

JOHN F. BURNSIDE

1    **Q**   **Each option is a separate leg of the trade?**
2    A   Correct.
3    **Q**   **What does the term spread trade mean?**
4    A   A spread is when you purchase one option
5 and sell another option.
6    **Q**   **Generally a strategy composed of two legs?**
7    A   Two options, one trade.
8    **Q**   **Right. A spread trade is generally**
9 **composed of two options, right?**
10   A   That's correct.
11   **Q**   **Do you know what a Monte Carlo simulation**
12 **is?**
13   A   I do.
14   **Q**   **What is it?**
15   A   You throw a bunch of probabilities into
16 a computer and it spits out where the probability
17 is of the outcome. I've never done one. I've
18 just done a little research on them and you can
19 do it for stocks, futures, fuel, whatever you want.
20 There's all kinds of different ...
21   **Q**   **What is your understanding as a market**
22 **professional as to why options traders use Monte**
23 **Carlo simulations?**
24   A   Because there are a lot of variables

1 that can happen in the marketplace.
2   **Q**   **Are Monte Carlo simulations used**
3 **to determine what the most likely outcome of**
4 **a trading strategy might be? Is that one way to**
5 **use it?**
6   A   Could be, yeah.
7   **Q**   **Earlier you used the term backtest.**
8 **What does it mean to backtest an options strategy?**
9   A   When I was using that, I was using
10 the backtest as a correlation between two asset
11 classes and how they moved in relationship together.
12 I think it was the gold versus corn. I may be
13 wrong, but we could take a look at the notes.
14 But, I mean, I would look at how gold performed
15 versus the corn and see how they moved in
16 correlation together.
17   **Q**   **Do options traders ever backtest**
18 **multi-legged strategies?**
19   A   With multi-legs it's fairly difficult
20 because you have multiple inputs and you have
21 multiple variances that can occur.
22   **Q**   **Before an options trader places**
23 **a multiple-legged strategy, is there a way to**
24 **determine whether or not the trade is more likely**

1 to be profitable than not?
2   A   When you place a multi-legged
3 strategy together, you know where your maximum
4 profit could be, where your maximum loss could
5 be, and in the meantime it mitigates -- because
6 in a spread you're going to be long one and short
7 one. So, therefore, it will mitigate your risk as
8 well.
9   **Q**   **In addition to determining maximum**
10 **profitability and maximum potential loss, is there**
11 **any way that an options trader can determine whether**
12 **or not a spread is likely to achieve profitability**
13 **before the trade is placed?**
14   A   There's no guarantee.
15   **Q**   **So the question isn't asking whether**
16 **or not there's a guarantee. I'm asking about**
17 **likelihood. Is there a way that a trader before**
18 **he or she places a multi-legged options trade can**
19 **determine whether or not a trade is likely to make**
20 **money?**
21   A   When you put a multi-legged trade on,
22 again, what you're trying to do is mitigate risk
23 while at the same time give you profit potential.
24 Now, is there a probability of that being a winner?

1 Yes, but then there's also a probability of it
2 being a loser as well.
3   **Q**   **How do you determine whether or**
4 **not a multi-legged strategy has a probability**
5 **of profitability?**
6   A   Probabilities are nothing more
7 than deltas of each option and how much -- and the
8 probability they will be in the money at expiration.
9   **Q**   **So I'm not sure I understand the**
10 **response, so let me back up to your earlier answer.**
11 **I asked if there was a way to determine whether or**
12 **not it was -- a trader could determine whether or**
13 **not it was likely for a multi-legged options trade**
14 **to be profitable before placing the trade. Do you**
15 **remember that question?**
16   A   Yeah, I do recall that question.
17   **Q**   **And I think your answer was there's**
18 **a way to determine the probability that a trade**
19 **would be profitable.**
20   A   But then it's only a probability.
21   **Q**   **Right. So my question is what**
22 **is the method by which a trader determines the**
23 **probability that any particular multi-legged options**
24 **spread will result in profits?**

JOHN F. BURNSIDE

Page 61

1    A    Usually it's risk versus reward.
2    Q    What does that mean?
3    A    How much capital do you deploy to how
4   much capital you can make.
5    Q    How do you determine how much capital
6   you can make on a particular multi-legged options
7   trade?
8    A    It's limited to the spread that is
9   deployed.
10    Q    And then is it just an arithmetical
11   subtract the maximum gain from the maximum loss?
12   I don't understand.
13    A    So if you put on a spread and
14   you're limiting your risk because you have
15   a spread on but then you have the potential to
16   make X, then you would say I can make X but I'm
17   only risking Y.
18    Q    Are you aware of any software
19   applications that could assist a trader in
20   determining the probability that a trade would
21   be profitable?
22    A    Well, they've tried to build a model
23   to establish that capability.  The problem with
24   that, it comes in the fact that there are so many

Page 62

1   other variables out there.  Like I mentioned to
2   you earlier, time, and that that is -- as much as
3   I would like to say that it's an absolute, there's
4   no way that any trading system can give me an
5   absolute outcome.
6    Q    You've placed spread trades before, right?
7    A    Every day.
8    Q    Your goal when you place spread trades,
9   is it to make money or lose money?
10    A    To make money.
11    Q    How do you determine before you place
12   a spread trade whether or not it's likely to make
13   money?
14    A    There's so many variables in
15   that situation, but I might be -- I might be
16   repositioning a hedge.  I might be -- if it's an
17   opening position, I might be just speculating and
18   protecting a downside event.  If it's a spread in a
19   time lateral situation, it might be that I'm trying
20   to reduce risk going out in time.  There's just so
21   many variables to that question that it depends on
22   the situation that we're referring to.
23    Q    Have you ever run an analysis that
24   tells you whether or not a spread trade is likely

Page 63

1   to achieve net profitability at the time the trade
2   is placed?
3    A    I guess I just do it because --
4   I've never run a spread trade in an analyzer to
5   see the probability of outcome because you know the
6   probability on the delta going in and that's what --
7   that's what's happening.
8    Q    What does it mean -- you used the term
9   probability on the delta and that's what you focus
10   on when you're analyzing whether or not a trade is
11   a good bet.  What do you mean by probability on
12   delta?
13    A    Yeah, it could be the delta or
14   it could also be -- there's several different
15   factors in pricing options and different Greeks
16   that go along with deltas.  And that's like a delta,
17   a gamma, a theta, a vega, a rho.  All these things
18   go into the pricing models of options, and based
19   upon what your position is going in or whether you
20   want to establish a position would be the variance
21   from what you're trying to accomplish on your
22   spread.
23    Q    So let me try and summarize your
24   testimony because there's a lot of things going

Page 64

1   on here.  It sounds to me like before you put
2   on a trade, an options spread trade, you look
3   at a bunch of variables, including the Greeks,
4   the max loss of the trade, the max gain of the
5   trade and you analyze those in your brain and
6   you determine whether or not that's a good trade,
7   is that right?
8    A    That's correct.
9    Q    And you do not use any automated
10   analysis to determine whether or not any particular
11   spread trade is likely to achieve net profitability,
12   is that also correct?
13    A    That is correct.
14    Q    But you're aware that such tools exist,
15   right?
16    A    I don't rely on them because there
17   are more factors out there that they don't -- that
18   they're not aware of.
19    Q    Do automated tools exist that
20   professional traders use to analyze the likelihood
21   that any particular multi-legged options trading
22   strategy will achieve net profitability?
23    A    I'm sure there are.
24    Q    What are they?  The Monte Carlo simulation,

JOHN F. BURNSIDE

Page 65

1  is that one of them?
2     A   No.  Monte Carlo -- because you have
3  too many variables in an options trade, especially
4  a multi-legged trade and a spread trade, there's so
5  many variables that can occur that there's no one
6  set.  And that's why you look at just the generic
7  trade itself and look at your risk/reward.
8     Q   That's what you do, right?  That's your
9  testimony, that that's how you analyze trades?
10    A   That's the way that I was -- I've always
11 traded.
12    Q   Right, yeah.  I'm only asking you is that
13 what you do, yes?
14    A   That's what I do because nobody can
15 forecast the future 100 percent.
16    Q   I agree with that also.  But you do
17 not attempt to employ any automated analysis that
18 will tell you a probability that a trade is likely
19 to make money, right?
20    A   No.
21    Q   So earlier when I asked you
22 about common reasons that traders trade options,
23 I think you mentioned hedging, you know, placing
24 a directional bet -- that's not the term you used,

Page 66

1  but I think that is what you meant -- and also
2  to put on sort of a limited risk income-generating
3  strategy.  Those were sort of the three buckets.
4  Do you remember that?
5     A   I agree.
6     Q   I want to focus on the third bucket,
7  which is the multi-legged strategy of limited risk
8  and defined profit potential.
9     A   Let's go for it.
10    Q   Actually, before we go there,
11 earlier today you said that you were a market
12 maker in options.  That's another sort of kind
13 of market participant.  Does market maker fall into
14 any of those three buckets that we discussed?
15    A   As a market maker I was a market maker,
16 not a market taker.
17    Q   Yeah.
18    A   Which means that I was always on
19 the other side.  I did not know what other people
20 would bring to my environment.  I just had to make
21 a market to try to fill that client's needs.
22    Q   The market maker's job is to provide
23 liquidity, you know, buying and selling on both
24 sides.  It's not necessarily hedging directional

Page 67

1  bets or placing sophisticated trades, is that fair?
2     A   That's correct.
3     Q   Like it's totally its own bucket, right?
4     A   That's right.  Yeah, you're there to
5  provide a service for the public.
6     Q   In terms of your professional career
7  as a financial services -- as an options trader,
8  how much of your experience has been as a market
9  maker on the one hand or as a nonmarket maker on
10 the other?
11    A   So I started trading stock options
12 in 1986.  I would say I probably stopped that
13 somewhere around 2011-ish when I was with G-Bar.
14 And then I started with the Saliba situation in
15 whatever it was, '12 I'm going to say, 2012, 2013,
16 worked there, and then since then I've been working
17 at Freeboard Capital.  So let's say it's been nine
18 years of -- nine years of doing it for other people.
19 And except for like between 1991 and '93 when
20 I moved back to Indianapolis to help my mom, I've
21 been trading as a market maker from '86 to '91 and
22 then '93 to 2011.  So maybe 23 years as a market
23 maker and maybe 10 years, 9 years as a professional.
24    Q   Okay.  And then so in those eight

Page 68

1  or nine years as a professional, if I heard that
2  right, nonmarket making options trading, how much of
3  your trading activity fell into the hedging bucket?
4     A   Most of it.
5     Q   It sounds like all of it.
6     A   Yeah, I would say 90 -- I mean, I would
7  say 90 percent or more.
8     Q   Would you say 99 percent?
9     A   Sure, I'll even go that high.  Sure,
10 99 percent.
11    Q   100 percent?
12    A   Probably not 100.  There might have
13 been a couple speculative trades, but you get the
14 idea.
15    Q   Okay.  Got it, got it.  That's
16 helpful.
17        MR. PLATT:  Okay.  Let's take a break
18 because we're sort of at a natural stopping
19 point.  Do you guys want to take ten --
20        THE WITNESS:  Sure.
21        MR. PLATT:  -- and then we'll look at
22 your report?
23        THE WITNESS:  Wonderful.
24        MR. PLATT:  Let's go off the record.

JOHN F. BURNSIDE

Page 69

1    **THE WITNESS:** Okay.
2        (Whereupon a recess was taken from
3        10:25 a.m., to 10:33 a.m., after
4        which the following proceedings were
5        had:)
6    **MR. PLATT:** Let's go back on the record,
7    please, at 10:33.
8    **Q   So, Mr. Burnside, before the break we**
9    **were discussing the way you analyze a spread trade**
10   **before you put it on. And I think your answer was,**
11   **and I'm summarizing, you know, you look at the**
12   **Greeks, you look at the volatilities, you look at**
13   **factors such as max loss and max gain or potential**
14   **max loss and potential max gain, and you sort of**
15   **reach an analysis as to whether or not it's an**
16   **advisable trade. Is that generally accurate?**
17   A    That is.
18   **Q   And do I have it right that it's**
19   **like a holistic analysis that you conduct based**
20   **on what the variables mean to you?**
21   A    The variables are what they are.
22   **Q   And your analysis of the variables,**
23   **is it a holistic analysis where you are looking**
24   **at the variables and you make an independent**

Page 70

1    determination in your head whether or not
2    it's a good trade?
3    A    Yes.
4    **Q   Do you ever attempt to calculate**
5    **any probabilities that a trade will be profitable,**
6    **a spread trade will be profitable before you put**
7    **a spread trade on?**
8    A    When you have a spread trade, you have
9    limited profit and loss to begin with. Therefore,
10   you already know your outer bounds. So is this the
11   proper place to do it is what I look at.
12   **Q   So what I'm asking -- just to clarify,**
13   **what I'm asking is options trades can have a variety**
14   **of outcomes, right, positive or negative?**
15   A    Agreed.
16   **Q   And you've identified that you look**
17   **at sort of an outer bound on both sides when you're**
18   **putting on a spread trade, right?**
19   A    Correct.
20   **Q   Do you ever attempt to calculate the**
21   **likelihood that a spread trade will have a positive**
22   **outcome?**
23   A    It's a probability outcome to begin with.
24   That's what a spread is. It's a probability outcome

Page 71

1    to begin with, so the probability's already built
2    into the trade.
3    **Q   So I think I'm asking a slightly**
4    **different question. I'm asking do you ever attempt**
5    **to calculate the likelihood that a spread trade will**
6    **achieve net profitability?**
7    A    Again, the probability is in the
8    spread. It's already built in the spread. It's
9    an inherent part of the spread. It's there. It is
10   what it is. You know how much you paid for a spread
11   or how much you sold the spread for. So, therefore,
12   you know what your risk is. That's the definition
13   of a spread, is that you have outer bounds on
14   either side.
15   **Q   Okay, that's helpful. And, again,**
16   **I'm not asking about the outer bounds or whether**
17   **or not the downside is defined. Do you know what**
18   **the term likelihood means in statistics?**
19   A    It's called probability outcome.
20   **Q   Right. And options trades can either**
21   **be profitable or not profitable, right?**
22   A    That is true.
23   **Q   Do you ever attempt to calculate**
24   **the probability that an options spread trade**

Page 72

1    will be profitable?
2    A    When you make the trade, the probability
3    is already set there.
4    **Q   Explain to me the method by which**
5    **you calculate the probability that a spread trade**
6    **will be profitable.**
7    A    Sure. Let's say that I sell a vertical --
8    a call vertical. I buy one call. I sell another
9    call. It's $10 strike differential. The maximum
10   it can go to is $10, agreed? I buy that spread
11   for $7. The maximum I can make on that trade is
12   $3, agreed? That's the probability outcome that
13   I'm -- that I look at on a daily basis, on an
14   every-minute basis. I might do something else
15   against it, but I'm using it in the purest of
16   terms in a vertical trade. Maybe I think that
17   the stock could go higher. Maybe I paid a dollar
18   for that $10. I risked a dollar to make nine.
19   Now, the probability is lower for me to make the
20   nine because I only paid a dollar for it, but then
21   again, things do change.
22   **Q   So it still sounds to me like you're not**
23   **conducting an analysis to determine the likelihood**
24   **that that trade will be profitable at the end.**

Page 73

1  It sounds like you're describing the maximum
2  you could gain and the maximum you could lose
3  and then sort of comparing the magnitude of those
4  two outcomes, right?
5     A   Correct.  You could look at it that
6  way, but the probability is I buy one option,
7  I sell another option.  What's the probability
8  of the one that I purchased being in the money and
9  what's the probability of the one that I sold being
10  out of the money or in the money or however you want
11  to look at it.  That is -- that's your delta of that
12  spread and that's your probability outcome of that
13  spread being in the money.  A minus B equals your
14  net.
15     Q   So it's just a simple arithmetic?
16     A   Yes.
17     Q   Do you take into account the likelihood
18  that one or the other outcomes will occur in this
19  arithmetic?
20     A   Always.
21     Q   How do you do that?
22     A   And I look at that and I evaluate that,
23  if I want to pay $1 or $7.
24     Q   Other than the process you've

Page 74

1  just described, which is you analyze each leg
2  independently and then you sort of make a gut
3  decision whether or not the trade is good or bad,
4  do you conduct any other analysis to determine
5  whether or not a trade is likely to make money
6  or not?
7     A   So the answer to your question
8  directly is that there's a probability of that
9  spread being in the money.  Nothing more, nothing
10  less, whether it is $3 in the money, $10 in the
11  money, whatever, $30 in the money.  And so that's
12  what I look at.
13     Q   It doesn't sound to me like you're
14  actually looking at the probability that the
15  trade will be in the money, but we'll move on.
16        THE WITNESS: All right.  Hold on
17  one second.  The door opened while we were
18  talking.  Hold on one sec.
19        (Discussion off the record.)
20        THE WITNESS: Sorry about that.
21  BY MR. PLATT:
22     Q   I'm going to put Exhibit 507 back up on
23  the screen, which is your --
24     A   Okay.

Page 75

1     Q   -- August 9, 2020 report.
2     A   Yep.
3     Q   Let me know when you can see it.
4     A   I can see it.
5     Q   And this is a two-page PDF with one,
6  two, three, four, five --
7     A   Yep, I get it.
8     Q   And under the Project heading
9  on page 1 you write that the project is to
10  review options trades that were suggested trades
11  by James A. Donelson and Long Leaf Trading Group.
12  "My job is not to validate the trades, but more
13  so to prove that the trades are viable options
14  strategies."  What time period --
15     A   Yep.
16     Q   -- does this analysis pertain to?
17     A   Well, I looked at some of the '17,
18  but predominantly after Jim had purchased or
19  taken over the company from December of -- I think
20  it was December of '17 until '19 or so.
21     Q   And is that your understanding,
22  that that's the time period that Donelson owned
23  the firm?
24     A   It is.

Page 76

1     Q   Is it your understanding that Long
2  Leaf's trading recommendations were materially
3  the same during the entire time period Donelson
4  was the principal of Long Leaf Trading?
5     A   They were -- they kind of fell in different
6  buckets but, yes, predominantly.
7     Q   What are the different buckets of
8  trades that Long Leaf's trading recommendations
9  fell into?
10     A   So they would be verticals that
11  could be turned into butterflies or butterflies
12  themselves or broken butterflies, or there might
13  be selling of straddles with some protection on
14  either side of less -- of lower volatility options.
15  And then, finally, there would be just time spreads
16  that they could be doing.  Some people refer to them
17  as calendars.  That was predominantly where they
18  would be -- the buckets fell into.
19     Q   And you go on to state in the second
20  sentence of the Project heading, "My job is not
21  to validate the trades, but more so to prove that
22  the trades are viable options strategies."  What
23  does it mean --
24     A   I never saw any statements is what I was

JOHN F. BURNSIDE

Page 77

1  trying to say there.
2      Q    What's that?
3      A    I never saw any statements of clients
4  or people that traded it.
5      Q    What does it mean that you didn't --
6  that your job was not to validate the trades?
7      A    Because I never -- again, I never saw
8  the actual statements of any one person's account.
9  I never saw a trade.  I saw his recommendations, and
10 that's what I went off of.
11     Q    Why would you need to see client statements
12 to be able to validate a trade?
13     A    To see that they got executed.
14     Q    Why was that valuable to your
15 analysis as to whether or not you could validate
16 a trade?
17     A    Because if they didn't -- if they
18 never made the trade, you wouldn't be here I'm
19 guessing.  Somebody made a trade somewhere, but
20 I never saw any trades.
21     Q    But you saw the designs of the trades,
22 right, and the structure --
23     A    Not -- not --
24     Q    -- of the trades, right?

Page 78

1      A    That's why I said I wanted to prove
2  that the trades were viable options strategies.
3          THE REPORTER:  Mr. Burnside, I just want
4      to remind you --
5      A    (Inaudible.)
6          THE REPORTER:  Mr. Burnside, can you
7      please not interrupt the questions?  Just
8      wait until he finishes the questions before
9      you answer because you get like all garbled
10     and I can't pick it up.
11         THE WITNESS:  Sorry.
12         THE REPORTER:  Thank you.
13 BY MR. PLATT:
14     Q    So your testimony, Mr. Burnside,
15 is that when you write that your job was not
16 to validate the trades, you mean I couldn't analyze
17 the trades because I didn't know that they were
18 actually executed?  Is that your testimony?
19     A    My testimony is that I never saw the
20 executed trades.  All I did was get information
21 on what was recommended.
22     Q    So I'm still trying to understand the
23 concept of what you mean by validate.  Is it like
24 you couldn't opine that they were good strategies

Page 79

1  or bad strategies or likely to make money or not
2  likely to make money?  Like what is it that you
3  couldn't do because you didn't know that they were
4  actually executed?
5      A    If I had a trading statement that
6  gave me the confirms, then I could actually see
7  what people were filled at and what was going on.
8  I never received anything in that regard.  All I
9  received was the recommendations of the options
10 strategy.  And, therefore, I was there to prove
11 that these strategies were viable.  That's pretty
12 clear.
13     Q    Maybe a little less clear than you
14 think, so let's move on to that second clause.
15 You write that your project was to prove that the
16 trades are viable options strategies.  What does it
17 mean to prove that the trades are viable options
18 strategies?
19     A    So that they are regularly used in common
20 trading environments.
21     Q    So scrolling down to the Analysis --
22     A    Yes, sir.
23     Q    -- section.  I don't know if you can see
24 this.

Page 80

1      A    I can.
2      Q    You describe the 2017 strategy
3  of selling condors and then you go on to list
4  three paragraphs, broken butterfly, calendar or
5  time spread and gut vertical.  Do you see those?
6      A    I do.
7      Q    Back up to the second sentence under
8  the Project heading.  When you say that your job
9  was to prove that the trades are viable options
10 strategies, can we interpret that to mean broken
11 butterflies, calendar spreads and gut verticals
12 are regularly used in common trading environments,
13 to use your words?
14     A    They're derivatives of basic options
15 strategies.
16     Q    In your August 9, 2021 report
17 are you making any statements or offering
18 any opinions about whether or not the trading
19 strategies were likely to make money or lose money?
20     A    I am not.
21     Q    Back up in the Analysis section,
22 this first paragraph here says that, "Options
23 trading strategies may vary and carry different
24 risks based upon the goals."  Do you see that?

JOHN F. BURNSIDE

Page 81

1  A  I do.
2  Q  What are the goals that you're referring
3  to here?
4  A  Goals of the -- of whomever's recommending
5  or whoever the client might be.
6  Q  What were the goals of Long Leaf Trading's
7  trades, as you understand them?
8  A  As I understand them, was to limit risk
9  and to make money for their client -- for their
10  client base.
11  Q  So as I understand your previous
12  testimony, when you say that your job is to
13  prove that the trades are viable, you are not
14  offering an opinion on whether or not Long Leaf's
15  trades were likely to generate income for its client
16  base, right?
17  A  Again, I never saw the confirms,
18  so I would not know what prices these actually
19  traded.
20  Q  That's not answering the question,
21  Mr. Burnside.  Setting aside whether or not you saw
22  the confirms -- because that goes to your validation
23  concept, right -- I'm asking about the viability
24  concept.  You said your job is to prove that Long

Page 82

1  Leaf's trades are viable options strategies,
2  and then you testified that you understood Long
3  Leaf's goals were to generate income for its
4  customers, right?
5  A  With limited risk.
6  Q  So my question is does your report
7  attempt to offer an opinion or a statement as to
8  whether or not Long Leaf's trades were designed to
9  meet Long Leaf's customers' goals?
10  A  I believe so.
11  Q  Where is that statement here?
12  A  So when you have a butterfly, as
13  in subsection A there, when you have a butterfly,
14  you have limited risk but have profit potential.
15  In the case of the broken butterfly, it skewed
16  a little bit off center whether it's a put or a
17  call and, therefore, there still is the premise
18  of the butterfly strategy so that you have limited
19  risk but at the same time you have profit potential.
20  Going to Number B, to answer your question -- can
21  you scroll down just real quickly just so I don't
22  get them backwards?
23  Q  (Scrolling).
24  A  The calendar spread, the time spread

Page 83

1  is based upon there might be an event that
2  allows the -- either their near-term options
3  to become elevated in implied volatility, as you
4  discussed earlier that Long Leaf was trying to take
5  advantage of, but he did not want to just be short
6  options against that strategy.  So, therefore, he
7  would buy other options against it, longer-dated
8  options, which may have a lower implied volatility
9  so, therefore, mitigating risk for the clients with
10  the potential of profit for the client.  And,
11  finally, the gut trade -- and, finally, the gut
12  trade is selling the straddle in the midst of
13  a higher volatility and buying the wings so that
14  he doesn't -- the client doesn't have complete
15  exposure being short that straddle.
16  Q  So let's go back to this concept --
17  A  So what he's trying to accomplish --
18  go ahead.
19  Q  Let's go back up to this concept
20  of viability.  You said that your project was to
21  prove that Long Leaf's trades are viable options
22  strategies.  You testified that that meant that your
23  project was to prove that the trades were those that
24  were regularly used in common trading environments.

Page 84

1  Do you remember that testimony?
2  A  I do.
3  Q  Are you offering an opinion in this
4  report that Long Leaf's trading recommendations
5  offered to its customers could be profitable?
6  A  They very well could be.
7  Q  Is that your opinion?
8  A  But at the same time, again, I never
9  saw the confirms so I don't know the pricing
10  of what things went down.  So it's not my -- it's
11  not my position to tell you whether they are or are
12  not profitable.
13  Q  Mr. Burnside, that's exactly your
14  position because you've been engaged as an expert
15  witness to opine on these trades.  So let's go back
16  to this concept of viability.  When you say that
17  your project was to prove that Long Leaf's trades
18  are viable options strategies, is it your expert
19  opinion that Long Leaf's specific trading
20  recommendations offered to its customers were
21  likely to result in profits?
22  A  I believe so, yes.
23  Q  Which of Long Leaf's trading
24  recommendations were designed to be more likely

JOHN F. BURNSIDE

1  than not to result in net profits?
2     A   I don't believe he had any one that was
3  more favorable than others.
4     Q   Can you provide an example of one
5  of Long Leaf's trading recommendations that was
6  designed to result in net profits?
7     A   Well, I mean, I'm sure you're going
8  to go through some trades and we can go through
9  a couple trades if you want.
10    Q   I'm asking you sitting here today,
11 do you remember any?
12    A   I recall that he was buying --
13 I don't remember the exact strike, but I'm going
14 to say it was the 360 -- 365, 380, 390 butterfly in
15 corn -- broken butterfly in corn, but I could be
16 wrong.  I mean, I'm not sitting here telling you
17 I have them memorized.
18    Q   So earlier you testified that your
19 job was not to validate the trades, which meant
20 that you couldn't offer an opinion on whether or
21 not any of the trades were likely to make money.
22 And now do I understand your testimony to be that
23 your opinion is that Long Leaf's trades were
24 designed to make money?

1     A   Anytime you put on a butterfly
2  or things along these commonly known options
3  strategies, they're designed to make money with
4  limited risk.
5     Q   That's not true, right?  Is it
6  your testimony, Mr. Burnside, that any butterfly
7  is designed to be -- more likely than not to be
8  profitable?  Is that what your testimony is?
9     A   My testimony is that a butterfly has
10 limited risk with profit potential.
11    Q   And you can make a determination based
12 only on the fact that a trade is a butterfly and not
13 looking at the strikes, the volatility, the Greeks,
14 all the other variables you talked about earlier,
15 that it's more likely than not to make money just
16 by the fact that it falls in the category of being
17 a butterfly?  Is that your testimony?
18    A   It is.
19    Q   Did you account for commissions in your
20 analysis of Long Leaf's trades?
21    A   I never saw a confirm.  I'm only
22 here to validate the viability of the options
23 strategies.
24    Q   So did you take into account commissions

1  into your analysis?
2     A   No.
3        MR. PLATT:  Let's take a five-minute
4     break.
5           (Whereupon a recess was taken from
6           11:02 a.m., to 11:09 a.m., after
7           which the following proceedings
8           were had:)
9        MR. PLATT:  It's 11:09 a.m. Central,
10    continued deposition of John Burnside.
11    Q   And, Mr. Burnside, before that brief
12 break, you stated that you didn't take commissions
13 into account in your analysis of Long Leaf's trading
14 recommendations.  Do you remember that testimony?
15    A   I do.
16    Q   Do you agree that commissions can impact
17 whether or not any particular options spread trade
18 is profitable?
19    A   That's not my forte.  My forte was to
20 talk about options trading.  So sorry.  I mean,
21 I'm sure there could be commissions or there could
22 not be commissions.  I don't know.
23    Q   You don't know whether or not Long Leaf
24 charged its clients commissions?

1     A   That's -- that wasn't -- that wasn't
2  part of my analysis.  My analysis was to look at
3  the options, just the pure trades.
4     Q   So setting aside whether or not
5  you know that Long Leaf charged its customers
6  commissions, do you agree that commissions are an
7  important factor to consider when assessing the
8  profitability of a trade?
9     A   When I design trades, I do not implement
10 commissions on a regular basis because things have
11 gotten down to the nitty-gritty on commissions.
12 So I don't know -- and I most certainly don't know
13 about the world of commodity commissions.  So I
14 would be -- it would be wrong for me to comment
15 one way or the other on that.
16    Q   Earlier you testified that your
17 commissions were commonly zero, right, or 40¢ per
18 option?
19    A   Yeah, correct.
20    Q   If Long Leaf charged its clients $10 per
21 option, would that impact your analysis of whether
22 or not its trades were profitable?
23    A   I honestly don't know.  I don't know
24 the pricing of what occurred.  So, again, I think

JOHN F. BURNSIDE

Page 89

1 the commission thing I just don't know about.
2 I'm sorry.
3 **Q Okay. I'm not asking you whether**
4 **or not you know. I'm asking you a hypothetical.**
5 **If Long Leaf charged its customers $10 per option**
6 **on a four-legged options trade, would that impact**
7 **your analysis of whether or not the trades were**
8 **designed to achieve net profits?**
9 A Again, is that $10 for the whole
10 trade? Is it $10 per option? Is it -- I mean,
11 there's so many variables that keep popping up
12 here. I don't know -- and I'm not trying to evade
13 the question. I mean, sure. I mean, commissions
14 could be a big part of it, but at the same time
15 that wasn't my responsibility to evaluate.
16 I'm sorry.
17 **Q So it sounds like we have some**
18 **confusion about the assumptions. So let's**
19 **agree that for purposes of this hypothetical**
20 **one commission means $10 per option, okay? So**
21 **on a four-legged options trade, $40 in, $40 out,**
22 **okay?**
23 A Okay.
24 **Q Under that scenario would commissions**

Page 90

1 **impact your analysis of whether or not Long Leaf's**
2 **trading recommendations were designed to achieve**
3 **net profits?**
4 A I'm sure at $40 that would have some
5 impact but, again, I'm only looking at the actual
6 trades. I'm going to defer to you guys to see if
7 that's egregious or whatever. I'm not --
8 **MR. PLATT:** Mr. Burden, can you please
9 mute your line.
10 **Q So you say that commissions could have**
11 **some impact. Do you agree that the impact that**
12 **commissions have on an option trade's profitability**
13 **is that every dollar paid towards commission comes**
14 **out of the client's pocket and reduces the**
15 **profitability of the trade? Do you agree with**
16 **that?**
17 A I would.
18 **Q So it has a negative impact on**
19 **profitability, correct?**
20 A Correct.
21 **Q Let's take the hypothetical one**
22 **step further and assume that Long Leaf charged**
23 **its clients $20 per option in commission. Do you**
24 **agree that that would be an even larger negative**

Page 91

1 **impact on the profitability of the client's options**
2 **trades?**
3 A Obviously it would be more than
4 the previous number mentioned, so yes. But,
5 again, I don't know -- I never got the confirms,
6 so I don't know what was going on behind the scenes.
7 **MR. PLATT:** Mr. Falvey, you know,
8 I don't think there's anything untoward going
9 on. But if we could decrease the discussion
10 between you and Mr. Burnside, I think that
11 would be --
12 **MR. FALVEY:** There is no -- and to
13 be clear, that was the first time I think
14 I've actually done it, but I will tell you
15 what I told him. I said just answer the
16 question.
17 BY MR. PLATT:
18 **Q I'm going to put Exhibit 507 back up,**
19 **Mr. Burnside --**
20 A Okay.
21 **Q -- which is your August 20, 2021 report --**
22 A Yep, yep.
23 **Q -- where you opine that your job is**
24 **not to validate the trades but more so to prove**

Page 92

1 **that the trades are viable options strategies.**
2 **So the record is clear, can you just explain one**
3 **more time what you mean when you say that your job**
4 **is to prove that the trades are viable options**
5 **strategies?**
6 A Again, we've talked about a butterfly.
7 We've talked about a time spread. We've talked
8 about selling the guts and buying the wings. This
9 is -- this -- these are viable options strategies
10 and they have limited risk for the client while
11 at the same time profitable outcomes that -- in
12 situations that should make -- not necessarily
13 make money but limit risk, limit risk and give
14 the client potential upside.
15 **Q And your testimony was that you did**
16 **not account for commissions into the extent to**
17 **which any particular trade could achieve any upside,**
18 **right?**
19 A I am not a commission specialist. I trade
20 options.
21 **Q The answer's no?**
22 A No.
23 **Q When you say viable options strategies,**
24 **do you mean that the specific trades were likely**

JOHN F. BURNSIDE

Page 93

1  to make money or could have made money? Because
2  it's a big difference.
3  A   Could have made money while having limited
4  exposure for the client.
5  Q   Did you look at any of the options
6  trade recommendations to determine if they were
7  likely to make money?
8  A   I just looked at the -- what was being
9  traded in the case of a broken butterfly or a time
10 spread or vertical or a, you know, time gut trade.
11 Q   Did you conduct any analysis
12 to determine whether or not Long Leaf's trading
13 recommendations were likely to make money or did
14 you only look to see whether they could make money?
15 A   I looked at if they could make money
16 because, as with all options trades, anything can
17 happen.
18 Q   You did not conduct an analysis
19 of whether or not Long Leaf's trades were likely
20 to make money, correct?
21 A   They had limited risk.  So, therefore,
22 whether they could make money, they weren't going to
23 get -- the client had limited risk.  So, therefore,
24 there was limited exposure so I -- there was --

Page 94

1  it was a proper options strategy.  So I did not --
2  so I did not go through the entire trade to see if
3  they could lose money.  There are risks in options.
4  Q   Right.  So you didn't answer the
5  question, Mr. Burnside.  I'm going to ask it again.
6  Did you conduct any analysis to determine whether
7  or not Long Leaf's trading recommendations were
8  likely to make money?
9  A   I think that's a -- the answer is no.
10 But that's kind of a misleading question from the
11 standpoint of when you have limited risk, you know
12 what your risk is going in.  So, therefore, you know
13 that that's your -- you have, in essence, a stop
14 loss.
15 Q   So the answer is no, you did not
16 conduct an analysis as to whether or not Long
17 Leaf's trade recommendations were likely to make
18 money, is that correct?
19 A   That's correct.
20 Q   And you described how you looked
21 at the limited downside and the limited upside,
22 right?
23 A   Correct.
24 Q   But in looking at the limited downside

Page 95

1  and the limited upside, you didn't account for the
2  impact of commissions on the upside, right?
3  A   My job, again, was to just see about the
4  options viability strategy.
5  Q   So you didn't answer the question.
6  You did not analyze the impact of commissions on
7  what was already --
8  A   I did not.
9  Q   -- limited upside, right?
10 A   I did not.
11 Q   So I think we were talking over
12 each other there a little bit.  I just want the
13 record to be clear.  When you analyzed Long Leaf's
14 trading recommendations to determine whether or not
15 they could possibly make money, you looked at the
16 limited downside and the limited upside, right?
17 A   Correct.
18 Q   And when you looked at the already
19 limited upside on Long Leaf's trading strategies,
20 you did not account for the impact of commissions
21 impacting the limited upside, right?
22 A   Correct.
23 Q   That's true for all the buckets
24 of the trades that you identified earlier, right?

