# In The Matter Of:

*COMMODITY FUTURES TRADING COMMISSION v.*
*LONG LEAF TRADING GROUP, INC., et al.*

---

*REBECCA J. WING*
*June 17, 2021*

---

*Mary Maslowski, CSR, RPR  (312) 726-7600*
*79 West Monroe Street, Suite 1001*
*Chicago, Illinois  60603*
*mmmrpr@sbcglobal.net*

Original File Rebecca Wing.txt
Min-U-Script® with Word Index

REBECCA J. WING

---

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   COMMODITY FUTURES TRADING        )
    COMMISSION,                      )
4                                    )
                  Plaintiff,         )
5                                    )
            vs.                      )  No. 20 C 3758
6                                    )
    LONG LEAF TRADING GROUP,         )
7   INC., et al.,                    )
                                     )
8                 Defendants.        )

9

10

11        The remote deposition of REBECCA J.

12   WING, called by the Plaintiff for examination,

13   pursuant to subpoena and pursuant to the Federal

14   Rules of Civil Procedure for the United States

15   District Courts pertaining to the taking of

16   depositions, taken before Mary Maslowski, Certified

17   Shorthand Reporter and Notary Public within and

18   for the County of Cook and State of Illinois with

19   the witness located in Downers Grove, Illinois,

20   commencing at the hour of 10:06 o'clock on

21   June 17, 2021.

22

23

24
```

---

**Page 2**

```
1   A P P E A R A N C E S :

2
         (Appearing via videoconference)
3    MR. JOSEPH C. PLATT, Trial Attorney
     MS. ELIZABETH M. STREIT, Trial Team Leader
4    MR. JOSEPH J. PATRICK, Senior Investigator
     U.S. COMMODITY FUTURES TRADING COMMISSION
5    DIVISION OF ENFORCEMENT
     525 West Monroe Street, Suite 1100
6    Chicago, Illinois 60661
     (312) 596-0700
7    jplatt@cftc.gov
     estreit@cftc.gov
8    jpatrick@cftc.gov

9         On behalf of the U.S. Commodity
          Futures Trading Commission;
10
         (Appearing via videoconference)
11   FALVEY LAW OFFICE
     BY MR. JAMES M. FALVEY
12   200 South Wacker Drive, Suite 3100
     Chicago, Illinois 60606
13   (312) 404-5839
     jimfalvey@yahoo.com
14
          On behalf of Long Leaf Trading Group,
15        Inc., and James Donelson;

16       (Appearing via videoconference)
     MR. JEREMY RUTH
17
          Appearing Pro Se.
18

19   A L S O   P R E S E N T :

20       MS. LAUREN STAPLETON, CFTC Intern (Remotely)

21

22
     CSR License No. 084-003278.
23

24
```

---

**Page 3**

```
1                   I N D E X

2   WITNESS                    DX  CX _RDX  RCX

3   REBECCA J. WING

4   By Mr. Platt                    4

5

6               E X H I B I T S

7   CFTC EXHIBIT                    MARKED FOR ID

8   No. 350   Amended Dep Notice         7
    No. 351   Stock Purchase Agreement  13
9   No. 352   Complaint                 23
    No. 353   Interrogatory Responses   27
10  No. 354   Interrogatory Responses   29
    No. 355   Registration Conversations 30
11  No. 356   Answer to Complaint       32
    No. 357   NFA Audit                 80
12  No. 358   Document Subpoena         86
    No. 359   Wells Notice Response     89
13  No. 360   la Definitions            94
    No. 361   Long Leaf RFAs            99
14  No. 362   6m Use of Mails          100
    No. 363   414 Exemption            102
15  No. 364   CFTC Int. Letter 95-82   104
    No. 365   Nelson/Donelson Emails   118
16  No. 366   NFA AP Registration      141
    No. 367   NFA/Donelson Int. Emails 145
17  No. 368   Donelson/NFA Response    148

