

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Commodity Futures Trading Commission, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Case No. 20-3758 |
| | ) | |
| Long Leaf Trading Group, Inc., | ) | Hon. Thomas A. Durkin |
| James A. Donelson, Timothy M. Evans, | ) | |
| Jeremy S. Ruth, and Andrew D. Nelson, | ) | |
| Defendants. | ) | |

### DEFENDANT'S RESPONSE TO CFTC'S STATEMENT OF FACTS

Defendant Jeremy Ruth responds to Plaintiff CFTC's statement of facts as follows:

### I. RELEVANT PARTIES

1. Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") is an independent federal regulatory agency charged by Congress with administering and enforcing the Commodity Exchange Act ("Act") and accompanying Regulations. (Doc. 36, Ruth Answer ¶ 15.)

**Answer: Defendant does not dispute.**

2. At all times relevant to this motion, Defendant Long Leaf Trading Group, Inc., ("Long Leaf") was an introducing broker ("IB"), and registered as such with the Commission. (Id. ¶ 21.)

**Answer: Defendant does not dispute.**

3. Defendant Jeremy S. Ruth worked for Long Leaf from April 29, 2015, through August 28, 2017. (Id. ¶ 19.)

**Answer: Defendant does not dispute.**

### II. JURISDICTION

4. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).

**Answer: Defendant does not dispute.**

5. In addition, 7 U.S.C. § 13a-1(a) provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

**Answer: Defendant does not dispute.**

6. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because Ruth and the other defendants transacted business in this District, and certain of the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places. (Doc. 36, Ruth Answer ¶ 14.)

**Answer: Defendant does not dispute.**

### III. LONG LEAF'S "TIME MEANS MONEY" TRADING PROGRAM

7. Starting in at least June 2015, Long Leaf began soliciting customers and prospective customers to participate in Long Leaf's so-called "Time Means Money" ("TMM") options trading program. (Id. ¶ 26; CFTC Ex. 5331, Ruth Test. 34:14–34:19.)

**Answer: Defendant does not dispute. However, TMM was not a "program" in the sense that it was not a discretionary trading program executed by Long Leaf with power of**

**attorney and was not a fund or a pool. It was a philosophy for how to structure trades and create a plan to enter the commodities market.**

8. Long Leaf provided customers that agreed to participate in the TMM program with trading recommendations, typically four recommendations every month. (Doc. 36., Ruth Answer ¶ 27.) Each recommendation was for a different spread trade, with each trade typically involving four out-of-the-money options on futures contracts traded on designated contract markets, i.e., exchanges, such as the Chicago Mercantile Exchange and New York Mercantile Exchange. (Id.)
**Answer: Defendant does not dispute that Long Leaf provided customers in TMM with trade recommendations and typically provided about four recommendations per customer each month. Defendant does not dispute that each recommendation was for a different spread trade. Defendant disputes that each trade typically involved four out-of-the-money options on future contracts. Long Leaf did not always recommend four out-of-the-money options. Long Leaf's recommendations used all different credit spread types. Defendant does not dispute that all the recommended trades were on designated contract markets but does dispute that all the recommended trades were on the CMEX or NYMEX.**

9. All customers who participated in the TMM program got substantially the same set of recommendations each month. (CFTC Ex. 533, Ruth Test. 102:1–102:6.)
**Answer: Defendant disputes this statement. Long Leaf customized a trade recommendation for each customer based on the customer's risk tolerance and financial goals.**

10. Ruth and the other Long Leaf associated persons ("APs") provided TMM recommendations to customers by email or phone. (Doc. 36, Ruth Answer ¶ 30; Doc. 23, Long Leaf Answer ¶ 30.)

**Answer: Defendant almost always made recommendations to TMM customers by phone and only approximately five times made recommendations by email.**

11. Ruth and the other APs instructed customers to respond "yes" in a text or email to accept the recommended trades. (Doc. 36, Ruth Answer ¶ 31.)

