UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) Case No. 20-3758 |
| Long Leaf Trading Group, Inc., James A. Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) Hon. Thomas A. Durkin ) ) ) |
| Defendants. | ) |

### PLAINTIFF CFTC'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT JEREMY S. RUTH

Ruth's response to the CFTC's motion for partial summary judgment makes clear there is no genuine issue of material fact for trial on the CFTC's fraud claims against Ruth. Ruth has submitted no evidence in support of his opposition, and fails to cite evidence already in the record. Ruth's arguments are irrelevant or wrong, and Ruth's factual assertions are contradicted by his sworn testimony, as well as his communications with customers and prospective customers of Long Leaf. Accordingly, the CFTC respectfully requests that the Court grant the CFTC's motion for partial summary judgement.

## I. ANALYSIS

**A. Ruth fails to create a genuine issue of material fact that he made the complained-of statements to customers and prospective customers.**

Ruth argues that the CFTC has identified as false or misleading only five statements made by Ruth to just three customers. (Doc. 99, Def. Ruth's Resp. to CFTC's Mot. for Summ. J. (hereinafter, "Ruth Resp.") at 4.) This is wrong.

The statements identified by the CFTC as false or misleading include Ruth's claims that:

- Long Leaf "wouldn't have the ability to work with hundreds of clients month after month for six years and oversee millions of dollars if we weren't being profitable for them;"

- Long Leaf's trading program was based on a "strong statistical likelihood" of winning three out of every four trades, thus providing a "much more predictable path to success;" and

- it is "very easy to … accomplish 12% [returns] on an annual basis."

(Doc. 76, CFTC's Mot. for Summ. J. Against Def. Ruth (hereinafter, "CFTC Mot.") at 5.) These statements were set forth in scripts and presentations provided to Ruth by Long Leaf. (Doc. 97, Def. Ruth's Resp. to CFTC's Statement of Facts (hereinafter, "Ruth SOF Resp.") ¶¶ 16-19.) Ruth does not dispute that he followed the scripts and presentations, and made these and other, similar statements to customers and prospective customers throughout his tenure at Long Leaf.[1] (*Id*. ¶¶ 16, 19-20.) The statements to specific, individual customers featured in the CFTC's motion were meant to serve as examples, and Ruth admits to having made them. (*Id*. ¶¶ 21-25.)

Ruth complains that the CFTC "does not present the full context of [each] conversation." (*Id*. ¶¶ 21-25.) Ruth does not explain how that context would serve to make his statements not false or misleading. In any event, the CFTC has provided "full context" by filing the unedited recording of each cited conversation. (*See* Doc. 83, Digital Exhibit Information Form for CFTC Exs. 153, 155, 352.)

---

[1] Ruth suggests that he "may not have made each of the statements described by the CFTC" after Long Leaf made changes to the solicitation process in mid-2016. (Doc. 98, Def. Ruth's Statement of Additional Facts (hereinafter, "Ruth SOAF") ¶ 24.) The undisputed facts show that he did; one of the calls highlighted by the CFTC in its motion is from August 2017. (Doc. 97, Ruth SOF Resp. ¶¶ 23-24.) In any event, Ruth has failed to create a genuine issue of fact on this point. *See Boykin v. Chess*, No. 16 CV 50161, 2020 WL 419408, at *3 (N.D. Ill. Jan. 27, 2020) (Durkin, J.) ("[A] witness's inability to recall something will not create a fact issue in the face of affirmative evidence of the fact.").

**B.     There is no genuine issue of material fact that Ruth's statements were false or misleading.**

Ruth's rosy statements about historical and potential profits of Long Leaf's trading program were false or misleading because substantially all customers who participated in the program lost money. (Doc. 76, CFTC Mot. at 5-6.) Ruth complains that the CFTC "does not say whether [Ruth's] customers lost money or whether there was any time during which those customers' accounts were actually making money." (Doc. 99, Ruth Resp. at 2-3 (emphasis omitted); *see also id*. at 5-6.) The CFTC does say this.

