UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 20-3758 |
| Long Leaf Trading Group, Inc., James A. Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) Hon. Thomas A. Durkin ) ) ) |
| Defendants. | ) |

**PLAINTIFF CFTC'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT JAMES A. DONELSON**

Donelson fails to raise a genuine issue of material fact for trial in response to the CFTC's motion for summary judgment. He doesn't really try.

Donelson offers no meaningful defense—factually or legally—to the CFTC's fraud claims. Donelson admits that substantially everyone who participated in Long Leaf's options trading program lost money doing so. Donelson admits that he knew this material fact, but omitted to disclose it to customers or prospective customers. Donelson does not dispute making any of the statements, directly or via APs, which form the basis for the CFTC's fraud claims, i.e.: Donelson provided "track records" of selected trades to customers and prospective customers reflecting positive trading results; Donelson touted his experience at large trading firms despite having no profitable trading experience; APs made various rosy statements of profit potential to customers and prospective customers, e.g., the trading program targets 6-12% annual returns and confers a "statistical advantage."

Donelson offers a declaration from a purported expert saying that Donelson's trading recommendations to Long Leaf customers "could" have made money. This is irrelevant. Donelson admits that the recommended trades did not make money. The undisputed evidence shows that trading program participants lost more than $2.3 million during Donelson's tenure at Long Leaf.

As for the CFTC's non-fraud claims, Donelson mostly fails to address them. For the claims related to CTA registration, Donelson seeks to invoke an advice-of-counsel defense based on purported advice from a lawyer that Long Leaf didn't have to register as a CTA. This is all for naught though, since these are strict-liability violations. Accordingly, the CFTC respectfully requests that the Court grant its motion for summary judgment against Donelson.

I. ANALYSIS

A. **There is no issue of material fact that Donelson knowingly made material misstatements and omissions to customers and prospective customers.**

1. **Donelson admits that he knowingly omitted to disclose to customers that substantially everyone who participated in Long Leaf's trading program lost money.**

Donelson does not dispute that substantially all customers lost money participating in Long Leaf's trading program. (Doc. 96-1, Donelson SOF Resp. ¶¶ 26-30.) Nor does Donelson dispute that he deliberately omitted to disclose these losses to customers and prospective customers, and instructed Long Leaf's APs to do the same. (*Id*. ¶¶ 47-51.)

Donelson argues that he had "no reason to disclose losses" incurred by customers prior to his acquisition of the company in December 2017 because those losses were incurred "under a different trading model" than the one utilized during his tenure. (Doc. 96, Donelson Resp. at 3.)

There are two problems with this argument. The first and most obvious one is that Donelson also omitted to disclose to customers and prospective customers losses incurred by

2

trading program participants *after* Donelson took over. (Doc. 96-1, Donelson SOF Resp. ¶¶ 27-30, 47-49.) These losses—totaling more than $2.3 million—are attributable entirely to Donelson's own "trading model." (*Id.*) Donelson does not deny, or even attempt to defend, this deliberate, material omission.

The second problem with Donelson's argument is that a material omission is determined not by what Donelson thought was "reasonable," but what an investor would find important in deciding whether to participate in Long Leaf's trading program. An objectively reasonable investor would want to know that substantially all previous participants in Long Leaf's trading program had lost money. *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1332-33 (11th Cir. 2002).[1] This would be true even if the firm was under new management, and even if the "model" behind the program had changed.

2. **Donelson fails to crate an issue of fact as to whether the "track records" sent to customers and prospective customers showing profitable trading were false or misleading.**

Starting in February 2019 and continuing through at least October 2019, Donelson created and distributed to customers and prospective customers, directly or through the APs, "track records" showing profitable trading results. (Doc 96-1, Donelson SOF Resp. ¶¶ 58-66.) Donelson admits this. (*See id*.) Donelson "objects," however, to the CFTC's characterization of certain track records as "hypothetical" (as opposed to merely "cherry-picked"), on the grounds that the trades "did occur." (Doc. 96-1, Donelson SOF Resp. ¶¶ 59, 61, 66; *see also* Doc. 96,

