UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | No. 20 C 03758 |
| v. | Judge Thomas M. Durkin |
| LONG LEAF TRADING GROUP, INC., JAMES A DONELSON, TIMOTHY M. EVANS, JEREMY S. RUTH, and ANDREW D. NELSON, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

The Commodity Futures Trading Commission filed suit against Long Leaf Trading Group and several of Long Leaf's principals and employees, alleging multiple counts of fraud and other violations of the Commodity Exchange Act, 7 U.S.C. §§ 1-26, and accompanying Commission regulations, 17 C.F.R. §§ 1-190. Now before the Court are the CFTC's motions for partial summary judgment on its claims against Long Leaf, James Donelson, and Jeremy Ruth.[1] For the reasons set forth below, the CFTC's motions are granted.

---

[1] Defendant Andrew Nelson was served on July 31, 2020 but never appeared and has since been defaulted. R. 49. Alternative service on Defendant Timothy Evans was executed on November 30, 2021, but to date Evans has not filed an Answer or otherwise appeared. The CFTC characterizes its motions as "partial" because, if they are granted, it says it will subsequently seek injunctive relief and the imposition of civil monetary penalties against the defendants by a separate motion.

## Background[2]

The CFTC is an independent federal regulatory agency tasked with administering and enforcing the Commodity Exchange Act and accompanying regulations. Long Leaf is an Illinois corporation registered with the National Futures Association ("NFA") as an "introducing broker." R. 96-1 ¶ 3. James Donelson was Long Leaf's CEO for a portion of the relevant time, while Jeremy Ruth was a Long Leaf employee for a separate portion.

An introducing broker, or "IB," cannot place orders on a designated contract market. Instead, an IB introduces its customers to a futures commission merchant ("FCM"). Customers then open an account for trading on a market. R. 96-1 ¶ 10. One method by which an IB earns revenue is through commissions when a customer places a trade (or when the IB places a trade on the customer's behalf) in an account with the FCM. R. 96-1 ¶ 11. During the relevant time, Long Leaf introduced customers to FCMs and received commissions for orders executed in those customers' accounts in this manner. R. 96-1 ¶¶ 13, 21. In contrast to an IB, a commodity trading advisor, or "CTA," acts as a type of financial advisor for clients, providing advice (for compensation or profit) about the buying or selling of futures contracts or options. A CTA can be a person or an entity. Long Leaf has never been registered as a CTA. R. 96-1 ¶ 3. An individual who acts as a "salesperson" for a firm (be it an IB, a CTA, or

---

[2] The facts set forth here are undisputed except where otherwise indicated. Long Leaf did not respond to the CFTC's motion for summary judgment or statement of facts. Statements of fact supported by citations to the record and to which no defendant has properly responded are deemed admitted pursuant to L.R. 56.1(e).

other category of industry player), soliciting customers or orders, is known as an "Associated Person" of the firm, or "AP."

The CFTC's claims addressed in this opinion can be broken into two main categories. The first set of claims concerns alleged fraud perpetrated by the defendants. In general, the CFTC accuses Long Leaf and its agents of defrauding customers with misleading information about profit potential in order to solicit trades and generate commissions for profit. In particular, the CFTC alleges that Long Leaf failed to tell customers that nearly all its clients lost money, and painted an inaccurately rosy picture of the likelihood customers would see positive returns on their investments. The second set of claims is premised on the underlying allegation that while Long Leaf was registered as an IB, it was in fact operating as an unregistered CTA, and that certain Long Leaf employees were themselves acting as CTAs and/or APs in violation of certain applicable regulations governing registration and disclosures to customers.

## I.    Long Leaf's Trading Program

During the relevant time (June 2015 to December 2019), Long Leaf recommended trades to customers as part of a "trading program" it developed known as the "Time Means Money" or "TMM" program. R. 79-1 ¶ 15; R. 96-1 ¶ 14; R. 97 ¶ 7. Long Leaf typically provided four trade recommendations a month to customers who agreed to participate in TMM. R. 96-1 ¶ 15. At least some of those recommendations

involved "out-of-the-money" options on futures contracts.[3] R. 96-1 ¶ 16; R. 97 ¶ 8. The trading structure (meaning the collection of calls and puts traded together) was the same for each customer who received these recommendations, though there could be variance among the numbers of contracts that were recommended. R. 96-1 ¶ 17; R. 97 ¶ 9. For example, customers with greater equity (i.e. money in their accounts) were advised to trade more contracts, while customers with less equity were advised to trade fewer. R. 79-1 ¶ 19.

Long Leaf's APs typically provided recommendations to Long Leaf's TMM customers over the phone or by email. R. 96-1 ¶ 19; R. 97 ¶ 10. Long Leaf APs instructed customers to respond "yes" in a text or email to accept the recommended trades. R. 96-1 ¶ 19; R. 97 ¶ 11. Long Leaf would then forward the customer orders to its FCM, which would place the orders on the exchange for execution. R. 96-1 ¶ 20; R. 97 ¶ 12. Approximately 80% of Long Leaf's customers participated in TMM. R. 96-1 ¶ 23. Those customers accepted Long Leaf's trading recommendations about 80% of the time. R. 96-1 ¶ 24.

