UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| Commodity Futures Trading Commission, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 20-3758 |
| Long Leaf Trading Group, Inc., James A. Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) ) ) ) | Hon. Thomas A. Durkin |
| Defendants. | ) ) | |

**MOTION FOR ENTRY OF SUPPLEMENTAL RELIEF AGAINST DEFENDANTS
DONELSON, LONG LEAF TRADING, AND RUTH[1]**

Having prevailed on its motion for summary judgment against Defendants Donelson, Long Leaf Trading Group, Inc. ("Long Leaf Trading"), and Ruth (together, "Defendants"), Plaintiff Commodity Future Trading Commission ("CFTC") now seeks entry of injunctive relief and a civil monetary penalty ("CMP") against those defendants, as authorized by 7 U.S.C.§ 13a-1. Defendants' participation in a years-long, multimillion-dollar options fraud scheme justifies an injunction against the trading or ownership of commodity interests, i.e., commodity futures, options, or swaps, as well as an injunction against applying for or acting in the capacity of a CFTC registrant. It also justifies imposition of the maximum civil monetary penalty allowable under 7 U.S.C. § 13a-1, which here is triple Defendants' ill-gotten gains. The foregoing relief is necessary to protect the public and the commodity markets from Defendants,

---

[1] Defendant Ruth and counsel for Defendant Donelson have advised the CFTC that they plan to oppose this motion. Counsel for Defendant Long Leaf Trading did not respond to the CFTC's email.

as well as to punish Defendants and deter them (and other would-be fraudsters) from future violations of the Commodity Exchange Act ("Act") and CFTC Regulations.

A.      **The Court Should Enter a Permanent Injunction Against Defendants.**

The CFTC seeks an order permanently enjoining Defendants from engaging in: (a) substantially any activity relating to commodity interests[2], i.e., a "trading ban;" (b) applying for registration or acting in a capacity that requires registration by Defendants, i.e., a "registration ban;" and (c) further violative conduct of the kind described in the Complaint. (Doc. 1., Compl. at 30-31.) 7 U.S.C. § 13a-1(b) provides that a permanent injunction may be entered against a defendant found to have committed a violation of the Act or Regulations upon a showing that there is "some reasonable likelihood of future violations" by the defendant. *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (holding that district court erred in failing to enter injunction against defendants). In assessing the likelihood of future violations, courts consider:

- the "egregiousness" of a defendant's actions;

- whether the past misconduct was "founded on systematic wrongdoing, rather than an isolated occurrence;"

- the "degree of scienter" involved;

- whether a defendant has continued to maintain that his or her conduct was "blameless," or otherwise failed to recognize "the wrongful nature of [the defendant's] conduct;" and

- whether a defendant, because of his or her "professional occupation or career interest," may once again be in a position to commit violations.

*See, e.g.*, *id.*; *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008) (affirming trading ban). These factors are present for Defendants, and militate strongly in favor of permanent injunctive relief.

---

[2] "Commodity interests" is defined to mean any commodity future, option, or swap transaction. 17 C.F.R. § 1.3.

1. **The Court Should Enter a Permanent Injunction, Including a Trading and Registration Ban, Against Defendant Donelson.**

    a. **Donelson willfully defrauded customers.**

Defendant Donelson was the principal of Long Leaf Trading from December 2017 through December 2019. (Doc. 106, Order on CFTC's Mot. for Summ. J. (hereinafter, "S.J. Order") at 5.) During that time, Donelson willfully misled customers as to past results and potential profits from Long Leaf Trading's options trading program. (*See id*. at 12-17.)

Donelson knew that substantially all customers lost money participating in the program. (*Id*. at 5-6.) Donelson nonetheless failed to provide this information to customers, and expressly instructed his sales staff to withhold it from customers who asked. (*Id*. at 14-15.) Instead of telling customers the truth, Donelson provided customers with "track records" reflecting a subset of profitable trades while omitting the much larger universe of Long Leaf's losing trades. (*Id*. at 16.) Donelson knew that his sales staff were telling customers and prospective customers that Long Leaf "targets" returns of six to twelve percent, and enjoys a "statistical advantage," and that those statements were highly misleading. (*Id*. at 17.) Donelson did nothing to prevent this. (*See id*.) Donelson also misled customers about his trading experience, intimating that he had a decade of experience with large trading firms when in fact he had substantially no personal trading experience. (*Id*. at 16.)

    b. **There is a reasonable likelihood of future violations by Donelson.**

The facts of the case suggest a reasonable likelihood of future violations by Donelson. Donelson's conduct is egregious by any standard. Donelson's violations are not isolated, and took place in the over the course of two years' worth of systematic wrongdoing. Donelson's conduct evidences a high level of scienter, which the Court expressly found. (*See id*. at 14-17 (finding scienter).)

