UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 20-3758 |
| Long Leaf Trading Group, Inc., James A. Donelson, Timothy M. Evans, Jeremy S. Ruth, and Andrew D. Nelson, | ) Hon. Thomas A. Durkin ) ) ) |
| Defendants. | ) |

**CFTC'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST
DEFENDANT TIMOTHY M. EVANS**

**I.  SUMMARY**

Plaintiff Commodity Futures Trading Commission ("CFTC") hereby moves the Court for entry of a default judgment against Defendant Timothy M. Evans under Federal Rule of Civil Procedure 55(b).  The CFTC's complaint against Evans includes charges for fraud and various registration-related violations of the Commodity Exchange Act ("Act") and accompanying regulations ("Regulations").  Evans's violations arise from a so-called options trading program offered to retail customers by Defendant Long Leaf Trading Group, Inc. ("Long Leaf"), a firm that Evans owned and controlled from June 2015 until December 2017, when he sold it to Defendant James A. Donelson.  (Doc. 1, Compl.)  The CFTC's complaint seeks monetary relief in the form of restitution, disgorgement, and a civil monetary penalty ("CMP"), as well as injunctive relief including, e.g., a trading ban.  Evans was served but failed to respond or appear, and a clerk's default was entered against him.  (Doc. 115.)

The Court has now entered summary judgment on liability, as well as on restitution and disgorgement, against the defendants who did appear in this case: Long Leaf, Donelson, and Jeremy Ruth, a salesperson who worked at Long Leaf during Evans's tenure. (Doc. 106, Order on Mot. for S.J.) The Court also entered, upon motion by the CFTC, CMPs and injunctive relief against those defendants. (Doc. 118, Order on Mot. for Supp. Relief.) With the CFTC's claims against Long Leaf, Donelson, and Ruth having been resolved, the Court may now enter a default judgment against Evans without the potential for inconsistent judgments.

The facts in the CFTC's complaint, taken as true for purposes of the default judgment, establish liability against Evans for the same reasons they do for the other Defendants. Evans is liable as a "controlling person" for Long Leaf's violations of the Act and Regulations because he knowingly induced them as the mastermind of the scheme. The amounts the CFTC seeks from Evans in restitution and disgorgement are readily ascertainable, and supported here by a declaration. The CMP and injunctive relief sought by the CFTC are easily justified by Evans's misconduct. The CFTC respectfully requests, therefore, that the Court enter a default judgment against Evans.

## II.   LEGAL STANDARD

In order to obtain a default judgment, Federal Rule of Civil Procedure 55(a) requires the plaintiff to obtain an entry of default against the defendant. The defendant must also not be in active military service such that he or she may be entitled to certain protections under the Soldiers' and Sailors' Civil Relief Act. *See* 10A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2691 (4th ed. 2008). Once these prerequisites have been satisfied, a plaintiff may apply to the court under Rule 55(b) for a default judgment against the defendant.

A default judgment under Rule 55(b) has two components: liability and damages. With respect to liability, all well-pleaded factual allegations in the complaint are taken as true. *See,*

2

*e.g.*, *Coast to Coast Claim Servs., Inc. v. Yagelski*, No. 21 C 04641, 2022 WL 16573461, at *1 (N.D. Ill. Oct. 31, 2022) (entering default judgment) (Durkin, J.). Conclusions of law are not, and so the plaintiff must demonstrate that the facts in the complaint satisfy the elements of each cause of action. *See* 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2688.1.

With respect to damages, the plaintiff must support its prayer for relief with evidence, and the court may conduct a hearing to ascertain damages or "investigate any other matter." *See Yagelski*, 2022 WL 16573461, at *1. A default may be entered without a hearing on damages if "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *Id.* (quoting *Dundee Cement Co. v. Howard Pipe & Concrete Prods.*, 722 F.2d 1319, 1323 (7th Cir. 1983)).

