UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Long Leaf Trading Group, Inc., James A. )<br>Donelson, Timothy M. Evans, Jeremy S. )<br>Ruth, and Andrew D. Nelson, )<br>)<br>Defendants. ) | Case No. 20-3758<br><br>Hon. Thomas A. Durkin |

**CFTC'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST
<u>DEFENDANT ANDREW D. NELSON</u>**

### I. SUMMARY

Plaintiff Commodity Futures Trading Commission ("CFTC") hereby moves the Court for entry of a default judgment against Defendant Andrew D. Nelson under Federal Rule of Civil Procedure 55(b). The CFTC's complaint against Nelson includes charges for fraud and failure to register as an associated person ("AP"), in violation of the Commodity Exchange Act ("Act") and accompanying regulations ("Regulations"). Nelson's violations arise from his participation in a so-called options trading program offered to retail customers by Defendant Long Leaf Trading Group, Inc. ("Long Leaf"), a firm that Nelson worked for during the period September 2017 through November 2018. (Doc. 1, Compl.) The CFTC's complaint seeks monetary relief in the form of restitution, disgorgement, and a civil monetary penalty ("CMP"), as well as injunctive relief including, e.g., a trading ban. Nelson was served but failed to respond or appear, and a clerk's default was entered against him. (Doc. 49.)

The Court has now entered summary judgment on liability, as well as on restitution and disgorgement, against the defendants who did appear in this case: Long Leaf, James A. Donelson, and Jeremy Ruth. (Doc. 106, Order on Mot. for S.J.) The Court also entered, upon motion by the CFTC, CMPs and injunctive relief against those defendants. (Doc. 118, Order on Mot. for Supp. Relief.) With the CFTC's claims against Long Leaf, Donelson, and Ruth having been resolved, the Court may now enter a default judgment against Nelson without the potential for inconsistent judgments.

The facts in the CFTC's complaint, taken as true for purposes of the default judgment, establish Nelson's liability for fraud. In its summary judgment order and rulings on CMPs and injunctive relief, the Court found in favor of the CFTC on issues of liability and remedies that apply with equal force to Nelson. Nelson made the same false and misleading statements and omissions as Defendant Ruth, Nelson's fellow AP, and the same ones that Long Leaf was found liable for as an entity. The facts in the CFTC's complaint also establish liability for Nelson's failure to register as an AP.

The amounts the CFTC seeks from Nelson in restitution and disgorgement are readily ascertainable, and supported here by a declaration. The CMP and injunctive relief sought by the CFTC are easily justified by Nelson's high level of scienter. The CFTC respectfully requests, therefore, that the Court enter a default judgment against Nelson.

## II.    LEGAL STANDARD

In order to obtain a default judgment, Federal Rule of Civil Procedure 55(a) requires the plaintiff to obtain an entry of default against the defendant. The defendant must also not be in active military service such that he or she may be entitled to certain protections under the Soldiers' and Sailors' Civil Relief Act. *See* 10A Charles Alan Wright & Arthur R. Miller, Fed.

2

Prac. & Proc. Civ. § 2691 (4th ed. 2008). Once these prerequisites have been satisfied, a plaintiff may apply to the court under Rule 55(b) for a default judgment against the defendant.

A default judgment under Rule 55(b) has two components: liability and damages. With respect to liability, all well-pleaded factual allegations in the complaint are taken as true. *See, e.g.*, *Coast to Coast Claim Servs., Inc. v. Yagelski*, No. 21 C 04641, 2022 WL 16573461, at *1 (N.D. Ill. Oct. 31, 2022) (entering default judgment) (Durkin, J.). Conclusions of law are not, and so the plaintiff must demonstrate that the facts in the complaint satisfy the elements of each cause of action. *See* 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2688.1.

With respect to damages, the plaintiff must support its prayer for relief with evidence, and the court may conduct a hearing to ascertain damages or "investigate any other matter." *See Yagelski*, 2022 WL 16573461, at *1. A default may be entered without a hearing on damages if "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *Id.* (quoting *Dundee Cement Co. v. Howard Pipe & Concrete Prods.*, 722 F.2d 1319, 1323 (7th Cir. 1983)).