Page 96

1  A   Correct.
2  Q   I'm going to put your August 9, 2021
3  report back up on the screen, Mr. Burnside --
4  A   Okay.
5  Q   -- Exhibit 507, and I'm going to scroll
6  down to the Disclaimers section.
7  A   Okay.
8  Q   Why did you include a disclaimer in your
9  expert opinion?
10 A   Honestly?  I went on the internet
11 and said, well, what are the other ones doing
12 and ...
13 Q   The first sentence of your disclaimer
14 says, "I did not trade in these markets during the
15 said time of complaint."  What do you mean by "these
16 markets"?
17 A   The markets that the recommendations
18 were made.
19 Q   Futures options, right?
20 A   Yeah.
21 Q   And, in fact, you've never traded
22 futures options, at least not since the '80s,
23 right?
24 A   That's right.

Page 97

1     Q    And at the time you traded futures
2 options they didn't trade on screens.  They traded
3 in pits, right?
4     A    Correct.
5     Q    And pit trading, I think you'll agree,
6 is completely different than screen trading, right?
7     A    Sure, I'll agree that it's different.
8 It still has the same premise, though.
9     Q    Yeah, people still buy and sell options.
10 That's about the extent of the similarities?
11    A    Actually, what's nice about the
12 screen is that the -- is that you can create
13 your own different strategies or what have you,
14 so yeah.  I mean, I don't know what, you know, what
15 goes on in the CFTC world because I haven't traded
16 in it -- in that since then so -- but, yes, I did
17 not trade on the screen for the futures options.
18    Q    Screen trading's faster than pit trading,
19 right?
20    A    I'm sorry?
21    Q    Screen trading is faster than pit trading,
22 right?
23    A    I honestly don't know.
24    Q    In your expert options trading opinion,

Page 98

1 you don't know if screen trading is faster than pit
2 trading?  Is that your testimony?
3     A    Oh, I thought you said has stopped
4 the pit trading.  Is faster, is that what you said?
5     Q    Faster, yes.
6     A    Yes, screen trading is faster than
7 the pit trading.  We already talked about that.
8     Q    Right.  And I'm going to go back
9 to Exhibit 508, which is your January 22, 2020
10 declaration.  Do you see that?
11    A    I do.
12    Q    Do you recall this document?
13    A    Vaguely.
14    Q    You testified that you didn't write it,
15 right?
16    A    Correct.
17    Q    I'm just going to scroll through.
18 There's a Scope of Engagement section, a Material
19 Reviewed section, an Affiant's Opinion section and
20 a Conclusion section.  Do you see those?
21    A    Yeah.
22    Q    In the Scope of Engagement section --
23    A    Yep.
24    Q    -- it says that, "Affiant," that's you,

Page 99

1 "has been engaged by counsel for James Donelson
2 to review the trading option trading strategy
3 for those trades recommended by Long Leaf Trading
4 Group, LLC, to its customers during the period of
5 December 1, 2017 to present."  Did I read that
6 correctly?
7     A    You did.
8     Q    So the scope of your engagement
9 for your declaration is different than the scope
10 of engagement for your report, right?
11    A    It was because it was, you know,
12 a long time prior to being reconvened into this
13 process.
14    Q    So why did you add this limiting
15 language to your report -- and I'll toggle back to
16 Exhibit 507 -- the purpose and the limiting language
17 is, "My job is not to validate the trades"?  Why did
18 you add that in there?
19    A    Because it wasn't to validate the
20 trades.  It was to prove that the options trades
21 were viable.
22    Q    But back in January of 2020 why didn't
23 you include that limiting language?
24    A    Maybe I've just gotten a little

Page 100

1 bit smarter on what to put in.  I don't recall.
2     Q    You haven't seen any trading statements
3 in connection with the January 2020 report, right?
4     A    If I did, I don't recall them.
5     Q    So let me -- the Affiant's Opinion, do you
6 see that under paragraph 5?
7     A    I see paragraph 5.  Where are you referring
8 to?
9     Q    It's titled Affiant's Opinion.
10    A    Oh, yeah.  I'm sorry.  Hello, right at
11 the very top.
12    Q    Please review Item A --
13    A    I'm not familiar with some of these fancy
14 word choices, right?
15    Q    Yeah, yeah, sorry.  Please review
16 subparagraph A and let me know after you've had
17 a chance to review that.
18    A    Yeah, I've -- okay.
19    Q    I'm now going to toggle back to your
20 August 2021 report.
21    A    Okay.  We've seen that one.
22    Q    Under Analysis, that first paragraph, does
23 that language look similar to you?
24    A    I would say, yeah, pretty close.

JOHN F. BURNSIDE

Page 101

1    Q   Those are the exact same words, right?
2  It's not close.  It's the same.
3    A   I'm going to tell you that you could
4  say that, but this thing was written, you know,
5  and I said it.  I'm -- this one is 100 percent me
6  writing it.
7    Q   So the record's clear, by "this one"
8  you're referring to Exhibit 507, your August 2021
9  report.  And your testimony is the second sentence
10 of this first paragraph under Analysis -- I'm going
11 to read it -- "At the root of all options strategies
12 are some very basic strategies that when tweaked,
13 can change the appearance, but they are all built
14 off these basic strategies."  And now I'm going to
15 flip to Exhibit 508, which is your declaration from
16 January 2020, which you testified --
17   A   Okay.
18   Q   -- was written by someone else.
19   A   They helped me.  I mean, I was there.
20 I wasn't -- I mean, and it does say exactly the
21 same thing.  I think that's weird.  Maybe it was
22 a recollection.  I don't know.  But I'm telling you
23 that the other one, the previous one, was written
24 by me.  And you can even see the word choices are

Page 102

1  different in the whole -- except for maybe that
2  one line -- everything is from a trader standpoint,
3  and I grant you that that is strange.  I'm not going
4  to sit there and say that, but I'm responsible for
5  both of these documents.  I signed them.
6    Q   Just to be clear, because I'd like to
7  understand who wrote the document, your testimony
8  I believe is 508, which is your January 2020 report,
9  was drafted by someone else and you executed it.
10 Do you remember that?
11   A   Vaguely.  That was, you know, almost
12 20 months ago.
13   Q   But I'm saying that's your testimony.
14   A   Yes, I'm taking responsibility of it.
15 I signed it.
16   Q   Someone else wrote it and you signed it,
17 right?
18   A   Not the whole -- I mean, I -- they
19 paraphrased perhaps, but these are my -- these
20 are my, you know -- these are my word choices.
21 I can see that.
22   Q   Did Donelson write your declaration
23 and you signed it?
24   A   No, I've -- like I said, I've only

Page 103

1  seen Jim once in my life and that was in, what,
2  I want to say it was February of 2020, something
3  like that.  I've only seen Jim -- I don't think so.
4    Q   I'm not asking whether or not --
5    A   I was -- I'll tell you --
6    Q   -- you've seen Jim.
7    A   The only guy who helped me with this
8  was Nick.
9    Q   You're referring to Mr. Iavarone?
10   A   Yeah.
11   Q   Did Nick Iavarone write Exhibit 508, which
12 is your January 2020 declaration?
13   A   I don't recall.  I know that I was
14 at a meeting when we were working on it, though.
15   Q   Who was in the meeting with you?
16   A   Just Nick and I.
17   Q   Okay.
18   A   Because he's got all the legalese.
19   Q   Items F through H on your declaration from
20 January 2020, do you see those?
21   A   F through H?
22   Q   Yeah, F, G and H.
23   A   F, G and H?
24   Q   Yes.

Page 104

1    A   Yeah, yeah.  Those are the same ones
2  that I had on the other side too.
3    Q   By "the other side" you mean Exhibit 507,
4  your August 9th --
5    A   Absolutely.
6    Q   -- report?
7    A   Absolutely.
8    Q   Mr. Burnside, Mr. Burnside, we're
9  starting to talk over each other a little bit
10 and I know --
11   A   Okay.
12   Q   -- it's going to be hard for Ms. Maslowski.
13 So I'll try to be better, but let's both be mindful,
14 okay?
15   A   Fair enough.
16   Q   So it sounds like the declaration, the
17 January 2020 declaration was drafted by Iavarone.
18 You signed it.  And then is it fair to say that
19 you incorporated a lot of this language into your
20 August 9th report?
21   A   I'm going to say yes, not because
22 I purposely did it.  It was in my folder, yeah.
23 I'm going to say yes, and I'm responsible for both
24 of these drafts.  But as you can see, this is all

Page 105

1  my information. I mean, this is -- this is what
2  time spreads are. This is what butterflies are.
3  This is what a gut strategy is. I can guarantee
4  you most attorneys don't know how to write that kind
5  of stuff.
6  **Q   But Nick Iavarone does because he wrote**
7  **this, right?**
8  A   Well, he typed it up. I told him what
9  to write.
10 **Q   The Conclusion, Item 6, of your**
11 **January 2020 affidavit says, "For the reasons**
12 **stated above, it is Affiant's opinion that the**
13 **trading strategy for the recommended option trades**
14 **under Donelson's supervision could not only make**
15 **money, but given the environment, made sense to**
16 **recommend those option positions." Did I read that**
17 **conclusion accurately?**
18 A   You did.
19 **Q   Why didn't you incorporate that conclusion**
20 **into your August 9th report?**
21 A   Because in the conclusion of the
22 August 9th report was that it was -- I wanted
23 to make sure that -- and literally I went to the
24 internet to see what the conclusion would say,

Page 106

1  and that was what their conclusion was. I just
2  basically was taking a format from the internet
3  and making sure that I didn't screw it up because
4  I had sent something and it was -- it was, quote,
5  not acceptable. So then I went on the internet
6  to see how to conclude the process, and that's
7  why I also included that I would be -- if you
8  look at my August 9th one, is it says I'll be
9  glad to show up at this kind of an environment
10 and be as honest as I am.
11 **Q   Let's take that back a step. When**
12 **you said that you sent a conclusion that someone**
13 **said was not acceptable, are you referring to**
14 **Exhibit 507, which is the August report, or are**
15 **you referring to Exhibit 508, which is the January**
16 **2020 declaration?**
17 A   The August 7th report.
18 **Q   So your August 7th report, you had**
19 **a different conclusion and someone sent it back**
20 **to you and said take that conclusion out. Do I have**
21 **that right?**
22 A   No, no, no, no, no. There was
23 no conclusion. I had to go to the internet to
24 find out how to conclude this thing. That was the

Page 107

1  difference.
2  **Q   Well, didn't you just testify that --**
3  A   I'm not smart enough to tell you
4  that it's -- that I reinvented the wheel here.
5  **Q   Didn't you just testify that someone**
6  **sent it back to you and told you to take something**
7  **out?**
8  A   Well, yes.
9  **Q   Describe that to me.**
10 A   Well, I sent it to Jim and Jim said you
11 need a conclusion. So he sent it back to me and I
12 reformatted it and went on the internet and looked
13 at what the other people had done on the internet
14 for a conclusion, and that's what the majority
15 were saying. And so that's what I paraphrased
16 and implemented in my conclusion and nothing
17 more, nothing less. And then Jim sent it back
18 to you for that.
19 **Q   So the first version that you sent to**
20 **Mr. Falvey did not have a conclusion?**
21 A   I honestly don't know.
22     THE WITNESS: You --
23 A   Well, he's not going to answer.
24

Page 108

1  BY MR. PLATT:
2  **Q   You're the witness, Mr. Burnside.**
3  A   That's fine. I mean, honestly,
4  I -- you know, I'm not an attorney on this stuff,
5  right? I'm just trying to get you the information
6  and I'm trying to be as honest and as forthright
7  as I can be and as knowledgeable as I can be about
8  options trading. And to get into the minutia of
9  how my conclusion was different on this one versus
10 that one is nothing more than I literally went to
11 the internet, changed it because I saw some
12 differentials in that.
13 **Q   Let's go back to the conclusion on your**
14 **declaration from January 2020.**
15 A   Okay.
16 **Q   You say that -- you reference the**
17 **trading strategy. Do you see that in the first**
18 **sentence?**
19 A   In the conclusion on -- which one?
20 On this one?
21 **Q   Yeah, sorry.**
22 A   The trading strategy, yeah.
23 **Q   Under paragraph 6 you --**
24 A   I see -- okay.

JOHN F. BURNSIDE

Page 109

1    Q   So we're talking over each other
2  a little bit, Mr. Burnside.  I'll try and do
3  better.  So under 6 --
4    A   Yeah.
5    Q   -- you write that it's your opinion
6  that "the trading strategy."  What do you mean by
7  "the trading strategy"?
8    A   The strategy that Long Leaf was
9  recommending, the options trades, could not only
10 make money but given the environment, made sense to
11 recommend these option positions.
12   Q   Did you mean all the trades that
13 were recommended by Long Leaf between 2018 and
14 2019 or only one specific trade because do you
15 see the confusion?  This is in the singular, but
16 you testified earlier that there are multiple
17 different strategies.
18   A   And I even referenced multiple
19 strategies in this document, so I should have
20 said these strategies.
21   Q   Okay.  Yeah, that's fine.
22   A   My bad.
23   Q   That's helpful.  Thank you for the
24 clarification.

Page 110

1    A   No problem.
2    Q   And then the --
3    A   Again, not an attorney.
4    Q   Yeah.  And that's just why I'm asking the
5  questions, just to --
6    A   Yeah.
7    Q   -- just so we make sure everything's
8  clear.  And then that sentence ends that Long
9  Leaf's trades, you know, it made sense to recommend
10 those option positions.  What does it mean -- what
11 does that mean, that they made sense?
12   A   So this goes back to the limited
13 risk with profit potential of a butterfly, guts
14 or time spreads or verticals.  It's just good,
15 prudent risk management for any trading strategy.
16   Q   Do I have it right that when
17 you opined that it made sense to recommend
18 the option positions in your conclusion to your
19 declaration, that that means that the options trades
20 you recommended could make money, not that they were
21 likely to make money?  Do I have that right?
22   A   They could make money, but then what's
23 also nice is that they have limited risk.
24   Q   Yep, so that's the first part

Page 111

1  of the question.  And, I apologize, we can break
2  it down because it's a compound question.  So when
3  you say that it made sense to recommend Long
4  Leaf's option positions you mean, one, that they
5  could make money potentially, right?
6    A   Right, yes.
7    Q   You do not mean that it's your opinion
8  that they were -- any particular trade was likely
9  to make money, correct?
10   A   That's correct.
11   Q   And is it also true that you did not
12 account for commissions in your analysis in your
13 January 2020 declaration?
14   A   That is correct.  Again, I was just looking
15 at the options trades themselves.
16   Q   Also in your conclusion you reference
17 the environment.  What is that?
18   A   The environment, lots of things
19 were happening in all kinds of asset classes.  So
20 to have limited risk I thought was a prudent way to
21 make sure that the clients would not be in jeopardy
22 of losing a lot of money.
23   Q   When you say lots of things
24 were happening, does that mean that markets were

Page 112

1  generally volatile during that time period?
2    A   Individual markets were.  But as an --
3  overall things had calmed down after the '08,
4  '09, 2010 crisis, but there were still individual
5  situations that were very unsettling, like interest
6  rates and such.
7    Q   Where did you get the information
8  that allowed you to make the determination about
9  what the environment was?  Did you get that from
10 Donelson or was that just something that you knew
11 generally from your participation in the markets?
12   A   My general knowledge of the marketplace.
13   Q   In your disclaimer in Exhibit 507 you
14 said that you did not trade in these markets during
15 said time of the complaint.  "These markets" is the
16 futures options markets.  So how could you make a
17 determination about the environment of the markets
18 if you weren't participating in them?
19   A   Just because I'm not trading in
20 them doesn't mean that I'm not paying attention
21 to them because everything works together in the
22 economy, whether it's interest rates, gold, silver,
23 corn, wheat.  They all have -- you've got to have a
24 general idea of what's going on in all the different

JOHN F. BURNSIDE

Page 113

1  assets to try to make some informed decisions.
2  I may not know every -- where every tick is, but
3  I have a general idea.  It was more of a general
4  statement than a specific environment.
5     Q  I'd like to return to -- we talked about
6  it a little bit -- the manner in which your January
7  2020 declaration was drafted.  And I think you said
8  it was drafted at a meeting with Donelson's lawyer
9  and you said --
10    A  Yeah, that was a long time ago.  Go ahead.
11    Q  Can you describe how it was drafted?
12    A  I was looking at the overall trades
13  and making -- I made assessments and then Nick
14  would formulate what happened and then I would tweak
15  it and then he would put it in the, quote, legalese
16  concept.
17    Q  What do you mean when you said Nick would
18  formulate what happened?
19    A  I formulated what -- I would give
20  the information and then he would kind of put
21  it into a legal environment and make sure -- and
22  then I would review it and make sure that it was
23  accurate to what was -- what I wanted it to say.
24    Q  Do you remember where this meeting took

Page 114

1  place?
2    A  I think it was at my office in Northbrook.
3    Q  Iavarone came to your office to do this?
4    A  I'm sorry?
5    Q  Iavarone visited you at your office?
6    A  Yeah.
7    Q  Do you remember how long it took?
8    A  I don't.  That was a long time ago.
9    Q  Do you think it took more than an hour?
10    A  I'm not even going to speculate because
11  I don't remember.
12    Q  So you didn't -- it wasn't like
13  you dictated the report to Mr. Iavarone, right?
14  You just were generally talking about trading?
15    A  I would write something and then
16  he would put -- like then he would try to put
17  it in a legalese word choice.  And I'd be like,
18  well, that's not what I meant or I would say this
19  is what I mean.  Just like he doesn't under -- he
20  wouldn't have understood a broken butterfly or
21  a time spread or a calendar spread or, you know,
22  things along those lines at all.
23    Q  In your conclusion you write that
24  it made sense to recommend those option positions.

Page 115

1  Were those your words or were those Iavarone's
2  words?
3    A  Those are my words.  And the reason
4  that I said that was that to recommend those
5  options because it -- I'm always big on limiting
6  risk for the client.  I pay attention to limiting
7  the risk, and it's just something that I've always
8  done or at least tried to do.
9    Q  We've already discussed, you know,
10  what your conclusion means, and I don't think we
11  need to belabor it.
12        MR. PLATT: So I'm at kind of a natural
13    stopping point.  Do you want to take a break
14    for lunch, half an hour?
15        THE WITNESS: Yeah, that's fine.  Say
16    12:30 your time?
17        MR. PLATT: Yeah, that's fine.  Let's go
18    off the record.
19        (Whereupon a lunch recess was taken
20        from 11:54 a.m., to 12:43 p.m., after
21        which the following proceedings were
22        had:)
23
24

Page 116

1        A F T E R N O O N  S E S S I O N
2        MR. PLATT: Let's go back on the record.
3  It's 12:43 Central, continuing the deposition
4  of John Burnside in the CFTC vs. Long Leaf
5  Trading litigation.
6        JOHN F. BURNSIDE,
7  called as a witness herein, having been previously
8  sworn and examined, testified further as follows:
9        DIRECT EXAMINATION (Cont'd.)
10  BY MR. PLATT:
11    Q  Mr. Burnside, before the lunch
12  break we were discussing your expert report
13  and the declaration you submitted back in January
14  of 2020, and I think one of the things we discussed
15  was that your opinion was that Long Leaf's trading
16  strategies could make money.  Do you remember that?
17    A  I do.
18    Q  Do you have an understanding of whether
19  or not Long Leaf's trades did make money?
20    A  No, that was not my objective.
21  My objective was to look at the options trades.
22    Q  Did you ever ask Donelson how his trades
23  performed?
24    A  Not to my recollection.

JOHN F. BURNSIDE

Page 117

1    Q   Did Donelson ever tell you that his
2  trades performed either well or poorly or provide
3  any information about performance?
4    A   Not to my knowledge.
5    Q   So you said you didn't ask Donelson
6  how the trades performed.  Why didn't you?  Weren't
7  you curious?
8    A   That's a fair question, but I would
9  say that I was just looking at the structure of
10  the trades versus the -- because they had limited
11  risk capacities, and I would assume that you're in
12  a trade to make money.
13    Q   Why do you assume that?
14    A   Why else would you put on a trade?
15    Q   Do you have an understanding as
16  to whether or not Long Leaf Trading charged its
17  customers commissions?
18    A   You've brought it up several times,
19  so I'm going to guess at some point they did.  But
20  I don't know the rates or what have you so ...
21    Q   Setting aside the rates, did you
22  ever know that Long Leaf charged its customers
23  commissions?
24    A   No.

Page 118

1    Q   So just to sum up, you didn't know
2  how Long Leaf's customers performed, you didn't
3  know -- you didn't ask Donelson for any performance
4  information, you didn't know that Long Leaf charged
5  its customers commissions and then you submitted a
6  report saying that the trades made sense, is that
7  right?
8    A   Yes, the trades did make sense
9  because I was looking at the pure trades themselves,
10  not all the other tertiary and things that you're
11  referring to, not because I don't care about those.
12  Just because I was just reviewing the actual trades
13  themselves, the options trades themselves.
14    Q   Since you submitted your report,
15  have you learned one way or another whether or
16  not Long Leaf's trades made money or lost money?
17    A   Well, since you've brought it up more
18  than once, I'm going to guess that they didn't make
19  a lot of money just from the standpoint of why we're
20  here.
21    Q   So setting aside what you've
22  learned today or gleaned from my questions,
23  were there any other sources of information before
24  today's deposition that provided information about

Page 119

1  the performance of Long Leaf's trades?
2    A   No, and the reason I say that is I was
3  just there to evaluate the actual trades themselves.
4    Q   Would it surprise you to learn that Long
5  Leaf's trades lost tons of money?
6    A   I would say yes.
7    Q   I'm going to show what you we've
8  marked as CFTC Exhibit 428, and I'll represent
9  to you that this is a summary of aggregate customer
10  account performance during the time that Donelson
11  owned the firm.  So you'll see it's 3 columns and
12  25 rows, 1 row per month.
13    A   I've never (inaudible).
14    Q   Excuse me?
15    A   I said I've never seen a report like
16  this.
17    Q   No, I understand that you've never
18  seen this report --
19    A   Okay.
20    Q   -- because you testified that you've
21  never -- you did not receive any information about
22  the performance of Long Leaf's trades.  I'm only
23  showing it to you to illustrate that the statements
24  of Long Leaf's customers reflect these losses.

Page 120

1  And on the right column, Cumulative Customer PNL,
2  do you see that?
3    A   I do.
4    Q   For the Donelson era the cumulative
5  monthly customer PNL is negative 2.376 million.
6  Do you see that?
7    A   I'm sorry.  For which one?
8    Q   The cumulative customer PNL, the very
9  bottom row.  So the last in time.
10    A   I just -- I get cut off at July '19.
11    Q   Oh, sorry.  I'll scroll down.
12    A   Yeah, okay.  I see that.
13    Q   And you testified that it surprised
14  you to learn that Long Leaf's customers lost tons
15  of money.  My question is why did that come as
16  a surprise to you?
17    A   Because the options trades that he was
18  recommending were simple, viable and for the most
19  part risk-averse trades.
20    Q   Can you think of a reason why risk-averse
21  trades might lose such a significant amount of money
22  in the aggregate?
23    A   No, to answer your question.
24    Q   I mean, can you speculate?  Do you

JOHN F. BURNSIDE

Page 121

1  think maybe it's because they were not designed
2  to generate very much profit?
3      A   That I don't know.  I just know
4  that these trades were very limited in their risk.
5  But if these numbers are correct, something is
6  amiss.  I'll say that.
7      Q   But just as they were limited in
8  their risk, you also agree that they were limited
9  in their upside, right?
10     A   Correct.
11     Q   And Long Leaf also -- I guess you said
12  you didn't account for commissions in your analysis,
13  right?
14     A   That's correct.
15     Q   So you think those two factors could have
16  contributed to these stunning losses?
17     A   I don't know what it could contribute
18  to but, yes, something is -- doesn't seem -- from
19  the trades that I saw to what you're showing me
20  here, there's something that's -- that disconnects.
21     Q   Do you think the disconnect could be
22  flowing from the fact that -- I think admittedly
23  you didn't evaluate the trades to determine whether
24  or not they were likely to make money.  You only

Page 122

1  analyzed the structure of the trades to determine
2  if they could make money.  Is that the disconnect
3  maybe?
4      A   Well, even if they lost money, they
5  had limited risk because they were defined, as
6  like in a butterfly or what have you.  There's --
7  there is risk, but then at the same time it's
8  limited to these spreads, the width of the spread
9  of the trade.  So I'm shocked at those numbers.
10     Q   Where do you think the shock is coming
11  from?
12     A   Only because of what you've brought
13  up several times today, is the commissions.  I'm
14  guessing that is where you are heading.
15     Q   I'm not heading anywhere, Mr. Burnside.
16  It's your testimony.  I'm only asking you based on
17  your market knowledge.  I understand you've been
18  a market participant for a long time.
19     A   Yes.
20     Q   And it's my speculation -- and I'll
21  ask you to confirm it or not -- that maybe the
22  disconnect between your analysis, which is the
23  trades could have succeeded, and the actual results
24  that we just looked at is coming from the fact that

Page 123

1  you didn't analyze the likelihood that the trades
2  would result in net profitability and you didn't
3  account for commissions.  And maybe that wasn't
4  your words, but I think that's the source of the
5  disconnect.  Do you agree with that?
6      A   Well, again, even on -- even if he
7  lost money on every one of the butterflies, I'm
8  just using that as an example, he has limited risk.
9  So I'm shocked at those numbers.
10     Q   Do you understand how many customers
11  Long Leaf had in 2018 and 2019?
12     A   I have no idea.
13     Q   So let's assume that Long Leaf had at
14  least 150 customers, okay?
15     A   Okay.
16     Q   And Long Leaf put on four trades per month,
17  okay?
18     A   Okay.
19     Q   So that's at least 600 trades per month,
20  right?
21     A   Very simple math.  There you go, yeah.
22     Q   And they're all doing the same trade,
23  right?
24     A   Okay.

Page 124

1      Q   So there's a lot of trading activity
2  that's all going to either rise or fall together,
3  right?
4      A   I would agree with that.  If they all
5  have the same (inaudible), they'll all win or all
6  lose.
7      Q   Yeah.  So let's just sort of circle back
8  to this disconnect because I don't know if you're --
9  I think you're just -- I don't think you're evading
10  the question, but I just want to see if my guess is
11  right.  And my guess is that the disconnect between
12  your analysis that the trades could have made money
13  and the devastating losses that we see here in this
14  two-year time period is flowing from the fact that
15  you didn't conduct an analysis as to the likelihood
16  that the trades would make money and the fact that
17  you didn't incorporate commissions into your
18  analysis.
19     A   Okay.  So, again, if you're making
20  a trade -- and I keep going back to the butterfly
21  just because it's at the top of the list.  But
22  if I buy a butterfly on a $20 vertical, on a $20
23  spread -- or 20¢ spread, the goal is is to make
24  money on the spread, not to lose money on the

JOHN F. BURNSIDE

Page 125

1  spread. To your point, you wouldn't be in business
2  very long if you kept losing money, right? So at
3  that point your goal is to make clients money while
4  at the same time you want them -- and hopefully they
5  succeed and, therefore, they continue to be your
6  clients. And the goal from my side was if I'm
7  making the proper trade with the proper risk in
8  this case, that you most certainly should have
9  made some money on some trades that would generate
10 positive returns for the clients.
11    Q   Maybe this is the disconnect. You
12 said that you analyzed that some trades could
13 make some money, but there was no attempt that
14 I've seen to determine the likelihood that trades
15 would make money or the magnitude of money that
16 trades would make, is that fair?
17    A   Again, if you put on a butterfly
18 trade, you're not going to spend 20¢ to put on
19 a 20¢ wide market. It's just you wouldn't do it.
20 You would have a -- going back to my probability
21 earlier conversation, you would put up 4, 5, 6¢ to
22 try to make 13, 14, 15¢ on it, and that would be
23 the goal. You would not pay full value for that
24 options strategy hoping to break even.

Page 126

1    Q   Do you know that that's what Donelson
2  did?
3    A   I was just looking at the structure
4  of the trades, just as I was -- I've mentioned
5  it several times. I'm here to look at the structure
6  of the trades and if they were viable trades. And
7  if he paid more or less for whatever he was doing,
8  then there could be losses and those weren't viable
9  probability bets. But in the meantime, the
10 structure of the trade itself was that, hey,
11 he bought a butterfly and broken or non-broken or
12 whatever you want to call it. Whether he bought
13 a butterfly, it had limited losses. And, therefore,
14 he would be able to -- should be -- if the trade
15 was executed properly and all that, then he should
16 have been able to make money for his clients.
17    Q   So let's go with the butterfly hypothetical
18 that you keep returning to.
19    A   Yeah.
20    Q   It's a four-legged trade, right?
21    A   Yeah.
22    Q   Let's assume that Long Leaf was charging
23 its customers $20 per option in commissions. It's
24 $80 in, $80 out, $160, right?

Page 127

1    A   Okay.
2    Q   I think it's your testimony that you
3  never attempted to determine whether or not that
4  broken wing butterfly would exceed the amount of the
5  commissions, right?
6    A   Correct. Again, I was looking
7  at the structure of the butterfly, or the broken
8  butterfly in this case, to make sure that it was
9  a viable option strategy.
10    Q   But you were not analyzing the trades to
11 determine whether or not they were likely to make
12 money, correct?
13    A   Correct, and I also did not receive
14 any confirms on the fills.
15    Q   So in light of this information that
16 we've just shown to you, which is taken directly
17 from Long Leaf's customer statements, are you going
18 to testify at trial that Long Leaf Trading's trade
19 recommendations made sense?
20    A   Yes, they're still viable. They're
21 still viable trades. They're viable strategies
22 in the options world.
23    Q   Who lost $2.3 million, Mr. Burnside.
24    A   All right. Well, okay. That's fine.

Page 128

1  I did not know how much he was charging in
2  commissions. I did not know what the behind the
3  scenes were. I never got any confirms. I'm just
4  looking at the structure of a position. Now, was
5  that 2.3 million of profit losses or all trading
6  losses? Was it all commissions? Was it all --
7  I don't know. I'm just looking at 2.3 million.
8  But at the same time I'm saying that a butterfly
9  is still a butterfly is still a butterfly, and it
10 makes sense to have that as a viable -- as a viable
11 trading strategy.
12    Q   But, Mr. Burnside, isn't the devil in
13 the details? It's too cute to say that a butterfly
14 is always capable of making money. Don't you have
15 to look at the details of the trade?
16    A   You have to look at the details
17 of the trade, but you would never put a -- like
18 I told you, you would never put on a butterfly or
19 vertical or anything else that had limited upside
20 and all downside. You would have limited downside
21 with more upside, if that makes sense.
22    Q   Is it your understanding that that's how
23 Long Leaf designed its trades?
24    A   Any trader that I've ever known tries

JOHN F. BURNSIDE

Page 129

1  to make money.
2  Q  Is it your understanding that that's
3  how Long Leaf designed its trades?
4  A  No.
5  Q  Would it surprise you to learn that
6  Jim Donelson has no professional experience in
7  the financial markets?
8  A  That would surprise me.
9  Q  Why would it surprise you?
10  A  Just because he's knowledgeable about
11  the options world and understanding how options work
12  on the conversations that we've had.
13  Q  Did he ever tell you that he had
14  professional trading experience?
15  A  He did not.
16  Q  I'm going to go back to -- I'm
17  going to shift gears a little and go back to
18  the documents and information that you relied
19  on in opining that Long Leaf's trades made sense.
20  So in your declaration, Mr. Burnside, which is
21  Exhibit 508, under paragraph 4 you list Material
22  Reviewed.  Do you see that?
23  A  Yeah, yeah, I do.
24  Q  There's three bullets, trading

Page 130

1  history of Long Leaf, QuikStrike analysis and
2  trade narrative.  What is the trading --
3  A  Yeah.
4  Q  What is the trading history of Long Leaf?
5  A  The trade narrative was that he
6  was buying butterflies, brokens, and then he gave
7  me examples of it.  Then he was doing time spreads
8  and verticals and then gave me examples of it and
9  then was selling guts, the middles, and buying wings
10  in regards to that trade as well.  And I saw
11  those -- I saw all those examples.
12  Q  So are you referring to the trade narrative
13  or the trade history?
14  A  Just his narrative of what he's been doing.
15  Q  Okay.  Was that a verbal discussion?
16  A  Yeah, that was -- yeah, that was a while
17  ago.
18  Q  Was it just you and Donelson?
19  A  Yes.
20  Q  How many times did you meet with Donelson?
21  A  Again, I only saw Jim one time
22  and we spoke on the phone several times besides
23  that, and I believe that it was during one of those
24  conversations that we talked about it.

Page 131

1  Q  Did the trade narrative occur before
2  you drafted the declaration or after you drafted
3  the declaration?
4  A  I'm going to say it was before.
5  Q  So do I have it right that the
6  trade narrative provided by Donelson in this
7  bullet point is one conversation between you and
8  Donelson that took place over the phone?
9  A  Yeah, and it may have been more than one.
10  I honestly can't remember.
11  Q  Did you take any notes during those
12  phone calls?
13  A  I may have.  That was a long time ago.
14  Q  Have you looked for those notes recently?
15  A  Well, honestly, no, because I thought
16  that -- I had completely forgotten about this case
17  until June or July when I was contacted.
18  Q  Have you stored your files related to this
19  case in any particular places?
20  A  I have a OneDrive that has some
21  notes.  It does not have -- I don't believe it
22  has this declaration in it or anything else, so
23  it's definitely not thorough by any means.
24      MR. PLATT:  Okay.  So, Mr. Falvey, I think

Page 132

1  those notes would probably be responsive --
2      MR. FALVEY:  Yep.
3      MR. PLATT:  -- to our request for
4  production, so maybe we could take a look
5  for those.
6      MR. FALVEY:  Absolutely.  I apologize
7  for that.  I thought we went over it, but
8  we'll take care of it.
9  BY MR. PLATT:
10  Q  Okay.  So the trade narrative, do
11  you remember what Donelson told you during this
12  conversation that occurred before January of 2020
13  about the trades?
14  A  Yeah, that he would do the -- he would
15  do broke -- I don't know if he classified them as
16  broken butterflies.  I do.  But it was a butterfly
17  that's not symmetrical.  And then on top of that
18  we talked about verticals, which are pretty --
19  again, very simple, very simple trading strategies.
20  We talked about calendars or time spreads which,
21  again, pretty straightforward trading strategies.
22  And then he talked about how he would sell the
23  guts, which is the straddle in between or the
24  strangle in between, and buy wings to protect

JOHN F. BURNSIDE

Page 133

1 the clients' capital.
2    Q    And during this conversation it never
3 came up whether or not Long Leaf's customers were
4 making or losing money?
5    A    No. I expect if you've got customers,
6 they're making money.
7    Q    When did Long Leaf first engage you?
8    A    I'm sorry. I don't know that answer.
9    Q    So your declaration is dated January 22nd
10 of 2020. Do you think it was over one month before
11 that date?
12    A    I feel pretty confident about that, yes.
13    Q    Do you think it was like three months
14 before that date?
15    A    Sure, I'll say it's three months.
16 It could be more or less, but it's definitely prior
17 to that declaration.
18    Q    Okay. I understand that you were
19 engaged prior to the declaration. I'm trying to
20 understand if it was like a year before, a month
21 before, three months before?
22    A    I honestly don't recall. As you
23 can imagine -- as you have noticed, this is not
24 my main business model. So I'm here to evaluate

Page 134

1 options trades and that's -- he hired me to
2 evaluate options trades and that's what I'm doing.
3    Q    What do you mean when you say it's not
4 your main business model?
5    A    Well, obviously I've got my own
6 companies that I run, right? The last time I was
7 a professional witness was 2013.
8    Q    Yeah, I understand. Did Donelson
9 explain how he came up with the legs and strikes
10 and premiums for his trades during your discussions
11 with him?
12    A    He just said that he found some
13 anomalies of different volatility values and would
14 try to take advantage of those.
15    Q    Did he explain how he identified those
16 volatility anomalies?
17    A    We went more into the actual trading
18 of what he was doing than the analysis that he put
19 forth on how to get there.
20    Q    So it sounds like Donelson didn't
21 explain or provide any information about how he
22 selected the underliers for his particular trades?
23    A    No. He would look at some different
24 asset classes that he felt either one was too high,

Page 135

1 one -- like one month might be too high versus
2 another month. So he wanted to do a time spread
3 or sell the straddle and buy the wing so that the
4 client would have limited risk or if they, you
5 know -- there might have been a time where he wanted
6 to -- to think that corn's going up and so he'd do
7 a butterfly in that, things along those lines.
8    Q    But did he explain the basis for
9 his belief that volatility was either over or
10 undervalued is what I'm getting at.
11    A    Not specifically.
12    Q    Did he ever tell you that he gambled in
13 front of news events?
14    A    I don't -- I wouldn't use the word
15 gamble. It's -- what happens is is volatility
16 gets bid up ahead of news events, and so he tried to
17 take advantage of that higher volatility and offset
18 it with lower volatility options.
19    Q    Any other reasons, other than news
20 events, that Donelson explained why he believed
21 that volatility was either over or undervalued by
22 the market?
23    A    Well, just like any trader, you can
24 have relationship trading. And so you can have

Page 136

1 either one week or one month that's trading higher
2 than the other, and you can try to take advantage
3 of that within the same contracts or -- and so
4 that's done all the time to try to make sure that
5 you are just not naked selling straddles or naked
6 selling strangles because you'd always want to have
7 the wings in place just in case something crazy
8 happened.
9    Q    Does it make sense to you that
10 Jim Donelson sitting in his office knows more
11 about whether volatility is properly priced than
12 the market? Does that make sense to you?
13    A    It's -- sometimes the market gets
14 it wrong. So he's trying to take -- he's trying
15 to take an anomaly of a price increase or decrease
16 and taking advantage of that. That happens all
17 the time in all asset classes, whether it's the
18 ones we're referring to here, stocks, whatever.
19 So because you have a -- I'll use your term, like
20 a -- I don't know. What's it called, USDA
21 announcement or something, you know, the food,
22 whatever, the food announcement, grain announcement
23 or something to that effect. So, you know, those
24 things, yeah, they're going to probably move the

JOHN F. BURNSIDE

Page 137

1 market more, but at the same time the volatility's
2 priced in and he's trying to take advantage of that
3 price movement while still having assets to protect
4 it in case it does move beyond his limit.
5 **Q Well, we've seen how well Donelson's**
6 **ability to exploit market inefficiencies worked**
7 **out for Long Leaf customers, so let's move on.**
8 **Under the Material Reviewed in your declaration,**
9 **the second -- or, excuse me, the first bullet point**
10 **is, "Trading History of Long Leaf with position**
11 **description and actual options traded." What does**
12 **that bullet point represent?**
13 A Just I reviewed several trades that
14 were made, as we've talked about ad nauseam here,
15 in regards to whether it was a broken butterfly, a
16 butterfly, a vertical, a time spread, the gut trade,
17 which means selling in the middle and buying the
18 wings, things along those lines.
19 MR. PLATT: I'm going to show you
20 what I'm going to mark as -- I think we're
21 up to Exhibit 512.
22 (Whereupon CFTC Exhibit No. 512
23 was marked for identification.)
24 **Q And this is an Excel file titled**

Page 138

1 **Trading Summary. Do you recognize this document,**
2 **Mr. Burnside?**
3 A Please hold. Yeah, I've seen it.
4 Of course, yes.
5 **Q Did you have this document -- or did**
6 **you rely on this document in drafting your expert**
7 **report in this case?**
8 A Yeah, so -- yeah. So we can go
9 through a couple trades, if you so desire, of what
10 I was looking at.
11 **Q What information is on this document?**
12 A So on -- what the hell is that.
13 Column F is what he's trading and then the quantity
14 is on Column H, and those were the predominant
15 columns that I was looking at.
16 **Q Okay. So this is an Excel file**
17 **that I'll represent to you has 185 rows of data.**
18 **And do you see Column B is Trade Month?**
19 A I do.
20 **Q And Column E is Entry Date?**
21 A I do.
22 **Q Are you familiar with Excel, Mr. Burnside?**
23 **Do you use it?**
24 A Yeah, I do.