18

19

20

21

22

23

24
```

---

**Page 4**

1       (Witness duly sworn.)

2       **MR. PLATT:** We're going on the record

3   at 10:06.  This is a deposition that's being

4   conducted pursuant to the Federal Rules of

5   Civil Procedure and the local rules for the

6   U.S. District Court for the Northern District

7   of Illinois.  Because of the COVID pandemic,

8   this deposition is being conducted remotely

9   by videoconference.  Does anybody object to

10   proceeding by videoconference?

11       **MR. FALVEY:** No.

12       **THE WITNESS:** No.

13          REBECCA J. WING,

14   called as a witness herein, having been first

15   duly sworn, was examined and testified as follows:

16          **DIRECT EXAMINATION**

17   BY MR. PLATT:

18   **Q**   So as I mentioned before we went on

19   the record, Ms. Wing, I'm a trial attorney at the

20   CFTC. I'm joined by my colleagues Beth Streit,

21   who's the chief trial attorney, Joe Patrick, who's a

22   futures investigator, and Lauren Stapleton, who's a

23   law student intern.  Also present at this deposition

24   is Jim Falvey.  He represents Defendants Long Leaf

---

REBECCA J. WING

Page 5

1  Trading Group and James Donelson, and Jeremy
2  Ruth is also present.  He is a defendant in this
3  action.  And, Ms. Wing, you're not being represented
4  by a lawyer today, is that correct?
5  A   That's correct.
6  Q   Have you ever provided a deposition
7  or sworn testimony?
8  A   Yes.
9  Q   In what context?
10 A   I've been an expert witness.  I have
11 been -- I've testified in testimony for the CFTC
12 in a couple matters.  Don't ask me which matters.
13 I do not recall the specific matters or the name.
14 I've had depositions before in one car accident
15 case and some other contract cases.
16 Q   And was the CFTC testimony, was that in
17 the last ten years?
18 A   I don't believe so.  Sorry, it's a long
19 time.
20 Q   I understand.  So the reason I ask
21 is just to make sure that we understand sort of
22 the rules of the road, and it sounds like you're
23 going to be an old pro at this and especially
24 because you're also an attorney.  So I'll just

Page 6

1  set them out so we're all on the same page.
2  Let's you and I do our best not to talk over one
3  another, and what that means is that I'll do my best
4  to let you finish answering the question and I'll
5  ask that you do your best to let me finish asking
6  my question before you start to answer it.  Is that
7  okay?
8  A   That's fine.
9  Q   And for the benefit of the court
10 reporter, you do need to give a verbal answer.
11 So sometimes we have an inclination to shake our
12 head or nod, but please try to do your best to give
13 a yes or no when it's called for, okay?
14 A   Will do.
15 Q   And another housekeeping matter
16 is if you answer my question, I'll assume that
17 you understood it.  So if the question is confusing
18 or unintelligible, just let me know.  I'll do my
19 best to rephrase it and make sure that we're talking
20 about the same thing.  Is that fair?
21 A   Yes.
22 Q   And, you know, the other rule
23 is that you have to answer the questions unless
24 you're objecting on the basis of a privilege.

Page 7

1  And because that may come up in this deposition
2  for obvious reasons, please state any objection
3  and the basis for it on the record so it's clearly
4  set forth, okay?
5  A   Will do.
6  Q   And if you need to take a break,
7  please let us know and we can take a break sort
8  of whenever you'd like.  The only thing I'd ask
9  is that you answer any pending questions before
10 we go off the record, okay?
11 A   Okay.
12 Q   Usually, Ms. Wing, we would use a paper,
13 a physical document to show you exhibits but today
14 I'm going to share my screen with you, and I want to
15 make sure that you can read these documents legibly.
16 So I'm going to share what I'm going to mark as CFTC
17 Exhibit 350.  And please let me know, one, if you
18 can see it and, two, you can read it clearly.
19         (Whereupon CFTC Exhibit No. 350
20          was marked for identification.)
21 A   Okay.  It's a little small, but I will try.
22 Q   Let me see if I can make it bigger.
23 A   Maybe I can make it bigger on my screen
24 here.  There, yes.

Page 8

1  Q   Do you recognize CFTC Exhibit 350?
2  A   I do.
3  Q   And this is a subpoena for testimony
4  directed to you in connection with the CFTC's case
5  against Long Leaf, right?
6  A   Correct.
7  Q   And is this the subpoena pursuant to
8  which you're appearing today for this deposition?
9  A   It is, yes.
10 Q   Ms. Wing, are you a licensed attorney?
11 A   I am.
12 Q   In what jurisdictions are you licensed
13 to practice?
14 A   I am licensed in the state of Illinois and
15 the state of Colorado, and I'm admitted in several
16 federal courts.
17 Q   When were you admitted to the Illinois bar?
18 A   It was in 1988.
19 Q   Can you please describe your educational
20 history briefly.
21 A   I have an undergraduate degree
22 in finance from the Illinois State University, and
23 I have a Juris Doctor degree from the University of
24 Denver.

REBECCA J. WING

1   Q   And what year did you graduate from
2   law school?
3   A   1987, I believe.
4   Q   So you were admitted to the bar in
5   1988.  Can you please briefly provide a summary
6   of your employment history since 1988.
7   A   Well, I was admitted to the Colorado
8   bar in 1987.  Then I was admitted to the Illinois
9   bar in 1988, and I was originally general counsel of
10  a family operation called Mr. Timber, incorporated,
11  which was the largest lumberyard in Illinois.  And
12  then I moved to Bellows and Bellows in October 31,
13  1988 and I became a principal at Bellows and
14  Bellows.  I left Bellows and Bellows in May 1, 1997,
15  became general counsel of Peregrine Financial Group
16  where I was in that role until I guess March 2015 I
17  was retained by the trustee, and my role shifted
18  from being general counsel to running the
19  liquidation.
20  Q   And how long did you -- were you in
21  the role as the trustee's counsel, if that's the
22  right term?
23  A   It's probably technically not counsel.
24  I was retained as the executive for Peregrine.  So

1   I was in that role from June 12th -- I mean, June 9,
2   2012 until approximately a few days later I guess,
3   until March of 2015, I believe.
4   Q   And have you been in private practice since
5   that time period, March 2015?
6   A   I've been a fractional general counsel and
7   in private practice, yes.
8   Q   Did you say fractional general counsel?
9   A   Yes.
10  Q   What is that?
11  A   That means I'm general counsel to several
12  different companies.
13  Q   Okay.  Which companies?
14  A   One is LW Lands and the other one
15  is Redemption Botanicals Group, and then I --
16  yes, I think that those are the only two that I'm
17  fractional GC for.
18  Q   Do either of those two companies have
19  business activities that relate to securities or
20  commodities?
21  A   Not in the commodities of the CFTC.
22  Q   Thank you.  That's how I meant it.  And
23  in private practice do you have any clients to whom
24  you provide legal services concerning securities or

1   commodities law?
2   A   I do.
3   Q   Approximately how many?
4   A   Oh, a half a dozen right now.
5   Q   And can you describe the nature of your
6   private practice?
7   A   The majority of my private practice
8   deals with securities, commodities, real estate,
9   occasional litigation.
10  Q   How do you charge your clients for legal
11  services?
12  A   Well, it varies.  Sometimes hourly,
13  sometimes a flat fee, sometimes a contingent fee.
14  Q   And you said -- I assume you send bills
15  or invoices to your clients?
16  A   It depends how the fee structure
17  is.  If it's a flat fee, no.  I would have an
18  engagement letter and that would be it.
19  Q   And if you bill by the hour, do you send
20  bills or invoices?
21  A   Sometimes, yes.  It depends if
22  I'm writing off time, which I'm a very generous
23  attorney.
24  Q   I understand.  And when you do send

1   bills, do you itemize the tasks that you performed
2   to justify the amounts?
3   A   I try to.  I would say billing is not
4   my No. 1 forte.
5   Q   Are you familiar with a company called
6   Long Leaf Trading Group?
7   A   I am.
8   Q   How are you familiar with Long Leaf
9   Trading?
10  A   At a point in time Long Leaf Trading became
11  a client of mine.
12  Q   And are you familiar with James Donelson?
13  A   Yes.
14  Q   How are you familiar with James Donelson?
15  A   I was in his wedding.
16  Q   Was James Donelson ever a client of yours?
17  A   Yes, he was.
18  Q   What's your understanding of the nature
19  of the relationship between Long Leaf Trading and
20  James Donelson?
21  A   At a point in time Mr. Donelson purchased
22  Long Leaf.
23  Q   Do you recall when that was?
24  A   December of -- and I forget the year.

REBECCA J. WING

Page 13

1  I need some assistance on the year.
2      MR. PLATT: I'll show you what I'm going
3  to mark as CFTC Exhibit 351.
4      (Whereupon CFTC Exhibit No. 351
5      was marked for identification.)
6  Q   This is -- I'll represent to you,
7  Ms. Wing, that this is a document that you produced
8  to the CFTC. Do you recognize this document?
9  A   Yes, it looks like the stock purchase
10 agreement.
11 Q   The stock purchase agreement concerning
12 the transaction in which Mr. Donelson purchased Long
13 Leaf Trading, right?
14 A   From Mr. Evans, yes.
15 Q   And the date is December 1, 2017.
16 Does that refresh your recollection about the
17 date that Mr. Donelson became the owner of Long
18 Leaf Trading?
19 A   Well, that's the date he entered into
20 the stock purchase agreement. I don't believe
21 that's the date he closed on it but, yes, around
22 there.
23 Q   Is it fair to describe Long Leaf Trading
24 as a closely held company?

Page 14

1  A   Yes.
2  Q   Earlier you mentioned that you enter
3  into engagement letters with clients. Do you have
4  engagement letters with Mr. Donelson or with Long
5  Leaf Trading?
6  A   I don't know if I do, no. I don't know.
7  I don't recall.
8  Q   Since Long Leaf Trading is a closely
9  held company and Mr. Donelson owned the company,
10 when you provided legal services to Donelson and
11 Long Leaf concerning Long Leaf, did you distinguish
12 between Mr. Donelson and Long Leaf when you provided
13 them with legal advice?
14 A   I'm unclear of your question.
15 Q   Sure. So I guess I'll ask it
16 a different way. Is there any reason today
17 that I should distinguish between legal services
18 you provided to Mr. Donelson and legal services you
19 provided to Long Leaf Trading?
20 A   Well, there's time I provided legal
21 services only to Mr. Donelson and not to Long Leaf,
22 and I can't answer that until you ask the particular
23 question.
24 Q   Okay, how about we do this. If there's a

Page 15

1  distinction to be drawn between legal services that
2  you provided to Mr. Donelson and legal services
3  that you provided to Long Leaf and it's not evident
4  from my question that that distinction is being
5  drawn, I'd like you to please draw that distinction
6  in your answer to make it clear.
7  A   I will try.
8  Q   Okay, great. What was your fee arrangement
9  with Mr. Donelson?
10 A   I'm sorry. You're going to have to repeat
11 that. I didn't hear.
12 Q   Sure. Earlier you mentioned that
13 you sometimes billed by the hour, sometimes at a
14 flat fee arrangement. What was your fee arrangement
15 with Mr. Donelson?
16 A   I believe I billed him a reduced hourly
17 rate.
18 Q   So it sounds like you billed Mr. Donelson
19 by the hour, is that right?
20 A   I may have done some flat fees on a few
21 things.
22 Q   What things do you think you did flat fee
23 on?
24 A   I'm sorry. You know, Joe, it's been

Page 16

1  a long time. I didn't look at past billings, so I
2  don't recall as I sit here today.
3  Q   But it sounds like for some of the
4  work you billed him by the hour and for some of
5  the work you billed Mr. Donelson on a flat fee
6  basis, is that fair?
7  A   That's fair, yes.
8  Q   And you did send him bills but you did
9  not review those in advance of this deposition, is
10 that accurate?
11 A   That is correct. And there are some things
12 I didn't bill him for.
13 Q   Do you remember what legal services
14 you provided to Mr. Donelson for which you did not
15 bill him?
16 A   Generally, no. I would have to look
17 back at my notes, but there were several hours
18 I didn't bill him.
19 Q   Okay, thank you. That's helpful. How
20 did you first come to be retained by Mr. Donelson?
21 A   He called me.
22 Q   Do you recall when he first retained you
23 to provide legal services?
24 A   As it relates to Long Leaf, after

**REBECCA J. WING**

Page 17

1  he located Long Leaf to purchase, identified
2  Long Leaf as the company he thought he would like
3  to purchase.
4      Q   And before the sale transaction reflected
5  in Exhibit 351 closed?
6      A   Yes.
7      Q   So did you advise Mr. Donelson
8  in connection with the purchase transaction?
9      A   Yeah.
10      Q   You mentioned that you participated
11  in the Donelsons' wedding.  Can you describe the
12  nature of your relationship with the Donelsons?
13      A   I knew his wife since she was two years
14  old.
15      Q   And that's Vicki Donelson, right?
16      A   That is correct.
17      Q   So is it fair to describe that the
18  relationship, you are social friends with the
19  Donelsons?
20      A   That is fair.
21      Q   That remains true?
22      A   I assume so.
23      Q   Okay.  Do you see them at their house
24  socially?

Page 18

1      A   Occasionally, not -- I haven't been
2  visiting in a while because of COVID obviously.
3  Haven't visited anybody in a while.
4      Q   Have you ever gone on a vacation with
5  the Donelsons?
6      A   I believe I have once or twice.
7      Q   Attend parties with the Donelsons?
8      A   Yes.
9      Q   Can you describe the process by which
10  Mr. Donelson purchased Long Leaf Trading?
11      A   Could you be a little more specific
12  on process?
13      Q   Sure.  How did he buy the company?
14      A   He did a stock purchase.
15      Q   How did he identify Long Leaf Trading
16  as a company to buy?
17      A   I believe he used a business broker.
18  I was not involved with the business broker.
19      Q   And I'll just admonish you before
20  I ask this question because it may be outside the
21  scope of Mr. Donelson's waiver of attorney-client
22  privilege.  Did Mr. Donelson conduct due diligence
23  in connection with the sale?
24          MR. FALVEY: I'm fine with that.

Page 19

1      A   To the best of my knowledge, he did.
2  I wasn't retained to do in-depth due diligence
3  so ...
4  BY MR. PLATT:
5      Q   What was the scope of your engagement
6  with respect to the purchase transaction of Long
7  Leaf Trading?
8      A   To review the stock purchase agreement
9  and to attend the closing, and I did give a list of
10  some due diligence items that he should request.
11      Q   What were those due diligence items that
12  you listed that he should request in connection with
13  the purchase of Long Leaf Trading?
14      A   All AP agreements, all disciplinary
15  issues, all regulatory inquiries, all NFA audits,
16  any accounting paper -- the accounting -- the
17  financial end of the purchase.  Mr. Donelson is a
18  CTA so he would have been more attuned to handling
19  than a lawyer.  Customer complaints, list of the
20  basic contract in existence with the business, the
21  operations side, data fee, leases.  I'm sure there
22  were a few more, but off the top of my head I can't
23  remember.
24      Q   You had never provided legal services

Page 20

1  to Long Leaf Trading before Mr. Donelson purchased
2  the company, is that right?
3      A   That's correct.
4      Q   You mentioned earlier that the seller
5  of Long Leaf Trading was Mr. Evans.  That's Timothy
6  Evans, right?
7      A   That's what was represented, yes.
8      Q   Fair enough.  And do you know if
9  Timothy Evans was in fact the owner of Long Leaf
10  Trading when it was sold to Mr. Donelson?
11      A   That's what it appeared to be, that he
12  owned the stock.
13      Q   Do you have any reason to think there
14  were other owners of the company?
15      A   No.  It's just I have -- I don't
16  believe the truthfulness of Mr. Evans, period,
17  now.
18      Q   Do you know where Mr. Evans is presently
19  located?
20      A   Last I knew, he'd gone to Mexico.
21      Q   When is the last time you interacted
22  or communicated with Timothy Evans?
23      A   I made a demand on his attorney for
24  rescission, and I attempted to serve Mr. Evans

REBECCA J. WING

Page 21

1  not through the Hague Convention but just through
2  the emails pursuant to the contract.  So that
3  would have been -- I'm sorry, you know.  The dates
4  escape me, but a couple years back.  Two years back,
5  maybe three, maybe two, okay.
6      **Q    Was it around the time that you filed**
7  **the complaint against Timothy Evans on behalf of**
8  **Donelson Enterprises?**
9      A   It was before that, of course, but yes.
10     **Q    Do you remember what Timothy Evans' email**
11 **address is?**
12     A   I believe it's in the stock purchase
13 agreement or some of the closing documents, but
14 offhand, no.
15     **Q    Other than the information that would**
16 **be in the stock purchase agreement, you're not aware**
17 **of any other email addresses that Mr. Evans uses?**
18     A   No, and his attorney was dark on that
19 matter.
20     **Q    You mentioned rescission.  Is that the**
21 **basis for Donelson Enterprises' lawsuit against**
22 **Mr. Evans?**
23     A   I don't know if that's an area --
24     THE WITNESS: Jim?

Page 22

1      MR. FALVEY: Can you say the question
2  again, Jody?  I'm sorry.
3      MR. PLATT: Sure.  Earlier Ms. Wing
4  referenced a desire to rescind the contract,
5  if I heard that correctly.
6      MR. FALVEY: Yes.
7      MR. PLATT: And I asked -- the question
8  is is that the basis for Mr. Donelson's lawsuit
9  against Timothy Evans that's pending in Cook
10 County Circuit Court.
11     MR. FALVEY: Yeah, that's fair.  It's
12 public so ...
13     A   Okay.  Well, rescission is the remedy
14 we're seeking.  That's not the basis of the lawsuit.
15 It's the remedy we're seeking.
16 **BY MR. PLATT:**
17     **Q    So what's the basis of the lawsuit?**
18     A   Fraud, fraud, fraud.
19     **Q    Just to flesh that out a little bit,**
20 **is it Mr. Evans' fraud against Donelson Enterprises**
21 **in connection with the sale transaction of Long Leaf**
22 **Trading?**
23     A   Correct.
24     **Q    What's the status of that litigation?**

Page 23

1      A   I'm not handling it on a day-to-day basis
2  anymore.
3      **Q    Do you know --**
4      A   I believe there was a substitution
5  of counsel.
6      **Q    Do you know who's prosecuting that lawsuit**
7  **on Mr. Donelson's behalf now?**
8      A   I thought Jim was or Mr. Iavarone, but
9  Mr. Iavarone retired so I don't know.
10     **Q    Do you know if Mr. Evans has been served**
11 **with process in that case?**
12     A   While I was representing, no, he had
13 not been successfully served yet.  Well, I take
14 that back.  It is our position that he was served
15 pursuant to contract, and he was successfully served
16 pursuant to giving email notice pursuant to
17 contract.  Was he served pursuant to the Hague
18 Convention, no.
19     **Q    That's helpful.  Thank you.**
20     MR. PLATT: I'm going to mark CFTC
21 Exhibit 352 and share this with you, Ms. Wing.
22     (Whereupon CFTC Exhibit No. 352
23       was marked for identification.)
24     **Q    Do you recognize Exhibit 352?**

Page 24

1  **And I can scroll down as much as you'd like,**
2  **but hopefully this initial page will give you**
3  **the gist of it.**
4      A   Well, I assume it is the complaint we
5  filed against Long Leaf.
6      **Q    Do you recognize this as the CFTC's**
7  **complaint against Long Leaf, Mr. Donelson,**
8  **Mr. Evans, Mr. Ruth and Mr. Nelson?**
9      A   Oh, wait.  I'm sorry.  Yes, thank you.
10 I assume it is the complaint you filed.  But, no,
11 I really don't know -- I don't remember it, yeah.
12     **Q    Are you aware that the CFTC sued Long Leaf**
13 **and Mr. Donelson in federal court?**
14     A   I am.
15     **Q    How did you become aware of that fact?**
16     A   I assume Mr. Donelson told me or the CFTC
17 told me.  I don't recall.
18     **Q    Have you ever reviewed the complaint**
19 **that the CFTC filed against Long Leaf Trading and**
20 **Mr. Donelson?**
21     A   Yes.
22     **Q    What is your understanding of the nature**
23 **of the CFTC's claims against Long Leaf Trading and**
24 **Mr. Donelson?**

**REBECCA J. WING**

Page 25

1    A   Oh, Joe, it's been a long time since
2   I've looked at it.  So I don't have an understanding
3   as I sit here today as to all the natures, but I can
4   agree or disagree if you list them out.
5    **Q   Do you generally agree that there**
6   **are fraud claims and regulatory violations alleged**
7   **in the CFTC's complaint?**
8    A   That is correct.
9    **Q   I'm just going to scroll down and if**
10  **you'd like me to slow down or stop, please just let**
11  **me know.  I just want to focus on the claims that**
12  **are listed in the complaint.**
13   A   Okay.  Let me exit out of something
14  that pops up from Webex, okay?  I missed Count I.
15   **Q   Sure.  So I'm on -- in CFTC Exhibit 352**
16  **I'm on page 18 of the internal pagination in the**
17  **blue ECF pagination, which you can see at the top**
18  **of the page.**
19   A   Uh-huh.
20   **Q   This is heading Roman Numeral V or 5.**
21  **It's titled Statutory and Regulatory Violations.**
22  **Do you see that?**
23   A   Yes.
24   **Q   Count I is Fraud in Connection**

Page 26

1   **with Options on Futures Contracts, is that right?**
2    A   Okay.  That's what it says.
3    **Q   I'm just going to scroll down and now**
4   **I'm on page 20.  Count II is also a fraud claim,**
5   **right?**
6    A   Fraud claim by a CTA, yes, is what
7   it claims.
8    **Q   On page 22 of CFTC Exhibit 352**
9   **Count III is another fraud claim that's titled**
10  **Fraudulent Advertising by a Commodity Trading**
11  **Advisor.  Did I read that correctly?**
12   A   That is what it says, yes.
13   **Q   Count IV, which is on page 23,**
14  **reads Failure to Register as a Commodity Trading**
15  **Advisor.  Did I read that correctly?**
16   A   Yes.
17   **Q   Count V on page 25 is Failure to**
18  **Provide Required Disclosures for Trading Program.**
19  **Did I read that right?**
20   A   Correct.
21   **Q   Count VI on page 26 is Failure to Register**
22  **as Associated Persons, right?**
23   A   That is what it says.
24   **Q   So this is a six-count complaint.  So**

Page 27

1   **do you agree that the first three counts relate to**
2   **fraud and Counts IV, V and VI relate to regulatory**
3   **violations?**
4    A   As stated here, yes.  I do not agree
5   that the allegations are correct, but that is what
6   it says.
7        **MR. PLATT:** I'm going to mark CFTC
8      Exhibit 353 and share my screen with you.
9         (Whereupon CFTC Exhibit No. 353
10         was marked for identification.)
11   **Q   Are you able to read CFTC Exhibit 353?**
12   A   I see that it's the response to
13  interrogatories by Mr. Donelson.
14   **Q   Exhibit 353 is Donelson's response**
15  **to the CFTC's first set of interrogatories.  Do you**
16  **agree?**
17   A   That's what it says, yes.
18   **Q   Have you ever seen this document before?**
19   A   I don't know.  Did I sign it?  You need
20  to scroll all the way down on the title.
21   **Q   Okay.  I'll scroll slowly through the**
22  **document and you can tell me --**
23   A   Yeah.  After 35 years of practicing law,
24  everything looks -- begins to blend in together,

Page 28

1   as you can appreciate.
2    **Q   I certainly can.  And just let me**
3   **know, you know, if you want me to slow down on**
4   **the document --**
5    A   I have not seen this document.
6    **Q   Okay.  On page 2 of CFTC Exhibit 353**
7   **there's a heading Responses, and under Responses**
8   **Mr. Donelson repeated Interrogatory No. 1 and then**
9   **you see the answer to Interrogatory No. 1.  Do you**
10  **see that?**
11   A   Yes.
12   **Q   Mr. Donelson's answer to interrogatory**
13  **No. 1 he writes, "Donelson will assert an Advice**
14  **of Counsel defense as it relates to Counts IV, V and**
15  **VI of the Complaint."  Did I read that correctly?**
16   A   That's what it says.
17   **Q   And we just looked at Counts IV, V**
18  **and VI of the complaint, and I think we all agree**
19  **that those were the regulatory violations.  Is that**
20  **a fair summary?**
21   A   That's a fair summary.
22   **Q   I'm going to scroll down on CFTC**
23  **Exhibit 353 to Donelson's response to CFTC**
24  **Interrogatory No. 2 and he writes, "Donelson relied**

REBECCA J. WING

Page 29

1 on the advice provided by Rebecca Wing."  That's
2 you, right?
3     A    That's -- I assume so, yes.  I don't know
4 of another one.
5     Q    That's your office address, the 5401 Patton
6 Drive in Lisle, Illinois?
7     A    That's correct.
8     Q    We can put that to the side.  Ms. Wing,
9 I'm going to mark CFTC Exhibit 354 and share it
10 with you.
11            (Whereupon CFTC Exhibit No. 354
12              was marked for identification.)
13     Q    This is another discovery response.
14 Do you agree that this is titled James Donelson's
15 response to plaintiff's second set of
16 interrogatories?
17     A    Yes.
18     Q    I'm scrolling down to the bottom
19 of page 2 on CFTC Exhibit 354.  What's listed
20 as Interrogatory No. 3 on this document -- but
21 I think it might actually have been the CFTC's
22 fifth interrogatory to Mr. Donelson, but we'll
23 call it 3 on this document -- it seeks information
24 about any conversations between you, Ms. Wing, and

Page 30

1 Mr. Donelson concerning Long Leaf Trading's
2 obligation to register as a commodity trading
3 advisor, its obligation to provide Part 4 disclosure
4 documents to prospective customers and the
5 obligation of any Long Leaf employee.  And I'll
6 represent to you that the interrogatory reads, "the
7 obligation of any Long Leaf employee to register
8 as an associated person of an introducing broker."
9 And you see Mr. Donelson's answer reads, "Please
10 see the attached outline of conversations with
11 approximate dates and subject matters discussed
12 in a PDF entitled 'Registration Conversations.'"
13 Did I read that answer correctly off of CFTC
14 Exhibit 354?
15     A    Yes.
16     Q    I'm going to mark CFTC Exhibit 355,
17 and I'll represent to you that this is the document
18 that's referenced in Mr. Donelson's interrogatory
19 response titled Registration Conversations.  This
20 was produced to us by Mr. Falvey on Mr. Donelson's
21 behalf and revised on June 14, 2021.
22            (Whereupon CFTC Exhibit No. 355
23              was marked for identification.)
24     Q    Do you recognize Exhibit 355?

Page 31

1     A    This is -- wait.  I thought this was
2 Exhibit 354.  Did I mismark in my notes?
3     Q    I think 354 is the interrogatory
4 responses.  I marked this separate document as 355.
5     A    Okay.  I don't know if I recognize this.
6 I might have seen it.  I don't recall offhand.
7     Q    Understanding that you don't
8 necessarily recognize the document, please take
9 a minute to review it and familiarize yourself
10 with its contents.
11     A    Yes.
12     Q    Ms. Wing, do you agree that CFTC
13 Exhibit 355 generally references four discrete
14 conversations between you and James Donelson at
15 various times between November 2017 and June
16 of 2018?
17     A    It represents four topics, yes, of
18 discussion.
19     Q    So the heading on Exhibit 355 on
20 the right-hand column is Nature of Conversation,
21 and I see four discrete paragraphs.  Do you think
22 this represents four individual conversations or
23 more than four individual conversations?
24     A    Oh, definitely more than four

Page 32

1 individual conversations.  It was over a period
2 of time.
3         MR. PLATT: I'm now going to show
4 what I'm going to mark as CFTC Exhibit 356.
5            (Whereupon CFTC Exhibit No. 356
6              was marked for identification.)
7     A    Yes.
8     Q    Do you recognize this as the corrected
9 answer of James A. Donelson that he filed in the
10 CFTC vs. Long Leaf Trading case?
11     A    First time I'm seeing it here.
12     Q    Up at the top in the blue text do you
13 see where it says in the middle of the document the
14 No. 30?
15     A    Yes.
16     Q    And the title of this legal document
17 is Corrected Answer of James A. Donelson, correct?
18     A    Yes, that's what it says.
19     Q    I'm going to scroll down to paragraph 35
20 of this document.
21     A    The mouse needs oil.
22     Q    The answer, James Donelson's answer to
23 paragraph 35 of the CFTC's complaint, the second
24 sentence reads, "Donelson Admits that subsequent

REBECCA J. WING

1 to January 1, 2018, representatives of Long Leaf
2 used scripts approved by Long Leaf's attorney in
3 soliciting customers." Did I read that accurately?
4　A　That's what it says.
5　Q　And I'm scrolling down to paragraph 45.
6 Donelson's answer to paragraph 45 of the CFTC's
7 complaint contains that same sentence. Do you
8 see that?
9　A　I see that.
10　Q　Ms. Wing, I'm going to ask you
11 questions today, and I already have, that seek
12 information that's potentially covered by the
13 attorney-client privilege. When a defendant
14 seeks to make an advice of counsel defense, he
15 impliedly waives privilege over at least the
16 documents and information concerning the topics
17 that have been placed at issue by the assertion
18 of the defense.
19　　　　Based on Mr. Donelson's
20 discovery responses which we've just reviewed
21 and on Mr. Donelson's answer, I understand he
22 may be making an advice of counsel defense over at
23 least Counts IV, V and VI of the CFTC's complaint,
24 which are the regulatory violations, and associated

1 controlling person and respondeat superior charges
2 and that you are the attorney who Mr. Donelson
3 contends advised him on some or all of the issues
4 concerning those violations.
5　　　　Is that consistent with your
6 understanding of Mr. Donelson's defense to this
7 case?
8　A　I believe the answer to that is yes.
9　Q　It's not my intent to elicit privileged
10 information on topics that have not been and will
11 not be placed at issue by Mr. Donelson's assertion
12 of the advice of counsel defense, but I may ask
13 questions that cross the line into privileged
14 territory to establish the topics on which
15 Mr. Donelson is not going to assert an advice
16 of counsel defense. Does that make sense?
17　A　That it does.
18　Q　What that means is for both you and
19 Mr. Falvey, who is present and represents Long
20 Leaf Trading and Mr. Donelson, that you'll have
21 to be vigilant in either objecting in Mr. Falvey's
22 case or your case, or in your case to not answer
23 any questions that elicit privileged information
24 that is not within the scope of Mr. Donelson's

1 at issue waiver. Do you understand?
2　A　I do.
3　　　MR. PLATT: Mr. Donelson -- or, excuse
4 me, Mr. Falvey, do you agree to proceed on
5 this basis?
6　　　THE WITNESS: You're on mute.
7　　　MR. FALVEY: Thank you, sorry. I do, yes.
8 BY MR. PLATT:
9　Q　The CFTC will take the position
10 that any assertion of an advice of counsel defense
11 on topics into which Mr. Donelson does not provide
12 discovery will be waived. In other words, if the
13 witness does not answer questions on the basis of
14 privilege, Mr. Donelson may not assert an advice
15 of counsel defense later on those respective topics,
16 and I think there's a lot of case law that supports
17 that position.
18　　　　So in light of this admonition,
19 if you want to go off the record, Ms. Wing, to
20 discuss any privilege issues with Mr. Falvey before
21 answering, please let us know and we can address
22 those issues as they arise, okay?
23　A　We can proceed.
24　Q　Thank you.

1　　　MR. PLATT: So we've been going for
2 about 45 or 50 minutes, and I'm at a natural
3 sort of break. Does anyone want to take a break
4 or should we continue?
5　　　THE WITNESS: It's up to you.
6　　　MR. PLATT: Well, with that in mind,
7 we can proceed. I don't need any breaks.
8　　　MR. FALVEY: Jody's the marathon man.
9　　　THE WITNESS: Well, some of us old pros
10 can go a long time.
11 BY MR. PLATT:
12　Q　So let's turn back to CFTC Exhibit 355,
13 which is the PDF that's titled Registration
14 Conversations. As I read this document, there
15 are four separate conversations or, as I understand
16 it, maybe a series of conversations and let's label
17 them by topic just for ease of reference. There
18 are four paragraphs. The top one can we label
19 Conversation 1 and the bottom one Conversation 4
20 and just go down sequentially? Does everyone agree
21 that that makes sense?
22　A　Yes.
23　　　MR. FALVEY: Yes.
24

REBECCA J. WING

Page 37

1 BY MR. PLATT:
2 Q Okay. So Conversation 1, it looks
3 like Mr. Donelson says that it took place sometime
4 between November 2017 and February 2018 and dealt
5 with the classification of the entity as an IB.
6 Is that -- did I read that correctly?
7 A You did.
8 Q And Conversation 2 has the same time
9 frame, November 2017 through February 2018, and
10 it dealt with the need for me, meaning Donelson,
11 to be registered as an associated person. Do you
12 agree with that reading of this little summary?
13 A You said No. 2? I would -- it was the
14 need of him to be registered as a principal upon
15 acquisition.
16 Q Thank you for that clarification.
17 So your understanding of Conversation 2, which
18 according to Exhibit 355 took place between November
19 and February -- November 2017 and February 2018,
20 only related to Mr. Donelson's requirement to be
21 registered as a principal, not as an associated
22 person. Do I understand your testimony correctly?
23 A Not necessarily. It deals with
24 Mr. Donelson wasn't registered at the time but

Page 38

1 must be disclosed as a principal when he acquired
2 ownership interest. He was taking the Series 3,
3 and upon his completion of the Series 3 he had to
4 be registered as an associated person.
5 Q We'll come back to Conversation 2 later
6 in the deposition. And then Conversation 3 looks
7 like it took place sometime in February of 2018 and,
8 again, dealt generally with Mr. Donelson's --
9 whether or not Mr. Donelson had to be registered
10 as an associated person. Do you agree with that?
11 A That's what it says, yes. I think it
12 encompasses more.
13 Q Okay. We'll come back to Conversation 3
14 as well. And then Conversation 4, fast forward a
15 couple months to June, the first two weeks of June
16 2018, again the topic of this conversation looks
17 like it dealt with Mr. Donelson's requirement to
18 register as an associated person. Do you generally
19 agree with that?
20 A Well, that's what it says, yes.
21 Q Okay, yeah. And I'm only asking, to
22 make sure we're talking about the same thing, when
23 we talk about the conversations that are listed on
24 Exhibit 355. So turning back to Conversation 1,

Page 39

1 what we've been calling Conversation 1, Mr. Donelson
2 writes in his interrogatory response, "We discussed
3 the classification of the entity as an IB. We
4 reviewed the requirements, looked at the ongoing
5 review of the NFA and information provided by
6 Mr. Evans. Based on information provided from
7 these sources, it was concluded that the
8 registration was correct." Did I read that summary
9 accurately?
10 A You did.
11 Q The entity in this summary of
12 Conversation 1 means Long Leaf Trading Group,
13 correct?
14 A Correct.
15 Q What is an IB?
16 A Introducing broker.
17 Q At the time this conversation took
18 place Long Leaf was registered as an introducing
19 broker, is that right?
20 A That's correct.
21 Q How do you know that?
22 A NFA BASIC listed it as an introducing
23 broker. We may have at this time requested the
24 registration file from the NFA and they listed it

Page 40

1 as an introducing broker, and the type of entity
2 Mr. Donelson was looking to buy was an introducing
3 broker.
4 Q So you recall seeking information
5 from the NFA, either through BASIC or from its
6 files, concerning the registration status of Long
7 Leaf Trading around this time?
8 A Yes, we requested the registration file.
9 I don't know exactly the timing of that, but that
10 is the normal course, yeah.
11 Q And just so the record is clear, what is
12 NFA BASIC?
13 A It's a database as to the registration
14 history of introducing brokers, associated persons,
15 CTAs, CPOs, FCMs.
16 Q And you know how to access NFA BASIC.
17 I'm sure you do it all the time, or have done it
18 all the time.
19 A Before it was on computer, yes.
20 Q But now that it's on the computer, are
21 you able to access it?
22 A Yes.
23 Q Do you recall the conversation that we've
24 been calling Conversation 1?

REBECCA J. WING

1    A   Do I recall?  I think it's a synopsis
2  of a series of conversations and, yes, we looked
3  into whether or not they were properly registered as
4  an introducing broker, and they were.  And that was
5  the type of business activity that was represented
6  to us.
7    Q   Exhibit 355, which is the regulatory
8  conversations PDF, lists a date range of three
9  months that spans before Donelson bought the
10  company and after Donelson bought the company.
11  Do you recall whether or not any of these series
12  of conversations concerning the registration status
13  of Long Leaf Trading Group occurred before Donelson
14  bought the business?
15    A   Yes.  I mean, that was an important
16  part, to make sure that it was -- we were buying
17  a registered introducing broker.
18    Q   Did any of the conversations you've
19  described occur after the sale closed sometime
20  in December 2017?
21    A   There would have been ongoing
22  conversations based on documents that were now
23  given to Mr. Donelson to confirm the accuracy of
24  those representations of an introducing broker.

1    Q   What documents are you referring to?
2    A   Oh, just compliance laws and other
3  items that was part of the purchase.  Do I recall
4  specific conversations after the close, no.
5    Q   To be clear about your recollection
6  of the way that Conversation 1 took place, you
7  do have a specific recollection of discussing Long
8  Leaf Trading's registration status with Mr. Donelson
9  before the sale closed but you do not have a
10  specific recollection of such a conversation
11  after the sale closed, is that accurate?
12    A   I don't know if I would say that
13  was accurate.  We talked about being registered
14  as an IB, but I don't recall specific dates of
15  conversations.  It was a collective conversation
16  over a group of time.
17    Q   Do you remember any specific
18  conversations after the sale closed on the issue
19  of whether or not Long Leaf Trading was properly
20  registered as an introducing broker?
21    A   I probably -- I remember talking
22  about the duties of an IB and requirements to
23  confirm that Long Leaf was conducting itself in
24  that course, which would mean whether or not it

1  was properly registered.
2    Q   So your testimony is, yes, you
3  recall specific conversations after the deal
4  closed concerning the registration status of Long
5  Leaf Trading?
6    A   I recall we discussed it, yes.
7    Q   Sorry to belabor the point, Ms. Wing.
8  When you say "that," what do you mean?
9    A   The issue of registration as an IIB for
10  Long Leaf Trading.
11    Q   And you recall discussing that issue
12  after the sale closed?
13    A   Yes, in the context of what is required
14  of an IIB at the time versus a non-guaranteed IB.
15    Q   Where did these conversations take place?
16    A   Probably on the -- most of them
17  on the phone, some in my office, some after the
18  close with -- probably then at Long Leaf's office.
19    Q   Was anyone else present for these
20  conversations?
21    A   I don't know if there were anybody
22  else present, definitely not at my office, and
23  I was aware of no one else on the phone when we
24  had phone calls.  There were brokers around at

1  Long Leaf's office, but they were not part of the
2  communications group.  Could they have overheard,
3  maybe, maybe not.  I don't know.  They shouldn't
4  have been eavesdropping.
5    Q   Do you have any notes reflecting these
6  conversations having taken place?
7    A   No, I'm not a big note taker.
8    Q   So it's your normal practice to not take
9  notes to memorialize conversations?
10    A   That's correct.  I find it's more
11  important to listen to what people are saying than
12  to worry about writing things down.
13    Q   I'm going to put Exhibit 355 back up
14  on the screen because I want to ask about some of
15  these specific terms that Mr. Donelson has written
16  here.  Do you see where he writes, "We reviewed the
17  requirements"?
18    A   Yes.
19    Q   What requirements did you and Mr. Donelson
20  review during Conversation 1?
21    A   Well, I of course don't know what
22  he's specifically referring to, but we reviewed
23  regulations.
24    Q   Do you remember what regulations

REBECCA J. WING

Page 45

1  you reviewed with Mr. Donelson as part of
2  Conversation 1?
3      A   Oh, the NFA rules concerning
4  introducing brokers, registration rules, the
5  CFTC rules.  Forgive me.  I don't recall now off
6  the top of my head the rule numbers without going
7  through the rule book, but we reviewed CFTC and NFA
8  rules and regulations.
9      Q   And for the NFA rules that you just
10  described, you said that they concerned introducing
11  brokers.  Did the CFTC rules that you reviewed also
12  concern introducing brokers?
13      A   Yes, what is an introducing broker.
14  Most of it is memorialized in the NFA rules on the
15  day-to-day requirements.
16      Q   Did you review any rules
17  concerning commodity trading advisors as part
18  of Conversation 1?
19      A   I probably did, yes.
20      Q   What makes you say you probably did?
21      A   Because I would have reviewed all the
22  registration rules.  That's normal.  And it was
23  based on our understanding of the activity.  They
24  were not registered as the CTA or CPO and they

Page 46

1  were not doing activity that required registration
2  as a CTA or CPO, as represented by Mr. Evans and
3  the documents that were provided as reflected on
4  the NFA audit sheet report.
5      Q   Between November 2017 and February 2018
6  did you advise Mr. Donelson that Long Leaf Trading
7  was not required by the Commodity Exchange Act and
8  CFTC regulations to register as a commodity trading
9  advisor?
10      A   Based on the representations
11  that were provided by Mr. Evans and the type of
12  business and based upon a review of the NFA audit
13  report, it did not appear that Long Leaf Trading was
14  operating other than an introducing broker.  And so,
15  therefore, the discussion was they had -- they were
16  properly registered as an introducing broker.
17      Q   I just want to make sure that
18  I understand your answer to my question, Ms. Wing.
19  Does that mean that you advised Mr. Donelson that
20  Long Leaf Trading was not required to register as
21  a commodity trading advisor between November 2017
22  and February 2018?
23      A   Based upon the representations that
24  Long Leaf was not engaging in any activity as

Page 47

1  a commodity trading advisor, yes, they were not
2  required to register as a CTA.
3      Q   So I think I'm getting -- I'm
4  asking a slightly different question.  Did you
5  tell Mr. Donelson that Long Leaf Trading was not
6  required to register as a commodity trading advisor
7  between November 2017 and February 2018?
8      A   We had discussions about the nature
9  of trading and the nature of business Long Leaf
10  did and what registrations would be required.
11  Did I come out and say you don't have to register
12  as a CTA, I don't recall saying that.  But I
13  recall confirming that they were not engaging in
14  any commodity trading advisor activity based on the
15  representations from Mr. Evans and the documents he
16  provided and the documents the NFA provided.
17      Q   So in this -- in Conversation 1, in
18  Donelson's conversation -- summary of Conversation 1
19  he writes we looked at the ongoing review of the
20  NFA and information provided by Mr. Evans, and I
21  think you referenced those two items in sort of the
22  factual underpinnings of your assessment of Long
23  Leaf Trading's registration status.  What does
24  this mean by review of the NFA, ongoing review

Page 48

1  of the NFA?  What is that?
2      A   I didn't write it so I don't know what
3  Mr. -- you're asking me what Mr. Donelson meant
4  by him writing something.  It is just an assumption
5  on my part.  I wouldn't have worded it that way.
6  We reviewed the NFA file, registration file and
7  audit report.
8      Q   What is the NFA audit report you're
9  talking about?
10      A   They did -- it's called an audit.
11  They would -- they were audited by the NFA and NFA
12  would write up their findings in an audit report.
13      Q   What aspect of Long Leaf Trading's business
14  was audited by the NFA before November 2017?
15      A   Well, I assume all aspects of it.
16      Q   What information was in the audit --
17  in the NFA audit report that you reviewed before
18  Conversation 1 took place?
19      A   The actual audit report.  I don't recall
20  which one.  There were several audit reports and I
21  don't recall the timing of those audit reports.
22      Q   Did Mr. Donelson provide the audit
23  report to you?
24      A   I don't recall whether I requested

REBECCA J. WING

Page 49

1 the NFA file or Mr. Donelson did and how it got
2 to us or whether it was provided by Mr. Evans.
3 I don't recall.
4 **Q But you recall --**
5 A I'm sorry.
6 **Q You recall looking at the NFA audit report**
7 **and having possession of it?**
8 A Reviewing it, yes. When I reviewed it,
9 timeline, it's foggy at this point.
10 **Q How do you think you got it?**
11 A Like I said, it was either my
12 requesting the NFA file, Mr. Donelson requesting
13 the NFA file or it was provided by Mr. Evans'
14 attorney in a request.
15 **Q Did it come to you by email do you think?**
16 A I have no idea.
17 **Q Do you still have it?**
18 A I don't know.
19 **Q Do you delete emails related to your**
20 **legal practice?**
21 A No, but I don't -- I've had some
22 computer technical issues. I don't have the
23 technical -- I don't have an IT officer, just
24 me. So depending on the time it was, it should

Page 50

1 have been there.
2 **Q You use Microsoft Outlook for your email,**
3 **right, Ms. Wing?**
4 A Yes, and Gmail and a few others depending
5 on --
6 **Q Which email address did you use when**
7 **you were representing Mr. Donelson?**
8 A The rebeccajwing@outlook.com. But
9 I've had a computer crash that destroyed some
10 of my documents, and my practice is to remove
11 emails and put them in a stored file. So I have
12 limited storage on email so I don't -- I haven't
13 looked and it may or may not be there. It may
14 have come by email. It may have come by mail.
15 I got a lot of hard documents back then.
16 **Q In 2017 you were still receiving**
17 **hard documents in connection with your business?**
18 A Well, the NFA can make a document
19 request and mail it out in hardcopy back then.
20 So if it came from my request from the NFA, it would
21 have been a hardcopy.
22 **Q What kinds of information are contained**
23 **in NFA audit reports of the type you're referencing?**
24 A They would -- they're assessments

Page 51

1 of the audit of first, you know, the financial,
2 the compliance activities review. They would have
3 reviewed broker recommendations, advertising.
4 Back then Long Leaf was an independent IB, so there
5 would have been a financial review. So those items
6 would have been covered or may have been covered.
7 Not all of them are always covered.
8 **Q You also mentioned that you based your**
9 **assessment of Long Leaf's registration status on**
10 **information you received from Mr. Evans. And I**
11 **know this is going back a ways, but what information**
12 **did Mr. Evans provide you that was germane to your**
13 **analysis of whether or not Long Leaf Trading was**
14 **required to register as a commodity trading advisor?**
15 A Whether they took discretion over
16 any account, whether they developed the trading
17 strategy, did all clients follow the same trading,
18 and I believe at the time they said that they may
19 have had a few discretionary accounts but they were
20 not a big part of the business and the majority
21 of their accounts were self-directed and they
22 obtained -- there was permissions to enter and
23 exit every trade.
24 **Q What do you mean by discretion over**

Page 52

1 the account?
2 A A discretionary account would mean
3 that a client gave permission to the broker to
4 trade the account without obtaining permission for
5 every activity of placing an order or exiting an
6 order in the market or the type of commodity or
7 futures trades.
8 **Q How do introducing --**
9 A I'm sorry.
10 **Q How do introducing brokers typically obtain**
11 **discretion over an account?**
12 A It would need to be a managed --
13 well, the FCM that they trade with would have
14 managed account paperwork that would need to be
15 completed.
16 **Q Did that include something called the**
17 **power of attorney?**
18 A That's correct. That would be in the
19 managed account paperwork.
20 **Q And so your recollection is that**
21 **Evans represented to you that most of the customers**
22 **were not managed accounts, were not discretionary**
23 **traders?**
24 A That's correct. I don't recall

REBECCA J. WING

Page 53

1  if I saw any managed account paperwork in their
2  customer files that we saw.
3  Q   What about whether or not Long Leaf
4  developed its own trading strategies, what did
5  Mr. Evans tell you about whether or not Long Leaf
6  developed its own trading strategies?
7  A   He did not tell me.  I didn't have
8  an individual conversation with Mr. Evans.  I can
9  tell you that he represented to Mr. Donelson, who
10  represented to me, that there were not -- that they
11  were not using a standardized trading system, that
12  they had -- they were broker-assisted accounts and
13  they may have had a recommended trade, that they
14  would reach out to the customers to see if the
15  customers wanted to enter those trades.
16  Q   But these were trades -- you understood
17  that they were trades that Long Leaf came up with,
18  not like some third-party service, right?
19  A   I didn't -- I wasn't aware if they
20  were using a third-party service.  I'm sure there
21  were some clients that used third-party service
22  themselves that may or may not have been disclosed
23  on the trading recommendation.  But, no, it
24  was my understanding that the brokers themselves

Page 54

1  adjusted certain trades but that they did not have
2  discretion.
3  Q   Okay.  So of these recommended trades
4  that you referenced, were you provided with any
5  information indirectly from Mr. Evans about whether
6  or not Long Leaf Trading devised those trades or
7  obtained those trades from a third party?
8  A   It was my recollection that they
9  devised the trades at the time.  I don't know if
10  that was my recollection later on.
11  Q   Can you explain how your recollection
12  may have changed?
13  A   Based upon your investigation of what
14  Long Leaf did prior to the purchase.
15  Q   Just so the record's clear, Ms. Wing,
16  did you understand that of the trades that Long Leaf
17  recommended to its customers, did you understand
18  that those trades were devised by Long Leaf Trading
19  personnel or that they got them from a third party?
20  A   During the time frame we're talking about,
21  it was my understanding that they were devised by
22  Long Leaf themself.
23  Q   And you also said that indirectly
24  from Mr. Evans before Mr. Donelson purchased the

Page 55

1  company, you learned that not all clients followed
2  the same trading strategy.  Did I hear that
3  correctly?
4  A   Yes, that many -- I mean, they were
5  nondiscretionary clients trading their own account
6  but they -- many of them were broker assisted,
7  meaning that the brokers themselves suggested
8  some trades.
9  Q   So of the broker-assisted clients,
10  Ms. Wing, indirectly from Mr. Evans did you learn
11  that those customers received the same trading
12  recommendations or different trading
13  recommendations?
14  A   They received -- at the time I believe
15  they received similar trading, but it varied on
16  account size, the account risk tolerance.  Not all
17  customers executed the suggestions.  They didn't
18  follow the broker's advice.
19  Q   Did Mr. Donelson provide you
20  with any information before the sale closed that
21  informed your advice about whether or not Long Leaf
22  Trading was required to register as a commodity