**Answer: Defendant does not dispute that on approximately five occasions he asked a customer's permission to execute a trade via email due to the customer's unavailability by phone. Defendant disputes that he ever asked permission to execute a trade via text message or instructed a customer to respond "yes" in a text message to accept a recommended trade. Defendant is not aware of whether other APs communicated with customers via text.**

12. Long Leaf would forward the customer orders to a futures commission merchant ("FCM"). (Id. ¶ 32.) The FCM would then place the orders on the exchange to be executed. (Id.)

**Answer: Defendant disputes that Long Leaf would forward the customer orders to an FCM. Defendant would typically take the customer order and give it to Defendant Tim Evans. To Defendant's knowledge, Evans would then compile the order and enter it in an Excel spreadsheet. Evans would then call an executing broker and instruct them to execute the order on Long Leaf's behalf through a give-up agreement. On occasions where one of Defendant's customers did not place their order in time to be included in the block order placed by Evans, Defendant would contact Gain Capital to work the order. Gain Capital is not an FCM.**

13. As an IB, Long Leaf earned revenue in the form of commissions when its recommended trades were executed. (Id. ¶¶ 24, 33.)

**Answer: Defendant does not dispute that Long Leaf earned revenue through commissions among other streams of revenue.**

14. During Ruth's tenure at Long Leaf, the majority of his customers were TMM program participants. (CFTC Ex. 533, Ruth Test. 36:6–36:15.) For the rest of the firm, "pretty much everything was Time Means Money." (Id.)

**Answer: Defendant does not dispute that at times during the second year of his employment at Long Leaf the majority of his customers were TMM participants. However, Defendant at all times had two types of customers in addition to TMM participants. Long Leaf Trading was a full service brokerage working with a wide variety of customer types and services. Defendant disputes that he said, "pretty much everything was Time Means Money."**

## IV. RUTH'S SOLICITATIONS

15. Ruth's primary responsibility at Long Leaf was to solicit customers for participation in the TMM program. (Id. at 28:10–28:22, 401:23–402:6.)

**Answer: Defendant disputes this statement. His primary responsibility was to solicit customers for Long Leaf generally as a full service brokerage.**

16. In so doing, Ruth utilized a script provided to him by Defendant Timothy Evans, Long Leaf's then- owner and CEO. (CFTC Ex. 134, Email from T. Evans to J. Ruth, Sept. 7, 2016, attaching "demo script"; CFTC Ex. 533, Ruth Test. 232:7-232:9; see also Doc. 36, Ruth Answer ¶ 2 (Evans was CEO).)

**Answer: Defendant does not dispute. Defendant also had customers, both in TMM and not in TMM, that he did not solicit.**

5

17. The script included statements touting the benefits of the TMM program, including that the TMM program uses short options strategies to "drive results;" by selling four options, the script explains, "[t]here is a strong statistical likelihood you are going to win 3 of those … giving you a much more predictable path to success …." (CFTC Ex. 134 at 5-62 (ellipses in original).)

**Answer: Defendant does not dispute that the script contains the quoted statements but disputes that this reflects the entire script and disputes that the phrase "drive results" was intended to imply a successful result.**

18. The script also includes the following statement: "At Long Leaf, we measure our success by our client's [sic] success. As a company, we wouldn't have the ability to work with hundreds of client's [sic] month-after-month for 6 years and oversee millions of dollars if we weren't being profitable for them." (Id. at 8-9.)

**Answer: Defendant does not dispute that the script contains these statements. The statements quoted here are not in context and are not the entirety of the script.**

19. In addition to the script, Ruth used a power point presentation—also provided by Evans—to solicit customers. (CFTC Ex. 141, Email from J. Ruth to T. Evans, Apr. 8, 2017, attaching "custom version 3"; CFTC Ex. 533, Ruth Test. 287:20–288:21.) The presentation features slides illustrating the TMM program and depicting an "annual return" of 12%. (CFTC Ex. 141 at 12, 14.)