In support of its motion, the CFTC adduced a declaration from investigator Joseph J. Patrick. (Doc. 76-23, CFTC Ex. 535.) In the declaration, Mr. Patrick set forth loss numbers for all customers who participated in Long Leaf's trading program. (*Id*. ¶ 7.) This necessarily includes Ruth's customers. Ruth does not attempt to call the accuracy of Mr. Patrick's declaration into question. Nor does Ruth attempted to explain why the performance of his customers' accounts would have differed from the overall performance of customers in the program. It would not have done, because all program participants received the same trading recommendations.[2] (Doc. 76-1, CFTC SOF ¶ 9.)

As for a time when customer accounts were making money, Mr. Patrick's declaration summarizes cumulative and monthly trading results for program participants. (Doc. 76-23, CFTC Ex. 535.) From June 2015 through August 2017—the period of Ruth's tenure at Long Leaf—customer accounts were down, i.e., running cumulative losses, for twenty-five out of

---

[2] Ruth disputes this. (Doc. 97, Ruth SOF Resp. ¶ 9.) In his testimony, however, Ruth said that customers received the same set of recommendations every month: "Q: I mean, for the Time Means Money program, right, substantially all of those customers get the same four trade recommendations every month, is that right? A: Essentially, yeah." (Doc. 76-21, CFTC Ex. 533, Ruth Test. at 102:1 – 102:6.) Ruth's testimony must prevail over his unsupported denial in opposition to summary judgment. *See, e.g.*, *FTC v. Bay Area Bus. Council, Inc*., 423 F.3d 627, 634 (7th Cir. 2005) (holding that a part cannot create an issue of fact with an affidavit containing conclusions that contradict sworn testimony).

3

twenty-six months, for total losses of approximately $3.1 million. (*Id.* at 10-11 ("Long Leaf Trading Monthly and Cumulative Profits and Losses (PNL) of Participants in the Trading Program June 2015 - December 2019").) The handful of individual months with profitable trading results were never profitable enough to outstrip much greater losses from previous or subsequent months. (*Id.*)

Ruth has failed to adduce any evidence to controvert Mr. Patrick's analysis. Ruth offers no evidence, and does not claim, that any customer of Long Leaf traded profitably under the program at any particular time. As such, Ruth has failed to create a genuine issue of material fact that his statements about Long Leaf's trading program—e.g., that Long Leaf' was "trading profitably" for customers—were anything other than false or misleading.

Ruth argues that certain of his statements, i.e., the "strong statistical likelihood" of success, or that it would be "easy" to achieve annual returns of 12%, were not false or misleading because they were "hypothetical" scenarios meant to illustrate Long Leaf's "trade design." (Doc. 99, Ruth Resp. at 5-6.) This argument is unavailing to Ruth. Whatever the "math" behind Long Leaf's trade design may have been, customers did not benefit from any statistical advantage, nor did any customer enjoy an annual return of 12%. (*See* Doc. 76-23, CFTC Ex. 535, Patrick Decl.) Ruth does not offer evidence—or even suggest—that they did.[3] These statements about potential profits had no basis in fact, and are therefore false or misleading as a matter of law. *See CFTC v. Matrix Trading Grp., Inc.*, No. 00-8880-CIV, 2002 WL 31936799, at *6 (S.D. Fla. Oct. 3, 2002) ("[T]he misstatements and omissions regarding

---

[3] Ruth argues that materiality is a question of fact for the jury. (Doc. 99, Ruth Resp. at 7.) Not here. It is well-settled that "representations about profit potential and risk go to the heart of a customer's investment decision and are therefore material as a matter of law." *See CFTC v. Kratville*, 796 F.3d 873, 895 (8th Cir. 2015).

4

profit potential, risk of loss, and performance record by the Defendants were material because a reasonable investor would have relied on these statements in determining whether to invest …."); *SEC v. Falor*, No. 1:09-CV-5644, 2010 WL 3385510, at *4 (N.D. Ill. Aug. 19, 2010) (denying motion to dismiss where defendant made "financial projections" but "lacked any reasonable basis to assume that the promised returns would materialize.").[4]

### C. Ruth has failed to create an issue of fact as to scienter.

Ruth claims that when he started at Long Leaf, he had never worked in finance and had "no reason" to believe that his statements were false or misleading because Long Leaf's scripts and presentations "had been approved by [then-CEO] Evans … and the National Futures Association." (Doc. 99, Ruth Resp. at 8-9.)