---

[1] *See also, e.g.*, *CFTC v. Risk Cap. Trading Grp., Inc.*, 452 F. Supp. 2d 1229, 1245 (N.D. Ga. 2006) ("Siegel's nondisclosure of his and Risk Capital's track record-which the Court found he knew by the fall of 2002-was a material omission of fact. Plaintiff established that approximately 97% of Risk Capital's customers lost money."); *CFTC v. Matrix Trading Grp., Inc.*, No. 00-8880-CIV, 2002 WL 31936799, at *8 (S.D. Fla. Oct. 3, 2002) ("Given that 92% of Matrix's customers lost money and that those losses began accruing from the outset, and given that Matrix's principals either were aware or should have been aware of the true state of affairs, this Court finds that their claims of profit and profit potential were made with knowledge of their falsity or, at the very least, with reckless disregard for the truth.")

Donelson Resp. at 4-5.) Donelson fails to offer evidence in support of this claim, which is contravened by Donelson's own deposition testimony:

> Q  All right.  So CFTC Exhibit 200 reflects hypothetical results for an account if that account traded one contract for all of the recommendations that Long Leaf provided between June and September of 2019, is that right?
>
> A  Correct.

(Doc. 77-18, CFTC Ex. 531, Donelson Dep. at 178:13-18; *see also id.* at 159:22 – 161:5 ("I don't believe any one person had every one of those trades.").)[2]

In any event, Donelson's argument fails to address the CFTC's fundamental point with respect to these track records. The point is that these track records are false or misleading because they reflect positive trading results at a time when customers were losing millions of dollars as a result of Long Leaf's trading program. Donelson does not deny these facts. (Doc. 96-1, Donelson SOF Resp. ¶¶ 58-66.)

### 3. Donelson admits that he failed to disclose his lack of trading experience to customers or prospective customers.

Donelson admits that he has no experience trading options professionally, and that he made just one options trade for his personal account before taking over Long Leaf.[3] (Doc. 96-1, Donelson SOF Resp. ¶¶ 53-56.) Despite this lack of trading experience, Donelson told customers that he had "10 years of financial and business development experience at two of the largest proprietary trading companies." (*Id.* ¶ 53.)

---

[2] Because Donelson's factual assertion is controverted by his deposition testimony, it must be disregarded. *See, e.g.*, *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005) (holding that a party cannot create an issue of fact with an affidavit containing conclusions that contradict sworn testimony).

[3] That trade lost money. (Doc 96-1, Donelson SOF Resp. ¶ 55.)

In his response to the CFTC's statement of facts, Donelson "denies" that he omitted to disclose his lack of trading experience to customers. (Doc. 96-1, Donelson SOF Resp. ¶ 57.) He also "denies" that this omission was material to customers or prospective customers. (*Id.*) Donelson fails to adduce any evidence in support of his position and his citations to the record do not show that Donelson disclosed to customers or prospects his lack of experience. Moreover, Donelson's denials are directly contradicted by his deposition testimony:

> Q   All right. So did you tell customers that you really didn't have any profitable experience trading options on futures?
>
> A   No.
>
> Q   And, in fact, you told customers that you had over 30 years of business experience, including 10 years of financial and business development experience, in two of the largest proprietary trading companies. That's what you told customers, right?
>
> A   Yes.
>
> \*\*\*\*
>
> Q   Mr. Donelson, do you think customers of Long Leaf would have wanted to take your trading recommendations if they knew that you had no profitable trading experience?
>
> A   No.

(Doc. 77-18, CFTC Ex. 531, Donelson Dep. at 80:13-23, 81:19-23.)

**4.   AP statements about "target" returns of 6-12% were materially false and misleading.**

Donelson admits that he knew and approved of Long Leaf APs telling customers and prospective customers, *inter alia*, that the trading program "target[s] 6 to 12 percent return on an annual basis." (Doc. 96-1, Donelson SOF Resp. ¶ 46.) Donelson argues that these statements were neither false nor misleading because they were "hypothetical" and referred to a "target" rate of return. (Doc. 96, Donelson Resp. at 6.)

5

Donelson's argument is without merit. There is no customer of Long Leaf who obtained 6-12% annual returns, or anything close to it. (Doc. 96-1, Donelson SOF Resp. ¶¶ 26-27, 30.) To the contrary, substantially all customers who participated in the trading program lost money—more than $2.3 million during Donelson's tenure alone. (*Id.*) Under these circumstances, it highly misleading (if not outright false) for Long Leaf APs to make statements about potential profits. *See CFTC v. Kratville*, 796 F.3d 873, 895 (8th Cir. 2015).[4] These statements had no basis in reality.