As the CFTC describes things, TMM was a disastrous program for Long Leaf's customers, who lost millions of dollars trading with the firm using the program. From June 2015 to December 2019, substantially all Long Leaf customers participating in

---

[3] An "out of the money" option refers to an option contract that lacks intrinsic value because the strike price (the price at which the holder may exercise the option) is above or below the futures market price, depending on whether the contract is a call or put option. *See generally CFTC v. Risk Capital Trading Group, Inc.*, 452 F. Supp. 2d 1229, 1234-35 (N.D. Ga. 2006).

TMM lost money. R. 79-1 ¶ 33. TMM participant losses during this period totaled $5,767,145.[4] R. 79-1 ¶ 32. During this same time, Long Leaf received a total of $4,010,994 in commission payments for accounts participating in TMM. R. 79-1 ¶ 34.

Long Leaf's CEO prior to December 2017, Timothy Evans, was aware of customer losses from TMM. He received customer account statements showing losses, as well as complaints from customers about their account performance. R. 79-1 ¶ 35. Other Long Leaf APs received similar information regarding customer losses. R. 79-1 ¶ 36. However, customers were not informed about these losses. R. 79-1 ¶ 41. Evans advised Long Leaf's AP's that they should not provide information about TMM's track record of performance, and that if customers requested such information, they should tell them firm policy did not allow Long Leaf to provide it. R. 79-1 ¶ 42.

## II. James Donelson's Activities

Donelson became Long Leaf's CEO in December 2017. As CEO, he was a principal of Long Leaf and possessed the power to direct its management and policies. R. 96-1 ¶ 4. He first registered as a Long Leaf AP in June 2018, and he remained registered through December 2019. R. 96-1 ¶ 5; R. 79-1 ¶ 6.

Substantially all Long Leaf customers who participated in TMM lost money during Donelson's tenure. R. 96-1 ¶ 27. Those customers' losses while Donelson was CEO totaled $2,376,738. R. 96-1 ¶ 30. During that same period, Long Leaf collected $1,235,413 in commissions from its TMM customers. R. 96-1 ¶ 31.

---

[4] The customer loss figures discussed in this opinion generally include both decline in investment value and commissions paid.

Donelson began receiving daily customer account statements shortly after starting at Long Leaf. Those statements showed that substantially all TMM customers had been losing money. R. 96-1 ¶ 32. In January 2018, Donelson did a "five-month look-back" and found that customers were "consistently losing money." R. 96-1 ¶ 33. He also monitored the performance of Long Leaf's recommended trades in real time. R. 96-1 ¶ 35. During his tenure, Donelson received emails and phone calls from customers complaining that their accounts lost value. R. 96-1 ¶¶ 34, 36.

Long Leaf marketed the TMM program to the public through the firm's website, while its APs also solicited customers via oral and written presentations. R. 96-1 ¶¶ 38-39. During Donelson's tenure, the goal was for APs to make 200 calls to prospective customers per day. R. 96-1 ¶ 40. Donelson reviewed written communications and recorded calls between Long Leaf APs and customers monthly. R. 96-1 ¶¶ 41-42. Donelson was aware that Long Leaf's APs told prospective customers that "76.5 percent of options expired worthless," which "increased the customer's statistical likelihood of success," and that "one of Long Leaf's values was to create a strong return for customers." R. 96-1 ¶¶ 43-44. At Donelson's direction, Long Leaf APs told customers that their "strategies" targeted a 6 to 12 percent annual return. R. 96-1 ¶¶ 45-46.

While Donelson was CEO, Long Leaf customers, including prospective customers, were not told that substantially all TMM customers lost money in the program. R. 96-1 ¶ 47. By the time of a sales meeting in February 2018, the results from TMM were "very bad." R. 79-1 ¶ 45. Nonetheless, at the meeting, Donelson

instructed APs not to provide customers with any information in response to questions about past performance, consistent with the policy that had existed under prior management. R. 96-1 ¶¶ 48-50. Donelson testified he was adopting a new trading model at this time. R. 96-1 ¶ 48. Long Leaf APs were provided with "rebuttal" scripts instructing them to respond to requests for past performance information with claims the "structure of the program" was "unmatched" and the reason it had been so successful. R. 79-1 ¶ 43. The policy against providing customers and prospective customers with information on past performance remained in place until June 2019. R. 96-1 ¶ 51.

On February 22, 2018, Donelson sent a letter to Long Leaf customers (through its APs) that stated he had "10 years of financial and business development experience at two of the largest proprietary trading companies." R. 96-1 ¶ 53. However, Donelson in fact had never worked as a trader for any company, and his only prior experience in options trading was a single trade in 2016 in which he lost $30,000. R. 96-1 ¶¶ 55-56. Donelson never shared this information with Long Leaf customers or prospective customers. R. 96-1 ¶ 57. The customer letter also said Donelson was working with Scott Gecas (then a Long Leaf AP) on "redesigning the trading processes to provide improved returns." R. 96-1 ¶ 53. Donelson and Gecas developed trading recommendations together until December 2018, when Gecas left Long Leaf. After that, Donelson generated the recommendations alone. R. 96-1 ¶ 54.