Donelson appears to believe that his conduct is blameless. Rather than admit wrongdoing, Donelson has continued to litigate the case through summary judgment. Moreover, Donelson's positions on summary judgment—e.g., that Long Leaf's false and misleading statements to customers were merely "hypothetical"—may reflect an earnest belief that his conduct is permissible.

Nothing in the record suggests that Donelson has attempted, or even expressed a desire, to repay Long Leaf's customers. Donelson has, however, paid a series of lawyers to press his meritless defenses in this case, as well as an expert witness whose opinion the Court appropriately disregarded. (Docs. 14, 16, 40, 93, Appearances for Attorneys Landsman, Iavarone, Falvey, and McElvenny; Doc. 96.3, Burnside Decl.)

Donelson's professional occupation and career interests have the potential to place him in a position where he may once again violate the Act or Regulations. Donelson previously worked for large proprietary trading firms. (Doc. 106, S.J. Order at 16.) The fact that he did so as an accountant is of no moment—Donelson's career has, for more than a decade, been in the financial industry, and in particular, with trading firms.

Donelson continues to work in the financial industry through the present day. Since Long Leaf Trading ceased operations, Donelson has started a new business venture relating to "middle office software for trading." (Doc. 82.4, Donelson Test. 9:20–10:7; *see also* Doc. 82.5, Donelson Dep. 217:24–218:9.) Donelson's post-Long Leaf work has also included consulting engagements with at least three trading firms, including a cryptocurrency trading firm. (Doc 82.5, Donelson Dep. 217:5–219:10.) Donelson's current LinkedIn profile extols his trading-firm *bona fides*, with the notable omission of his tenure at Long Leaf. (Ex. A, "Jim D." Linkedin Profile, *available at* https://www.linkedin.com/in/jim-donelson/ (last visited Aug. 12, 2022).)

The profile touts Donelson's acumen in the areas of "innovative performance management and financial solutions." (*Id*.) Given Donelson's conduct at Long Leaf, it seems unlikely that his innovative performance management or financial solutions will inhere to the benefit of future customers or markets regulated by the CFTC.

        **c.    A trading and registration ban, as well as an injunction against further misconduct, is appropriate to prevent future violations by Donelson.**

On the basis of the foregoing, the CFTC respectfully requests that the Court impose the injunctive relief sought in the Complaint. (Doc. 1 at 29–33 (itemizing requests in prayer for relief).) This relief includes a "trading ban," i.e., an injunction banning Donelson from trading commodity interests, for his own account, directly or indirectly, or on behalf of others, or on or subject to the rules of any entity registered with the CFTC, e.g., a registered futures or options exchange, or from soliciting or accepting any funds for the purpose of trading commodity interests. The requested relief also includes a "registration ban," to wit, an injunction against applying for, engaging in engaging in conduct that would require, or claiming an exemption from registration with the CFTC in any capacity, or acting as principal, agent, or other employee of a registered entity, or entity required to be registered. Finally, the requested relief includes an injunction against further conduct of the sort described in the Complaint.

Because the Court has found Donelson's conduct to be in violation of the Act and Regulations, it is appropriate that an injunction should issue to prevent further violations of the same sort. It is also appropriate for the Court to issue a trading and registration ban against Donelson. This is what courts typically impose in fraud cases, and it is what the Court should impose here. *See, e.g.*, *Wilshire*, 531 F.3d at 1343, 1346-47 (affirming injunction against engaging in any commodity-related activity, including soliciting new customers ); *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 726 (E.D.N.Y. 2018) (entering trading and registration bans

5

against defendant involved in fraudulent virtual currency scheme); *CFTC v. Harrison*, 255 F. Supp. 3d 645, 646 (D.S.C. 2015) ("Because fraud is one of the primary threats to market integrity, many district courts … have imposed permanent bans on market activity in response to the same types of fraudulent conduct engaged in by Defendant."); *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1352 (S.D. Fla. 2014) (entering trading and registration bans against defendants involved in off-exchange precious metals fraud scheme); *CFTC v. Driver*, 877 F. Supp. 2d 968, 982 (C.D. Cal. 2012) (entering trading and registration bans against defendants involved in commodity pool fraud scheme), *aff'd*, F. App'x 366 (9th Cir. 2014). Failing to impose trading and registration bans would make it possible for Donelson to commit further violations of the Act and Regulations.