### III.   ANALYSIS

**A.   Prerequisites**

The prerequisites for the CFTC to obtain a default judgment against Evans are satisfied. At the Court's direction, the Clerk entered a default against Evans on August 30, 2022[1]. (Doc. 115.) Evans is not in active military service and is therefore not entitled to the protections of the Soldiers' and Sailors' Civil Relief Act. (Burden Decl., Ex. A.)

---

[1] Because Evans has not appeared in this case, the CFTC need not serve him with a copy of the instant motion. *See* 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2687.

B.   Liability

   1.   Facts in the Complaint

The facts in the complaint supporting Evans's liability, which should be taken as true, are as follows.

   a.   **Evans and Long Leaf**

Defendant Long Leaf Trading is an Illinois corporation. (Doc. 1, Compl. ¶ 16.) During the period relevant to this motion, Long Leaf's principal place of business was Chicago, Illinois. (*Id.*) At all times relevant to this motion, Long Leaf was registered as an introducing broker ("IB"). (*Id.*) Long Leaf was not, however, registered as a commodity trading advisor ("CTA"). (*Id.* ¶ 33.)

Defendant Timothy M. Evans was the founder of Long Leaf, as well as its owner and CEO from at least 2009 through December 2017—the period of time relevant to this motion. (*Id.* ¶ 17.) During that period, Evans possessed and exercised, directly and indirectly, the power to direct or cause the direction of the management and policies of Long Leaf. (*Id.* ¶ 85.)

   b.   **The Time Means Money Program**

Starting in at least June 2015, Long Leaf began soliciting customers and prospective customers to participate in Long Leaf's so-called "Time Means Money" ("TMM") options trading program. (*Id.* ¶ 26.) Customers who agreed to participate in the TMM program received four trading recommendations from Long Leaf every month. (*Id.* ¶ 27.) Each recommendation was for a particular spread trade involving out-of-the-money options on futures contracts traded on an exchange, such as the Chicago Mercantile Exchange ("CME"). (*Id.*) Every customer got the same set of recommendations, except that a customer with more account equity or risk tolerance might receive a recommendation to trade a larger number of contracts. (*Id.* ¶ 29.)

4

Long Leaf's salespersons, referred to as "associated persons" or "APs," provided the recommendations to Long Leaf customers typically by email or over the phone. (*Id.* ¶ 30.) If the customer accepted the recommendation, Long Leaf would forward the customer orders to a futures commission merchant ("FCM"). (*Id.* ¶ 32.) The FCM would then place the orders on the exchange to be executed. (*Id.*) Long Leaf received a commission from the FCM for every customer order executed. (*Id.* ¶ 33.)

        c.     **False and Misleading Statements**

Long Leaf, by and through its APs, made false and misleading statements to customers and prospective customers to induce them to participate in the TMM program. (*Id.* ¶ 35.) Those statements were set forth in various scripts and presentations provided to the APs by Evans, and included the following:

- Long Leaf uses options-selling strategies to "drive results"; the results are attributable to the "basic advantage the seller has," which is that "on average 76.5% of options expire worthless." "[I]f you sell 4 options, there is a strong statistical likelihood you are going to win 3 on those . . . giving you a much more predictable path to success."

- Long Leaf was founded on the principal that "[w]e should provide our clients a strong return on their investment." Long Leaf measures its success by the success of its clients; "[a]s a company, we wouldn't have the ability to work with hundreds of clients month-after-month for 6 years and oversee millions of dollars if we weren't being profitable for them . . . ."

- Long Leaf combines industry expertise, technical analysis, and a "proprietary algorithm" to "form ideas that have been providing a strong return for our clients."

- Trades recommended by Long Leaf are "more likely than not" to make money for customers.