### III. ANALYSIS

**A.  Prerequisites**

The prerequisites for the CFTC to obtain a default judgment against Nelson are satisfied. At the Court's direction, the Clerk entered a default against Nelson on December 23, 2020.[1] (Doc. 49.) Nelson is not in active military service and is therefore not entitled to the protections of the Soldiers' and Sailors' Civil Relief Act. (Doc. 119-1, Burden Decl.)

---

[1] Because Nelson has not appeared in this case, the CFTC need not serve him with a copy of the instant motion. *See* 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2687.

B.   Liability

    1.   Facts in the Complaint

The facts in the complaint supporting Nelson's liability, which should be taken as true, are as follows.

        a.   **Nelson and Long Leaf**

Defendant Long Leaf is an Illinois corporation. (Doc. 1, Compl. ¶ 16.) At all times relevant to this motion, Long Leaf was registered as an introducing broker ("IB"). (*Id.*)

Defendant Andrew D. Nelson worked for Long Leaf from September 2017 through July 2018, soliciting and accepting customer orders, and thus acting as an AP. (*Id.* ¶ 20.) Nelson continued to work for Long Leaf after that, reviewing and developing solicitation materials through November 2018. (*Id.*) Nelson resided in Chicago, Illinois while working for Long Leaf. (*Id.*) Nelson has never been registered as an AP of Long Leaf, or in any other capacity. (*Id.*)

        b.   **The Time Means Money Program**

Starting in at least June 2015, Long Leaf began soliciting customers and prospective customers to participate in Long Leaf's so-called "Time Means Money" ("TMM") options trading program. (*Id.* ¶ 26.) Customers who agreed to participate in the TMM program received four trading recommendations from Long Leaf every month. (*Id.* ¶ 27.) Each recommendation was for a particular spread trade involving out-of-the-money options on futures contracts traded on an exchange, such as the Chicago Mercantile Exchange ("CME"). (*Id.*) Every customer got the same set of recommendations, except that a customer with more account equity or risk tolerance might be recommended to trade a higher number of contracts. (*Id.* ¶ 29.)

Long Leaf's salespersons, referred to as "associated persons" or "APs," provided the recommendations to Long Leaf customers typically by email or over the phone. (*Id.* ¶ 30.) If the customer accepted the recommendation, Long Leaf would forward the customer orders to a

futures commission merchant ("FCM"). (*Id.* ¶ 32.) The FCM would then place the orders on the exchange to be executed. (*Id.*) Long Leaf received a commission from the FCM for every customer order executed. (*Id.* ¶ 33.)

        c.     **Nelson Made False and Misleading Statements and Omissions**

Nelson made numerous false and misleading statements to customers and prospective customers about profits and losses in the TMM program. (*Id.* ¶ 69.) Nelson read these statements from a script provided to him by Long Leaf management. (*Id.*) These included the following:

- "As a company we would not have the ability to work with hundreds of clients month after month for nine years and oversee millions if we were not being profitable for our clients"

- "Tim [Evans] uses a proprietary methodology to then blend all these ideas together that have been providing strong returns for our clients."

(*Id.* ¶ 70.) Nelson made these or other similar statements to substantially every customer or prospective customer during his tenure at Long Leaf. (*Id.* ¶ 71.)

Nelson made additional, off-script misrepresentations to customers as well. (*Id.* ¶ 72.) For example, in a May 3, 2018 call, Nelson told a customer, "For the last month what I've done for the more aggressive guys I have . . . they are up a little bit over fifty percent; my more conservative guys are more around the thirty-two, thirty-five percent mark." (*Id.*)

Nelson also misled customers as to the status of their accounts. (*Id.* ¶ 77.) For example, on February 5, 2018, a customer wrote to Nelson asking how the most recent trade went; Nelson responded that "3/4 are hitting our profit target already . . . between 100 - 200%." (*Id.*) In reality, three out of the four recommended trades had lost money, for a net loss of $2,200 in that customer's account. (*Id.*)

        d.     **Nelson's Knowledge and Concealment of Losses**

5

Nelson knew that his statements to customers were false. (*Id.* ¶ 73.) Substantially all of the customers' accounts had lost money. (*Id.*) Nelson knew this because he received daily account statements for the customers he worked with. (*Id.*) Nelson also fielded calls and emails from customers complaining about losses in their accounts. (*Id.* ¶ 74.)