Page 139

1 **Q Okay. I'm going to --**
2 A I wouldn't call me an expert. I would say
3 that I'm competent on it.
4 **Q Okay. I'm going to sort Column B, right,**
5 **by -- at least I thought I was going to.**
6 A I feel your pain.
7 **Q Do you see the first -- I sorted**
8 **from oldest to newest. The first trade is January**
9 **of 2019. Do you see that?**
10 A I do.
11 **Q I'm going to scroll down to the bottom.**
12 **The oldest trade in Column E is July 24th of 2019.**
13 **Do you see that?**
14 A Oh, yeah, yeah, yeah. I'm sorry, yes.
15 **Q Do you agree that this file contains**
16 **trading activity from January 2019 to July 2019?**
17 A I feel pretty confident about that.
18 **Q Do you know what trades are included**
19 **in this file?**
20 A I'm looking at -- I'm looking at
21 the trades. So, for example, the top one is he
22 bought a March 146 call in the bonds. He bought
23 a March 151 put, right? He sold a 149 call, sold
24 a 146 put and then made an adjustment to sell the

Page 140

1 other 146 put.
2 **Q Do you have an understanding of what trades**
3 **Donelson included in this file?**
4 A I guess I don't understand the question.
5 **Q Sure, sorry. It's a bad question.**
6 **Do you think this is all of Long Leaf's trades**
7 **from January 2019 through July of 2019?**
8 A I was assuming so, I guess.
9 **Q I don't know one way or another. So I'm**
10 **asking you if --**
11 A Yeah, I would say this is the file
12 I received. I'm thinking that that's -- he's
13 got no reason not to tell me what he did and so,
14 therefore, let me look at them.
15 **Q Did Donelson tell you that this included**
16 **all the trading activity from January 2019 through**
17 **July 2019?**
18 A I don't recall him stating that by,
19 you know, here's everything, but I would assume
20 that he's got nothing to hide with me. Let me see
21 all your trades.
22 **Q Do you see the Greeks anywhere in this**
23 **file?**
24 A I'm sorry. The Greeks?

Page 141

1   Q  Yeah.  Where are the Greeks?
2   A  I do not.
3   Q  I'm going to -- can you see that
4 I'm switching to a different tab, Mr. Burnside?
5   A  Well, go for it.  Let's see what happens.
6 Okay, yeah.
7   Q  So I'm now on the tab labeled Summary.
8 I don't know if you can see the bottom of the file.
9   A  I cannot see the bottom of the file,
10 but we can -- maybe can you just point -- well,
11 maybe I can pull the thing down.  Hold on, hold on.
12 Okay, hold on.  Bear with me.  Okay.  Yeah, that's
13 better.  Okay, sorry.  I made mine a little bit
14 bigger.
15   Q  In Column C I'm going to unfilter this
16 column --
17   A  Under Column C?
18   Q  Yes, Column C.  I'm going to unfilter
19 Column C to include both open and closed trades.
20 Do you see that?
21   A  Okay.
22   Q  So now we have all the closed trades
23 from January 2019 through July of 2019.  Do you see
24 that?  There's 38 rows.

Page 142

1   A  Okay, yeah.
2   Q  What information is in Column H?
3   A  I'm going to say it's the PNL.
4   Q  It's titled Profit, right?
5   A  Yeah.
6   Q  I'm going to sum up Column H for the
7 trades that are closed, and I don't know if you
8 can see the bottom of this file but I'll represent
9 to you that it says negative $4,822.
10   A  Okay, I'll take your word for it.  I can't
11 see it, but I'll take your word for it.
12   Q  This is information that you had available
13 to you when you drafted your --
14   A  Yeah, I -- yeah, that's fine.
15   Q  Did you ask Donelson about Column H on
16 the trading summary file?
17   A  I'm sorry?
18   Q  Did you ask Donelson about Column H on
19 the trading summary file?
20   A  I did not.
21   Q  Is there anything that we've seen
22 on this file that would tell you whether or
23 not a particular trade was likely to lose money
24 or likely to make money?

Page 143

1   A  I do not see that as a probability, no.
2   Q  Sorry.  I took down Exhibit 512 too
3 quickly.
4   A  That's okay.
5   Q  And we're still -- we're on the
6 main tab right now, the Detail tab.  I'm going to
7 scroll over --
8   A  Okay.
9   Q  -- and highlight Column M.  Do you see
10 that?
11   A  M, as in Mary?
12   Q  Yeah.
13   A  Okay.
14   Q  What's the title of Column M?
15   A  Commissions.
16   Q  And what's the value populated in every
17 row for Commissions?
18   A  20.
19   Q  So do you remember reviewing QuikStrike
20 documents?
21   A  I do.
22   Q  What is QuikStrike?
23   A  It was a valuator.  It's kind of like
24 a simulator of trades and what each part as it's

Page 144

1 broken down would look like.
2   Q  Do you use QuikStrike in your daily duties?
3   A  No.
4   Q  Have you ever used QuikStrike?
5   A  Just very limited.
6   Q  It's a web application, right?
7   A  I believe so, and you can get
8 a subscription as well to get more enhancements
9 and blah, blah, blah so ...
10   Q  So when Donelson provided QuikStrikes
11 to you, he sent you screenshots, right?  Is that --
12 I'm going to mark CFTC Exhibit --
13   A  Yes, I see this.  I've seen this.
14     MR. PLATT:  This is Exhibit 513.
15     (Whereupon CFTC Exhibit No. 513
16     was marked for identification.)
17   A  Okay.
18   Q  And this is a two-page PDF titled
19 April 16, 2019.  What's going on here?  What kind
20 of trade is this?
21   A  Can you just -- can you do me a favor
22 and just go down a little bit?  I can't open my
23 screen big enough.
24   Q  Sure.  Let me point you to -- do you

JOHN F. BURNSIDE

Page 145

1  see where the Greeks are, the little green boxes
2  on top?
3      A   Yes, I do.  I see the Greeks.
4      Q   Under the Greeks do you see, it's the
5  two legs, Long Guts Strangle, Short Strangle?
6      A   Yeah, okay, yes.
7      Q   Does that help you determine what category
8  of trade this trade is?
9      A   Yeah, yeah.  So what he was doing
10  here is he's bought -- in essence he's bought the
11  144 and the 149 I'm calling in-the-money options,
12  for lack of a better term.  And then because it's --
13  the future price is 46.10, so they're both in the
14  money.  And then he sold the 45-1/2 and the 47-1/2
15  strangle to offset that purchase.
16      Q   So he's long the monthly strangle and
17  short the weekly strangle, right?
18      A   That's right.
19      Q   Is this what Donelson called the gut
20  strangle?
21      A   Yes.
22      Q   Is there anything on this document that
23  reflects the cost of commissions?
24      A   Not that I have ever seen.

Page 146

1      Q   Is there anything on this document
2  that would reflect whether or not this trade is
3  likely to result in net profits?
4      A   Well, there it is.  Again, it's a time
5  spread.  So as you see, the -- you've got days on
6  the long straddle -- on the long strangle I mean
7  of the 38 and on the short stuff you've got roughly
8  eight days left.  So he's trying to capture a little
9  bit of -- in my opinion he's trying to capture a
10  little bit of theta in that regard, and that is not
11  an unusual situation to have that position on.
12      Q   Where on this document is the
13  probability that this trade will result in net
14  profits reflected?
15      A   It's not.  Again, it's more of
16  a theta play versus a vega play.  Not that 38 days
17  is a big vega, but it's more vega obviously than
18  8 days.
19      Q   I'm not asking whether or not it's
20  a theta play or a vega play, but thank you for that
21  analysis.
22      A   Yeah.
23      Q   So this is a gut strangle, right,
24  Mr. Burnside?

Page 147

1      A   It is.
2      Q   Have you ever traded a gut strangle?
3      A   I have.
4      Q   When's the last time you traded a gut
5  strangle?
6      A   Well, I've kind of put myself into
7  them sometimes, but it's a way to generate theta
8  for perhaps owning something in the future.  I don't
9  know exactly the behind the scenes on this, but
10  maybe there was a report coming out in 35 days or
11  something and he wanted to own those and he was
12  trying to get it to have some reducing of costs.
13      Q   So the question is --
14      A   Again -- go ahead.
15      Q   So the question is when is the last
16  time you implemented a gut strangle for yourself
17  or for your clients?
18      A   I would say that I do -- I probably
19  have never done a gut strangle for my clients
20  because that's not my -- what I need to do, but
21  I would put on a condor or a butterfly.
22      Q   Have you ever traded a gut strangle?
23      A   Only when a client -- like when I was
24  on the floor, some people would trade these and

Page 148

1  I would make a market in them and I'd make --
2  you know, I'd provide liquidity.
3      Q   So to the extent you've traded
4  a gut strangle, it was in your role as a market
5  maker at least 15 or 20 years ago, is that right?
6      A   That's correct.
7      Q   And you can't put an exact time on it,
8  right?
9      A   Right.  I would not -- I would agree
10  with that.
11      Q   In your role sort of as either
12  a proprietary trader or as an advisor, you don't
13  use this strategy, right?
14      A   I do not, no.
15      Q   Do you know what I mean when I use the
16  term commodity interest?
17      A   Commodity what?
18      Q   Interest.
19      A   No, I don't know what that means.
20      Q   So I'll represent to you that it's
21  a legal term that means an option swap or future
22  on a commodity, so like --
23      A   Uh-hmm.
24      Q   -- gold futures, FX or --

JOHN F. BURNSIDE

Page 149

1    A    Okay.
2    Q    -- certain currency futures.  When
3  is the last time that you traded an instrument
4  involving a commodity interest?
5    A    Back in '89 I would say.  Well, maybe
6  I dabbled at G-Bar a little bit, but you get the
7  idea.  For the real part of this conversation the
8  options were -- especially in the options world,
9  it was '89.
10    Q    Going back to the QuikStrike, which is
11  Exhibit 513, do you see the underlier is -- I think
12  it's Treasury futures.  Do you agree with that?
13    A    I do.
14    Q    Is there any information on this
15  document that reflects the historical volatility
16  of Treasury futures?
17    A    Not that I know of, but then again,
18  I don't use this on a daily basis.  But I can
19  see what the, you know, the volatility is of each
20  segment of the gut swap.
21    Q    That's not historical volatility, though,
22  right?  That's implied volatility --
23    A    Yeah, that's the estimated implied
24  volatility, correct.

Page 150

1    Q    So just looking at this document,
2  there's no way to tell, you know, if the underlying
3  Treasury futures were relatively high or relatively
4  low with regard to historical volatility at the time
5  this trade was placed.  Do you agree with that?
6    A    I would agree with that, to the best of my
7  knowledge of understanding QuikStrike.
8        MR. PLATT:  I'm going to show you
9  Exhibit 514.
10        (Whereupon CFTC Exhibit No. 514
11          was marked for identification.)
12    Q    You see this is another QuikStrike.
13  This one's dated March 15, 2019 and this is another
14  gut strangle on corn futures.  Do you agree with
15  that analysis?
16    A    I do.
17    Q    And there's like a little annotation
18  there Donelson must have put on.  It says the
19  volatility is highlighted below, checkmark,
20  checkmark.  Do you see that?
21    A    Yep.
22    Q    And then there's like a little box
23  for ATM Volatility and it looks like a free text
24  field.  Do you see that?

Page 151

1    A    I do.  It's the one that's highlighted in
2  yellow.  Would you agree with that?
3    Q    Let me ask you.  Do you see At the Money
4  volatility is highlighted in yellow?
5    A    Yes.  How about that, yes.  Fair enough.
6    Q    Did Donelson tell you that he typed those
7  values in?
8    A    No.
9    Q    Did Donelson tell you how he came up
10  with the implied volatility values that he used
11  in his trade analysis?
12    A    Well, here again, I'm assuming that
13  this is just taken right off of QuikStrike and that
14  he's selling a 20.32 vol and buying a 17 point, what
15  is that, 8 vol and trying to capture some of that
16  volatility differential.
17    Q    But it sounds like that's your
18  assumption and you don't even use this application.
19  Like Donelson didn't tell you I came up with these
20  volatilities and I put them in here and this is how
21  I came up with them, right?  He never said anything
22  like that?
23    A    Well, that would be -- like I'm
24  looking at that.  So in essence this is usually

Page 152

1  you personally put those in, but that would be
2  the case of what would be a normal trade of trying
3  to take advantage of a gut swap.
4    Q    Let me ask it a little bit differently
5  because I think I asked a confusing question.  You
6  don't use QuikStrike, right?
7    A    I mean, like I said, I probably used it
8  five times in looking at this stuff.  So go ahead.
9  I'll do my best.
10    Q    You don't know whether or not --
11  you don't know the source of the volatility
12  values that are typed into this file, correct?
13    A    No.
14    Q    And Donelson didn't tell you how he came
15  up with his --
16    A    The only thing that I would know
17  as a fact is that I'm assuming that this is the
18  at-the-money volatility of the 14 days, and I'm
19  assuming that this is the at-the-money volatility
20  of the 42 days.  This goes back to just being able
21  to read what's going on and trying to take advantage
22  of what's happening in the marketplace.  Now, if
23  those numbers are wrong, I'm not going to go
24  through, you know, every trade and go do a

JOHN F. BURNSIDE

Page 153

1  QuikStrike to see if, you know, on what date what
2  this was trading.
3      Q    Have you ever held a QuikStrike account?
4      A    No.
5      Q    Have you ever used someone else's
6  QuikStrike account?
7      A    Yeah, I think a buddy of mine had one
8  once and I was trying to learn on it.
9      Q    When do you think that was?
10     A    That could have been during the
11  Quiddity event.  I don't -- it could have been
12  eight, nine years ago.
13     Q    What liquidity event are you referring to?
14     A    No, Quiddity.  The other people that
15  I (inaudible).
16     Q    Do you mean that you used it in connection
17  with your retention as an expert witness or do you
18  mean that you used QuikStrike --
19     A    The Quiddity -- or, I mean, excuse me.
20  QuikStrike is used more frequently in the commodity
21  world.  There's other things that are used in the
22  financial world that I'm more versed in, but it
23  all says about the same amount of stuff.
24     Q    Have you ever used QuikStrike in analyzing

Page 154

1  any of your trades?
2      A    No.
3      Q    In what context have you ever used
4  QuikStrike?
5      A    Just to review what was going on at
6  that time and to see where things were trading.
7      Q    What do you mean by "that time"?
8      A    Just like this is saying that this
9  is a 20 vol and this is a 17 vol.  That's it.
10  Or what was bought, what was sold.  I know what
11  the graphs look like when I sell the guts and I buy
12  the wings.  I mean, that's pretty simple, but that's
13  not the issue.  It's the gut of this information.
14  And as you can see, like, you know, you can get a
15  lot of data points, whether it's gamma or what have
16  you, up above.
17     Q    So I don't understand the answer.
18  Have you ever used QuikStrike, Mr. Burnside?
19     A    Yes, I have but very rarely.
20     Q    To the extent you've used QuikStrike,
21  you have not used it in connection with your own
22  trading, right?
23     A    Correct.
24     Q    When did you use QuikStrike?

Page 155

1      A    A long time ago to evaluate the other
2  CFTC person I was trying to defend.
3      Q    What do you mean when you say you used
4  QuikStrike during the Quiddity period?
5      A    Quiddity traded options just like this,
6  so I was brought up to speed on what QuikStrike --
7  how it worked, what goes on.  It's -- from my
8  standpoint, from what I do on a regular basis,
9  I deal in the stock world.  So this is not -- I
10  don't need all the different commodities involved.
11     Q    The only other time you've interacted with
12  QuikStrike, were you given printouts of QuikStrike
13  or were you using the application yourself?
14     A    I was using the application.
15     Q    Do you know whether the at-the-money
16  volatility on the QuikStrikes that Donelson provided
17  to you were automatically generated or were input
18  by Donelson?
19     A    I do not know.
20         MR. PLATT:  I'm going to show you
21      what I'm going to mark as CFTC Exhibit 515,
22      and this is another QuikStrike dated July 24,
23      2019.
24

Page 156

1         (Whereupon CFTC Exhibit No. 515
2          was marked for identification.)
3      Q    Do you agree that this is another gut
4  strangle, this time on gold futures?
5      A    I do.
6      Q    And I'm going to show you CFTC Exhibit --
7      A    Well, this is -- he is now long the
8  guts and short the wings.  But that's okay, yeah.
9      Q    So I'm going to go back to Exhibit 514.
10  This is the corn QuikStrike that we just looked at.
11     A    Yes, sir.
12     Q    Is it the same structure as Exhibit 515?
13     A    No.  This one was -- this one was actually
14  two time spreads.
15     Q    It's your testimony --
16     A    He's long the 380 calls in 42 days.
17  He's short the 380 calls in 14 days.  He's long
18  the 360 puts in 42 days, and he's short the 360 puts
19  in 14 days.
20     Q    Okay.  I thought you testified that this
21  was a gut strangle.
22     A    I was -- I was wrong.
23     Q    And what would you call this?  What bucket
24  does this fall into?

Page 157

1    A    That's your time spread, or calendar
2  spread.  Some people call it that.
3    Q    Just to drill down a tiny bit
4  on Exhibit 514, do you agree that this trade is
5  long the monthly strangle?
6    A    Yes.
7    Q    And it's short the weekly strangle?
8    A    Right.  He's got two time spreads on there,
9  the put and the call.
10    Q    And then Exhibit 515 --
11    A    He's long the 320 and the 3 -- he's
12  long the 320 puts, long the 330 -- or, excuse me,
13  1420 puts, 1430 calls and he's short the 1400 puts
14  and the 1450 calls.
15    Q    And is the distinction you're drawing
16  between Exhibit 514 and Exhibit 515 is the strikes
17  are the same in 514?
18    A    That's correct.
19    Q    Got it.
20    A    But, again, this is a time vertical
21  but you -- it's okay.
22        MR. PLATT: And then the last one,
23    I promise.
24

Page 158

1        (Whereupon CFTC Exhibit No. 516
2          was marked for identification.)
3    A    Good.
4    Q    Exhibit 516 --
5    A    Okay.
6    Q    -- is the fourth QuikStrike that Donelson
7  provided to you.  Do you agree that this is another
8  gut strangle?
9    A    He's long the 125s, he's short the
10  12, yeah, 13, 1375s, yes.  No, he's long the
11  call spread and he's -- yeah, he's long the guts
12  and short the wings, sure.  And it's a time spread,
13  just like the previous one.
14    Q    And on all of these four QuikStrikes
15  Donelson is long a long-dated straddle, right?
16    A    Yeah.
17    Q    And he's short a short-dated straddle,
18  right?
19    A    Correct.
20        MR. PLATT: I'm going to show you
21    what I'm going to mark as Exhibit 517, and
22    this is another Excel file.
23
24

Page 159

1        (Whereupon CFTC Exhibit No. 517
2          was marked for identification.)
3    Q    My first question is going to be do you
4  recognize the document?
5    A    I do.  I had a little bit of trouble
6  with this one, but go ahead.
7    Q    What information is on this file?
8    A    Right now we've got the -- well,
9  in the Column A we've got the trade month and
10  then the Trade Description in B is nothing, the
11  Underlying, Contract, Buy, Sell, Type and I believe
12  that's Direction, do you agree, in H?
13    Q    What did Donelson tell you about this
14  document?
15    A    He and I -- he and I really didn't
16  discuss any of the documents.  He kind of let
17  me figure it out for myself, and the reason was
18  is because -- go ahead.
19    Q    I cut --
20    A    He wanted me to come up with --
21    Q    I cut you off.  Please continue.
22    A    I said he just wanted me to kind of
23  figure out what was going on here by myself so --
24  which is fine.

Page 160

1    Q    But did you ask Donelson about this
2  file and he didn't know or --
3    A    No.
4    Q    -- you just didn't ask him?
5    A    I just didn't ask him.
6    Q    And what did you figure out from this
7  document, or did you not rely on it?
8    A    Well, so this goes back to my premise
9  of this whole thing.  Like you could see what he's
10  buying.  You could see what he was selling, whether
11  it's 1 or 93 or whatever the case might be.  So I
12  was able to put the pieces of the puzzle together
13  and then -- and verify that it was what it says
14  over in Q, that the iron condor or what have you.
15    Q    I'm going to just scroll down here.
16  You'll see that as of November of 2017, Column B
17  begins to be populated with what looks like a short
18  descriptor of the trade.  Do you see that?
19    A    I do.
20    Q    And then the chronological order of
21  this file cuts off at September of 2018.  Do you
22  see that?
23    A    I do.
24    Q    Do you see any information on this

JOHN F. BURNSIDE

1 file that would tell you the likelihood that
2 any of the trades would result in net profits for
3 customers?
4    A   No.  Again, this was me making sure
5 just reviewing these trades and saying okay, this
6 is a call spread or this is a broken wing or this
7 is, you know, whatever the case might be, and so
8 that was my analysis of this.  I did not -- again,
9 I did not get the fills on where these things
10 traded, so I don't know whether they were profitable
11 or what prices were paid or things along those lines
12 so that I didn't -- I just didn't have that --
13 I didn't get the confirms.
14    Q   Yeah.  And there's nothing on here that
15 would reflect that the trade was designed to have
16 positive expected returns, correct?
17    A   I would agree with that.
18    Q   There's nothing on this file reflecting
19 how much commissions were charged per trade, right?
20    A   Not on this file, correct, as far
21 as I can see.  Now, you know, there's -- there might
22 be some more, but I don't think there is on this
23 file.
24    Q   I'll represent to you that this is the

1 only tab on this spreadsheet that --
2    A   Yeah, I see -- I see nothing about
3 commissions.  I see nothing about probability of
4 outcome.  I see nothing.
5    Q   And --
6    A   All I'm looking -- yeah.  My whole
7 goal here is to make sure that we've got, you
8 know, hogs and, you know, and we've got two of
9 these and one of those and one of those and so
10 on and so forth.
11    Q   Am I right that you relied on this
12 file to verify that Donelson was actually trading
13 sort of broken wing butterflies, covered strangles,
14 broken wing condor, call spreads, that kind of
15 information?
16    A   That's exactly correct.
17    Q   So what about September 2018 through
18 December 2018, was there any information that
19 Donelson provided to you about that time period?
20    A   Let me check.  Yeah, I did get one
21 from Sep '18.  You said -- wait.  Sep '18, right?
22    Q   So do you recall --
23    A   To -- go ahead.  I'm sorry.
24    Q   Do you recall that Exhibit 517 ended

1 in September of 2018?
2    A   Yeah.
3    Q   And the other Excel file we looked
4 at didn't begin until January of 2019, right?
5    A   Right.
6    Q   And so there's a gap of October,
7 November and December of 2018.  And I'm trying
8 to understand did you have any information about
9 Long Leaf's trading activity during that gap?
10    A   From September of '18 to roughly January
11 of '19?
12    Q   The gap is actually October through
13 December of 2018, but yes.
14    A   I mean, I think I've got one here.
15 Yeah, it's got like November and December and
16 January -- and September and stuff on it.
17    Q   Mr. Burnside, what document are you
18 looking at?
19    A   I don't know.  I got it on 9/20.
20    Q   Can you turn it towards the camera?
21       MR. FALVEY: Well --
22    A   Yeah, this -- here, I can turn this.
23 How about this?
24       MR. FALVEY: It should have been in the

1    zip file.
2    A   Yeah, it was in the zip file.
3 BY MR. PLATT:
4    Q   Okay.  What's the title of the -- what's
5 the file name?
6    A   I think it was Trading and I renamed it
7 to Trading 9-18 through 1-19.
8       MR. PLATT: Okay.  I'll represent
9    to you that we don't have that document.
10 So, Mr. Falvey, maybe you can produce --
11       THE WITNESS: Absolutely.
12       MR. PLATT: -- that to us.
13       MR. FALVEY: Yeah, okay, yeah.
14    A   Sorry.  I'm not --
15 BY MR. PLATT:
16    Q   That's okay.  It sounds like there's
17 a document, Mr. Burnside, that's an Excel file that
18 covers October of 2018 through December of 2018 --
19    A   Yeah.
20    Q   -- is that right?
21    A   Yeah, September of '18 to -- I actually
22 had it down as September of '18 to January of '19.
23 So it might have ended on December of '18.  But
24 whatever it is, you're going to get it.

JOHN F. BURNSIDE

Page 165

1    Q    Let me ask you this, Mr. Burnside.
2   Is the information in the file you're looking at --
3   actually, can you tell me the name of that file?
4   Like what's the name of it on your computer?
5    A    On my computer it says Trading -- excuse
6   me, Trading 9-18 to 1-19.
7    Q    Okay.  And on that file that you're
8   looking at --
9    A    Yes, sir.
10    Q    -- does it have substantially the
11   same information as CFTC Exhibit 517, which was
12   the Trading Details Excel file?
13    A    Yeah.  I mean, it's not as -- honestly,
14   it's not as clean as what you had.  And I can send
15   it to you, but it doesn't -- like you had all the --
16   you know how you had all the granules, like the 2 by
17   2 and the 3 by 2 and whatever it was?  This did not
18   have that, but I'd be glad -- obviously I'll share
19   it with you.  I don't have any reason to hold it
20   or whatever.
21    Q    Can you read the --
22    A    I'm going to send this to Jim right now.
23   Do you mind?
24    Q    I'm not going to look at it right now.

Page 166

1   Can you read that name --
2    A    Okay.
3    Q    Can you read the headings of the columns,
4   please.
5    A    Absolutely.  So there's three tabs,
6   Sheet 3, Sheet 2 and 1 Lot, okay?  And on the
7   1 Lot the tab is Trade Date, Total Fee, Commission,
8   Commission Currency, Volume, Adjustment Description,
9   Trade, Trade Option, Date, Future, Future Value,
10   Volume, Commissions, Net, Trade Month.  That's
11   on one tab, Jody.
12    Q    Okay.
13    A    And then -- are you good with that?
14    Q    Yeah, we'll look at the document later.
15   I'm just curious what information is on there for
16   now.
17    A    That's fine.  On Tab 2 it has Trade
18   Months and then it's got 201809 and then 201809
19   Total and then 201810 and then 2018 Total.  I think
20   you get the idea here, right?  And then grand total.
21    Q    When did --
22    A    I'm sorry.  Go ahead.
23    Q    When did you receive this document,
24   Mr. Burnside?

Page 167

1    A    Honestly, I thought it was in the zip
2   drive.
3    Q    No.  I mean when did you get it?  Did you
4   get it like way back in 2019?
5    A    Well, it says 9/20 of this year.
6   So I might have made some adjustments to it, but
7   that's -- you know, I don't know when I got it.
8   I thought it was in the zip drive.
9    Q    I guess -- so you don't know when
10   you got it.  You adjusted the file in September
11   of this year?
12    A    Yeah, because what I think I did --
13   what I think I did is I renamed it because it was --
14   like for you, just like what you're going through,
15   it was confusing on where it was in the time --
16   in the time frame, right?  Dollars to doughnuts,
17   I think it's in that zip drive you have and it says
18   Trading.  But whatever it is, Jim and I will get
19   this to you today.
20        MR. FALVEY:  Yeah.
21   BY MR. PLATT:
22    Q    Okay.  So it sounds like you have two
23   Excel files that have information about commissions,
24   Mr. Burnside, is that right?

Page 168

1    A    Yeah, I'd agree with that.
2    Q    And that was something that you
3   thought was important in rendering an opinion
4   that the trades made sense?  Do I have that right?
5    A    No.  I -- so like when I make a trade,
6   I make a trade and I don't look at commissions
7   because it's not part of my analysis of is the trade
8   a good trade.  It's just -- it would be similar in
9   my world as if is it a good trade because of taxes.
10   I'm seeing if the trade makes sense and if the trade
11   makes sense, I'm going to make the trade.  If the
12   trade does not make sense, then I'm not going to
13   make the trade.
14    Q    How can you evaluate whether or
15   not a trade makes sense without understanding
16   the cost of putting the trade on?  That doesn't
17   make any sense to me, Mr. Burnside.
18    A    Because like in my world the
19   commissions are so negligible, it doesn't even
20   matter and I don't think that anybody's paying
21   ridiculous commissions.  So I'm just looking at
22   structure and I'm looking at doing the right thing,
23   and I would not be paying, for example, 15¢ for a
24   20¢ butterfly.

JOHN F. BURNSIDE

Page 169

1　Q　Is a $20 commission ridiculous?

2　A　I don't know.  It seems -- you know,

3　is it $20 on a 100 lot?  Is it $20 on a thousand

4　lot?  I don't know what they were referring to.

5　Nobody gave me -- nobody's given me the breakdown

6　on how this whole thing works on that.

7　Q　I think you said that --

8　A　Other than what -- other than what you've

9　described this after -- today.

10　Q　Well, look at the file that you've

11　got on your computer.  You said there's a tab called

12　1 Lot.  How many lots do you think that refers to?

13　A　Well, I could do a summation,

14　I suppose.  119 is what that column comes up to.

15　Q　Right.  But the tab, the name of the tab

16　of the file is 1 Lot, right?

17　A　Yeah.  There's a couple 2 lots in there,

18　but I'm just going to tell you that the summation of

19　the whole thing was 119 of all the different trades

20　between September 18 and -- of '18 and January 16th

21　of 2019.

22　Q　And what is the commission information

23　on that 1 Lot tab for a particular trade?

24　A　Again, I'm summating this whole thing.

Page 170

1　Q　So I don't want the sum.  I just want

2　per individual trade.

3　A　It looks like $35 of -- for some

4　denomination of a 1 lot.  I don't know if it's for

5　a hundred lot or a thousand lot or what.

6　Q　The name of the tab is 1 Lot trades.

7　What are you talking about?  Do you think it's

8　a thousand lot?

9　A　I don't -- look, you're doing a lot of

10　assuming that I know this.  I don't.

11　Q　I don't know it either, but I know

12　what you're telling me the title of the tab is.

13　Let's just move on.  So you said that when you

14　analyzed your own trades, because your commissions

15　are negligible you don't consider commissions,

16　right?

17　A　Correct, correct.

18　Q　If a customer was paying $20 per

19　option, would that still be a negligible amount

20　of commissions?

21　A　No.

22　Q　So to assess the viability of an

23　options trade, how can you ignore commissions if

24　they're $20 per option?

Page 171

1　A　As we've discussed, in my world I don't --

2　I get mine next to zero.

3　Q　I'm not talking about your world.

4　I'm talking about your expert report in which you

5　opined that Long Leaf's trades were viable and that

6　they made sense.

7　A　They did.  They are viable and they

8　make sense if I'm not -- again, I did not look

9　at the commissions.  That's not -- the commission

10　schedule is not what I'm looking at here.  I'm

11　looking at whether the trade itself makes sense

12　and is viable.

13　Q　And is it your --

14　A　That's all I have -- I'm not sitting

15　here saying that I'm dictating, you know, X, Y or Z.

16　Does the trade makes sense?  Yes, it makes sense.

17　Is it a viable trade?  It is.  That's what I was

18　commissioned to look at.

19　Q　And so your opinion could be amended

20　to say Long Leaf's trades made sense if you ignore

21　all costs, right?

22　A　At some point somebody's got to get

23　paid.  But, yes, you could -- I guess you could

24　say that.

Page 172

1　　　MR. PLATT: I'm going to show you

2　what I'm going to mark as CFTC Exhibit 518.

3　　　(Whereupon CFTC Exhibit No. 518

4　　　was marked for identification.)

5　Q　Can you see Exhibit 518, Mr. Burnside?

6　A　Yep.

7　Q　Do you recognize this document?

8　A　I do recognize that document.

9　Q　What is it?

10　A　It's a trade of -- for Long Leaf and

11　what a recommendation would be, the ALFA trade.

12　Q　What information is included on

13　Exhibit 518?

14　A　Obviously it's got the net amount.

15　It's got the pricing of what went on on the trades,

16　the cash costs, the margin amounts, the buys, the

17　sell and the net amount.

18　Q　What is your understanding of what

19　Long Leaf Trading used these recommendations for?

20　A　To have their clients make money.

21　Q　Do you understand that Long Leaf Trading

22　provided documents like this to their clients?

23　A　Okay.

24　Q　Do you know that?  Did Donelson tell

JOHN F. BURNSIDE

Page 173

1  you that?
2      A   He never told me that.  But is this how
3  he would send their, you know, his recommendations
4  out?
5      Q   I can't answer the question because you're
6  the witness, Mr. Burnside.
7      A   Okay.
8      Q   The first sentence is, "Please see
9  referenced positions below we are recommending
10  for execution."  Did I read that correctly?
11     A   You did.  So, yeah, so this is a sample
12  of what he would send out.
13     Q   And is there any information on
14  this document about the expected return of this
15  trade?
16     A   No.
17     Q   Down where -- close to the bottom of
18  this chart it says Estimated Net and then there's
19  a value that's like negative $26.82.  Do you see
20  that?
21     A   I do.
22     Q   What does that mean?
23     A   Well, it says right there, "Impact
24  assuming all other variables remain the same."