23  trading advisor other than the two sources you've
24  indicated, which are indirectly through Mr. Evans

Page 56

1  or the NFA audit?
2  A   That would be the only evidence he
3  would have -- or documentation he would have at
4  that time, yes.
5  Q   So the answer is, no, there's no other
6  sources of information that you relied on when you
7  came to your legal conclusion that Long Leaf Trading
8  did not need to register as a commodity trading
9  advisor in or around November of 2017?
10  A   I believe that's a correct statement.
11  Q   And to summarize the information that
12  you learned from Mr. Evans in or around November
13  of 2017 about Long Leaf's business activities, it
14  sounds like you learned that most of Long Leaf's
15  customers were nondiscretionary customers but there
16  were some customers that engaged in broker-assisted
17  trading, is that right?
18  A   Yes.
19  Q   And among the broker-assisted
20  trading customers, they would receive similar
21  trade recommendations but the differences might
22  vary based on the account size or the customer's
23  risk tolerance, is that right?
24  A   Correct.

REBECCA J. WING

Page 57

1  Q   But the underlying trade, the contract
2  underlying the strategy would be the same, is that
3  right?
4      A   Yeah.  I mean, were they trading corn,
5  were they trading wheat, were they -- I mean, yes,
6  I believe the underlying contract was the one that
7  the broker had done the research in.
8      Q   Right, and that's what I'm getting
9  at.  That's helpful.  And you also understood
10 based on information provided to you by Mr. Evans
11 that sometimes customers would not execute the
12 recommended trades but sometimes they would?
13     A   Yes, and sometimes they would exit
14 quicker than the recommended time frame to hold
15 the trade for.
16     Q   Did you receive any information
17 from Mr. Evans about the frequency with which
18 customers would not execute the recommended trades?
19     A   I don't -- I think -- no, I don't
20 recall that specifically the way you phrased it.
21     Q   What about the way that I phrased
22 it sort of brings it out of your recollection?
23     A   Boy, that's a hard question.
24     Q   Let me try and rephrase because I agree

Page 58

1  with you it's probably a poorly formed question,
2  so let's try it again.  We're discussing Long Leaf's
3  business model and when you learned about it from
4  Tim Evans in November of 2017 before Mr. Donelson
5  bought the company, okay?  And you said that there
6  were broker-assisted nondiscretionary accounts who
7  received trading recommendations that had the same
8  underlying components but varied based on the size
9  of the account or the customer's risk tolerance.
10 Do I have that right?
11     A   Yes.
12     Q   Did you learn anything from Mr. Evans
13 about the frequency with which customers did not
14 execute the recommended trades?
15     A   No, except that every customer gave
16 their approval or disapproval per every trade.
17     Q   So you didn't know if 90 percent
18 of recommendations were accepted or 10 percent
19 of recommendations were accepted, is that right?
20     A   That is correct.  But what we did know
21 is 100 percent that were approved activities per
22 each trade, they contacted each customer, they got
23 their permission or the permission was rejected
24 to enter those trades.

Page 59

1      Q   Did you learn any information from
2  Mr. Evans in November of 2017 about how frequently a
3  customer would deviate from the recommended trades?
4      A   I don't recall receiving anything at
5  that -- in November.
6      Q   Did you receive information of that nature
7  at any time?
8      A   I don't recall right now off the top
9  of my head, except for verification that every
10 customer authorized every trade and that several
11 customers traded more than what was recommended
12 and traded less.
13     Q   I think you also mentioned that
14 you reviewed documents that you received from
15 Mr. Donelson that had been provided to Mr. Donelson
16 from Mr. Evans.  Do you remember that?
17     A   That I received documents -- say it again.
18 I'm sorry.  I got distracted.
19     Q   I'm talking about -- I'm generally
20 asking about the sources of information that
21 you had in November of 2017 when you advised
22 Mr. Donelson that Long Leaf Trading was properly
23 registered as an introducing broker.  And I think
24 you mentioned the NFA audit as one source of

Page 60

1  information?
2      A   Yes.
3      Q   You mentioned information that you
4  received from Donelson that he was relaying from
5  Evans, right?
6      A   Well, Mr. Donelson brought information
7  to my office and we reviewed them, yes, that he
8  received from Mr. Evans.
9      Q   And I think you also mentioned that
10 Mr. Donelson provided you with documents that
11 he had received from Mr. Evans.  Did I hear that
12 correctly?  Was that a source of information that
13 you relied on?
14     A   I relied on documents that Mr. Donelson
15 received from Mr. Evans of -- be it directly or
16 through the business broker or whoever.
17     Q   Do you remember what those documents were?
18     A   There were runs, commission runs
19 and a whole stack of reports that -- oh, I'm losing
20 my train of what you used to call the report in
21 the back office system, you know, those reports.
22 CQG, no?  Is it CQG?  Sorry.  I haven't been in
23 that field for a little bit, but there were the
24 reports that they would -- Long Leaf would receive

REBECCA J. WING

Page 61

1  from their carrying broker listing activities
2  and trades and exception reports. There were
3  financial reports audited from Long Leaf's auditors
4  and compliance reports. There were, again, the NFA
5  reports from audits.
6      Q   Other than the NFA audit that you
7  referenced, information relayed to you verbally
8  by Mr. Donelson that he received from Mr. Evans and
9  these documents that you have just listed, do you
10  recall any other sources of information that formed
11  the basis for your analysis that Long Leaf Trading
12  did not have to register as a commodity trading
13  advisor in November 2017?
14     A   At this moment, no.
15     Q   Would anything refresh your recollection?
16     A   I -- at this point I don't know if anything
17  would.
18     Q   You've got a client file, right, for Long
19  Leaf?
20     A   Yes, but I wouldn't have retained
21  the client submission documents Mr. Donelson
22  brought. I mean, we sat down together and went
23  through it.
24     Q   What I'm getting at is if you went

Page 62

1  and looked at your client file, you don't think
2  there would be anything else that would jog your
3  memory about other sources of information --
4      A   I doubt it because Mr. Donelson kept
5  most of those records. I mean, he would -- he
6  brought the records to my office to review that
7  he would have received from the business broker
8  or Mr. Evans. I may have had the NFA reports and
9  stuff from BASIC in my files, but that we already
10  discussed.
11     Q   Before you provided Mr. Donelson with
12  your legal advice that Long Leaf Trading did not
13  need to register as a commodity trading advisor in
14  November 2017, what was your understanding of Long
15  Leaf's business model?
16     A   That they were an inter -- operating
17  purely as an introducing broker, an independent
18  introducing broker, and that they were -- they had
19  accounts that were broker assisted where they would
20  recommend trades. I believe there was a few clients
21  that had -- they had discretion over that was a
22  holdover from them acquiring some other business,
23  but that I don't recall, I don't have information
24  about, but that they were a small introducing

Page 63

1  broker. They had very few IB -- or APs, and they
2  all sat in the same location.
3      Q   Before you concluded that Long Leaf
4  Trading did not have to register as a commodity
5  trading advisor in November 2017, did you have
6  an understanding that Long Leaf Trading sold and
7  marketed a trading program called Time Means Money?
8      A   Did I have an understanding of that
9  one? I don't know if I was aware of Time Means
10  Money at that time.
11     Q   You don't --
12     A   I don't remember. It's the timing of
13  your question. I'm not aware of Time Means Money,
14  if I was aware of it in November of 2017.
15     Q   You're not sure if you were aware of it
16  or you were not aware of it?
17     A   I'm not sure.
18     Q   Were you aware generally that
19  Long Leaf Trading marketed a trading program
20  in November 2017 before you advised Mr. Donelson
21  that Long Leaf Trading did not need to register
22  as a commodity trading advisor?
23     A   I don't know if what they marketed was
24  in their marketing file that I saw.

Page 64

1      Q   Setting aside whether or not it was
2  in a marketing file, did you know that Long Leaf
3  Trading, part of their business model was a trading
4  program?
5      A   I don't believe I knew that at the time.
6      Q   But you knew that there were trading
7  recommendations made for broker-assisted customers
8  at that time, right?
9      A   Correct.
10     Q   Okay. And did you receive any
11  information concerning Long Leaf Trading's revenue
12  sources before you concluded that Long Leaf Trading
13  did not have to register as a commodity trading
14  advisor in November 2017?
15     A   We received those runs that -- from back
16  office that I referenced, the report.
17     Q   Did you have any way to know in
18  November 2017 before you advised Donelson that
19  Long Leaf Trading did not need to register as a
20  commodity trading advisor what proportion of Long
21  Leaf Trading's revenues were associated with the
22  broker-assisted trading recommendations?
23     A   I assumed the majority of it was
24  because these are brokers that gave trading

**REBECCA J. WING**

Page 65

1 recommendations. Do I know which accounts were
2 or were not, no. We did not have all that data.
3    Q  But just so I have it right, you
4 assumed in November 2017 that the majority of
5 Long Leaf Trading's revenue was associated with
6 the broker-assisted trading recommendations, is that
7 right?
8    A  Correct, based on their representations.
9    Q  Right. And what's the -- okay. And
10 information you received from Evans was the basis
11 for that understanding?
12    A  Correct.
13    Q  And when you say majority, can you
14 be more specific? Like 90 percent, 50 percent,
15 51 percent?
16    A  No, I can't be specific at this time.
17    Q  Yeah.
18    A  No.
19    Q  Do you have any reason to believe that
20 it wasn't 90 percent or more?
21    A  I can't speculate as to the percentage.
22    Q  But you understood that it was a
23 majority of Long Leaf Trading's recommendations?
24    A  Over 50 percent.

Page 66

1    Q  Ms. Wing, you referenced these
2 broker-assisted customers and you also referenced
3 that at the time Mr. Donelson bought the firm,
4 Long Leaf Trading had some totally self-directed
5 customers who were not part of this broker-assisted
6 trading program. Did you receive any information
7 in November 2017 concerning the proportion of
8 Long Leaf Trading's customers that received these
9 broker-assisted trading recommendations?
10    A  No, I don't recall what we received.
11    Q  So, Ms. Wing, earlier you explained
12 that you advised Mr. Donelson in November 2017
13 that the introducing broker registration status
14 for Long Leaf Trading was correct, and I think
15 the implication was that Long Leaf Trading did not
16 have to register as a commodity trading advisor.
17 Is that fair?
18    A  That based on the representations and the
19 documents provided, yes, that they were functioning
20 purely as an introducing broker.
21    Q  And then Donelson bought the firm.
22 The stock purchase agreement is dated December 1,
23 2017. Did there ever come a time when Donelson
24 provided you with additional information and

Page 67

1 asked you to reassess your analysis of whether
2 or not Long Leaf Trading was required to register
3 as a commodity trading advisor?
4    A  There came a time when you presented
5 an audit question, yes. I don't recall whether
6 it was you or the NFA that presented -- that "you"
7 being the CFTC -- or the NFA that presented that.
8    Q  By audit question do you mean whether
9 or not Long Leaf Trading should have registered
10 as a commodity trading advisor?
11    A  Yes.
12    Q  Do you recall approximately when that
13 occurred?
14    A  Sorry, Joe. I don't recall.
15    Q  Was it --
16    A  I've had a lot of deps, a husband
17 that had quadruple bypass surgery just recently.
18 I'm lucky if I can recall my name right now.
19    Q  I can appreciate that. Thank you for
20 that clarification. So when the NFA or the CFTC
21 raised the question of whether or not Long Leaf
22 Trading was required to register as a commodity
23 trading advisor, did Mr. Donelson provide you
24 with any other additional factual information

Page 68

1 that was germane to your analysis?
2    A  Yes, he -- we confirmed that he, Long
3 Leaf at the time, received client authorization
4 on every single trade. And he had several clients,
5 Long Leaf did, that would not execute the
6 recommended trade, that doubled or even -- I think
7 one even tripled the recommendation and several who
8 would not hold the trade as long as the strategy
9 requested. He reconfirmed all that, Mr. Donelson
10 did.
11    Q  When Mr. Donelson asked you to confirm
12 your analysis that Long Leaf Trading did not need
13 to register as a commodity trading advisor, did he
14 provide you with any information concerning the
15 frequency with which customers would deviate from
16 the trading recommendations?
17    A  Did he provide me with documentation,
18 I don't know. Did he provide me with his
19 representation, yes.
20    Q  I'm not asking about documentation.
21 I'm asking if he told you how commonly or how
22 often customers would deviate from the recommended
23 trades.
24    A  How often? He said it varied per trade.

REBECCA J. WING

Page 69

1    Q   So it sounds like the answer is no,
2  he didn't provide you with information about how
3  often customers deviated from the recommended
4  trades.
5    A   I wouldn't say that's accurate.
6  He provided me with information that customers
7  did deviate, and every trading recommendation they
8  pretty much had a customer that didn't follow it
9  or deviated from it.
10   Q   So approximately one customer per trade?
11   A   At least one.  There were several others.
12 It depended on the timing of the market, depended
13 on the financial environment.
14   Q   Do you know how many customers Long Leaf
15 Trading has had over the years?
16   A   Not over the years, Joe.  I don't recall.
17   Q   Do you think at any particular time
18 there were more than a hundred customers or fewer
19 than a hundred customers for Long Leaf Trading?
20   A   I have no idea as I sit here right
21 now.  I don't recall the number.  I've had several
22 clients that had numbers that, you know, over the
23 years that were not --
24   Q   So this request, to reconfirm your

Page 70

1  analysis about whether or not Long Leaf Trading
2  was properly registered as an introducing broker and
3  not as a commodity trading advisor, do you recall
4  whether or not that occurred after the CFTC sent
5  Mr. Donelson a subpoena?
6    A   It would have been before.
7    Q   How do you know that?
8    A   Because it would have -- the subpoena
9  didn't start the issue.  There was either an NFA
10 audit request or 4g from the CFTC.  I can't remember
11 which.  But something started it and it wasn't --
12   Q   Thank you.  That's a helpful clarification.
13 So it may have been the CFTC's 4g request to Long
14 Leaf Trading?
15   A   Could be, could be.  There was an NFA audit
16 going on at the same time.
17   Q   And you mentioned that Mr. Donelson
18 related to you that some customers wished to deviate
19 from the trading recommendation.  Was the deviation
20 in the number of contracts that would be purchased
21 or was it in the actual structure of the trade?
22   A   Both, both.
23   Q   So it's your understanding that Long
24 Leaf Trading had customers who received trading

Page 71

1  recommendations that executed their own trades
2  that did not track the structure of the recommended
3  trade?
4    A   Correct.
5    Q   Would it surprise you to learn that
6  Long Leaf Trading has provided discovery responses
7  to the contrary?
8    A   I don't -- I don't know if it would
9  surprise me or not.
10   Q   Either way, Donelson told you that --
11 told you when he asked you to redo your legal
12 analysis that lots of customers deviated from the
13 structured trade that was recommended, is that
14 right?
15   A   A lot is your words.  He said customers.
16 Not every customer --
17   Q   Did you have an --
18   A   Not every customer executed
19 the strategy.  Not every customer entered the
20 trade.  Not every customer exited the trade at the
21 recommended exit time.  Not every customer traded
22 the quantity.
23   Q   That's helpful.  So let me follow
24 up by asking you this.  At the time Mr. Donelson

Page 72

1  asked you to confirm your analysis that Long Leaf
2  Trading was not a commodity trading advisor, what
3  information did he provide you about how frequently
4  customers deviated from the recommended trade?
5    A   He said that certain customers did
6  not execute the trade as recommended.  Some of
7  them passed completely on the trade.  Some of them
8  entered the trade at different quantities.  Many
9  would exit at a time that they suggested -- at a
10 different time and different exit strategy.  But he
11 did confirm that every single customer was contacted
12 before trades were entered and before they were
13 executed, that there was no discretion involved.
14   Q   Did Mr. Donelson tell you at the time
15 he asked you to reconfirm your legal analysis as
16 to whether or not Long Leaf Trading was required to
17 register as a commodity trading advisor whether or
18 not a majority of his clients followed the trading
19 recommendations as they were recommended?
20   A   I don't know if he told me that or that
21 was my understanding.
22   Q   Was it your understanding?
23   A   That a majority -- yes, that he took
24 no discretion and they were all broker-assisted

REBECCA J. WING

Page 73

1 accounts.
2 **Q Sorry. I think I'm asking a slightly**
3 **different question than the discretion issue. What**
4 **I'm asking is what information did Mr. Donelson**
5 **provide you when he asked you to reconfirm your**
6 **legal analysis that Long Leaf Trading was not**
7 **required to register as a commodity trading advisor**
8 **concerning whether or not a majority of his clients**
9 **followed his trading recommendations as they were**
10 **recommended?**
11 A The majority of the clients received his
12 trading recommendations, okay? He talked about his
13 clients deviating from his trading recommendation
14 and that he confirmed that every client approved
15 every trade, that there was no discretion taken.
16 **Q So I want to circle back on that**
17 **second point where Mr. Donelson talked about**
18 **some deviations from the recommendations. Did**
19 **Mr. Donelson explain to you whether or not the**
20 **majority of his clients followed the recommendations**
21 **as recommended?**
22 A I don't know if he said that or that
23 was my assumption.
24 **Q Was it your assumption?**

Page 74

1 A Yes, but he got discretion -- he got
2 authorization.
3 **Q So, again, I'm not talking about the**
4 **authorizing and the discretion. I'm asking you**
5 **about what I think you just testified was your**
6 **assumption that the majority of Long Leaf Trading**
7 **clients followed Long Leaf's trading recommendations**
8 **as they were recommended. Do you recall that**
9 **testimony?**
10 A I wouldn't say as recommended,
11 all of it. That's the problem. I disagree.
12 It's my understanding that they recommended the
13 trade. Some clients deviated from it, the number --
14 that everyone received -- everyone got approval.
15 They talked to every single client before the trade
16 was entered for that client.
17 **Q Okay. Thank you for that clarification.**
18 **And I'm not asking about whether or not Long Leaf**
19 **Trading had discretion over customers' accounts.**
20 **Let's assume for now that they did not have**
21 **discretion. So we agree, right?**
22 A Yes, but that's the key component
23 to determine whether or not somebody's required
24 to register as a commodity trading advisor.

Page 75

1 Discretion is the cornerstone of that.
2 **Q Okay.**
3 A You're not going to get me to deviate
4 off that point. I have had 35 years on that point,
5 okay? So move on, okay?
6 **Q Okay, okay. I'm just going to stay**
7 **here for just one more second because I think**
8 **it's important so we understand what your factual**
9 **understanding of Long Leaf Trading's business model**
10 **was at the time that Mr. Donelson asked you to**
11 **reconfirm your analysis that Long Leaf Trading was**
12 **not a commodity trading advisor. Let's both assume**
13 **that Long Leaf Trading did not exercise discretion**
14 **through power of attorney over its customer accounts**
15 **and that each customer would either approve or**
16 **disapprove of a particular trading recommendation.**
17 **Can we start with that agreement?**
18 A Yes, there was no de facto control, yes.
19 **Q Okay. Well, that's not the factual**
20 **premise that I'm talking about, so let me ask**
21 **it this way. Did Mr. Donelson ever provide you**
22 **with information about whether or not a majority**
23 **of his clients followed the trading recommendations**
24 **as they were recommended?**

Page 76

1 A In those terms, probably not. He didn't
2 sit there and say the majority of my clients follow
3 the trading recommendations.
4 **Q Did he say, you know, most or some?**
5 **Did you have any understanding about how many**
6 **clients deviated from the trading recommendations?**
7 A The number, no. That there were
8 deviations, yes, and the deviations were possibly
9 on a consistent basis.
10 **Q Did you understand that the majority**
11 **of Long Leaf's customers deviated from the trading**
12 **recommendations?**
13 A At one time or another, yes.
14 **Q Do you understand that Long Leaf Trading**
15 **generally recommended four trades per month?**
16 A It was a small number, yes.
17 **Q So I'm talking about for any one**
18 **particular trading recommendation, what is your**
19 **understanding about how many --**
20 A I didn't evaluate -- I didn't
21 evaluate it by trade -- each recommendation trade
22 by trade by trade. I did not evaluate it that way.
23 **Q So it was not --**
24 A It's the totality -- I'm sorry. It's

**REBECCA J. WING**

Page 77

1  the totality of trades.
2  Q  Okay, that's helpful.  So it was not --
3  are you saying it wasn't relevant to your analysis
4  whether or not a majority of the Long Leaf Trading
5  customers followed the trades as recommended?
6  A  You're trying to look at a particular
7  one trade, did they follow a majority.  You don't
8  write a disclosure document for one trade.  You
9  write it for a trading program.  So you have to
10  look at the totality of trading, not just a
11  single snapshot picture.  That's where we're
12  miscommunicating.
13  Q  So it sounds like it wasn't something
14  that mattered to you, to evaluate how frequently
15  customers deviated from the trading recommendations,
16  is that right?
17  A  It did matter if they deviated.
18  Q  And what was your understanding about
19  how frequently customers deviated?
20  A  That they had customers that would
21  not follow the trading recommendations, that
22  it made -- that that may not have been the same
23  customer every time that didn't follow the trading
24  recommendation.  That was explained and that they

Page 78

1  gave specific answers to customers who exited
2  earlier, contrary to the recommendation, customers
3  who executed more trades than what they were
4  recommending and that customers who delayed getting
5  in the trade as recommended.
6  Q  It sounds like you don't know how
7  frequently customers deviated from the recommended
8  trades, is that right?
9  A  No, that's their -- as I sit here
10  today, no, but I do know there was deviations,
11  as was explained to me.
12  Q  But you didn't know how common it was
13  for customers to deviate, is that fair?
14  A  That's probably fair, yeah.
15  MR. PLATT: All right.  Let's take
16  a break.  Do you want to take a quick bathroom
17  break or would you like to take a lunch break?
18  We've been going for a while.
19  THE WITNESS: Fifteen minutes?
20  MR. PLATT: Sure, that's fine with me.
21  Actually, how about we come back at 12:30.
22  Give me time to run out and get some coffee.
23  MR. FALVEY: Sure, sounds good.
24  MR. PLATT: All right.  Let's go off the

Page 79

1  record.
2  (Whereupon a recess was taken from
3  12:10 p.m., to 12:32 p.m., after
4  which the following proceedings
5  were had:)
6  Q  Ms. Wing, earlier you testified that
7  you relied on some documents that were provided
8  to Mr. Donelson by Mr. Evans in assessing whether
9  or not Long Leaf should register as a CTA, and one
10  of the items you mentioned was a compliance report
11  I think.  What does that mean?
12  A  Any compliance -- the compliance file
13  basically.
14  Q  The company's compliance file?
15  A  Yes, on current problems.
16  Q  Like customer complaints or like AML type
17  stuff?
18  A  Both.
19  Q  Thank you.  And you mentioned
20  audited financials.  Were those -- those were
21  Long Leaf's financials, the reports provided by
22  its outside auditor, is that right?
23  A  That's correct.
24  Q  And then you also mentioned the NFA

Page 80

1  audit.
2  MR. PLATT: I'd like to show you
3  what I'm going to mark as CFTC Exhibit 357.
4  (Whereupon CFTC Exhibit No. 357
5  was marked for identification.)
6  Q  And this is a letter from the NFA to
7  Tim Evans dated January 12, 2017, and this is a
8  summary letter from the NFA describing its audit
9  findings.  Do you recognize this kind of letter?
10  A  Do I recognize this particular letter?
11  I don't know until I read all the way through it.
12  Do I recognize this type of letter, yes.
13  Q  Okay.  And what do you recognize
14  this kind of letter as, not this specific letter?
15  A  I would call it an audit summary.
16  Q  Is this what you -- is this what you
17  were referring to like when you were describing
18  the NFA audit that you relied on?
19  A  We -- yes, something similar, yes.
20  I don't know if we were provided with this one.
21  I will have to look at it further down the road --
22  I mean, further down.
23  Q  Okay.  So you can see this is dated
24  January 12, 2017?

REBECCA J. WING

Page 81

1    A   Yes.
2    Q   It's addressed to Mr. Evans and it's
3  two pages long, or two pages long with a
4  bit of a spillover and it's signed by Ryan Ahlfeld
5  from the NFA.  Do you think this may have been the
6  letter that you were -- the NFA audit summary that
7  you were referring to?
8    A   Can you scroll up?
9    Q   Sure.
10   A   Now scroll down.  Okay.  Next page,
11 please.  Next page.  Okay.  I do believe this is
12 one of the documents provided.
13   Q   Were there any other materials from
14 the NFA other than summary letters of this kind
15 that you relied on?
16   A   The registration file.
17   Q   And in the registration file -- or
18 excuse me.  What kind of documents are in the Long
19 Leaf registration file?
20   A   Oh, you're really testing my memory
21 now.  That IB 7-R, the form filled out by the --
22 Long Leaf to register, the individual associated
23 person's registration file.  They would include --
24 I believe they include those letters from the

Page 82

1  NFA audit.  Yeah, I can't recall any additional
2  items.
3    Q   Okay, thank you.  And in the
4  registration file is there a detailed description
5  of the company's business model?  What information
6  is on that document?
7    A   Oh, I don't recall at this time
8  but it's -- on the registration it lists --
9  I don't recall what's included in there versus
10 FINRA.  A broker-dealer, you have to include your
11 business plan.  I don't recall whether or not
12 I had to include the business plan or for an IB.
13   Q   Okay, thank you.  So it sounds like
14 based on your testimony earlier that there were
15 two different points where you provided legal
16 advice to Mr. Donelson, and the takeaway was that
17 Long Leaf Trading was properly registered as an
18 introducing broker and did not have to register
19 as a commodity trading advisor.  Is that generally
20 correct?
21   A   Based on the representations made to me,
22 correct.
23   Q   And one was in -- the first conversation
24 was in November 2017, right?

Page 83

1    A   Or thereabouts before the closing.
2    Q   And you're not sure when the
3  second conversation took place but it may have
4  been triggered by the CFTC's 4g request, is that
5  right?
6    A   It may -- that would be most likely, yes.
7    Q   And at the time of the 4g request
8  Donelson had been the principal of the firm for
9  at least a few months, right?
10   A   Not very long.
11   Q   But long enough to know the way that
12 the company operated, is that fair?
13   A   I think there's some evidence of
14 brokers acting outside of what he was aware of,
15 but otherwise yes.
16   Q   Okay.  And during both conversations
17 your conclusion was that Long Leaf Trading did not
18 have to register as a CTA.  And I think earlier you
19 testified that the key factor for you was that Long
20 Leaf Trading was not exercising discretion, is that
21 accurate?
22   A   That's one of the very key components,
23 yes, discretion.
24   Q   Did you conduct any legal research

Page 84

1  before providing -- before advising Mr. Donelson
2  that he did not need to register Long Leaf Trading
3  as a commodity trading advisor?
4    A   I looked at the rule, of course, and some
5  of this is past history.
6    Q   Do you think you would have looked at
7  any CFTC interpretive letters or agency guidance?
8    A   If they were easily obtainable, yes.
9  But the problem is how do you write a disclosure
10 document for a trading plan if people don't follow
11 the trading plan.  It would be misleading, and that
12 is the key.  We do not provide misleading
13 information to customers.
14   Q   So I think your answer was you would
15 have if they were easily locatable.  Do you recall
16 doing any research into whether or not there were
17 any CFTC interpretive letters or agency guidance
18 that would be --
19   A   Probably not.
20   Q   -- relevant to your analysis?  Probably
21 not?
22   A   Sorry.  No, that's not what I said.
23 I said probably around the 4g request.
24   Q   Okay.

REBECCA J. WING

Page 85

1    A    To see if there's any changes.
2    Q    Thank you.  I apologize.  I misheard
3    you.  Do you recall whether or not there were any
4    changes when you reviewed the CFTC agency guidance?
5    A    I don't believe what I reviewed altered
6    my assessment.
7    Q    Do you remember what you reviewed?
8    A    At this point, no, other than the 4.14
9    and a few other rules.
10   Q    What is 4.14 that you just referenced?
11   A    A CFTC regulation, Section 4.14,
12   the registration of a commodity trading advisor,
13   I believe, if I'm using -- if I'm recalling it
14   right.  Ten years ago I would have rattled it
15   off without even blinking.
16   Q    So in conducting this legal research,
17   did you maintain a research file or draft any memos
18   to yourself?
19   A    I don't draft memos to myself at all.
20   I've never done that in 35 years of practicing
21   law and, no, because I have the book at my desk.
22   I wouldn't make copies.  I wouldn't have put them
23   in a file.  There's a rule book.  I have a section
24   of the CFTC code.  I have the NFA rule book.

Page 86

1    I would go online to -- later it came -- I mean,
2    things are now digital, so no.
3    Q    How about like notes, did you make any
4    notes to yourself?
5    A    No.  Again, I'm not a copious note taker.
6         MR. PLATT:  I'm going to mark as 358
7    another document.
8         (Whereupon CFTC Exhibit No. 358
9              was marked for identification.)
10   Q    Ms. Wing, do you recognize CFTC
11   Exhibit 358?
12   A    Yes.
13   Q    And this is a document --
14   A    Yeah.
15   Q    This is the document subpoena we
16   sent to you in connection with this case, right?
17   A    I believe so.
18   Q    I'm just going to scroll down to the
19   document requests that are at the end.  What we
20   asked you to produce was all documents related to
21   legal advice, including but not limited to notes,
22   memos, research or other attorney work product or
23   attorney-client communications provided by you
24   to Donelson or Long Leaf about the registration

Page 87

1    issues that are present in this case, and you sent
2    us a document production that was about 78 pages
3    long.  Do you recall that document production?
4    A    You'll have to refresh my memory.
5    Like I said, I've had a lot of things going on
6    personally.
7    Q    But you do recall producing documents
8    to us, right?
9    A    I was glad I did.  Did I forget to
10   produce it?  But, yes, okay.  And, yes, that sounds
11   about the right amount of papers.
12   Q    Did you search -- did you look for
13   any engagement letters between you and Donelson
14   when you responded to the subpoena?
15   A    I probably did.
16   Q    So if you had them and they were
17   easily locatable, you would have produced them?
18   A    If I thought it fell -- I have not
19   reviewed the exact definition -- your document.
20   But if it fell within the documents you were
21   requesting and there was no objection that I did
22   not delineate, yes, I would have produced it.  But
23   like I said, I've known Jim 40 years.  I was in his
24   wedding.  So I don't know if there would have been

Page 88

1    an engagement letter.
2    Q    Okay.  So I'll just sort of make a
3    request on the record if there is an engagement
4    letter between you and Mr. Donelson or you and
5    Long Leaf, that you produce it to us.  I don't
6    think there's a valid claim of privilege unless
7    there's, you know, some weird attorney-client
8    communication there.  But most engagements don't --
9    most engagement letters don't have privileged
10   content.  So I'll just make that request on the
11   record.  And if there's nothing then, you know,
12   of course don't produce it.
13        MR. FALVEY:  And I'll check with
14   Mr. Donelson from his side.
15        MR. PLATT:  Thanks.
16   Q    And then I think it's -- you know, we
17   asked you to confirm that all responsive documents
18   have been produced.  So to the extent that you
19   possess any documents that are relevant to your
20   analysis of whether or not Long Leaf Trading was
21   required to register as a CTA, those have been
22   produced to us?
23   A    That's correct.  Documents I had retained.
24   Q    Did you search your billing records for

REBECCA J. WING

1  responsive documents?
2  A  I believe so.
3      MR. PLATT: Okay.  I'm now going to
4  share what's been marked as CFTC Exhibit 359.
5  Maybe I already marked it.
6         (Whereupon CFTC Exhibit No. 359
7            was marked for identification.)
8  Q  Ms. Wing, do you recognize Exhibit 359?
9  A  I don't know yet until you scroll down.
10  Q  What is Exhibit 359?
11  A  It's our document production in the
12  Enforcement matter.  The Commission, I'm sorry.
13  Q  Do you recognize --
14  A  It's the Wells response.
15  Q  And did you play a role in drafting this
16  document?
17  A  I believe I did.
18  Q  I'm going to scroll down to page 10
19  because that's the relevant part.  You can see
20  this is page 10 of Mr. Donelson's Wells response.
21  Under point Heading C --
22  A  Yes.
23  Q  -- the first sentence reads, "Long Leaf
24  never acted in the capacity of a Commodity Trading

1  Advisor, nor was it required to be registered as
2  such."  Did you draft that sentence?
3  A  I don't know if it was myself or Nick
4  drafting what each section is.  It was an evolution
5  of our work together.
6  Q  In the second paragraph on page 10,
7  I'm just going to read it into the record.  It
8  says, "Long Leaf, at all times relevant herein, was
9  properly registered as an IB -- or as an Introducing
10  Broker."  And that's the same -- is that the same
11  answer?  It may have been you, it may have been
12  Mr. Iavarone, but you both sort of played a role
13  in drafting this portion?
14  A  That's correct.  That's correct.
15  Q  And then in the third sentence here
16  in paragraph 2 it says, "After weighing the pros
17  and cons of a CTA, Long Leaf concluded that it
18  was better to reach out to each customer to discuss
19  the proposed trade, the strategy behind the
20  recommendation, and whether the customer desired
21  to continue to speculate in an options trading
22  strategy."  What does it mean to weigh the pros
23  and cons of a CTA?
24  A  Well, it's weighing the business

1  model of becoming a CTA versus where he retains
2  discretion over an account.  It's about discretion.
3  A CTA gets the power of attorney at the beginning
4  and they can execute a trading system without
5  receiving individual authorization per each trade
6  from the customer and an IB doesn't.  An IB has to
7  talk to each individual customer prior to putting
8  on a trade.
9  Q  And then there's some -- I'm sorry.
10  I cut you off.
11  A  And whether or not the trading strategy
12  could be documented in a disclosure document based
13  on the method.  That's -- those are pros and cons.
14  Q  So it wasn't like Long Leaf viewed
15  registration as a CTA as optional.  The question
16  was would they change their business model to fall
17  within the definition in your view?
18  A  Correct.
19  Q  Then there's some content in the
20  second paragraph describing how customers would
21  authorize each trade based on a recommendation or
22  not.  And then the concluding sentence is, "Were
23  Long Leaf functioning as a CTA, those customers
24  would have lost this independent ability to

1  evaluate each recommendation."  And, again,
2  that's the same answer where you and Mr. Iavarone
3  collaborated on this language, is that right?
4  A  Yes, and I was also relying on his 45 years
5  of being a commodity attorney.
6  Q  So I don't understand this paragraph.
7  Can you explain the argument that's present here
8  why Long Leaf was not required to register as a
9  commodity trading advisor?
10  A  Because they were not acting as a
11  CTA.  They were acting as a broker recommending
12  a trade to each individual customer and they did
13  not obtain discretion.  I've kind of said that all
14  along.  That's not going to vary.
15  Q  So I don't see any citations to
16  authority in this paragraph.  Is there a legal
17  rule that you're applying?
18  A  It's the interpretation of the rule
19  and, no, there wasn't -- we didn't have to cite
20  a legal requirement.  It is recommended that you do
21  in a Wells submission.
22  Q  You say it's the interpretation of the
23  rule.  Whose interpretation of the rule is it?
24  A  Counsel, myself and Mr. Iavarone.

REBECCA J. WING

Page 93

1   Q   So you guys, this is like your, like
2   your gut instinct?  Like where is it coming from?
3   A   Mr. Iavarone was -- has been a commodity
4   attorney for over 45 years.  I've been a commodity
5   attorney approximately 35 years.  We have dealt
6   with CTA issues both representing customers as
7   well as registrants.  So you're talking over
8   80 years of experience in this industry.  This
9   was our interpretation, not a guess.  It has been
10  our experience in what we've seen and based on our
11  reading of the rules and the regulations.
12  Q   Have you seen this concept that
13  exercising discretion is the dispositive factor
14  ever written down in any legal authority ever?
15  A   Oh, I think there has been some
16  legal cases that have litigated that.  I have
17  been involved in hundreds of cases, and I don't
18  recall one but there are -- specifically but I do
19  recall this concept of discretion being a very
20  important key part.
21  Q   But sitting here today you can't
22  identify a rule or a regulation or a statute or
23  an interpretation that would -- that's consistent
24  with that reading?

Page 94

1   A   The rule is 4.14, okay?  The cases --
2   there's a lot of cases out there and, no, I don't
3   recall right this moment.  But I didn't go and
4   review my past cases to see where that rule -- where
5   there would be an opinion that was similar to this
6   issue by a court of law or an arbitration panel
7   or whatever.
8   Q   What about CFTC guidance, did you look
9   for any CFTC guidance?
10  A   As I testified before, if the comment
11  letters were accessible, I would have reviewed
12  comment letters.  And I believe I did review comment
13  letters.  The problem with comment letters is not
14  all facts are disclosed.
15      MR. PLATT: I'm going to mark CFTC
16  Exhibit 360.
17      (Whereupon CFTC Exhibit No. 360
18          was marked for identification.)
19  Q   Ms. Wing, are you able to see CFTC
20  Exhibit 360?
21  A   Yes.
22  Q   Do you recognize this as a printout of
23  a section of the Commodity Exchange Act?
24  A   It appears to be, yes.

Page 95

1   Q   The heading here says 7 USCA § 1a.
2   Definitions.  Do you agree with that?
3   A   That's what it says, yeah.
4   Q   I'm going to scroll down to
5   Subsection 12, and you can see I've applied
6   some highlighting here.  Twelve is the definition
7   for commodity trading advisor and it reads, "(12)(A)
8   In general.  Except as otherwise provided in this
9   paragraph, the term 'commodity trading advisor'
10  means any person who (i) for compensation or profit,
11  engages in the business of advising others, either
12  directly or through publications, writings, or
13  electronic media, as to the value of or the
14  advisability of trading in (III) any commodity
15  option authorized under Section 6c of this title."
16  Do you agree that I have read that accurately?
17  A   You paraphrased it correctly, yes.
18  Q   You're right.  I did omit some content.
19  Thank you for that clarification.  Based on your
20  understanding of Long Leaf's business model, which
21  included providing trading recommendations to
22  customers, do you think Long Leaf satisfied the
23  definition in 7 USCA 1a(12)?
24  A   Every broker would satisfy that

Page 96

1   definition regardless of whether they continued
2   to act as the CTA or not.  It doesn't -- you have
3   to go further.
4   Q   Okay, we'll get there.  But for this
5   first initial step, do you agree that Long Leaf
6   qualified as a CTA?
7   A   Yes, they are a broker.  I agree that
8   they have advised and that giving advice is in the
9   definition of a CTA.  That's all I'm going to agree
10  to.
11  Q   Okay.  So I just want to drill down
12  on that.  Do you think that Long Leaf does not
13  meet the definition of a commodity trading advisor
14  in 7 USCA 1a?
15  A   I don't think that's the only
16  definition -- the only criteria of it.  But --
17  and so how you are wording it I have an issue with,
18  okay?  I think you're misconstruing the statute.  As
19  I've stated before, every broker would fall within
20  that definition, whether or not they were a CTA or
21  not.  If they said I think you should get out of
22  that trade, they're giving trading advice, okay?
23  So --
24  Q   So I just want to be clear.  I'm not

**REBECCA J. WING**

1  construing the statute at all.  I'm asking you, a
2  lawyer with 35 years of experience in the industry,
3  if you think that Long Leaf's business model does or
4  does not meet the definition of a commodity trading
5  advisor in 7 USCA 1a(12).
6      A    Based on the fact that there are
7  additional criteria to fall within a CTA definition,
8  I do not believe it is within that definition.  If
9  you're looking at the -- if you're dissecting it
10  and picking out one particular statement, do they
11  give trading advice, then yes.
12      Q    So I want to -- sorry.  I'm not asking
13  if you think they were required to be registered.
14  I think you don't.  I'm asking you if they meet the
15  definition.  And your answer is no?
16      A    My answer is is you've given only a part
17  of it.  There's more to that statute.
18      Q    Okay.  Let's go back to the definition --
19      A    And let's give me the annotated part of it.
20      Q    I'm not sure what you mean by annotated.
21  Let's just --
22      A    Annotated?  You're not sure what is meant
23  by the annotated of the statute?
24      Q    Why don't you point me to the portion

1  of the statute you need to review to answer the
2  question whether or not Long Leaf Trading meets
3  the statutory definition in 7 USCA 1a(12) or does
4  not meet the statutory definition of a commodity
5  trading advisor.
6      A    Scroll down, scroll down.  Okay.  Keep
7  scrolling, keep scrolling.
8      Q    So we're now into different definitions.
9      A    Yeah, you should have had an annotated
10  version.  So I'm not prepared to respond the way
11  you've worded it.  I will say that based upon this,
12  they got paid for advising about trading in options.
13      Q    Do you have an understanding
14  of whether or not their advisory services related
15  to the advisability of trading in options?
16      A    You lost me, Joe.  I didn't -- I mean,
17  sorry.  I didn't follow your question.
18      Q    Sure.  Do you have an understanding
19  as to whether or not Long Leaf Trading's advisory
20  services related to the value or advisability of
21  trading in options?
22      A    Whether or not a client should trade
23  in an option?  Advisability?  I don't know if the
24  recommendation would be of each one.  There's

1  an advisability as to the opening of an account,
2  whether a client is acceptable to trade particular
3  options or whether or not they are advising -- they
4  were advising clients on trades.  Yes, they have
5  advised -- if that's the only requirement to be
6  regulated as a commodity trading advisor, absolutely
7  not.
8          MR. PLATT: I'm going to share with you
9    what I'm going to mark as CFTC Exhibit 361.
10          (Whereupon CFTC Exhibit No. 361
11          was marked for identification.)
12      Q    And CFTC Exhibit 361 are Long
13  Leaf Trading's answers to the CFTC's first set
14  of requests for admission.  Do you see that?
15      A    Yes.
16      Q    I'm going to scroll down to Request
17  for Admission 2, Long Leaf's answer.  It reads,
18  "Long Leaf admits ¶2 that it recommended trades
19  to customers as part of the trading program because
20  Long Leaf Trading believed those trades to be
21  valuable or advisable for the specific period
22  that Mr. Donelson was a principal of Long Leaf."
23          With that in mind, do you continue
24  to disagree that Long Leaf Trading's trading

1  recommendations were not made -- were made because
2  Long Leaf believed them to be valuable or advisable?
3      A    Of course they would.  I mean, I'm
4  not disagreeing with that.  I'm disagreeing that
5  that's the only requirement to be -- that you must
6  list to be a CTA.  So it is what it is.  Of course
7  they would only recommend trades they thought were
8  valuable or advisable.
9      Q    Right.  And they got paid for making
10  those recommendations, right?
11      A    I can't -- what?
12      Q    And they got paid for making those
13  recommendations, right?
14      A    They received commissions, yes.
15      Q    Are commissions compensation?
16      A    Yes.
17      Q    Thank you.
18          MR. PLATT: I'm going to show you what
19    I'm marking as CFTC Exhibit 362.
20          (Whereupon CFTC Exhibit No. 362
21          was marked for identification.)
22      Q    Exhibit 362 is a printout of a different
23  section of the Commodity Exchange Act, Section 7 USC
24  6m.  The title is use of mails or other means

REBECCA J. WING

1  or instrumentalities of interstate commerce by
2  commodity trading advisors and commodity pool
3  operators. Did I read that title correctly?
4      A   I didn't follow it, but I'd say you did.
5      Q   Subsection (1) here states in the
6  highlighted portion, "It shall be unlawful for
7  any commodity trading advisor or commodity pool
8  operator, unless registered under this chapter,
9  to make use of the mails or any means or
10 instrumentality of interstate commerce in connection
11 with his business as such commodity trading advisor
12 or commodity pool operator."
13         Do you agree that this section
14 requires commodity trading advisors to register
15 with the CFTC?
16     A   Not technically. It deals with the
17 use of mail, that in order to make use of mail
18 or interstate commerce you must be -- a commodity
19 trading advisor needs to be registered. But it
20 doesn't -- I mean, I don't agree on the way you've
21 worded it. I understand -- it says what it says.
22     Q   Okay. And it says that a commodity
23 trading advisor may not use the means of interstate
24 commerce unless it's registered. Is that better?

1      A   You've correctly paraphrased what it said.
2      Q   Yeah. And now we're going to get to
3  Section 4.14, which you referenced earlier.
4         MR. PLATT: And I'm going to mark this
5  as CFTC Exhibit 363.
6         (Whereupon CFTC Exhibit No. 363
7            was marked for identification.)
8      Q   Do you recognize this as a printout of
9  17 CFR 4.14 titled Exemption from Registration as
10 a Commodity Trading Advisor?
11     A   That's what it purports to be.
12     Q   You referenced this regulation earlier.
13 Does this appear to be the regulation that you were
14 referencing?
15     A   Yes.
16     Q   I'm going to read what I think
17 is the relevant part. Let me know if you think
18 this is not the relevant part. Subsection (a) says,
19 "A person is not required to register under the Act
20 as a commodity trading advisor if: Subsection (6)
21 It is registered under the Act as an introducing
22 broker and the person's trading advice is solely
23 in connection with its business as an introducing
24 broker." Did I read that exception correctly?

1      A   Yes.
2      Q   Is that the exception you were referring
3  to earlier?
4      A   Yes.
5      Q   Do you agree that some entities
6  are required to register in dual capacities?
7      A   In some instances, yes.
8      Q   What does it mean for a commodity
9  trading advisor's advice to be solely in connection
10 with its business as an introducing broker?
11     A   That they are not conducting business
12 outside the introducing broker. For instance,
13 you could have an AP of an IB that's not giving
14 advice for a client of the IB. That would be
15 a violation -- would require that person to be
16 registered as a CTA on that advice given.
17     Q   Have you ever looked for any legal
18 authority that interprets this concept of what is
19 or is not solely in connection with an IB business?
20     A   Oh, yes, I have. I just don't remember
21 when and where.
22         MR. PLATT: I'm going to show you
23    what I'm going to mark as CFTC Exhibit 364.
24

1         (Whereupon CFTC Exhibit No. 364
2            was marked for identification.)
3      Q   The title of this document is
4  Commodity Futures Law Reporter, CFTC Interpretive
5  Letter No. 95-82. (Re: Clarification of Issues
6  Concerning Guided Accounts of Introducing Brokers
7  and Futures Commission Merchants. Did I read that
8  title correctly?
9      A   I believe so. I wasn't tracking.
10     Q   You stated earlier that you've
11 reviewed CFTC interpretive letters over the course
12 of your career as a commodities lawyer, correct?
13     A   Yes.
14     Q   Do you know if you ever looked at this
15 interpretative letter?
16     A   I assume I have, but I don't recall it
17 off the top of my head.
18     Q   Do you think you looked at this
19 interpretative letter before you provided advice
20 to Mr. Donelson that Long Leaf Trading was not
21 required to register as a commodity trading advisor?
22     A   Probably.
23     Q   Do you think you would have factored
24 in the content of this letter into the legal advice

REBECCA J. WING

Page 105

1  that you provided to Mr. Donelson concerning
2  whether or not Long Leaf Trading was required to
3  register as a commodity trading advisor?
4     A   I don't recall looking at it
5  specifically but if I had, I would have factored
6  it in.
7     Q   So this is a seven-page PDF, Ms. Wing,
8  and you can see there are some headnotes assembled
9  by the research service that publishes these
10 letters.  The second headnote, which is highlighted
11 in green here reads, "An FCM or an IB engaged solely
12 in the business of 'guiding' customer accounts
13 is, necessarily, engaging in a commodity interest
14 advisory activity which is neither 'solely
15 incidental' to nor 'solely in connection with'