**Answer: Defendant does not dispute that he used a Power Point presentation that was provided by Evans. The statement quoted here is not in context and is not the entirety of the presentation. The slides did not make a representation that the TMM program had an**

6

annual return of 12%. The slides were used to illustrate the structure of TMM, not the results.

20. Ruth made the statements featured in the script and presentation, and other similar statements, to customers and prospective customers throughout his tenure at Long Leaf. (See CFTC Ex. 533, Ruth Test. 240:20–241:11.)

**Answer: Defendant does not dispute that he followed the script and presentation when soliciting potential TMM customers.**

21. For example, on a January 12, 2016, call with then-prospective customer Harish Patel, Ruth explains that, under the TMM program, "following that math over those four assets, on the three, you can expect it to be right; in the long run it would generate 1500; and the one you're wrong losing 1,000; and that would leave you with a net of 500 bucks." (CFTC Ex. 1533 at 00:35:15–00:35:49.) "Now we want to continue that process month after month," Ruth explains, "continue that income-generating process, you know you carry that out for a year, you're looking at 6,000 dollars, which is a 6% return." (Id.) "Obviously these positions are scalable so its very easy to duplicate that to accomplish 12% on an annual basis." (Id.)

**Answer: Defendant does not dispute he made these statements. However, this does not present the full context of the conversation, which spanned at least an hour and a half and included a conversation about the use of credit spreads to define risk customized to the individual customer. The conversation was not a summary of TMM results, as this depiction implies. The last quoted statement was made to demonstrate one possible leverage strategy that could be used to generate a 12% return in a hypothetical scenario, not an illustration of what TMM's results would be.**

7

22. On a February 19, 2016, call with then-prospective customer Janice Janowiak, Ruth claims that the TMM program is based on the idea that, "if you sell four options, there is a strong statistical likelihood you will win three of them, giving you a much more predictable path to success." (CFTC Ex. 352 at 00:09:50–00:12:25.) Ruth goes on to say that, "we measure our success by our clients' success; now, as a company we wouldn't have the ability to work with hundreds of clients month after month for six years and oversee millions of dollars if we weren't being profitable for them." (Id.)

**Answer: Defendant does not dispute he made these statements. However, this does not present the full context of the conversation, which spanned approximately 45 minutes to over an hour.**

23. On an August 17, 2017, call with then-prospective customer Dale Bennett, Ruth explained that because 76.5% of options expire worthless (according to Ruth), Long Leaf is able to create "a predictable path to arrive at a specially targeted return." (CFTC Ex. 155 at 00:15:50–00:17:00.) Mr. Bennet says, "you got to be good to achieve that." (Id.) "We are," Ruth replies. (Id.)

**Answer: Defendant does not dispute he made these statements. However, this does not present the full context of the conversation, which spanned approximately 45 minutes to over an hour. Defendant also disputes the implication that his statement that 76.5% of options expire worthless was based solely on his opinion.**

24. Ruth goes on to tell Mr. Bennett, "I work with a lot of clients and a majority of them make money, and the ones that make money are the ones that keep emotions out of the process." (Id. at 00:57:55–00:58:30.) "The only time I see people lose money," Ruth told Mr. Bennett, "is

8

when they bring emotions into the process." (Id.) "If you're willing to work with me on that I can ensure [sic] you that things will work out." (Id.)

**Answer: Defendant does not dispute he made these statements. However, this does not present the full context of the conversation, which spanned approximately 45 minutes to over an hour. The quoted statements were made in the larger context of a conversation and the phrase "make money" referred to making money on single trades, not the end result of a customer's account.**

25. Ruth tells Mr. Bennett, "I'm sitting in a chair and I'm looking at a screen and I get to see all the results of my clients and so it's very easy for me to be almost certain about our ability to get you to reach your financial goals." (Id. at 1:05:00–1:05:55.)