Ruth offers no evidence to support these assertions. Whether statements in Long Leaf's solicitation materials were "approved" by Evans or the National Futures Association ("NFA") is, in any event, unavailing to Ruth. That is because Ruth knew those statements were false.[5]

Ruth admits that he received account statements for his customers; Ruth does not dispute that those statements showed ongoing losses resulting from the trading program. (Doc. 97, Ruth SOF Resp. ¶ 29.) Ruth claims, however, that for the majority of his tenure at Long Leaf he did

---

[4] *See also, e.g.*, *SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1298 (M.D. Fla. 2007) (granting summary judgment for SEC where defendant touted expected profits; "though the … the ads often utilized the single words 'projected' or 'estimated,' projections are nonetheless actionable as misrepresentations if there is no reasonable basis to support them"); *SEC v. USA Real Est. Fund 1, Inc.*, 30 F. Supp. 3d 1026, 1034 (E.D. Wash. 2014) (granting summary judgment for SEC; "had investors known that his basis for projecting the unrealistically high returns was [defendant's] personal belief, they could have understood the real risk of giving their money to [defendant]"); *SEC v. Constantin*, 939 F. Supp. 2d 288, 306 (S.D.N.Y. 2013) (granting summary judgment for SEC where defendant "had no basis for [ ] optimistic projections"); *SEC v. Concorde Am., Inc.*, No. 05-80128-CIV, 2007 WL 9706715, at *3 (S.D. Fla. July 19, 2007) (granting summary judgment for SEC where defendant had "no basis for making [ ] projections"; "[t]he fact that the company had no revenue to speak of and was still in a start-up phase at the time a prospectus report is projecting millions is profit is a fact that investors would value").

[5] Ruth does not claim that Evans ever told him the trading program generated profits for customers.

not understand how to "interpret" the statements and thus "did not know the outcome of his customers' trades." (*Id.* ¶¶ 28-29.) This is not a helpful fact for Ruth. If true, it means that Ruth made statements about the historical and potential profitability of the program with no basis to do so. That is fraud. *See CFTC v. Heffernan*, 245 F. Supp. 2d 1276, 1294 (S.D. Ga. 2003) (granting summary judgment where defendant's "statements are misleading because he has no basis for his claims that he traded profitably"). Moreover, Ruth's claim that he did not understand his customers' account statements is undermined by the fact that Ruth became a "Series 3 licensed broker" shortly before starting at Long Leaf.[6] (Doc. 98, Ruth SOAF ¶ 1.)

Regardless of whether Ruth understood the account statements, Ruth knew that customers were losing money in the trading program. Ruth knew this from his very earliest days at Long Leaf. Ruth does not dispute that his own grandfather participated in Long Leaf's trading program in November 2015, just a few months after Ruth started, and lost all but $54 of his $5,000 investment by June 2016. (Doc. 97, Ruth SOF Resp. ¶¶ 30-31.) Ruth likewise does not dispute that he received calls and emails from Long Leaf customers complaining about account performance. (*Id.* ¶¶ 32-35.) Ruth disputes that he received these complaints "frequently" (*id.* ¶ 32), but that is contrary to his deposition testimony[7]:

> Q    Mr. Ruth, … did you receive complaints from customers about account performance while you were at Long Leaf?
>
> A    How do you define complaints?
>
> Q    Customers expressing displeasure about poor account performance.
>
> A    Yeah, all the -- frequently, yeah.

---

[6] The "Series 3" is the National Commodities Futures Exam, administered by the NFA, the futures industry self-regulatory organization.

[7] As such, it must be disregarded by the Court. *See Bay Area Bus. Council, Inc.*, 423 F.3d at 634.

(Doc. 76-21, CFTC Ex. 533, Ruth Test. at 155:18 – 155:24.) Moreover, Ruth admits that in March 2017 he started using spreadsheets to track losses from Long Leaf's recommended trades. (Doc. 97, Ruth SOF Resp. ¶¶ 37-38, 40.) As such, there is no genuine issue of fact that Ruth knew his statements to customers about historical and potential profits from the Long Leaf trading program were false or misleading.

### D. Ruth made a material omission by failing to disclose that substantially all customers lose money participating in the program.