**B.     Donelson's so-called expert creates no issue of fact as to Donelson's scienter.**

Donelson argues that the declaration of his purported expert witness, John Burnside, creates an issue of material fact as to Donelson's scienter.[5] (Doc. 96, Donelson Resp. at 6-7.) That is ridiculous.

Burnside opines that "the trading strategy for the recommended option trades under Donelson's supervision, could not only make money, but given the environment, [it] made sense to recommend those option positions." (Doc. 96-3, Burnside Decl. at 3.) Whether the trade

---

[4] *See also, e.g.*, *SEC v. Falor*, No. 1:09-CV-5644, 2010 WL 3385510, at *4 (N.D. Ill. Aug. 19, 2010) (denying motion to dismiss where defendant made "financial projections" but "lacked any reasonable basis to assume that the promised returns would materialize."); *SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1298 (M.D. Fla. 2007) (granting summary judgment for SEC where defendant touted expected profits; "though the … the ads often utilized the single words 'projected' or 'estimated,' projections are nonetheless actionable as misrepresentations if there is no reasonable basis to support them."); *SEC v. USA Real Est. Fund 1, Inc.*, 30 F. Supp. 3d 1026, 1034 (E.D. Wash. 2014) (granting summary judgment for SEC; "had investors known that his basis for projecting the unrealistically high returns was [defendant's] personal belief, they could have understood the real risk of giving their money to [defendant]"); *SEC v. Constantin*, 939 F. Supp. 2d 288, 306 (S.D.N.Y. 2013) (granting summary judgment for SEC where defendant "had no basis for [ ] optimistic projections"); *SEC v. Concorde Am., Inc.*, No. 05-80128-CIV, 2007 WL 9706715, at *3 (S.D. Fla. July 19, 2007) (granting summary judgment where defendant had "no basis for making the projections" in report provided to investors; "[t]he fact that the company had no revenue to speak of and was still in a start-up phase at the time a prospectus report is projecting millions is profit is a fact that investors would value")

[5] At least that's what the CFTC assumes he's arguing. Donelson's brief actually says, "the testimony of Donelson's expert, which remains uncontested, discloses a finding of scienter." (Doc. 96, Donelson Resp. at 6-7.)

recommendations "could" make money, or whether it "made sense" to recommend those trades, is irrelevant to the question of Donelson's scienter.[6] The undisputed facts establish that Donelson was aware that customers lost money from the recommended trades. (Doc. 96-1, Donelson SOF Resp. ¶¶ 26-37.) Despite this awareness, Donelson omitted to disclose this fact to customers or prospective customers and provided them—personally or via the APs—with cherry-picked or hypothetical "track records" and rosy statements about 6-12% annual returns and Long Leaf's "statistical advantage." (*Id*. ¶¶ 47-51, 53-55, 58-66.) Donelson's scienter is conclusively, objectively established as a matter of law by the undisputed facts.

C.      **Long Leaf was a CTA and required to register as such.**

   1.      **Long Leaf was a CTA.**

Donelson argues that Long Leaf is not a CTA, and so Donelson cannot be held liable as a controlling person for CTA fraud (Count II), fraudulent advertising by a CTA (Count III), failure to register as a CTA (Count IV), or failure to make disclosures required of a CTA (Count V). (Doc. 96, Donelson Resp. at 7-9.) Donelson adduces no evidence and offers no legal argument for the proposition that Long Leaf is not a CTA. It definitely is. To qualify as a CTA, an entity