On February 18, 2019, Donelson sent a prospective customer an email attaching a description of a "bond replacement strategy" used by Long Leaf, which

claimed that "the targeted return for this type of trade is 6-10% per year after fees and commissions." Donelson told the customer, "the profitability is primarily driven by the time decay variable and therefore creates a higher probability of success." The email includes a "trade history" reflecting seven trades from August 2018 to January 2019 with an average return of 1.68% over a seven-month period. R. 96-1 ¶ 58. These seven trades represent a portion of the total trades made by Long Leaf on customers' behalf during that period, during which customers lost $323,932 overall. R. 96-1 ¶ 59.

On May 20, 2019, Donelson sent an email to Long Leaf APs titled "new track record." The email included a "track record" file that reflected a series of trades from July 2018 to May 2019 with a total return of $460.23. Donelson sent the email to the APs so they could distribute the "track record" file to prospective and existing customers. R. 96-1 ¶ 60. The track record file reflects a subset of trades that Long Leaf recommended and executed during the relevant period. However, the email did not disclose that Long Leaf customers in total lost $538,618 during that period. R. 96-1 ¶ 61. On other occasions, Long Leaf APs sent emails to prospective customers including "track record" files that showed positive returns on a series of trades, even though Long Leaf customers overall had lost money (sometimes hundreds of thousands of dollars) during those respective periods. R. 96-1 ¶¶ 62-66.

## III.  Jeremy Ruth's Activities

Ruth was an employee of Long Leaf from April 29, 2015 through August 28, 2017. R. 97 ¶ 3. Most of Ruth's customers during his tenure at Long Leaf participated in TMM. R 97 ¶ 14. Ruth's primary responsibility with Long Leaf was to solicit

customers—as he testified, to "open up accounts specifically for the Time Means Money program." R. 97 ¶ 15. In doing so, Ruth used a script provided to him by then-CEO Evans. R. 97 ¶ 16. The script included statements about the TMM program's strategies to "drive results;" explaining to customers that by selling four options, "there is a strong statistical likelihood you are going to win 3 of those … giving you a much more predictable path to success." R. 97 ¶ 17. The script continued, "At Long Leaf, we measure our success by our client's [sic] success. As a company, we wouldn't have the ability to work with hundreds of client's [sic] month-after-month for 6 years and oversee millions of dollars if we weren't being profitable for them." R. 96-1 ¶ 18. Ruth also used a PowerPoint presentation that contained slides illustrating the TMM program and depicting an "annual return" of 12%. R. 97 ¶ 19.

Ruth made statements consistent with this script in various calls with prospective customers. For example, in a January 12, 2016 call with a prospective customer, Ruth explained that, using the TMM program, "following that math over those four assets, on the three, you can expect it to be right; in the long run it would generate 1500; and the one you're wrong losing 1,000; and that would leave you with a net of 500 bucks." Ruth continued, "Now we want to continue that process month after month … continue that income-generating process, you know you carry that out for a year, you're looking at 6,000 dollars, which is a 6% return…. Obviously these positions are scalable so it's very easy to duplicate that to accomplish 12% on an annual basis." R. 97 ¶ 21. In another call with a prospective customer, Ruth said the TMM program was based on the idea that "if you sell four options, there is a strong

statistical likelihood you will win three of them, giving you a much more predictable path to success." R. 97 ¶ 22. He told another prospective customer Long Leaf was able to create "a predictable path to arrive a specially targeted return." When the customer said, "you got to be good to achieve that," Ruth replied, "we are." R. 97 ¶ 23. Ruth went on to tell the prospective customer that most of his clients made money, and that he could verify that fact by reviewing his clients' results on his computer screen. R. 97 ¶¶ 24-25.

Ruth received account statements for his customers every day the markets were open. R. 97 ¶ 29. The CFTC contends that these statements revealed that substantially all Ruth's customers participating in the TMM program lost money. Ruth says that he did not know the outcome of his customers' trades for most of his tenure with Long Leaf, that he did not know how to interpret the statements, and that they were inaccurate because an option's performance is not determined until the day it is closed. R. 97 ¶¶ 27-29. He tracked the results of Long Leaf's trading recommendations for a period of months in 2017, showing net losses on the trades. R. 97 ¶¶ 37-40. Ruth also "frequently" received calls and emails from customers complaining about their account performance. R. 97 ¶ 32; R. 76-21, at 155:18-24. Nonetheless, Ruth did not disclose information on past performance of the TMM program to customers or prospective customers, nor did he tell them that substantially all customers in the program lost money. R. 97 ¶ 43.

Ruth was paid a total of $301,541.39 for his work at Long Leaf. R. 97 ¶ 46. This compensation was primarily based on commissions charged to customers. *Id*. After

the first few months of work, Ruth's compensation consisted entirely of a percentage of the commissions he helped to generate. R. 97 ¶ 47.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

### I.    Claims against Donelson

The CFTC seeks summary judgment on six claims against Donelson. The first three are fraud claims: (1) options fraud; (2) commodity trading advisor fraud; and

(3) fraudulent advertising by a CTA or principal thereof. Counts 4 through 6 seek to hold Donelson liable for various non-scienter regulatory violations.