Donelson's conduct at Long Leaf Trading evidences a high level of scienter. As such, Donelson "cannot be trusted to operate only on his own behalf in a lawful and honest way." *See McDonnell*, 332 F. Supp. 3d at 726. If Donelson is permitted to trade, even just for his own account, he may engage in disruptive or manipulative trading practices. He may also be tempted to engage in "pool fraud," a common scheme in which a fraudster solicits investments from others and trades (or misappropriates) those investments through the fraudster's own account. *See, e.g.*, *CFTC v. Kholamian*, No. 18-CV-0797, 2022 WL 1577229 (N.D. Ill. Mar. 21, 2022) (consent order in pool fraud case). Donelson should be precluded from participation in all markets regulated by the CFTC.

### 2. The Court Should Enter a Permanent Injunction Against Long Leaf Trading.

This Court found that Long Leaf Trading, acting through its agents, employees, and principals, engaged in a wide-ranging scheme to defraud customers out of millions of dollars. (Doc. 106, S.J. Order at 29.) The factors which mitigate in favor of a permanent injunction

against Donelson apply with equal force to Long Leaf Trading. Donelson has nowhere suggested that he plans to abandon Long Leaf as a vehicle for further schemes.[3] Indeed, he may attempt to resurrect this entity. Donelson testified that he was planning in June 2019 to change the name of Long Leaf to "Forefront Options" to continue soliciting customers for his trading program. (Doc. 82.5, Donelson Dep. 211:11–212:15; *see also* Ex. B, Ill. Sec. of State Corp./ LLC search results for Long Leaf Trading, *available at* https://apps.ilsos.gov/corporatellc/CorporateLlcController (last accessed Aug. 17, 2022) (listing "assumed named" for Long Leaf as "4Front Options, Inc.").) The CFTC respectfully submits,

---

[3] Long Leaf Trading is listed on the Illinois Secretary of State's website as "dissolved." (Ex. B, Ill. Sec. of State Corp./ LLC search results for Long Leaf Trading.) However, that dissolution is involuntary, meaning that it was dissolved by the Secretary of State for failure to pay fees. (*Id.*) Long Leaf Trading can be un-dissolved by Donelson at his pleasure. (*See id.*) Long Leaf Trading should therefore still be enjoined from further violations, and from trading commodity interests. *See, e.g.*, *SEC v. Diversified Corp. Consulting Grp.*, 378 F.3d 1219, 1228 (11th Cir. 2004) (affirming entry of injunction again purportedly dissolved corporation; rejecting argument there is "nothing to enjoin"); *SEC v. Mahabub*, 411 F. Supp. 3d 1163, 1169 (D. Colo. 2019) (entering injunction against purportedly "defunct" corporation), *aff'd sub nom. SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022); *SEC v. Amerindo Inv. Advisors Inc.*, No. 05 CIV. 5231 RJS, 2014 WL 2112032, at *13 (S.D.N.Y. May 6, 2014) (entering injunction against "inactive" corporation), *aff'd*, 639 F. App'x 752 (2d Cir. 2016).

therefore, that a trading and registration ban, as well as an injunction against further violations, be entered against Long Leaf Trading.

### 3. The Court Should Enter a Permanent Injunction Against Defendant Ruth.

#### a. Ruth willfully defrauded customers.

Ruth worked for Long Leaf Trading as a salesperson, known as an associated person, or "AP," from late April 2015 through late August 2017. (Doc. 106, S.J. Order at 8-9.) In his capacity as an AP, Ruth solicited customers and prospective customers to participate in Long Leaf's trading program. (*Id*.) Ruth failed to advise those customers or prospective customers that substantially all program participants lost money. (*Id*. at 25.) Ruth knew about the losses from customer account statements, customer complaints he received, and his own monitoring of Long Leaf's recommended trades. (*Id*. at 26.)

Notwithstanding this knowledge, Ruth made false and misleading statements to customers and prospective customers to the effect that, e.g., 6 to 12% returns would be "easy" to achieve, and that Long Leaf's trades had a "strong statistical likelihood" of success. (*Id*. at 25-26.) Ruth also told customers that he was "almost certain about our ability to get you to reach your financial goals." (*Id*. at 26.)