(*Id.*)

In reality, substantially all Long Leaf customers lost money under the TMM program. (*Id.* ¶ 38.) Not only that, many customers lost all funds deposited in their accounts. (*Id.*) In many cases, these were customers' retirement accounts. (*Id.*)

5

#### d. Awareness and Concealment of Losses

Evans knew that customers lost money trading under the TMM program. (*Id.* ¶ 40.) Evans knew this because he monitored the recommended trades on a real-time basis, received daily account statements showing losses in substantially all customer accounts, and received calls and emails from customers complaining about losses in their accounts. (*Id.*)

Long Leaf actively concealed losses from customers and prospective customers. (*Id.* ¶ 43.) Long Leaf had a policy, instituted by Evans, of refusing to provide customers or prospective customers with historical trading results, average returns, or any kind of track record. (*Id.*) When customers asked if Long Leaf's recommendations were profitable for customers, Long Leaf APs claimed falsely that it was illegal for Long Leaf to provide that information. (*Id.* ¶ 44.)

#### e. Nelson

Defendant Nelson worked in the capacity of an AP for Long Leaf from September 2017 through at least July 2018. (*Id.* ¶ 119.) During that period, Nelson solicited customers for participation in the TMM program, advised clients of recommendations, and accepted customer orders for options on futures contracts. (*Id.*) Nelson was not at that time, and has never been, registered with the Commission as an AP of Long Leaf, or in any other capacity. (*Id.*)

Evans knew or should have known about Nelson's lack of registration status, which is available to the public online through the website of the National Futures Association ("NFA"). (*Id.* ¶ 112.) Evans nonetheless allowed Nelson to work as an AP. (*Id.*)

### 2. Liability

#### a. Fraud

The CFTC seeks to hold Evans liable as a controlling person for Long Leaf's fraud. 7 U.S.C. § 13c(b) provides that any person who, directly or indirectly, controls any person who

6

has violated the Act or Regulations may be held liable for such violation to the same extent as such controlled person, provided that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation. *See CFTC v. Kratville*, 796 F.3d 873, 894-95 (8th Cir. 2015) (affirming summary judgment for CFTC on options fraud claims). A controlling person "knowingly induces" conduct if he or she had actual or constructive knowledge of the core activities that make up the violation and allowed them to continue. *Id.*

In its summary judgment order, the Court found that Long Leaf, by and through its APs, made false and misleading statements to customers, touting the profit potential of the TMM program while omitting widespread customer losses. (Doc. 115, at 24–27, 29–30.) The facts in the complaint establish Evans's liability for Long Leaf's fraud. Evans exercised general control over Long Leaf by virtue of his position as founder, sole shareholder, and CEO of the firm. (Doc. 1., Compl. ¶ 17.) Evans provided the APs with scripts and presentations claiming that Long Leaf had a track record of success, and traded profitably for customers. (*Id.* ¶ 35.) Evans knew these statements were false, and that substantially all customers lost money from participating in the TMM program. (*Id.* ¶ 40.) Despite this knowledge, Evans instituted a policy prohibiting APs from disclosing these losses to customers. (*Id.* ¶ 43.) By so doing, Evans knowingly induced and is therefore liable for Long Leaf's fraudulent conduct. *See CFTC v. Crombie*, No. C 11-4577 CW, 2013 WL 3957506, at *25 (N.D. Cal. July 26, 2013) (entering summary judgment for CFTC on fraud and controlling person claims where defendant "was actually in control of the trading program itself"), *aff'd*, 914 F.3d 1208 (9th Cir. 2019); *see also CFTC v. PMC Strategy*, LLC, No. 3:11CV73, 2013 WL 1349177, at *7 (W.D.N.C. Apr. 3, 2013) (same). Accordingly, the CFTC respectfully requests that a default judgment be entered against

Evans on the CFTC's claims for options fraud (Count I), CTA fraud (Count II), and fraudulent advertising by a CTA (Count III).

### b. Registration-Related Claims

The CFTC's non-fraud claims seek to hold Evans liable as a control person for Long Leaf's registration-related violations. There are three such violations.