Pursuant to Long Leaf's policy, Nelson never provided any track record or accurate information about returns to any customer or prospective customer. (*Id.* ¶ 75.) Nelson did not tell any customer or prospective customer that almost all of Long Leaf's customers lost money. (*Id.*)

Nelson also lied to customers about his ability to share information regarding historic returns. (*Id.* ¶ 76.) In a November 1, 2017 call, for example, Nelson explained to a customer that he was precluded from disclosing Long Leaf's historical trading record because of "HIPAA." (*Id.*) HIPAA is the Health Insurance Portability and Accountability Act and does not preclude the disclosure of trading returns. (*Id.*)

### 2. Liability

#### a. Fraud

The CFTC seeks to hold Nelson liable for options fraud (Count I) because Nelson made fraudulent statements touting customer profits from the TMM program, and omitted to disclose widespread customer losses. In its summary judgment order, this Court found that the scripts used by Long Leaf APs were false with respect to, or failed to disclose, material facts, i.e., that substantially all customers lost money. (Doc. 115, at 24–27, 29–30.) The facts in the complaint establish that Nelson made these and other, similar misrepresentations and omissions to customers. (Doc. 1, Compl. ¶¶ 69–72, 77.) The facts in the complaint establish further that Nelson acted with scienter because he knew from customer account statements and customer complaints that his rosy statements about TMM were false or misleading. (*Id.* ¶ 73–75.)

The CFTC also seeks to hold Nelson liable for aiding and abetting Long Leaf's commodity trading advisor ("CTA") fraud (Count II). 7 U.S.C. § 13c(a) provides that any person who willfully aids or abets a violation of the Act or Regulations may be held liable as a principal. In order to be held liable for aiding and abetting, the defendant must knowingly associate himself or herself with an unlawful venture, participate in it to bring it about, and seek by his or her actions to make it succeed. *CFTC v. Hunter Wise Commodities*, *LLC*, 21 F. Supp. 3d 1317, 1348 (S.D. Fla. 2014) (citing *Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir.1987)). The same facts which support the CFTC's options fraud claim support its claim for aiding and abetting Long Leaf's CTA fraud. The court entered summary judgment against Defendant Ruth—another Long Leaf AP—on this basis, and should do so here as well. (*See* Doc. 106 at 27–28.)

    **b.**  **Registration**

In addition to its fraud claims, the CFTC seeks to hold Nelson liable for acting as an AP of Long Leaf without registration (Count VI). 7 U.S.C. § 6k(1) and 17 C.F.R. § 3.12(a) provide that it shall be unlawful for a person to be associated with an IB as, *inter alia*, and employee or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves the solicitation or acceptance of customers' orders, unless such person is registered with the Commission as an AP of such IB. 17 C.F.R. § 33.3(b)(1) provides that it shall be unlawful for any person to solicit or accept orders from a customer (other than in a clerical capacity) for any commodity option transaction, or to supervise any person or persons so engaged, unless such person is registered as an AP of an IB.

Nelson solicited and accepted customer orders for options on futures contracts on behalf of Long Leaf, an IB. (Doc. 1, Compl. ¶ 20.) Nelson was not, however, registered as an AP of

Long Leaf. (*Id.*) Nelson thus violated 7 U.S.C. § 6k(1), 17 C.F.R. § 3.12(a), and 17 C.F.R. § 33.3(b)(1).

## C. Monetary Relief

The CFTC seeks three forms of monetary relief against Nelson: restitution in the amount of customer losses pursuant to 7 U.S.C. § 13a-1(d)(3)(A); disgorgement in the amount of ill-gotten gains pursuant to 7 U.S.C. § 13a-1(d)(3)(B); and a CMP pursuant to 7 U.S.C. § 13a-1(d)(1)(A).

### 1. Restitution and Disgorgement

As set forth in the Declaration of CFTC investigator Joe Patrick, Nelson received a total of $26,356 in commission payments from Long Leaf customers. (Ex. A, Patrick Decl..) These commissions represent losses to customers. As such, the commissions should be repaid to customers in the form of restitution. *See CFTC v. Escobio*, 833 F. App'x 768, 772 (11th Cir. 2020) (affirming award of restitution and disgorgement in the amount of commissions charged to customers). The payments to Nelson may also be characterized as disgorgement, since Nelson's work consisted primarily of fraudulently soliciting customers. *Id.* at 772. The Court assessed restitution and disgorgement against Ruth, another Long Leaf AP, on the same basis. (Doc. 106, Order on Mot. for Summ. J. at 28.)