Page 174

1  I don't know what that means.
2      Q   Do you know if this document includes
3  the impact of commissions?
4      A   My gut says no.  I don't see any
5  commissions on it and, therefore, I'm going to
6  say no, it does not.
7      Q   Donelson didn't tell you one way or
8  another, right?
9      A   That's correct.
10     Q   So do you see the Cash Cost box that says
11  negative $5,464?
12     A   Yes.
13     Q   And then the estimated net is negative
14  $26.  Does that seem like a good bet to you to risk
15  $5400 to lose $26?
16     A   No, but you also have quite a bit of time
17  in this trade.
18     Q   If you were a Long Leaf customer and
19  you got this trade recommendation, would you pull
20  the trigger?
21     A   It depends what's gone on in the
22  past, and I'm not trying to be evasive to your
23  question.  Would I pull the trigger?  I might
24  because I see that we've got a long time.  We've

Page 175

1  got all of April and all of May to sell calls
2  and puts against this position.
3      Q   Is there anything on this document
4  that indicates that the number of additional
5  straddles that will be sold against that position?
6      A   No.
7      Q   I'm just going to put 518 back up real
8  quick.
9      A   Yes, sir.
10     Q   Does a trade that has a cost of $5464
11  and an estimated net of negative $26, does that
12  trade make sense to you?
13     A   In this context it actually does,
14  and the reason why is that he's selling the
15  shorter-dated options and protecting it with
16  longer-dated options so that the customer doesn't
17  get beat.  In theory he could be making his 200 and
18  some odd dollars and being able to make money on the
19  other side as well or sell other options against it.
20     Q   Anything's possible, right?
21     A   Anything is possible.  That's why they
22  call them options.
23         MR. PLATT:  Here's another document
24     that I'm marking as Exhibit 519.  This was

Page 176

1  produced to us by Donelson.  It's another
2  QuikStrike document, but it looks like this
3  is generated after the ALFA trade has been
4  put on.
5         (Whereupon CFTC Exhibit No. 519
6          was marked for identification.)
7      Q   Do you recognize this?
8      A   Okay.
9      Q   What information is on Exhibit 519?
10     A   What you own, where the future is,
11  what the at-the-money volatility is, how many
12  days you've got left, what your Greeks are, what
13  your theta is, everything.
14     Q   Does Exhibit 519 tell you whether or not
15  the trade is making money?
16     A   It does not.
17     Q   Does Exhibit 519 have any information
18  that says the trade is likely to make money?
19     A   No.  It obviously will make money if
20  we have a big move in this underlying contract.
21         MR. PLATT:  I'm going to show you what
22     I'm marking as Exhibit 520.  This is a document
23     that Donelson produced to us.
24

JOHN F. BURNSIDE

Page 177

1    (Whereupon CFTC Exhibit No. 520
2        was marked for identification.)
3    Q    My first question is going to be do you
4    recognize this document?
5    A    Yeah, I've seen this document.
6    Q    This is a document that you had access
7    to when you were drafting your expert report, right,
8    Mr. Burnside?
9    A    Sure.
10   Q    What did Donelson tell you about the
11   information in this document?
12   A    He didn't tell me anything about it.
13   Q    Do you know what information is reflected
14   on Exhibit 520?
15   A    I'm going -- my speculation was is how
16   many contracts each individual would trade based
17   upon the recommendation that he would make.
18   Q    In your opinion as a professional
19   options trader, do you know what the term net
20   liq balance means?
21   A    I do.
22   Q    What does it mean?
23   A    Net liquidation value.
24   Q    And what is that?

Page 178

1    A    The amount of capital in your account.
2    Q    Look at Row 2.  There's a customer
3    account F3782.  Let's not say the guy's name.
4    The net liq balance is $801 and it looks like
5    the recommendation is for two contracts.  Do you
6    see that?
7    A    I do.
8    Q    Can you see the title of this file?
9    A    A Corn 3-15 Analysis.
10       MR. PLATT:  So now I'm going to pull
11   up the trade recommendation on a 3-15 corn
12   trade.  I'm going to mark this as Exhibit 521.
13       (Whereupon CFTC Exhibit No. 521
14       was marked for identification.)
15   Q    Do you agree that this is a trading
16   recommendation disseminated by Long Leaf for a
17   corn calendar?  Do you see that in the file?
18   A    I do.
19   Q    Do you see down at the middle there's
20   a box that's called Cash Cost --
21   A    Yes.
22   Q    -- that's negative $343?  Do you see that?
23   A    I do.
24   Q    So if you bought two contracts or

Page 179

1    if you traded two contracts for this spread, what
2    would be your cost?
3    A    $687.76.
4    Q    It looks like the estimated net
5    included by Donelson is negative $8.  Do you see
6    that?
7    A    Yes.
8    Q    Does it make sense to you to advise
9    a retail customer with $800 in their account to
10   enter a trade that costs $680 with an estimated net
11   payoff of negative $16?  Does that make sense to you
12   in your professional opinion?
13   A    Well, this is very similar to the
14   last one where it's a big time spread.  Now,
15   I understand where you're going is like does he
16   have enough net liq.  That's -- I don't know the
17   customer.  I don't know what he's about.  I don't
18   know anything.  But to answer your question, no.
19   Q    I'm going to go back to your expert
20   report real quick, which was Exhibit 507.  So on
21   the second page there's a heading that says Data and
22   Documents Reviewed.  Do you see that?
23   A    I do.
24   Q    The complaint and answer is Item 1.

Page 180

1    Item 2 is trades recommended by Long Leaf.  Item 3
2    is your general knowledge of options markets.
3    A    That's right.
4    Q    Is it fair to say that you also relied
5    on the documents and information that you already
6    had access to in connection with your January 2020
7    declaration?
8    A    I would say that once I got reacquainted
9    with what was going on, they came back.  But if
10   you're referring to the person having $800 in their
11   account and making a 2 lot recommendation, well,
12   either the person has to be responsible not to do
13   the trade or put more money in their account if they
14   feel comfortable with the trade or not do the trade.
15   And so, therefore, when reviewing these trades that
16   were recommended by Long Leaf, I don't know the
17   client.  They're not my client.
18   Q    So I'm not asking you about
19   Exhibits 520 and 521.  What I'm trying to get at
20   now, Mr. Burnside, is just to close the universe
21   of documents and information that you relied on
22   in creating your report.  I see these three items
23   under Data and Documents Reviewed.  And my question
24   is should we also assume that you incorporated

JOHN F. BURNSIDE

Page 181

1  the data and information that you had available
2  to you in January of 2020 into this report?
3      A   I mean, I don't -- I couldn't find
4  any of the reports from previous.  So if I had
5  any of the reports, they were resubmitted to me.
6  And all I can tell you is is that if they were the
7  same, then maybe it jarred my memory.  But in the
8  meantime, I'm not -- I'm not holding documents to
9  hold documents.  I honestly thought this case was
10 settled and gone away until June or July of this
11 year so ...
12     Q   Do you see under Item 2 it says you
13 reviewed trades that were recommended by Long Leaf
14 Trading?
15     A   I do.
16     Q   What is the -- what data and information
17 does that encompass?
18     A   It was the trades, the broken collars --
19 I mean, excuse me, the broken butterflies, the
20 verticals, the gut stuff.  I mean, all that stuff.
21 I reviewed those trades that were recommended.
22     Q   Does it include the --
23     A   I didn't go through every trade that
24 they recommended with every client that they sent

Page 182

1  it out to, by no means.
2      Q   Right.  I'm just trying to determine
3  what this refers to.  I'm not saying that you should
4  have or that you did.  I'm asking what does this
5  mean.  We looked at two Excel files.  Do those --
6  so should we consider those to be within Item 2?
7      A   When you -- when I look at -- when
8  I'm looking at these, the trades that were done,
9  whether they were butterflies, broken butterflies,
10 guts, whatever, time spreads, whatever you want to
11 call them, that's what I was reviewing.  I reviewed
12 these trades that were recommended by Long Leaf.
13 I reviewed them.  And based on my options knowledge,
14 they were viable options trades and, therefore, they
15 could be recommended and it limited the risk of
16 their -- of the clients that chose to deploy them.
17     MR. PLATT: It's 2:30 Central.  Let's
18 go off the record for, you know, a ten-minute
19 afternoon break.
20     THE WITNESS: Hot dog.
21     (Whereupon a recess was taken from
22     2:30 p.m., to 2:50 p.m., after which
23     the following proceedings were had:)
24     MR. PLATT: Can we please go back on the

Page 183

1  record with the deposition of John Burnside.
2      Q   So, Mr. Burnside, earlier today we
3  discussed -- I asked you whether you had ever
4  implemented a gut strangle and your testimony
5  was that you hadn't.  And I'd like to ask you
6  the same question about some of the other Long
7  Leaf trading strategies, okay?
8      A   Okay.
9      Q   And I'm putting back on the screen
10 Exhibit 517, which is an Excel file titled Trading
11 Details.  You'll remember this --
12     A   Okay.
13     Q   -- this document covers --
14 the information in Column B covers the time
15 period November 2017 through September 2018.
16 And looking in Column G, I'd like to ask you
17 whether or not you've -- have you ever implemented
18 an iron butterfly trade?
19     A   Yes.
20     Q   When is the last time you implemented
21 an iron butterfly trade?
22     A   I have one on currently.
23     Q   In what product?
24     A   (Inaudible).

Page 184

1      Q   Excuse me?
2      A   Facebook.
3      Q   Options on Facebook stock?
4      A   Yes.
5      Q   And it's your goal with the iron
6  butterfly on Facebook stock to generate revenue
7  or to hedge another position?
8      A   It's hedging a position.
9      Q   What about an iron condor, have you ever
10 implemented an iron condor?
11     A   I have that as well in another stock called
12 Envestnet.
13     Q   Is your currently implemented
14 Envestnet iron condor for the purpose of hedging
15 or generating --
16     A   It's hedging.  It is hedging, not to
17 talk over you.
18     Q   What about a broken wing butterfly,
19 have you ever implemented a broken wing butterfly?
20     A   Yes, only because it ends up that
21 way after trading into it.  Not as a strategy to
22 implement in one fell swoop, shall I say.
23     Q   And is it accurate to say that the
24 broken wing butterflies that you've ended up in

JOHN F. BURNSIDE

Page 185

1  have been for the purpose of hedging?
2     A   They have been.
3     Q   When is the last time you traded a broken
4  wing butterfly?
5     A   I would say it was last month in Microsoft.
6     Q   But for iron butterflies, iron condors
7  and broken wing butterflies is it correct to say
8  that whenever you've implemented those kinds of
9  trades, you've done it for the purpose of hedging?
10    A   That is correct.
11    Q   What about a volatility swap, do you know
12  what a volatility swap is?
13    A   Volatility spread.  So you'd be buying --
14  well, theoretically you'd be buying the back month
15  and selling the front month, and I do that all the
16  time and I do that -- for example, I just did it
17  this week in Facebook because I was selling the
18  Octobers and buying November, and the reason is is
19  that it was a hedge and the hedge for the earnings
20  announcement, which comes out at the end of October.
21  So I wanted to be long in November, so there was an
22  earnings announcement was the reasoning.
23    Q   So you wanted to protect against
24  the risk of increased volatility due to a news

Page 186

1  event in the future --
2     A   Yep.
3     Q   -- is that right?
4     A   That's exactly correct.
5     Q   You weren't trying to generate
6  income in connection with a future news event,
7  right?
8     A   No, it was -- the trades that I make
9  currently are for hedging stock positions.
10    Q   And every time you've implemented
11  a volatility swap or a volatility spread it's
12  been for the purpose of hedging, is that correct?
13    A   That is correct.
14    Q   What about a ratio spread, have you ever
15  traded ratio spreads?
16    A   I do.  And that is -- the reason
17  I do is it might be -- it's -- again, it's
18  hedging a stock position and then it could also
19  be from the standpoint of making sure I have units
20  that are protecting my stock, but then I also have
21  an opportunity if the stock does something crazy,
22  I've got some extra units.
23    Q   Again, the ratio spreads that you
24  implement are for the purpose of hedging and not

Page 187

1  for income generation, correct?
2     A   That's correct.
3     Q   What about calendar spreads, do you
4  implement calendar spreads?
5     A   All the time.  Again, hedging, but
6  I probably do that every week.
7     Q   And so to the extent that you implement
8  broken wing butterflies, calendar spreads, ratio
9  spreads, volatility spreads, you implement those
10  trades exclusively for hedging purposes.  Do I have
11  that right?
12    A   You do.
13    Q   And to the extent you trade those
14  options, they are options on single name securities,
15  not on futures, right?
16    A   That is correct.
17    Q   I'm going to put your expert report
18  back up on the screen.  This is Exhibit 507.  And
19  so I just want to make sure that we understand the
20  time period that this opinion applies to, and I
21  think your testimony was it only applies to the
22  time period that Donelson owned the company.
23  Do I have that correct?
24    A   That is correct.  I did peruse prior

Page 188

1  trades, but it was predominantly once Donelson
2  took an interest in the company.
3     Q   Approximately in November or December 2017,
4  does that sound right?
5     A   It does.
6     Q   Just so the record's clear, you are
7  not offering an opinion on Long Leaf's trading
8  recommendations from before November of 2017, right?
9     A   Correct.
10    Q   Do you remember earlier today
11  we also discussed a gap in the records that had
12  been produced to the CFTC?  It sounds like it was
13  inadvertent.  There was an Excel file that covered
14  November of 2017 through September of 2018 and then
15  I have a gap until January of 2019 through July of
16  2019, but you have data for that time period.
17  Do you remember that?
18    A   I do.
19    Q   What is your understanding of when Long
20  Leaf stopped operating?
21    A   I'm sorry.  I didn't hear the question.
22    Q   When is your understanding of the
23  time period when Long Leaf stopped operating?
24    A   It appeared to me that it stopped

JOHN F. BURNSIDE

Page 189

1  operating in the, I would say, second quarter of
2  2019 just because I got no -- I had no more data.
3     Q   Did you ever ask Donelson when the company
4  stopped operating?
5     A   I did not.
6     Q   And he never provided you with any
7  information about the company's trades from August
8  of 2019 through December of 2019.  Do I have that
9  right?
10    A   Yeah, I've got to say, no, I never
11 saw anything in regards to that.  At least I don't
12 think.
13    Q   So would it surprise you to learn
14 that Long Leaf continued to operate until the end
15 of 2019?
16    A   In the trading world nothing surprises me.
17    Q   What does that mean?
18    A   I've just seen so many different
19 things occur in this environment, it's amazing.
20 So the ever-popular never say never.
21    Q   So I'm going to show you CFTC
22 Exhibit 428 back up on the screen, and this
23 is our summary of Long Leaf's customer statements
24 summarizing their closed PNL for the months

Page 190

1  when Donelson owned the company.  And do you
2  see from August through December of 2019 it looks
3  like there was a cumulative loss of about $600,000?
4  Do you agree with that?
5     A   Hang on.  I'm trying to widen the screen.
6  Give me two seconds.
7     Q   Sure.  Let me do this.
8     A   Okay, yeah.  Okay, good.  Thank you.
9  Yeah, okay.  My fat fingers got to it and it didn't
10 work out so well.  Can you scroll down a little bit,
11 do you mind?  Just so I can see -- the bottom that
12 I can see is like -- thank you.  Okay.  What was the
13 question?  I'm sorry.
14    Q   From August 2019 through December
15 of 2019 do you agree that Long Leaf's -- according
16 to this exhibit which summarizes Long Leaf's
17 customers' aggregate PNL, do you agree that from
18 August of 2019 through December of 2019 the
19 customers lost in the aggregate approximately
20 $600,000?
21    A   I'll take your word for the 600, but they
22 definitely lost money.
23    Q   I'm rounding.  The entry for August
24 is 1.779 million and the entry for December of

Page 191

1  2019 is 2.376 million.
2     A   Yeah, yeah, yeah.  It's 600.
3     Q   And your testimony is that Donelson didn't
4  provide you any data, information in connection with
5  your expert report about the August through December
6  of 2019 time period, right?
7     A   I never received any that I'm aware of.
8     Q   And for the starting date of your
9  report, I just asked you a couple of questions.
10 Can you narrow it down between November and December
11 of 2017 what your best recollection is as to when
12 your report begins?
13    A   I'm going to guess the earlier,
14 not the latter only because, if I'm not mistaken,
15 he started doing some trades I think in August
16 or something but then really got full tilt into
17 October or November time frame.  So I would say
18 it was in that time frame that I was looking at
19 it and that's when I started, you know, perusing,
20 as we've discussed numerous times here, that we --
21 you know, I started looking at did he do
22 butterflies, did he do broken butterflies, dada,
23 dada, dada, da.
24    Q   Okay.  Let me just put 517 back up

Page 192

1  on the screen.  This might help us narrow it down.
2     A   Okay.
3     Q   Do you see Exhibit 517 on the screen?
4     A   I do.
5     Q   And do you see for December and
6  November of 2017 it's almost exclusively condors,
7  short condors?
8     A   Right.  It's the condors, the
9  broken wings, all that stuff.  And what else
10 is interesting, now that you bring it up, is that
11 that B column is filled in as well going into the
12 November of '17.
13    Q   So is your answer that your opinion
14 does apply to November of '17 or that it doesn't?
15    A   I would say that it does.
16    Q   Okay.  Even though it's mostly short
17 condors?
18    A   Yeah.
19    Q   Okay, that's fine.  So you remember
20 we've looked at two Excel files today.  I showed
21 you one, and it sounds like you have another, that
22 have data and information about Long Leaf's trades
23 in late 2018 and the first half of 2019.  Do you
24 remember those files?

JOHN F. BURNSIDE

Page 193

1    A   I do.  I do.
2    Q    And we identified data and information
3   concerning profit and loss and commission rates
4   on those files?
5    A   We did.
6    Q    In your review of the material
7   that Donelson provided to you, did you notice
8   that information when you were reviewing those
9   documents on your own?
10    A   I saw the columns, but I was not
11   concerned about the columns as much as I was
12   concerned about the proper structure of the trades,
13   since that was my forte of what I was trying to
14   help, for lack of a better term, educate people
15   on that these were broken butterflies, these were
16   gut trades, these were time spreads and so on and
17   so forth.  So I honestly -- even if I'd go another
18   spreadsheet, I would -- I didn't even include the --
19   I included what I -- what I only included was the
20   contract, what was happening and so on and so forth
21   like that, how many contracts were traded.  So I
22   did not look at the commissions, as I've mentioned
23   several times.
24    Q    So the record is clear, at the

Page 194

1   time you issued your report, Exhibit 507, you
2   were aware that Long Leaf Trading -- or you had
3   information and documents that reflected Long Leaf
4   Trading's commission rates and its profit and loss
5   information but you didn't include that in your
6   analysis, is that right?
7    A   That is correct.
8    Q    Did anyone tell you not to include that
9   information in your expert report?
10    A   No.  My job was to evaluate the
11   trades, not all the other fees, and no one ever
12   said that.  It's just what I do.  If I'm looking
13   at a trade, I'm looking at a trade.  I'm not looking
14   at the commissions and everything else.  I'm looking
15   at risk management.  I'm looking at prudence on, you
16   know, is there unlimited risk or is there defined
17   risk.  Is there -- is it -- is the trade that's
18   being done actually the trade that's being done,
19   and that was what I was, at least in my opinion,
20   was sanctioned to do.
21    Q    So your report, as best I can tell,
22   it says that your job is not to validate the trades
23   but to prove that the options -- but to prove that
24   the trades are viable options strategies.  Do you

Page 195

1   remember that line in the project?
2    A   You don't have to bring up the strategy --
3   or the document.  I remember that quote.
4    Q    Is it accurate to say that your opinion
5   in this case is limited only to the opinion that
6   in 2018 and 2019 Long Leaf implemented trades that
7   can be categorized as broken butterflies, calendar
8   spreads and gut strangles?
9    A   Correct.  That was what I --
10   predominantly, yes.
11    Q    What's the qualifier --
12    A   I think I saw a couple of future trades
13   in there that I -- that were one-offs and I didn't
14   even comment on those.
15    Q    And so the qualifier predominantly
16   is there may be some trades that are not in those
17   categories and you're not worried about those?
18    A   They weren't options trades so I --
19   that was not my -- that's not my forte.  I hope
20   I didn't talk over you there.  Sorry.
21    Q    To the extent there are trades
22   that aren't broken butterflies, calendar spreads
23   or gut strangles, do you have an opinion on those?
24    A   That was predominantly the option

Page 196

1   trades that I reviewed and I basically bucketed
2   them into those three categories.  If there's
3   something that I missed, which is highly probable
4   with all these trades that went on, but the majority
5   of the trades were in those three buckets.  And
6   if he went out and bought, say, a gold future, I
7   didn't -- that, you know, I don't know anything
8   about that.
9    Q    Do you agree that the wording of
10   your report is a little bit confusing when you
11   say that you're proving that Long Leaf's trades
12   are viable options strategies?
13    A   No.
14    Q    You think it's crystal clear?
15    A   I think it is because as a pure
16   trade in the options world it is a viable trade.
17   Now, you've brought up -- you've brought up several
18   times many other factors that are out there, meaning
19   the commissions or what have you.  I did not review
20   those.  That's not my job.  My job was to review
21   the options trades, not all the other things that
22   were going on.
23    Q    Well, remember this morning when
24   we discussed all the different factors that would

JOHN F. BURNSIDE

Page 197

1 make a trade profitable or not profitable?  I'm
2 having a hard time squaring that testimony with
3 your testimony that the only thing that matters
4 is the pure structure of the trade.  Can you help
5 me reconcile that?
6     A    Absolutely.  So the reason is is that
7 my job was to validate that these trades were viable
8 option trades that are done on a regular basis, and
9 even I've mentioned to you that I've done quite a
10 few of them in my trading, and the point that I'm
11 making is is that they're viable trades.  Now, that
12 was all I was sanctioned to do, look at the options
13 trades, don't -- you know, I didn't -- was not --
14 I didn't, you know, drill down on where everybody
15 got filled.  I didn't drill down on the commission
16 rates, and maybe people have different commission
17 rates.  I don't know.
18         So my whole point is that's not
19 my speculation.  My speculation is to -- my point
20 of being here today for these last almost seven
21 hours is to tell you that the trades that were made
22 were viable options trades.  Now, you've brought up
23 numerous other things that are out of my control.
24 They're not part of my jurisdiction, shall I say.

Page 198

1 It's between Long Leaf and the client or you and
2 the client or you and Long Leaf, but that doesn't
3 have any bearing on me.  I'm just here to evaluate
4 an option trade, whether it makes sense, whether
5 it's a consistent trade that is done.
6     Q    Would you be willing to amend your report
7 so it says that in those words?
8     A    I don't have -- sure, that's fine.
9 I don't have a problem.  But at the same time I
10 just want you to recognize that that is what was --
11 that is what I was sanctioned to do.
12     Q    Here's what I would propose because
13 here's what it sounds like you've testified to
14 consistently today, that your project is to opine
15 that some of Long Leaf's trades in 2018 and 2019
16 can be categorized as broken butterflies, calendar
17 spreads and gut strangles.  It seems very limited
18 to me.  Do you agree with that?
19     A    Wasn't that most of the trades?
20 I know I can't ask questions.  I believe that
21 was most of the trades, and that's why I put it
22 in those three buckets.
23     Q    But that's all you're saying, right,
24 is that the trades fall into those buckets?  You're

Page 199

1 not saying anything about whether or not the
2 trades at either the individual level or in the
3 aggregate were either well designed or designed more
4 likely than not to make money, isn't that right?
5     A    I'm not -- again, the point that
6 I was -- the reason I was brought in here was
7 to make sure that the trades that were executed
8 were legitimate, viable, consistent trades in
9 regards to what he was trying to accomplish.  Now,
10 I'm not looking behind the screen of everything
11 else that's going on because that's not my job.
12 My job is to look at the options trades themselves.
13 I'm -- I trade options.  I don't do everything
14 else.  That's why I'm here as an options expert,
15 not an attorney expert or anything else.  I'm
16 here as an options expert to say that these trades
17 are legitimate trades, and we've -- I think we've
18 established that they are.  And what's gone on,
19 whether they're time trades, time spreads, calendar
20 spreads, whatever they might be, what you want me
21 to do is go beyond that scope and opine on what
22 could be, which I don't know is a fact.
23     Q    So that's helpful and that's exactly the
24 opposite of what I'm asking you to do, Mr. Burnside.

Page 200

1 I'm not asking you to go beyond anything and opine
2 on anything.  I'm asking you is the only thing your
3 report says that Long Leaf's trades from 2018 and
4 2019 can be categorized as broken butterflies,
5 calendar spreads and gut strangles and then leave
6 it at that.
7     A    Can I use the word predominantly
8 because I'm sure there's something else in there.
9     Q    Sure.  So let's try it again because
10 like to the extent that there may be a handful
11 of trades --
12     A    There aren't -- that aren't -- that
13 don't fall into those three buckets, right?  You
14 would agree with that I think, and so --
15     Q    Hold on, hold on, because you can't
16 ask the questions.  Let's do it this way.  Among
17 Long Leaf's trades from 2018 and 2019 there are
18 broken butterflies, calendar spreads and gut
19 strangles, right?
20     A    Yes.
21     Q    I think that's all your report says
22 based on your testimony today.  Do you agree with
23 that?
24     A    I agree with that but that they are

JOHN F. BURNSIDE

Page 201

1 viable option strategy trades.
2 **Q The categories of trades are potentially**
3 **viable, right? They could make money. That's your**
4 **testimony?**
5 A Yeah.
6 **Q Not that Long Leaf's trades were likely**
7 **to make money, right?**
8 A I don't know. I never got the confirms.
9 I've said that to you many times.
10 **Q Well, you've also testified that you**
11 **didn't even undertake to analyze whether or not the**
12 **trades were likely to make money, right?**
13 A Again, why would you be in a trade if
14 it's not going to make money?
15 **Q That's not the question.**
16 A I'm saying that I have a premise that
17 people make trades to make money, and that's the
18 premise that I always go off of. And maybe that's
19 a wrong premise, but that's the premise that I would
20 say is -- why would you put on a trade if you don't
21 think you're going to make money on it?
22 **Q You didn't conduct any independent**
23 **analysis of any Long Leaf trade to determine whether**
24 **or not it was designed to achieve net profitability,**

Page 202

1 **isn't that true?**
2 A That's true to the extent that these
3 strategies are viable.
4 **Q That doesn't make any sense and it's**
5 **not responsive to the question. It's a yes-or-no**
6 **question. Did you undertake an analysis of whether**
7 **or not any specific Long Leaf trade was designed to,**
8 **more likely than not, to generate net profits for**
9 **a customer?**
10 A You're putting -- yes, I did but limited.
11 **Q Explain when you analyzed --**
12 A We just went through one -- well, I'm
13 not trying to talk over you. We just went through
14 one where you said, well, why would you do this
15 trade and I said maybe there's an announcement,
16 maybe he wants to own this, maybe he's trying to
17 get a theta trade, maybe he's got two more months
18 of selling calls against it -- or strangles against
19 it, straddles or whatever. And I'm just saying that
20 that trade makes sense if, if, those other things
21 happen. I don't know. If I sell the March's, I've
22 got all of March to sell, I've got all of April to
23 sell, and now I've got May left.
24 **Q I'm sharing Exhibit 514 with you.**

Page 203

1 **Do you --**
2 A Yes, I see --
3 **Q -- see Exhibit 514? Do you see this**
4 **document, Mr. Burnside?**
5 A I see it.
6 **Q This is the document that you just**
7 **referenced, right?**
8 A Sure, it's one of them. Go ahead.
9 **Q Where does this document reflect**
10 **the probability that this trade will result in net**
11 **profits? Point me to that data.**
12 A It does not.
13 **Q Did you undertake any independent**
14 **analysis to determine whether or not this corn**
15 **calendar trade was likely to generate net profits?**
16 A When trades are made you have to
17 sometimes have the position on and be able to --
18 and roll them to make the money that you're hoping
19 to make.
20 **Q I'm going to strike that answer as**
21 **not responsive. The question is what independent**
22 **analysis did you conduct to determine whether or not**
23 **this trade was more likely than not to make money?**
24 A This trade as an independent trade does

Page 204

1 not make money. Does not mean that there aren't
2 other trades that go along with it. That's all I'm
3 saying, and it's a viable strategy.
4 **Q What independent analysis did you**
5 **undertake to determine that this trade was more**
6 **likely than not to make money? You didn't do it,**
7 **did you?**
8 A This trade is a simple trade. It's
9 a calendar spread.
10 MR. FALVEY: He's just asking did you
11 do analysis.
12 A The analysis is that I spent $343 to
13 do a 1 lot -- I guess to answer your question, no,
14 I did not do an analysis on this trade because there
15 are many variables that can go on between March 5th
16 and the May contract expiring.
17 BY MR. PLATT:
18 **Q And isn't it true that you didn't**
19 **do any analysis on any other trade recommended**
20 **by Long Leaf available to you as to whether or not**
21 **the trade was more likely than not to make money?**
22 **Isn't that true, Mr. Burnside?**
23 A That is true.
24 MR. PLATT: Let's go off the record.

JOHN F. BURNSIDE

Page 205

1    I think we're almost done.

2       (Whereupon a recess was taken from

3       3:23 p.m., to 3:26 p.m., after which

4       the following proceedings were had:)

5    **MR. PLATT:** Let's go back on the record

6  at 3:26 Central, continuing with the deposition

7  of John Burnside in the Long Leaf matter.

8    Mr. Burnside, I have no further

9  questions at this time. I'll pass to Mr. Falvey

10  if he has any questions for you on behalf of

11  Long Leaf Trading.

12    **MR. FALVEY:** I don't have any questions,

13  Mr. Platt. Thank you.

14    **MR. PLATT:** Okay. I think we can go

15  off the record and conclude the deposition.

16  Mr. Burnside, thank you for appearing.

17    **THE WITNESS:** It's been a special day.

18    **MR. PLATT:** For you and me both.

19    (WITNESS EXCUSED)

20

21

22

23

24

---

Page 206

1  NORTHERN DISTRICT OF ILLINOIS)
    EASTERN DIVISION       )

2  STATE OF ILLINOIS        )
                   ) ss.

3  COUNTY OF COOK         )

4    I, Mary Maslowski, Certified Shorthand

5  Reporter and Notary Public in and for the County of

6  Cook, State of Illinois, do hereby certify that on

7  September 30, 2021, the deposition of the witness,

8  JOHN F. BURNSIDE, called by the Plaintiff, was taken

9  before me, reported stenographically and was

10  thereafter transcribed by me.

11    The said witness, JOHN F. BURNSIDE, was

12  first duly sworn to tell the truth, the whole truth,

13  and nothing but the truth, and was then examined

14  upon oral interrogatories.

15    I further certify that the foregoing is a

16  true, accurate and complete record of the questions

17  asked of and answers made by the said witness, at

18  the time and place hereinabove referred to.

19    The signature of the witness was waived by

20  agreement.

21    The deposition terminated at 3:27 p.m.

22    The undersigned is not interested in the

23  within case, nor of kin or counsel to any of the

24  parties.

---

Page 207

1    Witness my official signature and seal as

2  Notary Public, in and for Cook County, Illinois on

3  this 15th day of October, A.D., 2021.