16 his business as an FCM or an IB, respectively,
17 and thus is required to register as a CTA."
18 Did I read that headnote correctly?
19    A   Yes.
20    Q   Scrolling down to the body here,
21 do you see that this letter is organized sort of
22 in like a question-and-answer format?
23    A   Yes.
24    Q   Questions 1 and 2 -- or Question 1

Page 106

1  reads -- and I've got it highlighted again
2  here -- it says, "You," referring to the market
3  participant that submitted this question, "ask
4  whether an FCM or an IB, engaged solely (your
5  emphasis) in the business of 'guiding' commodity
6  customer accounts, is required to register as
7  a CTA."  And then the answer, which is also
8  highlighted states, "Section 1a(5) of the Commodity
9  Exchange Act generally defines the term commodity
10 trading advisor as any person who for compensation
11 or profit, engages in the business of advising
12 others, either directly or indirectly, as to the
13 value or the advisability of trading in commodity
14 interests.  In your letter you state that for
15 purposes of the scenarios that you have presented,
16 a 'guided' account 'will be considered a customer
17 account that is being informed by the FCM or IB
18 of the particular commodity or futures contract to
19 purchase or sell, the price at which the customer
20 should make the purchase or sale and the number
21 of contracts to buy or sell.'  You further state
22 that the difference between a 'guided' account and
23 a 'discretionary' account in these scenarios is
24 that, in the case of a 'guided account,' the

Page 107

1  customer has not provided the FCM or IB with
2  a signed power of attorney and [orally authorizes]
3  the FCM or IB to initiate the trades.'  Therefore,
4  the 'guiding' of customer accounts, as that term
5  is defined by you, constitutes providing commodity
6  interest trading advice and, thus, is an activity
7  which causes one to fall within the Act's definition
8  of the term CTA.'"
9           And my question is is there
10 anything about Long Leaf's business model that
11 is materially different from the scenario described
12 in this letter?
13    A   They had customers that they
14 (inaudible) their own trades according to the
15 representation.  So it wasn't solely.  They had a
16 customer -- they had foreign customers that probably
17 go on recommendations.  So that does not fall
18 into --
19    Q   Do you think this -- do you think
20 this letter is relevant to the analysis of whether
21 or not Long Leaf was required to register as a
22 commodity trading advisor?
23    A   As is all comment letters.
24    Q   In light of the information in this

Page 108

1  letter, do you think in retrospect that Long Leaf
2  should have registered as a commodity trading
3  advisor?
4     A   No.  It wasn't -- as I understand it,
5  it was not their sole business.  They had other
6  customers that did not trade their recommendations.
7     Q   What's your understanding of the
8  proportion of customers who followed Long Leaf's
9  trading recommendations versus the customers who
10 were solely self-directed?
11    A   I don't know but it wasn't 100 percent,
12 and sole means 100 percent.
13    Q   And that's the dispositive factor for
14 you as an attorney with 35 years' experience in
15 this field?
16    A   Yes, how many letters are fact
17 specific to the person requesting it.  It gives
18 guidance, but there's other fact patterns that
19 I may not be privy to.
20    Q   And in your view the guidance
21 provided by this letter would not bring Long Leaf
22 into the category of entity that would be required
23 to have registered under as a commodity trading
24 advisor.  Am I hearing you correctly?

REBECCA J. WING

Page 109

1    A   I still believe that because they
2   had clients that did not follow -- they did
3   not provide advice to that traded on their own.
4    **Q   But you don't know what proportion**
5   **of Long Leaf's clientele followed Long Leaf's**
6   **recommendations on the one hand as opposed to**
7   **the proportion of the clientele that were purely**
8   **self-directed on the other hand, right?**
9    A   Not a portion -- not proportion.
10   I do know that there was some large commissions
11   paid -- generated from some that did not.  I was
12   informed of large commissions from traders that did
13   not follow the trading recommendations.
14   **Q   Do you know how much revenue was**
15   **generated from the trading recommendations versus**
16   **revenue generated from self-directed trading?**
17   A   No, I do not.
18   **Q   So you don't know how much revenue**
19   **was generated by the self-directed trading and**
20   **you don't know how many self-directed traders there**
21   **were, right?**
22   A   I knew there were some.  I remember
23   specifically a foreign customer that generated
24   a sizable commission.  How that relates to the

Page 110

1   remaining customers I'm unaware.
2    **Q   If there was only one customer out**
3   **of Long Leaf's many customers who didn't follow**
4   **Long Leaf's recommendations, would that bring them**
5   **outside the category of entity that was required to**
6   **register as a CTA in your view?**
7    A   I'm not going to speculate to that.
8   I'm not going to go on speculation because there
9   may be other scenarios.  But based upon the reading
10   of sole, sole means sole, as in only.
11   **Q   So, Ms. Wing, earlier you testified**
12   **that the dispositive factor in your mind was the**
13   **lack of discretion from Long Leaf?**
14   A   Yes.
15   **Q   So in light of this comment letter that**
16   **we've just discussed, do you think maybe that's not**
17   **a dispositive factor?**
18   A   No, I still think it's one of the
19   dispositive factors.  If they did -- if they
20   did not -- if they exercised discretion, boom,
21   automatic.  You have to be a CTA, okay?  If you
22   don't exercise discretion, then you've got to go
23   further in your analysis.
24   **Q   So if Long Leaf didn't exercise**

Page 111

1   **discretion, what's the next step in the analysis**
2   **for you?**
3    A   The next is looking at the individual
4   recommendations, whether or not the customers
5   followed those recommendations, whether or not all
6   customers followed those recommendations, whether
7   there's variance and deviance.  All those exist.
8    **Q   What information was provided to**
9   **you by Mr. Donelson at the time he asked you**
10   **to revisit your analysis as to whether or not Long**
11   **Leaf was required to register as a CTA concerning**
12   **how many of the customers followed Long Leaf's**
13   **recommendations?**
14   A   You asked what documents or what --
15   I mean, I --
16   **Q   What information.**
17   A   Information.  I queried Mr. Donelson,
18   who responded to a series of questions.
19   **Q   What questions did you ask him?**
20   A   I asked him how -- were there customers
21   that did not follow the trading, that you did not
22   give recommendations to, and he said yes.  Were --
23   did all customers follow all trade recommendations.
24   First I also verified whether or not they contacted

Page 112

1   each customer before entering the trade or did
2   they have discretion.  And then I asked about
3   whether or not all customers who were following
4   their recommendations, did they trade the same.
5   And they said, no, many of the customers entered
6   at different prices because they delayed getting
7   in or they passed on the trades, that some of them
8   exited trades before they recommended it and one in
9   particular liked trading more than they recommended.
10   So that was the gist of my questioning.
11   **Q   And did Mr. Donelson tell you**
12   **that the majority of the customers followed**
13   **the recommendations as recommended the majority**
14   **of the time?**
15   A   No, and I don't believe those were the
16   words he used, no.  He had customers -- he didn't
17   quantify it with those quantifiers.  He said he had
18   customers that followed and customers that didn't.
19   **Q   He didn't attempt to provide**
20   **any information about the frequency with which**
21   **customers deviated from the trading recommendations,**
22   **is that right?**
23   A   He said that there were customers that
24   deviated almost every time.

REBECCA J. WING

Page 113

1 Q Right.
2 A But beyond that, no.
3 Q Did he tell you how many customers deviated
4 almost every time?
5 A No.
6 Q Let's turn back to CFTC Exhibit 352,
7 which is the complaint in this matter.
8 A Okay.
9 Q I'm going to scroll down here.
10 THE WITNESS: Who is Caller -- Call-In
11 User 5?
12 MR. PLATT: Can everyone who's present
13 in this deposition turn your cameras on and
14 identify yourselves, please, at the request
15 of the witness?
16 MR. FALVEY: Jim Falvey here.
17 MR. PLATT: Let's just let the record
18 reflect that there's a potentially unidentified
19 party participating. I would recommend let's
20 proceed. Ms. Wing, are you comfortable
21 proceeding?
22 THE WITNESS: Not if I don't know who's
23 on.
24 MR. PLATT: Okay. You know, if you want

Page 114

1 to take a break, we can -- you know, we'll
2 have to reconvene at another time.
3 THE WITNESS: No, I think as hosts
4 you're able to disconnect the person. If they
5 don't identify themselves, disconnect them.
6 MR. PLATT: You know, that may be --
7 let's go off the record for a second.
8 (Discussion off the record.)
9 (Whereupon a recess was taken from
10 1:37 p.m., to 2:04 p.m., after which
11 the following proceedings were had:)
12 MR. PLATT: So we're back on the
13 record at 2:05 Central Time. We just had an
14 interruption because there was an unidentified
15 caller potentially participating in the Webex.
16 We switched Webex sessions, and now all the
17 participants appear to be identified as either
18 parties or lawyers involved in the case.
19 Q Ms. Wing, are you comfortable proceeding
20 on this basis?
21 A Yes.
22 Q Thank you.
23 MR. PLATT: And for the record, on
24 a going-forward basis only participants

Page 115

1 who are willing to turn on their cameras and
2 identify themselves for the record are going
3 to be permitted to participate in depositions
4 in connection with this litigation that are
5 noticed by the CFTC. So just take notice of
6 that going forward.
7 Q I think there was not a pending question
8 before we were sidetracked, Ms. Wing, and I want to
9 circle back to CFTC Exhibit 352, which is the CFTC's
10 complaint. And --
11 A Are you sharing? I don't see it. Oh,
12 thank you.
13 Q And Count V you'll see is Long Leaf's
14 failure to provide disclosures pursuant to Part 4
15 of the CFTC's regulations. Are you familiar with
16 the Part 4 disclosure requirements for commodity
17 trading advisors, Ms. Wing?
18 A Oh, it's been a while, but yes.
19 Q And what is your understanding of
20 what the Part 4 disclosure requirements require of
21 commodity trading advisors?
22 A To present a disclosure document.
23 Q And what information -- oh, I'm sorry.
24 I cut you off.

Page 116

1 A No. I was just saying to clients.
2 Q What information is required to be included
3 in the disclosure document?
4 A Their -- the history of -- their
5 trading history performance, background information
6 on who they are and a description of their trading
7 methodology. It's been a while so I'm sure there's
8 a few other requirements in there.
9 Q Did Mr. Donelson ever ask you whether
10 or not Long Leaf should provide a Part 4 disclosure
11 document to prospective customers?
12 A We talked about if a -- about a CTA must
13 provide a disclosure document.
14 Q And how did that conversation proceed?
15 A When we were talking about whether
16 or not their activity was a CTA versus activity as
17 an introducing broker, and I believe Mr. Donelson's
18 thought was in the future he would like to become
19 a CTA and develop a trading program.
20 Q And so did you advise Mr. Donelson
21 that he did not need to provide a Part 4 disclosure
22 document?
23 A I told him -- I don't know if I said
24 it in that many words. But since he was not acting

REBECCA J. WING

1 as a CTA or our interpretation, he did not need
2 to provide disclosure documents.
3   **Q So Count VI of the CFTC's complaint,**
4 **which I'm sharing with you here as Exhibit 352,**
5 **again deals with various failures to register as**
6 **associated persons. Do you see that?**
7   A Yes.
8   **Q And one of these individuals here**
9 **that's listed, you can see in parentheses at the**
10 **bottom is against Long Leaf, Donelson, Evans and**
11 **Nelson. Do you know who Andrew Nelson is?**
12   A I do.
13   **Q Who is Andrew Nelson?**
14   A He was a client of mine.
15   **Q Was he also a broker at Long Leaf?**
16   A Yes.
17   **Q When was he a client of yours?**
18   A During the time he was a broker at Long
19 Leaf.
20   **Q Can you put a more concrete time**
21 **frame on it? Was it his entire tenure as a Long**
22 **Leaf broker?**
23   A Oh, no. After Mr. Donelson purchased Long
24 Leaf, there came a time period where Mr. Nelson's AP

1 registration came into question, or lack thereof.
2   **Q Do you recall when that was?**
3   A No, I do not recall when it was. And
4 Mr. Nelson has not waived attorney-client privilege,
5 so I cannot discuss those areas.
6   **Q Is it your position that the fact**
7 **of representation is privileged information?**
8   A No, but I was anticipating where you
9 were going with it.
10   **Q So I'm just asking when you started to**
11 **represent Mr. Nelson.**
12   A After Mr. Donelson purchased and
13 before his termination as an AP, that time period.
14 I don't know specifically when. It would have been
15 in 2018.
16   MR. PLATT: I'm going to show you what
17 I'm marking as CFTC Exhibit 365.
18   (Whereupon CFTC Exhibit No. 365
19   was marked for identification.)
20   **Q And this is a document that**
21 **you produced to us, Ms. Wing. It looks like**
22 **Mrs. Donelson is forwarding you an email chain**
23 **between her and Mr. Nelson. Do you recognize this**
24 **document?**

1   A Yes. Can you scroll down?
2   **Q Sure. You can see it's correspondence**
3 **between Mr. Nelson and the NFA in March of 2018,**
4 **and then Mr. Nelson forwards this correspondence**
5 **with the NFA to Mrs. Donelson on July 12, 2018.**
6 **Do you see that?**
7   A Yes.
8   **Q And then Mrs. Donelson forwards**
9 **it to you that same day that she received it from**
10 **Mr. Nelson. Do you agree with that?**
11   A Probably.
12   **Q Do you think this is the first time that**
13 **you heard about Mr. Nelson?**
14   A No. He was listed as a broker from
15 Tim Evans.
16   **Q Do you think this is when you --**
17 **approximately when your representation of Mr. Nelson**
18 **began?**
19   A Probably.
20   **Q Why do you say probably?**
21   A It was a dual representation as it
22 related to Long Leaf and Mr. Nelson as to the
23 registration issue. It may have been a little --
24 a few weeks subsequent or a few weeks before,

1 probably before or a week before.
2   **Q Is it fair to say that your joint**
3 **representation of Mr. Nelson and Long Leaf probably**
4 **began around the July 2018 time period?**
5   A That's fair.
6   **Q Okay. And so Mr. Donelson never**
7 **reached out to you in January of 2018 to highlight**
8 **this potential issue?**
9   A I don't recall. I don't recall that he
10 was aware of that potential issue.
11   **Q Do you think your --**
12   A I do believe when we ran BrokerCheck
13 on all brokers, Mr. Nelson at the NFA showed he was
14 registered.
15   **Q So you don't recall receiving an email**
16 **from Mr. Donelson in January of 2018 that would**
17 **have reflected the NFA initiating a registration**
18 **disqualification proceeding against Mr. Nelson?**
19   A I'm confused on the timeline. I think
20 I would have received something from Mr. Donelson
21 concerning Mr. Nelson's registration. When that was
22 I don't recall right now.
23   **Q We looked at the document subpoena that**
24 **we sent to you in connection with this litigation**

REBECCA J. WING

1 earlier today. Did you search your emails for
2 responsive information, Ms. Wing?
3    A  Yes.
4    Q  So if Mr. Donelson had sent you an email
5 about Mr. Nelson in January of 2018 highlighting
6 a registration disqualification proceeding, would
7 that be in your emails?
8    A  Should have been.
9    Q  But you didn't produce anything like that.
10 So I'm assuming that if you got notice in January
11 of 2018, it didn't come by email?
12    A  Yes, it could have been a phone call.
13 It could have been an in-person meeting.
14    Q  But you don't remember that occurring
15 and you don't maintain notes. So there would be
16 no notes reflecting such a conversation took place,
17 correct?
18    A  I remember having a conversation about
19 Mr. Nelson's lack of -- problem of registration
20 at the NFA. When that occurred I don't recall.
21 How I was informed on it I don't recall, but I was
22 informed.
23    Q  And you testified earlier that the
24 earliest you probably heard about this issue was

1 whether it was close in time to when you began
2 your representation of Mr. Nelson?
3    A  I don't -- it could have been January.
4 It could have been closer to July. There was a lot
5 going on in those six months.
6    Q  But the truth is that you have no
7 idea sitting here today when it happened, right?
8    A  I don't recall when it happened. I was
9 dealing with my father-in-law dying at that time
10 period.
11    Q  Let's turn back to CFTC Exhibit
12 355, which is the registration conversations PDF.
13 Ms. Wing, you mentioned just before we turned back
14 to the registration conversations PDF, you mentioned
15 that you looked at BrokerCheck to see if
16 Mr. Nelson's registrations were current. Did you
17 mean BASIC?
18    A  BASIC. Sorry, I misspoke.
19    Q  Yeah, no problem. Just clarifying.
20 So, Ms. Wing, here on CFTC Exhibit 355 we looked
21 at these four conversation summaries earlier, one
22 of which dealt with Long Leaf's registration as
23 a commodity trading advisor or lack thereof. The
24 other three I think at least potentially relate to

1 around the July 2018 time period, is that right?
2    A  Well, then I might have misstated
3 because I don't -- I said it was a fair assumption
4 that it was around that time. It could have been
5 earlier, but you were asking when my representation
6 of Mr. Nelson began. There are two different --
7 those are two different questions, sir. When I
8 became aware of it and when my representation of
9 Mr. Nelson began are two different questions.
10    Q  When did you become aware that the
11 NFA was initiating registration disqualification
12 proceedings against Mr. Nelson?
13    A  Shortly after Mr. Donelson was informed.
14    Q  When was that?
15    A  That I don't recall when.
16    Q  How do you know it was shortly after
17 Mr. Donelson was informed?
18    A  Because he said he just found out.
19    Q  But you don't remember when that was
20 and you don't remember how he told you, right?
21    A  I'm sure it was in person or by phone.
22    Q  But you don't remember when it took place?
23    A  No.
24    Q  And do you think -- do you know

1 Mr. Donelson's registration status as an associated
2 person.
3    A  Yes.
4    Q  Conversations 2 and 3, it looks like
5 they took place sometime before March 2018. Do you
6 agree with that?
7    A  That's what it appears.
8    Q  And then Conversation 4 took place in
9 early June of 2018, right?
10    A  Yes, that's what it appears.
11    Q  Are these -- do you recall these
12 conversations with Mr. Donelson?
13    A  Somewhat.
14    Q  What do you remember about Conversations 2,
15 3 and 4?
16    A  Well, 2, we were discussing that
17 he -- at the time of purchase he did not have
18 a Series 3, but Mr. Evans was staying on to be
19 the principal supervisor and that he would shadow
20 Mr. Evans and take his Series 3. But, yeah, I
21 informed him he must be disclosed as the principal
22 because he is an owner.
23    Q  What is a Series 3?
24    A  A license, commodity license.

REBECCA J. WING

Page 125

1    Q   What kind of license?
2    A   An associated person's license.
3    Q   Did you advise Mr. Donelson
4  in February of 2018 that he was not required to
5  register as an associated person at that time?
6    A   I recall advising him that he would
7  have to register as an associated person should
8  he do -- should he perform any activities as an
9  associated person, that he has to be listed as a
10  principal and that there needs to be a supervisory
11  principal for the firm.  And that's about the time
12  I believe he was scheduled to take the Series 3
13  test.
14    Q   What are the activities that would
15  require registration as an associated person of
16  an introducing broker?
17    A   Giving trading recommendations,
18  holding yourself out as an associated person,
19  receiving commissions for trading activity and
20  then -- and the profit of a firm.  Generally those
21  are the main ones.  Operating as compliance does
22  not, negotiating a dispute does not, interacting
23  with the regulators does not require.
24    Q   How did Jim Donelson describe his

Page 126

1  role at Long Leaf Trading to you in or around
2  February 2018?
3    A   As owner, that he was looking
4  at where he can cut costs and looking at the
5  brokers' trading and recommendations that they're
6  making, compliance, listening to broker calls.
7    Q   Any other activities?
8    A   Interacting with the clearing firm.
9    Q   Did Mr. Donelson describe any
10  activities that related to the supervision of the
11  Long Leaf broker staff in February 2018?
12    A   Nothing other than an owner.  He had
13  principals involved to supervise.  I believe Brian
14  Adams was one, Scott Gecas.  These were brokers with
15  considerable years of being brokers that were in
16  a supervisory role.
17    Q   Before your discussion with Mr. Donelson
18  in February 2018 concerning his registration status
19  as an associated person, did Mr. Donelson tell you
20  that he met with newly hired brokers to discuss
21  expectations and goals and explain the company's
22  sales process to them?
23    A   As an owner he would have met with newly
24  hired brokers, yeah.

Page 127

1    Q   Did Mr. Donelson explain to you that
2  he explained the company's sales process to the
3  new brokers?
4    A   I don't know what you mean.  If you
5  mean that he would have explained to a broker that
6  he didn't -- that he does not take discretion and
7  they must talk to the client before placing the
8  order, yes, that was the company's position.
9    Q   Were there any other sales processes at
10  Long Leaf besides giving trading recommendations?
11    A   I'm sure there's a whole host of
12  procedures and policies that they should follow,
13  some of them dictated by the trading.  Am I aware of
14  them, no.  I wouldn't get involved in the day-to-day
15  operations.
16    Q   Before you had a conversation with
17  Mr. Donelson in February 2018 about whether or
18  not he was required to register as an associated
19  person, did he tell you that he met with the Long
20  Leaf broker staff to engage them on sales targets,
21  data quality improvements and trading?
22    A   I don't recall, but I would assume
23  any owner would sit with their sales staff and
24  say here's -- you know, we must follow the rules

Page 128

1  and regulations of the CFTC, here's the compliance
2  manual, here is our clearing firm's requirements
3  and this is what I expect of you.  That would not be
4  out of the norm to expect that kind of conversation.
5    Q   What about sales targets and sales
6  processes, did you know that Mr. Donelson -- did
7  Mr. Donelson ever tell you before February 2018 that
8  he met with brokers to discuss sales targets and
9  sales processes?  I'm not talking about compliance
10  processes or regulatory processes.  I'm talking
11  about sales targets and sales processes.
12    A   Probably not.  I wouldn't have -- I was
13  concerned only with compliance.
14    Q   Before February 2018 when you and
15  Mr. Donelson discussed his registration status
16  as an associated person, did he explain to you
17  that he sent correspondence to brokers that he had
18  drafted and directed them to send the correspondence
19  to clients?
20    A   I don't know what correspondence you're
21  referring to but there was some correspondence that
22  he drafted, as is standard when there's a change of
23  ownership in the firm.
24    Q   So you were aware that Donelson drafted

REBECCA J. WING

1  correspondence, sent it to the brokers and told the
2  brokers to send it to the clients before February
3  2018?
4      A   I don't know which correspondence
5  you're referring to, but I know there was a change
6  of ownership form.
7      Q   Let's just say any correspondence.
8      A   Yeah, yeah.
9      Q   Did Mr. Donelson ever tell you
10 before June of 2018 that he conducted individual
11 performance reviews with the brokers?
12     A   I don't know if he told me before,
13 but at some point in time I became aware of that.
14     Q   But you don't know when that happened?
15     A   No.
16     Q   Did Donelson tell you before June
17 of 2018 that he was in charge of making sure that
18 non-scripted customer solicitations met NFA rules?
19     A   Would you repeat your question?  I want
20 to make sure I'm accurate in my answer, of course.
21     Q   Sure.  Before June of 2018, which
22 is when Conversation 4 on Exhibit 355 occurred
23 according to Mr. Donelson, did Mr. Donelson tell
24 you that he was in charge of making sure that non-

1  scripted customer solicitations met NFA rules?
2      A   I do believe Mr. Donelson told me
3  he was talking to the NFA on a script.  I said
4  any script you use must be approved by the NFA, and
5  he was interacting with NFA's marketing department
6  or his point of contact to get -- to get review and
7  approval of that, and I believe that was before
8  June.  I don't know for sure.
9      Q   Sure, that's helpful.  And you're
10 discussing scripted communications I think.  I'm
11 asking you about non-scripted communications.  Did
12 Mr. Donelson ever tell you that he was in charge at
13 Long Leaf of reviewing non-scripted communications?
14     A   Was he involved in reviewing broker
15 conversations with customers for compliance, yes.
16     Q   So your understanding is that he would
17 review recorded telephone calls?
18     A   I don't know if they record -- I can't
19 recall if they recorded their telephone calls or
20 not, but he would listen to telephone calls.  It was
21 a small room.
22     Q   Do you know whether or not he reviewed
23 emails?
24     A   I would assume he did.  Mr. Donelson

1  only wanted to be compliant with everything.
2      Q   Did you do any legal research before you
3  advised Mr. Donelson on what he could and couldn't
4  do without a Series 3 license?
5      A   I don't remember doing any specific
6  legal research.  It was my experience and number
7  of years in the industry.
8      Q   Did you look on the NFA website to
9  see if they had any guidance about what a person
10 can and can't do without a Series 3 license?
11     A   He was studying for the Series 3
12 at the time, so I think he was aware of what he
13 was doing, what a Series 3 could or could not do.
14 But as an attorney, you do not have to be a Series 3
15 license.  As a compliance officer you do not have
16 to have a Series 3 license at the time.  As a
17 trade desk person you do not need a Series 3.  As
18 administrative support you don't need a Series 3.
19 All that was experience.
20     Q   But I think the question is did you
21 look at the NFA website to determine what a person
22 can do without an associated person registration?
23     A   Did I at the time, I don't recall.
24     Q   What is your understanding of the rule

1  about whether or not a supervisor of associated
2  persons is required to register as an associated
3  person?
4      A   If they're involved in the
5  direct supervision of an associated person, there
6  must be a -- there must be a designated principal,
7  registered principal, as there was at Long Leaf.
8  That was not Mr. Donelson.
9      Q   So I think I'm asking a slightly
10 different question, Ms. Wing.  I'm asking what is
11 your understanding of whether or not a supervisor
12 of an associated person is required to also register
13 as an associated person.
14     A   It depends on what they're supervising
15 for.  HR can supervise an associated person for
16 an HR situation and doesn't need to be registered as
17 a supervisor.  A compliance officer can supervise
18 for compliance and doesn't need to be registered
19 as a supervisor.  There are different -- your
20 question's too broad.  If you want to ask about
21 a specific activity, I'll answer that.
22     Q   Sure.  What is your understanding
23 of the obligations of a person who supervises
24 associated persons with respect to sales processes

REBECCA J. WING

Page 133

1   vis-a-vis registering as an associated person?
2      A    And I'm unclear what you mean as sales
3   processes.  I really don't know what you mean by
4   sales processes.
5      Q    What product did Long Leaf Trading sell?
6      A    Futures, options.
7      Q    How did they package their product?
8      A    Broker assisted.
9      Q    It's a trading program, right, Ms. Wing?
10  It's what we're here about.  It's their trading
11  program.
12     A    No, that's what you're here about.
13  They're an IB, okay?  I'm not going to -- they
14  had other situations, other products other than
15  a trading program.  They had customers who traded
16  other products other than your trading program.
17     Q    Among the customers who opened
18  accounts when Mr. Donelson owned the firm, how
19  many of those customers participated in Long Leaf's
20  trading program?
21     A    I do not know how many customers, we went
22  over that earlier, but not all.
23     Q    Your understanding is that there were
24  customers who opened accounts when Donelson owned

Page 134

1   the firm that did not participate in the trading
2   program?
3      A    Yeah.
4      Q    What's that understanding based on?
5      A    Comments that were told to me by
6   Mr. Donelson.
7      Q    But you do acknowledge that there was
8   a trading program at Long Leaf, right?
9      A    No, I acknowledge that there were
10  broker recommendations.  You're using the word
11  trading program.  I do not know if I agree or
12  disagree with that terminology.
13     Q    So the recommendations, do you
14  have an understanding of how frequently they
15  were communicated to customers?
16     A    They weren't trading quite a bit
17  throughout a month.  They weren't everyday
18  recommendations.  So they were infrequent, as
19  I would call it.
20     Q    Is it consistent with your recollection
21  that Long Leaf made approximately four trading
22  recommendations per month to its customers?
23     A    That would be of those customers they
24  made trading recommendations, that sounds about

Page 135

1   right.  They weren't prolific trade recommendations.
2      Q    So it's your testimony as Long Leaf's
3   regulatory attorney that Long Leaf was not selling
4   a trading program?  Is that what you're telling us?
5      A    I'm saying they're doing broker assist
6   and that they would develop recommendations.  I do
7   not know if you consider it a trading program.
8      Q    How did Long Leaf Trading get customers?
9      A    I would have no idea.
10     Q    What do you think the brokers did all day
11  at Long Leaf Trading?
12     A    They probably did cold calling.
13     Q    Why do you think that?
14     A    Because that's typically how brokerage
15  firms get customers.
16     Q    And so your testimony is you have
17  no idea how Long Leaf Trading obtained customers?
18     A    I wasn't retained to look at how they
19  got customers.  That's not my area.
20     Q    So now you don't know how Long Leaf
21  obtained customers?
22     A    I said I assumed they did it by cold
23  calling because that's how most brokerage firms
24  got it -- customers.

Page 136

1      Q    Are you aware that Long Leaf brokers
2   called prospects and tried to sell the trading
3   program to them?
4      A    I'm aware they called customers and
5   that they tried to sell their services.  Yes, I'm
6   aware of that.
7      Q    Okay, great.  So let's put a box
8   around that activity, that concept of cold calling
9   customers or calling customers and trying to sell
10  services, okay?  And we'll call that Long Leaf's
11  sales process, okay?
12     A    Yes, fine.
13     Q    If a person was supervising Long Leaf's
14  sales process, would they be required to register
15  as an associated person?
16     A    Not completely.  Were they supervising
17  it by compliance status?  Were they supervising
18  it to make sure if a customer signs up, that they
19  received appropriate account opening documents?
20  That part would not need to be registered as a
21  supervisor.
22     Q    What about the part where the
23  broker explains the trading recommendations,
24  would the supervisor of a broker describing the

REBECCA J. WING

1    trading recommendations be required to register
2    as an associated person?
3    A    I don't -- I don't know.  Are they
4    explaining -- are they explaining what an option
5    is, here's an option, here's the definition that
6    I'd like -- that people recognize from the CME?
7    Then no.
8        Q    What if the associated person was
9    explaining Long Leaf's trading recommendations,
10   would the supervisor of Long Leaf's brokers who
11   explained Long Leaf's trading recommendations need
12   to register as an associated person?
13   A    It depends on the extent of the definition
14   of what they're providing.
15       Q    I don't understand your answer.
16   A    That's my answer.  You can ask me another
17   question.
18       Q    Do you know what Long Leaf's trading
19   recommendations looked like?
20   A    Not offhand.
21       Q    Have you ever seen one?
22   A    Yes.
23       Q    So you do know what one looks like?
24   A    I don't recall, if that's the appropriate

1    answer, what it looks like.
2        Q    Okay.  What about if a person was
3    supervising a Long Leaf broker's solicitation
4    of orders from customers, would that person have
5    to register as an associated person?
6    A    How is the solicitation being --
7    I mean, it is a fine line.  So, I'm sorry, how --
8    what super -- I mean solicitation are you referring
9    to?  Are you referring to that all calls must be on
10   a recorded line and somebody making sure that that's
11   the case?  In a sense would I call that supervising
12   a broker, yes.  Would I call it supervising a broker
13   that requires registration, no.
14       Q    Do you know --
15   A    It's enforcing company policy.
16       Q    Do you know how Long Leaf brokers
17   solicited orders in connection with Long Leaf's
18   trading recommendations?
19   A    No, I said I assumed it was cold call.
20   I don't know for sure.
21       Q    So I'm asking a slightly different
22   question now.  I'm not asking about the cold call
23   to solicit customers.  I'm asking Long Leaf's got
24   some customers, right?  And the brokers, do you

1    understand that the brokers would call them to
2    ask them if they wanted to participate in the
3    trading recommendations?
4    A    Yes, that I did know.  That was that
5    they sought the clients' approval to see if they
6    wanted to enter in any and all trades.
7        Q    And that happened by phone, right?
8    A    That's my understanding.
9        Q    It happened by email too, right?
10   A    I'm unsure about how much would be email,
11   but I assume there was some.
12       Q    What is your understanding of how
13   a Long Leaf broker would solicit customer orders
14   in connection with a trading recommendation?
15   A    There was a trading recommendation
16   that was developed.  That recommendation went
17   to the brokers to see if their customers wanted
18   to participate or not.  So the broker would then
19   communicate with the customer and those who wanted
20   to -- and I believe they got something in writing,
21   if I'm not mistaken, from the customer as to whether
22   or not the customer wanted to participate.
23       Q    So if a person was supervising
24   the process that you just described, would they

1    be required to register as an associated person?
2    A    I don't think so.  They're following
3    through company policy.  That's their policy of
4    doing that.
5        Q    What kind of supervision do you think
6    requires registration as an AP?
7    A    You asked me that before.  You asked
8    me that before and I'm standing by my prior answer.
9        Q    So I'm not sure if I did and if I did,
10   I apologize.  I forget, and please indulge me.
11   What kind of activities -- if a person supervises,
12   what category of activities would that person then
13   be required to register as an associated person?
14   A    Those activities that involve
15   directly encouraging a customer to trade a certain
16   way.  That would require supervising.
17       Q    Anything else?
18   A    It's late.  I can't remember anymore.
19       MR. FALVEY:  Do you need to take a break,
20   Rebecca?
21       THE WITNESS:  No, I just need to
22   move on because I do have other commitments.
23       MR. FALVEY:  Okay.
24       MR. PLATT:  We're almost done.  Just

REBECCA J. WING

Page 141

1  a couple more. This has gone a little more
2  slowly than I had imagined it would go.
3      MR. FALVEY: No worries.
4      MR. PLATT: I'm going to show you
5  what I'm going to mark as CFTC Exhibit 366.
6          (Whereupon CFTC Exhibit No. 366
7          was marked for identification.)
8      Q  And I'll represent to you that
9  I printed this out off the NFA website after doing
10  a Google search for associated person registration.
11  Do you see that the heading is Associated Person
12  Registration and there's -- it's underneath the
13  NFA logo?
14      A  Yeah.
15      Q  In the second paragraph here do you see
16  that it says, "The registration requirements," and
17  it's referring to the AP registration requirements,
18  "apply to any person in the supervisory chain
19  of command and not only to persons who directly
20  supervise the solicitations of orders, customers
21  or funds," and then it provides a notice to members
22  for more information.
23          Do you think that you knew of
24  this rule at the time you discussed Donelson's

Page 142

1  AP registration or lack thereof in February 2018?
2      A  Yes.
3      Q  And it was your understanding
4  that Donelson was not supervising the solicitation
5  of orders, customers or funds at that time?
6      A  Based on what I was informed, yes.
7      Q  So I'm going to turn back to
8  Mr. Donelson's corrected answer to the CFTC's
9  complaint, and I don't recall what exhibit I
10  marked this as. But do you recall when we reviewed
11  Mr. Donelson's corrected answer earlier, Ms. Wing,
12  that he referenced the review of scripts by his
13  attorneys?
14      A  I believe I read something to that effect.
15      MR. PLATT: So, Mr. Falvey, I'm just
16  going to you, you know, highlight that I'm going
17  to ask about the scripts. And, Ms. Wing, please
18  allow Mr. Falvey a moment to object if he sees
19  fit after I ask the questions before you answer.
20      MR. FALVEY: Okay, thank you.
21  BY MR. PLATT:
22      Q  Did Mr. Donelson ever provide you
23  with Long Leaf's sales scripts and ask you to
24  review them?

Page 143

1      A  Yes.
2      Q  What was the purpose of the review that
3  he asked you to conduct?
4      A  It was in response to I believe an NFA
5  inquiry.
6      Q  Do you recall when that occurred?
7      A  I have no idea.
8      Q  What about the NFA's inquiry
9  led Mr. Donelson to ask you to review Long Leaf
10  Trading's sales scripts?
11      A  It was something brought up by the NFA.
12      Q  I'm going to show you what's been
13  marked previously as CFTC Exhibit 289. And do
14  you see this is an email from Donelson to James
15  Hatzigiannis, Alexander Stemper, Ben Cybulski and
16  Vicki Donelson and it's dated January 7, 2019, and
17  the subject is new demo and talking points. Do you
18  know what new demo means in the context of Long Leaf
19  Trading's business?
20      A  No, nor have I ever seen this email before.
21      Q  I'm going to scroll down to
22  the attachments. This is the first page of a
23  Power Point deck. The page is Options Portfolio
24  Strategies. I'm just going to scroll through it

Page 144

1  so you can familiarize yourself with it.
2      A  Um-hmm.
3      Q  Do you see on page 7 of Exhibit 289
4  it's titled Portfolio Strategies. There's a little
5  bullet that says Income Generating. Do you see
6  that?
7      A  Yes.
8      Q  Again on page 8 there's another bullet
9  that says Income Generating. Do you see that?
10      A  Yes.
11      Q  On page 14 of the PDF, which is page 15
12  of Exhibit 289, do you see where it says What We Can
13  Offer your Portfolio, one of the bullets says Income
14  Generating Strategies? Do you see that?
15      A  Yes.
16      Q  And then the second attachment is titled
17  here, it says Long Leaf Trading Talking Points.
18  Do you see that?
19      A  Yes.
20      Q  Do you recognize these attachments to
21  Exhibit 289?
22      A  I don't recognize the first one.
23  I don't know -- there were some talking points.
24  I don't know if these were the ones I reviewed after

REBECCA J. WING

Page 145

1  the -- around the NFA.
2      MR. PLATT: I'm going to show you
3  a document that I'm going to mark as CFTC
4  Exhibit 367.
5      (Whereupon CFTC Exhibit No. 367
6          was marked for identification.)
7  A    Okay.
8  Q    Because I'd like to put a time frame
9  around when you reviewed Long Leaf's scripts.  Do
10 you recognize CFTC Exhibit 367 as an email to Jim
11 Donelson and Brian Adams from an NFA person named
12 Brian Dempsey?
13 A    Well, this is what the document says.
14 I don't recommend -- or recognize if I ever saw
15 this document before now.
16 Q    Sure.  And I'm only asking you if this
17 appears to be an email that Mr. Donelson received
18 from bdempsey@nfa.futures.org.
19 A    If that's what it appears to be.
20 Q    Yeah.  Dated May 17, 2018, right?
21 A    Yes.
22 Q    Subject line NFA Inquiry, and there's
23 a PDF attachment.  And the body of the email says,
24 "Mr. Donelson, as we discussed today, please see

Page 146

1  the attached letter regarding NFA's review of
2  Long Leaf Trading Group Inc.'s solicitations."
3  Did I read that correctly?
4  A    Yeah.
5  Q    I'm going to scroll down to
6  the attachment, which is a letter addressed
7  to Mr. Donelson.  Have you ever seen this letter
8  before in your life?
9  A    Maybe.
10 Q    I guess just take a minute
11 to familiarize yourself with it and see if you
12 recognize the content generally.
13 A    I've read it.
14 Q    I'm going to scroll down so you can
15 review the second page of the letter.  Do you see
16 that, Ms. Wing?
17 A    Yes.
18 Q    So do you recognize Exhibit 367
19 as part of the NFA inquiry in connection with
20 which you reviewed Long Leaf Trading's scripts?
21 A    I don't recall the letter, but I would
22 assume I would have read -- reviewed it, but I don't
23 recall it.
24 Q    Okay.  And what I'm asking is does

Page 147

1  this refresh your recollection about approximately
2  when this review occurred?
3  A    I would assume it was summer of 2018.
4  Q    What materials did Mr. Donelson provide
5  to you to review after this NFA inquiry surfaced?
6      MR. PLATT: Mr. Falvey, I think I'm
7  getting pretty close to the line here as
8  I understand it.
9      MR. FALVEY: Yeah, yeah.  I mean,
10 I think this question's okay, Rebecca.  But
11 you're right, Jody, it's close -- or Mr. Platt.
12 A    Unfortunately, I don't recall too
13 much of what he provided.  There would have been
14 a letter or a couple letters from the NFA and a
15 draft response he would have drafted, and I don't
16 know what else at this point.  I'm sorry.  It was
17 a long time ago for me.
18 BY MR. PLATT:
19 Q    Did Mr. Donelson ask you to provide
20 legal advice concerning whether or not the scripts
21 and solicitation materials he provided to you were
22 misleading?
23 A    In those terms, no.  I don't think I was
24 retained to do that.

Page 148

1  Q    What was the scope of your engagement with
2  respect to the review of Long Leaf's solicitation
3  materials in connection with the NFA's May 2018
4  inquiry?
5  A    To prepare a response to the NFA.
6      MR. PLATT: I'm going to show you
7  what I'm going to mark as CFTC Exhibit 368,
8  which purports to be an email from Jim Donelson
9  to Brian Dempsey at the NFA copying Brian Adams
10 on May 24, 2018, Subject line Long Leaf Trading
11 Group 2018CINV352 Response.
12     (Whereupon CFTC Exhibit No. 368
13         was marked for identification.)
14 Q    Is this the response that you were
15 referencing that you assisted in preparing?
16 A    Can you show me the response instead
17 of the reference to the response?
18 Q    Yeah, sure.  I'm going to scroll
19 down through the attachments to get to the letter,
20 and let me know when you're ready for me to scroll
21 through the rest.
22 A    Go ahead, start scrolling.  You're going
23 too fast.
24 Q    Sorry.

REBECCA J. WING

Page 149

1    A   Okay, go ahead.

2    Q   (Scrolling).

3    A   Go ahead.

4    Q   (Scrolling).

5    A   Okay.

6    Q   Ms. Wing, is this the letter that you

7    were referencing that you assisted in preparing in

8    connection with the NFA inquiry?

9    A   I don't know.  It could be.  But, quite

10   frankly, I can't recall one way or another at this

11   point or if there was a subsequent issue.  I know

12   I've seen this letter, but was it one that I helped

13   draft?  I don't know.

14   Q   Do you see this first sentence of the

15   final paragraph reads, "Long Leaf takes compliance

16   very seriously and we are consistently reviewing

17   our sales practices and scripts to confirm that they

18   accurately represent the risk and reward a customer

19   would experience trading the Time Means Money

20   broker-assisted trading system."

21           So, first, does this refresh

22   your recollection that Long Leaf Trading offered

23   a trading system?

24   A   No, it doesn't because I don't recall

Page 150

1    the letter at this time.

2    Q   Did you actually review Long Leaf

3    Trading's sales practices and scripts to confirm

4    that they accurately represented the risk and reward

5    a customer would experience trading the Time Means

6    Money broker-assisted trading system?

7    A   As I stated before -- you asked this

8    question before -- I was not retained to review

9    the script.

10   Q   So that's a no?

11   A   That's a no.  I was not retained to do it.

12   Q   And, in fact, you never did it.  Is that

13   your testimony?

14   A   I -- no, I reviewed the scripts.

15   My testimony was that I reviewed the script in

16   responding to an NFA inquiry.  Was it this inquiry

17   or a subsequent one, I don't know.

18   Q   So I'm going to ask this question

19   again because I don't think you answered it and

20   this is an important question, Ms. Wing.  Did you

21   ever review Long Leaf Trading's sales practices and

22   scripts to confirm that they accurately represented

23   the risk and reward a customer would experience

24   trading the Time Means Money broker-assisted

Page 151

1    trading system?  And I don't mean were you retained

2    to do it.  I mean did you do it.

3    A   Did I review it to advise them whether or

4    not it was compliant, the answer is no.  I reviewed

5    it after this to respond to an NFA inquiry.

6    Q   Just so the record's clear, because

7    I don't think I understand your answer -- and that

8    may be my fault -- is your testimony, no, you never

9    reviewed Long Leaf Trading's sales practices and

10   scripts to confirm that they accurately represented

11   the risk and reward a customer would experience

12   trading the Time Means Money broker-assisted

13   trading system?

14   A   There's a timing issue here, okay,

15   where I'm giving -- where I -- did I review the

16   scripts before they used it or to see if it was

17   compliant, the answer is no.  Did I review the

18   script in response to responding to a regulatory

19   inquiry, the answer is yes.

20       MR. PLATT: Okay.  Let's go off the

21   record, maybe a five- or ten-minute break.

22   I think I'm almost done.  I just want to make

23   sure that I don't have any followup.  Thank you.

24       MR. FALVEY: Okay.

Page 152

1           (Whereupon a recess was taken from

2            3:13 p.m., to 3:35 p.m., after which

3            the following proceedings were had:)

4       MR. PLATT: It's 3:35.  Back on record

5    with Ms. Wing.

6    Q   So, Ms. Wing, before we took a break,

7    I think you testified that you did review Long Leaf

8    scripts and solicitation materials in connection

9    with drafting a response to an NFA inquiry but

10   you did not review NFA scripts and solicitation

11   materials on a prospective basis.  Is that an

12   accurate summary?

13   A   Correct.

14   Q   Did there ever come a time when

15   Mr. Donelson did ask you to review Long Leaf's

16   scripts on a prospective basis?

17   A   I don't believe so.

18   Q   Do you have a recollection of Long Leaf

19   revising its script in early 2019?

20   A   I believe that Long Leaf was working with

21   the NFA to revise that script, yes.

22   Q   Did you revise -- did you review

23   Long Leaf's scripts and solicitations in early

24   2019 to ensure that they would not be misleading?

REBECCA J. WING

---

Page 153

1    A   I did not -- I don't believe I did.
2  It would have been confirming with Long Leaf that
3  they work with the NFA in reviewing that.
4    Q   I'm not sure I understand.  So we've
5  discussed the response to the NFA inquiry, and I
6  understand that you reviewed Long Leaf's scripts
7  in connection with drafting that response letter to
8  the NFA.  How was that similar or different in 2019
9  when Long Leaf revised its solicitation materials?
10   A   I confirmed that they were working with
11  the NFA to review that script prior to use.  Did I
12  review it, no.  There's a whole NFA department that
13  discusses these things.
14   Q   Okay.  I think I understand and
15  I just want to summarize it to make sure that
16  I do accurately understand.  So there was a time
17  when you reviewed scripts in connection with the
18  response to the NFA's inquiry and there was also
19  a time when you -- it sounds like you told Long
20  Leaf to get its scripts approved by the NFA,
21  is that right?
22   A   That's correct.
23   Q   But at no time did you review a script
24  before it was used to ensure that it would not be

---

Page 154

1  misleading to customers, right?
2    A   That's correct.  That fell -- on option
3  trading I deferred to the experts.
4    Q   Did Donelson ever provide you any
5  information about the performance of Long Leaf's
6  trading recommendations?
7    A   We're getting in an area that probably
8  is attorney-client privilege because it deals with
9  representing Mr. Donelson in his deposition with
10  the CFTC.
11       MR. FALVEY: I couldn't hear you, Rebecca,
12  very well there.
13       THE WITNESS: It deals with
14  my representation of Mr. Donelson at the
15  CFTC deposition.  So I do not feel that
16  this is --
17       MR. FALVEY: Okay.
18       THE WITNESS: -- within the parameters
19  of the waiver of attorney-client privilege.
20  BY MR. PLATT:
21   Q   Okay.  And just so the record's
22  clear, I'm asking you if Long Leaf provided
23  information regarding the performance of its
24  trading recommendations so that the CFTC can

---

Page 155

1  determine whether or not any advice you may have
2  provided was fully informed.  And I understand that
3  you're objecting on the basis of attorney-client
4  privilege, is that right?
5    A   That's correct.
6       MR. PLATT: Okay.  I think that's
7  all my questions.  Mr. Falvey, I don't know
8  if you have any questions.  Ms. Wing, you're
9  welcome to make any clarifications on the record
10  that you'd like.
11       MR. FALVEY: I don't have any, Mr. Platt.
12  Ms. Wing, I don't know if there's anything you
13  want to clarify.
14       THE WITNESS: No.  I mean, remind me.
15  Do I get to review and reserve signature?
16       MR. FALVEY: Yes.  And, Mary, you want
17  to address that?
18       (Discussion off the record.)
19       MR. FALVEY: Okay.
20       MR. PLATT: Mr. Ruth, did you have
21  any questions?  All right.  Hearing nothing,
22  I think we can go off the record.  Thank you
23  for your time, Ms. Wing.  We appreciate you
24  participating in this deposition.

---

Page 156

1       THE WITNESS: Okay.  Enjoy the beautiful
2  day.
3       (WITNESS EXCUSED)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

REBECCA J. WING

Page 157