**Answer: Defendant does not dispute he made these statements. However, this does not present the full context of the conversation, which spanned approximately 45 minutes to over an hour and was about how Defendant had not and would not share any previous results with Bennett and that Bennett should not open an account based on previous results, but rather based on believing in the structure of TMM.**

## V. RUTH'S AWARENESS OF LOSSES

26. During the period Ruth worked at Long Leaf—approximately June 2015 through the end of August 2017—customers who participated in the TMM program lost more than $3.1 million. (See CFTC Ex. 535, Patrick Decl., Ex. A (showing customer losses by month).)

**Answer: Defendant disputes this statement because it is vague and misleading. This statement does not indicate which customers it refers to or whether those customers were Defendant's. It also does not refer to whether the "customers" were all enrolled for the same period of time or the history of those customers' accounts. Defendant also disputes**

9

this because not all options closed within the same calendar month, so a monthly statement does not necessarily reflect the outcome of all of a customer's recent trades.

27. Substantially all customers who participated in the TMM program lost money during that period. (Id. ¶ 17.)

**Answer: Defendant disputes this statement because it is misleading and vague. Defendant did not make recommendations to every customer in TMM.**

### A. Daily Account Statements

28. Ruth knew that his customers lost money participating in Long Leaf's TMM program. (See Doc. 36, Ruth Answer ¶¶ 3, 38.)

**Answer: Defendant disputes this statement because for a majority of his tenure at Long Leaf he did not know the outcome of his customers' trades. Defendant also disputes this statement because it implies that Defendant knew all of his clients would always lose money, which is not true.**

29. Ruth knew this because he received account statements for his customers every day the markets were open. (Id. ¶ 41; see, e.g., CFTC Ex. 346 at 29-55, Email from Gain Capital to J. Ruth, March 22, 2016 (attaching customer statements reflecting negative "profit & loss" for all funded accounts).) Ruth reviewed these statements every day he received them. (CFTC Ex. 533, Ruth Test. 77:16–78:8.)

**Answer: Defendant disputes this because he did receive statements but was not aware of how to interpret them and because an option's performance is determined on the day it is closed, so a daily account statement does not provide accurate information as to a trade's performance at the time the statement is printed.**

30. One of Ruth's accounts belonged to Ruth's own grandfather, Michael Bruno. (Ex. 534, Ruth Dep. 57:16–57:18, 59:21–60:7; CFTC Ex. 346 at 46-47.) The account was assigned to Ruth, and Ruth received statements for Mr. Bruno's account. (Ex. 534, Ruth Dep. 57:16–57:18, 59:21–60:7; CFTC Ex. 346 at 46-47.)

**Answer: Defendant does not dispute. However, Defendant did not solicit his grandfather's account and his grandfather's account was "assigned" to Defendant at his grandfather's request.**

31. Mr. Bruno funded the account with $5,000 in November 2015. (Ex. 534, Ruth Dep. 57:16–57:18, 59:21–60:7.) In the space of seven months, the account had lost substantially all of its value. (CFTC Ex. 532, M. Bruno account statement, June 8, 2016.) In June 2016, Mr. Bruno withdrew the $54 remaining in his account. (Id.)

**Answer: Defendant does not dispute. Mr. Bruno was an experienced investor with a high net worth.**

**B. Customer Complaints**

32. Ruth received calls and emails from customers complaining about account performance. (Doc. 36, Ruth Answer ¶¶ 41, 63; see, e.g., CFTC Ex. 126, Email from J. Hermanson to J. Ruth, June 14, 2017; CFTC Ex. 128, Email from S. Allen to J. Ruth, May 17, 2017; CFTC Ex. 129, Email from D. Snyder to J. Ruth, June 17, 2017.) He received these complaints "frequently." (CFTC Ex. 533, Ruth Test. 155:18–156:1.)