Ruth argues that he was not required to disclose to customers or prospective customers that "other TMM customers lost money." (Doc. 99, Ruth Resp. at 8.) This is wrong. A reasonable investor would consider it important in deciding whether to participate in the program that substantially all customers had lost money doing so. *See CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1332-33 (11th Cir. 2002).[8] Ruth's failure to disclose this constitutes the omission of a material fact without the disclosure of which Ruth's statements touting historical and potential returns were false or misleading.

Ruth argues that disclosure of a "track record" would be impossible because every customer "executed different trade options scaled to their preference." (Doc. 99, Ruth Resp. at 8.) This is a straw man. The basis for the CFTC's fraudulent omission claim is not that Ruth failed to provide a "track record." Rather, it is that Ruth made statements to customers touting the purported advantages of Long Leaf's trading program—including statements that Long Leaf

---

[8] *See also CFTC v. Risk Cap. Trading Grp., Inc.*, 452 F. Supp. 2d 1229, 1245 (N.D. Ga. 2006) ("Siegel's nondisclosure of his and Risk Capital's track record-which the Court found he knew by the fall of 2002- was a material omission of fact. Plaintiff established that approximately 97% of Risk Capital's customers lost money."); *Matrix Trading Grp.*, 2002 WL 31936799, at *8 ("Given that 92% of Matrix's customers lost money and that those losses began accruing from the outset, and given that Matrix's principals either were aware or should have been aware of the true state of affairs, this Court finds that their claims of profit and profit potential were made with knowledge of their falsity or, at the very least, with reckless disregard for the truth.").

7

had traded profitably for customers in the past and that it would be "easy" to generate returns of 12%—without disclosing that substantially all customers lost money participating in it.[9]

E.  **Ruth's unsupported statements about customers do not create an issue of material fact.**

Ruth makes a number of unsupported assertions about the characteristics of Long Leaf customers. These are easily disposed of.

First, Ruth claims that Long Leaf customers "were typically not novice investors" (Doc. 98, Ruth SOAF ¶ 7.) Ruth fails to substantiate this with evidence or citation to the record. Ruth also fails to explain how this fact, if true, is availing to him. To the extent it is meant to suggest that Long Leaf customers did not rely on Ruth's misrepresentation, reasonable reliance is not an element the CFTC must prove. *See Slusser v. CFTC*, 210 F.3d 783, 786 (7th Cir. 2000). To the extent it is meant to suggest that Ruth's misstatements were not material because customers should have known better, Ruth fails to explain how. The fact that an investor is "not a novice" does not imbue them with knowledge of Long Leaf's dismal trading record—a fact that was deliberately concealed from customers and prospective customers. (Doc. 97, Ruth SOF Resp. ¶ 43.) *See Matrix Trading Grp.*, 2002 WL 31936799, at *7 ("The experience level of a customer does not vitiate the materiality of misrepresentations.").

Next, Ruth asserts that Long Leaf customers received "many risk disclosure statements" (Doc. 98, Ruth SOAF ¶¶ 5-6.) Ruth fails to attach or even describe these risk disclosures. The only risk disclosures in the record (all submitted by the CFTC) consist of generic, boilerplate

---

[9] It is not, of course, impossible to provide a track record for program participants. 17 C.F.R. § 4.31(a) provides that a CTA who offers participation in a trading program is required to disclose, *inter alia*: (1) the annual and year-to-date rate of return for the program specified for the five most recent calendar years and year-to-date, computed on a compounded monthly basis, and with monthly rates of return; and (2) the number of accounts traded pursuant to the offered trading program that were opened and closed with a negative net lifetime rate of return as of the date the account was closed. 17 C.F.R. § 4.35(a)(1).

disclaimers warning of the "risk of loss" from futures or options trading. (*See*, *e.g.,* Doc. 76-12, CFTC Ex. 134 at 4 (solicitation script); Doc. 76-13, CFTC Ex. 141 at 4 (solicitation power point); Doc. 76-17, CFTC Ex. 330 at 3 (email exchange with customer).) It is well-settled that such disclosures do not absolve a defendant of liability for making false or misleading statements or omissions. *See CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 501–02 (S.D.N.Y. 2004) (granting summary judgment for CFTC where "risk disclosure and customer account statements … do not disclose the actual material facts: that IFS Inc. adopted trading practices deliberately designed to make clients lose their money, while maximizing commissions for IFS Inc.").[10]

Finally, Ruth points out that Long Leaf customers received daily and monthly account statements; the customers approved all recommended trades and had the ability to stop participating in the program or withdraw their money. (Doc. 99, Ruth Resp. at 2.) Once again, Ruth fails to support this with citation to the record. Nonetheless, Ruth's argument is unavailing. Nothing about a customer's account statements would provide the customer with the critical knowledge that substantially all trading program participants had lost money.