---

[6] Burnside does not purport to opine that Donelson's trades were profitable. Burnside testified that his opinion does not rely on any information concerning the actual results of the trades. (Doc. 96-4, Burnside Dep. at 193:24–194:7 (Burnside had access to certain "information and documents that reflected Long Leaf Trading's commission rates and its profit and loss information but [he] didn't include that in [his] analysis").) Burnside testified that his "opinion in this case is limited only to the opinion that in 2018 and 2019 Long Leaf implemented trades that can be categorized as broken butterflies, calendar spreads and gut strangles." (*Id*. at 195:4–195:10.) Burnside did not attempt to analyze whether Long Leaf's trades were likely to make money. (*Id*. at 80:16–80:20, 94:4–94:19, 203:20–204:23.) In opining that Donelson's trades "made sense," Burnside admits that he failed to consider the impact of commissions charged by Long Leaf. (*Id.* at 86:19–87:2, 126:22–127:14; *see also id.* 171:19–24 (agreeing that he could amend his opinion to read "Long Leaf's trades made sense if you ignore all costs").) This is a significant oversight because more than $1.2 million of customer losses consist of commission payments. (Doc. 96-1, Donelson SOF Resp. ¶ 31.) As shown by these testimony excerpts, Burnside's opinions are not relevant and would therefore not assist the jury to determine whether Donelson acted with scienter. *See* Fed. R. Evid. 702. Should this case proceed to trial, the CFTC reserves the right to further challenge the admissibility of Burnside's opinion testimony.

need only: (1) be engaged in the business of advising others as to the value or of the advisability of trading in, in relevant part, options on commodity futures contracts, and (2) do so for compensation or profit. 7 U.S.C. § 1a(12)(A). Donelson does not dispute that Long Leaf satisfies these criteria. (Doc. 96-1, Donelson SOF Resp. ¶¶ 14-16, 19, 21.)

### 2. Long Leaf was required to register as a CTA.

Donelson next argues that Long Leaf was exempt from having to *register* as a CTA under 17 C.F.R. § 4.14(a)(6).[7] (Doc. 96, Donelson Res. at 8-10.) Donelson argues that an exemption applies because Long Leaf "did not have [ ] discretion over [customer] trades," and had to obtain customer approval before executing the recommended trades. (*Id*. at 9.) The fact that Long Leaf lacked discretionary authority over customer accounts does not exempt it from having to register as a CTA.

17 C.F.R. § 4.14(a)(6) provides an exemption from registration as a CTA if a person otherwise acting as a CTA is already registered as an introducing broker ("IB"), and if "the person's trading advice is issued solely in connection with its business as an introducing broker."[8] An IB which "guides" trading in the majority of its customer account is not providing advice solely in connection with its business as an IB. *Clarification of Issues Concerning Guided Accounts of Introducing Brokers and Futures Commission Merchants*, CFTC Letter No.

---

[7] The CFTC's claims against Donelson for CTA fraud and fraudulent advertising by a CTA apply regardless of whether a CTA is exempt from registration. 17 C.F.R. § 4.15 (2019) (7 U.S.C. § 6*o*(1) shall apply to a CTA even if the CTA is exempt from registration); 17 C.F.R. § 4.41(c)(2) (2019) (CTA and CPO advertising provisions apply "[r]egardless of whether the commodity pool operator or commodity trading advisor is exempt from registration under the Act"). Donelson's registration argument is therefore only relevant to the CFTC's claims for failure to register as a CTA (Count IV) and failure to make disclosures required of a CTA (Count V) under 17 C.F.R. § 4.31(a), which, by its terms, applies only to CTAs that are registered or required to be registered as such.

[8] The business of an IB is to solicit or accept orders for the purchase or sale of, *inter alia*, commodity options, futures, or options on commodity futures. 7 U.S.C. § 1a(31).

8

95-82, 1995 WL 707862 (Sept. 19, 1995).[9] Rather, such an IB is "acting primarily as a CTA." *Id*. Even if the IB/CTA lacks discretionary control over the account, "the CTA is expected to influence the trading decisions made by the 'guided account' customer." *Id*. "While the customer is free to deviate from the selections proposed by the CTA, the customer is not likely to do so to any significant degree." *Id*.

This reasoning applies to Long Leaf. Through its trading program, Long Leaf guided customer accounts with recommendations for specific spread trades on out-of-the money options-on-futures contracts. (Doc. 96-1, Donelson SOF Resp. ¶¶ 14-16.) Long Leaf did this for the vast majority of customer accounts. (*Id*. ¶ 23.) Moreover, customers rarely deviated from Long Leaf's recommendations, accepting them between 80% and 85% of the time. (*Id*. ¶ 24.) Long Leaf was therefore acting primarily as a CTA, and required to be register as such.[10]

### 3. Donelson has no advice-of-counsel defense.

Donelson seeks to invoke an advice-of-counsel defense, arguing that a private attorney named Rebecca Wing told him that Long Leaf did not have to register as a CTA. (Doc. 96, Donelson Resp. at 9-10.) This argument is without merit.