### a. Options Fraud

The options fraud claim arises under 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10. In simple terms, these provisions make it unlawful to defraud or make a false statement to another person in connection with an offer to enter into or the execution of a commodity option transaction. To prove its claim for options fraud, the CFTC must establish that "(a) [Donelson] made a misrepresentation, misleading statement, or a deceptive omission; (b) acted with scienter; and (c) the misrepresentation or omission is material." *CFTC v. Caniff*, 2020 WL 956302, at *7 (N.D. Ill. Feb. 27, 2020). Proof of customer reliance is not required. *See Slusser v. CFTC*, 210 F.3d 783, 785-86 (7th Cir. 2000).

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *CFTC v. Kratville*, 796 F.3d 873, 892 (8th Cir. 2015) (quoting *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). Thus, the Court considers how the message would be interpreted by an objectively reasonable person. *Id.* The CFTC may establish scienter by showing the defendant intended to defraud, manipulate, or deceive, or if the defendant's conduct constituted an extreme departure from the ordinary standard of care." *Id.* at 893; *see also R.J. Fitzgerald*, 310 F.3d at 1328 ("[S]cienter is met when Defendant's conduct involves 'highly unreasonable omissions or representations … that present a danger of misleading [customers] which is either known to the

Defendant or so obvious that Defendant must have been aware of it.'"). "A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald*, 310 F.3d at 1328-29.

According to the CFTC, Donelson committed options fraud in at least three different ways. First, Donelson fraudulently omitted the fact that almost all Long Leaf customers who participated in TMM lost money on their investments. Second, the "track record" information Donelson provided to various customers and prospective customers was false or misleading. Third, Donelson's statements touting his trading experience were misleading to customers. The CFTC also contends that Donelson directed Long Leaf APs to solicit customers by similar fraudulent means.

This Court agrees that failing to disclose information regarding Long Leaf customers' losses was a material omission. A reasonable investor would want to know that the person or firm to whom she is entrusting her money has a history of losing customers' investments. *See id.* at 1332-33 ("Given the extremely rosy picture for profit potential painted in the Seminar and in the Commercial, a reasonable investor *surely* would want to know—before committing money to a broker—that 95% or more of RJFCO investors lost money."); *CFTC v. Risk Capital Trading Grp., Inc.*, 452 F. Supp. 2d 1229, 1246-47 (N.D. Ga. 2006) ("It therefore was a material omission on Siegel's part not to disclose Risk Capital's general track record when he knew that the trading advisors to whom customers would be transferred lost money the vast majority of the time.); *see also CFTC v. Commonwealth Fin. Grp., Inc.*, 874 F. Supp.

1345, 1353-54 (S.D. Fla. 1994) (citing same principle and collecting related CFTC administrative guidance). Here, the undisputed facts establish that Long Leaf's trading program was a consistent loser for customers both before and after Donelson took over as CEO. Donelson was aware of this fact, but Long Leaf's customers were kept in the dark.

Donelson's position that failing to disclose customer losses under his predecessor or a prior trading model was reasonable is unavailing for two reasons. First, it approaches the materiality question from the wrong perspective—what matters is not whether Donelson believed he was justified in withholding that information, but whether a reasonable investor would consider it important. *See R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000). Second, it wrongly assumes that new leadership or an apparent change in trading strategy would render information about a firm's prior performance irrelevant. But a reasonable investor would be rightfully skeptical about jumping on board with an investment firm that consistently squandered its clients' money in the past, simply because new management had stepped in or a new strategy had been adopted. And in any event, Donelson also failed to tell customers about losses under his leadership and the revamped training model. This information is undoubtedly material.

The scienter element is also satisfied here. As Long Leaf's CEO, Donelson was intimately familiar with the firm's poor trading performance using TMM but did not pass that information on to customers. *Cf. Commonwealth Fin. Grp.*, 874 F. Supp. at 1354-55 (finding scienter element satisfied where firm directors and salespeople were

14

aware of customer losses but did not disclose this information). He directed Long Leaf APs to withhold this information even when customers explicitly requested it, apparently in reliance on a policy that he was fully capable of changing or disregarding (as eventually occurred in 2019). And when Donelson *did* send "track record" information to customers, it consisted of a subset of trades selected retrospectively for profitability, with no mention of the overall losses most customers were seeing at the same time. This supports the conclusion that Donelson knowingly withheld information about Long Leaf's poor performance, or at least acted with reckless disregard for the truth. *See CFTC v. Matrix Trading Grp., Inc.*, 2002 WL 31936799, at *8 (S.D. Fla. Oct. 3, 2002) (finding scienter element satisfied where firm's principals made profitability claims despite knowing 92% of firm's customers lost money).

Donelson's response cites to an affidavit from John Burnside, a purported expert in option trading and strategy. *See* R. 96-3. Burnside opines, in summary, that the trading strategy practiced under Donelson's leadership could viably turn a profit and was reasonable given the trading environment. Setting aside whether Burnside's opinion has merit, it is irrelevant. Even if the TMM program *could* have made money, and even if Donelson believed in good faith that it *should* have been making money, it was not. Donelson's supposed confidence in Long Leaf's trading model does not change the fact that it had a consistently poor track record that he knowingly withheld from customers. Optimism about the future does not excuse making false statements about the present or past.