#### b. There is a reasonable likelihood of future violations by Ruth.

There is a reasonable likelihood that Ruth will engage in future violations of the Act and Regulations. Ruth's conduct in fraudulently soliciting customers and prospective customers was egregious, and evidenced a high degree of scienter. (*See id.* at 24-28.) Ruth knowingly misled customers and prospective customers, and did so with gleeful rapacity. (*See* Doc. 76.8, Email from J. Ruth to T. Evans, Jan. 26, 2017 ("I just got a good laugh reading this [customer complaint] again."); Doc. 76.4, Email from J. Ruth to J. Leeney, Long Leaf AP, Apr. 27, 2017 ("the value in this call is how to get around a request for a track record and how to show empathy

so he feels you understand him").) Ruth's misconduct was not fleeting or isolated, but systematic and ongoing over the two-year period he worked for Long Leaf Trading.

Ruth has continued to maintain that his conduct was blameless, complaining that he was just following a script his bosses gave him. (Doc. 106, S.J. Order at 28.) As the Court points out, Ruth knew the script was false. (*See id*.) Rather than resigning his employment in what Ruth knew was a fraudulent scheme, Ruth continued to mislead customers at Long Leaf Trading for a two-year period.

Ruth's professional occupation or career interests may put him in a position to commit future violations. After leaving Long Leaf, Ruth implemented Long Leaf's "business model" at another introducing broker ("IB") called Postrock Brokerage LLC ("Postrock"). (*See* Doc. 76.21, Ruth Test. 23:1–24:5 (Ruth's customers at Postrock traded out-of-the-money options spreads in a "broker-assisted" program), 386:16–386:21 ("I did something similar to the Time Means Money Program.").) In March 2020, the National Futures Association ("NFA") brought a complaint against Ruth for a panoply of NFA rule violations during his time at Postrock arising out of Ruth's "Time of Our Lives" options trading program, including: making misleading statements to customers; failing to disclose that his other customers lost money; failing to disclose the impact of commissions on account performance; placing unauthorized trades on behalf of customers; and placing trades with no economic benefit to customers. (Ex. C, NFA Decision at 1–2.) Ruth settled the NFA's claims on a neither-admit-nor-deny basis. (*Id*. at 2.) After leaving Postrock, Ruth took steps to start his own IB firm, though his efforts to date have

9

not been successful. (Doc. 76.21, Ruth Test. 19:18–20:7 ("I've been trying to open up my own GIB[4].")

### c. A trading and registration ban, as well as an injunction against further misconduct, is appropriate to prevent future violations by Ruth.

A permanent injunction against further violations, as well as a trading and registration ban, is appropriate against Ruth for the same reasons it is appropriate against Donelson. Ruth's high level of scienter in the Long Leaf Trading scheme evidences a propensity for dishonesty that could manifest itself in manipulative or deceptive trading practices, or in some new fraud upon customers. Ruth should be permanently excluded from trading commodity interest on his own behalf, or on behalf of others. He should likewise be precluded from seeking to register or acting in the capacity of, or working for, a registrant. This is consistent with the results in other fraud cases, cited above. Ruth is at least as likely to violate the Act or Regulations as the defendants in those cases, as reflected in his post-Long Leaf conduct.

## B. The Court Should Enter a Civil Monetary Penalty Against Defendants.

In addition to permanent injunctions, the CFTC seeks a CMP against each Defendant in the amount of three times their ill-gotten gains. (Doc. 1, Compl. at 32–33.) 7 U.S.C. § 13a-1(d)(1)(A) provides for civil monetary penalties against a defendant found to have committed a violation of the Act or Regulations, in an amount of not more than $199,094[5] or triple the monetary gain to the defendant for each violation, whichever is greater. In determining the amount of a CMP, courts look to: (1) the nature of the violations, (2) the injury caused by the

---

[4] "GIB" refers to a guaranteed IB, i.e., an IB that operates with the benefit of a guarantee from a futures commission merchant or other CFTC registrant.

[5] Adjusted for inflation, per 17 C.F.R. § 143.8.

violations, and (3) penalties used in similar cases.[6] *See CFTC v. Li*, No. 15 C 5839, 2016 WL 8256392, at *8 (N.D. Ill. Dec. 9, 2016) (citing *Monieson v. CFTC*, 996 F.2d 852, 864 (7th Cir. 1993)). These factors weigh heavily in favor of imposing the maximum CMP on Defendants in this case.

The nature of Defendants' violations is serious; all three defendants were involved in a willful, systematic, multi-year fraud scheme aimed at retail investors. The injuries caused to those investors was substantial. Indeed, investors lost more than $5.7 million during the four-year course of Long Leaf's so-called trading program. (Doc. 106, S.J. Order at 29.) $2.3 million of that was during Donelson's tenure. (*Id*. at 24.) In many cases, Long Leaf solicited retirees to open and fund accounts using their retirement accounts. (*See* Doc. 82-4, Donelson Test. 99:17–102:22 (discussing profile of typical Long Leaf customer).)