First, Long Leaf failed to register as a CTA (Count IV). (Doc. 1, Compl. ¶¶ 101–107.) The Court ruled in its summary judgment order that Long Leaf was required to register as a CTA because it guided the majority of customer accounts pursuant to a "trading program," i.e., TMM. (Doc. 106, Order on Mot for S.J. at 29.) Evans oversaw the TMM program without registering Long Leaf as a CTA, and thus knowingly induced the conduct giving rise to violation. (Doc. 1, Compl. ¶¶ 102–106.)

Second, Long Leaf failed to provide certain required disclosures (Count V). (Doc. 1, Compl. ¶¶ 108-114.) As a CTA, Long Leaf was required to provide customers with a detailed disclosure statement setting forth historical returns from the TMM trading program. (Doc. 106, Order on Mot. for S.J. at 29.) Long Leaf did not provide customers with the required disclosures. (Doc. 1, Compl. ¶ 111.) To the contrary, Evans knowingly induced Long Leaf AP's to withhold information about TMM's historical returns. (*Id.* ¶ 43.)

Third, Defendant Nelson acted as an AP of Long Leaf without registration (Count VI). (*Id.* ¶¶ 108-114.) Nelson solicited and accepted customer orders during the period relevant to this motion. (*Id.* ¶ 119.) 7 U.S.C. § 6k(1) and 17 C.F.R § 33.3(b)(2) prohibit an IB from allowing a person to engage in such solicitation and acceptance of customer orders without registration as an AP, if the IB knew or should have known the person was unregistered. Long Leaf (and Evans) knew or should have known about Nelson's lack of registration status, which is available to the public online through the website of the NFA. (Doc. 1., Compl. ¶ 121.) Evans

8

nonetheless employed Nelson in the capacity of an AP, and thus knowingly induced Long Leaf's violation. (*Id.* ¶ 123.)

## C. Monetary Relief

The CFTC seeks three forms of monetary relief against Evans: restitution in the amount of customer losses pursuant to 7 U.S.C. § 13a-1(d)(3)(A); disgorgement in the amount of ill-gotten gains pursuant to 7 U.S.C. § 13a-1(d)(3)(B); and a CMP in the amount of three times disgorgement pursuant to 7 U.S.C. § 13a-1(d)(1)(A).

### 1. Restitution and Disgorgement

As set forth in the Declaration of CFTC investigator Joe Patrick, Long Leaf customers lost a total of $3,390,407 during the period June 2015 through November 2017, when Evans was CEO. (Doc. 82.7, Patrick Decl. ¶ 18, Ex. 535 to CFTC's MSJ against Long Leaf Trading.) During the same period, Long Leaf collected $3,083,978 in commissions from customers. (Ex. D to Patrick Decl., Doc. 82.7 at 20.) Evans should therefore be ordered to pay $3,390,407 in restitution and $3,083,978 in disgorgement. (With any sums paid in restitution to offset the amount owed in restitution.) Because restitution and disgorgement are capable of ascertainment from definite figures set forth in Mr. Patrick's declaration, the CFTC respectfully suggests that no hearing is required.

### 2. CMP

A CMP should be "rationally related" to offense, and should reflect: (1) the nature of the violations; (2) the injury caused by the violations; (3) penalties imposed in similar cases. *See CFTC v. Li*, No. 15 C 5839, 2016 WL 8256392, at *8 (N.D. Ill. Dec. 9, 2016) (citing *Monieson v. CFTC*, 996 F.2d 852, 864 (7th Cir. 1993)). Evans's violations easily justify the maximum penalty of the three times disgorgement. Evans was the CEO of Long Leaf and masterminded a years' long-fraud scheme that resulted in customer losses of $3.39 million. (Doc. 82.7, Patrick

9

Decl. ¶ 18.) Evans's direct personal involvement in the scheme is reflected in his distribution of scripts to the APs containing claims he knew were false. (Doc. 1, Compl. ¶ 35.) And Long Leaf's policy of withholding the truth about historical trading results—even when customers asked—came directly from Evans. (*Id.* ¶ 43.) Similar cases, i.e., cases involving intentional fraud, have resulted in penalties of three times disgorgement.[2] For Evans, that would be $9,251,934 (3,083,978 x3). (*See* Ex. D to Patrick Decl., Doc. 82.7 at 20.)