### 2. CMP

7 U.S.C. § 13a–1(d)(1) provides for a CMP in an amount not exceeding the greater of $199,094[2] or triple the monetary gain to defendant for violations of the Act and Regulations. A CMP should be "rationally related" to the offense, and should reflect: (1) the nature of the violations; (2) the injury caused by the violations; (3) penalties imposed in similar cases. *See*

---

[2] As adjusted for inflation, per 17 C.F.R. § 143.8.

*CFTC v. Li*, No. 15 C 5839, 2016 WL 8256392, at *8 (N.D. Ill. Dec. 9, 2016) (citing *Monieson v. CFTC*, 996 F.2d 852, 864 (7th Cir. 1993)).

For Nelson, $199,094 is greater than three times his monetary gain. The CFTC respectfully suggests that $199,094 is the penalty the Court should impose. Nelson willfully participated in Long Leaf's fraud scheme, making false and misleading statements about the TMM program that he knew were incorrect. (Doc. 1, Compl. ¶¶ 69–71.) Not only did Nelson recite the misrepresentations in the Long Leaf scripts, he made up entirely new ones of his own, e.g., that he was precluded by HIPAA from sharing historical trading results. (*Id.* ¶ 72, 76–77.)

**D.     Injunctive Relief**

The CFTC seeks an order permanently enjoining Nelson from engaging in: (a) substantially any activity relating to commodity interests, i.e., a "trading ban;" (b) applying for registration or acting in a capacity that requires registration by Defendants, i.e., a "registration ban;" and (c) further violative conduct of the kind described in the Complaint. (Doc. 1, Compl. at 30–31.) This injunctive relief is justified by the high level of scienter evidenced by Nelson's actions. Entering such relief against Nelson would be consistent with the Court's recent order enjoining Defendants Long Leaf, Donelson, and Ruth from trading, registration, and further violative conduct. (Doc. 118, Order on CFTC's Mot. for Supp. Relief.)

For the foregoing reasons, the CFTC respectfully requests that the Court enter a default judgment:

- finding Nelson liable the violations of the Act and Regulations set forth in the complaint;
- ordering Nelson to pay restitution of $26,356, and disgorgement in the same amount, with an offset thereto for any payments made towards restitution;
- a CMP of $199,094; and

9

- enjoining Nelson from (a) engaging in substantially any activity relating to commodity interests, i.e., a "trading ban;" (b) applying for registration or acting in a capacity that requires registration by Defendants, i.e., a "registration ban;" and (c) further violative conduct of the kind described in the Complaint.

/s/ Ashley J. Burden

Ashley J. Burden
aburden@cftc.gov
Elizabeth M. Streit
estreit@cftc.gov
Jody Platt
jplatt@cftc.gov
Counsel for Plaintiff CFTC
Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Blvd.
Suite 800
Chicago, IL 60604
(312) 596-0700

## CERTIFICATE OF SERVICE

I hereby certify that on \_\_\_\_, 2023, I provided service to the persons listed below, and by the following means:

| Via the Court's electronic CM/ECF system: | Via email, pursuant to agreement, to: |
|---|---|
| Jim Falvey<br>Falvey Law Office<br>200 S. Wacker Dr., Ste. 3100<br>Chicago, IL 60606-5877<br>jimfalvey@yahoo.com | Jeremey S. Ruth<br>11220 Brista Way<br>Austin, TX 78726<br>jeremysruth@hotmail.com |
| Charles E. McElvenny<br>Law Office of Charles E. McElvenny<br>33 N. Dearborn St., Ste. 1000<br>Chicago, IL 60602 | *Pro se* |
| Counsel to James A. Donelson and Long Leaf Trading Group, Inc.[3] | |

/s/ Ashley J. Burden

Ashley J. Burden
Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Blvd.
Suite 800
Chicago, IL 60604
(312) 596-0700
aburden@cftc.gov

---

[3] Mr. McElvenny is counsel to Defendant Donelson only, and not to Long Leaf Trading.