4

5

6

7      **Mary Maslowski, CSR, RPR**
       Notary Public

8       79 West Monroe, Suite 1001
       Chicago, Illinois 60603

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

**$**

**$1 (1)**
73:23
**$10 (9)**
72:9,10,18;74:10;
88:20;89:5,9,10,20
**$120 (1)**
26:15
**$16 (1)**
179:11
**$160 (1)**
126:24
**$2.3 (1)**
127:23
**$20 (9)**
90:23;124:22,22;
126:23;169:1,3,3;
170:18,24
**$26 (3)**
174:14,15;175:11
**$26.82 (1)**
173:19
**$3 (2)**
72:12;74:10
**$30 (1)**
74:11
**$343 (2)**
178:22;204:12
**$35 (1)**
170:3
**$4,822 (1)**
142:9
**$40 (3)**
89:21,21;90:4
**$5,464 (1)**
174:11
**$5400 (1)**
174:15
**$5464 (1)**
175:10
**$600 (1)**
15:11
**$600,000 (2)**
190:3,20
**$680 (1)**
179:10
**$687.76 (1)**
179:3
**$7 (2)**
72:11;73:23
**$8 (1)**
179:5
**$80 (2)**
126:24,24
**$800 (2)**
179:9;180:10
**$801 (1)**
178:4

**A**

**ability (1)**
137:6
**able (9)**
10:10;29:7;77:12;
126:14,16;152:20;
160:12;175:18;203:17
**above (3)**
24:8;105:12;154:16
**absolute (2)**
62:3,5
**Absolutely (8)**
21:9;51:19;104:5,7;
132:6;164:11;166:5;
197:6
**acceptable (2)**
106:5,13
**access (2)**
177:6;180:6
**accompanying (1)**
6:23
**accomplish (3)**
63:21;83:17;199:9
**according (1)**
190:15
**account (27)**
33:18;34:1,16;35:12;
37:11,12,13;38:2;
73:17;77:8;86:19,24;
87:13;92:16;95:1,20;
111:12;119:10;121:12;
123:3;153:3,6;178:1,3;
179:9;180:11,13
**accurate (6)**
7:21;19:12;69:16;
113:23;184:23;195:4
**accurately (1)**
105:17
**achieve (9)**
59:12;63:1;64:11,22;
71:6;89:8;90:2;92:17;
201:24
**acted (1)**
39:4
**action (1)**
7:12
**activity (8)**
25:18,20;26:1;68:3;
124:1;139:16;140:16;
163:9
**actual (8)**
25:12;77:8;90:5;
118:12;119:3;122:23;
134:17;137:11
**actually (20)**
17:23;18:17;23:12;
33:23;50:21;66:10;
74:14;78:18;79:4,6;
81:18;91:14;97:11;
156:13;162:12;163:12;
164:21;165:3;175:13;
194:18
**ad (1)**
137:14

**add (2)**
99:14,18
**addition (1)**
59:9
**additional (1)**
175:4
**adjusted (1)**
167:10
**adjustment (2)**
139:24;166:8
**adjustments (1)**
167:6
**admittedly (1)**
121:22
**advantage (8)**
83:5;134:14;135:17;
136:2,16;137:2;152:3,
21
**advisable (1)**
69:16
**advise (1)**
179:8
**advisor (3)**
26:8;30:2,6;31:13;
148:12
**Affiant (1)**
98:24
**Affiant's (4)**
98:19;100:5,9;
105:12
**affidavit (1)**
105:11
**afternoon (1)**
182:19
**again (47)**
5:21;17:5;24:3;
27:15;51:2;54:15;
55:12;56:12;59:22;
71:7,15;72:21;77:7;
81:17;84:8;88:24;89:9;
90:5;91:5;92:6;94:5;
95:3;110:3;111:14;
123:6;124:19;125:17;
127:6;130:21;132:19,
21;146:4,15;147:14;
149:17;151:12;157:20;
161:4,8;169:24;171:8;
186:17,23;187:5;
199:5;200:9;201:13
**against (12)**
14:11,21;25:10;
72:15;83:6,7;175:2,5,
19;185:23;202:18,18
**agenda (1)**
33:17
**aggregate (5)**
119:9;120:22;
190:17,19;199:3
**ago (12)**
10:22;20:21;27:15;
40:1;102:12;113:10;
114:8;130:17;131:13;
148:5;153:12;155:1

**agree (49)**
6:11;16:18;17:12,20;
29:1;43:17,18;47:21;
48:13;50:15,17;51:17;
52:4;55:9;65:16;66:5;
87:16;88:6;89:19;
90:11,15,24;97:5,7;
121:8;123:5;124:4;
139:15;148:9;149:12;
150:5,6,14;151:2;
156:3;157:4;158:7;
159:12;161:17;168:1;
178:15;190:4,15,17;
196:9;198:18;200:14,
22,24
**agreed (5)**
15:6;17:18;70:15;
72:10,12
**agreement (1)**
15:3
**ahead (13)**
9:20;40:18,21;83:18;
113:10;135:16;147:14;
152:8;159:6,18;
162:23;166:22;203:8
**al (1)**
4:9
**ALFA (2)**
172:11;176:3
**allowed (1)**
112:8
**allows (1)**
83:2
**almost (5)**
52:16;102:11;192:6;
197:20;205:1
**along (7)**
63:16;86:2;114:22;
135:7;137:18;161:11;
204:2
**alternatives (1)**
45:17
**always (11)**
33:15;38:11;55:23;
65:10;66:18;73:20;
115:5,7;128:14;136:6;
201:18
**amazing (1)**
189:19
**amend (1)**
198:6
**amended (1)**
171:19
**amiss (1)**
121:6
**Among (1)**
200:16
**amount (9)**
43:23;49:5;120:21;
127:4;153:23;170:19;
172:14,17;178:1
**amounts (1)**
172:16

**Anadarko (1)**
20:18
**analysis (55)**
6:6;10:21,24;14:19;
62:23;64:10;65:17;
69:15,19,22,23;72:23;
74:4;75:16;77:15;
79:21;80:21;86:20;
87:1,13;88:2,2,21;
89:7;90:1;93:11,18;
94:6,16;100:22;
101:10;111:12;121:12;
122:22;124:12,15,18;
130:1;134:18;146:21;
150:15;151:11;161:8;
168:7;178:9;194:6;
201:23;202:6;203:14,
22;204:4,11,12,14,19
**analyze (10)**
48:15;64:5,20;65:9;
69:9;74:1;78:16;95:6;
123:1;201:11
**analyzed (5)**
95:13;122:1;125:12;
170:14;202:11
**analyzer (1)**
63:4
**analyzing (3)**
63:10;127:10;153:24
**annotation (1)**
150:17
**announcement (6)**
136:21,22,22;
185:20,22;202:15
**annual (2)**
37:22;38:14
**anomalies (2)**
134:13,16
**anomaly (1)**
136:15
**answer's (1)**
92:21
**Anything's (1)**
175:20
**apart (1)**
53:17
**Apologies (1)**
43:13
**apologize (2)**
111:1;132:6
**appearance (1)**
101:13
**appeared (1)**
188:24
**appearing (1)**
205:16
**appears (1)**
8:9
**Apple (2)**
25:14,14
**application (4)**
144:6;151:18;
155:13,14

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

**applications (1)**
61:19
**applies (2)**
187:20,21
**apply (1)**
192:14
**approximately (4)**
10:17;26:17;188:3;
190:19
**April (4)**
30:1;144:19;175:1;
202:22
**arithmetic (2)**
73:15,19
**arithmetical (1)**
61:10
**around (1)**
67:13
**Ashley (1)**
7:10
**aside (4)**
81:21;88:4;117:21;
118:21
**assess (1)**
170:22
**assessing (1)**
88:7
**assessments (1)**
113:13
**asset (18)**
24:11,15,20;25:10;
43:5,8,24;44:3;46:6,7;
47:4;50:1,4;52:16;
58:10;111:19;134:24;
136:17
**assets (4)**
26:15;36:5;113:1;
137:3
**assist (1)**
61:19
**assume (8)**
8:19;90:22;117:11,
13;123:13;126:22;
140:19;180:24
**assuming (6)**
140:8;151:12;
152:17,19;170:10;
173:24
**assumption (1)**
151:18
**assumptions (1)**
89:18
**astute (1)**
10:11
**ATM (1)**
150:23
**attempt (7)**
65:17;70:4,20;71:4,
23;82:7;125:13
**attempted (1)**
127:3
**attention (2)**
112:20;115:6

**at-the-money (5)**
49:24;152:18,19;
155:15;176:11
**attorney (11)**
4:6;7:1,9;11:18;
13:16;14:18;17:5;42:1;
108:4;110:3;199:15
**attorneys (1)**
105:4
**August (26)**
6:13;17:22;18:6,24;
34:19;75:1;80:16;
91:21;96:2;100:20;
101:8;104:4,20;
105:20,22;106:8,14,17,
18;189:7;190:2,14,18,
23;191:5,15
**Austin (1)**
34:17
**authority (1)**
31:13
**automated (3)**
64:9,19;65:17
**automatically (5)**
44:6,6;52:5,7;155:17
**available (4)**
40:22;142:12;181:1;
204:20
**aware (10)**
9:15;13:9;14:5,8;
31:1;61:18;64:14,18;
191:7;194:2
**away (2)**
4:21;181:10

**B**

**back (56)**
10:22;15:14;17:16;
20:4;22:4;25:7;29:6;
38:20;40:9;42:16;51:2;
60:10;67:20;69:6;
74:22;80:7,21;83:16,
19;84:15;91:18;96:3;
98:8;99:15,22;100:19;
106:11,19;107:6,11,17;
108:13;110:12;116:2,
13;124:7,20;125:20;
129:16,17;149:5,10;
152:20;156:9;160:8;
167:4;175:7;179:19;
180:9;182:24;183:9;
185:14;187:18;189:22;
191:24;205:5
**background (2)**
11:23;42:21
**backtest (4)**
58:7,8,10,17
**backtests (1)**
54:7
**backwards (1)**
82:22
**bad (4)**

74:3;79:1;109:22;
140:5
**balance (2)**
177:20;178:4
**ballpark (1)**
56:1
**base (2)**
81:10,16
**based (13)**
21:15,16;24:16;
50:18;63:18;69:19;
80:24;83:1;86:11;
122:16;177:16;182:13;
200:22
**BASIC (5)**
29:10,12;80:14;
101:12,14
**basically (3)**
51:13;106:2;196:1
**basics (1)**
7:16
**basis (11)**
12:12;32:13;36:22;
50:5;72:13,14;88:10;
135:8;149:18;155:8;
197:8
**Bear (1)**
141:12
**bearing (1)**
198:3
**beat (1)**
175:17
**became (1)**
12:4;22:6
**become (2)**
48:7;83:3
**becomes (1)**
44:2
**begin (4)**
70:9,23;71:1;163:4
**beginning (1)**
10:23
**begins (2)**
160:17;191:12
**behalf (2)**
31:21;205:10
**behind (4)**
91:6;128:2;147:9;
199:10
**belabor (1)**
115:11
**belief (1)**
135:9
**below (2)**
150:19;173:9
**benefit (1)**
40:16
**besides (2)**
26:22;130:22
**best (6)**
8:2;31:11;150:6;
152:9;191:11;194:21
**bet (3)**

63:11;65:24;174:14
**Beth (1)**
7:7
**bets (2)**
67:1;126:9
**better (6)**
8:15;104:13;109:3;
141:13;145:12;193:14
**betting (1)**
45:18
**beyond (5)**
9:14;55:7;137:4;
191:21;200:1
**bid (2)**
21:11;135:16
**big (8)**
37:5;89:14;93:2;
115:5;144:23;146:17;
176:20;179:14
**bigger (2)**
5:15;141:14
**bio (1)**
32:11
**bit (22)**
14:4;23:6;25:17;
50:16;56:18;82:16;
95:12;100:1;104:9;
109:2;113:6;141:13;
144:22;146:9,10;
149:6;152:4;157:3;
159:5;174:16;190:10;
196:10
**Black (1)**
49:11
**Black-Scholes (3)**
49:9,10,17
**blah (3)**
144:9,9,9
**Board (5)**
22:7;34:11;39:11;
41:15,20
**bond (1)**
53:19
**bonds (1)**
139:22
**boss (1)**
31:18
**both (11)**
23:6;46:24;47:3;
66:23;70:17;102:5;
104:13,23;141:19;
145:13;205:18
**bottom (8)**
16:5;120:9;139:11;
141:8,9;142:8;173:17;
190:11
**bought (10)**
48:6;126:11,12;
139:22,22;145:10,10;
154:10;178:24;196:6
**bound (1)**
70:17
**bounds (3)**

70:10;71:13,16
**box (3)**
150:22;174:10;
178:20
**boxes (1)**
145:1
**brain (1)**
64:5
**break (11)**
8:20;42:8;68:17;
69:8;87:4,12;111:1;
115:13;116:12;125:24;
182:19
**breakdown (1)**
169:5
**breaks (1)**
8:22
**brief (1)**
87:11
**bring (3)**
66:20;192:10;195:2
**bringing (1)**
36:5
**broke (1)**
132:15
**broken (33)**
76:12;80:4,10;82:15;
85:15;93:9;114:20;
126:11;127:4,7;
132:16;137:15;144:1;
161:6;162:13,14;
181:18,19;182:9;
184:18,19,24;185:3,7;
187:8;191:22;192:9;
193:15;195:7,22;
198:16;200:4,18
**brokens (1)**
130:6
**broker-dealer (2)**
19:22;38:15
**brokers (1)**
13:11
**brought (12)**
38:5,6,7;39:9;
117:18;118:17;122:12;
155:6;196:17,17;
197:22;199:6
**bucket (4)**
66:6;67:3;68:3;
156:23
**bucketed (1)**
196:1
**buckets (10)**
66:3,14;76:6,7,18;
95:23;196:5;198:22,
24;200:13
**buddy (1)**
153:7
**build (1)**
61:22
**built (3)**
71:1,8;101:13
**bullet (6)**

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

39:1;40:6;41:9;
131:7;137:9,12
**bullets (2)**
38:22;129:24
**bunch (5)**
23:24;48:16;54:7;
57:15;64:3
**bundle (1)**
33:13
**Burden (2)**
7:10;90:8
**Burnside (68)**
4:7,15,20;5:5,23;
6:18;7:14;8:12;9:4;
15:22;16:4,8;24:18;
29:8;32:8;37:7;38:21;
42:17,19,22;48:13;
69:8;78:3,6,14;81:21;
84:13;86:6;87:10,11;
91:10,19;94:5;96:3;
104:8,8;108:2;109:2;
116:4,6,11;122:15;
127:23;128:12;129:20;
138:2,22;141:4;
146:24;154:18;163:17;
164:17;165:1;166:24;
167:24;168:17;172:5;
173:6;177:8;180:20;
183:1,2;199:24;203:4;
204:22;205:7,8,16
**Burnside's (1)**
43:11
**business (11)**
12:14;31:3;37:11;
38:2,8;39:10;41:11,16;
125:1;133:24;134:4
**busy (1)**
27:22
**butcher (1)**
11:16
**butterflies (24)**
76:11,11,12;80:11;
105:2;123:7;130:6;
132:16;162:13;181:19;
182:9,9;184:24;185:6,
7;187:8;191:22,22;
193:15;195:7,22;
198:16;200:4,18
**butterfly (43)**
80:4;82:12,13,15,18;
85:14,15;86:1,6,9,12,
17;92:6;93:9;110:13;
114:20;122:6;124:20,
22;125:17;126:11,13,
17;127:4,7,8;128:8,9,9,
13,18;132:16;135:7;
137:15,16;147:21;
168:24;183:18,21;
184:6,18,19;185:4
**buy (20)**
23:5;24:3,4,7;34:2;
43:4;46:5,10,18,19;
72:8,10;73:6;83:7;

97:9;124:22;132:24;
135:3;154:11;159:11
**buying (15)**
24:6;33:5;45:18;
66:23;83:13;85:12;
92:8;130:6,9;137:17;
151:14;160:10;185:13,
14,18
**buys (1)**
172:16

## C

**calculate (5)**
70:4,20;71:5,23;72:5
**calendar (17)**
80:4,11;82:24;
114:21;157:1;178:17;
187:3,4,8;195:7,22;
198:16;199:19;200:5,
18;203:15;204:9
**calendars (2)**
76:17;132:20
**call (33)**
16:18,19;23:6,9;
24:9;33:8;40:16;46:4,
5;48:1,6,7;53:2;54:24;
55:1;56:22,24;72:8,8,
9;82:17;126:12;139:2,
22,23;156:23;157:2,9;
158:11;161:6;162:14;
175:22;182:11
**called (10)**
4:16;24:6;38:22;
71:19;116:7;136:20;
145:19;169:11;178:20;
184:11
**calling (1)**
145:11
**calls (13)**
24:5,7,8;45:8,24;
47:3;131:12;156:16,
17;157:13,14;175:1;
202:18
**calmed (1)**
112:3
**came (10)**
34:13,14;114:3;
133:3;134:9;151:9,19,
21;152:14;180:9
**camera (1)**
163:20
**can (122)**
5:2,9,10,12,15,20;
6:12,24;7:21;8:21;
9:21;10:13;16:7,18,19;
17:22;23:8;24:3,7;
25:1,21;33:19,24;39:3;
43:15;44:5,10,11,11,
12,18;45:8,24;47:3,7;
52:19;56:1;57:18;58:1,
21;59:11,18;61:4,6,16;
62:4;65:5,14;70:13;

71:20;72:10,11;75:3,4;
78:6;79:23;80:1,10;
82:20;85:4,8;86:11;
87:16;90:8;92:2;93:16;
97:12;101:13,24;
102:21;104:24;105:3;
108:7,7;111:1;113:11;
120:20,24;133:23;
135:23,24;136:2;
138:8;141:3,8,10,10,
11;142:8;144:7,21,21;
149:18;154:14,14;
161:21;163:20,22;
164:10;165:3,14,21;
166:1,3;168:14;
170:23;172:5;178:8;
181:6;182:24;190:10,
11,12;191:10;194:21;
195:7;197:4;198:16;
200:4,7;204:15;205:14
**capability (1)**
61:23
**capable (2)**
47:22;128:14
**capacities (1)**
117:11
**capacity (1)**
56:16
**Capital (30)**
26:3,4,6,7,20;27:4,4;
29:7;30:5;32:14,24;
33:16;34:10,20;35:3,8,
19,20;36:7,16;37:8,19,
22;38:13;61:3,4,5;
67:17;133:1;178:1
**Capital's (4)**
32:9,18;33:4,10
**captioned (1)**
4:8
**capture (3)**
146:8,9;151:15
**care (2)**
118:11;132:8
**career (1)**
67:6
**Carlo (5)**
57:11,23;58:2;64:24;
65:2
**carry (1)**
80:23
**case (27)**
4:8,9;13:14,15;
15:19;22:12;24:8;37:2;
39:19;40:13;47:24;
53:16;55:15;82:15;
93:9;125:8;127:8;
131:16,19;136:7;
137:4;138:7;152:2;
160:11;161:7;181:9;
195:5
**cases (1)**
49:1
**cash (5)**

71:20;72:10,11;75:3,4;
78:6;79:23;80:1,10;
82:20;85:4,8;86:11;
**catchall (1)**
41:24
**categories (4)**
18:2;195:17;196:2;
201:2
**categorized (2)**
195:7;198:16;200:4
**category (3)**
45:22;86:16;145:7
**cause (1)**
51:20
**CBOE (3)**
41:11,14,17
**center (1)**
82:16
**centered (1)**
20:12
**Central (5)**
4:5;87:9;116:3;
182:17;205:6
**certain (10)**
18:2;38:10;43:5,5;
46:6,6,8,8,11;149:2
**certainly (1)**
88:12;125:8
**CFTC (41)**
4:7,8;5:6,7;7:8,10;
13:9;14:5,8;15:23;
16:1;19:4,7;29:3,4,7,
15;32:5,6;39:9;97:15;
116:4;119:8;137:22;
144:12,15;150:10;
155:2,21;156:1,6;
158:1;159:1;165:11;
172:2,3;176:5;177:1;
178:13;188:12;189:21
**CFTC's (3)**
13:24;14:11,21
**chair (1)**
42:5
**chairman (1)**
39:10
**challenged (1)**
38:18
**chance (1)**
100:17
**change (2)**
72:21;101:13
**changed (1)**
108:11
**charged (10)**
15:13;87:24;88:5,20;
89:5;90:22;117:16,22;
118:4;161:19
**charging (3)**
15:10;126:22;128:1
**chart (1)**
173:18
**check (1)**
162:20
**checkmark (2)**

33:24;35:16;172:16;
174:10;178:20

150:19,20
**Chicago (4)**
22:7;39:11;41:15,19
**choice (2)**
39:8;114:17
**choices (3)**
100:14;101:24;
102:20
**chose (1)**
182:16
**chronological (1)**
160:20
**circle (2)**
40:9;124:7
**claims (2)**
14:11,21
**clarification (1)**
109:24
**clarify (2)**
14:5;70:12
**class (3)**
39:20;47:4;52:16
**classes (7)**
24:20;25:10;40:24;
58:11;111:19;134:24;
136:17
**classified (1)**
132:15
**clause (1)**
79:14
**clean (1)**
165:14
**clear (14)**
7:17;23:24;37:18;
79:12,13;91:13;92:2;
95:13;101:7;102:6;
110:8;188:6;193:24;
196:14
**clearing (1)**
55:14
**client (25)**
23:13;31:2,14;33:21;
34:3,11;77:11;81:5,9,
10,15;83:10,14;92:10,
14;93:4,23;115:6;
135:4;147:23;180:17,
17;181:24;198:1,2
**clients (34)**
12:17;14:16;30:17;
31:11,22;32:2;33:12,
16;34:20,23;35:4,5,7;
36:9;37:9,15;38:4,10,
16;77:3;83:9;87:24;
88:20;90:23;117:1;
125:3,6,10;126:16;
147:17,19;172:20,22;
182:16
**clients' (1)**
133:1
**client's (4)**
34:7;66:21;90:14;
91:1
**close (4)**

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

100:24;101:2;
173:17;180:20
**closed (3)**
141:19,22;142:7;
189:24
**closing (1)**
56:10
**collar (3)**
23:7;24:6;33:8
**collars (1)**
181:18
**colleagues (2)**
7:7,8
**collects (1)**
55:6
**column (24)**
120:1;138:13,14,18,
20;139:4,12;141:15,16,
17,18,19;142:2,6,15,
18;143:9,14;159:9;
160:16;169:14;183:14,
16;192:11
**columns (3)**
119:11;138:15;
166:3;193:10,11
**com (2)**
20:3,3
**comfortable (3)**
37:15;38:5;180:14
**coming (3)**
122:10,24;147:10
**comment (2)**
88:14;195:14
**commission (16)**
55:10;56:12;89:1,20;
90:13,23;92:19;166:7,
8;169:1,22;171:9;
193:3;194:4;197:15,16
**commissioned (1)**
171:18
**commissions (58)**
48:20,22;55:8,24;
56:15;86:19,24;87:12,
16,21,22,24;88:6,6,10,
11,13,17;89:13,24;
90:10,12;92:16;95:2,6,
20;111:12;117:17,23;
118:5;121:12;122:13;
123:3;124:17;126:23;
127:5;128:2,6;143:15,
17;145:23;161:19;
162:3;166:10;167:23;
168:6,19,21;170:14,15,
20,23;171:9;174:3,5;
193:22;194:14;196:19
**Committee (3)**
41:11,16,18
**commodities (2)**
26:24;155:10
**commodity (5)**
10:8;30:2,5;88:13;
148:16,17,22;149:4;
153:20

**common (8)**
44:23;45:12,14;49:9;
65:22;79:19;80:12;
83:24
**commonly (4)**
44:19,19;86:2;88:17
**communicate (2)**
35:4;37:3
**companies (1)**
134:6
**company (8)**
20:9;22:4;29:21;
75:19;187:22;188:2;
189:3;190:1
**company's (1)**
189:7
**compared (1)**
28:22
**comparing (1)**
73:3
**compensated (1)**
15:7
**competent (1)**
139:3
**complaint (6)**
13:14,19,24;96:15;
112:15;179:24
**complete (2)**
19:12;83:14
**completely (2)**
97:6;131:16
**components (2)**
33:3,9
**composed (3)**
56:19;57:6,9
**compound (1)**
111:2
**computer (7)**
9:19;28:14,16;57:16;
165:4,5;169:11
**computers (1)**
28:12
**concentrated (1)**
35:13
**concept (9)**
24:17;25:4;78:23;
81:23,24;83:16,19;
84:16;113:16
**concerned (2)**
193:11,12
**concerning (1)**
193:3
**conclude (3)**
106:6,24;205:15
**Conclusion (22)**
98:20;105:10,17,19,
21,24;106:1,12,19,20,
23;107:11,14,16,20;
108:9,13,19;110:18;
111:16;114:23;115:10
**condor (5)**
147:21;160:14;
162:14;184:9,10,14

**condors (6)**
80:3;185:6;192:6,7,
8,17
**conduct (12)**
39:10;41:11,16;
69:19;74:4;93:11,18;
94:6,16;124:15;
201:22;203:22
**conducting (1)**
72:23
**confident (2)**
133:12;139:17
**confirm (2)**
86:21;122:21
**confirms (9)**
79:6;81:17,22;84:9;
91:5;127:14;128:3;
161:13;201:8
**confusing (3)**
152:5;167:15;196:10
**confusion (3)**
16:20;89:18;109:15
**connection (11)**
6:9;13:20;15:13;
25:9;41:5;100:3;
153:16;154:21;180:6;
186:6;191:4
**consider (3)**
88:7;170:15;182:6
**considered (2)**
23:7;24:9
**consistent (2)**
198:5;199:8
**consistently (1)**
198:14
**contacted (1)**
131:17
**Cont'd (1)**
116:9
**content (2)**
17:18;18:23
**context (5)**
23:20;43:7;55:9;
154:3;175:13
**continue (2)**
125:5;159:21
**continued (2)**
87:10;189:14
**continuing (2)**
116:3;205:6
**contract (13)**
50:7;51:14;53:2,3,7;
55:10,17;56:4,7;
159:11;176:20;193:20;
204:16
**contracts (10)**
52:13,15,20,24;
53:11;136:3;177:16;
178:5,24;179:1;193:21
**contribute (1)**
121:17
**contributed (1)**
121:16

**control (2)**
5:16;197:23
**conversation (5)**
125:21;131:7;
132:12;133:2;149:7
**conversations (2)**
129:12;130:24
**copy (1)**
4:23
**corn (15)**
27:17;53:23;54:5,10;
58:12,15;88:15,15,15;
112:23;150:14;156:10;
178:9,11,17;203:14
**corn's (1)**
135:6
**Coronavirus (1)**
4:14
**correctly (3)**
12:8;99:6;173:10
**correlated (13)**
52:13,17,18,20;53:1,
11,19,24;54:7,8,11,13,
19
**correlation (7)**
53:3,7,14,15;54:15;
58:10,16
**correlations (1)**
53:17
**cost (6)**
145:23;168:16;
174:10;175:10;178:20;
179:2
**costs (6)**
48:20,22;147:12;
171:21;172:16;179:10
**counsel (2)**
6:20;99:1
**couple (9)**
7:22;30:15,16;68:13;
85:9;138:9;169:17;
191:9;195:12
**course (1)**
138:4
**Court (2)**
4:10;40:11
**covered (3)**
33:15;162:13;188:13
**covers (4)**
139:15;164:18;
183:13,14
**crazy (2)**
136:7;186:21
**create (10)**
6:18;32:15;36:19;
37:22;38:13;40:22;
41:7;44:12,17;97:12
**created (3)**
6:8;32:13;50:21
**creating (1)**
180:22
**crisis (1)**
112:4

**crop (4)**
52:22,22,23;53:1
**crystal (1)**
196:14
**Cumulative (4)**
120:1,4,8;190:3
**curious (1)**
117:7;166:15
**Currencies (1)**
27:1
**currency (2)**
149:2;166:8
**current (1)**
15:20
**currently (3)**
183:22;184:13;186:9
**customer (14)**
35:18;119:9;120:1,5,
8;127:17;170:18;
174:18;175:16;178:2;
179:9,17;189:23;202:9
**customers (27)**
30:10,12;35:9;36:17,
24,24;37:19;82:4;84:5,
20;88:5;89:5;99:4;
117:17,22;118:2,5;
119:24;120:14;123:10,
14;126:23;133:3,5;
137:7;161:3;190:19
**customers' (2)**
82:9;190:17
**cut (4)**
24:12;120:10;
159:19,21
**cute (1)**
128:13
**cuts (1)**
160:21
**CV (4)**
19:11;20:10;22:2;
38:20

**D**

**da (1)**
191:23
**dabbled (1)**
149:6
**dada (3)**
191:22,23,23
**daily (3)**
72:13;144:2;149:18
**data (12)**
138:17;154:15;
179:21;180:23;181:1,
16;188:16;189:2;
191:4;192:22;193:2;
203:11
**date (9)**
6:13;44:4;133:11,14;
138:20;153:1;166:7,9;
191:8
**dated (6)**

**Mary Maslowski, CSR, RPR**

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

16:10,13;30:1;133:9;
150:13;155:22
**day (4)**
10:2;45:9;62:7;
205:17
**days (12)**
146:5,8,16,18;
147:10;152:18,20;
156:16,17,18,19;
176:12
**deal (2)**
42:2;155:9
**dealing (1)**
40:15
**decade (1)**
40:4
**December (18)**
75:19,20;99:5;
162:18;163:7,13,15;
164:18,23;188:3;
189:8;190:2,14,18,24;
191:5,10;192:5
**decision (2)**
34:7;74:3
**decisions (1)**
113:1
**Declaration (35)**
16:3,8,18,19;17:1,4,
6,8;18:7,20,24;19:2;
98:10;99:9;101:15;
102:22;103:12,19;
104:16,17;106:16;
108:14;110:19;111:13;
113:7;116:13;129:20;
131:2,3,22;133:9,17,
19;137:8;180:7
**decrease (2)**
91:9;136:15
**defend (1)**
155:2
**defendant (2)**
7:11;8:9
**defense (1)**
40:21
**defer (1)**
90:6
**defined (4)**
66:8;71:17;122:5;
194:16
**definitely (6)**
35:4;48:24;49:1;
131:23;133:16;190:22
**definition (1)**
71:12
**delta (6)**
63:6,9,12,13,16;
73:11
**deltas (2)**
60:7;63:16
**demand (4)**
50:10,10;51:3;52:10
**denominate (1)**
35:23

**denomination (1)**
170:4
**department (2)**
5:18;41:19
**dependence (1)**
56:9
**depends (5)**
51:14;55:13;56:8;
62:21;174:21
**deploy (2)**
61:3;182:16
**deployed (1)**
61:9
**deposed (1)**
7:15
**deposit (2)**
35:13,15
**deposition (15)**
4:7,22;8:11;9:4,17;
10:6;11:5;40:14;42:17;
87:10;116:3;118:24;
183:1;205:6,15
**derivatives (1)**
80:14
**describe (7)**
17:22;21:10,13;23:1;
80:2;107:9;113:11
**described (3)**
74:1;94:20;169:9
**describing (2)**
53:6;73:1
**description (5)**
19:13;25:8;137:11;
159:10;166:8
**descriptor (1)**
160:18
**design (1)**
88:9
**designed (17)**
12:24;82:8;84:24;
85:6,24;86:3,7;89:8;
90:2;121:1;128:23;
129:3;161:15;199:3,3;
201:24;202:7
**designs (1)**
77:21
**desire (1)**
138:9
**Detail (1)**
143:6
**details (5)**
128:13,15,16;
165:12;183:11
**determination (4)**
70:1;86:11;112:8,17
**determine (31)**
46:13;48:14;58:3,24;
59:11,19;60:3,11,12,
18;61:5;62:11;64:6,10;
72:23;74:4;93:6,12;
94:6;95:14;121:23;
122:1;125:14;127:3,
11;145:7;182:2;

201:23;203:14,22;
204:5
**determined (1)**
50:7
**determines (1)**
60:22
**determining (2)**
59:9;61:20
**devastating (1)**
124:13
**developed (4)**
22:22;23:2;41:1;
49:12
**development (1)**
41:4
**deviating (1)**
34:5
**devices (1)**
28:10
**devil (1)**
128:12
**dictated (1)**
114:13
**dictating (1)**
171:15
**difference (3)**
46:3;93:2;107:1
**different (46)**
18:13;33:17;35:12,
14;36:3,4,5,12;39:15;
44:13;49:8,13;50:23;
51:17,18;52:12,15,15,
16;53:3,8,10;57:20;
63:14,15;71:4;76:5,7;
80:23;97:6,7,13;99:9;
102:1;106:19;108:9;
109:17;112:24;134:13,
23;141:4;155:10;
169:19;189:18;196:24;
197:16
**differential (2)**
72:9;151:16
**differentials (1)**
108:12
**differently (2)**
25:17;152:4
**difficult (3)**
35:24;36:11;58:19
**DIRECT (2)**
4:18;116:9
**direction (3)**
45:18;48:12;159:12
**directional (2)**
65:24;66:24
**directly (2)**
74:8;127:16
**disciplinary (1)**
42:2
**disclaimer (3)**
96:8,13;112:13
**Disclaimers (1)**
96:6
**disconnect (7)**

121:21;122:2,22;
123:5;124:8,11;125:11
**disconnects (1)**
121:20
**discretion (1)**
32:1
**discretionary (3)**
31:7,16,22
**discuss (2)**
42:23;159:16
**discussed (11)**
33:11;56:18;66:14;
83:4;115:9;116:14;
171:1;183:3;188:11;
191:20;196:24
**discussing (2)**
69:9;116:12
**Discussion (3)**
74:19;91:9;130:15
**discussions (2)**
39:8;134:10
**dispute (1)**
41:6
**disseminated (1)**
178:16
**dissolved (1)**
20:8
**distinction (1)**
157:15
**District (2)**
4:10,11
**dividend (2)**
25:21;49:18
**dividends (3)**
32:20,23;33:5
**docs (1)**
13:23
**document (49)**
5:9,24;12:5;15:21;
16:3,17;17:9,18;18:8,
15,21;19:4;98:12;
102:7;109:19;138:1,5,
6,11;145:22;146:1,12;
149:15;150:1;159:4,
14;160:7;163:17;
164:9,17;166:14,23;
172:7,8;173:14;174:2;
175:3,23;176:2,22;
177:4,5,6,11;183:13;
195:3;203:4,6,9
**documents (19)**
9:5,7,8;14:23;16:22;
17:3;102:5;129:18;
143:20;159:16;172:22;
179:22;180:5,21,23;
181:8,9;193:9;194:3
**dog (1)**
182:20
**dollar (4)**
72:17,18,20;90:13
**Dollars (2)**
167:16;175:18
**done (21)**

4:21;8:5;23:19;
31:21;54:9,16;57:17,
18;91:14;107:13;
115:8;136:4;147:19;
182:8;185:9;194:18,
18;197:8,9;198:5;
205:1
**Donelson (64)**
9:6;11:10,12,20,20;
12:3,10,22;13:10;
14:24;75:11,22;76:3;
99:1;102:22;112:10;
116:22;117:1,5;118:3;
119:10;120:4;126:1;
129:6;130:18,20;
131:6,8;132:11;134:8,
20;135:20;136:10;
140:3,15;142:15,18;
144:10;145:19;150:18;
151:6,9,19;152:14;
155:16,18;158:6,15;
159:13;160:1;162:12,
19;172:24;174:7;
176:1,23;177:10;
179:5;187:22;188:1;
189:3;190:1;191:3;
193:7
**Donelson's (5)**
11:22;12:22;105:14;
113:8;137:5
**door (1)**
74:17
**doughnuts (1)**
167:16
**down (35)**
6:12;7:20,21;16:4;
18:10,17;19:16;29:23;
32:10;34:1;37:14;
48:23;79:21;82:21;
84:10;88:11;96:6;
111:2;112:3;120:11;
139:11;141:11;143:2;
144:1,22;157:3;
160:15;164:22;173:17;
178:19;190:10;191:10;
192:1;197:14,15
**downside (10)**
24:4;33:15;37:6;
62:18;71:17;94:21,24;
95:16;128:20,20
**Dr (2)**
49:11,12
**drafted (10)**
17:23;18:6;102:9;
104:17;113:7,8,11;
131:2,2;142:13
**drafting (3)**
11:3;138:6;177:7
**drafts (1)**
104:24
**drawing (1)**
157:15
**drill (3)**

JOHN F. BURNSIDE
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

157:3;197:14,15
**drive (3)**
167:2,8,17
**drought (1)**
27:16
**due (3)**
4:12;48:24;185:24
**duly (2)**
4:3,17
**during (19)**
4:22;15:14;27:9,16;
39:13;76:3;96:14;99:4;
112:1,14;119:10;
130:23;131:11;132:11;
133:2;134:10;153:10;
155:4;163:9
**duties (1)**
144:2
**dwindled (1)**
37:14
**dynamics (1)**
38:7

**E**

**earlier (18)**
34:16;50:24;55:8;
58:7;60:10;62:2;65:21;
66:11;83:4;85:18;
86:14;88:16;95:24;
109:16;125:21;183:2;
188:10;191:13
**early (1)**
49:12
**earnings (2)**
185:19,22
**economy (1)**
112:22
**educate (1)**
193:14
**effect (1)**
136:23
**egregious (1)**
90:7
**eight (4)**
40:1;67:24;146:8;
153:12
**either (19)**
24:3,14;44:2;47:7;
71:14,20;76:14;83:2;
117:2;124:2;134:24;
135:9,21;136:1;
148:11;170:11;180:12;
199:2,3
**electronic (2)**
28:10;48:24
**elevated (1)**
83:3
**else (15)**
6:22;27:1;72:14;
101:18;102:9,16;
117:14;128:19;131:22;
192:9;194:14;199:11,

14,15;200:8
**else's (1)**
153:5
**employ (1)**
65:17
**employed (2)**
44:19,20
**employees (2)**
26:10,12
**employment (1)**
19:13
**encompass (1)**
181:17
**encounter (1)**
23:11
**end (4)**
10:23;72:24;185:20;
189:14
**ended (3)**
162:24;164:23;
184:24
**ends (2)**
110:8;184:20
**engage (1)**
133:7
**engaged (5)**
14:24;25:17;84:14;
99:1;133:19
**engagement (5)**
15:8;98:18,22;99:8,
10
**Engagements (6)**
38:23;39:3,22;40:7,
10;41:10
**enhancements (1)**
144:8
**enough (9)**
5:11;8:7;37:14;48:7;
104:15;107:3;144:23;
151:5;179:16
**enter (2)**
39:21;179:10
**entered (1)**
25:23
**entire (2)**
76:3;94:2
**entity (1)**
30:8
**entries (1)**
30:1
**entry (7)**
20:10;21:18;22:2;
30:1;138:20;190:23,24
**Envestnet (2)**
184:12,14
**environment (13)**
42:1;45:5;66:20;
105:15;106:9;109:10;
111:17,18;112:9,17;
113:4,21;189:19
**environments (3)**
79:20;80:12;83:24
**equal (1)**

51:11
**equals (1)**
73:13
**era (1)**
120:4
**especially (2)**
65:3;149:8
**essence (4)**
12:15;94:13;145:10;
151:24
**establish (2)**
61:23;63:20
**established (3)**
35:24;50:9;199:18
**establishing (1)**
39:19
**estimated (6)**
149:23;173:18;
174:13;175:11;179:4,
10
**et (1)**
4:9
**ETFs (1)**
33:13
**ethics (1)**
41:23
**evade (1)**
89:12
**evading (1)**
124:9
**evaluate (10)**
73:22;89:15;119:3;
121:23;133:24;134:2;
155:1;168:14;194:10;
198:3
**Evan (1)**
13:2
**Evans (2)**
13:3,5
**evasive (1)**
174:22
**even (18)**
48:7;68:9;90:24;
101:24;109:18;114:10;
122:4;123:6,6;125:24;
151:18;168:19;192:16;
193:17,18;195:14;
197:9;201:11
**event (8)**
38:11;53:5;62:18;
83:1;153:11,13;186:1,
6
**event-driven (1)**
52:4
**events (5)**
51:20;53:22;135:13,
16,20
**ever-popular (1)**
189:20
**everybody (2)**
35:6;197:14
**every-minute (1)**
72:14

**everything's (2)**
7:23;110:7
**exact (3)**
85:13;101:1;148:7
**exactly (6)**
84:13;101:20;147:9;
162:16;186:4;199:23
**EXAMINATION (2)**
4:18;116:9
**examined (2)**
4:17;116:8
**example (10)**
35:12;47:24;51:23;
52:19;53:16;85:4;
123:8;139:21;168:23;
185:16
**examples (6)**
18:3,3;48:9;130:7,8,
11
**exceed (1)**
127:4
**Excel (15)**
9:11,13,14;137:24;
138:16,22;158:22;
163:3;164:17;165:12;
167:23;182:5;183:10;
188:13;192:20
**except (2)**
67:19;102:1
**Exchange (6)**
22:7;39:11;41:15,20;
42:1,3
**exclusively (2)**
187:10;192:6
**excuse (8)**
49:14;119:14;137:9;
153:19;157:12;165:5;
181:19;184:1
**EXCUSED (1)**
205:19
**execute (1)**
31:13
**executed (10)**
12:20;17:10,19;
77:13;78:18,20;79:4;
102:9;126:15;199:7
**execution (1)**
173:10
**exercise (1)**
44:5
**exercises (1)**
47:17
**exhibit (80)**
5:6,6,7;15:23,24;
16:1,8,19;17:21;19:5,
7;29:3,4,8,16,24;32:5,
6;38:21;74:22;91:18;
96:5;98:9;99:16;101:8,
15;103:11;104:3;
106:14,15;112:13;
119:8;129:21;137:21,
22;143:2;144:12,14,
15;149:11;150:9,10;