```
 1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3  COMMODITY FUTURES TRADING    )
    COMMISSION,                  )
 4                               )
                Plaintiff,       )
 5                               )
                vs.              ) No. 20 C 3758
 6                               )
    LONG LEAF TRADING GROUP,     )
 7  INC., et al.,                )
                                 )
 8              Defendants.      )

 9

10          I, REBECCA J. WING, do hereby certify
11  that I have read the foregoing transcript of my
    deposition given on June 17, 2021, consisting of
12  pages 1 to 159, inclusive, and I do again subscribe
    and make oath that the same is a true, correct and
13  complete transcript of my deposition so given as
    aforesaid, and includes changes, if any, so made by
14  me.

15                      Corrections have been submitted
16                      No corrections have been
                        submitted
17

18                      REBECCA J. WING, Deponent
19  Subscribed and sworn to
20  before me this    day of
                   , 20
21  Notary Public

22

23

24
```

Page 158

```
 1  ORTHERN DISTRICT OF ILLINOIS  )
    ASTERN DIVISION               )
 2  TATE OF ILLINOIS              )
                                  )  ss.
 3  OUNTY OF COOK                 )

 4

 5          I, Mary Maslowski, Certified Shorthand

 6  Reporter and Notary Public in and for the County

 7  of Cook, State of Illinois, do hereby certify that

 8  on June 17, 2021, at 10:06 a.m., the deposition of

 9  the witness, REBECCA J. WING, called by the

10  Plaintiff, was taken before me remotely, reported

11  stenographically and was thereafter transcribed

12  by me.

13          The said witness, REBECCA J. WING, was

14  first duly sworn to tell the truth, the whole truth,

15  and nothing but the truth, and was then examined

16  upon oral interrogatories.

17          I further certify that the foregoing is a

18  true, accurate and complete record of the questions

19  asked of and answers made by the said witness, at

20  the time and place hereinabove referred to.

21          The signature of the witness was not waived

22  by agreement.

23          The deposition terminated at 3:43 p.m.

24          Pursuant to Rule 30(e) of the Federal
```

Page 159

```
 1  Rules of Civil Procedure for the United States

 2  District Courts, if deponent fails to read and sign

 3  this deposition transcript within 30 days or make

 4  other arrangements for reading and signing thereof,

 5  this deposition transcript may be used as fully

 6  as though signed, and the instant certificate will

 7  then evidence such failure to read and sign this

 8  deposition transcript as the reason for signature

 9  being waived.

10          The undersigned is not interested in the

11  within case, nor of kin or counsel to any of the

12  parties.

13          Witness my official signature and seal as

14  Notary Public, in and for Cook County, Illinois on

15  this 1st day of July, A.D., 2021.

16

17

18          Mary Maslowski, CSR, RPR
            Notary Public
19          79 West Monroe, Suite 1001
            Chicago, Illinois  60603
20