**Answer: Defendant does not dispute that he received occasional calls and emails in which customers complained about their account performance but disputes that these were formal complaints as that term is used in the industry. Defendant disputes that he received customer complaints "frequently."**

33. For example, on August 30, 2016, Long Leaf customer Rob Mixer complained to Ruth, "My account is down 33% when I look at my cash balance. At this point, I need a 50% return on current capital just to get back to where we started a year ago. Even if you met the targeted 20% return per year that we initially discussed, it will be 2+ years to recover." (CFTC Ex. 124.)

**Answer: Defendant does not dispute Mr. Mixer made these statements in email. Defendant disputes that the statement by Mr. Mixer is correct. Mr. Mixer was in control of his account at all times and continued to trade after making this statement.**

34. The next day, however, Ruth wrote an email to prospective customer, David Norris, claiming that, "This strategy would be perfect for your situation. Selling options is an income generating strategy. This will give you the ability to supplement your part time employment with that additional income generation." (CFTC Ex. 330.)

**Answer: Defendant does not dispute that he made this statement via email. However, Mixer's account had no bearing on whether Norris would be successful if he participated in TMM. Defendant's statements were about the structure of options as an investment vehicle, not about the performance of TMM and the comment was custom tailored to address Norris's circumstances.**

35. In another example of a customer complaint, customer Steve Beranek sent Ruth an email on January 26, 2017: "Your firms [sic] business model is very impressive. It looks like the commissions and fees for the year will surpass my entire $20K in investments, and I have only lost about 20% of my investment. At this rate in ten years my account balance will be zero and your firm will have made $200K." (CFTC Ex. 125.)

12

**Answer: Defendant does not dispute Mr. Beranek made these statements via email. Defendant disputes the characterization of this statement as a complaint. Mr. Beranek is a registered investment advisor and was in control of his account and trades at all times.**

36. Ruth forwards Mr. Beranek's email to Evans, LLT's then-CEO, commenting, "I just got a good laugh reading this again." (Id.)

**Answer: Defendant does not dispute he made this statement via email. Defendant disputes the implication that Mr. Beranek was complaining and that Defendant was disregarding his complaint.**

C. Keeping Track of Losses

37. Ruth kept track of results from Long Leaf trading recommendations and emailed them to other Long Leaf personnel, as set forth in the paragraphs below.

**Answer: Defendant disputes that he kept track of results from Long Leaf trading recommendations for a majority of his tenure at Long Leaf. Defendant kept track of results for a few months in 2017 as described in the following paragraphs.**

38. On April 13, 2017, Ruth emailed follow Long Leaf APs James Leeney and Vince Prieto with a spreadsheet titled "March 2017 results." (CFTC Ex. 121.) The spreadsheet reflects net losses of at least $920 on the four trades recommended to customers in March. (Id.)

**Answer: Defendant does not dispute that he forwarded this email. Defendant disputes that a loss of the four trades recommended that month indicates any information about a customer's account.**

39. On May 9, 2017, Ruth emailed Leeney and another colleague with "April 2017 results," reflecting net losses of at least $1,105 on the four trades recommended in April. (CFTC Ex. 93.)

13

**Answer: Defendant does not dispute that he forwarded this email. Defendant disputes that a loss of the four trades recommended that month indicates any information about a customer's account.**

40. On June 9, 2017, Ruth sent another email to his colleagues titled "May Results," with a note, "For your info only." (CFTC Ex. 94.) The results showed net losses of at least $28.90 on the four trades recommended in May. (Id.)

**Answer: Defendant does not dispute that he forwarded this email. Defendant disputes that a loss of the four trades recommended that month indicates any information about a customer's account.**

41. On July 25, 2017, Ruth emailed LLT's then-CEO, Evans, trading results for Long Leaf customer Harish Patel. (CFTC Ex. 122.) In the email, Ruth noted that Mr. Patel started with $25,700, ended with $9,200, and lost a total of $16,400. (Id.)

**Answer: Defendant does not dispute this. However, Mr. Patel had many successful trades.**

42. Despite this knowledge, Ruth sent an email to prospective customer Chris Zolton later the same day stating, "Normally with a 10k account my clients Target [sic] $500 to $1000 per month. Obviously there are going to be months where we don't win, but getting an average of win in that range is a realistic Target [sic]." (CFTC Ex. 149.)