## F. The undisputed facts establish that Long Leaf was a CTA.

Ruth argues that he cannot be liable for aiding and abetting Long Leaf's CTA fraud because Long Leaf was not a CTA. (*Id*. at 10.) Ruth makes no legal or factual argument, but seeks to incorporate by reference Defendants Long Leaf and Donelson's arguments on this point.

---

[10] *See also, e.g.*, *CFTC v. Am. Bullion Exch. ABEX, Corp*., No. SACV101876DOCRNBX, 2013 WL 12139086, at *3 (C.D. Cal. Oct. 17, 2013) ("Boilerplate risk disclosures do not make for an ironclad defense to liability."); *Risk Cap. Trading Grp.*, 452 F. Supp. 2d at 1244 ("Notwithstanding the abundance of these risk disclosures, [defendant] is not insulated from liability."); *Matrix Trading Grp.*, 2002 WL 31936799, at *7 ("[T]he Court finds that the boilerplate risk disclosure language used by the Defendants does not overcome the material misrepresentations made by the Defendants and the Matrix APs.").

(*Id.*) Unfortunately for Ruth, there is nothing to incorporate. (Doc. 96, Def. Donelson Resp. to CFTC's Mot. for Summ. J. at 7 n.4 (expressly disclaiming any arguments with respect to the Long Leaf's CTA status pre-December 2018).) Regardless, the only facts that matter for establishing Long Leaf's status as a CTA are whether Long Leaf (1) engaged in the business of advising customers with respect to trading options on commodity futures, and (2) did so for compensation or profit. *See* 7 U.S.C. § 1a(12)(A)(i), (ii). The undisputed facts show that Long Leaf did both. (Doc. 97, Ruth SOF Resp. ¶¶ 8, 13.)

More substantively, Ruth argues that he did not "aid and abet" Long Leaf because the statements he made were set forth in scripts and presentations provided by management, and Ruth had "no management or decision-making authority at Long Leaf." (Doc. 99, Ruth Resp. at 10.) This is what the Seventh Circuit referred to as the "I am just a copying machine" defense. *SEC v. Lyttle*, 538 F.3d 601, 604 (7th Cir. 2008) (affirming summary judgment for SEC on fraud claims). It is well-settled that "[o]ne doesn't have to be the inventor of a lie to be responsible for knowingly repeating it to a dupe." *Id.*

## II. CONCLUSION

Ruth has failed to create a genuine issue of material fact with respect to CFTC's claims for options fraud, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10, or CTA fraud (via aiding and abetting), in violation of 7 U.S.C. § 6*o*(1). Accordingly, and for the foregoing reasons, the CFTC respectful requests that the Court grant the CFTC's motion for partial summary judgment against Ruth, finding Ruth liable for the foregoing violations of the Act and Regulations and entering an order requiring Ruth to pay $301,541.39 in restitution and disgorgement.

/s/ Ashley J. Burden
_____
Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700

11

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2022, I provided service to the persons listed below, and by the following means:

Via the Court's electronic CM/ECF system:

Jim Falvey
Falvey Law Office
200 S. Wacker Dr., Ste. 3100
Chicago, IL 60606-5877
jimfalvey@yahoo.com

Counsel to Long Leaf Trading Group, Inc. and James A. Donelson

Via email, pursuant to D.E. 13, to:

Andrew D. Nelson
267 May St. E.
Elmhurst, IL 60126
adnelson0503@gmail.com

*Pro se*

Via email, pursuant to agreement, to:

Jeremey S. Ruth
11220 Brista Way
Austin, TX 78726
jeremysruth@hotmail.com

*Pro se*

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700
aburden@cftc.gov