---

[9] *See also Section 4m(1) of the Act; Applicability of Commodity Trading Advisor Registration Requirements to a Futures Commission Merchant's and an Introducing Broker's Use of a Commodity Interest Trading System*, CFTC Letter No. 96-17, 1996 WL 100977 (Feb. 9, 1996) (opining that an IB's use of a trading system "as a means to solicit discretionary trading authority over or effectively 'guide' certain accounts could require registration a CTA").

[10] In support of his argument, Donelson cites a no-longer-available "notice" from the NFA, which he fails to attach and for which he fails to provide a web address. (Doc, 96, Donelson Resp. at 8-9.) According to Donelson, the notice suggests that discretion over customer trades is a "key consideration" in determining whether a CTA has to register. (*Id*.) It is, but not in the way Donelson suggests. 17 C.F.R. § 4.14(a)(9)(i) provides that none of its exemptions to registration apply if the CTA is "directing client accounts," i.e., engaging in discretionary trading. *See* 17 C.F.R. § 4.10(f) (defining "direct" as an "agreement[ ] where a person is authorized to cause transactions to be effected for a client's … account without the client's specific authorization"). The fact that Long Leaf does not engage in discretionary trading of client accounts does not therefore entitle it to an exemption from registration. In other words, discretion is sufficient but not necessary to trigger CTA registration for IBs.

As the Seventh Circuit explained, "[t]here is no such thing as an 'advice of counsel' defense …" *United States v. Urfer*, 287 F.3d 663, 665–66 (7th Cir. 2002). The advice a defendant receives from counsel is only relevant "if a [ ] statute requires proof that the defendant knew he was violating the statute in order to be [ ] liable for the violation." *Id*.

The statute which mandates registration of CTAs, 7 U.S.C. § 6m(1), contains no such requirement. Failure to register as a CTA is a strict-liability offense with no *mens rea* requirement, and certainly no requirement of proof that a defendant know he or she is in violation of the statute. *See CFTC v. JBW Capital*, 812 F.3d 98, 106 (1st Cir. 2016) (holding that violation of 7 U.S.C. § 6m(1) "is a strict liability offense," and so the defendant "cannot raise a reliance on professionals defense").[11]

## II. CONCLUSION

As set forth above, Donelson does not meaningfully dispute the CFTC's statement of facts. Nor does Donelson make any intelligible legal arguments in support of his position. According, the CFTC respectfully requests that the Court grant its motion for summary judgment. Since Donelson fails to contest—and in fact admits to—the CFTC's calculation of customer losses and commissions (Doc. 96-1, Donelson SOF Resp. ¶¶ 28-31), the CFTC requests that the Court enter an order for payment restitution in the amount of $2,376,738, and payment of restitution in the amount of $1,235,413.

---

[11] Donelson's personal liability for Long Leaf's failure to register derives from 7 U.S.C. § 13c(b), which holds controlling persons liable to the same extent as the primary violator. 7 U.S.C. § 13c(b) requires only that the controlling person knew of the "core activities that constitute the violations at issue," as Donelson unquestionably did. *CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311, 1323 (S.D. Fla. 2014). It does not require proof that the defendant knew the conduct was unlawful or that he intended to violate the law. *Id*. As such, Donelson cannot avail himself of an advice-of-counsel defense with respect to his controlling person liability.

10

/s/ Ashley J. Burden
_____
Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2022, I provided service to the persons listed below, and by the following means:

Via the Court's electronic CM/ECF system:

Jim Falvey
Falvey Law Office
200 S. Wacker Dr., Ste. 3100
Chicago, IL 60606-5877
jimfalvey@yahoo.com

Counsel to Long Leaf Trading Group, Inc. and James A. Donelson

Via email, pursuant to D.E. 13, to:

Andrew D. Nelson
267 May St. E.
Elmhurst, IL 60126
adnelson0503@gmail.com

*Pro se*

Via email, pursuant to agreement, to:

Jeremey S. Ruth
11220 Brista Way
Austin, TX 78726
jeremysruth@hotmail.com

*Pro se*

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe St., Ste. 1100
Chicago, IL 60661
(312) 596-0700
aburden@cftc.gov