The Court likewise finds that the "track record" documents Donelson created and distributed to customers, either himself or through Long Leaf APs, were material misrepresentations. The parties quibble over whether the trades reflected in these documents were "hypothetical" or "cherry-picked" or simply selected to demonstrate the viability of the model. But even if the Court credits Donelson's position that the trades shown in these documents actually occurred and collectively turned a profit, they nonetheless amount to a woefully incomplete picture of Long Leaf's performance, given that the firm's TMM customers collectively lost hundreds of thousands of dollars over the same time frame. Even accurate statements can be misleading if presenting them without context paints an incomplete and inaccurate picture. *See Kratville*, 796 F.3d at 892. Here, it was patently misleading to present customers with a profitable subset of trades while omitting the much larger universe of Long Leaf's losing trades.

The same logic applies to Donelson's statements about his trading experience. What Donelson told customers about his experience—that he had 10 years of financial industry experience with large proprietary traders—may have been accurate on its face, but it was nonetheless deceptive because he was not in a trading position with those companies, and his only actual option trading experience was a substantial loss on a single trade. Donelson never told customers these facts, and tellingly, he testified that he didn't think customers would have wanted to take his trading recommendations if they knew he had no profitable trading experience. R. 82-5, at 81:19-23. Any reasonable jury would be compelled to find a fraudulent

misrepresentation based on this evidence. *See CFTC v. McLaurin*, 1996 WL 385334, at \*3 (N.D. Ill. July 3, 1996) (granting summary judgment for CFTC on fraud claim where defendant misrepresented his qualifications and trading experience).

The CFTC also seeks to hold Donelson liable for statements made by Long Leaf APs telling customers about "target" return rates of 6 to 12 percent and touting a "statistical likelihood of success." Donelson says these statements could not have been misleading because they were obviously hypothetical, not outright promises. But Courts have scrutinized similar statements about profit potential or the likelihood of positive returns, notwithstanding their "hypothetical" character. *See Kratville*, 796 F.3d at 895 (noting that statements obscuring the distinction between the possibility and probability of profit may be misleading); *SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1298 (M.D. Fla. 2007) ("Even though the cash flow sheet and the ads often utilized the single words "projected" or "estimated," projections are nonetheless actionable as misrepresentations if there is no reasonable basis to support them."). Even if Donelson and the Long Leaf APs did not explicitly promise returns of 6-12 percent, it was misleading to imply that such returns were likely while knowing the firm in fact consistently lost money for its customers. There is no evidence in the record to suggest customers frequently, if ever, achieved those types of returns.

For these reasons, the Court finds that Donelson has not shown that a genuine issue of material fact exists as to the options fraud claim against him in Count I. The CFTC is entitled to summary judgment on that claim.

### b. CTA Fraud

The CTA fraud claim in Count II arises under 7 U.S.C. § 6*o*(1). Section 6*o* prohibits fraud by a CTA, which the Commodity Exchange Act defines as a person (or entity) who, "for compensation or profit, engages in the business of advising others … as to the value of or advisability of trading in" commodity options, including futures contracts. 7 U.S.C. § 1a(12)(A)(i). "Courts interpret the definition of a CTA liberally." *CFTC v. Equity Fin. Grp., LLC*, 2007 WL 1098754, at *3 (D.N.J. Mar. 30, 2007). Section 6*o*(1)(A) requires proof of a false or misleading statement or omission of material fact, made with scienter. *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000). Section 6*o*(1)(B) does not require proof of scienter, but prohibits any course of conduct by a CTA that "operates as a fraud or deceit" on a customer or prospective customer. *Id.* at 993-94.

There is no question that Long Leaf engaged in the business of advising clients on options trading for compensation. Donelson nonetheless disputes that Long Leaf qualified as a CTA. According to Donelson, the CEA and National Futures Association (a self-regulatory organization of the derivatives industry) require that an entity must have discretion over a customer's account (such as the ability to make trades on a customer's account without first contacting the customer) to be considered a CTA. Donelson cites no law or other authority for this proposition,[5] and the Court finds no predicate for this requirement in the CEA language defining a CTA. Courts

---

[5] Donelson references an NFA publication concerning "Registration as a CTA," which is a separate issue.

appear to routinely apply the CTA definition to entities that only provide recommendations to clients (as Donelson and Long Leaf did here). *See, e.g., Gunderson v. ADM Inv'r Servs., Inc.*, 85 F. Supp. 2d 892, 910-11 (N.D. Iowa 2000); *CFTC v. AVCO Fin. Corp.*, 979 F. Supp. 232, 236-37 (S.D.N.Y. 1997). Long Leaf plainly meets the statutory definition of a CTA.

Donelson is liable for CTA fraud perpetrated by Long Leaf because, as CEO, he was a controlling person. 7 U.S.C. § 13c(b). Donelson claims to have acted in good faith with regard to the trading strategies employed by Long Leaf, again citing to the Burnside affidavit. But as explained above, the Burnside affidavit is irrelevant to the fraud claims leveled against Donelson and Long Leaf. The CFTC is therefore entitled to summary judgment on Count II against Donelson.