The penalties in similar cases counsel in favor of the maximum penalty, which in this case is three times Defendants' ill-gotten gains. *See, e.g.*, *Li*, 2016 WL 8256392, at *8 (imposing CMP in the amount of 3x ill-gotten gains in trader's scheme to defraud employer through fictitious trading); *CFTC v. Sarvey*, No. 08 C 192, 2012 WL 426746, at *6 (N.D. Ill. Feb. 10, 2012) (imposing CMP in the amount of 3X ill-gotten gains in brokers' scheme to defraud clients through prearranged trading).[7] Defendants' ill-gotten gains are, respectively, $1,235,413 for

---

[6] The Court need not assess the collectability of a CMP against Defendants. *See Sarvey*, 2012 WL 426746, at *6 n.8 ("In determining the amount of the civil monetary penalty, 'the financial worth of the defendant or the collectability of any fine are no longer relevant considerations.'") (quoting *Brenner v. CFTC*, 338 F.3d 713, 723 (7th Cir. 2003)); *see also Li*, 2016 WL 8256392, at *8 n.7 (same). Imposing a lower CMP on the basis of a defendant's ability to pay creates a strong incentive for the defendant to dissipate assets in anticipation of a judgment. It also allows a defendant who comes into money after the judgment to retain the benefit of that windfall despite earlier misconduct. Moreover, consideration of a defendant's ability to pay would lead to potentially lengthy and burdensome asset discovery during the merits phase of the case. The CFTC respectfully submits that such discovery is better reserved for post-judgment collection proceedings.

[7] *See also McDonnell*, 332 F. Supp. 3d at 728 (imposing 3X CMP "[i]n light of the core relationship of the anti-fraud regulations to the purpose of the Act"); *Hunter Wise*, 21 F. Supp. 3d at 1353 (imposing 3X

---

Donelson, $4,010,994 for Long Leaf Trading, and $301,541 for Ruth. (Doc. 106, S.J. Order at 24, 28-29.) That means Donelson should be required to pay a CMP of $3,706,239; Long Leaf should be required to pay a CMP of $12,032,982; and Ruth should be required to pay a CMP of $904,624.17.

To impose a lesser penalty would fail to appropriately penalize Defendants for their protracted, willful misconduct. Imposing a lesser penalty would also encourage would-be fraudsters to try their luck; if the penalty for fraud is simply returning what a fraudster owes to customers plus ill-gotten gains, that simply restores the parties to the status quo.[8]

For the foregoing reasons, the CFTC respectfully requests that the Court enter permanent injunctive relief and CMPs against Defendants Donelson, Long Leaf Trading, and Ruth, with the specific terms of such relief consistent with the prayer for relief set forth in the CFTC's complaint.

---

CMP on defendants involved in "well thought-out scheme" to defraud retail customers); *Driver*, 877 F. Supp. 2d at 983 ("Courts and the CFTC have found that a high civil monetary penalty is warranted where customers have been defrauded of a substantial amount of money.").

[8] Another important reason to impose a CMP is that it cannot be discharged in bankruptcy. *See* 11 U.S.C. §§ 523(a)(7) (exception to discharge for a penalty "payable to … a governmental unit"); *see SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1193 (D. Nev. 2009) (holding that civil monetary penalty owed to SEC non-dischargeable in bankruptcy).

/s/ Ashley J. Burden
───────────────────────────
Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Blvd.
Suite 800
Chicago, IL 60604
(312) 596-0700

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2022, I provided service to the persons listed below, and by the following means:

| Via the Court's electronic CM/ECF system: | Via email, pursuant to agreement, to: |
|---|---|
| Jim Falvey<br>Falvey Law Office<br>200 S. Wacker Dr., Ste. 3100<br>Chicago, IL 60606-5877<br>jimfalvey@yahoo.com | Jeremey S. Ruth<br>11220 Brista Way<br>Austin, TX 78726<br>jeremysruth@hotmail.com |
| Charles E. McElvenny<br>Law Office of Charles E. McElvenny<br>33 N. Dearborn St., Ste. 1000<br>Chicago, IL 60602 | *Pro se* |
| Counsel to James A. Donelson and Long Leaf Trading Group, Inc.[9] | |

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Blvd.
Suite 800
Chicago, IL 60604
(312) 596-0700
aburden@cftc.gov

---

[9] Mr. McElvenny is counsel to Defendant Donelson only, and not to Long Leaf Trading.