The CFTC recognizes that the Court imposed a lower penalty—50% of disgorgement—against Long Leaf, Donelson, and Ruth because there was no fictitious trading or misappropriation. (Doc. 118, Order on Motion for Supp. Relief at 8.) The CFTC respectfully suggests that the Court should not extend its reasoning to Evans. Evans was the mastermind of the TMM program, and Long Leaf's long-running fraud scheme was conceived during his tenure. While it is true that neither Long Leaf nor Evans engaged in fictitious trading or misappropriation, it makes no difference to the aggrieved customers. Their money is gone either way. While Long Leaf may not have been, e.g., a Ponzi scheme, its customers' losses were no smaller or less painful than if it had been.

**D.     Injunctive Relief**

The CFTC seeks an order permanently enjoining Evans from engaging in: (a) substantially any activity relating to commodity interests, i.e., a "trading ban;" (b) applying for registration or acting in a capacity that requires registration by Defendants, i.e., a "registration ban;" and (c) further violative conduct of the kind described in the Complaint. (Doc. 1, Compl. at 30–31.) This injunctive relief is justified by the extraordinarily high level of scienter

---

[2] *See, e.g.*, *Li*, 2016 WL 8256392, at *8 (imposing CMP in the amount of 3x ill-gotten gains in trader's scheme to defraud employer through fictitious trading); *CFTC v. Sarvey*, No. 08 C 192, 2012 WL 426746, at *6 (N.D. Ill. Feb. 10, 2012) (imposing CMP in the amount of 3X ill-gotten gains in brokers' scheme to defraud clients through prearranged trading).

evidenced by Evans's actions. This scienter, as well as the ongoing nature of the Long Leaf fraud, gives rise to a likelihood of future violations by Evans. Entering such relief against Evans would be consistent with the Court's recent order enjoining Defendants Long Leaf, Donelson, and Ruth from trading, registration, and further violative conduct. (Doc. 118, Order on CFTC's Mot. for Supp. Relief.)

For the foregoing reasons, the CFTC respectfully requests that the Court enter a default judgment:

- finding Evans liable the violations of the Act and Regulations set forth in the complaint;

- ordering Evans to pay restitution of $3,390,407, disgorgement of $3,083,978, and a CMP of $9,251,934, and;

- enjoining Evans from (a) engaging in substantially any activity relating to commodity interests, i.e., a "trading ban;" (b) applying for registration or acting in a capacity that requires registration by Defendants, i.e., a "registration ban;" and (c) further violative conduct of the kind described in the Complaint.

/s/ Ashley J. Burden

Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Blvd.
Suite 800
Chicago, IL 60604
(312) 596-0700

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2023, I provided service to the persons listed below, and by the following means:

Via the Court's electronic CM/ECF system:

Jim Falvey
Falvey Law Office
200 S. Wacker Dr., Ste. 3100
Chicago, IL 60606-5877
jimfalvey@yahoo.com

Charles E. McElvenny
Law Office of Charles E. McElvenny
33 N. Dearborn St., Ste. 1000
Chicago, IL 60602

Counsel to James A. Donelson and Long Leaf Trading Group, Inc.[3]

Via email, pursuant to agreement, to:

Jeremey S. Ruth
11220 Brista Way
Austin, TX 78726
jeremysruth@hotmail.com

*Pro se*

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Blvd.
Suite 800
Chicago, IL 60604
(312) 596-0700
aburden@cftc.gov

---

[3] Mr. McElvenny is counsel to Defendant Donelson only, and not to Long Leaf Trading.

12