155:21;156:1,6,9,12;
157:4,10,16,16;158:1,
4,21;159:1;162:24;
165:11;172:2,3,5,13;
175:24;176:5,9,14,17,
22;177:1,14;178:12,
13;179:20;183:10;
187:18;189:22;190:16;
192:3;194:1;202:24;
203:3
**exhibits (2)**
4:23;180:19
**exist (3)**
45:15;64:14,19
**existing (1)**
36:23
**expect (2)**
52:1;133:5
**expected (2)**
161:16;173:14
**experience (9)**
12:11;22:19;27:7,24;
45:1,2;67:8;129:6,14
**expert (22)**
6:9;39:2,4;40:9,12;
84:14,18;96:9;97:24;
116:12;138:6;139:2;
153:17;171:4;177:7;
179:19;187:17;191:5;
194:9;199:14,15,16
**Expertise (2)**
38:23;40:7;41:10
**expiration (2)**
47:17;60:8
**expire (4)**
44:1;46:24;47:3,8
**expires (3)**
46:21;47:11,16
**expiring (1)**
204:16
**explain (9)**
24:22;33:19;72:4;
92:2;134:9,15,21;
135:8;202:11
**explained (2)**
45:11;135:20
**exploit (1)**
137:6
**exposure (3)**
83:15;93:4,24
**extent (11)**
34:5;56:14;92:16;
97:10;148:3;154:20;
187:7,13;195:21;
200:10;202:2
**extra (1)**
186:22

**F**

**F3782 (1)**
178:3
**Facebook (4)**

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

184:2,3,6;185:17
**fact (10)**
61:24;86:12,16;
96:21;121:22;122:24;
124:14,16;152:17;
199:22
**factor (1)**
88:7
**factors (8)**
48:16,20;63:15;
64:17;69:13;121:15;
196:18,24
**fair (14)**
6:7;8:7;17:8;24:18;
25:7;48:14;56:22;67:1;
104:15,18;117:8;
125:16;151:5;180:4
**fairly (1)**
58:19
**fall (7)**
45:21;53:17;66:13;
124:2;156:24;198:24;
200:13
**falls (1)**
86:16
**FALVEY (25)**
5:14,19;6:24;7:4;
9:16,21;10:5,13;11:4;
42:18;43:13;91:7,12;
107:20;131:24;132:2,
6;163:21,24;164:10,
13;167:20;204:10;
205:9,12
**Falvey's (1)**
43:11
**familiar (4)**
48:23;49:20;100:13;
138:22
**fancy (1)**
100:13
**far (2)**
48:7;161:20
**faster (7)**
28:23;97:18,21;98:1,
4,5,6
**fat (1)**
190:9
**fault (1)**
14:4
**favor (1)**
144:21
**favorable (1)**
85:3
**February (1)**
103:2
**Federally (1)**
26:9
**fee (4)**
55:11,13,16;166:7
**feel (6)**
8:20;37:15;133:12;
139:6,17;180:14
**fees (3)**

55:19,22;194:11
**fell (5)**
68:3;76:5,9,18;
184:22
**felt (2)**
38:5;134:24
**few (4)**
11:14;20:4;28:13;
197:10
**field (1)**
150:24
**figure (5)**
9:23;49:13;159:17,
23;160:6
**file (39)**
137:24;138:16;
139:15,19;140:3,11,23;
141:8,9;142:8,16,19,
22;152:12;158:22;
159:7;160:2,21;161:1,
18,20,23;162:12;
163:3;164:1,2,5,17;
165:2,3,7,12;167:10;
169:10,16;178:8,17;
183:10;188:13
**files (8)**
9:11,14;131:18;
167:23;182:5;192:20,
24;193:4
**fill (1)**
66:21
**filled (3)**
79:7;192:11;197:15
**fills (2)**
127:14;161:9
**finally (4)**
40:23;76:15;83:11,
11
**financial (5)**
12:12;26:19;67:7;
129:7;153:22
**find (3)**
9:18;106:24;181:3
**finding (1)**
38:18
**fine (12)**
108:3;109:21;
115:15,17;127:24;
142:14;159:24;166:17;
192:19;198:8
**fingers (2)**
18:18;190:9
**finish (1)**
8:2
**finishes (1)**
78:8
**firm (4)**
55:14;56:1;75:23;
119:11
**first (19)**
4:16;7:22;20:10;
80:22;91:13;96:13;
100:22;101:10;107:19;

108:17;110:24;133:7;
137:9;139:7,8;159:3;
173:8;177:3;192:23
**five (6)**
8:21;10:17;11:5;
49:13;75:6;152:8
**five-minute (1)**
87:3
**flip (1)**
101:15
**floor (4)**
22:16;28:16;41:23;
147:24
**flow (1)**
34:1
**flowing (2)**
121:22;124:14
**fluctuate (1)**
51:21
**focus (2)**
63:9;66:6
**focused (1)**
24:19
**folder (1)**
104:22
**follow (1)**
33:22
**following (6)**
42:15;69:4;87:7;
115:21;182:23;205:4
**follows (2)**
4:17;116:8
**food (2)**
136:21,22
**forecast (1)**
65:15
**forgotten (2)**
19:1;131:16
**form (3)**
9:10;14:17,20
**format (1)**
106:2
**formula (1)**
49:11
**formulate (2)**
113:14,18
**formulated (1)**
113:19
**forte (4)**
87:19,19;193:13;
195:19
**forth (6)**
9:9;39:21;134:19;
162:10;193:17,20
**forthright (1)**
108:6
**found (1)**
134:12
**four (3)**
75:6;123:16;158:14
**four-legged (1)**
89:6,21;126:20
**fourth (1)**

158:6
**frame (3)**
167:16;191:17,18
**free (5)**
8:20;55:20,22;56:6;
150:23
**Freeboard (29)**
26:3,4,6,7,19;27:4,4;
32:1,1,9,14,18,24;33:4,
10;34:6,10,20;35:3,8,
19,20;36:7,15;37:8,19,
22;38:13;67:17
**Freeboard's (1)**
32:16
**frequently (1)**
153:20
**front (2)**
135:13;185:15
**fuel (1)**
57:19
**full (2)**
125:23;191:16
**functionality (1)**
29:13
**fund (8)**
22:18,19,23;30:16;
34:21;35:9;37:23,24
**funny (1)**
35:21
**further (4)**
33:19;90:22;116:8;
205:8
**future (16)**
43:16;44:11,16;
45:20;51:20;65:15;
145:13;147:8;148:21;
166:9,9;176:10;186:1,
6;195:12;196:6
**futures (40)**
21:4;26:23;27:10,12,
14,18,24;28:4,23;50:6;
52:13,15,20;53:7,10,
12,18,20,23,24;54:10,
11,13,14,19,20;57:19;
96:19,22;97:1,17;
112:16;148:24;149:2,
12,16;150:3,14;156:4;
187:15
**FX (1)**
148:24

## G

**gain (6)**
47:13;61:11;64:4;
69:13,14;73:2
**gamble (1)**
135:15
**gambled (1)**
135:12
**gamma (2)**
63:17;154:15
**gap (5)**

163:6,9,12;188:11,
15
**garbled (1)**
78:9
**gave (7)**
18:2;39:15;50:23;
79:6;130:6,8;169:5
**G-Bar (5)**
22:3,3,8;67:13;149:6
**G-Bar's (1)**
22:4
**gears (1)**
129:17
**Gecas (1)**
13:7
**general (15)**
9:24;14:2;18:3,11,
12;50:17;54:12,16,21;
55:13;112:12,24;
113:3,3;180:2
**generally (8)**
26:16;55:10;57:6,8;
69:16;112:1,11;114:14
**generate (5)**
33:24;44:17;81:15;
82:3;121:2;125:9;
147:7;184:6;186:5;
202:8;203:15
**generated (3)**
28:14;155:17;176:3
**generating (4)**
25:19,24;44:13;
184:15
**generation (1)**
187:1
**generic (1)**
65:6
**gentleman (1)**
34:17
**gets (4)**
34:20;35:8;135:16;
136:13
**given (5)**
44:24;105:15;
109:10;155:12;169:5
**gives (2)**
46:5,7
**giving (1)**
12:16
**glad (2)**
106:9;165:18
**gleaned (1)**
118:22
**goal (7)**
62:8;124:23;125:3,6,
23;162:7;184:5
**goals (6)**
80:24;81:2,4,6;82:3,
9
**God (2)**
5:18;11:6
**goes (11)**
10:11;34:1;47:4;

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

48:1;51:2;81:22;97:15;
110:12;152:20;155:7;
160:8
**gold (10)**
53:11,24;54:6,11;
58:12,14;112:22;
148:24;156:4;196:6
**good (13)**
8:1;63:11;64:6;70:2;
74:3;78:24;110:14;
158:3;166:13;168:8,9;
174:14;190:8
**grain (1)**
136:22
**grand (1)**
166:20
**grant (1)**
102:3
**granules (1)**
165:16
**graphs (1)**
154:11
**Great (1)**
7:18
**Greeks (11)**
63:15;64:3;69:12;
86:13;140:22,24;
141:1;145:1,3,4;
176:12
**green (1)**
145:1
**ground (1)**
20:8
**Group (3)**
4:9;75:11;99:4
**guarantee (3)**
59:14,16;105:3
**guess (14)**
40:16;45:16;63:3;
117:19;118:18;121:11;
124:10,11;140:4,8;
167:9;171:23;191:13;
204:13
**guessing (3)**
13:12;77:19;122:14
**gut (32)**
74:2;80:5,11;83:11,
11;93:10;105:3;
137:16;145:19;146:23;
147:2,4,16,19,22;
148:4;149:20;150:14;
152:3;154:13;156:3,
21;158:8;174:4;
181:20;183:4;193:16;
195:8,23;198:17;
200:5,18
**guts (9)**
92:8;110:13;130:9;
132:23;145:5;154:11;
156:8;158:11;182:10
**guy (4)**
13:5,7;34:14;103:7
**guys (3)**

9:24;68:19;90:6
**guy's (1)**
178:3

## H

**half (3)**
17:15;115:14;192:23
**Halliburton (1)**
20:19
**hand (1)**
67:9
**handed (1)**
4:23
**handful (1)**
200:10
**handheld (1)**
28:19
**Hang (1)**
190:5
**happen (3)**
58:1;93:17;202:21
**happened (3)**
113:14,18;136:8
**happening (5)**
63:7;111:19,24;
152:22;193:20
**happens (3)**
135:15;136:16;141:5
**hard (2)**
104:12;197:2
**head (4)**
7:24;44:22,24;70:1
**heading (7)**
38:22;75:8;76:20;
80:8;122:14,15;179:21
**headings (1)**
166:3
**hear (2)**
14:7;188:21
**heard (2)**
31:6;68:1
**hedge (16)**
22:23;23:5,23;24:10,
16;25:13,13,14;32:24;
35:17;44:10,16;62:16;
184:7;185:19,19
**hedged (1)**
23:14
**hedges (2)**
24:4,5
**hedging (25)**
22:22;23:1,20;24:2,
19;25:8,18,23;32:21;
33:6;65:23;66:24;68:3;
184:8,14,16,16;185:1,
9;186:9,12,18,24;
187:5,10
**held (2)**
19:19;153:3
**hell (1)**
20:6;138:12
**Hello (1)**

100:10
**help (9)**
35:6;38:16,17;40:19;
67:20;145:7;192:1;
193:14;197:4
**helped (2)**
101:19;103:7
**helpful (5)**
8:3;68:16;71:15;
109:23;199:23
**helping (1)**
41:6
**herein (2)**
4:16;116:7
**here's (4)**
140:19;175:23;
198:12,13
**hey (1)**
126:10
**hide (1)**
140:20
**high (6)**
37:4;48:5;68:9;
134:24;135:1;150:3
**higher (4)**
72:17;83:13;135:17;
136:1
**highlight (1)**
143:9
**highlighted (3)**
150:19;151:1,4
**highly (1)**
196:3
**hired (1)**
134:1
**historic (1)**
50:2,4
**historical (6)**
36:8,16;37:8;149:15,
21;150:4
**historically (1)**
50:5
**history (6)**
19:13;45:11;130:1,4,
13;137:10
**hit (2)**
5:13,14
**hitting (1)**
5:15
**hog (1)**
54:20
**hogs (1)**
162:8
**Hold (13)**
16:6,6;19:17;74:16,
18;138:3;141:11,11,
12;165:19;181:9;
200:15,15
**holder (3)**
44:4;47:12,16
**holding (1)**
181:8
**holistic (2)**

69:19,23
**Homeland (1)**
40:16
**honest (2)**
106:10;108:6
**honestly (15)**
17:7;19:1;30:13;
88:23;96:10;97:23;
107:21;108:3;131:10,
15;133:22;165:13;
167:1;181:9;193:17
**hope (1)**
195:19
**hopefully (1)**
125:4
**hoping (2)**
125:24;203:18
**horizons (1)**
53:8
**Hot (1)**
182:20
**hour (4)**
15:11;42:9;114:9;
115:14
**hours (4)**
10:17;11:1,5;197:21
**hundred (1)**
170:5
**hung (1)**
38:1
**hypothetical (4)**
89:4,19;90:21;
126:17
**hypothetically (1)**
25:13

## I

**Iavarone (9)**
11:17,19;103:9,11;
104:17;105:6;114:3,5,
13
**Iavarone's (1)**
115:1
**IBM (2)**
25:15,15
**ID (1)**
29:16
**idea (8)**
30:9;34:19;68:14;
112:24;113:3;123:12;
149:7;166:20
**identification (15)**
5:8;16:2;19:8;29:5;
32:7;137:23;144:16;
150:11;156:2;158:2;
159:2;172:4;176:6;
177:2;178:14
**identified (4)**
70:16;95:24;134:15;
193:2
**ignore (2)**
170:23;171:20

**Illinois (1)**
4:11
**illustrate (1)**
119:23
**imagine (1)**
133:23
**impact (16)**
49:16;52:2;87:16;
88:21;89:6;90:1,5,11,
11,18;91:1;95:2,6,20;
173:23;174:3
**impacting (1)**
95:21
**implement (1)**
88:9;184:22;186:24;
187:4,7,9
**implementation (1)**
23:10
**implemented (13)**
22:22;23:2;107:16;
147:16;183:4,17,20;
184:10,13,19;185:8;
186:10;195:6
**implied (21)**
49:20,23;50:6,12,18,
20,22;51:1,7,12,12,16,
18,20,24;52:12;83:3,8;
149:22,23;151:10
**important (3)**
16:22;88:7;168:3
**inadvertent (1)**
188:13
**inaudible (6)**
14:1;78:5;119:13;
124:5;153:15;183:24
**include (7)**
96:8;99:23;141:19;
181:22;193:18;194:5,8
**included (8)**
106:7;139:18;140:3,
15;172:12;179:5;
193:19,19
**includes (1)**
174:2
**Including (2)**
48:18;64:3
**income (6)**
25:22;32:14;81:15;
82:3;186:6;187:1
**income-generating (1)**
66:2
**incorporate (3)**
18:23;105:19;124:17
**incorporated (2)**
104:19;180:24
**incorrect (2)**
24:23;46:23
**increase (4)**
5:20;51:24;52:5;
136:15
**increased (1)**
185:24
**independent (9)**

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

25:20;26:1;53:21;
69:24;201:22;203:13,
21,24;204:4
**independently (1)**
74:2
**Indianapolis (1)**
67:20
**indicates (1)**
175:4
**individual (9)**
12:8;34:12;35:11;
56:13;112:2,4;170:2;
177:16;199:2
**inefficiencies (1)**
137:6
**inevitably (1)**
23:22
**information (53)**
12:21;35:20;36:8,15;
37:9,18;78:20;105:1;
108:5;112:7;113:20;
117:3;118:4,23,24;
119:21;127:15;129:18;
134:21;138:11;142:2,
12;149:14;154:13;
159:7;160:24;162:15,
18;163:8;165:2,11;
166:15;167:23;169:22;
172:12;173:13;176:9,
17;177:11,13;180:5,
21;181:1,16;183:14;
189:7;191:4;192:22;
193:2,8;194:3,5,9
**informed (1)**
113:1
**inherent (1)**
71:9
**input (1)**
155:17
**inputs (1)**
58:20
**inserted (1)**
25:4
**instrument (2)**
52:2;149:3
**interacted (1)**
155:11
**interest (7)**
49:19;112:5,22;
148:16,18;149:4;188:2
**interesting (1)**
192:10
**internet (8)**
96:10;105:24;106:2,
5,23;107:12,13;108:11
**interpret (1)**
80:10
**interrupt (1)**
78:7
**in-the-money (1)**
145:11
**into (37)**
18:2,24;25:5;33:12;

34:16;44:3;50:18;
57:15;63:18;66:13;
68:3;71:2;73:17;76:9,
11,18;86:24;87:1,13;
92:16;99:12;104:19;
105:20;108:8;113:21;
124:17;134:17;147:6;
152:12;156:24;181:2;
184:21;191:16;192:11;
196:2;198:24;200:13
**intrinsic (2)**
43:21,22
**introduced (3)**
11:15,19;15:5
**investment (6)**
26:8;32:14,18;33:4,
10;36:12
**investments (1)**
36:4
**invited (1)**
7:12
**invoices (2)**
15:16,18
**involved (3)**
30:21;39:19;155:10
**involving (1)**
149:4
**iron (9)**
160:14;183:18,21;
184:5,9,10,14;185:6,6
**issue (1)**
154:13
**issued (1)**
194:1
**Item (7)**
100:12;105:10;
179:24;180:1,1;
181:12;182:6
**Items (2)**
103:19;180:22

### J

**James (2)**
75:11;99:1
**January (32)**
16:13;17:17;34:14;
98:9;99:22;100:3;
101:16;102:8;103:12,
20;104:17;105:11;
106:15;108:14;111:13;
113:6;116:13;132:12;
133:9;139:8,16;140:7,
16;141:23;163:4,10,
16;164:22;169:20;
180:6;181:2;188:15
**Japanese (1)**
54:18
**jarred (1)**
181:7
**jeopardy (1)**
111:21
**Jeremy (2)**

7:11;8:9
**Jim (20)**
7:1;11:10,12,20,22;
12:3,10;14:24;75:18;
103:1,3,6;107:10,10,
17;129:6;130:21;
136:10;165:22;167:18
**Jim's (1)**
11:18
**job (21)**
8:1;66:22;75:12;
76:20;77:6;78:15;80:8;
81:12,24;85:19;91:23;
92:3;95:3;99:17;
194:10,22;196:20,20;
197:7;199:11,12
**Jody (2)**
10:13;166:11
**John (10)**
4:7,15;16:4,8;42:17;
87:10;116:4,6;183:1;
205:7
**joined (2)**
7:9;8:10
**Joseph (2)**
4:6;7:7
**JPMorgan (1)**
20:19
**July (10)**
120:10;131:17;
139:12,16;140:7,17;
141:23;155:22;181:10;
188:15
**June (3)**
52:24;131:17;181:10
**jurisdiction (1)**
197:24
**Justice (1)**
41:19

### K

**keep (5)**
8:13;16:22;89:11;
124:20;126:18
**kept (1)**
125:2
**keyboard (1)**
18:18
**kind (20)**
9:23,24;21:19;35:15,
20;38:3;53:5;66:12;
76:5;94:10;105:4;
106:9;113:20;115:12;
143:23;144:19;147:6;
159:16,22;162:14
**kinds (4)**
18:13;57:20;111:19;
185:8
**knew (1)**
112:10
**knowledge (8)**
28:21;55:18;112:12;

117:4;122:17;150:7;
180:2;182:13
**knowledgeable (3)**
56:12;108:7;129:10
**known (2)**
86:2;128:24
**knows (1)**
136:10

### L

**labeled (1)**
141:7
**lack (2)**
145:12;193:14
**language (5)**
99:15,16,23;100:23;
104:19
**large (1)**
5:11
**larger (1)**
90:24
**last (17)**
10:20;11:17;24:17;
34:10;39:23;40:4;
120:9;134:6;147:4,15;
149:3;157:22;179:14;
183:20;185:3,5;197:20
**late (2)**
34:18;192:23
**later (2)**
7:9;166:14
**lateral (1)**
62:19
**latter (1)**
191:14
**lawyer (1)**
113:8
**lawyers (1)**
12:22
**laymen's (1)**
50:16
**lead (5)**
20:11;21:9,24;22:5,
11
**Leaf (72)**
4:8;6:6,8,17;7:2;
12:4,11;13:10,11;14:6,
8,11,21;15:1,2,4,10,16,
18;19:6;75:11;76:4;
81:6;83:4;87:23;88:5,
20;89:5;90:22;99:3;
109:8,13;116:4;
117:16,22;118:4;
121:11;123:11,13,16;
126:22;127:18;128:23;
129:3;130:1,4;133:7;
137:7,10;172:10,19,21;
174:18;178:16;180:1,
16;181:13;182:12;
183:7;188:20,23;
189:14;194:2,3;195:6;
198:1,2;201:23;202:7;

204:20;205:7,11
**Leaf's (53)**
12:14,24;76:2,8;
81:14;82:1,3,8,9;
83:21;84:4,17,19,23;
85:5,23;86:20;87:13;
90:1;93:12,19;94:7,17;
95:13,19;110:9;111:4;
116:15,19;118:2,16;
119:1,5,22,24;120:14;
127:17;129:19;133:3;
140:6;163:9;171:5,20;
188:7;189:23;190:15,
16;192:22;196:11;
198:15;200:3,17;201:6
**lean (1)**
54:19
**learn (5)**
119:4;120:14;129:5;
153:8;189:13
**learned (2)**
118:15,22
**least (9)**
31:2;96:22;115:8;
123:14,19;139:5;
148:5;189:11;194:19
**leave (1)**
200:5
**left (5)**
22:5,15,16;146:8;
176:12;202:23
**leg (2)**
57:1;74:1
**legal (3)**
14:19;113:21;148:21
**legalese (3)**
103:18;113:15;
114:17
**legitimate (2)**
199:8,17
**legs (2)**
57:6;134:9;145:5
**lengthy (1)**
45:3
**less (7)**
46:19;74:10;76:14;
79:13;107:17;126:7;
133:16
**level (2)**
42:3;199:2
**liable (1)**
55:6
**liaison (1)**
41:18
**licenses (2)**
19:17,20
**life (1)**
103:1
**light (1)**
127:15
**likelihood (11)**
59:17;64:20;70:21;
71:5,18;72:23;73:17;

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

123:1;124:15;125:14;
161:1
**likely (41)**
58:3,24;59:12,19;
60:13;62:12,24;64:11;
65:18;74:5;79:1,2;
80:19;81:15;84:21,24;
85:21;86:7,15;92:24;
93:7,13,19;94:8,17;
110:21;111:8;121:24;
127:11;142:23,24;
146:3;176:18;199:4;
201:6,12;202:8;
203:15,23;204:6,21
**likes (1)**
33:24
**limit (7)**
12:16;36:18;44:12;
81:8;92:13,13;137:4
**limited (44)**
28:1;61:8;66:2,7;
70:9;82:5,14,18;86:4,
10;92:10;93:3,21,23,
24;94:11,21,21,24;
95:1,9,16,16,19,21;
110:12,23;111:20;
117:10;121:4,7,8;
122:5,8;123:8;126:13;
128:19,20;135:4;
144:5;182:15;195:5;
198:17;202:10
**limiting (7)**
44:18;61:14;99:14,
16,23;115:5,6
**line (3)**
90:9;102:2;195:1
**lines (4)**
114:22;135:7;
137:18;161:11
**liq (3)**
177:20;178:4;179:16
**liquidation (1)**
177:23
**liquidity (4)**
21:16;66:23;148:2;
153:13
**list (4)**
39:3;80:3;124:21;
129:21
**listed (1)**
45:12
**Listen (1)**
10:14
**literally (2)**
105:23;108:10
**litigation (3)**
6:10;41:6;116:5
**little (29)**
13:23;14:4;18:16;
23:6;25:16;33:19;
50:16;56:18;57:18;
79:13;82:16;95:12;
99:24;104:9;109:2;

113:6;129:17;141:13;
144:22;145:1;146:8,
10;149:6;150:17,22;
152:4;159:5;190:10;
196:10
**live (1)**
37:13
**LLC (3)**
22:3;29:19;99:4
**Long (159)**
4:8;6:6,8,17;7:2;
10:22;12:4,11,14,24;
13:10,11;14:6,8,11,21;
15:1,2,4,10,16,18;19:5;
20:20;27:15;33:22;
45:11;47:14;51:15;
54:23;59:6;75:11;76:1,
4,8;81:6,14,24;82:2,8,
9;83:4,21;84:4,17,19,
23;85:5,23;86:20;
87:13,23;88:5,20;89:5;
90:1,22;93:12,19;94:7,
16;95:13,19;99:3,12;
109:8,13;110:8;111:3;
113:10;114:7,8;116:4,
15,19;117:16,22;118:2,
4,16;119:1,4,22,24;
120:14;121:11;122:18;
123:11,13,16;125:2;
126:22;127:17,18;
128:23;129:3,19;
130:1,4;131:13;133:3,
7;137:7,10;140:6;
145:5,16;146:6,6;
155:1;156:7,16,17;
157:5,11,12,12;158:9,
10,11,15;163:9;171:5,
20;172:10,19,21;
174:18,24;178:16;
180:1,16;181:13;
182:12;183:6;185:21;
188:7,19,23;189:14,23;
190:15,16;192:22;
194:2,3;195:6;196:11;
198:1,2,15;200:3,17;
201:6,23;202:7;
204:20;205:7,11
**long-dated (1)**
158:15
**longer (1)**
42:19
**longer-dated (2)**
83:7;175:16
**long-term (1)**
21:14
**look (43)**
10:11;58:13,14;64:2;
65:6,7;68:21;69:11,12,
12;70:11,16;72:13;
73:5,11,22;74:12;88:2;
93:5,14;100:23;106:8;
116:21;126:5;128:15,
16;132:4;134:23;

140:14;144:1;154:11;
165:24;166:14;168:6;
169:10;170:9;171:8,
18;178:2;182:7;
193:22;197:12;199:12
**looked (15)**
17:14;27:7;75:17;
93:8,15;94:20;95:15,
18;107:12;122:24;
131:14;156:10;163:3;
182:5;192:20
**looking (39)**
38:16;69:23;74:14;
86:13;90:5;94:24;
111:14;113:12;117:9;
118:9;126:3;127:6;
128:4,7;138:10,15;
139:20,20;150:1;
151:24;152:8;162:6;
163:18;165:2,8;
168:21,22;171:10,11;
182:8;183:16;191:18,
21;194:12,13,13,14,15;
199:10
**looks (7)**
150:23;160:17;
170:3;176:2;178:4;
179:4;190:2
**lose (3)**
35:14;48:10;62:9;
73:2;80:19;94:3;
120:21;124:6,24;
142:23;174:15
**loser (1)**
60:2
**losing (3)**
111:22;125:2;133:4
**loss (11)**
59:4,10;61:11;64:4;
69:13,14;70:9;94:14;
190:3;193:3;194:4
**losses (8)**
37:5;119:24;121:16;
124:13;126:8,13;
128:5,6
**lost (8)**
118:16;119:5;
120:14;122:4;123:7;
127:23;190:19,22
**lot (23)**
30:20;57:24;63:24;
104:19;111:22;118:19;
124:1;154:15;166:6,7;
169:3,4,12,16,23;
170:4,5,5,6,8,9;180:11;
204:13
**lots (5)**
56:8;111:18,23;
169:12,17
**low (1)**
150:4
**lower (4)**
72:19;76:14;83:8;

135:18
**lumped (2)**
18:1,12
**lunch (3)**
115:14,19;116:11

## M

**magnitude (2)**
73:3;125:15
**main (3)**
133:24;134:4;143:6
**majority (2)**
107:14;196:4
**maker (14)**
21:9,10;22:5,6,11;
66:12,13,15,15;67:9,9,
21,23;148:5
**makers (1)**
22:5
**maker's (2)**
21:13;66:22
**makes (12)**
8:15;47:21;128:10,
21;168:10,11,15;
171:11,16,16;198:4;
202:20
**making (20)**
21:7,22;22:9;34:7;
40:20;68:2;80:17;
106:3;113:13;124:19;
125:7;128:14;133:4,6;
161:4;175:17;176:15;
180:11;186:19;197:11
**Management (9)**
22:13,17;23:3,11;
26:15;29:19;30:5;
110:15;194:15
**manager/founder (1)**
26:5
**managing (1)**
32:15
**manner (2)**
31:22;113:6
**many (27)**
27:18;35:3;36:12,20,
20;37:3;39:12,13,18;
44:13;49:8;61:24;
62:14,21;65:3,5;89:11;
123:10;130:20;169:12;
176:11;177:16;189:18;
193:21;196:18;201:9;
204:15
**March (5)**
139:22,23;150:13;
202:22;204:15
**March's (1)**
202:21
**margin (1)**
172:16
**mark (9)**
15:23;19:4;29:3;
137:20;144:12;155:21;

158:21;172:2;178:12
**marked (16)**
5:8;16:2;19:8;29:5;
32:7;119:8;137:23;
144:16;150:11;156:2;
158:2;159:2;172:4;
176:6;177:2;178:14
**market (33)**
21:9,10,13,22;22:5,5,
6,11;39:14;52:9;55:16;
57:21;66:11,13,13,15,
15,16,21,22;67:8,21,
22;122:17,18;125:19;
135:22;136:12,13;
137:1,6;148:1,4
**marketplace (5)**
21:17;36:21;58:1;
112:12;152:22
**markets (17)**
20:12;21:7;22:8,9;
54:3;96:14,16,17;
111:24;112:2,11,14,15,
16,17;129:7;180:2
**marking (4)**
5:5;32:5;175:24;
176:22
**Mary (1)**
143:11
**Maslowski (2)**
4:1;104:12
**Material (4)**
98:18;129:21;137:8;
193:6
**materially (1)**
76:2
**math (1)**
123:21
**Matter (5)**
38:23;40:7;41:10;
168:20;205:7
**matters (3)**
40:10;42:2;197:3
**max (6)**
64:4,4;69:13,13,14,
14
**maximum (10)**
59:3,4,9,10;61:11,
11;72:9,11;73:1,2
**may (22)**
7:8,15;23:5;24:15;
33:5;35:15;37:3;48:6,
8;51:20;53:3;58:12;
80:23;83:8;113:2;
131:9,13;175:1;
195:16;200:10;202:23;
204:16
**maybe (32)**
10:9,24;11:9;38:1;
42:9;45:21;67:22,23;
72:16,17;79:13;99:24;
101:21;102:1;121:1;
122:3,21;123:3;
125:11;132:4;141:10,

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

11;147:10;149:5;
164:10;181:7;197:16;
201:18;202:15,16,16,
17
**McDonald's (1)**
20:14
**mean (83)**
9:22;22:16;24:2;
31:6,9;33:20;34:16;
41:1;43:1,6,19;44:1;
45:16;46:9;48:2;49:4,
23;50:3,23;54:23;55:4;
57:3;58:8,14;61:2;
63:8,11;68:6;69:20;
76:23;77:5;78:16,23;
79:17;80:10;85:7,16;
87:20;89:10,13,13;
92:3,24;96:15;97:14;
101:19,20;102:18;
104:3;105:1;108:3;
109:6,12;110:10,11;
111:4,7,24;112:20;
113:17;114:19;120:24;
134:3;146:6;148:15;
152:7;153:16,18,19;
154:7,12;155:3;
163:14;165:13;167:3;
173:22;177:22;181:3,
19,20;182:5;189:17;
204:1
**meaning (1)**
196:18
**meanings (1)**
52:16
**means (16)**
31:10,12;45:7;54:24;
66:18;71:18;89:20;
110:19;115:10;131:23;
137:17;148:19,21;
174:1;177:20;182:1
**meant (5)**
39:17;66:1;83:22;
85:19;114:18
**meantime (3)**
59:5;126:9;181:8
**mechanical (1)**
18:16
**meet (4)**
9:16;11:12;82:9;
130:20
**meeting (4)**
103:14,15;113:8,24
**meetings (1)**
23:13
**memberships (1)**
19:23
**memorized (1)**
85:17
**memory (2)**
9:12;181:7
**mentioned (9)**
15:21;44:16;55:8;
62:1;65:23;91:4;126:4;

193:22;197:9
**met (5)**
11:10,13,15,20;
50:10
**method (2)**
60:22;72:4
**Microsoft (1)**
185:5
**middle (2)**
137:17;178:19
**middles (1)**
130:9
**midst (1)**
83:12
**might (29)**
9:24;20:7;28:13;
35:13;40:22;51:24;
58:4;62:15,15,16,17,
19;68:12;72:14;76:12;
81:5;83:1;120:21;
135:1,5;160:11;161:7,
21;164:23;167:6;
174:23;186:17;192:1;
199:20
**million (8)**
26:15,17;120:5;
127:23;128:5,7;
190:24;191:1
**mind (4)**
8:13;20:20;165:23;
190:11
**mindful (2)**
7:22;104:13
**minds (1)**
16:23
**mine (4)**
5:12;141:13;153:7;
171:2
**minus (1)**
73:13
**minutes (4)**
8:22;11:7,9;42:10
**minutia (1)**
108:8
**misleading (1)**
94:10
**miss (1)**
45:4
**missed (1)**
196:3
**missing (2)**
45:4;49:2
**mistaken (1)**
191:14
**mitigate (2)**
59:7,22
**mitigates (1)**
59:5
**mitigating (1)**
83:9
**model (7)**
12:14;26:6;38:9;
49:17;61:22;133:24;

134:4
**models (1)**
63:18
**mom (1)**
67:20
**money (123)**
12:17;30:14;31:2;
34:15;37:13;40:22;
43:20,23;44:7;46:15,
16,21,21;47:5,6,8,8,9,
11,17;48:8,10;55:6;
59:20;60:8;62:9,9,10,
13;65:19;73:8,10,10,
13;74:5,9,10,11,11,15;
79:1,2;80:19,19;81:9;
85:21,24;86:3,15;
92:13;93:1,1,3,7,13,14,
15,20,22;94:3,8,18;
95:15;105:15;109:10;
110:20,21,22;111:5,9,
22;116:16,19;117:12;
118:16,16,19;119:5;
120:15,21;121:24;
122:2,4;123:7;124:12,
16,24,24;125:2,3,9,13,
15,15;126:16;127:12;
128:14;129:1;133:4,6;
142:23,24;145:14;
151:3;172:20;175:18;
176:15,18,19;180:13;
190:22;199:4;201:3,7,
12,14,17,21;203:18,23;
204:1,6,21
**Monte (5)**
57:11,22;58:2;64:24;
65:2
**month (15)**
34:16;119:12;
123:16,19;133:10,20;
135:1,2;136:1;138:18;
159:9;166:10;185:5,
14,15
**monthly (3)**
120:5;145:16;157:5
**months (8)**
20:4;102:12;133:13,
15,21;166:18;189:24;
202:17
**more (47)**
10:24;18:16;24:19;
34:2,2;35:24;46:18;
58:24;60:6;64:17;68:7;
74:9;75:12;76:21;
84:24;85:3;86:7,15;
91:3,24;92:3;107:17;
108:10;113:3;114:9;
118:17;126:7;128:21;
131:9;133:16;134:17;
136:10;137:1;144:8;
146:15,17;153:20,22;
161:22;180:13;189:2;
199:3;202:8,17;
203:23;204:5,21

**morning (2)**
7:6;196:23
**most (11)**
12:16;32:22;49:9;
58:3;68:4;88:12;105:4;
120:18;125:8;198:19,
21
**mostly (1)**
192:16
**move (10)**
24:15;37:20;45:8;
74:15;79:14;136:24;
137:4,7;170:13;176:20
**moved (4)**
50:5;58:11,15;67:20
**movement (5)**
25:10;44:17;48:18;
55:6;137:3
**movements (2)**
44:12;45:21
**much (21)**
10:4,16;36:21;40:19;
41:23,24;48:8;56:1;
60:7;61:3,4,5;62:2;
67:8;68:2;71:10,11;
121:2;128:1;161:19;
193:11
**multi-asset (1)**
22:23
**multi-legged (13)**
56:22,24;58:18;59:2,
18,21;60:4,13,23;61:6;
64:21;65:4;66:7
**multi-legs (1)**
58:19
**multiple (5)**
56:19;58:20,21;
109:16,18
**multiple-legged (1)**
58:23
**must (1)**
150:18
**mute (1)**
90:9
**myself (3)**
147:6;159:17,23