21

22

23

24
```

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

**[**

**[orally (1)**
107:2

**¶**

**¶2 (1)**
99:18

**A**

**ability (1)**
91:24
**able (4)**
27:11;40:21;94:19;
114:4
**absolutely (1)**
99:6
**acceptable (1)**
99:2
**accepted (2)**
58:18,19
**access (2)**
40:16,21
**accessible (1)**
94:11
**accident (1)**
5:14
**according (3)**
37:18;107:14;129:23
**account (20)**
51:16;52:1,2,4,11,14,
19;53:1;55:5,16,16;
56:22;58:9;91:2;99:1;
106:16,17,22,23;
136:19
**account' (1)**
106:24
**accounting (2)**
19:16,16
**accounts (16)**
51:19,21;52:22;
53:12;58:6;62:19;65:1;
73:1;74:19;75:14;
104:6;105:12;106:6;
107:4;133:18,24
**accuracy (1)**
41:23
**accurate (7)**
16:10;42:11,13;69:5;
83:21;129:20;152:12
**accurately (8)**
33:3;39:9;95:16;
149:18;150:4,22;
151:10;153:16
**acknowledge (2)**
134:7,9
**acquired (1)**
38:1
**acquiring (1)**
62:22

**acquisition (1)**
37:15
**Act (7)**
46:7;94:23;96:2;
100:23;102:19,21;
106:9
**acted (1)**
89:24
**acting (4)**
83:14;92:10,11;
116:24
**action (1)**
5:3
**activities (12)**
10:19;51:2;56:13;
58:21;61:1;125:8,14;
126:7,10;140:11,12,14
**activity (5)**
41:5;45:23;46:1,24;
47:14;52:5;105:14;
107:6;116:16,16;
125:19;132:21;136:8
**Act's (1)**
107:7
**actual (2)**
48:19;70:21
**actually (3)**
29:21;78:21;150:2
**Adams (3)**
126:14;145:11;148:9
**additional (4)**
66:24;67:24;82:1;
97:7
**address (5)**
21:11;29:5;35:21;
50:6;155:17
**addressed (2)**
81:2;146:6
**addresses (1)**
21:17
**adjusted (1)**
54:1
**administrative (1)**
131:18
**admission (2)**
99:14,17
**Admits (2)**
32:24;99:18
**admitted (5)**
8:15,17;9:4,7,8
**admonish (1)**
18:19
**admonition (1)**
35:18
**advance (1)**
16:9
**Advertising (2)**
26:10;51:3
**advice (27)**
14:13;28:13;29:1;
33:14,22;34:12,15;
35:10,14;55:18,21;
62:12;82:16;86:21;

96:8,22;97:11;102:22;
103:9,14,16;104:19,24;
107:6;109:3;147:20;
155:1
**advisability (6)**
95:14;98:15,20,23;
99:1;106:13
**advisable (3)**
99:21;100:2,8
**advise (5)**
17:7;46:6;116:20;
125:3;151:3
**advised (9)**
34:3;46:19;59:21;
63:20;64:18;66:12;
96:8;99:5;131:3
**advising (7)**
84:1;95:11;98:12;
99:3,4;106:11;125:6
**Advisor (51)**
26:11,15;30:3;46:9,
21;47:1,6,14;51:14;
55:23;56:9;61:13;
62:13;63:5,22;64:14,
20;66:16;67:3,10,23;
68:13;70:3;72:2,17;
73:7;74:24;75:12;
82:19;84:3;85:12;90:1;
92:9;95:7;96:13;97:5;
98:5;99:6;101:7,11,19,
23;102:10,20;104:21;
105:3;106:10;107:22;
108:3,24;123:23
**advisor' (1)**
95:9
**advisors (5)**
45:17;101:2,14;
115:17,21
**advisor's (1)**
103:9
**advisory (3)**
98:14,19;105:14
**again (13)**
22:2;38:8,16;58:2;
59:17;61:4;74:3;86:5;
92:1;106:1;117:5;
144:8;150:19
**against (12)**
8:5;21:7,21;22:9,20;
24:5,7,19,23;117:10;
120:18;122:12
**agency (3)**
84:7,17;85:4
**ago (2)**
85:14;147:17
**agree (26)**
25:4,5;27:1,4,16;
28:18;29:14;31:12;
35:4;36:20;37:12;
38:10,19;57:24;74:21;
95:2,16;96:5,7,9;
101:13,20;103:5;
119:10;124:6;134:11

**agreement (8)**
13:10,11,20;19:8;
21:13,16;66:22;75:17
**agreements (1)**
19:14
**ahead (3)**
148:22;149:1,3
**Ahlfeld (1)**
81:4
**Alexander (1)**
143:15
**allegations (1)**
27:5
**alleged (1)**
25:6
**allow (1)**
142:18
**almost (3)**
112:24;113:4;
140:24;151:22
**along (1)**
92:14
**altered (1)**
85:5
**always (1)**
51:7
**AML (1)**
79:16
**among (2)**
56:19;133:17
**amount (1)**
87:11
**amounts (1)**
12:2
**analysis (18)**
51:13;61:11;67:1;
68:1,12;70:1;71:12;
72:1,15;73:6;75:11;
77:3;84:20;88:20;
107:20;110:23;111:1,
10
**Andrew (2)**
117:11,13
**annotated (5)**
97:19,20,22,23;98:9
**answered (1)**
150:19
**anticipating (1)**
118:8
**anymore (2)**
23:2;140:18
**AP (7)**
19:14;103:13;
117:24;118:13;140:6;
141:17;142:1
**apologize (2)**
85:2;140:10
**appear (3)**
46:13;102:13;114:17
**appeared (1)**
20:11
**appearing (1)**
8:8

**appears (5)**
94:24;124:7,10;
145:17,19
**applied (1)**
95:5
**apply (1)**
141:18
**applying (1)**
92:17
**appreciate (3)**
28:1;67:19;155:23
**appropriate (2)**
136:19;137:24
**approval (4)**
58:16;74:14;130:7;
139:5
**approve (1)**
75:15
**approved (5)**
33:2;58:21;73:14;
130:4;153:20
**approximate (1)**
30:11
**approximately (8)**
10:2;11:3;67:12;
69:10;93:5;119:17;
134:21;147:1
**APs (1)**
63:1
**arbitration (1)**
94:6
**area (3)**
21:23;135:19;154:7
**areas (1)**
118:5
**argument (1)**
92:7
**arise (1)**
35:22
**around (14)**
13:21;21:6;40:7;
43:24;56:9,12;84:23;
120:4;122:1,4;126:1;
136:8;145:1,9
**arrangement (3)**
15:8,14,14
**aside (1)**
64:1
**aspect (1)**
48:13
**aspects (1)**
48:15
**assembled (1)**
105:8
**assert (3)**
28:13;34:15;35:14
**assertion (3)**
33:17;34:11;35:10
**assessing (1)**
79:8
**assessment (3)**
47:22;51:9;85:6
**assessments (1)**

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

50:24
**assist (1)**
135:5
**assistance (1)**
13:1
**assisted (5)**
55:6;62:19;133:8;
148:15;149:7
**Associated (41)**
26:22;30:8;33:24;
37:11,21;38:4,10,18;
40:14;64:21;65:5;
81:22;117:6;124:1;
125:2,5,7,9,15,18;
126:19;127:18;128:16;
131:22;132:1,2,5,12,
13,15,24;133:1;
136:15;137:2,8,12;
138:5;140:1,13;
141:10,11
**assume (16)**
6:16;11:14;17:22;
24:4,10,16;29:3;48:15;
74:20;75:12;104:16;
127:22;130:24;139:11;
146:22;147:3
**assumed (4)**
64:23;65:4;135:22;
138:19
**assuming (1)**
121:10
**assumption (5)**
48:4;73:23,24;74:6;
122:3
**attached (2)**
30:10;146:1
**attachment (3)**
144:16;145:23;146:6
**attachments (3)**
143:22;144:20;
148:19
**attempt (1)**
112:19
**attempted (1)**
20:24
**Attend (2)**
18:7;19:9
**attorney (21)**
4:19,21;5:24;8:10;
11:23;20:23;21:18;
33:2;34:2;49:14;52:17;
75:14;86:22;91:3;92:5;
93:4,5;107:2;108:14;
131:14;135:3
**attorney-client (8)**
18:21;33:13;86:23;
88:7;118:4;154:8,19;
155:3
**attorneys (1)**
142:13
**attuned (1)**
19:18
**audit (28)**

46:4;12;48:7,8,10,12,
16,17,19,20,21,22;
49:6;50:23;51:1;56:1;
59:24;61:6;67:5,8;
70:10,15;80:1,8,15,18;
81:6;82:1
**audited (4)**
48:11,14;61:3;79:20
**auditor (1)**
79:22
**auditors (1)**
61:3
**audits (2)**
19:15;61:5
**authority (3)**
92:16;93:14;103:18
**authorization (3)**
68:3;74:2;91:5
**authorize (1)**
91:21
**authorized (2)**
59:10;95:15
**authorizes] (1)**
107:2
**authorizing (1)**
74:4
**automatic (1)**
110:21
**aware (22)**
21:16;24:12,15;
43:23;53:19;63:9,13,
14,15,16,18;83:14;
120:10;122:8,10;
127:13;128:24;129:13;
131:12;136:1,4,6

**B**

**back (25)**
16:17;21:4,4;23:14;
36:12;38:5,13,24;
44:13;50:15,19;51:4,
11;60:21;64:15;73:16;
78:21;97:18;113:6;
114:12;115:9;123:11,
13;142:7;152:4
**background (1)**
116:5
**bar (4)**
8:17;9:4,8,9
**Based (26)**
33:19;39:6;41:22;
45:23;46:10,12,23;
47:14;51:8;54:13;
56:22;57:10;58:8;65:8;
66:18;82:14,21;91:12,
21;93:10;95:19;97:6;
98:11;110:9;134:4;
142:6
**basic (8)**
19:20;39:22;40:5,12,
16;62:9;123:17,18
**basically (1)**

79:13
**basis (18)**
6:24;7:3;16:6;21:21;
22:8,14,17;23:1;35:5,
13;61:11;65:10;76:9;
114:20,24;152:11,16;
155:3
**bathroom (1)**
78:16
bdempsey@nfafuturesorg (1)
145:18
**beautiful (1)**
156:1
**became (6)**
9:13,15;12:10;13:17;
122:8;129:13
**become (3)**
24:15;116:18;122:10
**becoming (1)**
91:1
**began (5)**
119:18;120:4;122:6,
9;123:1
**beginning (1)**
91:3
**begins (1)**
27:24
**behalf (3)**
21:7;23:7;30:21
**behind (1)**
90:19
**belabor (1)**
43:7
**Bellows (6)**
9:12,12,13,14,14
**Ben (1)**
143:15
**benefit (1)**
6:9
**besides (1)**
127:10
**best (6)**
6:2,3,5,12,19;19:1
**Beth (1)**
4:20
**better (2)**
90:18;101:24
**beyond (1)**
113:2
**big (2)**
44:7;51:20
**bigger (2)**
7:22,23
**bill (4)**
11:19;16:12,15,18
**billed (5)**
15:13,16,18;16:4,5
**billing (2)**
12:3;88:24
**billings (1)**
16:1
**bills (4)**
11:14,20;12:1;16:8

**bit (4)**
22:19;60:23;81:4;
134:16
**blend (1)**
27:24
**blinking (1)**
85:15
**blue (2)**
25:17;32:12
**body (2)**
105:20;145:23
**book (4)**
45:7;85:21,23,24
**boom (1)**
110:20
**Botanicals (1)**
10:15
**both (8)**
34:18;70:22,22;
75:12;79:18;83:16;
90:12;93:6
**bottom (3)**
29:18;36:19;117:10
**bought (6)**
41:9,10,14;58:5;
66:3,21
**box (1)**
136:7
**Boy (1)**
57:23
**break (11)**
7:6,7;36:3,3;78:16,
17,17;114:1;140:19;
151:21;152:6
**breaks (1)**
36:7
**Brian (5)**
126:13;145:11,12;
148:9,9
**briefly (2)**
8:20;9:5
**bring (2)**
108:21;110:4
**brings (1)**
57:22
**broad (1)**
132:20
**broker (60)**
18:17,18;30:8;39:16,
19,23;40:1,3;41:4,17,
24;42:20;45:13;46:14,
16;51:3;52:3;55:6;
57:7;59:23;60:16;61:1;
62:7,17,18,19;63:1;
66:13,20;70:2;82:18;
90:10;92:11;95:24;
96:7,19;102:22,24;
103:10,12;116:17;
117:15,18,22;119:14;
125:16;126:6,11;
127:5,20;130:14;
133:8;134:10;135:5;
136:23,24;138:12,12;

139:13,18
**brokerage (2)**
135:14,23
**broker-assisted (16)**
53:12;55:9;56:16,19;
58:6;64:7,22;65:6;
66:2,5,9;72:24;149:20;
150:6,24;151:12
**BrokerCheck (2)**
120:12;123:15
**broker-dealer (1)**
82:10
**brokers (29)**
40:14;43:24;45:4,11,
12;52:10;53:24;55:7;
64:24;83:14;104:6;
120:13;126:14,15,20,
24;127:3;128:8,17;
129:1,2,11;135:10;
136:1;137:10;138:16,
24;139:1,17
**brokers' (1)**
126:5
**broker's (2)**
55:18;138:3
**brought (4)**
60:6;61:22;62:6;
143:11
**bullet (2)**
144:5,8
**bullets (1)**
144:13
**business (39)**
10:19;18:17,18;
19:20;41:5,14;46:12;
47:9;48:13;50:17;
51:20;56:13;58:3;
60:16;62:7,15,22;64:3;
75:9;82:5,11,12;90:24;
91:16;95:11,20;97:3;
101:11;102:23;103:10,
11,19;105:12,16;106:5,
11;107:10;108:5;
143:19
**buy (4)**
18:13,16;40:2;
106:21
**buying (1)**
41:16
**bypass (1)**
67:17

**C**

**call (11)**
29:23;60:20;80:15;
121:12;134:19;136:10;
138:11,12,19,22;139:1
**called (10)**
4:14;6:13;9:10;12:5;
16:21;48:10;52:16;
63:7;136:2,4
**Caller (2)**

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

113:10;114:15
**Call-In (1)**
    113:10
**calling (6)**
    39:1;40:24;135:12,
    23;136:8,9
**calls (6)**
    43:24;126:6;130:17,
    19,20;138:9
**came (7)**
    50:20;53:17;56:7;
    67:4;86:1;117:24;
    118:1
**cameras (2)**
    113:13;115:1
**can (56)**
    7:7,15,18,18,22,23;
    8:19;9:5;11:5;17:11;
    18:9;22:1;24:1;25:3,
    17;27:22;28:1,2;29:8;
    35:21,23;36:7,10,18;
    50:18;53:8;54:11;
    65:13;67:18,19;75:17;
    80:23;81:8;89:19;91:4;
    92:7;95:5;105:8;
    113:12;114:1;117:9,
    20;119:1,2;126:4;
    131:10,22;132:15,17;
    137:16;144:1,12;
    146:14;148:16;154:24;
    155:22
**capacities (1)**
    103:6
**capacity (1)**
    89:24
**car (1)**
    5:14
**career (1)**
    104:12
**carrying (1)**
    61:1
**case (14)**
    5:15;8:4;23:11;
    32:10;34:7,22,22,22;
    35:16;86:16;87:1;
    106:24;114:18;138:11
**cases (6)**
    5:15;93:16,17;94:1,
    2,4
**category (3)**
    108:22;110:5;140:12
**causes (1)**
    107:7
**Central (1)**
    114:13
**certain (3)**
    54:1;72:5;140:15
**certainly (1)**
    28:2
**CFR (1)**
    102:9
**CFTC (90)**
    4:20;5:11,16;7:16,

19;8:1;10:21;13:3,4,8;
23:20,22;24:12,16,19;
25:15;26:8;27:7,9,11;
28:6,22,23;29:9,11,19;
30:13,16,22;31:12;
32:4,5,10;35:9;36:12;
45:5,7,11;46:8;67:7,
20;70:4,10;80:3,4;
84:7,17;85:4,11,24;
86:8,10;89:4,6;94:8,9,
15,17,19;99:9,10,12;
100:19,20;101:15;
102:5,6;103:23;104:1,
4,11;113:6;115:5,9;
118:17,18;123:11,20;
128:1;141:5,6;143:13;
145:3,5,10;148:7,12;
154:10,15,24
**CFTC's (16)**
    8:4;24:6,23;25:7;
    27:15;29:21;32:23;
    33:6,23;70:13;83:4;
    99:13;115:9,15;117:3;
    142:8
**chain (2)**
    118:22;141:18
**change (3)**
    91:16;128:22;129:5
**changed (1)**
    54:12
**changes (2)**
    85:1,4
**chapter (1)**
    101:8
**charge (4)**
    11:10;129:17,24;
    130:12
**charges (1)**
    34:1
**check (1)**
    88:13
**chief (1)**
    4:21
**circle (2)**
    73:16;115:9
**Circuit (1)**
    22:10
**citations (1)**
    92:15
**cite (1)**
    92:19
**Civil (1)**
    4:5
**claim (4)**
    26:4,6,9;88:6
**claims (4)**
    24:23;25:6,11;26:7
**clarification (6)**
    37:16;67:20;70:12;
    74:17;95:19;104:5
**clarifications (1)**
    155:9
**clarify (1)**

155:13
**clarifying (1)**
    123:19
**classification (2)**
    37:5;39:3
**clear (7)**
    15:6;40:11;42:5;
    54:15;96:24;151:6;
    154:22
**clearing (2)**
    126:8;128:2
**clearly (2)**
    7:3,18
**client (16)**
    12:11,16;52:3;61:18,
    21;62:1;68:3;73:14;
    74:15,16;98:22;99:2;
    103:14;117:14,17;
    127:7
**clientele (2)**
    109:5,7
**clients (27)**
    10:23;11:10,15;14:3;
    51:17;53:21;55:1,5,9;
    62:20;68:4;69:22;
    72:18;73:8,11,13,20;
    74:7,13;75:23;76:2,6;
    99:4;109:2;116:1;
    128:19;129:2
**clients' (1)**
    139:5
**close (5)**
    42:4;43:18;123:1;
    147:7,11
**closed (9)**
    13:21;17:5;41:19;
    42:9,11,18;43:4,12;
    55:20
**closely (2)**
    13:24;14:8
**closer (1)**
    123:4
**closing (3)**
    19:9;21:13;83:1
**CME (1)**
    137:6
**code (1)**
    85:24
**coffee (1)**
    78:22
**cold (5)**
    135:12,22;136:8;
    138:19,22
**collaborated (1)**
    92:3
**colleagues (1)**
    4:20
**collective (1)**
    42:15
**Colorado (2)**
    8:15;9:7
**column (1)**
    31:20

**comfortable (2)**
    113:20;114:19
**coming (1)**
    93:2
**command (1)**
    141:19
**comment (6)**
    94:10,12,12,13;
    107:23;110:15
**Comments (1)**
    134:5
**commerce (4)**
    101:1,10,18,24
**commission (4)**
    60:18;89:12;104:7;
    109:24
**commissions (5)**
    100:14,15;109:10,
    12;125:19
**commitments (1)**
    140:22
**commodities (5)**
    10:20,21;11:1,8;
    104:12
**Commodity (77)**
    26:10,14;30:2;45:17;
    46:7,8,21;47:1,6,14;
    51:14;52:6;55:22;56:8;
    61:12;62:13;63:4,22;
    64:13,20;66:16;67:3,
    10,22;68:13;70:3;72:2,
    17;73:7;74:24;75:12;
    82:19;84:3;85:12;
    89:24;92:5,9;93:3,4;
    94:23;95:7,9,14;96:13;
    97:4;98:4;99:6;100:23;
    101:2,2,7,7,11,12,14,
    18,22;102:10,20;
    103:8;104:4,21;105:3,
    13;106:5,8,9,13,18;
    107:5,22;108:2,23;
    115:16,21;123:23;
    124:24
**common (1)**
    78:12
**commonly (1)**
    68:21
**communicate (1)**
    139:19
**communicated (2)**
    20:22;134:15
**communication (1)**
    88:8
**communications (5)**
    44:2;86:23;130:10,
    11,13
**companies (3)**
    10:12,13,18
**company (16)**
    12:5;13:24;14:9,9;
    17:2;18:13,16;20:2,14;
    41:10,10;55:1;58:5;
    83:12;138:15;140:3

**company's (5)**
    79:14;82:5;126:21;
    127:2,8
**compensation (3)**
    95:10;100:15;106:10
**complaint (17)**
    21:7;24:4,7,10,18;
    25:7,12;26:24;28:15,
    18;32:23;33:7,23;
    113:7;115:10;117:3;
    142:9
**complaints (2)**
    19:19;79:16
**completed (1)**
    52:15
**completely (2)**
    72:7;136:16
**completion (1)**
    38:3
**compliance (18)**
    42:2;51:2;61:4;
    79:10,12,12,14;125:21;
    126:6;128:1,9,13;
    130:15;131:15;132:17,
    18;136:17;149:15
**compliant (3)**
    131:1;151:4,17
**component (1)**
    74:22
**components (2)**
    58:8;83:22
**computer (4)**
    40:19,20;49:22;50:9
**concept (4)**
    93:12,19;103:18;
    136:8
**concern (1)**
    45:12
**concerned (2)**
    45:10;128:13
**concerning (21)**
    10:24;13:11;14:11;
    30:1;33:16;34:4;40:6;
    41:12;43:4;45:3,17;
    64:11;66:7;68:14;73:8;
    104:6;105:1;111:11;
    120:21;126:18;147:20
**concluded (4)**
    39:7;63:3;64:12;
    90:17
**concluding (1)**
    91:22
**conclusion (2)**
    56:7;83:17
**concrete (1)**
    117:20
**conduct (3)**
    18:22;83:24;143:3
**conducted (3)**
    4:4,8;129:10
**conducting (3)**
    42:23;85:16;103:11
**confirm (10)**

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

41:23;42:23;68:11;
72:1,11;88:17;149:17;
150:3,22;151:10
**confirmed (3)**
68:2;73:14;153:10
**confirming (2)**
47:13;153:2
**confused (1)**
120:19
**confusing (1)**
6:17
**connection (23)**
8:4;17:8;18:23;
19:12;22:21;25:24;
50:17;86:16;101:10;
102:23;103:9,19;
105:15;115:4;120:24;
138:17;139:14;146:19;
148:3;149:8;152:8;
153:7,17
**cons (3)**
90:17,23;91:13
**consider (1)**
135:7
**considerable (1)**
126:15
**considered (1)**
106:16
**consistent (4)**
34:5;76:9;93:23;
134:20
**consistently (1)**
149:16
**constitutes (1)**
107:5
**construing (1)**
97:1
**contact (1)**
130:6
**contacted (3)**
58:22;72:11;111:24
**contained (1)**
50:22
**contains (1)**
33:7
**contends (1)**
34:3
**content (5)**
88:10;91:19;95:18;
104:24;146:12
**contents (1)**
31:10
**context (3)**
5:9;43:13;143:18
**contingent (1)**
11:13
**continue (3)**
36:4;90:21;99:23
**continued (1)**
96:1
**contract (9)**
5:15;19:20;21:2;
22:4;23:15,17;57:1,6;

106:18
**Contracts (3)**
26:1;70:20;106:21
**contrary (2)**
71:7;78:2
**control (1)**
75:18
**controlling (1)**
34:1
**Convention (2)**
21:1;23:18
**Conversation (38)**
31:20;36:19,19;37:2,
8,17;38:5,6,13,14,16,
24;39:1,12,17;40:23,
24;42:6,10,15;44:20;
45:2,18;47:17,18,18;
48:18;53:8;82:23;83:3;
116:14;121:16,18;
123:21;124:8;127:16;
128:4;129:22
**conversations (31)**
29:24;30:10,19;
31:14,22,23;32:1;
36:14,15,16;38:23;
41:2,8,12,18,22;42:4,
15,18;43:3,15,20;44:6,
9;83:16;123:12,14;
124:4,12,14;130:15
**Conversations' (1)**
30:12
**Cook (1)**
22:9
**copies (1)**
85:22
**copious (1)**
86:5
**copying (1)**
148:9
**corn (1)**
57:4
**cornerstone (1)**
75:1
**corrected (4)**
32:8,17;142:8,11
**correctly (17)**
22:5;26:11,15;28:15;
30:13;37:6,22;55:3;
60:12;95:17;101:3;
102:1,24;104:8;
105:18;108:24;146:3
**correspondence (9)**
119:2,4;128:17,18,
20,21;129:1,4,7
**costs (1)**
126:4
**counsel (17)**
9:9,15,18,21,23;10:6,
8,11;23:5;28:14;33:14,
22;34:12,16;35:10,15;
92:24
**Count (9)**
25:14,24;26:4,9,13,

17,21;115:13;117:3
**counts (5)**
27:1,2;28:14,17;
33:23
**County (1)**
22:10
**couple (5)**
5:12;21:4;38:15;
141:1;147:14
**course (10)**
21:9;40:10;42:24;
44:21;84:4;88:12;
100:3,6;104:11;129:20
**Court (5)**
4:6;6:9;22:10;24:13;
94:6
**courts (1)**
8:16
**covered (4)**
33:12;51:6,6,7
**COVID (1)**
4:7;18:2
**CPO (2)**
45:24;46:2
**CPOs (1)**
40:15
**CQG (2)**
60:22,22
**crash (1)**
50:9
**criteria (2)**
96:16;97:7
**cross (1)**
34:13
**CTA (33)**
19:18;26:6;45:24;
46:2;47:2,12;79:9;
83:18;88:21;90:17,23;
91:1,3,15,23;92:11;
93:6;96:2,6,9,20;97:7;
100:6;103:16;105:17;
106:7;110:6,21;
111:11;116:12,16,19;
117:1
**CTA' (1)**
107:8
**CTAs (1)**
40:15
**current (2)**
79:15;123:16
**Customer (45)**
19:19;53:2;58:15,22;
59:3,10;69:8,10;71:16,
18,19,20,21;72:11;
75:14,15;77:23;79:16;
90:18,20;91:6,7;92:12;
105:12;106:6,16,19;
107:1,4,16;109:23;
110:2;112:1;129:18;
130:1;136:18;139:13,
19,21,22;140:15;
149:18;150:5,23;
151:11

**customers (96)**
30:4;33:3;52:21;
53:14,15;54:17;55:11,
17;56:15,15,16,20;
57:11,18;58:13;59:11;
64:7;66:2,5,8;68:15,
22;69:3,6,14,18,19;
70:18,24;71:12,15;
72:4,5;76:11;77:5,15,
19,20;78:1,2,4,7,13;
84:13;91:20,23;93:6;
95:22;99:19;107:13,
16;108:6,8,9;110:1,3;
111:4,6,12,20,23;
112:3,5,12,16,18,18,21,
23;113:3;116:11;
130:15;133:15,17,19,
21,24;134:15,22,23;
135:8,15,17,19,21,24;
136:4,9,9;138:4,23,24;
139:17;141:20;142:5;
154:1
**customers' (1)**
74:19
**customer's (2)**
56:22;58:9
**cut (3)**
91:10;115:24;126:4
**Cybulski (1)**
143:15

## D

**dark (1)**
21:18
**data (3)**
19:21;65:2;127:21
**database (1)**
40:13
**date (5)**
13:15,17,19,21;41:8
**dated (5)**
66:22;80:7,23;
143:16;145:20
**dates (3)**
21:3;30:11;42:14
**day (3)**
119:9;135:10;156:2
**days (1)**
10:2
**day-to-day (3)**
23:1;45:15;127:14
**de (1)**
75:18
**deal (1)**
43:3
**dealing (1)**
123:9
**deals (6)**
11:8;37:23;101:16;
117:5;154:8,13
**dealt (6)**
37:4,10;38:8,17;

93:5;123:22
**December (4)**
12:24;13:15;41:20;
66:22
**deck (1)**
143:23
**defendant (2)**
5:2;33:13
**Defendants (1)**
4:24
**defense (9)**
28:14;33:14,18,22;
34:6,12,16;35:10,15
**deferred (1)**
154:3
**defined (1)**
107:5
**defines (1)**
106:9
**definitely (2)**
31:24;43:22
**definition (19)**
87:19;91:17;95:6,23;
96:1,9,13,16,20;97:4,7,
8,15,18;98:3,4;107:7;
137:5,13
**Definitions (2)**
95:2;98:8
**degree (2)**
8:21,23
**delayed (2)**
78:4;112:6
**delete (1)**
49:19
**delineate (1)**
87:22
**demand (1)**
20:23
**demo (2)**
143:17,18
**Dempsey (2)**
145:12;148:9
**Denver (1)**
8:24
**department (2)**
130:5;153:12
**depended (2)**
69:12,12
**depending (2)**
49:24;50:4
**depends (4)**
11:16,21;132:14;
137:13
**deposition (12)**
4:3,8,23;5:6;7:1;8:8;
16:9;38:6;113:13;
154:9,15;155:24
**depositions (2)**
5:14;115:3
**deps (1)**
67:16
**describe (8)**
8:19;11:5;13:23;

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

17:11,17;18:9;125:24;
126:9
**described (4)**
41:19;45:10;107:11;
139:24
**describing (4)**
80:8,17;91:20;
136:24
**description (2)**
82:4;116:6
**designated (1)**
132:6
**desire (1)**
22:4
**desired (1)**
90:20
**desk (2)**
85:21;131:17
**destroyed (1)**
50:9
**detailed (1)**
82:4
**determine (3)**
74:23;131:21;155:1
**develop (2)**
116:19;135:6
**developed (4)**
51:16;53:4,6;139:16
**deviance (1)**
111:7
**deviate (7)**
59:3;68:15,22;69:7;
70:18;75:3;78:13
**deviated (14)**
69:3,9;71:12;72:4;
74:13;76:6,11;77:15,
17,19;78:7;112:21,24;
113:3
**deviating (1)**
73:13
**deviation (1)**
70:19
**deviations (4)**
73:18;76:8,8;78:10
**devised (4)**
54:6,9,18,21
**dictated (1)**
127:13
**difference (1)**
106:22
**differences (1)**
56:21
**different (20)**
10:12;14:16;47:4;
55:12;72:8,10,10;73:3;
82:15;98:8;100:22;
107:11;112:6;122:6,7,
9;132:10,19;138:21;
153:8
**digital (1)**
86:2
**diligence (4)**
18:22;19:2,10,11

**DIRECT (2)**
4:16;132:5
**directed (2)**
8:4;128:18
**directly (5)**
60:15;95:12;106:12;
140:15;141:19
**disagree (4)**
25:4;74:11;99:24;
134:12
**disagreeing (1)**
100:4,4
**disapproval (1)**
58:16
**disapprove (1)**
75:16
**disciplinary (1)**
19:14
**disclosed (4)**
38:1;53:22;94:14;
124:21
**disclosure (12)**
30:3;77:8;84:9;
91:12;115:16,20,22;
116:3,10,13,21;117:2
**Disclosures (2)**
26:18;115:14
**disconnect (2)**
114:4,5
**discovery (4)**
29:13;33:20;35:12;
71:6
**discrete (2)**
31:13,21
**discretion (28)**
51:15,24;52:11;54:2;
62:21;72:13,24;73:3,
15;74:1,4,19,21;75:1,
13;83:20,23;91:2,2;
92:13;93:13,19;
110:13,20,22;111:1;
112:2;127:6
**discretionary (3)**
51:19;52:2,22
**discretionary' (1)**
106:23
**discuss (5)**
35:20;90:18;118:5;
126:20;128:8
**discussed (8)**
30:11;39:2;43:6;
62:10;128:15;141:24;
145:24;153:5
**discusses (1)**
153:13
**discussing (5)**
42:7;43:11;58:2;
124:16;130:10
**discussion (5)**
31:18;46:15;114:8;
126:17;155:18
**discussions (1)**
47:8

**dispositive (5)**
93:13;108:13;
110:12,17,19
**dispute (1)**
125:22
**disqualification (3)**
120:18;121:6;122:11
**dissecting (1)**
97:9
**distinction (3)**
15:1,4,5
**distinguish (2)**
14:11,17
**distracted (1)**
59:18
**District (2)**
4:6,6
**Doctor (1)**
8:23
**document (42)**
7:13;13:7,8;27:18,
22;28:4,5;29:20,23;
30:17;31:4,8;32:13,16,
20;36:14;50:18;77:8;
82:6;84:10;86:7,13,15,
19;87:2,3,19;89:11,16;
91:12;104:3;115:22;
116:3,11,13,22;118:20,
24;120:23;145:3,13,15
**documentation (3)**
56:3;68:17,20
**documented (1)**
91:12
**documents (33)**
7:15;21:13;30:4;
33:16;41:22;42:1;46:3;
47:15,16;50:10,15,17;
59:14,17;60:10,14,17;
61:9,21;66:19;79:7;
81:12,18;86:20;87:7,
20;88:17,19,23;89:1;
111:14;117:2;136:19
**done (6)**
15:20;40:17;57:7;
85:20;140:24;151:22
**Donelson (176)**
5:1;12:12,14,16,20,
21;13:12,17;14:4,9,10,
12,18,21;15:2,9,15,18;
16:5,14,20;17:7,15;
18:10,22;19:17;20:1,
10;21:8,21;22:20;24:7,
13,16,20,24;27:13;
28:8,13,24;29:22;30:1;
31:14;32:9,17,24;34:2,
15,20;35:3,11,14;37:3,
10,24;38:9;39:1;40:2;
41:9,10,13,23;42:8;
44:15,19;45:1;46:6,19;
47:5;48:3,22;49:1,12;
50:7;53:9;54:24;55:19;
58:4;59:15,15,22;60:4,
6,10,14;61:8,21;62:4,

11;63:20;64:18;66:3,
12,21,23;67:23;68:9,
11;70:5,17;71:10,24;
72:14;73:4,17,19;
75:10,21;79:8;82:16;
83:8;84:1;86:24;87:13;
88:4,14;99:22;104:20;
105:1;111:9,17;
112:11;116:9,20;
117:10,23;118:12,22;
119:5,8;120:6,16,20;
121:4;122:13,17;
124:12;125:3,24;
126:9,17,19;127:1,17;
128:6,7,15,24;129:9,
16,23,23;130:2,12,24;
131:3;132:8;133:18,
24;134:6;142:4,22;
143:9,14,16;145:11,17,
24;146:7;147:4,19;
148:8;152:15;154:4,9,
14
**Donelsons (4)**
17:12,19;18:5,7
**Donelsons' (1)**
17:11
**Donelson's (27)**
18:21;22:8;23:7;
27:14;28:12,23;29:14;
30:9,18,20;32:22;33:6,
19,21;34:6,11,24;
37:20;38:8,17;47:18;
89:20;116:17;124:1;
141:24;142:8,11
**doubled (1)**
68:6
**doubt (1)**
62:4
**down (32)**
24:1;25:9,10;26:3;
27:20;28:3,22;29:18;
32:19;33:5;36:20;
44:12;61:22;80:21,22;
81:10;86:18;89:9,18;
93:14;95:4;96:11;98:6,
6;99:16;105:20;113:9;
119:1;143:21;146:5,
14;148:19
**dozen (1)**
11:4
**draft (5)**
85:17,19;90:2;
147:15;149:13
**drafted (4)**
128:18,22,24;147:15
**drafting (5)**
89:15;90:4,13;152:9;
153:7
**draw (1)**
15:5
**drawn (2)**
15:1,5
**drill (1)**

96:11
**Drive (1)**
29:6
**dual (2)**
103:6;119:21
**due (4)**
18:22;19:2,10,11
**duly (2)**
4:1,15
**during (4)**
44:20;54:20;83:16;
117:18
**duties (1)**
42:22
**dying (1)**
123:9

**E**

**Earlier (20)**
14:2;15:12;20:4;
22:3;66:11;78:2;79:6;
82:14;83:18;102:3,12;
103:3;104:10;110:11;
121:1,23;122:5;
123:21;133:22;142:11
**earliest (1)**
121:24
**early (3)**
124:9;152:19,23
**ease (1)**
36:17
**easily (3)**
84:8,15;87:17
**eavesdropping (1)**
44:4
**ECF (1)**
25:17
**educational (1)**
8:19
**effect (1)**
142:14
**either (10)**
10:18;34:21;40:5;
49:11;70:9;71:10;
75:15;95:11;106:12;
114:17
**electronic (1)**
95:13
**elicit (2)**
34:9,23
**else (6)**
43:19,22,23;62:2;
140:17;147:16
**email (20)**
21:10,17;23:16;
49:15;50:2,6,12,14;
118:22;120:15;121:4,
11;139:9,10;143:14,
20;145:10,17,23;148:8
**emails (6)**
21:2;49:19;50:11;
121:1,7;130:23

**Mary Maslowski, CSR, RPR  (312) 726-7600**

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

**emphasis (1)**
106:5

**employee (2)**
30:5,7

**employment (1)**
9:6

**encompasses (1)**
38:12

**encouraging (1)**
140:15

**end (2)**
19:17;86:19

**Enforcement (1)**
89:12

**enforcing (1)**
138:15

**engage (1)**
127:20

**engaged (3)**
56:16;105:11;106:4

**engagement (9)**
11:18;14:3,4;19:5;
87:13;88:1,3,9;148:1

**engagements (1)**
88:8

**engages (2)**
95:11;106:11

**engaging (3)**
46:24;47:13;105:13

**Enjoy (1)**
156:1

**enough (2)**
20:8;83:11

**ensure (2)**
152:24;153:24

**enter (5)**
14:2;51:22;53:15;
58:24;139:6

**entered (6)**
13:19;71:19;72:8,12;
74:16;112:5

**entering (1)**
112:1

**Enterprises (2)**
21:8;22:20

**Enterprises' (1)**
21:21

**entire (1)**
117:21

**entities (1)**
103:5

**entitled (1)**
30:12

**entity (6)**
37:5;39:3,11;40:1;
108:22;110:5

**environment (1)**
69:13

**escape (1)**
21:4

**especially (1)**
5:23

**establish (1)**

34:14

**estate (1)**
11:8

**evaluate (5)**
76:20,21,22;77:14;
92:1

**Evans (50)**
13:14;20:5,6,9,16,18,
22,24;21:7,17,22;22:9;
23:10;24:8;39:6;46:2,
11;47:15,20;49:2;
51:10,12;52:21;53:5,8;
54:5,24;55:10,24;
56:12;57:10,17;58:4,
12;59:2,16;60:5,8,11,
15;61:8;62:8;65:10;
79:8;80:7;81:2;117:10;
119:15;124:18,20

**Evans' (3)**
21:10;22:20;49:13

**even (3)**
68:6,7;85:15

**everyday (1)**
134:17

**everyone (4)**
36:20;74:14,14;
113:12

**evidence (2)**
56:2;83:13

**evident (1)**
15:3

**evolution (1)**
90:4

**exact (1)**
87:19

**exactly (1)**
40:9

**EXAMINATION (1)**
4:16

**examined (1)**
4:15

**except (3)**
58:15;59:9;95:8

**exception (3)**
61:2;102:24;103:2

**Exchange (4)**
46:7;94:23;100:23;
106:9

**excuse (2)**
35:3;81:18

**EXCUSED (1)**
156:3

**execute (6)**
57:11,18;58:14;68:5;
72:6;91:4

**executed (5)**
55:17;71:1,18;72:13;
78:3

**executive (1)**
9:24

**Exemption (1)**
102:9

**exercise (3)**

75:13;110:22,24

**exercised (1)**
110:20

**exercising (2)**
83:20;93:13

**Exhibit (76)**
7:17,19;8:1;13:3,4;
17:5;23:21,22,24;
25:15;26:8;27:8,9,11,
14;28:6,23;29:9,11,19;
30:14,16,22,24;31:2,
13,19;32:4,5;36:12;
37:18;38:24;41:7;
44:13;80:3,4;86:8,11;
89:4,6,8,10;94:16,17,
20;99:9,10,12;100:19,
20,22;102:5,6;103:23;
104:1;113:6;115:9;
117:4;118:17,18;
123:11,20;129:22;
141:5,6;142:9;143:13;
144:3,12,21;145:4,5,
10;146:18;148:7,12

**exhibits (1)**
7:13

**exist (1)**
111:7

**existence (1)**
19:20

**exit (6)**
25:13;51:23;57:13;
71:21;72:9,10

**exited (3)**
71:20;78:1;112:8

**exiting (1)**
52:5

**expect (2)**
128:3,4

**expectations (1)**
126:21

**experience (10)**
93:8,10;97:2;108:14;
131:6,19;149:19;
150:5,23;151:11

**expert (1)**
5:10

**experts (1)**
154:3

**explain (6)**
54:11;73:19;92:7;
126:21;127:1;128:16

**explained (6)**
66:11;77:24;78:11;
127:2,5;137:11

**explaining (3)**
137:4,4,9

**explains (1)**
136:23

**extent (2)**
88:18;137:13

**fact (7)**
20:9;24:15;97:6;
108:16,18;118:6;
150:12

**facto (1)**
75:18

**factor (5)**
83:19;93:13;108:13;
110:12,17