**Answer: Defendant does not dispute that he made this statement. Defendant disputes the implication that the performance of Patel's account had any bearing on Zolton's investment and also disputes the implication that this statement had any relation to performance. This statement was an explanation of the ability of options of an investment vehicle.**

## VI. RUTH'S OMISSIONS

14

43. Ruth did not disclose any historical results from the TMM program, such as annual or average rates of return, to customers or prospective customers. (CFTC Ex. 533, Ruth Test. 299:10–299:15, 300:23–301:4, 312:4–312:8.)

**Answer: Defendant does not dispute this statement. It is a violation of NFA and CFTC regulations to do so in this situation because TMM accounts were self-directed accounts and customers could participate or not participate whenever they chose, customer trades were not uniform, and had different fill prices, different trades, and different commission rates. The TMM accounts were not a pool of funds. Therefore, a track record of the past performance of TMM accounts is not indicative of what a future customer's account will do. A record of "historical results" for TMM does not exist because TMM is not a pool or fund. TMM accounts are individual self-directed accounts. The results of those accounts are private information reflecting those customers' trading activity, which would not reflect a prospective customer's activity or results.**

44. This was pursuant to a policy at Long Leaf instituted by Evans. (Id. at 299:10–299:15; CFTC Ex. 142, Email from T. Evans to J, Ruth, June 1, 2015.)

**Answer: Defendant does not dispute that this was a policy of Long Leaf instituted by Evans. It was also in compliance with regulations. It is Defendant's belief that a customer should never open any investment account, including a TMM account, based on previous results, because past results are only indicative of a different customer's results.**

45. Ruth abided by the policy, and advised other APs at Long Leaf on how to "get around a request for a track record" by a prospective customer. (CFTC Ex. 110, Email from J. Ruth to J. Leeney, Apr. 27, 2017.)

**Answer: Defendant does not dispute that he followed the policy and regulations against providing past results to prospective customers. Defendant disputes that he advised other APs. Defendant provided an email with an example of a call in which a customer asked him for a track record and he informed them that he could not provide them with such a record.**

## VII. RUTH'S COMPENSATION

46. Ruth was paid a total of $301,541.39 for his work at Long Leaf Trading. (CFTC Ex. 525, J. Ruth Form 1099s.) Ruth's compensation at Long Leaf was based primarily on commissions charged to customers. (Doc. 36, Ruth Answer ¶¶ 51, 56.)

**Answer: Defendant does not dispute this statement.**

47. For the his first few months at Long Leaf Trading, Ruth was paid $1,500 per month salary, plus a percentage of the commissions that he helped to generate. (CFTC Ex. 533, Ruth Test. 31:2–31:20, 32:1–32:5, 32:12–32:20.) After those first months, Ruth's compensation consisted entirely of commissions. (Id. at 32:12–32:20.)

**Answer: Defendant does not dispute this statement.**

*s/*Jeremy S. Ruth

Jeremy S. Ruth

*Pro se*

## CERTIFICATE OF SERVICE

I, Jeremy S. Ruth, hereby certify that on March 4th, 2022, I provided service to the persons listed below via email:

**Defendants:**

Andrew D. Nelson
Pro se
adnelson0503@gmail.com


James M. Falvey
Attorney for Defendant
James A. Donelson & Long Leaf Trading
jimfalvey@yahoo.com

**Plaintiff's:**

Ashley J. Burden
Senior Trial Attorney
aburden@cftc.gov

Joseph C. Platt
Trial Attorney
jplatt@cftc.gov

Elizabeth M. Streit
Chief Trial Attorney
estreit@cftc.gov

Joseph J. Patrick
Investigator
jpatrick@cftc.gov

                       *s/*Jeremy S. Ruth

                       Jeremy S. Ruth

                       *Pro se*