### c. Fraudulent Advertising by a CTA

Count III arises under 17 C.F.R. § 4.41, which makes it unlawful for a CTA or principal thereof to advertise in a manner that "employs any device, scheme or artifice to defraud any participant or client or prospective participant or client," or "involves any transaction, practice or course of business which operates as a fraud or deceit upon any participant or client or any prospective participant or client." Courts have observed that the language in Rule 4.41(a) is substantially the same as the language in section 6$o$(1), construing advertising conduct that violates the latter to also violate the former. *See, e.g., CFTC v. Arrington*, 998 F. Supp. 2d 847, 871 (D. Neb. 2014), *aff'd sub nom. Kratville*, 796 F.3d 873; *CFTC v. Heffernan*, 2006 WL 2434015, at *6-7 (D.S.C. Aug. 21, 2006).

Donelson does not meaningfully respond to this count beyond reiterating his other arguments, claiming this portion of the CFTC's motion is "so unclear that it is near impossible to respond." The Court finds no such difficulty. Long Leaf, through its principal and APs, advertised its services via fraudulent means as described above. Donelson is liable as Long Leaf's controlling person. The CFTC is therefore entitled to summary judgment as to Count III against Donelson.

### d. Failure to Register as a CTA

In Count IV, the CFTC seeks to hold Donelson liable as a controlling person for Long Leaf's failure to register as a CTA, in violation of 7 U.S.C. § 6m(1). That section requires any person or entity acting as a CTA to register as such if the person or entity makes use of a means or instrumentality of interstate commerce (such as the telephone or internet). Failure to register is a strict liability violation; there is no scienter requirement. *CFTC v. JBW Capital*, 812 F.3d 98, 106 (1st Cir. 2016).

It is beyond dispute that Long Leaf was acting as a CTA and was making use of various instrumentalities of interstate commerce. However, Donelson argues Long Leaf was exempt from the registration requirement under 17 C.F.R. § 4.14(a)(6). Rule 4.14(a)(6) exempts a person or entity from CTA registration requirements if "it is registered under the Act as an introducing broker and the person's trading advice is solely in connection with its business as an introducing broker."

The CFTC has issued guidance stating that, "absent special circumstances, the exemption from CTA registration [in Rule 4.14(a)(6)] should not be available to an IB that 'guides' trading in a majority of its customers' accounts." *Clarification of Issues*

20

*Concerning Guided Accounts of Introducing Brokers & Futures Commission Merchants*, CFTCLTR No. 95-82, 1995 WL 707862, at *2 (Sept. 19, 1995). "Guiding" an account in this context refers to an account "that is being informed by the FCM or IB of the particular commodity or futures contract to purchase or sell, the price at which the customer should make the purchase or sale and the number of contracts to buy or sell." *Id.* at *1. This is an apt description of Long Leaf's conduct. Long Leaf "guided" its TMM customers' accounts (which encompassed the majority of its customers) by recommending options trades, and in doing so was "acting primarily as a CTA." *Id.* at *2. Long Leaf did not render advisory services "solely in connection with its business as an IB," so the exemption in Rule 4.14(a)(6) does not apply.

Alternatively, Donelson raises an "advice of counsel" defense, stating that his attorney told him that neither he nor Long Leaf needed to register as a CTA. As the Seventh Circuit has recognized, "[t]here is no such thing as an 'advice of counsel' defense." *United States v. Urfer*, 287 F.3d 663, 665 (7th Cir. 2002). Counsel's advice may be relevant when a criminal statute requires proof the defendant knew he was violating the statute, *id.* at 666, but § 6m(1) has no such requirement. *See JBW Capital*, 812 F.3d at 106 (rejecting a "reliance on professionals defense" to a § 6m violation because it is a "strict liability offense"). As such, any uncertainty on Donelson's part as to whether Long Leaf had to register as a CTA, or qualified as a CTA at all, is irrelevant. The facts are unambiguous and compel a summary judgment ruling in favor of the CFTC on Count IV.

21

### e. Failure to Make Required CTA Disclosures

Count V asserts that Long Leaf failed to make certain disclosures as required by 17 C.F.R. §§ 4.31(a), (b), and 4.36(d)(1), and seeks to hold Donelson liable as the controlling person. Donelson disputes the factual premise underpinning this Count as "unintelligible"—it appears the CFTC's statement of fact was submitted in somewhat garbled form. *See* R. 77-1 ¶ 52 ("Long Leaf did not provide disclosures required by 17 C.F.R. § 4.31(a) to customers or prospective customers required by." [sic]). However, this statement cites to Donelson's Answer, in which he admits that Long Leaf did not provide the purportedly required CTA disclosures but denies that it was required to register as a CTA or provide said disclosures. R. 30 ¶ 34. Because the Court has already found that Long Leaf qualified as a CTA, it was required to provide all the attendant disclosures, and the undisputed facts show that it did not. Summary judgment is granted to the CFTC on Count V against Donelson.

### f. Failure to Register as an AP

Finally, Count VI asserts that Donelson failed to timely register as an AP, in violation of 7 U.S.C. § 6k(1). That provision requires registration for any person associated with an IB in a capacity that involves the solicitation or acceptance of customers' orders or the supervision of any person or persons so engaged. It is undisputed that Donelson, as CEO, occupied such a role, but was not registered for several months between December 2017 and May 2018. Donelson does not offer a discrete response to this Count in his opposition.