## N

**naked (2)**
136:5,5
**name (15)**
6:14;11:17;16:14;
20:22;21:1,22;48:1;
164:5;165:3,4;166:1;
169:15;170:6;178:3;
187:14
**named (3)**
7:10;13:5,7
**name's (1)**
4:5
**narrative (7)**
130:2,5,12,14;131:1,

6;132:10
**narrow (2)**
191:10;192:1
**natural (2)**
68:18;115:12
**nature (3)**
7:24;14:11,20
**natures (1)**
56:11
**nauseam (1)**
137:14
**near-term (1)**
83:2
**necessarily (3)**
37:4;66:24;92:12
**need (6)**
48:15;77:11;107:11;
115:11;147:20;155:10
**needed (2)**
22:19;37:13
**needs (1)**
66:21
**negative (12)**
70:14;90:18,24;
120:5;142:9;173:19;
174:11,13;175:11;
178:22;179:5,11
**negligible (3)**
168:19;170:15,19
**negotiations (1)**
12:7
**net (29)**
63:1;64:11,22;71:6;
73:14;85:1,6;89:8;
90:3;123:2;146:3,13;
161:2;166:10;172:14,
17;173:18;174:13;
175:11;177:19,23;
178:4;179:4,10,16;
201:24;202:8;203:10,
15
**new (6)**
34:11,20;35:8;41:22;
52:22;53:2
**newest (2)**
34:17;139:8
**news (7)**
51:24;52:1;135:13,
16,19;185:24;186:6
**next (4)**
8:12;21:18;22:2;
171:2
**NFA (5)**
19:24;29:10,11,12,
16
**nice (2)**
97:11;110:23
**Nick (9)**
11:16,18;15:5;103:8,
11,16;105:6;113:13,17
**Nick's (1)**
11:17
**nine (6)**

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

67:17,18;68:1;72:18,
20;153:12
**nitty-gritty (1)**
88:11
**nobody (2)**
65:14;169:5
**nobody's (1)**
169:5
**nods (1)**
7:24
**nominal (1)**
56:10
**non-broken (1)**
126:11
**nondiscretionary (1)**
31:17
**none (1)**
44:21
**nonmarket (2)**
67:9;68:2
**non-traders (1)**
24:1
**nor (1)**
30:8
**normal (3)**
33:23;34:6;152:2
**Northbrook (1)**
114:2
**Northern (1)**
4:10
**notes (5)**
58:13;131:11,14,21;
132:1
**notice (1)**
193:7
**noticed (1)**
133:23
**notional (1)**
26:18
**November (16)**
52:23;53:2;160:16;
163:7;15;183:15;
185:18,21;188:3,8,14;
191:10,17;192:6,12,14
**number (4)**
38:10;82:20;91:4;
175:4
**numbers (4)**
121:5;122:9;123:9;
152:23
**numerous (2)**
191:20;197:23

**O**

**objective (2)**
116:20,21
**Obviously (6)**
91:3;134:5;146:17;
165:18;172:14;176:19
**occur (5)**
58:21;65:5;73:18;
131:1;189:19

**occurred (2)**
88:24;132:12
**Oceanic (1)**
20:20
**October (5)**
163:6,12;164:18;
185:20;191:17
**Octobers (1)**
185:18
**odd (1)**
175:18
**off (23)**
8:21,24;18:8,21;
20:8;21:12;24:13;
42:12;56:11;68:24;
74:19;77:10;82:16;
101:14;115:18;120:10;
151:13;159:21;160:21;
182:18;201:18;204:24;
205:15
**offer (4)**
21:11;37:11;82:7;
85:20
**offered (2)**
84:5,20
**offering (4)**
80:17;81:14;84:3;
188:7
**office (1)**
43:12;114:2,3,5;
136:10
**offset (2)**
135:17;145:15
**oil (1)**
54:13
**old (1)**
53:1
**oldest (2)**
139:8,12
**once (6)**
11:14;103:1;118:18;
153:8;180:8;188:1
**one (89)**
8:2;12:9;14:22;
26:10,12;28:1,16;
33:21;34:15,17;35:2,
22;39:24;40:3;55:17;
57:4,7,17;58:4;59:6,7;
65:1,5;67:9;72:8;73:6,
8,9,18;74:17,18;75:5;
77:8;85:2,4;88:15;
89:20;90:21;92:2;
100:21;101:5,7,23,23;
102:2;106:8;108:9,10,
19,20;109:14;111:4;
116:14;118:15;120:7;
123:7;130:21,23;
131:7,9;133:10;
134:24;135:1,1;136:1,
1;139:21;140:9;151:1;
153:7;156:13,13;
157:22;158:13;159:6;
162:9,9,20;163:14;

**O**

166:11;174:7;179:14;
183:22;184:22;192:21;
194:11;202:12,14;
203:8
**OneDrive (1)**
131:20
**one-offs (1)**
195:13
**ones (4)**
20:19;96:11;104:1;
136:18
**one's (1)**
150:13
**only (36)**
8:22;11:13;28:4;
30:22;38:9;40:3;60:20;
61:17;65:12;72:20;
86:12,21;90:5;93:14;
102:24;103:3,7;
105:14;109:9,14;
119:22;121:24;122:12,
16;130:21;147:23;
152:16;155:11;162:1;
184:20;187:21;191:14;
193:19;195:5;197:3;
200:2
**open (3)**
25:1;141:19;144:22
**opened (1)**
74:17
**opening (1)**
62:17
**operate (1)**
189:14
**operating (4)**
188:20,23;189:1,4
**opine (6)**
78:24;84:15;91:23;
198:14;199:21;200:1
**opined (2)**
110:17;171:5
**opining (1)**
129:19
**opinion (31)**
14:14;39:16;40:12;
81:14;82:7;84:3,7,19;
85:20,23;96:9;97:24;
98:19;100:5,9;105:12;
109:5;111:7;116:15;
146:9;168:3;171:19;
177:18;179:12;187:20;
188:7;192:13;194:19;
195:4,5,23
**opinions (1)**
80:18
**opportunity (2)**
12:17;186:21
**opposed (1)**
24:6
**opposite (1)**
199:24
**option (68)**
43:3,16,19,23;44:1,5,

5;45:17;46:13,17,20;
47:7,11,12,16,17,21;
48:1,2,7,10,15;49:6,14,
16;50:1,20;51:5,8,9;
52:6;54:23;55:4,5,19,
21;56:10;57:1,4,5;
60:7;73:6,7;88:18,21;
89:5,10,20;90:12,23;
99:2;105:13,16;
109:11;110:10,18;
111:4;114:24;126:23;
127:9;148:21;166:9;
170:19,24;195:24;
197:8;198:4;201:1
**options (170)**
6:5;10:7,8,10;12:15;
20:23;21:2,4,18,19,23;
22:7,18,20;23:16;25:9,
14,15,17,18,19;27:10,
12,14,19;28:1,4,22;
33:2;39:11,20;41:15,
20;43:7;44:9,14,19,20;
45:1,3,8,12,13,14,18,
24;49:7,9;50:13,19;
52:24;55:9,17;56:1,7,
19,20;57:7,9,22;58:8,
17,22;59:11,18;60:13,
23;61:6;63:15,18;64:2,
21;65:3,22;66:12;67:7,
11;68:2;70:13;71:20,
24;75:10,13;76:14,22;
78:2;79:9,16,17;80:9,
14,22;82:1;83:2,6,7,8,
21;84:18;86:2,22;
87:17,20;88:3;89:6,21;
91:1;92:1,4,9,20,23;
93:5,16;94:1,3;95:4;
96:19,22;97:2,9,17,24;
99:20;101:11;108:8;
109:9;110:19;111:15;
112:16;115:5;116:21;
118:13;120:17;125:24;
127:22;129:11,11;
134:1,2;135:18;
137:11;145:11;149:8,
8;155:5;170:23;
175:15,16,19,22;
177:19;180:2;182:13,
14;184:3;187:14,14;
194:23,24;195:18;
196:12,16,21;197:12,
22;199:12,13,14,16
**option's (1)**
51:2
**order (2)**
23:4;160:20
**orders (2)**
31:18;39:21
**others (1)**
85:3
**out (38)**
4:21;5:4;9:12,18,23;
35:16;37:12;46:21;

47:4,5,8;49:13;51:15;
52:23;57:16;62:1,20;
64:17;73:10;89:21;
90:14;106:20,24;
107:7;126:24;137:7;
147:10;159:17,23;
160:6;173:4,12;182:1;
185:20;190:10;196:6,
18;197:23
**outcome (11)**
57:17;58:3;62:5;
63:5;70:22,23,24;
71:19;72:12;73:12;
162:4
**outcomes (4)**
70:14;73:4,18;92:11
**outer (4)**
70:10,17;71:13,16
**outright (1)**
45:18
**over (20)**
7:16;10:20;14:3;
34:13,14;53:7;75:19;
95:11;104:9;109:1;
131:8;132:7;133:10;
135:9,21;143:7;
160:14;184:17;195:20;
202:13
**overall (2)**
112:3;113:12
**overview (1)**
6:5
**own (13)**
23:8;33:18;34:7;
54:24;67:3;97:13;
134:5;147:11;154:21;
170:14;176:10;193:9;
202:16
**owned (7)**
20:3,3;23:14;75:22;
119:11;187:22;190:1
**owner (1)**
55:1
**owning (2)**
23:9;147:8

**P**

**page (5)**
6:13;29:24;42:24;
75:9;179:21
**paid (11)**
15:16,18;41:2;48:9;
71:10;72:17,20;90:13;
126:7;161:11;171:23
**pain (1)**
139:6
**pandemic (1)**
4:14
**paper (2)**
4:23;18:17
**paragraph (7)**
80:22;100:6,7,22;

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

101:10;108:23;129:21
**paragraphs (1)**
80:4
**parameters (2)**
24:10;38:6
**paraphrased (2)**
102:19;107:15
**part (11)**
12:16;31:2;71:9;
88:2;89:14;110:24;
120:19;143:24;149:7;
168:7;197:24
**participant (3)**
8:11;66:13;122:18
**participate (1)**
7:12
**participating (1)**
112:18
**participation (1)**
112:11
**particular (14)**
34:7;48:15;51:21;
60:23;61:6;64:10,21;
87:17;92:17;111:8;
131:19;134:22;142:23;
169:23
**partner (2)**
30:8;37:11
**partner's (1)**
38:2
**pass (1)**
205:9
**passive (1)**
8:10
**past (4)**
34:22;35:10;37:10;
174:22
**Patrick (1)**
7:7
**pay (8)**
32:20,22;33:5;55:24;
56:15;73:23;115:6;
125:23
**paying (4)**
112:20;168:20,23;
170:18
**payoff (1)**
179:11
**pays (2)**
55:1;56:1
**PDF (3)**
16:9;75:5;144:18
**pen (1)**
18:17
**pending (3)**
4:9;8:23,24
**people (30)**
28:13;35:6,22;36:3,
4,5,20;37:3;38:11;
39:12,14,19;40:20;
41:1;44:8,20;45:13;
66:19;67:18;76:16;
77:4;79:7;97:9;107:13;

147:24;153:14;157:2;
193:14;197:16;201:17
**per (17)**
55:10;56:4,6;88:17,
20;89:5,10,20;90:23;
119:12;123:16,19;
126:23;161:19;170:2,
18,24
**perceived (1)**
39:17
**percent (6)**
65:15;68:7,8,10,11;
101:5
**performance (9)**
36:8,16;37:9,23;
117:3;118:3;119:1,10,
22
**performed (7)**
34:21;35:10;58:14;
116:23;117:2,6;118:2
**perhaps (2)**
102:19;147:8
**period (15)**
27:9;75:14,22;76:3;
99:4;112:1;124:14;
155:4;162:19;183:15;
187:20,22;188:16,23;
191:6
**permission (1)**
31:14
**person (5)**
4:22;55:5;155:2;
180:10,12
**personal (1)**
39:16
**personally (2)**
14:24;152:1
**person's (1)**
77:8
**pertain (1)**
75:16
**peruse (1)**
187:24
**perusing (2)**
14:23;191:19
**Petroleum (1)**
20:18
**philosophies (1)**
36:12
**phone (4)**
11:14;130:22;131:8,
12
**pick (1)**
78:10
**Picking (2)**
24:12,17
**pieces (1)**
160:12
**pit (12)**
20:12,13,15,17;21:5;
38:3;97:5,18,21;98:1,4,
7
**pits (3)**

28:5,9;97:3
**place (8)**
4:13;59:2;62:8,11;
70:11;114:1;131:8;
136:7
**placed (4)**
59:13;62:6;63:2;
150:5
**places (3)**
58:22;59:18;131:19
**placing (3)**
60:14;65:23;67:1
**plain (1)**
35:16
**planned (1)**
40:18
**PLATT (60)**
4:1,4,6,19;5:5,22;
7:3;8:8;10:3,18;19:3;
29:2;32:4;42:8,12,16;
43:10,14;68:17,21,24;
69:6;74:21;78:13;87:3,
9;90:8;91:7,17;108:1;
115:12,17;116:2,10;
131:24;132:3,9;
137:19;144:14;150:8;
155:20;157:22;158:20;
164:3,8,12,15;167:21;
172:1;175:23;176:21;
178:10;182:17,24;
204:17,24;205:5,13,14,
18
**play (5)**
50:12;146:16,16,20,
20
**please (13)**
4:2;8:23;39:5;69:7;
78:7;90:8;100:12,15;
138:3;159:21;166:4;
173:8;182:24
**plus (2)**
5:16;10:21
**pm (5)**
115:20;182:22,22;
205:3,3
**PNL (6)**
120:1,5,8;142:3;
189:24;190:17
**pocket (1)**
90:14
**point (21)**
37:15;39:1;41:3,9;
68:19;115:13;117:19;
125:1,3;131:7;137:9,
12;141:10;144:24;
151:14;171:22;197:10,
18,19;199:5;203:11
**points (1)**
154:15
**policies (1)**
41:7
**poorly (1)**
117:2

**popping (1)**
89:11
**populated (2)**
143:16;160:17
**Portfolio (6)**
22:13,17,23;23:2,11;
29:19
**portion (1)**
32:10
**position (23)**
23:5,15,22,23;25:1,5,
14,15;35:13;62:17;
63:19,20;84:11,14;
128:4;137:10;146:11;
175:2,5;184:7,8;
186:18;203:17
**positions (13)**
24:20;25:9;33:1;
44:10,16;105:16;
109:11;110:10,18;
111:4;114:24;173:9;
186:9
**positive (4)**
70:14,21;125:10;
161:16
**possible (2)**
175:20,21
**possibly (1)**
95:15
**potential (13)**
53:6;59:10,23;61:15;
66:8;69:13,14;82:14,
19;83:10;86:10;92:14;
110:13
**potentially (3)**
48:20;111:5;201:2
**practice (1)**
18:13
**practices (1)**
18:11
**predominant (1)**
138:14
**predominantly (8)**
75:18;76:6,17;188:1;
195:10,15,24;200:7
**preexisting (2)**
24:19;25:4
**premise (7)**
82:17;97:8;160:8;
201:16,18,19,19
**premises (1)**
36:14
**premium (11)**
48:9,19;49:3,4;
50:19;51:4,9,11,13,15;
55:2
**premiums (1)**
134:10
**Premium's (1)**
49:5
**prep (1)**
11:5
**preparation (1)**

11:4
**prepare (1)**
9:3
**preparing (1)**
10:5
**present (6)**
7:6,13;19:14;27:8;
42:19;99:5
**pretty (13)**
10:9,9,11;41:23,23;
45:3;79:11;100:24;
132:18,21;133:12;
139:17;154:12
**prevailing (1)**
55:16
**previous (7)**
11:18;44:10;81:11;
91:4;101:23;158:13;
181:4
**previously (1)**
116:7
**price (20)**
43:5;46:6,8,9,11;
48:11,19;49:5,8,16,18;
50:18;51:4,9,11;52:6;
55:7;136:15;137:3;
145:13
**priced (3)**
49:7;136:11;137:2
**prices (2)**
81:18;161:11
**pricing (7)**
49:13;50:13;63:15,
18;84:9;88:24;172:15
**principal (3)**
12:4;30:8;76:4
**printout (1)**
32:9
**printouts (1)**
155:12
**prior (4)**
99:12;133:16,19;
187:24
**probabilities (3)**
57:15;60:6;70:5
**probability (35)**
57:16;59:24;60:1,4,
8,18,20,23;61:20;63:5,
6,9,11;65:18;70:23,24;
71:7,19,24;72:2,5,12,
19;73:6,7,9,12;74:8,14;
125:20;126:9;143:1;
146:13;162:3;203:10
**probability's (1)**
71:1
**probable (1)**
196:3
**probably (10)**
17:17;27:22;45:15;
67:12;68:12;132:1;
136:24;147:18;152:7;
187:6
**problem (5)**

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

25:3;38:8;61:23;
110:1;198:9
**procedures (6)**
39:3,5,20;40:24;
41:5,22
**proceed (1)**
42:20
**proceeding (2)**
4:11,24
**proceedings (6)**
42:15;69:4;87:7;
115:21;182:23;205:4
**process (5)**
15:14;17:22;73:24;
99:13;106:6
**produce (1)**
164:10
**produced (3)**
176:1,23;188:12
**product (1)**
183:23
**production (1)**
132:4
**products (6)**
12:12;20:16;22:8;
26:19;27:3,5
**professional (15)**
11:23;12:12;19:17,
19;56:16;57:22;64:20;
67:6,23;68:1;129:6,14;
134:7;177:18;179:12
**profit (15)**
44:17;59:4,23;66:8;
70:9;82:14,19;83:10;
86:10;110:13;121:2;
128:5;142:4;193:3;
194:4
**profitability (14)**
59:10,12;60:5;63:1;
64:11,22;71:6;88:8;
90:12,15,19;91:1;
123:2;201:24
**profitable (27)**
14:15;22:22;40:23;
46:14;47:22;48:2,15;
59:1;60:14,19;61:21;
70:5,6;71:21,21;72:1,6,
24;84:5,12;86:8;87:18;
88:22;92:11;161:10;
197:1,1
**profits (16)**
25:19,24;44:13;
47:18;60:24;84:21;
85:1,6;89:8;90:3;
146:3,14;161:2;202:8;
203:11,15
**project (11)**
38:4;75:8,9;76:20;
79:15;80:8;83:20,23;
84:17;195:1;198:14
**promise (1)**
157:23
**proper (6)**

48:11;70:11;94:1;
125:7,7;193:12
**properly (2)**
126:15;136:11
**propose (1)**
198:12
**proprietary (1)**
148:12
**prospective (6)**
23:13;35:18;36:9,17,
24;37:9
**protect (6)**
24:11;25:10;33:15;
132:24;137:3;185:23
**protected (1)**
37:6
**protecting (4)**
24:19;62:18;175:15;
186:20
**protection (2)**
25:11;76:13
**protocol (1)**
33:23
**prove (17)**
75:13;76:21;78:1;
79:10,15,17;80:9;
81:13,24;83:21,23;
84:17;91:24;92:4;
99:20;194:23,23
**provide (14)**
35:20;36:2,7,16,18;
37:8,17;66:22;67:5;
85:4;117:2;134:21;
148:2;191:4
**provided (10)**
12:21;118:24;131:6;
144:10;155:16;158:7;
162:19;172:22;189:6;
193:7
**provides (1)**
37:19
**providing (3)**
20:12;21:16;40:11
**proving (1)**
196:11
**prudence (1)**
194:15
**prudent (2)**
110:15;111:20
**public (2)**
21:11;67:5
**pull (4)**
141:11;174:19,23;
178:10
**purchase (5)**
32:20,22;35:16;57:4;
145:15
**purchased (5)**
12:3,6,11;73:8;75:18
**purchaser (1)**
48:6
**pure (4)**
88:3;118:9;196:15;

197:4
**purest (1)**
72:15
**purpose (8)**
25:19,24;99:16;
184:14;185:1,9;
186:12,24
**purposely (1)**
104:22
**purposes (2)**
89:19;187:10
**put (51)**
18:4,17;23:6;25:16;
46:3,7;47:20;54:24;
55:1;59:21;61:13;64:1;
66:2;69:10;70:6;74:22;
82:16;86:1;91:18;96:2;
100:1;113:15,20;
114:16,16;117:14;
123:16;125:17,18,21;
128:17,18;134:18;
139:23,24;140:1;
147:6,21;148:7;
150:18;151:20;152:1;
157:9;160:12;175:7;
176:4;180:13;187:17;
191:24;198:21;201:20
**puts (14)**
23:9;24:4,7;33:15,
24;45:8,24;47:3;
156:18,18;157:12,13,
13;175:2
**putting (4)**
70:18;168:16;183:9;
202:10
**puzzle (1)**
160:12

**Q**

**qualifier (2)**
195:11,15
**quality (1)**
20:12
**quantity (1)**
138:13
**quarter (1)**
189:1
**quarterly (2)**
37:23;38:13
**quick (4)**
15:22;29:7;175:8;
179:20
**quickly (3)**
16:10;82:21;143:3
**Quiddity (9)**
39:6,7,24;40:13;
153:11,14,19;155:4,5
**QuikStrike (28)**
130:1;143:19,22;
144:2,4;149:10;150:7,
12;151:13;152:6;
153:1,3,6,18,20,24;

154:4,18,20,24;155:4,
6,12,12,22;156:10;
158:6;176:2
**QuikStrikes (4)**
9:11;144:10;155:16;
158:14
**quite (2)**
174:16;197:9
**quote (3)**
106:4;113:15;195:3

**R**

**ran (1)**
37:12
**rarely (1)**
154:19
**rate (2)**
15:12;49:19
**rates (9)**
55:17;112:6,22;
117:20,21;193:3;
194:4;197:16,17
**ratio (4)**
186:14,15,23;187:8
**reach (1)**
69:15
**reacquainted (1)**
180:8
**read (11)**
5:11;14:22;24:1;
99:5;101:11;105:16;
152:21;165:21;166:1,
3;173:10
**readjust (1)**
24:16
**real (7)**
15:22;29:7;50:9;
82:21;149:7;175:7;
179:20
**realize (1)**
47:12
**really (8)**
5:12;8:1;21:15;
48:23;50:8,11;159:15;
191:16
**reason (11)**
115:3;119:2;120:20;
140:13;159:17;165:19;
175:14;185:18;186:16;
197:6;199:6
**reasoning (1)**
185:22
**reasons (7)**
44:8,13,20;45:13;
65:22;105:11;135:19
**recall (13)**
12:8;17:7;28:11;
60:16;85:12;98:12;
100:1,4;103:13;
133:22;140:18;162:22,
24
**receive (3)**

119:21;127:13;
166:23
**received (5)**
17:9;79:8,9;140:12;
191:7
**recently (1)**
131:14
**recess (5)**
42:13;69:2;87:5;
115:19;182:21;205:2
**recognize (11)**
5:23;6:2;16:14;19:9;
138:1;159:4;172:7,8;
176:7;177:4;198:10
**recognizes (1)**
52:9
**recollection (4)**
30:4;101:22;116:24;
191:11
**recommend (9)**
30:10,12;105:16;
109:11;110:9,17;
111:3;114:24;115:4
**recommendation (7)**
172:11;174:19;
177:17;178:5,11,16;
180:11
**recommendations (20)**
76:2,8;77:9;79:9;
84:4,20,24;85:5;87:14;
90:2;93:6,13;94:7,17;
95:14;96:17;127:19;
172:19;173:3;188:8
**recommended (14)**
78:21;99:3;105:13;
109:13;110:20;180:1,
16;181:13,21,24;
182:12,15;204:19
**recommending (4)**
81:4;109:9;120:18;
173:9
**reconcile (1)**
197:5
**reconvened (1)**
99:12
**record (26)**
4:4;7:10,21;8:8,21;
9:1;10:14;35:19;37:18;
42:12,17,18;43:10;
68:24;69:6;74:19;92:2;
95:13;115:18;116:2;
182:18;183:1;193:24;
204:24;205:5,15
**records (1)**
188:11
**record's (4)**
7:17;23:24;101:7;
188:6
**reduce (1)**
62:20
**reduces (1)**
90:14
**reducing (1)**

JOHN F. BURNSIDE
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

147:12
**refer (1)**
    76:16
**reference (2)**
    108:16;111:16
**referenced (2)**
    109:18;173:9;203:7
**references (1)**
    43:16
**referred (1)**
    34:13
**referring (14)**
    51:14;62:22;81:2;
    100:7;101:8;103:9;
    106:13,15;118:11;
    130:12;136:18;153:13;
    169:4;180:10
**refers (2)**
    169:12;182:3
**reflect (8)**
    7:11;8:9;42:18;
    43:10;119:24;146:2;
    161:15;203:9
**reflected (4)**
    52:5;146:14;177:13;
    194:3
**reflecting (1)**
    161:18
**reflects (2)**
    145:23;149:15
**reformatted (1)**
    107:12
**refresh (1)**
    30:4
**reg (1)**
    39:14
**regard (4)**
    18:4;79:8;146:10;
    150:4
**regards (7)**
    10:1;23:8;40:23;
    130:10;137:15;189:11;
    199:9
**registered (3)**
    26:7,9;30:2
**registrations (2)**
    19:17,20
**regular (5)**
    22:6;36:22;88:10;
    155:8;197:8
**regularly (4)**
    35:5;79:19;80:12;
    83:24
**regulations (1)**
    41:22
**reinvented (1)**
    107:4
**related (2)**
    4:13;131:18
**relation (1)**
    43:24
**relationship (2)**
    58:11;135:24

**relatively (2)**
    150:3,3
**release (1)**
    51:23
**relied (4)**
    129:18;162:11;
    180:4,21
**rely (4)**
    28:10;64:16;138:6;
    160:7
**remain (1)**
    173:24
**remember (23)**
    53:17;60:15;66:4;
    84:1;85:11,13;87:14;
    102:10;113:24;114:7,
    11;116:16;131:10;
    132:11;143:19;183:11;
    188:10,17;192:19,24;
    195:1,3;196:23
**remind (1)**
    78:4
**renamed (2)**
    164:6;167:13
**rendered (1)**
    15:19
**rendering (1)**
    168:3
**report (57)**
    6:8,18;11:3;13:13;
    15:13;16:20;17:2,5,21;
    18:7,24;38:19;42:22;
    68:22;75:1;80:16;82:6;
    84:4;91:21;96:3;99:10,
    15;100:3,20;101:9;
    102:8;104:6,20;
    105:20,22;106:14,17,
    18;114:13;116:12;
    118:6,14;119:15,18;
    138:7;147:10;171:4;
    177:7;179:20;180:22;
    181:2;187:17;191:5,9,
    12;194:1,9,21;196:10;
    198:6;200:3,21
**REPORTER (3)**
    78:3,6,12
**reports (4)**
    37:23;38:14;181:4,5
**repositioning (1)**
    62:16
**represent (8)**
    32:8;119:8;137:12;
    138:17;142:8;148:20;
    161:24;164:8
**represented (1)**
    6:20
**representing (1)**
    44:3
**request (1)**
    132:3
**research (2)**
    54:16;57:18
**response (3)**

50:24;54:21;60:10
**responsibility (2)**
    89:15;102:14
**responsible (5)**
    41:17,21;102:4;
    104:23;180:12
**responsive (3)**
    132:1;202:5;203:21
**restrictions (1)**
    4:12
**resubmitted (1)**
    181:5
**result (10)**
    47:18;60:24;84:21;
    85:1,6;123:2;146:3,13;
    161:2;203:10
**results (1)**
    122:23
**resumé (1)**
    19:10
**retail (1)**
    179:9
**retained (1)**
    6:17
**retention (1)**
    153:17
**return (2)**
    113:5;173:14
**returned (1)**
    43:11
**returning (1)**
    126:18
**returns (6)**
    32:15;36:19;37:4;
    38:17;125:10;161:16
**revenue (1)**
    184:6
**review (13)**
    9:7;13:19;18:9;
    75:10;99:2;100:12,15,
    17;113:22;154:5;
    193:6;196:19,20
**reviewed (18)**
    9:5;13:13,15,18,24;
    17:9,24;98:19;129:22;
    137:8,13;179:22;
    180:23;181:13,21;
    182:11,13;196:1
**reviewing (7)**
    12:19;118:12;
    143:19;161:5;180:15;
    182:11;193:8
**reward (1)**
    61:1
**rho (1)**
    63:17
**ridiculous (2)**
    168:21;169:1
**right (180)**
    4:21;5:19;6:18;7:4;
    12:22;18:19;20:14;
    22:24;25:6;26:8,12,16;
    27:10;28:2,5,6,7,12,17,

18;30:24;31:3;34:8;
    39:8;41:6;42:6;43:4;
    44:5,24;45:8,15,23;
    46:5,7,10,11;47:9;
    48:21;50:21;52:2,10;
    55:2;56:5,16,20;57:8,
    9;60:21;62:6;64:7,15;
    65:8,12;69:7;3,4;
    68:2;69:18;70:14,18;
    71:20,21;73:4;74:16;
    77:22,24;81:16,23;
    82:4;86:5;88:17;92:18;
    94:4,22;95:2,9,16,21,
    24;96:19,23,24;97:3,6,
    19,22;98:8,15;99:10;
    100:3,10,14;101:1;
    102:17;105:7;106:21;
    108:5;110:16,21;
    111:5,6;114:13;118:7;
    120:1;121:9,13;
    123:20,23;124:3,11;
    125:2;126:20,24;
    127:5,24;131:5;134:6;
    139:4,23;142:4;143:6;
    144:6,11;145:17,18;
    146:23;148:5,8,9,13;
    149:22;151:13,21;
    152:6;154:22;157:8;
    158:15,18;159:8;
    161:19;162:11,21;
    163:4,5;164:20;
    165:22,24;166:20;
    167:16,24;168:4,22;
    169:15,16;170:16;
    171:21;173:23;174:8;
    175:20;177:7;180:3;
    182:2;186:3,7;187:11,
    15;188:4,8;189:9;
    191:6;192:8;194:6;
    198:23;199:4;200:13,
    19;201:3,7,12;203:7
**rise (1)**
    124:2
**risk (51)**
    12:16;24:9;26:5;
    32:15;36:19,21;38:6;
    44:12,18;59:7,22;61:1,
    14;62:20;66:2,7;71:12;
    81:8;82:5,14,19;83:9;
    86:4,10;92:10,13,13;
    93:21,23;94:11,12;
    110:13,15,23;111:20;
    115:6,7;117:11;121:4,
    8;122:5,7;123:8;125:7;
    135:4;174:14;182:15;
    185:24;194:15,16,17
**risk/reward (1)**
    65:7
**risk-averse (2)**
    120:19,20
**risked (1)**
    72:18
**risking (1)**

61:17
**risks (4)**
    34:2;36:4;80:24;
    94:3
**role (6)**
    21:10,14;50:12,14;
    148:4,11
**roll (2)**
    23:22;203:18
**room (1)**
    6:22
**root (1)**
    101:11
**roughly (2)**
    146:7;163:10
**rounding (1)**
    190:23
**row (4)**
    119:12;120:9;
    143:17;178:2
**rows (3)**
    119:12;138:17;
    141:24
**rule (1)**
    8:12
**Rules (1)**
    41:22
**run (3)**
    62:23;63:4;134:6
**running (1)**
    20:6
**Ruth (2)**
    7:11;8:10

**S**

**Saliba (19)**
    22:13,14,15,15,17,
    21;23:2,11,16,19;29:7,
    19;30:5,10,14,18;31:1,
    2;67:14
**Saliba's (2)**
    31:16,21
**same (43)**
    15:12;21:21,21;24:9,
    10;25:2,12;32:21;
    36:11,13,13,19;42:24;
    53:7,14,16;54:21;
    59:23;76:3;82:19;84:8;
    89:14;92:11;97:8;
    101:1,2,21;104:1;
    122:7;123:22;124:5;
    125:4;128:8;136:3;
    137:1;153:23;156:12;
    157:17;165:11;173:24;
    181:7;183:6;198:9
**sample (1)**
    173:11
**sampling (1)**
    37:12
**sanctioned (3)**
    194:20;197:12;
    198:11

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

**sat (1)**
18:17
**saw (20)**
76:24;77:3,7,9,9,20,
21;78:19;81:17,21;
84:9;86:21;108:11;
121:19;130:10,11,21;
189:11;193:10;195:12
**saying (16)**
7:20;45:9;47:14;
102:13;107:15;118:6;
128:8;154:8;161:5;
171:15;182:3;198:23;
199:1;201:16;202:19;
204:3
**scaleable (2)**
38:9,11
**scenario (1)**
89:24
**scenes (3)**
91:6;128:3;147:9
**schedule (1)**
171:10
**Scholes (1)**
49:12
**Scope (5)**
98:18,22;99:8,9;
199:21
**Scott (1)**
13:7
**screen (19)**
5:1,9;74:23;96:3;
97:6,12,17,18,21;98:1,
6;144:23;183:9;
187:18;189:22;190:5;
192:1,3;199:10
**screens (2)**
28:7;97:2
**screenshots (1)**
144:11
**screw (1)**
106:3
**scroll (12)**
16:4,9;19:16;32:10;
82:21;96:5;98:17;
120:11;139:11;143:7;
160:15;190:10
**scrolled (1)**
29:23
**scrolling (3)**
6:12;79:21;82:23
**seat (2)**
20:3,4
**SEC (2)**
41:19;74:18
**second (11)**
6:13;29:23;39:1;
74:17;76:19;79:14;
80:7;101:9;137:9;
179:21;189:1
**seconds (2)**
10:14;190:6
**section (8)**

79:23;80:21;96:6;
98:18,19,19,20,22
**securities (8)**
20:22;21:1,22;23:16;
27:5;45:1,12;187:14
**security (5)**
25:12;40:17;43:4,15;
48:1
**seeing (1)**
168:10
**seeking (1)**
31:14
**seem (2)**
121:18;174:14
**seems (2)**
169:2;198:17
**segment (1)**
149:20
**segregate (1)**
18:14
**selected (1)**
134:22
**sell (24)**
23:6;24:5,8;33:24;
43:4;46:7,10,18;57:5;
72:7,8;73:7;97:9;
132:22;135:3;139:24;
154:11;159:11;172:17;
175:1,19;202:21,22,23
**selling (15)**
66:23;76:13;80:3;
83:12;92:8;130:9;
136:5,6;137:17;
151:14;160:10;175:14;
185:15,17;202:18
**send (4)**
165:14,22;173:3,12
**sense (35)**
8:16;47:21;105:15;
109:10;110:9,11,17;
111:3;114:24;118:6,8;
127:19;128:10,21;
129:19;136:9,12;
168:4,10,11,12,15,17;
171:6,8,11,16,16,20;
175:12;179:8,11;
198:4;202:4,20
**sent (14)**
9:6,9;12:5;19:5;
106:4,12,19;107:6,10,
11,17,19;144:11;
181:24
**sentence (7)**
76:20;80:7;96:13;
101:9;108:18;110:8;
173:8
**Sep (2)**
162:21,21
**separate (2)**
16:23;57:1
**September (14)**
4:5;34:18;52:24;
160:21;162:17;163:1,

10,16;164:21,22;
167:10;169:20;183:15;
188:14
**Series (2)**
19:22;29:24
**served (1)**
41:11
**service (1)**
67:5
**services (2)**
15:19;67:7
**set (4)**
35:22;41:7;65:6;
72:3
**Setting (4)**
81:21;88:4;117:21;
118:21
**settled (1)**
181:10
**seven (1)**
197:20
**several (8)**
63:14;117:18;
122:13;126:5;130:22;
137:13;193:23;196:17
**shakes (1)**
7:24
**shall (4)**
38:3,18;184:22;
197:24
**share (2)**
5:1;165:18
**sharing (1)**
202:24
**Sheet (2)**
166:6,6
**sheets (2)**
28:14;56:11
**shift (1)**
129:17
**shock (1)**
122:10
**shocked (2)**
122:9;123:9
**short (19)**
47:15;55:4;59:6;
83:5,15;145:5,17;
146:7;156:8,17,18;
157:7,13;158:9,12,17;
160:17;192:7,16
**short-dated (1)**
158:17
**shorter-dated (1)**
175:15
**short-term (1)**
21:14
**show (15)**
15:22;16:10;19:3;
29:2;32:4;106:9;119:7;
137:19;150:8;155:20;
156:6;158:20;172:1;
176:21;189:21
**showed (1)**