**factored (2)**
104:23;105:5

**factors (1)**
110:19

**facts (1)**
94:14

**factual (4)**
47:22;67:24;75:8,19

**Failure (4)**
26:14,17,21;115:14

**failures (1)**
117:5

**fair (17)**
6:20;13:23;16:6,7;
17:17,20;20:8;22:11;
28:20,21;66:17;78:13,
14;83:12;120:2,5;
122:3

**fall (5)**
91:16;96:19;97:7;
107:7,17

**FALVEY (32)**
4:11,24;18:24;22:1,
6,11;30:20;34:19;35:4,
7,20;36:8,23;78:23;
88:13;113:16,16;
140:19,23;141:3;
142:15,18,20;147:6,9;
151:24;154:11,17;
155:7,11,16,19

**Falvey's (1)**
34:21

**familiar (5)**
12:5,8,12,14;115:15

**familiarize (3)**
31:9;144:1;146:11

**family (1)**
9:10

**fast (2)**
38:14;148:23

**father-in-law (1)**
123:9

**fault (1)**
151:8

**FCM (7)**
52:13;105:11,16;
106:4,17;107:1,3

**FCMs (1)**
40:15

**February (17)**
37:4,9,19,19;38:7;
46:5,22;47:7;125:4;
126:2,11,18;127:17;
128:7,14;129:2;142:1

**Federal (3)**
4:4;8:16;24:13

**fee (10)**
11:13,13,16,17;15:8,
14,14,22;16:5;19:21

**feel (1)**
154:15

**fees (1)**
15:20

**fell (3)**
87:18,20;154:2

**few (12)**
10:2;15:20;19:22;
50:4;51:19;62:20;63:1;
83:9;85:9;116:8;
119:24,24

**fewer (1)**
69:18

**field (2)**
60:23;108:15

**Fifteen (1)**
78:19

**fifth (1)**
29:22

**file (21)**
39:24;40:8;48:6,6;
49:1,12,13;50:11;
61:18;62:1;63:24;64:2;
79:12,14;81:16,17,19,
23;82:4;85:17,23

**filed (5)**
21:6;24:5,10,19;32:9

**files (3)**
40:6;53:2;62:9

**filled (1)**
81:21

**final (1)**
149:15

**finance (1)**
8:22

**Financial (6)**
9:15;19:17;51:1,5;
61:3;69:13

**financials (2)**
79:20,21

**find (1)**
44:10

**findings (2)**
48:12;80:9

**fine (5)**
6:8;18:24;78:20;
136:12;138:7

**finish (2)**
6:4,5

**FINRA (1)**
82:10

**firm (9)**
66:3,21;83:8;125:11,
20;126:8;128:23;
133:18;134:1

**firms (2)**
135:15,23

**firm's (1)**

**F**

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

128:2
**first (18)**
  4:14;16:20,22;27:1,
  15;32:11;38:15;51:1;
  82:23;89:23;96:5;
  99:13;111:24;119:12;
  143:22;144:22;149:14,
  21
**fit (1)**
  142:19
**five- (1)**
  151:21
**flat (6)**
  11:13,17;15:14,20,
  22;16:5
**flesh (1)**
  22:19
**focus (1)**
  25:11
**foggy (1)**
  49:9
**follow (18)**
  51:17;55:18;69:8;
  71:23;76:2;77:7,21,23;
  84:10;98:17;101:4;
  109:2,13;110:3;
  111:21,23;127:12,24
**followed (14)**
  55:1;72:18;73:9,20;
  74:7;75:23;77:5;108:8;
  109:5;111:5,6,12;
  112:12,18
**following (5)**
  79:4;112:3;114:11;
  140:2;152:3
**follows (1)**
  4:15
**followup (1)**
  151:23
**foreign (2)**
  107:16;109:23
**forget (3)**
  12:24;87:9;140:10
**Forgive (1)**
  45:5
**form (2)**
  81:21;129:6
**format (1)**
  105:22
**formed (2)**
  58:1;61:10
**forte (1)**
  12:4
**forth (1)**
  7:4
**forward (2)**
  38:14;115:6
**forwarding (1)**
  118:22
**forwards (2)**
  119:4,8
**found (1)**
  122:18

**four (11)**
  31:13,17,21,22,23,
  24;36:15,18;76:15;
  123:21;134:21
**fractional (3)**
  10:6,8,17
**frame (5)**
  37:9;54:20;57:14;
  117:21;145:8
**frankly (1)**
  149:10
**fraud (10)**
  22:18,18,18,20;25:6,
  24;26:4,6,9;27:2
**Fraudulent (1)**
  26:10
**frequency (4)**
  57:17;58:13;68:15;
  112:20
**frequently (6)**
  59:2;72:3;77:14,19;
  78:7;134:14
**friends (1)**
  17:18
**fully (1)**
  155:2
**functioning (2)**
  66:19;91:23
**funds (2)**
  141:21;142:5
**further (5)**
  80:21,22;96:3;
  106:21;110:23
**future (1)**
  116:18
**futures (7)**
  4:22;26:1;52:7;
  104:4,7;106:18;133:6

## G

**gave (4)**
  52:3;58:15;64:24;
  78:1
**GC (1)**
  10:17
**Gecas (1)**
  126:14
**general (7)**
  9:9,15,18;10:6,8,11;
  95:8
**Generally (12)**
  16:16;25:5;31:13;
  38:8,18;59:19;63:18;
  76:15;82:19;106:9;
  125:20;146:12
**generated (5)**
  109:11,15,16,19,23
**Generating (3)**
  144:5,9,14
**generous (1)**
  11:22
**germane (2)**

51:12;68:1
**gets (1)**
  91:3
**gist (2)**
  24:3;112:10
**given (1)**
  41:23;97:16;103:16
**gives (1)**
  108:17
**giving (7)**
  23:16;96:8,22;
  103:13;125:17;127:10;
  151:15
**glad (1)**
  87:9
**Gmail (1)**
  50:4
**goals (1)**
  126:21
**going-forward (1)**
  114:24
**good (1)**
  78:23
**Google (1)**
  141:10
**graduate (1)**
  9:1
**great (2)**
  15:8;136:7
**green (1)**
  105:11
**Group (10)**
  5:1;9:15;10:15;12:6;
  39:12;41:13;42:16;
  44:2;146:2;148:11
**guess (5)**
  9:16;10:2;14:15;
  93:9;146:10
**guidance (8)**
  84:7,17;85:4;94:8,9;
  108:18,20;131:9
**Guided (2)**
  104:6;106:24
**guided' (2)**
  106:16,22
**guiding' (3)**
  105:12;106:5;107:4
**gut (1)**
  93:2
**guys (1)**
  93:1

## H

**Hague (2)**
  21:1;23:17
**half (1)**
  11:4
**hand (2)**
  109:6,8
**handling (2)**
  19:18;23:1
**happened (5)**

123:7,8;129:14;
  139:7,9
**hard (3)**
  50:15,17;57:23
**hardcopy (2)**
  50:19,21
**Hatzigiannis (1)**
  143:15
**head (5)**
  6:12;19:22;45:6;
  59:9;104:17
**heading (6)**
  25:20;28:7;31:19;
  89:21;95:1;141:11
**headnote (2)**
  105:10,18
**headnotes (1)**
  105:8
**hear (4)**
  15:11;55:2;60:11;
  154:11
**heard (2)**
  119:13;121:24
**hearing (2)**
  108:24;155:21
**held (2)**
  13:24;14:9
**helped (1)**
  149:12
**helpful (7)**
  16:19;23:19;57:9;
  70:12;71:23;77:2;
  130:9
**herein (2)**
  4:14;90:8
**here's (4)**
  127:24;128:1;137:5,
  5
**highlight (2)**
  120:7;142:16
**highlighted (4)**
  101:6;105:10;106:1,
  8
**highlighting (2)**
  95:6;121:5
**hired (1)**
  126:20,24
**history (6)**
  8:20;9:6;40:14;84:5;
  116:4,5
**hold (2)**
  57:14;68:8
**holding (1)**
  125:18
**holdover (1)**
  62:22
**hopefully (1)**
  24:2
**host (1)**
  127:11
**hosts (1)**
  114:3
**hour (4)**

11:19;15:13,19;16:4
**hourly (2)**
  11:12;15:16
**hours (1)**
  16:17
**house (1)**
  17:23
**housekeeping (1)**
  6:15
**HR (2)**
  132:15,16
**hundred (2)**
  69:18,19
**hundreds (1)**
  93:17
**husband (1)**
  67:16

## I

**Iavarone (6)**
  23:8,9;90:12;92:2,
  24;93:3
**IB (23)**
  37:5;39:3,15;42:14,
  22;43:14;51:4;63:1;
  81:21;82:12;90:9;91:6,
  6;103:13,14,19;105:11,
  16;106:4,17;107:1,3;
  133:13
**idea (6)**
  49:16;69:20;123:7;
  135:9,17;143:7
**identification (19)**
  7:20;13:5;23:23;
  27:10;29:12;30:23;
  32:6;80:5;86:9;89:7;
  94:18;99:11;100:21;
  102:7;104:2;118:19;
  141:7;145:6;148:13
**identified (2)**
  17:1;114:17
**identify (5)**
  18:15;93:22;113:14;
  114:5;115:2
**II (1)**
  26:4
**IIB (2)**
  43:9,14
**III (2)**
  26:9;95:14
**Illinois (7)**
  4:7;8:14,17,22;9:8,
  11;29:6
**imagined (1)**
  141:2
**implication (1)**
  66:15
**impliedly (1)**
  33:15
**important (5)**
  41:15;44:11;75:8;
  93:20;150:20

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

**improvements (1)**
127:21
**inaudible (1)**
107:14
**incidental' (1)**
105:15
**inclination (1)**
6:11
**include (5)**
52:16;81:23,24;
82:10,12
**included (3)**
82:9;95:21;116:2
**including (1)**
86:21
**Income (3)**
144:5,9,13
**incorporated (1)**
9:10
**Inc's (1)**
146:2
**independent (3)**
51:4;62:17;91:24
**in-depth (1)**
19:2
**indicated (1)**
55:24
**indirectly (5)**
54:5,23;55:10,24;
106:12
**individual (10)**
31:22,23;32:1;53:8;
81:22;91:5,7;92:12;
111:3;129:10
**individuals (1)**
117:8
**indulge (1)**
140:10
**industry (3)**
93:8;97:2;131:7
**information (57)**
21:15;29:23;33:12,
16;34:10,23;39:5,6;
40:4;47:20;48:16;
50:22;51:10,11;54:5;
55:20;56:6,11;57:10,
16;59:1,6,20;60:1,3,6,
12;61:7,10;62:3,23;
64:11;65:10;66:6,24;
67:24;68:14;69:2,6;
72:3;73:4;75:22;82:5;
84:13;107:24;111:8,
16,17;112:20;115:23;
116:2,5;118:7;121:2;
141:22;154:5,23
**informed (10)**
55:21;106:17;
109:12;121:21,22;
122:13,17;124:21;
142:6;155:2
**infrequent (1)**
134:18
**initial (2)**

24:2;96:5
**initiate (1)**
107:3
**initiating (2)**
120:17;122:11
**in-person (1)**
121:13
**inquiries (1)**
19:15
**inquiry (14)**
143:5,8;145:22;
146:19;147:5;148:4;
149:8;150:16,16;
151:5,19;152:9;153:5,
18
**instance (1)**
103:12
**instances (1)**
103:7
**instead (1)**
148:16
**instinct (1)**
93:2
**instrumentalities (1)**
101:1
**instrumentality (1)**
101:10
**intent (1)**
34:9
**inter (1)**
62:16
**interacted (1)**
20:21
**interacting (3)**
125:22;126:8;130:5
**interest (3)**
38:2;105:13;107:6
**interests (1)**
106:14
**intern (1)**
4:23
**internal (1)**
25:16
**interpretation (6)**
92:18,22,23;93:9,23;
117:1
**interpretative (2)**
104:15,19
**interpretive (4)**
84:7,17;104:4,11
**interprets (1)**
103:18
**interrogatories (3)**
27:13,15;29:16
**Interrogatory (10)**
28:8,9,12,24;29:20,
22;30:6,18;31:3;39:2
**interruption (1)**
114:14
**interstate (4)**
101:1,10,18,23
**into (12)**
13:19;14:3;34:13;

35:11;41:3;84:16;90:7;
98:8;104:24;107:18;
108:22;118:1
**introducing (35)**
30:8;39:16,18,22;
40:1,2,14;41:4,17,24;
42:20;45:4,10,12,13;
46:14,16;52:8,10;
59:23;62:17,18,24;
66:13,20;70:2;82:18;
90:9;102:21,23;
103:10,12;104:6;
116:17;125:16
**investigation (1)**
54:13
**investigator (1)**
4:22
**invoices (2)**
11:15,20
**involve (1)**
140:14
**involved (8)**
18:18;72:13;93:17;
114:18;126:13;127:14;
130:14;132:4
**issue (16)**
33:17;34:11;35:1;
42:18;43:9,11;70:9;
73:3;94:6;96:17;
119:23;120:8,10;
121:24;149:11;151:14
**issues (8)**
19:15;34:3;35:20,22;
49:22;87:1;93:6;104:5
**itemize (1)**
12:1
**items (7)**
19:10,11;42:3;47:21;
51:5;79:10;82:2
**IV (5)**
26:13;27:2;28:14,17;
33:23

**J**

**James (11)**
5:1;12:12,14,16,20;
29:14;31:14;32:9,17,
22;143:14
**January (9)**
33:1;80:7,24;120:7,
16;121:5,10;123:3;
143:16
**Jeremy (1)**
5:1
**Jim (8)**
4:24;21:24;23:8;
87:23;113:16;125:24;
145:10;148:8
**Jody (2)**
22:2;147:11
**Jody's (1)**
36:8

**Joe (6)**
4:21;15:24;25:1;
67:14;69:16;98:16
**jog (1)**
62:2
**joined (1)**
4:20
**joint (1)**
120:2
**July (4)**
119:5;120:4;122:1;
123:4
**June (7)**
10:1,1;30:21;31:15;
38:15,15;124:9;
129:10,16,21;130:8
**Juris (1)**
8:23
**jurisdictions (1)**
8:12
**justify (1)**
12:2

**K**

**Keep (2)**
98:6,7
**kept (1)**
62:4
**key (5)**
74:22;83:19,22;
84:12;93:20
**kind (9)**
80:9,14;81:14,18;
92:13;125:1;128:4;
140:5,11
**kinds (1)**
50:22
**knew (6)**
17:13;20:20;64:5,6;
109:22;141:23
**knowledge (1)**
19:1
**known (1)**
87:23

**L**

**label (2)**
36:16,18
**lack (5)**
110:13;118:1;
121:19;123:23;142:1
**Lands (1)**
10:14
**language (1)**
92:3
**large (2)**
109:10,12
**largest (1)**
9:11
**last (3)**
5:17;20:20,21

**late (1)**
140:18
**later (5)**
10:2;35:15;38:5;
54:10;86:1
**Lauren (1)**
4:22
**law (8)**
4:23;9:2;11:1;27:23;
35:16;85:21;94:6;
104:4
**laws (1)**
42:2
**lawsuit (5)**
21:21;22:8,14,17;
23:6
**lawyer (4)**
5:4;19:19;97:2;
104:12
**lawyers (1)**
114:18
**Leaf (190)**
4:24;8:5;12:6,8,10,
19,22;13:13,18,23;
14:5,8,11,11,12,19,21;
15:3;16:24;17:1,2;
18:10,15;19:7,13;20:1,
5,9;22:21;24:5,7,12,19,
23;30:1,5,7;32:10;
33:1;34:20;39:12,18;
40:7;41:13;42:8,19,23;
43:5,10;46:6,13,20,24;
47:5,9,23;48:13;51:4,
13;53:3,5,17;54:6,14,
16,18,22;55:21;56:7;
59:22;60:24;61:11,19;
62:12;63:3,6,19,21;
64:2,11,12,19,21;65:5,
23;66:4,8,14,15;67:2,9,
21;68:3,5,12;69:14,19;
70:1,14,24;71:6;72:1,
16;73:6;74:6,18;75:9,
11,13;76:14;77:4;79:9;
81:19,22;82:17;83:17,
20;84:2;86:24;88:5,20;
89:23;90:8,17;91:14,
23;92:8;95:22;96:5,12;
98:2,19;99:13,18,20,
22,24;100:2;104:20;
105:2;107:21;108:1,
21;110:13,24;111:11;
116:10;117:10,15,19,
22,24;119:22;120:3;
126:1,11;127:10,20;
130:13;132:7;133:5;
134:8,21;135:3,8,11,
17,20;136:1;138:3,16;
139:13;143:9,18;
144:17;146:2,22;
148:10;149:15,22;
150:2,21;151:9;152:7,
18,20;153:2,9,20;
154:22

REBECCA J. WING
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

**Leaf's (41)**
33:2;43:18;44:1;
51:9;56:13,14;58:2;
61:3;62:15;74:7;76:11;
79:21;95:20;97:3;
99:17;107:10;108:8;
109:5,5;110:3,4;
111:12;115:13;123:22;
133:19;135:2;136:10,
13;137:9,10,11,18;
138:17,23;142:23;
145:9;148:2;152:15,
23;153:6;154:5

**learn (4)**
55:10;58:12;59:1;
71:5

**learned (4)**
55:1;56:12,14;58:3

**leases (1)**
19:21

**least (5)**
33:15,23;69:11;83:9;
123:24

**led (1)**
143:9

**left (1)**
9:14

**legal (32)**
10:24;11:10;14:10,
13,17,18,20;15:1,2;
16:13,23;19:24;32:16;
49:20;56:7;62:12;
71:11;72:15;73:6;
82:15;83:24;85:16;
86:21;92:16,20;93:14,
16;103:17;104:24;
131:2,6;147:20

**legibly (1)**
7:15

**less (1)**
59:12

**letter (33)**
11:18;80:6,8,9,10,12,
14,14;81:6;88:1,4;
104:5,15,19,24;105:21;
106:14;107:12,20;
108:1,21;110:15;
146:1,6,7,15,21;
147:14;148:19;149:6,
12;150:1;153:7

**letters (17)**
14:3,4;81:14,24;
84:7,17;87:13;88:9;
94:11,12,13,13;104:11;
105:10;107:23;108:16;
147:14

**license (8)**
124:24,24;125:1,2;
131:4,10,15,16

**licensed (3)**
8:10,12,14

**life (1)**
146:8

**light (3)**
35:18;107:24;110:15

**liked (1)**
112:9

**likely (1)**
83:6

**limited (2)**
50:12;86:21

**line (6)**
34:13;138:7,10;
145:22;147:7;148:10

**liquidation (1)**
9:19

**Lisle (1)**
29:6

**list (4)**
19:9,19;25:4;100:6

**listed (10)**
19:12;25:12;29:19;
38:23;39:22,24;61:9;
117:9;119:14;125:9

**listen (2)**
44:11;130:20

**listening (1)**
126:6

**listing (1)**
61:1

**lists (2)**
41:8;82:8

**litigated (1)**
93:16

**litigation (4)**
11:9;22:24;115:4;
120:24

**little (9)**
7:21;18:11;22:19;
37:12;60:23;81:3;
119:23;141:1;144:4

**local (1)**
4:5

**locatable (2)**
84:15;87:17

**located (2)**
17:1;20:19

**location (1)**
63:2

**logo (1)**
141:13

**Long (243)**
4:24;5:18;8:5;9:20;
12:6,8,10,19,22;13:12,
17,23;14:4,8,11,11,12,
19,21;15:3;16:1,24;
17:1,2;18:10,15;19:6,
13;20:1,5,9;22:21;
24:5,7,12,19,23;25:1;
30:1,5,7;32:10;33:1,2;
34:19;36:10;39:12,18;
40:6;41:13;42:7,19,23;
43:4,10,18;44:1;46:6,
13,20,24;47:5,9,22;
48:13;51:4,9,13;53:3,5,
17;54:6,14,16,18,22;

55:21;56:7,13,14;58:2;
59:22;60:24;61:3,11,
18;62:12,14;63:3,6,19,
21;64:2,11,12,19,20;
65:5,23;66:4,8,14,15;
67:2,9,21;68:2,5,8,12;
69:14,19;70:1,13,23;
71:6;72:1,16;73:6;
74:6,7,18;75:9,11,13;
76:11,14;77:4;79:9,21;
81:3,3,18,22;82:17;
83:10,11,17,19;84:2;
86:24;87:3;88:5,20;
89:23;90:8,17;91:14,
23;92:8;95:20,22;96:5,
12;97:3;98:2,19;99:12,
17,18,20,22,24;100:2;
104:20;105:2;107:10,
21;108:1,8,21;109:5,5;
110:3,4,13,24;111:10,
12;115:13;116:10;
117:10,15,18,21,23;
119:22;120:3;123:22;
126:1,11;127:10,19;
130:13;132:7;133:5,
19;134:8,21;135:2,3,8,
11,17,20;136:1,10,13;
137:9,10,11,18;138:3,
16,17,23;139:13;
142:23;143:9,18;
144:17;145:9;146:2,
20;147:17;148:2,10;
149:15,22;150:2,21;
151:9;152:7,15,18,20,
23;153:2,6,9,19;154:5,
22

**look (10)**
16:1,16;77:6,10;
80:21;87:12;94:8;
131:8,21;135:18

**looked (16)**
25:2;28:17;39:4;
41:2;47:19;50:13;62:1;
84:4,6;103:17;104:14,
18;120:23;123:15,20;
137:19

**looking (7)**
40:2;49:6;97:9;
105:4;111:3;126:3,4

**looks (9)**
13:9;27:24;37:2;
38:6,16;118:21;124:4;
137:23;138:1

**losing (1)**
60:19

**lost (2)**
91:24;98:16

**lot (7)**
35:16;50:15;67:16;
71:15;87:5;94:2;123:4

**lots (1)**
71:12

**lucky (1)**

67:18

**lumberyard (1)**
9:11

**lunch (1)**
78:17

**LW (1)**
10:14

## M

**mail (4)**
50:14,19;101:17,17

**mails (2)**
100:24;101:9

**main (1)**
125:21

**maintain (2)**
85:17;121:15

**majority (19)**
11:7;51:20;64:23;
65:4,13,23;72:18,23;
73:8,11,20;74:6;75:22;
76:2,10;77:4,7;112:12,
13

**makes (2)**
36:21;45:20

**making (7)**
33:22;100:9,12;
126:6;129:17,24;
138:10

**man (1)**
36:8

**managed (5)**
52:12,14,19,22;53:1

**manual (1)**
128:2

**many (16)**
11:3;55:4,6;69:14;
72:8;76:5,19;108:16;
109:20;110:3;111:12;
112:5;113:3;116:24;
133:19,21

**marathon (1)**
36:8

**March (5)**
9:16;10:3,5;119:3;
124:5

**mark (16)**
7:16;13:3;23:20;
27:7;29:9;30:16;32:4;
80:3;86:6;94:15;99:9;
102:4;103:23;141:5;
145:3;148:7

**marked (24)**
7:20;13:5;23:23;
27:10;29:12;30:23;
31:4;32:6;80:5;86:9;
89:4,5,7;94:18;99:11;
100:21;102:7;104:2;
118:19;141:7;142:10;
143:13;145:6;148:13

**market (3)**
52:6;69:12;106:2

**marketed (3)**
63:7,19,23

**marketing (3)**
63:24;64:2;130:5

**marking (2)**
100:19;118:17

**Mary (1)**
155:16

**materially (1)**
107:11

**materials (7)**
81:13;147:4,21;
148:3;152:8,11;153:9

**matter (5)**
6:15;21:19;77:17;
89:12;113:7

**mattered (1)**
77:14

**matters (4)**
5:12,12,13;30:11

**may (36)**
7:1;9:14;15:20;
18:20;33:22;34:12;
35:14;39:23;50:13,13,
13,14;51:6,18;53:13,
22,22;54:12;62:8;
70:13;77:22;81:5;83:3,
6;90:11,11;101:23;
108:19;110:9;114:6;
119:23;145:20;148:3,
10;151:8;155:1

**Maybe (10)**
7:23;21:5,5;36:16;
44:3,3;89:5;110:16;
146:9;151:21

**mean (35)**
10:1;41:15;42:24;
43:8;46:19;47:24;
51:24;52:2;55:4;57:4,
5;61:22;62:5;67:8;
79:11;80:22;86:1;
90:22;97:20;98:16;
100:3;101:20;103:8;
111:15;123:17;127:4,
5;133:2,3;138:7,8;
147:9;151:1,2;155:14

**meaning (2)**
37:10;55:7

**means (18)**
6:3;10:11;34:18;
39:12;63:7,9,13;95:10;
100:24;101:9,23;
108:12;110:10;143:18;
149:19;150:5,24;
151:12

**meant (3)**
10:22;48:3;97:22

**media (1)**
95:13

**meet (4)**
96:13;97:4,14;98:4

**meeting (1)**
121:13

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

**meets (1)**
98:2
**members (1)**
141:21
**memorialize (1)**
44:9
**memorialized (1)**
45:14
**memory (3)**
62:3;81:20;87:4
**memos (3)**
85:17,19;86:22
**mentioned (17)**
4:18;14:2;15:12;
17:10;20:4;21:20;51:8;
59:13,24;60:3,9;70:17;
79:10,19,24;123:13,14
**Merchants (1)**
104:7
**met (6)**
126:20,23;127:19;
128:8;129:18;130:1
**method (1)**
91:13
**methodology (1)**
116:7
**Mexico (1)**
20:20
**Microsoft (1)**
50:2
**middle (1)**
32:13
**might (4)**
29:21;31:6;56:21;
122:2
**mind (3)**
36:6;99:23;110:12
**mine (2)**
12:11;117:14
**minute (2)**
31:9;146:10
**minutes (2)**
36:2;78:19
**miscommunicating (1)**
77:12
**misconstruing (1)**
96:18
**misheard (1)**
85:2
**misleading (5)**
84:11,12;147:22;
152:24;154:1
**mismark (1)**
31:2
**missed (1)**
25:14
**misspoke (1)**
123:18
**misstated (1)**
122:2
**mistaken (1)**
139:21
**model (10)**

58:3;62:15;64:3;
75:9;82:5;91:1,16;
95:20;97:3;107:10
**moment (1)**
61:14;94:3;142:18
**Money (7)**
63:7,10,13;149:19;
150:6,24;151:12
**month (3)**
76:15;134:17,22
**months (4)**
38:15;41:9;83:9;
123:5
**more (19)**
18:11;19:18,22;
31:23,24;38:12;44:10;
59:11;65:14,20;69:18;
75:7;78:3;97:17;112:9;
117:20;141:1,1,22
**most (10)**
43:16;45:14;52:21;
56:14;62:5;76:4;83:6;
88:8,9;135:23
**mouse (1)**
32:21
**move (2)**
75:5;140:22
**moved (1)**
9:12
**Mrs (3)**
118:22;119:5,8
**much (6)**
24:1;69:8;109:14,18;
139:10;147:13
**must (11)**
38:1;100:5;101:18;
116:12;124:21;127:7,
24;130:4;132:6,6;
138:9
**mute (1)**
35:6
**myself (3)**
85:19;90:3;92:24

**N**

**name (2)**
5:13;67:18
**named (1)**
145:11
**natural (1)**
36:2
**nature (8)**
11:5;12:18;17:12;
24:22;31:20;47:8,9;
59:6
**natures (1)**
25:3
**necessarily (3)**
31:8;37:23;105:13
**need (26)**
6:10;7:6;13:1;27:19;
36:7;37:10,14;52:12,

14;56:8;62:13;63:21;
64:19;68:12;84:2;98:1;
116:21;117:1;131:17,
18;132:16,18;136:20;
137:11;140:19,21
**needs (3)**
32:21;101:19;125:10
**negotiating (1)**
125:22
**neither (1)**
105:14
**Nelson (21)**
24:8;117:11,11,13;
118:4,11,23;119:3,4,
10,13,17,22;120:3,13,
18;121:5;122:6,9,12;
123:2
**Nelson's (4)**
117:24;120:21;
121:19;123:16
**new (3)**
127:3;143:17,18
**newly (2)**
126:20,23
**Next (4)**
81:10,11;111:1,3
**NFA (85)**
19:15;39:5,22,24;
40:5,12,16;45:3,7,9,14;
46:4,12;47:16,20,24;
48:1,6,8,11,11,14,17;
49:1,6,12,13;50:18,20,
23;56:1;59:24;61:4,6;
62:8;67:6,7,20;70:9,
15;79:24;80:6,8,18;
81:5,6,14;82:1;85:24;
119:3,5;120:13,17;
121:20;122:11;129:18;
130:1,3,4;131:8,21;
141:9,13;143:4,11;
145:1,11,22;146:19;
147:5,14;148:5,9;
149:8;150:16;151:5;
152:9,10,21;153:3,5,8,
11,12,20
**NFA's (5)**
130:5;143:8;146:1;
148:3;153:18
**Nick (1)**
90:3
**nod (1)**
6:12
**non- (1)**
129:24
**nondiscretionary (3)**
55:5;56:15;58:6
**non-guaranteed (1)**
43:14
**non-scripted (3)**
129:18;130:11,13
**nor (3)**
90:1;105:15;143:20
**norm (1)**

128:4
**normal (3)**
40:10;44:8;45:22
**Northern (1)**
4:6
**note (2)**
44:7;86:5
**notes (9)**
16:17;31:2;44:5,9;
86:3,4,21;121:15,16
**notice (4)**
23:16;115:5;121:10;
141:21
**noticed (1)**
115:5
**November (26)**
31:15;37:4,9,18,19;
46:5,21;47:7;48:14;
56:9,12;58:4;59:2,5,
21;61:13;62:14;63:5,
14,20;64:14,18;65:4;
66:7,12;82:24
**number (7)**
69:21;70:20;74:13;
76:7,16;106:20;131:6
**numbers (2)**
45:6;69:22
**Numeral (1)**
25:20

**O**

**object (2)**
4:9;142:18
**objecting (3)**
6:24;34:21;155:3
**objection (2)**
7:2;87:21
**obligation (4)**
30:2,3,5,7
**obligations (1)**
132:23
**obtain (2)**
52:10;92:13
**obtainable (1)**
84:8
**obtained (4)**
51:22;54:7;135:17,
21
**obtaining (1)**
52:4
**obvious (1)**
7:2
**obviously (1)**
18:2
**occasional (1)**
11:9
**Occasionally (1)**
18:1
**occur (1)**
41:19
**occurred (7)**
41:13;67:13;70:4;

121:20;129:22;143:6;
147:2
**occurring (1)**
121:14
**October (1)**
9:12
**off (19)**
7:10;11:22;19:22;
30:13;35:19;45:5;59:8;
75:4;78:24;85:15;
91:10;104:17;114:7,8;
115:24;141:9;151:20;
155:18,22
**Offer (1)**
144:13
**offered (1)**
149:22
**offhand (3)**
21:14;31:6;137:20
**office (9)**
29:5;43:17,18,22;
44:1;60:7,21;62:6;
64:16
**officer (3)**
49:23;131:15;132:17
**often (3)**
68:22,24;69:3
**oil (1)**
32:21
**old (3)**
5:23;17:14;36:9
**omit (1)**
95:18
**once (1)**
18:6
**one (44)**
5:14;6:2;7:17;10:14,
14;29:4;36:18,19;
43:23;48:20;57:6;
59:24;63:9;68:7;69:10,
11;75:7;76:13,17;77:7,
8;79:9;80:20;81:12;
82:23;83:22;93:18;
97:10;98:24;107:7;
109:6;110:2,18;112:8;
117:8;123:21;126:14;
137:21,23;144:13,22;
149:10,12;150:17
**ones (2)**
125:21;144:24
**ongoing (4)**
39:4;41:21;47:19,24
**online (1)**
86:1
**only (19)**
7:8;10:16;14:21;
37:20;38:21;56:2;
96:15,16;97:16;99:5;
100:5,7;110:2,10;
114:24;128:13;131:1;
141:19;145:16
**opened (2)**
133:17,24

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

**opening (2)**
99:1;136:19
**operated (1)**
83:12
**operating (3)**
46:14;62:16;125:21
**operation (1)**
9:10
**operations (2)**
19:21;127:15
**operator (2)**
101:8,12
**operators (1)**
101:3
**opinion (1)**
94:5
**opposed (1)**
109:6
**option (5)**
95:15;98:23;137:4,5;
154:2
**optional (1)**
91:15
**Options (8)**
26:1;90:21;98:12,15,
21;99:3;133:6;143:23
**order (4)**
52:5,6;101:17;127:8
**orders (5)**
138:4,17;139:13;
141:20;142:5
**organized (1)**
105:21
**originally (1)**
9:9
**others (4)**
50:4;69:11;95:11;
106:12
**otherwise (2)**
83:15;95:8
**out (20)**
6:1;22:19;25:4,13;
47:11;50:19;53:14;
57:22;78:22;81:21;
90:18;94:2;96:21;
97:10;110:2;120:7;
122:18;125:18;128:4;
141:9
**outline (1)**
30:10
**Outlook (1)**
50:2
**outside (5)**
18:20;79:22;83:14;
103:12;110:5
**over (20)**
6:2;32:1;33:15,22;
42:16;51:15,24;52:11;
62:21;65:24;69:15,16,
22;74:19;75:14;91:2;
93:4,7;104:11;133:22
**overheard (1)**
44:2

**own (6)**
53:4,6;55:5;71:1;
107:14;109:3
**owned (1)**
14:9;20:12;133:18,
24
**owner (7)**
13:17;20:9;124:22;
126:3,12,23;127:23
**owners (1)**
20:14
**ownership (3)**
38:2;128:23;129:6

**P**

**package (1)**
133:7
**page (23)**
6:1;24:2;25:16,18;
26:4,8,13,17,21;28:6;
29:19;81:10,11;89:18,
20;90:6;143:22,23;
144:3,8,11,11;146:15
**pages (3)**
81:3,3;87:2
**pagination (2)**
25:16,17
**paid (4)**
98:12;100:9,12;
109:11
**pandemic (1)**
4:7
**panel (1)**
94:6
**paper (2)**
7:12;19:16
**papers (1)**
87:11
**paperwork (3)**
52:14,19;53:1
**paragraph (12)**
32:19,23;33:5,6;
90:6,16;91:20;92:6,16;
95:9;141:15;149:15
**paragraphs (2)**
31:21;36:18
**parameters (1)**
154:18
**paraphrased (2)**
95:17;102:1
**parentheses (1)**
117:9
**Part (25)**
30:3;41:16;42:3;
44:1;45:1,17;48:5;
51:20;64:3;66:5;89:19;
93:20;97:16,19;99:19;
102:17,18;115:14,16,
20;116:10,21;136:20,
22;146:19
**participant (1)**
106:3

**participants (2)**
114:17,24
**participate (5)**
115:3;134:1;139:2,
18,22
**participated (2)**
17:10;133:19
**participating (3)**
113:19;114:15;
155:24
**particular (10)**
14:22;69:17;75:16;
76:18;77:6;80:10;
97:10;99:2;106:18;
112:9
**parties (2)**
18:7;114:18
**party (3)**
54:7,19;113:19
**passed (2)**
72:7;112:7
**past (3)**
16:1;84:5;94:4
**Patrick (1)**
4:21
**patterns (1)**
108:18
**Patton (1)**
29:5
**PDF (8)**
30:12;36:13;41:8;
105:7;123:12,14;
144:11;145:23
**pending (3)**
7:9;22:9;115:7
**people (3)**
44:11;84:10;137:6
**per (7)**
58:16,21;68:24;
69:10;76:15;91:5;
134:22
**percent (10)**
58:17,18,21;65:14,
14,15,20,24;108:11,12
**percentage (1)**
65:21
**Peregrine (2)**
9:15,24
**perform (1)**
125:8
**performance (4)**
116:5;129:11;154:5,
23
**performed (1)**
12:1
**period (9)**
10:5;20:16;32:1;
99:21;117:24;118:13;
120:4;122:1;123:10
**permission (4)**
52:3,4;58:23,23
**permissions (1)**
51:22

**permitted (1)**
115:3
**person (51)**
30:8;34:1;37:11,22;
38:4,10,18;95:10;
102:19;103:15;106:10;
108:17;114:4;122:21;
124:2;125:5,7,9,15,18;
126:19;127:19;128:16;
131:9,17,21,22;132:3,
5,12,13,15,23;133:1;
136:13,15;137:2,8,12;
138:2,4,5;139:23;
140:1,11,12,13;141:10,
11,18;145:11
**personally (1)**
87:6
**personnel (1)**
54:19
**Persons (6)**
26:22;40:14;117:6;
132:2,24;141:19
**person's (3)**
81:23;102:22;125:2
**phone (6)**
43:17,23,24;121:12;
122:21;139:7
**phrased (2)**
57:20,21
**physical (1)**
7:13
**picking (1)**
97:10
**picture (1)**
77:11
**place (13)**
37:3,18;38:7;39:18;
42:6;43:15;44:6;48:18;
83:3;121:16;122:22;
124:5,8
**placed (2)**
33:17;34:11
**placing (2)**
52:5;127:7
**plaintiff's (1)**
29:15
**plan (4)**
82:11,12;84:10,11
**PLATT (50)**
4:2,17;13:2;19:4;
22:3,7,16;23:20;27:7;
32:3;35:3,8;36:1,6,11;
37:1;78:15,20,24;80:2;
86:6;88:15;89:3;94:15;
99:8;100:18;102:4;
103:22;113:12,17,24;
114:6,12,23;118:16;
140:24;141:4;142:15,
21;145:2;147:6,11,18;
148:6;151:20;152:4;
154:20;155:6,11,20
**play (1)**
89:15

**played (1)**
90:12
**please (16)**
6:12;7:2,7,17;8:19;
9:5;15:5;25:10;30:9;
31:8;35:21;81:11;
113:14;140:10;142:17;
145:24
**pm (6)**
79:3,3;114:10,10;
152:2,2
**point (16)**
12:10,21;43:7;49:9;
61:16;73:17;75:4,4;
85:8;89:21;97:24;
129:13;130:6;143:23;
147:16;149:11
**points (4)**
82:15;143:17;
144:17,23
**policies (1)**
127:12
**policy (3)**
138:15;140:3,3
**pool (3)**
101:2,7,12
**poorly (1)**
58:1
**pops (1)**
25:14
**Portfolio (3)**
143:23;144:4,13
**portion (4)**
90:13;97:24;101:6;
109:9
**position (5)**
23:14;35:9,17;118:6;
127:8
**possess (1)**
88:19
**possession (1)**
49:7
**possibly (1)**
76:8
**potential (2)**
120:8,10
**potentially (4)**
33:12;113:18;
114:15;123:24
**power (5)**
52:17;75:14;91:3;
107:2;143:23
**practice (9)**
8:13;10:4,7,23;11:6,
7;44:8;49:20;50:10
**practices (4)**
149:17;150:3,21;
151:9
**practicing (2)**
27:23;85:20
**premise (1)**
75:20
**prepare (1)**

**REBECCA J. WING**
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

148:5
**prepared (1)**
98:10
**preparing (2)**
148:15;149:7
**present (9)**
4:23;5:2;34:19;
43:19,22;87:1;92:7;
113:12;115:22
**presented (4)**
67:4,6,7;106:15
**presently (1)**
20:18
**pretty (2)**
69:8;147:7
**previously (1)**
143:13
**price (1)**
106:19
**prices (1)**
112:6
**principal (12)**
9:13;37:14,21;38:1;
83:8;99:22;124:19,21;
125:10,11;132:6,7
**principals (1)**
126:13
**printed (1)**
141:9
**printout (3)**
94:22;100:22;102:8
**prior (4)**
54:14;91:7;140:8;
153:11
**private (5)**
10:4,7,23;11:6,7
**privilege (11)**
6:24;18:22;33:13,15;
35:14,20;88:6;118:4;
154:8,19;155:4
**privileged (5)**
34:9,13,23;88:9;
118:7
**privy (1)**
108:19
**pro (1)**
5:23
**probably (24)**
9:23;42:21;43:16,18;
45:19,20;58:1;76:1;
78:14;84:19,20,23;
87:15;104:22;107:16;
119:11,19,20;120:1,3;
121:24;128:12;135:12;
154:7
**problem (5)**
74:11;84:9;94:13;
121:19;123:19
**problems (1)**
79:15
**Procedure (1)**
4:5
**procedures (1)**

127:12
**proceed (5)**
35:4,23;36:7;113:20;
116:14
**proceeding (5)**
4:10;113:21;114:19;
120:18;121:6
**proceedings (4)**
79:4;114:11;122:12;
152:3
**process (8)**
18:9,12;23:11;
126:22;127:2;136:11,
14;139:24
**processes (9)**
127:9;128:6,9,10,10,
11;132:24;133:3,4
**produce (5)**
86:20;87:10;88:5,12;
121:9
**produced (7)**
13:7;30:20;87:17,22;
88:18,22;118:21
**producing (1)**
87:7
**product (3)**
86:22;133:5,7
**production (3)**
87:2,3;89:11
**products (2)**
133:14,16
**profit (3)**
95:10;106:11;125:20
**Program (19)**
26:18;63:7,19;64:4;
66:6;77:9;99:19;
116:19;133:9,11,15,16,
20;134:2,8,11;135:4,7;
136:3
**prolific (1)**
135:1
**properly (8)**
41:3;42:19;43:1;
46:16;59:22;70:2;
82:17;90:9
**proportion (6)**
64:20;66:7;108:8;
109:4,7,9
**proposed (1)**
90:19
**pros (4)**
36:9;90:16,22;91:13
**prosecuting (1)**
23:6
**prospective (4)**
30:4;116:11;152:11,
16
**prospects (1)**
136:2
**provide (29)**
9:5;10:24;16:23;
26:18;30:3;35:11;
48:22;51:12;55:19;

67:23;68:14,17,18;
69:2;72:3;73:5;75:21;
84:12;109:3;112:19;
115:14;116:10,13,21;
117:2;142:22;147:4,
19;154:4