22

The CFTC also contends Donelson is liable for allowing another Long Leaf employee, Andrew Nelson, to act as a Long Leaf AP without proper registration. However, the Court finds the facts supporting this allegation unclear (they are premised solely on the CFTC's pleadings and Donelson's somewhat muddled admissions) and therefore declines to grant summary on this basis. Nonetheless, Donelson's own failure to register is sufficient to warrant summary judgment for the CFTC on Count VI.

### g. Restitution and Disgorgement

The CFTC in its motion also seeks equitable remedies against Donelson ordering restitution and disgorgement. 7 U.S.C. § 13a-1(d)(3) permits the Court to impose equitable remedies including "(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and (B) disgorgement of gains received in connection with such violation." Obtaining restitution relief ordinarily requires proof of investors' individual reliance. *CFTC v. Driver*, 877 F. Supp. 2d 968, 980 (C.D. Cal. 2012). However, the Court may presume reliance by customers if the violations involve "material omissions in the context of a fraudulent scheme," *CFTC v. Ross*, 2014 WL 6704572, at *2 (N.D. Ill. Nov. 26, 2014), or "pervasive or widespread misrepresentation," *Driver*, 877 F. Supp. 2d at 980. A controlling person who knowingly induces the acts constituting a violation may be held liable to the same extent as the violating entity. § 13c(b).

As discussed above, Donelson was a controlling person of Long Leaf and personally participated in or directed the acts that make up the violations. He is

therefore jointly and severally liable for Long Leaf's violations during his tenure as CEO. *See* § 13c(b). Donelson does not dispute the total amount of TMM participant losses during his tenure as CEO, nor does he raise any other argument in opposition to the CFTC's restitution claim in his brief. Because the undisputed evidence establishes that TMM customer losses were pervasive and resulted at least in part from fraudulent omissions, ordering restitution in the amount of customer losses during Donelson's tenure ($2,376,738, inclusive of paid commissions) is proper. *See Ross*, 2014 WL 6704572, at *2-3. Disgorgement of Long Leaf's collected commissions during the same period, totaling $1,235,413, is also appropriate. *See CFTC v. Escobio*, 833 F. App'x 768, 772 (11th Cir. 2020) (affirming order for disgorgement of the full value of commissions charged to customers). The amount owed in disgorgement shall be offset by any sums paid toward restitution.

## II. Claims against Ruth

The CFTC seeks summary judgment on two claims against Ruth. Count I asserts an options fraud claim akin to Count I against Donelson, described above. Count II alleges that Ruth is liable for aiding and abetting Long Leaf's CTA fraud.

### a. Options Fraud

The CFTC's options fraud claim against Ruth partly follows its claim against Donelson. The CFTC contends that Ruth's failure to tell his clients and prospective clients that substantially all TMM customers lost money was a material omission. It also argues Ruth's scripted statements suggesting returns of 6 to 12 percent were

"easy" to achieve with "strong statistical likelihood" were fraudulent given the program's dismal track record.

The Court finds Ruth's failure to inform customers about Long Leaf's history of investment losses was a fraudulent omission for the same reasons discussed above in connection with the claim against Donelson. Ruth raises the same argument that information about TMM's past performance was irrelevant, which the Court has already rejected. Ruth further suggests that providing information on historical results would have been a violation of NFA and CFTC regulations. This assertion is not only illogical, but is unsupported by any legal authority. The Court is highly skeptical of its accuracy given that CFTC regulations in fact *require* extensive disclosures about a trading program's past performance, not to mention the many cases cited in this opinion in which courts have condemned an advisor's failure to provide such information. *See, e.g.*, 17 C.F.R. § 4.35 (setting forth required performance disclosures); *Commonwealth Fin. Grp.*, 874 F. Supp. at 1353-54.

Ruth also disputes some of the factual support for the CFTC's motion, but the evidence—including his testimony—does not create a genuine issue of material fact that would preclude summary judgment. Ruth testified that all TMM customers got the same four trade recommendations each month, belying his argument that the CFTC has not shown across-the-board losses for TMM customers. R. 76-21, at 102:1-6. Ruth's arguments amount to a "small sample size" claim that the CFTC is wrongly extrapolating broad losses from a few customer accounts. But nowhere does Ruth identify any evidence in the record to dispute that most Long Leaf customers lost

money (as evidenced by his own trade monitoring and an analysis from the CFTC's investigator), making these examples representative of TMM's overall performance.

Ruth's statements about a targeted 6 to 12 percent return and the "strong statistical likelihood" of success are likewise misleading for the same reasons discussed above. It is of no moment that the statements were framed as "hypothetical" or may have only reflected a trading "philosophy." *See Kirkland*, 521 F. Supp. 2d at 1298. The evidence shows that if *any* TMM customer achieved returns on the level Ruth described, it was a statistical anomaly, not a reliable result of Long Leaf's recommendations. Telling customers otherwise created a false sense of confidence that had no reasonable basis in fact.

The evidence also establishes scienter. Ruth admitted that he "frequently" received customer complaints regarding poor account performance, and he tracked the performance of Long Leaf's trading recommendations for several months, consistently showing losses. Ruth's claim that he "was not aware of how to interpret" customer account statements is neither credible nor helpful. R 97 ¶ 29. Ruth had passed his Series 3 broker exam before starting at Long Leaf, R. 98 ¶ 1, and he told other customers that he could see all his clients' results, making it "very easy for me to be almost certain about our ability to get you to reach your financial goals." R. 97 ¶ 25. No reasonable jury could conclude that Ruth was unable to determine whether his clients had lost or gained money on their accounts. And if Ruth was truly incapable of understanding customer account statements, his sales pitches about customer returns were simply hot air. The evidence compels a finding that Ruth made

misleading statements and omissions about the performance of Long Leaf's trading program with full knowledge of its consistent history of losses.