192:20
**showing (3)**
15:23;119:23;121:19
**shown (1)**
127:16
**side (7)**
66:19;71:14;76:14;
104:2,3;125:6;175:19
**sides (2)**
66:24;70:17
**signature (3)**
6:14,15;16:15
**signed (7)**
16:11;17:16;102:5,
15,16,23;104:18
**significant (2)**
50:14;120:21
**silver (2)**
53:11;112:22
**similar (4)**
23:9;100:23;168:8;
179:13
**similarities (1)**
97:10
**simple (7)**
73:15;120:18;
123:21;132:19,19;
154:12;204:8
**simplest (1)**
33:7
**simply (1)**
45:10
**simulation (2)**
57:11;64:24
**simulations (2)**
57:23;58:2
**simulator (1)**
143:24
**single (6)**
20:22;21:1,22;22:10;
47:24;187:14
**singular (1)**
109:15
**sit (1)**
102:4
**sitting (4)**
85:10,16;136:10;
171:14
**situation (5)**
62:15,19,22;67:14;
146:11
**situations (3)**
39:18;92:12;112:5
**skewed (1)**
82:15
**slash (1)**
39:14
**slightly (2)**
50:23;71:3
**slower (2)**
28:23,24
**smart (1)**
107:3

**smarter (1)**
100:1
**software (1)**
61:18
**sold (9)**
46:19;55:5;71:11;
73:9;139:23,23;
145:14;154:10;175:5
**Somebody (1)**
77:19
**somebody's (1)**
171:22
**someone (13)**
6:22;22:19;33:17;
35:12,15;41:7;101:18;
102:9,16;106:12,19;
107:5;153:5
**sometime (1)**
12:7
**Sometimes (7)**
23:21;38:18;53:17;
55:23;136:13;147:7;
203:17
**Somewhere (3)**
56:2;67:13;77:19
**sophisticated (1)**
67:1
**Sorry (35)**
14:3,7;15:17;20:24;
24:12,13;26:11;34:23;
40:8;51:6;74:20;78:11;
87:20;89:2,16;97:20;
100:10,15;108:21;
114:4;120:7,11;133:8;
139:14;140:5,24;
141:13;142:17;143:2;
162:23;164:14;166:22;
188:21;190:13;195:20
**sort (12)**
66:2,3,12;68:18;
69:14;70:17;73:3;74:2;
124:7;139:4;148:11;
162:13
**sorted (1)**
139:7
**sound (2)**
74:13;188:4
**sounds (16)**
11:4;12:9;37:17;
64:1;68:5;72:22;73:1;
89:17;104:16;134:20;
151:17;164:16;167:22;
188:12;192:21;198:13
**source (2)**
123:4;152:11
**sources (1)**
118:23
**soybean (1)**
53:18
**soybeans (1)**
27:17
**speak (2)**
34:12;50:16

JOHN F. BURNSIDE
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

**special (1)**
205:17

**specialist (1)**
92:19

**specific (6)**
18:2;84:19;92:24;
109:14;113:4;202:7

**specifically (1)**
135:11

**specifics (1)**
10:1

**speculate (6)**
44:11,11,16;45:20;
114:10;120:24

**speculating (1)**
62:17

**speculation (4)**
122:20;177:15;
197:19,19

**speculative (1)**
68:13

**speed (1)**
155:6

**spend (2)**
10:5;125:18

**spent (2)**
11:3;204:12

**spits (1)**
57:16

**spoke (1)**
130:22

**spread (67)**
24:9;57:3,4,8;59:6,
12;60:24;61:8,13,15;
62:6,8,12,18,24;63:4,
22;64:2,11;65:4;69:9;
70:6,7,8,18,21,24;71:5,
8,8,9,10,11,13,24;72:5,
10;73:12,13;74:9;80:5;
82:24,24;87:17;92:7;
93:10;114:21,21;
122:8;124:23,23,24;
125:1;135:2;137:16;
146:5;157:1,2;158:11,
12;161:6;179:1,14;
185:13;186:11,14;
204:9

**spreads (26)**
76:15;80:11;105:2;
110:14;122:8;130:7;
132:20;156:14;157:8;
162:14;182:10;186:15,
23;187:3,4,8,9,9;
193:16;195:8,22;
198:17;199:19,20;
200:5,18

**spreadsheet (2)**
162:1;193:18

**squaring (1)**
197:2

**stand (1)**
9:11

**standpoint (5)**

**94:11;102:2;118:19;**
155:8;186:19

**start (3)**
8:5;18:7,20

**started (6)**
18:10;67:11,14;
191:15,19,21

**starter (1)**
38:3

**starting (2)**
104:9;191:8

**state (1)**
76:19

**stated (3)**
12:5;87:12;105:12

**statement (5)**
46:23;79:5;82:7,11;
113:4

**statements (9)**
76:24;77:3,8,11;
80:17;100:2;119:23;
127:17;189:23

**States (2)**
4:10;20:14

**stating (1)**
140:18

**statistics (1)**
71:18

**status (2)**
22:6;38:19

**stenographer (1)**
7:19

**step (2)**
90:22;106:11

**still (15)**
4:13;24:8;72:22;
78:22;82:17;97:8,9;
112:4;127:20,21;
128:9,9;137:3;143:5;
170:19

**stock (27)**
10:7;22:10,18;23:5,
8,14,14;24:3,7;33:1,22;
34:1,2;35:13,14;38:6;
49:18;67:11;72:17;
155:9;184:3,6,11;
186:9,18,20,21

**Stocks (13)**
26:21,22;32:20,21,
22;33:5,6,14;35:16,17;
40:21;57:19;136:18

**stop (1)**
94:13

**stopped (6)**
67:12;98:3;188:20,
23,24;189:4

**stopping (2)**
68:18;115:13

**stored (1)**
131:18

**straddle (7)**
83:12,15;132:23;
135:3;146:6;158:15,17

**straddles (4)**
76:13;136:5;175:5;
202:19

**straightforward (1)**
132:21

**strange (1)**
102:3

**strangle (22)**
132:24;145:5,5,15,
16,17,20;146:6,23;
147:2,5,16,19,22;
148:4;150:14;156:4,
21;157:5,7;158:8;
183:4

**strangles (8)**
136:6;162:13;195:8,
23;198:17;200:5,19;
202:18

**strategies (45)**
22:23;39:2,5,16;
44:12,17,19;58:18;
75:14;76:22;78:2,24;
79:1,11,16,18;80:10,
15,19,23;82:1;83:22;
84:18;86:3,23;92:1,5,9,
23;95:19;97:13;
101:11,12,14;109:17,
19,20;116:16;127:21;
132:19,21;183:7;
194:24;196:12;202:3

**strategy (45)**
23:1,7;24:6;25:8,24;
32:14,19;33:4,8,10;
34:6;56:23,24;57:6;
58:4,8,23;59:3;60:4;
64:22;66:3,7;79:10;
80:2;82:18;83:6;94:1;
95:4;99:2;105:3,13;
108:17,22;109:6,7,8;
110:15;125:24;127:9;
128:11;148:13;184:21;
195:2;201:1;204:3

**Streit (1)**
7:7

**strike (7)**
46:9;47:4;48:19;
49:18;72:9;85:13;
203:20

**strikes (3)**
86:13;134:9;157:16

**structure (12)**
77:22;117:9;122:1;
126:3,5,10;127:7;
128:4;156:12;168:22;
193:12;197:4

**stuff (10)**
40:15;105:5;108:4;
146:7;152:8;153:23;
163:16;181:20,20;
192:9

**stunning (1)**
121:16

**Subject (3)**

38:22;40:6;41:10

**submitted (4)**
15:14;116:13;118:5,
14

**subparagraph (1)**
100:16

**subscription (1)**
144:8

**subsection (1)**
82:13

**substantially (1)**
165:10

**subtract (1)**
61:11

**succeed (1)**
125:5

**succeeded (1)**
122:23

**successful (1)**
55:21

**sued (3)**
13:9;14:6,8

**suggested (1)**
75:10

**sum (3)**
118:1;142:6;170:1

**summarize (3)**
17:8;25:8;63:23

**summarizes (1)**
190:16

**summarizing (2)**
69:11;189:24

**summary (6)**
119:9;138:1;141:7;
142:16,19;189:23

**summating (1)**
169:24

**summation (4)**
24:23,24;169:13,18

**summer (2)**
27:22;28:1

**supervision (1)**
105:14

**supply (4)**
50:9,10;51:3;52:9

**suppose (1)**
169:14

**sure (52)**
13:19;16:21;17:24;
19:11;23:4;29:9;33:21;
36:10;39:6;40:5;42:11,
23;43:2;44:21;45:3,7;
52:21;53:13;60:9;
64:23;68:9,9,20;72:7;
85:7;87:21;89:13;90:4;
97:7;105:23;106:3;
110:7;111:21;113:21,
22;127:8;133:15;
136:4;140:5;144:24;
158:12;161:4;162:7;
177:9;186:19;187:19;
190:7;198:8;199:7;
200:8,9;203:8

**surprise (6)**
119:4;120:16;129:5,
8,9;189:13

**surprised (1)**
120:13

**surprises (1)**
189:16

**Susquehanna (4)**
20:11,13;21:8;22:11

**swap (6)**
148:21;149:20;
152:3;185:11,12;
186:11

**swear (1)**
4:2

**switching (1)**
141:4

**swoop (1)**
184:22

**sworn (3)**
4:3,17;116:8

**symmetrical (1)**
132:17

**synonymous (1)**
51:13

**system (3)**
20:5,7;62:4

**T**

**tab (14)**
141:4,7;143:6,6;
162:1;166:7,11,17;
169:11,15,15,23;170:6,
12

**table (2)**
36:6;38:7

**tablet (1)**
28:19

**tabs (1)**
166:5

**taker (1)**
66:16

**talk (6)**
38:11;87:20;104:9;
184:17;195:20;202:13

**talked (13)**
9:22;11:14;86:14;
92:6,7,7;98:7;113:5;
130:24;132:18,20,22;
137:14

**talking (8)**
14:3;74:18;95:11;
109:1;114:14;170:7;
171:3,4

**taxes (1)**
168:9

**TD (3)**
21:18,19;22:10

**technical (1)**
42:24

**telling (3)**
85:16;101:22;170:12

Case: 1:20-cv-03758 Document #: 96-4 Filed: 03/04/22 Page 71 of 74 PageID #:2644
JOHN F. BURNSIDE
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

tells (1)
62:24
ten (5)
8:21;10:24;39:23;
42:10;68:19
tendency (1)
52:7
ten-minute (1)
182:18
term (16)
24:2;31:6;43:6;49:3,
20;57:3;58:7;63:8;
65:24;71:18;136:19;
145:12;148:16,21;
177:19;193:14
terms (7)
11:3;33:7;42:21;
43:1;50:16;67:6;72:16
tertiary (1)
118:10
testified (15)
4:17;27:9;82:2;
83:22;85:18;88:16;
98:14;101:16;109:16;
116:8;119:20;120:13;
156:20;198:13;201:10
testify (3)
107:2,5;127:18
testimony (31)
37:7;54:4,10;63:24;
65:9;78:14,18,19;
81:12;84:1;85:22;86:6,
8,9,17;87:14;92:15;
98:2;101:9;102:7,13;
122:16;127:2;156:15;
183:4;187:21;191:3;
197:2,3;200:22;201:4
Texas (1)
34:18
theoretically (1)
185:14
theory (2)
48:10;175:17
therefore (18)
18:14;37:14;59:7;
70:9;71:11;79:10;
82:17;83:6,9;93:21,23;
94:12;125:5;126:13;
140:14;174:5;180:15;
182:14
theta (7)
63:17;146:10,16,20;
147:7;176:13;202:17
thinking (1)
140:12
third (3)
40:6;41:9;66:6
thorough (1)
131:23
though (6)
14:2;48:7;97:8;
103:14;149:21;192:16
thought (12)

14:22;39:15;98:3;
111:20;131:15;132:7;
139:5;156:20;167:1,8;
168:3;181:9
thousand (3)
169:3;170:5,8
three (16)
44:15;45:12;66:3,14;
75:6;80:4;129:24;
133:13,15,21;166:5;
180:22;196:2,5;
198:22;200:13
three-page (1)
16:9
throw (1)
57:15
tick (1)
113:2
tilt (1)
191:16
times (12)
11:15;39:12;117:18;
122:13;126:5;130:20,
22;152:8;191:20;
193:23;196:18;201:9
Timothy (1)
13:5
tiny (1)
157:3
title (4)
143:14;164:4;
170:12;178:8
titled (7)
16:3,17;100:9;
137:24;142:4;144:18;
183:10
today (16)
4:12;6:20,23;16:20;
66:11;85:10;118:22;
122:13;167:19;169:9;
183:2;188:10;192:20;
197:20;198:14;200:22
today's (1)
118:24
together (12)
15:6;18:5,12;33:14;
53:1;56:20;58:11,16;
59:3;112:21;124:2;
160:12
toggle (2)
99:15;100:19
told (7)
34:3;91:15;105:8;
107:6;128:18;132:11;
173:2
tons (2)
119:5;120:14
took (7)
49:12;113:24;114:7,
9;131:8;143:2;188:2
tools (2)
64:14,19
top (10)

16:4,7;29:15;44:22,
24;100:11;124:21;
132:17;139:21;145:2
Total (4)
166:7,19,19,20
totally (1)
67:3
towards (2)
90:13;163:20
track (2)
35:19;37:18
trade (209)
12:15,15;21:12;
26:18,20;27:4,10,14;
28:7,23;32:2;35:15;
39:17;44:9,14,20;
45:13;54:7;57:1,3,7,8;
58:24;59:13,18,19,21;
60:13,14,18;61:7,20;
62:12,24;63:1,4,10;
64:2,2,4,5,6,11;65:3,4,
4,7,18,22;69:9,16;70:2,
5,6,7,8,18,21;71:2,5,
24;72:2,5,11,16,24;
74:3,5,15;77:9,12,16,
18,19;83:11,12;86:12;
87:17;88:8;89:6,10,21;
90:15;92:17,19;93:6,
10;94:2,17;96:14;97:2,
17;109:14;111:8;
112:14;117:12,14;
122:9;123:22;124:20;
125:7,18;126:10,14,20;
127:18;128:15,17;
130:2,10,12,13;131:1,
6;132:10;137:16;
138:18;139:8,12;
142:23;144:20;145:8,
8;146:2,13;147:24;
150:5;151:11;152:2,
24;157:4;159:9,10;
160:18;161:15,19;
166:7,9,9,10,17;168:5,
6,7,8,9,10,10,11,12,13,
15,16;169:23;170:2,
23;171:11,16,17;
172:10,11;173:15;
174:17,19;175:10,12;
176:3,15,18;177:16;
178:11,12;179:10;
180:13,14,14;181:23;
183:18,21;187:13;
194:13,13,17,18;
196:16,16;197:1,4;
198:4,5;199:13;
201:13,20,23;202:7,15,
17,20;203:10,15,23,24,
24;204:5,8,8,14,19,21
traded (32)
20:16;21:5;22:18;
27:12,16;28:4;30:17;
31:2;54:1,3,5,5;65:11;
77:4;81:19;93:9;96:21;

97:1,2,15;137:11;
147:2,4,22;148:3;
149:3;155:5;161:10;
179:1;185:3;186:15;
193:21
trader (17)
13:16;20:11;21:24;
25:17,18;58:22;59:11,
17;60:12,22;61:19;
67:7;102:2;128:24;
135:23;148:12;177:19
traders (6)
28:9;52:1;57:22;
58:17;64:20;65:22
trades (212)
6:6;10:11;12:19;
13:1,15,21;14:14;
17:24;18:1,10,13;
27:18;30:10,12;31:11,
13,16,19;39:15;40:18,
18,21,23;56:19;62:6,8;
65:9;67:1;68:13;70:13;
71:20;75:10,10,12,13;
76:8,21,22;77:6,20,21,
24;78:2,16,17,20;
79:16,17;80:9;81:7,13,
15;82:1,8;83:21,23;
84:15,17;85:8,9,19,21,
23;86:20;88:3,9,22;
89:7;90:6;91:2,24;
92:1,4,24;93:16,19;
95:24;99:3,17,20,20;
105:13;109:9,12;
110:9,19;111:15;
113:12;116:19,21,22;
117:2,6,10;118:6,8,9,
12,13,16;119:1,3,5,22;
120:17,19,21;121:4,19,
23;122:1,23;123:1,16,
19;124:12,16;125:9,12,
14,16;126:4,6,6;
127:10,21;128:23;
129:3,19;132:13;
134:1,2,10,22;137:13;
138:9;139:18,21;
140:2,6,21;141:19,22;
142:7;143:24;154:1;
161:2,5;168:4;169:19;
170:6,14;171:5,20;
172:15;180:1,15;
181:13,18,21;182:8,12,
14;185:9;186:8;
187:10;188:1;189:7;
191:15;192:22;193:12,
16;194:11,22,24;195:6,
12,16,18,21;196:1,4,5,
11,21;197:7,8,11,13,
21,22;198:15,19,21,24;
199:2,7,8,11,16;
200:3,11,17;201:1,2,6,
12,17;203:16;204:2
trade's (1)
90:12

Trading (155)
4:8;6:8,17;9:8;10:7,
10;12:4,11,12;13:10;
15:1,2;18:11,12;19:6;
20:5,7,13,15,22;21:1,
14,14,19,21;22:20;
23:19;25:18,20;26:1;
27:24;30:2,5,18;31:5,7,
21;33:23;39:2,4,16,20;
43:9;45:1,2,12;47:12;
48:24;50:1;51:2,5,8,
10;52:23;55:9;56:7,15;
58:4;62:4;64:21;67:11,
21;68:2,3;75:11;76:2,
4,8;79:5,20;80:12,18,
23;83:24;84:4,19,23;
85:5;87:13,20;90:2;
93:12;94:7;95:14,19;
97:5,6,18,21,21,24;
98:1,2,4,6,7;99:2,2,3;
100:2;105:13;108:8,
17,22;109:6,7;110:15;
112:19;114:14;116:5,
15;117:16;124:1;
128:5,11;129:14,24;
130:2,4,5;132:19,21;
134:17;135:24;136:1;
137:10;138:1,13;
139:16;140:16;142:16,
19;153:2;154:6,22;
162:12;163:9;164:6,7;
165:5,6,12;167:18;
172:19,21;178:15;
181:14;183:7,10;
184:21;188:7;189:16;
194:2;197:10;205:11
Trading's (4)
81:6;97:18;127:18;
194:4
Trans (1)
20:20
transaction-based (2)
55:11,15
transcript (1)
24:1
transferred (1)
34:15
travel (1)
4:12
Treasury (4)
53:19;149:12,16;
150:3
trial (3)
4:6;7:9;127:18
tribunal (1)
40:11
tried (5)
18:14;20:5;61:22;
115:8;135:16
tries (1)
128:24
trigger (2)
174:20,23

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

**trouble (1)**
159:5
**true (1)**
45:16;71:22;86:5;
95:23;111:11;202:1,2;
124:18,22,23
**try (19)**
4:20;5:4,15;8:15;
35:5,6;36:19;55:19;
63:23;66:21;104:13;
109:2;113:1;114:16;
125:22;134:14;136:2,
4;200:9
**trying (41)**
9:23;23:10;24:11;
31:10;35:23;36:18;
40:19;45:5;47:20;
59:22;62:19;63:21;
77:1;78:22;83:4,17;
89:12;108:5,6;133:19;
136:14,14;137:2;
146:8,9;147:12;
151:15;152:2,21;
153:8;155:2;163:7;
174:22;180:19;182:2;
186:5;190:5;193:13;
199:9;202:13,16
**turn (2)**
163:20,22
**turned (1)**
76:11
**turns (1)**
44:3
**tweak (1)**
113:14
**tweaked (1)**
101:12
**two (29)**
10:13,20;16:22;
17:14;26:10,12;50:8;
53:4,15;54:3;57:6,7,9;
58:10;73:4;75:6;
121:15;145:5;156:14;
157:8;162:8;167:22;
178:5,24;179:1;182:5;
190:6;192:20;202:17
**two-page (2)**
75:5;144:18
**two-year (1)**
124:14
**Type (1)**
159:11
**typed (3)**
105:8;151:6;152:12

**U**

**Uh-hmm (1)**
148:23
**under (21)**
26:15;38:22;40:6;
45:21;49:17;75:8;80:7;
89:24;100:6,22;

101:10;105:14;108:23;
109:3;114:19;129:21;
137:8;141:17;145:4;
180:23;181:12
**underlier (8)**
43:6,8,15;46:10;
48:1,19;51:21;149:11
**underliers (2)**
51:17;134:22
**underlying (12)**
24:10,15;25:12;
36:13;43:24;45:19;
48:11;49:14;51:12;
150:2;159:11;176:20
**understands (1)**
34:4
**understood (2)**
82:2;114:20
**undertake (4)**
201:11;202:6;
203:13;204:5
**undervalued (2)**
135:10,21
**unfilter (2)**
141:15,18
**United (1)**
4:10
**units (2)**
186:19,22
**universe (1)**
180:20
**unless (2)**
33:17;54:7
**unlimited (1)**
194:16
**unsettling (1)**
112:5
**untoward (1)**
91:8
**unusual (1)**
146:11
**up (53)**
20:5;24:12,17;25:7;
38:1;39:12,14;48:1,6,
8;60:10;74:22;78:10;
80:7,21;83:19;89:11;
91:18;96:3;105:8;
106:3,9;117:18;118:1,
17;122:13;125:21;
133:3;134:9;135:6,16;
137:21;142:6;151:9,
19,21;152:15;154:16;
155:6;159:20;169:14;
175:7;178:11;184:20,
24;187:18;189:22;
191:24;192:10;195:2;
196:17,17;197:22
**upon (6)**
24:16;56:9;63:19;
80:24;83:1;177:17
**upside (13)**
24:5;92:14,17;94:21;
95:1,2,9,16,19,21;

121:9;128:19,21
**USDA (1)**
136:20
**use (19)**
24:2;25:9;28:19;
57:22;58:5;64:9,20;
80:13;135:14;136:19;
138:23;144:2;148:13,
15;149:18;151:18;
152:6;154:24;200:7
**used (24)**
41:2;49:3;58:2,7;
63:8;65:24;79:19;
80:12;83:24;144:4;
151:10;152:7;153:5,
16,18,20,21,24;154:3,
18,20,21;155:3;172:19
**using (7)**
28:16;58:9,9;72:15;
123:8;155:13,14
**Usually (2)**
61:1;151:24
**utilizing (1)**
36:13

**V**

**Vaguely (2)**
98:13;102:11
**validate (14)**
75:12;76:21;77:6,12,
15;78:16,23;85:19;
86:22;91:24;99:17,19;
194:22;197:7
**validation (1)**
81:22
**valuable (1)**
77:14
**valuator (1)**
143:23
**value (8)**
26:18;43:21,22;
125:23;143:16;166:9;
173:19;177:23
**valued (1)**
56:10
**values (5)**
55:19;134:13;151:7,
10;152:12
**variables (17)**
49:13,16;57:24;62:1,
14,21;64:3;65:3,5;
69:20,21,22,24;86:14;
89:11;173:24;204:15
**variance (1)**
63:20
**variances (1)**
58:21
**varies (1)**
56:6
**variety (1)**
70:13
**vary (1)**

80:23
**vega (5)**
63:17;146:16,17,17,
20
**verbal (2)**
7:24;130:15
**verify (2)**
160:13;162:12
**versed (2)**
10:10;153:22
**version (1)**
107:19
**versus (8)**
51:16;58:12,15;61:1;
108:9;117:10;135:1;
146:16
**vertical (9)**
72:7,8,16;80:5;
93:10;124:22;128:19;
137:16;157:20
**verticals (6)**
76:10;80:11;110:14;
130:8;132:18;181:20
**viability (6)**
81:23;83:20;84:16;
86:22;95:4;170:22
**viable (41)**
75:13;76:22;78:2;
79:11,16,17;80:9;
81:13;82:1;83:21;
84:18;92:1,4,9,23;
99:21;120:18;126:6,8;
127:9,20,21,21;128:10,
10;171:5,7,12,17;
182:14;194:24;196:12,
16;197:7,11,22;199:8;
201:1,3;202:3;204:3
**vicinity (1)**
56:2
**videoconference (3)**
4:12,24;8:10
**visited (1)**
114:5
**vol (4)**
151:14,15;154:9,9
**volatile (1)**
112:1
**volatilities (5)**
51:18;52:12,20;
69:12;151:20
**Volatility (63)**
48:5;49:21,23,24;
50:2,4,5,6,11,12,18,20,
22;51:1,7,12,13,16,20,
24;52:5;53:18,19,23,
24;54:18,19;76:14;
83:3,8,13;86:13;
134:13,16;135:9,15,17,
18,21;136:11;149:15,
19,21,22,24;150:4,19,
23;151:4,10,16;152:11,
18,19;155:16;176:11;
185:11,12,13,24;

186:11,11;187:9
**volatility's (1)**
137:1
**Volume (2)**
166:8,10
**vs (2)**
4:8;116:4

**W**

**wait (4)**
8:4,4;78:8;162:21
**wants (3)**
33:22;34:2;202:16
**way (29)**
8:15;11:15;12:10;
24:14;33:16;35:23;
47:20;49:9;50:9;58:4,
23;59:11,17;60:11,18;
62:4;65:10;69:9;73:6;
88:15;111:20;118:15;
140:9;147:7;150:2;
167:4;174:7;184:21;
200:16
**ways (2)**
49:8;50:8
**web (1)**
144:6
**website (1)**
32:9
**week (3)**
136:1;185:17;187:12
**weekly (2)**
145:17;157:7
**weeks (1)**
10:20
**weird (1)**
101:21
**Wells (1)**
15:14
**weren't (6)**
93:22;112:18;117:6;
126:8;186:5;195:18
**what's (25)**
24:23;41:21;43:22;
46:3,23;49:10;63:7;
73:7,9;77:2;97:11;
110:22;112:24;136:20;
143:14,16;144:19;
152:21,22;164:4,4;
165:4;174:21;195:11;
199:18
**wheat (2)**
54:13;112:23
**wheel (1)**
107:4
**whenever (1)**
185:8
**When's (1)**
147:4
**Whereupon (21)**
5:7;16:1;19:7;29:4;
32:6;42:13;69:2;87:5;

**Mary Maslowski, CSR, RPR**

JOHN F. BURNSIDE
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

115:19;137:22;144:15;
150:10;156:1;158:1;
159:1;172:3;176:5;
177:1;178:13;182:21;
205:2
**whole (10)**
48:16;89:9;102:1,18;
160:9;162:6;169:6,19,
24;197:18
**whomever's (1)**
81:4
**Who's (2)**
6:23;7:11
**wide (1)**
125:19
**widen (1)**
190:5
**width (1)**
122:8
**willing (1)**
198:6
**win (1)**
124:5
**wing (11)**
127:4;135:3;161:6;
162:13,14;184:18,19,
24;185:4,7;187:8
**wings (10)**
83:13;92:8;130:9;
132:24;136:7;137:18;
154:12;156:8;158:12;
192:9
**winner (1)**
59:24
**within (2)**
136:3;182:6
**without (2)**
31:14;168:15
**witness (30)**
4:2,3,16,23;5:17,20;
6:9;9:20;39:2,4;40:10;
42:11;68:20,23;69:1;
74:16,20;78:11;84:15;
107:22;108:2;115:15;
116:7;134:7;153:17;
164:11;173:6;182:20;
205:17,19
**Wonderful (1)**
68:23
**word (10)**
39:8;100:14;101:24;
102:20;114:17;135:14;
142:10,11;190:21;
200:7
**wording (1)**
196:9
**words (7)**
80:13;101:1;115:1,2,
3;123:4;198:7
**work (7)**
15:6;18:4,8,21;
22:16;129:11;190:10
**worked (6)**

21:7,19;29:21;67:16;
137:6;155:7
**working (3)**
30:16;67:16;103:14
**works (2)**
112:21;169:6
**world (15)**
30:20;88:13;97:15;
127:22;129:11;149:8;
153:21,22;155:9;
168:9,18;171:1,3;
189:16;196:16
**worried (1)**
195:17
**worth (1)**
43:24
**worthless (3)**
44:2;46:24;47:4
**write (14)**
17:2,4;18:10;75:9;
78:15;79:15;98:14;
102:22;103:11;105:4,
9;109:5;114:15,23
**writing (1)**
7:19;40:24;101:6
**written (5)**
15:3;17:13;101:4,18,
23
**wrong (7)**
58:13;85:16;88:14;
136:14;152:23;156:22;
201:19
**wrote (6)**
5:13;6:3;17:6;102:7,
16;105:6

## X

**Xerox (1)**
20:18

## Y

**year (5)**
17:15;133:20;167:5,
11;181:11
**years (14)**
10:8,8,9;17:14;
39:23;40:1;67:18,18,
22,23,23;68:1;148:5;
153:12
**yellow (2)**
151:2,4
**yen (1)**
54:18
**Yep (14)**
38:24;45:23;75:2,7,
15;91:22,22;98:23;
110:24;122:2;150:21;
172:6;186:2
**yes-or-no (1)**
202:5

## Z

**zero (2)**
88:17;171:2
**zip (5)**
164:1,2;167:1,8,17

## 0

**0330807 (1)**
29:16
**08 (1)**
112:3
**09 (1)**
112:4

## 1

**1 (15)**
30:1;39:6;75:9;99:5;
119:12;160:11;166:6,
7;169:12,16,23;170:4,
6;179:24;204:13
**1.779 (1)**
190:24
**10 (1)**
67:23
**10,000 (1)**
27:23
**10:25 (1)**
69:3
**10:33 (2)**
69:3,7
**100 (5)**
65:15;68:11,12;
101:5;169:3
**11:02 (1)**
87:6
**11:09 (2)**
87:6,9
**11:54 (1)**
115:20
**119 (2)**
169:14,19
**1-19 (2)**
164:7;165:6
**12 (2)**
67:15;158:10
**12:30 (1)**
115:16
**12:43 (2)**
115:20;116:3
**125s (1)**
158:9
**13 (4)**
39:24;40:2;125:22;
158:10
**1375s (1)**
158:10
**14 (4)**
125:22;152:18;
156:17,19

**1400 (1)**
157:13
**1420 (1)**
157:13
**1430 (1)**
157:13
**144 (1)**
145:11
**1450 (1)**
157:14
**146 (3)**
139:22,24;140:1
**149 (2)**
139:23;145:11
**15 (2)**
148:5;150:13
**15¢ (2)**
125:22;168:23
**150 (2)**
26:17;123:14
**151 (1)**
139:23
**16 (1)**
144:19
**16th (1)**
169:20
**17 (8)**
12:7,8;75:17,20;
151:14;154:9;192:12,
14
**18 (8)**
162:21,21;163:10;
164:21,22,23;169:20,
20
**185 (1)**
138:17
**19 (5)**
10:23;75:20;120:10;
163:11;164:22
**1986 (1)**
67:12
**1988 (2)**
28:9,17
**1989 (2)**
20:4;27:16
**1991 (1)**
67:19
**1999 (2)**
19:13;27:8

## 2

**2 (11)**
165:16,17,17;166:6,
17;169:17;178:2;
180:1,11;181:12;182:6
**2.3 (2)**
128:5,7
**2.376 (2)**
120:5;191:1
**2:30 (2)**
182:17,22
**2:50 (1)**

182:22
**20 (8)**
4:9;10:23;11:7;
91:21;102:12;143:18;
148:5;154:9
**20.32 (1)**
151:14
**20¢ (4)**
124:23;125:18,19;
168:24
**200 (1)**
175:17
**2001 (1)**
42:5
**2003 (1)**
42:5
**2010 (2)**
20:7;112:4
**2011 (2)**
30:1;67:22
**2011-ish (1)**
67:13
**2012 (1)**
67:15
**2013 (2)**
67:15;134:7
**2017 (9)**
80:2;99:5;160:16;
183:15;188:3,8,14;
191:11;192:6
**2018 (18)**
109:13;123:11;
160:21;162:17,18;
163:1,7,13;164:18,18;
166:19;183:15;188:14;
192:23;195:6;198:15;
200:3,17
**201809 (2)**
166:18,18
**201810 (1)**
166:19
**2019 (36)**
109:14;123:11;
139:9,12,16,16;140:7,
7,16,17;141:23,23;
144:19;150:13;155:23;
163:4;167:4;169:21;
188:15,16;189:2,8,8,
15;190:2,14,15,18,18;
191:1,6;192:23;195:6;
198:15;200:4,17
**2020 (24)**
15:14;16:14;17:1,17;
75:1;98:9;99:22;100:3;
101:16;102:8;103:2,
12,20;104:17;105:11;
106:16;108:14;111:13;
113:7;116:14;132:12;
133:10;180:6;181:2
**2021 (11)**
4:5;6:13;17:2,22;
18:6,24;80:16;91:21;
96:2;100:20;101:8

JOHN F. BURNSIDE
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

**22 (2)**
16:13;98:9
**22nd (1)**
133:9
**23 (1)**
67:22
**24 (1)**
155:22
**24th (1)**
139:12
**25 (1)**
119:12

---

**3**

**3 (5)**
119:11;157:11;
165:17;166:6;180:1
**3:23 (1)**
205:3
**3:26 (2)**
205:3,6
**30 (2)**
4:5;11:9
**3-15 (2)**
178:9,11
**320 (2)**
157:11,12
**330 (1)**
157:12
**35 (2)**
10:8;147:10
**360 (3)**
85:14;156:18,18
**365 (1)**
85:14
**3758 (1)**
4:9
**38 (3)**
141:24;146:7,16
**380 (3)**
85:14;156:16,17
**390 (1)**
85:14

---

**4**

**4 (3)**
10:9;125:21;129:21
**40¢ (3)**
56:2,6;88:17
**42 (3)**
152:20;156:16,18
**428 (2)**
119:8;189:22
**45-1/2 (1)**
145:14
**46.10 (1)**
145:13
**47-1/2 (1)**
145:14

---

**5**

**5 (4)**
10:8;100:6,7;125:21
**5,000 (1)**
27:22
**507 (15)**
5:6,7;16:19;17:21;
74:22;91:18;96:5;
99:16;101:8;104:3;
106:14;112:13;179:20;
187:18;194:1
**508 (9)**
15:24;16:1,8;98:9;
101:15;102:8;103:11;
106:15;129:21
**509 (3)**
19:5,7;38:21
**510 (5)**
29:3,4,8,16,24
**511 (2)**
32:5,6
**512 (3)**
137:21,22;143:2
**513 (3)**
144:14,15;149:11
**514 (8)**
150:9,10;156:9;
157:4,16,17;202:24;
203:3
**515 (5)**
155:21;156:1,12;
157:10,16
**516 (2)**
158:1,4
**517 (7)**
158:21;159:1;
162:24;165:11;183:10;
191:24;192:3
**518 (5)**
172:2,3,5,13;175:7
**519 (5)**
175:24;176:5,9,14,
17
**520 (4)**
176:22;177:1,14;
180:19
**521 (3)**
178:12,13;180:19
**5th (1)**
204:15

---

**6**

**6 (3)**
105:10;108:23;109:3
**6¢ (1)**
125:21
**600 (3)**
123:19;190:21;191:2

---

**7**

**7 (1)**
19:22
**70s (1)**
49:12
**7th (2)**
106:17,18

---

**8**

**8 (2)**
146:18;151:15
**8:35 (1)**
4:4
**80s (1)**
96:22
**86 (1)**
67:21
**88 (4)**
28:1,4,20,23
**89 (8)**
28:1,4,9,17,20,23;
149:5,9

---

**9**

**9 (5)**
6:13;67:23;75:1;
80:16;96:2
**9/11 (2)**
39:13;40:15
**9/20 (2)**
163:19;167:5
**9:30 (1)**
42:14
**9:47 (2)**
42:14,16
**90 (2)**
68:6,7
**91 (1)**
67:21
**9-18 (2)**
164:7;165:6
**93 (3)**
67:19,22;160:11
**99 (2)**
68:8,10
**9th (5)**
104:4,20;105:20,22;
106:8

---