**provided (45)**
5:6;14:10,12,18,19,
20;15:2,3;16:14;19:24;
29:1;39:5,6;46:3,11;
47:16,16,20;49:2,13;
54:4;57:10;59:15;
60:10;62:11;66:19,24;
69:6;71:6;79:7,21;
80:20;81:12;82:15;
86:23;95:8;104:19;
105:1;107:1;108:21;
111:8;147:13,21;
154:22;155:2
**provides (1)**
141:21
**providing (4)**
84:1;95:21;107:5;
137:14
**public (1)**
22:12
**publications (1)**
95:12
**publishes (1)**
105:9
**purchase (19)**
13:9,11,20;17:1,3,8;
18:14;19:6,8,13,17;
21:12,16;42:3;54:14;
66:22;106:19,20;
124:17
**purchased (8)**
12:21;13:12;18:10;
20:1;54:24;70:20;
117:23;118:12
**purely (3)**
62:17;66:20;109:7
**purports (2)**
102:11;148:8
**purpose (1)**
143:2
**purposes (1)**
106:15
**pursuant (8)**
4:4;8:7;21:2;23:15,
16,16,17;115:14
**put (7)**
29:8;44:13;50:11;
85:22;117:20;136:7;
145:8
**putting (1)**
91:7

## Q

**quadruple (1)**
67:17
**qualified (1)**

96:6
**quality (1)**
127:21
**quantifiers (1)**
112:17
**quantify (1)**
112:17
**quantities (1)**
72:8
**quantity (1)**
71:22
**queried (1)**
111:17
**question-and-answer (1)**
105:22
**question's (2)**
132:20;147:10
**quick (1)**
78:16
**quicker (1)**
57:14
**quite (2)**
134:16;149:9

## R

**raised (1)**
67:21
**ran (1)**
120:12
**range (1)**
41:8
**rate (1)**
15:17
**rattled (1)**
85:14
**Re (1)**
104:5
**reach (2)**
53:14;90:18
**reached (1)**
120:7
**read (24)**
7:15,18;26:11,15,19;
27:11;28:15;30:13;
33:3;36:14;37:6;39:8;
80:11;90:7;95:16;
101:3;102:16,24;
104:7;105:18;142:14;
146:3,13,22
**reading (4)**
37:12;93:11,24;
110:9
**reads (10)**
26:14;30:6,9;32:24;
89:23;95:7;99:17;
105:11;106:1;149:15
**ready (1)**
148:20
**real (1)**
11:8
**really (3)**
24:11;81:20;133:3

**reason (4)**
5:20;14:16;20:13;
65:19
**reasons (1)**
7:2
**reassess (1)**
67:1
**REBECCA (5)**
4:13;29:1;140:20;
147:10;154:11
**rebeccajwing@outlookcom (1)**
50:8
**recall (77)**
5:13;12:23;14:7;
16:2,22;24:17;31:6;
40:4,23;41:1,11;42:3,
14;43:3,6,11;45:5;
47:12,13;48:19,21,24;
49:3,4,6;52:24;57:20;
59:4,8;61:10;62:23;
66:10;67:5,12,14,18;
69:16,21;70:3;74:8;
82:1,7,9,11;84:15;
85:3;87:3,7;93:18,19;
94:3;104:16;105:4;
118:2,3;120:9,9,15,22;
121:20,21;122:15;
123:8;124:11;125:6;
127:22;130:19;131:23;
137:24;142:9,10;
143:6;146:21,23;
147:12;149:10,24
**recalling (1)**
85:13
**receive (6)**
56:20;57:16;59:6;
60:24;64:10;66:6
**received (26)**
51:10;55:11,14,15;
58:7;59:14,17;60:4,8,
11,15;61:8;62:7;64:15;
65:10;66:8,10;68:3;
70:24;73:11;74:14;
100:14;119:9;120:20;
136:19;145:17
**receiving (5)**
50:16;59:4;91:5;
120:15;125:19
**recently (1)**
67:17
**recess (3)**
79:2;114:9;152:1
**recognize (25)**
8:1;13:8;23:24;24:6;
30:24;31:5,8;32:8;
80:9,10,12,13;86:10;
89:8;13:94:22;102:8;
118:23;137:6;144:20,
22;145:10,14;146:12,
18
**recollection (14)**
13:16;42:5,7,10;
52:20;54:8,10,11;

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

57:22;61:15;134:20;
147:1;149:22;152:18
**recommend (4)**
62:20;100:7;113:19;
145:14
**recommendation (17)**
53:23;68:7;69:7;
70:19;73:13;75:16;
76:18,21;77:24;78:2;
90:20;91:21;92:1;
98:24;139:14,15,16
**recommendations (66)**
51:3;55:12,13;56:21;
58:7,18,19;64:7,22;
65:1,6,23;66:9;68:16;
71:1;72:19;73:9,12,18,
20;74:7;75:23;76:3,6,
12;77:15,21;95:21;
100:1,10,13;107:17;
108:6,9;109:6,13,15;
110:4;111:4,5,6,13,22,
23;112:4,13,21;
125:17;126:5;127:10;
134:10,13,18,22,24;
135:1,6;136:23;137:1,
9,11,19;138:18;139:3;
154:6,24
**recommended (33)**
53:13;54:3,17;57:12,
14,18;58:14;59:3,11;
68:6,22;69:3;71:2,13,
21;72:4,6,19;73:10,21;
74:8,10,12;75:24;
76:15;77:5;78:5,7;
92:20;99:18;112:8,9,
13
**recommending (2)**
78:4;92:11
**reconfirm (4)**
69:24;72:15;73:5;
75:11
**reconfirmed (1)**
68:9
**reconvene (1)**
114:2
**record (22)**
4:2,19;7:3,10;35:19;
40:11;79:1;88:3,11;
90:7;113:17;114:7,8,
13,23;115:2;130:18;
151:21;152:4;155:9,
18,22
**recorded (3)**
130:17,19;138:10
**records (3)**
62:5,6;88:24
**record's (3)**
54:15;151:6;154:21
**Redemption (1)**
10:15
**redo (1)**
71:11
**reduced (1)**

15:16
**reference (2)**
36:17;148:17
**referenced (12)**
22:4;30:18;47:21;
54:4;61:7;64:16;66:1,
2;85:10;102:3,12;
142:12
**references (1)**
31:13
**referencing (4)**
50:23;102:14;
148:15;149:7
**referring (11)**
42:1;44:22;80:17;
81:7;103:2;106:2;
128:21;129:5;138:8,9;
141:17
**reflect (1)**
113:18
**reflected (3)**
17:4;46:3;120:17
**reflecting (2)**
44:5;121:16
**refresh (5)**
13:16;61:15;87:4;
147:1;149:21
**regarding (2)**
146:1;154:23
**regardless (1)**
96:1
**Register (55)**
26:14,21;30:2,7;
38:18;46:8,20;47:2,6,
11;51:14;55:22;56:8;
61:12;62:13;63:4,21;
64:13,19;66:16;67:2,
22;68:13;72:17;73:7;
74:24;79:9;81:22;
82:18;83:18;84:2;
88:21;92:8;101:14;
102:19;103:6;104:21;
105:3,17;106:6;
107:21;110:6;111:11;
117:5;125:5,7;127:18;
132:2,12;136:14;
137:1,12;138:5;140:1,
13
**registered (33)**
37:11,14,21,24;38:4,
9;39:18;41:3,17;42:13,
20;43:1;45:24;46:16;
59:23;67:9;70:2;82:17;
90:1;97:13;101:8,19,
24;102:21;103:16;
108:2,23;120:14;
132:7,16,18;136:20
**registering (1)**
133:1
**registrants (1)**
93:7
**Registration (51)**
30:12,19;36:13;39:8,

24;40:6,8,13;41:12;
42:8;43:4,9;45:4,22;
46:1;47:23;48:6;51:9;
66:13;81:16,17,19,23;
82:4,8;85:12;86:24;
91:15;102:9;118:1;
119:23;120:17,21;
121:6,19;122:11;
123:12,14,22;124:1;
125:15;126:18;128:15;
131:22;138:13;140:6;
141:10,12,16,17;142:1
**registrations (2)**
47:10;123:16
**regulated (1)**
99:6
**regulation (4)**
85:11;93:22;102:12,
13
**regulations (7)**
44:23,24;45:8;46:8;
93:11;115:15;128:1
**regulators (1)**
125:23
**regulatory (10)**
19:15;25:6,21;27:2;
28:19;33:24;41:7;
128:10;135:3;151:18
**rejected (1)**
58:23
**relate (4)**
10:19;27:1,2;123:24
**related (8)**
37:20;49:19;70:18;
86:20;98:14,20;
119:22;126:10
**relates (3)**
16:24;28:14;109:24
**relationship (3)**
12:19;17:12,18
**relayed (1)**
61:7
**relaying (1)**
60:4
**relevant (8)**
77:3;84:20;88:19;
89:19;90:8;102:17,18;
107:20
**relied (7)**
28:24;56:6;60:13,14;
79:7;80:18;81:15
**relying (1)**
92:4
**remaining (1)**
110:1
**remains (1)**
17:21
**remedy (2)**
22:13,15
**remember (22)**
16:13;19:23;21:10;
24:11;42:17,21;44:24;
59:16;60:17;63:12;

70:10;85:7;103:20;
109:22;121:14,18;
122:19,20,22;124:14;
131:5;140:18
**remind (1)**
155:14
**remotely (1)**
4:8
**remove (1)**
50:10
**repeat (2)**
15:10;129:19
**repeated (1)**
28:8
**rephrase (2)**
6:19;57:24
**report (12)**
46:4,13;48:7,8,12,17,
19,23;49:6;60:20;
64:16;79:10
**reporter (2)**
6:10;104:4
**reports (12)**
48:20,21;50:23;
60:19,21,24;61:2,3,4,5;
62:8;79:21
**represent (6)**
13:6;30:6,17;118:11;
141:8;149:18
**representation (10)**
68:19;107:15;118:7;
119:17,21;120:3;
122:5,8;123:2;154:14
**representations (7)**
41:24;46:10,23;
47:15;65:8;66:18;
82:21
**representatives (1)**
33:1
**represented (10)**
5:3;20:7;41:5;46:2;
52:21;53:9,10;150:4,
22;151:10
**representing (4)**
23:12;50:7;93:6;
154:9
**represents (4)**
4:24;31:17,22;34:19
**request (15)**
19:10,12;49:14;
50:19,20;69:24;70:10,
13;83:4,7;84:23;88:3,
10;99:16;113:14
**requested (4)**
39:23;40:8;48:24;
68:9
**requesting (4)**
49:12,12;87:21;
108:17
**requests (2)**
86:19;99:14
**require (5)**
103:15;115:20;

125:15,23;140:16
**Required (38)**
26:18;43:13;46:1,7,
20;47:2,6,10;51:14;
55:22;67:2,22;72:16;
73:7;74:23;88:21;90:1;
92:8;97:13;102:19;
103:6;104:21;105:2,
17;106:6;107:21;
108:22;110:5;111:11;
116:2;125:4;127:18;
132:2,12;136:14;
137:1;140:1,13
**requirement (5)**
37:20;38:17;92:20;
99:5;100:5
**requirements (11)**
39:4;42:22;44:17,19;
45:15;115:16,20;
116:8;128:2;141:16,17
**requires (3)**
101:14;138:13;140:6
**rescind (1)**
22:4
**rescission (3)**
20:24;21:20;22:13
**research (9)**
57:7;83:24;84:16;
85:16,17;86:22;105:9;
131:2,6
**reserve (1)**
155:15
**respect (3)**
19:6;132:24;148:2
**respective (1)**
35:15
**respectively (1)**
105:16
**respond (2)**
98:10;151:5
**respondeat (1)**
34:1
**responded (2)**
87:14;111:18
**responding (2)**
150:16;151:18
**response (21)**
27:12,14;28:23;
29:13,15;30:19;39:2;
89:14,20;143:4;
147:15;148:5,11,14,16,
17;151:18;152:9;
153:5,7,18
**Responses (5)**
28:7,7;31:4;33:20;
71:6
**responsive (3)**
88:17;89:1;121:2
**rest (1)**
148:21
**retained (2)**
9:17,24;16:20,22;
19:2;61:20;88:23;

REBECCA J. WING
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

135:18;147:24;150:8,
11;151:1
**retains (1)**
91:1
**retired (1)**
23:9
**retrospect (1)**
108:1
**revenue (5)**
64:11;65:5;109:14,
16,18
**revenues (1)**
64:21
**review (41)**
16:9;19:8;31:9;39:5;
44:20;45:16;46:12;
47:19,24,24;51:2,5;
62:6;94:4,12;98:1;
130:6,17;142:12,24;
143:2,9;146:1,15;
147:2,5;148:2;150:2,8,
21;151:3,15,17;152:7,
10,15,22;153:11,12,23;
155:15
**reviewed (34)**
24:18;33:20;39:4;
44:16,22;45:1,7,11,21;
48:6,17;49:8;51:3;
59:14;60:7;85:4,5,7;
87:19;94:11;104:11;
110:16;130:22;142:10;
144:24;145:9;146:20,
22;150:14,15;151:4,9;
153:6,17
**Reviewing (5)**
49:8;130:13,14;
149:16;153:3
**reviews (1)**
129:11
**revise (2)**
152:21,22
**revised (2)**
30:21;153:9
**revising (1)**
152:19
**revisit (1)**
111:10
**reward (4)**
149:18;150:4,23;
151:11
**right (72)**
8:5;9:22;11:4;13:13;
15:19;17:15;20:2,6;
26:1,5,19,22;29:2;
39:19;50:3;53:18;
56:17,23;57:3,8;58:10,
19;59:8;60:5;61:18;
64:8;65:3,7,9;67:18;
69:20;71:14;74:21;
77:16;78:8,15,24;
79:22;82:24;83:5,9;
85:14;86:16;87:8,11;
92:3;94:3;95:18;100:9,

10,13;109:8,21;
112:22;113:1;120:22;
122:1,20;123:7;124:9;
133:9;134:8;135:1;
138:24;139:7,9;
145:20;147:11;153:21;
154:1;155:4,21
**right-hand (1)**
31:20
**risk (7)**
55:16;56:23;58:9;
149:18;150:4,23;
151:11
**road (2)**
5:22;80:21
**role (8)**
9:16,17,21;10:1;
89:15;90:12;126:1,16
**Roman (1)**
25:20
**room (1)**
130:21
**rule (15)**
6:22;45:6,7;84:4;
85:23,24;92:17,18,23,
23;93:22;94:1,4;
131:24;141:24
**Rules (17)**
4:4,5;5:22;45:3,4,5,
8,9,11,14,16,22;85:9;
93:11;127:24;129:18;
130:1
**run (1)**
78:22
**running (1)**
9:18
**runs (3)**
60:18,18;64:15
**Ruth (3)**
5:2;24:8;155:20
**Ryan (1)**
81:4

**S**

**sale (10)**
17:4;18:23;22:21;
41:19;42:9,11,18;
43:12;55:20;106:20
**sales (22)**
126:22;127:2,9,20,
23;128:5,5,8,9,11,11;
132:24;133:2,4;
136:11,14;142:23;
143:10;149:17;150:3,
21;151:9
**same (18)**
6:1,20;33:7;37:8;
38:22;51:17;55:2,11;
57:2;58:7;63:2;70:16;
77:22;90:10,10;92:2;
112:4;119:9
**sat (2)**

61:22;63:2
**satisfied (1)**
95:22
**satisfy (1)**
95:24
**saw (4)**
53:1,2;63:24;145:14
**saying (5)**
44:11;47:12;77:3;
116:1;135:5
**scenario (1)**
107:11
**scenarios (3)**
106:15,23;110:9
**scheduled (1)**
125:12
**school (1)**
9:2
**scope (4)**
18:21;19:5;34:24;
148:1
**Scott (1)**
126:14
**screen (4)**
7:14,23;27:8;44:14
**script (9)**
130:3,4;150:9,15;
151:18;152:19,21;
153:11,23
**scripted (2)**
130:1,10
**scripts (21)**
33:2;142:12,17,23;
143:10;145:9;146:20;
147:20;149:17;150:3,
14,22;151:10,16;152:8,
10,16,23;153:6,17,20
**scroll (24)**
24:1;25:9;26:3;
27:20,21;28:22;32:19;
81:8,10;86:18;89:9,18;
95:4;98:6,6;99:16;
113:9;119:1;143:21,
24;146:5,14;148:18,20
**scrolling (8)**
29:18;33:5;98:7,7;
105:20;148:22;149:2,4
**search (4)**
87:12;88:24;121:1;
141:10
**second (12)**
29:15;32:23;73:17;
75:7;83:3;90:6;91:20;
105:10;114:7;141:15;
144:16;146:15
**Section (10)**
85:11,23;90:4;94:23;
95:15;100:23,23;
101:13;102:3;106:8
**securities (3)**
10:19,24;11:8
**seeing (1)**
32:11

**seek (1)**
33:11
**seeking (3)**
22:14,15;40:4
**seeks (2)**
29:23;33:14
**sees (1)**
142:18
**self-directed (7)**
51:21;66:4;108:10;
109:8,16,19,20
**sell (5)**
106:19;133:5;136:2,
5,9
**sell' (1)**
106:21
**seller (1)**
20:4
**selling (1)**
135:3
**send (6)**
11:14,19,24;16:8;
128:18;129:2
**sense (3)**
34:16;36:21;138:11
**sent (7)**
70:4;86:16;87:1;
120:24;121:4;128:17;
129:1
**sentence (7)**
32:24;33:7;89:23;
90:2,15;91:22;149:14
**separate (2)**
31:4;36:15
**sequentially (1)**
36:20
**series (18)**
36:16;38:2,3;41:2,
11;111:18;124:18,20,
23;125:12;131:4,10,11,
13,14,16,17,18
**seriously (1)**
149:16
**serve (1)**
20:24
**served (5)**
23:10,13,14,15,17
**service (4)**
53:18,20,21;105:9
**services (15)**
10:24;11:11;14:10,
17,18,21;15:1,2;16:13,
23;19:24;98:14,20;
136:5,10
**sessions (1)**
114:16
**set (5)**
6:1;7:4;27:15;29:15;
99:13
**Setting (1)**
64:1
**seven-page (1)**
105:7

**several (9)**
8:15;10:11;16:17;
48:20;59:10;68:4,7;
69:11,21
**shadow (1)**
124:19
**shake (1)**
6:11
**shall (1)**
101:6
**share (7)**
7:14,16;23:21;27:8;
29:9;89:4;99:8
**sharing (2)**
115:11;117:4
**sheet (1)**
46:4
**shifted (1)**
9:17
**Shortly (2)**
122:13,16
**show (12)**
7:13;13:2;32:3;80:2;
100:18;103:22;118:16;
141:4;143:12;145:2;
148:6,16
**showed (1)**
120:13
**side (3)**
19:21;29:8;88:14
**sidetracked (1)**
115:8
**sign (1)**
27:19
**signature (1)**
155:15
**signed (2)**
81:4;107:2
**signs (1)**
136:18
**similar (5)**
55:15;56:20;80:19;
94:5;153:8
**single (4)**
68:4;72:11;74:15;
77:11
**sit (6)**
16:2;25:3;69:20;
76:2;78:9;127:23
**sitting (2)**
93:21;123:7
**situation (1)**
132:16
**situations (1)**
133:14
**six (1)**
123:5
**six-count (1)**
26:24
**sizable (1)**
109:24
**size (3)**
55:16;56:22;58:8

REBECCA J. WING
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

**slightly (4)**
47:4;73:2;132:9;
138:21
**slow (2)**
25:10;28:3
**slowly (2)**
27:21;141:2
**small (4)**
7:21;62:24;76:16;
130:21
**snapshot (1)**
77:11
**social (1)**
17:18
**socially (1)**
17:24
**sold (2)**
20:10;63:6
**sole (5)**
108:5,12;110:10,10,
10
**solely (9)**
102:22;103:9,19;
105:11,14,15;106:4;
107:15;108:10
**solicit (2)**
138:23;139:13
**solicitation (6)**
138:3,6,8;142:4;
147:21;148:2;152:8,
10;153:9
**solicitations (5)**
129:18;130:1;
141:20;146:2;152:23
**solicited (1)**
138:17
**soliciting (1)**
33:3
**somebody (1)**
138:10
**somebody's (1)**
74:23
**sometime (4)**
37:3;38:7;41:19;
124:5
**sometimes (10)**
6:11;11:12,13,13,21;
15:13,13;57:11,12,13
**Somewhat (1)**
124:13
**Sorry (25)**
5:18;15:10,24;21:3;
22:2;24:9;35:7;43:7;
49:5;52:9;59:18;60:22;
67:14;73:2;76:24;
84:22;89:12;91:9;
97:12;98:17;115:23;
123:18;138:7;147:16;
148:24
**sort (8)**
5:21;7:7;36:3;47:21;
57:22;88:2;90:12;
105:21

**sought (1)**
139:5
**sounds (12)**
5:22;15:18;16:3;
56:14;69:1;77:13;78:6,
23;82:13;87:10;
134:24;153:19
**source (2)**
59:24;60:12
**sources (7)**
39:7;55:23;56:6;
59:20;61:10;62:3;
64:12
**spans (1)**
41:9
**specific (17)**
5:13;18:11;42:4,7,
10,14,17;43:3;44:15;
65:14,16;78:1;80:14;
99:21;108:17;131:5;
132:21
**specifically (6)**
44:22;57:20;93:18;
105:5;109:23;118:14
**speculate (3)**
65:21;90:21;110:7
**speculation (1)**
110:8
**spillover (1)**
81:4
**stack (1)**
60:19
**staff (3)**
126:11;127:20,23
**standard (1)**
128:22
**standardized (1)**
53:11
**standing (1)**
140:8
**Stapleton (1)**
4:22
**start (4)**
6:6;70:9;75:17;
148:22
**started (2)**
70:11;118:10
**state (6)**
7:2;8:14,15,22;
106:14,21
**stated (4)**
27:4;96:19;104:10;
150:7
**statement (2)**
56:10;97:10
**states (2)**
101:5;106:8
**status (12)**
22:24;40:6;41:12;
42:8;43:4;47:23;51:9;
66:13;124:1;126:18;
128:15;136:17
**statute (6)**

93:22;96:18;97:1,17,
23;98:1
**Statutory (3)**
25:21;98:3,4
**stay (1)**
75:6
**staying (1)**
124:18
**Stemper (1)**
143:15
**step (2)**
96:5;111:1
**still (4)**
49:17;50:16;109:1;
110:18
**stock (9)**
13:9,11,20;18:14;
19:8;20:12;21:12,16;
66:22
**stop (1)**
25:10
**storage (1)**
50:12
**stored (1)**
50:11
**strategies (5)**
53:4,6;143:24;144:4,
14
**strategy (9)**
51:17;55:2;57:2;
68:8;71:19;72:10;
90:19,22;91:11
**Streit (1)**
4:20
**structure (3)**
11:16;70:21;71:2
**structured (1)**
71:13
**student (1)**
4:23
**studying (1)**
131:11
**stuff (2)**
62:9;79:17
**subject (4)**
30:11;143:17;
145:22;148:10
**submission (2)**
61:21;92:21
**submitted (1)**
106:3
**subpoena (7)**
8:3,7;70:5,8;86:15;
87:14;120:23
**Subsection (4)**
95:5;101:5;102:18,
20
**subsequent (4)**
32:24;119:24;
149:11;150:17
**substitution (1)**
23:4
**successfully (2)**

23:13,15
**sued (1)**
24:12
**suggested (2)**
55:7;72:9
**suggestions (1)**
55:17
**summaries (1)**
123:21
**summarize (2)**
56:11;153:15
**summary (12)**
9:5;28:20,21;37:12;
39:8,11;47:18;80:8,15;
81:6,14;152:12
**summer (1)**
147:3
**super (1)**
138:8
**superior (1)**
34:1
**supervise (4)**
126:13;132:15,17;
141:20
**supervises (2)**
132:23;140:11
**supervising (10)**
132:14;136:13,16,
17;138:3,11,12;
139:23;140:16;142:4
**supervision (3)**
126:10;132:5;140:5
**supervisor (8)**
124:19;132:1,11,17,
19;136:21,24;137:10
**supervisory (3)**
125:10;126:16;
141:18
**support (1)**
131:18
**supports (1)**
35:16
**sure (43)**
5:21;6:19;7:15;
14:15;15:12;18:13;
19:21;22:3;25:15;
38:22;40:17;41:16;
46:17;53:20;63:15,17;
78:20,23;81:9;83:2;
97:20,22;98:18;116:7;
119:2;122:21;127:11;
129:17,20,21,24;130:8,
9;132:22;136:18;
138:10,20;140:9;
145:16;148:18;151:23;
153:4,15
**surfaced (1)**
147:5
**surgery (1)**
67:17
**surprise (2)**
71:5,9
**switched (1)**

114:16
**sworn (3)**
4:1,15;5:7
**synopsis (1)**
41:1
**system (8)**
53:11;60:21;91:4;
149:20,23;150:6;
151:1,13

**T**

**takeaway (1)**
82:16
**taker (2)**
44:7;86:5
**talk (4)**
6:2;38:23;91:7;
127:7
**talked (5)**
42:13;73:12,17;
74:15;116:12
**talking (17)**
6:19;38:22;42:21;
48:9;54:20;59:19;74:3;
75:20;76:17;93:7;
116:15;128:9,10;
130:3;143:17;144:17,
23
**targets (4)**
127:20;128:5,8,11
**tasks (1)**
12:1
**technical (2)**
49:22,23
**technically (2)**
9:23;101:16
**telephone (3)**
130:17,19,20
**telling (1)**
135:4
**ten (2)**
5:17;85:14
**ten-minute (1)**
151:21
**tenure (1)**
117:21
**term (5)**
9:22;95:9;106:9;
107:4,8
**termination (1)**
118:13
**terminology (1)**
134:12
**terms (3)**
44:15;76:1;147:23
**territory (1)**
34:14
**test (1)**
125:13
**testified (9)**
4:15;5:11;74:5;79:6;
83:19;94:10;110:11;

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

121:23;152:7
**testimony (13)**
  5:7,11,16;8:3;37:22;
  43:2;74:9;82:14;135:2,
  16;150:13,15;151:8
**testing (1)**
  81:20
**Thanks (1)**
  88:15
**thereabouts (1)**
  83:1
**therefore (2)**
  46:15;107:3
**thereof (3)**
  118:1;123:23;142:1
**third (3)**
  54:7,19;90:15
**third-party (3)**
  53:18,20,21
**thought (6)**
  17:2;23:8;31:1;
  87:18;100:7;116:18
**three (4)**
  21:5;27:1;41:8;
  123:24
**throughout (1)**
  134:17
**thus (2)**
  105:17;107:6
**Tim (3)**
  58:4;80:7;119:15
**Timber (1)**
  9:10
**timeline (2)**
  49:9;120:19
**times (2)**
  31:15;90:8
**timing (5)**
  40:9;48:21;63:12;
  69:12;151:14
**Timothy (6)**
  20:5,9,22;21:7,10;
  22:9
**title (7)**
  27:20;32:16;95:15;
  100:24;101:3;104:3,8
**titled (8)**
  25:21;26:9;29:14;
  30:19;36:13;102:9;
  144:4,16
**today (12)**
  5:4;7:13;8:8;14:16;
  16:2;25:3;33:11;78:10;
  93:21;121:1;123:7;
  145:24
**together (3)**
  27:24;61:22;90:5
**told (13)**
  24:16,17;68:21;
  71:10,11;72:20;
  116:23;122:20;129:1,
  12;130:2;134:5;153:19
**tolerance (3)**

55:16;56:23;58:9
**took (14)**
  37:3,18;38:7;39:17;
  42:6;48:18;51:15;
  72:23;83:3;121:16;
  122:22;124:5,8;152:6
**top (7)**
  19:22;25:17;32:12;
  36:18;45:6;59:8;
  104:17
**topic (2)**
  36:17;38:16
**topics (6)**
  31:17;33:16;34:10,
  14;35:11,15
**totality (3)**
  76:24;77:1,10
**totally (1)**
  66:4
**track (1)**
  71:2
**tracking (1)**
  104:9
**trade (49)**
  51:23;52:4,13;53:13;
  56:21;57:1,15;58:16,
  22;59:10;68:4,6,8,24;
  69:10;70:21;71:3,13,
  20,20;72:4,6,7,8;73:15;
  74:13,15;76:21,21,22,
  22;77:7,8;78:5;90:19;
  91:5,8,21;92:12;96:22;
  98:22;99:2;108:6;
  111:23;112:1,4;
  131:17;135:1;140:15
**traded (5)**
  59:11,12;71:21;
  109:3;133:15
**traders (3)**
  52:23;109:12,20
**trades (36)**
  52:7;53:15,16,17;
  54:1,3,6,7,9,16,18;
  55:8;57:12,18;58:14,
  24;59:3;61:2;62:20;
  68:23;69:4;71:1;72:12;
  76:15;77:1,5;78:3,8;
  99:4,18,20;100:7;
  107:14;112:7,8;139:6
**trades' (1)**
  107:3
**Trading (262)**
  5:1;12:6,9,10,19;
  13:13,18,23;14:5,8,19;
  18:10,15;19:7,13;20:1,
  5,10;22:22;24:19,23;
  26:10,14,18;30:2;
  32:10;34:20;39:12;
  40:7;41:13;42:19;43:5,
  10;45:17;46:6,8,13,20,
  21;47:1,5,6,9,14;51:13,
  14,16,17;53:4,6,11,23;
  54:6,18;55:2,5,11,12,

15,22,23;56:7,8,17,20;
  57:4,5;58:7;59:22;
  61:11,12;62:12,13;
  63:4,5,6,7,19,19,21,22;
  64:3,3,6,12,13,19,20,
  22,24;65:6;66:4,6,9,14,
  15,16;67:2,3,9,10,22,
  23;68:12,13,16;69:7,
  15,19;70:1,3,14,19,24,
  24;71:6;72:2,2,16,17,
  18;73:6,7,9,12,13;74:6,
  7,19,24;75:11,12,13,
  16,23;76:3,6,11,14,18;
  77:4,9,10,15,21,23;
  82:17,19;83:17,20;
  84:2,3,10,11;85:12;
  88:20;89:24;90:21;
  91:4,11;92:9;95:7,9,14,
  21;96:13,22;97:4,11;
  98:2,5,12,15,21;99:6,
  19,20,24;101:2,7,11,
  14,19,23;102:10,20,22;
  103:9;104:20,21;
  105:2,3;106:10,13;
  107:6,22;108:2,9,23;
  109:13,15,16,19;
  111:21;112:9,21;
  115:17,21;116:5,6,19;
  123:23;125:17,19;
  126:1,5;127:10,13,21;
  133:5,9,10,15,16,20;
  134:1,8,11,16,21,24;
  135:4,7,8,11,17;136:2,
  23;137:1,9,11,18;
  138:18;139:3,14,15;
  144:17;146:2;148:10;
  149:19,20,22,23;150:5,
  6,24;151:1,12,13;
  154:3,6,24
**Trading's (19)**
  30:1;42:8;47:23;
  48:13;64:11,21;65:5,
  23;66:8;75:9;98:19;
  99:13,24;143:10,19;
  146:20;150:3,21;151:9
**train (1)**
  60:20
**transaction (5)**
  13:12;17:4,8;19:6;
  22:21
**trial (2)**
  4:19,21
**tried (2)**
  136:2,5
**triggered (1)**
  83:4
**tripled (1)**
  68:7
**true (1)**
  17:21
**trustee (1)**
  9:17
**trustee's (1)**

9:21
**truth (1)**
  123:6
**truthfulness (1)**
  20:16
**try (6)**
  6:12;7:21;12:3;15:7;
  57:24;58:2
**trying (2)**
  77:6;136:9
**turn (6)**
  36:12;113:6,13;
  115:1;123:11;142:7
**turned (1)**
  123:13
**turning (1)**
  38:24
**Twelve (1)**
  95:6
**twice (1)**
  18:6
**two (15)**
  7:18;10:16,18;17:13;
  21:4,5;38:15;47:21;
  55:23;81:3,3;82:15;
  122:6,7,9
**type (7)**
  40:1;41:5;46:11;
  50:23;52:6;79:16;
  80:12
**typically (2)**
  52:10;135:14

**U**

**Um-hmm (2)**
  144:2
**unaware (1)**
  110:1
**unclear (2)**
  14:14;133:2
**under (7)**
  28:7;89:21;95:15;
  101:8;102:19,21;
  108:23
**undergraduate (1)**
  8:21
**underlying (4)**
  57:1,2,6;58:8
**underneath (1)**
  141:12
**underpinnings (1)**
  47:22
**understood (4)**
  6:17;53:16;57:9;
  65:22
**Unfortunately (1)**
  147:12
**unidentified (2)**
  113:18;114:14
**unintelligible (1)**
  6:18
**University (2)**

8:22,23
**unlawful (1)**
  101:6
**unless (4)**
  6:23;88:6;101:8,24
**unsure (1)**
  139:10
**up (11)**
  7:1;25:14;32:12;
  36:5;44:13;48:12;
  53:17;71:24;81:8;
  136:18;143:11
**upon (7)**
  37:14;38:3;46:12,23;
  54:13;98:11;110:9
**USC (1)**
  100:23
**USCA (5)**
  95:1,23;96:14;97:5;
  98:3
**use (18)**
  7:12;50:2,6;100:24;
  101:9,17,17,23;130:4;
  153:11
**used (7)**
  18:17;33:2;53:21;
  60:20;112:16;151:16;
  153:24
**User (1)**
  113:11
**uses (1)**
  21:17
**using (4)**
  53:11,20;85:13;
  134:10
**Usually (1)**
  7:12

**V**

**vacation (1)**
  18:4
**valid (1)**
  88:6
**valuable (3)**
  99:21;100:2,8
**value (3)**
  95:13;98:20;106:13
**variance (1)**
  111:7
**varied (4)**
  55:15;58:8;68:24
**varies (1)**
  11:12
**various (2)**
  31:15;117:5
**vary (2)**
  56:22;92:14
**verbal (1)**
  6:10
**verbally (1)**
  61:7
**verification (1)**

REBECCA J. WING
**COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.**

59:9
**verified (1)**
111:24
**version (1)**
98:10
**versus (6)**
43:14;82:9;91:1;
108:9;109:15;116:16
**VI (6)**
26:21;27:2;28:15,18;
33:23;117:3
**Vicki (2)**
17:15;143:16
**videoconference (2)**
4:9,10
**view (3)**
91:17;108:20;110:6
**viewed (1)**
91:14
**vigilant (1)**
34:21
**violation (1)**
103:15
**violations (6)**
25:6,21;27:3;28:19;
33:24;34:4
**vis-a-vis (1)**
133:1
**visited (1)**
18:3
**visiting (1)**
18:2
**vs (1)**
32:10

**W**

**wait (2)**
24:9;31:1
**waived (2)**
35:12;118:4
**waiver (3)**
18:21;35:1;154:19
**waives (1)**
33:15
**way (16)**
14:16;27:20;42:6;
48:5;57:20,21;64:17;
71:10;75:21;76:22;
80:11;83:11;98:10;
101:20;140:16;149:10
**ways (1)**
51:11
**Webex (3)**
25:14;114:15,16
**website (3)**
131:8,21;141:9
**wedding (3)**
12:15;17:11;87:24
**week (1)**
120:1
**weeks (3)**
38:15;119:24,24

**weigh (1)**
90:22
**weighing (2)**
90:16,24
**weird (1)**
88:7
**welcome (1)**
155:9
**Wells (3)**
89:14,20;92:21
**weren't (3)**
134:16,17;135:1
**What's (11)**
12:18;22:17,24;
29:19;65:9;82:9;89:4;
108:7;111:1;134:4;
143:12
**wheat (1)**
57:5
**whenever (1)**
7:8
**Whereupon (22)**
7:19;13:4;23:22;
27:9;29:11;30:22;32:5;
79:2;80:4;86:8;89:6;
94:17;99:10;100:20;
102:6;104:1;114:9;
118:18;141:6;145:5;
148:12;152:1
**whole (3)**
60:19;127:11;153:12
**who's (6)**
4:21,21,22;23:6;
113:12,22
**Whose (1)**
92:23
**wife (1)**
17:13
**willing (1)**
115:1
**WING (47)**
4:13,19;5:3;7:12;
8:10;13:7;22:3;23:21;
29:1,8,24;31:12;33:10;
35:19;43:7;46:18;50:3;
54:15;55:10;66:1,11;
79:6;86:10;89:8;94:19;
105:7;110:11;113:20;
114:19;115:8,17;
118:21;121:2;123:13,
20;132:10;133:9;
142:11,17;146:16;
149:6;150:20;152:5,6;
155:8,12,23
**wished (1)**
70:18
**with' (1)**
105:15
**within (8)**
34:24;87:20;91:17;
96:19;97:7,8;107:7;
154:18
**without (7)**

45:6;52:4;85:15;
91:4;131:4,10,22
**Witness (20)**
4:1,12,14;5:10;
21:24;35:6,13;36:5,9;
78:19;113:10,15,22;
114:3;140:21;154:13,
18;155:14;156:1,3
**word (1)**
134:10
**worded (3)**
48:5;98:11;101:21
**wording (1)**
96:17
**words (4)**
35:12;71:15;112:16;
116:24
**work (5)**
16:4,5;86:22;90:5;
153:3
**working (2)**
152:20;153:10
**worries (1)**
141:3
**worry (1)**
44:12
**write (5)**
48:2,12;77:8,9;84:9
**writes (5)**
28:13,24;39:2;44:16;
47:19
**writing (4)**
11:22;44:12;48:4;
139:20
**writings (1)**
95:12
**written (2)**
44:15;93:14

**Y**

**year (3)**
9:1;12:24;13:1
**years (19)**
5:17;17:13;21:4,4;
27:23;69:15,16,23;
75:4;85:14,20;87:23;
92:4;93:4,5,8;97:2;
14,16
**years' (1)**
108:14

**1**

**1 (24)**
9:14;12:4;13:15;
28:8,9,13;33:1;36:19;
37:2;38:24;39:1,12;
40:24;42:6;44:20;45:2,
18;47:17,18;48:18;
66:22;101:5;105:24,24
**1:37 (1)**
114:10

**10 (4)**
58:18;89:18,20;90:6
**10:06 (1)**
4:3
**100 (3)**
58:21;108:11,12
**12 (4)**
80:7,24;95:5;119:5
**12:10 (1)**
79:3
**12:30 (1)**
78:21
**12:32 (1)**
79:3
**12A (1)**
95:7
**12th (1)**
10:1
**14 (2)**
30:21;144:11
**15 (1)**
144:11
**17 (2)**
102:9;145:20
**18 (1)**
25:16
**1987 (2)**
9:3,8
**1988 (5)**
8:18;9:5,6,9,13
**1997 (1)**
9:14
**1a (2)**
95:1;96:14
**1a12 (3)**
95:23;97:5;98:3
**1a5 (1)**
106:8

**2**

**2 (13)**
28:6,24;29:19;37:8,
13,17;38:5;90:16;
99:17;105:24;124:4,
14,16
**2:04 (1)**
114:10
**2:05 (1)**
114:13
**20 (1)**
26:4
**2012 (1)**
10:2
**2015 (3)**
9:16;10:3,5
**2017 (30)**
13:15;31:15;37:4,9,
19;41:20;46:5,21;47:7;
48:14;50:16;56:9,13;
58:4;59:2,21;61:13;
62:14;63:5,14,20;
64:14,18;65:4;66:7,12,

23;80:7,24;82:24
**2018 (37)**
31:16;33:1;37:4,9,
19;38:7,16;46:5,22;
47:7;118:15;119:3,5;
120:4,7,16;121:5,11;
122:1;124:5,9;125:4;
126:2,11,18;127:17;
128:7,14;129:3,10,17,
21;142:1;145:20;
147:3;148:3,10
**2018CINV352 (1)**
148:11
**2019 (4)**
143:16;152:19,24;
153:8
**2021 (1)**
30:21
**22 (1)**
26:8
**23 (1)**
26:13
**24 (1)**
148:10
**25 (1)**
26:17
**26 (1)**
26:21
**289 (4)**
143:13;144:3,12,21

**3**

**3 (20)**
29:20,23;38:2,3,6,
13;124:4,15,18,20,23;
125:12;131:4,10,11,13,
14,16,17,18
**3:13 (1)**
152:2
**3:35 (2)**
152:2,4
**30 (1)**
32:14
**31 (1)**
9:12
**35 (8)**
27:23;32:19,23;75:4;
85:20;93:5;97:2;
108:14
**350 (3)**
7:17,19;8:1
**351 (1)**
13:3,4;17:5
**352 (8)**
23:21,22,24;25:15;
26:8;113:6;115:9;
117:4
**353 (6)**
27:8,9,11,14;28:6,23
**354 (6)**
29:9,11,19;30:14;
31:2,3

REBECCA J. WING
COMMODITY FUTURES TRADING COMMISSION v. LONG LEAF TRADING GROUP, INC., et al.

**355 (14)**
30:16,22,24;31:4,13,
19;36:12;37:18;38:24;
41:7;44:13;123:12,20;
129:22
**356 (2)**
32:4,5
**357 (2)**
80:3,4
**358 (3)**
86:6,8,11
**359 (4)**
89:4,6,8,10
**360 (3)**
94:16,17,20
**361 (3)**
99:9,10,12
**362 (3)**
100:19,20,22
**363 (2)**
102:5,6
**364 (2)**
103:23;104:1
**365 (2)**
118:17,18
**366 (2)**
141:5,6
**367 (4)**
145:4,5,10;146:18
**368 (2)**
148:7,12

**4**

**4 (11)**
30:3;36:19;38:14;
115:14,16,20;116:10,
21;124:8,15;129:22
**4.14 (6)**
85:8,10,11;94:1;
102:3,9
**40 (1)**
87:23
**45 (5)**
33:5,6;36:2;92:4;
93:4
**4g (5)**
70:10,13;83:4,7;
84:23

**5**

**5 (2)**
25:20;113:11
**50 (3)**
36:2;65:14,24
**51 (1)**
65:15
**5401 (1)**
29:5

**6**

**6 (1)**
102:20
**6c (1)**
95:15
**6m (1)**
100:24

**7**

**7 (8)**
95:1,23;96:14;97:5;
98:3;100:23;143:16;
144:3
**78 (1)**
87:2
**7-R (1)**
81:21

**8**

**8 (1)**
144:8
**80 (1)**
93:8

**9**

**9 (1)**
10:1
**90 (3)**
58:17;65:14,20
**95-82 (1)**
104:5