Ruth's assertions about the relative experience of Long Leaf's customers and the various other disclosures they received are neither supported by evidence nor relevant. "The experience level of a customer does not vitiate the materiality of misrepresentations." *Matrix Trading Grp.*, 2002 WL 31936799, at *7. Furthermore, to the extent Ruth means to argue that Long Leaf's customers could not have reasonably relied on the misrepresentations, reliance is not an element of the CFTC's claims. *Slusser*, 210 F.3d at 786.

Because no genuine issue of material fact exists as to the CFTC's options fraud claim against Ruth, it is entitled to summary judgment on Count I.

### b. Aiding and Abetting Long Leaf's CTA Fraud

Count II against Ruth alleges he aided and abetted Long Leaf's violation of the CEA under § 13c(a). To be liable for aiding and abetting, a defendant must knowingly associate himself with an unlawful venture, participate in it, and seek by his actions to make it succeed. *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1348 (S.D. Fla. 2014).

In opposition to Count II, Ruth incorporates Donelson and Long Leaf's arguments that Long Leaf was not a CTA. Technically, there is nothing to incorporate, as Donelson disclaimed any position on whether Long Leaf was a CTA during the time Ruth was employed there, R. 96, at 7 n.4, and Long Leaf submitted no opposition to the CFTC's motion. But in any event, the Court has already

concluded that Long Leaf was operating as a CTA based on the undisputed facts encompassing the time Ruth worked there.

Alternatively, Ruth says he is not liable for aiding and abetting CTA fraud because Ruth did not know Long Leaf was committing or intended to commit fraud. He merely made statements according to a provided script, which he apparently knew were approved by Long Leaf's compliance officer and believed had been approved by the NFA. The Seventh Circuit has rejected this type of "I am just a copying machine" defense. *See SEC v. Lyttle*, 538 F.3d 601, 604 (7th Cir. 2008) ("One doesn't have to be the inventor of a lie to be responsible for knowingly repeating it to a dupe."). The Court has already concluded that Ruth knowingly made misleading statements to customers and fraudulently omitted material information. The fact that the precise words he used may have been written or blessed by someone else is insufficient to avoid liability. Summary judgment in favor of the CFTC on Count II is proper.

### c. Restitution and Disgorgement

As with Donelson, the CFTC seeks equitable remedies in the form of an order for restitution and disgorgement against Ruth. And as with Donelson, Ruth has offered no arguments in opposition to this request beyond contesting the underlying violations themselves. Therefore, for the same reasons discussed above, the Court finds that an order of restitution and disgorgement is appropriate as to Ruth, in the amount of $301,541,39. This reflects his compensation for work at Long Leaf, comprised primarily of ill-gotten commissions from customers, and should be repaid to customers as such.

### III.    Claims against Long Leaf

The CFTC's motion as to Long Leaf seeks summary judgment on six Counts, largely tracking it claims against Donelson and premised on essentially the same facts. Long Leaf itself filed no opposition to the CFTC's motion.[6] Regardless, the analysis of the claims against Donelson and Ruth applies with equal force to Long Leaf, which acts through its principals and APs. Long Leaf failed to inform its customers of the poor performance of TMM participants' investments and made misleading statements suggesting a likelihood of positive returns with no reasonable basis to do so.

The facts also clearly demonstrate that Long Leaf was acting as a CTA but unlawfully failed to register as such, and failed to make the required customer disclosures in connection with its offering of a trading program. Finally, having found that Donelson unlawfully failed to register as a Long Leaf AP, *see supra*, Long Leaf is liable for permitting him to become or remain associated while knowing (or in circumstances where it should have known) he was not so registered. 7 U.S.C. § 6k(1).

Given these findings, the Court also orders Long Leaf to pay $5,767,145 in restitution and $4,010,994 in disgorgement. The amount owed in disgorgement shall be offset by any sums paid toward restitution. Both totals shall also be offset by any

---

[6] Because the motions as to Donelson and Long Leaf are so similar, Donelson's response covers much of the same ground as Long Leaf's response likely would have covered, though Donelson explicitly disclaims any position on allegations outside the time he was Long Leaf's CEO.

sums paid toward the restitution and disgorgement amounts, respectively, imposed against Donelson jointly and severally with Long Leaf.

## Conclusion

For the foregoing reasons, the CFTC's motions for partial summary judgment against James Donelson [R. 77], Jeremy Ruth [R. 76], and Long Leaf Trading Group [R. 79] are granted. Long Leaf is ordered to pay $5,767.145 in restitution and $4,010,994 in disgorgement. Donelson shall be considered jointly and severally liable with Long Leaf for $2,376,738 in restitution and $1,235,413 in disgorgement. Any amount owed by a party in disgorgement shall be offset by all sums paid toward restitution. Ruth is ordered to pay $301,541.39, constituting both restitution and disgorgement.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: July 27, 2022